**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY LEON DEES, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:07-cv-00306-MHT-CSC** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, and HYUNDAI MOTOR** | ) | |
| **AMERICA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' EVIDENTIARY SUBMISSION IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

Come now Defendants Hyundai Motor America, Inc. and Hyundai Motor Manufacturing Alabama, LLC, (hereinafter "Defendants") and submit this Evidentiary Submission in Support of Their Motion for Summary Judgment. Defendants rely upon the following evidence[1]:

|  |  |
|---|---|
| Exhibit A | Deposition of Plaintiff Jerry Dees and exhibits |
| Exhibit B | Deposition of James Brookshire and exhibits (Exhibit 14 filed under seal) |
| Exhibit C | Deposition of John Wayne Applegate and exhibits (Exhibits 17 – 20 filed under seal) |
| Exhibit D | Deposition of Wendy Warner |
| Exhibit E | First Declaration of Wendy Warner |

---

[1] Defendants have filed a Motion to Seal portions of their Evidentiary Submission for the reasons set forth in that Motion. Pursuant to instructions from the Clerk of Court's Office for the Middle District, Defendants filed a paper copy of the documents Defendants seek to seal that are included in their Evidentiary Submission. Defendants also will electronically file references to these documents. Defendants are also serving via e-mail and U.S. Mail a copy of the documents they seek to have sealed.

Exhibit F        Second Declaration of Wendy Warner and exhibits

Exhibit G        Declaration of Rob Clevenger and exhibits

Exhibit H        Declaration of Kathy Parker

Exhibit I        *Hurst v. Cook*, ___ So. 2d ___, 2007 WL 2812150 (Ala. Civ. App. September 28, 2007)

Exhibit J        *Daggett v. Chicago Transit Authority*, 1998 WL 831843 (N.D. Ill. 1998)

Exhibit K        *Byer v. DTG Operations, Inc.*, 2007 WL 2746619 (S.D. Fla. September 18, 2007)

Exhibit L        *Chance v. Dallas Co. Hosp. Dist.*, 1998 DL 177963 (N.D. Tex. 1998)

Exhibit M        *Dees v. Hyundai Motor Mfg. Alabama*, LLC, ___ F.Supp.2d ___, 2007 WL 4215884 (M.D. Ala. November 30, 2007)

Exhibit N        *Church v. City of Reno*, 1999 U.S. App. LEXIS 2068 (9th Cir. Nev. Feb. 9, 1999)

Exhibit O        *McKie v. Miller Brewing Co*., 1992 WL 150160 (M.D. Ga. March 16, 1992).

Exhibit P        HMMA Letter Terminating the Employment of Jerry Dees dated February 26, 2007 (Bates Labeled 00006 and produced by Defendants on July 17, 2007).

Respectfully submitted this 14th day of December, 2007.

/s/ J. Trent Scofield

J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of December, 2007, I electronically filed the

foregoing *Defendants' Evidentiary Submission in Support of Their Motion for Summary*

*Judgment* with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the following: W. Perry Hall, Vincent F. Kilborn, III, David

Allen McDonald, Jeffrey Rayborn Sport, T. Scott Kelly, and Matthew K. Johnson.

/s/ J. Trent Scofield
J. Trent Scofield (SCO-024)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
E-mail: trent.scofield@odnss.com

# FREEDOM COURT REPORTING

## Page 5

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3       NORTHERN DIVISION
4
5  CASE NUMBER: 2:07-cv-00306-MHT-CSC
6  JERRY LEON DEES, JR.,
7       Plaintiff,
8       vs.
9  HYUNDAI MOTOR MANUFACTURING
10  ALABAMA, LLC, and HYUNDAI
11  MOTOR AMERICA, INC.,
12       Defendants.
13  BEFORE:
14     ANGELA SMITH MCGALLIARD, Commissioner.
15  APPEARANCES:
16     VINCENT KILBORN, ESQUIRE, of
17  KILBORN, ROEBUCK & MCDONALD, 1810 Old
18  Government Street, Mobile, Alabama 36606,
19  appearing on behalf of the Plaintiff.
20     JEFFREY R. SPORT, ESQUIRE, of
21  KILBORN, ROEBUCK & MCDONALD, 1810 Old
22  Government Street, Mobile, Alabama 36606,
23  appearing on behalf of the Plaintiff.

## Page 6

1  APPEARANCES (continued):
2     MATTHEW K. JOHNSON, ESQUIRE, of
3  OGLETREE, DEAKINS, NASH, SMOAK & STEWART,
4  The Ogletree Building, 300 North Main
5  Street, Greenville, South Carolina 29602,
6  appearing on behalf of the Defendants.
7     CHRISTOPHER N. SMITH, ESQUIRE, of
8  HYUNDAI MOTOR MANUFACTURING ALABAMA, 700
9  Hyundai Boulevard, Montgomery, Alabama
10  36105, appearing on behalf of the
11  Defendants.
12     ALSO PRESENT: Katherine Dees
13         Bobby Hall
14     * * * * * *
15
16
17
18
19
20
21
22
23

## Page 7

1       I, ANGELA SMITH MCGALLIARD, RPR,
2  CRR, a Court Reporter of Pike Road, Alabama,
3  acting as Commissioner, certify that on this
4  date, as provided by the Federal Rules of
5  Civil Procedure and the foregoing
6  stipulation of counsel, there came before me
7  at the offices of Freedom Court Reporting,
8  416 S. Perry Street, Montgomery, Alabama
9  36104, beginning at 9:10 a.m., Jerry Leon
10  Dees, Jr., witness in the above cause, for
11  oral examination, whereupon the following
12  proceedings were had:
13       JERRY LEON DEES, JR.,
14  being first duly sworn, was examined and
15  testified as follows:
16       MR. KILBORN:  Court reporter,
17  can you keep the time for us?
18       COURT REPORTER:  Certainly.
19  Usual stipulations?
20       MR. JOHNSON:  I assume that
21  means the usual stipulations that we've got
22  in the guidelines --
23       MR. KILBORN:  Witness waives

## Page 8

1  the reading and signing and all objections
2  except as to the form are reserved until
3  trial.
4       MR. JOHNSON:  Sounds fine with
5  me.
6       EXAMINATION
7  BY MR. JOHNSON:
8       Q.   Okay, Mr. Dees, my name is
9  Matt Johnson.  I practice law at Ogletree,
10  Deakins.  And I'm here basically to ask you
11  some questions about yourself and about this
12  case, and what you know about this case, and
13  other people that might know about the case.
14       This may seem like a fairly
15  formal proceeding, but I'm sort of here to
16  have a conversation with you and just ask
17  you questions.
18       Let me tell you up front,
19  occasionally I'm thinking two or three
20  questions down the line; and for better or
21  for worse, sometimes I ask questions that
22  don't make sense, and I apologize.  If I do
23  that, I want you to stop me, and let me know

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 9

1 that. Don't be embarrassed. I'm fairly
2 thick skinned; and if I don't make sense or
3 my questions don't make sense, that's okay
4 with me. You just let me know because I
5 just want to make sure you're comfortable
6 and that you're answering questions that you
7 understand. Okay?
8    A.    I'll do it.
9    Q.    And the other thing, our court
10 reporter here is typing up everything that
11 we say. And she's probably got one of the
12 harder jobs of any of us today, so we want
13 to make her job as easy as we can. The best
14 way to do that is to make sure we speak up
15 loud and clear. Okay?
16    A.    Roger.
17    Q.    And if you can, Roger may
18 work, assuming that means yes. But I'd
19 prefer, and I'm sure our court reporter
20 would prefer it if you could say yes or no.
21 Is that okay?
22    A.    Yes.
23    Q.    Again, nods, shrugs of the

Page 10

1 shoulders, things of that nature are
2 difficult for her to write up, so make sure
3 everything you want to get across to me or
4 to her is in loud, clear, spoken English.
5 Okay?
6    A.    No problem.
7    Q.    I appreciate it.
8         And this is not an endurance
9 contest. It's probably going to take longer
10 than you or I want it to, but that's just
11 the way it goes, and I apologize in advance.
12 What I want to make sure you understand is
13 that you can take a break whenever you want
14 to; you can try to get something to drink if
15 we can find something; you can use the
16 restroom; you can stand up and walk around
17 as you'd like. Okay?
18    A.    Yes, sir.
19    Q.    Okay. Finally, I just want to
20 make sure before we get started into the
21 heart of things that you understand this is
22 sworn testimony?
23    A.    Yes.

Page 11

1    Q.    And you swear to tell the
2 truth?
3    A.    Whole truth, nothing but the
4 truth, so help me God.
5    Q.    Okay. And are you on any
6 medication that would prohibit you from
7 understanding me or my questions?
8    A.    No, sir.
9    Q.    Are you on any medication that
10 would prohibit you from being able to answer
11 truthfully and accurately?
12    A.    I'm not on any type of
13 medication.
14    Q.    Thank you.
15         If you would give me your full
16 name, including your middle name.
17    A.    Jerry Leon Dees, Junior.
18    Q.    Have you ever gone by any
19 other names?
20    A.    No, sir. Yeah. Staff
21 sergeant.
22    Q.    What's your date of birth?
23    A.    ██████ '65.

Page 12

1    Q.    Where were you born?
2    A.    ██████, Alabama.
3    Q.    ██████?
4    A.    Yes, sir.
5    Q.    Where is that?
6    A.    ██████ County.
7    Q.    What's that near?
8         MR. SPORT: It's an hour north
9 of here.
10    A.    It's out in the middle of the
11 woods.
12         (Off-the-Record discussion
13         was held.)
14    Q.    What's your current address?
15    A.    ██████████████,
16 ██████, Alabama █████
17    Q.    And do you own a house -- Is
18 that a house?
19    A.    Yes, sir.
20    Q.    Do you own it or rent it?
21    A.    Well, the bank owns it right
22 now. Give me about thirteen more years, and
23 I might own it.

3 (Pages 9 to 12)

## FREEDOM COURT REPORTING

Page 13

1    Q.    Do you have any secondary
2    residences?
3    A.    Yeah. The armory one weekend
4    a month.
5    Q.    And where do you work
6    currently?
7    A.    International Paper,
8    Prattville Mill.
9    Q.    What do you do at the
10   Prattville mill?
11   A.    Millwright, maintenance.
12   Q.    How long have you been there?
13   A.    Few months.
14   Q.    Okay. Do you remember which
15   month you started?
16   A.    Approximately four months ago.
17   Q.    Okay. And when you started
18   there four months ago, were you doing
19   millwright/maintenance?
20   A.    Yes, sir.
21   Q.    And prior to that, where did
22   you work?
23   A.    BE&K Construction Company at

Page 14

1    that mill.
2    Q.    At the Prattville mill?
3    A.    Yes, sir.
4    Q.    What were you doing for BE&K?
5    A.    Millwright, millwright and
6    welder.
7    Q.    Was that different than what
8    you're doing now?
9    A.    Not really, no.
10   Q.    Prior to BE&K where was the
11   last place you worked?
12   A.    Hyundai.
13   Q.    Do you remember what month you
14   started work at BE&K?
15   A.    27 February '07.
16   Q.    Okay. And who is your
17   supervisor at the Prattville mill?
18   A.    Neil Causey.
19   Q.    Can you spell Causey?
20   A.    Causey, C-A-U-S-E-Y, I
21   believe. I'm not sure.
22   Q.    Okay. What is his position at
23   the mill?

Page 15

1    A.    Maintenance supervisor.
2    Q.    Who is Neil Causey's boss?
3    A.    I have no idea.
4    Q.    Okay.
5    A.    I haven't been there in a
6    month. I've been at an Army school for the
7    last month, so I don't know.
8    Q.    Okay. What kind of Army
9    school have you been at?
10   A.    BNCOC Phase II and III, Staff
11   NCO Advanced Leadership School.
12   Q.    Now, one thing I want to ask
13   you to do, both for my sake and for our
14   court reporter's sake. I know throughout
15   this deposition we're going to refer to a
16   lot of Army terms, and say them slow or
17   spell them or do whatever you can to make
18   sure it gets on the Record clearly.
19   A.    It's B-N-C-O-C, Basic
20   Noncommissioned Officers Course.
21   Q.    Okay. If you can, I know you
22   guys use a lot of abbreviations and stuff,
23   for purposes of this, if you could make sure

Page 16

1    and give us the full, plain spoken English.
2    A.    No acronyms?
3    Q.    Just define them before you
4    start using them. Okay?
5    A.    All right.
6    Q.    Tell me, what is your Social
7    Security number?
8    A.    ███████. Why?
9    Q.    You say why -- Why did I ask?
10   A.    Yes, sir.
11   Q.    Well, because I'm taking your
12   deposition.
13        And your driver's license
14   number?
15   A.    ███████
16   Q.    Is that an Alabama license?
17   A.    Yes, sir.
18   Q.    Is it restricted in any way?
19   A.    Negative.
20   Q.    Okay. You don't wear glasses?
21   A.    No, sir.
22   Q.    And I'm assuming -- We have
23   some other people here today, and I'm

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1 assuming one of them is your wife?
2    A.  Yes, sir.
3    Q.  Okay.  And what is her name?
4    A.  ████████.
5    Q.  ████████ with a K?
6    A.  ████████, Yun, Y-U-N,
7 Dees.
8    Q.  How long have y'all been
9 married?
10    A.  Twenty-two years.
11    Q.  And where is she from?
12    A.  ████████.
13    Q.  And prior to Mrs. Dees that's
14 here with us today, have you ever been
15 married before?
16    A.  No, sir.
17    Q.  Do you and Mrs. Dees have any
18 children?
19    A.  Two.
20    Q.  What are their names?
21    A.  ████████, ████████
22 common spelling, Dees; ████████,
23 ████, common spelling, Dees.

Page 18

1    Q.  How old are ████████ and
2 ████████?
3    A.  Twenty-one and sixteen --
4 seventeen.  She just had a birthday.
5    Q.  I assume those are the only
6 two children you have?
7    A.  Roger.  Yes, sir.
8    Q.  Okay.  Do you have other
9 relatives by blood or marriage that live in
10 Alabama?
11    A.  A lot of them.
12    Q.  You do?
13    A.  Yes, sir.
14    Q.  Tell me the names or towns
15 where they might live.
16    A.  Oh, God.
17    Q.  Let me explain why I'm asking.
18 At some point we may have to pick a jury in
19 this case, I don't want your cousin, aunt,
20 or uncle sitting on the jury.
21    A.  You're probably out then.
22 I've got relatives all over the state, all
23 the way up to South Carolina, Fort Bragg,

Page 19

1 all the way out to California.
2    Q.  I'm only interested in the
3 ones in Alabama.
4    A.  Well, I don't know.
5    Q.  You can give me their last
6 names, can't you?
7    A.  Yeah.  Dees, Mobley,
8 Patterson, Bates, Peek.  Heck I could go on
9 all day.  I don't know.
10    Q.  How do you spell Peek?
11    A.  P-E-E-K.
12    Q.  I'm assuming this jury will be
13 drawn from people that live somewhere in
14 proximity to Montgomery.  Do most of your
15 relatives live in and around Montgomery?
16    A.  I have some in Montgomery but
17 not most of them, no.  Like I said, they're
18 scattered throughout the state.
19    Q.  The ones that live in
20 Montgomery, can you give me the names of
21 some of the ones that live in or around
22 Montgomery.  By the way, I need you to
23 answer.

Page 20

1    A.  I'm trying -- She knows more
2 of my family than I do.  I grew up in
3 Alabama, but all I do is work.
4        MR. KILBORN:  You can't talk
5 to Katherine.  He just wants to know what
6 you know.
7    A.  Distant cousins, no, I don't
8 know them.
9    Q.  I'm assuming you're a U.S.
10 citizen?
11    A.  Yes, sir.
12    Q.  Did you graduate from high
13 school?
14    A.  Clay County High School,
15 Ashland, Alabama.
16    Q.  And when did you graduate?
17    A.  May '83.
18    Q.  And did you go to college?
19    A.  Some college.
20    Q.  Where?
21    A.  Didn't graduate.  Through the
22 military, University of Maryland, Wallace
23 Community College in Selma, and J.P. Tech.

5  (Pages 17 to 20)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1    Q.    J.P. Tech?
2    A.    Yeah.  It's Faulkner now, I
3  believe.
4    Q.    Say that again.
5    A.    They changed the name to
6  Faulkner.
7    Q.    Faulkner Tech?
8    A.    I'm not sure what it is.  It
9  was John Patterson Technical College when I
10  went there.
11    Q.    Okay.  You mentioned one in
12  between the military University of Maryland
13  and J.P. Tech, what was that?
14    A.    Wallace Community College,
15  Selma.
16    Q.    And you did not get a degree
17  from any of those three institutions?
18    A.    No, sir.
19    Q.    And what did you study at the
20  military University of Maryland?
21    A.    It wasn't military.  It was
22  the University of Maryland, when I was in
23  the military.

Page 22

1    Q.    Got it.
2    A.    Just core, basics, science,
3  English, math.
4    Q.    And at J.P. Tech or Faulkner?
5    A.    Maintenance program.
6    Q.    How much time did you spend at
7  the University of Maryland?
8    A.    I don't know.  Depends on how
9  often I was deployed.  I don't know, maybe a
10  year.  I don't know.  I mean, it was off and
11  on.  It wasn't on a campus.  Military brings
12  instructors in to the bases and the posts,
13  and you'll meet at a building there.  And I
14  had a certified college instructor, and
15  that's where you had the classes.  I was
16  never on the campus, except for J.P. Tech
17  and Wallace.
18    Q.    What kind of maintenance did
19  you study at J.P. Tech?
20    A.    Hydraulics, pneumatics,
21  electrical, blueprint reading, basic
22  maintenance technician studies.
23    Q.    Okay.  What about --

Page 23

1    A.    Wallace was welding.
2    Q.    In welding, can you get some
3  sort of certification for that?
4    A.    Yes, sir, if you stay there
5  the whole two years.
6    Q.    All right.
7    A.    I had a family to feed, I
8  couldn't afford to stay there the whole two
9  years.
10    Q.    So you did not become
11  certified?
12    A.    No, sir.
13    Q.    And you're doing some welding
14  now at the Prattville mill?
15    A.    When it -- When it arises,
16  yes, sir.
17    Q.    Okay.  Is that something that
18  you would need to be certified for?
19    A.    I got certified through one of
20  the companies I worked for.  But as far as
21  actual certification, unless you're welding
22  on a boiler, or any type of military
23  equipment, stuff like that, no, you don't --

Page 24

1  If it's a pressurized vessel, you need a
2  certification; if it's not pressurized or
3  done to code -- some code you can get by
4  welding without a certification, like on
5  water tanks and stuff, you just have be able
6  to pass X-rays.
7    Q.    Okay.  But now you're
8  certified?
9    A.    Well, I don't know if it is
10  still current or not to be honest.  It was
11  before I went to work for Hyundai.
12    Q.    Who were you working with?
13    A.    Sim-Cala.
14    Q.    Sim-Cala.  Other than the
15  schooling you got at University of Maryland,
16  J.P. Tech, Wallace Community College in
17  Selma, have you attended any other classes
18  or seminars since you got out of high
19  school?
20    A.    Just the classes that
21  International Paper sent all their
22  maintenance people to.
23    Q.    Okay.  What was that?

6  (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1    A.    Well, I mean, same thing. We
2  got precision skilled craftsman classes,
3  it's a forty- or eighty-hour class, I can't
4  remember. Same thing, hydraulic classes,
5  welding classes.
6    Q.    And did IP pay for that?
7    A.    Yes.
8    Q.    And did they pay you for your
9  time away from work or how did that work?
10    A.    Instead of going to work, we
11  went to the schools.
12    Q.    You got paid for the time?
13    A.    Yes, sir.
14    Q.    And how many hours was that?
15    A.    Altogether at different
16  schools, I have no idea. I mean, skilled
17  craftsman class was just one school. We
18  went to the same thing just like J.P. Tech,
19  blueprint reading classes, hydraulics. It
20  could go anywhere from a day to two or three
21  weeks, depending on what class it was. That
22  was several years back.
23    Q.    That was at -- I think you

Page 26

1  worked at International Paper before you
2  came to Hyundai?
3    A.    Yes, sir.
4    Q.    Okay. Let's go back and talk
5  about your employment history before
6  Hyundai. Do you remember when you started
7  with Hyundai?
8    A.    It was either 19 or 21
9  November '05.
10    Q.    All right. Let's walk
11  backwards. Where were you working until
12  November of '05?
13    A.    International Paper, Thorsby.
14    Q.    I'm sorry?
15    A.    I was at a different mill than
16  I am now. I was at the Thorsby mill.
17    Q.    How do you spell Thorsby?
18    A.    T-H-O-R-S-B-Y.
19    Q.    How long were you at the
20  Thorsby mill?
21    A.    Six years.
22    Q.    Do you remember -- So you
23  would have started in '99?

Page 27

1    A.    I believe so.
2    Q.    And during the time period
3  that you were at the Thorsby mill, what did
4  you do?
5    A.    I started out as just a
6  regular maintenance man. And when I left, I
7  was a maintenance leadman.
8    Q.    And what does a maintenance
9  leadman do?
10    A.    Schedules the work for all the
11  other shifts, for the -- all four
12  maintenance shifts we had; I was in charge
13  of the major projects; I basically handled
14  everything while the supervisor just took
15  care of all the paperwork.
16    Q.    Okay.
17    A.    All the major calls, I'd
18  respond to the major breakdowns, decide what
19  action we was going to take, let the
20  supervisor know what was going on, and go
21  from there.
22    Q.    Was that similar to what you
23  were doing at Hyundai?

Page 28

1    A.    No, sir.
2    Q.    Okay. How was it different?
3    A.    At Hyundai I was just a
4  regular maintenance technician.
5    Q.    You said you had done regular
6  maintenance at the Thorsby mill also?
7    A.    Yes, sir.
8    Q.    Was what you were doing at the
9  Thorsby mill consistent with what you were
10  doing at Hyundai?
11    A.    Yes, sir.
12    Q.    Tell me what you were doing at
13  the Thorsby mill as a regular maintenance
14  person?
15    A.    Same thing, answer calls; work
16  orders that came down, I'd handle them;
17  breakdowns; break-ins; welding; hydraulics;
18  pneumatics; electrical; just regular
19  maintenance work.
20    Q.    But what you were doing at the
21  Thorsby mill was essentially the same as
22  what you were later doing at Hyundai?
23    A.    Yes, sir. Basically.

7 (Pages 25 to 28)

# FREEDOM COURT REPORTING

1    Q.    How much were you getting paid
2  at Thorsby mill for maintenance?
3    A.    Fifteen -- No. I topped out
4  -- I went to the pay for skills program, it
5  was eighteen something.
6    Q.    Per hour?
7    A.    Yes, sir. I started out at
8  fifteen, and topped out at eighteen
9  something.
10    Q.    And what about as a
11  maintenance leadman?
12    A.    Twenty dollars, little over
13  twenty dollars.
14    Q.    How long did you work as a
15  maintenance leadman?
16    A.    Approximately three years, I
17  believe. I think. I'm not sure.
18    Q.    Okay. Who -- As a -- When you
19  were a regular maintenance tech, who was
20  your supervisor?
21    A.    John Allen.
22    Q.    Allen?
23    A.    A-L-L-E-N.

1    Q.    And when you were a
2  maintenance leadman, who was your
3  supervisor?
4    A.    John Allen.
5    Q.    What was his role?
6    A.    He was a maintenance
7  supervisor on the old part of the mill.
8  There was two parts to the mill, we had an
9  old part and a new part, and he had
10  everything on the old side.
11    Q.    Okay. And how much -- When
12  you started at Hyundai, what were you making
13  per hour?
14    A.    Nineteen fifty-six.
15    Q.    What were you making when you
16  left?
17    A.    Twenty-three thirty-five.
18    Q.    And what were the
19  circumstances of your leaving the Thorsby
20  mill? Why did you leave?
21    A.    Go to work for Hyundai.
22    Q.    Okay.
23    A.    That was a -- That was the job

1  to have, better benefits. Had better
2  benefits there than any place I've ever had,
3  even in the military.
4    Q.    Okay.
5    A.    Better pay. Like I say, that
6  was the job to have.
7    Q.    When you say job to have, you
8  mean generally in the community, or just for
9  you personally?
10    A.    No. Everywhere around where I
11  lived, it was either Mercedes or Hyundai,
12  everybody was wanting to go to one of the
13  two.
14    Q.    Okay.
15    A.    They both had outstanding
16  benefits, the work conditions weren't near
17  as rigorous as what we had. It was in a
18  controlled environment, air conditioned in
19  the summer, heated in the winter. And pay,
20  pay was a lot better than any wood yard you
21  were going to work on.
22    Q.    Okay. Did you know anybody
23  that was working for Hyundai before you went

1  to work there?
2    A.    Yes, sir. A couple of
3  production people from the mill I worked at
4  had gotten jobs down there in production.
5    Q.    Who was that?
6    A.    Lamar Powell; I can't remember
7  Mike's last name. Mike somebody, I can't
8  remember his last name. And another guy we
9  called him Scooby, I don't know his real
10  name.
11    Q.    Okay. Scooby?
12    A.    Yes, sir.
13    Q.    Okay. Did you talk to Lamar
14  Powell or Mike or Scooby about coming to
15  work for Hyundai before you came?
16    A.    No, sir. When we left the
17  plant -- They probably left the plant six
18  months before I got hired on there. The
19  hours they were working, nobody talked to
20  them.
21    Q.    Okay. They were working --
22    A.    Long hours.
23    Q.    Okay. What -- Once you came

# FREEDOM COURT REPORTING

Page 33

1  to work for Hyundai, did you talk to Lamar
2  Powell or Mike or Scooby?
3      A.    Scooby, no.  Lamar and Mike, a
4  couple of times.
5      Q.    Okay.  Did you talk to them
6  about your military career or uniformed
7  service or anything like that as --
8      A.    They asked was I going back to
9  Iraq any time soon, and I told them I didn't
10 know.
11     Q.    Okay.  Anything else y'all
12 talked about in terms of your military
13 career?
14     A.    Asked me was I still in, yeah.
15     Q.    I assume they were not members
16 of the Guard?
17     A.    No, sir.
18     Q.    Did you talk to them about
19 Greg Prater at all?
20     A.    No, sir.
21     Q.    Did they send you at
22 Kevin Hughes at all?
23     A.    No, sir.

Page 34

1      Q.    Did you talk to them about
2  John Applegate at all?
3      A.    I don't think so.
4      Q.    Okay.
5      A.    I'd see them -- They worked
6  production, they was on the line.  You may
7  get to talk to them a minute at the most,
8  because they don't stop the line.  Because
9  if the line stops, it ain't good.
10     Q.    Okay.  And going back to your
11 employment history, let's talk about your
12 work prior to going to IP at the Thorsby
13 mill.  Where did you work before that?
14     A.    Sim-Cala.
15     Q.    And what did you do at
16 Sim-Cala?
17     A.    Maintenance.
18     Q.    And when you say maintenance,
19 were you doing basically the same thing you
20 were doing as a regular maintenance person
21 at the IP Thorsby mill?
22     A.    Yes and no.  It was a foundry.
23     Q.    And what were you doing there?

Page 35

1      A.    At the foundry?
2      Q.    Uh-huh.
3      A.    Maintenance.  It was more
4  welding than anything.
5      Q.    Okay.  And give me your dates
6  of employment at Sim-Cala.
7      A.    I don't know.  I mean, I don't
8  know.  That was years ago.
9      Q.    Okay.
10     A.    I don't know.
11     Q.    Okay.  Do you remember who
12 your supervisor was?
13     A.    Huh-uh.  I can't remember his
14 name.  He was a short fellow.  I can't
15 remember his name.
16     Q.    Okay.  Did you have any sort
17 of on-the-job training with Sim-Cala?
18     A.    Yeah.  They're the ones that
19 sent me to J.P. Tech.  You had to go to J.P.
20 Tech.  And, no, I wasn't paid.
21     Q.    Did they send you at night?
22     A.    Yes, sir.  I had to complete
23 my ten-hour work shift, then go to school.

Page 36

1      Q.    Okay.  And what was the reason
2  for the termination of the position at
3  Sim-Cala?
4      A.    Wasn't termination.  I quit --
5  left there to go to International Paper.
6      Q.    Why?
7      A.    Better pay.  I mean, make a
8  better living for my family.
9      Q.    Anything other than better
10 pay?
11     A.    Yeah.  We didn't have good
12 insurance.  I mean, that was -- Sim-Cala was
13 a rough job.  I mean, it was a rough job.
14 Even in the winter time, it was a
15 hundred-some-odd degrees in the plant.
16 Don't nobody want to work there.
17     Q.    Okay.  Is it still in
18 business?
19     A.    I have no idea.
20     Q.    Where was Sim-Cala?
21     A.    Off the Mt. Meigs exit here in
22 Montgomery.
23     Q.    Mt. Meigs?

9  (Pages 33 to 36)

# FREEDOM COURT REPORTING

Page 37

1    A.    Uh-huh.
2    Q.    **And prior to Sim-Cala, where**
3  **did you work?**
4    A.    Miller Mechanical.  It is a
5  company out of New York.
6    Q.    **What did you do for them?**
7    A.    Worked shutdowns in paper
8  mills.
9    Q.    **So you traveled for that?**
10   A.    Yes, sir.
11   Q.    **Were you married then?**
12   A.    Yes, sir.
13   Q.    **Imagine that was rough?**
14   A.    Yes, sir.
15   Q.    **How long were you with them?**
16   A.    Several years.
17   Q.    **Do you remember what years?**
18   A.    No, sir.  To be honest, no.
19   Q.    **And what -- you say you did --**
20 **you traveled and did shutdowns for Miller**
21 **Mechanical?**
22   A.    Yeah.
23   Q.    **Tell me what that involved.**

Page 38

1    A.    We worked in the pulp
2  divisions.  We did everything from changing
3  out motors, pumps, welding in the digesters,
4  changing screens out.  Anything to do in the
5  pulp division, we did it.
6    Q.    **Okay.  And prior to Miller**
7  **Mechanical, do you remember where you**
8  **worked?**
9    A.    I think it was just military
10 there.
11   Q.    **Just in the military?**
12   A.    Yes, sir.
13   Q.    **Okay.  Mr. Dees, let me give**
14 **you what we have been provided by your**
15 **attorneys.  I'm assuming this is your**
16 **resume?**
17   A.    Yes, sir.
18   Q.    **If you see down at the bottom**
19 **it says Dees V. HMMA 00013.**
20       MR. KILBORN:  Do you want to
21 go ahead and mark it.
22       MR. JOHNSON:  Yeah, let's go
23 ahead and mark it.

Page 39

1        (Whereupon, Defendant's
2        Exhibit No. 1 was marked
3        for identification.)
4        (Off-the-Record discussion
5        was held.)
6    Q.    Mr. Dees, what we've marked as
7  Exhibit 1 to your deposition, you agree
8  that's your resume?
9    A.    Starting at the top?
10   Q.    Sure.
11   A.    All right.  Projective,
12 employment with Hyundai Corporations --
13   Q.    No.  No.  No.  You don't have
14 to read it.  Just look at it and tell me if
15 that is what it looks like.
16   A.    Yes, sir.
17   Q.    That was your resume?
18   A.    Yes, sir.
19   Q.    And to your knowledge, was
20 that the one that you submitted to Hyundai
21 when you applied?
22   A.    Yes, sir.
23   Q.    Okay.  That's all I've got to

Page 40

1  ask on that one.
2        All right.  Mr. Dees, let's
3  talk a little bit about your background in
4  the military.  I think you said your
5  employment prior to Miller Mechanical was
6  basically in the military.  So let's take
7  it, I guess, from the bottom.  You got out
8  of high school and went in the military?
9    A.    No, sir.  I went to basic
10 training before I ever graduated.  Army
11 Basic Training, Fort McClellan, Alabama.
12   Q.    Okay.  And when did you do
13 basic?
14   A.    Summer of '82.  Between my
15 junior and senior year of high school.
16   Q.    Okay.  And is Fort McClellan,
17 is that an Army base?
18   A.    Yes, sir.
19   Q.    And so then you did basic
20 training in the summer and then went back
21 and finished high school?
22   A.    Yes, sir.
23   Q.    Okay.  Then when you got out

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  of high school, did you go back into the
2  Army?
3      A.   No, sir. I went to basic
4  training for the Army National Guard.
5      Q.   That's what you did in the
6  summer of '82?
7      A.   Yes, sir.
8      Q.   Okay. Well, talk me through
9  your military career, starting the summer of
10 '82.
11     A.   Summer of '82, basic training,
12 Fort McClellan, Alabama.
13     Q.   Okay.
14     A.   Summer of '83, Lackland Air
15 Force Base. Left the guard, went to the Air
16 Force. Army wouldn't let me be an MP and
17 that's what I wanted to do, that or
18 infantry, and they wouldn't let me go either
19 one so I went to the Air Force. Went to the
20 Air Force as an MP school.
21     Q.   Okay. When did you do that?
22     A.   '83.
23     Q.   All right. Did you have to do

Page 43

1      Q.   Okay.
2      A.   M-60 machine gun nonspecialist
3  school, then M-60 machine gun specialist,
4  that was another four weeks.
5      Q.   The machine gun nonspecialist
6  school?
7      A.   Was two weeks. And the
8  specialist school was two weeks. Four weeks
9  to be a machine gunner.
10     Q.   Where was this school?
11     A.   Camp Bullis.
12     Q.   And the specialist school was
13 also at Bullis?
14     A.   Camp Bullis.
15     Q.   And that took four weeks?
16     A.   Four weeks for the total of
17 both of them, two weeks apiece.
18     Q.   Then after you completed the
19 machine gun specialist school, what did you
20 do?
21     A.   Went to Lackland Air Force
22 Base, Florida.
23     Q.   What did you do there?

Page 42

1  basic training for the Air Force too?
2      A.   No, sir. I'd have probably
3  got kicked out, probably.
4      Q.   Why is that?
5      A.   I can't fold clothes in
6  sixteen squares.
7      Q.   Okay. So you did the MP
8  school in '83?
9      A.   Yes, sir.
10     Q.   Okay. How long did that take?
11     A.   Eight weeks, I believe.
12     Q.   What did you do after that
13 eight weeks?
14     A.   Ground combat skills training.
15     Q.   Where?
16     A.   Camp Bullis, Texas.
17     Q.   How do you spell that?
18     A.   C-A-M-P B-U-L-L-I-S.
19     Q.   How long did ground combat
20 skills training take?
21     A.   I don't know. Around eight
22 weeks, I think. Six, eight weeks, I don't
23 know.

Page 44

1      A.   Went to school a lot, stayed
2  in the woods a lot; got certified on a
3  radar, Intoxilizer, Breathalizer; a lot of
4  exercises, deployment exercises in the
5  woods; and I worked a lot of gates.
6      Q.   All right. When you say you
7  were in school, I assume that was learning
8  stuff like how to operate radar, how to
9  operate Breathalizer?
10     A.   Competitions. I shot
11 competitions for the Air Force. Combat
12 competitions, peace keeper challenge.
13     Q.   Okay. And when you say you
14 were in the woods a lot, I assume that was
15 all training?
16     A.   Yes, sir.
17     Q.   Okay. What kind of training
18 were you doing?
19     A.   Ground combat skills.
20     Q.   Okay.
21     A.   I had some -- I had prior Army
22 training, and the Air Force don't really
23 have a lot of combat training so they

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1  utilize on the other branches, Army and
2  Marine Corps combat courses. So that's why
3  I got stuck back in the woods.
4      Q.   When you say you worked a lot
5  of gates, does that mean doing security at
6  gates?
7      A.   Yes, sir.
8      Q.   I assume that's because you
9  were an MP?
10     A.   Yes, sir.
11     Q.   And technically were -- At
12  what point did you become an MP, when you
13  finished MP school in '83?
14     A.   Yes, sir.
15     Q.   All this other stuff, the
16  ground combat skills training, machine gun
17  training, that was all to sort of further
18  your education as an MP?
19     A.   Not really.
20     Q.   Okay.
21     A.   Air Force is responsible for
22  their own perimeter security, in the States
23  and overseas. And being as I had prior Army

Page 46

1  service, that's where I got stuck.
2      Q.   Why is that?
3      A.   Because they thought I was a
4  grunt, so I went back to being a grunt.
5      Q.   Okay. And how long were you
6  at Lackland?
7      A.   Approximately a year I
8  believe.
9      Q.   What year was that? Was that
10  in '83 or '84 or both?
11     A.   '84 to '85, I believe.
12  February of '84 to maybe February of '85,
13  January of '85. I don't know.
14     Q.   After Lackland, where did you
15  go?
16     A.   Korea.
17     Q.   How long were you in Korea?
18     A.   Twelve months.
19     Q.   1985 through '86?
20     A.   February of '85 to February of
21  '86.
22     Q.   What did you do in Korea?
23     A.   I was on the SWAT team there.

Page 47

1  I did a lot of SWAT recalls, worked town
2  patrol some, team spirit, got stuck in the
3  woods a lot, again. And that was it.
4      Q.   What are SWAT recalls?
5      A.   SWAT team. I was on the
6  military SWAT team. They call it a special
7  reaction team, SRT. That's their version of
8  the SWAT team.
9      Q.   And what did you do?
10     A.   I was an entry man, first one
11  in the door.
12     Q.   That would be like if there
13  was a hostage or crisis --
14     A.   Hostage situation, bank
15  robbery, anything you call a civilian SWAT
16  team for, that's what we was for.
17     Q.   Okay. And town patrol, is
18  that what it sounds like?
19     A.   Yes, sir.
20     Q.   I assume you just made sure
21  that other members of the military weren't
22  causing trouble, things like that?
23     A.   You worked strictly at night

Page 48

1  patrolling local towns, walking through the
2  bars, off-limits areas, make sure the GIs
3  wasn't in the off-limits areas, things of
4  that nature.
5      Q.   And you say you got stuck in
6  the woods some more, what were you doing,
7  training?
8      A.   Team spirit exercises and
9  training exercises.
10     Q.   What are team spirit
11  exercises?
12     A.   There was a big military
13  buildup in Korea around every February or
14  March to show military strength without
15  all-out war.
16     Q.   Okay. And that was the team
17  spirit exercise?
18     A.   Yes, sir.
19     Q.   Okay. What else did you do
20  while you were in Korea?
21     A.   Got married.
22     Q.   I guess that's a big deal?
23     A.   Yes, sir.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 49

1  Q.  When did you get married?
2  A.  28 June '85.
3  Q.  My wife would be happy if I
4  could reel off those dates as quick as you
5  do.
6      Did y'all get married actually
7  in Korea?
8  A.  Yes, sir.
9  Q.  Anything else that you did
10  while you were in Korea?
11  A.  No. I don't know. That was
12  years ago. Maybe, maybe not. I don't know.
13  I don't remember.
14  Q.  All right. You came back to
15  the states in '86?
16  A.  Yes, sir. Fort Lewis,
17  Washington.
18  Q.  Fort Lewis?
19  A.  Yes. Tacoma, Washington.
20  Q.  That's an Air Force base?
21  A.  That's an Army post.
22  Q.  How did you get put on an Army
23  post?

Page 50

1  A.  Being an MP.
2  Q.  Okay. Did you serve as an MP
3  at Fort Lewis?
4  A.  Yes, sir.
5  Q.  How long?
6  A.  Was on a SWAT team three
7  years. Was on their SWAT team, completed
8  Washington State SWAT School, their state
9  certified school.
10  Q.  Those three years were 1986
11  through when?
12  A.  '89.
13  Q.  '89?
14  A.  March of '86 through May or
15  June of '89.
16  Q.  Okay.
17  A.  Germany.
18  Q.  You went to Germany after Fort
19  Lewis?
20  A.  Yes, sir.
21  Q.  Where in Germany?
22  A.  Bitburg Air Base,
23  B-I-T-B-U-R-G.

Page 51

1  Q.  How long were you at Bitburg?
2  A.  Three, three and a half years.
3  I don't know.
4  Q.  I assume your wife was
5  traveling with you at Fort Lewis and
6  Bitburg?
7  A.  Yes, sir.
8  Q.  And had y'all had any kids by
9  the time --
10  A.  My oldest daughter was born on
11  Fort Lewis, Madigan Army Medical Center.
12  Q.  How do you spell Madigan?
13  A.  M-A-D-I-G-A-N. And my
14  youngest daughter was born in Germany.
15  Q.  Okay. And when did you leave
16  Bitburg?
17  A.  August '92. August, September
18  '92, I'm not sure.
19  Q.  Now, around that time was
20  during, I guess, the first Gulf War?
21  A.  Yes, sir.
22  Q.  Were you deployed over in the
23  Middle East during that period?

Page 52

1  A.  Yes, sir. Desert Storm.
2  Desert Shield and Desert Storm. I was there
3  for both phases.
4  Q.  What were you doing during
5  Desert Storm?
6  A.  Combat patrols.
7  Q.  What did that involve?
8  A.  Security patrols, recons,
9  raids, ambushes, just basic combat patrol.
10  Q.  Where were you?
11  A.  Turkey, northern Iraqi border.
12  We traveled from -- what's the name of that
13  Air Force base? We traveled from some Air
14  Force base over the Turkish border, did
15  patrols and back. I don't remember the name
16  of the base.
17  Q.  Okay. What about -- Were you
18  anywhere else during Desert Storm?
19  A.  No, sir.
20  Q.  Okay. What about during
21  Desert Shield, what were you doing?
22  A.  Same thing. It all rolled one
23  into the other.

13 (Pages 49 to 52)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1    Q.    Same place?
2    A.    Only thing that changed for us
3  was the name.
4    Q.    Okay.  How long were you over
5  in the Middle East?
6    A.    Little over three months.
7  Three months, I don't know.  It wasn't long.
8  Air Force deploys three months.  They're not
9  like the Army.
10    Q.    Okay.  And then I assume you
11  came back to Bitburg?
12    A.    Yes, sir.
13    Q.    Okay.  And then after Bitburg,
14  where did you go?
15    A.    Got out.
16    Q.    Got out of the Air Force?
17    A.    Yes, sir.
18    Q.    All right.
19    A.    Stayed out for a while and
20  joined the National Guard.
21    Q.    Do you remember when you --
22  when you got out of the Air Force?
23    A.    30 November '92.  Nine years,

Page 54

1  seven months, six days.
2    Q.    Okay.  Now, did you get any
3  sort of retirement from the military?
4    A.    No, sir.  I didn't -- I only
5  did -- I didn't do twenty years.
6    Q.    Okay.
7    A.    That's why I joined the
8  National Guard, finish it up and get my
9  retirement.
10    Q.    Okay.  When did you join the
11  National Guard?
12    A.    I don't know.  '93 or '94, I
13  don't know.
14    Q.    When you -- When you left
15  Bitburg and got out of the Air Force, did
16  you come back to Alabama?
17    A.    Yes, sir.
18    Q.    And is that when you started
19  working with Miller Mechanical?
20    A.    Yes, sir.  After -- Well, I
21  signed up, took some welding classes first,
22  and then went to work for Miller Mechanical.
23    Q.    Where did you take your

Page 55

1  welding classes?
2    A.    Wallace.
3    Q.    Wallace.  And you say it was a
4  couple of months before you joined the
5  National Guard?
6    A.    I don't know.  May have been a
7  year.  I don't know.
8    Q.    Okay.
9    A.    I don't know.
10    Q.    And you joined the Alabama
11  Army National Guard?
12    A.    Yes, sir.  2nd of the 117th
13  Field Artillery Battery.
14    Q.    And are you in a different
15  unit now?
16    A.    Yes, sir.
17    Q.    Okay.
18    A.    March 14th of '03 I was
19  involuntary transferred and extended to the
20  1165th MP Company.  Deployed March 15th,
21  sent to Iraq for seems like forever; kept
22  getting extended, kept getting extended, I
23  had three extensions; then came back.  I

Page 56

1  stayed with that company.
2    Q.    Okay.  How long were you in
3  Iraq during that time?
4    A.    Seventeen, eighteen months.  I
5  don't know.
6    Q.    When did you return?  I assume
7  it was in 2004?
8    A.    Oh, it was in 2004.  Late
9  2004.  I think it was around August.
10    Q.    Okay.  And what did the -- You
11  said you were in the 117th Field Artillery
12  Battery, what was their -- what were they
13  there for?  What did they do?
14    A.    It was field artillery unit.
15  I was 13 Echo.  It's called fire directional
16  specialist.
17    Q.    Which means what?
18    A.    Which means I -- The forward
19  observer sends me coordinates of where he
20  wants the rounds to go from the guns.
21    Q.    Okay.
22    A.    I take the wind velocity, the
23  -- The forward observer is looking at it,

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  the view, from where the guns would be
2  looking at it; I plot everything on a map,
3  and I send the message to the guns, fire
4  mission, get ready to fire, I tell them what
5  to fire, how to fire it, when to fire it, at
6  what elevation, and what angle.
7      Q.    What kind of guns are you
8  talking about?
9      A.    105 Howitzers.
10     Q.    Okay.  And was that -- Were
11 you pretty narrowly focused with the 117th?
12     A.    Yes, sir.
13     Q.    Okay.
14     A.    What do you mean was I --
15     Q.    I mean, was that what you did?
16 Did you do anything else?
17     A.    No, sir.  Well, they changed
18 to a chemical company and I didn't -- I
19 don't like chemicals.
20     Q.    When did they change to a
21 chemical company, after you had gone to
22 Iraq?
23     A.    No, sir.  A few months before

Page 58

1  I left.  I don't remember.
2      Q.    Okay.  And when you say you
3  were involuntary transferred in March of
4  2003, how did that happen?
5      A.    They called me up, told me to
6  pack my bags, I was leaving the next day and
7  go, and I did.
8          I'm a soldier, I go where I'm
9  told to go, and fight where I'm told to
10 fight.
11         DET 1, 1165th, Detachment 1.
12     Q.    Okay.  What is the 1165th?
13     A.    Combat MP company.
14     Q.    Now, was that more consistent
15 with what you had done over in Korea and
16 with your prior training?
17     A.    Yes, sir.  That's the reason I
18 got pulled.  The state went through the
19 records, they didn't have enough people to
20 deploy, so I got pulled and sent with them.
21     Q.    Okay.  Tell me what you did
22 when you got to Iraq.
23     A.    Besides trying to stay alive?

Page 59

1      Q.    I'm assuming you did that.
2      A.    We conducted patrols to our
3  assigned sector of town, Baghdad at first.
4  My responsibility was the southeast side of
5  Baghdad.  Pretty good sector.  I had a
6  police station called Billot Police Station.
7  We was training Iraqi police, and helped
8  them set up their force protection, teach
9  them how to patrol, teach them how to
10 policeman.  At the same time we had to
11 conduct dismounted and mounted patrols of
12 the area, IED sweeps, raids, ambushes.
13 Basically you've got an MP on one side of
14 the fence, infantry on other side of the
15 fence, you combine them and you throw them
16 in.
17         We got in all-out ambushes so
18 bad that I had drivers thrown out of the
19 vehicles, men dying.  Went from there to a
20 town we called Little Fallujah, the name of
21 it was Latifiyah, thirty-five miles south of
22 Baghdad; we took it over from the Marine
23 Corps.  And it got its name Little Fallujah

Page 60

1  for a reason.  If you was going down there,
2  you were going to make contact.
3          And we stayed down there every
4  day.  We didn't have -- An army in a combat
5  zone, there is no such thing as a day off.
6  You work, you patrol.  We patrolled every
7  day.  Got -- Ran across I don't even know
8  how many IEDs, ambushes, going in kicking in
9  doors, taking the Iraqis out, taking them to
10 jail.
11         Train the Iraqi police so you
12 could fight them that night; train the Iraqi
13 army so you could fight them that night.
14         Left Latifiyah, went to First
15 Armored Division.  I was on Colonel Baker's
16 personal security detail.
17     Q.    Who is Colonel Baker?
18     A.    Second Combat Brigade Team,
19 First Armored Division, commander.
20     Q.    You were on his personal
21 security team?
22     A.    Yes, sir.
23     Q.    What did that involve?

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1    A.    Everywhere he wanted to go, I
2  had to make sure he made it there safely. I
3  mean every day he -- He was a jam-up
4  commander: He took care of his solders and
5  he knew his solders.
6         He traveled all over Iraq. He
7  had soldiers -- First Armored Division is a
8  big division, and he had a whole brigade
9  combat team, that's approximately
10  twenty-plus thousand soldiers. We'd go
11  anywhere up to a hundred miles from Baghdad.
12    Q.    Okay.
13    A.    His safety and welfare was my
14  responsibility. I'd make sure he stayed --
15  he was kept safe no matter where he went or
16  what he did.
17    Q.    And was that the last thing
18  you did when you were in Iraq?
19    A.    Yes, sir.
20    Q.    Okay. Since you -- Well, when
21  did you get back home from Iraq that second
22  time?
23    A.    Like I say, I think it was

Page 62

1  around August of '04. I'm not sure.
2    Q.    Okay. And beginning in --
3  Well, after August of '05, were you still a
4  member of the National Guard?
5    A.    Yes, sir. I still am.
6    Q.    Same company and everything?
7    A.    Yes, sir.
8    Q.    Okay. What is your current
9  rank?
10    A.    Staff sergeant, E-6. Until a
11  few months from now, and I'll be promoted to
12  an E-7.
13    Q.    What's the difference between
14  E-6 and E-7?
15    A.    Pay.
16    Q.    Pay?
17    A.    Title, job title. I'll be
18  taking over -- Right now I'm a fill-in
19  platoon sergeant. Any time we deploy, I'm
20  in charge of a platoon. But when I get that
21  promotion, it will be officially on paper,
22  I'll take official command of that platoon.
23    Q.    Okay. Which platoon?

Page 63

1    A.    Third platoon.
2    Q.    What's the difference in pay
3  between E-6 and E-7?
4    A.    I don't know yet.
5    Q.    Okay. And when you -- When
6  you began back in 1983 at Lackland -- or at
7  Fort McClellan, what was your rank then?
8    A.    E-1.
9    Q.    E-1?
10    A.    Bottom of the totem pole.
11    Q.    And did you move from E-1 to
12  E-2?
13    A.    Yeah.
14    Q.    When was that?
15    A.    I don't know.
16    Q.    Do you remember when your
17  ranks changed, thinking back?
18    A.    No. Back then it didn't
19  matter. Until you hit E-5 in the military,
20  it don't matter.
21    Q.    All right. When did you hit
22  E-5?
23    A.    Right before we went to Desert

Page 64

1  Shield.
2    Q.    And to progress from E-5 to
3  E-6, does it take training, recommendations
4  from superiors?
5    A.    Takes training, takes certain
6  schools you have to have, takes
7  recommendations. There's a lot of
8  requirements you have to have. Your packet
9  goes up before the State board. I picked my
10  E-6 up in Iraq.
11    Q.    When was that, the second time
12  or first time?
13    A.    Second time. In Air Force you
14  don't get E-6 prior to ten years. It just
15  don't happen. Like I say, you got all these
16  E-9s on the State board looking at your
17  packet, your records, your recommendations,
18  whether you have the requirements. They
19  pick your record apart with a fine-toothed
20  comb.
21    Q.    What have you done to go from
22  E-6 to E-7?
23    A.    Same thing. This last school,

16  (Pages 61 to 64)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1 month-long school I've been in, was the last
2 requirement I needed to make E-7. And
3 really it's up to the State and my unit. My
4 unit, if they don't think you're ready,
5 you're not going to get it.
6    Q.    What was the last school you
7 attended?
8    A.    That BNCOC, Basic
9 Noncommissioned Officers Course.
10    Q.    Okay. Let's talk about that.
11    A.    All right.
12    Q.    Tell me more about that. What
13 is it?
14    A.    Well, you've got to know the
15 military legal system, as far as Uniform
16 Code of Military Justice; you've got to have
17 managerial skills; you've got to have -- I
18 mean, you spend two weeks in the field, so
19 your combat skills is tested big time.
20    Q.    During the school?
21    A.    Yes, sir.
22    Q.    And is it a month-long school?
23    A.    Well, I did two phases.

Page 66

1 There's three phases for my MOS, and each
2 one is two weeks long. And I did the second
3 and third phrases back to back.
4    Q.    All right. What was the first
5 phase?
6    A.    First phase is all basic
7 military knowledge, as far as your admin
8 side.
9    Q.    When did you do that?
10    A.    Last year. Last September, I
11 believe.
12    Q.    All right. When did you do
13 Phase II?
14    A.    I don't know. A month ago.
15    Q.    Okay. And you still have to
16 do Phase III?
17    A.    No, sir. I did Phase II and
18 III back to back.
19    Q.    Okay.
20        THE WITNESS: I need to take a
21 break if you don't mind.
22        MR. JOHNSON: That's fine.
23        (Recess taken.)

Page 67

1    Q.    Mr. Dees, going back on the
2 Record here. Just a couple other questions
3 about your military background.
4        You had mentioned that you
5 finished Phases II and III of BNCOC school.
6 How long did that take to finish II and III?
7    A.    Four weeks. That's mostly
8 field training.
9    Q.    Okay.
10    A.    All my -- I spent -- Like I
11 said, when I was seventeen, I went through
12 basic training. I come from a military
13 family, I've been a -- military is all I've
14 ever known. I don't have one blemish. I've
15 got letters of certificates, letters of
16 appreciation from full bird colonels; I've
17 got achievement medals, accommodation
18 medals; put in for a bronze star in Iraq.
19 You can ask any of my soldiers, Sergeant
20 Barnes, my soldiers that work for me, my
21 seniors, any of them, they'll attest to my
22 military background and my career.
23    Q.    Who -- And you mentioned

Page 68

1 Sergeant Barnes, is he one of your soldiers?
2    A.    He's my operation NCO, he
3 works for me. Sergeant Richberg, Sergeant
4 Martin.
5    Q.    Give me those names. You had
6 Sergeant Barnes?
7    A.    Sergeant Franklin D. Barnes.
8    Q.    He's your NCO?
9    A.    He's my operations NCO. He
10 works for me. He's the one that sent the
11 letter to Hyundai.
12    Q.    Did you tell him to send it?
13    A.    I went to the unit and
14 complained because I was being ordered to
15 give military orders for a drill weekend.
16 And Greg Prater knows -- He was in the
17 Guard, he knows you do not get military
18 orders for a drill weekend. I gave them a
19 schedule. Every time I hire on with an
20 employer, I tell them up front, I'm in the
21 National Guard, is this going to cause a
22 problem.
23    Q.    Did you tell Hyundai that up

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1  front?
2      A.    I told Hyundai that up front.
3  I told International Paper, I told BE&K, I
4  told IP at Thorsby. I've always been up
5  front. You can ask my soldiers, you can ask
6  the people I -- Well, y'all's lawyer
7  interviewed my coworkers, they told him the
8  same thing. Leon Dees is honest. If he
9  screws up he will tell you. I may not be
10  perfect. I make mistakes just like the next
11  guy. But if I make one, I'll tell you. You
12  can go back to my employer at Thorsby, my
13  maintenance manager Danny Wyatt, I crashed
14  an eighty-five thousand dollar chipper. I
15  didn't know it. I went home that day, I
16  come back in, it was strowed all over
17  everywhere. They didn't have a clue what
18  happened to it. I knew what had happened.
19  I went up and I told them. I thought I was
20  fixing to get fired. But I told them
21  exactly what happened.
22          If I mess up, you can ask my
23  soldiers or anybody, if I mess up, I'm the

Page 70

1  first one to admit it.
2      Q.    You mentioned something that
3  was interesting to me. You said when you
4  got hired on by Hyundai, as with other
5  employers, you told them you were a member
6  of the National Guard.
7      A.    I gave Greg Prater my yearly
8  schedule, year in advance we get our
9  schedules, every October.
10      Q.    Let me make sure you
11  understand my question. I assume what
12  you're talking about with Greg Prater, he
13  wasn't the one that hired you, was he?
14      A.    Danny Blue interviewed me.
15  And I told Danny Blue I was in the Guard. I
16  told him I was in the National Guard, was an
17  active member in the Guard and have a
18  commitment to the Guard.
19      Q.    And was Danny Blue -- Who was
20  he? Was he somebody that interviewed you
21  during the hiring process?
22      A.    Yes, sir.
23      Q.    And do you know what his role

Page 71

1  is at Hyundai?
2      A.    He's a maintenance assistant
3  -- maintenance manager or assistant
4  maintenance of the -- I'm not sure which
5  department. He's on the electrical side.
6  I'm not sure.
7      Q.    Do you know if he was in the
8  military?
9      A.    Danny Blue?
10      Q.    Uh-huh.
11      A.    I don't think so. I'm not
12  sure, but I don't think so.
13      Q.    That's fine. I don't know him
14  at all.
15          But you told him specifically
16  you were in the Guard?
17      A.    Yes, sir, I did.
18      Q.    And did he indicate that would
19  be a problem?
20      A.    No, sir.
21      Q.    Did he indicate that anybody
22  at Hyundai would have a problem with that?
23      A.    No, sir.

Page 72

1      Q.    Did he say anything about
2  whether Hyundai has policies that support
3  members of the Guard?
4      A.    Their handbook states that.
5  You've got a copy of their handbook, and it
6  states their military policy.
7      Q.    And you've got a copy of their
8  handbook?
9      A.    Yes, sir.
10      Q.    When you got a copy of the
11  handbook, did they get you to sign an
12  acknowledgement saying you received it?
13      A.    I don't remember. I don't
14  know. I may have, I may not. I don't know.
15          (Whereupon, Defendant's
16          Exhibit No. 2 was marked
17          for identification.)
18      Q.    Mr. Dees, this is an exhibit
19  we've marked as Exhibit Number 2. Do you
20  recognize that document?
21      A.    Let me read it and make sure.
22          This is it.
23      Q.    And I know that -- It appears

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1  the date on that is January 10th of '06;
2  correct?
3      A.    Yes, sir.  10 January '06.
4      Q.    And is that your signature
5  down there at the bottom?
6      A.    Yes, sir.
7      Q.    And my assumption is, since
8  it's from January 10th, of '06, this wasn't
9  signed at the time you initially hired on;
10  correct?  You hired on before '06; right?
11     A.    Yes, sir.
12     Q.    Do you know -- Do you recall
13  if you received a handbook at the time you
14  were hired and then they issued another
15  handbook later?
16     A.    No, sir.  That was it.  But
17  why was the '06 -- What was the original
18  number?  Looks like 10 January '07 and then
19  the '06 is highlighted.
20     Q.    Okay.  Do you know if that's
21  your handwriting or do you remember doing
22  that?
23     A.    I know -- I know they had a

Page 74

1  big push for everybody to sign that there,
2  because nobody had actually signed the --
3  They had a form in the handbook to sign, but
4  nobody had actually signed it.
5      Q.    Do you remember when they sent
6  this -- sent the acknowledgement around to
7  get people to sign it?
8      A.    To be honest, the exact date
9  or time, no.
10     Q.    Okay.
11     A.    But, mine says 10 January '07,
12  then the 7 is crossed out and the 6 is
13  highlighted.
14     Q.    Okay.  And you don't recall
15  whether you did that or not?
16     A.    No, sir.  Well, normally when
17  I do something like that, from my military
18  background, I initial it.
19     Q.    Okay.  But I assume that's
20  your signature?
21     A.    That's my signature.
22     Q.    Okay.
23     A.    And that's my clock number.

Page 75

1      Q.    Your clock number?
2      A.    Old clock number.
3      Q.    Okay.  And would it be fair to
4  state that possibly prior to that, you had
5  received a copy of the handbook?
6      A.    I received a copy of the
7  handbook when I hired on.
8      Q.    Okay.
9      A.    But like I said, this here, if
10  you look in the back of that handbook, or
11  the front, one, it's got this -- a statement
12  similar to this, or something in it --
13     Q.    Okay.
14     A.    -- and you're supposed to sign
15  it.  And none of us signed it.
16     Q.    Okay.
17     A.    That's why they came out with
18  these.
19     Q.    Do you remember reading the
20  handbook when you first got hired on?
21     A.    All the way through?
22     Q.    Sure.
23     A.    No.  Not all the way through.

Page 76

1  I mean I read bits and pieces and parts here
2  and there, yes, sir.
3      Q.    All right.  Do you remember
4  reading the part about military leaves or
5  anything related to military training?
6      A.    Yes, sir, it is.
7      Q.    Do you remember what it says?
8      A.    It says that -- that you don't
9  have to use your vacation time in lieu of
10  your military training.  Because that was a
11  big issue.
12     Q.    Okay.  Was his name Danny
13  Blue?
14     A.    Yes, sir.
15     Q.    Okay.  Did he say anything
16  else about Hyundai supporting members of the
17  military services or Guard with leaves?
18     A.    He said my being in the Guard
19  wouldn't have anything to do with me getting
20  hired.
21     Q.    Okay.  And you did get hired?
22     A.    Yes, sir.
23     Q.    Okay.

19  (Pages 73 to 76)

# FREEDOM COURT REPORTING

Page 77

1    A.    But like I said, my military
2    career, they can -- they can look at
3    anything that they want to or talk to
4    anybody in my unit if they want to, I'd be
5    glad to let them.
6        Q.    My assumption is, your
7    attorneys have given us a number of
8    commendations and awards and things that
9    relate to your military service.
10       A.    Yes, sir. I've got
11   achievement metals out the ying-yang,
12   accommodation metals.
13       Q.    I'm assuming that you've
14   provided to your attorneys all of those that
15   are in your possession?
16       A.    Yes, sir.
17       Q.    Okay. Based on what you've
18   said and based on my review of your
19   accommodations and awards, my assumption is
20   you were never disciplined for anything
21   while you were in the military?
22       A.    No, sir. I had an outstanding
23   military -- I even took honor grad from a

Page 78

1    Marine Corps school.
2        Q.    Were you ever disciplined for
3    anything while you were with the National
4    Guard?
5        A.    No, sir. I know my job and
6    I'm very, very proud of the job I do, and
7    proud of the uniform I wear.
8        Q.    Okay.
9        A.    I've served my country two
10   different tours, combat tours, and I'm going
11   back again next year, and I'm going back
12   willingly.
13       Q.    Going back where?
14       A.    Iraq.
15       Q.    Do you know what you're going
16   to do when you go?
17       A.    Yes, sir, I do.
18       Q.    What are you going to do?
19       A.    Convoy security. Most
20   dangerous job you can have over there right
21   now.
22       Q.    Okay. When are you leaving?
23       A.    We won't know that until they

Page 79

1    feel we have the need to know. There's
2    three companies from my battalion going,
3    217th, 214th, 1165th.
4        Q.    And in addition to not being
5    disciplined while you were in the military,
6    I assume you were never court martialed for
7    anything?
8        A.    No, sir. No Article 15, no
9    letters of counseling, no letters of
10   reprimand. I come -- I know what my duty
11   is, and, like I said, I fulfill that duty.
12   I take care of my soldiers and my soldiers
13   take care of me. That's all I've ever
14   known, that's what I like, and I'm good at
15   it.
16       Q.    Now, earlier you used a term I
17   want to clear up, you said MOS, that stands
18   for Military Occupational Skill; correct?
19       A.    Yes, sir. I don't remember
20   using it, but that's what it stands for.
21       Q.    I think you used it.
22           Your military occupational
23   skill, would that be military police?

Page 80

1        A.    Yes, sir. That's one of them.
2        Q.    I don't know the answer to
3    this: Can people have more than one MOS?
4        A.    Yes, sir.
5        Q.    And do you have more than one?
6        A.    Yes, sir.
7        Q.    Okay. Tell me what yours are?
8        A.    13 Echo, field artillery, fire
9    direction control, FDC, fire direction
10   specialist. And 74 Delta. I ain't got a
11   clue what that is. It's in my records, it's
12   either chemical or signal one, I don't know.
13       Q.    13 Echo is that military
14   police?
15       A.    No, sir. That's artillery.
16       Q.    Okay. And is that all the
17   MOS's that you're aware of?
18       A.    Yes, sir.
19       Q.    Okay. Have you ever been
20   arrested for anything?
21       A.    No, sir.
22       Q.    Have you ever filed a worker's
23   compensation claim?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 81

1     A.    No, sir.
2     Q.    Have you ever filed a Social
3  Security claim?
4     A.    No, sir.
5     Q.    Are you receiving any sort of
6  payments now for any sort of disability,
7  illness, short-term disability, long-term
8  disability, anything like that?
9     A.    When I came back from Iraq, I
10  had to have my shoulder operated where I
11  messed it up in Iraq. I got, I think it
12  was, short-term disability through the IP, I
13  believe. I'm not sure how it worked. They
14  took care of everything.
15     Q.    All right. What kind of
16  shoulder surgery did you have? Did you have
17  a rotator cuff injury?
18     A.    Rotator cuff, lost the lining
19  in my shoulders, muscles. Something to do
20  with the bone, I don't know.
21     Q.    What did you have done, do you
22  know?
23     A.    The muscles was completely

Page 82

1  torn off from the front or the back, one,
2  half way on the other side. Like I say, I
3  lost the lining in my shoulder. Something
4  else, I don't remember what the doc said.
5  He said it was screwed up.
6     Q.    Where did you have the surgery
7  done?
8     A.    Birmingham.
9     Q.    Birmingham?
10     A.    Yes, sir. I ain't letting the
11  Army cut on me no more. They've done it two
12  or three times, and every time it ain't gone
13  good.
14     Q.    Okay. What were the other two
15  or three times for?
16     A.    When I was in Baghdad, they
17  cut me open in a make-shift hospital in the
18  middle of Baghdad to take my appendix out.
19  And I woke up with industrial staples in my
20  gut that I had to take out. They cut my
21  wisdom teeth out up at Fort Lewis, and I
22  still don't have the feeling in my jaw. So
23  I wasn't going for a third.

Page 83

1     Q.    Okay. Is your shoulder back
2  where you can work fully at this point?
3     A.    Yes, sir.
4     Q.    Are you having any ongoing
5  problems that prevent you from working in
6  any way, shape, or form?
7     A.    No, sir.
8     Q.    Now, prior to today, to get
9  ready for this deposition, did you review
10  any documents?
11     A.    Just what Hyundai sent me, I
12  went over my military records.
13     Q.    Okay. Anything -- When you
14  say just what Hyundai sent you, what was
15  that?
16     A.    I don't remember. Benefits
17  packages, hire-on package, junk like that.
18     Q.    Okay. Are you talking about
19  stuff we sent to your lawyer?
20     A.    Yeah. Some statements from
21  Will Ware, I think.
22     Q.    Okay.
23     A.    Mostly it was all benefits,

Page 84

1  and hire-on package, and stuff from my
2  previous employers.
3     Q.    Okay. Have you reviewed
4  anything else?
5     A.    No, sir.
6     Q.    Did you -- And, again, I'm not
7  -- I'm not going to ask you anything that
8  you talked to your lawyers about or asked
9  your lawyers or anything like that.
10         But other than your lawyers,
11  did you speak to anybody getting ready for
12  the depo?
13     A.    No, sir.
14     Q.    Did you review the complaint
15  that was filed?
16     A.    That my -- What do you mean?
17  Which -- That my lawyers filed?
18     Q.    Yes, sir. To start the
19  lawsuit, your lawyers filed a summons and
20  complaint at the courthouse.
21     A.    Yes, sir.
22     Q.    Did you look at it getting
23  ready for today?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1  A.  I looked at it awhile back. I
2  don't remember. I've looked at it, yes,
3  sir.
4  Q.  But did you look at it to get
5  ready for today?
6  A.  I don't remember, to be
7  honest.
8  Q.  Okay.
9  A.  I talked to Bob yesterday
10  about some stuff, but I don't remember. To
11  be honest, I don't remember.
12  Q.  Okay. And when you say you
13  talked to Bob, are you referring to
14  Mr. Hall, who is here?
15  A.  Hall, yes, sir.
16  Q.  Okay. And what did y'all talk
17  about?
18  A.  The paperwork that he had
19  drawn up, gone over, my records.
20  Q.  Did you review his expert
21  report with him?
22  A.  Yes, sir.
23  Q.  Okay. Was there anything in

Page 86

1  his expert report that you disagreed with?
2  A.  No, sir. I mean, I ain't no
3  accountant or no lawyer.
4  Q.  Okay.
5  A.  So did I understand
6  everything? No, sir.
7  Q.  All right. Was there anything
8  in his expert report that you asked him to
9  change in any way, shape, or form?
10  A.  I don't believe so.
11  Q.  Okay. Other than reviewing
12  the report that he drafted, what else did
13  you do?
14  A.  That was about it.
15  Q.  When was that?
16  A.  I looked at Mr. Hall's report
17  yesterday.
18  Q.  Okay. Did you speak with
19  anybody else that worked for Hyundai getting
20  ready -- prior to today getting ready?
21  A.  No, sir. I mean, my
22  coworkers, they called me. I mean, we're
23  friends. We was tight, we was real close.

Page 87

1  Basically, I lived there more than I did at
2  home.
3  Q.  Okay. Which -- I mean, when
4  was the last time you spoke to one of your
5  coworkers?
6  A.  Bornberg called me yesterday
7  evening I believe. Yesterday sometime.
8  Q.  Who was that?
9  A.  Mark Bornberg.
10  Q.  What did he talk about?
11  A.  Just letting me know he was
12  going to Maplesville to cut a tree down for
13  one of my friends.
14  Q.  Did y'all talk about the
15  deposition or the lawsuit at all?
16  A.  No, sir. He asked how it was
17  going, I said I don't know yet.
18  Q.  Have you talked to any of your
19  former coworkers about the lawsuit or this
20  deposition?
21  A.  They -- Some lawyers from
22  South Carolina interviewed -- had them all
23  at work, was going to interview them all one

Page 88

1  night. And he interviewed three of them and
2  said he didn't want to talk to none of the
3  rest of them is the only thing they told me.
4  Q.  Who said that?
5  A.  Drake Barefoot.
6  Q.  And he said what now?
7  A.  Said that a lawyer told him
8  that they didn't have to talk to him, but
9  he'd like to ask them some questions. And
10  he started interviewing them, and says he
11  interviewed the third one and come out and
12  told the rest of them to leave, that he
13  wasn't getting what he wanted.
14  Q.  Okay. Who are the three that
15  you think were interviewed?
16  A.  I don't remember. Drake told
17  me the names, but I don't remember who it
18  was.
19  Q.  Okay. And that's Drake
20  Barefoot?
21  A.  Yes, sir.
22  Q.  Okay. Did Drake tell you
23  anything else about the interview?

22  (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1    A.    No, sir. I didn't ask him
2  nothing else.
3      Q.    Okay.
4    A.    I didn't ask him that, but --
5      Q.    Did you talk to anybody else
6  about an interview?
7    A.    No, sir.
8      Q.    Other than Drake, do you know
9  anybody that gave an interview?
10    A.    Like I said, Drake came and
11  told me who all he talked to, but I don't
12  remember who it was. That's been a while --
13  few months ago, I guess.
14      Q.    Okay.
15    A.    Like I said, we was good
16  friends. Most of the time we just call each
17  other to pick on each other.
18      Q.    Okay. And other than that
19  discussion, after those interviews, have you
20  had any other talks with Drake about the
21  lawsuit or this deposition or anything like
22  that?
23    A.    No. Like I said, they'll call

Page 90

1  and ask, and I -- Like I said, I ain't no
2  lawyer and I don't know, so I just -- that's
3  the same thing I tell them, I don't know.
4      Q.    Okay. Have you talked to
5  anybody else at Hyundai, other than your
6  coworkers about this lawsuit?
7    A.    No, sir.
8      Q.    Or about this deposition?
9    A.    No, sir.
10      Q.    I assume you talked to your
11  wife before coming here today?
12    A.    I live with her, yes, sir.
13      Q.    Well, did you talk to her --
14  Again, remember I told you earlier some of
15  my questions don't make sense.
16        That made sense, but it wasn't
17  the right question. Did you talk to her
18  about this lawsuit or about your deposition
19  in preparation for today?
20    A.    I reckon, yes, sir.
21      Q.    Okay. Do you remember what
22  y'all talked about?
23    A.    No. I mean, she just said

Page 91

1  this -- her Korean culture, she just -- she
2  was nervous.
3      Q.    Okay.
4    A.    That was it.
5      Q.    Okay.
6    A.    She's scared of the Koreans.
7      Q.    Okay. Why is that?
8    A.    I mean, in Korea you don't
9  buck the system at all. Korean civilian
10  life is like military life, you don't -- you
11  don't go up against the system at all. If
12  they tell you to jump off a bridge, you jump
13  off a bridge and thank them half way down.
14      Q.    Okay. Other than your wife,
15  did you speak to any other family members
16  getting ready for the deposition?
17    A.    No, sir. I ain't had time.
18  I've been up at Fort McClellan for a month,
19  I came home Saturday. And she's always got
20  something for me to do around the house, so,
21  no.
22      Q.    I understand that.
23        Either in getting ready for

Page 92

1  the deposition or at any time during the
2  lawsuit, have you kept a journal or put
3  anything down in writing that might have
4  information relevant to the lawsuit?
5    A.    Have I kept a journal? No,
6  sir. I kept notes when I was at Hyundai,
7  and they were taken.
8      Q.    When you say you kept notes,
9  what were your notes like?
10    A.    I spent several years in the
11  military, I kept meticulous notes: dates,
12  times, places, specific comments.
13      Q.    What did you keep them on?
14    A.    Just blank copy paper.
15      Q.    Blank copy paper?
16    A.    Yes, sir.
17      Q.    What color copy paper, plain
18  white?
19    A.    Plain white paper.
20      Q.    Where did the blank copy paper
21  come from?
22    A.    Probably out of the copy
23  machine there.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1    Q.    At work?
2    A.    Yes, sir. I mean, I don't
3  know. They gave us tablets to keep notes
4  on, to write daily logs on. So I don't know
5  where I got it from.
6    Q.    Did you ever keep anything on
7  a journal or a daily log?
8    A.    We had to fill out daily
9  reports there at the plant, yes.
10    Q.    Okay. And what did you do
11  with those reports?
12    A.    I turned mine in every day,
13  except for one day when I forgot to turn one
14  in and got in trouble for it.
15    Q.    Who did you turn it in to?
16    A.    We'd turn them in. There was
17  a box in the office we had to turn them in
18  to.
19    Q.    When you say the office, is
20  that like a maintenance office?
21    A.    Yes, sir. Every section has
22  their own maintenance office.
23    Q.    Okay. Did any of your

Page 94

1  coworkers ever see you writing on copy paper
2  or writing in a journal about what was going
3  on at work?
4    A.    Yes, sir.
5    Q.    Okay.
6    A.    I mean, they knew I had notes.
7    Q.    Who were they? Which ones?
8    A.    All of them. Everybody on my
9  shift and the other shift.
10    Q.    All right. Did they ever look
11  at them?
12    A.    No, I don't reckon so.
13    Q.    You don't remember ever
14  showing your notes to anybody?
15    A.    I don't reckon. No. No.
16    Q.    When you say they all knew
17  that you had them, what makes you say that?
18    A.    I mean, I told them.
19    Q.    Okay. Other than you telling
20  them --
21    A.    They seen that -- I kept them
22  in my jacket pocket. Wherever I went, they
23  went.

Page 95

1    Q.    But other than you telling
2  them that you had notes, did they ever --
3    A.    Yeah. I'd pull them out of my
4  pocket, and they asked me, you got your
5  notes? Yeah.
6    Q.    And were these notes related
7  to issues you were having with Greg Prater
8  or somebody else at the plant?
9    A.    Issues I was having period
10  regarding my military service.
11    Q.    Okay. Did you ever take your
12  notes home?
13    A.    Yes, sir. I'd take them home
14  and bring them back -- they'd stay with me
15  or either I'd lock them up in my locker.
16    Q.    And you kept them in your
17  pocket?
18    A.    Yes, sir.
19    Q.    Did you take any notes home
20  that are still at your home?
21    A.    No, sir. When I left, my
22  jacket was locked up in my locker, and I
23  wasn't allowed to even go to my locker. I

Page 96

1  was took out of there like a prisoner, like
2  a criminal. Prater went and got my jacket
3  and brought it back to me, and there was no
4  notes in the pocket.
5        MR. SPORT: For the Record,
6  Matt, we've asked y'all for those notes and
7  haven't gotten them.
8    A.    That's like this box here, I
9  don't know -- My locker stayed open,
10  unlocked, for two months after I was fired.
11  Then all of a sudden two months later they
12  come in and throw a lock on it for another
13  couple of months. Then they -- all of a
14  sudden they take the lock off again.
15    Q.    You say that it was unlocked
16  for two months?
17    A.    Yeah.
18    Q.    I assume you didn't go back
19  there to see it personally?
20    A.    No.
21    Q.    What makes you think it was
22  unlocked for two months?
23    A.    Bornberg told me. I asked him

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  to look for my notes, and he said there's
2  nothing -- he said Kevin Hughes and Prater
3  had gone all through my locker.
4      Q.    Do you know -- Did Bornberg go
5  there the day you were terminated or the day
6  after?
7      A.    It was the day after.  That
8  night I got terminated, I'd been at work an
9  hour -- I drove fifty-something miles to
10  work -- to work for an hour, didn't have a
11  clue I was being fired; got security guards
12  coming in with me, around my friends,
13  telling you, let's go.  Like I said, I was
14  drug out like a criminal, and then that
15  lady, Wendy Warner, she was cold, short,
16  treated me like a piece of trash.
17      Q.    Okay.
18      A.    I've never been fired from a
19  job in my life.
20      Q.    And we're going to talk more
21  about Wendy Warner before the day is out.
22  The notes that you're talking about, how
23  much information was it?  How many pages?

Page 98

1  One page, more pages?
2      A.    No.  No.  There was several
3  pages.
4      Q.    Several being what, two,
5  three?
6      A.    Probably three or four.
7      Q.    So.
8      A.    My military career, when it
9  started, I figured it would drop after my
10  unit sent the letter, but, no.
11      Q.    Okay.
12      A.    But it wasn't just Prater, it
13  was Applegate, it was HR.  It wasn't one
14  individual, it was company.
15      Q.    What was Applegate doing?
16      A.    He basically told me -- I
17  asked him one time, I said:  What about the
18  letter my unit sent?  He said:  Well, I
19  ain't worried about that letter; He said,
20  whatever Prater says, I'm going to back him
21  up.  I've never heard Prater say anything
22  out of the way, which he was never around
23  Prater when Prater was in our shop; he sat

Page 99

1  up there in his office.  He said however
2  Prater wants to run his shop, that's what
3  he's going to do and I'm going to back him
4  up.
5      Q.    Is that all that Applegate had
6  to say?
7      A.    Basically, yeah.  Chewed me
8  out.
9      Q.    Chewed you out how?
10      A.    Told me that I needed to get
11  my act together.  I mean, I got Guard duty,
12  I have a military obligation.  I have to go
13  to that obligation.  I'm going to go to that
14  obligation.  Federal law protects me under
15  that obligation, but yet I'm still being
16  told that if I don't go to Guard duty and
17  don't show up to work, I'm going to be wrote
18  up for missing work.
19      Q.    When Applegate said "get your
20  act together," what was he referring to?
21      A.    I have no idea.  I didn't ask
22  him.
23      Q.    Did John Applegate ever ask to

Page 100

1  see any military orders of yours?
2      A.    No.  He just told me that he
3  backed Prater up on whatever he said.
4      Q.    Okay.
5      A.    HR did, yeah.
6            Well, I take that back.  There
7  was a little girl from HR, her name was
8  Keisha, I don't know what her last name is.
9  This was after my unit had sent the letter.
10  Said that -- She come out quoting something
11  from the ESGR regulation and then saying
12  that I had to provide orders so many days
13  prior to, or something, I don't remember.
14  And I said no, the regulation states that I
15  can be deployed up to three months on a
16  verbal order.
17            And I said:  Y'all have my
18  schedule a year advance.  You've had it.
19  They got my updated version, which he turned
20  in.  It got so bad that when I -- like, the
21  -- I went to BNCOC Phase I, I believe in
22  September, and I was deployed in support of
23  Katrina, I had to carry my orders to human

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 101

1  resources section myself, which y'all got
2  the papers somewhere in there where the HR
3  person had to sign off on me bringing my
4  orders up there, said manager not available,
5  because Prater wouldn't turn my orders in.
6  And you got Applegate and HR backing him up
7  on it, I'm against the wall.  That's why I
8  kept notes.
9      Q.    I want to carve out Greg
10  Prater for just a moment.
11          In terms of Mr. Applegate, how
12  many discussions did you have with him that
13  had anything to do with your military
14  service?
15      A.    Two or three.
16      Q.    Two or three?
17      A.    I mean, every time I -- It was
18  several times, even after my unit sent the
19  letter.  And he admitted to the letter being
20  there.
21      Q.    All right.  Do you think it
22  was more than two or three or just two or
23  three?

Page 102

1      A.    I don't know.  Like I said, it
2  was ongoing several, several months.
3      Q.    All right.  So over a period
4  of several months, you had several
5  discussions with him?
6      A.    Uh-huh.  And HR.
7      Q.    But I'm asking about Applegate
8  for now.
9      A.    Okay.
10      Q.    During the discussions that
11  you had with Applegate, did he ever demand
12  to see any orders of yours?
13      A.    I don't -- I don't think so.
14  I don't know.  I don't remember.
15      Q.    Okay.  You --
16      A.    He said I needed to get my
17  mind together and focus on the plant,
18  instead of -- How did he phrase it?
19          He came up with some elaborate
20  word and said I needed to basically just
21  don't worry about my Guard duty and stay at
22  work.  I don't remember how he phrased it.
23      Q.    Do you remember when he said

Page 103

1  it?
2      A.    No.
3      Q.    How long before you were
4  actually terminated did your discussions
5  with Applegate take place?  Was it back in
6  the fall?
7      A.    It started around the fall.
8  And it went on up through December and
9  January.
10      Q.    December and January?
11      A.    Uh-huh.
12      Q.    Did you have any problems
13  after January?
14      A.    With -- Yeah, I mean --
15      Q.    With Applegate, I'm sorry.
16      A.    With Applegate, yeah.
17      Q.    Okay.  So it went past
18  December and January, is what you're telling
19  me?
20      A.    I believe it was in January, I
21  don't know.  I don't remember the dates to
22  be exact.  Like I say, they've got my notes,
23  that's got everything on it.  They've got

Page 104

1  them somewhere.  I didn't bring them out of
2  the plant.
3          Prater is the one that brought
4  my jacket to me, they was in the pocket.  He
5  had keys to my locker.  I had security
6  guards on me, I couldn't go back and get my
7  personal stuff.  I had to give Prater my
8  keys to my locker and it stayed unlocked.
9  He unlocked it and it stayed unlocked.  And
10  I was pushed out with security guards in
11  front of everybody, like I said, like a
12  common criminal.
13      Q.    During the time that you were
14  there, what kind of lock was on your locker?
15      A.    I don't remember.  I think it
16  was just a little red Master lock.
17      Q.    Was it a keyed lock or
18  combination?
19      A.    It was a keyed lock.  I had to
20  give Prater my keys to get in it.
21      Q.    Okay.
22      A.    He's the one who brought my
23  stuff to me.  And all he brought was my

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  jacket and a little MP3 player that they had
2  given us for Christmas.
3      Q.    Was he with anybody else?
4      A.    No. I mean, I had to -- Like
5  I said, I had to stay there with the
6  security guards.
7      Q.    Okay.
8      A.    And Applegate may have walked
9  around with him. I don't know, I was so
10 upset. I didn't --
11     Q.    When you came to work that
12 morning --
13     A.    That night.
14     Q.    I mean that night. -- had you
15 gone to your locker?
16     A.    Yes, sir. I mean that's where
17 my tools was at. I had to go to my locker,
18 get my tools out. And that's the first
19 thing we did was go get our tools, go out on
20 the floor and get back briefed and all for
21 the shift, any problems we had. And I
22 went -- I'd go to my area of responsibility,
23 which was SOPS.

Page 106

1      Q.    So at what point during that
2  evening were you pulled off the job?
3      A.    I'd been there probably thirty
4  minutes or an hour.
5      Q.    Tell me what you had done that
6  day so far.
7      A.    Nothing. Like I said, I come
8  in, went to my locker, got my tools.
9      Q.    Did you put your coat in your
10 locker?
11     A.    Yes, sir. Because it was warm
12 that night. And I went out on the floor.
13 Might have been Paul Powell and them I was
14 talking to, I don't know, somebody on the
15 other shift, to see if we had problems that
16 day. And then I went back up to my area.
17 And about -- They was having a problem or
18 something on the press, and I seen Mr. Moon
19 down there, and I come down and was talking
20 to him, and my fellow coworkers. Prater
21 come up and said we need to talk. I turn
22 around and walk off to the office and --
23 Applegate's office; he said no, no, around

Page 107

1  here. I walk around there, and there's the
2  security guards and John Applegate. I knew
3  what was going on, because I heard the
4  rumors, the war stories when they fire
5  someone. They bring security guards in and
6  try to bag and tag you and take you out. I
7  said, I can't believe this is happening. He
8  said no, no, we're just going to talk, you
9  ain't fired. I said, what's the security
10 guards doing here? No. No. We need to
11 talk. I said no, I know what's going on.
12 So I grabbed my radio, took it off, gave it
13 to Applegate, I think. I said, I'm going
14 back to go get my junk; I said I know y'all
15 are taking me to the gates, I'm going to get
16 my junk. No, you can't go back in there.
17 And the security guards come up. I said,
18 I've got personal stuff in there, I'm going
19 to get. No, you can't go get it. I said,
20 well, I'm not leaving without my gear.
21 Prater said, well, I'll go get it, he said
22 give me your keys. So I handed him my keys.
23 Like I said, I was so upset, I don't

Page 108

1  remember if Applegate went with him or not.
2      Q.    Okay.
3      A.    Then they whisked me out with
4  security guards, took me around to the gate,
5  five miles from the parking lot I had parked
6  in, took me in the office, I walked in and
7  all the security guards are sitting there
8  bowed up, staring at me, walked me in a
9  little room. That lady sits me down,
10 introduces everybody, says her name, the
11 next fellow's name, Applegate's, and
12 somebody was sitting on my side of the
13 table, I don't remember. Held a letter up
14 like this (indicating), read it, slammed it
15 down on the table. I said, you're firing
16 me; I said, you've got a team leader in
17 there who's threatening several people
18 jumped up in their faces and you're firing
19 me and letting him stay. She said yes.
20     Q.    Who are you referring to?
21     A.    Wendy Warner, I guess. I
22 didn't know the lady.
23     Q.    No. Who is the team leader

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

1 you're referring to?
2     A.    Kevin Hughes. I mean he had
3 had several altercations.
4     Anyhow, she slammed the paper
5 face down on the table, got up and walked
6 out. She was just cold. The little short
7 fellow, I don't remember his name, she told
8 me his name. I mean, he was cordial, but --
9     Q.    What did he look like?
10     A.    I don't know. Just a little
11 short fellow, a little overweight. He
12 wasn't fat. I don't know.
13     Q.    Okay. You don't remember his
14 name?
15     A.    Huh-uh.
16     Q.    Did he wear glasses?
17     A.    I don't remember. I was --
18 like I said, I was upset. I've never been
19 fired, never had a blemish in my civilian or
20 military record. And here all of a sudden
21 I'm getting fired for something I didn't do.
22     Q.    Had Greg Prater brought you
23 your jacket yet?

Page 110

1     A.    Yeah. He brought it to me
2 before the security guards took me out.
3 Like I said -- and I asked them then, I said
4 all that's in here is the MP3 player. I
5 said, when am I going to get the rest of my
6 junk, in the vehicle on the way around
7 there. We'll mail it to you.
8     Q.    Did you -- When you were in
9 the room with Wendy Warner and the other
10 fellow that you were talking, and anybody
11 else that was in the room, did you tell
12 them, I've got more personal stuff in my
13 locker and I'd like to go get it?
14     A.    She -- Yes, sir.
15     Q.    You said that to Wendy Warner
16 and the other people?
17     A.    I asked was I going to be able
18 to get my tool bag and my other stuff. And
19 Applegate is the one that told me no, said,
20 you're not going back in the plant.
21     She slammed the paper down and
22 got up and left. And Applegate, he took my
23 keys to my personal safety lock, my lock,

Page 111

1 and he said here, here's your jacket.
2     Q.    Did you look in your jacket at
3 that point?
4     A.    I looked in my jacket when
5 Prater brought it to me.
6     Q.    Did you know that there were
7 notes missing?
8     A.    Yes, I did.
9     Q.    Did you say anything to
10 Applegate?
11     A.    That's when I said, can I go
12 back and get my stuff. No. Security guard,
13 they put me in the vehicle, we left. I
14 mean . . .
15     Q.    When you were in the room with
16 Wendy Warner and the other gentlemen,
17 including Mr. Applegate, did you tell them
18 that I have some notes that are missing?
19     A.    I asked them could I go back
20 and get my personal stuff, that's what I
21 asked Applegate, said my tool bag and my
22 personal stuff, like I said before.
23     Q.    But you never told them

Page 112

1 anything specific that you were missing
2 other than your tool bag?
3     A.    I said my personal stuff.
4     Q.    And you never mentioned any
5 notes?
6     A.    No. I didn't mention
7 specifically. I said my personal stuff,
8 like I said.
9     Q.    Is it your testimony that you
10 were aware at that point in time that your
11 notes were not in your jacket?
12     A.    Yes, sir. Like I said, Prater
13 went and got my jacket, so . . .
14     Q.    Did you ask Prater where your
15 notes were?
16     A.    I don't remember. Like I say,
17 I was mad. I was upset. I never had -- I
18 never had anything -- Like I say, I've
19 served my country and I've served it
20 proudly, and I've served it for a long time.
21     Q.    Okay.
22     A.    And I'll do it again, gladly.
23 And I've never, never been treated like I

28 (Pages 109 to 112)

# FREEDOM COURT REPORTING

Page 113

1  was a piece of trash like I was that night.
2  It was embarrassing. Then I have to go to
3  church on Sunday and look at my friends and
4  everybody knows, he got fired because he's
5  supposedly sleeping on the job. Everybody
6  is looking at you. No, that ain't right.
7      Q.   Where were you when you
8  realized that the notes weren't in your
9  jacket?
10     A.   There at the shop when they
11 brought me my jacket, like I said before.
12     Q.   How far is the shop from your
13 locker?
14     A.   My locker was in the shop. We
15 was on the outside of the shop. I wasn't in
16 the shop. He walked me from my area, around
17 the office, said go on around here. And we
18 went around the side of the shop.
19     Q.   Could you see your locker from
20 where you were outside the shop?
21     A.   No, sir. Block wall. And I
22 had the security guards there telling me I
23 couldn't go nowhere.

Page 114

1      Q.   Okay. And we're going to get
2  back to some of these issues, but I want to
3  cover some more basic stuff before we get
4  into it more deeply.
5           Have you ever filed any other
6  lawsuits?
7      A.   No, sir.
8      Q.   Have you ever filed any
9  administrative complaints like with the EEOC
10 or some sort of governmental entity?
11     A.   No, sir.
12     Q.   Have you ever been sued?
13     A.   No, sir.
14     Q.   And you may have shaken your
15 head, but I don't know if I heard you say
16 no --
17     A.   No.
18     Q.   You've not filed any EEOC --
19     A.   I filed -- When me and my wife
20 first came home from Germany, probably two
21 years after being home, I filed bankruptcy
22 because I didn't manage my finances right, I
23 was used to being in the Army and everything

Page 115

1  taken care of. The first two years kicked
2  my butt. After that, I haven't had a
3  problem since.
4      Q.   Okay. When was this you filed
5  bankruptcy?
6      A.   I don't know. You'll have to
7  -- I don't know. I'll have to get back with
8  you on that.
9      Q.   Right when you got back from
10 Germany, though?
11     A.   No, sir. It wasn't right --
12 It was like a year or two later. I don't
13 remember.
14     Q.   Where were you working then?
15     A.   I don't remember.
16     Q.   During the time that you were
17 with Hyundai, did you file any sort of
18 complaints with the HR department?
19     A.   Yes, sir. That's where I
20 started out. It, apparently, didn't do no
21 good.
22     Q.   All right. Let's talk about
23 the complaints. Did you file any written

Page 116

1  complaints?
2      A.   No, sir. There wasn't no form
3  -- a format for filing written complaints.
4  And when we tried, they didn't want to hear
5  it.
6      Q.   Okay. Did you ever talk to a
7  team relations representative about problems
8  you were having?
9      A.   Several times. Lucas Cooner
10 and Will Ware.
11     Q.   Will Ware?
12     A.   Yes, sir. And Lucas Cooner.
13     Q.   Anybody else with Hyundai?
14     A.   Greg Kimball.
15     Q.   Greg Kimball?
16     A.   And Keisha. I don't know what
17 -- I don't remember what her last name is.
18 She is no longer there. She went to Kia.
19 They moved her to Kia, in the HR department.
20     Q.   Can you think of anybody else
21 that you complained to?
22     A.   Other than the managers and
23 assistant managers, the production manager

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1  who said he was over Prater, Craig Stapley
2  and Jim Brookshire both.
3      Q.    And the production manager was
4  who?
5      A.    Craig Stapley --
6      Q.    Stapler?
7      A.    Stapley, S-T-A-P-L-E-Y.
8      Q.    All right.  And what other
9  members of management did you complain to?
10      A.    That was about it, I reckon.
11      Q.    Just to make sure I'm clear,
12  you never submitted anything in writing to
13  human resources?
14      A.    There was no way to submit
15  anything in writing.  When I complained they
16  didn't want to hear anything about it.  I
17  submitted an e-mail to Greg Kimball about
18  Prater harassing me about my Guard duty, and
19  I never received a reply to the e-mail in
20  person or anything.
21      Q.    When you say the last time
22  Greg Prater harassed you about your Guard
23  duty --

Page 118

1      A.    Before I got fired.
2      Q.    Where did you send the e-mail
3  from?
4      A.    The maintenance shop.
5      Q.    All right.  Was Greg Kimball
6  working at that time?
7      A.    I don't remember.  I think it
8  was on -- I don't remember if it was on day
9  shift or night shift.  I think it was on
10  night shift.  But the e-mail, I mean, that
11  was probably a month before I'd gotten
12  fired, and he had plenty of time to respond.
13      MR. SPORT:  Matt, we'd like to
14  request that e-mail, because I don't think
15  we have that.
16          (Recess taken.)
17      Q.    Mr. Dees, we're back on the
18  Record.
19          You had talked a minute ago
20  about an e-mail you sent to Greg Kimball.
21  Did you have a log-in ID and a password at
22  Hyundai?
23      A.    Yes, sir.

Page 119

1      Q.    What was your log-in?
2      A.    I don't know.  That was a year
3  ago, almost.  I don't know.
4      Q.    Okay.
5      A.    I have no idea.  I think it
6  was my clock number, I think.  I'm not sure.
7      Q.    Okay.  Do you know when you
8  were assigned the log-in ID?
9      A.    It wasn't long after I was
10  hired.  I'm not sure.
11      Q.    Was it after you were hired?
12      A.    Yeah.
13      Q.    Okay.  So when you say you
14  sent an e-mail to Greg Kimball, would that
15  have been on an internal Hyundai system,
16  e-mail system?
17      A.    Yes, sir.
18      Q.    You didn't send it from
19  Yahoo --
20      A.    No, sir.
21      Q.    -- or Google e-mail or
22  anything like that?
23      A.    No, sir.  It was on the

Page 120

1  Hyundai system.
2      Q.    And it was while you were at
3  work?
4      A.    Yes, sir.
5      Q.    And do you remember where you
6  sent it from?
7      A.    The maintenance shop.  Stamp
8  and maintenance shop.
9      Q.    Anybody else see you send it?
10      A.    Drake Barefoot and someone
11  else was there.  I don't remember who the
12  other one was.
13      Q.    Do you remember what was in
14  it?
15      A.    It was a -- I don't remember
16  the exact wording, no.  I was complaining to
17  Mr. Kimball that Prater was still giving me
18  a hard time about my Guard duty, and I felt
19  that my job was in jeopardy for that reason.
20  Because even -- Like I said, even after my
21  unit sent the letter, I complained to HR at
22  least two more times and both times met with
23  negative results, and I was still getting

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 121

1　harassed about getting orders for my weekend
2　duty, when I wasn't showing up to work to go
3　to drill.
4　　　Q.　　Was the e-mail after you went
5　to HR?
6　　　A.　　Yes, sir.
7　　　Q.　　And the e-mail was after
8　somebody apparently sent a letter to
9　Hyundai?
10　　　A.　　Yes, sir. After my unit sent
11　the letter.
12　　　Q.　　Okay. Did you talk to anybody
13　else in management or in HR after you sent
14　that e-mail?
15　　　A.　　No, sir. I don't believe so.
16　　　Q.　　Okay.
17　　　A.　　I mean, I don't know. Like I
18　said, that was almost a year ago.
19　　　Q.　　Okay. But you don't recall
20　it?
21　　　A.　　No, sir.
22　　　Q.　　Do you recall having any more
23　discussions with Greg Prater about your

Page 122

1　service or weekend duty or anything after
2　that e-mail got sent?
3　　　A.　　He was always -- If he wasn't
4　telling me to bring in orders about my Guard
5　duty, he was making fun of what we did. Oh,
6　y'all just go down there and drink. Like I
7　said, it didn't matter who I complained to,
8　I complained to Greg Kimball, or Keisha,
9　John Applegate, they all: Well, I've never
10　heard Greg say anything like, I've never
11　heard Greg talk in a derogatory manner.
12　　　Q.　　That's what they said?
13　　　A.　　Yeah. And we back Greg up in
14　any decision he makes.
15　　　Q.　　When you talked to William
16　Ware, who's with team relations, what did he
17　say about it?
18　　　A.　　Prater would always use the
19　excuse that Rob Clevenger just said I can
20　do -- just like in the instance he was
21　trying to make me use my vacation for my
22　military service when I went to school.
23　　　Q.　　Who was?

Page 123

1　　　A.　　Prater. And supposedly
2　Applegate was backing him up, because
3　Applegate backed him on everything else, and
4　HR backed him too. And he told me I had to
5　use my vacation time -- He was thinking
6　about making me use my vacation time in lieu
7　of my military leave. And I said, well,
8　you're just going to go against the HMMA
9　handbook and throw it out the window. Rob
10　Clevenger told me I can do whatever I want
11　to, run my shop however I need to for the
12　benefit of the company.
13　　　Q.　　And this is Greg Prater said
14　that?
15　　　A.　　Yes, sir. Then he said that
16　Rob Clevenger had told him that.
17　　　Q.　　Did John Applegate ever tell
18　him he could do that, to your knowledge?
19　　　A.　　John Applegate told me to my
20　face that whatever decision Greg Prater
21　makes, he would back him on it.
22　　　Q.　　Did anybody else from human
23　resources ever say anything like that, to

Page 124

1　your knowledge?
2　　　A.　　Keisha -- Greg Kimball -- The
3　only reason HR got on to Prater the first
4　time was because he told us we couldn't talk
5　to HR. As far as my military obligation,
6　anything else, nothing ever came out of
7　that. It was just like I hadn't said
8　anything to them at all.
9　　　　　(Off-the-Record discussion
10　　　　　was held.)
11　　　Q.　　The notes that you said you
12　kept?
13　　　A.　　Yes, sir.
14　　　Q.　　When did you start keeping
15　them?
16　　　A.　　The first time I went to HR.
17　I mean, when Prater -- he was -- He said he
18　was a tank commander in the National Guard
19　as an E-4, that's not allowed. It goes
20　against Army regulation.
21　　　Q.　　Say that again. I'm sorry.
22　　　A.　　He said that he was a tank
23　commander in the National Guard as an E-4.

31 (Pages 121 to 124)

## FREEDOM COURT REPORTING

Page 125

1　He showed me his ID card one time, he was a
2　corporal, and his ID card was expired.  And
3　you're not allowed to be a tank commander in
4　the National Guard or the Army, period, as
5　an E-4.  You have to be an E-7 or higher.
6　But anyhow -- What did you ask me?  What did
7　I start out on?
8　　　Q.　No.  Let's -- I mean --
9　　　A.　Like I said, Clevenger and all
10　of them -- His excuse on everything was Rob
11　Clevenger told me I can run my shop how I
12　want to for the benefit of the company.
13　　　Q.　Okay.  Now, to your knowledge,
14　did Rob Clevenger ever say anything to you
15　about your military service?
16　　　A.　I never met the man.
17　　　Q.　So you don't have any
18　firsthand information --
19　　　A.　But Will Ware sat there and
20　told Prater, well, he can do whatever he
21　wants to, in front of me and everybody.
22　　　Q.　Said who can do whatever he
23　wants to?

Page 126

1　　　A.　That Prater could.  And that
2　Applegate and HR could.  He said we can run
3　the company however we want to.
4　　　Q.　William Ware said that?
5　　　A.　Yes, sir.  Because Prater put
6　him on the spot, and he had to come up with
7　an answer.
8　　　Q.　How did Prater put him on the
9　spot?
10　　　A.　Prater -- Because I was told
11　to stay over that morning.  Their handbook,
12　once again, states that you don't have to
13　stay over -- you can't be forced over ten
14　hours.  I'd worked ten hours, Prater come up
15　and asked questions.  I said as long as it
16　don't take over fifteen minutes, I'm tired.
17　He said, I can force you to stay here
18　twenty-four hours a day if I want to.  I
19　said, no, once again, that goes against your
20　own handbook.
21　　　Q.　What -- Is this a different
22　conversation here?
23　　　A.　Yeah.  Like I said he just --

Page 127

1　Everything was Rob Clevenger and human
2　resources and Applegate said I can do this.
3　And every time we talked to human relations
4　or human resources or Applegate, they backed
5　him up on every conversation.
6　　　Q.　Okay.  Tell me when did -- You
7　first started taking notes when?
8　　　A.　Like I said, the very first
9　time he got on to me about my Guard duty.  I
10　don't remember the exact date.  I have no
11　idea.
12　　　Q.　Do you remember the
13　approximate date?
14　　　A.　No.  I mean, August,
15　September, I don't know.  July, August,
16　September, I don't know.
17　　　Q.　At that point in time, did he
18　have your calendar for that year?
19　　　A.　He had my calendar when I
20　hired on.
21　　　Q.　Okay.
22　　　A.　We get our yearly training
23　calendar every October.

Page 128

1　　　Q.　Uh-huh.
2　　　A.　And he had it in his office on
3　his desk.
4　　　Q.　Greg Prater did?
5　　　A.　Yes, sir.
6　　　Q.　Okay.  So there would be no
7　question that if you were scheduled for
8　duty, he had it in advance?
9　　　A.　Yes, sir.
10　　　Q.　Okay.
11　　　A.　But yet he still wanted
12　military orders.  And I backed him up on it.
13　　　Q.　Did he want military orders
14　for every single weekend duty, every
15　training --
16　　　A.　Not the first six or eight
17　months, no, sir.
18　　　Q.　Okay.  When did he ask for
19　orders?
20　　　A.　Like I said, I don't remember
21　the exact date.  I don't know.  You're
22　wanting a date, and I can't give it to you.
23　　　Q.　Can you give me an approximate

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 129

1  date?
2      A.   I already did.
3          MR. SPORT:  Matt, we've
4  produced those documents, those drill
5  schedules, but they've not been produced to
6  us from Hyundai's records, so we'd also like
7  those.
8      Q.   And, again, just to make sure
9  I'm clear, the year that you say that he
10 started demanding orders, that was in 2006?
11     A.   Yes, sir.
12     Q.   Okay.  Do you have any idea
13 approximately how many times Greg Prater
14 asked you for copies of your orders?
15     A.   I don't know.  Seems like it
16 was every month.  But to be honest, the
17 exact times, no.  I have no idea.
18     Q.   Do you remember when the last
19 time he asked you for a copy of your orders
20 was?
21     A.   No, sir.  Like I said, I don't
22 -- the exact dates and times, no, sir.  I
23 don't know.

Page 130

1      Q.   Okay.  Was there a period in
2  time from the date that you were terminated
3  in which you and Greg Prater did not have
4  any discussions about your Guard duties?
5      A.   I don't know.  I filed a
6  complaint to the ESGR.
7      Q.   When was that?
8      A.   I don't know.  I don't know if
9  it was right before I got fired or after I
10 got fired.  And they basically told me that
11 if Hyundai tells them it's not a military
12 matter, they don't have anything to do with
13 it.  And that's what happened, so that was a
14 deadend street.
15     Q.   Wait.  Who said that?
16     A.   The ESGR representative.  I
17 can't remember his name.  Dan or -- I don't
18 remember.  I e-mailed him and he e-mailed me
19 and he said -- then he called me one time
20 and said, well, I've called them, they told
21 me this has nothing to do with the Guard, so
22 therefore I cannot get involved.  And he
23 went off, all they got to do was a

Page 131

1  statement, no, this ain't Guard related, and
2  he was out of it.
3      Q.   All right.  You don't remember
4  who told you that?
5      A.   The ESGR rep.  I don't
6  remember his name, no.
7      Q.   Did he provide you any sort of
8  paperwork or anything?
9      A.   No, sir.
10     Q.   Do you know if Hyundai
11 provided him with any paperwork or evidence?
12     A.   No, sir.  He said that -- Per
13 the conversation, he said I called them, and
14 this is what was said, so I'm out of it.
15     Q.   Okay.
16     A.   So I don't know if they
17 provided him with paperwork or not.  I mean,
18 I have no idea.
19     Q.   Again, I just want to make
20 sure I understand what it is he said he was
21 told.  This didn't have to do with guard
22 duty?
23     A.   That's what they told him.

Page 132

1  That's what they're going to say.  That's
2  common sense.  I mean . . .
3      Q.   And to your knowledge, he
4  didn't know anything else?
5      A.   No, sir.
6      Q.   And you don't remember his
7  name?
8      A.   I think it was Dan something.
9  I don't know.  They've got -- They had
10 copies of the e-mails.  I don't know.
11     Q.   Who is they?
12     A.   Hyundai, I think.  I don't
13 remember.  I seen a copy of it somewhere.  I
14 don't know.
15         (Whereupon, Defendant's
16         Exhibit No. 3 was marked
17         for identification.)
18     Q.   Okay.  Let's go -- I want to
19 go through what we've marked as Defendant's
20 Exhibit 3, which is a copy of the complaint
21 that you and your lawyers filed.
22         If you go over a couple of
23 pages you'll see a page that's marked

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1  complaint.
2      A.    All right.
3      Q.    Did you have an opportunity to
4  review it before it got filed?
5      A.    Yes, sir.  I believe so.
6      Q.    Okay.
7      A.    I believe.  I don't know.
8  Like I say, that's been a year ago.
9      Q.    Okay.  Let's turn to page two,
10  paragraph seven.  In there it says you began
11  working on or about November 21, 2005.  Do
12  you agree with that?
13      A.    Yes, sir.
14      Q.    Okay.  And it says you were
15  working as a maintenance technician in the
16  stamping maintenance department; is that
17  accurate?
18      A.    Yes, sir.
19      Q.    And were you working under the
20  direct supervision of Kevin Hughes, who is
21  identified as a team leader?
22      A.    Yes, sir, he was a team
23  leader.

Page 134

1      Q.    Okay.  And were you also
2  working under Greg Prater?
3      A.    Yes, sir.  He was the
4  assistant manager.
5      Q.    Okay.  And it's indicated in
6  here that Greg Prater reported to John
7  Applegate, is that your understanding?
8      A.    Yes, sir.
9      Q.    And who -- Do you know who
10  John Applegate is?
11      A.    As far as I know, he was the
12  only American in charge of the American side
13  of the maintenance.
14      Q.    What makes you think that
15  Prater was reporting to Applegate?
16      A.    Only thing we had -- That was
17  the way Applegate and Prater put it.
18      Q.    To who?
19      A.    All of us in the section.
20      Q.    Okay.  I mean, did you have
21  regular conversations with John Applegate?
22      A.    No, sir.  He had an office
23  over in the energy building, and we worked

Page 135

1  over in the stamping shop.
2      Q.    Okay.  So when did John
3  Applegate tell you anything about his
4  relationship with Greg Prater?
5      A.    As in?
6      Q.    His working relationship, who
7  reported to who?
8      A.    Well, the very first time I --
9  I believe it was the first time I went to
10  HR.  Then after HR, Applegate wanted to know
11  why we had gone to HR, I believe.
12      Q.    When you say "we went to HR,"
13  who are you talking about?
14      A.    I, myself, Barefoot, and
15  Weihe.
16      Q.    All right.  And what was that
17  about?
18      A.    It all started with me because
19  of Prater and my Guard duty.  Then it went
20  from that to he told -- I told him, I said,
21  well, I'm going to talk to HR about this
22  after this meeting.  He said HR is not in
23  your chain of command, you don't have the

Page 136

1  authority to talk to them.
2      Q.    Who said that?
3      A.    Prater.  I said -- Well, I
4  said, the handbook we're supposed to be
5  going by says HR has an open-door policy,
6  and I can talk to them any time.  And I
7  said, you're telling me my Guard duty is a
8  problem, I said, I'm going to talk to HR.
9  And Chris Weihe and Barefoot said, well,
10  we're going to talk to them too.  They had
11  their own issues.
12      Q.    Let me ask you this.  So you
13  sat down with Greg Prater and Chris Weihe?
14      A.    No.  He called the whole shift
15  in.  It started out about a schedule.  He
16  called the whole shift in, some goof up
17  about a schedule, the weekend.  They got a
18  force list, an overtime force list.  And he
19  would just take his force list and disregard
20  it, his own list, and that Applegate had
21  signed off on and HR had signed off on, and
22  threw it out the window and come out with
23  his own list.  I had Guard duty that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1  weekend, I said, I'm not going to be here.
2  He said, you're going to be here or you're
3  going to produce orders. I said, I'm going
4  to talk to HR.
5      Q.    Okay. And Chris Weihe and
6  Drake Barefoot were in on that discussion?
7      A.    The whole shift was.
8      Q.    Okay. And tell me more. What
9  else did Greg Prater say -- Was that the
10  first time you had a problem with him about
11  your Guard duty?
12      A.    That's where it all started,
13  yes.
14      Q.    Okay.
15      A.    Wasn't the first time. I'd
16  been blowing it off up to this point.
17      Q.    Okay. Who did you go see --
18  Well, did you go see --
19      A.    That was the first time I went
20  to HR and complained about it.
21      Q.    Is that when you talked to
22  Keisha?
23      A.    No, sir. That's when I talked

Page 138

1  to Greg Kimball. He was the very first one
2  I talked to. I was told that he was the man
3  in charge of human resources, and that's who
4  I talked to.
5      Q.    And you spoke to him face to
6  face?
7      A.    Yes, sir. In his office.
8      Q.    Okay. I mean, did you submit
9  anything in writing to him?
10      A.    No, sir.
11      Q.    Any e-mails at that time?
12      A.    No, sir.
13      Q.    I mean, did you just show up
14  in his office, did you schedule a meeting
15  with him?
16      A.    I took my lunch break. I did
17  not leave my work floor --
18      Q.    What time was your lunch
19  break?
20      A.    I don't remember.
21      Q.    You were working the night
22  shift?
23      A.    No. I was on the day shift

Page 139

1  the very first time it happened.
2      Q.    Okay. Let me go back to your
3  complaint. In paragraph eight there on page
4  three, it says that harassment of Dees by
5  Hyundai through Prater and Hughes began
6  almost immediately when Prater learned that
7  Dees was a member of the Alabama Army
8  National Guard and had served two tours in
9  Iraq.
10      Did Greg Prater -- How did
11  Greg Prater harass you because you were a
12  member of the Guard or because you served to
13  tours in Iraq?
14      A.    He said that -- He made the
15  comment that he had been in Baghdad, he had
16  killed people, he had been a Navy SEAL, he
17  had been a tank commander. And when I asked
18  him where he was at in Baghdad, he says --
19  when I asked him where he was in Iraq, I was
20  on the southside of Baghdad. I said, what
21  compound? I don't remember, there was so
22  many. I said, what was the name of the
23  compound? I don't remember. You know how

Page 140

1  it was there was compounds all over the
2  southside of Baghdad. I said, no, there
3  wasn't, there was one, the one I lived in.
4      And I had put him on the spot
5  because I listened to him six or eight
6  months, him and Applegate come around and
7  Prater start running up and talking about
8  how he been in combat and killed so many
9  people. And Applegate was like, yeah, this
10  is my boy. And I got friends that died in
11  Iraq, I've killed people in Iraq, and my
12  friends served proudly in Iraq. And
13  Applegate and HR and everybody was making a
14  disgrace of what we had done.
15      Q.    Well, what --
16      A.    When I went to them with my
17  complaints about my Guard duty, being forced
18  to produce military orders, they were like,
19  well, we'll look into the regulations.
20      Q.    Did Applegate ever demean you
21  or try to diminish your service in Iraq in
22  any way?
23      A.    He basically sat there the

35  (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1 last -- said, well, I know Prater is a hero.
2 And he's -- like I said, basically he's my
3 man, he's my boy.
4 **Q. When did he say that?**
5 A. I don't remember the exact
6 date. I don't know.
7 Q. Okay.
8 A. Ask him.
9 **Q. Other than saying good things**
10 **about Prater, did he say anything bad about**
11 **you or your service?**
12 A. Directly, no.
13 **Q. Indirectly what did he say?**
14 A. Well, I -- I don't know. Like
15 I say, that's been a long time ago.
16 **Q. All right. I need --**
17 A. And just -- You're asking a
18 question I can't answer.
19 **Q. That's fine. If you can't**
20 **answer, that's all I need to know.**
21 A. He'd make comments like: What
22 do you need to go down there for, all y'all
23 do is party.

Page 142

1 **Q. Who said that?**
2 A. Prater --
3 **Q. I know. Let's talk about**
4 **Applegate. Let's try to do this in some**
5 **orderly fashion.**
6 A. It's my depo, so I've got to
7 go at my own rate.
8 **Q. All right. Let me ask you**
9 **this: Am I hearing you correctly that you**
10 **don't have anything to tell me about ways**
11 **that Applegate either directly or indirectly**
12 **said bad things about you or your service?**
13 A. No. Just, like I said, that I
14 need to focus more on my job and not worry
15 about my Guard duty, and most of the time
16 all they do is party down there anyhow.
17 **Q. Is that the worst thing that**
18 **Applegate said?**
19 A. Yeah. Other than like I said,
20 just backing Prater up saying whatever
21 Prater decides is what I'm going with.
22 **Q. And are you telling me that**
23 **John Applegate told you that all y'all do**

Page 143

1 when you do this duty is party?
2 A. To my face, yes.
3 **Q. Okay. So did he and Prater**
4 **say that?**
5 A. Prater said that in front of
6 everybody.
7 **Q. Okay. Who did John Applegate**
8 **say it in front of?**
9 A. Me. Like I said, I had to
10 have meetings -- If I complained to HR, I
11 had to go see Applegate.
12 **Q. There are no witnesses to**
13 **Applegate saying all y'all do is party;**
14 **right?**
15 A. Nope.
16 Did your lawyers interview him
17 too?
18 **Q. Let me ask you about Keisha.**
19 **Did Keisha ever say anything to you about**
20 **you or your service in the Guard or Iraq?**
21 A. No. She just said I had to
22 have orders before I could be deployed or
23 sent out.

Page 144

1 **Q. Did Greg Kimball ever say**
2 **anything about you or your service in the**
3 **Guard or Iraq or Korea or anywhere else?**
4 A. No. The only thing he was
5 worried about was that Prater told us we
6 couldn't talk to human resources. He didn't
7 care about -- basically didn't care about
8 the complaint I was making about Prater
9 harassing me about my Guard. The only thing
10 he worried about was Prater telling we
11 couldn't talk to human resources.
12 **Q. Because he disagreed with it?**
13 A. Yeah. Because it's basically
14 telling him that he's not over Prater, that
15 Prater can do whatever he wants. That's the
16 only reason he got -- He could care less
17 whether Prater was harassing me about my
18 Guard service.
19 **Q. What makes you think he could**
20 **care less?**
21 A. Because nothing was done about
22 it, ever.
23 **Q. Let me ask you this: Did**

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1  Kimball ever say anything to suggest that
2  either you or your service in Iraq or the
3  Guard was insignificant?
4      A.   No.  Like I say, the only
5  thing he cared about was Prater saying we
6  couldn't talk to him.
7      Q.   Okay.
8      A.   But that still doesn't excuse
9  the fact that he let Prater get away with
10  telling me I had to have military orders or
11  I was going to get wrote up for missing
12  work.
13      Q.   Did William Ware ever say
14  anything to you about your military service,
15  your Guard duty service in Iraq?
16      A.   No.  Will's only job there was
17  to keep the union out, keep peace, and tell
18  us that Prater could do whatever he wanted
19  to.
20      Q.   Okay.  Did anybody other than
21  Applegate and/or Prater say anything about
22  your service in Iraq, your service in the
23  National Guard, or your uniformed service?

Page 146

1      A.   No.  But like I said, that
2  doesn't change the factor or dismiss the
3  fact that they let him tell me I had to have
4  military orders or I was getting wrote up.
5      Q.   All right.  And understand,
6  I'm trying to figure out what the evidence
7  is, I'm trying to figure out what people
8  said and what you know.
9      A.   Uh-huh.
10      Q.   So, I want to figure out who
11  said what.
12      A.   All right.
13      Q.   Can you think of anybody else,
14  other than Applegate or Prater, that ever
15  said anything or did anything to you that
16  was harassing or demeaning in any way with
17  respect to your uniformed service?
18      A.   No.  I never had a problem
19  with anyone else about it.
20      Q.   Okay.  And with respect to
21  Applegate, I just want to make sure I
22  understand exactly what it is he said and
23  did.  Am I correct that he made a comment

Page 147

1  that during your reserve or Guard duty
2  people partied?
3      A.   Yes.
4      Q.   And did he ever say anything
5  else that was demeaning or insulting or
6  harassing in any way with respect to your
7  service?
8      A.   Other than backing Prater up
9  about having to have military orders, no.
10      Q.   Okay.  So backing Prater up
11  about orders?
12      A.   Yeah.
13      Q.   Okay.  You've indicated in
14  paragraph nine of your complaint in
15  subparagraph B, that Prater told you you
16  couldn't miss work to attend Guard training?
17      A.   Yes, sir.
18      Q.   Was that on one occasion or
19  multiple occasions?
20      A.   That was on multiple
21  occasions.
22      Q.   Okay.  And do you remember
23  specifically any of those particular

Page 148

1  occasions?
2      A.   Well, I mean, sometimes he'd
3  just walk up and say, hey, you've got to
4  have orders this weekend or it's a write-up,
5  and sometimes he'd say it in front of
6  everybody.
7      Q.   Did he ever write you up for
8  not having orders?
9      A.   No, sir.
10      Q.   Did anybody ever write you up
11  for anything related to your military
12  service?
13      A.   Not that I know of.  I don't
14  know.  I never signed anything.
15      Q.   Okay.  And you were never told
16  that you were being written up after the
17  fact?
18      A.   After the fact, no, sir.  He
19  just still kept coming up harassing me
20  saying where's your orders, where's your
21  orders.
22      Q.   Did you ever not attend any
23  Guard duty because of --

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 149

1    A.    Because of work?
2    **Q.    Because of Greg Prater or**
3  **work?**
4    A.    I don't know.  I'd have to go
5  back and look at my LES's and see.
6    **Q.    Let me ask you this:  Do you**
7  **remember ever skipping any Guard duty on a**
8  **weekend, or a week-long duty, or any sort of**
9  **training because of your job at Hyundai?**
10    A.    I don't know.  I may have.
11    **Q.    But you don't remember it?**
12    A.    I may have.  I don't know.
13    **Q.    Do you remember it?**
14    A.    I said I don't know.
15    **Q.    Okay.  And I assume you**
16  **haven't provided your attorneys with any**
17  **information to suggest you ever missed any**
18  **Guard duty because of your work at Hyundai?**
19    A.    Like I said, I can go back and
20  look at my LES's and see.
21    **Q.    All right.  Let me ask you**
22  **this:  In paragraph 9-E of your complaint it**
23  **says:  Prater attempted to force Dees'**

Page 150

1  **coworkers to say that Dees had violated**
2  **Hyundai's policies and procedures when**
3  **Prater knew it was not true.**
4    **Do you have any idea from a**
5  **factual perspective what that means?**
6    A.    Yes, sir.
7    **Q.    Tell me about that.**
8    A.    About a month before I was
9  fired he tried to get one of my coworkers to
10  say that I was creating a hostile work
11  environment.
12    **Q.    Who did he say that to?**
13    A.    Shane Archer.
14    **Q.    What did he say to Shane?**
15    A.    He wanted Shane to say -- He
16  called Shane in the office with team
17  relations and wanted Shane to specifically
18  say that Leon was creating a hostile work
19  environment.
20    **Q.    You think he called Shane into**
21  **a meeting with team relations?**
22    A.    We all saw Shane go in the
23  office with him and team relations.  And

Page 151

1  Shane said out of his own mouth that that's
2  what Prater had said and he made the
3  statement -- he wrote a statement saying
4  that.
5    **Q.    Okay.  Who from team relations**
6  **were they with?**
7    A.    Will Ware.
8    **Q.    Were there any other instances**
9  **that fall within what you've described in**
10  **paragraph 9-E?**
11    A.    Yeah.  One other time that I
12  had a breakdown, Prater tried to get Shane
13  to say that I said, heck with the breakdown,
14  let's just go to lunch.  And I never stated
15  that.  That was Shane, myself, and Drake
16  Barefoot there.  And Drake was the one that
17  made the comment, but Prater wouldn't talk
18  to Drake.  And I asked him what happened, he
19  called Shane in once again trying to get
20  Shane to say I had caused the breakdown and
21  just walked off and left it, when Drake had
22  to run him down that I'm the one that stated
23  it --

Page 152

1    **Q.    That you stated what?**
2    A.    That I didn't, that Drake
3  stated it.
4    **Q.    Did you walk off the**
5  **breakdown?**
6    A.    No.
7    **Q.    You did not?**
8    A.    No.  We took our lunch shifts
9  -- Half the shift come in an hour early and
10  other shift came in an hour late.  We split
11  our lunch breaks up.  We had a breakdown in
12  my section.  The SOP asked -- that I was
13  told to stay in is where they supposedly
14  caught me sleeping.  It's out in open view
15  of everybody.  And I was working on it, we
16  had worked fifteen minutes over into our
17  lunch break, and myself and Drake was
18  working on it.  I handed my radio to Shane,
19  said call Kevin and get him to get the other
20  ones out here, they're fifteen minutes into
21  our lunch break, they're over theirs, tell
22  them to come finish up.  Shane went up and
23  took the radio, went downstairs, he found

38  (Pages 149 to 152)

## FREEDOM COURT REPORTING

Page 153

1  Kevin told him what was going on, me and
2  Drake was still working on the breakdown.
3  Kevin came up, everything was explained to
4  him, told him what he had to do to fix it.
5  Drake said, heck with this, he used a
6  four-letter word, said, we're going to
7  lunch. Kevin said, well, I don't know how
8  to fix this. Drake says, you need to step
9  up and do your job. We told you how to fix
10  it, we're going to lunch. And the other
11  shift came out, took the breakdown.
12         When I came in the next night,
13  the same thing, Jim Brookshire and Prater
14  and them was in there telling me that I had
15  walked off of a breakdown and left the line
16  down.
17  Q.    You said Brookshire was there?
18  A.    Yes, sir. Trying to chew me
19  out for having a breakdown. Drake seen what
20  was going on, come in and to talk to them.
21  They said, no, we got this. He called Shane
22  in and tried to get Shane to say Leon said
23  such and such. Drake come and said this is

Page 154

1  what happened, I'm the one that said what
2  you're trying to blame on him, this is how
3  it happened. They didn't want to talk to
4  Drake, he had to force them to listen.
5  Q.    Were you written up or
6  anything for that?
7  A.    No. I would have been if it
8  hadn't been for Drake.
9  Q.    Was there another incident
10  where you walked off your job to your
11  recollection?
12  A.    I don't believe so. After
13  reading all the stuff from Hyundai,
14  apparently they had a lot to say about me.
15  Q.    But to your knowledge, this
16  incident that you're talking about, was it
17  investigated by team relations?
18  A.    No. It was investigated by
19  Prater, the same one who investigated me for
20  supposedly sleeping, and firing me. He did
21  the sole investigation.
22  Q.    You think Prater did?
23  A.    That's what their statements

Page 155

1  are saying.
2  Q.    Whose statements?
3  A.    Will Ware's and Prater's.
4  Q.    Okay.
5  A.    That's what he admitted to the
6  coworkers after I was fired. This Wendy
7  Warner totally bypassed all their own
8  policies in their handbook for termination,
9  their termination procedure, and fired me
10  right off the bat, off someone else's word.
11  That's what I'm saying, everybody knew about
12  the problem, and everybody supported him on
13  every decision he made; they supported
14  Applegate, human resources.
15  Q.    Can you think of any other
16  instances that fit within paragraph 9-E of
17  your complaint?
18  A.    I don't know. You keep
19  asking, there may be something. I don't
20  know.
21  Q.    That's why I keep asking.
22  A.    I don't know. Maybe. I don't
23  remember anything else right now at this

Page 156

1  moment.
2  Q.    Okay. Paragraph 9-F of the
3  complaint talks about having to clean out
4  the pit.
5  A.    Yes, sir.
6  Q.    All right. Let's talk a
7  little bit about the pit. Is there just one
8  pit at the plant?
9  A.    Yes, sir. It's all one big
10  system.
11  Q.    I mean, is there one pit or
12  two pits or three?
13  A.    There was one -- After I
14  answer this, we've got to go to lunch. My
15  stomach is growling.
16        There's a pit under each
17  press.
18  Q.    All right. So there's more
19  than one pit?
20  A.    There's two presses and one
21  pit under the -- what's that other -- I
22  can't remember what that other press is
23  called, where it all -- scrap comes from two

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 157

1  pits on a metal conveyor and goes down to
2  that where it's all crushed into one bale
3  and sent out and sold for scrap.
4      Q.    Okay.
5      A.    But I was always sent under
6  press one or two pit to clean up.
7      Q.    Okay.
8      A.    It's a dangerous process.
9  Because when you get down there, you have no
10  communication with nobody.  If anything
11  happens to you, you're there until somebody
12  decides to come looking for you.
13      Q.    Let me ask you this:  What
14  evidence do you have to suggest that anybody
15  at Hyundai assigned you to clean the pit to
16  try to get you to quit your job?
17      A.    Because after all this stuff
18  come up and my unit sent the letter, it
19  wasn't but a few weeks after that, I was
20  getting sent down to the pit to clean it, at
21  least once, two or three times a week,
22  sometimes three or four times a week.
23  Wasn't even our responsibility, production

Page 158

1  was supposed to clean the pit.
2      Q.    Production was supposed to
3  clean the pit?
4      A.    Yes, sir.  Like I said, we had
5  radios, but when you get to the pit, you
6  have no communication.
7      Q.    Why -- I mean, if somebody
8  from production is supposed to clean the
9  pit, did anybody from maintenance ever clean
10  the pit before you?
11      A.    Yes, sir.
12      Q.    All right.
13      A.    When they would make Prater
14  mad.
15      Q.    Okay.
16      A.    Or if they made Kevin mad or
17  if they made Jim Brookshire mad or if they
18  made Craig Stapley mad.
19      Q.    Those are production guys,
20  Brookshire and Stapley?
21      A.    Doesn't mean nothing though.
22  If they told you to go clean the pit, you
23  had to go clean the pit.

Page 159

1      Q.    So am I right, that the pit,
2  it wasn't like something that was cleaned on
3  schedule?
4      A.    No, sir.  Well, it was
5  supposed to be but, no, sir.
6      Q.    Okay.  Wasn't like there was a
7  schedule posted on the wall for who was
8  supposed to clean it when and that kind of
9  stuff?
10      A.    No, sir.  That was a
11  production thing.  But it didn't turn out to
12  be a production thing.
13      Q.    How many times do you think
14  you had to clean the pit?
15      A.    God, I don't know.  Like I
16  said, several weeks, at least two, three,
17  four times a week.
18      Q.    How often --
19      A.    Huh?
20      Q.    How often would your coworkers
21  in maintenance clean it?
22      A.    Nowhere near -- Mark Hanks
23  cleaned it once I think.

Page 160

1      Q.    Okay.
2      A.    Other than that, I don't
3  remember anybody being singled out to go
4  clean it.
5      Q.    Did anybody clean it as often
6  as you did?
7      A.    No, sir.
8      Q.    Did anybody clean it more than
9  you did?
10      A.    No, sir.
11      Q.    And other than Mark Hanks
12  cleaning it once, can you think of anybody
13  else who had to clean it one or more times?
14      A.    Not individually.  Sometimes
15  he'd send a whole shift down there once
16  every three or four months to clean it.
17      Q.    And is it your testimony the
18  pit got cleaned based purely on somebody
19  like Hughes or Prater or Brookshire or
20  Stapley telling you or your coworkers to go
21  do it?
22      A.    Yes, sir.
23      Q.    All right.  Let's say if you

40 (Pages 157 to 160)

# FREEDOM COURT REPORTING

Page 161

1  were working on -- is the -- Are the presses
2  numbered one and two?
3      A.    Yes, sir.
4      Q.    Would your maintenance duties
5  be assigned to either press one or press two
6  on a given shift?
7      A.    There was maintenance
8  personnel on my shift assigned to those
9  presses. That wasn't even my area of
10 responsibility.
11     Q.    Okay. What was your area of
12 responsibility?
13     A.    SOPS.
14     Q.    Okay.
15     A.    When we came in, we was told
16 to get our tool bags, get the brief from the
17 off-going shift, and go to our areas of
18 responsibility. Mark Hanks had to stay on
19 press one, Darrel Gray press two, Drake
20 Barefoot on that other stamping press, I
21 can't remember what it was called, Chris
22 Weihe had to handle ASRS, and I had the
23 SOPS, and Shane was a floater.

Page 162

1      Q.    Okay.
2      A.    And I ended up running the
3  SOPS for the production people; I went above
4  and beyond my spectrum of duty. I was
5  supposed to be there for breakdowns. If it
6  broke down, I was supposed to fix it. They
7  was only allowed to run so many parts, like
8  so many Sonata right side outers, they get
9  to running good and they'd run way over
10 their quota. I'd have to go up there and
11 operate the system for them so they could do
12 that. I became instead of -- basically a
13 production worker. And if I hadn't have
14 done it, they wouldn't have ran. So it
15 ain't like I was a slouch. I could have
16 said, no, that's not my scope of duty. I
17 helped out. You can ask production, I even
18 went back there sometimes and I'd help them
19 catch panels if they was getting in a bind.
20     Q.    In your complaint it says you
21 cleaned the pit almost daily some weeks; is
22 that true?
23     A.    Yes, sir.

Page 163

1      Q.    And that's five days a week?
2      A.    Sometimes it's seven days a
3  week.
4      Q.    Sometimes seven days a week.
5      A.    We'd work a weekend off,
6  weekend on. Sometimes we might get a Sunday
7  off. I mean, I never cleaned it seven days
8  in a row, no.
9      Q.    Okay.
10     A.    Even after I complained about
11 it.
12     Q.    Did you clean it five days in
13 a row?
14     A.    Fricken Applegate told me
15 don't worry about it, it all pays the same.
16     Q.    Did you ever clean it five
17 days in a row?
18     A.    I may have. I don't know. I
19 mean, I cleaned it so many times so much, I
20 don't know.
21     Q.    Is it your testimony that you
22 cleaned it significantly more than any of
23 your coworkers?

Page 164

1      A.    Yes, sir. And they'll tell
2  you that.
3      Q.    Okay.
4      A.    As they told -- I believe -- I
5  don't know, you'd have to ask the lawyer who
6  interviewed the three.
7      Q.    I've talked to him.
8          Anyway, let me ask you this,
9  in paragraph ten it says: Applegate wrote
10 up about each and every action by Prater and
11 Hughes. He stood behind each and every
12 decision they made in running the stamping
13 department and refusing to act on or even
14 investigate complaints to Applegate about
15 Prater and Hughes.
16         We've talked a lot about what
17 Applegate said in terms of it's Prater's
18 department and he runs it. Is there more to
19 that story than you and I have talked about
20 so far?
21     A.    No. Like I said, even if I
22 complained about cleaning the pit all the
23 time, and Applegate asked me, said, what's

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  it to you, it all pays the same?  I said,
2  well, it seems funny after this letter came,
3  all of a sudden I'm cleaning the pit all the
4  time.  He said, well, that letter don't have
5  nothing to do with this, it's just a
6  maintenance thing.  I said, well, we don't
7  normally clean it.  Well, it all pays the
8  same, don't worry about it.
9      **Q.    Did you talk to him about the**
10  **fact that it's typically production that**
11  **cleans the pit but they're making**
12  **maintenance people clean it?**
13      A.    Yes, sir.
14      **Q.    And he said he's okay with**
15  **that --**
16      A.    Don't worry about it, it all
17  pays the same.
18      **Q.    In paragraph eleven of your**
19  **complaint you say that the harassment --**
20      A.    Are you ready for chow?
21      **Q.    Not yet.**
22          **I mean, if you're ready to go,**
23  **we'll go.**

Page 166

1      A.    I'm hungry.
2      MR. JOHNSON:  Y'all ready to
3  take a break?
4          (Recess taken.)
5      MR. KILBORN:  I want to mark
6  this as --
7      MR. JOHNSON:  It's marked as
8  Exhibit 4.
9          (Whereupon, Defendant's
10          Exhibit No. 4 was marked
11          for identification.)
12      MR. KILBORN:  Defendant's
13  Exhibit 4 was just produced about ten
14  minutes after one, during Leon Dees's
15  deposition; it should have been produced
16  before.  It's obviously on the subject of
17  Guard duty; it's obviously on the subject of
18  human resources; and on the subject of Leon
19  Dees.  And I've asked -- I've told counsel I
20  want to redepose Wendy Warren on the subject
21  matter of this e-mail.
22      MR. JOHNSON:  Just for the
23  Record, with respect to Exhibit 4, this was

Page 167

1  the exhibit that came up, was identified
2  initially by Mr. Dees, which had not been
3  previously identified in Mr. Dees' discovery
4  responses by Mr. Dees or his counsel.  Once
5  it was identified by Mr. Dees during his
6  deposition, we were able to contact the
7  Hyundai plant and have it faxed to the court
8  reporter's office.  We've now marked it as
9  Defendant's Exhibit 4 and provided a copy to
10  Mr. Dees' lawyers, who had not identified it
11  previously.
12          MR. KILBORN:  I also note for
13  the Record that the letter that Sergeant
14  Barnes wrote has not been produced, which is
15  a key letter in this case.  And we've asked
16  that it be produced, that a search be made
17  for it.  That's a letter identified in
18  Franklin D. Barnes Dees 00002 dated March
19  26, 2007.
20          MR. JOHNSON:  Is that all?
21          MR. KILBORN:  That's it.  Go
22  ahead.
23      **Q.    Mr. Dees, we're going back on**

Page 168

1  **the Record.  I've got a couple of questions**
2  **to ask you.**
3          **We've now marked an exhibit**
4  **that you mentioned previously in your**
5  **deposition, that we've gone back and gotten,**
6  **we've marked as Exhibit Number 4.  I know**
7  **that you and your lawyers have had an**
8  **opportunity to review that exhibit; is that**
9  **accurate?**
10      A.    Yes, sir.
11      **Q.    Okay.  And is that, in fact,**
12  **the e-mail that you testified to prior to**
13  **our lunch break?**
14      A.    This is it.
15      **Q.    Okay.**
16      A.    6 February '07.  I asked
17  Mr. Kimball for a meeting, because, like I
18  said, both times I even had to file the
19  complaint through my unit.  And after
20  positive results, meeting the first time, we
21  went there, Prater told us we couldn't talk
22  to HR.  My unit stayed abreast of the
23  meeting, and it would die back down for a

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1  week, and then everything else would kick
2  back up. Nothing changed over all. I'm
3  currently working night shift, and we would
4  greatly appreciate a meeting at your
5  convenience. And a week or two later I was
6  fired.
7      Q.   Now, if I could just look at
8  that. Again, this e-mail was sent on
9  February 6th of '07, does that sound right
10  to you?
11      A.   Yes, sir.
12      Q.   At that time, do you know
13  whether Greg Kimball was actively employed
14  or on leave from the plant?
15      A.   No one had told us he wasn't
16  there. Like I said, I worked night shift.
17      Q.   Did you know him personally?
18      A.   Did I know him personally?
19  You mean away from the plant?
20      Q.   No. I mean, did you know him?
21  You'd know him if he walked into the room
22  and talked to him?
23      A.   Yes, sir.

Page 170

1      Q.   Had you talked to him before?
2      A.   Yes, sir.
3      Q.   Had you talked to him
4  previously about any issues you may have had
5  with Greg Prater?
6      A.   It wasn't Prater specifically.
7  Like I said before, he was the very first
8  person I talked to when I went to HR.
9      Q.   Okay. But you didn't talk to
10  him about Prater specifically?
11      A.   Well, about Prater and
12  Applegate and having a problem with my Guard
13  duty, yes, sir, I did.
14      Q.   Okay. And what -- And I'm
15  just trying to think back to what we talked
16  about earlier this morning. I want to make
17  sure I'm right. That was what you had
18  testified to earlier, the year before you
19  got fired in the -- I think you testified in
20  the fall?
21      A.   Do what now?
22      Q.   The meeting -- That first
23  meeting you had with Greg Kimball.

Page 171

1      A.   Yes, sir.
2      Q.   Was that a meeting -- Was that
3  the year before you got terminated in that
4  fall period that you testified to?
5      A.   Yes, sir.
6      Q.   Okay. And where did that
7  meeting take place?
8      A.   In Greg Kimball's office.
9      Q.   Okay. And am I right that
10  neither you nor Greg Kimball produced
11  anything in writing after that meeting?
12      A.   No, sir.
13      Q.   And one of the things that it
14  says here on Defendant's Exhibit Number 4,
15  you'd indicate issues that have arisen on my
16  shift between Greg Prater, Kevin Hughes, and
17  yourself. What was the issue with Kevin
18  Hughes?
19      A.   Like I stated earlier, Kevin
20  had a history of jumping on employees.
21  And --
22      Q.   And when you say jumping on
23  employees, was that having to do with

Page 172

1  military duty or just his style of
2  management?
3      A.   His style of management. I
4  mean, he had -- he had jumped on two or
5  three other employees, one of them twice.
6  He'd get up in their face and holler at them
7  and bow up on them and intimidate them. And
8  he did the same thing to me, and I asked
9  him, I said: Are you bowing up on me? And
10  he made some comment, and I turned around
11  and I left.
12      Q.   Now, did that have anything to
13  do with your military service or your
14  reserve duties or anything like that?
15      A.   That particular incident? I
16  -- I don't know. After the letter came in,
17  and I started having all these problems is
18  when Kevin started -- I mean, that's when he
19  started birddogging me.
20      Q.   When who started birddogging
21  you?
22      A.   Kevin Hughes.
23      Q.   When did that start?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 173

1    A.    After -- Like I said, after my
2    letter from the unit came in.
3        Q.    Okay.  That's the letter from
4    Sergeant Barnes?
5        A.    Yes, sir.
6        Q.    Do you remember when that
7    letter came in?
8        A.    As I stated earlier, no, sir.
9        Q.    Do you recall who it was sent
10   to specifically?
11       A.    Yes, sir.  Like I stated
12   before, Greg Kimball.
13       Q.    Okay.  Did you ever talk to
14   Greg Kimball about whether or not he'd
15   actually gotten that letter?
16       A.    No, sir, I did not.
17       Q.    Do you have any evidence that
18   Greg Kimball or anybody else in Hyundai
19   management received the letter?
20       A.    I said just John Applegate
21   saying:  Don't worry about that letter,
22   we've seen it, something to that effect.  I
23   don't remember exactly what his words were,

Page 174

1    but, yeah, he admitted the letter was there.
2        Q.    Do you remember when he said
3    that?
4        A.    I think it was the second
5    meeting I had with him.  I don't remember.
6        Q.    Second meeting with Applegate?
7        A.    Yeah.  I mean, I don't know to
8    be honest.  I can't say either way.
9        Q.    How many meetings did you have
10   with Applegate?
11       A.    I don't know.  Two, three.
12   Whatever I said this morning.
13       Q.    Okay.  In your letter to Greg
14   Kimball that we've marked as Exhibit 4 you
15   say:  I have talked to human resources on
16   two separate occasions regarding Greg Prater
17   and also filed a complaint on him through my
18   National Guard unit.
19       A.    Yes, sir.
20       Q.    Were the two separate
21   occasions the one time that you talked to
22   Greg Kimball and then when you talked to
23   Keisha?

Page 175

1        A.    No, sir.  The two separate
2    occasions was what it says, it was two
3    separate occasions.
4        Q.    But I'm trying to figure out
5    when those two separate occasions were and
6    who were they with?
7        A.    What do you mean?
8        Q.    On February 6th you basically
9    say you had two separate occasions that you
10   had discussions with human resources; right?
11       A.    Yes, sir.
12       Q.    Okay.  I want -- I'm just
13   trying to figure out if we can pin down when
14   those were and who you talked to.
15       A.    It's like I stated earlier
16   this morning, I don't know the exact dates.
17   That was over a year ago.  No, I don't.  I
18   don't know specific dates, times, no, sir.
19       Q.    Do you recall who they were
20   with?
21       A.    Like I stated this morning,
22   the first meeting was with Greg Kimball --
23       Q.    Okay.  That's one.

Page 176

1        A.    -- in HR, and the last two I
2    believe was with Keisha.
3        Q.    Okay.  So other than Greg
4    Kimball and Keisha, you don't recall having
5    discussions with anybody in HR?
6        A.    No, sir.
7        Q.    No, sir, I'm wrong or no, sir,
8    you didn't have meetings with anyone else?
9        A.    No, sir, I don't recall having
10   meetings with anyone else in HR.
11       Q.    And did Keisha ever say
12   anything to you that in any way demeaned or
13   insulted your prior uniformed service?
14       A.    No, sir.
15       Q.    Do you have any reason to
16   think that Keisha in any way influenced the
17   decision to terminate your employment?
18       A.    I have no idea who had any --
19   I don't know.  You're standing at work,
20   somebody comes up and tells you you're
21   fired, I mean --
22       Q.    Let me ask you this:  Do you
23   have any information to suggest who was

44  (Pages 173 to 176)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1  involved in the decision to terminate your
2  employment?
3       A.    Rephrase.
4       Q.    Do you have any knowledge as
5  to who was involved in the decision to
6  terminate your employment?
7       A.    Nope.  I mean -- No.
8       Q.    Do you know whether Greg
9  Prater was involved?
10       A.    Well, I read statements that
11  he wrote.
12       Q.    Other than the statements that
13  he wrote --
14       A.    And he told the coworkers that
15  he did the investigation and it was his
16  decision.
17       Q.    Okay.  Who did he say that to?
18       A.    My shift.  But, they also said
19  that -- I believe it was that -- I don't
20  know, how was it phrased?
21       He didn't make the actual --
22  He can only make a recommendation.  The
23  actual decision had to come from HR.

Page 178

1       Q.    Okay.  And do you know who in
2  HR was involved in that decision-making
3  process?
4       A.    No, sir, I do not.
5       Q.    Also on Exhibit 4 it indicates
6  here that -- or you say:  There have been
7  positive results from both meetings and once
8  again I am seeking your help.
9       What were the positive results
10  that came from --
11       A.    Well, the first time Prater
12  said:  Y'all can't go to HR, that's not in
13  your chain of command.
14       Q.    Okay.
15       A.    And I -- Everything with me
16  was military term acronyms, because that's
17  all I've ever known, that's how I live my
18  life.  And HR jumped all over him.  Like I
19  said, that was only for their benefit.
20  Said, yeah, you can talk to us any time you
21  want.  And everything calmed down for a few
22  days or a week, but then same old routine
23  kicked in.

Page 179

1       Q.    What routine?
2       A.    Of getting harassed, are you
3  going to duty this weekend?  Where is your
4  orders?  Are you coming back Monday?  Do you
5  have my orders?  You're going to get wrote
6  up if you miss work.
7       Q.    Did Greg Prater ever do
8  anything other than demand to see orders or
9  suggest that he was going to write you up if
10  you missed work?
11       A.    As in?
12       Q.    You tell me.  I just want to
13  know what he did.
14       A.    I mean, other than hounding me
15  about my orders, harassing me about my duty,
16  HR and Applegate and basically team
17  relations and everyone backing him up, that
18  was pretty much enough.
19       Q.    Okay.  So would it be fair to
20  state that that's all that Greg Prater did
21  or that Applegate or HR did with respect to
22  your service?
23       A.    Well, yeah, I reckon.

Page 180

1       Q.    Okay.  Now, let's look at
2  paragraph twelve of your complaint.  And I'm
3  going to mark --
4       MR. SPORT:  Matt, do you have
5  another copy of that?
6       MR. JOHNSON:  Yeah.  I'm
7  getting it.  Hang on.
8       Q.    I'm going to mark as Exhibit 5
9  a fax cover letter and a letter --
10       (Off-the-Record discussion
11       was held.)
12       (Whereupon, Defendant's
13       Exhibit No. 5 was marked
14       for identification.)
15       Q.    All right.  Mr. Dees, in
16  paragraph twelve of your complaint it
17  references an October 23, 2006, letter from
18  Sergeant Franklin Barnes --
19       A.    I said on or about October 23.
20       Q.    On or about October 23, 2006,
21  Franklin Barnes, of Dees' Guard unit wrote a
22  letter of instruction to the human resources
23  department at Hyundai.  And if you look at

45  (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1  what we've marked as Exhibit 5, that is
2  apparently a letter from Sergeant Barnes --
3  it says it's a memorandum for Record.
4      Are you aware of anything else
5  that Sergeant Barnes produced that was
6  produced to Hyundai?
7      A.   No, sir.
8      Q.   And let me -- I won't --
9      A.   This is not the actual letter
10 because he didn't keep a copy of the actual
11 letter.  This is in reference to what he had
12 stated -- basically stated.
13     Q.   Okay.  And let me make sure
14 and --
15     A.   On or about 23 October, that's
16 a military term, if you're not sure of the
17 date, exact date, that's what we use.
18     MR. JOHNSON:  Okay.  And let
19 me make sure, Mr. Kilborn or Mr. Sport,
20 we've definitely got one and two here, and I
21 don't want to -- if I'm overlooking or
22 misunderstanding, the 10/23 letter --
23     MR. SPORT:  We have not

Page 182

1  produced it because we don't have a copy of
2  it.
3      MR. JOHNSON:  Okay.
4      MR. SPORT:  It's our
5  understanding that Mr. Barnes cannot locate
6  a copy of it.  Based on his notes, and it
7  would roughly correspond, I believe, to
8  Mr. Dees' drill date of that month, that
9  that's when he wrote the letter.  And based
10 on that, we're requesting that letter from
11 human resources.
12     MR. JOHNSON:  All right.
13 So --
14     MR. SPORT:  Is that what you
15 were asking?
16     MR. JOHNSON:  I think so.
17 Thank you.
18     MR. SPORT:  Okay.
19     Q.   So, Mr. Dees, it's at least my
20 understanding that what we've got here as
21 Exhibit 5, that's different from the letter
22 we were talking about earlier that was sent
23 by Mr. Barnes to the human resources

Page 183

1  department?
2      A.   Yes, sir.  It's not the exact
3  same letter, no.  Sergeant Barnes didn't
4  keep a copy of the letter that was sent.
5      Q.   Did he send a copy to you?
6      A.   No, sir.  I didn't ask him to.
7      Q.   Well, regardless of what you
8  asked him to do, did he send one?
9      A.   No, sir.
10     Q.   Okay.  Do you know if he sent
11 one to anybody else?
12     A.   No, sir.
13     Q.   And you -- Do you know if -- I
14 want to make sure I understand.  Did he keep
15 a copy and lost it or did he not keep a copy
16 to your knowledge?
17     A.   To my knowledge, he did not
18 keep a copy.
19     Q.   Okay.
20     A.   And it not being an official
21 government document, he wasn't required to
22 keep a copy.
23     Q.   Okay.  Then is it your

Page 184

1  testimony it wasn't an official government
2  document?
3      A.   It was a letter -- When you
4  have a problem, you go to your unit.
5      Q.   Okay.  And he was actually
6  your subordinate in the unit; correct?
7      A.   Yes, sir.  But he's the full
8  time AGR person, so it's his job to take
9  care of stuff like that.
10     Q.   Okay.  Did you ask anyone who
11 you were subordinate to to write you a
12 letter like that?
13     A.   No, sir, I did not.  I went to
14 the unit, I talked to Sergeant Barnes.
15 Sergeant Barnes called Sergeant Richberg my
16 superior.  Sergeant Richberg was the senior
17 man, he's retired now, that was off Sergeant
18 Richberg's recommendations.
19     Q.   Okay.  Tell me Sergeant
20 Richberg's full name?
21     A.   Wendell Richberg.
22     Q.   And do you know where he
23 lives?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

|  | Page 185 |
|---|---|

1   A.   Anniston.
2        Q.   **Anniston. Have you spoken to**
3   **him since this lawsuit was filed?**
4   A.   Friday night.
5        Q.   **Okay. Did y'all talk about**
6   **this lawsuit?**
7   A.   No, sir.
8        Q.   **Did you talk about your**
9   **deposition at all?**
10  A.   No, sir.
11       Q.   **Okay. What about Sergeant**
12  **Barnes, do you still talk to him?**
13  A.   Every month at Guard. He
14  works for me.
15       Q.   **At Guard duty. Okay. And,**
16  **again, going back to Exhibit 5 that we've**
17  **marked today, is the second page of that a**
18  **memo that you're familiar with?**
19  A.   The actual letter?
20       Q.   **Yes.**
21  A.   Yes, sir.
22       Q.   **You're familiar with that?**
23  A.   I read it once.

|  | Page 187 |
|---|---|

1        Q.   **He retyped this memo?**
2   A.   I'm just assuming. Like I
3   said, you'll have to ask Sergeant Barnes
4   this information.
5        Q.   **Okay.**
6   A.   I'm not going to sit here and
7   answer for him because I don't know.
8        Q.   **I want to know what you know.**
9   **Do you know whether or not this is a retyped**
10  **memorandum or something he'd done --**
11  A.   No, sir, I do not know. Like
12  I stated, I do not know. You'll have to ask
13  Sergeant Barnes, and he'll be glad to talk
14  to you.
15       Q.   **Do you know where this copy**
16  **came from?**
17  A.   Sergeant Barnes. It's got his
18  signature on it.
19       Q.   **So I'm assuming Sergeant**
20  **Barnes kept a copy of this one?**
21  A.   Apparently so. I don't know
22  that for sure either. I'm not going to say
23  either way.

|  | Page 186 |
|---|---|

1        Q.   **Did you read it before**
2   **Sergeant Barnes sent it?**
3   A.   No, sir, I do not.
4        Q.   **Do you know if Sergeant Barnes**
5   **sent it to anybody?**
6   A.   Sergeant Barnes told me that
7   he sent it to Greg Kimball.
8        Q.   **He said he sent it to Greg**
9   **Kimball?**
10  A.   Yes, sir.
11       Q.   **Did he indicate he had sent it**
12  **to anybody other than Greg Kimball?**
13  A.   No, sir.
14       Q.   **Did he send a copy to you?**
15  A.   No, sir.
16       Q.   **I assume he saved a copy of**
17  **this?**
18  A.   No, sir.
19       Q.   **Do you know where this -- this**
20  **copy came from?**
21  A.   Sergeant Barnes retyped it.
22  You'll have to ask Sergeant Barnes this
23  info. This, I do not know.

|  | Page 188 |
|---|---|

1        Q.   **And not a copy of the other**
2   **one?**
3   A.   Well, the other one shouldn't
4   have been a problem. He has to do it for
5   civilian law enforcement officers. I mean,
6   he didn't think nothing about it.
7        Q.   **Did you ask him to prepare**
8   **this Exhibit Number 5?**
9   A.   I asked him if he had a copy
10  of the letter he sent. He said he would
11  check and see. And he said he did not have
12  a copy. I said, look, what did you write?
13  I said I need a letter about what you said,
14  and that's what he produced. Anything other
15  than that, you'll have to ask Sergeant
16  Barnes.
17       Q.   **Okay. So from what you're**
18  **telling me, either he told you he couldn't**
19  **find one, and then he found it --**
20  A.   No, sir. He did not find it.
21  I never said he found it. I said he did not
22  find it.
23       Q.   **Okay. That's fine.**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 189

1      To your knowledge, was this
2  done on March 26th originally?
3      A.    I have no idea.
4      Q.    Okay.  Do you have any idea
5  when he initially prepared it?
6      A.    No, sir.
7      Q.    All right.  And was -- The
8  first page of Exhibit 5 is to Mrs. Dees, I
9  assume that's your wife?
10     A.    Yes, sir.
11     Q.    Was this faxed to some fax
12 numbers of hers or at her office somewhere?
13     A.    Yes, sir.
14     Q.    Did you ask Sergeant Barnes to
15 send it to your wife?
16     A.    Yes, sir.
17     Q.    And was it at her office?
18     A.    Yes, sir.
19     Q.    Where does she work?
20     A.    Peachtree Bank in Maplesville,
21 Alabama.
22     Q.    So to your knowledge, Sergeant
23 Barnes sent this to her bank?

Page 190

1      A.    Yes, sir.
2      Q.    And did she bring it home to
3  you?
4      A.    Yes, sir.
5      Q.    And it looks like it was faxed
6  on March 26th; is that accurate?
7      A.    Yes, sir.
8      Q.    And do you recall whether that
9  was when you got it or not?
10     A.    Yeah.  She got it that day,
11 she brought it home that evening, yes, sir.
12     Q.    All right.  Had you talked to
13 Sergeant Barnes that day?
14     A.    I don't know.  I don't know.
15     Q.    Okay.  Do you remember talking
16 to Sergeant Barnes asking him to send you
17 some sort of memorandum for the Record or
18 something telling what he had done in the
19 past?
20     A.    Yes, sir.
21     Q.    Did he fax this to you on the
22 same day or did this take place at a later
23 time?

Page 191

1      A.    I don't know.
2      Q.    Okay.  Do you know if Sergeant
3  Barnes ever called Hyundai's HR department
4  for any reason?
5      A.    Not to my knowledge.
6      Q.    Okay.  Had you provided him
7  with Greg Kimball's name?
8      A.    Yes, sir.
9      Q.    Did you provide him with Greg
10 Kimball's address or fax number or anything
11 like that?
12     A.    Address to the plant.
13     Q.    Just the plant address?
14     A.    Yes, sir.  Attention Greg
15 Kimball.
16     Q.    Okay.  In paragraph thirteen
17 of your complaint you say:  After the letter
18 from Sergeant Barnes was sent to Hyundai,
19 the incidences of harassment outlined above
20 escalated.
21     Let me ask you that:  Is that
22 accurate?
23     A.    Yes, sir.

Page 192

1      Q.    How did they escalate?
2      A.    I mean, it went from every
3  other day I was being called on the carpet.
4  I mean --
5      Q.    Called on the carpet for what?
6      A.    Anything he could make up,
7  they could make up, everything.
8      Q.    What would they make up?
9      A.    The daily reports, and I
10 believe that was in there somewhere, where I
11 didn't turn in my daily report where I
12 actually filled it out but I worked over,
13 and it was still in the book, I just didn't
14 drop it off in the box.  And I was being
15 threatened with a write-up when there were
16 several other team members on both shifts
17 who hadn't turned in a daily report in over
18 a month.  That was just one example.
19     Q.    Well, during that period, were
20 -- were you ever suspended for any reason?
21     A.    No, sir.  They ignored their
22 whole firing process.  I was never written
23 up, to my knowledge.

48 (Pages 189 to 192)

# FREEDOM COURT REPORTING

Page 193

1    Q.   Okay.
2    A.   They went against their own
3    program, their own handbook, their own
4    system.
5    Q.   Okay. Just so I understand,
6    how did they do that?
7    A.   Well, supposedly there's a
8    system, a process, you have to go through to
9    get fired. Several steps in between. I
10   went from zero to fired.
11   Q.   So when you say they
12   disregarded the steps, you're talking about
13   your termination?
14   A.   Their own firing process.
15   It's not my termination. That's their
16   process that they came up with, that they
17   said they would abide by that they threw out
18   the window.
19   Q.   Okay. Also in paragraph
20   thirteen you say that on or about February
21   26, 2007, Prater got the stamping manager,
22   Jim Brookshire to falsely accuse Dees of
23   sleeping on the job.

Page 194

1    A.   February 26th was the day I
2    was terminated. I believe, like you said,
3    it was the 19th. I'm not sure, it was the
4    week before that.
5    Q.   Okay. So you put -- Do you
6    know why it says the 26th? Is it for any
7    reason other than that's the day you were
8    terminated?
9    A.   Yes, sir.
10   Q.   Do you have any personal
11   knowledge that Greg Prater tried to get Jim
12   Brookshire to say that you were sleeping?
13   A.   I don't know. Prater wasn't
14   even there that night. It was Jim
15   Brookshire.
16   Q.   So you agree Prater wasn't
17   even there that night?
18   A.   No, he wasn't. It was on a
19   night shift.
20   Q.   Okay. So if Greg Prater
21   wasn't at the plant the night that Jim
22   Brookshire made the allegations, how is it
23   that you say that Prater tried to convince

Page 195

1    Brookshire to make those allegations?
2    A.   Well, I mean -- I'm not sure
3    how he -- what went on. I know I was
4    standing up there in my area that I was
5    supposed to be in, with one of my coworkers,
6    who had left me standing out there in plain
7    site on a wire mesh floor where everybody
8    can see, not five minutes before I was
9    accused of sleeping. And I read Will Ware's
10   statements where Jim Brookshire said he
11   never saw my eyes closed. And the next
12   thing I know, I'm getting fired for sleeping
13   on duty. If I sleep on duty, he's saying
14   this ain't a military thing, he was always
15   referring to military things, every time
16   someone talked to me, they put it in a
17   military perspective. If I didn't live my
18   life in a military manner, why would they do
19   that? If I sleep on duty on post, I die.
20   That's not the most important thing. If I
21   sleep on duty on post, my men die, that's
22   the most important thing. I live my
23   civilian life just like I do my military

Page 196

1    life. Just because for the same reason --
2    Just like is fixing to happen next year, I
3    am going back to Iraq. If I slough off in
4    my civilian life, I slough off in my
5    military life. I don't do that.
6    Q.   Okay. Let me ask you this:
7    Do you know the night that Jim Brookshire
8    allegedly made the allegations he saw you
9    sleeping?
10   A.   Yes. I don't remember the
11   exact date. I think it was around the 19th.
12   But the exact incident, yes, sir, I remember
13   it.
14   Q.   So you know the incident?
15   A.   Yes, sir.
16   Q.   And you agree Greg Prater
17   wasn't on duty that night?
18   A.   No, sir, he was not.
19   Q.   Wasn't at the plant?
20   A.   No, sir.
21   Q.   Do you even know whether he
22   worked the next day?
23   A.   I don't know.

49 (Pages 193 to 196)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 197

1    Q.    Okay.  Do you know whether --
2  Do you have any evidence to suggest that he
3  and Jim Brookshire had talked before that
4  night about accusing you of something?
5    A.    If I had it, you would have
6  it.
7    Q.    Okay.  So, but, again, I just
8  want to make sure.  Okay?
9    A.    Like I say, you're the one
10  that's talked to them.  You'll have to go
11  ask them.
12    Q.    Let me ask you this:  You're
13  not aware of any evidence to suggest Greg
14  Prater told Jim Brookshire to make up some
15  allegations before that night, and Greg
16  Prater wasn't there that night, and you
17  don't know whether Greg Prater even worked
18  the next day, what evidence do you have to
19  suggest that Greg Prater told Jim Brookshire
20  what to do, or when to do it, or how to do
21  it?
22    A.    I don't have any evidence of
23  Prater and Jim corroborating or whatever you

Page 198

1  want to call it.
2    Q.    Okay.  Well, you would agree
3  that that's not consistent with what's
4  contained in your complaint?
5    A.    Did Prater and Brookshire
6  stick together on everything?  Yes.
7    Q.    In other words, they're
8  consistent?
9    A.    Yeah.  I mean, if Prater said
10  something, Brookshire backed him up;
11  Brookshire said something, Prater backed him
12  up.
13    Q.    Okay.  But where you've
14  indicated in your complaint that Prater got
15  the production staffing manager, Jim
16  Brookshire, to falsely accuse Dees of
17  sleeping on the job, what evidence do you
18  have that Prater did that?
19    A.    Like I said before, I don't
20  have none.  If I did, you'd have it.
21    Q.    Okay.  Thank you.
22          And am I correct that on the
23  evening of -- Well, you indicated you know

Page 199

1  the evening in question?
2    A.    Yes, sir.
3    Q.    All right.  How is it you know
4  when Jim Brookshire made those allegations?
5    A.    I saw him and Kevin Hughes
6  standing down on the floor pointing up at me
7  and Shane.
8    Q.    Pointing up at you where?
9    A.    Up in my area of
10  responsibility.  They said that I was
11  supposedly sleeping up in the SOPS.  It's
12  about -- It's what they call the third
13  floor.  And there's an open wire mesh floor
14  right there.  You can't hide.  And Shane
15  walked downstairs, and I let my guard down.
16  I had a brain cramp.  And it wasn't five
17  minutes, here come Jim walking up the
18  stairs, walking around the back, looked over
19  at me about fifty foot away, walked down,
20  looked out over the presses, came back,
21  looked at me again.  I watched him, I
22  watched him walk all the way back down the
23  stairs.  When he did, I got up and walked

Page 200

1  downstairs.
2    Q.    Okay.  Were you sitting down?
3    A.    Yes, sir, I was.  I was trying
4  to text message my daughter.
5    Q.    You were text messaging your
6  daughter?
7    A.    I was trying to, yes, sir, I
8  was.
9    Q.    So you had your phone in your
10  hand?
11    A.    Yes, sir, I did.
12    Q.    Were you looking down into
13  your lap at the phone?  Or how did you have
14  your phone?
15    A.    I had my phone right here
16  (indicating).  Like I said, I watched him
17  walk up the stairs, and I watched him.  We
18  made eye contact, he kept walking.  So I
19  went back to text messaging.  And here come back,
20  I looked up at him again, and I watched him
21  walk all the way down.  I closed my phone, I
22  got up, and I went down.
23    Q.    Did you actually send someone

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 201

1  a text message?
2      A.    I tried.  No, I couldn't get
3  out.
4      Q.    **What do you mean you couldn't**
5  **get out?**
6      A.    Depending on the weather and
7  where you was at, sometimes you could get a
8  good signal in the plant and sometimes you
9  couldn't.
10      Q.    **Would there be any records to**
11  **support whether or not you actually made a**
12  **text message that evening?**
13      A.    I've got my phone bill, but,
14  no, I told you, I didn't get out.
15      Q.    **Okay.  So is it your testimony**
16  **you had the phone in your hand, you were**
17  **pressing buttons, but nothing was happening?**
18      A.    Pretty much it.
19      Q.    **Were you wearing a hard hat?**
20      A.    No, sir.  We wear ball caps
21  with a little plastic insert.  And it was
22  sitting on the spool beside me, spool of
23  cable.

Page 202

1      Q.    **So you were not wearing a ball**
2  **cap?**
3      A.    No, sir.
4      Q.    **Were you wearing any sort of**
5  **eye protection or anything like that?**
6      A.    They were in my hard hat.
7      Q.    **Hard hat or ball cap?**
8      A.    Ball cap.
9      Q.    **Did you have a hard hat with**
10  **you?**
11      A.    No.  They don't wear hard
12  hats.
13      Q.    **They don't wear them anywhere?**
14      A.    Not to my knowledge, no.
15      Q.    **In the whole plant?**
16      A.    Some people may, but I was
17  stuck in my section, I don't know.
18      Q.    **And your section was**
19  **somewhere?**
20      A.    Stamping maintenance.
21      Q.    **So to your knowledge, in**
22  **stamping maintenance they don't wear hard**
23  **hats?**

Page 203

1      A.    No, sir.  They wear a ball
2  cap, what they call a bump cap, little
3  plastic insert.
4      Q.    **Okay.  And during the period**
5  **in which you saw Jim Brookshire up on that**
6  **third floor, I mean, you saw Jim Brookshire**
7  **on the third floor?**
8      A.    Yes, sir.  I watched him walk
9  up, around, and back down.
10      Q.    **Was this after Shane Archer**
11  **had left?**
12      A.    About five minutes after Shane
13  left.
14      Q.    **Five minutes.  Do you recall**
15  **it being five minutes?  That was a long time**
16  **ago.**
17      A.    It wasn't long.  Like I said,
18  me and Shane had just been standing there
19  wondering why they were standing down on the
20  floor pointing up at us talking.
21      Q.    **Okay.  Do you remember what**
22  **time it was you saw them down on the floor**
23  **pointing up at you?**

Page 204

1      A.    It was before chow.
2  Everything happened before chow that night.
3      Q.    **What time is chow?**
4      A.    I believe it was -- I think it
5  was eleven thirty that night, eleven thirty
6  or eleven forty-five.
7      Q.    **What time did you get to work?**
8      A.    I don't know.  You would have
9  to -- Y'all got that.
10      Q.    **What time did you usually**
11  **start?**
12      A.    It depended whether I was
13  coming in early that night or late that
14  week.
15      Q.    **What's the latest you would**
16  **have gotten there?**
17      A.    I believe it was six or seven.
18      Q.    **P.m.?**
19      A.    I think.
20      Q.    **Okay.  And starting at six or**
21  **seven, whenever you got there --**
22      A.    Six to four forty-five and
23  seven to five forty-five.

51 (Pages 201 to 204)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 205

1   Q.   All right.
2   A.   But we always had to be there
3   early.
4   Q.   So you would have been there
5   sometime slightly before six or seven?
6   A.   Yes, sir.
7   Q.   All right. So you get there a
8   little bit before six or seven. Do you go
9   to the -- is there an office for stamping
10  maintenance?
11  A.   That's where our lockers are
12  at.
13  Q.   All right. So would you
14  usually go to your locker first?
15  A.   Yes, sir.
16  Q.   All right. Do you remember
17  doing that on the night in question?
18  A.   I did it every night. That's
19  where my tools was locked up.
20  Q.   So you would go get your tools
21  to start the day?
22  A.   Yes, sir.
23  Q.   And on the evening in

Page 206

1   question, did you go immediately from
2   getting your tools to a meeting with Greg
3   Prater or Kevin Hughes or anybody like that?
4   What did you do?
5   A.   We didn't have meetings.
6   Q.   Okay.
7   A.   We'd get our tools and --
8   Q.   How did you know what to do?
9   A.   I mean, it's just standard.
10  Everybody -- We'd come in, we'd get our
11  tools, we'd go to work. I mean --
12  Q.   But how did you --
13  A.   -- that was the norm.
14  Q.   How did you know what to work
15  on?
16  A.   We didn't work on nothing. If
17  nothing wasn't broke down, we would go to
18  our area of responsibility.
19  Q.   So you would just go to an
20  area that you were responsible for?
21  A.   An area I was assigned.
22  Q.   And that was the SOP section
23  up on third floor?

Page 207

1   A.   Second and third floor.
2   Q.   Second and third floor.
3   A.   And if they was running them,
4   it could be on the first floor too.
5   Q.   All right. Did you go to the
6   second floor that night?
7   A.   Right off the bat?
8   Q.   Yeah.
9   A.   Probably not. I probably went
10  and got the brief from the off-going shift.
11  Q.   What is that? Is that
12  something telling you what to do?
13  A.   Like I said earlier this
14  morning, we go get our tools, go talk to
15  people on the off-going shift, find out if
16  there's any breakdowns, anything, any major
17  events we needed to know about or look out
18  for.
19  Q.   How long does that usually
20  take?
21  A.   If nothing happened, two
22  seconds. Give me your radio. Bye, y'all
23  take it easy.

Page 208

1   Q.   Would you share a radio with
2   the off-going shift?
3   A.   Yes, sir.
4   Q.   Do you know who your
5   counterpart is on the off-going shift or who
6   was on the evening in question?
7   A.   They didn't really have
8   assigned areas like we did, I don't think.
9   I mean, it would be different people.
10  Sometimes it would be Duane Tatum, or
11  sometimes it would be Lance Honeycutt, or --
12  I can't remember the other guy's name.
13  Q.   All right. Well, that's okay.
14       Once y'all sort of made the
15  shift change and talked with the off-going
16  guys, you would go to your work area;
17  correct?
18  A.   Yes, sir.
19  Q.   And on the evening in
20  question, you think that would have been
21  immediately up to the third level?
22  A.   Maybe not. Not if they was
23  running. If they was running, we would be

52 (Pages 205 to 208)

# FREEDOM COURT REPORTING

Page 209

1  over at the press and see how they were
2  running and make sure the trolleys were
3  switching out right.
4      Q.    Do you remember what you did?
5      A.    No.
6      Q.    You can't remember?
7      A.    I remember the weather was bad
8  that night. There had been a couple of
9  nights that week the weather was bad, so I
10  don't -- several nights we had to go to the
11  storm shelters, like the pit and bathrooms,
12  because of the weather. So, no.
13      Q.    Do you remember having to go
14  to the storm shelter on the evening we're
15  talking about?
16      A.    I don't know if it was that
17  evening or a couple of evenings before.
18      Q.    Okay. Do you remember when
19  you first went up to the third level on the
20  evening we're talking about?
21      A.    Me and Shane went up there --
22  at the time the incident occurred, me and
23  Shane had gone up there because we had to

Page 210

1  pull trolleys.
2      Q.    Pull trolleys?
3      A.    Yes, sir. Because we had a
4  problem.
5      Q.    Just so -- I think I know what
6  you're talking about, but when you say pull
7  trolleys, is that when part of that conveyor
8  system gets off line or something, and you'd
9  have to go straighten it out?
10      A.    If you know what I'm talking
11  about, yeah, the things that ride the rails,
12  that's the trolleys.
13      Q.    Okay. Does that just mean one
14  of those got offline and you had to correct
15  it?
16      A.    Yes, sir.
17      Q.    Okay. And when you went up
18  there with Shane Archer, was that when you
19  looked down and saw Kevin Hughes and Jim
20  Brookshire looking up at you or was that
21  later in the evening?
22      A.    No. It was at that instant.
23  We had just finished pulling a trolley, just

Page 211

1  got the system back online.
2      Q.    How long did that take?
3      A.    Not long. I don't know to be
4  honest.
5      Q.    Okay. And so when you got the
6  trolleys back online, is that when Shane
7  Archer went downstairs?
8      A.    After we talked about Jim and
9  Kevin pointing up at us talking.
10      Q.    Okay. So you and Shane Archer
11  had a conversation where y'all talked about
12  Jim Brookshire and Kevin Hughes looking up
13  at you?
14      A.    Yes, sir.
15      Q.    And pointing?
16      A.    Yes, sir. It was basically
17  what are they doing? Why are they pointing
18  up here? I don't know.
19      Q.    And was that before midnight?
20      A.    Yes, sir.
21      Q.    And how much -- How long after
22  that was it that Jim Brookshire came
23  upstairs?

Page 212

1      A.    Like I said earlier, no more
2  than five minutes.
3      Q.    All right. And was it unusual
4  to see him walking around up there?
5      A.    Yes, sir. It was very unusual
6  to see him walking around up there unless
7  something was bad broke down.
8      Q.    Okay. Do you recall seeing
9  him up there more than that one time on that
10  evening?
11      A.    No, sir.
12      Q.    No?
13      A.    No, sir.
14      Q.    Do you recall when Jim
15  Brookshire walked up there, was there
16  anybody else on the third level?
17      A.    No, sir.
18      Q.    Just you and him?
19      A.    Yes, sir.
20      Q.    Have you talked to anybody
21  else who talked to Jim Brookshire about what
22  he had gone up there for?
23      A.    No, I don't guess I have.

53 (Pages 209 to 212)

## FREEDOM COURT REPORTING

Page 213

1  Q.   Okay.  And did you talk to Jim
2  Brookshire?
3     A.   That night, no.  And then
4  later on, huh-uh.
5     Q.   When he walked up there and
6  you saw him, did you say anything to him?
7     A.   No, sir.  Like I said he
8  was -- I was there at an MCC panel, and he
9  was up, I don't know, forty-five, fifty foot
10  away over there on the handrail.
11     Q.   Okay.  Did you wave at him or
12  motion to him at all?
13     A.   No, sir.  I just looked at
14  him.
15     Q.   You looked at him?
16     A.   Yes, sir.  He looked at me and
17  walked down to the presses, looked out over
18  the presses, then walked back, looked at me
19  again, and walked back down.
20     Q.   What was the closest he got to
21  you?
22     A.   Like I say, forty-five, maybe
23  fifty feet.

Page 214

1     Q.   Now, what was the thing you
2  said you were near?
3     A.   Motor control panel, MCC
4  panel.
5     Q.   MCC panel.  Now, is that --
6  What is that?
7     A.   It houses the PLC, computer
8  that runs the SOPS system.
9     Q.   Okay.  That's helpful.  Thank
10  you.  What is the PLC?
11     A.   Programmable logic computer.
12     Q.   Just for the sake of the
13  record, what does SOP mean?
14     A.   SOP is the trolley system,
15  side outer panel system.
16     Q.   Okay.  Again, what was the
17  thing that you were standing near?
18     A.   MCC.
19     Q.   Is the MCC, is it like a
20  computer, it has got computer readouts on
21  it, buttons and stuff?
22     A.   It's not a computer like
23  you're thinking of.  It's got cards and it

Page 215

1  -- Yes, it is a computer, but it doesn't
2  have a screen and the keys -- keyboards are
3  like what you're thinking.  You have to get
4  online with it.
5     Q.   How big is it?
6     A.   It's probably about ten-foot
7  long, two-foot deep, six-foot high.
8     Q.   Okay.  Does it have doors that
9  enclose it or some sort of cover or
10  anything?
11     A.   Yes, sir.
12     Q.   What's it got?
13     A.   It's got doors.
14     Q.   Okay.  How big are the doors?
15     A.   About like that door there
16  (indicating).
17     Q.   Okay.  Just for the sake of
18  the Record, that's not going to translate
19  well on paper.  Are there two doors to the
20  whole thing?
21     A.   No.  There was four -- four
22  doors.
23     Q.   So they would have each been

Page 216

1  about a fourth of that ten-foot length?
2     A.   Yes, sir.
3     Q.   Okay.
4     A.   Plus you had your stabs in
5  between.
6     Q.   What is a stab?
7     A.   Just your door frame.
8     Q.   Okay.  Now, at the time Jim
9  Brookshire came up there, did you have your
10  back to the MCC?
11     A.   Yes, sir, I did.
12     Q.   Okay.  Any reason you had your
13  back to the MCC?
14     A.   So I could watch the trolleys.
15     Q.   Okay.  Were you not up there
16  to watch the MCC?
17     A.   No, sir.
18     Q.   Okay.  Why would you be there
19  near the MCC as opposed to some other area
20  to watch the trolleys?
21     A.   Because if you try to sit out
22  on open mesh, you're going through the
23  floor.

54 (Pages 213 to 216)

# FREEDOM COURT REPORTING

Page 217

1    Q.    Was it not open mesh there
2 near the MCC?
3    A.    About a two-foot section, no,
4 sir.
5    Q.    A two-foot section was not
6 open mesh?
7    A.    No, sir.  But you can clearly
8 see up there everywhere.  And that's where
9 me and Shane was standing when Jim and Kevin
10 was standing up there pointing at us talking
11 about us.
12    Q.    Okay.  So from where you were
13 sitting at the time Jim Brookshire came up,
14 is it your testimony that you could see from
15 where you were sitting all the way down
16 through the second floor, and then down to
17 the first floor?
18    A.    Yes, sir.
19    Q.    And the first floor was the
20 main production level?
21    A.    Yes, sir.
22    Q.    Okay.  Had you ever sat up
23 there before?

Page 218

1    A.    Everybody had.
2    Q.    Okay.  And everybody being,
3 everybody in stamping maintenance or
4 everybody period?
5    A.    Everybody in stamping
6 maintenance.  Because if it goes down, you
7 may be up there five minutes, you may be up
8 there five hours.
9    Q.    Okay.  Let me ask you this:
10 When Shane Archer -- You and Shane Archer
11 were up there working together that night?
12    A.    Yes, sir.  Shane came up to
13 help me out.
14    Q.    When you and Shane had got
15 done and he walked downstairs, why did you
16 stay upstairs as opposed to going with
17 Shane?
18    A.    Wait to see if that trolley
19 stopped again or kept going.  They had track
20 switches, you've seen them.  Track switches
21 switch, they had a track that had gone out
22 on a track switch, which if you've seen the
23 system, which I'm sure you have, it may stop

Page 219

1 on this one, go to the next one, but then it
2 may stop again on the next one.  Just
3 because you get it going for two seconds,
4 don't mean it's going to be going -- it's
5 going to take off and run.
6    Q.    Okay.  So you were going to
7 stay up there and make sure it kept running?
8    A.    Yes, sir.
9    Q.    Okay.  What were you planning
10 to do?  I mean, how long would you stay
11 there?
12    A.    As long as nothing happened --
13 Well, that was my area of responsibility.  I
14 could have stayed there all night, and I
15 would have been right in doing so.  I was
16 told to stay in my area of responsibility
17 just like everyone else.  Like I said, Mark
18 Hanks, he had to stay on press one, Darrel
19 Gray, he had to stay on press two, and Weihe
20 and Barefoot.  That was my AO that I was
21 responsible for.
22    Q.    AO meaning what?
23    A.    Area of operation, area of

Page 220

1 responsibility.
2    Q.    Okay.  Did you ever sleep up
3 on the third level?
4    A.    I don't sleep.
5    Q.    Ever?
6    A.    Ever.
7    Q.    On the job?
8    A.    I don't sleep on the job, no.
9    Q.    Okay.
10    A.    I told you if I sleep -- I'm a
11 career soldier.  I've been doing this since
12 I was seventeen.
13    Q.    Doing what?  Stamping
14 maintenance?
15    A.    No.  I've been a soldier since
16 I was seventeen, and I don't sleep.  You've
17 got a young Joe out there, yeah, they may
18 fall asleep every now and then.  First big
19 exercise they have and they wake up with a
20 black ink mark cross their throat and they
21 know that they've been visited, and don't
22 know when or where, you don't sleep no more.
23 That's real life.  When you go to the combat

55  (Pages 217 to 220)

# FREEDOM COURT REPORTING

Page 221

1  zone, you know what happens. You don't
2  sleep. You sleep, people die.
3      Q.    Well, in terms of your work at
4  Hyundai, I'm assuming your testimony is
5  you've never slept?
6      A.    No, sir.
7      Q.    Before that night, on that
8  night, or since that night?
9      A.    No, sir. You don't sleep at
10  work.
11      Q.    Okay. What was it --
12      A.    If you sleep at work --
13      Q.    Was it unusual for people
14  working up on that third level to sleep?
15      A.    I never saw nobody up there
16  other than maintenance production go up
17  there and count the panels.
18      Q.    Okay. Did you ever see
19  anybody from maintenance sleep up there?
20      A.    No, sir.
21      Q.    Did you ever see any
22  indication that somebody from maintenance
23  had slept up there?

Page 222

1      A.    Talking about a chair in the
2  back corner? Yes, sir, there was a chair in
3  the back corner.
4      Q.    Was there a chair in the
5  corner?
6      A.    In that back corner over
7  there, yes, sir, there was.
8      Q.    What kind of chair was it?
9      A.    Same kind of chair I was
10  sitting in, a metal chair.
11      Q.    Was that all that was there?
12      A.    I believe so.
13      Q.    Nothing else in that back
14  corner?
15      A.    No.
16      Q.    Do you think somebody was back
17  there sleeping in that chair?
18      A.    I don't know. Wasn't nobody
19  on my shift was.
20      Q.    All right. Did you hear
21  anybody talking about people from other
22  shifts sleeping in that corner?
23      A.    No, sir.

Page 223

1      Q.    And is it your testimony that
2  nobody from your shift ever indicated that
3  they or anybody else on your shift slept in
4  that corner?
5      A.    I never talked to nobody on my
6  shift about sleeping in that corner, no,
7  sir.
8      Q.    Okay. Did you ever talk to
9  anybody on your shift about sleeping
10  anywhere up on the third level?
11      A.    No, sir. Drake Barefoot would
12  take his lunch break and go in the office
13  and sleep. Other than that, no, sir.
14      Q.    In the office?
15      A.    Yes, sir. During his lunch
16  break.
17      Q.    And is it your testimony that
18  while you were there, that there was nothing
19  other than a chair in the back corner?
20      A.    I don't remember seeing
21  nothing other than a chair there.
22      Q.    Okay. Do you -- Do you have
23  any personal knowledge, based on your

Page 224

1  conversations with Wendy Warner at the time
2  you were terminated or anybody at that time
3  or before then or after then, to know what
4  went on at the time the decision to
5  terminate was made?
6      A.    Say again.
7      Q.    Let me see if I can come up
8  with an easier way of asking it.
9          Would it be fair to state you
10  don't know who was involved in the decision
11  to terminate you?
12      A.    I have no idea who was
13  involved.
14      Q.    Okay. And do you know
15  anything else about the decision to
16  terminate you?
17      A.    No. Just that statement I
18  read where Prater said his recommendation
19  was termination. And that he told Hanks
20  that he did the investigation.
21      Q.    All right. And would it be
22  fair to state that you don't know whether
23  Greg Prater sat in on the discussions or

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 225

1  decision to terminate you?
2      A.    I didn't know they had had a
3  meeting on it.
4      Q.    Okay.  Do you have any reason
5  to think that Greg Prater had any other
6  involvement on it?
7      A.    Like I said, I didn't even
8  know they had a meeting.
9      Q.    Okay.  Do you have any
10  evidence to suggest that your past military
11  involvement, either in Korea, Iraq, National
12  Guard, was a motivating factor in the
13  decision to terminate you?
14      A.    That's the way it seemed.
15      Q.    And it seemed that way why?
16      A.    Because every bit of that
17  stemmed from my prior duty commitment.
18  Everything stemmed around my drill weekends.
19      Q.    What stemmed?
20      A.    All the problems, all the
21  harassments.
22      Q.    I'm talking about the actual
23  decision to terminate you.

Page 226

1      A.    Oh, I have no idea.  I don't
2  know.  Like I said, I didn't even know they
3  had a meeting on it.
4      Q.    Okay.  So it would be fair to
5  state that you're not aware, based on your
6  own personal knowledge, of any evidence to
7  suggest that your military service was a
8  motivating factor in the decision to
9  terminate you?
10      A.    Rephrase.
11      Q.    Would it be fair to say that
12  you don't have any personal knowledge that
13  your military history was a motivating
14  factor or part of the reason why they made
15  the decision to terminate you?
16      A.    I -- As far as my personal
17  knowledge, like I said, seems like my
18  military career was the whole reason for my
19  being fired.
20      Q.    Being fired or for being
21  harassed?
22      A.    Both.  It started with the
23  harassment and ended in the termination.

Page 227

1      Q.    How was it that was part of
2  your termination?
3      A.    Like I said before, that's
4  where all my problems stem from.  That's
5  where they all started with the drill
6  weekend.
7      Q.    Okay.  So are you suggesting
8  that the fact that you had problems with
9  your drill weekends leads you to think that
10  that's why you were terminated?
11      A.    Yes, sir.
12      Q.    And do you have any firsthand
13  knowledge that that is in fact the case?
14      A.    Just all the incidents leading
15  up to it.
16      Q.    Okay.  And do you know if
17  those incidents were discussed or considered
18  in the termination process?
19      A.    No, sir, I do not know that.
20          THE WITNESS: It's break time.
21          MR. JOHNSON: Okay.  If you
22  need a break, take one.
23          (Recess taken.)

Page 228

1      Q.    Okay, Mr. Dees, we're back on
2  the Record again.  I want to ask you a couple
3  couple more questions about some of the --
4  this alleged sleeping incident.
5          Jim Brookshire is somebody we
6  talked about.  Did you know Jim Brookshire
7  well?
8      A.    He was -- Yeah.  Working with
9  him every day near about.
10      Q.    Okay.  Did you ever have any
11  problems with him?
12      A.    No.  Not like with everyone
13  else, no.
14      Q.    Okay.  Did he ever demand
15  orders from you, or anything like that?
16      A.    No.  Because he wasn't in my
17  immediate chain of command.
18      Q.    Okay.  Did he ever say
19  anything to you about your military career
20  or your Guard duty or anything like that?
21      A.    No.  The only thing he cared
22  about was whether them presses was running.
23      Q.    Was what?

57 (Pages 225 to 228)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 229

1   A.   Whether the presses was
2   running.
3   Q.   Okay. Do you have any reason
4   to think that Jim Brookshire has any bad
5   feelings or bad will towards you or anybody
6   else in the military for any reason?
7   A.   Towards me? Yeah. You got,
8   like I say, him and Prater, they were --
9   they rubbed each other's back. You got
10  Prater come back down here a week ago,
11  talked to Bill Seivers telling him that
12  Applegate had told him to get rid of me.
13  You got --
14  Q.   Now, wait a minute. Let's --
15  A.   After I got fired, I called
16  Mr. Moon, he said he would look into it. He
17  says Prater was wrong in doing what he's
18  doing, but I can't do anything about it.
19       Were they rubbing each other's
20  back? Yeah. I mean, everything --
21  Everything started when Prater said I had to
22  have orders.
23  Q.   Okay.

Page 230

1   A.   And that come because -- I
2   don't know why it come about.
3   Q.   Well, I -- I got a pretty good
4   understanding of your relationship with Greg
5   Prater. But I'm interested now in Jim
6   Brookshire. I want to make sure I know all
7   about that.
8        Is what you're telling me that
9   the only issue you've got with Brookshire
10  was his closeness with Greg Prater?
11  A.   Well, every time I -- Not
12  every time. Several times I got called into
13  the office, Jim was there, yes.
14  Q.   When you got called into the
15  office for what?
16  A.   Anything. Like the daily
17  reports, the pit, the lift. Anything.
18  Q.   All right. Would that all be
19  stuff in Brookshire's area?
20  A.   Yeah. He was over that whole
21  area.
22  Q.   Would there be any reason he
23  shouldn't be there?

Page 231

1   A.   Yeah. It wasn't a production
2   issue.
3   Q.   All right. In other words, it
4   was a maintenance issue and Brookshire
5   shouldn't have been there?
6   A.   Yeah.
7   Q.   All right. During any of
8   those meetings did he ever suggest to you
9   that he came because he didn't like you,
10  didn't like the work you did, didn't like
11  the fact that you were in the service, or
12  anything like that?
13  A.   He's a politician, he's not
14  going to come out and say -- He's going to
15  try to make himself look good.
16  Q.   When you say he's a
17  politician, do you mean that literally or
18  figuratively?
19  A.   Figuratively.
20  Q.   Okay. I'm assuming he's never
21  run for -- Had he run for office or anything
22  like that?
23  A.   Not that I know of. You

Page 232

1   probably know him better than I do. I don't
2   know.
3   Q.   Are you just commenting on his
4   personality?
5   A.   Commenting on his personality.
6   Q.   Okay. Can you think of
7   anything else -- Other than showing up when
8   you got called into the office, can you
9   think of anything else Jim Brookshire did or
10  said that you think suggests any sort of
11  feelings against you?
12  A.   I mean, there had to be, why
13  else would he accuse me of sleeping?
14  Q.   What are they? Are you
15  guessing or you know of some?
16  A.   I don't know. You'll have to
17  ask him.
18  Q.   All right.
19       MR. SPORT: And we're trying
20  to right now.
21  Q.   Okay. But from your personal
22  standpoint, do you know of anything?
23  A.   Like I said, everything

58 (Pages 229 to 232)

# FREEDOM COURT REPORTING

Page 233

1   started with my military problem -- my
2   military commitment. And that's where it
3   stayed throughout my tenure there.
4        Q.   Okay.
5        A.   So you have to ask him.
6        Q.   To your knowledge, has Hyundai
7   ever been nominated for any awards related
8   to their employment of military personnel?
9        A.   According to -- According to
10  them they have. And --
11       Q.   Do you think it's not true?
12       A.   -- ESGR.
13            Well, it may be, I don't know.
14       Q.   Okay. Are you saying it's not
15  true?
16       A.   The ESGR rep said they had
17  been put in for one. And they said after I
18  got fired, about two weeks after I got
19  fired, I think, somebody said they put in
20  for one. I'm not sure. The ESGR rep, I
21  don't know, you'll have to call him.
22       Q.   Who are you talking about?
23       A.   That Dan, the one that I told

Page 234

1   you I had e-mailed, that ESGR
2   representative. You'll have to ask him.
3        Q.   Okay. All right. We'll have
4   to come back to that question because I lost
5   that e-mail.
6            Is there anybody else that you
7   and I haven't talked about that either knows
8   -- that works at Hyundai, that either knows
9   anything about problems you had with Prater
10  or HR or anybody related to your service,
11  anybody else?
12       A.   I called Mr. Moon the night I
13  got fired.
14       Q.   Yeah. Let's talk about
15  Mr. Moon. Did you talk to Mr. Moon or did
16  your wife talk to Mr. Moon?
17       A.   I talked to Mr. Moon first and
18  then my wife talked to him.
19       Q.   All right. What did you tell
20  Mr. Moon?
21       A.   I told him that I had been
22  fired, and that I was supposedly fired for
23  sleeping in the SOPS, up on the third floor,

Page 235

1   a week prior.
2        Q.   What did he say?
3        A.   He said that he didn't even
4   know that I was being considered for
5   termination; that he didn't know nothing
6   about it; and that he would look into it.
7        Q.   Okay. Did he say anything
8   else on the night of that call?
9        A.   He apologized for my being
10  fired and he hated that happened because I
11  was a good worker.
12       Q.   Okay. Did you say anything
13  else to him that night?
14       A.   I don't remember. By the time
15  I got home, I was pretty perturbed.
16       Q.   I mean, did you call him from
17  home?
18       A.   Yes, sir.
19       Q.   Did your wife talk to him that
20  night?
21       A.   Yes. She explained everything
22  to him in Korean.
23       Q.   Do you speak Korean?

Page 236

1        A.   Some. Between my Korean and
2   his English, we was able to communicate
3   pretty good.
4        Q.   Did you speak to him some in
5   Korean?
6        A.   I may have. Like I said, I
7   was pretty hot.
8        Q.   But, again, am I right that
9   you told me everything that you told him or
10  that he said to you on that telephone call?
11       A.   He said he would look into it
12  and get back with me.
13       Q.   All right. Based on either
14  what you overheard in Korean -- Was the
15  conversation your wife had with him in
16  Korean?
17       A.   Yes, sir.
18       Q.   Okay. From what you could
19  hear and understand in Korean, or from what
20  she told you later, what is your
21  understanding as to what she said?
22       A.   I wasn't paying attention to
23  the conversation she had with him. But

59 (Pages 233 to 236)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 237

1  basically the same thing, that he told her
2  he hated to see me fired because I was a
3  good employee and that he would look into it
4  and that he would get back with me.
5      Q.    Did he say anything else to
6  your wife that evening?
7      A.    I don't know.
8      Q.    Okay.  Do you know if your
9  wife had any later conversations with him?
10     A.    The next night he called back.
11     Q.    Okay.  And did he speak to you
12 that night?
13     A.    A little bit.  He mostly
14 talked to my wife.
15     Q.    Okay.  Were you able to
16 overhear the conversation?
17     A.    Yes, sir.  I talked to her
18 afterward.
19     Q.    All right.  What did they talk
20 about that night?
21     A.    He stated that Prater was
22 lying, that Prater had been wrong.
23     Q.    That Prater was lying?

Page 238

1      A.    Yes, sir.
2      Q.    Lying about what?
3      A.    My supposedly sleeping at
4  work.
5      Q.    Why did he say Prater was
6  wrong?
7      A.    And that he was --
8          MR. KILBORN:  Don't interrupt
9  him.
10     A.    I don't know.  You'll have to
11 ask him.  That Prater was wrong in firing me
12 and that there was nothing he could do about
13 it now, he was told to stay away from it.
14     Q.    Did he say who said to stay
15 away?
16     A.    No.  You'll have to -- I think
17 he made the comment to Mark Hanks.  I'm not
18 sure.
19     Q.    Do you know what Mr. Moon's --
20 what his position is at the plant?
21     A.    He was the Korean counterpart
22 to Prater; he was from HMC, he was our
23 Korean boss.

Page 239

1      Q.    Okay.  Did he indicate who he
2  had talked to since the last time y'all had
3  a telephone call?
4      A.    I think he talked to -- I
5  think he said it was J.H. Kim or president
6  Ahn.  It was J.H. Kim or Ahn, one, I can't
7  remember.
8      Q.    All right.  Do you know why
9  Mr. Moon said that Greg Prater had lied?
10     A.    You'll have to ask Mr. Moon
11 that.
12     Q.    Okay.  Do you --
13     A.    Mr. Moon said that Prater was
14 a bad man.
15     Q.    Okay.  Did he say specifically
16 what he understood Greg Prater to have lied
17 about?
18     A.    Yeah.  Said that Greg Prater
19 lied about my sleeping at work.
20     Q.    Okay.  Did you get the
21 impression that Mr. Moon thought that Greg
22 Prater had been there that night?
23     A.    No, sir, I did not.

Page 240

1      Q.    Okay.  Did Mr. Moon say that
2  Jim Brookshire had lied?
3      A.    I didn't ask him about Jim
4  Brookshire.
5      Q.    You never talked about Jim
6  Brookshire?
7      A.    No, sir.
8      Q.    Did you know that Jim
9  Brookshire was the one that indicated he had
10 seen you sleeping?
11     A.    Yes, I did.  I knew from the
12 very first meeting.
13     Q.    Okay.  You never told Mr. Moon
14 about that?
15     A.    No, I did not.
16     Q.    You never told Mr. Moon to
17 talk to Mr. Brookshire?
18     A.    No.  I'm sure he probably did,
19 though.  You've interviewed my friends,
20 you'd have to ask them what -- they talked
21 to them.
22     Q.    When you say you're sure
23 you're sure he did, do you know that or are

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 241

1  you just wanting that to be the case?
2     A.   Say again.
3     Q.   When you say you're sure that
4  Mr. Moon talked to Jim Brookshire, why?  Why
5  do you say that?
6     A.   Because of Mr. Moon's attitude
7  toward Prater and production --
8  stamping/production in general.
9     Q.   Okay.
10    A.   Stamping management.
11    Q.   Okay.  Did he ever say
12  anything about Jim Brookshire?
13    A.   On the phone?  No.
14    Q.   Did he say anything about Jim
15  Brookshire in person?
16    A.   No.  We never talked about
17  Jim.
18    Q.   Okay.
19    A.   Usually all we talked about
20  was production -- I mean work-related
21  problems.  But me and Mr. Moon was good
22  friends.  We talked.  We talked a lot.
23    Q.   Did you and Mr. Moon talk

Page 242

1  about who had made the decision to terminate
2  you?
3     A.   No, I did not.
4     Q.   Okay.  Y'all didn't talk about
5  anybody but Greg Prater?
6     A.   I didn't talk about Greg
7  Prater.  I asked -- He told me he would
8  check into seeing why I got fired.  I don't
9  know who he talked to specifically, no.  He
10  said, like I say, it was either J.H. Kim or
11  Ahn, one, and I told you the statements he
12  made.
13    Q.   Okay.  And he didn't say
14  anything else?
15    A.   I don't know.  He talked to my
16  wife, you'll have to -- I don't know.
17    Q.   Okay.  And is your wife's
18  English perfect English?
19    A.   Pretty much.
20    Q.   If we were to take her
21  deposition, would there be any reason we
22  would need an interpreter?
23    A.   Not unless you don't speak

Page 243

1  English.
2     Q.   That's debatable.  I'm
3  assuming y'all talk in English at the house?
4     A.   Yes, sir.
5     Q.   And she works in an
6  English-speaking environment?
7     A.   Yes, sir.  My daughters don't
8  speak Korean, so she speaks English pretty
9  well.
10    Q.   Okay.  Did Mr. Moon indicate
11  -- or did you and Mr. Moon discuss John
12  Applegate at all?
13    A.   No, sir.  At that point I was
14  still upset.  I mean, I was -- I was fired
15  up.  I had been treated like crap, treated
16  like trash, accused of something I didn't
17  do; gone through the wringer for several,
18  several months.  No, I was just upset.  I
19  was bad upset.  I had never had nothing like
20  that happen to me in my life.
21    Q.   Okay.
22    A.   I've got my evaluations from
23  BE&K and everywhere.  When I left BE&K and

Page 244

1  went to International Paper, I got a
2  fifty-three out of fifty-four rating.  I had
3  outstanding marks on my record.  I've had
4  outstanding marks everywhere I worked.  I've
5  never been accused of sleeping or had a
6  blemish on my record.
7     Q.   Okay.  Let's talk a little bit
8  about in your complaint you've included as
9  count number two an outrage claim.  That
10  starts on, I guess, page seven on your
11  complaint.
12        What's indicated here in count
13  two suggests that Hyundai intentionally
14  created a harassing environment and
15  subjected Dees to a pattern of intentional
16  harassment regarding Dees' membership in the
17  Guard and Dees' Guard service obligations.
18        MR. KILBORN:  Are you
19  referring to a specific paragraph?
20        MR. JOHNSON:  Paragraph
21  twenty-four.
22        MR. KILBORN:  Take a look at
23  twenty-four.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 245

1    Q.    If you want to look at that
2  paragraph, you can, Mr. Dees.
3          Have you read it?
4    A.    Yes, sir.
5    Q.    Okay.  Other than the things
6  that we have already talked about, which is
7  obviously quite a bit, are there any other
8  facts that you're aware of to suggest that
9  Hyundai intentionally created a harassing
10  environment?
11    A.    Yes, sir.  Like I said, right
12  from the time it started, my Guard service
13  was a -- the center of everything, until my
14  termination.
15    Q.    Okay.  And you've indicated
16  that.  Is there anything else that you're
17  relying on to support your outrage claim
18  factually?
19    A.    Like I said, you've got a team
20  leader still working out there that said
21  Prater came down a week ago and told him
22  that Applegate told him to get rid of me,
23  that he needed to get rid of me.

Page 246

1    Q.    Who said this and when did
2  they say it?
3    A.    Bill Seivers, he's a team
4  leader on one of the shifts out there now.
5    Q.    When did you talk to him?
6    A.    I didn't.  You'll get a chance
7  to talk to him when you go back to the
8  plant, I reckon.  Prater came by his house a
9  week ago and made the comment that he had
10  recordings of Applegate making the comment
11  he needed to get rid of me.
12    Q.    And you didn't talk to Bill
13  Seivers?
14    A.    No, sir.
15    Q.    Do you know who talked to Bill
16  Seivers and told him he needed to get rid of
17  you?
18    A.    Yes, sir.  Mark Bornberg.
19    Q.    So Mark Bornberg talked to
20  Bill Seivers?
21    A.    Yes, sir.  They work together
22  everyday.
23    Q.    And called you and told you

Page 247

1  what you're telling me now?
2    A.    Yes, sir.
3    Q.    And this was -- when Prater
4  came was when?
5    A.    About a week ago, I think.
6    Q.    And Bill Seivers told Mark
7  Bornberg that Prater had recordings?
8    A.    Of Applegate stating --
9  telling him he needed to get rid of me.
10    Q.    All right.  When were they
11  made?
12    A.    I have no idea.  You'll have
13  to ask Applegate and Prater.
14    Q.    Do you have any idea, based on
15  your discussions with Mark Bornberg, why,
16  apparently, Greg Prater came to Bill
17  Seivers' house to talk to him?
18    A.    I have no idea.
19    Q.    Do you have any idea why they
20  would have talked about this situation?
21    A.    You'll have to ask Bill
22  Seivers that, or Prater.
23    Q.    And, again, I just want to

Page 248

1  know what you know.  If you don't know
2  anything, that's fine.
3          Did you work with Bill
4  Seivers?
5    A.    Yes, sir.  He was a team
6  leader on the other shift.
7    Q.    Okay.  Was Bill Seivers
8  somebody you were close to?
9    A.    I mean, yeah, we worked --
10  Like I said, everybody in our section, we
11  lived there, twelve hours a day, sometimes
12  seven days a week.
13    Q.    Okay.  Were he and Prater
14  particularly close?
15    A.    I don't know.  You'll have to
16  ask them about that.
17    Q.    Okay.  Another thing that
18  you've indicated in your outrage claim on
19  page seven of your complaint is that this
20  situation caused you severe emotional
21  distress.
22          What -- I mean, what kind of
23  severe emotional distress have you suffered?

62  (Pages 245 to 248)

### 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 249

1     A.    I have never, never had a
2  blemish on any record, as I've stated
3  before, military or civilian.  When you're
4  standing there among your friends, you've
5  got security guards coming in telling you
6  you've got to go, treating you like a
7  criminal, they won't even let you go get
8  your personal property, that HMMA says
9  belongs to them once it gets through that
10  gate, says it's no longer yours, it's
11  theirs, you can't go get it; walking you
12  out, surrounding you like you're a crook.
13         Here I have -- Like I said, I
14  ain't no war hero, but I served my country
15  proudly so they can act like that and that
16  ain't -- I was walked out like a criminal.
17  When I got to that building, that security
18  building, I walked in, everybody is just
19  standing there bowed up and everything.  I'm
20  the focus of attention and it ain't good.
21  I'm walked in a room, I'm sat down, this
22  lady introduces herself, the next gentleman,
23  the next gentleman, and then she reads me a

Page 250

1  letter, slams it down on the table, face
2  down.  When I asked her questions, she's
3  short, very rude, gets up and walks out.
4         And then, the only thing
5  they're worried about is getting your little
6  security lock, your safety lock, and the
7  keys.  And you ask why come I'm being fired?
8  What happened to your firing process?  They
9  act like you're not even there; they don't
10  even want to acknowledge you.  You get
11  walked out, you're dropped off down here
12  (indicating), your truck is three gates up.
13  Security guard volunteered to take me to my
14  truck.  When I get to my truck, I had to
15  call them aside to get them to bring me my
16  tool bag, and then they got on to Shane
17  Archer for bringing me my tool bag that I
18  had purchased with my money, that they said
19  now belonged to them because I brought it in
20  that gate.  I go home, my wife, I call her,
21  she's crying.
22         All of a sudden I've gone from
23  a very, very good job that I wanted to keep,

Page 251

1  that was very hard to get, with better
2  benefits than I had on active duty in the
3  military, to unemployed.  Then I've got to
4  go home and try to comfort her.  All my
5  friends at work, everybody -- there's a lot
6  of people that work there, then they're
7  looking at you like why did you get fired?
8  Yeah, it hurt.  That ain't right.
9     Q.    It sounds to me like you got a
10  significant amount of problems with the way
11  in which the termination was conducted?
12     A.    It ain't just the way.  Why
13  was I terminated?
14     Q.    Okay.
15     A.    Like I said, they ignored
16  their own process.  They got a seven -- six-
17  or seven-step process.  I went from zero to
18  fired.  After several complaints, even a
19  complaint -- a letter sent by my unit, and
20  it's the same complaint the whole time, all
21  of a sudden I'm fired for an accusation that
22  occurred in a matter of five minutes.  No.
23     Q.    Any other facts you can point

Page 252

1  to that have resulted in severe emotional
2  distress?
3     A.    Made it look like my military
4  career wasn't worth a flip.  Made it look
5  like I was just some piece of trash come up
6  looking for a job.
7     Q.    Is that all the facts that
8  you're relying on to support your severe
9  emotional distress claim?
10     A.    Is that all the facts?  No.
11  My wife is still -- Everybody is still like:
12  I can't believe Leon got fired.
13     Q.    Tell me how -- I mean, tell me
14  how else it has impacted you.
15     A.    It impacted me financially big
16  time.  I go from a job where I'm bringing
17  home real good money, insurance, like I
18  said, better than I had in the military, to
19  a job where -- I'm just jobless.  And the
20  only reason I got a job the next day, is
21  because of a fellow I grew up with that I'd
22  known all my life.  Because when I went in
23  to fill out the job application the next

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 253

1  morning, the fellow told me, he asked me,
2  why did you leave Hyundai.  I told him, I
3  said, I got fired.  He said, I'm going to
4  tell you straight up, if it hadn't been for
5  your friend there recommending you, I would
6  not have hired you.
7      Q.    Who was your friend that
8  recommended you?
9      A.    James Daniel Smitherman.
10     Q.    Smitherman?
11     A.    Yes, sir.  They told me
12  straight up they wouldn't have hired me
13  simply because I had been fired.  I didn't
14  lie to them, I told them why I was fired,
15  said they accused me of sleeping on the job.
16  And when I got on with International Paper,
17  same thing, if I hadn't been working there
18  for five months and they hadn't seen my work
19  performance, they told me they would not
20  have hired me.  Because I told them, same
21  thing, they asked me why I left Hyundai, I
22  told them the circumstances, everything, I
23  didn't holdback.  I told them everything.

Page 254

1  And they said, you better be glad we saw
2  your work performance and James recommended
3  you or you would not be getting this job.
4      Q.    Okay.  In terms of the severe
5  emotional distress you're claiming in this
6  lawsuit, did you ever talk to your pastor
7  about it, seek any counseling, go to the
8  doctor about it?
9      A.    I'm a soldier, I don't have
10  time to talk to nobody and I had a family to
11  feed, a kid in college, a kid in high
12  school.  I had to work because I wasn't
13  making nowhere near what I was bringing home
14  out there.
15     Q.    Did it have any physical
16  impact on you at home?  I mean did you cry a
17  lot?
18     A.    I don't cry.  Unless my friend
19  is dead, I don't cry.
20     Q.    Did you lose sleep over it?
21     A.    Yeah.  When you get fired, I
22  stayed wake all night several nights.
23     Q.    How many nights?

Page 255

1      A.    I don't know.
2      Q.    All night?
3      A.    All night the first few
4  nights, yeah.  I've never -- I told you I've
5  never, never had a blemish on my record.
6      Q.    Since those first few nights,
7  have you lost any sleep over it?
8      A.    I don't know.  I mean, there's
9  times me and her talk about it, yeah.  I've
10  never been treated like that, never.
11     Q.    All right.  Are there any
12  other sort of psychological problems that
13  you've had as a result of the emotional
14  distress of this incident?
15     A.    Yeah.  Every time I go to fill
16  out an application anywhere it says have you
17  ever been terminated?  Yes, I have.  And
18  why?
19     Q.    Are you filling out job
20  applications currently?
21     A.    No.  But even if you go to a
22  bank and fill out a loan application,
23  they'll ask if you've ever been terminated

Page 256

1  from a job.  I'm an honest person, like I
2  said, I'll tell you when I mess up.  And
3  I've got to put yes, and they're going to
4  ask my why and I've got to tell them.
5      Q.    Have you received any medical
6  treatment as a result of emotional distress
7  as a result of this incident?
8      A.    I told you, I've got a family
9  with a kid in college, I ain't got time to
10  seek nothing, I've got to make money.
11          I've got a girl that's in a
12  third year in college and junior in high
13  school, I don't have time to go talk to
14  nobody.  I got bills to pay, like everybody
15  else.
16     Q.    You mentioned that Shane
17  Archer had gotten your tool bag?
18     A.    Yes, sir.  And they got onto
19  him for that.  They threatened to fire him.
20     Q.    I want to make sure I
21  understand what was going on there.  I
22  assume your tool bag -- Where was your tool
23  bag when he went to get it?

64  (Pages 253 to 256)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 257

1    A.    It was in the plant back there
2  in the stamping section. I don't even
3  remember where I left it.
4    Q.    So when they had come to get
5  you before they went and cleaned out your
6  locker and gave you your jacket, had you had
7  your tool bag with you somewhere out in the
8  plant, you just left it there?
9    A.    Yes, sir.
10    Q.    When they came up to you?
11    A.    Yes, sir.
12    Q.    Where did Shane Archer bring
13  it to you?
14    A.    He brought it to the gate up
15  there in front of body weld, up there where
16  I parked.
17    Q.    Okay. And that was after you
18  sat down with Wendy Warner and the others to
19  talk about the termination?
20    A.    They kicked me out of the
21  plant, I couldn't get back in. As a matter
22  of fact, the guard that gave me a ride to my
23  truck, come back around there to the gate

Page 258

1  and wanted to know why I was still there.
2  And Don Gillingham, something like that, the
3  body weld maintenance manager, he was
4  standing outside, about thirty feet down
5  from me. Apparently everybody but me knew I
6  was getting fired because he called security
7  and asked what I was still doing there, when
8  all I'm doing is waiting on my tool bag. I
9  was treated like a thug, and I don't like
10  it. I might as well have been a prisoner of
11  war somewhere.
12    THE WITNESS: Let me take a
13  break and go check on my wife.
14    MR. JOHNSON: Okay. That's
15  fine.
16    (Recess taken.)
17    (Whereupon, Defendant's
18    Exhibit No. 6 was marked
19    for identification.)
20    Q.    Mr. Dees, this is something
21  we've marked as Exhibit 6 to your
22  deposition. Can you take a look at that and
23  tell me whether that -- you've seen this

Page 259

1  document before?
2    MR. SPORT: Matt, while he's
3  looking at that, would you mind -- if the
4  document is Bates numbered, putting the
5  Bates number in the Record?
6    MR. JOHNSON: The only reason
7  I wouldn't, is because some of these are our
8  documents and some are your documents, so
9  the Bates numbers -- if I say it's Bates
10  number 35 --
11    MR. SPORT: Just read the
12  Bates number into the Record.
13    MR. JOHNSON: I know. But if
14  I say Bates number 35, it could be my Bates
15  number 35 or your Bates number 35.
16    MR. SPORT: Well, no, your
17  Bates sequence is Dees V. HMMA and ours is
18  just Dees. So they are different.
19    MR. JOHNSON: Why don't we
20  just use the exhibit numbers. It's a
21  deposition, why don't we just use exhibit
22  numbers.
23    MR. SPORT: Okay. Well, I

Page 260

1  don't know why you would be opposed to
2  putting the Bates number in the Record.
3    MR. KILBORN: Well, I'll put
4  it in there. It's Dees versus HMMA 00035.
5    Q.    Have you read it?
6    A.    Yes, sir.
7    Q.    Several lines down there in
8  bold print it suggests that -- or Greg
9  Prater suggests that during his discussion
10  with you at one point you responded by
11  saying, quote, I just don't give a damn.
12  You guys just do whatever you want. I'm fed
13  up with this -- and I'll spell -- S-H-I-T,
14  period, end quote.
15    Do you recall ever making a
16  statement similar to that?
17    A.    A statement I made to him.
18  Then he referred to -- You've got to look at
19  it if you were a forward observer on lookout
20  guard duty. The statement I made to him is,
21  if I were the lookout on guard duty, I
22  wouldn't be sleeping.
23    Q.    So are you saying you did not

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 261

1  make the comment he has in bold print there?
2      A.    No, sir, I did not.
3      Q.    Okay.  Not at that time, and
4  never at any time?
5      A.    (Witness shakes head in the
6  negative.)
7      Q.    When you say you remember --
8  Are you saying you don't remember making it
9  or you know you didn't make it?
10     A.    No, sir, I didn't -- I didn't
11 cuss him like that.
12     Q.    Okay.
13     A.    And I didn't make --
14     Q.    When you say you didn't cuss
15 him like that, is that because you don't use
16 curse words?
17     A.    Try not to.
18     Q.    Okay.  When you say try not
19 to, do you succeed or do you use them?
20     A.    Most of the time I do.
21     Q.    Okay.  Is it your testimony
22 that you did not use curse words at Greg
23 Prater?

Page 262

1      A.    No, sir, I did not.
2      Q.    Did you use any at anybody at
3  the plant?
4      A.    No, sir.
5      Q.    Okay.  Did you use curse words
6  around your coworkers?
7      A.    No, sir.  Most of the time --
8  If I mash my finger or something.
9             No, sir, I try not to, and
10 most of the time I don't.  I'm not going to
11 sit here and tell you no, I never do it.
12     Q.    In your conversations with
13 Greg Prater, at any point in time did you
14 ever ask him, what can I do about this
15 situation?  How can I keep my job?  What can
16 I do to keep my job?
17     A.    I didn't think my job was in
18 jeopardy at that point.  Like I said, they
19 have a six- or seven-step firing process.  I
20 haven't even entered phase one at this step,
21 at this phase.  I have not entered the
22 firing process whatsoever.  Any time you --
23 Lucas Cooner told us, any time you enter a

Page 263

1  firing process, they have to tell you.
2      Q.    All right.  Now, so in terms
3  of this process, did you ever raise that
4  issue?  Did you ever say, hey, somebody,
5  it's not right to terminate me, I haven't
6  gone through the process?
7      A.    That lady.
8      Q.    Wendy Warner?
9      A.    That's her.
10     Q.    Okay.
11     A.    And like I said, it's like I
12 wasn't even talking.
13     Q.    Did she respond to you or say
14 anything about that process?
15     A.    No, sir.
16     Q.    Okay.  Now, I mean, in terms
17 of processes and procedures, did you engage
18 in any subsequent processes or procedures
19 after your termination to try to get your
20 job back or try to get the situation
21 changed?
22     A.    I called them about the --
23 what's it called?

Page 264

1      Q.    Team member review?
2      A.    That's it.
3      Q.    Okay.  Tell me about that.
4  Who did you call?
5      A.    I never could get ahold of
6  nobody.  I had Rob Clevenger's number, I
7  think, and I never saw him.  I'd leave him
8  messages and he'd leave me messages.
9      Q.    So y'all traded messages?
10     A.    Yes, sir.
11     Q.    Did Wendy Warner ever call
12 you?
13     A.    No, sir.
14     Q.    Did anybody but Rob Clevenger
15 ever call you about the review process?
16     A.    I don't think so.  I don't
17 know.
18     Q.    Okay.  Do you remember getting
19 a letter from Wendy Warner indicating when
20 the team member review would be scheduled
21 for?
22     A.    Yeah.  I got it on a Saturday
23 evening and that review was supposed to have

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 265

1   been a Monday morning.
2           (Whereupon, Defendant's
3           Exhibit No. 7 was marked
4           for identification.)
5       Q.    Okay.  And let me mark as
6   Exhibit 7, a copy of the letter.
7       MR. JOHNSON:  For Mr. Sport
8   and Mr. Kilborn's benefit, that's Dees V
9   HMMA document 1.
10      MR. KILBORN:  Thank you.
11      Q.    Mr. Dees, what we've marked
12  there as Exhibit 7, do you recall receiving
13  that letter at your home?
14      A.    Yes, sir.
15      Q.    And you say you received that
16  on a Saturday?
17      A.    Yes, sir.
18      Q.    Okay.  And then the review was
19  scheduled for the following Monday?
20      A.    Yes, sir.
21      Q.    Okay.  And it was scheduled
22  for ten o'clock in the morning?
23      A.    Yes, sir.

Page 266

1       Q.    And did you attend?
2       A.    No, sir.
3       Q.    Did you call Wendy Warner to
4   talk about it?
5       A.    No, sir.
6       Q.    Did you call Rob Clevenger to
7   talk about it?
8       A.    No, sir.
9       Q.    Did you call anybody to say I
10  can't be there at ten?
11      A.    No, sir.  I believe I talked
12  to my lawyers about it.
13      Q.    Okay.  And after talking to
14  your lawyers, you didn't show up?
15      A.    No, sir.  The reason I didn't
16  show up, because I had a job that was paying
17  a little bit, even though it wasn't paying
18  what I was making at Hyundai.  And if I had
19  taken off from a job, not only being there a
20  week or two to go to meet to try to get my
21  old job, I wouldn't have had a job when I
22  got back the next day.
23      Q.    Did you tell anybody at

Page 267

1   Hyundai that you got another job and it
2   conflicts with that ten o'clock meeting?
3       A.    I got this letter Saturday
4   evening.  Monday morning you're not going to
5   get ahold of anybody there.
6       Q.    Had you ever left a voicemail
7   with Rob Clevenger saying that you had
8   another job and telling him when it ought to
9   be scheduled?
10      A.    No, sir.  This letter and
11  those two little messages, the only thing I
12  got was that I met the requirements, and
13  that was it.  I didn't know what was going
14  on, I never could get ahold of nobody there.
15      Q.    Did you write them a letter?
16      A.    No, sir, I did not.
17      Q.    Were you keeping notes about
18  what was going on at this point in time?
19      A.    No, sir.  I had to make money.
20      Q.    Okay.
21      A.    Because I had to work a lot of
22  hours because I wasn't making nowhere near
23  what I was making.

Page 268

1       Q.    You said you were keeping
2   notes when you were at Hyundai, you were
3   making money then, weren't you?
4       A.    Yes, I was.
5       Q.    And you were working?
6       A.    Yes, sir.
7       Q.    And you were keeping notes
8   then?
9       A.    I didn't have the problems I
10  was having then.
11      Q.    And this was still going on
12  later?
13      A.    There was no one to talk to,
14  what notes was there to keep?  I had two
15  messages on my answering machine.  What else
16  is there to keep?  I kept the messages.
17      Q.    Do you think they were both
18  from Rob Clevenger?
19      A.    I don't remember.  I know one
20  of them was.  I don't remember if both of
21  them were or not.  I don't know.
22      Q.    So you remember one of them
23  was from Rob Clevenger?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 269

1    A.    Yes, sir.
2    Q.    And the other may have been
3    from him, may have been from somebody else?
4    A.    May have been.
5    Q.    Do you know when those
6    telephone messages came in?
7    A.    According to this, it says
8    March the 2nd and March the 7th.  May or may
9    not have been, I don't know.  Like I said,
10   my world had been turned upside down.
11   Q.    Do you recall receiving the
12   initial phone message on March the 2nd?
13   A.    I don't believe so.
14   Q.    And do you know whether that
15   was from Rob Clevenger or who?
16   A.    I don't remember.
17   Q.    Do you remember returning that
18   call immediately?
19   A.    No, sir.  Because it was late
20   in the evening, I had gotten home from work
21   late.
22   Q.    All right.  Did you return
23   that call the next day?

Page 270

1    A.    I may have.  I don't know.
2    Q.    All right.  Do you remember
3    returning that call before March the 5th?
4    A.    I don't know.  I don't recall.
5    Q.    All right.  Do you remember
6    returning that call before March the 7th?
7    A.    I don't know.
8    Q.    Okay.  And, again, was it your
9    understanding when you received this letter
10   marked Exhibit 7, that the -- you were
11   supposed to meet with Rob Clevenger on that
12   Monday morning to talk about the review
13   process?
14   A.    Yes, sir.  That wasn't a
15   guarantee that I was going to get a job
16   back.  That was just a selected panel to see
17   about getting the job back, to go back into
18   the firing.
19   Q.    Did you know how the panel
20   selection process worked?
21   A.    No, sir.
22   Q.    Do you know whether it would
23   have been a panel of your peers that you

Page 271

1    would have selected from or how it would
2    have been done?
3    A.    I didn't know anything about
4    the process at all.
5    Q.    And you didn't show up to find
6    out?
7    A.    No, sir.  Like I said, I had
8    to work.  I couldn't take a chance on losing
9    a job that I had gotten through a friend to
10   try and look, maybe possibly one in a
11   million shot getting a job back that I had
12   been fired from.
13   Q.    You never called Rob Clevenger
14   that morning before you went to work to tell
15   him you couldn't make it?
16   A.    No, sir.
17   Q.    And you never called him
18   since, did you?
19   A.    No, sir.
20   Q.    Are you aware of any other
21   process at Hyundai that might possibly allow
22   you to get your job back, other than this
23   team member review process?

Page 272

1    A.    I don't know.  I don't know
2    what they have.
3    Q.    Okay.  But the one you did
4    know of, you didn't use, did you?
5    A.    At that point, no, sir.  Like
6    I said, I have a family to feed.  I can't
7    afford to lose one job for a job I had been
8    fired from already.  If I'd have left that
9    job to try and get that review back, I might
10   not have got another job.
11          (Whereupon, Defendant's
12          Exhibit No. 8 was marked
13          for identification.)
14   Q.    Let's mark this as Exhibit 8.
15   And this is Dees 3.
16          Mr. Dees, have you had a
17   chance to look at Exhibit 8?
18   A.    Yes, sir.
19   Q.    Okay.  Are you familiar with
20   that exhibit?
21   A.    Yes, sir.
22   Q.    Okay.  Tell me what it is.
23   A.    It's a yearly training

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 273

1  calendar schedule for my unit.
2      Q.    For a period beginning October
3  2006?
4      A.    Yes, sir.
5      Q.    Is this -- We talked earlier
6  about y'all get a training schedule on an
7  annual basis.  Was this what you were
8  talking about there?
9      A.    Yes, sir.
10     Q.    Okay.  Would this -- Am I
11 correct that this would show all training
12 dates beginning October 21 of '06 through
13 that training year?
14     A.    When this schedule was made,
15 yes, sir.  They were subject to change and
16 subject to be added to and taken from.
17     Q.    Okay.  Do you know if from
18 October 21st going forward, it was in fact
19 changed, added to, or subtracted from?
20     A.    You'd have to call my unit and
21 ask them.
22     Q.    Again, I'm asking you if you
23 know.

Page 274

1      A.    I don't remember.  It may
2  have, may not have been.  I don't know.
3      Q.    Okay.  Do you know -- You'd
4  indicated there was sort of an initial point
5  at which Greg Prater demanded orders.  Do
6  you know if any of the -- if any of these
7  are the dates that he demanded orders for?
8      A.    Probably several of them.
9      Q.    You think more than one
10 possibly?
11     A.    It had to have been October.
12 Like I said, it was several, several months.
13          (Whereupon, Defendant's
14          Exhibit No. 9 was marked
15          for identification.)
16     Q.    Okay.  And let's go ahead,
17 just so you can have both documents, also
18 mark as Exhibit 9, your '05 schedule.
19     A.    This is an '06 schedule.  It
20 says '06 on top.
21          MR. SPORT:  I was wondering
22 where you got the '05, because I don't have
23 it.

Page 275

1          MR. JOHNSON:  It's Dees 4.
2      A.    You got 1 October 05 in the
3  upper right-hand corner, but your month and
4  dates say '06.  This is the company training
5  schedule, this is my detachment training
6  schedule.
7      Q.    Okay.  Let me make sure.
8          MR. SPORT:  So somewhere on
9  this document is an error, we just don't
10 know what it is.  It's either in the dates
11 or it's on the date of the document.  We
12 don't know what it is.
13     A.    This one has company
14 commander's signature (indicating), this one
15 has my detachment commander's signature
16 (indicating).
17     Q.    All right.  Well, let me get
18 these marked and we'll talk through them and
19 figure out what they show.
20          All right.  So if we look at
21 -- What we've marked Exhibit 9, that shows a
22 date of October 1, of '05, but it has drill
23 dates in '06; correct?

Page 276

1      A.    Yes, sir.
2      Q.    Does that -- Does that make
3  sense to you?
4      A.    No.  I mean, I don't know.
5  You'll have to call my unit and ask them.
6      Q.    Okay.
7      A.    That would be Sergeant Barnes.
8      Q.    Look at the fax numbers there
9  at the top.  Do you recognize any of those
10 fax numbers?
11     A.    Yes, sir.
12     Q.    What is the -- Do you
13 recognize the 334-366-5278?
14     A.    Yes, sir.  That's to my wife.
15     Q.    That's to your wife?
16     A.    Yes, sir.
17     Q.    And the date of that fax
18 letter is March 26 of '07; correct?
19     A.    Yes, sir.
20          MR. SPORT:  Matt, if I can
21 interrupt you.
22          MR. JOHNSON:  Sure.
23          MR. SPORT:  It appears those

69 (Pages 273 to 276)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 277

1  two pages, page three and four, are pages
2  three and four of a fax that starts with
3  Dees 1 and 2, which you've already marked
4  earlier as Exhibit whatever.
5        MR. JOHNSON:  Okay.
6        MR. SPORT:  So it appears on
7  March 26th, Sergeant Barnes faxed all four
8  of those pages.  And Dees 5 is simply the
9  original of the fax version of Dees 3.  I
10 don't know if that clears anything up, but
11 that's the way it appears.
12       Q.    Okay.  Well, let's go back on
13 the Record.
14       Just so I can make sure, if we
15 look at Exhibit 6 and Exhibit -- I'm sorry,
16 Exhibit 8 and Exhibit 9, the 334-366-5278
17 fax number is to your wife; correct?
18       A.    Yes, sir.
19       Q.    And the date is March the
20 26th?
21       A.    Same day as the letter.
22       Q.    Same day as the letter, which
23 we previously marked as Exhibit 5.  So if

Page 278

1  you'd look -- hold Exhibit 5 up there for
2  just a second.
3        A.    (Witness complies.)
4        Q.    All right.  So, Mr. Dees, does
5  it make sense to you that Exhibit 5 goes
6  along with Exhibit 8 and 9, as a single fax?
7        A.    Yes, sir.
8        Q.    Okay.  And it was sent from
9  the National Guard unit?
10       A.    Yes, sir.
11       Q.    Were you there on March the
12 26th of '07?
13       A.    No, sir.  I don't believe.  I
14 believe that was a weekday.
15       Q.    Okay.
16       A.    And if it was, I was at work.
17       Q.    And who is Kevin Smith?
18       A.    Company commander.
19       Q.    And who is Shawn C. Dall?
20       A.    Detachment commander.
21       Q.    Okay.  What's the difference
22 between company commander and the detachment
23 commander?

Page 279

1        A.    Company commander is over the
2  detachment commander, we fall under the
3  company.
4        Q.    So would Shawn Dall have been
5  higher up the chain of command than Kevin
6  Smith?
7        A.    No, sir.
8        Q.    I got it backwards?
9        A.    Yes, sir.  Company is down in
10 Fairhope, we're up in Brewton.
11       Q.    Why would orders come from two
12 different places?  Would they not always
13 come from the same place?
14       A.    That's not orders.  That's
15 just the schedule.
16       Q.    Why would the schedule come
17 from two different places?
18       A.    Because we're not in the same
19 building as the company.  Our company is
20 down in Fairhope, we're up in Brewton.
21 We're in two separate locations.
22       Q.    Okay.  Now, what is the -- and
23 the company is the 1165th Detachment 1?

Page 280

1        A.    We're Detachment 1, 3rd
2  Platoon, 1165th Military Police Company.
3        Q.    Okay.  So does the training
4  schedule ordinarily come from the detachment
5  or from the company?
6        A.    That depends on the CO, what
7  he wants, what he tells that lieutenant to
8  do.
9        Q.    Okay.  And the CO being who?
10       A.    CO being Lieutenant Smith,
11 which is no longer the CO.
12       Q.    Who is now?
13       A.    Captain Payne.
14       Q.    What's his first name?
15       A.    Captain.
16       Q.    Or her first name?
17       A.    I don't know.
18       Q.    And Captain Payne is in
19 Fairhope?
20       A.    Yes, sir.
21       Q.    Did you keep records of your
22 training schedule?
23       A.    I have one posted on my

70 (Pages 277 to 280)

# FREEDOM COURT REPORTING

Page 281

1  refrigerator at the house.
2      Q.    All right.  Did you keep it
3  for '06?
4      A.    Do I have it now is what
5  you're saying?
6      Q.    Yes.
7      A.    Whatever this current year's
8  training schedule is on my refrigerator,
9  yes.
10     Q.    All right.  But --
11     A.    Did I keep them from the
12  previous?
13     Q.    Right.
14     A.    No.
15     Q.    Okay.  Do you have -- Do you
16  have a training schedule for the period
17  beginning the first part of '07?  Will that
18  -- I assume that's Exhibit 8 here?
19     A.    Yes, sir.  My company went to
20  Fort McClellan for AT this summer, and I
21  went this year and I went to Belize for AT.
22     Q.    AT being annual training?
23     A.    Annual training.

Page 282

1      Q.    And where did that take place
2  -- I mean when did that take place?
3      A.    12 May through 26 May.
4      Q.    And the training that you were
5  just on?
6      A.    Yes, sir.
7      Q.    Tell me what that was called
8  again.
9      A.    Basic Noncommissioned Officers
10  Course Phase II and III.
11     Q.    And was your current employer
12  aware you were going on that?
13     A.    Yes, sir.
14     Q.    And is your current employer
15  aware that you are back?
16     A.    Yes, sir.
17     Q.    Okay.  Is your current
18  employer aware that you are here today?
19     A.    Yes, sir.
20     Q.    We've gotten a copy of some
21  cell phone records from your attorneys that
22  were faxed to us here today.
23     A.    Yes.

Page 283

1      Q.    I want to mark those as
2  Exhibit 10.
3              (Whereupon, Defendant's
4              Exhibit No. 10 was marked
5              for identification.)
6          MR. SPORT:  Matt, do I
7  understand you'd like me to get you a little
8  more legible copy than that?
9          MR. JOHNSON:  Yes.
10         MR. SPORT:  I'll scan it and
11  e-mail it to you.
12         MR. JOHNSON:  That would be
13  great.  I would appreciate that.
14     Q.    Mr. Dees, let me let you look
15  at Exhibit 10.  Unfortunately we're going to
16  have to share a little bit on Exhibit 10,
17  because it's the only copy we've got -- or
18  it's the only copy I've got.
19         MR. JOHNSON:  Do we have
20  another copy?  Doesn't matter.  Just so I
21  understand, has any portion of this been
22  redacted, Jeff?
23         MR. SPORT:  Yes.

Page 284

1          MR. JOHNSON:  Do you know
2  which portion has been redacted?
3          MR. SPORT:  Account number and
4  carrier.
5          MR. JOHNSON:  I can see where
6  account number is redacted, invoice number
7  is redacted --
8          MR. SPORT:  And the carrier's
9  name appears on the page and we redacted
10  that.  All the phone call information --
11         MR. JOHNSON:  You mean who
12  provided the cell phone service?
13         MR. SPORT:  Yes.
14         MR. JOHNSON:  You mean you're
15  not going to tell us who he got his cell
16  phone from?
17         MR. SPORT:  I don't think
18  you're entitled to it.
19         MR. JOHNSON:  Well, I'm going
20  to ask him about it, and we can argue about
21  that later.
22             It also suggests here under
23  detail for Leon, it says 334, did you redact

71 (Pages 281 to 284)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 285

1  his cell phone number?
2       MR. SPORT: Yes.
3       MR. JOHNSON: Are you not
4  wanting us to know what cell phone number he
5  used? I mean was it redacted on purpose?
6       MR. SPORT: Yes.
7       MR. JOHNSON: What was the
8  purpose?
9       MR. SPORT: We originally
10 objected to it because of privacy reasons.
11 It does have something -- the calls made
12 around the date in question do have
13 something to do with the case, so we
14 produced that page, we just don't feel
15 you're entitled to the rest of the
16 information.
17      Q.   Okay. I'm going to ask you
18 questions now about Exhibit Number 10.
19 Mr. Dees, am I correct that it's your
20 testimony today and previously that on the
21 night in question, when Jim Brookshire saw
22 you up on the third level, you were using
23 your phone to send a text message to your

Page 286

1  daughter?
2       A.   Yes, sir.
3       Q.   And what was the text message
4  about?
5       A.   To let her know that I was
6  okay.
7       Q.   Would there be any reason you
8  would not be okay?
9       A.   Well, she was worried.
10      Q.   Well, when you say she was
11 worried, how do you know she was worried?
12      A.   Because she called me before I
13 got to work on my way to work, I believe.
14      Q.   Okay. You think she called
15 you on your cell phone?
16      A.   Yes, sir. I believe it's on
17 there.
18      Q.   All right. If you can, show
19 me where that is.
20      A.   I can't for my life make out
21 -- I don't know. I see the 14:45, incoming.
22      Q.   All right. What is the date
23 you're looking at?

Page 287

1       A.   13th, February 13th and 14th.
2       Q.   Okay. And you see a telephone
3  call coming in on the 13th?
4       A.   I don't remember what day --
5  What day are you talking about? What day
6  are you wanting?
7       Q.   Well, what I understand to be
8  the case, and subject to your agreement or
9  disagreement, was that, at least according
10 to the witness statements, Jim Brookshire
11 saw you in the third level at approximately
12 one a.m. on February 14th. So you would
13 have been coming to work on the 13th, I
14 assume.
15      MR. KILBORN: Say that again.
16      MR. JOHNSON: He was seen on
17 February 14th and would have been -- started
18 work on the afternoon or dinnertime on the
19 13th.
20      A.   That's going to be it there,
21 the Birmingham, Alabama. 671, whatever it
22 is, six-something p.m.
23      Q.   Say that again.

Page 288

1       A.   Right here (indicating),
2  whatever this is here. There's two or
3  three. It looks like my wife called or
4  either the youngest daughter called from the
5  house.
6       Q.   Are you looking on the 13th
7  there?
8       A.   These right here (indicating).
9       Q.   The 5:23 p.m., I'm assuming
10 that's what that says.
11      A.   Yeah.
12      Q.   And then six --
13      A.   Let's see. I start -- I think
14 it's these two (indicating), from what I can
15 see. I don't -- Six something, I don't know
16 what that is.
17      Q.   All right. Well, let's just
18 -- we'll break this thing out -- it says --
19 the dotted lines going across, there's seven
20 -- this is in the seventh area between the
21 dotted lines.
22      A.   That's the Birmingham call
23 there.

72 (Pages 285 to 288)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 289

1    Q.    All right.  The Birmingham
2    call from, and is that 205-389-5974?
3    A.    Yes, sir, I believe that's it.
4    Q.    All right.  Whose number is
5    that?
6    A.    That's one of her friends.
7    Q.    That's one of your daughter's
8    friends?
9    A.    Yes.
10    Q.    So you think that was your
11    daughter calling from Birmingham?
12    A.    They was down in the basement.
13    She had left her phone in the room.
14    Q.    Okay.
15    A.    They put them down in the
16    basement because of the weather.
17    Q.    Okay.  And the call right
18    before that, from a 334 number in
19    Maplesville, is that your home number or
20    your wife's number?
21    A.    That's my home number.
22    Q.    Okay.  And then the next
23    number from Maplesville, I'm assuming that's

Page 290

1    also your home number?
2    A.    Yes, sir.
3    Q.    Okay.  Can you read what time
4    that came in to you?
5    A.    I have no idea.
6    Q.    Okay.
7    A.    Something P, twenty-eight P.
8    Q.    All right.  Now, do you carry
9    your personal cell phone with you when you
10    were in the plant?
11    A.    Yes, sir.
12    Q.    All the time?
13    A.    Reason being, those radios --
14    like I said, those radios, sometimes they
15    work, sometimes they didn't.  A lot of times
16    we would -- Prater told us if we had a
17    breakdown over five or ten minutes, to call
18    him at home, no matter what time of the
19    night it was.  And we got called by him on
20    our personal phones that we paid for the
21    calls a lot of times on breakdowns.  I even
22    had to call Mr. Moon several times on
23    breakdowns.

Page 291

1    Q.    Okay.  Let me ask you here.
2    Looks like on February 14th, there's a
3    couple of incoming calls from -- I'm
4    guessing that's 334-419-1445?
5    A.    That's my number.  It says
6    incoming.  I don't know who it was.
7    Q.    That's your home phone number?
8    A.    No, sir.  That's my cell
9    number.  I don't know who was calling.  I
10    don't know.  It just lists it as an incoming
11    call.
12    Q.    Well, on your cell phone
13    records does it list as an incoming call --
14    A.    It's listed there as an
15    incoming call.
16    Q.    I'm just trying to figure out,
17    it looks to me -- I'm just trying to read
18    your records, does it not make more sense
19    that the calls to Maplesville and Birmingham
20    were calls that were made by you to somebody
21    else?
22    A.    No, sir.  Like this here
23    (indicating), it lists my number, that means

Page 292

1    they don't know who the number was that
2    called me.
3    Q.    Oh, okay.  So is it -- is this
4    all incoming calls or does it -- On your
5    phone records, does it separately list calls
6    that you made outgoing?
7    A.    I ain't never been asked
8    before, so . . .
9    Q.    All right.  Does it separately
10    list calls -- text messages that goes out?
11    A.    It just charges you for each
12    text message.
13    Q.    Okay.  Does it indicate when
14    you made those text messages?
15    A.    No, sir.  You just get a
16    charge.
17    Q.    All right.  Do you still have
18    the same telephone number?
19    A.    Yes, sir.
20    Q.    And have you reviewed your
21    telephone to see if you still have the text
22    messages on it from this period of time?
23    A.    A year ago?  No, sir.  I never

73 (Pages 289 to 292)

# FREEDOM COURT REPORTING

Page 293

1  did get through that night.  The weather was
2  bad.  Sometimes it could be sunny outside
3  and for some reason you may not get through,
4  you may get through.
5      Q.    And just to be safe, I want to
6  make sure we're clear.  When you said a year
7  ago, I'm talking about back in February of
8  this year?
9      A.    All right.  This is November.
10     Q.    Okay.  I just want to make
11 sure you were also talking about February of
12 this year.
13     A.    Yes, sir.
14     Q.    Okay.  Do you -- Do you have
15 any idea whether your cell phone records
16 show anything about text messages incoming
17 or outgoing as per a specific time?
18     A.    You get a charge, ten cents
19 per message, period.
20     Q.    And what is your complete
21 telephone number, cell phone number?  And I
22 promise I won't use it to call you.
23     A.    If you're writing it down, I

Page 294

1  ain't saying it.
2      Q.    I need you to say it.
3      A.    334-419-1445.  I thought you
4  weren't going to write it down.
5      Q.    I never said that.
6          Again, I'll make a promise to
7  you, I'm not going to give it to anybody
8  who's going to give it out.
9          MR. KILBORN:  That's covered
10 by the protective order we agreed on; right?
11         MR. JOHNSON:  That's fine.  I
12 agree.
13     Q.    Do you know if you made any
14 outgoing telephone calls on the night in
15 question?
16     A.    You've got the record.
17     Q.    Okay.  Again, it's hard for me
18 to, one, read it; and, two, it's hard to
19 tell which is incoming and which is
20 outgoing.  I mean, are -- because I think
21 what you told me earlier was that the ones
22 that say, for instance, Birmingham, Alabama,
23 isn't necessarily an outgoing call, it might

Page 295

1  be an incoming call.
2      A.    If I get an incoming call and
3  it comes up unknown number, they can't get
4  the number, they put my number down.
5      Q.    Okay.  And what about if it's
6  an incoming call from your daughter, what
7  does it show?
8      A.    That's it right there,
9  Birmingham.
10     Q.    And what if you make a call to
11 your daughter in Birmingham?
12     A.    Well, hold on, let me see if I
13 can find one.
14     Q.    And, again, this is for your
15 attorney's benefit --
16     A.    That may have been a call to
17 her friend's phone, I don't know.
18         MR. JOHNSON:  Without the
19 complete records, Mr. Sport, I'm having a
20 difficult time making heads or tails of this
21 thing.
22         MR. SPORT:  What else is
23 there?

Page 296

1          MR. KILBORN:  Hold on.  We
2  gave you what you asked for.  Now, we can
3  stop there.
4          We asked to inspect the plant.
5  Somebody on the legal team took the position
6  that we were a couple days late, therefore,
7  we couldn't inspect the plant.  Now, I'll
8  give you plenty more discovery which I don't
9  have to give you, as an accommodation, but I
10 expect the same.
11         MR. JOHNSON:  I think you have
12 to give us his cell phone records.  I was
13 trying to be gracious to you and your client
14 by not demanding them all.  And I haven't
15 demanded them all.  All I'm doing is saying
16 now that we're at the deposition and I can't
17 make heads nor tails of it in order to
18 examine the witness, then it's appropriate
19 for me to get.
20         MR. KILBORN:  This was covered
21 by your request for production, that's why
22 we gave it to you.
23         MR. JOHNSON:  I think

74  (Pages 293 to 296)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 297

1  technically, it's all covered by the request
2  for production and the protective order.
3      MR. KILBORN: What period of
4  time?
5      MR. JOHNSON: For the night in
6  question, and that would include --
7      MR. KILBORN: That is in
8  response to the request for production.
9      MR. JOHNSON: I think it's
10 fair for me to get the whole record. You're
11 giving me one page out of --
12     MR. SPORT: What are you
13 asking me for?
14     MR. JOHNSON: What I'm asking
15 you for is all seven pages of that invoice
16 so I can make the interpretation fairly
17 whether or not there is other information
18 that helps me to interpret the single page
19 that you've provided in a redacted version.
20 I'm not fussing at you for
21 redacting it, that's perfectly fine with me.
22 What I'd like to see is the entire invoice.
23 And I also want --

Page 298

1      MR. KILBORN: What did you ask
2  for?
3      MR. JOHNSON: I asked for the
4  whole thing and he said he would provide me
5  records --
6      MR. KILBORN: You did?
7      MR. JOHNSON: -- from the
8  evening in question.
9      MR. KILBORN: Will you show me
10 that request?
11     MR. JOHNSON: Okay.
12 All I can say is that by fax
13 dated August the 9th, your partner,
14 Mr. Sport, said: Your statement that we
15 agreed to, quote, produce copies of your
16 client's mobile phone records inclusive of
17 the entire shift he worked on the night in
18 question is incorrect. Rather he says: We
19 agreed to produce our client's cell phone
20 records for the time period in question
21 only.
22 All right. The time period in
23 question only would be the night of this

Page 299

1  incident. It does not necessarily mean that
2  you're not going to give me the entire
3  invoice.
4      MR. KILBORN: I think it does.
5  I'm just telling you that I don't mind
6  discussing a fair exchange of documents, but
7  I want the same consideration and not some
8  technicality that we were two days late.
9      Let me just say this. Let me
10 look at the entire bill. I don't
11 necessarily -- I don't necessarily think
12 there's a problem, but I don't think it's
13 going to help you and here's why. I used to
14 be with a carrier that provided a bill like
15 this. My current carrier actually shows to
16 and from, so you know if it's outgoing or
17 incoming. These don't do that. But my
18 former carrier that gave me a bill identical
19 to this, this is what it means, and you can
20 make this out, kind of sort of. And when I
21 give you the cleaner copy, you'll be able to
22 see. This says number called, that's that
23 column title, this column is entitled

Page 300

1  destination called.
2      When you see destination
3  called and a city, I believe that indicates
4  an outgoing call; and when there's an
5  incoming call, instead of a destination
6  city, it says incoming call. That's what I
7  believe this means. Other than contacting
8  the carrier and confirming that, I don't
9  know how the rest of the bill will help you.
10     MR. JOHNSON: Again, you
11 hadn't provided that to us, so I don't know.
12 It may not, I agree with you. But I can't
13 feel like I'm doing my job --
14     MR. SPORT: Is that your
15 question, you want to know what's outgoing
16 and what's incoming?
17     MR. KILBORN: Let's go off the
18 Record and you and I will talk. Take a
19 break.
20     (Recess taken.)
21     (Whereupon, Defendant's
22     Exhibit No. 11 was marked
23     for identification.)

75 (Pages 297 to 300)

# FREEDOM COURT REPORTING

Page 301

1    Q.    All right. Mr. Dees, we're
2  going back on the Record now, just so you
3  know.
4        Let me show you what I have
5  marked as Defendant's Exhibit 11. And I
6  know that you and your attorneys had an
7  opportunity to look at that just before we
8  got started; is that correct?
9    A.    Yes, sir. We had just seen
10 the box before we got started?
11   Q.    Right.
12   A.    Yes, sir.
13   Q.    And just for the Record, I
14 gave you a box of items; correct?
15   A.    Yes, sir.
16   Q.    And you reviewed the contents
17 of the box?
18   A.    Yes, sir.
19   Q.    And were the contents of the
20 box consistent with what's indicated on
21 Exhibit 11?
22   A.    Yes, sir. But you got to take
23 into account, like I said, my locker was

Page 302

1  left unlocked for several months, then a
2  lock was placed on it, then a lock was taken
3  off, and then whoever -- one of y'all was
4  videoed taking the contents out of the
5  box --
6    Q.    Okay.
7    A.    I mean, out of the locker.
8    Q.    Okay.
9    A.    I mean, there's no chain of
10 custody there.
11   Q.    Okay. But I just want to make
12 sure that we're clear on the box of items
13 that was given to you today was consistent
14 with what's listed on that sheet?
15   A.    You can have them back. The tools
16 That's not my stuff on that box. The tools
17 belong to Hyundai.
18   Q.    Now, let me ask you this.
19 With respect to the list of items there on
20 Exhibit Number 11, do you have any reason to
21 think at the time of your termination there
22 were other items in that locker, other than
23 the jacket that you got back and some notes

Page 303

1  that you mentioned earlier?
2    A.    Yeah. I mean, I had Army pay
3  stubs in there, with my account number,
4  where my money is being sent, my social, all
5  my information pertaining to my Army -- my
6  account that my Army check goes into, and my
7  military service --
8    Q.    Did they get sent to you --
9    A.    -- notes. No, they didn't get
10 sent to me. The only thing I received since
11 I left was when you brought that box today.
12 I haven't received, I haven't heard from
13 them, nothing.
14   Q.    Your Army pay stubs, were
15 those sent to you at Hyundai? Did you
16 receive your paycheck at Hyundai?
17   A.    No, sir. I had it in my
18 pocket, and carried it in there, and forgot
19 it, took it out and put it in my locker.
20   Q.    Is it one pay stub?
21   A.    No. It's several. But like I
22 said, it had my savings account number, my
23 Social Security number, it had everything on

Page 304

1  there.
2    Q.    Your pay stubs have your
3  Social Security number on it and your
4  account number for your bank?
5    A.    An Army pay stub, yes, sir, it
6  does.
7    Q.    Do you have subsequent Army
8  pay stubs?
9    A.    Yes, sir, somewhere.
10   Q.    All right. The ones that you
11 do have, are they in the same format and
12 look just like the ones that were in your
13 locker on date of termination?
14   A.    Yes, sir. It's got my rank,
15 my years of service, unit.
16   Q.    And this is just a pay stub,
17 that's all we're talking about?
18   A.    Yeah. There was a couple of
19 them. I mean I don't know.
20   Q.    All right.
21   A.    At the time, yeah, I left a
22 lot of stuff in there. That was back in
23 February. And y'all show up with stuff that

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 305

1  don't even belong to me. That stuff there
2  belonged to Hyundai. You can carry it back
3  to them. My personal stuff, they left.
4      Prater went in, left my tool
5  bag, everything out there, everything in my
6  locker, and brought me that jacket with that
7  little MP3 player and my notes was missing
8  and everything is -- and this here, I can't
9  even read hardly.
10     Q.    I'm trying to figure out what
11 else you had in your locker, other than
12 what's on that list, the MP3 player, the
13 notes, the pay stubs, and the jacket. Can
14 you think of anything?
15     A.    No, sir.
16     Q.    Was there anything else of
17 value in that locker?
18     A.    I don't know.
19     Q.    Okay.
20     A.    I don't know.
21     Q.    Now, how many Army pay stubs
22 would there have been?
23     A.    There was two or three.

Page 306

1      Q.    Two or three?
2      A.    Yes, sir.
3      Q.    Okay. And do you know what
4  months they were for?
5      A.    No, sir.
6      Q.    Do you remember when you put
7  them in your locker?
8      A.    No, sir.
9      Q.    Do you remember how long they
10 were in your locker?
11     A.    No, sir.
12     Q.    Do you remember showing them
13 to anybody or talking to anybody about it?
14     A.    No, sir.
15     Q.    And when you say pay stubs,
16 are they literally pay stubs where you tear
17 the check off the bottom half?
18     A.    No, sir. It's a computer
19 printout.
20     Q.    Okay. It just shows what was
21 direct deposited into your account?
22     A.    Yes, sir.
23     Q.    Okay. So it doesn't actually

Page 307

1  come with an actual check?
2      A.    No, sir.
3      Q.    And is it on a
4  eight-and-a-half-by-eleven, normal sheet of
5  paper size thing?
6      A.    Yes, sir.
7      Q.    And I assume, like regular pay
8  stubs, it shows, you know, what your gross
9  is, what they took out, what they withheld
10 for taxes, and that kind of stuff?
11     A.    Yes, sir.
12     Q.    Okay. Anything else you can
13 think of that was in your locker?
14     A.    I don't know. I hadn't
15 thought about it today.
16     Q.    All right. Well, have you
17 thought about it before today?
18     A.    A while back, after I'd gotten
19 fired, yes, sir, I did.
20     Q.    All right. Did you write down
21 what you thought was in your locker at that
22 point in time, take notes on it?
23     A.    No, sir, I did not. I was

Page 308

1  flustered, I was mad.
2      Q.    Does being mad make you not
3  take notes?
4      A.    No, sir. That didn't have
5  nothing to do with me not taking notes.
6      Q.    Okay.
7      A.    That had everything to do with
8  me being flustered and mad because I had
9  gotten fired for somebody recommending that
10 I be fired, off of a recommendation that he
11 had made. It's right there in your letter
12 that you had, that he recommended it.
13     Q.    What are you talking about?
14     A.    Prater. He recommended it.
15     Q.    I know what you're talking
16 about. But you're referring to Prater?
17     A.    Yeah. It said he recommended
18 it: Based on this conversation, I feel that
19 even if he were not sleeping, that he
20 doesn't care enough about his job to defend
21 anyone from thinking he was sleeping. John,
22 my recommendation is termination.
23     Q.    What exhibit are you referring

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 309

1  to?
2      A.    Number 6.
3           (Whereupon, Defendant's
4           Exhibit No. 12 was marked
5           for identification.)
6      Q.    Okay.  Let me show you what
7  we've marked as Exhibit 12, and that's Dees
8  versus HMMA number 6, deposition Exhibit 12.
9      A.    Where is 9?  Or have I got
10  them.  I got them backwards.  Hold on.
11     Q.    Do you recognize that
12  document, Mr. Dees?
13     A.    I've never seen this document.
14     Q.    You've never seen that
15  document?
16          Is it your testimony you've
17  never seen that?
18     A.    Not until -- I believe I saw
19  it yesterday, but prior to that, no, I'd
20  never seen this document.
21     Q.    You indicated that when you
22  met with Wendy Warner and some others at the
23  time of your termination, Wendy Warner had a

Page 310

1  piece of paper that as you testified,
2  slammed it on the table?
3      A.    Yes, sir.
4      Q.    Did you read that document?
5      A.    No, sir, I didn't read it.
6  She read a document that she had in her hand
7  that she was holding up at an angle that she
8  could see.  I was sitting across the table
9  from her.  She read the document, she
10  finished it, placed it face down on the
11  table like that (indicating).
12     Q.    Do you remember anything about
13  what she read out loud to you?
14     A.    Just that I had been accused
15  of sleeping and I was being terminated
16  immediately.
17     Q.    All right.  Was that on
18  February 26th?
19     A.    That was it.
20     Q.    Do you remember if the letter
21  said anything like this:  Dear Leon, it has
22  been brought to my attention on February
23  14th, 2007, you were found by a member of

Page 311

1  HMMA management in the third floor overhead
2  sleeping.  HMMA policy states, quote,
3  serious and excessive violations of HMMA's
4  performance standards, end quote, is a
5  serious misconduct violation.
6          I won't read the whole thing,
7  but since you're looking at Exhibit 12, what
8  you're reading there, is that consistent
9  with what she read to you?
10     A.    I don't know.  Like I said, I
11  had been floored.  The only thing I heard
12  was sleeping and terminated immediately, and
13  I couldn't believe it.
14     Q.    Okay.
15     A.    I mean, that was --
16     Q.    Do you -- Just so I can make
17  sure that the Record is clear, what does
18  cleaning the pit involve?
19     A.    Cleaning the pit involves
20  picking all the scrap up around the
21  conveyors that's fallen while the presses
22  are running.  And you have a -- It's very
23  dangerous because you're doing it, you're

Page 312

1  down there, you have no communication, if
2  anything happens to you, you're there until
3  someone decides to come looking for you.
4      Q.    Would you go there without
5  telling somebody you're in it?
6      A.    I wouldn't go there unless
7  told to go there.
8      Q.    Would the -- Are the -- You
9  say the presses are running when you're down
10  there?
11     A.    Yes, sir.
12     Q.    And I want to make sure I
13  understand.  I mean, the presses aren't some
14  giant thing that comes down and stamps where
15  you're actually standing when you're
16  cleaning out the pit, is it?
17     A.    No, sir.  But the scraps are
18  falling down where you're actually standing.
19  I mean, it's falling onto a metal conveyor,
20  but the reason you're having to go clean the
21  pit is because it bounces out of that
22  conveyor onto the floor.  And you do -- you
23  get stuck.  You've got little protective

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 313

1  gloves, but it only covers your forearms and
2  your hands, everything else is fair game.
3      Q.   But what we're talking about
4  is picking up or removing, essentially,
5  debris from the stamping equipment that
6  comes off a conveyor belt?
7      A.   No, sir.  We're talking about
8  putting yourself in a hazardous situation
9  with scrap falling thirty foot into a chute,
10  bouncing off a metal conveyor, coming down
11  right beside your head, your back, your
12  neck, everything else that's exposed.  And
13  the gloves you're wearing is only cut
14  resistant, not cut proof.
15      Q.   Do you have any reason to
16  think that working in the pit is
17  unreasonably dangerous or inappropriate?
18      A.   It's very dangerous.  Like I
19  said, you got sharp steel coming down
20  through these chutes, sheet metal, some of
21  it is perfectly square corners, and then
22  comes out to a razor point.  And that's the
23  reason you're cleaning it, because it

Page 314

1  doesn't stay in the conveyor, it bounces out
2  all over the place.  And if you get hit by
3  it, you get cut no matter what you're
4  wearing.
5      Q.   To your knowledge, has anybody
6  been injured because of the pit?
7      A.   Several people has been --
8  Well, I believe somebody has.  I don't
9  remember who it was.
10      Q.   You don't recall?
11      A.   No.
12      Q.   Okay.
13      A.   The metal is very sharp.
14  They've got numerous instances of people
15  getting cut by that metal.
16      Q.   Is there -- Did you ever get
17  cut by the metal?
18      A.   I got -- Yes, sir.  Not bad
19  cuts where I had to have stitches, no.
20      Q.   Did you file any sort of
21  worker's comp claim or report an injury or
22  anything like that?
23      A.   No, sir.

Page 315

1      Q.   Did you ever see -- Do y'all
2  have a nurse or doctor on site at the plant?
3      A.   Yes, sir.  But you was
4  discouraged from going there.
5      Q.   Did you ever get hurt and go
6  there?
7      A.   No, sir, I never went there.
8      Q.   Okay.
9      A.   If I got a cut, I covered it
10  up and I drove home.
11      Q.   Did you ever file any
12  complaints to anybody in management about
13  the pit?
14      A.   Yes, sir, I did.  Several
15  times.
16      Q.   Who was that?
17      A.   I went to HR and Applegate.
18      Q.   Did you file any written
19  complaints?
20      A.   No, sir.  Like I said, they
21  didn't have a format or process for filing
22  written complaints.
23      Q.   Okay.  When you talked to

Page 316

1  Applegate, what did he say about the pit?
2      A.   Like I said this morning, he
3  said it all pays the same, what's your
4  problem.
5      Q.   Who did you talk to in HR
6  about the pit?
7      A.   I believe it was Keisha.
8      Q.   Keisha.  And what did she say
9  about the pit?
10      A.   She said she would get with
11  Applegate and Prater.  The next thing I know
12  I'm going to talk to Applegate.
13      Q.   Okay.  Do you have any reason
14  to think you've been discriminated against
15  or harassed for any other protected
16  characteristic like sex, age, race?
17      A.   Everything stems around my
18  military career, everything.  Like I say, it
19  all started with harassment about my orders.
20  Everything had to do with my weekend drill,
21  all the way from Prater to HR.  Every time
22  I'd go to them, the letter from my unit, the
23  e-mail, everything all the way to the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 317

1  recommendation for Prater saying I recommend
2  him for termination, everything stemmed
3  around my Guard duty.
4       Q.   Okay.  And so I'm assuming
5  that since you're saying everything stems
6  from your Guard duty, I'm assuming it would
7  be safe to rule out any other issues, like
8  age, race, sex, religion, anything like
9  that?
10      A.   I reckon.
11      Q.   You would agree?
12      A.   I mean, I don't know what --
13      Q.   Let me ask you this --
14      A.   Like I said, everything come
15  from my Guard duty.  As far as to my
16  knowledge, everything from the beginning
17  from when it started, to the end, to my
18  knowledge, seemed like it come from my Guard
19  duty and my commitment to the Guard.
20      Q.   Let me ask you some pretty
21  simple questions.  Were you terminated
22  because of your age?
23      A.   Well, they say I was

Page 318

1  terminated because I was sleeping.  But,
2  like I say, that all started because of my
3  Guard duty.
4       Q.   Are you saying you were
5  terminated because of your age?
6       A.   I'm not saying anything.  I'm
7  saying I was terminated because of my Guard
8  duty is what I'm saying.
9       Q.   Were you discriminated against
10  because of your age?
11      A.   Like I said before, I believe
12  I was terminated against because of my Guard
13  duty service.
14      Q.   Were you discriminated against
15  because of your age?
16      A.   I have no idea.
17      Q.   Is that a yes or no, were you
18  or weren't you?
19      MR. KILBORN:  Don't raise your
20  voice.  We're not suing over any type of
21  discrimination other than the circumstances
22  that we sued over.
23      MR. JOHNSON:  I agree.  And I

Page 319

1  just want to rule out that there's no other
2  lawsuits coming in the future related to
3  this.
4       MR. KILBORN:  You're not.
5  That's guaranteed.
6       MR. JOHNSON:  Okay.
7       Q.   And when did you first start
8  taking notes about the harassment issues?
9       A.   The very first time it
10  happened.
11      Q.   The very first time?
12      A.   Yes, sir.
13      Q.   Okay.  And did you ever show
14  your notes to any of your coworkers?
15      A.   We went through this this
16  morning.
17      Q.   That's right.  Did you ever
18  show them to anybody in HR?
19      A.   No, sir.
20      Q.   And would it be fair to state
21  that --
22      A.   I never showed them to no one
23  in HR, but I made the complaints from my

Page 320

1  notes to HR.  When I went to HR, I discussed
2  what was on my notes.
3       Q.   Okay.
4       A.   Did I pull them out and show
5  them to them?  No.
6       Q.   Other than with respect to
7  your military service, how was your
8  relationship with Greg Prater?
9       A.   He was my boss, I was the
10  employee.
11      Q.   I mean, was he a good boss?
12      A.   No.
13      Q.   Why not?
14      A.   I mean, well, you talked to my
15  coworkers.
16      Q.   I'm talking to you now.
17      A.   He has no supervisory skills.
18      Q.   Okay.  What makes you say
19  that?
20      A.   His mismanagement of funds,
21  his mismanagement of time.
22      Q.   Mismanagement of funds, how?
23      A.   Not ordering parts, then when

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 321

1 he ordered parts, he ordered too many of the
2 wrong thing and not having money to order
3 the right parts.
4    Q.    **Mismanagement of time, how is**
5 **that?**
6    A.    Scheduling people to come in
7 on the weekend to work and not having the
8 parts there to do the job.
9    Q.    **Did you have any problems with**
10 **Greg Prater because of that? Did you tell**
11 **him he was a bad manager?**
12    A.    No, sir. It wasn't my job.
13    Q.    **Did you ever suggest to him**
14 **that he wasn't a good manager?**
15    A.    No, sir. I was being paid to
16 do a job, and I did the job I was paid to
17 do.
18    Q.    **Did you ever indicate to him**
19 **that he didn't do his job well?**
20    A.    No, sir.
21    Q.    **Okay.**
22    A.    Several others did, but not
23 me.

Page 322

1    Q.    **Not you? You never did?**
2    A.    No, sir.
3    Q.    **Okay. Now, before the letter**
4 **was sent from Sergeant Barnes, back in**
5 **October —**
6    A.    Yes, sir.
7    Q.    **— did you have any problems**
8 **with Greg Prater?**
9    A.    That's the reason the letter
10 was sent.
11    Q.    **Okay. And prior to that time**
12 **in October, can you think — do you have any**
13 **idea how many times you had issues with Greg**
14 **Prater?**
15    A.    I don't know.
16    Q.    **Was it one instance and then**
17 **Sergeant Barnes — you had Sergeant Barnes**
18 **send that letter?**
19    A.    No, sir. If it had been one
20 incident, I wouldn't have sent it. I don't
21 hit the panic button for no reason.
22    Q.    **Had you gone to human**
23 **resources before the letter from Sergeant**

Page 323

1 **Barnes got sent?**
2    A.    Yes, sir. That's why I had
3 Sergeant Barnes send the letter. That's why
4 I made a complaint to my unit, and Sergeant
5 Richberg made the recommendation.
6    Q.    **Okay.**
7    A.    Like I said earlier, the only
8 thing HR was concerned about was he told us
9 we couldn't talk to them. They could care
10 less whether his harassment about my Guard
11 service or not.
12    Q.    **All right. How was Greg**
13 **Prater viewed by your coworkers?**
14    A.    You'll have to ask them that.
15    Q.    **Well, did they ever say**
16 **anything to you about what they thought of**
17 **him?**
18    A.    Yeah.
19    Q.    **What did they say?**
20    A.    I don't remember specific
21 quotes. He wasn't very popular.
22    Q.    **Okay. Did he have specific**
23 **problems with anybody?**

Page 324

1    A.    You'll have to ask them that.
2 I can't testify as to their problems they
3 had with or without him. I don't know.
4    Q.    **Do you remember anything any**
5 **of your coworkers ever said about problems**
6 **they were having with Prater?**
7    A.    No, sir.
8    Q.    **Do you recall any of your**
9 **coworkers ever arguing with Prater in your**
10 **presence?**
11    A.    Well, that very first day we
12 went to HR, everybody was arguing with him.
13    Q.    **About what?**
14    A.    When he told us we couldn't go
15 to HR. And Chris Weihe jumped on him about
16 making fun of my military career and about
17 harassing me about my military career.
18    Q.    **What did Chris say?**
19    A.    I don't remember exact words.
20 I don't know.
21    Q.    **Were you there when he said**
22 **them?**
23    A.    Oh, yeah, we was there. The

81 (Pages 321 to 324)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 325

1 whole shift was there.
2 Q. Do you remember approximately
3 what Chris said?
4 A. No. That was over a year ago.
5 Q. Okay. Can you think of
6 anybody other than Chris Weihe that might
7 have said something to Prater about your
8 military service?
9 A. Some of the fellows on the
10 other shift said they did, I don't know.
11 Q. Do you know if Chris Weihe is
12 still working at the plant?
13 A. Yes, he is.
14 Q. He hasn't been terminated for
15 taking up for you or anything like that?
16 A. No. Well, I take that back,
17 Drake and -- Who is it? I think it was
18 Drake and Hanks both said something to him.
19 Q. To who?
20 A. Prater.
21 Q. Do you know what they said?
22 A. No.
23 Q. Were you there when they said

Page 326

1 it?
2 A. Yeah. But that was -- that
3 was -- that was a pretty good -- pretty big
4 meeting. And I -- He had jumped on me
5 pretty hard about my Guard duty that day.
6 Q. How did he jump on you?
7 A. Telling me that all we did was
8 go down there and party, we didn't train.
9 Q. Was it --
10 A. All we was was a bunch of
11 losers wanting to play army.
12 Q. Was that the worst incident?
13 A. Was that the worst incident?
14 Probably not. That was probably the worst
15 group incident.
16 Q. Okay. What was the worst
17 incident that the two of you had?
18 A. I mean, we never -- I never
19 got in a shouting match.
20 Q. What is the worst thing he
21 ever said to you?
22 A. Like I said, basically telling
23 me I wasn't -- that my military career was

Page 327

1 basically a ruse, a joke.
2 Q. How did he say that?
3 A. Y'all ain't nothing but a
4 bunch of weekend wienie wannabe's, something
5 of that nature. And all the time -- Like I
6 said, you got a fellow sitting here saying
7 he's been to Baghdad, talking about how many
8 people he's killed and everything, and then
9 all of a sudden you've been over there a
10 couple times, you've done it, and sitting
11 there and telling you you're a joke. I
12 mean, as far as actual knock-down dragouts,
13 no, I don't -- I can control myself better
14 than that.
15 Q. What about him? Did he ever
16 yell at you?
17 A. He yelled at everybody.
18 Q. When you say yelled, did he
19 literally raise his voice?
20 A. Oh, yeah. When I say he
21 yelled, yes, he yelled.
22 Q. Did he ever yell at you about
23 your military service?

Page 328

1 A. Yeah.
2 Q. What did -- How did he yell at
3 you? What did he yell at you?
4 A. You're going to bring me some
5 military orders. And come in Monday:
6 Where's my orders? If you don't bring them,
7 you're going to get wrote up. You're going
8 to get fired for your military service. You
9 were supposed to be here this weekend.
10 If you haven't talked to him,
11 I'm sure you will, which I'm sure you have.
12 Q. Anything else that he said?
13 A. I don't remember. I mean, it
14 was -- it was an ongoing event for several,
15 several months.
16 Q. But I need to make sure I know
17 what he did.
18 A. Okay. We've covered it.
19 Q. All right.
20 A. I'm telling you what he did.
21 Like I said, you talk to my friends, you
22 pretty much know.
23 Q. Is there anything else that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 329

1  Greg Prater did or said that you felt was
2  harassing in any way?
3       A.    Yeah.  Like I said -- Like I
4  started out this morning, my military
5  service became an issue, and it never went
6  away.  It stayed an issue, it caused
7  problems.  And I believe, to my utmost
8  ability, that that was the reason I'm fired
9  -- I was fired.  I mean, everything points
10 -- everything falls back on my military
11 commitment, everything, from get-go to
12 finish.
13       I don't care what her letter
14 (indicating) says, even -- Like I said,
15 Prater's recommendation, even if he wasn't
16 sleeping, I recommend he be terminated.
17 Everything falls back to me not providing
18 something that I cannot provide for a drill,
19 for a weekend.
20       MR. KILBORN:  For the Record,
21 you pointed to a Defendant's Exhibit 12.
22       THE WITNESS:  Yes, sir.
23       MR. KILBORN:  All right.  I

Page 330

1  just wanted the Record to be clear what you
2  pointed to.
3       Q.    Mr. Dees, was using the cell
4  phone for text messaging or other personal
5  purposes, a violation of Hyundai policy or
6  other policy?
7       A.    Well, you've got their policy
8  there somewhere, I know.
9       Q.    I'm asking you?
10      A.    Their policy states your cell
11 phone is to be kept in your locker and only
12 used on breaks and lunch breaks.  And as I
13 stated earlier, Prater, Mr. Moon, Applegate
14 even called some of our team members on our
15 personal cell phones during breakdowns
16 wanting to know what was going on.
17      Q.    Okay.
18      A.    Their policy said one thing,
19 they enforced something else.
20      Q.    Okay.
21      A.    And that come from management,
22 all the way down.  And if you didn't have
23 your cell phone, why didn't you call me on

Page 331

1  your cell phone was the question asked.
2       Q.    Okay.
3       A.    So they ignored -- They threw
4  their own policy out the window, as they did
5  with everything else, as they did with their
6  policy on the military leave.  Prater
7  telling me he's going to make me use my
8  vacation time in lieu of my military leave.
9       Q.    They never did that, though?
10      A.    No, sir, he didn't.
11      Q.    Okay.
12      A.    But I didn't know that.
13      Q.    You called -- Why is it you
14 made the decision to call Mr. Moon after you
15 were terminated?  Why Mr. Moon?
16      A.    He was the only person I knew
17 to call.
18      Q.    Why didn't you call Mr. Moon
19 and complain about Greg Prater when he was
20 allegedly harassing you?
21      A.    The Koreans -- Well, everybody
22 complained to Mr. Moon about Prater.
23 Mr. Moon knew how Prater was, that's what he

Page 332

1  said.
2       Q.    Did you?
3       A.    Yeah, I complained to
4  Mr. Moon.
5       Q.    What did you tell Mr. Moon
6  about Prater before you were terminated?
7       A.    The exact comments, I have no
8  idea.
9       Q.    Did you tell him he's
10 harassing me because I go on Guard duty?
11      A.    Yes, I did.  I told Mr. Moon
12 that I was being picked on by Greg Prater,
13 by Applegate and HR.  And he said, look, I
14 know Prater is a bad man.  Give me time.
15      Q.    This was before you were
16 terminated?
17      A.    Yes.  I wasn't the only one
18 that complained to him.
19      Q.    Okay.
20      A.    But as far as, like I said,
21 about my Guard duty, yes, I did.  I didn't
22 know nobody else to call.  Mr. Moon was the
23 only one I knew.  He was the other

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 333

1  counterpart, the Korean counterpart, my
2  Korean boss in that shop, and I called him.
3      Q.    What I'm trying to make sure I
4  understand, is in the sense that you called
5  him after you were terminated, did you call
6  him or have your wife call him during the
7  period in which you were allegedly harassed
8  to try to get him to stop Greg Prater?
9      A.    No.  I talked to him a few
10  times at work.  But I didn't know I was
11  being terminated.  How am I supposed to call
12  somebody if I don't know I'm being
13  terminated?
14      Q.    Did you know you were being
15  harassed?
16      A.    Yes.  Why do you think I went
17  to HR.
18      Q.    So you knew that but you
19  didn't go to Mr. Moon with that?
20      A.    I told you earlier that I
21  complained to Mr. Moon about one time and he
22  said give me time.  And Prater was -- He
23  knew Applegate.  But apparently it didn't do

Page 334

1  no good, they told him to leave it alone.
2      Q.    Is that the only discussion
3  you had with Mr. Moon about the harassment?
4      A.    Probably.  Because the Koreans
5  don't like to discuss problems like that.
6  They think if they wait, they will just go
7  away; that's their custom.
8      Q.    Do you have any reason to
9  think that Mr. Moon talked to President Ahn
10  about the situation?
11      A.    Say again.
12      Q.    Do you have any reason to
13  think that Mr. Moon spoke to President Ahn
14  about your situation?
15      A.    Before I was fired?
16      Q.    Before or after.
17      A.    Well, he talked to either J.H.
18  Kim or Mr. Ahn, one, after I was fired.  I
19  have no idea who he talked to before I was
20  fired.
21      Q.    Do you have any reason to
22  think that President Ahn had anything to do
23  with your termination or even knew about

Page 335

1  your termination?
2      A.    I don't know.  Like I said,
3  everything went back to that military
4  record.
5      Q.    But again what did you know.
6  Do you have any reason to think that Mr. Ahn
7  knew about your situation?
8      A.    Like I said, it all went back
9  to my military record.  Apparently it had to
10  have come up somewhere along the line.
11      Q.    Do you have any personal
12  knowledge as to what Mr. Ahn knew about it?
13  That's an easy question to answer.
14      A.    I wasn't in the meeting.  I
15  don't know what they discussed.  All I
16  know --
17      Q.    So the answer is no?
18          MR. KILBORN:  Hold on.  Don't
19  interrupt him.
20      A.    All I know is that it went
21  back -- it started with my military career,
22  my military commitment, and it stayed there.
23      Q.    Would it be fair --

Page 336

1      A.    I wasn't in the meeting, I
2  don't know what they discussed.  I just know
3  everything come from my military obligation.
4      Q.    Would it be fair to state that
5  you, today, don't have knowledge of whether
6  President Ahn were involved or not involved?
7  Would that be a fair statement?
8      A.    I'm going with my last
9  comment.
10      Q.    Well, is that not a fair
11  statement or is it a fair statement?
12      A.    Like I said, I wasn't in the
13  meeting.  I have no idea what they said.
14  All I know is everything stemmed from my
15  military career and commitment.
16      Q.    So you don't know what
17  involvement, if any, Mr. Ahn had; is that
18  true?
19      A.    Like I said --
20          MR. KILBORN:  Object.  You
21  asked him that four or five times.
22          MR. JOHNSON:  He doesn't want
23  to answer the question though.

84  (Pages 333 to 336)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 337

1    MR. KILBORN: Hold on. I'm
2  going to get my objection in or we're going
3  to be here until the cows come home. You
4  asked him that four or five times, he's told
5  you what he knows about Mr. Ahn, he's told
6  you that Mr. Moon said that he was going to
7  Mr. Ahn or Mr. Kim. Now get on with your
8  next question.
9    MR. JOHNSON: What he hasn't
10  said is what he knows about whether or not
11  Mr. Ahn was involved.
12    MR. KILBORN: I think he's
13  told you what he knows. If you know
14  anything else, tell him about Mr. Ahn.
15    Q.  Do you know anything else
16  about Mr. Ahn's involvement?
17    A.  I've answered the question the
18  only way I know how to answer it, and that's
19  the answer I'm sticking with.
20    Q.  Okay. So there's nothing else
21  you can tell me about Mr. Ahn's involvement
22  with your situation?
23    A.  Like I said, I've answered to

Page 338

1  the best of my ability, and that's the
2  answer I'm sticking with.
3    Q.  I'm sure that will be
4  satisfactory.
5    Who is the other gentleman,
6  Mr. Kim?
7    A.  J.H. Kim.
8    Q.  What do you know about
9  Mr. Kim's involvement? Tell me what you
10  know.
11    A.  Same thing.
12    Q.  So you don't have anything to
13  tell me?
14    A.  No, sir.
15    Q.  Do you have anything to tell
16  me about Jason Lee's involvement?
17    A.  I have no knowledge of who
18  Jason Lee is.
19    Q.  Okay.
20    A.  All I know is that he called
21  my wife and interviewed her for a job.
22    Q.  Okay. When did that happen?
23    A.  I don't know. I was working

Page 339

1  there.
2    Q.  Okay. You mentioned your
3  military pay stubs earlier. Did you get pay
4  stubs from Hyundai?
5    A.  Yes, sir.
6    Q.  And you do you remember what
7  company name was on the pay stub?
8    A.  No, I do not.
9    Q.  Okay. Do you remember if it
10  was Hyundai Motor Manufacturing Alabama?
11    A.  I don't know. I don't
12  remember. I don't remember what was on the
13  pay stub.
14    I know -- I tell you what I do
15  know, I know that HMC owns everything,
16  because our Korean bosses worked for HMC,
17  and that's what their badges said, and
18  that's what they said, so HMC owned all of
19  us, and they told us that.
20    Q.  Okay. Did you ever deal with
21  anybody from HMA?
22    A.  I don't remember. I may have,
23  I may not have.

Page 340

1    Q.  But you don't recall if you
2  did or didn't?
3    A.  No, sir. I mean, I know it
4  went HMC, HMA, and like I say, HMMA, and we
5  all fell under HMC; HMC owns all of it.
6  That's what we was told by the Koreans.
7    Q.  Do you have any information to
8  suggest that anybody from HMA was involved
9  in your termination?
10    A.  They own our company.
11    Q.  Do you have any other
12  knowledge?
13    A.  They own our company. HMC
14  owns all of us, we're all one big -- they
15  were all one big company.
16    Q.  Do you have any information to
17  suggest that HMA was involved, other than in
18  the ownership, as you state?
19    A.  Like I said, it was all one
20  company.
21    Q.  Is there anything else you can
22  tell me about that?
23    A.  It was all one company.

85 (Pages 337 to 340)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 341

1    Q.    Okay. I'm going to take that
2  as a no.
3    A.    It was all one company. It's
4  not a no, it was all one company. You talk
5  to the Koreans out there, and they will tell
6  you this is all one company.
7    Q.    Who? Who says that? What
8  Koreans?
9    A.    Any Korean. You go out there
10 and ask any one of them, and they will tell
11 you that HMC is sole owner and HMC controls
12 everything.
13   Q.    They say HMC controls
14 everything?
15   A.    HMC, HMC, HMA, it goes down
16 the chain. They run their companies like a
17 military organization in a chain of command.
18 And you've got HMC, HMA; HMC would be the
19 commandant, HMA would be your generals, and
20 HMMA would be your peons and your officers.
21   Q.    Did any of them -- Well, do
22 you know any HMA employees?
23   A.    I may have met some of them.

Page 342

1  We had people coming in from HMA all the
2  time, but I don't remember. I don't know.
3  We had people coming in from all. We had
4  people coming in from Kia that HMC owns. We
5  had people from everywhere. As far as
6  personally knowing them, I don't remember.
7  I may have met them, I may not have met
8  them.
9    Q.    Okay.
10        MR. JOHNSON: Can we mark this
11 one?
12        MR. SPORT: Sure.
13        (Whereupon, Defendant's
14        Exhibit No. 13 was marked
15        for identification.)
16   Q.    Mr. Dees, I'm going to mark as
17 Exhibit 13, which is a seven-page document
18 which appears to be your cell phone record.
19 Can you just take a look at it and confirm
20 that that's what it is?
21        (Recess taken.)
22   Q.    Okay. Mr. Dees, we've got
23 marked as Exhibit 13 the seven-page phone

Page 343

1  bill. And we've had some discussions with
2  your attorneys after the Record.
3        MR. JOHNSON: As I understand
4  it, Mr. Sport, correct me if I'm wrong.
5  Mr. Sport is going to provide to our court
6  reporter an additional copy of pages one
7  through seven of Exhibit 13 and we'll mark
8  that -- Can we have that marked as 14?
9        COURT REPORTER: Sure.
10        MR. JOHNSON: And just for the
11 Record, 14 will basically be this exactly
12 presumably less the fax transmittal
13 information.
14        MR. SPORT: Hopefully more
15 legible.
16        MR. JOHNSON: More legible
17        MR. SPORT: That's the goal.
18        (Whereupon, Defendant's
19        Exhibit No. 14 was marked
20        for identification.)
21   Q.    Okay. Now, to the extent that
22 I can, Mr. Dees, I want to look through
23 Exhibit 13, since I haven't had a chance to

Page 344

1  look at it yet, and then possibly ask some
2  questions.
3        I assume Nikki is one of your
4  daughters?
5    A.    Yeah.
6    Q.    And are there only two phones
7  on this plan?
8    A.    Is that the only two plans on
9  that for phone?
10        MR. KILBORN: You have to
11 answer the question. This is your
12 deposition.
13   A.    I can't -- I don't pay the
14 bills, I just work.
15   Q.    Okay. And, Mr. Dees, this
16 question is as much for your attorneys as it
17 is for you. I'm looking at page five of
18 this bill, and it looks like some of the
19 incoming calls don't have a number
20 associated with it.
21        MR. SPORT: They have not been
22 redacted, if that's your question.
23   A.    I didn't say I had a good

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 345

1  provider, I just said I had a provider.
2      MR. JOHNSON: And who -- You
3  know, I know that it's been redacted from
4  this, but I don't see any issues asking who
5  his provider is, is that something y'all are
6  opposed to him answering, subject to the
7  protective order?
8      MR. KILBORN: I'll let him
9  answer who his provider is. But outside of
10 what you've got there, you hadn't asked for
11 it and we're going to object to any further
12 request. But as I further stated, I'll
13 discuss with you sharing documents as we
14 talked about earlier.
15     MR. JOHNSON: Okay. I'm not
16 sure I understand. But I understand you'll
17 let him tell me who his cell phone provider
18 is.
19     MR. KILBORN: Well, no, let me
20 make that clear. We've asked a simple
21 request to look at the plant and photograph
22 it, that's what I'm talking about. In other
23 words, what I'm talking about is, I like

Page 346

1  free discovery, and I'll do that with you,
2  even though you haven't asked about it.
3      MR. JOHNSON: I think we did
4  ask for --
5      MR. KILBORN: But you guys
6  pulling these technicalities, so don't be
7  asking us for accommodations unless you're
8  willing to also give us accommodations.
9      MR. JOHNSON: Well, let me say
10 this, Mr. Kilborn, I believe and if
11 necessary I can go back and dig through the
12 file and find it, I think we asked for all
13 of his cellular telephone records. And we
14 were told we couldn't have them, I didn't
15 complain about that. I thought Mr. Sport
16 and I had reached some agreement on that,
17 which was fine with me. But my
18 understanding was that I would at least know
19 who the provider was. And I don't see why
20 that's a problem.
21     If I need to go back and
22 search for what we did in fact, ask for
23 months and months ago, I can do it.

Page 347

1      MR. KILBORN: I just told you,
2  I'd let him testify who his provider was.
3  But I'm just asking for accommodation, and I
4  want it on the Record, you said you didn't
5  know what I was talking about and I wanted
6  to make clear what I was talking about.
7      Q.  Mr. Dees, who is your cell
8  phone provider?
9      A.  Unicel.
10     Q.  And was Unicel your provider
11 back in 2007?
12     A.  Yes, sir.
13     Q.  And how do you spell Unicel?
14     A.  U-N-I-C-E-L.
15     Q.  Just one L?
16     A.  Yes.
17     Q.  And, Mr. Dees, are you
18 familiar with anywhere in this invoice where
19 it talks about you having text messaging
20 capacity or how much you were charged for
21 text messages?
22     A.  Like I said, I just work. I
23 don't pay the bills.

Page 348

1      Q.  Okay.
2      A.  I don't --
3      Q.  So, you never look at the cell
4  phone bills?
5      A.  No.
6      Q.  Okay. Have you ever looked at
7  this one before today?
8      A.  I may have. I don't know.
9      Q.  You don't recall?
10     A.  No.
11     Q.  Mr. Dees, did you have a
12 chance to look at the report that Mr. Hall,
13 who is here with us today, prepared?
14     A.  Yes, sir.
15     Q.  Okay. And when did you review
16 it?
17     A.  I reviewed it yesterday with
18 Mr. Hall, like I said this morning.
19     Q.  Okay. And in reviewing it
20 with Mr. Hall, did y'all do a page-by-page
21 analysis of it, or what did you do?
22     A.  Somewhat. Not really. I'm
23 not an accountant or a lawyer, I don't know.

87 (Pages 345 to 348)

# FREEDOM COURT REPORTING

Page 349

1    Q.    Okay. And was there anything
2  in Mr. Hall's report that you didn't agree
3  with?
4         MR. KILBORN: Asked and
5  answered.
6         MR. JOHNSON: Did I cover
7  that?
8    Q.    I know you indicated that you
9  filed a complaint with the ESGR. Did you
10 file a complaint with any other governmental
11 agencies?
12   A.    No, sir.
13   Q.    Did you ever go to the EEOC to
14 try to file a claim there?
15   A.    No.
16   Q.    Did you talk to any other
17 governmental entities about possibly filing
18 a claim?
19   A.    Not after I talked to ESGR, I
20 felt it was a waste of time.
21   Q.    Did you ever call the
22 Department of Labor?
23   A.    No. I told you, I had to go

Page 350

1  back to work. I didn't have time for --
2    Q.    Okay.
3         MR. JOHNSON: We'll take a
4  short break, talk with Mr. Smith, and we may
5  be done.
6    A.    All right. A while ago, when
7  you asked me did I call that Monday morning,
8  I'd forgotten but yes, I called. I kept
9  getting an answering machine, I got
10 frustrated, call my wife, asked her to call.
11 She wouldn't call because she didn't know
12 what to say. And I don't know whether I
13 ever left a message that I was trying to
14 call and reschedule.
15   Q.    All right. What Monday
16 morning are you talking about?
17   A.    That Monday morning, that peer
18 review process.
19   Q.    All right. Let me ask you
20 this. Did you talk to somebody on a break
21 about your prior answer?
22   A.    No, I --
23        MR. KILBORN: Hold on. You

Page 351

1  can't ask who he talked to on a break.
2         MR. JOHNSON: Why not? He's
3  not supposed to talk to people on a break
4  about the substance of his testimony.
5         MR. KILBORN: He can talk to
6  his lawyers all he wants.
7         MR. JOHNSON: About the
8  substance of his testimony?
9         MR. KILBORN: He can talk to
10 his lawyer about anything he wants to.
11        MR. JOHNSON: In Alabama state
12 court maybe. Do you think that will fly in
13 Federal Court?
14        MR. KILBORN: I certainly do.
15   A.    Look, I'm the type person,
16 when I read something over and over again,
17 the more I think about it, the more it jars
18 my memory.
19   Q.    Are you telling me you didn't
20 talk to anybody else about the substance of
21 your testimony on that point?
22   A.    You asked a question earlier,
23 I gave you an answer.

Page 352

1    Q.    I know. Now you've got a
2  different answer.
3    A.    Yes. And I told you that I
4  did call them that morning. And I kept
5  getting the answering machine, I told you
6  what happened, I got frustrated. Called my
7  wife, I asked her to try and call. And she
8  wouldn't call because she didn't know what
9  to say. So I tried to call back. I don't
10 remember whether I left a message or not,
11 but I know I was trying to call and
12 reschedule.
13   Q.    Let me ask you this, did you
14 talk to your wife about that on the break?
15   A.    You asked -- I told you what
16 I'd done. I mean, you asked a question
17 earlier, I answered it, and I had answered
18 the question wrong.
19   Q.    Okay.
20   A.    What the question was, did I
21 attempt to call anyone that day to
22 reschedule, did I attempt to go, did I
23 attempt to talk to anyone, did I attempt to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 353

1 write anyone, and I had said no. And I
2 forgot, I did try to call that morning. And
3 I had -- I kept getting an answering
4 machine.
5    Q.    All right. And you agree
6 that's not what you testified to earlier
7 today?
8    A.    That's not what I testified to
9 earlier today, no.
10    Q.    All right. Did any particular
11 thing spur you to change your testimony in
12 that regard?
13    A.    Well --
14    Q.    Did you talk to your wife
15 about what you said earlier?
16    A.    I told you, I forgot and I
17 answered the question wrong.
18    Q.    Okay. Did you talk to your
19 wife about your testimony?
20    A.    I told you, that was my
21 answer. I gave you my answer.
22    Q.    I'm asking you a specific
23 question.

Page 354

1    A.    And I answered your question.
2 I said I forgot what I had done.
3    Q.    And are you also --
4    A.    And I answered the question.
5 I stated that I had called. I have
6 forgotten that I had called.
7    Q.    I heard you.
8    A.    I also stated that I got an
9 answering machine several times. I also
10 stated that I got frustrated; that I called
11 my wife; that I had asked my wife to call;
12 my wife would not call. Therefore, I don't
13 know if I left a message or not. I was
14 upset, and I was working to make money.
15 That's my answer.
16    Q.    And I understand that's your
17 answer now --
18    A.    Yes, sir.
19    Q.    -- but that wasn't your answer
20 earlier --
21    A.    No, sir, that was not my
22 answer earlier.
23    Q.    -- I'm trying to figure out

Page 355

1 what spurred you --
2    A.    But I gave you the answer,
3 like I said.
4    Q.    Did you talk to your wife
5 about your testimony here today?
6    A.    No, sir. I'm telling you that
7 that was my answer, period, plain and
8 simple.
9    Q.    And you did not talk to your
10 wife about it? That's your sworn testimony?
11    A.    She's got wrote down what I
12 said.
13    Q.    I'm asking a simple question,
14 yes or no.
15    A.    I gave you an answer to your
16 question.
17    Q.    Did you talk to your wife?
18    A.    I gave you an answer to your
19 question, sir.
20    Q.    That didn't sound like an
21 answer to me and I --
22    A.    You asked me earlier today had
23 I tried to get in contact with anybody, and

Page 356

1 I answered no.
2    Q.    You did answer no.
3    A.    You acknowledge I answered no.
4 That was my answer.
5    Q.    Your testimony earlier today
6 is different than your testimony right now;
7 correct?
8    A.    You don't make mistakes?
9    Q.    I make mistakes.
10    A.    So do I, I'm human. I don't
11 know nobody that don't make mistakes.
12    Q.    Let me ask some questions
13 here. And I'd like some answers from you.
14 I mean, we've got several hours we can be
15 here or we can go home.
16    A.    I can stay awake.
17    Q.    That's what you say.
18    A.    That's what I know.
19    Q.    Now let me ask the question:
20 Your testimony was different this morning
21 than it is now. And if it just suddenly
22 struck you for no apparent reason, that's
23 fine.

89 (Pages 353 to 356)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 357

1   A.   You've never had that happen?
2   Q.   I have had it happen. Is that
3   what happened to you?
4   A.   What's so strange about it?
5   Q.   Is that what happened to you?
6   A.   What's so strange about it?
7   Q.   Is that what happened to you?
8   A.   I told you.
9   Q.   No.
10   A.   I answered the question wrong
11   earlier today, and that's my answer.
12   Q.   I know you said you changed
13   your testimony, that's obvious from what
14   you're saying.
15   A.   Yes, I did.
16   Q.   That's obvious from what
17   you're saying.
18   A.   Yes.
19   Q.   What I'm asking you is, what
20   made it change? Were you just suddenly
21   struck by a different thought or did you
22   talk to somebody that made you change your
23   testimony?

Page 358

1   A.   I answered the question.
2   Q.   You did not answer that
3   question.
4   A.   That's my testimony I'm
5   sticking with, period.
6   Q.   I'm going to get an answer.
7   A.   We've got a couple more hours.
8   Q.   And we can go now or we can go
9   then. But I want an answer to the question.
10   A.   Okay. Ask your question.
11   Q.   Did you talk to your wife or
12   anybody else and that made you change your
13   testimony?
14   A.   I told you -- Well, she's got
15   what I told you, that's what I'm sticking
16   with.
17   Q.   Did you talk to your wife
18   about substance of your testimony during
19   this deposition?
20   A.   She's through typing now.
21   MR. KILBORN: Let's take a
22   break.
23   (Recess taken.)

Page 359

1   MR. JOHNSON: Back on the
2   Record.
3   Q.   Mr. Dees, before we took a
4   break, I had started asking you some
5   questions --
6   A.   Yes, sir.
7   Q.   -- because you testified to
8   one thing earlier today, and moments ago,
9   just before the break, you testified
10   something different.
11   A.   Yes, I did.
12   Q.   And, again, that's okay with
13   me. I just want to know why. And if your
14   testimony is that you just remembered, then
15   I'd like to know that. But if the truth is
16   that you talked to your wife, and she jogged
17   your memory, and you now know more, I want
18   to know that.
19   A.   She told me that I -- She told
20   me that I had called them. I forgot about
21   it. Because she told me I called her saying
22   I was frustrated. When she said that, I
23   remembered, yeah, I called them several

Page 360

1   times.
2   Q.   Okay. So now you remember
3   calling them?
4   A.   Yes, sir, I did. And I got
5   mad because I kept getting that stinking
6   answering machine.
7   Q.   Okay. See, that wasn't too
8   hard, was it?
9   A.   Well, this is all new to me.
10   I'm a soldier. I go fight where I'm told to
11   fight and jump on who I'm told to.
12   Q.   This is where we fight.
13   A.   That's what y'all get paid
14   for. This ain't my environment.
15   Q.   All right. There wasn't any
16   magic to that, I just wanted to know the
17   answer to the question. Okay?
18   A.   Well . . .
19   Q.   Have you ever appeared in
20   court before?
21   A.   Just when I filed bankruptcy.
22   Q.   Okay. Did you give a
23   deposition?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 361

1  A.   No, sir.
2  Q.   Have you ever given a
3  deposition like this today?
4  A.   Nope.
5       MR. SPORT:  You have now.
6       THE WITNESS:  Yeah.  I don't
7  like these at all.
8  Q.   When you filed bankruptcy, did
9  you actually have to go to bankruptcy court?
10  A.   Yes, I did.  It was quite
11  embarrassing.
12  Q.   Now, Mr. Dees, before we get
13  -- I basically get one shot at asking you
14  questions.
15  A.   All right.
16  Q.   And I don't want to leave here
17  thinking I didn't ask you something or I
18  didn't get a fair answer from you.
19       Are there any other questions
20  that I've asked you today that you've
21  already answered that you feel like you need
22  to change or add to or take from?
23  A.   I'm still uncertain as to what

Page 362

1  you was wanting when you were asking about
2  my knowledge of a meeting and whatever.  You
3  kept asking the question, and I still don't
4  -- I'm still unsure of what you was hinting
5  at.
6  Q.   Okay.  What --
7  A.   Like I said, all I know is
8  everything stemmed from my military
9  service --
10  Q.   And that's all you know?
11  A.   -- and my military commitment.
12  I don't care what was said in the meeting, I
13  wasn't in the meeting.  All I know is
14  everything when my military commitment
15  became a problem, it escalated to a point
16  and it got me terminated because of my
17  military commitment.
18       I didn't even know they had
19  had a meeting.  But I know -- do know that
20  my military career was the reason for my
21  being terminated.
22  Q.   All right.  And you know that
23  just because that's the only problems you

Page 363

1  had with Mr. Prater or how do you know that?
2  A.   That stemmed -- That caused
3  all of my problems from when we started to
4  finish.
5       MR. JOHNSON:  As I said
6  earlier, I'm going to take a quick break and
7  talk with Mr. Smith.  And assuming he hasn't
8  thought of anything else, we'll probably be
9  done.  So give me just a few minutes, and
10  we'll be right back.
11       (Recess taken.)
12  Q.   Mr. Dees, I know that your
13  attorneys had early on in the case provided
14  something called Plaintiff's Initial
15  Disclosures.  It included a list of
16  witnesses and people that know something
17  about the case.
18       And I want to ask -- I want to
19  read off some of the names and ask you to
20  let me know if there is anybody else that
21  you're familiar with that might have
22  information that's not included here.
23       MR. SPORT:  Matt, before he

Page 364

1  starts on that, do you also have the
2  supplement?
3       MR. JOHNSON:  Yeah.  I think
4  so.
5       MR. SPORT:  We added some
6  names.
7       MR. JOHNSON:  Okay.  Well, let
8  me make sure.  Did you add names on the
9  supplement?  I know you provided those tax
10  documents.
11       MR. SPORT:  Yeah.  I think we
12  added a couple of names, four, five, six,
13  seven, something like that.
14       MR. JOHNSON:  You don't happen
15  to have them, do you?
16       MR. SPORT:  I don't.  But go
17  ahead and ask him, and the documents will
18  say what they say.
19       MR. JOHNSON:  Yeah.  Sure.
20  Q.   All right.  Well, anyways,
21  Mr. Dees, I realize that there might be
22  additional names on a supplemental
23  disclosure, and if they're there, I'll look

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 365

1 at it and see what they are.
2        But for purposes of the
3 deposition, let me just refer to the Initial
4 Disclosures that were provided.  And they've
5 indicated a number of names that have come
6 up plenty of times:  Your name, your wife's
7 name, Greg Prater's name, Kevin Hughes, John
8 Applegate.  They list here Keisha Morris, is
9 that the Keisha you're referring to?
10       A.    Yes, sir.
11       Q.    Okay.  Mr. Moon is included,
12 Wendy Warner is included.  It's identified
13 Drake Barefoot, he was a coworker of yours;
14 is that right?
15       A.    That's right.
16       Q.    Okay.  And we've talked about
17 him some.  Mark Bornberg, was he also your
18 coworker?
19       A.    Yes.
20       Q.    And we've talked about him
21 some?
22       A.    Yes.
23       Q.    Okay.  And Chris -- W-E-I-H-E?

Page 366

1       A.    Weihe.
2       Q.    And we talked about him some.
3 I think we also talked about Shane Archer
4 who worked with you as well?
5       A.    Uh-huh.
6       Q.    Is that a yes?
7       A.    Yes.
8       Q.    And I think you mentioned Mark
9 Hanks' name, but I didn't get a good feel
10 for what you understood Mark Hanks to know.
11 Tell me what -- I know we talked about the
12 big meeting where you and a number of your
13 coworkers were there, you talked with
14 Prater, and that was sort of a big deal
15 meeting that we talked about.  Was Mark
16 Hanks there?
17       A.    Yes.
18       Q.    And was Shane Archer there?
19       A.    Yes.  Well, wait a minute.
20 The first meeting?  I don't know if Shane
21 was there or not.
22       Q.    Did he start later than some
23 of the other guys?

Page 367

1       A.    Yeah.
2       Q.    Okay.
3       A.    No.  He came to work -- I
4 don't know when he started with the company.
5 Plus he started out on that weekend shift
6 and then he moved to our shift.
7       Q.    Okay.  What about Chris Weihe,
8 was he --
9       A.    Chris was one of the very
10 first ones hired on.
11       Q.    Was he at that meeting?
12       A.    Yes.
13       Q.    And was Mark Bornberg at that
14 meeting?
15       A.    I don't know if Bornberg was
16 or not.
17       Q.    Okay.  And was Drake Barefoot
18 at the meeting?
19       A.    Yes.
20       Q.    Okay.  And also included here
21 is a guy we haven't talked about, John
22 Wingo?
23       A.    Yes.  Wingo was there too.

Page 368

1       Q.    Who is John Wingo?
2       A.    He worked at International
3 Paper with me, came down to Hyundai with me.
4 And I'd known him several years, and he left
5 and went to Honda.
6       Q.    Okay.  When did he do that?
7       A.    I don't know.
8       Q.    I mean, did he leave before
9 your termination, or since then?
10       A.    Before I was fired, yes.
11       Q.    Okay.  And what did John Wingo
12 know?
13       A.    He was there for most of the
14 harassment, most of the time I was being
15 pushed and harassed.
16       Q.    All right.  Did you ever have
17 any conversations with John Wingo about it?
18       A.    Yes, sir.  Me and John were
19 tight.  He was a former Marine.  Me and him
20 had a good military bond.
21       Q.    You use the word pushed and
22 harassed, were you actually physically
23 pushed or were you just talking mentally

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 369

1   pushed?
2      A.   I was actually physically
3   grabbed, yes.
4      Q.   When?
5      A.   By Prater.
6      Q.   When?
7      A.   Before a shift one time.  He
8   come in and somebody stated, I got a
9   headache, and he said:  Yeah, so do I, and
10  pointed at me.  And, I don't know, several
11  minutes later came up and tried to bear hug
12  me from behind.  And I don't even remember
13  what the comment was that he made.
14     Q.   You don't remember?
15     A.   No, sir.
16     Q.   I mean, was he just goofing
17  around, or what was the point of the bear
18  hug?
19     A.   He -- It was -- Dadgumit.  No,
20  I mean, it wasn't goofing.  I didn't --
21  There was nothing goofing around.  I didn't
22  goof around with him, with management.  I
23  don't -- I don't remember.

Page 370

1      Q.   I mean, did you think he was
2   trying to physically attack you?
3      A.   No.  Because then that would
4   -- I mean, I don't know what he was trying
5   to do.  He come up and grabbed me from
6   behind.  And I don't remember what the
7   comment was that was made, but it was there
8   in the shift office.  Bill Seivers' shift
9   saw it, my shift saw it.  I busted loose,
10  grabbed my tools, and walked out.
11     Q.   Okay.
12     A.   I don't remember what it was
13  for.  I don't remember what he said.  I was
14  -- I don't know.
15     Q.   Did y'all have any other
16  discussion about it?
17     A.   No.  I mean, some of the other
18  fellows voiced their opinions.
19     Q.   What did they say?
20     A.   Just like every other thing --
21  I don't know, I wasn't in there.  I left.
22  They voiced their opinion, like I said, it
23  was like everything else, it was washed

Page 371

1   under the bridge because he was management.
2      Q.   Okay.
3      A.   He cussed two of our
4   specialists out, they went to team
5   relations, went to HR, same thing, washed
6   under the bridge because he was management.
7      Q.   All right.  With respect to
8   these guys that are your coworkers, Drake
9   Barefoot, Mark Bornberg, Chris Weihe, Shane
10  Archer, Mark Hanks, or John Wingo, can you
11  think of any other discussions you had with
12  them about Prater or your problems because
13  of your military service that we haven't
14  talked about already?
15     A.   There probably is, but right
16  offhand, no, I don't remember.  Plus there
17  was Sergeant First Class Richberg and
18  Sergeant Martin in my unit.
19     Q.   Wait.  Say that again.
20     A.   You have Sergeant First Class
21  Richberg and Sergeant Martin you need to add
22  to your list.
23     Q.   Who is Richberg?  I think you

Page 372

1   mentioned his name earlier.
2      A.   He was my superior.  He
3   retired.
4          MR. SPORT:  I'll represent to
5   you, I think those are two of the names we
6   added in our supplement.
7          MR. JOHNSON:  I think you're
8   right.  Now I remember it.
9      Q.   Martin is somebody we talked
10  about earlier?
11     A.   Martin, he took Sergeant First
12  Class Richberg's place in our unit.  I've
13  known him for about ten years.
14     Q.   Barring anybody that may be in
15  a supplemental disclosure that your
16  attorneys have provided to us, and I'm sorry
17  I can't hand them to you to look at, can you
18  think of any other people that would have
19  knowledge about your case or the allegations
20  that you've made?
21     A.   You need to talk to some of
22  the production people there, if you haven't
23  already.  I mean, they -- I don't know.

93  (Pages 369 to 372)

# FREEDOM COURT REPORTING

Page 373

1   **Q.   Is there anybody that knows**
2   **anything about it that we should talk to?**
3       A.   Right offhand --
4           MR. SPORT: I don't think we
5   had listed one of the names he had mentioned
6   today. The guy's name ends in a Y, works in
7   production.
8           MR. JOHNSON: Stapley.
9           MR. SPORT: Stapley. I don't
10  think we've listed him, but we probably need
11  to supplement him.
12      **Q.   Mr. Dees, sort of my last**
13  **question here, I know -- your attorneys have**
14  **provided me a lot of documents, and I'm**
15  **assuming they all came from you. Are you**
16  **aware of any documents related to this case,**
17  **issues you had with Hyundai, issues you've**
18  **had with Greg Prater individually, or**
19  **anybody else that might relate to this case**
20  **that you haven't provided to your lawyers?**
21      **Is there any other**
22  **correspondence, any other e-mails, notes, or**
23  **anything?**

Page 374

1       A.   I don't -- Not offhand. But
2   like the e-mail from -- that I sent to
3   Kimball, I'd forgotten about it until today.
4   I mean, if I remember it, they'll know about
5   it. But as of right now, no.
6       **Q.   Okay. So as of right now, you**
7   **don't know of anything else that hasn't been**
8   **provided to your lawyers?**
9       A.   No.
10          MR. JOHNSON: That's it. I
11  appreciate your time. I know it was a long
12  time.
13          MR. KILBORN: I've got a few
14  questions.
15          EXAMINATION
16  BY MR. KILBORN:
17      **Q.   Mr. Dees, the security**
18  **building where you were taken, does that**
19  **building have recording devices?**
20      A.   Yes, sir.
21      **Q.   What type?**
22      A.   I know it has video recording
23  devices, I don't know if it has audio or

Page 375

1   not.
2       **Q.   Were there video recording**
3   **devices when you come into the security**
4   **building when you were fired?**
5       A.   Yes, sir. They have a room in
6   there, when you walk in the door, there's a
7   door straight across from the entry door,
8   and that room is all their recording
9   devices, I believe. That's where I saw
10  them.
11      **Q.   You saw them there?**
12      A.   Yes, sir.
13      **Q.   Okay. And what about the**
14  **plant, does it have any recording devices?**
15      A.   Yes, sir.
16      **Q.   Where are they?**
17      A.   Specifics, I don't know. I
18  know we had a coax running up in our
19  building in the production building, because
20  Prater would brag that he would go back
21  there and disconnect the coax to their
22  cameras in our section and then they would
23  call him and ask him what was wrong with it.

Page 376

1   And he'd have to go hook it back up.
2       But as far as where they
3   actually located, I don't know, I just know
4   they had them. Because like I said, he took
5   several of us back there and showed us the
6   coax bragging how he would turn it --
7   disconnect it, and then they would call and
8   make -- the cameras would go blank when you
9   disconnect your feed, the cameras go black,
10  then they would call him and make him
11  reconnect it. So they did have cameras in
12  our section.
13      **Q.   And you mentioned another**
14  **recording, you said it was -- was it a Bill**
15  **Shivers?**
16      A.   Seivers.
17      **Q.   Seivers. Said he had**
18  **recordings by Applegate?**
19      A.   Said Prater stated to him that
20  he had voice recordings of Applegate telling
21  him to terminate me, that he needed to get
22  rid of me.
23      **Q.   Okay. Now, prior to the 26th**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 377

1  of February when you were taken into the
2  firing room in the security house or
3  building, had you had any warning at all or
4  had you been told that you were going to be
5  terminated or that you were being considered
6  for termination?
7      A.  No, sir.  I had no idea
8  whatsoever.  It floored me when I walked in
9  the room and they told me I was being fired.
10  There was nothing leading up to it, no
11  inclination, nothing.
12      Q.  For instance, Defendant's
13  Exhibit 6 is the e-mail counsel asked you
14  about February 21, 2007, at 5:30 a.m. from
15  Prater to Applegate.  It says:  Based on
16  this conversation, I feel that even if he
17  was not sleeping, that he doesn't care
18  enough about his job to prevent anyone from
19  thinking he was sleeping.  John, my
20  recommendation, as hard as it is for me to
21  say, termination.  Greg.
22          Had you been told anything
23  like that at that time?

Page 378

1      A.  No, sir.  And Prater when he
2  got anybody fired, he always bragged about
3  it later.  He had been responsible for two
4  people being fired prior to me, and all we
5  heard was him bragging about how he had got
6  them fired.
7      Q.  Were you told when you were
8  terminated that you -- You were told you
9  were being terminated for sleeping?
10      A.  That's what that -- the lady
11  said.
12      Q.  All right.  Were you told that
13  you were being terminated, because, quote,
14  you don't care about your job to prevent
15  anyone from thinking you were sleeping?
16      A.  No, sir.
17      Q.  And counsel also asked you
18  about embarrassment.  And you do attend a
19  church?
20      A.  Yes, sir.
21      Q.  And do the people in the
22  church know that you got terminated?
23      A.  Yes, sir.

Page 379

1      Q.  Do they know why Hyundai said
2  you were terminated?
3      A.  Yes, sir.
4      Q.  All right.  Does that create
5  any embarrassment for you?
6      A.  Yes, sir.  Because I didn't
7  talk to no one for a long time about it, and
8  everyone just assumed that I had actually
9  fell asleep on the job and all my military
10  friends and all my close friends, they
11  couldn't believe it.  They kept asking me
12  did -- what happened.  And I just -- I
13  didn't talk to nobody about it for a long
14  time, because like I said, that's -- I've
15  never.
16      Q.  And up until Hyundai decided,
17  in their infinite wisdom, that you were a
18  man who slept on the job, you had a
19  blemish-free record both in civilian and
20  military life?
21      A.  Yes, sir.
22      Q.  And now whenever you apply for
23  employment or apply for anything, bank

Page 380

1  credit, where there's a question about have
2  you ever been terminated or received any
3  type of job action, you've got to put that
4  down?
5      A.  Yes, sir.  When I went to work
6  for International Paper in Thorsby, I made
7  -- I made leadman in three years, and that
8  was unheard of.
9      Q.  And was that -- Does the fact
10  that that blemish is now on your reputation,
11  does that cause you any distress?
12      A.  Yes, sir.  It still causes
13  problems.  Even between me and my wife.  I
14  mean, that -- Like I said, I've -- I take
15  pride in my work, just like I do my uniform.
16  And if I go to do something, I put a hundred
17  and fifty percent into whatever I'm doing.
18  Even the production people there and
19  maintenance people, all, when they said --
20  found out that I had been accused of
21  sleeping, they said:  There's no way, he's
22  too hyper.  Because I'm an outgoing person,
23  even at night.  I've always been that way.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 381

1 They said there's no way he was sleeping, it
2 ain't no way. And you can ask several of
3 the production people there in stamping,
4 production that I worked with, any of them,
5 they all know me.
6        MR. KILBORN: That's all I
7 have.
8        MR. JOHNSON: Just a couple
9 follow-up questions.
10        EXAMINATION CONTINUED
11 BY MR. JOHNSON:
12        Q.    You mentioned some sort of
13 video in the security building?
14        A.    Yes, sir.
15        Q.    Do you know if it's actually
16 recording or just a video camera that's
17 monitored?
18        A.    We was told it was a video
19 recording.
20        Q.    Who told you that?
21        A.    Prater and -- I have to think
22 about that one. Because it was one of the
23 other maintenance supervisors from one of

Page 382

1 the other sections. I don't remember.
2        Q.    When were you told that?
3        A.    About from get-go. Well, they
4 briefed it in -- I believe they briefed it
5 in their hiring process. And -- Well, I
6 know it was recording, because they busted
7 one of the temporary workers out back and on
8 the floor there by the presses one night for
9 -- she was doing a striptease apparently
10 there by the presses one night, they said
11 the next thing they knew, security come
12 running through the building; said they used
13 the recording when they fired her.
14        Q.    Okay. Are you aware of any --
15 Well, you mentioned some coax cables?
16        A.    For the cameras.
17        Q.    Okay. Other than something
18 that Greg Prater might have told you about
19 those coax cables, do you know what they
20 were, where they went to, or where they came
21 from?
22        A.    We tried to follow them out,
23 but it was seventy-five, seventy feet up in

Page 383

1 the ceiling, running conduit, waves through
2 conduit, through cable waves. There was no
3 way to follow that, no, we didn't have a
4 clue.
5        Q.    Did you ever see them attached
6 to a camera?
7        A.    No. I said there's no way.
8 But they had to -- How did they -- They said
9 they recorded the old girl doing the
10 striptease there in the plant by the press.
11        Q.    Did you ever see any cameras
12 up in that third level near the SOP?
13        A.    I never looked for them up
14 there.
15        Q.    So you never saw any?
16        A.    Like I said, I never looked
17 for any. They may have been up there, may
18 not have. I don't know, I never looked for
19 them.
20        Q.    Okay. And what church do you
21 go to?
22        A.    Hillcrest Baptist Church in
23 Maplesville, Alabama.

Page 384

1        Q.    How big a church is that?
2        A.    I don't know. Your average
3 sized church. Probably got a hundred people
4 there at any service.
5        Q.    How many members total?
6        A.    Oh, God, I don't know.
7        Q.    You don't know?
8        A.    I don't know.
9        Q.    Do you know anybody else from
10 HMMA that works there -- or that goes to
11 church there?
12        A.    Yes, sir.
13        Q.    Who?
14        A.    Keith Smith.
15        Q.    Who is he?
16        A.    He works -- He's a production
17 team leader over in general assembly.
18        Q.    Okay. Now, you said people at
19 church knew that you had been terminated?
20        A.    Yes, sir.
21        Q.    Did you tell anybody at the
22 church?
23        A.    Nope.

96 (Pages 381 to 384)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 385

1  Q.  Do you have any idea how they
2  knew?
3  A.  Yes, sir.
4  Q.  How?
5  A.  Keith's son worked in the
6  building I worked in.  Derick.
7  Q.  You think Derick told somebody
8  at the church?
9  A.  They said Derick told his
10  father, and it just went from there.  I live
11  in a small community, if you look wrong,
12  everybody knows it within five minutes.
13  Q.  Okay.  Did you ever talk to
14  Derick Smith or Keith Smith about it?
15  A.  No, sir.
16  Q.  You never talked to either of
17  them?
18  A.  No, sir.
19  Q.  Okay.  Do you know anybody who
20  has?
21  A.  No.
22  Q.  Do you know if your wife did?
23  A.  I don't know.

Page 386

1  Q.  Other than Derick and Keith
2  Smith, do you know anybody else at your
3  church who knows about it?
4  A.  I think Keith is the only one,
5  I think, from church that goes there.  But,
6  like I said, there's several people there in
7  the community that work down there.
8  Q.  Did anybody from your church
9  say anything to you about what the situation
10  at HMMA?
11  A.  There was a couple that asked,
12  but I don't remember.
13  Q.  Do you know who asked?
14  A.  They was asking that Sunday,
15  and I was trying to avoid the issue because
16  I was embarrassed.
17  Q.  Did you ever have any
18  conversations with anybody at church that
19  you can recall, that knew about you being
20  terminated at Hyundai?
21  A.  Just one person.  Mr. Bob
22  Eddy.  He's the one -- When I got fired, I
23  didn't know what to do.  I had never had

Page 387

1  anything like this happen, and I was just --
2  I went and talked to Mr. Bob and --
3  Q.  Who is Mr. Bob?
4  A.  -- explained to him everything
5  that happened.  And he's the one who put me
6  in contact with Mr. Kilborn.
7  Q.  Okay.  And is Bob Eddy just a
8  member of the church?
9  A.  He's a member of the church
10  and a friend.
11  Q.  Okay.  But he's not like your
12  pastor or something like that?
13  A.  No, sir.
14  Q.  Okay.  And what's the pastor's
15  name at the church?
16  A.  We don't have one.  He went
17  north with his family who is ill, and
18  he resigned a few weeks ago.  His father is
19  in bad health.
20  Q.  What was his name?
21  A.  Jason Vincent.
22  Q.  Did you ever talk to Jason
23  Vincent about this situation?

Page 388

1  A.  No, sir.
2  Q.  Did he ever call you to check
3  on you about it or do anything to suggest he
4  knew about it?
5  A.  Like I said, I was embarrassed
6  about it, I didn't let on -- I didn't want
7  to talk to -- I didn't want to talk to
8  nobody about it.  Like I say, ain't never
9  had anything like this happen.  And when you
10  got -- When I walked in that first Sunday
11  and Keith looked at me and just hung his
12  head, and other people, I started to turn
13  around and walk out.
14      MR. JOHNSON:  Okay.  That's
15  all I've got.  I appreciate it.
16  (The deposition was concluded at 5:33 p.m.,
17  November 20, 2007.)
18
19
20
21
22
23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 389

1        REPORTER'S CERTIFICATE
2    STATE OF ALABAMA,
3    MONTGOMERY COUNTY,
4        I, Angela Smith McGalliard,
5    Registered Professional Reporter and
6    Certified Realtime Reporter, Commissioner
7    for the State of Alabama at Large, do hereby
8    certify that the above and foregoing
9    proceeding was taken down by me by
10   stenographic means, and that the content
11   herein was produced in transcript form by
12   computer aid under my supervision, and that
13   the foregoing represents, to the best of my
14   ability, a true and correct transcript of
15   the proceedings occurring on said date and
16   at said time.
17       I further certify that I am neither
18   of kin nor of counsel to the parties to the
19   action; nor in any manner interested in the
20   result of said case.
21

22   _____
     Angela Smith
     McGalliard, RPR, CRR,
23   CCR Lic. No. 98.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

 

# JERRY (LEON) DEES JR.

## OBJECTIVE

Employment with Hyundai Corporation in a maintenance position.

## SUMMARY OF QUALIFICATIONS

I am skilled in reverse dial and laser alignment. I can pass an X-Ray in stick, MIG, and TIG welding on plate and pipe. I am knowledgeable in hydraulic systems and trouble shooting them. I can read hydraulic, mechanical, and some electrical blue prints.

## WORK EXPERIENCE

Nov 99 – Present       International Paper                    Thorsby , Al
Maintenance Lead Man

- Assign work schedule for all the maintenance shifts on the veneer side of the plant which consists of four shifts.
- Ensure all parts are available to complete the assigned jobs.
- Plan, lead, and ensure successful completion of all major projects and shutdowns, as well as all assigned down days.
- Always available for call in if the off shifts have a problem they can't solve.

## EDUCATION

| May 83 | Clay County High School | Ashland, Al |
| Jul 94 | Wallace Community College Welding and basic core curriculum | Selma, Al |
| Jan 99 | John Patterson Technical College Basic and Advanced Hydraulics | Montgomery, Al |

## EXTRACURRICULAR ACTIVITIES

Coaching a high school rifle team that is responsible for getting four of our five graduating senior's full scholarships at Birmingham Southern College and Jacksonville State College.

**DEFENDANT'S EXHIBIT**

DEES V HMMA 00013  DOCS PRODUCED

## INTERESTS AND ACTIVITIES

I like hunting and fishing as well as hiking. I also like to ride my four wheeler and most outdoor sports.

## LANGUAGES

I can speak and understand some Korean.

## REFERENCES

| | | |
|---|---|---|
| Kieth Smith | Hyundai Corporation |  |
| Jason Vinson | Pastor Hillcrest Baptist Church | |
| Jimmy Parnell | President, Chilton Water Authority | |

DEES V HMMA 00014  DOCS PRODUCED

| HYUNDAI Hyundai Motor Manufacturing Alabama | RECEIPT of HANDBOOK ACKNOWLEDGEMENT | HR-AL-HR-TR-F-00021 |
|---|---|---|
| Rev Date: 01/10/06 | Owner: Team Relations | Revision Level: 00 |

The information contained in the Team Member Handbook of Hyundai Motor Manufacturing Alabama, LLC has been prepared as an aid and a guideline to give you a summary of the benefits, policies, and procedures at HMMA. It contains information about what you can expect from HMMA, and in turn, what HMMA expects of you.

If, in this Handbook, we have inadvertently said or implied anything that is different from the actual provisions of any HMMA policy or benefit plan document, the actual provisions of the policy or benefit plan will govern.

If at any time you have any questions regarding policies, you may talk to your group leader, assistant manager, manager, or team relations representative.

The policies and statements contained in this Handbook, and in other pro-visions that may be added in the future, are not a contract of any kind, but are rather a description of company policies. Employment with HMMA is at will and is not offered, contracted, or promised for any specific length of time. You have the right at HMMA to quit for any reason or for no reason at any time. Conversely, HMMA may terminate your employ-ment on the same basis. Although this Handbook reflects current policies, these policies may be unilaterally changed or rescinded by HMMA at any time.

I, _Jerry L. Dees Sr_____, acknowledge that I have received, the Handbook and that it is my responsibility to read the handbook and ask questions if needed in order to gain understanding.

Signature: _Jerry Dees_

Team Member Number: _103039_

Date: _10 Jan 06_

**DEFENDANT'S EXHIBIT**

2

DEES V HMMA 00018  DOCS PRODUCED

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____ MIDDLE _____        District of _____ ALABAMA _____

JERRY LEON DEES, JR.

## SUMMONS IN A CIVIL ACTION

V.

HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC and HYUNDAI MOTOR AMERIC

CASE NUMBER:

2:07CV306-MHT

TO: (Name and address of Defendant)

HYUNDAI MOTOR MOTOR AMERICA, INC.
c/o NATIONAL REGISTERED AGENTS, INC.
150 S. PERRY ST.
MONTGOMERY, AL 36104

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

VINCENT F. KILBORN, III
KILBORN, ROEBUCK & MCDONALD
1810 OLD GOVERNMENT ST.
P.O. BOX 66710
MOBILE, AL 36660

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

_Debra P. Hackett_

CLERK

(By) DEPUTY CLERK

DATE    4/12/07

**DEFENDANT'S EXHIBIT**

3

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me⁽¹⁾ | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                        Date                              *Signature of Server*

_____
*Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| MIDDLE | District of | ALABAMA |

JERRY LEON DEES, JR.

## SUMMONS IN A CIVIL ACTION

V.

HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC and HYUNDAI MOTOR AMERIC

CASE NUMBER:

2:07cv306-mht

TO: (Name and address of Defendant)

HYUNDAI MOTOR MANUFACTURING, LLC
c/o MR. RICHARD NEAL
700 HYUNDAI BLVD.
MONTGOMERY, AL 36105

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

VINCENT F. KILBORN, III
KILBORN, ROEBUCK & MCDONALD
1810 OLD GOVERNMENT ST.
P.O. BOX 66710
MOBILE, AL 36660

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

_Debra P. Hackett_

CLERK

(By) DEPUTY CLERK

DATE    4|12|07

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

    I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
             Date           *Signature of Server*

                          _____
                          *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA

JERRY LEON DEES, JR.,

    Plaintiff,

Vs.

HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC, and HYUNDAI
MOTOR AMERICA, INC.,

    Defendants.

CASE NO. CV-07-_____

2: 07CV306-mht

**JURY TRIAL DEMANDED**

### COMPLAINT

Comes now the Plaintiff, JERRY LEON DEES, JR., by and through his counsel of record, and alleges against Defendants HYUNDAI MOTOR MANUFACTURING ALABAMA, L.L.C., and HYUNDAI MOTOR AMERICA, INC., as follows:

### PARTIES

1. Plaintiff, JERRY LEON DEES, JR. (hereinafter "Dees"), is now, and was at all times relevant hereto, a resident of Maplesville, Chilton County, Alabama. Dees is a Staff Sergeant and combat MP in the 1165th Military Police of the Alabama Army National Guard (hereinafter "Guard"), and was an employee of Defendant HYUNDAI MOTOR MANUFACTURING ALABMA, L.L.C. Dees has already served two tours in Iraq, and stands ready to serve again should his nation call.

2. Defendant, HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, is a Delaware limited liability company having its principal place of business in

- 1 -

Montgomery, Montgomery County, Alabama, and is engaged in the manufacture of automobiles for sale in interstate commerce.

3. Defendant, HYUNDAI MOTOR AMERICA, INC., is a California corporation having its principal offices in California. HYUNDAI MOTOR AMERICA, INC. is engaged in the nationwide distribution of the vehicles manufactured by defendant HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, and is registered to do business in Alabama.

4. Defendant, HYUNDAI MOTOR AMERICA, INC., is the alter ego of defendant HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC. Further, defendant HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC is a mere instrumentality of defendant, HYUNDAI MOTOR AMERICA, INC. These two defendants are hereinafter collectively referred to as "Hyundai."

## VENUE

5. This action arises under the Uniformed Services Employment and Reemployment Rights Act of 1994 § 2(a), 38 U.S.C.A. §§ 4301-4333 (West 2007), as hereinafter more fully appears.

6. Defendant HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, maintains its principle place of business in Montgomery County, Alabama.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

7. Dees began working at Hyundai on or about November 21, 2005, as a maintenance technician in the Stamping Maintenance department, under the direct supervision of "team leader" Kevin Hughes (hereinafter "Hughes") and Stamping Maintenance assistant manager Greg Prater (hereinafter "Prater").

- 2 -

Prater reported to John Applegate, American maintenance senior manager (hereinafter "Applegate").

8. Harassment of Dees by Hyundai through Prater and Hughes began almost immediately when Prater learned that Dees was a member of the Alabama Army National Guard and had served two tours in Iraq.

9. Hyundai, through Prater, Hughes and Applegate, harassed Dees during his entire tenure at Hyundai. Harassing acts included:

   a. Prater repeatedly demanded that Dees provide military orders to excuse missing work when Dees would have to attend his monthly weekend training with the Guard, even though the Guard issues only an annual training schedule;

   b. Prater telling Dees he could not miss work to attend his Guard training;

   c. Prater frequently made derogatory remarks about the Guard in the presence of Dees and other employees;

   d. Prater told Dees that he could not go to the Human Resources department to complain about how he was being treated, despite Hyundai having an "open door" policy regarding employee complaints;

   e. Prater attempted to force Dees' coworkers to say that Dees had violated Hyundai policies and procedures when Prater knew it was not true;

   f. In an effort to coerce Dees into quitting his job at Hyundai so that Hyundai would not have to deal with Dees' Guard service obligations, Dees' was forced to clean the "pit" more frequently than the other

personnel. It became a way for Hyundai, through Prater and Hughes, to punish Dees. The pit is a highly dangerous area where metal pieces which are scrap from the stamping process, many of which are sharp, come off of a conveyor and are supposed to fall into a scrap bin. Many of the parts do not fall into the bin, but are thrown to the floor of the pit. This scrap process was running while Dees was made to clean the pit, making working in the pit far more dangerous than the maintenance technician's other duties. Dees cleaned the pit almost daily some weeks, and the frequency with which he was assigned to the pit was several times that of his coworkers.

10. Applegate ratified each and every action of harassment by Prater and Hughes by stating that he stood behind each and every decision they made in running the stamping maintenance department, and refusing to act on or even investigate complaints to Applegate about Prater and Hughes.

11. The harassment regarding Dees having to provide military orders for his monthly Guard service continued despite Human Resources confirming that Dees' was correct about there only being a annual schedule of training times. In an attempt to end the harassment, Dees finally asked the Guard to write a letter to Hyundai asking Hyundai to stop harassing Dees about his Guard duty.

12. Per Dees' request, on or about October 23, 2006, Sergeant Franklin Barnes of Dees' Guard unit wrote a Letter of Instruction ("LOI") to the Human Resources department at Hyundai. The LOI stated that military orders were

not cut, that only an annual schedule was prepared and could be furnished to Hyundai if it needed one, and that Barnes would be happy to provide a Letter of Participation stating that Dees was present on the weekends indicated on the schedule.

13. After the letter from Sergeant Barnes was sent to Hyundai, the incidences of harassment outlined above escalated until finally, on or about February 26, 2007, Prater got the Production Stamping Manager, Jim Brookshire, to falsely accuse Dees of sleeping on the job, whereupon Hyundai fired Dees.

14. Even if Dees had been sleeping, Dees was fired immediately and unceremoniously by Hyundai despite the fact that other employees caught sleeping were merely reprimanded – another act of harassment perpetrated on Dees by Hyundai.

15. In fact, Hyundai's own policies and procedures include *Corrective Action*, which is a six-step process to identify employee work performance weaknesses, provide counseling and a plan to correct the employee's work performance, and ultimately to terminate the employee if the preceding five steps do not provide the required improvement in the employee's work performance. Dees was never even subject to step one, *Discussion Planner*, wherein the employee's supervisor meets with the employee to determine if the performance issue is a failure in the process, equipment, or with the employee.

16. Upon firing Dees, Hyundai confiscated Dees' personal belongings kept in his locker at the plant, and did not allow Dees to collect them, even under

supervision. Dees' personal belongings included notes regarding dates, times, and specific acts of harassment he had been subjected to because of his military affiliation during his fifteen months of employment by Hyundai. These notes were not returned to Dees by Hyundai when Hyundai returned Dees' other personal belongings to him.

17. Because of Hyundai's termination of Dees in violation of USERRA and Alabama public policy, Dees has had to obtain other employment. Dees' new job pays less per hour, includes virtually no overtime, and has fewer benefits that Dees enjoyed at Hyundai.

### COUNT ONE

**Violations of the Uniformed Services Employment and Reemployment Rights Act of 1994 § 2(a), 38 U.S.C.A. § 4311**

18. Dees incorporates herein all of the allegations in preceding paragraphs 1-17.

19. Dees is a Staff Sergeant and combat MP in the 1165th Military Police of the Alabama Army National Guard, and, as such, is a person protected under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") § 2(a), 38 U.S.C.A. §§ 4301-4333 (West 2007).

20. Hyundai violated § 4311 of USERRA by creating an environment of harassment in the Stamping Maintenance department at Hyundai, and harassed Dees continually because of his Guard membership and service obligations.

21. Hyundai further violated § 4311 when the pattern of harassment escalated after Dees had Sergeant Barnes of the Guard send a letter to Hyundai

reminding them of Hyundai's legal obligations with respect to Dees' military service membership and obligations.

22. As a result of Huyndai's termination of Dees in violation of § 4311 of USERRA, Dees now works for less pay and benefits than he enjoyed while employed at Hyundai.

WHEREFORE, Dees demands judgment against Hyundai for compensatory and punitive and/or liquidated damages, reasonable attorneys' fees and court costs under USERRA, 38 U.S C.A. § 4323 (West 2007).

## COUNT TWO

### Outrage

23. Dees incorporates herein all of the allegations in preceding paragraphs 1-22.

24. Hyundai intentionally created a harassing environment and subjected Dees to a pattern of intentional harassment regarding Dees' membership in the Guard and Dees' Guard service obligations.

25. The specific acts of intentional harassment perpetrated by Hyundai were extreme and outrageous conduct.

26. Dees' termination by Hyundai was the culmination of the protracted pattern of intentional harassment related to Dees' Guard membership and requisite Guard service obligations, and therefore, violated the public policy of Alabama with respect to the employment of military reserve personnel.

27. As a result of Hyundai's extreme and outrageous conduct, Dees has suffered severe emotional distress.

- 7 -

WHEREFORE, Dees demands judgment against Hyundai for compensatory and punitive damages, reasonable attorneys' fees and court costs, and any other damages the court finds appropriate.

### COUNT THREE

#### Conversion

28. Dees incorporates herein all of the allegations in preceding paragraphs 1-27.

29. Dees personal belongings in his locker at Hyundai were confiscated by Hyundai when Dees was unlawfully terminated, and Hyundai refused to allow Dees to collect his personal belongings, even under supervision. Dees' personal belongings included notes regarding the pattern of harassment engaged in by Hyundai through Hughes, Prater and Applegate during Dees' tenure as an employee at Hyundai.

WHEREFORE, Dees demands judgment against Hyundai for compensatory and punitive damages, reasonable attorneys' fees and court costs, and any other relief the court deems appropriate.

BY: _____
Vincent F. Kilborn, III

Vincent F. Kilborn, III (KIL004)
KILBORN, ROEBUCK & McDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747

OF COUNSEL:

David A. McDonald (MCD042)
KILBORN, ROEBUCK & McDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747

Jeffrey R. Sport (SPO005)
JEFFREY R. SPORT, P.C.
8475 Sterling Drive
Mobile, Alabama 36695
Telephone: (251) 633-7120
Fax: (251) 633-7252


### PLAINTIFF RESPECTFULLY DEMANDS A TRIAL BY JURY OF THIS CAUSE

BY: _____
        Vincent F. Kilborn, III


### DEFENDANT TO BE SERVED AS FOLLOWS:

Hyundai Motor Manufacturing, L.L.C.          **VIA CERTIFIED MAIL**
c/o Mr. Richard Neal
700 Hyundai Blvd.
Montgomery, Alabama 36105

Hyundai Motor America, Inc.                  **VIA CERTIFIED MAIL**
c/o National Registered Agents, Inc.
150 South Perry Street
Montgomery, Alabama 36104

**Powers, Nancy HMMA/HR**

**From:** Dees, Jerry L. Jr HMMA/Plant Engineering
**Sent:** Tuesday, February 06, 2007 10:57 PM
**To:** Kimble, Greg HMMA/HR

Mr. Kimble,

I am writing to request a meeting with you regarding several issues that have arisen on my shift between Greg Prater, Kevin Hughes, and myself. I have talked to Human Resources on two separate occasions regarding Greg Prater and also filed a complaint on him through my National Guard Unit. There have been positive results from both meetings and once again I am seeking your help. I am currently working night shift but would greatly appreciate a meeting with you at your convenience. Thank you.

Leon Dees
Stamping Maintenance



DEFENDANT'S
EXHIBIT

4

# ATTN: MRS DEES

# FROM: SGT BARNES
#        DET 1, 1165TH MP
#        BREWTON, AL



DEFENDANT'S EXHIBIT

5

DEES000001

DETACHMENT 1, 1165TH MILITARY POLICE (CBT)(SPT)
ALABAMA ARMY NATIONAL GUARD
95 AIRPORT DRIVE
BREWTON, ALABAMA 36426

TM4A-1-RNCO                                             26 MAR 2007

MEMORANDUM FOR RECORD

SUBJECT: IDT INSTRUCTIONAL LETTER FOR HUMAN RESOURCE OFFICER

1.   This is in reference to a letter that was sent on behalf of SSG Jerry L. Dees, on or
around 23 OCT 2006. SSG Dees notified this office that his supervisor was requiring a
copy of orders for SSG Dees' IDT Training Periods,(drill weekends). At this time I
mailed a LOI, letter of instruction to the Human Resource Office of Hyundai in
Montgomery, which is SSG Dees' place of employment.

2. Basically the letter stated that orders for drill weekends were not cut. The only orders
cut was a unit order for the 2 week annual training period. Drill weekends are scheduled
out on a YTC, yearly training schedule and this provides the employer with all the drill
dates and annual training dates for that physical year. Also if the employer required it, the
unit would gladly provide a Letter of Participation stating that SSG Dees was present at
the scheduled drill. I also provided a copy of the yearly drill calendar to the HRO and to
SSG Dees to give to his supervisor. I also informed the HRO if there was anything that
the unit could do to make this process easier for the employer, let me know.

3.  If you need any further information, please contact me, SGT BARNES at 251-867-
5473.

FOR THE COMMANDER:

*Franklin D Barnes*
FRANKLIN D. BARNES
SGT, MP, AL ARNG
TRAINING NCO

DEES000002

Page 1 of 1

**Clevenger, Robert A HMMA/HR**

From:    Applegate, John HMMA/Plant Engineering
Sent:    Wednesday, February 21, 2007 5:58 AM
To:      Clevenger, Robert A HMMA/HR
Subject: FW: Leon Deez

From: Prater, Greg L HMMA/Plant Engineering
Sent: Wednesday, February 21, 2007 5:20 AM
To: Applegate, John HMMA/Plant Engineering
Subject: Leon Deez

John per Leon and I and Wills conversation: I started that it was reported by management that he was sleeping in the SOPS – he said I know who it is it was Jim, I didn't confirm or deny, I just said I was just following up.
Leon said that he was not sleeping there in the SOPS, He watched Jim walk all around the Mezzanine area and he was Text Messaging his daughter due to the bad weather, I asked what time he said around 10:30 or 11 pm he wasn't for sure , He also stated that he knew what Jim was doing and what he thought he was doing, he just watched him and continued text messaging, I asked why would you leave a question in his mind, why didn't he nod at him or wave or something just to prove that he wasn't sleeping, his response is I just don't give a DAMN, You guys just do what ever you want IM fed up with this SHIT, I explained that what you do if you were a Forward Observer on look out and on Guard Duty and you had some one (Officer ) come by would you have done the same, HIS Reply was that's totally different, you cant compare that with this , and he goes on about his war stories, . .... then back to the point, I asked him at any time did Jim approach you while you were Text Messaging him he said the closest he came to me was 50 ft and that was it. .. I asked him again are you sure that he couldn't have approached you when you were looking down or anything , his reply NO the closest he got was 50ft. and I asked him if he had anything else to say... he grumbled around about he wanted to talk with Jim and confront this and I told him NO, that this was not to be brought up to Jim he didn't need to confront Jim, that he needed to leave things alone with him, he said again bring him in here, I said again, No that all I was doing was following up, and trying to gather facts that's all. He didn't need to confront Jim that this could make things worst especially if it were a hostile confrontation. I asked him for anything else, he said no. Based on this conversation I feel that even if he were not sleeping, that he doesn't care enough about his job to prevent anyone from thinking his was sleeping. John my recommendation, as hard as it is for me to say: Termination. Greg



DEFENDANT'S EXHIBIT
6

DEES V HMMA 00035  DOCS PRODUCED



Motor Manufacturing Alabama, LLC
700 Hyundai Blvd
Montgomery, Al 36105

March 7, 2007

Jerry Leon Dees Jr

██████████████
██████████████

Dear Leon:

You were left a phone message on March 2, 2007, stating you had met the contact requirement for Team Member Review. On March 5, 2007 and again on March 7, 2007 you were contacted but a phone answering machine was reached.

To continue the Team Member Review process you must meet with Rob Clevenger on Monday March 12, 2007 at 10:00am to review the process and select your panel. At that time you will be given the date and time of your review panel meeting. Please come to the security building at gate 3 at the specified time above.

Sincerely,

*Wendy Warner*

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

**DEFENDANT'S EXHIBIT**

7

DEES V HMMA 00001  DOCS PRODUCED

03/26/2007 13:16 FAX 3343665278                                    TO:13343665 @003

MAR-26-2007 13:52   FROM:ARNG-RECRUITING



**HEADQUARTERS**
**1165th MILITARY POLICE COMPANY**
Alabama Army National Guard
550 Fairwood Blvd
Fairhope, Alabama 36532



21 Oct 06

ATM4-CO

MEMORANDUM FOR All Personnel, 1165th Military Police Company

SUBJECT: 2007 IDT (Drill) Dates for 1165th Military Police Company

1. The training year 2007 IDT (Drill) dates for the 1165th Military Police Company is as follows:
(Remember- Drill Dates Can Change Based on OPCON.)

FY 07 Drill Dates:

    21-22 October 2006  (Preparation for COMET)
    04-05 November 2006 (COMET Inspection)
    09-10 December 2006 (Family Day/Briefings)
    06-07 January 2007 (APFT / CTT)
    03-04 February 2007 (SRP Mobile AL Ft Whitting)
    03-04 March 2007 (PRI / Training, preload weapons Q)
    20-21-22 April 2007 (IWQ Eglin AFB  MUTA 6)
    05-06 May (Annual Training 12 May – 26 May 07) 11 PAX 31B
    02-03 June 2007 (APFT Make-up/ Semi Annual ht/wt & Showdown Insp 100%)
    **No July Drill**
    3-4-5 August 2007  (IWQ Make-up / CSW Eglin AFB MUTA 6)
    08-09 September 2007 (CTT Make-up)

    Annual Training (Belize 11 PAX 12 May -26 May 07) MP's only

2. Drill time: 0715.  Training Meeting:  0645 for all key leaders/section sergeants.  PT clothes/shoes must be brought each drill.  Uniform unless otherwise specified:  BDU's/Patrol Cap

3. YOU MAY ONLY BE EXCUSED BY THE COMMANDER.

4. Point of contact is  SFC Wendell C. Richburg @ 251-928-9833.

FOR THE COMMANDER:

KEVIN A. SMITH
1LT, MP, AL ARNG
COMMANDER

**DEFENDANT'S EXHIBIT**

8

DEES000003

03/26/2007 13:16 FAX 3343665278                                              TO:15343665(cut off)     004

MAR-26-2007 13:52  FROM:ARNG-RECRUITING



DETACHMENT 1, 1165TH MILITARY POLICE (CBT)(SPT)
ALABAMA ARMY NATIONAL GUARD
95 AIRPORT DRIVE
BREWTON, ALABAMA 36426

01 OCT 2005

TM4A1-RNCO

MEMORANDUM FOR  All Personnel, Det 1, 1165th Military Police Company

SUBJECT: 2006 IDT (Drill) Dates for Det 1, 1165th Military Police Company

1.  The training year 2006 IDT (Drill) dates for Det 1, 1165th Military Police Company is
as follows:
(Remember Drill Dates Can Change Based on OPCON)

FY 06 Drill Dates:
>                01-02 October 2006
>                05-06 November 2006
>                03-04 December 2006
>                07-08 January 2006
>                04-05 February 2006
>                04-05 March 2006
>                01 April 2006
>                13-14 May 2006
>                02, 03-04 June 2006
>                08-09 July 2006
>                05-06 August 2006
>                09-10 September 2006

Annual Training ( Ft McClellan, Alabama 05-MAR-06 – 19 MAR 2006).

2.  Drill time 0700. Training meeting 0630 for all key leaders/section sergeants. PT cloths
and shoes must be brought each drill. Uniform unless otherwise specified: BDU's/Patrol
Cap.

3. YOU MAY ONLY BE EXCUSED BY THE COMMANDER.

4. Point of contact is SGT Franklin D. Baures Jr. @ 251-867-5473

FOR THE COMMANDER:

SHAWN C DOLL
2LT, MP, AL ARNG
DET COMMANDER

DEFENDANT'S
EXHIBIT

9

Account Number
Bill Date
Invoice Number    03/01/07

## Detail for LEON 334-

Extended Area Detail (continued)

| Date | Time | Number Called | Originated At | Minutes | Prefer | Alpha | 10/10xx | Total |
|---|---|---|---|---|---|---|---|---|

## Detail for LEON 334-

Extended Area Detail (continued)

| Date | Time | Number Called | Destination/City | Seconds | Prefer | Alpha | 10/10xx | Total |
|---|---|---|---|---|---|---|---|---|

DEFENDANT'S EXHIBIT

10

Leon Rees Locker Contents

9/10/2007
C 5:23 pm

- 2 gloves (1 pair)
- 1 clip board
- 1 WIRING component
- 1 WIRING component
- Hunting brochure
- 1 screw tool
- 1 Hunting & Fishing Digest
- 1 Registration Package — Weight Loss Program
- 1 paint brush
- 1 drill bit
- 1 plug — Thomas & Betts
- 1 pack of pens / needles
- 1 writing pen
- 1 pack of Altoids
- 1 pack of Alka — Seltzer
- 1 security badge clip
- 1 lockout / tag out picture + orange sign
- 2 band aids

**DEFENDANT'S EXHIBIT**

11

CLNS (Chris Smith) John McClenney, Sgt. Darry Jackson
Barry Jackson



**HYUNDAI**
Motor Manufacturing Alabama, LLC
700 Hyundai Blvd.
Montgomery, Al 36105

February 26, 2007

Jerry Leon Dees



Dear Leon:

It has been brought to my attention on February 14, 2007 you were found, by a member of HMMA management, in the third floor overhead sleeping.

HMMA policy states, "Serious and excessive violations of HMMA's performance standards", is a serious misconduct violation. When a person commits such an action against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment HMMA considers you action to be in violation of the aforementioned policy

Based on the aforementioned, I regret that I have no alternative but to terminate your employment, effective immediately.

Sincerely,

*Wendy J. Warner*

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

DEES V HMMA 00006 DOCS PRODUCED

**DEFENDANT'S EXHIBIT**
12

Page 1 of 7

LEON DEES

| | |
|---|---|
| Account Number | |
| Invoice Number | |
| Bill Date | 03/05/07 |

## Account Summary

| | |
|---|---|
| Previous Balance | CR |
| Payments | .00 |
| Adjustments | .00 |
| Balance Forward – Due Immediately | .00 |
| Late Payment Charges | |
| Current Monthly Charges | |

Total Amount Due on 04/01/2007

### Customer Service

Dial toll free

Dial *611 from your wireless phone

**Payments by Mail**
Please detach and mail the pay stub at the right with your payment to ensure prompt handling.

**Easy Payment Options**
Call Customer Service for ways to pay by phone, credit card, or establish UPay direct debit

Account Number

LEON DEES

Total Amount Due on 04/01/2007

Amount Enclosed

DEFENDANT'S EXHIBIT
13

Account Number
Bill Date          03/06/07
Invoice Number

Page 2 of 7

## Payments & Adjustments
for LEON DEES

### Payments

| Date | Account Number | Description | Amount |
|---|---|---|---|
| 2/27/07 | | PAYMENT | CR |
| | | **Total Payments** | CR |

### Adjustments & Taxes

| Date | Account Number | Description | Amount |
|---|---|---|---|
| | | **Total Adjustments & Taxes** | $.00 |

## Current Monthly Charges
for LEON DEES

### Monthly Service Summary

| PhoneNumber | Name | Monthly Access & Features | Total Usage Charges | Miscellaneous Charges & Credits | Taxes & Surcharges | Total Charges |
|---|---|---|---|---|---|---|
| 334-419-1446 | LEON | | | | | |
| | **Total** | | | | | |

**Total Current Monthly Charges**

---

## General Billing Information

Taxes are calculated in accordance with the appropriate tax laws in your area and are applied to transactions differently, whether the taxes are federal, state, county, local, or use, etc.

**Universal Service Fund (USF) fees*:** The USF supports affordable access to telecommunications services for schools, libraries, low-income customers and high cost areas.

**Regulatory Program Fees*:** A monthly, per line fee which helps Unicel recover some of our costs of satisfying certain federal government mandates and programs related to customers.

**Fraud Protection Fees*:** A monthly, per line fee that funds Unicel's efforts to protect our customers from wireless fraud.

**USF, Fraud Protection and Regulatory Program Fees are neither taxes nor government imposed assessments but are charges which we are allowed to assess to recover our costs of compliance with these programs.

**E911 fees:** Mandatory fees for supporting network upgrades which are required for emergency service providers to determine the location of wireless callers who dial 911. E911 service may not be available or may be of similar availability at this time.

**Late Payment Fees** of 1.5% may be applied to any past due amount.

**Payments Returned** for non-sufficient funds or uncollected funds will be reassessed for electronic payment.

Selection of service plan(s), additional service changes to service are the sole responsibility of the customer.

---

**Ringtones**
Changing your phone's ringer is now even easier! Download one or more songs right on your GSM compatible wireless phone. Choose from an endless variety of categories - everything from Jazz to Hard Rock to movie clips. Want to know more? Visit

**Add a Line**
Delight your teen, spouse or parents by getting them their own phones. Add them to your account so you can always be in touch. Additional lines, available on select plans, are an affordable way to share minutes and stay connected with those you love.

**Refer to Your Account Number**
Whether you contact us by phone or mail, please mention your account number, found at the top of page 1.

**Changing Your Address**
If you are moving or need to make changes to your mailing address, please contact Customer Service

**Returned Payments**
A $25.00 charge will be added to your account on all payments returned including unsuccessful electronic payments due to insufficient funds, closed accounts or invalid account information.

# Summary for Nikki 334-

## Access & Features

| Monthly | Amount |
|---|---|
| 3/06 - 4/05 | $55.00 |
| 1200 Included Min. | |
| HOME AREA MKT 333 | .00 |
| ACCESS CREDIT | 10.00 CR |
| CALL-WAIT/FWD/CONF | .00 |
| MOBILE BROWSING | .00 |
| 4CS 2 GO 20 | 2.00 |
| UNLIM | .00 |
| CANADA ROAM $.59 | .00 |
| NATION ROAM $.40 | .00 |
| LOC TO CANADA $30 | .00 |
| LOC TO MEXICO $.30 | .00 |
| VOICEMAIL | .00 |
| DETAILED BILLING E0 | .00 |
| INSURANCE | 4.00 |
| INCLUDED 2&B DATA | .00 |
| **Total Access & Features Charges** | **$51.00** |

## Monthly Usage

| | Quantity | Amount |
|---|---|---|
| Plan Minutes Used | 325.00 | $.00 |
| Text Messages Overage | 2.00 | .20 |
| **Total Usage Charges** | | **$.20** |

## Taxes & Other Fees

| Fees & Surcharges | Amount |
|---|---|
| AL STATE 911 SURCHAR | $.70 |
| AL CELLULAR SERVICE | 3.31 |
| REGULATORY PRGM FEE | .96 |
| Cost Recovery Fees | |
| FEDERAL USF FEE | $1.70 |
| **Total Taxes & Other Fees** | **$6.67** |

---

Account Number
Bill Date    03/05/07
Invoice Number

## Detail for Nikki 334-

**Home Area Detail**

| Date | Time | Number Dialed | Destination | Minutes | Peak | Night | Total |
|---|---|---|---|---|---|---|---|
| FEB 10 | 12:14P | 334-419-0002 | VOICE MAIL CL | 1.00 D | .20 | .20 | $.00 |
| FEB 11 | 01:41P | 334-419-0004 | VOICE MAIL CL | 1.00 D | .00 | .00 | .00 |
| FEB 17 | 02:05P | 334-368-0315 | MAPLESVL AL | 2.00 P | .00 | .00 | .00 |
| FEB 18 | 02:30P | 334-438-0008 | VOICE MAIL CL | 3.00 P | .00 | .00 | .00 |
| MAR 05 | 09:10P | 615-336-2410 | NASHVL 1 TN | 2.00 D | .00 | .00 | .00 |
| MAR 05 | 09:14A | 334-366-2361 | MAPLESVL AL | 1.00 P | .00 | .00 | .00 |
| MAR 05 | 09:56A | 334-368-2301 | MAPLESVL AL | 1.00 P | .00 | .00 | .00 |
| | | | **Total Home Area Detail** | 10.00 | | | .00 |

**Extended Area Detail**

| Date | Time | Number Dialed | Destination | Minutes | Peak | Night | Total |
|---|---|---|---|---|---|---|---|
| BIRMINGHAM | | | | | | | |
| FEB 04 | 04:52P | 334-305-0015 | MAPLESVL AL | 1.00 D | .00 | .00 | $.00 |
| FEB 04 | 05:59P | 334-305-0015 | MAPLESVL AL | 13.00 D | .00 | .00 | .00 |
| FEB 04 | 05:55P | 334-419-0008 | INCOMING CL | 2.00 D | .00 | .00 | .00 |
| FEB 04 | 06:28P | 334-368-0015 | MAPLESVL AL | 1.00 D | .00 | .00 | .00 |
| FEB 04 | 07:34P | 334-419-0015 | MAPLESVL AL | 1.00 D | .00 | .00 | .00 |
| FEB 04 | 07:52P | 334-434-6265 | ENTERPRISE AL | 1.00 D | .00 | .00 | .00 |
| FEB 01 | 07:50P | 334-368-0315 | MAPLESVL AL | 2.00 D | .00 | .00 | .00 |
| FEB 04 | 07:52P | 334-419-0050 | SELMA CEL AL | 1.00 D | .00 | .00 | .00 |
| FEB 05 | 06:07P | 334-419-0050 | NASHVL 1 TN | 16.00 D | .00 | .00 | .00 |
| FEB 05 | 06:24P | 334-368-0015 | MAPLESVL AL | 1.00 D | .00 | .00 | .00 |
| FEB 06 | 05:43P | 334-368-0015 | MAPLESVL AL | 1.00 D | .00 | .00 | .00 |
| FEB 03 | 06:52P | 334-368-0015 | SELMA CEL AL | 4.00 P | .00 | .00 | .00 |
| FEB 06 | 05:38P | 131-419-0008 | UNKNOWN CL | 1.00 D | .00 | .00 | .00 |
| FEB 08 | 06:17P | 334-434-4245 | ENTERPRISE AL | 1.00 P | .00 | .00 | .00 |
| FEB 09 | 06:07A | 334-419-0008 | INCOMING CL | 4.00 P | .00 | .00 | .00 |
| FEB 09 | 10:56A | 334-419-0008 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 09 | 01:48P | 334-419-0006 | INCOMING CL | 4.00 P | .00 | .00 | .00 |
| FEB 10 | 01:39P | 334-419-0006 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 10 | 11:26A | 334-419-0008 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 11 | 02:55P | 334-419-0008 | MAPLESVL AL | 1.00 P | .00 | .00 | .00 |
| FEB 11 | 02:14P | 334-419-0008 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 12 | 01:51P | 334-419-0006 | INCOMING CL | 2.00 P | .00 | .00 | .00 |
| FEB 12 | 07:48P | | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 17 | 07:46P | 334-419-0008 | INCOMING CL | 5.00 D | .00 | .00 | .00 |
| FEB 13 | 05:57P | 334-419-0008 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 13 | 09:07P | 334-419-0008 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 13 | 06:47P | 334-434-5015 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 13 | 03:19A | 334-434-4245 | ENTERPRISE AL | 1.00 P | .00 | .00 | .00 |
| FEB 14 | 03:29P | 334-434-4245 | ENTERPRISE AL | 2.00 P | .00 | .00 | .00 |
| FEB 14 | 06:13P | 334-419-0003 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 14 | 06:48P | 334-419-0003 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 14 | 06:55P | 334-419-0008 | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 14 | 06:79P | 334-434-6265 | ENTERPRISE AL | 1.00 P | .00 | .00 | .00 |
| FEB 14 | 07:17P | 334-419-0008 | INCOMING CL | 5.00 D | .00 | .00 | .01 |
| FEB 14 | | 331-368-0015 | MAPLESVL AL | | | | |

Account Number
BillDate        03/05/07
Invoice Number

## Detail for Nikki 334-419-0008 (continued)

| Date | Time | Number Dialed | Destination of Call | Elapse | Period | Airtime | LDToll | Total |
|------|------|---------------|---------------------|--------|--------|---------|--------|-------|
| FEB 15 | 0529 P | 334-419-0008 | INCOMING CL | 1.00 P | | .00 | .00 | .00 |
| FEB 15 | 0600 P | 334-404-0345 | ENTERPRISE AL | 1.00 P | | .00 | .00 | .00 |
| FEB 15 | 0619 P | 334-419-0008 | INCOMING CL | 1.00 P | | .00 | .00 | .00 |
| FEB 15 | 0634 P | 334-419-0008 | INCOMING CL | 1.00 P | | .00 | .00 | .00 |
| FEB 18 | 0742 P | 334-419-0008 | INCOMING CL | 9.00 O | | .00 | .00 | .00 |
| FEB 18 | 0905 P | 334-419-0008 | INCOMING CL | 1.00 O | | .00 | .00 | .00 |
| FEB 18 | N230A | 334-464-0515 | ENTERPRISE AL | 1.00 D | | .00 | .00 | .00 |
| FEB 17 | 1221 P | | LINCOMING CL | 1.00 D | | .00 | .00 | .00 |
| FEB 18 | 0155 P | 615-306-6479 | MASHVL1 TN | 5.00 D | | .00 | .00 | .00 |
| FEB 18 | 0341 P | 334-366-0215 | MAPLESV AL | 1.00 D | | .00 | .00 | .00 |
| FEB 18 | 0712 M | | MAPLESV AL | 2.00 D | | .00 | .00 | .00 |
| FEB 19 | 0958 P | 334-366-0215 | MAPLESV AL | 2.30 D | | .00 | .00 | .00 |
| FEB 19 | 0920 P | | AUBURN N | 1.00 O | | .00 | .00 | .00 |
| FEB 20 | 1104 A | 615-995-5740 | KUDHUE TN | 1.00 D | | .00 | .00 | .00 |
| FEB 20 | 1105 A | 615-803-7439 | MUDHUE TN | 3.00 D | | .00 | .00 | .00 |
| FEB 21 | 0931 F | 334-419-0008 | INCOMING CL | 5.00 D | | .00 | .00 | .00 |
| FEB 22 | 0559P | 334-366-0215 | MAPLESV AL | 5.00 D | | .00 | .00 | .00 |
| FEB 22 | 0806 P | 334-416-1445 | SELMA EEL AL | 1.00 O | | .00 | .00 | .00 |
| FEB 22 | 0954 P | 334-419-0008 | INCOMING CL | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 1040 A | | MAPLESV AL | 5.00 O | | .00 | .00 | .00 |
| FEB 24 | 0119 P | 615-305-7479 | MAPLESV AL | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 1152 A | 334-419-0008 | INCOMING CL | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 1158 P | 334-419-0008 | INCOMING CL | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 1211 P | 334-404-0345 | MAPLESV AL | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 1240 P | 334-366-0215 | MAPLESV AL | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 1227 P | 334-464-0345 | ENTERPRISE AL | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 0111 P | 615-305-7479 | NASHVL1 TN | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 0148P | 615-305-7479 | NASHVL1 TN | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 0149P | 615-305-7479 | NASHVL1 TN | 1.00 O | | .00 | .00 | .00 |
| FEB 24 | 0159 P | 615-305-7479 | NASHVL1 TN | 1.00 O | | .00 | .00 | .00 |
| FEB 21 | 0221 P | 334-419-1446 | INCOMING CL | 1.00 O | | .00 | .00 | .00 |
| FEB 21 | 0181 P | 334-504-6945 | SELMA CEL AL | 1.00 O | | .00 | .00 | .00 |
| FEB 27 | 0184 P | 334-504-6945 | ENTERPRISE AL | 1.00 O | | .00 | .00 | .00 |
| FEB 28 | 0122 P | 334-419-0008 | INCOMING CL | 4.00 O | | .00 | .00 | .00 |
| FEB 28 | 0242 P | 334-419-0008 | INCOMING CL | 3.00 O | | .00 | .00 | .00 |
| FEB 28 | 0558P | 334-366-0215 | MAPLESV AL | 6.00 O | | .00 | .00 | .00 |
| FEB 28 | 0740P | 334-385-0025 | MAPLESV AL | 7.00 O | | .00 | .00 | .00 |
| FEB 20 | 0749P | 334-384-0074 | MAPLESV AL | 7.00 O | | .00 | .00 | .00 |
| FEB 20 | 0850P | 205-567-0017 | BIRMINGHAM AL | 2.00 O | | .00 | .00 | .00 |
| FEB 28 | 0300 P | 334-366-0015 | INCOMING CL | 5.00 O | | .00 | .00 | .00 |
| MAR 01 | 06:42A | 100-385-5989 | DOVER EO AL | 3.00 O | | .00 | .00 | .00 |
| MAR 01 | 11:40A | 334-366-2871 | MAPLESV AL | 3.00 O | | .00 | .00 | .00 |
| MAR 01 | 1045 P | 615-336-M29 | NASHVL1 TN | 4.00 P | | .00 | .00 | .00 |
| MAR 01 | 0435 F | 334-414-0008 | INCOMING CL | 3.00 O | | .00 | .00 | .00 |
| MAR 01 | 06:48 P | 334-366-0015 | INCOMING CL | 1.00 O | | .00 | .00 | .00 |
| MAR 01 | 06:49P | 205-567-1011 | CRAFT OR AL | 3.00 O | | .00 | .00 | .00 |
| MAR 01 | 06:51 P | 205-567-1011 | CRAFT OR AL | 1.00 O | | .00 | .00 | .00 |
| MAR 01 | 11:52 A | 334-366-2321 | INCOMING | 1060 P | | .00 | .00 | .00 |
| MAR 01 | 11:33 A | 334-366-0315 | MAPLESV AL | 7.00 P | | .00 | .00 | .00 |

## Detail for Nikki 334-419-0008 (continued)

| Date | Time | Number Dialed | Destination of Call | Airtime | Period | Airtime | LDToll | Total |
|------|------|---------------|---------------------|---------|--------|---------|--------|-------|
| | | Expanded Area Detail (continued) | | | | | | |
| MAR 02 | 1158 A | 334-366-2971 | MAPLESV AL | 4.00 P | | .00 | .00 | .00 |
| MAR 02 | 0651 P | 334-419-0008 | INCOMING CL | 4.00 O | | .00 | .00 | .00 |
| MAR 03 | 0617 P | 334-366-5249 | BREWER ECO | 1.00 O | | .00 | .00 | .00 |
| MAR 02 | 09:11 P | 206-287-1048 | QUATE OR AL | 5.00 O | | .00 | .00 | .00 |
| MAR 03 | 09:11 P | 205-715-5747 | QUATE OR AL | 1.00 O | | .00 | .00 | .00 |
| MAR 03 | 09:12 P | 205-715-5747 | CRAFT OR AL | 1.00 O | | .00 | .00 | .00 |
| MAR 03 | 09:12 P | 206-715-6996 | CRAFT OR AL | 1.00 O | | .00 | .00 | .00 |
| MAR 03 | 06:20 P | 206-715-5747 | CRAFT OR AL | 7.00 O | | .00 | .00 | .00 |
| MAR 02 | 06:51 A | 206-715-5747 | CRAFT OR AL | 2.00 O | | .00 | .00 | .00 |
| MAR 03 | 09:49 A | 334-419-0008 | MAPLESV AL | 1.00 O | | .00 | .00 | .00 |
| MAR 03 | 0261 P | 334-366-0315 | INCOMING CL | 5.00 O | | .00 | .00 | .00 |
| MAR 05 | 0350 P | 334-419-0008 | INCOMING CL | 5.00 O | | .00 | .00 | .00 |
| MAR 03 | 0154 P | 615-306-7439 | HASING 1 TN | 5.00 O | | .00 | .00 | .00 |
| MAR 03 | 0402 P | 334-366-0315 | MAPLESV AL | 1.00 O | | .00 | .00 | .00 |
| AL 01 BlmFn, | | | | | | | | |
| MAR 01 | 0230 P | 334-419-0008 | INCOMING CL | 1.00 P | | $.00 | $.00 | $.00 |
| | | | Total Expanded Area Detail | $13.99 | | $.00 | $.00 | $.00 |
| | | | Total of All Details | | | $.00 | $.00 | $.00 |

Legend:   P = Peak Minutes   O = Off-Peak Minutes   CF = Call Forwarded to Cell   ILD = ILD + IMB

Account Number:
BAN Date      01/06/07
Service Number

## Summary for LEON 334-419-1445

### Access & Features

| Monthly 3/06 - 4/05 | Amount |
|---|---|
| 300 Included Min. | $35.00 |
| HOME AREA MKT 333 | .00 |
| ACCESS CREDIT | 5.00 CR |
| CALL-WAIT/FWD/CONF | .00 |
| MOBILE BROWSING | .00 |
| CANADA ROAM $.50 | .00 |
| NAT TO CANADA $.50 | .00 |
| NAT TO MEXICO $.30 | .00 |
| VOICEMAIL | .00 |
| DETAILED BILLING $0 | .00 |
| INCLUDED 2MB DATA | .00 |
| **Total Access & Features Charges** | **$30.00** |

### Monthly Usage

| | Quantity | Amount |
|---|---|---|
| Plan Minutes Used | 536.00 | $.00 |
| **Total Usage Charges** | | **$.00** |

### Taxes & Other Fees

| Taxes & Surcharges | Amount |
|---|---|
| AL STATE 911 SURCHAR | $.70 |
| AL CELLULAR SERVICE | 2.10 |
| REGULATORY PRGM FEE | .96 |
| **Cost Recovery Fees** | |
| FEDERAL USF FEE | $1.08 |
| **Total Taxes & Other Fees** | **$4.84** |

### Detail for LEON 334-419-1445

| Date | Time | Number Called | Destination/Call | Minutes | Period | Airtime | LD/Toll | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | 150 P | .00 | .00 | .00 | $.00 |
| | | | | 2.00 O | .00 | .00 | .00 | .00 |
| | | | | 1.00 O | .00 | .00 | .00 | .00 |
| | | | | 2.00 O | .00 | .00 | .00 | .00 |
| | | | | 1.00 O | .00 | .00 | .00 | .00 |

#### Detail for LEON 334-419-1445

| Date | Time | Number Called | Destination/Call | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| Home Area Detail | | | | | | | | |
| FEB 07 | 03:38 P | | INCOMING CL | | | | | |
| FEB 08 | 03:36 A | | INCOMING CL | | | | | |
| FEB 09 | 03:02 P | 706-315-9872 | DALTON GA VA | | | | | |
| FEB 09 | 03:26 P | 334-395-9936 | INCOMING CL | | | | | |
| FEB 09 | 11:54 A | 334-419-1445 | VOICE MAIL CL | | | | | |

## Detail for LEON 334-419-1445 (continued)

| Date | Time | Number Dialed | Destination/Call | Minutes Period | Airtime | LD/Toll | Total |
|---|---|---|---|---|---|---|---|
| Home Area Detail (continued) | | | | | | | |
| FEB 13 | 07:12 P | | INCOMING CL | 4.00 P | .00 | .00 | .00 |
| FEB 13 | 07:16 P | | INCOMING CL | 2.00 P | .00 | .00 | .00 |
| FEB 13 | 08:22 P | | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 13 | 08:59 P | 334-395-0225 | BAPLESV AL | 1.00 P | .00 | .00 | .00 |
| FEB 14 | 06:07 P | | MOBILE CL | 1.00 P | .00 | .00 | .00 |
| FEB 14 | 07:17 P | 334-419-1445 | VOICE MAIL CL | 1.00 P | .00 | .00 | .00 |
| FEB 15 | 08:24 A | 334-419-1445 | VOICE MAIL CL | 1.00 P | .00 | .00 | .00 |
| FEB 15 | 05:23 A | 334-306-2911 | BAPLESV AL | 3.00 P | .00 | .00 | .00 |
| FEB 15 | 01:46 P | 334-419-1445 | VOICE MAIL CL | 1.00 P | .00 | .00 | .00 |
| FEB 16 | 08:19 P | 334-060-6025 | BAPLESV AL | 2.00 P | .00 | .00 | .00 |
| FEB 16 | 03:01 P | 334-060-6025 | VOICE MAIL CL | 4.00 P | .00 | .00 | .00 |
| FEB 17 | 03:17 P | 334-419-1446 | MONTGMRY AL | 1.00 P | .00 | .00 | .00 |
| FEB 17 | 09:20 P | 334-391-2721 | MONTGMRY AL | 1.00 P | .00 | .00 | .00 |
| FEB 17 | 09:23 P | 706-315-9872 | COLUMBU GA | 3.00 P | .00 | .00 | .00 |
| FEB 17 | 06:26 P | | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 17 | 06:55 P | 334-419-1445 | VOICE MAIL CL | 2.00 O | .00 | .00 | .00 |
| MAR 17 | 07:00 P | | MOBILE CL | 2.00 O | .00 | .00 | .00 |
| FEB 17 | 09:47 P | 334-419-4119 | MOBILE CL | 2.00 P | .00 | .00 | .00 |
| FEB 19 | 11:10 P | 334-205-5021 | MONTGMRY AL | 3.50 O | .00 | .00 | .00 |
| FEB 19 | 09:31 P | 334-364-0215 | BAPLESV AL | 1.00 O | .00 | .00 | .00 |
| FEB 19 | 09:56 A | | INCOMING CL | 2.00 O | .00 | .00 | .00 |
| FEB 19 | 10:14 P | | INCOMING CL | 1.00 P | .00 | .00 | .00 |
| FEB 21 | 03:14 P | 334-419-1445 | MONTGMRY AL | 1.00 P | .00 | .00 | .00 |
| FEB 21 | 09:15 P | 334-354-1145 | BAPLESV AL | 1.00 O | .00 | .00 | .00 |
| FEB 21 | 09:11 P | 334-419-1445 | VOICE MAIL CL | 1.00 O | .00 | .00 | .00 |
| FEB 21 | 09:37 P | 334-419-1445 | MOBILE CL | 6.00 O | .00 | .00 | .00 |
| FEB 23 | 07:32 P | | MOBILE CL | 2.00 O | .00 | .00 | .00 |
| FEB 27 | 07:59 A | 334-419-1445 | VOICE MAIL CL | 1.00 P | .00 | .00 | .00 |
| FEB 28 | 06:59 A | 334-419-1445 | VOICE MAIL CL | 1.00 O | .00 | .00 | .00 |
| FEB 28 | 11:36 A | 334-308-2921 | BAPLESV AL | 1.00 O | .00 | .00 | .00 |
| MAR 01 | 11:30 A | 205-205-5027 | BIRMGNG 1 AL | 1.00 P | .00 | .00 | .00 |
| MAR 02 | 08:56 A | 334-419-1146 | VOICE MAIL CL | 1.50 P | .00 | .00 | .00 |
| MAR 02 | 08:56 A | 334-419-1415 | VOICE MAIL CL | 2.00 F | .00 | .00 | .00 |
| MAR 02 | 10:14 A | | INCOMING CL | 1.00 F | .00 | .00 | .00 |
| MAR 03 | 10:17 A | 334-419-1445 | INCOMING CL | 1.00 O | .00 | .00 | .00 |
| MAR 03 | 10:18 A | 205-205-5027 | BIRMGNG 1 AL | 6.00 O | .00 | .00 | .00 |
| MAR 02 | 10:30 A | 334-419-1445 | VOICE MAIL CL | 1.00 O | .00 | .00 | .00 |
| MAR 02 | 10:30 A | 334-419-5663 | FAIRHOPE AL | 1.00 P | .00 | .00 | .00 |
| MAR 03 | 10:30 A | 251-236-6663 | BAPLESV AL | 1.00 O | .00 | .00 | .00 |
| MAR 03 | 07:31 P | 251-234-4119 | BRWTON AL | 6.00 O | .00 | .00 | .00 |
| | | | **Total Home Area Detail** | 118.00 | 0.00 | 0.00 | 0.00 |

### Extended Area Detail

| Date | Time | Number | Destination | | | | | |
|---|---|---|---|---|---|---|---|---|
| MONROVVAL | | | | | | | | |
| FEB 04 | 03:01 A | 251-869-0357 | MOBILE 4 AL | 8.00 D | .00 | .00 | $.00 |
| FEB 04 | 02:10 A | 251-669-0357 | MOBILE 4 AL | 1.50 D | .00 | .00 | .00 |

Account Number
Bill Date                         03/25/07
Invoice Number

## Detail for LEON 334-419-1445 (continued)

| Date | Time | NumberCalled | Min/Sec | Period | AddIns | LD/Tell | Tax |
|------|------|--------------|---------|--------|--------|---------|-----|

**Extended Area Detail (continued)**

| Date | Time | NumberCalled | Destination/Svf | Min/Sec | Period | AddIns | LD/Tell | Tax |
|------|------|--------------|-----------------|---------|--------|--------|---------|-----|

## Detail for LEON 334-419-1445 (continued)

**Extended Area Detail (continued)**

| Date | Time | NumberCalled | Destination/Svf | Min/Sec | Period | AddIns | LD/Tell | Tax |
|------|------|--------------|-----------------|---------|--------|--------|---------|-----|

Account Number
Bill Date            03/05/07
Invoice Number

# Detail for LEON 334-

Extended Area Detail (continued)

| Date | Time | NumberCalled | Destination(cps) | Minutes | Period | Airtime | L/D/OM | Tax | Total |
|------|------|--------------|------------------|---------|--------|---------|--------|-----|-------|

# Detail for LEON 334-

Extended Area Detail (continued)

| Date | Time | NumberCalled | Destination(cps) | Minutes | Period | Airtime | L/D/OM | Tax | Total |
|------|------|--------------|------------------|---------|--------|---------|--------|-----|-------|

Account Number
Bill Date        03/05/07
Invoice Number

## Detail for LEON 334-419-1445 (continued)

| | | | | | | | CallCharge | |
|---|---|---|---|---|---|---|---|---|
| Date | Time | Number Called | Destination/City | Min/Sec | Period | Airtime | LD/RW | Total |
| **Expanded Area Detail [continued]** | | | | | | | | |
| MAR 01 | 05:01 P | 334-356-0215 | MAPLESVILLE AL | 4:00 | P | .00 | .00 | .00 |
| MAR 03 | 04:19 A | 334-494-0245 | ENTERPRISE AL | 3:00 | O | .00 | .00 | .00 |
| MAR 03 | 08:26 P | 334-356-0215 | MAPLESVILLE AL | 1:00 | O | .00 | .00 | .00 |
| MAR 01 | 06:49 P | 334-419-1445 | INCOMING CL | 1:00 | O | .00 | .00 | .00 |
| MAR 03 | 06:51 P | 334-494-6345 | ENTERPRISE AL | 1:00 | O | .00 | .00 | .00 |
| MAR 03 | 06:57 P | 334-356-0215 | MAPLESVILLE AL | 2:00 | O | .00 | .00 | .00 |
| MAR 03 | 09:54 P | 334-494-6345 | ENTERPRISE AL | 1:00 | O | .00 | .00 | .00 |
| **PENSACOLA,** | | | | | | | | |
| MAR 03 | 05:41 A | 334-419-1445 | INCOMING CL | 1:00 | O | $.00 | $.00 | $.00 |
| **AL, Elmwin,** | | | | | | | | |
| FEB 12 | 03:10 P | 334-419-1445 | INCOMING CL | 1:00 | P | $.00 | $.00 | $.00 |
| FEB 16 | 06:11 P | 334-419-1445 | INCOMING CL | 1:00 | O | .00 | .00 | .00 |
| FEB 16 | 08:57 P | 334-419-1445 | INCOMING CL | 1:00 | O | .00 | .00 | .00 |
| **AL, Montge,** | | | | | | | | |
| FEB 12 | 05:09 P | 334-494-0245 | ENTERPRISE AL | 1:00 | P | $.00 | $.00 | $.00 |
| FEB 12 | 05:09 P | 334-419-1445 | INCOMING CL | 1:00 | P | .00 | .00 | .00 |
| FEB 18 | 06:58 P | 334-494-0245 | ENTERPRISE AL | 1:00 | O | .00 | .00 | .00 |
| FEB 20 | 06:43 P | 334-494-6345 | ENTERPRISE AL | 2:00 | P | .00 | .00 | .00 |
| FEB 21 | 06:50 P | 334-551-2722 | MONTGOMERY AL | 1:00 | P | .00 | .00 | .00 |
| | | **Total Extended Area Detail** | | 42:00 | | $.00 | $.00 | $.00 |
| | | **Total of All Details** | | | | $.00 | $.00 | $.00 |

Legend    P = Peak Minutes    O = Off-Peak Minutes    CF = Call Forwarded Call    1.02E KB = kRB

# JAMES ALLEN BROOKSHIRE

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3   NORTHERN DIVISION
4   CASE NO.:  2:0cv00306-MHT-CSC
5
6   JERRY LEON DEES, JR.,
7       Plaintiff,
8       V.
9   HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and
10  HYUNDAI MOTOR AMERICA, INC.,
11      Defendants.
12
13   S T I P U L A T I O N S
14
15
16      IT IS STIPULATED AND AGREED by and
17  between the parties, through their respective
18  counsel, that the deposition of JAMES ALLEN
19  BROOKSHIRE may be taken before STACEY L.
20  JOHNSON, Commissioner, at the Marriott
21  Prattville at Capitol Hill, 2500 Legends Circle,
22  Prattville, Alabama, on the 29th day of
23  November, 2007.

**Page 3**

1       INDEX
2   EXAMINATION BY:            PAGE NUMBER
3   Mr. Kilborn.............................5-177
4   Mr. Johnson............................177-182
5   Mr. Kilborn............................182-186
6   Mr. Johnson................................186
7
8   EXHIBITS:
9   Plaintiff's Exhibit 13......................12
10  (two handwritten statements)
11  Plaintiff's Exhibit 14......................33
12  (employment application)
13  Plaintiff's Exhibit 15......................38
14  (Team Member Handbook)
15  Plaintiff's Exhibit 16......................98
16  (Team Relations Memo)
17
18
19
20
21
22
23

**Page 2**

1       IT IS FURTHER STIPULATED AND AGREED
2   that the signature to and the reading of the
3   deposition by the witness is hereby waived, the
4   deposition to have the same force and effect as
5   if full compliance had been had with all laws
6   and rules of Court relating to the taking of
7   depositions.
8       IT IS FURTHER STIPULATED AND AGREED
9   that it shall not be necessary for any
10  objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties may
13  make objections and assign grounds at the time
14  of trial, or at the time said deposition is
15  offered in evidence, or prior thereto.
16      IT IS FURTHER STIPULATED AND AGREED
17  that the notice of filing of the deposition by
18  the Commissioner is waived.
19
20
21
22
23

**Page 4**

1       A P P E A R A N C E S
2   FOR THE PLAINTIFF, JERRY LEON DEES, JR.:
3   KILBORN, ROEBUCK & McDONALD
3   Jeffrey R. Sport
4   (SPORJ5390)
4   jeff.sport@sportlaw.us
5
5   Vincent F. Kilborn, III
6   (KILBV4484)
6   1810 Old Government Street
7   Mobile, Alabama 36606
7   (251) 479-9010
8
9   FOR THE DEFENDANTS, HYUNDAI MOTOR MANUFACTURING
10  ALABAMA, LLC and HYUNDAI MOTOR AMERICA, INC:
11  OGLETREE, DEAKINS, NASH, SMOAK
11      & STEWART, P.C.
12  Matthew K. Johnson
12  P. O. Box 2757
13  Greenville, South Carolina  29602
13
14  HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC
14  Christopher N. Smith
15  chrissmith@hmmausa.com
15  700 Hyundai Boulevard
16  Montgomery, Alabama  36105
16  (334) 387-8057
17
18
19
20
21
22
23

1 (Pages 1 to 4)

### JAMES ALLEN BROOKSHIRE

1    I, STACEY L. JOHNSON, a CCR of Deatsville,
2  Alabama, and Notary Public for the State of
3  Alabama at Large, acting as Commissioner,
4  certify that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there came
7  before me at 2500 Legends Circle, Prattville,
8  Alabama, beginning at 9:25 a.m., JAMES ALLEN
9  BROOKSHIRE, witness in the above cause, for oral
10 examination, whereupon the following proceedings
11 were had:
12        JAMES ALLEN BROOKSHIRE,
13 the witness, after having been first duly sworn
14 to speak the truth, the whole truth, and nothing
15 but the truth, testified as follows:
16        EXAMINATION
17 BY MR. KILBORN:
18    Q   State your full name, Mr. Brookshire.
19    A   James Allen Brookshire.
20    Q   How old are you?
21    A   35.
22    Q   Are you married?
23    A   Yes, sir.

5

1    Q   Well, I'm going to let that question
2  stand.  What is your current employment status?
3    A   I'm employed if that's...
4    Q   All right.  You're employed?
5    A   Yeah.
6    Q   How long have you been employed?
7    A   I've been working at Hyundai since
8  August of '05.
9    Q   So you've been employed by -- we'll
10 call it HMMA?
11    A   Yes, sir.
12    Q   Hyundai Motor Manufacturing?
13    A   Yes, sir.
14    Q   Since August of 2005?
15    A   Yes, sir.
16    Q   And what is your current job title?
17    A   Stamping Production Manager.
18    Q   What is that?  What are your job duties
19 as Stamping Production Manager?
20    A   I oversee all the day-to-day operations
21 in the Stamping Shop, whether it be safety,
22 quality, tool and die, scheduling, and any HR
23 Team Member concerns or Team Relations problems.

7

1    Q   Any children?
2    A   Two of my own and two stepchildren.
3    Q   And just for background information,
4  how old are your own children?
5    A   My little one just turned seven months
6  and the other one is 19 months.
7    Q   Seven months and 19 months?
8    A   Driving my wife nuts.
9    Q   Okay.  And your wife's name?
10   A   Stephanie Lynn Brookshire.
11   Q   And where do you live?
12   A   Where did I live or where do I live
13 currently?
14   Q   Where do you live currently?
15   A   1048 East Poplar Street here in
16 Prattville.
17   Q   Are you currently employed?
18   A   Yes, sir.
19   Q   By who?
20   A   Hyundai Motor Manufacturing.
21   Q   What's your current employment status?
22   A   What do you mean by that?  My
23 position?

6

1    Q   Safety, quality?
2    A   Production.
3    Q   Production.
4    A   Scheduling, tool and die, and
5  day-to-day personnel Team Member issues or Team
6  Relations problems.
7    Q   Do you have a work schedule?
8    A   The start time and stop time?
9    Q   Right.
10   A   I start at 5:45 in the morning and
11 usually finish up about 5:30 in the evening.
12   Q   And do you have a lawyer here today?
13   A   Yes, I do.
14   Q   Who is your lawyer?
15   A   Matt and our company lawyer, Chris.
16   Q   And what are your lawyers' last names?
17   A   Chris' last name is Smith.  Matt, I'm
18 rusty on that.
19   Q   What's your other lawyer's last name?
20   A   I'm not sure.
21   Q   So you've got one lawyer here you know
22 his real name and one lawyer here you only know
23 his first name?

8

2  (Pages 5 to 8)

### JAMES ALLEN BROOKSHIRE

1    A    That's correct.
2    Q    And when did the lawyer that you've
3  identified as Matt become your lawyer?
4    A    His official start date with the case,
5  that was back -- I'm trying to remember the
6  first encounter I had.  That was probably back
7  in April, April time frame.
8    Q    And how about the lawyer that you've
9  identified as Chris Smith?  When did he become
10 your lawyer?
11   A    He's been part of our legal counsel
12 since probably at least about a year I've known
13 him.
14   Q    Well, I don't want to know just how
15 long he's been legal counsel.  I want to know
16 how long has Chris Smith been your lawyer.
17   MR. JOHNSON:  Just for the Record,
18 object to the form.  I don't see the relevance
19 of asking when Chris Smith's start date with
20 HMMA was.
21   MR. KILBORN:  I don't want his start
22 date.  I want to know when Chris Smith became
23 Jim Brookshire's lawyer.
                                                9

1    and your explanation for asking it, I'll
2  instruct him not to answer.  And he's stated he
3  will follow.  However, please understand that
4  I'm willing to reconsider if you're willing to
5  give me some reason to do so.
6        MR. KILBORN:  The reason I think it is
7  relevant and discoverable is because of the
8  Federal Rules of Civil Procedure.  But let's
9  move on from that.
10   Q    What did you do to prepare for your
11 deposition today?
12   A    I had just met with my legal counsel
13 yesterday and -- to discuss when the time was I
14 was supposed to appear here today and what it
15 was in regards to.
16   Q    Okay.  Did you review any documents to
17 prepare for your deposition?
18   A    Yes, sir.
19   Q    What documents did you review?
20   A    The documents that I had signed back, I
21 believe, in the April time frame that -- the
22 statements I had made in regards to Mr. Dees.
23   Q    Let's see if we can't identify those.
                                               11

1        MR. JOHNSON:  And obviously that would
2  be attorney-client privilege.
3        MR. KILBORN:  Not today it would not
4  be.
5        MR. JOHNSON:  When Chris became
6  involved in representing Mr. Brookshire -- the
7  way you phrased the question -- would certainly
8  be.
9        MR. KILBORN:  Well, you can instruct
10 him not to answer.
11       MR. JOHNSON:  I instruct you not to
12 answer that.
13   Q    Are you going to follow your lawyer's
14 instructions?
15   A    Yes, sir.
16   Q    And you're going to refuse to tell me
17 the date that Mr. Chris Smith became your
18 lawyer; is that right?
19   A    Yes, sir.
20       MR. JOHNSON:  I mean, Mr. Kilborn, if
21 you'll explain to me why it's relevant and
22 necessary, I'm certainly willing to reconsider,
23 but based on the way you've asked the question
                                              10

1
2        (Whereupon, Plaintiff's Exhibit
3  Number 13 was marked for identification
4  and copy of same is attached hereto.)
5
6    Q    Mr. Brookshire, take a look at what
7  I've marked as Exhibit 13, which is made up of
8  two pages and they've got Bates numbers at the
9  bottom.  See these little numbers down here at
10 the bottom, Dees V HMMA 00037 and 38?
11   A    Yes, sir.
12   Q    So just to distinguish between the two
13 I'll call it Plaintiff's Exhibit 13.  The first
14 one will be 37 and the second one will be 38.
15 Are those the documents that you reviewed?
16   A    Yes, sir.
17   Q    And are these your statements?
18   A    Yes, sir.
19   Q    And you reviewed them to prepare for
20 your deposition?
21   A    (Witness nods head.)
22   Q    You have to say yes or no.
23   A    Yes.
                                              12

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## JAMES ALLEN BROOKSHIRE

1    Q    Any other documents that you reviewed?
2    A    No.
3    Q    And take a look at Exhibit 13, the
4    first document, Bates number 37.  Whose
5    handwriting is that in?
6    A    The signature at the bottom or the
7    handwriting itself?
8    Q    Is that your signature?
9    A    Yes, that's my signature at the bottom.
10    Q    And it's dated February 15, '07?
11    A    Yes, sir.
12    Q    And the second document, Bates number
13    38, is that your signature?
14    A    Yes, sir.
15    Q    And the date is four days later?
16    A    Yeah.
17    Q    Who's handwriting is that?
18    A    Team Relations rep Will Ware.
19    Q    What's the name?
20    A    Team Relations rep William Ware.
21    Q    Did you write up one yourself?
22    A    No.
23    Q    And tell me how it came to pass that

13

1    had told my supervisor about it the next day
2    because I was working night shift when it
3    happened.  My senior manager was sleeping, so
4    I'm not going to wake him up in the middle of
5    the night to tell him something like that.  I
6    just reported it to Mr. Dees' direct supervisor,
7    as well as my own, the next day.
8    Q    Your supervisor was Kevin Hughes?
9    A    No.  That's the team leader for
10    Maintenance.  My direct supervisor is Craig
11    Stapely.
12    Q    Craig Stapler?
13    A    Stapely.
14    Q    What is his job title?
15    A    He's senior manager of Stamping
16    Operations.
17    Q    And did you report anything to
18    Mr. Stapler (sic) or your Team Leader?
19    A    I just reported the incident to
20    Mr. Stapely the next day and reported it to
21    Leon's direct supervisor -- salaried supervisor,
22    Craig Prater.  The team leader that I spoke of
23    on night shift is the team leader over Leon

15

1    you signed the first -- that you had this first
2    interview, Bates number 37.
3    A    The one -- the issue was brought about
4    during a time frame in which Leon's supervisor,
5    Mr. Prater, had asked me about a problem that I
6    had the night before.  I told the Team
7    Leader on the night shift -- because I was
8    currently on night shift at the time covering
9    because we had an assistant manager that had
10    resigned and went to work for another company,
11    and my senior manager had moved me to night
12    shift to cover for his position.  And I had a
13    problem there with Mr. Dees in which he was
14    caught in a position of sleeping, and I had made
15    note to the Team Leader and also informed his
16    assistant manager the next day on day shift.
17    Q    We'll get into that in detail.  Who did
18    you first report that to?
19    A    Reported it to the Team Leader.
20    Q    Who was that?
21    A    Kevin Hughes.
22    Q    Was the Team Leader your supervisor?
23    A    Team Leader is not my supervisor.  I

14

1    Dees, Kevin Hughes.
2    Q    Kevin Hughes?
3    A    Yeah.
4    Q    And so the first person you reported
5    this incident to was Mr. Hughes?
6    A    Yes, sir.
7    Q    And did you report it verbally or in
8    writing?
9    A    Verbally.
10    Q    And what did you tell him?
11    A    I told him I'd caught one of his
12    Maintenance Team Members up there by the control
13    panel upstairs on the third floor in the SOP
14    area sleeping.
15    Q    What's SOP stand for?
16    A    Side outer panel area.  SOP, side outer
17    panel.
18    Q    And why did you report the sleeping
19    incident?
20    A    Because that's an unbecoming nature of
21    conduct or action of a Team Member to be in a
22    concealed area sleeping during working time.
23    Q    What's wrong with sleeping during

16

4 (Pages 13 to 16)

**JAMES ALLEN BROOKSHIRE**

working time?

A It's not permissible.

Q Why not?

A It's against policy.

Q What's that policy designed to prevent?

A That's unbecoming performance of a Team Member. They're not doing their job.

Q Not doing their job?

A (Witness nods head.)

Q You have to answer yes or no. Is that a yes?

A He wasn't doing his job.

Q You nodded and she can't get nods. You have to say yes or no.

A Yes. He wasn't doing his job.

Q Wasn't doing his job. Was that a safety issue?

A Could be.

Q How could it be?

A Well, if he'd fall off the -- fall off the chair onto the mezzanine or the catwalk floor, he could injure himself. Possibly he could fall in the position -- because upstairs

17

we have trolleys carrying panels around. And if he wasn't watching what he was doing or fell in a particular manner, maybe had a bad dream or something like that, if he got up, he could get seriously cut or injured by moving trolleys.

Q And is safety one of the things you're in charge of?

A Yes, sir.

Q Have you had safety training?

A Depends on what training you're talking about.

Q Well, safety in regard to being in the plant.

A I've had lock-out/tag-out training.

Q What's that?

A That's where if you enter any area where operational energy or any potential hazards are in your working area that you can disable that energy source.

Q Any other safety training?

A Not there at that facility. Just a basic -- excuse me. We had basic introduction to safety when I first started there in August

18

'05. During our two-week orientation, we had Safety members of management come in there and train us on basic fundamentals in operations of the automation in the plant.

Q When myself and Jeff Sport were there yesterday with the two Hyundai attorneys, I noticed we had to wear ear plugs, safety goggles, Kevlar sleeves, and hard hats. I got the feeling it was sort of a dangerous place to be. Is that a good description of that plant?

MR. JOHNSON: Object to the form.

A Depending on which area you're in in the plant deems which appropriate PPE is necessary to wear in that department. Our department, you're exposed to a lot of outer surface metal, sheet metal, which we're in a higher chance of getting lacerations or getting cuts. And it's always been a standard to wear hard hats in the area. Each area is designated to wear certain parts of PPE. Just like in GA all you have to wear out there is safety shoes, safety shoes and safety glasses.

Q Is the part of the plant where you were

19

the night we're talking about -- is that called the Stamping area?

A Yes.

Q And the two large stamping presses stamp out metal sheets --

A Yes, sir.

Q -- into car parts?

A Yes, sir.

Q And they use it with what -- I mean, they accomplish it by hydraulic force?

A They're actually pneumatics and mechanically driven presses.

Q So it's a -- it's not a cutting with, say, a laser torch. It's a stamping with brute force?

A Yeah. 5400 ton IHI stamping presses.

Q Did you say tons?

A Yeah, 5400 ton presses.

Q Not pounds?

A Right. Correct.

Q And when that 5400 tons stamps out a part, I imagine that's noisy, isn't it?

A Yeah.

20

5 (Pages 17 to 20)

**JAMES ALLEN BROOKSHIRE**

| | |
|---|---|
| 1  Q  Do you in that area -- we call it the | 1  A  Yes. |
| 2 Stamping Plant; is that correct? | 2  Q  And welded down on there? |
| 3  A  Yes. | 3  A  Yes. |
| 4  Q  The Stamping Plant, what safety gear do | 4  Q  And I noticed that in walking across |
| 5 you wear? | 5 the mesh it was recommended that you walk on the |
| 6  A  I wear sleeves, gloves, eye protection, | 6 angle iron, not on the mesh itself.  Is that a |
| 7 bump cap.  Safety has just designated in the | 7 good practice? |
| 8 last six months that we need to wear hearing | 8  A  We walk across it.  We've been |
| 9 protection and steel-toe shoes. | 9 instructed that it's okay to walk across it. |
| 10  Q  So at the time of the Dees incident, | 10  Q  Okay.  And then the way to get to the |
| 11 you wore helmets, Kevlar sleeves, gloves? | 11 different levels is up metal stairs? |
| 12  A  Gloves if you're handling material, the | 12  A  Yes, sir. |
| 13 steel material. | 13  Q  And the area where you describe where |
| 14  Q  All right.  Eye protection? | 14 Mr. Dees was sleeping, the trolleys, are those |
| 15  A  Yes, sir. | 15 the devices that sort of hang from the ceiling |
| 16  Q  But not necessarily ear plugs? | 16 and parts are carried around on some kind of |
| 17  A  Not at that time. | 17 conveyor system? |
| 18  Q  How about steel-toe shoes? | 18  A  Yes. |
| 19  A  Yes, sir. | 19  Q  You call those trolleys? |
| 20  Q  And you've got on steel-toe shoes now, | 20  A  Yes. |
| 21 don't you? | 21  Q  And the panel, the SOP panel, why is |
| 22  A  Yes, I do. | 22 that -- what does that do? |
| 23  Q  And that safety equipment is basically | 23  A  The SOP panel is the panel that's hung |
| 21 | 23 |

| | |
|---|---|
| 1 for the protection of the individual who is in | 1 on the trolley. |
| 2 the plant? | 2  Q  That's hung on the trolley? |
| 3  A  Correct. | 3  A  By the robots in the automation on the |
| 4  Q  And I also noticed in looking at the | 4 back of the press line. |
| 5 plant yesterday that it's a very large building, | 5  Q  The panels that I'm talking about would |
| 6 isn't it? | 6 be the metal panel where Mr. Dees was located. |
| 7  A  Correct. | 7  A  Oh, the control panel, electrical |
| 8  Q  And the levels in the building are | 8 control panel. |
| 9 floored with what I would call catwalks.  Is | 9  Q  That's different than the SOP? |
| 10 that a good name for that? | 10  A  Yeah.  You've got three levels.  You've |
| 11  A  Yeah, that's appropriate. | 11 got the base floor, you've got the second level, |
| 12  Q  And a catwalk would be a metal grate? | 12 which they do the rework for the SOP panels |
| 13  A  Mesh floor. | 13 where they have the repair booth and do |
| 14  Q  Mesh floor.  And the mesh is a steel | 14 inspection of those panels, and then the third |
| 15 mesh, isn't it? | 15 floor is actually the storage system for the SOP |
| 16  A  Correct. | 16 panels. |
| 17  Q  Almost like a wire, except very heavy | 17  Q  So the SOP panels are part of the |
| 18 gauge metal? | 18 automobile eventually? |
| 19  A  Yes, sir. | 19  A  Yeah.  That's side outer, the big sides |
| 20  Q  And the mesh is put down on -- what do | 20 of the car. |
| 21 you call them? | 21  Q  Okay.  So what I want to talk about is |
| 22  A  Angle. | 22 the control panel where Mr. Dees was. |
| 23  Q  Angle iron? | 23  A  Electrical control panel. |
| 22 | 24 |

6 (Pages 21 to 24)

## JAMES ALLEN BROOKSHIRE

1  Q    What does that control?
2  A    That's the -- I guess you'd -- in base
3  form, you'd say that's the brain behind the
4  operation of the SOP system. It's where they go
5  to check faults and reset faults.
6  Q    What's a fault?
7  A    If they have any kind of fault in the
8  system.
9  Q    Such as?
10  A    Maybe a trolley quit, maybe there's a
11  low voltage fault on one of the trolley boxes
12  and they've got to search for it. Then the
13  fault -- the system itself will capture the
14  fault and then the system will send out to a
15  touch screen and prompt a fault to let
16  Maintenance know that they need to fix the
17  problem.
18  Q    And that touch screen is inside the
19  control panel?
20  A    There's one down on the floor between
21  the presses.
22  Q    Well, how does it show up on the
23  control panel if there's a fault?

                                          25

1  Q    So was Mr. Dees in Maintenance?
2  A    Yes, he was.
3  Q    Would he have to know how to use that
4  control panel?
5  A    He should.
6  Q    Part of his job?
7  A    He should, yeah.
8  Q    Going back to Exhibit 13, the first
9  page, Bates number 37, is this statement that
10  you signed true and correct?
11  A    Yeah, the best of my knowledge.
12  Q    Okay. You don't want to make any
13  changes in it, do you?
14  A    No.
15  Q    And the second page of that exhibit,
16  Bates number 38, is that also true and correct?
17  A    Yes.
18  Q    Do you want to make any changes in
19  that?
20  A    No.
21  Q    Outside of these two documents, there's
22  no other documents you reviewed?
23  A    No.

                                          27

1  A    Because you can look in the control
2  panel and you've got PLC processors in there and
3  you'll have input and output analogue blocks.
4  And they'll have certain bits that will be
5  toggled that you can look it up. Maintenance
6  typically has books up there, and they can look
7  at which bit light is toggled on on the input or
8  output card, and that will indicate to them what
9  the fault is.
10  Q    This may be a simplification, but I
11  know on cars nowadays, even when I was growing
12  up, you can go into your car dealership and they
13  can plug in a computer and they can tell what's
14  wrong with the car with the computer. Is that a
15  simplified way of what this control panel can
16  tell you?
17  A    Yeah.
18  Q    You can locate where the fault is by --
19  A    Yeah, they can figure out -- it will
20  give them basic error coding, give them an
21  understanding of what's wrong. It doesn't tell
22  them exactly where the problem is at, but it
23  gives them an idea of what's wrong.

                                          26

1  Q    What was the reason that the second
2  statement was taken four days later on Bates
3  number 38?
4  A    There was two situations where -- with
5  Team Relations there's an interview with Kevin,
6  then there was another interview later. And
7  they just wanted to reassure that the
8  understanding was the same both times.
9  Q    Who is they?
10  A    Team relations.
11  Q    I mean who? What human being?
12  A    William Ware is the one that took the
13  statements, but whoever he reports to, Audie
14  Swegman and Rob Clevenger and those guys.
15  Q    So what were you told when you --
16  before you did the second interview on February
17  19, '07?
18  A    That -- I wasn't really told anything.
19  They just told me that we needed to make sure
20  that there was a clear understanding of what
21  happened on this night of this incident.
22  Q    Well, is this the first page, Bates
23  number 37 -- that's not a clear understanding?

                                          28

7 (Pages 25 to 28)

## JAMES ALLEN BROOKSHIRE

1    A    I thought it was.
2    Q    So you didn't know why the second one
3  was necessary?
4    A    I didn't understand why they needed
5  another one, but whatever they needed, I told
6  them, you know, I would sign off on it.
7  Whatever information they deemed to make things
8  gel up and what was needed, I was willing to do
9  what they needed to do.
10    Q    And why do you think they needed to
11  make things gel up?
12    A    Make sure my story is consistent to be
13  fair to the Team Member, because that's Team
14  Relations' job to make sure things are fair.
15    Q    Fair to Mr. Dees?
16    A    Yes.
17    Q    Well, you were fair to Mr. Dees on the
18  first statement, number 37, weren't you?
19    A    That's what I seen.
20    Q    Was there anything -- you thought that
21  was complete and accurate, number 37, didn't
22  you?
23        MR. JOHNSON:  Object to the form.
                                                    29

1    Q    You're not on drugs?  You're not on
2  alcohol?  You don't have any mental problems
3  now?
4    A    No.  My wife tells me I'm nuts
5  sometimes, but...
6    Q    Well, sometimes they're right and
7  sometimes they're wrong.  But outside of that?
8    A    No.
9    Q    On the night in question -- and I think
10  that is the date of February 14th, according to
11  Exhibit 13, number 37 -- how many people were
12  you in charge of supervising?
13    A    On night shift at that time would have
14  been approximately 30.
15    Q    And were the 30 people scattered around
16  the Stamping Plant?
17    A    Yeah.
18    Q    And at that time, you were in charge of
19  quality, safety, production, those type issues?
20    A    Yeah.  In that position in that place
21  when I was working night shift, I was actually
22  filling in for the responsibility of the
23  assistant manager.  When I'm actually in my full
                                                    31

1    A    To the best of my knowledge.
2    Q    Okay.  Did Mr. Ware or anybody else
3  tell you why it was necessary to make things gel
4  up?
5    A    Me using the term gel up was my
6  terminology.
7    Q    I understand.  What did you mean by
8  that term?
9    A    Make sure the story is consistent for
10  fairness to the team member.
11    Q    So fairness to the Team Member would be
12  a paramount?  Fairness to Mr. Dees would be a
13  paramount concern?
14    A    To team relations and for HMMA Team
15  Members in general.  People need to be treated
16  fair and equal.
17    Q    Right.  And you're not on any
18  medication or anything now, are you?
19    A    No.  I've got asthma.  Sometimes I take
20  albuterol.
21    Q    All right.  Well, there's no reason why
22  you cannot testify truthfully today?
23    A    Correct.
                                                    30

1  responsibility is when I'm on day shift as the
2  manager where I'm responsible for both shifts.
3  At that time, I was filling in that position for
4  assistant manager on night shift.
5    Q    Who was that?
6    A    Mr. Rick Harvey, which he resigned and
7  moved to a job out in Arizona.
8    Q    And do you know a Mr. Prater?
9    A    Yeah, I know Mr. Prater.
10    Q    What was his job that evening?
11    A    He was not there that time of night.
12  He works day shift as assistant manager over
13  Stamping Maintenance.
14    Q    All right.  Was he Mr. Dees' usual
15  superior or supervisor?
16    A    That was his usual supervisor, yes.
17  Other than the fact of his Team Leader, Kevin
18  Hughes, which he reports to on his shift.
19    Q    Were you given an orientation when you
20  went to work for HMMA?
21    A    Yeah.  Two-week orientation.
22    Q    What did that cover?
23    A    It covers benefits as far as your
                                                    32

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

JAMES ALLEN BROOKSHIRE

1 dental, eye, health, and your different
2 coverages, deductible. You had an introduction
3 to Team Relations. You had an introduction to
4 all the heads of departments and what their
5 functions and responsibilities are for each
6 department. And then Safety and Payroll and
7 Team Relations.
8    **Q   This was a two-week orientation?**
9    A   Yeah.
10    **Q   And I'm going to -- your counsel has**
11 **given us your personnel file. I'm going to mark**
12 **that as Exhibit 14. Do you have access to your**
13 **personnel file?**
14    A   I guess I would. I mean, I've never
15 went up and asked them for anything.
16
17    (Whereupon, Plaintiff's Exhibit
18 Number 14 was marked for identification
19 and copy of same is attached hereto.)
20
21    **Q   I'm going to mark the entire thing as**
22 **Exhibit 14. They've got some numbers at the**
23 **bottom of the page. We'll just refer to those**
                                                    33

1 **257, it has a notice to applicant down at the**
2 **bottom of the page. Did you read that?**
3    A   The Applicant Notice?
4    **Q   Right.**
5    A   Yes, sir.
6    **Q   Do you know what that means?**
7    A   Yeah.
8    **Q   What does it mean?**
9    A   HMMA endorses the EEO requirements,
10 equal employment opportunities for people, and
11 doesn't place any discrimination on whatever
12 your status is in regards to your background.
13    **Q   All right. And then on the second**
14 **page, Bates number 257, about a third of the way**
15 **down, it says do you know of any reason why you**
16 **would not be able to perform the various**
17 **functions of the job you're seeking. See that?**
18    A   Yeah.
19    **Q   And you checked off no?**
20    A   Right.
21    **Q   Did you know what jobs you were seeking**
22 **at the time?**
23    A   At the time, I had had a recruiter that
                                                    35

1 for easy reference. **And your employment**
2 **application in there begins at number 257.**
3 **Would you turn to that?**
4    A   257. Okay.
5    **Q   And I believe it goes from 257 to 260.**
6 **Would you check those four pages and tell me if**
7 **that's your employment application?**
8    A   (Witness reviews document.) Yeah.
9    **Q   That's it?**
10    A   Yeah.
11    **Q   And it looks like on Certification on**
12 **last page it says right above your signature --**
13 **I'll just paraphrase. It just says everything**
14 **on here is true and correct. Would that be a**
15 **true statement?**
16    A   Yes, sir.
17    **Q   And then it also said any material**
18 **omissions and misstatements are grounds for**
19 **termination?**
20    A   Yeah.
21    **Q   You understood that?**
22    A   Yeah.
23    **Q   And then if you flip to the first page,**
                                                    34

1 contacted me. I had graduated with my Master's
2 Degree and I was interested in pursuing other
3 opportunities, because at the time, General
4 Motors was actually doing salary freezes,
5 overtime freezes and there really wasn't much
6 opportunity to pursue a better career, better
7 profession. So this recruiter contacted me and
8 disclosed a position opening to me at Hyundai.
9 And at that time, it was assistant manager
10 position open in the Stamping Weld Shop. And
11 after I went for the first interview, everything
12 went extremely well. I came in for the second
13 interview, and it went extremely well, also.
14 And they actually offered me the Stamping
15 Manager's position because of my background of
16 experience and the satisfaction of the
17 interviews.
18    **Q   And you were hired into that position?**
19    A   Yes, sir.
20    **Q   So you've held the same position from**
21 **start to now?**
22    A   Correct.
23    **Q   So you were actually hired into a**
                                                    36

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## JAMES ALLEN BROOKSHIRE

1  management position and still maintain that now?
2    A  Correct.
3    Q  And look at number 270. That's
4  Acknowledgment of Sexual Harassment Prevention
5  Training. It's got a checklist of things that
6  you've received.
7    A  270?
8    Q  270. You signed that?
9    A  Correct.
10   Q  And it looks like, for instance, you
11  viewed a videotape called Sexual Harassment.
12  That's number 3.
13   A  Yeah.
14   Q  And you reviewed -- for instance,
15  number 8, it says I have received and reviewed a
16  copy of HMMA's Serious Misconduct Policy.
17   A  Yes.
18   Q  Do you know what the Serious Misconduct
19  Policy is?
20   A  It depends on the circumstances of what
21  the employee had done as far as the Serious
22  Misconduct Policy applying to them. I don't
23  have it memorized verbatim in my head.

37

1    A  Yeah.
2    Q  All right. Is there anything unclear
3  about your testimony so far?
4    A  No.
5    Q  Now, Exhibit 15, is that a copy of a
6  manual that you would have received, knowing
7  that this may not be the exact piece of paper
8  that you got?
9    A  Yeah, this is a Team Member Handbook
10  that's been handed out to myself and all the
11  Team Members in the plant.
12   Q  Do you still have your copy?
13   A  I handed it out to one of my assistant
14  managers. He borrowed it right before I went on
15  Thanksgiving holiday, and I'm not sure if he
16  returned it because I haven't looked for it back
17  on my desk.
18   Q  But you do have a copy when it's not
19  loaned out to somebody else?
20   A  Yes.
21   Q  And you understand this is the rules
22  and regulations of Hyundai with regard to the
23  employees?

39

1
2    (Whereupon, Plaintiff's Exhibit
3  Number 15 was marked for identification
4  and copy of same is attached hereto.)
5
6    Q  I'm going to mark Exhibit Number 15, a
7  copy of a manual called Team Member Handbook,
8  and have you take a look at that and see if that
9  is something that you received and reviewed.
10   A  Yes, I have a copy of this.
11   Q  What did you write down there?
12   A  Exhibit number.
13   Q  Exhibit number?
14   A  Right.
15   Q  Can I see those notes you're writing
16  down?
17   A  (Witness complied.)
18   Q  What's the purpose of you keeping your
19  own notes in the deposition?
20   A  Clarity for my own self-purpose.
21   Q  What self-purpose would that be?
22   A  Clarity.
23   Q  For you?

38

1    A  Yes.
2    Q  And there's a section in here on
3  serious misconduct, I believe, isn't it?
4    A  Yes, there is. It's under Disciplinary
5  section.
6    Q  And take a look at page 36.
7    MR. JOHNSON: Do y'all have an extra
8  one?
9    MR. KILBORN: I don't but I think it's
10  produced.
11   Q  Serious misconduct starts at the bottom
12  of 33 and you go over to page 34, and toward the
13  middle and lower part of the document it's got
14  listed below are some examples of activities
15  that statute serious misconduct at HMMA. You
16  see that?
17   A  Yes, sir.
18   Q  Are you familiar with those?
19   A  Like I say, I don't have all of them
20  exactly memorized, but if I have something in
21  question, that's why we have the handbook for a
22  reference tool.
23   Q  Well, you had to read it and

40

10 (Pages 37 to 40)

JAMES ALLEN BROOKSHIRE

1  acknowledge what it said in the beginning,
2  didn't you?
3     A  Correct.
4     Q  Did you have any questions about these
5  rules?
6     A  No, sir.
7     Q  And serious misconduct can result in
8  termination, can it not?
9     A  It can.
10    Q  Okay.  All right.  And, for instance,
11  the first bullet point under the list it says
12  serious and/or excessive violations of HMMA's
13  attendance program.  You see that?
14    A  Yes, sir.
15    Q  The second bullet point says serious
16  and/or excessive violations of HMMA's
17  performance standards.  You see that?
18    A  Yes, sir.
19    Q  It goes on.  It's got quite a few
20  bullet points.  Which of these bullet points did
21  Mr. Dees violate?
22       MR. JOHNSON:  Object to the form of the
23  question.  Are you asking for -- if he knows for
                                              41

1     Q  Okay.
2     A  The second or third one from the
3  bottom.
4     Q  Okay.  Which other one?
5     A  Deliberately using unsafe work
6  practices that might seriously jeopardize the
7  health and safety of the Team Member.
8     Q  How did Mr. Dees deliberately use
9  unsafe work practice that might seriously
10  jeopardize the health and safety of the Team
11  Member or a fellow Team Member?
12    A  Jeopardizing his own health and safety
13  by sleeping in an area that's considered
14  dangerous.
15    Q  How is it considered dangerous?
16    A  Because of the moving panels.  You have
17  moving sheet steel that moves around the area.
18  And being in a state of not being aware of your
19  surroundings, he could easily put himself in a
20  state of jeopardy to cut himself or get himself
21  hurt.
22    Q  So your opinion is Mr. Dees
23  deliberately put himself in a dangerous
                                              43

1  sure, or are you asking what his opinions are?
2       MR. KILBORN:  My question will just
3  stand like it is.
4       MR. JOHNSON:  Okay.  Object to the
5  form.
6     A  (Witness reviews document.)  Basically
7  in the condition in which he was in the bullet
8  insubordination, including with failing to
9  perform assigned work and deliberately
10  performing unsafe work practices.
11    Q  Why don't you just take this black felt
12  pen or take your own pen there and just circle
13  the ones that you saw Mr. Dees violate?
14    A  (Witness complied.)
15    Q  Would you put your initials and today's
16  date by that?
17    A  (Witness complied.)
18    Q  All right.  So we all know since we
19  don't all have copies.  Would you read for us
20  both of those so we can markup our copies?
21    A  Insubordination, including refusing to
22  perform assigned work or refusing to follow
23  direction of HMMA.  Deliberately --
                                              42

1  situation where he himself might get hurt?
2     A  Yes.
3     Q  Go back up to the one you marked first,
4  insubordination.  Tell me how Mr. Dees was
5  guilty of insubordination as outlined in that
6  bullet point.
7     A  He wasn't performing work.  He was off
8  his -- lunch period time off in a concealed area
9  asleep.
10    Q  Okay.  Concealed area?
11    A  That's not -- in a hidden area.  That's
12  not a trafficked area.  There was no problems at
13  the time with the SOP system.
14    Q  How did you know that?
15    A  Because I was up there.
16    Q  And that's why you were up there?
17    A  I was up there checking quality
18  problems.
19    Q  Quality problems?
20    A  Yeah.  Quality problems on the CM side
21  outer panel.
22    Q  What were the quality problems you were
23  checking?
                                              44

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## JAMES ALLEN BROOKSHIRE

1    A   For wrinkles and splits on the panel.
2    Q   Did you have some suspicion that there
3  were quality problems?
4    A   Yeah.
5    Q   What made that occur to you?
6    A   We got a call from the Quality
7  Department, the Weld Shop, and they had told us
8  they'd seen some problems with it.  The other
9  piece was we had the die back in the shop being
10  worked on.  We had to bring it back up.  We ran
11  very close to running the Body Shop out of
12  parts.  So we had to put the job back in the
13  press quickly to get parts to the Weld Shop, and
14  we had to check the quality on them quickly also
15  to make sure we weren't going to jeopardize the
16  customer in shutting down production at the Weld
17  Shop.
18    Q   And do you agree with the fact that
19  Mr. Dees should have been terminated for
20  violating these two bullet points, Serious
21  Misconduct Policies?
22        MR. JOHNSON:  Object to the form.
23    A   For any employee taking their own time

45

1        Now, the part of it that I was not was
2  not under the influence on HMMA property.
3    Q   Well, did you violate that policy you
4  just read or not?
5    A   I don't actually know the policy of
6  that, but I know I failed a urine exam when I
7  went up to Medical after I had been cut.  I had
8  been cut through my glove when I was helping
9  some Team Members pull some scrap out of the
10  scrap shoot.  I went to Medical to be treated
11  for the laceration I received on my hand, and
12  it's protocol for safety incidents to be drug
13  tested.
14    Q   So you got caught with drugs?
15        MR. JOHNSON:  Object to the form.
16    A   I had shown up positive in the urine
17  sample.
18    Q   But you didn't expect to be caught, did
19  you?
20    A   I didn't think about it because of the
21  time of when the incident happened I had been at
22  a party and drinking alcohol.
23    Q   You got caught?

47

1  and not being -- performing the regular job task
2  and sleeping on the job, I do have a problem
3  with that.  I do believe that's a problem
4  conflicting with company policy.
5    Q   So you believe he should have been
6  terminated?
7    A   Yes.
8    Q   So you agree with that?
9    A   Yes.
10    Q   And how many of these serious
11  misconduct policies on page 34 and 35 have you
12  yourself violated?
13    A   One of them.
14    Q   Which one is that?
15    A   The use of -- use of illegal drugs.
16    Q   Would you read for us that willful
17  misconduct that you yourself violated?
18    A   Use or possession, sale, transfer or
19  being under the influence of illegal drugs,
20  alcohol, or other intoxicating substances at any
21  time on HMMA property.  Gifts of alcohol or
22  coolers containing alcohol are prohibited at
23  HMMA.

46

1    A   Showed up positive in the urine sample,
2  yes.
3    Q   What about the alcohol?  Did they catch
4  you with that, too?
5    A   No.
6    Q   Did you tell them you'd also been
7  drinking alcohol?
8    A   On the weekend I had, that Saturday,
9  but I wasn't at work.
10    Q   Did you tell them that?
11    A   Yeah, I disclosed that to the HR
12  people, and then also I had to attend a
13  substance abuse program -- alcohol and substance
14  abuse program for condition of employment.
15    Q   What was the date you got caught?
16    A   March the 24th or 5th or 6th somewhere
17  in there.  Towards the last week of March.
18    Q   2007?
19    A   Yes, sir.
20    Q   So what happened?  You were the
21  Stamping Plant manager at that time?
22    A   Yeah.
23    Q   In charge of 30 people?

48

12  (Pages 45 to 48)

**JAMES ALLEN BROOKSHIRE**

1    A    Yeah.  As the manager, I'd be in charge
2  of the whole department then, but at that time,
3  I was just in charge of night shift.  That would
4  be correct.
5    Q    How many people on the night shift
6  would you be in charge of?
7    A    Night shift is 30 people.  But the
8  department as a whole is around 80 people.
9    Q    And you were in charge of the night
10  shift then?
11    A    Right.
12    Q    But you're also in charge of the whole
13  department?
14    A    Normally.
15    Q    Normally.  So that would be 80 people?
16    A    Correct.
17    Q    And you would be in charge of the
18  safety of those 80 people?
19    A    Correct.
20    Q    So you showed up on the job with
21  cocaine in your system and alcohol in your
22  system and in charge of the safety of 30 people
23  in Stamping Plant?

49

1    Q    Knew what it would do to the human
2  brain?
3    A    Yes, sir.
4    Q    Knew what it would do to your brain?
5      MR. JOHNSON:  Object to the form.
6    Q    Is that correct?
7    A    I knew the feeling.
8    Q    Right.  Well, you knew it was -- it's a
9  brain-altering substance, didn't you?
10      MR. JOHNSON:  Object to the form.
11    A    I know what the feeling is.
12    Q    Well, you know it's a mind-altering
13  substance, don't you, Mr. Brookshire?
14      MR. JOHNSON:  Object to the form.
15    Q    You can answer me.
16    A    I already have.
17    Q    Well, you say you knew what it felt
18  like.  I want to know did you know what it does
19  to the brain.
20    A    I had done classes on it.  I've had
21  classes on it back in high school, Health and
22  Science classes.
23    Q    So you knew it was an illegal drug;

51

1      MR. JOHNSON:  Object to the form.
2    A    I tested positive for -- on a drug
3  test, not alcohol.
4    Q    Well, but you had been using alcohol?
5    A    On the weekend when I wasn't at the
6  plant.  Correct.
7    Q    Well, you said it.  I just want to find
8  out about it.  You had been using alcohol and
9  you'd been -- what did you do?  Snort cocaine?
10      MR. JOHNSON:  Object to the form.
11    A    I had had a person at the party hand me
12  some out of their pocket.
13    Q    Did you snort it?
14    A    Yeah.
15    Q    How did you know how to ingest it?
16    A    During my younger, stupid days I had
17  messed around with it in my mid 20s.
18    Q    So you used cocaine before?
19    A    Yeah, my younger days I had.
20    Q    You knew how to snort it?
21    A    Yes, sir.
22    Q    Knew what it was?
23    A    Yes, sir.

50

1  correct?
2      MR. JOHNSON:  Object to the form.
3    A    Correct.
4    Q    And you knew it was a crime; correct?
5      MR. JOHNSON:  Object to the form.
6    A    Correct.
7    Q    And you knew that it has serious long-
8  and short-term effects; correct?
9      MR. JOHNSON:  Object to the form.
10    A    I'm not an expert on that subject
11  matter.  I couldn't tell you what the exact
12  long-term and short-term effects are on it.
13    Q    I thought you said you took some course
14  or class on it?
15    A    High school.
16    Q    In high school.  All right.  Well, are
17  you on drug rehab now?
18    A    No.
19    Q    Were you ever on drug rehab?
20    A    There was a three-week program,
21  substance abuse program.
22    Q    When were you on that program?
23    A    April, first part of May.  Three

52

13 (Pages 49 to 52)

**JAMES ALLEN BROOKSHIRE**

1  weeks.  It's a three-week program.
2  **Q   2007?**
3  A   Correct.
4  **Q   Put on by who?**
5  A   By the HR group.  It's -- it was a
6  condition of employment.
7  **Q   You mean --**
8  A   A successful completion.
9  **Q   So it's Hyundai?**
10  A   Correct.
11  **Q   So you spent how many weeks in a**
12  **Hyundai substance abuse program?**
13  A   Three weeks.
14  **Q   Three weeks.  Did you get paid for**
15  **going?**
16  A   Yes.
17  **Q   Did you go on company time?**
18  A   I went on -- you get put on disability.
19  **Q   So you were put on disability?**
20  A   Correct.
21  **Q   So you got paid as a disabled person?**
22  A   However the program works.  They call
23  it -- however it works out.  I don't know all
53

1
2  **Q   Turn back if you would to the Team**
3  **Member Handbook.  That's Exhibit 15.  We were**
4  **looking at that earlier.  Page 34.  That's that**
5  **little list of serious misconduct.  How about**
6  **circling that one that you say you violated and**
7  **put your name and your initials?**
8  A   (Witness complied.)
9  **Q   Have you done that?**
10  A   Yeah.
11  **Q   Okay.  So you said you had abused**
12  **cocaine early on in life?**
13  A   Yeah.
14  **Q   Over what period of time?**
15  A   Mid 20s.  Between 24 and 26, 27.
16  Somewhere around there.
17  **Q   And then you're 35 now?**
18  A   Excuse me?
19  **Q   How old are you now?**
20  A   35.
21  **Q   35.  And where was this party you were**
22  **at?**
23  A   Place over in Prattville.
55

1  the stipulations.
2  **Q   What were you told?**
3  A   That I had to complete a successful --
4  how do I put it -- I had to complete the program
5  successfully to maintain my job, and then I
6  would be monitored for two years after at random
7  drug and alcohol screens.  And at any point in
8  time if I tested positive on either one of
9  those, I would meet immediate termination of my
10  employment.
11  **Q   So were you -- you were still employed**
12  **while you were on this Hyundai substance abuse**
13  **program?**
14  A   Correct.
15  **Q   But you didn't receive your regular**
16  **salary, you received disability?**
17  A   Correct.  That was my -- I didn't look
18  into all that, so I don't know how all that
19  works out but I was paid while I was gone.
20  **Q   All right.**
21
22  (Whereupon, a discussion was held off the
23  Record.)
54

1  **Q   Prattville.  Whose house?**
2  A   Hector.
3  **Q   What's the name?**
4  A   Hector.
5  **Q   Hector.  What's the full name?**
6  A   Hector.  I can't remember his last
7  name.  My wife -- my stepdaughter is good
8  friends their daughter, and that's why we were
9  over there.  I believe his name is Hector Gomez,
10  I think.
11  **Q   You didn't know Hector Gomez?**
12  A   I knew him, yes.
13  **Q   You knew him.  It must have been a**
14  **pretty fun party, huh?**
15  MR. JOHNSON: Object to the form.
16  A   It was just a party.
17  **Q   All right.  So it was just a party.  So**
18  **you were drinking alcohol and snorting cocaine**
19  **at this party; is that correct?**
20  A   Yeah.
21  **Q   Did you cut it yourself?**
22  A   No.
23  **Q   Who cut it?**
56

14  (Pages 53 to 56)

**JAMES ALLEN BROOKSHIRE**

1  A  A guy that I didn't know.
2  **Q  Did you pay for it?**
3  A  I didn't know the guy.  No.
4  **Q  It was given to you?**
5  A  Yeah.  He had one of those little --
6  little things that's already cut up in there and
7  they carry it around in a vial.  He just...
8  **Q  You had seen that before?**
9  A  Yeah.
10  **Q  Have you used that before?**
11  A  Yeah, I have.
12  **Q  I've looked up how cocaine works.  One**
13  **of the descriptions that I found, I'm going to**
14  **read it to you.  See if you agree with it.  It**
15  **causes initially euphoria and a sense of buoyant**
16  **well-being marked by a feeling of complete**
17  **self-confidence, as well as pleasant**
18  **hallucinations, visual and auditory.  The peak**
19  **lift lasts only briefly, however, only 15 to 30**
20  **minutes.  Although, lesser effects last up to**
21  **two to four hours.  Do you know that that's what**
22  **it does?**
23  A  Euphoria.  I've experienced that with
                                                        57

1  is a stimulant.  I mean, you're almost leveled
2  out.
3  **Q  So you felt leveled out?**
4  A  (Witness nods head.)
5  **Q  Is that correct?**
6  A  Yeah.
7  **Q  All right.  And did you know -- how did**
8  **you know that the alcohol and cocaine had that**
9  **effect?**
10  A  I told you.  I had had experience with
11  both of them in the past.
12  **Q  So you'd actually done both of them in**
13  **the past together?**
14  A  I have before, yes.
15  **Q  So sometimes you'd snort cocaine and**
16  **use the alcohol to level it out; sometimes you'd**
17  **use the alcohol and use the cocaine to level it**
18  **out?**
19      MR. JOHNSON:  Object to the form.
20  **Q  Isn't that right?**
21  A  I guess.
22  **Q  Well, don't guess.  Tell me.  What's**
23  **the truth?**
                                                        59

1  it, but not hallucinations.
2  **Q  So you would be immune to that type of**
3  **effect?**
4      MR. JOHNSON:  Object to the form.
5  **Q  Is that correct?**
6  A  I don't know if anybody is immune to
7  anything.  But I can just tell you what I've
8  experienced with it.
9  **Q  How many other people were there**
10  **snorting cocaine?**
11  A  I just know about myself and the other
12  guy that had given me some.  I don't know who
13  else.
14  **Q  And you were drinking alcohol at the**
15  **same time?**
16  A  Yes, sir.
17  **Q  What's the effect of alcohol combined**
18  **with cocaine?**
19      MR. JOHNSON:  Object to the form.
20  A  I'm not an expert on that.  I mean, I
21  can tell you how I felt.
22  **Q  Yeah.  How did you feel?**
23  A  The alcohol is a depressant.  Cocaine
                                                        58

1  A  That's what I had done at the time.
2  **Q  And what time was this party over?**
3  A  Probably around 11 or 12.
4  **Q  Midnight?**
5  A  Probably around there.
6  **Q  And what time did you go to work?**
7  A  I didn't go to work until that Monday.
8  That was Saturday night.
9  **Q  Saturday night.  So you didn't know**
10  **whether or not the cocaine was still in your**
11  **system, did you?**
12  A  No.  Obviously if I knew that I had
13  done it and done a lot of it, I wouldn't have
14  even went to the hospital to get -- because I
15  know it's a known protocol to get drug tested.
16  **Q  What was that?**
17  A  I said obviously if I knew that I had
18  done a lot of it and intentionally done it, I
19  wouldn't have even went up to the hospital to
20  get treatment for my cut.
21  **Q  So when you cut yourself, you knew**
22  **that you were going to get drug tested, didn't**
23  **you?**
                                                        60

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

### JAMES ALLEN BROOKSHIRE

1   A   Yeah.
2   Q   Why didn't you just fess up before they
3   found it?
4   A   Because I didn't acknowledge it because
5   of the state I was in in intoxication and
6   drinking alcohol.
7   Q   You were still intoxicated?
8   A   No. Not at that time, no. But at the
9   time I had done the cocaine I had been.
10  Q   All right. And there's various
11  nicknames for this stuff. Which one do you use?
12  A   I just call it coke.
13  Q   Coke. Have you ever heard it referred
14  to as flake or free base or lady or nose candy
15  or rock snow or anything like that?
16  A   I've heard it called snow before, but
17  that's about it.
18  Q   How about big C?
19  A   Huh-uh.
20  Q   How about blow?
21  A   I have heard of that because I've seen
22  a movie called Blow.
23  Q   Okay. Before you went on this Hyundai
                                                        61

1   A   Like I said, I knowingly didn't think
2   it was in me.
3   Q   You wouldn't have volunteered it, would
4   you?
5   A   No.
6   Q   How about a hair sample? Did they take
7   a hair sample?
8   A   They didn't take one.
9   Q   Did somebody else take one?
10  A   Did somebody...
11  Q   You can take hair samples and find out
12  about cocaine use, too, can't you?
13  A   I don't know. I know you can find it
14  in urine, and I understand that you can find it
15  in blood but I don't know about hair.
16  Q   Well, I was giving you what I thought
17  was your whole personnel file. Why isn't this
18  drug test in your personnel file?
19  A   Why what?
20  Q   I don't see the drug test, the urine
21  test in personnel file. Why isn't it in there?
22  A   I couldn't answer. I'm guessing they
23  probably keep that in Medical Department or
                                                        63

1   drug treatment program, had you ever been on any
2   other drug treatment programs?
3   A   No.
4   Q   And with cocaine in your system and
5   managing 30 people that day you don't feel like
6   you had created an unsafe work practice?
7       MR. JOHNSON: Object to the form.
8   A   It wasn't in my system at work. I
9   wasn't at work.
10  Q   Well, it was in your system because
11  they found it on the job, didn't they?
12  A   I tested positive in urine, but I
13  wasn't knowingly taking it at work or going to
14  work taking it.
15  Q   So it was in your urine; correct?
16  A   Correct.
17  Q   Well, why did they take a urine sample
18  if all you came in there for was a cut?
19  A   It's protocol for every safety incident
20  to be drug tested.
21  Q   And if they hadn't found it in your
22  urine sample, you wouldn't have volunteered it,
23  would you?
                                                        62

1   Teams Relations keeps it. I'm not sure.
2   Q   Did the 30 people under your
3   supervision while you had cocaine in your
4   system -- did they know that you had cocaine in
5   your system?
6       MR. JOHNSON: Object to the form.
7   A   No.
8   Q   You think they would have entrusted you
9   with their safety if they had known you had
10  cocaine in your system?
11      MR. JOHNSON: Object to the form.
12  A   I'm not sure. I can't answer that for
13  them.
14  Q   Well, would you trust somebody
15  supervising you in a dangerous plant like that
16  with cocaine in their system?
17      MR. JOHNSON: Object to the form.
18  A   I can't -- I mean, I know how I had
19  felt when I was on it. I can't -- I can't...
20  Q   So are you -- you made a medical
21  determination that you weren't affected by this
22  cocaine and that's why you went to work?
23      MR. JOHNSON: Object to the form.
                                                        64

16  (Pages 61 to 64)

JAMES ALLEN BROOKSHIRE

1   A   No.
2   Q   Well, why did you go to work with this
3   stuff in your system?
4       MR. JOHNSON: Object to the form.
5   A   Because I knowingly wasn't -- obviously
6   the urine sample tested positive. But you
7   yourself just read that the effects last how
8   long?
9   Q   Well, I just read the short-term
10  effects. Do you want me to read you the
11  long-term effects?
12  A   That's with how much usage?
13  Q   Well, what are the long-term effects?
14  You've been through the program. Did you learn
15  what they are?
16      MR. JOHNSON: Object to the form.
17  Q   Tell me what you learned.
18  A   With serious usage and consumption, you
19  will have problems down the road with lower
20  dopamine samples in your brain internally.
21  Q   Okay. Well, other than lower dopamine,
22  what other long-term effects are there?
23  A   Depression.

65

1   Q   So you've never suffered anything like
2   rapid heartbeat?
3   A   Instantaneously you do.
4   Q   How about rapid breathing?
5   A   Instantaneously you do.
6   Q   How about soaring blood pressure?
7   A   Instantaneously.
8   Q   How about palpitations?
9   A   I don't know about that one.
10  Q   Sweating?
11  A   Yeah.
12  Q   Severe headache?
13  A   No.
14  Q   Pallor?
15  A   What's that?
16  Q   Pale. You haven't ever suffered that?
17  A   Huh-uh.
18  Q   And you do know that use of cocaine can
19  sometimes result in heart failure and death,
20  don't you?
21      MR. JOHNSON: Object to the form.
22  A   My understanding taking of that class
23  in mass quantities it can.

66

1   Q   So you took the risk with your safety
2   and the safety of your fellow workers that some
3   of those effects might take place, didn't you?
4       MR. JOHNSON: Object to the form.
5   A   At the time when I was under it, that
6   was the short-term side effects.
7   Q   How do you know you haven't suffered
8   long-term side effects?
9   A   I'm not a medical expert. I can't
10  justify that. But I know in the past -- from
11  what I understand of that class after you
12  discontinue use of it, your dopamine levels will
13  come back and level out and your mindset is
14  normal.
15  Q   But you didn't know that at the time
16  you got caught, did you?
17  A   No.
18  Q   And you think showing up at work with
19  cocaine in your system is not near as bad as
20  sleeping on the job, is it?
21      MR. JOHNSON: Object to the form.
22  A   I can't -- I can't answer that one.
23  Q   Well, you're a manager. What do you

67

1   think?
2   A   To me, it would depend on if the person
3   just done it or if they'd been off of it for a
4   couple of days. To me, there's a big
5   difference. There's the quick effects and the
6   long-term effects. The quick effects, I
7   wouldn't trust somebody at work. Just like with
8   alcohol or somebody experiences problems and
9   uncontrolled states and drinking excessive
10  amounts of coffee and caffeine.
11  Q   So you equate cocaine usage to drinking
12  coffee?
13  A   If I drink two or three cups of coffee
14  and did a snort of that, yeah, I would.
15  Q   Have you ever heard of a Hyundai coffee
16  abuse program?
17  A   No, they don't do that because coffee
18  is legal.
19  Q   Have you ever served any time in prison
20  for this cocaine habit?
21  A   No, sir.
22      MR. JOHNSON: Object to the form.
23  Q   Did Hyundai report you to law

68

17 (Pages 65 to 68)

## JAMES ALLEN BROOKSHIRE

1 enforcement?
2    A  I have no idea.
3    Q  Have you ever bought the cocaine?
4    A  In the past when I was younger, I --
5    MR. JOHNSON:  Just a second.
6 Obviously, object to the form of the question.
7 I'm not sure it's relevant here.  But
8 additionally to the extent that I don't want him
9 to make any statements that might get him into
10 criminal jeopardy.
11    MR. KILBORN:  Well, he can take the
12 Fifth Amendment.  But I want to know the answer
13 to that question.  This is the eye witness to
14 this case who has been caught red handed using
15 cocaine, showed up at the Hyundai plant with it
16 in his system in a managerial position, given a
17 pass, wasn't terminated, around the time that
18 these incidents occurred.  I want to go into
19 that.  I think it's a credibility issue.
20    MR. JOHNSON:  And I understand your
21 point.  However -- and we've allowed him to
22 testify fully about his cocaine usage and you've
23 asked him plenty of questions about what

69

1 happened at work.  But beyond that, I see no
2 relevance, and I can't imagine anything -- I'm
3 not a criminal lawyer, and my recommendation to
4 him is to seek criminal counsel if he's going to
5 testify beyond what he's already testified to.
6    MR. SPORT:  Well, he indicated he was
7 represented by counsel today, so direct him not
8 to answer.
9    MR. JOHNSON:  Well, then, I direct him
10 not to answer that question.
11    MR. KILBORN:  Well, I'm going to pursue
12 this.  You can direct him not to answer.
13    Q  Are you refusing to answer whether or
14 not you have ever purchased cocaine?
15    MR. JOHNSON:  Under my advice, he is.
16    Q  All right.  Have you ever sold cocaine?
17    MR. JOHNSON:  Again, we would also --
18 my advice is that he not answer that and he will
19 not answer that.
20    MR. KILBORN:  Is he taking the Fifth
21 Amendment?
22    MR. JOHNSON:  Yes.
23    Q  Have you ever had possession of

70

1 cocaine?
2    MR. JOHNSON:  Again, same response
3 there.  My advice is that he not answer.  He
4 pleads the Fifth Amendment and is not answering.
5    Q  Have you ever had possession of drug
6 paraphernalia?
7    MR. JOHNSON:  Again, same response to
8 that issue.
9    Q  Are you taking the Fifth Amendment on
10 that, too?
11    A  Yes.
12    Q  Well, you committed a felony, right,
13 prior to showing up at work, didn't you?
14    MR. JOHNSON:  Object to the form.  And
15 same response to that question.
16    Q  You take the Fifth Amendment on that?
17    A  Yes.
18    Q  Well, don't you think commission of a
19 felony would be willful misconduct under
20 anybody's definition?
21    MR. JOHNSON:  Object to the form.
22    A  I think that condition lies within the
23 company's policies.  That's not something that I

71

1 solely determine myself.
2    Q  Well, you -- on your application we
3 reviewed a minute ago in Bates number 258, you
4 said on your application do you know of any
5 reason why you would not be able to perform
6 various functions of the job you're seeking
7 now.  Wouldn't you agree that snorting cocaine
8 could impair you in performing your job?
9    MR. JOHNSON:  Object to the form.
10    A  If I had deliberately done it right
11 before I went to work or during work, I would
12 agree with that.
13    Q  Suppose you had not deliberately done
14 it.
15    A  I think I would know if I had
16 deliberately done it or not right before I went
17 to work or not.
18    Q  Well, why didn't you reveal in this
19 application that you were basically a cocaine
20 abuser?
21    MR. JOHNSON:  Object to the form.
22    A  At the time in which this application
23 was filled out, I wasn't.  And to get a job at

72

18  (Pages 69 to 72)

JAMES ALLEN BROOKSHIRE

1  Hyundai, I had to take a drug test; hair test,
2  blood test, and urine.
3      Q   So you do know what a hair test is?
4      A   At that time they took it.  But what
5  you asked me was if I knew if it showed up on it
6  or what it takes to show up on it.  I don't
7  know.
8      Q   So you took a hair test, a blood test,
9  and a urine test?
10     A   Yeah.
11     Q   But you knew you were going to have to
12  take that; right?
13     A   I what?
14     Q   You knew to get a job you were going to
15  have to take that drug screen, didn't you?
16     A   Not necessarily.  I know you've got to
17  take urine tests to get jobs.
18     Q   Well, you knew -- you'd consented to
19  taking a drug test on your application, didn't
20  you?
21     A   Right.
22     Q   So you knew they were going to test you
23  for cocaine and any other drug, didn't you?

73

1      Q   All right.  So you made the judgment as
2  a manager that since you felt physically free of
3  the effects of cocaine you could go in there and
4  supervise 30 workers?
5          MR. JOHNSON:  Object to the form.
6      Q   Is that correct?
7      A   I felt confident in my physical
8  condition in which I appeared to work on Monday.
9      Q   Well, apparently, Hyundai didn't feel
10  confident in that, did they?
11         MR. JOHNSON:  Object to the form.
12     A   They were following protocol for a
13  positive test on a urine sample.
14     Q   Well, do you know why Hyundai has got a
15  policy against drug usage?
16     A   I wouldn't be able to tell you all the
17  reasons why.  I mean, I didn't make the policy
18  and I wouldn't be able to tell you what -- all
19  the reasons why.
20     Q   Well, tell me one reason why.
21         MR. JOHNSON:  Object to the form.
22     A   Probably with deliberate or current
23  usage it probably would debilitate the judgment,

75

1  A   Yeah, I knew they was going to take a
2  urine test.  Most jobs, places conditions of
3  employment do call for urine samples.
4      Q   So you knew full well not to use
5  cocaine before you did that?
6      A   I never knew what the actual period was
7  it stayed in your system until I took the class.
8      Q   Well, how do you know it didn't stay in
9  your system for a year if you didn't know before
10  you took the class?
11     A   I guess I wouldn't.
12     Q   How do you know it didn't stay in your
13  system for a week?
14     A   I guess I wouldn't.
15     Q   Well, how do you know it wouldn't stay
16  in your system for at least 48 hours?
17     A   (No response.)
18     Q   How do you know it wouldn't have stayed
19  in your system from the midnight you left the
20  party until the five a.m. when you showed up
21  Monday morning?
22     A   You just know the condition which you
23  feel physically at the time.

74

1  activities, and reasoning of the individual.
2      Q   Well, this policy doesn't require
3  that.  It just says if you're using drugs that's
4  a willful misconduct, doesn't it?
5          MR. JOHNSON:  Object to the form.
6      Q   Excuse me?
7      A   If that's the way it's worded, that's
8  the way it's worded.
9      Q   Now, let's turn to Bates number 282 of
10  your personnel file, Exhibit 14.  That's a memo
11  from Wendy Warner to James Brookshire.  That's
12  you.  Have you ever seen that before?
13     A   Yeah, I signed that.
14     Q   It says management TM.  Whose signature
15  is that?
16     A   Management TM.  Oh, you mean Team
17  Relations rep?
18     Q   Well, MGMT TM.  Whose signature is
19  that?
20     A   Are you talking about where it says
21  management TM REL?
22     Q   No.  Right above that.
23     A   Management TM, Wendy Warner.

76

19 (Pages 73 to 76)

## JAMES ALLEN BROOKSHIRE

1  Q   And then where it says management TM
2  REL, whose signature is that?
3  A   Rob Clevenger.
4  Q   He would be your superior?
5  A   Team Relations Representative.
6  Q   Okay.
7  A   Same person that would represent
8  Mr. Dees. Well, him or William Ware.
9  Q   So Mr. Clevenger has full knowledge of
10 your drug use?
11 A   He knows -- he has knowledge of this
12 incident and violation of this policy.
13 MR. JOHNSON: Object to the form.
14 Q   And so does Ms. Warner?
15 MR. JOHNSON: Object to the form.
16 A   I presume.
17 Q   What happened to you after this urine
18 test showed the presence of cocaine?  What
19 happened to you after that?
20 A   I was admitted to a program,
21 three-week -- well, they gave me the option of a
22 three-week program or a six-week program.
23 Q   Were you told -- were you threatened

77

1  to let me know that it was policy; that they
2  needed to follow protocol; that I either needed
3  to self-admit or they would admit me to a
4  program.  And failure to complete or admit
5  myself to the program would end in termination
6  of employment.
7  Q   Is this program on the premises of
8  Hyundai?
9  A   No.
10 Q   Where is it?
11 A   It's -- I think they have a couple
12 different places, but the one I went to is
13 Alabama Psych.
14 Q   Give me the name of that.
15 A   I think they call it APS.
16 Q   APS.  And you attended that daily?
17 A   Yeah, every day for three weeks.
18 Q   All day?
19 A   Yeah.
20 Q   Where is it located?
21 A   Carmichael Parkway.
22 Q   In Prattville?
23 A   Montgomery.

79

1  with termination?
2  A   If I did not complete the program --
3  did not submit myself to the program or complete
4  the program with success, then, yes, I would be
5  terminated.
6  Q   And who told you that?
7  A   That was told to me by Wendy.
8  Q   And where was this meeting with
9  Ms. Warner?
10 A   Up in HR.
11 Q   In her office?
12 A   Well, they've got conference rooms
13 along the wall there.
14 Q   Was it a private conference room?
15 A   Yeah.
16 Q   Nobody else listening?
17 A   Rob was there.
18 Q   Rob Clevenger was there?
19 A   Yeah.
20 Q   Well, tell me what happened.
21 A   They informed me that Medical had
22 contacted them and informed them of the status
23 or condition of my urine sample and they wanted

78

1  Q   And it's called APS?
2  A   Yeah.
3  Q   How many other people were in that
4  program?
5  A   At the time I had started, there was
6  four other people, but they weren't from
7  Hyundai.  They were other people in the program.
8  Q   Right.  And did you get drug screens
9  during that program?
10 A   Oh, yeah.
11 Q   Every day?
12 A   It varied.  They wouldn't tell you.
13 They wouldn't tell you.  It would be in the
14 morning, in the afternoon, lunchtime.
15 Q   Did you tell them about your alcohol
16 abuse?
17 A   Yeah.
18 MR. JOHNSON: Object to the form.
19 A   Yes, I did.
20 Q   Is that a 12 Step program?
21 A   Yeah.
22 Q   And what step are you in right now?
23 A   I had -- part of that program was I had

80

20  (Pages 77 to 80)

JAMES ALLEN BROOKSHIRE

1  to attend AA meetings as well and get signatures
2  from representatives of AA meetings.
3      Q   So you were simultaneously going to the
4  drug rehab program with APS as well as AA?
5      A   Yeah.
6      Q   And how did you end up in AA?
7      A   Because the position that was given by
8  my therapist and the psychiatric doctors that
9  were there, they had clinically diagnosed that
10 it wasn't a substance abuse problem that I
11 have.  They had seen with the disposition of my
12 family in the past with my mother being an
13 alcoholic and my grandfather being an alcoholic
14 and -- and I had admitted to them that I would
15 drink on weekends but I did not drink during the
16 week while I was working.  But I admitted it to
17 them.  And they had ran me through, like I said,
18 with the psychiatrist and the therapist that's
19 what they deemed the most important thing was
20 for me to attend AA meetings.
21     Q   What was the name of the psychiatrist?
22     A   Dr. Shaw, I believe.
23     Q   Is he a medical doctor?

81

1      A   That's part of their meetings.  That's
2  part of their protocol.  There's people there
3  that hadn't drank in ten years and they've still
4  got to stand up and say that.
5      Q   Well, you had to stand up and say that,
6  didn't you?
7      A   That would be correct.
8      Q   And you had to stand up and say that in
9  the drug abuse program, too, regarding drugs,
10 didn't you?
11     MR. JOHNSON:  Object to the form.
12     A   What do you mean?  Stand up in the drug
13 program?
14     Q   Well, you had to admit that you were
15 addicted to drugs, that's why you were there.
16     A   That wasn't the clinical analysis that
17 was done by the doctor or the therapist.
18     MR. JOHNSON:  Object to the form.
19     Q   Did you stand up and admit that?
20     A   Admit what?
21     Q   That you were addicted to drugs?
22     A   No.  I admitted I made a stupid
23 decision one night.

83

1      A   I don't know what -- all of his
2  classifications.  I believe he was a
3  psychiatrist.  I know that much.
4      Q   And what's the name of the therapist?
5      A   Jena Empy.
6      Q   E-M-B-Y?
7      A   E-M-P-Y.
8      Q   And what is she?
9      A   She's a licensed therapist.  And I
10 don't know what all of her credentials were, but
11 she was a licensed therapist.
12     Q   And the first step in either the 12
13 point drug abuse program or the 12 point alcohol
14 abuse program is admission that you are addicted
15 to alcohol and/or drugs, isn't it?
16     MR. JOHNSON:  Object to the form.
17     A   The AA meeting it was admitting that
18 alcohol could have control over your life.
19 Meaning that it can be a problem in your life.
20     Q   Well, you have to get up there and say
21 my name is Jim Brookshire and I'm an alcoholic.
22 You have to make that admission, don't you?
23     MR. JOHNSON:  Object to the form.

82

1      Q   One night; right?
2      A   That would be correct.
3      Q   Okay.  And let's go back to this Bates
4  number 282, Plaintiff's Exhibit 14.  At the time
5  of this -- well, it says on March 27, 2001, HMMA
6  received confirmation as a result of your random
7  drug screen.  When was the actual date that you
8  were caught?
9      A   It was somewhere around March the 25th,
10 26th.  Somewhere right around there.  I can't
11 remember.  It was on a Tuesday or Wednesday.
12     Q   And it says in here that it's got four
13 conditions; is that correct?
14     A   Yeah.
15     Q   One, you had to attend a substance
16 abuse assessment session scheduled through
17 HMMA's Medical Clinic.  Was that done?
18     A   Yes.
19     Q   Said you were required to comply with
20 all aspects of the prescribed rehab program.
21 Was that done?
22     A   Yeah.
23     Q   Said you must agree to allow HMMA

84

21 (Pages 81 to 84)

## JAMES ALLEN BROOKSHIRE

1  Medical Clinic to monitor your progress and
2  communicate with the assessment and
3  rehabilitation provider.
4     A   Yeah.
5     Q   That was accomplished?
6     A   Yeah.
7     Q   And then it said any future use or
8  possession of illegal and/or nonprescription
9  drugs or being under the influence of alcohol or
10 nonprescription drugs and/or illegal drugs while
11 on HMMA premises will subject you to corrective
12 action up to and including termination.  You
13 understood that?
14    A   Yeah.  They told me that without a
15 doubt I'd be -- anything happened again I'd be
16 terminated.  And I've been -- part of their
17 process also is I'm subjected to random
18 drug/alcohol tests every month.  I get two to
19 three tests every month.  It's been going on
20 since then.
21    Q   Outside of Ms. Warner and Mr. Clevenger
22 who else at the Hyundai plant knows that?
23    A   I couldn't tell you.  I don't know.

85

1     Q   Did anybody ask you why did you
2  disappear?
3     A   I had Team Members ask me that.
4     Q   Who asked you that?
5     A   Just Team Members on the floor.  They
6  said is everything okay.  Because they knew my
7  wife and I had had some marital problems, too.
8     Q   Well, had your cocaine use caused
9  marital problems?
10    A   No.
11    Q   You hesitated.  Are you sure?
12    A   No.
13    Q   How about your alcohol abuse?
14    MR. JOHNSON:  Object to the form.
15    A   Alcohol did interfere with it in the
16 sense that my wife and I would have serious
17 arguments and I would walk out of the house and
18 go to the garage and drink a few beers, drink a
19 six-pack or so just to not listen to her because
20 she was unhappy about the move down here.
21    Q   Y'all didn't go through the unfortunate
22 experience of getting in a divorce, did you?
23    A   No.

86

1     Q   So at the time that you saw Mr. Dees
2  sleeping on the job, you were an alcoholic and
3  you did abuse alcohol; is that correct?
4     MR. JOHNSON:  I'm sorry.  I
5  misunderstood that.  What was that?
6     Q   At the time you saw Mr. Dees sleeping
7  and reported him, you were an alcoholic and you
8  were abusing alcohol; is that correct?
9     MR. JOHNSON:  Object to the form.
10    A   I had no deliberate use of alcohol at
11 the time, but on the weekend I had a drink.
12    Q   Well, how do you not deliberately use
13 alcohol?
14    A   Like if I knew I was going into work
15 that afternoon drinking a few beers before I
16 went in to work.
17    Q   And I don't mean to embarrass you and
18 there are a lot of people who are recovering
19 alcoholics.  But were you an alcoholic on the
20 day you saw Dees sleeping?
21    A   What's your definition of an
22 alcoholic?
23    Q   Whatever your definition is.  You're

87

1  the expert.
2     A   I'm not an expert.
3     MR. JOHNSON:  Object to the form.
4     Q   Well, you've been through the program.
5     A   From my understanding the clinical
6  definition is I was a conditional alcoholic.
7     Q   And you were that on the day you saw
8  Dees sleeping?
9     A   A conditional alcoholic on the weekends
10 when my wife and I would have altercations.
11    Q   And that alcoholism had led to serious
12 problems with your wife?
13    MR. JOHNSON:  Object to the form.
14    A   No.  It was due to the stress of the
15 move and going through a custody battle with my
16 wife's ex-husband.
17    Q   And if you had been terminated for
18 being positive drug tested for cocaine, what do
19 you think that would have done to your
20 employment career?
21    A   Probably dismantled it.
22    Q   And that would have been a severe
23 emotional as well as financial blow to you,

88

22 (Pages 85 to 88)

## JAMES ALLEN BROOKSHIRE

1  wouldn't it?
2      MR. JOHNSON: Object to the form.
3      A   Yeah, it would have been a trial
4  sometime.
5      Q   You would have had trouble getting a
6  job, wouldn't you?
7      MR. JOHNSON: Object to the form.
8      A   I can't -- I can't say that. I don't
9  know.
10     Q   So you've never been in a position of
11 having been terminated and tried to get a job?
12     A   No.
13     Q   Well, Mr. Dees is now in that position,
14 isn't he?
15     MR. JOHNSON: Object to the form.
16     A   I don't know what he's doing right
17 now. I can't speak for that.
18     Q   Well, you wouldn't want termination to
19 be a black mark on your employment record, would
20 you?
21     MR. JOHNSON: Object to the form.
22     A   I mean, if it's -- if something like
23 that happens, it happens. I mean, I can't...

89

1      Q   Well, do you agree with me that
2  termination is a black mark on your employment
3  record?
4      A   I'm sure it would be a problem.
5      Q   Would you agree with me that
6  termination for drug abuse like cocaine would be
7  a black mark on your employment record?
8      A   Probably would be.
9      Q   And at the time you were caught red
10 handed with cocaine in your system, you were the
11 only eye witness to Mr. Dees sleeping, were you
12 not?
13     MR. JOHNSON: Object to the form.
14     A   I was the person that seen him
15 sleeping. That would be correct.
16     Q   And you had signed two statements to
17 that effect, hadn't you?
18     A   Correct.
19     Q   And in this document we're looking at,
20 Bates number 228, signed by you, Wendy Warner,
21 and Mr. Clevenger, it says -- in the last
22 sentence it says this Letter of Conditional
23 Employment will remain in your file for a period

90

1  of 24 months. You see that?
2      A   Yes.
3      Q   So you are a conditional employee,
4  aren't you?
5      A   (Witness nods head.)
6      Q   Is that correct?
7      A   That would be correct.
8      Q   All right. So basically you're on
9  probation today, aren't you?
10     A   Correct.
11     Q   With Hyundai; is that correct?
12     A   Correct.
13     Q   And you know that the slightest
14 misbehavior on your part is going to result in
15 immediate termination, don't you?
16     MR. JOHNSON: Object to the form.
17     A   That's my understanding.
18     Q   And Mr. Clevenger and Wendy Warner, as
19 well as the other Hyundai officials, they've
20 basically got life and death authority over your
21 job right now, don't they?
22     MR. JOHNSON: Object to the form.
23     A   I don't know about they have sole

91

1  control or life or death. That falls in my
2  lap. That's my responsibility to control my
3  destiny through this issue.
4      Q   So you're going to be on conditional
5  employment for two years?
6      A   Correct.
7      Q   So your conditional employment is going
8  to end when?
9      A   Probably as of the date that I signed
10 on here, two years after that, '09.
11     Q   April '09?
12     A   April '09.
13     Q   When is the last time you had used
14 cocaine before you got caught at the Hyundai
15 plant?
16     A   I don't know. I was probably around 25
17 or 26. Somewhere right around there. I can't
18 recall exactly. That was ten years ago, eight
19 years ago.
20     Q   Were you addicted to it?
21     A   No. I was more or less experimenting.
22 Experimenting. Kind of a recreational --
23 recreational-type thing. You're around some

92

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969

## JAMES ALLEN BROOKSHIRE

1  people that were doing some of that stuff
2  sometimes, so it's kind of a stupid thing of
3  peer pressure, just fitting in, not making a
4  sound judgment on it at that time.
5      Q   Are you in charge of enforcing the drug
6  and alcohol abuse policy at the Hyundai plant in
7  your job as Stamping manager?
8      A   As far as enforcing the policy, if I
9  have an employee that I suspect that is doing
10  something like that or acting out in some way,
11  shape, or form, they are sent to Medical and
12  then dealt with through a process.  As far as me
13  following through and dictating all that, that's
14  not my scope.
15      Q   When's the last time you've been
16  randomly drug tested?
17      A   I think the Wednesday or Thursday right
18  before Thanksgiving week.
19      Q   Two weeks ago?
20      A   Yeah.
21      Q   What did it show?
22      A   Negative.
23      Q   Who gets the results of that?
                                                93

1      A   My understanding -- from what I
2  understand, Medical people give the results to,
3  I believe, HR, I believe.
4      Q   I want to take a break.
5      MR. KILBORN:  Matt, I'd like to get his
6  entire file regarding this cocaine incident.
7      MR. SMITH:  Make a request.
8      MR. KILBORN:  Well, I think it's
9  covered by our current discovery.  It should
10  have been in his personnel file.
11      MR. SMITH:  It's at ICM.  It's
12  maintained in separate files.
13      MR. JOHNSON:  The current request
14  that's outstanding that we responded to has to
15  do with the personnel file.  This is a
16  completely separate medical file that contains
17  medical information, private health information
18  that employers, as I understand it, must keep
19  separately from general everyday personnel
20  info.
21      MR. KILBORN:  I know.  Well, we do have
22  a protective order.  I do think it's covered by
23  our request.  I do think it's relevant
                                                94

1  information.  And I note that a document related
2  to it was in his file that was produced, which
3  is Bates number 282.  And I'd like for y'all to
4  produce that today so I can ask him questions
5  about it.
6      And I would also point out that cocaine
7  usage is a serious problem.  Cocaine usage can
8  affect one's ability to recollect, one's
9  observation capabilities.  There are long-term
10  effects, which I think could bear on his
11  credibility.
12      MR. JOHNSON:  If we can just take a
13  quick break.  Let me and Chris go discuss that
14  issue, and then we'll get back with you.
15
16      (Whereupon, a brief recess was had in
17  the proceeding.)
18
19      MR. KILBORN:  I have requested prior to
20  the break the files on the Hyundai substance
21  abuse program treatment that the witness has
22  testified about as being relevant to credibility
23  issues clearly since he's the only eye witness
                                                95

1  in the case and the presence of cocaine in his
2  system was a short time after this incident took
3  place.  As I understand, counsel has refused to
4  produce that on the grounds that, one, it hasn't
5  been requested and, two, that it's in the
6  possession of some other company called ICM.
7  And my position on the latter would be that it's
8  within Hyundai's possession, custody, or
9  control.  Control being the operative word.  And
10  I'm requesting it now so that I will not have to
11  come back and redepose the witness on the
12  subject matter of that since he's such a
13  critical witness in the case.
14      MR. JOHNSON:  Is that -- are you --
15  have you stated your case?
16      MR. KILBORN:  Yes.
17      MR. JOHNSON:  And just for the Record,
18  again, as Mr. Kilborn has stated, medical
19  records or anything related to the personal
20  health information of Mr. Brookshire or any
21  other witness in the case has not been requested
22  and as such has not been identified or produced
23  in discovery in this case.  To the extent a
                                                96

                                24  (Pages 93 to 96)

### JAMES ALLEN BROOKSHIRE

1  request is made, it will be addressed
2  appropriately and in a timely fashion. We do
3  not have that information here today in part
4  because it wasn't requested and as such we are
5  not in a position to produce it today.
6        Secondly, and perhaps of equal
7  practical importance, it is our understanding
8  that the Medical Department information is kept
9  on an outsource basis by a third-party and those
10 documents would not be available on site at HMMA
11 today. It may be possible to get them if they
12 had been timely and appropriately requested, but
13 it's our understanding that is likely not the
14 case.
15       MR. KILBORN: Will you state on the
16 Record whether or not Hyundai does have control
17 of those documents such that if they requested
18 them they could get them?
19       MR. JOHNSON: Had they been timely
20 requested, we could have gotten them and
21 responded appropriately.
22       MR. KILBORN: Well, I'm going to
23 continue.

97

1        (Whereupon, Plaintiff's Exhibit
2  Number 16 was marked for identification
3  and copy of same is attached hereto.)
4
5
6  BY MR. KILBORN:
7     Q   Mr. Brookshire, let me give you a copy
8  of a document marked Plaintiff's Exhibit 16 and
9  ask you if you would look at the front and back
10 of that and tell me if you recognize either the
11 front or the back.
12    A   (Witness reviews document.) I've never
13 seen this document.
14    Q   Do you know who drew the sketch on the
15 back?
16    A   No.
17    Q   Do you know what that's a sketch of?
18    A   It's the control cabinet upstairs.
19    Q   Is it accurate?
20    A   Is this sketch saying that the doors
21 were open or the doors were closed?
22    Q   All I know is that I was given that
23 sketch, so I can't answer your question. My

98

1  question is if that appears to be a sketch of
2  this control panel is an accurate sketch?
3     A   I can't remember if it's got three or
4  four doors, but I believe it's got three and
5  then it's got the sheet metal platform below it.
6     Q   So your testimony is it's accurate?
7     A   (Witness nods head.) Yeah.
8     Q   Is that a yes?
9     A   Yes.
10    Q   Do you see a chair in the sketch?
11    A   Yes, I do.
12    Q   Was that chair there on the night of
13 the incident in question?
14    A   Yeah, the chair was about where it was
15 up against the middle of the cabinet.
16    Q   The middle door?
17    A   The middle door.
18    Q   Mr. Dees was sitting in that chair?
19    A   Yes.
20    Q   And what is this -- appears to be some
21 type of object here and it's facing -- the
22 control panel would be on the left of the
23 sketch, bottom left?

99

1     A   I don't recall that object being
2  there. I remember the chair being back up
3  against the cabinet, the middle door, facing
4  forward.
5     Q   Was the back of the chair touching the
6  middle door?
7     A   I couldn't tell you exactly if it was
8  touching the door or not. I know it was close
9  to back up towards the middle of the door -- or
10 middle door.
11    Q   How far in your judgment?
12    A   It was pretty close to the door.
13    Q   Inches?
14    A   Probably four inches or less.
15    Q   And was the chair in the position
16 indicated on the drawing that Mr. Dees was
17 sitting in?
18    A   The position I can recall was the chair
19 was facing parallel going off the platform which
20 it's sitting on, not angled, parallel in the
21 direction of the platform up towards the middle
22 door.
23    Q   So the chair was sitting square on --

100

25 (Pages 97 to 100)

### JAMES ALLEN BROOKSHIRE

1  up against or close to the middle door facing
2  directly toward you?
3      A   Correct.
4      Q   All right. And that's as opposed to
5  being at the angle it appears in the sketch?
6      A   Correct.
7      Q   And you did not see some object that
8  appears at the lower left of that sketch?
9      A   I don't recall any object being there.
10 There could have been a wire spool or something
11 off maybe close to the cabinet or off to the
12 side but I didn't see that.
13     Q   You did not see a wire spool?
14     A   If that's what that drawing is supposed
15 to be, I didn't see that.
16     Q   How about taking your pen there and
17 drawing a circle around what appears to be a
18 wire spool?
19     A   (Witness complied.)
20     Q   And draw a little line around there and
21 just put a line to your initials and today's
22 date so we'll know that's you today instead of
23 at the time it was drawn.

101

1      A   (Witness complied.)
2      Q   And that object you do not recall
3  seeing was there?
4      A   No, sir.
5      Q   All right. Would your testimony be
6  that it was not there?
7      A   It was not there.
8      Q   Okay. Do you know who drew the sketch
9  that shows it there?
10     A   No idea.
11     Q   What would a wire spool be doing there?
12     A   Maybe if they had made some engineering
13 changes or some wiring changes inside this
14 cabinet and they had a wire spool there to run
15 input bits or something. I don't know.
16     Q   There would be no other purpose for a
17 wire spool to be there?
18     A   (Witness shakes head.)
19     Q   You have to say yes or no.
20     A   No.
21     Q   What was the chair doing there?
22     A   That's a good question.
23     Q   Where did the chair come from?

102

1      A   What I can tell what the chair looked
2  like it's an office chair. It came from the
3  office.
4      Q   Was that the first time you'd ever seen
5  that chair?
6      A   I don't recall seeing -- I've seen
7  ladders. I've seen ladders there, but I don't
8  recall seeing that specific chair sitting there
9  right there in front of the door.
10     Q   So that would have been an unauthorized
11 chair?
12     A   Yeah, because the office chairs are not
13 supposed to leave the office.
14     Q   All right.
15     A   Unless they have assigned chairs in
16 break areas or conference rooms or something
17 like that.
18     Q   Had that chair ever been there before?
19     A   Not that I can recall. Like I said,
20 all I've ever seen there has been a ladder.
21     Q   And immediately after the incident
22 where you saw Mr. Dees in the chair asleep was
23 the chair removed?

103

1      A   After the fact? After time passed?
2      Q   Right.
3      A   Yeah.
4      Q   Who removed it?
5      A   I'm not sure. I don't know who removed
6  it.
7      Q   That would have taken place February
8  14, 2007. How long after that approximately
9  would it have been removed?
10     A   I can't recall that, sir. I mean, I
11 didn't remove the chair. I didn't tell my
12 people to remove the chair. So I can't account
13 for who removed the chair and when it actually
14 was removed. I don't know.
15     Q   So the chair was an unauthorized piece
16 of equipment?
17     A   Yeah.
18     Q   And is your job -- part of your job to
19 remove unauthorized equipment from the plant?
20     A   I've never -- I've never been in charge
21 of removing -- we make notes of stuff like that,
22 or I've had chairs in -- office chairs come out
23 in other break areas where we -- out of break

104

26 (Pages 101 to 104)

## JAMES ALLEN BROOKSHIRE

1   areas and in places where they shouldn't be.
2   And presuming that we have heard some other
3   people had been sleeping, we removed those
4   chairs immediately.  I know there have been some
5   chairs located in other areas and we've removed
6   and disposed of the chairs.
7      Q   So are you telling me that it was
8   fairly common to find employees sitting in
9   chairs sleeping?
10        MR. JOHNSON:  Object to the form.
11     A   No, that wasn't common, but we had
12  found some chairs that we had presumed that
13  people were using for that purpose and we
14  disposed of the chair.
15     Q   To sleep in a chair?
16     A   I'm guessing or having a break in the
17  chair off somewhere where it wasn't supposed to
18  be outside of a standard break area.
19     Q   Were there two chairs on that level?
20     A   I can't recall.  This whole platform up
21  here is a mesh platform.  And if you had set the
22  chair anywhere outside of here, your legs would
23  go through the platform.
                                                    105

1      Q   So you have no information about
2   another chair on that level?
3      A   No.  I know there was plywood --
4   there's a piece of plywood up on that mezzanine
5   and I remember there was a ladder but that was
6   on the opposite side.
7      Q   Was there a chair on the plywood?
8      A   I can't recall, because at the time,
9   our senior director of Engineering Maintenance
10  done a great job.  He actually got that stuff
11  cleaned up up there.  But I can't recall.  I
12  remember there was a ladder there because
13  sometime when they've got to work on those
14  trolleys they've got to pull a ladder out and
15  they can't put a ladder on that wire mesh
16  because it will wobble.  So they've got to move
17  that piece of plywood around if they've got to
18  work on a trolley.  But another chair...
19     Q   Looking at Plaintiff's Exhibit 16, the
20  reverse side, the sketch, and looking directly
21  at the control panel, you see three doors, do
22  you not?
23     A   Correct.
                                                    106

1      Q   And those are the same three doors you
2   saw; correct?
3      A   Yeah.
4      Q   And the door on the left of the
5   drawing, which side of that door looking at the
6   drawing, left or right, is it hinged in the
7   drawing?
8      A   Looking at the drawing?
9      Q   Right.
10     A   Going by this drawing, I would say it's
11  hinged on the right side looking at the left
12  door.
13     Q   All right.  Draw an arrow down there
14  and put the word hinged and today's date and
15  your initials.
16     A   (Witness complied.)
17     Q   Now, and looking at the drawing on
18  the -- regarding the door on the right side of
19  the drawing looking directly at it, which side
20  of that door on the right is that door hinged in
21  the drawing?
22     A   Looking at the right door, it's hinged
23  on the left-hand side.
                                                    107

1      Q   Go ahead and write hinged.
2      A   (Witness complied.)
3      Q   And the door in the middle is hinged on
4   its left or right side looking at the drawing?
5      A   Looking at the drawing the handle is on
6   the left-hand side of the door, so it would have
7   to be hinged on the right.
8      Q   Okay.  Now, I've heard that somehow or
9   another Mr. Dees had used the doors to provide a
10  hiding place.  Is that your recollection?
11     A   My recollection at the time of this
12  incident the doors may have been cracked open
13  because sometimes Maintenance doesn't completely
14  shut the doors so they can easily access the
15  panel.  But my recollection was the doors were
16  mostly shut.  I can't account if they were
17  exactly locked shut but they were mostly shut.
18  As far as him using that routinely and opening
19  the doors to hide, I don't know.
20     Q   You didn't see door panels -- excuse
21  me -- you didn't see doors open to the extent
22  that you thought they were being used by
23  Mr. Dees as a blind to hide behind?
                                                    108

                          27 (Pages 105 to 108)

### JAMES ALLEN BROOKSHIRE

1   MR. JOHNSON: Object to the form.
2   A   What I can tell you is the day of the
3   incident that I seen him I can't tell you
4   whether the doors were completely locked or not,
5   but they weren't wide open.
6   **Q   Well, in your opinion, since you were**
7   **the only one there besides Mr. Dees, were the**
8   **doors positioned so they made a blind to assist**
9   **in hiding?**
10  MR. JOHNSON: Object to the form.
11  A   I can't really see how opening these
12  doors hides him from anything.
13  **Q   I can't either, but that's not my**
14  **question.**
15  A   This is the third floor, and when
16  you're down here, this door is going to hide you
17  from a crane coming at you and that door hides
18  you from an elevator. So there's really...
19  **Q   So if you wanted to hide, you wouldn't**
20  **open the door panels looking at this drawing on**
21  **the left or right because the visibility would**
22  **be --**
23  A   Down below.
                                                    109

1   **Q   -- down below --**
2   A   Correct.
3   **Q   -- looking up and there's no door panel**
4   **to hide you there?**
5   MR. JOHNSON: Object to the form.
6   A   You're hidden by this floor plate. You
7   can't see through it because it's not mesh.
8   **Q   Does it appear to you in that sketch on**
9   **the reverse of Exhibit 16 that one has drawn the**
10  **left and right doors to make it appear they were**
11  **open to the extent that maybe they would provide**
12  **some cover or a blind of some type?**
13  MR. JOHNSON: Object to the form.
14  A   To me, it just looks like somebody has
15  drawn an electrical cabinet with the doors open
16  with a chair in it, and that to me doesn't -- to
17  me, I mean, they could have been looking at a
18  problem in either cabinet and left the door open
19  for all I know. I mean, I -- as far as somebody
20  setting something up like that, I don't know.
21  **Q   So is it your testimony that -- is it**
22  **your testimony that two of the doors on the**
23  **control panel were opened and used as a blind to**
                                                    110

1   hide Mr. Dees while he was sleeping?
2   A   It's not my testimony. I mean, what I
3   can tell you I can account for is how I
4   recollect the chair being positioned and how I
5   remember the doors being.
6   **Q   And you were the only one there besides**
7   **Mr. Dees?**
8   A   Correct.
9   **Q   Do you know where Hyundai got**
10  **information that two doors on the control panel**
11  **were used as a blind to hide Mr. Dees?**
12  A   No.
13  **Q   And, in fact, as you told me, if you**
14  **had opened the control panel doors to use them**
15  **as a blind on the left and right doors looking**
16  **at the drawing, it wouldn't be hiding you from**
17  **visibility anyway because the visibility is from**
18  **the front not the side?**
19  A   Visibility is from the bottom.
20  **Q   As a matter of fact, if you're standing**
21  **over here on the right of the drawing, you're**
22  **going to fall off into an abyss because there's**
23  **nothing there, is there?**
                                                    111

1   A   There's a little bit of an entranceway
2   and then right here is an elevator that brings
3   the trolleys up.
4   **Q   That elevator is just an open area,**
5   **isn't it?**
6   A   Right.
7   **Q   Maybe, what, 15 by 15?**
8   A   Probably.
9   **Q   So if somebody was standing there**
10  **they'd be talking to St. Peter?**
11  A   Yeah, they'd fly off.
12  **Q   So if Mr. Dees was trying to make a**
13  **blind out of the control panel doors, he would**
14  **have had to somehow or another taken the door**
15  **off and stuck it in front of him, wouldn't he?**
16  MR. JOHNSON: Object to the form.
17  A   To me, it's the approach of it. I
18  mean, you access it -- like if you -- this
19  walkway, there's a walkway or trolley
20  entranceway that comes down here. If you were
21  over here, like if you accessed and came up to
22  this elevator and came up over here and you were
23  right here and that door was open, that would
                                                    112

28 (Pages 109 to 112)

JAMES ALLEN BROOKSHIRE

1 conceal him from there. But if you came around
2 the front, then you would see him. Back over
3 here, there's nothing here, and then you access
4 from the front or the bottom. But the bottom is
5 hidden by the floor plate.
6    Q   You came up directly -- you would have
7 been facing Dees, correct, and facing the
8 control panel?
9    A   Correct. I was off -- maybe like if it
10 was here, I was a little off coming in at this
11 angle.
12    Q   So when you came up, you could clearly
13 see him?
14    A   Yeah.
15    Q   He wasn't behind a blind or anything?
16    A   No.
17    Q   And I know there are quite a bit of
18 scuff marks on that plate in front of the
19 control panel. What causes that?
20    A   Scuff marks on the plate?
21    Q   Scuff marks, yeah.
22    A   I don't know. I mean, depends on what
23 the Maintenance guys do over there. Like I
113

1 the panels because that's the easiest way to
2 look for splits and wrinkles is from the
3 backside of the panel. I had an LED flashlight
4 with me shining through there checking the
5 panels. I had a flashlight in one hand and a
6 stone in the other. And then I put the stone
7 away because I was going over there to check --
8 check -- because we were running them on the
9 press at the time, so they were coming in on the
10 entry lane over here.
11    Q   That would be on the left side of the
12 drawing look at it?
13    A   Yes. And I came and I -- and that's
14 the first lane. And that would be the first
15 lane.
16    Q   So you're writing the words first lane
17 on there?
18    A   Yeah.
19    Q   Make sure you put a date by anything
20 you write on there.
21    A   Okay. And you've got two lanes.
22 You've got an entry lane that comes in here and
23 then a -- where the trolleys are coming down
115

1 said, I've seen ladders over there. I have no
2 idea. Multiple things cause scuff marks. I
3 mean, down on our other floor, we've got scuff
4 marks on our platforms from laying scrap panels
5 down. Every time you lay those panels down it
6 chips the paint and flakes the paint.
7    Q   And describe for me your actions in
8 coming up to the third floor where Mr. Dees was,
9 or the third level -- you call it a level or a
10 floor?
11    A   Third floor, third level.
12    Q   Describe what happened as you came up
13 there.
14    A   I was coming up the third floor, like I
15 said earlier, to check on some CM side outer
16 right-hand panels for splits and waves. I come
17 in through the entranceway there at the stairway
18 and came over between the panels to the row 6
19 and row 7 because that's their storage lane for
20 those panels. And I wanted to check the panels
21 that we had in there to see if we had good
22 panels to get to our customer. And I was coming
23 between the lanes to look at the backsides of
114

1 this lane, and then you've got a return lane
2 where empty trolleys are going down to this
3 elevator that goes to the presses. And that
4 circles back around actually above this area
5 here. And I was coming in here at the sixth
6 lane if you're looking at it from this way --
7 the sixth lane and the seventh lane.
8    Q   And you're putting the letters sixth
9 and seventh there?
10    A   Yeah.
11    Q   Go ahead and put your initials and date
12 there.
13    A   And I was coming down in between these
14 lanes with the flashlight checking these
15 panels. I come to the end, and it's kind of
16 hard. You've got to flip this around. But
17 there's two -- two lanes. You've got your lane
18 going around from the reworks station coming up
19 from the elevator. It comes up and comes across
20 right in front of here. And then you have the
21 other lane that comes off 6 and 7 to go to the
22 drop down station for the elevator in the
23 opposite direction. So I was wanting to check
116

29  (Pages 113 to 116)

## JAMES ALLEN BROOKSHIRE

```
 1   panels and make sure we had good panels going to
 2   the customer.  And then that's when I had to
 3   come to a stop because we had panels making lane
 4   changes and that's when I looked over there and
 5   seen Leon over there.  And I was probably 30
 6   feet right there at the end, because it's
 7   probably from -- towards the end of the lane
 8   right here to there it's about 30 feet, 25 to 30
 9   feet.  Somewhere around in there.  And then this
10   went by and I had to wait for the other lane to
11   go by.  And then I crossed through and went
12   here, and that's probably 15 to 20 feet.  Right
13   in there in the middle I squelched my radio.  I
14   turned my radio up to squelch it.  Because I had
15   called the guys down on the floor to let them
16   know what I had seen as far as quality issues.
17   Then I was crossing across to go here.  And then
18   I seen Leon and I squelched my radio.  Kind of
19   like, hey, here's the alarm clock, wake up, wake
20   up.  So I was hurrying.  Once the panels came
21   through, I went over here to check the first
22   trolleys that were coming through.  We'd just
23   run them off the press and they'd just came up.
                                              117
```

```
 1   told his Team Leader what I saw.
 2       Q   Well, when you saw him last up there on
 3   the third level, he was looking sleepy and
 4   groggy?
 5       A   He had the look of somebody just seen
 6   him doing something he wasn't supposed to be
 7   doing.  To me, he appeared to be fishing for
 8   something to do, the reason why he was up
 9   there.  Because normally we don't go up to the
10   third level unless there's a problem.
11       Q   So he was --
12       A   Normally nobody is up there unless we
13   had a problem.  We didn't have a trolly problem
14   because we were running fine.  We were just
15   waiting on the panels to make it to the Weld
16   Shop.  We was running them off the press.
17       Q   So Mr. Dees was basically creating a
18   ruse acting like he was doing something when he
19   really wasn't?
20       MR. JOHNSON:  Object to the form.
21       A   What it appeared to be to me was he had
22   came out of a stance off that chair having a
23   surprised look on his face that I was up there.
                                              119
```

```
 1   I was circling around going through here waiting
 2   for those to come by and I was going to this
 3   first -- I think there was probably five -- five
 4   right in here.  And then I was checking the
 5   quality on them, going around the backside of
 6   the panel and checking the quality.
 7       After that that's when I noticed he had
 8   gotten up out of his chair and grabbed what they
 9   call -- we call them fishing poles, but they're
10   actually brake release poles.  They use them on
11   the trolleys.  We've got a mechanical brake on
12   there that actually releases the trolleys so
13   Maintenance can move the trolley out of
14   position.  And I had seen him grab that brake
15   pole.  He like jumped up out of the chair and he
16   grabbed the brake pole, and I'm wondering why he
17   grabbed the brake pole because we weren't having
18   any problems.  All the trolleys were moving at
19   the time.  And then after point after I made
20   that, I went back by and he was over here just
21   walking around looking at trolleys when I walked
22   back by and went back down the stairs.  And then
23   within that next half an hour, that's when I
                                              118
```

```
 1       Q   And you say surprised look on his face?
 2       A   Kind of like where did I come from kind
 3   of a look.
 4       Q   And the first time you saw Mr. Dees
 5   sitting in the chair how many feet away were
 6   you?
 7       A   25.  20, 30.  Somewhere right around in
 8   there.
 9       Q   How close did you get to him?
10       A   Probably around 15 to 20.  Because
11   you've got the two lanes that run through here,
12   the return lane from rework and then the feed
13   lane.  And I went in between those lanes.
14       Q   And you say when you -- what did you
15   say you did with your radio?
16       A   Squelched it.
17       Q   Squelched your radio.  What did he do?
18       A   He didn't do anything.
19       Q   Nothing?
20       A   (Witness shakes head.)
21       Q   And what's the next thing you saw him
22   do?
23       A   That's when -- like I said, I went
                                              120
```

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

### JAMES ALLEN BROOKSHIRE

1  through there and squelched my radio. And I was
2  on my mission to get these panels to the Weld
3  Shop, because our priority is to make sure the
4  Weld Shop doesn't run out of parts, don't shut
5  the Weld Shop down. So we're going through
6  here, cutting through here -- well, not we're --
7  I'm cutting through here, and I just squelched
8  my radio. And I'm over here getting ready to
9  check these panels and make sure they're okay.
10  I go over here and flashlight them from the
11  front side and then go to the backside. And
12  when I go to the backside obviously the door
13  openings are there, and that's when I realized
14  he -- he was like up out of the chair grabbing
15  one of the fishing poles.
16  **Q    Well, did he like jump out of the**
17  **chair?**
18  A    He was already up out of the chair just
19  moving around. He had one of the poles in his
20  hand.
21  **Q    Where had he gotten the pole from?**
22  A    Normally the Maintenance guys will
23  leave them like laying with the -- there's like
                                                        121

1  a fence over here. They'll leave them laying on
2  the floor up against the fence or leave them on
3  this side laying up against the fence like on
4  the mesh floor leaning up against the guardrail.
5  **Q    So was he looking real guilty, wasn't**
6  **he?**
7      MR. JOHNSON: Object to the form.
8  A    I can't say a person is guilty. I can
9  just say that the person -- that Mr. Dees
10  appeared to me that he had this surprised look
11  on his face, where did I come from.
12  **Q    And you knew Mr. Dees, didn't you?**
13  A    Yeah, I knew Mr. Dees.
14  **Q    So you would know what a surprised look**
15  **on his face was; right?**
16      MR. JOHNSON: Object to the form.
17  A    How personal are you saying I knew
18  him? Because I talked to him as a person. But
19  as an expert knowing all of his integral aspects
20  of his life, I don't know that. But I can tell
21  when somebody kind of gives a look like where
22  did you come from or what are you doing here
23  kind of look.
                                                        122

1  **Q    That's the kind of look you saw?**
2  A    Yeah. Kind of (indicating).
3  **Q    And when you first saw him, he was dead**
4  **asleep, wasn't he?**
5      MR. JOHNSON: Object to the form.
6  A    The position I seen him in, he appeared
7  to be asleep just like I made in my statement
8  with his hat on and the way his legs were
9  extended and the posture that he exhibited in
10  the chair.
11  **Q    Did you see his eyes?**
12  A    No, I didn't see his eyes.
13  **Q    Were his eyes opened or closed?**
14  A    I can't honestly tell you that because
15  he had a hat on, because we've got to wear a
16  bump cap. And he had the hat on. He was
17  positioned like this (indicating).
18  **Q    And he was sitting in the chair?**
19  A    Yes.
20  **Q    And when you made your radio make that**
21  **chirping sound, he didn't move?**
22  A    I didn't see him move.
23  **Q    Okay. Well, he didn't move as far as**
                                                        123

1  you know?
2  A    Right.
3  **Q    So that didn't wake him up, the**
4  **chirping sound?**
5  A    (No response.)
6  **Q    Excuse me?**
7  A    At that point I guess it didn't because
8  he didn't move when I squelched my radio. Like
9  I said, I walked by and I squelched the radio.
10  And if anybody's ever been up there, you can
11  feel vibrations in that platform when you're
12  walking. I don't know if the vibrations
13  actually got him or what happened, but I know I
14  squelched my radio, no movement, and I was on my
15  way to go check the panels. I did not stay
16  there and stare at him to see if he got up after
17  I squelched the radio.
18  **Q    Why didn't you go over there and say,**
19  **hey, Leon, wake up?**
20  A    Because at the time I thought the
21  squelching of the radio and me walking across
22  the platform would get him up. And I was, like
23  I said, on my way to check the panels and make
                                                        124

31 (Pages 121 to 124)

## JAMES ALLEN BROOKSHIRE

1  sure that they were on the way to the Body Shop
2  and make sure we were making good quality panels
3  to go to the Body Shop.
4      Q   Well, you knew that chirping the radio
5  hadn't woken him up, didn't you?
6          MR. JOHNSON:  Object to the form.
7      A   I'm not for sure.
8      Q   Well, you didn't see any activity?
9      A   I knew it chirped and I didn't stand
10  there and stare at him.
11     Q   You did not see him wake up, did you?
12     A   No.
13     Q   All right, sir.  As far as you knew
14  when you walked back off, he was still asleep,
15  wasn't he?
16         MR. JOHNSON:  Object to the form.
17     A   From my recollection you can say that.
18     Q   And he only was awake as far as you
19  knew is when you came back and he was up
20  pretending like he was doing something with the
21  pole?
22     A   He had the pole in his hand.  Correct.
23     Q   Is it noisy up there with the trolleys
                                          125

1  danger, wouldn't it?
2          MR. JOHNSON:  Object to the form.
3      A   It could put him in danger.
4      Q   You left where you saw him sleeping
5  without making sure he was awake or attempting
6  to wake him?
7      A   I did attempt to wake him, and I didn't
8  leave the area.  And you could rest assured if
9  he was still in that chair after I looked at
10  those two racks or two trolleys of panels, I
11  would have went over there and talked to him.
12     Q   But you didn't?
13     A   He was already up.
14     Q   Well, when you found him already up why
15  didn't you go over and say something to him
16  about what you had seen?
17     A   Because I'm not his direct supervisor.
18  That's not for me to address.
19     Q   Well, you were his supervisor on this
20  shift, weren't you?
21     A   No, no.
22     Q   I thought you were substituting for
23  the --
                                          127

1  and everything?
2      A   The trolleys are pretty quiet.  Down
3  towards the presses is where the noise is at.
4      Q   Did you wear earplugs?
5      A   Up on the third floor you don't have to
6  wear them, or the SOP booth.  But down around
7  the press areas, you're supposed to wear
8  earplugs.
9      Q   Did you have earplugs?
10     A   No.  Because at that time hearing
11  protection wasn't mandatory yet.  I believe it
12  was around late spring to early summer is when
13  they -- Safety mandated hearing protection.
14     Q   Did he have earplugs?
15     A   I couldn't vouch for that at that
16  time.  It depends on what type of hearing
17  protection he might have had, it would be hard
18  to tell.  If he had the ones without the cords
19  in it, they could be up in his ears and I
20  wouldn't see them unless I was really close to
21  him.
22     Q   Well, you would agree that sleeping on
23  the job would certainly put Mr. Dees himself in
                                          126

1      A   Assistant manager.  That would be
2  correct.  But Maintenance is not a direct report
3  to me.  Greg Prater is his direct report.
4      Q   But you did not report to Mr. Prater,
5  did you?
6      A   Oh, yeah, I did the next day, along
7  with my senior manager, Craig Stapely.
8      Q   But not then?
9      A   No.  That was one in the morning.  I
10  wasn't going to call Craig -- or Greg and wake
11  him up in the middle of the night.  Now, if
12  Kevin called him maybe he did, but I don't know
13  if Kevin did or not.  But I reported it to Kevin
14  within a half hour.
15     Q   And how long did you observe him
16  sitting in this sleeping position?
17     A   To be honest with you about the time I
18  come out of these two lanes and come through
19  there and squelched my radio, from the time I
20  went through here and cut between those trolleys
21  and made it over there, it couldn't have been
22  probably more than a minute.  A minute to two
23  minutes at the most.
                                          128

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## JAMES ALLEN BROOKSHIRE

1    Q    You observed him sleeping for two
2    minutes?
3        A    Probably around that time frame.
4    Q    Did he have a cell phone in his hand?
5        A    Not that I could see.
6    Q    What time of night was it?
7        A    Probably right around one o'clock.  It
8    was after lunch on second shift.
9    Q    One a.m.?
10        A    Yeah.
11    Q    And you say he had his head down?
12        A    Yeah.
13    Q    Had he made a pillow of some type?
14        A    I didn't see any type of pillow.
15    Q    Was he wearing a jacket?
16        A    I can't recall whether he was or
17    wasn't.
18    Q    Did he have on his sleeves?
19        A    I can't recall whether he did or
20    didn't.  You're supposed to.  I can tell you
21    that.  If he had his jacket on, I would not have
22    been able to tell if he had sleeves on.
23    Q    Had he somehow or another fashioned his
129

1    eating with the guys that went on the second
2    lunch at 12:15.  I usually only take about a 15-
3    to 20-minute lunch.
4    Q    What time did you finish lunch?
5        A    Probably around 12:30, 12:40.  And then
6    I went out to check the press and see if they
7    were getting it started making those parts out,
8    calling the AM down at the Body Shop and let him
9    know we had the job in the press and we were
10    trying to make some side outers.
11    Q    So you have a clear recollection it was
12    after you had finished your lunch around
13    12:30 a.m.?
14        A    Yeah.
15    Q    When I was there yesterday I saw these
16    huge big lights.  Were the lights on?
17        A    They're spotty.  They're energy-saving
18    lights.  So spontaneously some of them will shut
19    off for energy consumption savings.
20    Q    Were the lights on that night?
21        A    Some were.
22    Q    How about the lights around the control
23    panel?
131

1    jacket into some type of pillow?
2        A    Not that I could recall.  I never seen
3    his jacket in any way, shape, or form rolled up
4    around him or anything.
5    Q    What makes you think that the time was
6    around one a.m.?
7        A    It was after lunch.  It was after lunch
8    on night shift.
9    Q    And lunch on night shift is when?
10        A    The way it's broke up is typically
11    between 11:15 and midnight and the other one is
12    from midnight to 12:45.
13    Q    So there are two 45-minute lunch breaks
14    in the middle of the night?
15        A    That's the way we have it for
16    Production.  Maintenance is typically right
17    around 11:30 to 12:15.
18    Q    And your testimony is it was after the
19    lunch break?
20        A    Yeah, it was after everybody had ate.
21    Q    Anything that makes you particularly
22    recollect that?
23        A    I had personally myself just got done
130

1        A    To honestly tell you if those were on
2    at that point right above that panel, I can't
3    tell you that for sure.  I remember what I seen
4    Leon doing.
5    Q    I believe I asked you who drew this
6    sketch on the reverse of Exhibit 16.
7        A    Yeah, you did.
8    Q    And did you tell me?
9        A    I didn't know who drew it.  I don't
10    know.
11    Q    And did you -- I forgot.  I apologize.
12    Is that an accurate sketch of what you saw?
13        A    Yeah, it's pretty accurate other than
14    the fact, you know, to say these doors were
15    parallel to the way the floor is facing, I
16    couldn't tell you that.  But I said I couldn't
17    tell you whether it was actually locked or
18    unlocked.  They might have been cracked open.
19    It's not unusual for those Maintenance guys to
20    leave these doors cracked open or laying open a
21    little bit.
22    Q    Well, the way the sketch is drawn it
23    looks like the doors were positioned to make a
132

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## JAMES ALLEN BROOKSHIRE

1   blind, and you said that wasn't the case?
2       MR. JOHNSON: Object to the form.
3     A   What I can recall, I can't tell you
4   whether they were open. I'm positive they
5   weren't open parallel to the floor plate, but
6   they could have been open some.
7     Q   But not to make a blind?
8       MR. JOHNSON: Object to the form.
9     A   As far as somebody intentionally using
10   it for a blind, I don't know.
11     Q   What's your opinion?
12       MR. JOHNSON: Object to the form.
13     A   My opinion is that to me it really
14   doesn't make a difference what you're doing with
15   the doors. I mean, if you're in there working
16   on the equipment, you're in there working on
17   it. But as far as making a blind out of it, it
18   really doesn't make a difference, like I said,
19   unless you're coming back here from this
20   elevator lift station.
21     Q   Did you ever speak to Mr. Dees at all?
22     A   When?
23     Q   During this incident.

              133

1     A   No.
2     Q   It's the second to last paragraph.
3     A   This one right here; right?
4     Q   On 37 it says, last sentence, not long
5   after this, Jim witnessed Leon walking down the
6   stairs. Is that true?
7     A   I'm trying to remember. I was hurrying
8   back downstairs. Probably in the time frame
9   which I talked to Kevin when I was talking to
10   Kevin, he came down, because down there in
11   the -- on the second floor, we have the rework
12   station, and I was down there with those guys
13   checking through panels and trying to sort out
14   the bad ones from the good ones to supply the
15   Body Shop because the entryway to the Body Shop
16   is right there on the second floor. And from
17   what I can recall, we were out there sorting
18   panels. And to say he was walking down
19   immediately after I seen him, I can't say that,
20   but I can recall that he came down at a later
21   time frame. But to say that he done it right
22   after I seen him, I can't recall that.
23     Q   Well, let me just read what it says.

              135

1     A   Later on that evening. I didn't see
2   him much the rest of the evening after I ran
3   into him upstairs and went downstairs because --
4   trying to get that side outer to run. I believe
5   also that night we had some palletizing problems
6   on the other press as well. As far as being
7   there and being focused around Leon and talking
8   to him in particular, no, I didn't. Like I
9   said, he's not a direct report to me, so...
10     Q   And did you see him walking down the
11   stairs after you saw him sleeping?
12     A   I didn't -- I didn't pay attention. I
13   seen he was up and he was moving around. I was
14   heading back downstairs to make sure the press
15   was running.
16     Q   Well, I notice in your written
17   statement there, Exhibit 13, Bates number 37
18   says not long after this, Jim witnessed Leon
19   walking down the stairs. Is that true?
20     A   Which one was it?
21     Q   Second to last paragraph, number 37.
22     A   (Witness reviews document.)
23     Q   See where I'm talking about?

              134

1   It just says not long after this, Jim witnessed
2   Leon walking down the stairs. My question is,
3   is that a true statement?
4     A   Yeah, that's a true statement. But,
5   like I said, if you are saying immediately, I
6   can't say he came down immediately, but he came
7   down before I talked to Kevin.
8     Q   Did you say anything to him?
9     A   To Leon or Kevin?
10     Q   Leon.
11     A   I didn't say anything to Leon. I just
12   said he's not a direct report to me, so it's
13   not...
14     Q   Did Kevin say anything to him to your
15   knowledge?
16     A   To my knowledge, no. I don't know.
17     Q   And was that the last you had to do
18   with this sleeping incident other than the
19   signing of the two statements that we've seen?
20     A   Yeah.
21     Q   Did you attend any disciplinary
22   hearings?
23     A   No.

              136

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

### JAMES ALLEN BROOKSHIRE

1    Q   Did you give any further statements or
2  interviews?
3    A   No.
4    Q   Did anyone, other than after this
5  lawsuit was filed, ever interview you or talk to
6  you about what you saw?
7    A   I had one of the Korean -- Korean
8  Maintenance manager he asked me, you know, what
9  I had seen, and I told him what I seen. As far
10  as him being involved in the disciplinary
11  process, I don't know if he was or not. But
12  Mr. Mun came and spoke with me about it.
13    Q   And was that shortly after Mr. Dees got
14  terminated or before?
15    A   I believe it was before.
16    Q   I think Mr. Dees was terminated on or
17  about the 26th of February. You think it was
18  before that?
19    A   Yeah, I believe so.
20    Q   Let's maybe relate to that a date you
21  might remember. What was the date of your
22  youngest's birth, the one that's seven months
23  old now you said?

137

1    A   He said he wanted to talk to me in the
2  office, and we went in the conference room and
3  closed the door and he just asked me about it.
4    Q   There in the Stamping Plant?
5    A   Yeah.
6    Q   So there's some type of office there in
7  the plant?
8    A   Yeah. We've got -- in our Stamping
9  Shop we have two conference rooms. And then in
10  the Maintenance office there's one conference
11  room.
12    Q   Was anybody else there when you and
13  Mr. Mun were talking?
14    A   Just me and Mr. Mun.
15    Q   Did you know why he was asking you
16  about it?
17    A   He was just trying to understand what I
18  seen and what I visualized.
19    Q   And what did you tell Mr. Mun?
20    A   I described the same thing to him what
21  I told you, I went up there to check on side
22  outer panels. Then I showed him -- I was in
23  there with him and I showed in the chair the

139

1    A   That was in May.
2    Q   In May. So we can't date that.
3        What was the occasion when Mr. Mun
4  talked to you and asked you about this?
5    A   If the 26th is when he was terminated,
6  it had to be that week of right before when all
7  this -- all the stuff was going on. Like I
8  said, I couldn't honestly tell you when the
9  exact day was that he was terminated because I
10  don't know. And I don't know when all the Team
11  Relations meetings went on with him and stuff
12  with Greg and John and all that. All I can tell
13  you is the stuff I was asked and witnessed.
14    Q   Well, the date of your last statement
15  is February 19, 2007.
16    A   Correct.
17    Q   That's Plaintiff's Exhibit 13. You
18  talked to Mr. Mun after that?
19    A   Yeah.
20    Q   And how did you happen to be talking to
21  him?
22    A   He came up and asked me.
23    Q   All right.

138

1  position I see him in.
2    Q   So you actually took him up to the
3  site?
4    A   No. I just showed him from a chair
5  there in the conference room.
6    Q   Okay. What did Mr. Mun say?
7    A   He just kind of looked at me. His
8  English isn't very well spoken. So he just kind
9  of looked at me and nodded his head, oh, okay.
10    Q   That was it?
11    A   Yeah.
12    Q   All right. Where is Mr. Greg Prater
13  now?
14    A   He had taken a job at some other
15  company up in Tennessee or Kentucky.
16    Q   Do you know why he left?
17    A   From what I understand, he wasn't happy
18  with what he was doing here. He was wanting to
19  pursue another career, something promotional, or
20  get better options. And the other piece was he
21  was wanting to get closer to home. I think he
22  as one or two kids up in Tennessee. That's what
23  it was, Tennessee.

140

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## JAMES ALLEN BROOKSHIRE

1  Q   Had you ever heard any discussions
2  between Mr. Prater and Mr. Dees?
3     A   I only heard one discussion, and that
4  was the day after we had an incident with Leon
5  where that trolley elevator system I was showing
6  you right here -- the lift station -- him and
7  another employee were working on that around
8  lunchtime, either the day before or two days
9  before. And they had just walked off the job
10  and went to lunch without telling anybody. And
11  we were very close to shutting the Body Shop
12  down. Kevin had to hurry up and go find some
13  other Maintenance Team Members to get that
14  system running before we shut the Maintenance
15  shop down. And the next day Kevin had told
16  Greg, and Greg had asked me to come in the
17  office and was asking me about this incident.
18  And he had called me and my senior manager in
19  there, Craig. And he was talking to me about
20  it. Then it wasn't too long after that he
21  called Leon in there and started asking Leon
22  about it. Leon was like I didn't walk off the
23  F'ing job. He goes, I always do my F'ing job.
141

1  be present as he asked Leon those questions
2  because I had been there on night shift. I
3  didn't actually know when Leon had left, but I
4  do know that Kevin had to call other people for
5  backup to get the elevator running or we were
6  going to shut the Body Shop down.
7     Q   How long before you reported Mr. Dees
8  sleeping did this occur?
9     A   This incident here?
10    Q   I'm talking about where he used all the
11  profanity.
12    A   I think in the conference room office
13  it was the day before. The day before this
14  incident happened. Then the issue with the
15  trolley happened that night -- that night
16  before. All within two days.
17    Q   Within two days?
18    A   Yeah, a couple of days.
19    Q   Was Mr. Prater and Mr. Dees on speaking
20  terms?
21    A   I don't know their personal
22  relationship. I mean, he -- obviously Greg
23  was -- Greg was his boss and what I can see I'm
143

1  And then Greg is like did you tell anybody.
2  Leon was like there wasn't an F'ing problem. I
3  mean, it was -- my boss, he's a preacher, and he
4  got up and walked out.
5     Q   What was it, the last thing Mr. Dees
6  said?
7     A   He said something about he don't walk
8  off the F'ing job. He tried calling -- let's
9  see. He said he tried calling Kevin on the
10  radio. I forget what he said. He said he tried
11  calling -- I forgot how he said it. I tried --
12  it had a couple of flavorful words in there, but
13  basically he said he tried getting ahold of
14  Kevin. But without confirmation of getting
15  ahold of Kevin, he still had left with the
16  system down.
17    Q   So this was some incident Mr. Dees had
18  left his work area without permission?
19    A   I would say so. I mean, he said it was
20  his lunchtime and he's entitled to his lunchtime
21  and he's going to take his F'ing lunch. And he
22  said he tried contacting Kevin and that's --
23  that's -- but Greg had asked for me and Craig to
142

1  sure there are assignments and stuff that Leon
2  didn't always agree with that I think Greg asked
3  him to do. But it wasn't nothing out of the
4  ordinary.
5     Q   Greg Prater was called a Team Leader.
6     A   He was assistant manager.
7     Q   Assistant manager. Okay. Was there
8  any kind of disciplinary action about that?
9     A   I couldn't tell you. I don't know.
10  Like I said, Greg dealt with that on his own
11  because Craig and I was always if you got one
12  issue, you need to take it behind closed doors
13  and deal with it. It don't need to involve all
14  of us. That's between Greg and John Applegate
15  and Leon. Like I said, Leon is not a direct
16  report to me or Craig.
17    Q   Did you ever hear any discussion at
18  that plant about Mr. Dees' National Guard duty?
19    A   No. I knew he was in it because him
20  and I had talked personally and I knew he was
21  still in the Reserves, still had duty.
22    Q   Since he was not basically -- you were
23  not his direct report how did y'all get in that
144

## JAMES ALLEN BROOKSHIRE

1  conversation?
2      A   Just being around him on the floor. I
3  mean, he's out there with the rest of the guys
4  on the floor. I mean, I always try to make sure
5  I have a working relationship with people, and,
6  you know, even though I didn't have direct
7  reports of Maintenance, I'd still try to help
8  them get parts and help them get stuff. Because
9  the bottom line, their performance affects our
10 productivity.
11     Q   What did Mr. Dees tell you about his
12 National Guard?
13     A   He just told me he was in -- my
14 understanding he was in the Reserves and we
15 talked a little bit about his military
16 background, some time he spent in Korea. And he
17 said he still actively does some stuff for the
18 military and has some weekend duties
19 sometimes. I didn't know when he went, but I
20 knew he was still involved with it.
21     Q   All right. Any other discussion
22 between you and Mr. Dees?
23     A   I mean, just personable stuff, talking

145

1  about military or talking about press problems
2  or stuff like that.
3      Q   Tell me, other than the two lawyers
4  here today and Mr. Hughes who you've told me
5  about, that you've discussed this sleeping
6  incident with.
7      A   Mr. Hughes. And I'm sorry. I
8  discussed it with my senior manager, Craig
9  Stapely.
10     Q   Craig Stapely?
11     A   And discussed it with Mr. Mun and
12 discussed it with Greg Prater and John
13 Applegate.
14     Q   When is the last time you talked to
15 Greg Prater?
16     A   It's been when he left. Whenever he
17 left. The last day that he was leaving.
18     Q   So you talked to him the last day he
19 was leaving?
20     A   The last day he left. You know, the
21 day before and the last day, just kind of
22 shaking his hand and wishing him good look on
23 his new assignment.

146

1      Q   No discussion about Mr. Dees?
2      A   No.
3      Q   No discussion about you?
4      A   (Witness shakes head.)
5      Q   No?
6      A   No.
7      Q   Did he know you were in the substance
8  abuse program at Hyundai?
9      A   Greg Prater?
10     Q   Right.
11     A   No.
12     Q   I want to show you a collection of
13 documents we've previously marked as Plaintiff's
14 Exhibit 9. And there's a Bates number 39. I
15 want you to refer to this if you would. That's
16 an e-mail transmission dated -- from Greg Prater
17 dated February 8, 2007, and it refers to an
18 original message from William Ware to
19 Mr. Clevenger, copies to Greg Prater. It says,
20 Rob, Greg P. and I met with all the TMs in
21 question about Leon leaving to go to lunch while
22 the lift was down. We came to the consensus
23 that a Discussion Planner is needed for the TMs

147

1  who left to go to lunch while the lift was down;
2  Shane, Drake, and Leon. The TMs performing the
3  repair should have waited until help arrived to
4  take over the repair. The TL and Leon are not
5  on speaking terms and it appears that he blew
6  the incident out of proportion and he only
7  singled Leon out but for no apparent reason.
8  Proper communication and task transfer will be
9  the topic of the Discussion Planner. If
10 necessary, I can type up all the notes in the
11 report, but I didn't think it was necessary if
12 Greg and I both agree on the resolution. Let me
13 know if I need to. Is that the incident you're
14 talking about?
15     A   Yeah.
16     Q   Now, I don't see any --
17     A   I remember Shane being with Leon, too,
18 but I don't remember Drake. But I remember Leon
19 and Shane.
20     Q   You testified earlier that Mr. Dees had
21 used quite a bit of profanity. You kept using
22 the words F'ing. Meaning F-U-C-K-I-N-G; right?
23     A   Yeah.

148

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## JAMES ALLEN BROOKSHIRE

1    Q   You said that was throughout that
2  conversation.
3    A   There was damn and hell.
4    Q   Damn and hell.  What other profanity?
5    A   And shit.
6    Q   Shit.
7    A   That's it.
8    Q   What other profanity?
9    A   That's the four I can remember.
10   Q   And, of course, neither you nor
11 Mr. Prater and anybody else in that discussion
12 used any profanity; would that be true?
13       MR. JOHNSON: Object to the form.
14   A   No, I didn't.  Greg didn't use it, and
15 Craig definitely didn't use it, and I didn't use
16 it either.
17   Q   Right.  So Mr. Dees was out of line in
18 your opinion?
19   A   It was pretty verbally -- I mean,
20 normally if a Production Team Member talks like
21 that to another Team Member or member of
22 management, I'll take corrective action on it.
23 What Greg done with it, I don't know.  But if a
                                                    149

1  him, kind of like a -- kind of like a team --
2  like he tried to lead the guys in kind of a
3  negative -- negative way.
4    Q   Mr. Dees did?
5    A   Yeah.
6    Q   So Kevin Hughes is the first person you
7  reported the sleeping to; right?
8    A   Right.
9    Q   Kevin Hughes is your --
10   A   He's Maintenance's Team Leader.
11   Q   Your leader?
12   A   Greg Prater.
13   Q   Greg Prater is your leader?
14   A   No.  John Applegate is senior manager
15 of Maintenance.  Greg Prater reported to John
16 Applegate.  Kevin Hughes reports to Greg Prater
17 and Leon reports to Kevin.
18   Q   And Kevin is the one that you first
19 reported the sleeping to?
20   A   Correct.  Because that's the only
21 leadership figure that Maintenance has on night
22 shift is Kevin.
23   Q   And Kevin Hughes is the same person
                                                    151

1  Team Member does that that works for me or any
2  member of management that works for me and talks
3  to another person like that I get them -- I
4  mean, depending on what phase they are in the
5  disciplinary process, I'll at least give them a
6  Discussion Planner for it.  We call them
7  Discussion Planners.  My boss that's a preacher,
8  he's definitely against -- he's a big one
9  against --
10   Q   Your boss would be who?
11   A   Craig Stapely.
12   Q   Stapely.  And this says the TL and Leon
13 are not on speaking terms.  Who would that be?
14   A   That's Kevin Hughes.
15   Q   And that's the man you reported the
16 sleeping incident to first?
17   A   Correct.
18   Q   And why weren't Mr. Hughes and Mr. Dees
19 on speaking terms?
20   A   I couldn't -- I mean, I don't know
21 their past history or what.  I do know that
22 Kevin has came to me a couple of times and, you
23 know, said that Leon is very standoff-ish to
                                                    150

1  mentioned in this e-mail I just showed you?
2    A   Yeah.  That's correct.
3    Q   And he would be the TL who wasn't on
4  speaking terms with Mr. Dees?
5    A   (Witness nods head.)
6    Q   Correct?
7    A   As far as what their speaking terms
8  are, I don't know, but...
9    Q   Well, that's what this says?
10   A   Right.  He is Leon's Team Leader.
11   Q   This looks like Mr. William Ware sent
12 this.  He's the same person that took this
13 statement from you?
14   A   Correct.
15   Q   So Mr. Ware would have known when he
16 took that statement from you that Mr. Kevin
17 Hughes and Mr. Dees were not on speaking terms
18 according to this?
19   A   He would be the guy, yeah.
20   Q   And it says Mr. Dees was singled out
21 for no apparent reason.  Do you know where that
22 came from?
23   A   (Witness shakes head.)
                                                    152

38 (Pages 149 to 152)

### JAMES ALLEN BROOKSHIRE

1    Q   You don't?
2    A   I mean, I don't know why -- I don't
3  know why he would be considered being the one
4  singled out.  I can tell you I remember Leon had
5  been working on it and Shane.  I don't recall
6  Mr. Drake working on it, but I remember Shane
7  and Leon working on that drop.
8    Q   Well, Shane and Mr. Drake -- what's
9  Mr. Drake's first name?
10   A   That is his first name.  It's Drake
11 Barefoot.
12   Q   Shane and Drake Barefoot were not in
13 this discussion about this incident that you
14 participated in?
15   A   With Craig?  Me and Craig and Greg?
16   Q   Right.
17   A   He just called -- I don't know if he
18 had already talked to Shane or Drake or who he
19 talked to in what order.  I know that I was
20 there when he had talked to Leon.
21   Q   Well, this apparently says that Leon
22 was singled out as opposed to Shane or Drake,
23 doesn't it?

153

1  already answered.
2    A   It was talking about that incident that
3  happened with the trolley lift station and
4  addressing him walking off the job and not
5  telling anybody.
6    Q   So he was cussing in the meeting and
7  then cussing leaving the meeting?
8    A   He said I'm not going to deal with this
9  shit and he opened the door and left.
10   Q   Well, do you know why you were in the
11 meeting at all?
12   A   Because I witnessed downtime.  I didn't
13 witness him walk off the job, but I witnessed
14 downtime and that he was the one that was
15 working on it.  But I don't know when he left,
16 but I did witness him and Shane working on it
17 and I did know that we almost shut the Body Shop
18 down because the elevator was down.  There was
19 no communication made that he had gone to lunch
20 from my understanding.
21   Q   Did you ever hear anybody at Hyundai,
22 other than the discussion you and Leon had, talk
23 about Mr. Dees' Guard obligation?

155

1    A   Going by what was put in this right
2  here, that's what it appears to be.  But as far
3  as me knowing anything about him being singled
4  out, I don't know.  I just know that I was in
5  there for when Greg had called Leon into the
6  office.
7    Q   Did Greg call Drake or Shane into the
8  office?
9    A   Not while we were there.  After Leon
10 had came in there and had spewed out a few cuss
11 words, my boss got up and left.  He just looked
12 at Greg and was like I'm not going to tolerate
13 this.  He goes I'm leaving.
14   Q   So you were there just as a witness?
15   A   Craig had witnessed this talking and
16 Leon had walked out.  Leon didn't -- he didn't
17 stay there.  Had he finished uttering out a few
18 words and phrases and then he walked out.
19   Q   What words and phrases?
20   A   Well, that I was telling you, the hell,
21 the damn, and shit and...
22   Q   Tell me what you remember he said.
23      MR. JOHNSON:  Object to the form.  He's

154

1    A   And that probably -- I mean, we talked
2  about him being in the Guard a couple of times,
3  but I don't know specifically when his weekends
4  were or when his periods were that he had to go
5  serve.  But I knew he was actively involved in
6  it and there was times he had to do weekend duty
7  or whatever it was.
8    Q   Do you know what Hyundai's policy is
9  regarding weekend duty?
10   A   No, I don't.  Because back when we had
11 talked about that, there was a memorandum, I
12 think, that was sent out by Team Relations
13 talking about that particular issue and there
14 was nobody in our area at the time that was
15 actively involved in duty.  So I didn't really
16 get involved in the policy or the action or the
17 course that's taken for that.
18   Q   You said there was a memorandum put out
19 by HR talking about Guard duty?
20   A   Yeah, there was because there was like
21 some other people across the plant.  I don't
22 know if it was Team Relations or HR or who it
23 was, but there was a notice or something put out

156

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

**JAMES ALLEN BROOKSHIRE**

1  that kind of said, hey, here's what we're going
2  to do. I can't recall exactly what it said.
3  But there were some people across the plant that
4  was also involved in the Forces.
5      Q    Involved in what?
6      A    Forces. Armed Forces.
7      Q    And did this come out after the
8  sleeping incident that you say you saw?
9      A    I can't recall. It was sometime this
10  year. I would guess it probably was. I don't
11  know.
12      Q    And who was it from?
13      A    It was either Team Relations or HR.
14      Q    And you got a copy?
15      A    No, I don't have one.
16      Q    What did -- did you get a copy and just
17  throw it away?
18      A    Well, we had gotten e-mails sent to
19  us -- I'm pretty sure it was in e-mail format
20  Team Relations, I think. What they had done is
21  we had to go around and check and see who's all
22  actively involved or participating in the Forces
23  or was part of the Forces. And then we didn't
157

1      Q    And since you didn't have any Armed
2  Forces under your immediate supervision --
3      A    I didn't get in touch with the policy
4  or get deeply involved. If we had somebody and
5  they came up to me and said they're serving in
6  the Guard or something like that, then I would
7  go to HR and Team Relations and find out what
8  it --
9      Q    Did it specifically mention Guard duty?
10      A    It said -- I believe it said something
11  about serving, serving the Armed Forces or
12  serving duty or something like that. I can't
13  recall if it said National Guard or whatever.
14      Q    And what did it say about -- what was
15  the company policy that was in this e-mail?
16      A    I can't recall that.
17      Q    Was it setting forth the protocol to
18  follow if somebody on Guard duty --
19      A    Yeah, it was basically like -- just
20  like -- like I said, it was either guidelines or
21  policy or something. Just laying it out there
22  so there's no misunderstanding that this is what
23  needs to happen or...
159

1  have nobody in our area participating in it, so
2  I didn't really find a need for myself to really
3  investigate what we needed to do because we
4  didn't have anybody involved in duty.
5      Q    You have a company e-mail address?
6      A    Yeah.
7      Q    What is it?
8      A    Jamesbrookshire@hmmausa.com.
9      Q    You would have gotten this through that
10  e-mail?
11      A    Yeah.
12      Q    And your best judgment is it was after
13  this sleeping incident?
14      A    I think. I think.
15      Q    And it said what? Some kind of notice?
16          MR. JOHNSON: Object to the form.
17      Q    A notice about what?
18      A    Just how the company policies apply or
19  the protocol that we follow for people serving
20  duty or serving in the Armed Forces.
21      Q    And it was sent to you because you're
22  in a supervisory capacity?
23      A    Right.
158

1      Q    Did it refer to the fact that there was
2  a misunderstanding?
3      A    No. I think there was questions --
4  questions brought about. Because, like I said,
5  they have people in General Assembly, people in
6  Paint Shop, I think, also that had Guard duty or
7  served in the Forces. Actually our last Team
8  Member letter that's published, we've got
9  somebody in Iraq right now, and they were
10  talking about how they missed working at the
11  plant and ready to come back and put their
12  uniform on and work back at the plant again.
13      Q    Who at HR would have sent out this
14  e-mail?
15      A    I don't know. Like I said, it was
16  probably either -- usually notices or
17  information like that is either HR or Team
18  Relations, one of those two.
19      Q    Who would be the people? Would it be
20  Wendy Warner maybe?
21      A    Wendy or Rob.
22      Q    Rob Clevenger?
23      A    Rob Clevenger or Wendy Warner.
160

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

**JAMES ALLEN BROOKSHIRE**

1    Q   So you think it was one of those two?
2    A   Yeah.  It would have to be one of those
3  two or their assistants, or sent out on their
4  behalf.
5    Q   And was it a mass e-mail to everybody?
6    A   Typically for information purposes,
7  they usually send it to -- they've usually got
8  -- the acronym they use is HMMA all and it goes
9  out to everybody on the e-mail system.
10    Q   Did it ever refer to whether or not
11  military orders would be required for Reserve
12  duty?
13    A   I can't recall that.
14        MR. KILBORN:  I want to take a break.
15
16    (Whereupon, a brief recess was had in
17  the proceeding.)
18
19  BY MR. KILBORN:
20    Q   Okay.  Was your wife at this party
21  where you were snorting that cocaine?
22    A   She wasn't.  She was only there for a
23  couple of hours.

161

1  their computers, but I don't know if it's like
2  for interconference calls or whatever at their
3  desk.
4    Q   So HMC headquarters in Seoul; right?
5    A   Yeah.
6    Q   They were monitoring the --
7    A   Press repair.
8    Q   -- press repair from Seoul?
9    A   I think so.  They've got some
10  organization they've got called Global Command
11  Center or something like that where they monitor
12  all the KPIs, key performance indexes, for all
13  the plants and any major catastrophic problems
14  or anything.  Our press was down for about a
15  month, and that's big downtime, big concern.
16    Q   Did you get any orientation when you
17  began work at Hyundai or had some since then
18  about the company organization relationship
19  between Hyundai Motor Corporation, AMC, HMMA, or
20  HMA?
21    A   Any meetings?
22    Q   Yeah.  Any orientation where the
23  relationship was discussed.

163

1    Q   But she was there?
2    A   Yeah, she was there in the earlier part
3  of the...
4    Q   When did she learn that you snorted
5  cocaine and ended up being found out at the
6  Hyundai plant?
7    A   I told her when -- that day when I
8  tested positive and when I went through all
9  that.
10    Q   She didn't know before then?
11    A   No.  She knew I had -- in my younger
12  years I had done it a couple of times.
13    Q   Are there any cameras in that Stamping
14  Plant?
15    A   There's some, I believe, externally on
16  the outsides of the building to kind of view
17  what's going on outside in some of the parking
18  lots.  They had had some set up inside the plant
19  just recently when we broke the press, and HMC
20  was monitoring the press repair from
21  headquarters.  But that was -- as far as any
22  other ones internally, I don't know of any.  I
23  know some of the Koreans have the web cams on

162

1    A   They had put us through what they --
2  well, not all of us.  But what they've been
3  trying to do is put everybody through what they
4  call cultural training, HMC culture training.
5  And they'll take, Team Members, management
6  members, and all that.  They had sent me last
7  year right before my wife -- about two weeks
8  before she was due to have the baby -- sent me
9  to Korea for a week.  But they picked Team
10  Members, management members and sent them
11  together as a group over to Korea.  And they've
12  been doing that off and on for a couple of
13  years, just to kind of learn their culture and
14  learn their ways and stuff.
15    Q   They took you out of your drug abuse
16  program?
17    A   No, no.  This was last year.
18    Q   2006?
19    A   2006, yes, sir.
20    Q   Did they tell you that this is just one
21  big company really --
22        MR. JOHNSON:  Object to the form.
23    Q   -- run by Seoul HMC?

164

41 (Pages 161 to 164)

## JAMES ALLEN BROOKSHIRE

1    A    Their philosophy is it's a company
2  working together in harmony to build the
3  quality -- highest quality automobiles for
4  people in the world.
5    Q    Right. Well, what I'm hearing is that
6  HMC controls everything; is that true?
7        MR. JOHNSON: Object to the form.
8    A    No, they don't control everything, but
9  I mean, it's -- my opinion, if I was starting --
10  just like Toyota or Honda when they first
11  started their first plant in a new country,
12  they're going to have active involvement on how
13  the company is structured, how it's ran to make
14  sure the business is going to prosper, because
15  they had a company they tried running in Canada
16  and had some problems there and it ended up not
17  making it. So I think they know that they need
18  to take an active foothold in making sure the
19  company is going to be prosperous and move in
20  the right direction or otherwise they're going
21  to lose a lot of money.
22    Q    And who is they?
23    A    HMC and HMA. It's in their best

165

1  interest to make sure the company is moving in
2  the right direction. They've already -- just
3  our plant alone they've already reduced the
4  Korean head count activity in our Stamping
5  Department because we used to have like 15
6  Koreans in our department. Now we only have
7  probably six.
8    Q    You started in 2005?
9    A    Yes, sir, August.
10    Q    So the HMC and HMA desired and actually
11  had active control to make sure that the
12  operations got up and running correctly?
13    A    (Witness nods head.) And still it's
14  still a young plant. We're still working bugs
15  out now, but it's progressed a lot from what it
16  was a couple of years ago.
17    Q    Was that a yes to my last question?
18  You nodded your head.
19    A    Yes. Sorry.
20    Q    And is that active control by HMC and
21  HMA still present?
22        MR. JOHNSON: Object to the form.
23    A    There's a joint partnership that

166

1  they're working through. I wouldn't say HMC is
2  controlling everybody and telling them what to
3  do.
4    Q    How about HMA?
5    A    They don't have much of an influence on
6  us. I mean, that's our sales group. That's our
7  sales group, and they kind of -- really the only
8  involvement they have with us as far as giving
9  us an understanding of our production schedule
10  and our orders and how much overtime we need to
11  work to fulfill those orders.
12    Q    HMA does that?
13    A    Yeah, they give you a sales forecast.
14    Q    So you run production to meet the sales
15  forecast HMA puts out?
16    A    Yeah.
17    Q    Is that in written form?
18    A    I'm not involved with that. That's
19  something that's done with Production Control.
20  Production Control figures out what all the
21  other departments need to do and the suppliers
22  and they kind of disseminate the information and
23  give it to us.

167

1    Q    Is HMA -- do they have people on the
2  scene at the Hyundai plant?
3    A    We used to have a guy, Mr. Duckworth,
4  but he went back to HMA out in California. He
5  was our major presence for HMA. My
6  understanding is we have people that come in off
7  and on into our plant, but as far as having
8  direct people from HMA at our plant, I don't
9  know of any and where they're at.
10    Q    Outside of the sleeping incident, do
11  you know of any employment problems that's
12  Mr. Dees had at Hyundai?
13    A    The only other issue I know about
14  besides the issue with the elevator system that
15  was in the e-mail, the sleeping problem, Greg
16  had mentioned to me a couple of times he had
17  some issues with Leon kind of being defiant on
18  doing some work. And that's about it.
19    Q    Tell me what you remember there.
20    A    Just him thinking that he doesn't need
21  to go clean up messes or clean up after
22  himself. We've got areas that we agreed to --
23  between Production and Maintenance we agreed to

168

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## JAMES ALLEN BROOKSHIRE

1  clean up in the plant. And we -- Production is
2  responsible for the baler area. We clean up the
3  baler area and Maintenance is responsibile for
4  cleaning up the press pits. And a lot of those
5  Maintenance guys -- I know Greg had mentioned
6  Leon, he didn't like to go down there and do his
7  share of cleaning up the press pit. He had
8  problems with that before.
9      Q    And the press pit is on the basement
10  **level underneath the two giant presses?**
11     A    Yes, sir.
12     Q    And that's where the shards and pieces
13  **left over from the Stamping process come down**
14  **the shoot, hit the conveyor belt, and go off to**
15  **the baling area?**
16     A    They have what they call the scrap
17  metal slugs -- they call them slugs, punch
18  pieces. Oil pisses out of the press from leaks
19  and stuff like that.
20     Q    **And have you been down in the pit when**
21  **it's operating?**
22     A    Yeah, I've been down there.
23     Q    **Describe that for me.**
                                              169

1  **just besides the little round slugs, aren't**
2  **there?**
3      A    Basically what makes it out to the
4  floor is slugs. That's basically what --
5  because they're small and they fall out from the
6  sides of the conveyor. Most of the scrap metal
7  comes down the shoots which are enclosed shoots
8  and hit the conveyor.
9      Q    **And Mr. Dees didn't like to be in the**
10  **pit?**
11        MR. JOHNSON: Object to the form.
12     A    Me asking him personally or knowing him
13  personally, I can't vouch for that, but I know
14  Greg had told me he had some issues with Leon
15  going down there and doing his job in the pit.
16  They had like a rotation set up where guys took
17  turns going down to the pit and cleaning the
18  pit. I know from what I understand he had some
19  problems with Leon going down there and doing
20  his.
21     Q    **Mr. Dees didn't like the pit, did he?**
22        MR. JOHNSON: Object to the form.
23     A    I don't know.
                                              171

1      A    Just, you mean, like the environment or
2  the sound or everything there?
3      Q    **Everything.**
4      A    The press pit you definitely have to
5  wear hearing protection. There's oil spots in
6  certain places like where it's dripping down
7  from either the blank washer, the press
8  hydraulic units, or what have you. And then the
9  scrap comes down the shoots and it's pretty
10  noisy coming down the shoots and hits the
11  conveyor and rolls out on the conveyor.
12  Sometimes those little slugs bounce out of the
13  sides of the conveyor. But you can't -- if you
14  get anywhere near the conveyor, they've got what
15  they call an E stop switch that you pull if
16  anything emergency happens and it shuts
17  everything off, shuts the press off, conveyor
18  off and everything there.
19     Q    **There's a lot more than slugs that**
20  **comes out of there, isn't there? Isn't there**
21  **giant metal shards?**
22        MR. JOHNSON: Object to the form.
23     Q    **And all kinds of sharp pieces of metal**
                                              170

1      Q    **Did anybody like the pit?**
2      A    I don't what they -- I've been down
3  there cleaning scrap up and oil up myself just
4  to show people I'll get in there and work with
5  them just to say, hey, it's not that bad of a
6  job.
7      Q    **How many decibels is the noise in the**
8  **pit when the two presses are running?**
9      A    I couldn't vouch for that, but I know
10  at the back of the presses it's 90, 95. 90 to
11  95 decibels.
12     Q    **What is the level at which permanent**
13  **hearing loss is a danger?**
14        MR. JOHNSON: Object to the form.
15     A    Over 85 decibels over an extended
16  eight-hour period you experience hearing loss.
17     Q    **And this is about 90?**
18     A    If you stand right there at the back of
19  the press consistently. That's right back there
20  where the opening is at the back of the press.
21  Currently right now we're purchasing sound
22  deadening material because we're trying to make
23  an effort -- consorted effort with Safety to
                                              172

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969

### JAMES ALLEN BROOKSHIRE

1  reduce the decibels so people don't have to wear
2  hearing protection in the area anymore.
3      Q   And are Kevlar sleeves mandatory in the
4  pit?
5      A   Yes.
6      Q   Is hard hat mandatory in the pit?
7      A   Yes.
8      Q   Safety goggles mandatory in the pit?
9      A   Yes.
10     Q   Steel-toe shoes mandatory in the pit?
11     A   Yes.
12     Q   Any other safety gear mandatory?
13     A   If you're going to be picking up like
14  the metal scrap you were talking about, you've
15  got to wear gloves.
16     Q   Kevlar gloves?
17     A   Yes.
18     Q   Was one of Leon's jobs in the pit
19  picking up the metal shards?
20     A   Yeah.
21     Q   Anybody ever get cut doing that?
22     A   Usually if you're wearing your PPE most
23  of the time you won't get cut unless you're

173

1      Q   What you were doing it was dangerous
2  because it went right through your Kevlar glove;
3  isn't that true?
4      MR. JOHNSON:  Object to the form.
5      A   There's ways you can handle the metal
6  that will reduce the danger of the job.  And
7  that's -- that was just -- me personally I was
8  in a hurry trying to get the press running.  I
9  was yanking it out.  You can take the shards or
10  scrap pieces and you can bend them into pieces
11  and get poles and yank them out with poles and
12  stuff.
13     Q   Well, see if you can answer this
14  question.  Isn't it true that the pit is a
15  dangerous, noisy, oily place to work?
16     MR. JOHNSON:  Object to the form.
17     A   It's -- I mean, it's got noise because
18  of the presses running.  It's going to be noisy
19  anywhere there are presses.  5400 tons, that
20  kind of pressure is going to generate noise.  As
21  far as the oil, just like a car that ages, with
22  time you're going to have some oil leaks.  It's
23  Maintenance's responsibility to fix those leaks

175

1  really tugging on a sharp piece of metal and
2  they'll kind of cut through the glove.  But as
3  far as I know, I haven't heard anybody that's
4  been wearing their PPE got hurt like that.
5      Q   And you got cut because of why?
6      A   I was doing exactly what I just told
7  you.  I was -- we had a piece of scrap stuck
8  down in the scrap shoot from above.  When the
9  die cuts off the trim edge, it goes into the
10  scrap shoot which goes to the pit.  Sometimes
11  those will get backed up or a panel will fall
12  off inside the scrap shoot and then the scrap
13  will back up.  Then we have to pull all that
14  scrap out by hand.  And there was a piece stuck
15  in there and I yanked on it and it just -- it
16  will go right through the glove.
17     Q   And it went right through your glove?
18     A   Yeah.
19     Q   That's a Kevlar glove?
20     A   Yeah.
21     Q   So it's dangerous, isn't it?
22     MR. JOHNSON:  Object to the form.
23     A   Depends on what you're doing.

174

1  as they come about.
2      Q   So it's not oily?
3      A   I wouldn't call it excessive oily.
4      Q   But it's oily?
5      A   Yeah, there's oil down there.
6      Q   Oil is slippery, isn't it?
7      A   Yes.
8      Q   Even in steel-toe shoes it's slippery?
9      MR. JOHNSON:  Object to the form.
10     A   It can be if you've got puddles of it
11  everywhere, yeah.  Of course it can be
12  slippery.  I mean, that's also part of us buying
13  our industrial boots.
14     Q   Did you ever see anybody taking
15  photographs of the control panel area where you
16  claim Mr. Dees was sleeping?
17     A   Have I seen anybody taking pictures?
18     Q   Right.
19     A   Huh-uh.
20     Q   Have you ever seen any photographs of
21  that area?
22     A   No.
23     Q   Is that area the same today as it was

176

44 (Pages 173 to 176)

## JAMES ALLEN BROOKSHIRE

1  when you say you saw Mr. Dees sleeping?
2      A   I'm trying to think.  The only
3  different thing that's up there right now from
4  that picture, there's an orange ladder that's
5  laying up there, been laying up there.  I mean,
6  there's no chair up there.  And somebody drew
7  that wire spool.  I don't remember that wire
8  spool.  There's nothing out in front of that
9  cabinet right now.
10     MR. KILBORN:  Thank you,
11 Mr. Brookshire.  That's all I have.
12         EXAMINATION
13 BY MR. JOHNSON:
14     Q   Mr. Brookshire, I've got a couple of
15 follow-up questions.  Some I just want to make
16 sure I'm clear on a couple of things.
17         The incident where you injured your
18 hand was that actually done in the pit or was
19 that up on the Production level at the
20 Stamping --
21     A   It was on the Production level.
22     Q   So that wasn't actually in the pit?
23     A   No, sir.

177

1  serious misconduct?
2      A   Yes, sir.
3      Q   Okay.  And Mr. Kilborn asked you to
4  circle some bullet points, and one of the ones
5  that you circled was -- I guess it's the fifth
6  bullet point -- use, possession, sale, transfer
7  of, or being under the influence of illegal
8  drugs, alcohol, or any other intoxicating
9  substance at any time on HMMA property; correct?
10     A   Yeah.
11     Q   Now, just to go back and clarify.  Did
12 you ever use illegal drugs, alcohol, or any
13 other intoxicating substance on HMMA property?
14     A   No, sir.
15     Q   Did you ever possess any illegal drugs,
16 alcohol, or intoxicating substances on HMMA
17 property?
18     A   No, sir.
19     Q   Did you ever sell any illegal drugs,
20 alcohol, or other intoxicating substances on
21 HMMA property?
22     A   No, sir.
23     Q   Okay.  Did you ever transfer or give or

179

1      Q   Mr. Brookshire, you reviewed
2  Plaintiff's Exhibit Number 15 with Mr. Kilborn;
3  correct?
4      A   Yes, sir.
5      Q   And just to make sure, when Mr. Kilborn
6  asked you to review the list, I think you looked
7  at some of the bullet points there; correct?
8      A   Yes, sir.
9      Q   And did you also review or read into
10 the Record what follows those bullet points?
11     A   The bullet points that I circled, I
12 read most of the bullet point.  I mean, I didn't
13 finish that one or that one towards the end.
14     Q   Did you read the final sentence there
15 that says the aforementioned list is not all
16 inclusive?
17     A   No, I didn't.  I didn't see that.
18     Q   You did not see that?
19     A   No.
20     Q   You understand what that means?
21     A   Right.  There could be other issues
22 that aren't included on this list.
23     Q   Other things that may constitute

178

1  receive any illegal drugs, alcohol, or other
2  intoxicating substances at any time on HMMA
3  property?
4      A   No, sir.
5      Q   Were you ever under the influence of
6  illegal drugs, alcohol, or other intoxicating
7  substances at any time on HMMA property?
8      A   I wasn't under the influence, but I
9  know that I tested positive.
10     Q   And what do you mean by you know you
11 weren't under the influence?
12     A   As in the immediate debilitating
13 effects of drugs or alcohol.
14     Q   You often hear the term impairment.
15 Were you impaired at any time because of illegal
16 drugs, alcohol, or other intoxicating substances
17 on HMMA property?
18     A   No.
19     MR. KILBORN:  I'm going to object to
20 that as to him being an expert on what's
21 impaired.
22     Q   Okay.  Have you ever used any illegal
23 drugs, alcohol, or any other intoxicating

180

45 (Pages 177 to 180)

## JAMES ALLEN BROOKSHIRE

1  substances immediately prior to coming to work?
2      A   No, sir.
3      Q   Had you ever felt drunk at work?
4      A   No.  Tired, not drunk.
5      Q   Mr. Kilborn had asked you about a wire
6  spool that was on a drawing that somebody had
7  made.  Is it your testimony that you recall that
8  there was no wire spool there at the time you
9  saw Mr. Dees sleeping, or is it that you don't
10 remember whether it was there or not?
11     MR. KILBORN:  I object to counsel
12 leading his own witness.
13     A   I don't remember it being there.
14     Q   Okay.  You had mentioned to Mr. Kilborn
15 this Mr. Mun had come and spoken to you at some
16 point.  Do you recall whether he received a
17 telephone call from Mr. Dees' wife?
18     A   Yes, he did.
19     Q   Do you remember what he said about the
20 call from Dees' wife?
21     A   I think something to the effect that
22 his wife didn't feel that it was right for what
23 happened and he should not be getting any kind

181

1  didn't you?
2      A   I didn't have anything -- I didn't
3  possess anything.
4      Q   You knew about that, didn't you?
5      MR. JOHNSON:  Object to the form.
6      A   (No response.)
7      Q   You didn't know that was possible?
8      A   I don't have this whole book memorized.
9      Q   Let's see if you've got the rest of it
10 memorized.  HMMA also considers off-the-job
11 illegal drug use as proper cause for
12 disciplinary action up to and including
13 termination of employment.  You read that?
14     A   Yeah.
15     Q   And you are guilty of off-the-job
16 illegal drug use, aren't you?
17     MR. JOHNSON:  Object to the form.
18     A   I showed up positive in a urine screen.
19     Q   That's not my question.  You are guilty
20 of off-the-job illegal drug use, aren't you?
21     A   Going by a urine specimen, yes, I am.
22     Q   Well, going by what you know you did,
23 which is snort cocaine --

183

1  of discipline for doing that on the job, that he
2  didn't do anything wrong.
3      MR. JOHNSON:  I think I'm about done if
4  we could take a quick break so I could talk to
5  Chris.
6
7      (Whereupon, a brief recess was had in
8  the proceeding.)
9
10     MR. JOHNSON:  I'm done.
11     FURTHER EXAMINATION
12 BY MR. KILBORN:
13     Q   Mr. Brookshire, would you look at
14 Plaintiff's Exhibit 15, the handbook?  And if
15 you'll look on page 38 and 39, it's got specific
16 handbook rules on drug and alcohol, doesn't it?
17     A   Yeah.  I haven't -- like I said, I
18 haven't reviewed everything, but...
19     Q   Well, let me help you.  Look at the top
20 of page 39.  The third line down says any
21 illegal substance will be turned over to the
22 appropriate law enforcement agency and criminal
23 prosecution may result.  You knew about that,

182

1      MR. JOHNSON:  Object to the form.
2      Q   -- you violated this policy, didn't
3  you?
4      A   Yeah.
5      Q   And isn't it true that you have shown
6  up at work at Hyundai with alcohol on your
7  breath?
8      MR. JOHNSON:  Object to the form.
9      A   No, I haven't.
10     Q   You have not.  All right.  And you say
11 in response to your lawyer's questions that you
12 had, I think, gotten over the debilitating
13 effects of alcohol and cocaine by the time you
14 had showed up at work; is that true?
15     A   What's that?
16     Q   You told your lawyer you had gotten
17 over the debilitating effects of alcohol and
18 cocaine by the time you went to work?
19     A   That would be correct.
20     Q   When did you get over the debilitating
21 effects of both the alcohol and the cocaine?
22     MR. JOHNSON:  Object to the form.
23     A   I don't know the mathematical

184

46  (Pages 181 to 184)

### JAMES ALLEN BROOKSHIRE

1 calculations off the top of my head.
2    **Q    What's your best judgment?**
3    A    Alcohol is out of your body within 24
4 hours.
5    **Q    Well, I'm not talking about anybody's**
6 **body.  When did you, Jim Brookshire, get over**
7 **the effects of cocaine and alcohol that you had**
8 **consumed at that party at this gentleman's**
9 **house?**
10    A    The incident had happened on Saturday,
11 and I was over the debilitating effects by
12 Sunday.
13    **Q    What time Sunday?**
14    A    I don't know.  I was fine, out mowing
15 the yard by lunchtime Sunday.
16    **Q    So you didn't even have a hangover;**
17 **right?**
18    A    (Witness shakes head.)
19    **Q    No?**
20    A    No.  Tired.  Tired and thirsty.
21    **Q    Did the cocaine make you thirsty or the**
22 **alcohol?**
23    A    Alcohol.
                                                185

1    MR. KILBORN:  That's all my questions.
2 Thank you.
3       FURTHER EXAMINATION
4 BY MR. JOHNSON:
5    **Q    Just to follow up with you,**
6 **Mr. Brookshire.  Mr. Kilborn referenced on page**
7 **39 of the Team Member Handbook, which was been**
8 **marked as Plaintiff's Exhibit 15, the last**
9 **sentence in the first partial paragraph on page**
10 **39 it says HMA also considers off-the-job**
11 **illegal drug use as proper cause for**
12 **disciplinary action up to and including**
13 **termination from employment.  Was the**
14 **conditional offer of employment to your**
15 **knowledge some form of disciplinary action?**
16    MR. KILBORN:  Object.  Leading.
17    A    Most definitely.
18    MR. JOHNSON:  That's all I have.
19
20
21
22
23       FURTHER DEPONENT SAITH NOT
                                                186

1       C E R T I F I C A T E
2
3 STATE OF ALABAMA      )
4
5 COUNTY OF AUTAUGA     )
6
7
8       I hereby certify that the above and
9 foregoing deposition was taken down by me in
10 stenotype, and the questions and answers thereto
11 were transcribed by means of computer-aided
12 transcription, and that the foregoing represents
13 a true and accurate transcript of the testimony
14 given by said witness upon said hearing.
15       I further certify that I am neither of
16 counsel, nor kin to the parties to the action,
17 nor am I in anywise interested in the result of
18 said cause.
19
20
21       ------------------------------
21       STACEY L. JOHNSON, Commissioner
22       Certified Court Reporter,
22       ACCR#: 386 - Expires 09-30-08
23       Commission Expires 06-22-2011
                                                187

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

Interview with Jim Brookshire

On Feb 14 at approx. 1:00 AM, Jim went upstairs to check on some quality issues in the SOP (side outer)

Jim went up to the 3rd floor where he noticed Leon Dear sitting at operating station. Leon was positioned with his head down and his back was towards the cabinet.

Jim observed Leon sitting in this position for approx. 2 minutes.

At this time Jim turned up his radio and let it chirp about 4 times before Leon responded.

Whenever Leon woke up he grabbed a pole and began to act like he was pulling trolleys.

Jim went around to check some panels and when he approached the area again he noticed Leon sitting in the same chair; however, this time he was alert. Not long after this Jim witnessed Leon walking down the stairs.

About 30 minutes passed by before Jim talked to TL Kevin Hughes. During this time Kevin did not know where Leon was.

J-A B— 2-15-07

PLAINTIFF'S EXHIBIT

13

DEES V HMMA 00037  DOCS PRODUCED

Jim was approximately 25 feet away from Leon when he noticed that he was asleep.

Jim walked towards Leon and began chirping his radio at a distance approx. 15 feet.

Due to Leon's hat being on his head Jim did not see his eyes closed; however he (Jim) stated that his head was facing towards the floor, (i.e. with his chin tucked to his chest).

J.A.B.
2-19-07

DEES V HMMA 00038 DOCS PRODUCED

(FILED UNDER SEAL)


**Plaintiff's Exhibit 14 to James Brookshire's Deposition**

**(James Brookshire's Personnel File)**




PLAINTIFF'S EXHIBIT

15

Team Member Handbook




HYUNDAI

Hyundai Motor Manufacturing Alabama, LLC.

DEES000009

1st Edition

# CONTENTS

HMMA History........................................Page 1
HMMA Vision Statement.............................Page 1
HMMA Mission Statement............................Page 1
HMMA's Team Values and Standards.................Page 1
   Safety
   Quality
   Team Diversity
   Efficiency
   Stewardship
Equal Employment Opportunity......................Page 2
Unlawful Harassment...............................Page 2
HMMA's Position on Unions.........................Page 3
Purpose of the Handbook...........................Page 3
Employment Statement..............................Page 3
Team Member Records...............................Page 4
Probation Period..................................Page 4
Length of Service.................................Page 5
Employment of Relatives...........................Page 6
Temporary Workers and Replacement Workers.........Page 6
Team Member Orientation...........................Page 6
Hours of Work.....................................Page 6
Breaks/Communication Period.......................Page 7
   Break Periods
   Communication Period
Attendance........................................Pages 7-10
Work Week.........................................Page 10
Overtime..........................................Page 10
   Non-Exempt Team Members
   Exempt Team Members
Pay...............................................Page 11
Payday............................................Page 11
Direct Deposit....................................Page 11
Questions Regarding Pay...........................Page 11
"Call In" Pay.....................................Page 11
"Report In" Pay...................................Page 11
Statement of Earnings.............................Page 12
Garnishments......................................Page 12
Benefits..........................................Pages 12-20
   Attendance Incentive Program
   Family and Medical Act (FMLA)
   Holidays
   Vacation Non-Exempt/Exempt Team Members
   Scheduling Vacation
   Summer Shutdown
      Soliciting Volunteers
      Required Work
      Medical Leave

DEES000010

i

Canceling Vacation
Personal Days
Scheduled Personal Days
Unscheduled Personal Days
Transfers
Unscheduled Vacation
Vacation Eligibility
Unused Vacation Time
Personal Leave
Bereavement Leave ............................................................. Page 20-22
Jury Duty ...................................................................................... Page 22
Military Leave ............................................................................. Page 22
Team Wear .................................................................................. Page 22
Safety ................................................................................ Pages 22-24
Safety Committees .................................................................. Page 24-25
Safety Wear
Hard Hats and Bump Caps
Shoes
Safety Glasses
Personal Protective Equipment (PPE)
Housekeeping
Lock Out/Tag Out Procedures
Special Authorization Permits ............................................................. Page 26
Confined Space Entry Permits
Hot Work
Area Specific Safety Rules
Security ................................................................................ Page 26 -27
Foreign Trade Zone (FTZ)
Video Surveillance
HMMA Identification Badges (ID)
Parking/Traffic Control
Career Opportunity Program ............................................................. Page 27-28
Transfers .................................................................................... Page 28-29
Solicitation, Distribution, and Postings ............................................. Page 29-30
Team Member Work Conduct ........................................................... Page 30-31
Corrective Action ........................................................................... Page 31-33
Discussion Planner
Informal Discussion
Formal Discussion
Commitment Discussion
Decision Leave
Termination
Serious Misconduct ...................................................................... Page 34-35
Workplace Threats and Violence ...................................................... Page 35-36
Team Member Resolution Program and Procedure ...................... Pages 36-38
Step 1: Supervisory Level
Step 2: Resolution Request
Step 3: Resolution Appeal
Step 4: Resolution Final Appeal

DEES000011

Team Member Review Board .......................................................... Page 38
Drugs, Alcohol and Weapons ....................................................... Page 38-40
For Cause Testing and Random Testing ......................................... Page 40-41
Public Relations .......................................................................... Page 41
Internal Communications ......................................................... Pages 42-44
Open-Door Policy
Bulletin Board
President's Roundtable
Group Leader/Manager One-on-Ones
Manager's Lunches
Team Advisor
Hyundai Communication System (HCS)
HMMA Closed Circuit Television System
HMMA Weekly News
Hyundai Insights
Five Minute Communication Meetings
Community Relations ................................................................. Page 44-45
Speeches
Tours
General Information .................................................................. Page 45-46
Electronic Devices
Camera/Video Camera
Cell Phones/Pagers
Audio Tape Recorders
HMMA Tools ............................................................................... Page 46
Lockers .................................................................................. Page 46-47
Cafeteria .................................................................................... Page 47
Smoking ...................................................................................... Page 47
Telephone Calls ........................................................................... Page 47

DEES000012

## HMMA HISTORY

Hyundai Motor Company (HMC) was established in 1967. By 1974, HMC produced the Pony as their first independently designed and manufactured model.

In 1985 HMC established Hyundai Motor America (HMA) and launched the Excel which was the best selling import sub-compact in the US for three years. Eight years later Hyundai launched the Sonata II and started assembly of the Excel in Thailand.

Over the last 35 years Hyundai has established its place in a global marketplace. On April 2, 2002, Hyundai announced it had chosen Montgomery, Alabama to build its first U. S. manufacturing facility which will produce the next generation Sonata and Santa Fe.

## HMMA's VISION STATEMENT

Our Team provides value for your future

## HMMA's MISSON STATEMENT

To create exceptional automotive value for our customers by harmoniously blending safety, quality, and efficiency. With our diverse team, we will provide responsible stewardship to our community and environment while achieving stability and security now and for future generations.

## HMMA's TEAM VALUES

**SAFETY:** HMMA is committed to providing a safe working environment to preserve and enhance the health and personal safety of our Team Members. We will achieve this through the implementation of safety policies, safe work practices, a drug free workplace, and by daily commitment of all Team Members.

**QUALITY:** HMMA's commitment to Quality begins with its ability to achieve continuous improvement in its product by always listening to our customers. HMMA works with its suppliers to ensure high standards are continually maintained. All HMMA Team Members have an active role in maintaining and improving both the manufacturing process and quality.

**TEAM DIVERSITY:** HMMA's success depends on treating each Team Member with dignity and respect and utilizing our Team's diversity to its maximum potential. HMMA's definition of Team Diversity is accepting our differences and learning from each Team Member's unique perspective in order to achieve a new standard of excellence in society, at home and at work. We must all work as a Team, practicing integrity as we deal with our customers while listening and learning from one another, sharing in our successes, and helping one another succeed.

**EFFICIENCY:** In order to provide job stability and maintain profitability to HMMA we must all act effectively to minimize all aspects of waste.

1

DEES000013

DEES000014

To achieve continuous growth and innovation, each Team Member has the responsibility to find more efficient ways to produce our products for our internal and external customers.

**STEWARDSHIP:** At HMMA, we are committed to the stewardship of our environment and our community. Stewardship simply means managing responsibly. We are committed to conserving energy, recycling, and eliminating elements that could cause harm to the environment. HMMA is also committed to being actively involved in our community in order that it may grow for the benefit of our Team Members and their families.

## EQUAL EMPLOYMENT OPPORTUNITY

HMMA is committed to providing an environment that is free of unlawful discrimination and providing equal employment opportunities and promotional opportunities to all Team Members.

Equal employment opportunity means eliminating any practice of unlawful discrimination from employment - in recruitment, application, qualification, hiring, training and education, promotions, corrective action, layoffs, terminations, and all other conditions of employment.

HMMA makes all decisions with regard to employment without discriminating on the basis of race, color, religion, national origin, age, sex, disability, veteran status or any other unlawful basis. Additionally, HMMA will make reasonable accommodations for qualified job applicants and Team Members with disabilities, in accordance with the Americans with Disabilities Act.

## UNLAWFUL HARASSMENT

In order for all HMMA Team Members to enjoy a work environment free from all forms of unlawful discrimination, including sexual harassment, no Team Member - male or female - should be subject to unsolicited and unwelcome sexual advances or conduct, whether verbal, physical, explicit, or implied. This includes verbal innuendoes, suggestive comments, off-color jokes, gestures or physical contact. Such embarrassing, demeaning or intimidating behaviors interfere with a Team Member's work performance and may create a hostile, offensive work environment. It is also unlawful sexual harassment when submission to sexual

2    DEES000015

advances is a condition of getting or keeping one's job or when it influences personnel decisions. Furthermore, it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, veteran's status, or any other unlawful basis. Cases of such unlawful harassment should be reported to your group leader/manager, team relations representative, or the team relations manager.

## HMMA's POSITION ON UNIONS

HMMA's team concept and creating a team environment is based on faith in each Team Member and recognizes our commitment to ensure a positive working environment. HMMA has developed its policies, wage structure and benefits plans with our Team Members' best interests in mind. Additionally, HMMA is committed to providing all Team Members with a safe place to work by utilizing state of the art equipment, technologies, as well as work practices to ensure safety.

By joining together as a team, we can accomplish our mutual goals assuring the success of Hyundai Motor Manufacturing Alabama, LLC and providing greater opportunities and job security for all Team Members and their families. Because of HMMA's commitment to every Team Member we do not believe that a third party such as a union is necessary at HMMA.

## PURPOSE OF THE HANDBOOK

HMMA's handbook is intended as a summary of HMMA's policies and procedures. We ask each Team Member to read the handbook and familiarize themselves with HMMA's policies and procedures in order for you to understand HMMA's responsibilities to you and your responsibilities to HMMA.

This handbook is not a contract. We ask each Team Member to understand that in order for HMMA to remain competitive in a global market there may be times when changes are necessary. HMMA reserves the right to change policies and procedures when it becomes necessary, either in whole or in part, with or without notice. When it is determined that a policy or procedure needs to be changed, all Team Members will be notified by their manager and/or a video or other printed material to communicate such changes.

If Team Members have any questions concerning these policies and procedures they should ask their group leader/manager. If the Team Member is still unclear about the policies and procedures they should contact their team relations representative for clarification.

## EMPLOYMENT STATEMENT

Every Team Member's employment with HMMA is a **voluntary** one and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this

3    DEES000016

handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA Team Members.

This policy of employment-at-will may not be modified by any officer or Team Member and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the president or the board of directors, whichever is applicable.

This handbook or any policies or procedures are not contracts of employment.

## TEAM MEMBER RECORDS

Team Member records will be kept for information and business purposes only. Any of the following changes to your status must be reported to Human Resources:

- Name, address, or telephone number
- Marital Status
- Birth date, total number of dependents, their relationship to you
- Citizenship status
- Benefit - plan beneficiary designation
- Person(s) to be notified in case of emergency
- Formal education, courses completed, other training or professional skills acquired

Upon request, you may examine your own personnel file and indicate to Human Resouces any information you think is inaccurate. Any Team Member wishing to view his/her personnel file must make a written request specifically stating what he/she wants to review and why they want to review the record on file. All personnel files are confidential information and can only be accessed by HMMA Team Members who have authorization. All personnel folders are located in Human Resources.

## PROBATION PERIOD

The probationary period is 90 calendar days. This probationary period is a time for evaluation, both by you and by HMMA. The probationary Team Member needs to evaluate HMMA's policies, procedures and overall working environment. The automotive industry is highly competitive. The work is fast-paced, physically demanding, high volume production which demands high standards of quality and safety. Learning to meet performance standards, working in a fast-paced manufacturing environment while meeting the guidelines which govern our conduct, and becoming acquainted with our team approach are also a part of the evaluation new Team Members need to make of HMMA.

HMMA needs to evaluate your progress during this period as well. Three performance evaluations are conducted during the probationary period.

These evaluations occur at the following intervals:

| 1 | 30 days |
| 2 | 60 days |
| 3 | 85 days |

If any new Team Member is off due to an approved leave of absence, the number of days absent will be added to the probation period.

Your overall progress is evaluated during the probation period. Strengths and weaknesses are discussed and helpful feedback regarding your development and progress is given during each of the aforementioned reviews.

In the event progress is less than acceptable or violations of standards of conduct occur, a probationary Team Member's employment may be terminated prior to the end of the 90 day period.

Before any new Team Member is terminated, a review of the facts and approvals by the department manager, team relations manager, director of human resources are required.

Once the probationary period is completed, the new Team Member becomes eligible for the following programs:

Equal Treatment Procedure
Peer Review Panel
Corrective Action Program
Attendance Incentive

## LENGTH OF SERVICE

HMMA considers "length of service" (LOS) as the period of continuous employment, starting from your date-of-hire and applies to all full-time Team Members. Length of service will be broken when a Team Member:

- resigns from employment (leaving the plant without proper authorization is considered voluntary resignation)
- is terminated from employment
- fails to return to work on the day following the end of a personal, medical, military, or other leave of absence, unless unusual conditions or circumstances exist that would prevent the Team Member from returning on the scheduled day
- retires
- fails to communicate with HMMA regarding an absence of three (3) consecutive days or longer (subject to the Family and Medical Leave Act and regulations)
- is not actively employed with HMMA for 12 consecutive months or length of service, whichever is the lesser.

A Team Member who voluntarily terminated his/her employment, and who is rehired, will not have any prior service restored. The date of rehire

will become the new service date. Computation of service, for retirement purposes and the effect of breaks in service for retirement rights, however, will be determined in accordance with the Employee Retirement Income Security Act of 1974 (ERISA).

Transfer opportunities will be awarded based on LOS. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

Position Advancement Opportunities will be based on qualifications. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie-breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

## EMPLOYMENT OF RELATIVES

Relatives of Team Members may be employed at HMMA; however, they may not work or come under the direct supervision of another relative. Relatives are defined as those people who are related either by birth, adoption, or marriage.

The employment of relatives at certain levels of HMMA in positions where one might have influence over another will not be allowed.

## TEMPORARY WORKERS AND REPLACEMENT WORKERS

HMMA intends to utilize temporary and replacement workers to reduce temporary peaks of excess overtime, perform special projects, and fill vacancies while Team Members are on military leave, personal leave, or medical leave of absence. Use of temporary replacement workers also helps HMMA avoid potential layoffs.

## TEAM MEMBER ORIENTATION

HMMA will provide every Team Member with the training needed to understand HMMA's philosophies. Each Team Member will receive an orientation outlining HMMA team concepts, policies, benefits, and all other aspects related to their employment at HMMA.

## HOURS OF WORK

### Hours of Work

HMMA's normal work week for all production and administrative (non-exempt) Team Members consists of forty (40) hours per week based on an 8 hour work day five days per week. HMMA's normal work week for all administrative exempt Team Members consists of forty-five (45) per week based on an 8 hour work day and 5 hours of casual time per week. All production and maintenance Team Members will rotate shifts every 4 months. Production, maintenance, and administrative shift hours will

be as follows:

| SHIFT | SHIFT START TIME | SHIFT END TIME |
| --- | --- | --- |
| Production | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 a.m. |
| Maintenance | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 p.m. |
| 3rd Shift | 10:00 p.m. | 6:45 a.m. |
| Administration | | |
| 1st Shift | 8:00 a.m. | 4:45 p.m. |

There may be times when Team Members will be asked to work irregular hours due to production requirements. Any deviation in HMMA's weekly scheduled hours must be reviewed and approved by the payroll and benefits manager or his/her designee prior to any change in HMMA's normal work schedule. Any permanent adjustment to any HMMA Team Members regularly scheduled work hours must have approval by the director of Human Resources.

## BREAKS AND COMMUNICATION PERIODS

### Break Periods

HMMA provides all Team Members with two (2) ten (10) minute paid break periods per day. The first break period will be given in the first half of the Team Members shift; the second break period will be given in the second half of the Team Members shift. All Production Team Members will be provided specific time for each of the described breaks. Due to the nature of Maintenance Team Members responsibilities their breaks will be given at their convenience. In order to allow Administrative Team Members the ability to maintain the continuity of their responsibilities they may take their breaks at their convenience.

There will be times when HMMA schedules overtime. In these situations the Team Member will be given a 5 minute break for every hour of scheduled overtime. These breaks must be given at the end of the eighth hour of work.

### Communication Period

Each Team will have a five minute paid communication meeting at the beginning of each shift. This meeting is for the manager, group leader, or team leader to communicate important information to the team.

## ATTENDANCE

Regular attendance is the cornerstone for the success of HMMA. A Team Member's absenteeism can reduce the quality and effect of the overall efficiency of HMMA's operations, as well as cause hardship on fellow Team Members who report to work regularly. Regular attendance will

is every Team Member's responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.

The minimum acceptable standard of attendance is 98%.

Any scheduled workday missed is considered an absence. However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, short-term disability, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

If a Team Member is absent due to a catastrophic event that results in a legally declared emergency which results in the closure of all major roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences will not count against the Team Member's attendance for the purpose of calculating the acceptable standard of attendance, nor be cause for corrective action. Final approval as to the declaration of a "Catastrophic Event" shall be made by the director of Human Resources.

Team Members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God which result in Team Members being tardy will be evaluated on a case by case basis. If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy shall not affect a Team Member's attendance record.

Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early. A leave early will be considered as one-half day of absence for purposes of attendance calculation.

Any situation where a Team Member leaves the facility during scheduled work time (including overtime whether scheduled or voluntary) without their group leader, manager, senior manager, or any other member of management's authorization, the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA.

Attendance will be calculated using a rolling calendar year using the following formula:

• Calculate the number of scheduled workdays. Scheduled workdays will include all excused scheduled workdays.
• Calculate the number of unexcused workdays.
• Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team Member's attendance percentage.

8    DEES000021

o Example:

    237 Scheduled workdays
    $\underline{-\ 5}$   unexcused workdays
    232/237 = 97.9%

When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve-month period, corrective action will be considered. The rolling twelve-month period is a 365-day period.

Every Team Member is expected to notify his/her group leader and/or manager, in advance, of any known absence or future absence. When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift.

Failure to notify within 30 min. at start of the shift may result in corrective action up to and including termination.

Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

The following will be considered:

• Cause
• Frequency
• Patterns
• Failure to report
• Time pattern of reporting

A Team Member that **does not communicate** to his/her group leader and/or manager regarding his/her absence for a **period of three (3) consecutive days or longer is considered to have voluntarily resigned** his/her employment at HMMA.

HMMA will maintain appropriate attendance records. Any corrective action necessary is taken by the group leader and/or the manager. The appropriate team relations representative will be in attendance.

The corrective action process is intended to help Team Members correct any attendance problems. However, if the Team Member's attendance continues to be unacceptable it could result in further corrective action up to and including termination.

When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when corrective action is taken, the following steps must be followed:

1    Informal Discussion
2    Formal Discussion
3    Commitment Discussion

DEES000022

9

4

## Decision Leave

The team relations representative will be consulted for guidance at each step of the aforementioned corrective action steps. The team relations representative will also attend each step as it occurs.

When corrective action is required beyond the four steps above, the Team Member's group leader and/or manager will contact the team relations manager and request a review of the Team Member's record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and director of Human Resources.

## WORK WEEK

HMMA's work week begins at 12:01 a.m. Monday and ends on Sunday at 11:59 p.m.

## OVERTIME

### Non-exempt Team Members

Due to the nature of the automotive industry there will be times when we will be required to work overtime in order to meet our customer's needs. Overtime will be paid in one-tenth hour increments; any overtime worked will be paid during the normal pay cycle and included in the regular payroll check.

Overtime is calculated using the base rate of pay plus shift premium and team leader premium, if applicable. Overtime will be paid at 1.5 times the Team Member's regular rate of pay for any time worked in excess of eight hours during the normally scheduled work day as long as 40 hours of work has been achieved for that work week. Team Members will be paid at 1.5 times their regular rate of pay for time worked on Saturday or the sixth work day. Additionally, Team Members will be paid 2 times their regular rate of pay for time worked on Sunday or the seventh day of continuous work. Team Members who work on a scheduled HMMA holiday will be paid at 2 times their rate of pay. Vacation time will count as hours worked when calculating overtime.

### Exempt Team Members

Assistant managers and specialist Team Members wages are based on a 40 hour work week and 5 hours of casual overtime. Casual overtime is time that is worked without approval. Assistant managers and specialists will be paid at 1.5 times their calculated regular hourly rate for all pre-approved overtime.

In situations where the assistant manager and/or specialist Team Member is required to work because of scheduled production overtime they will be paid at 1.5 times their calculated hourly rate. Due to the fact that production overtime is scheduled and the assistant manager and/or specialist is required to work in order to support production needs the overtime will

10    DEES000023

be considered as pre-approved. Additionally, the casual overtime rule will not apply in this situation.

## PAY

HMMA reviews wages each year and makes appropriates changes to the wage scale based on several factors, such as: automotive industry, HMMA's performance, and the cost of living. Each Production and Maintenance Team Member will receive a base rate when joining the HMMA family and will receive a rate increase periodically over a 24 month period until they reach the top pay rate.

## PAYDAY

All Team Members will be paid on Tuesday on a biweekly basis.

## DIRECT DEPOSIT

All HMMA Team Members are required to use direct deposit. Each Team Member will receive an advice stub which will itemize pay and deductions in detail. Any questions regarding direct deposit should be directed to the Payroll and Benefits Department.

## QUESTIONS REGARDING PAY

If any Team Member has a question regarding pay, they are to contact their manager/assistant manager/group leader. The manager/assistant manager/group leader will notify the payroll department of any issues concerning pay and report back to the Team Member or arrange a meeting with the payroll department for the Team Member.

## "CALL IN" PAY

HMMA will pay for a minimum of four hours work at the regular straight time hourly rate for those Team Members who are called to work at a time other than their regularly scheduled work hours (before or after, but not continuous with their regularly scheduled shift). If there is at least four hours work available and the Team Members are given the option to work less hours, they will be paid only for the hours worked if they exercise the option to leave early.

## "REPORT IN" PAY

If the scheduled production is canceled due to any emergency, prior to the start of the shift and at least one hour of notification has been provided to the Team Members, no work will be available and no pay made to the Team Members.

If the scheduled production is canceled due to any emergency and less than one hour of notification is provided, Team Members will have the option of leaving and receiving pay only for the time worked or staying for a total of four hours. If the Team Member elects to remain at work, he or she must leave the plant at the end of this period.

11    DEES000024

If the notification of canceled production is made after four hours of work from the normal scheduled starting time of the shift have been completed, for the time worked or staying until the end of the regular shift, Team Members that have not been given their options and have been forced to leave will be paid for 8 hours.

Anytime a Team Member volunteers to go home early or is required to go home early, the Team Member may elect to use any available vacation time to make up for lost income. This time will always be excused and the lost time will not count against the Team Member's attendance.

## STATEMENT OF EARNINGS

Each Team Member will receive a yearly statement of earnings. The yearly statement of earnings is known as a W-2 Withholding Statement which provides the amount earned and the taxes that have been withheld. The W-2 will be issued in January each year for use in filing income tax forms.

## GARNISHMENTS

HMMA respects every Team Member's right to privacy with regard to personal and confidential information. However, HMMA may be required, by law, to withhold a portion of your pay if served with a court notice of a garnishment, wage assignment, wage deduction, or government levy. When situations such as this occur HMMA's payroll department will notify you of any pending action involving such matter that requires a wage withholding situation.

## BENEFITS

HMMA benefits are described in the Summary Description Plan.

## ATTENDANCE INCENTIVE PROGRAM

HMMA will pay a premium of $100.00 to non-exempt and exempt Team Member's up to assistant manager for perfect attendance for each 4-week period. All regular, full-time, non-exempt and exempt Team Members up to assistant manager are eligible to participate in the Attendance Incentive Program.

During the probationary period, a Team Member is not eligible to participate in the Attendance Incentive Program. A Team Member becomes eligible the first full 4-week attendance period following the end of his/her probation period.

The Team Member must maintain a perfect attendance record for a four (4) week attendance period to receive an attendance incentive. Perfect attendance is defined as **no absences**, including tardiness, early leave, lost time including scheduled overtime, or personal leaves.

12    DEES000025

---

The only exceptions to this policy are:

- HMMA observed holiday, unless the Team Member is scheduled to work on the holiday
- Scheduled Vacation
- Personal Days (HMMA may require documentation)
- Jury Duty
- Military Leave. Military leave shall be considered in accordance with applicable law.
- Bereavement Leave
- The balance of a shift lost due to an occupational illness/injury.
- Workers Compensation related doctor appointments. (When a Team Member misses part of a day due to a workrelated injury/illness doctor appointment scheduled by the HMMA Medical Clinic.)
- Any work-related activities away from the plant
- Any medical leave, either work-related or non-work related that is determined to be FMLA
- Any leave that is determined to be FMLA

## FMLA

### General Provisions

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12 month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be unpaid, paid, or a combination of unpaid and paid leave, depending on the circumstances of the leave and as specified in the policy.

A Team Member must have worked for HMMA for 12 months, or 52 weeks. In addition a Team Member must have worked at least 1250 hours during the 12 month period immediately before the date when the leave is requested to commence.

In order for the leave to qualify under the policy, the Team Member must be taking leave for one of the reasons listed:

- The birth of a child and in order to care for that child;
- The placement of a child for adoption or foster care, and to care for the newly placed child;
- The care of a spouse, child, or parent with a serious health condition; or
- The serious health condition of the Team Member.

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the medical certification form. Request for medical certification must be made in writing as part of

13    DEES000026

HMMA's response to the Team Member's request for leave.

All Team Members requesting leave under the policy must provide verbal notice with an explanation of reason(s) for the needed leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reason(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

## HOLIDAYS

HMMA observes paid holidays each calendar year. HMMA will review the holiday schedule each year and communicate to all Team Members the holiday schedule for the coming year in November. All full time Team Members and team leaders are eligible for holiday pay, which includes shift premium if applicable. All full time Team Members will be eligible for holiday pay as of their first day of employment.

All Team members must work his/her last full scheduled workday before the holiday and the first full scheduled workday following the holiday in order to receive holiday pay.

All non-exempt Team Members and exempt Team Members up to assistant manager will be paid double time for hours worked on a designated HMMA holiday.

## VACATION NON-EXEMPT/EXEMPT TEAM MEMBERS

HMMA realizes that vacation is an important benefit for all Team Members. HMMA's intention is to provide Team Members with a means to take a scheduled vacation without loss of pay. Vacation does not apply to holidays, bereavement leave, jury duty or military leave pay. The vacation allowance is granted for the calendar year only. Once it is used for the year, it is not renewed until January 1st of the next calendar year.

A Team Member's vacation eligibility is determined based on his/her length of service with HMMA and is to be used during the calendar year January 1st through December 31st. Any Team Member that has not worked hours for the year in which the vacation is scheduled will not be paid until at least one day has been worked in the qualifying year. Although Team Members must actually perform work in a new calendar year before qualifying for vacation, Team Members may use their vacation in January if it is connected with vacation or a holiday from the previous year. Five vacation days are reserved and must be used during HMMA's summer shutdown. However, a Team Member may use these days prior to shutdown for Family Medical Leave or if the Team Member is scheduled to work the vacation days that are reserved for the summer shutdown period. Anticipated unused shutdown vacation days may not be scheduled for dates before the actual shutdown occurs.

Starting the year of the Team Member's second anniversary, the Team

14    DEES000027

---

Member is eligible for vacation according to the following schedule. (The Team Member's vacation allowance is available as of January 1st each year)

Team Members with:

- Less than one year will receive a prorated vacation based on the following
  - January – 10 days vacation
  - February – 9 days vacation
  - March – 8 days vacation
  - April – 7 days vacation
  - May – 6 days vacation
  - June – 5 days vacation
  - July – 4 days vacation
  - August – 3 days vacation
  - September – 2 days vacation
  - October – 1 days vacation
  - November & December – 0 days vacation

- Beginning January of the next year Team Members will receive:
  - 1st year – 10 days vacation
  - 2nd year – 11 days vacation
  - 3rd year – 12 days vacation
  - 4th year – 13 days vacation
  - 5th year – 14 days vacation
  - 6th year – 15 days vacation
  - 7th year – 16 days vacation
  - 8th year – 17 days vacation
  - 9th year – 18 days vacation
  - 10th year – 19 days vacation
  - 11th year – 20 days vacation
  - 12th year – 21 days vacation
  - 13th year – 22 days vacation
  - 14th year – 23 days vacation
  - 15th year – 25 days vacation

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

## SCHEDULING VACATION

In order for HMMA to plan proper coverage for Team Member vacations, the scheduling period for the subsequent year's vacations will be during November and December as follows:

- Full week and single days of vacation for January and/or February must be scheduled between November 1 and

15    DEES000028

November 30 of the preceding year.
- Full weeks and single days of vacation for the remainder of the year - March through December - must be scheduled between December 1 and December 22 of the preceding year.
- Full weeks take precedence over single day vacation requests.
- Single days take precedence over 1/2 day vacation requests.
- When two (2) or more Team Members with the same length of service request the same dates for time off, the last letter of the Team Members' names will be used to determine who has first preference.

## SUMMER SHUTDOWN

HMMA reserves the right to schedule a plant shutdown each year. When a plant shutdown is planned, HMMA will inform Team Members of the planned shutdown by the end of December the prior year. HMMA reserves the right to require the Team Members to use up to 5 days of his or her vacation if needed during the shutdown period.

There may be occasions when it is necessary to schedule work during HMMA's summer shutdown period. When it is necessary to schedule work, each department will notify Team Members 30 days prior to the planned summer shutdown, which they will be required to work.

## Procedure

The manager and/or group leader will solicit volunteers and/or require Team Members to work during the shutdown period using the following criteria:

- **Soliciting Volunteers:**
  - Solicit volunteers based on length of service for shut down days that are not holidays. The Team Member volunteering with the longest length of service will be awarded the work. If two or more Team Members volunteer with the same length of service, the first letter of their last names will determine which Team Member is awarded the work.
  - If the voluntary work being offered is an HMMA holiday, the manager and/or group leader will use the overtime equalization chart to determine which Team Member will be awarded the overtime, as stated in the Equalization of Overtime Policy.
- **Required Work:**
  - When requiring Team Members to work on shutdown days that are not holidays, start from the bottom of the length of service list until the required manning is obtained.
  - All Team Members who volunteer or that are required to work during an HMMA shutdown that involves reserved vacation days will be eligible to reschedule

the vacation days.

- **Skills Requirement**
  - In overtime situations that require a specific skill and or qualifications to accomplish this job task, Skill will take precedence over length of service.
  - If more than one Team Member has the skill and qualifications, overtime equalization should be used as a determining factor and then length of service if applicable.

## Medical Leaves During Shutdown Periods

All Team Members that are on an approved medical leave, or personal leave during the shutdown period will be paid for any vacation reserved for the shutdown period, and will not be eligible to reschedule vacation days reserved for the shutdown period.

## Canceling Vacation

Team Members who choose to cancel their scheduled vacation must notify their manager and/or group leader as soon as possible. Team Members may only cancel a scheduled vacation one time per scheduled year.

When a Team Member cancels a scheduled vacation week or day, he/she may reschedule the canceled vacation to any open block of available vacation time. The opportunity for the canceled week or day will be posted in a central area for the entire group or department, whichever is applicable, for 48 hours following the cancellation.

## Personal Days

All Team Members will be given three Personal Days each year. HMMA encourages its Team Members to schedule their Personal Days in advance if possible. However a Team Member may use Personal Days at their discretion for emergency situations or unforeseen circumstances (HMMA may require documentation) that prevent them from reporting to work, leaving early, or reporting late to work.

If a Team Member is already at work and needs to leave, the Team Member must contact his/her manager and/or group leader and get approval before leaving the plant. If the Team Member does not contact his/her manager and/or group leader or another member of management and leaves without proper authorization, he/she will be considered to have voluntarily resigned.

## Personal Day Limitations

- Personal Days were not developed to extend vacation periods or to be utilized in lieu of vacation

- Personal Days were not intended to be used to extend a holiday period, however if a verifiable unforeseen circumstance were to arise the Team Member would be

16   DEES000029

allowed to utilize a personal day to cover his/her absence.

- Can not be used during the New Hire 90 day probation period.

- If a Team Member uses a Personal Day on a Saturday or Sunday for a verifiable emergency he/she will not be eligible for compensation at a premium rate, but will be compensated at a straight time rate and may be required to provide documentation.

**Scheduled Personal Days**

- Must be scheduled in advance of the day taken (before close of previous shift).

- Must be approved in advance by immediate supervisor (may also be denied by immediate supervisor if manning not sufficient).

- Does not require documentation or explanation.

- Scheduled Personal Day will not effect attendance percentage.

- Scheduled Personal Day will remain eligible for attendance bonus.

- Scheduled Personal Day before a holiday will not disqualify holiday pay.

- Scheduled Personal Day before "scheduled Saturday/Sunday" does not allow for missing Saturday/Sunday if scheduled.

- Scheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Scheduled Personal Day will be paid at straight time (regardless of day requested).

**Unscheduled Personal Days**

- Must only be used for emergency purposes.

- Emergency reason may be required to be documented.

- Documented emergency will still be eligible for attendance bonus.

- Un-documented emergency will disqualify for attendance bonus.

18     DEES000031

- Non-emergency use will disqualify for attendance bonus.

- Un-documented/non-emergency use before a holiday will disqualify holiday pay.

- Un-documented/non-emergency use will not count against attendance percentage.

- Un-documented/non-emergency use to cover tardy will disqualify attendance bonus.

- Utilizing to cover tardy will not count against attendance percentage.

- Unscheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Unscheduled Personal Day will be paid at straight time (regardless of day requested).

**Transfers**

If a Team Member transfers to a new Team, the Team Member will be required to reschedule his or her vacation.

**Unscheduled Vacation**

A Team Member's vacation allowance does not accumulate and must be taken in the calendar year in which it is earned. Team Members will be paid for any unscheduled vacation on the first pay period in February of the following year.

**Vacation Eligibility**

All regular, full time, exempt Team Members are eligible for vacation.

Vacation is earned by the Team Member each January. In order for the Team Member to be eligible for vacation he/she must have reported for work in the year of eligibility.

Requests for vacation days must be submitted to the supervisor one week in advance. The supervisor is required to approve or deny the request within 48 hours.

**Unused Vacation Time**

A Team Member will not be allowed to carry over unused vacation into the next year. Team Members that have vacation days remaining after the close of the calendar year (December) will be paid for any remaining vacation time by the first pay period in February.

Upon separation from employment with HMMA, the Team Member's vacation will be prorated and the Team Member will receive pay for any unused vacation during the year in which the termination occurs. If a

19 DEES000032

Team Member should die during the term of employment, pay for unused vacation will be paid in a lump sum to the Team Member's beneficiary (as designated for retirement plan).

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

### Personal Leave

In an effort to recognize the need of Team Members who require time off in addition to personal days or vacation, HMMA may consider a personal leave of absence without pay for up to a maximum of thirty (30) days.

All regular permanent, full time Team Members employed by HMMA for a minimum of ninety (90) days are eligible to apply for an unpaid personal leave of absence. Departmental requirements will all be taken into consideration before a request is approved. Requests for unpaid personal leave may be denied or granted by HMMA. Approvals of the immediate supervisor, department director, and Director of Human Resources are required. All personal leaves are unpaid leaves.

An eligible Team Member should submit a request in writing to his/her immediate supervisor.

A Team Member is required to return from the unpaid personal leave on the originally scheduled return date. If the Team Member is unable to return, he/she must request in writing the extension of the leave.

If HMMA does not extend the leave, the Team Member must then return to work on the originally scheduled return date or be considered to have voluntarily resigned from his or her employment. Extensions of leave will be considered on a case-by-case basis.

### BEREAVEMENT LEAVE

The bereavement leave policy was developed to provide Team Members with a suitable period of time away from work, with pay, in order to properly attend to the arrangements required when a death in the Team Member's family occurs.

The Team Member's group leader or management Team Member should be immediately notified when such leave is needed.

A bereavement leave of absence, with pay, for a period not to exceed five workdays shall be granted to a Team Member when death occurs to the Team Member's:

- parent
- stepparent
- spouse

20

DEES000033

- child or stepchild

A bereavement leave of absence, with pay, for a period not to exceed three workdays shall be granted to a Team Member when death occurs to a member of a Team Member's family.

For the purpose of this policy, the Team Member's family shall be defined as follows:

- In the event of a miscarriage, if a death certificate is issued, then the above policy will apply
- Mother-In-Law/Father-In-Law
- Sister/Brother
- Grandparent/Grandchildren
- Stepsister/Stepbrother
- Grandparent-In-Law
- Half-sister/Half-brother
- Great Grandparents
- Son-In-Law/Daughter-In-Law

Exceptions may be made to the "Team Member's family" provisions if the deceased was a relative or foster parent and the Team Member resided with or was reared by the deceased.

In the event of the death of a Team Member's relative not mentioned above the Team Member will be excused, with pay, for up to one day (8 hours). This applies to the following family members only:

- Aunts
- Uncles
- First cousins
- Nephews
- Nieces
- Brother-In-Law and Sister-In-Law

When a Team Member is on vacation and a member of the Team Member's family dies, the time off will be considered as bereavement leave. Vacation time missed because of the death may be utilized at a later time. If an official HMMA holiday occurs during time considered as a bereavement leave, the Team Member's bereavement will begin the day following the holiday. In addition, Saturdays, Sundays and holidays are not considered as bereavement. Any Team Member who is off on a Friday Saturday or Sunday after the approved bereavement leave.

All bereavement leaves of more than one day must be taken on consecutive work days. (For example: Tuesday, Wednesday, Thursday, or Friday, Monday, Tuesday).

A Team Member who leaves during his or her shift due to the death of a family member that qualifies for bereavement leave will receive eight hours of total pay for that day. By leaving during the shift, the Team

21

DEES000034

Member has started his/her bereavement leave and the partial day will count as a full day of the allowable bereavement leave.

HMMA may request documentation for verification to be retained with the leave of absence request.

**JURY DUTY**

HMMA will provide income protection while a Team Member carries out his/her civic responsibility regarding jury duty.

Upon receipt of notification from the state or federal courts of an obligation to serve on a jury, the Team Member should notify his/her supervisor. The Team Member is required to provide copies of the jury subpoena or jury summons to his/her supervisor and to the Payroll Department.

Any Team Member appearing as a plaintiff, defendant, and/or witness in any legal proceeding, or for other appearances related to legal proceedings or court cases (e.g. deposition testimony), whether or not pursuant to a court-issued subpoena will not receive paid time off. Vacation, personal time, or unpaid time should be used for these instances.

**MILITARY LEAVE**

Team Members who are inducted into the U.S. Armed Forces or who are reserve members of the U.S. Armed Forces or state militia groups will be granted leaves of absence for military service, training, or other obligations in compliance with state and federal laws. These Team Members may use accrued vacation leave but are not required to do so. At the conclusion of the leave, Team Members generally have the right to return to the same position they held prior to the leave or to a position with equivalent seniority, pay and benefits. HMMA will pay the difference between military pay and regular wages/salary for up to one month. Team Members are requested to notify their supervisor as soon as they are aware of the military obligation. Questions regarding HMMA military leave policy, applicable state and federal laws, and continuation of benefits should contact the Human Resources Department.

**TEAM WEAR**

The purpose of *Team Wear* is to support the spirit of team work, build open communication, ensure safety for Team Members, protect product finish, ensure proper security and identify visitors.

*Team Wear* will be worn by all Team Members in a neat and appropriate manner during normal business hours, except when a special business meeting requires other clothing. *Team Wear* may be worn to and from work. The *Team Wear* concept also applies to interns & co-op Team Member who are issued *Team Wear* by HMMA.

Other HMMA apparel is not considered *Team Wear* and should not be worn during normal working hours. Likewise, jackets, sweaters and

22     DEES000035

sweatshirts not issued or purchased through the *Team Wear Collection* should not be worn over *Team Wear* during business hours.

The color choices at the present time are:

- pants/skirts in khaki, navy, grey, olive and black
- shirts in tan, white, blue & blue/white, herringbone, green, slate blue, denim, khaki, and black.

Team Members will also have choices of sweatshirts and sweaters which are also embroidered with the company logo.

Skirts may be hemmed to no more than 3 inches above the top of the knee.

All alterations will be done at Team Member expense. Safety issues and mutilation hazards for clothing should be kept in mind when altering clothes.

*Team Wear* is provided to Team Members once each 18 months. During orientation each Team Member will order his/her initial set of:

- 5 pants/skirts
- 5 tops
- 1 hat
- 1 belt

Every 18 months Team Members will receive a full replacement set of *Team Wear* due to wear and tear. Team Members will also have the option to purchase, at their own expense, pants/skirts in the same approved colors as those provided by HMMA.

Jeans (blue, black or any other color) are not considered appropriate for work at HMMA and are not to be worn during normal working hours. All items must conform to the Team Wear concept. Safety issues and protecting the finish of the vehicle should be taken into consideration when choosing Team Wear (100% cotton clothing is required in some areas and loose clothing is not allowed on production lines).

*Team Wear* which is damaged during work hours at HMMA will be replaced.

Maternity wear is available upon request. The choices will include a navy jumper, navy slacks and a white blouse. The jumper must be dry cleaned at the Team Member's expense. Due to changes in sizes, maternity clothing may be requested twice during pregnancy. Team Members may choose to wear maternity clothing of their own choosing (and expense) if the colors match those outlined above.

Additional HMMA apparel from the HMMA Team Wear Collection may be purchased by the Team Member through the supplier for Team Member use only. Team Wear may not be purchased for family members, however, Hyundai logo items may be purchased through the HMMA

23     DEES000036

Gift Shop. Team Members will bear the expense of tax and shipping for individual purchases.

Note: No pins, buttons, or other items may be worn on HMMA Team Wear unless it is issued by HMMA. Furthermore, only HMMA issued hats may be worn at HMMA. All HMMA head wear must be worn as issued and may not be altered. The only acceptable alteration is the addition of the Team Members name.

## SAFETY

HMMA's goal is to eliminate potential hazards before they become an accident. Every Team Member is responsible for safety not only for themselves but for others. We can all prevent incidents by avoiding unsafe acts, reporting unsafe acts and conditions and by learning and following the policies and procedures that have been developed to keep our facility safe.

### Safety Committees

HMMA's safety committees provide Team Members an opportunity to participate in safety improvements in their areas. The safety committees will conduct area audits, identify safety training needs and support safety awareness programs in the facility.

### Safety Wear

As part of HMMA's total Team Member safety program, special clothing and other apparel designated by department managers and the Safety/Environmental Department must be worn by Team Members, when and where required, to help guarantee your personal safety.

### Hard Hats and Bump Caps

Hard hats (heavy-duty, impact-resistant hats) must be worn in work areas where there is danger of falling objects or hazardous conditions. Bump caps (lighter weight hats) may be required in some areas as an additional means of protection. Team Members are reminded to obey signs or directions in areas where such protective devices must be worn.

HMMA will issue all bump caps and hard hats. Only HMMA-issued hats may be worn. Additionally, safety caps may not be altered in any way. The only exception is the addition of the Team Members name.

### Shoes

HMMA safety-approved shoes are required in many areas of the plant and are necessary to safeguard your health. HMMA has established a specified dollar amount it will pay toward the purchase of safety shoes. Contact the safety department for the exact amount.

### Safety Glasses

All Team Members, vendors and visitors at HMMA are required to

wear OSHA-approved safety glasses in the production areas. Safety glasses are provided by HMMA and can be ordered through the Safety Department. Eye examination charges are not covered under this program. Safety glasses do not have to be worn when entering, exiting, or during breaks and lunch.

### Personal Protective Equipment (PPE)

When it is required, use of special safety equipment by Team Members shall be regarded as a condition of employment. Further information will be given to you during your training regarding equipment needed for your job. If you are not sure of the PPE required in your work area, please contact your group leader.

### Housekeeping

Good housekeeping habits allow all HMMA Team Members to be safe in their work areas as well as the ability to work more efficiently. Each Team Member is responsible for maintaining their work area. If we allow dust and dirt to accumulate or if we do not regularly maintain the work area safety hazards may occur. Team Member is responsible for disposing of trash both inside and out into the proper receptacle. Failure to adhere to the aforementioned is considered to be a performance issue and could result in corrective action.

### Lock-out/Tag-out Procedures

The safety of all HMMA Team Members is a primary concern. In order to protect all Team Members from danger, we have established a Lock-out/Tag-out procedure to protect all those who enter machinery, work within machinery, or use machinery as part of their job duties at HMMA. Only authorized Team Members who have completed lock-out/tag-out training may work within machine guarding or enter machinery. Strict compliance with the lock-out/tag-out procedures and rules are required from all HMMA Team Members and contractors at all times.

HMMA will issue each trained and authorized Team Member a personal safety lock along with an identification tag. The Team Members lock and tag is required to be properly attached to the lock-out devices located on each piece of machineries control panel before entering. In situations where multiple persons must enter a piece of machinery requiring lock-out/tag-out, each person must attach his/her lock and tag to the lock-out device with a multi-lock hasp. All locks and tags must be removed before the equipment is restarted.

Because of the differences in each machine or piece of equipment, the Team Member should learn the proper method of locking and tagging each piece of equipment they operate, repair or maintain. If a Team Member is unsure about the procedures for locking out the equipment, the Team Member must ask their manager and/or call the Safety Department for assistance.

## SPECIAL AUTHORIZATION PERMITS

Because of the varied types of work required, certain types of work require special authorization and/or training. Areas designated as confined space or certain welding operations require a permit prior to beginning work.

### Confined Space Entry Permits

When a location is designated a "confined space" it requires specialized training before a Team Member can work in the designated area. Confined spaces present characteristics of an atmosphere or have the potential for serious safety and/or health hazards.

Lack of oxygen or contamination of the air is possible in confined spaces. No Team Member or contractor is allowed to enter a "permit required" confined space unless they have received the proper training and the area has been adequately tested and a confined space entry permit has been issued. When training and/or a permit is needed contact the Safety Department to obtain training and/or a permit.

### Hot Work

There are areas within our facility that are susceptible to fire and explosions. Because of these dangers Team Members planning to do "hot work" in these areas must obtain a hot work permit before performing cutting, welding and/or spark producing work. Hot work being done on welding lines and in authorized maintenance areas does not require a hot work permit unless otherwise posted. All hot work permits must be obtained from the Safety Department.

### Area Specific Safety Rules

Individual areas within our facility will have area specific safety requirements. These include but are not limited to:

- Rules for the proper use of different kinds of tools and equipment
- Rules for performing different kinds of operations
- Proper techniques for lifting or performing other physical activity

Each department will be responsible for communicating the safety rules that apply to your particular job function. If a Team Member is unsure of the safety requirements for their work area they are to contact the manager for the department or the Safety Department.

## SECURITY

### Foreign Trade Zone (FTZ)

HMMA is designated as a FTZ under the Foreign Trade Zone Act of 1934.

26    DEES000039

The FTZ makes it possible for HMMA to receive parts from other countries without paying the required duty tax until the parts leave the FTZ as part of a completed vehicle. Operation of the FTZ is under the supervision of U.S. Customs Service and therefore HMMA is required to operate under stricter security than you may be accustomed.

### Video Surveillance

At HMMA the security of our Team Members as well as our product is important to us.

In order to ensure our Team Member's safety, protect our product, and maintain the FTZ zone, HMMA uses video surveillance throughout our facilities.

### HMMA Identification Badges

HMMA identification ("ID") badges are issued on the first day of employment. All HMMA Team Members are required to wear their ID badges, and have them visible when entering and exiting HMMA. Team Members do not have to have their badges visible when they are in their assigned work area. However, the Team Member must wear, and have their badge visible when traveling between HMMA facilities. Personal identification from your ID badge is an FTZ requirement. Security personnel may periodically inspect badges. All Team Members will be required to return his/her badge to security on their last day of employment. If any Team Member loses their identification badge, the Team Member is to notify Security immediately so that a new badge can be issued and activated.

### Parking/Traffic Control

The ability to park on HMMA premises is allowed during scheduled work times. At HMMA we have reserved parking spaces for visitors as well as for the disabled. Here at HMMA, all other Team Members have equal access to parking and parking spaces on a first come first serve basis. All Team Members are responsible for parking in the proper parking spaces and for respecting the visitors and disabled parking areas.

Additionally, HMMA has a posted speed limit as well as designated lanes which allow for smooth traffic flow in and out of the facility. All Team Members are required to follow all posted limits, as well as safe driving habits, to ensure the safety of all HMMA Team Members and visitors. Any Team Member found in violation of these rules is subject to corrective action up to and including termination.

## CAREER OPPORTUNITY PROGRAM

The purpose of the HMMA Career Opportunity Program (COP) is to encourage promotion from within HMMA and to ensure that all qualified Team Members have an equal opportunity for job advancement. This program is designed to provide: an effective means of communication to Team Members of specific job vacancies within HMMA. This policy will

27    DEES000040

be administered by the Employment Department.

It is the intent of HMMA to fill job vacancies from within the organization when Team Members with the skills and qualifications for the positions are available. In the event a posted position cannot be filled from within HMMA due to a lack of qualified Team Members external sources can and will be utilized to fill the position. Job advancement and transfers will be made without regard to race, color, religion, sex, age, national origin, veteran status, or disability.

This program will be used for exempt and non-exempt positions excluding the following: production Team Member, team leader, entry level support staff Team Member, management Team Member and above.

A manager may fill a vacancy internally within his/her section and within the same salary classification without posting the position by realigning a Team Member into the position. The position vacated will then be posted.

All full-time Team Members who have completed the probationary period of at HMMA are eligible to apply for vacancies posted under this policy. In the interest of stability and continuity, a Team Member who accepts a promotion will be expected to remain in the new position for a period of twenty-four (24) months and will be prohibited from applying for another promotional opportunity during that twenty-four (24) month period.

A Team Member will be disqualified from consideration for any Career Opportunity Posting if he/she has active corrective actions at the Formal Discussion level or above. Any conflict with the Employment of Relatives Policy may also prohibit a Team Member from being considered eligible for the posted position.

Vacancies to be filled by the Career Opportunity Program will be announced via closed circuit television and/or on the Career Opportunity Bulletin Boards. Vacancies will remain posted for five (5) working days following the first date of the announcement.

All Team Members who have filed a Career Opportunity Application but do not meet the minimum eligibility requirements will be notified in writing by the Employment Department. Candidates may be contacted for a screening interview to verify and/or clarify experience. Applicants not selected will be notified of their status, in writing, by the Employment Department.

A Team Member who has been awarded job advancement will be transferred within thirty (30) days of the selection decision. The Director of Human Resources must authorize any decision to delay the transfer.

## TRANSFERS

HMMA wants all of its Team Members to become multi-talented. In order to achieve this goal HMMA Team Members will have the ability to

28     DEES000041

request an assignment to another work area of their choice. Not only does this allow the Team Members to gain important job experience but it also helps HMMA to develop Team Members for other responsibilities.

Team Members with permanent medical restrictions, either off work or on a temporary work assignment, will be considered for placement, with or without accommodation, as required by the Americans with Disabilities Act. Placements of Team Members with permanent medical restrictions will take priority over transfer requests.

When a vacancy is declared, it shall be posted for department or group transfer, provided the position cannot be filled by a Team Member with permanent medical restrictions. This vacancy will be posted plant wide denoting the department and group. The requesting eligible Team Member with the longest length of HMMA service shall be placed in the open position. The job posting will be posted in designated areas of the facility for a period of three (3) working days, excluding weekends and holidays. All requests received by the end of the posting period shall be reviewed to determine which candidate has the longest length of service and is eligible for transfer.

The requesting Team Member must be a full-time, non-probationary Team Member with at least 12 months of HMMA service as of the date of the posting. The Team Member requesting transfer must not have transferred within the last twelve (24) months.

Any corrective action at the Commitment Discussion level or above will result in the denial of a Team Member's transfer request or promotional request. When two or more Team Members have identical length of service dates, the Team Member identification number will be used as the tie breaker. The Team Member with the lowest Team Member identification number will be awarded the transfer. Team Members will not be considered for any transfer that would result in conflict with the HMMA Employment of Relatives Policy.

To assure that adequate skill levels are maintained in each department, all transfer requests will be evaluated based on operational viability.

Any Team Member who submits and is awarded a transfer request must accept the transfer. The Team Member who receives a transfer shall be prohibited from another transfer for a period of twenty-four (24) calendar months. This period shall begin as of the actual date the award of transfer notification is given. A Team Member who transfers will be required to reschedule vacation time previously approved. A Team Member who transfers to a new department will assume high overtime hours on that team for overtime equalization purposes.

## SOLICITATION, DISTRIBUTION, & POSTINGS

HMMA prohibits the solicitation, distribution and posting of materials on or at HMMA property by any Team Member or non-HMMA Team Members, except as may be permitted by this policy. The sole excep-

29     DEES000042

tions to this policy are charitable and community activities su~, ...ed by HMMA and HMMA-sponsored programs related to HMMA products and services.

Non-HMMA Team Members may not solicit Team Members or distribute literature of any kind on HMMA premises at any time. Team Members may only admit non-HMMA Team Members to work areas with HMMA approval or as part of a HMMA-sponsored program. These visits should not disrupt workflow. The HMMA Team Member must accompany the non-HMMA Team Member at all times. Former Team Members are not permitted onto HMMA property except for official company business. Team Members may not solicit other Team Members during work times, except in connection with a HMMA-approved or sponsored event. Team Members may not distribute literature of any kind during work times, or in any work area at any time, except in connection with a HMMA-sponsored event

The posting of materials or electronic announcements are permitted with approval from the Director of Human Resources. All team communication boards located in team areas are intended for team related instruction and production-related materials only. Violations of this policy should be reported to the Director of Human Resources.

## TEAM MEMBER WORK CONDUCT

It is the policy of HMMA that Team Members maintain a working environment that encourages mutual respect, maintains fellow Team Members dignity, promotes civil and congenial relationships among Team Members and is free from all forms of harassment and violence.

Team Members are expected to conduct themselves in an appropriate manner as judged by a reasonable person at work, at all HMMA functions, and also in the community. Team Members have the right to conduct their work without disorderly or undue interference from other Team Members. HMMA prohibits Team Members from violating the rights of their co-workers.

HMMA encourages a congenial work environment of dignity and respect as well as professionalism. Therefore, HMMA prohibits Team Members from intentionally harming or threatening to harm other Team Members, clients, vendors, visitors or property belonging to any of these parties.

Team Members are responsible for maintaining their work area in a neat and professional manner.

Team Members are responsible for assuring the security of HMMA confidential/proprietary material in their possession and similarly maintaining the security of HMMA provided equipment. Team Members concerned for the security of their work area or equipment must inform their supervisor of such concerns.
HMMA reserves the right to search locked, unlocked and/or publicly

30    DEES000043

used HMMA property at any time without consent, HMMA may rep a search of personal property at the worksite or locked HMMA property assigned to an individual if there is reasonable suspicion that evidence of illegal or prohibited activities resides therein. Refusal of such a request may result in corrective action up to and including termination.

## CORRECTIVE ACTION

The intent of corrective action is to provide a consistent way to address unacceptable attendance, performance, or conduct. Corrective action is designed to allow Team Members formal notice and the opportunity to correct any performance deviations from HMMA's acceptable standards.

The following corrective action procedures will be taken by HMMA's management in order to address a Team Members' inability to meet HMMA's standards regarding attendance, performance, or conduct. Corrective action applies to exempt Team Members at the specialist level and below, non-exempt administrative Team Members and all production Team Members, including maintenance Team Members. A team relations representative will be available and must attend each phase of the corrective action procedure. The steps are as follows:

### Discussion Planner

Once it has come to the group leader and/or manager's attention that a Team Member's performance does not meet HMMA's performance standards, the group leader and/or manager will meet with the Team Member. This discussion is designed to gather facts about the performance issue and is to be a two-way conversation. The group leader and/or manager is to explore whether the performance issue is failure in the process, equipment, or with the Team Member.

- Equipment Problem. The group leader and/or manager will investigate and seek help in resolving any equipment problems.
- Process Problem. The group leader and/or manager will investigate and seek help in resolving any process problems.
- Team Member's Performance. Inform the Team Member of performance expectations and explain potential ramifications if the poor performance continues.

### Informal Discussion – Phase I

Phase I of corrective action is to address minor performance problems. The intent of Phase I is to bring the performance problem to the Team Member's attention through an Informal Discussion. The group leader and/or manager is responsible for conducting the Informal Discussion. The team relations representative will attend the Informal Discussion and serve as a witness. The Informal Discussion is an open discussion between the Team Member and the group leader and/or manager that identifies the nature of the problem and the possible solution.

31    DEES000044

If the performance problem is corrected and no additional problems develop during the following twelve months, the documented Informal Discussion will be removed from the Team Member's file and will not be used for any future corrective action.

### Formal Discussion – Phase II

The Formal Discussion is the 2nd phase of corrective action and is to be used for more serious performance issues, or if a Team Member fails to correct an existing performance issue after receiving an Informal Discussion, or if it is decided that a Team Member's performance issue is serious enough that it warrants a higher phase of corrective action. The Team Member will be given a Formal Discussion letter. Attendees at the Formal Discussion phase are the group leader and/or a member of management, team relations representative and the Team Member. The group leader and/or production management Team Member will prepare a Formal Discussion document addressed to the Team Member summarizing the performance issue. If the performance issue is corrected and no additional performance issues arise during the following twelve (12) months, the Formal Discussion letter will be removed from the Team Member's file and will not be used for any future corrective action.

### Commitment Discussion – Phase III

The Commitment Discussion is the 3rd phase of corrective action. This phase will be used if a Team Member's performance continues to be unacceptable or the Team Member commits a serious action that requires a higher level of corrective action.

A Commitment Discussion is a formal meeting, which is conducted with the affected Team Member, his/her group leader and/or manager, team relations representative, the team relations manager, and the appropriate production management Team Member. The purpose of this phase of corrective action will be to determine what aspects of the Team Member's performance are unacceptable, why they are unacceptable, and the reasons behind the Team Member's failure to correct the performance problem. The Team Member will be required to write an action plan stating what actions he or she will take to resolve the performance problem.

The Commitment Discussion letter and the Team Member's commitment letter will remain in the Team Member's personnel file for a period of 24 months. If the Team Member is able to correct the performance problem and no additional problems develop, the Commitment Discussion letter and the Team Member's action letter will be removed from the Team Member's personnel file and will not be used for any future corrective action.

### Decision Leave – Phase IV

The Decision Leave is the 4th phase of corrective action. This phase may be taken if the Team Member fails to correct the performance problem after the Commitment Discussion or if it is determined that the Team Member's performance is serious enough to warrant action beyond a

### Commitment Discussion.

The affected Team Member will meet with his/her group leader and/or manager, team relations representative, team relations manager and the appropriate production management Team Member for a formal meeting. The Team Member will be given the following day off with pay. The Team Member will be asked to use this time to make a final decision whether or not he/she wants to remain employed by HMMA.

If the Team Member decides to return to work and commit to correcting his/her performance, the day off will be excused with pay.

Information regarding a decision leave will remain in the Team Member's personnel file for a period of twenty-four (24) months. If the Team Member is able to correct the performance problem, and no additional performance problems develop, it will be removed from the Team Member's personnel file and will not be used for any future corrective action.

Corrective action will be administered sequentially with regard to all attendance performance situations. Specific performance-related issues regarding performance, quality, and conduct will be evaluated on a case-by-case basis, and corrective action may be applied based on the severity of the performance issue. Any Team Member whose employment is terminated by HMMA may be entitled to request a Peer Review Panel Hearing.

### Termination

HMMA and its Team Members have a mutual interest in maintaining job security and stability in our organization. Because of our mutual interest, HMMA and its management team hope that we may be able to terminate a Team Member's employment. However, in situations where a Team Member refuses to respond to the steps in the "Corrective Action Program" outlined above, or if a Team Member's actions are such that HMMA feels his/her employment cannot be continued, the Team Member will be terminated. Every termination decision will be reviewed by the team relations manager, the Team Member's manager, and the Director of Human Resources to review all facts and information before a termination decision is made.

Notwithstanding anything to the contrary contained in this handbook, every Team Member's employment with HMMA is voluntary and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA.

### SERIOUS MISCONDUCT

HMMA requires a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment immediately.

In serious misconduct cases where it is determined that termination is not appropriate, the Team Member will receive a Letter of Conditional Employment which will remain in the Team Member's file for 36 months. Upon issuance of a letter of conditional employment, the affected Team Member, group leader, team relations representative, team relations manager and the appropriate management Team Member will have a formal meeting. Following this meeting, the Team Member will develop an action plan and make a written commitment to successfully implement that plan.

Listed below are some examples of activities that constitute serious misconduct at HMMA:

- Serious and/or excessive violations of HMMA's attendance program.
- Serious and/or excessive violations of HMMA's performance standards.
- Threatening or fighting on HMMA's premises, at HMMA sponsored functions, or while conducting business away from the plant.
- Disclosing, misusing or removing from the premises any HMMA or fellow Team Member's property unless authorized.
- Use, possession, sale, transfer of or being under the influence of illegal drugs, alcohol or any other intoxicating substance any time on HMMA property. Gifts of alcohol and/or coolers containing alcohol are also prohibited at HMMA.
- Deliberate damage to HMMA property or the property of a fellow Team Member.
- Intentionally misrepresenting or falsifying any information concerning employment or any report of HMMA record.
- Engaging in any form of discrimination in the workplace, including racial or sexual harassment of a fellow Team Member or harassment by a person in a supervisory position of a Team Member under the supervisor's authority.
- Insubordination, including refusing to perform a work assignment or refusing to follow direction of HMMA security or safety personnel.
- Deliberately trying to conceal serious quality problems in HMMA products.
- Deliberately using unsafe work practices that might seriously jeopardize the health or safety of the Team Member or a fellow Team Member.

DEES000047    34

- Use, possession, sale or transfer of a weapon at any time on HMMA property.
- Engaging in illegal activities such as gambling or trafficking stolen goods.
- Deliberately violating HMMA's Solicitation and Distribution Policy.
- Deliberately spreading false or malicious rumors or slandering or libeling a fellow Team Member, HMMA or an HMMA product.
- Leaving the plant without proper authorization (note: this is also considered a voluntary resignation).
- Chronic violations of HMMA's Safety Rules or Procedures.
- Willful violations of HMMA's Lockout/Tag out, Confined Space Procedures or other situations where the violation places the Team Member or others in immediate danger.

The aforementioned list is not all inclusive.

WORKPLACE THREATS AND VIOLENCE

This policy applies to any Team Member and/or person that make substantial threats, exhibits threatening behavior, or engages in violent acts on HMMA property or makes threats, exhibits threatening behavior, or engages in violent acts relating directly or indirectly to any work activities.

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors, or other individuals by anyone on HMMA property will not be tolerated (zero tolerance).

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors or other individuals relating directly or indirectly to work activities including phone calls, written materials, behavior at HMMA-sponsored activities will not be tolerated. Firearms, ammunitions, knives, bows or any other types of weapons are not permitted on HMMA property which includes the parking area(s).

In the event that violations of this policy are substantiated, HMMA will initiate a decisive and appropriate response. This response may include, but is not limited to: suspension or termination of any business relationship, reassignment of job duties, suspension or termination of employment, and/or seeking arrest and prosecution of the person or persons involved. Any violation of this policy will be considered serious misconduct. Any Team Member terminated pursuant to violations of this policy shall not be subject to the Team Member Review Board process.

Any Team Member that has knowledge of or witnesses threats, threatening behavior or an actual incident or violations of this policy is required to report the information to his/her immediate supervisor and/or the manager of security and/or his/her Team Member relations representative.

TEAM MEMBER RESOLUTION PROGRAM AND

35    DEES000048

## PROCEDURE

In any organization there can be differences of opinion about working conditions, work rules and policies, and other work-related issues. To resolve these differences effectively, communication is essential. This program is designed to enhance communication by providing a formal process to resolve legitimate disputes. HMMA will provide a prompt, orderly means of receiving and responding to Team Members' concerns. This program and procedure is intended to supplement, rather than dis-courage or replace, informal discussions between supervisors and Team Members. A supervisor should make every reasonable effort to resolve Team Members' concerns outside the formal Team Member Resolution Procedure.

The Team Member Resolution Program and Procedure is available to all full-time Team Members who have successfully completed their proba-tion period. The Team Member Resolution Program and Procedure is not available to individuals employed in a temporary status or to employees of any contracted services provided to HMMA. The initiation of the Team Member Resolution Procedure in good faith by Team Members shall not adversely affect their standing as Team Members.

The Team Member Resolution Program consists of four steps, which are outlined below.

### Step 1: Supervisory Level

#### Team Member's Role

The Team Member should contact the team relations representative to coordinate a meeting in order for the Team Member to verbally present the concern to his/her supervisor within five (5) working days of the original cause for the appeal, or from the date the Team Member learned the cause for the appeal.

#### Supervisor's Role

The supervisor will meet with the Team Member and the team relations representative and respond verbally to the concerned Team Member within five (5) working days.

### Step 2: Resolution Request

#### Team Member's Role

If a Team Member does not agree with the supervisor's verbal response, he/she should contact a team relations representative for a Resolution Request Form. The team relations representative will give the Team Member the form and assist the Team Member in filing the form if necessary. The team relations representative will forward the Resolution Request form to the Team Member's section manager and coordinate within five (5) working days of receiving the answer to Step 1. The team relations representative will attend the meeting.

#### Section Manager's Role

The section manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The depart-ment manager will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the department manager will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

### Step 3: Resolution Appeal

#### Team Member's Role

If a Team Member does not agree with the department manager's response, he/she should contact a team relations representative. The Team Member must make a written request stating he/she does not agree with the department manager's response and request to go to the next step. The team relations representative will forward the request to the team relations manager and coordinate a meeting within five (5) working days of receiving the answer to Step 2. The team relations representative will attend the meeting.

#### Manager of Team Relations Role

The team relations manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The man-ager of team relations will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the manager of team relations will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

### Step 4: Resolution Final Appeal

The Resolution Final Appeal is the last step of the process. The commit-tee's written response is the final decision and cannot be appealed. The committee cannot change or alter any approved policy.

Outside counsel will not be permitted to attend any of the meetings. However, appropriate witnesses may be permitted to attend with approval from the manager of team relations.

36     DEES000049

37     DEES000050

## Team Member's Role.

If the Team Member is not satisfied with the decision of the team relations manager, he/she will give written notice, within five (5) working days of receipt of the Step 3 written response, to the team relations representative stating his/her wish to initiate the final step of the Resolution Appeal Process.

## Top Management's Role

The manager of team relations will coordinate and facilitate a meeting consisting of three of HMMA's top management within 10 days of the request. HMMA's top management representatives will meet with the Team Member and allow the Team Member to present his/her facts to the final appeal committee.

The committee may ask questions and/or speak to any witnesses as they feel may be necessary to reach a final decision. The Team Member filing will be notified of the committee's final decision in writing within 5 business days of the resolution meeting.

A Team Member may withdraw an appeal at any time. Once withdrawn, however, it may not be reinstituted. If the Team Member does not meet the time constraints outlined in this policy, Team Member Resolution request decisions will remain as defined by prior actions.

The procedure as outlined describes the normal course in which resolution requests are resolved. Team Members should note that the Team Relations Department is available to provide Team Member consultation on a problem and any other assistance at any time prior to or during the Team Member Resolution Procedure.

**Team Members cannot file a Team Member Resolution Request against a policy they feel is unfair. However, a Team Member may file a Team Member Resolution Request regarding a policy that is not implemented properly.**

## TEAM MEMBER REVIEW BOARD

The Team Member Review board is to allow those Team Members who feel they have been wrongfully terminated to request a review of that termination by a random selection of trained and qualified fellow Team Members. Any Team Member terminated for any reason except for violations of HMMA's policy on workplace threats and violence, drugs and alcohol, and the anti-harassment policy will have the right to appeal the termination to a Team Member Review Board.

## DRUGS, ALCOHOL AND WEAPONS PROHIBITED

HMMA is committed to maintaining a drug, alcohol and weapon free workplace for all Team Members in order to ensure the safety of all those working at our facility and at all HMMA sponsored events. The illegal

38          DEES000051

use, sale or possession of narcotics or illegal drugs, alcohol or co [...] substances while on the job or on HMMA property (which includes parking areas) is prohibited and is a dischargeable offense. Any illegal substance will be turned over to the appropriate law enforcement agency and criminal prosecution may result. HMMA also considers off-the-job illegal drug use as proper cause for disciplinary action up to and including termination of employment.

Any Team Member convicted of driving under the influence which results in the suspension or revocation of his/her driving privileges and who, in the course of his/her job duties, is required to operate a motorized vehicle, including fork lifts, must notify the manager of the department. The suspension or revocation of a driver license will result in a job reassignment either temporarily or permanently. Any job reassignment will be to an open position only.

HMMA's business involves manufacturing, use of powered equipment, engineering, procurement, and project management. Therefore, the general public and our ability to fulfill our obligations under the Drug-Free Work Place Act of 1988, are of paramount concern.

While HMMA has no intention of intruding into the private lives of its Team Members, HMMA does expect Team Members to report for work in a condition that allows them to perform their duties without jeopardizing their own safety or the safety of other Team Members. HMMA recognizes that Team Members' off-the-job, as well as on-the-job, involvement with drugs and/or alcohol can have an impact on the workplace and on our ability to accomplish our goal of a drug and alcohol-free work environment.

HMMA will take steps to prevent and discourage the use, possession, sale, or distribution of stated contraband at any time by any HMMA Team Members or contracted vendors. In accordance with this policy, periodic searches, random or annual urinalysis, drug screening or blood testing may be conducted. Such searches and testing will be performed by HMMA using qualified contracted agents or qualified management Team Members.

Any Team Member who is taking medication prescribed by a physician must be able to provide a record of the prescription, including the name of the medication, the prescribing physician's name, and any limitations the prescription may place on the Team Member's ability to perform assigned duties. Furthermore, Team Members taking prescription or non-prescription medication are responsible for being aware of any potential effect such drugs may have on their reactions, judgment, or ability to perform their duties, and if impairment is possible, to report such use to their group leader/manager or HMMA's medical clinic prior to reporting to work.

Any refusal by a Team Member to submit to a search or testing procedure may, however, constitute grounds for termination. The primary

39          DEES000052

purpose of this policy is to promote the safety and well-bei..., all Team Members. It would be inconsistent to promote a strong, safety effort while allowing the use of drugs and alcohol or the possession of drugs, alcohol and/or weapons on HMMA property to undermine the safe and effective performance of Team Members on the job.

Each applicant for employment will be required, as a condition of employment, to undergo a urine drug screen/hair analysis. Applicants will be asked to read the policy and sign the post offer employment offer and Team Member consent to alcohol and drug screening. If an applicant tests positive and is determined to be in violation of this policy, applicant will be ineligible for employment.

## FOR CAUSE TESTING AND RANDOM TESTING

Each Team Member, as a condition of continued employment, is subject to medical or physical examination or tests, including urine drug screen and/or a drug screen using hair, at the determination of the responsible group leader, department manager and concurrence of the HMMA team relations manager and/or his/her designee, providing the following conditions are met:

- If the Team Member's group leader and/or manager has reasonable cause to suspect that the Team Member is in violation of this policy; or
- If the Team Member's job performance is deficient in a manner which suggests a possible violation of this policy; or
- If the position is designated as a safety sensitive and/or high risk occupation; or
- If the Team Member is selected at random for testing in order to monitor and ensure compliance by all Team Members with this policy. The random selection will be done centrally by HMMA's medical facility. Team Members will be asked to sign the Pre-Employment Offer and Team Member Consent to Alcohol and Drug Screening form.

If a Team Member tests positive for a random and/or for-cause testing and is determined to be in violation of this policy, the Team Member will be required to:

- attend a substance abuse program
- follow the attending physician and/or a qualified substance abuse counselor's guidance
- agree to random testing over the next 12 months
- supply HMMA's medical clinic with documentation of treatment and/or documentation that no further treatment is necessary
- agree to remain substance free as a condition of employment
- be responsible for any cost incurred that is not covered by HMMA's medical plan for treatment
- voluntarily resign if the Team Member subsequently tests

40    DEES000053

positive for any subsequent illegal or un-prescribed substan, and or being under the influence of alcohol.

Any adulterated specimen will be viewed as falsification and will result in immediate termination.

Any Team Member requesting rehabilitation assistance will be referred to the Team Member Assistance Program (TMAP) provider for assessment and treatment recommendations. The TMAP provider will monitor the program and advise HMMA of the Team Member's progress. Should the Team Member fail to maintain satisfactory progress or discontinue the program, the Team Member will be subject to termination.

Any Team Member who refuses to submit to drug testing will be considered to be insubordinate and will be terminated. Additionally, if a Team Member refuses to submit to or cooperate with a post-accident blood or urine test, he/she may forfeit his/her right to recover workers' compensation benefits.

HMMA recognizes that drug abuse and/or dependency are medical/behavioral conditions that can be successfully treated. Team Members with drug problems are encouraged to request assistance from the Team Member Assistance Program. Participation in TMAP is totally voluntary and completely confidential; however, a request for assistance or participation in a TMAP does not excuse a Team Member from violation of this policy.

HMMA reserves the right to conduct unannounced searches of its property, vehicles, and facilities, including Team Member's vehicles, work areas, desks and lockers assigned to Team Members, at any time. No Team Member has the right to interfere with or object to such searches of HMMA property based on expectations of privacy or otherwise. HMMA reserves the right to search personal property belonging to its Team Members, such as, but not limited to, lunch boxes or bags, pocketbooks or briefcases if such property is brought onto HMMA premises or into HMMA vehicles.

All Team Members will be required to sign a statement acknowledging their understanding of and compliance with HMMA policy.

## PUBLIC RELATIONS

To ensure that all information given to the public and the media is consistent, beneficial and accurate, it is important that the Public Relations Department coordinates and controls all information going out externally. If you are contacted by the news media and asked for information about HMMA or if you are asked to comment about HMMA, you are to refer the interviewer to the Public Relations Department. You may not release any information about HMMA business or activities unless you have been specifically authorized by the Public Relations Department.

## INTERNAL COMMUNICATIONS

41    DEES000054

Communication at HMMA is a key factor to our s    s. In order to maintain good communications, HMMA has establi    arious avenues of communicating information to the Team Members. Additionally, and just as important, are the avenues that have been created to allow you, the Team Member, to communicate to HMMA. It is important to keep the avenues of communication open. By communicating we can all be successful. Even though we have many avenues for communication at HMMA all Team Members are encouraged to communicate with their group leaders and managers. Some of those methods are:

## Open-Door Policy

HMMA believes that each Team Members should have the ability to address problems as they arise personally. As with all companies, misunderstandings, differences of opinions and disagreements occur. If issues and concerns are not addressed in a timely manner those issues of concern can damage your relationships and affect all the parties involved. HMMA wants, and encourages all Team Members to openly communicate with one another to resolve misunderstandings, differences of opinion and disagreements. One way that we can resolve these issues is by having open communications with one another and the ability to discuss issues and concerns openly.

Unfortunately, there may be times when an agreement cannot be reached. In these situations HMMA wants every Team Member to know that through the Open-Door Policy they can address these issues in order to achieve a fair and practical solution.

Any member of the team relations department will assist you should a concern or issue were to arise.

Again, HMMA encourages all Team Members to discuss the situation in a respectful manner with the party involved. If a resolution is not reached, discuss the situation with the next level of management. The Open-Door Policy is meant to be used in a systematic fashion and may be pursued to the top levels of HMMA's management.

## Bulletin Board

HMMA has bulletin boards at all entrances and exits. These bulletin boards are for communicating work related information, information required by law, and job postings. Additionally, each team will have a bulletin board; these boards are for work related communications only. Team Members are prohibited from posting any information or notices directly on any bulletin board at HMMA.

## President's Roundtables

The President's Roundtables provide HMMA's Team Membe    pportunity to meet and talk with HMMA's President as well as our    ...cutive Vice Presidents. Team Members will be selected randomly on a bi-monthly basis and sent invitations to attend the meetings. Participation is voluntary; however each Team Member is encouraged to attend so that they can communicate directly with the President.

## Group Leader/Managers One-on-Ones

Each group leader/manager will meet with each Team Member twice a year. In a company the size of HMMA it is difficult at times for the two to get together and have a casual conversation. HMMA feels that develop-ing these relationships is important and helps foster open communication. These meetings will be held away from the production work areas and are meant to be an opportunity for The Team Member and group leader/man-ager to have a 15 minute casual conversation.

## Manager Lunches

The managers lunches are another opportunity for a team to get together in a casual setting were the manager/assistant manager of the department meets with each team in their department every six months and provides lunch. Participation is voluntary. The purpose of these meetings is to continue to foster open communication, and promote a team spirit as well a felling of family within the department. The meeting is held during the normal lunch period and is unpaid time.

## Team Advisor

The Team Advisor is a bulletin that will be issued to the team to com-municate important information to the teams. The Team Advisor will be issued on an as needed basis to each team leader. The Team Advisor will information during the Five Minute Communication meeting. Once the bulletin has been read it will be posted for a specified time in order to allow Team Members to read it at their leisure.

## Hyundai Communication System (HCS)
## 334-387-8008

HMMA has established the HCS in order to allow Team Members an opportunity to ask questions in the event their group leader, team rela-tions representative or another member of management has been unable to answer your question or concern. This means of communication is done anonymously, by calling the HCS. The HCS does not record the extension or phone number from which the call came. HMMA encour-ages Team Members to talk with their managers first, but in the event you need to ask a question, make a comment, or voice a concern on a confidential basis, we also encourage you to call the HCS.

The HCS will be available 24 hours a day, seven days a week. Your call will be directed to the Director of Human Resources and or his designee.

The Director of Human Resources will review the question a... . comment and direct them to the most qualified person. If you leave your name and want a personal response, a meeting will be scheduled if you request one. Every effort will be made to make sure all replies are given within ten working days of receiving the call.

Anonymous calls will be posted with the answers on the HCS boards for a period of five days. We also ask everyone to be patient. Some calls may contain complex issues that require more time in order to answer them accurately.

## HMMA Closed Circuit Television System (CCTV)

HMMA CCTV System is an internal video system that will be used to broadcast HMMA information to all Team Members daily.

## HMMA Weekly News

HMMA Weekly News is a weekly summary of company-related information. The HMMA Weekly News will be distributed every Monday on a weekly basis.

## HYUNDAI Insights

Hyundai Insights is a newsletter that will be sent to the Team Members home on a biweekly basis. This news letter will keep you and your family informed about what is going on at HMMA as well as what is going on at HMC and HMA.

## Five Minute Communication Meetings

Each team will have a five minute communication meeting at the start of each shift. The purpose of this meeting is to provide the Team Members with information pertaining to production, quality, or safety. These meetings may also be used to discuss sales, benefits, policy updates, or other pertinent information the team may need to know. All Team Members must be in their assigned meeting area ready for work at the start of their shift.

## COMMUNITY RELATIONS

### Speeches

HMMA receives many requests for speeches about our company from a variety of groups. If your organization is not-for-profit and would like a representative from HMMA to speak to a group, you or your organization needs to submit in writing the following information: All requests must be on the group's letterhead:

• Requested date of speech
• Time
• Location
• Name of Group

• Topic you would like covered
• Background information on the organization
• Person to contact with their phone number or email address

All requests must be turned in at least one month prior to the requested date for the speech and should be addressed to the manager of public relations.

## Tours

All family and public tours must be scheduled through the Public Relations Department.

# GENERAL INFORMATION

## Electronic Devices

HMMA has a responsibility to protect every Team Member as well as to protect HMMA assets. The automotive industry is a very competitive industry, and in order to protect its Team Members and proprietary information, HMMA must control what types of electronic devices are allowed in the workplace.

In order to ensure the health and safety of all Team Members, personal radios, televisions, tape recorders, and tape/CD/mp3 players are not permitted anywhere in the facility.

## Camera/Video Camera

In situations where a department uses a camera/video camera in order to conduct investigations, the department must have approval by the Security Department and must have a camera/video camera pass attached to the camera/video camera at all times. If a supplier has a need that requires the use of a camera/video camera in order to conduct an investigation or to assist in the function of their job duties, he/she must gain written approval from the responsible department. The written approval must be submitted to the Security Department for approval and verification from the responsible department. Once the Security Department has approved the use of a camera/video camera, Security personnel will issue a temporary camera/video camera pass. The camera/video camera pass must be attached to the camera/video camera.

Any camera/video camera without a camera/video camera pass will be confiscated, held in security and returned to the owner as they exit HMMA's premises, minus its film.

Personal camera/video cameras and camera/video phones are not permitted within the plant, nor will pictures be allowed during general tours. Business situations may require photos to be taken in the plant, but when these situations occur, only Team Members with an approved camera/video camera pass using a HMMA-owned camera/video camera will be

allowed to do so.

### Cell Phones/Pagers

HMMA reserves the right to issue cell phones and/or pagers for business reasons to those individuals that have been approved in order to conduct HMMA business matters.

Personal cell phones and pagers will be allowed in the facility. However, cell phones and pagers must be kept in the Team Member's locker or desk during work times. In addition, the devices must have the volume muted while being stored. Team Members may use their cell phones and/or pagers during breaks and lunch periods only, and the Team Member must be in a designated break area.

### Audio Tape Recorders

Audio tape recorders are prohibited on HMMA premises. In situations where an audio tape recorder is needed a request for approval must be submitted to and approved by the Director of Human Resources or his/her designee.

Any violation of the aforementioned could result in corrective action up to and including termination. Any violation by a non-HMMA Team Member could result in their being asked to leave the premises and the Member could result in their being asked to leave the premises and the film, tape, disk, and/or any other type of device capable of storing audio or video information will be confiscated and/or memory erased.

### HMMA TOOLS

HMMA has supplied each Team Member with the tools as well as state of the art equipment needed to perform their daily job functions. Each Team Member is responsible for the care and upkeep, and inventory of tools and other equipment issued by HMMA. These tools and equipment are not to be removed from the appropriate HMMA work area. Personal tools must not be brought into HMMA.

Intentional damage to any HMMA tooling or equipment is subject to corrective action up to and including termination.

### LOCKERS

HMMA will provide each Team Member with a locker so that they may store personal items. However, these lockers should not be used to store money or valuables. HMMA will not be responsible for anything that is destroyed, lost or stolen from any locker.

Lockers will remain the property of HMMA at all times. HMMA maintains the right to inspect any locker and its contents at any time with or without notice if it is believed the locker (s) contain items contrary to HMMA policy. This includes but is not limited to items such as firearms, explosives, dangerous or lethal weapons, alcohol, illegal drugs, or missing HMMA property.

### CAFETERIA

HMMA provides two dining facilities for our Team Member's convenience. HMMA has designed each of our dining facilities so that you can experience a clean and pleasant area while dinning. Prepared meals will be served daily. However if you choose to bring your own meal our dining facilities have ample seating for everyone. Team Members will also find vending machines located throughout the facility if you wish to purchase food or drink.

### SMOKING

In an effort to provide safe and comfortable work conditions, HMMA prohibits smoking and/or the use of smokeless tobacco products in all production facilities and administrative areas. Team Members who use tobacco products should respect all areas designated as "no smoking," limit their tobacco use to those areas where and when smoking is permitted (outside of the facility and only during breaks and dinner/lunch), and dispose of all smoking materials/smokeless tobacco products in proper containers.

Smoking or the use of smokeless tobacco is only permitted during non-work times. This is outlined as follows: one 10-minute paid rest period in the first half of the shift, one 10-minute paid rest period in the second half of the shift and during the unpaid lunch period. In case of overtime work, an additional 5-minute rest period for each full hour (60 minutes) of overtime can be taken. There are some jobs where there are no set scheduled break times, such as maintenance, administration, etc. It is understood that these Team Members still fall with the guidelines of taking only a 10-minute break in the first half of the shift, and a 10-minute break in the second half of the shift.

HMMA intends to consistently enforce the smoke free environment policy described in this document. Any HMMA Team Member violating this policy is subject to corrective action up to and including termination.

### TELEPHONE CALLS

All HMMA phones are for business purposes only. Team Members are not allowed to use HMMA phones for personal business. However, if an emergency situation should arise, the Team Member is to contact their group leader/manager and/or another member of management in order to use a HMMA phone.

All emergency phone calls into HMMA will be forwarded to the appropriate area. HMMA's Team Members and their families are very important and considered HMMA's extended family. Each Team Member should supply their family members with an emergency contact number for their work area, as well as the department they work in, the group leader/ manager's name, and make sure their family knows that the contact information is for emergencies only.

## ACKNOWLEDGMENT

The information contained in the Team Member Handbook of Hyundai Motor Manufacturing Alabama, LLC has been prepared as an aid and a guideline to give you a summary of the benefits, policies, and procedures at HMMA. It contains information about what you can expect from HMMA, and in turn, what HMMA expects of you.

If, in this Handbook, we have inadvertently said or implied anything that is different from the actual provisions of any HMMA policy or benefit plan document, the actual provisions of the policy or benefit plan will govern.

If at any time you have any questions regarding policies, you may talk to your group leader, assistant manager, manager, or team relations representative.

The policies and statements contained in this Handbook, and in other provisions that may be added in the future, are not a contract of any kind, but are rather a description of company policies. Employment with HMMA is at will and is not offered, contracted, or promised for any specific length of time. You have the right at HMMA to quit for any reason or for no reason at any time. Conversely, HMMA may terminate your employment on the same basis. Although this Handbook reflects current policies, these policies may be unilaterally changed or rescinded by HMMA at any time.

I, _____, acknowledge that I have received the handbook and that it is my responsibility to read the handbook and ask questions if needed in order to gain understanding.

Signature _____    Number _____

Date _____

49                DEES000062

DEES000061

## GRANT OF LICENSE AND RELEASE OF I      48

I acknowledge that while employed with HMMA, I may, either individually or in a group setting, be photographed, filmed, or videotaped from time to time, and I voluntarily agree to be photographed, filmed, and/or videotaped. I fully understand and agree that such photographs, films, or videotapes may be freely used for public display in any form of media for the purpose of furthering the business interests of Hyundai Motor Manufacturing Alabama, LLC, Hyundai Motor America, Inc., and/or Hyundai Motor Company through advertising, publicity, trade, or any lawful purpose whatsoever. I further acknowledge and agree that I shall not be entitled to, nor shall I demand, compensation for such use.

By signing below, I hereby grant to Hyundai Motor Manufacturing Alabama, LLC, Hyundai Motor America, Inc., and Hyundai Motor Company, and their respective subsidiaries and affiliated companies, associate agencies, successors, and assigns, and to such other persons as they may designate from time to time (collectively the "Company"), an unconditional, royalty free license giving them the absolute right and permission to use my name, image, and/or likeness in such photographs, film, videotape, or other medium for the purposes set forth above without any entitlement to compensation for such use. This license shall be of unlimited duration and shall survive the cessation of my employment with HMMA.

In consideration for allowing me to participate in any photo, film or video shoot, I, for myself, my heirs, executors, administrators, and assigns, and all those who might claim through me, hereby release and discharge the Company and its/their officers, employees, agents, and representatives, from any and all claims, demands, damages, loss, expenses, and liability (specifically including but not limited to claims for compensation, royalties, or fees for use of my name, image, or likeness), whether known or unknown or presently existing, formerly existing, and which may hereafter arise, as a direct or indirect result of the use of my name, image, or likeness.

TEAM MEMBER:

Signature _____  Date _____

Printed Name _____  Number _____

50      DEES000063

DEES000064

DEES000065

**Hyundai Motor Manufacturing Alabama, LLC.**
700 Hyundai Boulevard
Montgomery, Alabama 36105

| HYUNDAI | TEAM RELATIONS MEMO | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date:  05/26/06 | Owner: Team Relations | Revision Level:  02 |

**TO:**     Rob Clevenger

**FROM:**     William Ware

**DATE:**     February 21, 2007

**SUBJECT:**   Leon Dees

**Inteverview with Leon Dees, William Ware, and Greg Prater**

Greg began our talk with Leon by informing him that a member of management noticed him on the third floor asleep on the morning of February 8th.  Leon responded, "I was not asleep, I know exactly who you are talking about, call Jim Brookshire in here and I will confront him right now."  Greg calmed Leon down and explained that the reason why we had assembled into the room was so that we could get his side of the story. Leon stated that he was sitting in a chair text messaging his daughter due to the bad weather outside. His location was at the RO 1 station.  Leon stated that this event took place around 10:30-11:30 pm.  Leon also contends that Jim never approached him.  In fact when asked what was the closest Jim came to him he replied about "55 feet."  Leon made the following comment several times; he sat and watched Jim walk around on the third floor; however, he is to the point where he does not care about what people say.  He went on to say that we complain over and over again but nothing happens, so I just don't care anymore.  "If something breaks then I will fix it but I will not run the shop like I used to."

PLAINTIFF'S
EXHIBIT
16



## JOHN WAYNE APPLEGATE

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4    CASE NO.:  2:0cv00306-MHT-CSC
5
6    JERRY LEON DEES, JR.,
7         Plaintiff,
8         V.
9    HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and
10   HYUNDAI MOTOR AMERICA, INC.,
11        Defendants.
12
13
14        S T I P U L A T I O N S
15
16
17        IT IS STIPULATED AND AGREED by and
18   between the parties, through their respective
19   counsel, that the deposition of JOHN WAYNE
20   APPLEGATE may be taken before STACEY L. JOHNSON,
21   Commissioner, at the Marriott Prattville at
22   Capitol Hill, 2500 Legends Circle, Prattville,
23   Alabama, on the 29th day of November, 2007.

**Page 3**

1              INDEX
2    EXAMINATION BY:              PAGE NUMBER
3    Mr. Sport................................5-96
4    Mr. Johnson............................96-100
5    Mr. Sport..............................100-107
6
7    EXHIBITS:
8    Plaintiff's Exhibit 17.......................9
9      (John Applegate's Personnel File)
10   Plaintiff's Exhibit 18......................75
11     (Greg Prater's Personnel File)
12   Plaintiff's Exhibit 19......................76
13     (Greg Prater's Team Relations File)
14   Plaintiff's Exhibit 20......................83
15     (Supplement to Greg Prater's Personnel
16      File)
17
18
19
20
21
22
23

**Page 2**

1         IT IS FURTHER STIPULATED AND AGREED
2    that the signature to and the reading of the
3    deposition by the witness is hereby waived, the
4    deposition to have the same force and effect as
5    if full compliance had been had with all laws
6    and rules of Court relating to the taking of
7    depositions.
8         IT IS FURTHER STIPULATED AND AGREED
9    that it shall not be necessary for any
10   objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties may
13   make objections and assign grounds at the time
14   of trial, or at the time said deposition is
15   offered in evidence, or prior thereto.
16        IT IS FURTHER STIPULATED AND AGREED
17   that the notice of filing of the deposition by
18   the Commissioner is waived.
19
20
21
22
23

**Page 4**

1         A P P E A R A N C E S
2    FOR THE PLAINTIFF, JERRY LEON DEES, JR.:
3    KILBORN, ROEBUCK & McDONALD
4    Jeffrey R. Sport
     (SPORJS390)
5    jeff.sport@sportlaw.us
6
     Vincent F. Kilborn, III
7    (KILBV4484)
     1810 Old Government Street
8    Mobile, Alabama  36606
     (251) 479-9010
9
10   FOR THE DEFENDANTS, HYUNDAI MOTOR MANUFACTURING
     ALABAMA, LLC and HYUNDAI MOTOR AMERICA, INC:
11   OGLETREE, DEAKINS, NASH, SMOAK
        & STEWART, P.C.
12   Matthew K. Johnson
     P. O. Box 2757
13   Greenville, South Carolina  29602
14   HYUNDAI MOTOR MANUFACTURING ALABAMA,
     LLC
15   Christopher N. Smith
     chrissmith@hmmausa.com
16   700 Hyundai Boulevard
     Montgomery, Alabama  36105
17   (334) 387-8057
18
19
20
21
22
23

1 (Pages 1 to 4)

### JOHN WAYNE APPLEGATE

1  I, STACEY L. JOHNSON, a CCR of Deatsville,
2  Alabama, and Notary Public for the State of
3  Alabama at Large, acting as Commissioner,
4  certify that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there came
7  before me at 2500 Legends Circle, Prattville,
8  Alabama, beginning at 2:58 p.m., JOHN WAYNE
9  APPLEGATE, witness in the above cause, for oral
10 examination, whereupon the following proceedings
11 were had:
12         JOHN WAYNE APPLEGATE,
13 the witness, after having been first duly sworn
14 to speak the truth, the whole truth, and nothing
15 but the truth, testified as follows:
16         EXAMINATION
17 BY MR. SPORT:
18   Q   Mr. Applegate, good afternoon.
19       Would you state your full name for the
20 Record, please?
21   A   Okay. My name is John Wayne Applegate,
22 A-P-P-L-E-G-A-T-E.
23   Q   What's your current address?

5

1   A   1110 Woodward, W-O-O-D-W-A-R-D, Avenue,
2  Montgomery, Alabama 37106.
3    Q   And how long have you lived there?
4    A   I've lived there approximately four and
5  a half years.
6    Q   Would that be the same length of time
7  you've worked for Hyundai?
8    A   Approximately. There were four months
9  before we moved to that address that I worked
10 for Hyundai.
11   Q   Temporary living arrangement?
12   A   Yes, sir.
13   Q   And where did you work before then?
14   A   I worked in Illinois.
15   Q   Who was that with?
16   A   That was with Mitsubishi Motor
17 Manufacturing North America.
18   Q   Have you ever given your deposition
19 before?
20   A   Yes, sir.
21   Q   Tell me about that.
22   A   The last case was just a labor case,
23 just...

6

1    Q   How long ago was that?
2    A   Maybe within the last year.
3    Q   So while you've been with --
4    A   Yes, sir.
5    Q   -- Hyundai?  Labor case meaning
6  workers' compensation?
7    A   It wasn't a workers' compensation.  It
8  was a hiring issue.
9    Q   Hiring issue.  Can you be a little more
10 specific?
11   A   We had a person who was not hired by
12 the company and then brought suit against the
13 company concerning that.
14   Q   Claimed they were not hired for some
15 reason?
16   A   Yes.
17   Q   If they were never hired, why would you
18 be testifying in that case?
19   A   Because the hiring department -- I was
20 the head of the department of the department
21 they would have gone into had they been hired.
22   Q   And so did you interview that
23 individual?

7

1    A   I never did, no.
2    Q   What was the substance of your
3  testimony?
4    A   Just the hiring process.
5    Q   Have you ever given your deposition
6  other than that case?
7    A   I can't -- I can't recall any other
8  time in the past several years that I've -- no,
9  not that I can remember.
10   Q   That's the only one for Hyundai --
11   A   Yes, sir.
12   Q   -- while you've been in Hyundai's
13 employ?
14   A   Yes.
15   Q   So I assume, then, that you're familiar
16 with how depositions work.  I'm going to ask you
17 some questions.
18   A   Sure.
19   Q   You'll give me as complete and truthful
20 an answer as you can sitting here today.  And if
21 you don't remember, it's not a crime to say I
22 don't remember.
23   A   Yes, sir.

8

2 (Pages 5 to 8)

JOHN WAYNE APPLEGATE

1    Q    I'm sure your lawyer will have told you
2 not to speculate about your answer.
3    A    (Witness nods head.)
4    Q    And if you need to take a break, tell
5 me you need to take a break.
6    A    Okay.  Thank you.
7    Q    Go to the restroom or whatever you
8 need.
9        Mr. Applegate, I've got here what we're
10 going to mark as the next exhibit, Exhibit 17.
11
12    (Whereupon, Plaintiff's Exhibit
13 Number 17 was marked for identification
14 and copy of same is attached hereto.)
15
16    Q    I'm going to show that to you and
17 represent to you that this is what your
18 attorneys gave us as your personnel and/or Team
19 Relations file.  Would you just take a look
20 through that?
21    A    (Witness reviews document.)
22    Q    Seem to be your file?  Everything in
23 there pertain to you?  There shouldn't be any

9

1 you didn't have to go, did you report to work?
2    A    To the best of my recollection, I did.
3    Q    Okay.  Flip over to 191.
4    A    (Witness complied.)
5    Q    This is obviously your -- you signed
6 this at the bottom; is that correct?
7    A    Yes, that's my signature.
8    Q    This document is entitled Receipt of
9 Handbook Acknowledgment, Grant of License and
10 Release of Claims.  Basically where you're
11 agreeing that if you're photographed, filmed, or
12 videotaped that they have the right to use that
13 in whatever promotional or other fashion that
14 they choose -- that Hyundai chooses.  Are you
15 aware of where any video cameras would be placed
16 within your department?
17    A    Let's see.  Within my department?
18 Because in my office there are no video cameras
19 to the best of my knowledge.
20    Q    Well, you are in charge of Stamping
21 Maintenance; is that correct?
22    A    My position is senior manager of plant
23 engineering and maintenance.  So all Maintenance

11

1 surprises in there?
2    A    (No response.)
3    Q    If you would, down at the bottom you'll
4 notice there's some little numbers.  It says
5 Dees v. HMMA and then a six digit number.
6    A    Okay.
7    Q    If you would, turn to -- and they're
8 sequential.  If you would, turn to the document
9 that has 187 at the bottom of it.
10    A    (Witness complied.)  Okay.
11    Q    This is apparently your jury summons?
12    A    Yes.
13    Q    And attached to that was an e-mail that
14 said your jury duty was cancelled, you didn't
15 have to report?
16    A    Correct.
17    Q    So when you didn't have to report, did
18 you go to work that day?
19    A    Yeah, it was cancelled.  I believe it
20 was cancelled before I had to go.
21    Q    There just seemed to be some confusion
22 in here as to whether or not you were there, and
23 that's why I was asking you what took place.  If

10

1 departments.
2    Q    Oh, not just Stamping Maintenance?
3    A    Not just Stamping Maintenance.
4    Q    All of Maintenance?
5    A    Yes, sir.
6    Q    But you are in charge of Stamping
7 Maintenance?
8    A    I am -- yes.  Stamping Maintenance is
9 one of the areas that reports up through me.
10    Q    And, as I understand, the services that
11 the Stamping Maintenance Team Members provide,
12 they do the work on the machines that are
13 located within the Stamping area?
14    A    Yes, sir.
15    Q    Stamping Production area.  So Stamping
16 Maintenance is the Stamping Production area, so
17 to speak?
18    A    Yes.
19    Q    They have no other separate area where
20 they perform services; is that correct?
21    A    Basically, yes.
22    Q    So within that area are you aware that
23 there are any video cameras?

12

3  (Pages 9 to 12)

### JOHN WAYNE APPLEGATE

1    A   Yes, there are video cameras on certain
2  pieces of equipment.  I believe the output of
3  the presses -- there is a video camera on the
4  output of the presses that shows as you go
5  through the press panels as they come through
6  the press.  And I believe there's one on the
7  robots that palletize.  But those are the only
8  ones that I'm aware of.
9    Q   And those simply record production
10 activities?
11   A   Production -- it's really more machine
12 activity than anything else.  It's, you know,
13 how the machine is running, how it's producing,
14 it's picking parts.  You know, that type of
15 thing.
16   Q   So I guess by your response you would
17 not be aware of any security video cameras
18 within that area of the facility?
19   A   No, I would not be aware of any
20 security video cameras.
21   Q   When we drove into the plant last
22 night, it's a very impressive facility.  It's
23 huge.  There's a building out by the road.  Can

13

1    A   Yes, sir.
2    Q   Was he the only direct report that you
3  had relating to Stamping Maintenance?
4    A   Yes, he was the only direct report at
5  that time that I would have in Stamping
6  Maintenance.
7    Q   And just so -- there's been some
8  confusion -- it's probably just on our part --
9  as to how that organization worked in terms of
10 its hierarchy.  If you were the guy that was --
11 you were the head of that group; right?
12   A   I'm the -- I'm the American head of
13 department over all that.
14   Q   And Greg Prater reported to you?
15   A   Yes, sir.
16   Q   And how many direct reports did he
17 have?
18   A   You would have to confirm this, but it
19 is in the -- approximately -- maybe around 18.
20 Some number around 18.
21   Q   You're including all of the Team
22 Members?
23   A   Team Members and specialists.

15

1  you tell me what that's used for?  Near the
2  interstate, the smaller building that sets
3  apart.
4    A   If this is what you are referring to as
5  you come over the interstate onto Hyundai
6  Boulevard from the west or from the airport, the
7  first building you see is the Hyundai Training
8  Center.
9    Q   And is that where they orient new
10 employees?
11   A   They have them -- they have new
12 employee orientation and training there.
13   Q   And training.  So other training
14 besides just the new employee --
15   A   Yes, sir.
16   Q   -- orientation?  So you would have,
17 then, as the senior manager of Maintenance --
18 you would have a number of direct reports, not
19 just one or two --
20   A   Yes, sir.
21   Q   -- is that correct?
22   A   Yes, sir.
23   Q   And was Greg Prater one of those?

14

1    Q   Okay.  So then in the chain of command,
2  does a Team Leader have any other additional
3  authority above and beyond a normal Team Member?
4    A   And, again, you'd have to confirm this
5  with our Human Resources Department exactly, but
6  Team Leader is just that.  It's a Team Leader.
7  Does not have any supervisory authority over the
8  Team Members but still can direct work and will,
9  you know, make reports and that type of thing.
10   Q   Okay.  You indicated that you were the
11 American head of department?
12   A   Uh-huh.
13   Q   Does that mean, then, that there's a
14 Korean head of department?
15   A   There are Korean coordinators.
16   Q   And who would that be?
17   A   In Stamping we've had two Korean
18 coordinators.  The current Korean coordinator is
19 Mr. Mun.
20   Q   Mr. Mun?
21   A   Uh-huh.
22   Q   And do you report to Mr. Mun?
23   A   No.

16

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

JOHN WAYNE APPLEGATE

1    Q    Are you basically the same level --
2    A    Basically.
3    Q    -- on the chart?
4    A    Basically.
5    Q    You're counterparts?
6    A    Basically the same level, yes.
7    Q    Does he supervise anyone?
8    A    As far as supervisory, I believe his
9    position is coordinator.
10   Q    What does that involve?
11   A    It is more along the lines of a
12   technical coordinator on, you know, getting --
13   getting work scheduled, getting the proper work
14   done. That type of thing.
15   Q    And is he coordinator for Stamping
16   Maintenance or for Stamping and Stamping
17   Maintenance?
18   A    For Stamping Maintenance.
19   Q    Stamping Maintenance only?
20   A    Yes.
21   Q    Okay. During the entire time that Greg
22   Prater worked for Hyundai were you his
23   supervisor?

17

1    A    Yes, sir.
2    Q    During that time when you were his
3    supervisor, did any of his direct reports come
4    to you and complain about Mr. Prater?
5    A    Yes, sir.
6    Q    Can you tell me about those times that
7    you remember?
8    A    Again, I don't remember specifically
9    any, you know, particular individual, but there
10   were individuals who came to me and, you know,
11   complained about his management directives or
12   work that he was having them do.
13   Q    And what would their complaints be in
14   the nature of?
15   A    Mostly either too much overtime or --
16   mostly, you know, it was with overtime, you
17   know, and requiring work on the weekend or
18   requiring work, you know, on a day staying over
19   to do some work.
20   Q    Did Leon Dees ever come to you and talk
21   to you about Mr. Prater?
22   A    Leon -- Leon and I had a conversation
23   and I believe -- and, again, I don't remember

18

1    the exact time or the exact nature of the
2    conversation -- but he had -- basically he was
3    complaining about some of Greg's management of
4    his, you know, work and he disagreed with Greg's
5    management of his work.
6    Q    Did he share with you that Mr. Prater
7    was demanding from him military orders relating
8    to his weekly or monthly Guard weekends and that
9    Mr. Prater was in other ways harassing him
10   relating to his military service?
11       MR. JOHNSON: Object to the form.
12   Q    You can answer.
13   A    Oh, okay. Yes, I was aware that
14   Mr. Dees and -- Mr. Dees and I talked -- and I
15   can't remember if Greg was there or not -- but
16   we talked about Greg requesting, you know,
17   written orders for the weekend military duty.
18   That's something that I was not familiar with,
19   you know, the company position on that. So I
20   went to our Team Relations people and I asked
21   them what is our expectation, what's our -- you
22   know, can we reasonably expect for a person who
23   is either in the Guard or Reserve. From our

19

1    Team Relations people I was informed that we can
2    ask for orders, but a verbal confirmation of,
3    you know, this is my weekend is sufficient in
4    accordance with the laws. So I told that again
5    to Greg is that, yeah, we can ask for orders,
6    but if he doesn't want to give us written
7    orders, a verbal -- you know, just a verbal
8    confirmation that this is my weekend or this is
9    my week is sufficient.
10   Q    Did Mr. Dees explain to you at that
11   meeting or any other time that there was an
12   annual list published of those weekends and that
13   he had provided that to Mr. Prater previously?
14   A    We -- in the discussion, we had talked
15   about, you know, an annual or -- I don't know if
16   it was for every weekend but for like his two
17   weeks in the summer, some schedule that was to
18   be provided. But beyond that, I can't recall
19   any deep discussion of that. Again, my point on
20   that was from our Team Relations people, we can
21   ask, but if he doesn't give that, then a verbal
22   is okay.
23   Q    Do you recall approximately when that

20

5 (Pages 17 to 20)

JOHN WAYNE APPLEGATE

1 meeting when? Whether that was between the two
2 of you or the three of you, including
3 Mr. Prater?
4    A  I don't know exactly when that was.
5    Q  Do you believe that it was in 2007?
6 2006?
7    A  No. It was before 2007.
8    Q  Sometime in 2006?
9    A  Yes.
10   Q  Do you have any knowledge of whether or
11 not the requesting of military orders from
12 Mr. Dees by Mr. Prater ceased after that
13 meeting?
14   A  I don't recall.
15   Q  Did Mr. Dees ever come back to you with
16 complaints about Mr. Prater relating to his
17 military service?
18   A  I don't recall any other times that
19 Mr. Dees come back with that complaint.
20   Q  Are you aware of a letter that
21 Mr. Dees' Guard unit sent to Hyundai informing
22 Hyundai of the rules and regulations regarding
23 the Guard service and what Hyundai's

21

1 assigned to work in the pit, clean up the pit
2 far more frequently than any other Team Member?
3    A  I remember he had complained about
4 having to do that work, but there again, that
5 was -- that was work that all Team Members did.
6    Q  And by that would you mean that all
7 Team Members should share in that equally?
8    A  That was a task that was, you know,
9 assigned to Team Members, and I can't guarantee
10 that every person had exactly the same number of
11 hours. But I can guarantee -- or I can say that
12 it was the intention that all Team Members
13 shared in keeping the shop clean.
14   Q  Oh, sure. I mean, by human nature
15 there could be some small variance. I mean,
16 certainly no one would sit down and write out a
17 schedule and say today it's your day in the
18 pit. But would it surprise you to learn that,
19 say, in a particular week Mr. Dees might have
20 spent four out of those five days in the pit?
21      MR. JOHNSON: Object to the form.
22   A  Only in the context if that was -- you
23 know, if that was his job that week and the next

23

1 responsibilities were?
2    A  I never saw any type of letter to that
3 concerning that.
4    Q  Well, I'll take that answer, but that
5 really wasn't what I asked. What I asked you
6 was are you aware of a letter.
7    A  I don't recall.
8    Q  When Mr. Dees met with you, did he
9 mention any of the other acts that Mr. Prater
10 was participating in that Mr. Dees perceived
11 were harassing acts relating to his military
12 service?
13   A  I mean, nothing relating to his
14 military service. I mean, he didn't care for
15 the way that Mr. Prater, you know, assigned
16 tasks or, you know, that type of thing, but the
17 only thing that I recall in relation to the
18 military service was just the issue of orders.
19   Q  Mr. Dees never shared with you that
20 Mr. Prater would commonly make jokes about the
21 National Guard?
22   A  No, not that I recall.
23   Q  Did Mr. Dees share with you that he was

22

1 week it was somebody else and the next week it
2 was somebody else.
3    Q  When Mr. Dees came to you and either
4 informed you, made his complaint, however you
5 want to phrase it, about being assigned to work
6 in the pit, what did you tell Mr. Dees?
7    A  I do not recall exactly, you know,
8 exactly, but, you know, it was along the lines
9 of, you know, this is a job like any other job
10 in the shop and everybody does it.
11   Q  Could you have said it all pays the
12 same?
13   A  I don't recall saying that, but, you
14 know, I could have said that. Sure.
15   Q  So in your view, then, would working in
16 the pit simply be one of the assignments that
17 one of the Team Members might have to do?
18   A  Yes.
19   Q  No more difficult, rigorous, or
20 dangerous than any other assignment?
21   A  No.
22   Q  As I understand the pit, when the
23 Stamping presses stamp out parts, the material

24

6 (Pages 21 to 24)

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

JOHN WAYNE APPLEGATE

1 that is not stamped out comes down the shoot --
2 or scrap pieces maybe, not the entire sheet --
3 comes down the shoot onto the conveyor and then
4 goes to the end of the conveyor into an area
5 where they bale it --
6   A   Yes.
7   Q   -- is that correct?  So when those
8 pieces come out of that shoot -- and we observed
9 some of them on the floor last night -- some of
10 them are little round disks, some of them are
11 other nondescript pieces and some of them seem
12 to be fairly large and fairly sharp.  Would that
13 be consistent with your knowledge of what comes
14 out of those shoots onto that conveyor?
15   A   Yes.
16     MR. JOHNSON:  Object to the form.
17   Q   That was a yes?
18   A   Yes.
19   Q   And is it your experience that
20 oftentimes materials comes over the conveyor and
21 spills onto the floor?
22     MR. JOHNSON:  Object to the form.
23   A   Not often.  But there is material

25

1   Q   So what would you estimate the
2 percentage of time that would be split between
3 working under the Stamping press in that
4 location versus working near the conveyor
5 picking up scrap that had come off of it?
6   A   For the Maintenance person, he would be
7 spending the majority of his or her time
8 underneath the press on the press side and not
9 so much time over by the scrap shoot.  The scrap
10 shoots -- I mean, there's no equipment over
11 there, you know, so they spend their time where
12 the equipment is.
13   Q   The Team Members, as I understand it,
14 complete daily reports -- are required to
15 complete daily reports and turn those in?
16   A   Yes.
17   Q   And put them in a book?
18   A   Yes.
19   Q   I guess that book is maintained by
20 whoever the supervisor is?
21   A   Yes.
22   Q   Okay.  And I assume that those daily
23 reports would log whatever it is that Team

27

1 that -- especially if there's a -- the conveyor
2 belt stops or there's blockage on the conveyor
3 belt that it may spill over.
4   Q   So if I saw a pile of that material on
5 the floor last night, where would that have come
6 from?
7   A   Again, probably if there was a blockage
8 or some material got hung up and spilled over.
9   Q   So when a Team Member is assigned to
10 work in the pit, what is it that he's doing?
11   A   Well, if he is assigned to work in the
12 pit, he would actually not be -- actually not be
13 very near that conveyor.  He would actually be
14 on the other side under the presses where the
15 hydraulics, which is separate from the belt
16 where the scrap goes.  And under the presses
17 where the hydraulics are -- I mean, the Team
18 Member, they do patrols down there, they check
19 the equipment, they would be cleaning up any
20 hydraulic fluid, any material that was used
21 during any kind of maintenance activity they
22 would be cleaning up.  That type of thing.
23 It's just general housekeeping.

26

1 Member was assigned to do that day?
2   A   It should, yes.
3   Q   It should.  So if I were to look at
4 those daily reports, it should tell me what,
5 say, on any particular day Mr. Dees was doing
6 versus what Mr. Archer, Mr. Barefoot, or any
7 other Team Member was doing?
8   A   Yes.  If they -- again, if they
9 completed them, you know, accurately it should.
10     MR. SPORT:  Matt, I think those are
11 responsive and we'd like those.  I haven't seen
12 any of those.
13     MR. JOHNSON:  I don't -- I'm not sure
14 what they would be responsive to.  I'm not
15 saying they're not responsive.  They certainly
16 haven't come up.  And I don't know anything
17 about the retention policy on those or how long
18 they keep them or who keeps them.  So I don't
19 know.  We can -- I can certainly go back and try
20 to figure out, one, whether they're responsive
21 to any and, two, if we still have them or would
22 have them.
23     MR. SPORT:  Well, let's ask

28

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

JOHN WAYNE APPLEGATE

1  Mr. Applegate.
2    Q   Mr. Applegate, do you know how long
3  those documents are retained?
4    A   No, I don't.
5    Q   Do you know where they're kept?
6    A   Those would be kept in the shop. I'm
7  not sure how long they keep those, if it's for
8  month by month or six months or...
9    Q   And by shop, you mean -- is there an
10  area that's called the shop that --
11    A   The office.
12    Q   The office. Okay. And that is like a
13  Maintenance office?
14    A   Yes.
15    Q   So people report in and out of there --
16    A   Yes.
17    Q   -- when they come in to work and they
18  go out to their assigned tasks?
19    A   (Witness nods head.)
20    MR. SPORT: Well, Matt, if you would
21  please check on that. I'll also look at our
22  request just to verify that those are
23  responsive, but I believe that they relate to
                                                29

1  some of our allegations and I think they'd be
2  responsive.
3    MR. JOHNSON: Okay. I'm happy to look.
4    MR. SPORT: Additionally, while we're
5  talking about that, I believe Mr. Dees testified
6  the other day that Mr. Prater was the one that
7  received the annual Guard weekend list and kept
8  it in a book. Can you see if you might be able
9  to located that? Those were not produced to
10  us. We produced copies to Hyundai in our
11  production, but we've not received whatever
12  Hyundai had. So I think all that information
13  would be in the relatively same location.
14    MR. JOHNSON: Okay. I'll look.
15    Q   When Mr. Dees would come to you and
16  talk to you about Mr. Prater, did you tell
17  Mr. Dees that Mr. Prater was in charge and he
18  can run his shop as he sees fit?
19    A   Huh-uh. I did not. I'm sure I would
20  not use those words.
21    Q   Would you use words to that effect?
22    A   I don't recall ever saying anything
23  like that to Mr. Dees. I mean, I don't recall
                                                30

1  saying something like to Mr. Dees.
2    Q   I'm going to show you what has been
3  previously marked as Plaintiff's Exhibit 9, and
4  it's a set of documents that your lawyers
5  produced to us. And included in it are a number
6  of policies. These documents are similarly
7  numbered. We call those Bates numbers. And
8  these are numbered 1 through I believe it's 93.
9  And I ask you to take a look starting at number
10  80. Document number 80, as it says, is an
11  electronics device policy that talks about the
12  use of electronic devices within the plant; is
13  that correct?
14    A   Yes.
15    Q   And down at the bottom, not the Bates
16  number, but the last little statement right
17  above the page number of the policy, there's a
18  sentence that says Notice, paper copies of this
19  procedure should not be used for decision making
20  purposes. Only use the electronic copy at -- I
21  assume that is a -- like a network server
22  reference -- r:hrdepartment/policies and
23  form/policesandprocedures. Is that what that
                                                31

1  is?
2    A   Yes.
3    Q   It's a network drive reference?
4    A   Yes.
5    Q   All right. If you would, flip over to
6  page 81, which is the second page of this
7  policy. It appears that someone has written in
8  where it says section 5.1.1 -- they have written
9  in 5.2.1, and then there are other notations
10  made on this document. Do you know who made
11  those notations?
12    A   No.
13    Q   It just seems odd that we would be
14  given a document that has been hand altered when
15  the notice at the bottom says don't use the
16  paper copy, use the one online.
17    MR. SPORT: Can you just check me,
18  Matt, and make sure that the copy you gave us
19  has that on it? It's very possible that we
20  could have done that. I'd just like to know the
21  answer to that.
22    MR. JOHNSON: No. I know that's the
23  way we got the original paper version.
                                                32

8 (Pages 29 to 32)

JOHN WAYNE APPLEGATE

1    Q    So we have an unexplained alteration on
2  a document that's not official unless it's
3  electronic.  But you don't know the answer to my
4  question?
5    A    No, sir.
6    Q    Flip over to document number 83.
7    A    (Witness complied.)
8    Q    This is the harassment policy, and it
9  starts in the first paragraph there, HMMA is
10  committed to providing a work environment that
11  is free of discrimination and unlawful
12  harassment.  Actions, words, jokes, or comments
13  based on an individual's sex, race, ethnicity
14  age -- 40 plus -- religion or any other legally
15  protected characteristic will not be tolerated.
16  And it goes on to say that this does not just
17  include sexual harassment.  Are you familiar
18  with this policy?
19    A    Yes, sir.
20    Q    So you understand -- you understood at
21  the time and have, I guess, come to understand
22  since that an individual's military status is
23  one of these protected classes --
                                                    33

1    A    Yes.
2    Q    The first paragraph also says this type
3  of behavior is strictly prohibited.  It says --
4  and then it goes in the second paragraph, it may be but
5  is not limited to words, signs, jokes, pranks,
6  intimidation, physical contact, or violence.  If
7  you would, flip over to page 84.
8    A    (Witness complied.)
9        MR. JOHNSON:  Bates number?
10    Q    Bates number 84.  Under the numbered
11  paragraph two, reporting harassment.  It say, if
12  you feel that you have experienced harassment,
13  you should take action immediately.  I guess
14  that's speaking to each Team Member.  Would you
15  agree that that's what Mr. Dees did when he came
16  to you and complained about his -- the demanding
17  of Mr. Prater of orders for his Guard weekends?
18        MR. JOHNSON:  Object to the form.
19    A    Again, reading this and looking back,
20  what was -- I don't see that as a harassment.
21  That was a question about whether or not we have
22  the ability and authority to ask for orders.
23
                                                    35

1        MR. JOHNSON:  Object to the form.
2    Q    -- is that correct?  Do you understand
3  that someone's Guard status is a protected class
4  under this policy?
5    A    Let me read through the policy again.
6    Q    Absolutely.  Please do.
7    A    (Witness reviews document.)  Okay.  I
8  don't know at the time this came out that I knew
9  the military status was covered by this policy.
10  I understand that now.
11    Q    You don't recall if you understood
12  it --
13    A    At the time.
14    Q    -- during the time that Mr. Dees came
15  to you and complained?
16    A    No, I don't remember that.
17    Q    Can we agree, though, that up at the
18  top left corner of that document it says
19  revision date 4 November 2004?
20    A    Yes.
21    Q    So I think we would be in agreement
22  that this policy existed and was in effect
23  during the entire term of Mr. Dees' employment?
                                                    34

1  And, again, as I said, we went through Team
2  Relations, clarified that point, and then got
3  that information to make sure that Mr. Prater,
4  you know, understood what the policy was on
5  that.
6    Q    If Mr. Prater asked Mr. Dees for orders
7  once and Mr. Dees explained to Mr. Prater that,
8  no, that's not the way that works, there's this
9  document, I gave it to you when I was hired
10  which shows the weekends, Mr. Prater took that
11  document, oh, yes, you're correct, I accept
12  that, put it in a binder, then you would have
13  never had a visit from Mr. Dees; correct?
14        MR. JOHNSON:  Object to the form.
15    A    I can't answer that.  I don't know.
16    Q    Doesn't it seem logical that Mr. Dees
17  only came to you because he had been asked
18  multiple times for these orders?
19        MR. JOHNSON:  Object to the form.
20    A    I have no information that he was asked
21  multiple times.  Again, my understanding was
22  that Mr. Prater had asked him for the orders and
23  there was a disagreement about, you know,
                                                    36

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## JOHN WAYNE APPLEGATE

1  providing the orders. And, like I said, I went
2  back to Team Relations for clarification on what
3  we can ask and what we can reasonably expect.
4  Got the explanation from our Team Relations
5  people, you know, relayed that to Mr. Prater,
6  and then, to my knowledge, that was the end of
7  the situation.
8      **Q    Okay. I'll accept that. If, in fact,**
9  **the demanding of the orders occurred after that**
10 **meetings -- continued to occur after that**
11 **meeting -- and on at least one occasion**
12 **Mr. Prater told Mr. Dees that he was going to**
13 **make him take vacation to avoid working on a**
14 **weekend when he would otherwise have been**
15 **scheduled to work but he was supposed to go to**
16 **his Guard duty, would you think that would**
17 **constitute harassment?**
18     MR. JOHNSON: Object to the form.
19     A    I have no comment on that. I don't
20 know. I have no knowledge that that happened.
21     **Q    Well, I was just asking you to make an**
22 **assumption. The jury is going to hear the**
23 **facts.**
                                                   37

1      A    Sure.
2      **Q    And the jury is going to decide what**
3  **the facts are. But if the jury decides that**
4  **that happened would that be harassment?**
5      MR. JOHNSON: Object to the form.
6      A    Again, that's something that, you know,
7  I'd have to leave up to our Team Relations
8  people to determine if that violates the policy
9  or not.
10     **Q    Okay. Well, let's say -- assume for me**
11 **that Mr. Dees was black and he came to you and**
12 **told you that Mr. Prater was making fun of him**
13 **because he was black, would that constitute**
14 **harassment under this policy?**
15     MR. JOHNSON: Object to the form.
16     A    Again, I would turn that over to Team
17 Relations people and they would do an
18 investigation and they would make that
19 determination.
20     **Q    Okay. That's fair enough. When**
21 **Mr. Dees came to you and told you that**
22 **Mr. Prater was harassing him about his Guard**
23 **duty and his military orders, did you turn that**
                                                   38

1  over to Team Relations?
2      MR. JOHNSON: Object to the form.
3      A    Again, I discussed that with Team
4  Relations to clarify what we could and could not
5  ask for.
6      **Q    Okay. Paragraph 3 there says --**
7      MR. JOHNSON: What page are you on?
8      MR. SPORT: I'm on the same page, 84.
9  Bates number 84.
10     **Q    Numbered paragraph 3, all reports will**
11 **be promptly investigated with due regard for the**
12 **privacy for everyone involved. Team Relations**
13 **department will investigate the complaints with**
14 **particular care and to the extent possible keep**
15 **them confidential. That sounds like a little**
16 **bit more rigorous process than you going to them**
17 **and asking them a question to clarify the**
18 **responsibilities of Hyundai with respect to**
19 **Guard duty. Did an investigation of the nature**
20 **described in paragraph 3 occur?**
21     A    I have no knowledge if an investigation
22 occurred.
23     **Q    Do you have any knowledge that Mr. Dees**
                                                   39

1  at some point or on at least one occasion went
2  to Human Resources directly and complained?
3      A    I can't recall anything specific about
4  that.
5      **Q    Would you agree that if he had gone to**
6  **Human Resources and complained that he was being**
7  **harassed because of his Guard obligation, and**
8  **if, in fact, Human Resources had instigated or**
9  **initiated the investigation discussed in**
10 **paragraph 3 right here that you would have heard**
11 **about it?**
12     A    Not necessarily.
13     **Q    As his superior, you would not have**
14 **heard about it?**
15     A    Not necessarily.
16     **Q    Numbered paragraph 1 on this same page**
17 **starting with the second sentence it says, any**
18 **Team Member who becomes aware of an incident of**
19 **harassment, whether by witnessing the incident**
20 **or being told of it, must report it to the Team**
21 **Relations manager or any member of management of**
22 **HMMA with whom you feel comfortable. Who is the**
23 **Team Relations manager?**
                                                   40

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

JOHN WAYNE APPLEGATE

1    A   Team Relations -- the manager of Team
2    Relations is Audie Swegman.
3    Q   So under this policy, they would either
4    go to him or any other member of management that
5    they felt comfortable with?
6    A   (Witness nods head.)
7    Q   And I guess my question to you is, when
8    Dees came to you and complained about what was
9    going on with his Guard obligation in the
10   demanding of orders, would you not have been
11   required by this policy to report that?
12       MR. JOHNSON:  Object to the form.
13   A   And as I said, I went and discussed
14   with Team Relations the obligations and
15   expectations for military orders and how we
16   handle that.  And then they gave me the company
17   policy on that and I got that back to
18   Mr. Prater.
19   Q   So at the time -- let me ask you this
20   question first.  At the time of that visit
21   between you and Mr. Dees were you aware of this
22   policy?
23   A   Yes.

41

1    Q   So at the time that Mr. Dees came to
2    you and complained of the situation, did you
3    simply not view what he told you as harassment
4    under this policy or were you unclear that his
5    Guard service was a protected class under this
6    policy?
7        MR. JOHNSON:  Object to the form.
8    A   The situation at that time, it was a
9    question, you know, on what was our obligation
10   and expectation when it came to, you know,
11   orders for the Guard.  And the question was
12   outstanding what can we reasonably expect and
13   then -- you know, that was the question on the
14   table.  I took that question, found the answer
15   for it, and then, you know, gave that back to
16   Mr. Prater.
17   Q   Would you agree that when Mr. Dees came
18   to you it was because he was not able to resolve
19   it with Mr. Prater?
20   A   I would agree that when he came and
21   talked with me about it, yeah, there was an open
22   question between him and Greg about the -- you
23   know, the orders and what we can expect.

42

1    Q   Mr. Prater was demanding them and he
2    was telling Mr. Prater that, no, I don't have to
3    provide them --
4        MR. JOHNSON:  Object to the form.
5    Q   -- because I've given you this list?
6        MR. JOHNSON:  Object to the form.
7    A   I think Greg was asking for them, and I
8    don't really know what Mr. Dees' response was.
9    But I know there was a question on what should
10   be provided and what we can reasonably ask.
11   Q   And if I asked this question a little
12   bit ago, I apologize, but I don't recall it so
13   I'm going to ask it again.  Do you recall
14   Mr. Dees telling you of any other comment or
15   action made by Mr. Prater or done by Mr. Prater
16   towards Mr. Dees relating to his Guard activity;
17   making fun of the Guard, telling Mr. Dees he was
18   going to have to use vacation to go fulfill his
19   Guard commitment?
20   A   I don't remember any of that.
21   Q   Anything of that nature?
22   A   No, I don't recall any of that.
23   Q   If you would, flip over to Bates number

43

1    85.
2    A   (Witness complied.)
3    Q   That's the page -- obviously this
4    doesn't have anything to do with Guard duty.  I
5    think we can agree on that.
6        MR. JOHNSON:  I was wondering where you
7    were going.
8    Q   Consensual romantic or sexual
9    relationships.  HMMA strongly discourages
10   romantic or sexual relationships between Team
11   Members.  It prohibits them between any HMMA
12   member of management and any subordinate Team
13   Member.  Are you aware of any of your direct
14   reports having such a relationship as prohibited
15   by this policy?
16   A   No.
17   Q   All right.  If you would, flip on over
18   to Bates number 87.
19   A   (Witness complied.)
20   Q   This is the military leave policy.
21   A   Uh-huh.
22       MR. SPORT:  And before we talk about
23   this, Matt, I believe I wrote you about this in

44

11 (Pages 41 to 44)

### JOHN WAYNE APPLEGATE

1  a letter. If I didn't, I should. There is one
2  request that talks about all policies. You've
3  simply given me the ones that you felt were
4  relevant to the issues in this case. Our
5  request -- we had one request that was specific
6  to that, and we had another request that talked
7  about all of the policies. And it's clear that
8  these policies are not numbered sequentially, so
9  we don't have them all. And I don't know that
10 you objected to the other ones. So can you go
11 back and look at your response to me?
12     MR. JOHNSON: I'll certainly go back
13 and look. My recollection -- subject to
14 actually going and looking -- is that we
15 provided potentially responsive policies. And
16 for some reason I think we may have indicated
17 somewhere some other policies, but withheld them
18 on the grounds of relevance or something. But I
19 can't remember exactly. But I'll be happy to go
20 back and look.
21     MR. SPORT: Please do because I don't
22 recall an objection on that point, and I know
23 that we had two requests that dealt with
                                              45

1  policies and procedures. One specifically dealt
2  with the issues in this case and the other was
3  more broad that would have covered everything
4  that's in this number sequence that seems to be
5  missing.
6      MR. JOHNSON: And I'll be happy to go
7  back and look, but today I don't recall ever
8  receiving anything from you suggesting you felt
9  like you were owed more or that there were more.
10     MR. SPORT: I'll go back and look at
11 the correspondence and get you that if you'll
12 agree to check your responses to me.
13     MR. JOHNSON: (Counsel nods head.)
14  Q  Bates number 87, Military Leave
15 Policy. Paragraph 2.1, Team Members who are
16 inducted into the U.S. Armed Forces or who are
17 Reserve members of the U.S. Armed Forces or
18 state militia groups will be granted leaves of
19 absence for military service, training, or other
20 obligations in compliance with state and federal
21 laws. These Team Members may use accrued
22 vacation leave but are not required to do so.
23 You would agree with me that this policy was in
                                              46

1  effect during the entire of Mr. Dees'
2  employment?
3      A  I'm trying to remember when he started
4  work.
5      Q  I'll represent to you that it was
6  November of '05.
7      A  Then yes.
8      Q  Then would you agree by what we just
9  read that he would be covered in the description
10 in paragraph 2.1?
11     MR. JOHNSON: Object to the form.
12     A  To be honest, I'm not sure exactly what
13 military group he was attached to. You know, I
14 don't know specifics of which military group he
15 was attached to, but I assume it's covered by
16 this.
17     Q  Okay. When you went to Human Resources
18 to ask them that question, did they refer to
19 this policy at all? Did this policy come up in
20 your discussions?
21     A  I believe the answer they gave me was
22 in accordance with this policy, but we did not
23 review specifically this policy.
                                              47

1      Q  They did not refer you to this policy?
2      A  No. They just answered my question.
3      Q  You know Wendy Warner?
4      A  Yes, sir.
5      Q  She indicated in her deposition that
6  these inquiries by Mr. Dees brought to light a
7  situation of confusion regarding what ought to
8  be done with Guard members like Mr. Dees. Have
9  you heard anything about that? Are you familiar
10 with that?
11     A  No.
12     Q  I mean, it sounds like when you were
13 unfamiliar with what -- the answer to what
14 Mr. Dees was asking you going to HR, you seemed
15 a little bit confused by his question. You were
16 not completely familiar with this policy at the
17 time; is that correct?
18     A  I wanted to get a clarification, and I
19 wanted to make sure that I gave him and Greg the
20 correct answer.
21     Q  You had not previously had a Guard
22 employee in your department?
23     A  Our department had Guard employees,
                                              48

                                   12  (Pages 45 to 48)

JOHN WAYNE APPLEGATE

1  but, you know, this -- his question had not come
2  up.
3      Q   Paragraph 3.1 on that same document,
4  Team Members are requested to notify their
5  supervisors as soon as they're aware of the
6  military obligation.  Did you tell me earlier
7  that you were not familiar with whether or not
8  Mr. Dees had provided that list of Guard
9  weekends?
10     A   I can't recall if he did or not.
11     Q   Are you aware of any instances where
12 Mr. Dees went to Human Resources about his Guard
13 obligation and the fact that Mr. Prater was
14 demanding these orders and doing some of these
15 other things that I've asked you about?  Did
16 Human Resources come to you and discuss that
17 with you?
18     A   No.
19         MR. JOHNSON:  Object to the form.
20     Q   Flip over one page to Bates number 88.
21     A   (Witness complied.)
22     Q   Serious Misconduct Policy.  This policy
23 also seems to have been in effect since November

                                                   49

1  from this policy or not.
2      Q   Well, the first sentence of the second
3  paragraph says HMMA policy states serious and
4  excessive violations of HMMA's performance
5  standards is a Serious Misconduct Violation.
6      A   Again, I'm not sure if the quote is
7  found in this policy.
8      Q   Okay.  Well, let's flip back over --
9  holding that document flip back over to Bates
10 number 88.  Have you got that?
11     A   Okay.  Yes.
12     Q   Under numbered paragraph 3.0 look at
13 the second bullet point.
14     A   Okay.  Yes, that's the same.
15     Q   She seems to be quoting that standard.
16 So, then, it would appear, then, that she --
17 that HMMA fired Mr. Dees because of a violation
18 of the Serious Misconduct Policy.  Would you
19 agree with that?
20     A   It appears that this comes from the
21 Serious Misconduct Policy, yes.
22     Q   Okay.  The third paragraph, which is
23 simply one sentence, states, based on the

                                                   51

1  of 2004.  Are you aware of whether or not
2  Mr. Dees was fired because of a violation of
3  this policy?
4          MR. JOHNSON:  Object to the form.
5      A   I don't recall.  I just don't recall as
6  to the exact policy.
7      Q   Well, I'll tell you what.  Why don't we
8  go back up to the front of that stack of
9  documents you have there and look at Bates
10 number 6?
11     A   (Witness complied.)
12     Q   Read that letter.  Have you ever seen
13 that letter before?
14     A   No.
15     Q   How about just reading that real
16 quick?  It's pretty short.
17     A   Okay.
18     Q   She seems to be quoting the Serious
19 Misconduct Policy, does she not?  This is a
20 letter, just for the Record, written by Wendy
21 Warner to Mr. Dees dated February 26th
22 terminating him.
23     A   I don't know if that quotation comes

                                                   50

1  aforementioned -- his violation of the policy --
2  I regret that I have no alternative but to
3  terminate your employment effectively
4  immediately.  And what I want you to focus on is
5  I have regret that I have no alternative.  That
6  sounds like that's a hard-and-fast rule, doesn't
7  it?  You violate the policy, you're gone?
8          MR. JOHNSON:  Object to the form.
9      A   I really can't comment on that.  I
10 don't know.
11     Q   Are you familiar with the Serious
12 Misconduct Policy?
13     A   Familiar with it, yes.
14     Q   What's your interpretation of what it's
15 designed to do?
16         MR. JOHNSON:  Object to the form.
17     A   It's, you know, part of the -- it's
18 part of the corrective action, you know,
19 procedures that we have.
20     Q   You said you're familiar with the
21 policy; correct?
22     A   Yes.
23     Q   Would you agree with me that there is

                                                   52

13 (Pages 49 to 52)

JOHN WAYNE APPLEGATE

1  more than one alternative to handling someone
2  who has violated the Serious Misconduct Policy?
3      MR. JOHNSON: Object to the form.
4      A   In the Serious Misconduct Policy it has
5  provisions for termination and serious
6  misconduct letters and that type of thing.
7      Q   So termination isn't the only option
8  when someone violates this policy?
9      A   Again, termination is not the only
10  option based on the way the policy is written.
11      Q   Do you know who decides who stays and
12  who goes?
13      A   All of this goes before a review board.
14      Q   Is that a static group of individuals?
15      A   Actually, I'm not sure exactly how it
16  works.
17      Q   Have you ever participated in that
18  process?
19      A   Only from the standpoint if a person in
20  my department is being considered for a serious
21  misconduct or for termination, I go before that
22  board. And that's my only involvement with it.
23      Q   And how many times have you gone before
                                                    53

1      Q   Who were they?
2      A   The people that I remember that were in
3  the room at the time -- but, again, I don't know
4  if they're on the board or if they're advisors
5  or if they're presenters. I don't know their --
6  I don't know their duties or position on that.
7  I remember the plant manager, John Calsom
8  (phonetic) was in there, Wendy Warner was in
9  there, there was usually somebody from Team
10  Relations in there, our general counsel is in
11  there. That's all I remember right now.
12      Q   Is this review board also what's been
13  referred to as a termination committee meeting?
14      A   I think so. Again, I just go before
15  the review board. The review board is what I
16  understood it to be. And the termination review
17  committee, I'm not -- I'm not sure it's always
18  the termination review committee.
19      Q   Did you attend the review board meeting
20  relating to Mr. Dees?
21      A   Yes.
22      Q   And what was your purpose there?
23      A   Representing the department. And, you
                                                    55

1  that board?
2      A   I can't remember an exact number,
3  but --
4      Q   More than one?
5      A   More than one.
6      Q   And on each of those occasions that you
7  went before the board, do you recall it being
8  basically the same group of people?
9      A   It was not -- well, I'm not sure who
10  was on the board and who was just there. I
11  mean, just participating. I don't know. You
12  know, because I go in if it's one of my people,
13  there's somebody from Team Relations there, the
14  facts of the case are reviewed, and then
15  basically I leave. And there's some
16  deliberation and then a decision is made. So,
17  again, you know, there's people in there, but I
18  don't know if it's static, if it changes. I
19  don't really know how the board is put together.
20      Q   You don't recall seeing any of the same
21  people there?
22      A   Oh, yes, there were some of the same
23  people there.
                                                    54

1  know, mostly just the facts of the case as I
2  remember are presented by Team Relations and the
3  review board can ask or would ask questions of
4  me as far as, you know, is my understanding of
5  what Team Relations has presented true. And in
6  this case, yes, based on my understanding. And
7  then that's basically about it.
8      Q   Did they ask you for -- since it was
9  one of your subordinates, did they ask you for a
10  recommendation as to what to do with him?
11      A   I'm trying to remember. In this
12  particular case, the recommendation, again, from
13  Team Relations -- the recommendation was
14  termination and, you know, I concurred with that
15  recommendation.
16      Q   Who made the presentation from Team
17  Relations?
18      A   I knew you were going to ask me that.
19  It's Team Relations or Wendy.
20      Q   Well, while you are thinking about that
21  answer this question. Is there a difference
22  between Human Resources and Team Relations?
23      A   Team Relations is a sub department
                                                    56

                                    14  (Pages 53 to 56)

### JOHN WAYNE APPLEGATE

1  under Human Resources.
2  **Q   Is it like a disciplinary quality**
3  **control?**
4  A   I think they have a larger, you know,
5  focus than that, but they're part of Human
6  Resources.
7  **Q   Okay.  Do you recall yet who might have**
8  **made the presentation for Team Relations?**
9  A   I'm tying to think who was in there.
10  I'm not -- I can't remember.  I'm not sure.
11  Maybe Wendy made some presentation and the Team
12  Relations guy.  You'd have to go back to the
13  notes.
14  **Q   Is Rob Clevenger in Team Relations?**
15  A   Yes.
16  **Q   So might it have been him?**
17  A   It might have been rob Clevenger.
18  **Q   All right.  In that same stack of**
19  **documents you have there, take a look at Bates**
20  **number 733.  Have you ever seen that document**
21  **before?  And while you're reading that, I'm just**
22  **going to say for the Record this is a document**
23  **entitled Team Relations Memo dated February 23,**

57

1  in this memo, is that your understanding of what
2  happened, and you would have said yes?
3  A   To the best of my knowledge.
4  **Q   Then someone in Team Relations/Human**
5  **Resources would have made the recommendation to**
6  **terminate Mr. Dees?**
7  A   Yes.
8  **Q   And you would have concurred?**
9  A   Yes.
10  **Q   On what basis did you concur that**
11  **Mr. Dees should be terminated?**
12  A   In the discussion on Mr. Dees sleeping
13  there was a discussion of other instances within
14  the company.  This was in accordance with the
15  company past practice for terminating a person
16  who goes out of his way to find a place to
17  sleep.
18  **Q   Let's take that one piece at a time.**
19  **On what particular facts in this memo do you**
20  **rely upon to form your opinion that he went out**
21  **of his way to find a place to sleep?**
22  A   The location, third level location, and
23  that he was asleep in front of a control panel

59

1  **2007 from Rob Clevenger to Greg Kimball.**
2  A   I don't recall seeing this memo.
3  **Q   Well, if you would take just a moment**
4  **and read it.  Then I'm going to ask you is**
5  **this -- is what's written in this memo the**
6  **substance of what was presented at that review**
7  **board.**
8  MR. JOHNSON:  Off the Record.
9
10  (Whereupon, a discussion was held off
11  the Record.)
12
13  A   Yes, this is my understanding of what
14  was presented at the review board.
15  **Q   So as I understand what you told me one**
16  **or two questions ago, someone, whether it was**
17  **Mr. Clevenger and/or Ms. Warner, presented the**
18  **facts contained in this memo --**
19  A   Yes.
20  **Q   -- to the review board?**
21  A   Yes.
22  **Q   Someone would have asked you,**
23  **Mr. Applegate, you agree with the facts that are**

58

1  with the doors open in kind of a tucked-away
2  area.
3  **Q   Okay.  So for your opinion that he went**
4  **out of his way to find a place to sleep, you**
5  **rely upon, one, that the doors were open on the**
6  **panel, and that, two, he was in an**
7  **out-of-the-way spot; is that correct?**
8  A   He was in -- yes, he was in an
9  out-of-the-way spot and up in an area where --
10  very difficult to see him.
11  **Q   Are you familiar with the area where he**
12  **was?**
13  A   Yes.
14  **Q   And where is that?**
15  A   It's in the Stamping Shop up on what
16  would be the third level or the mezzanine right
17  below the roof level part of the SOPS.
18  **Q   And that control panel you're talking**
19  **about is that what's referred to as the PLC?**
20  A   Yes.
21  **Q   Are you familiar at all with how**
22  **Mr. Prater assigned tasks to the Team Members?**
23  A   They were given area responsibilities.

60

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## JOHN WAYNE APPLEGATE

1    Q    And are you familiar with how he told
2  them to carry out those responsibilities?
3    A    Not specifically, no.
4    Q    What I mean by that is -- let me be a
5  little more specific -- are you aware that he
6  issued them instructions to remain within their
7  area of responsibility?
8    A    Yes, yes.  He would normally do that.
9    Q    And so is this area called the SOPS?
10    A    Yes.
11    Q    And if Mr. Dees were assigned the SOPS,
12  would this be an unusual place for him to be?
13    A    No, not necessarily.
14    Q    Okay.
15    A    The location, not sitting in a chair
16  asleep, but the location.
17    Q    That's what I'm referring to, the
18  location
19    A    Yeah, the whole area of the third floor
20  and the second floor is all the SOPS.
21    Q    Okay.  So if he were assigned to the
22  SOPS, where he was would not be an unusual place
23  for him to be?

61

1    Q    That came directly to you?
2    A    Yes.
3    Q    And other than that e-mail would this
4  be the -- this culmination of the investigative
5  process, this is the document that you saw and
6  that you relied upon?
7    A    That -- well, again, I don't remember
8  seeing this document, but, you know, based upon
9  what we've talked about, this is, you know, a
10  reasonable summary of what was presented at the
11  review board.
12    Q    Did anyone during the time that this
13  was being looked into by Team Relations or
14  someone else -- did anyone from Team Relations
15  or Mr. Prater himself discuss this with you?
16    A    Yes.
17    Q    And can you recall the substance of
18  those discussions?
19    A    Very -- I mean, just very basic, very
20  simple that a member of Production Management
21  found Mr. Dees asleep up on the third level in
22  front of a cabinet and -- you know, at the
23  middle of the night found him asleep up there.

63

1    A    No, it would not be an unusual place
2  for him to be.
3    Q    Okay. When this whole situation
4  occurred, did you ever discuss this directly
5  with Mr. Dees?
6    A    No.
7    Q    Are you aware of who did discuss it
8  directly with Mr. Dees?
9    A    Not specifically.  I know it was
10  during -- turned over to Team Relations for an
11  investigation.
12    Q    Does this memo at Bates number 33
13  included in Exhibit 9 -- is this the only
14  document that you saw with respect to this
15  incident?
16        MR. JOHNSON: Object to the form.
17    Q    I'll represent to you that a number
18  of -- that a couple of people were questioned
19  and that there are written statements and there
20  are e-mails that went back and forth.  Did you
21  see any of that?
22    A    I saw one e-mail.  I remember seeing
23  one e-mail.

62

1    Q    Okay.  If you would, flip over two
2  documents to Bates number 35.  Is this the
3  e-mail that you saw?
4    A    Yes.
5    Q    This appears to be an e-mail from --
6  well, I guess it's from Mr. Prater to you.
7    A    Uh-huh.
8    Q    And it looks like Mr. Clevenger also
9  sent it to you?
10    A    (Witness nods head.)
11    Q    I think there actually are two copies
12  of this in here.
13    A    Well, this would have been -- this
14  particular one was from me to Rob.
15    Q    Oh, I'm sorry.  The top address is from
16  you to Mr. Clevenger.  So Mr. Prater sent this
17  to you?
18    A    Yes.
19    Q    If you look at the subject line in
20  Mr. Prater's transmission to you it says Leon
21  Deez, and he spelled Dees D-E-E-Z.  Are you
22  familiar with why he might have done that?
23    A    No.

64

16  (Pages 61 to 64)

## JOHN WAYNE APPLEGATE

1    Q   You think he might have not known how
2  his employee's names were spelled?
3    A   Could be or maybe, you know, just -- I
4  don't know.
5    Q   Are you aware that the misspelling of
6  Mr. Dees name was kind of a running joke in
7  the --
8    A   No.
9    Q   -- within the group?
10    A   No.
11    Q   If you would, flip over one page to
12  Bates number 36. Have you ever seen this
13  document?
14    A   No, not that I can recall.
15    Q   Let me show you what's marked as
16  Plaintiff's Exhibit 13. Have you ever seen
17  that?
18    A   I do not recall seeing this.
19    Q   As we learned earlier today from
20  Mr. Brookshire that is a transcription by
21  Mr. William Ware of what Mr. Brookshire told him
22  happened that evening.
23    A   Okay.

65

1  supervisor and a member of Team Relations. I
2  assume that Mr. Ware is in Team Relations?
3    A   Yes, sir.
4    Q   So all we have of that interview is,
5  one, what Mr. Ware apparently has written down
6  in this document and, two, what Mr. Prater sent
7  up in the e-mail that is at Bates number 35 that
8  appears to be a summary of that same interview.
9  But you don't think it's unusual that the person
10  accused is not allowed to write his own
11  statement?
12    MR. JOHNSON: Object to the form.
13    A   No.
14    Q   Look at Bates number 35. Do you still
15  have that? That's the e-mail --
16    A   Uh-huh.
17    Q   -- from Mr. Prater to you. Down the
18  third to the last line about halfway across the
19  page the sentence begins, based on this
20  conversation, I feel that even if he were not
21  sleeping that he doesn't care enough about his
22  job to prevent anyone from thinking he was
23  sleeping. John, my recommendation, as hard as

67

1    Q   And apparently it took two different
2  sessions to get it all down. Mr. Brookshire
3  indicated that was his signature on the bottom
4  of both pages. You've never seen that?
5    A   No, not that I recall.
6    Q   Would you have any opinion on whether
7  or not it would be unusual for someone to
8  transcribe what somebody said rather than ask
9  them to just write a statement?
10    MR. JOHNSON: Object to the form.
11    A   No, it's not unusual.
12    Q   Would it seem unusual to you that
13  Mr. Dees was never asked to write a statement?
14    MR. JOHNSON: Object to the form.
15    A   I don't know if he was interviewed or
16  not.
17    Q   Well, if you would, look at Plaintiff's
18  Exhibit 9 and flip back to Bates number 36.
19    (Witness complied.) Okay.
20    Q   Under the subject line --
21    A   Interview with Leon Dees, William Ware
22  and Greg Prater. Okay.
23    Q   So apparently he was interviewed by his

66

1  it is for me to say, termination, Greg.
2    When you concurred in the meeting, the
3  review board meeting, to terminate him, did you
4  place some of your reliance on the
5  recommendation of Mr. Dees' supervisor?
6    A   No.
7    Q   Was he not asked to provide a
8  recommendation?
9    A   It's not really his authority to
10  terminate somebody.
11    Q   Well, if it was his authority, he would
12  have fired him. Here he's just making a
13  recommendation. My question was, was he asked
14  to make this recommendation, or did he just
15  offer it?
16    A   He volunteered it. He was not asked.
17    Q   So do you think Mr. Prater was just
18  confused about whether or not he had the
19  authority to make a recommendation?
20    A   No. I think he just offered it.
21    Q   Just offered it. If I were to tell you
22  that Mr. Prater has said that you told him to
23  get Dees, what would you say to that?

68

17 (Pages 65 to 68)

JOHN WAYNE APPLEGATE

1    A   I have absolutely no recollection of
2  ever saying that to Greg.
3    Q   Would it surprise you to learn that he
4  claims to have a tape-recording of that
5  conversation?
6        MR. JOHNSON: Object to the form.
7    A   I have no idea what he has.
8    Q   Flip over to Bates number 39 in
9  Plaintiff's Exhibit 9. I take it you have seen
10  this e-mail before?
11    A   Yes.
12    Q   The text of the substantive part of the
13  e-mail -- absent all the forwarding around --
14  says Rob, Greg P. -- I assume that's Prater --
15  and I met with all the Team Members in question
16  about Leon leaving for lunch while the lift was
17  down. We came to the consensus that a
18  Discussion Planner is needed for the Team
19  Members who left to go to lunch while the lift
20  was down. That's Shane, Drake, and Leon. TMs
21  performing the repair should have waited until
22  help arrived to take over the repair. Team
23  Leader and Leon are not on speaking terms. Team
69

1  a general disagreement between them.
2    Q   Okay. Were you ever told -- and let's
3  just clarify the context of this document we
4  were just discussing. This is a situation where
5  the lift was down?
6    A   Uh-huh. Yes.
7    Q   And Leon's team -- Mr. Archer,
8  Mr. Barefoot, and Mr. Dees -- were working on
9  the lift, lunchtime rolled around. As I
10  understand it, the other team was late coming
11  back from lunch and they were getting ready to
12  go to lunch. It was their lunchtime. And the
13  accusation is that they left and went to lunch
14  and left the lift down causing some additional
15  production downtime. Is that the situation?
16    A   That's my understanding.
17    Q   Has anyone ever mentioned to you that
18  Mr. Hughes was aware of this situation, that
19  they had contacted him on his radio prior to
20  leaving?
21    A   It was my understanding that they had
22  not.
23    Q   Based on that e-mail only?
71

1  Leader, does that mean Kevin Hughes?
2    A   Yes.
3    Q   Are not on speaking terms and it
4  appears that he blew the incident out of
5  proportion and he only singled Leon out for no
6  apparent reason. What is that referring to?
7    A   I'm not...
8    Q   It seems to be referring to something
9  that's not in this e-mail. The Discussion
10  Planner was to deal with all three of them. But
11  then it says the Team Leader and Leon are not on
12  speaking terms and it appears that he blew the
13  incident out of proportion and he only singled
14  Leon out for no apparent reason. Do you know
15  whether or not the other two got Discussion
16  Planners?
17    A   I believe all three of them did.
18    Q   So are you, then, not aware of what
19  that sentence means?
20    A   I'm not sure if there was a problem
21  between Kevin -- or specific problem between
22  Kevin and Leon. You know, I don't know really
23  if that refers to a particular incident or just
70

1    A   I can't remember if it's based on this
2  e-mail or just, you know, a description of the
3  events.
4    Q   I asked you earlier about Mr. Dees
5  coming to visit you and talking about his Guard
6  obligation, the fact that Mr. Prater was
7  demanding orders. Did Mr. Dees ever come to you
8  and talk about Mr. Prater aside from that one
9  meeting we discussed?
10        MR. JOHNSON: Object to the form.
11    A   I can only recall, you know, one
12  meeting with Mr. Dees.
13    Q   Just that one meeting?
14    A   Yes.
15    Q   What about any of his coworkers? Did
16  they ever come to you and discuss Mr. Prater
17  with you?
18    A   I've had discussions with other Team
19  Members in Stamping, complaints about the way
20  the shop was run, yes.
21    Q   Did any of these comments -- were any
22  of those comments consistent with anything
23  Mr. Dees told you, or were they about different
72

18 (Pages 69 to 72)

JOHN WAYNE APPLEGATE

1  topics?
2      A   Mostly about different topics.  There
3  was nothing that I can recall concerning
4  Mr. Dees in any of these other conversations.
5      Q   Mr. Dees testified last week that a few
6  minutes before Mr. Brookshire came upstairs and
7  allegedly found him sleeping that he and
8  Mr. Archer were there together on that platform
9  and that they saw Mr. Brookshire and Mr. Hughes
10 down below.  Were you aware of that?
11     A   No.
12         MR. JOHNSON:  Is the question was he
13 aware of that testimony or that --
14     Q   Fair point.  Let me -- that was a bad
15 question.  Okay.  Were you aware that Mr. Archer
16 was with Mr. Dees a few minutes prior to
17 Mr. Brookshire allegedly finding Mr. Dees
18 asleep?
19         MR. JOHNSON:  Object to the form.
20     A   I have no knowledge of that.
21     Q   Are you aware of whether or not
22 Mr. Archer was questioned about the events that
23 occurred that evening that Mr. Brookshire found
                                              73

1  I understand that there's a personnel file and a
2  Team Relations file.  Are you familiar with how
3  they keep those records?
4      A   No.
5      Q   No.  Let me give this to you and ask
6  you to flip to the little tabbed page there.
7      A   (Witness complied.)
8      Q   And for the Record, can you give us the
9  Bates number on that document?
10     A   00154.
11     Q   154.  And tell us what that is?
12     A   It's titled Acknowledgment of Ethics
13 Guidelines.
14     Q   And that appears to be a two-page
15 policy; is that correct?
16     A   Yes.
17     Q   Have you signed a document like that?
18     A   I don't recall specifically if it's in
19 my packet and I signed it, then I did.
20     Q   Does Hyundai have what many
21 corporations commonly refer to as a Code of
22 Conduct or Code of Ethics?
23     A   Yes.
                                              75

1  him asleep?
2      A   I have no knowledge of that.
3      Q   Are you aware of whether or not
4  Mr. Dees' Team Members told Mr. Prater if
5  Mr. Dees was fired they would walk out?
6      A   I don't recall any specific allegation
7  like that.
8      Q   Was, in fact, Mr. Prater moved to some
9  other department for some period of time?
10     A   No.
11     Q   He was never moved out of Stamping
12 Maintenance?
13     A   No.
14     Q   I'm going to mark what's going to be
15 Exhibit 18.
16
17         (Whereupon, Plaintiff's Exhibit
18 Number 18 was marked for identification
19 and copy of same is attached hereto.)
20
21     Q   I'm going to show this to you and
22 represent to you that this is Mr. Prater's
23 personnel file I believe is what that would be.
                                              74

1      Q   And would this be an acknowledgement
2  that an employee -- in this case, Mr. Prater --
3  received or was made available a copy of that
4  Code of Conduct or Ethics and reviewed it and
5  has knowledge his receipt and compliance of
6  that?
7      A   I think you'd have to read this.  All
8  it says here is that he acknowledges that he's
9  read this and understands it.  I don't know if
10 that -- if you're referring to anything else --
11     Q   No.  What I'm asking is, did you also
12 read and sign a document like those two 154 and
13 155?
14     A   I don't remember.  If it's in my
15 personnel file, I did.  If it's not, I don't
16 remember -- I can't recall if I did or not.
17     Q   I'll represent to you that's the only
18 one of those I've seen.
19     A   Yeah.  I can't recall if I did or not.
20
21         (Whereupon, Plaintiff's Exhibit
22 Number 19 was marked for identification
23 and copy of same is attached hereto.)
                                              76

19  (Pages 73 to 76)

JOHN WAYNE APPLEGATE

1
2    Q    This, I believe, is Mr. Prater's Team
3  Relations file.  And I believe that the front
4  page is a summary of the Discussion Planners
5  that follow.
6    A    Okay.
7    Q    And those Discussion Planners seem to
8  run in the same vein.  And what I mean by that
9  is there were performance issues with
10  Mr. Prater's performance, Discussion Planners
11  were prepared relating to those, Mr. Prater's
12  comments always seem to be it's somebody else's
13  fault.  I assume you were the guy that went over
14  those with him --
15    A    Yes.
16    Q    -- as a supervisor?
17    A    Yes.
18    Q    Would you agree with the statement I
19  just made?
20        MR. JOHNSON:  Object to the form.
21    A    No, no.
22    Q    Let me see.  Who are Spencer and Amos?
23    A    Specialists in the Stamping Maintenance
                                                        77

1  team.
2    Q    Specialists?
3    A    Engineers.
4    Q    Oh, engineers.  And that's different
5  from like Mr. Dees' position?
6    A    Yes, sir.
7    Q    How are they different?
8    A    They -- I mean, they -- they're
9  different positions within the company.
10  Maintenance Team Members are -- you would call
11  hourly technicians.  The engineers are
12  salaried.  It's a different responsibility,
13  different position.
14    Q    Okay.  In this particular Discussion
15  Planner basically the topic is it's his
16  responsibility to clearly communicate job
17  requirements to engineers, the specialists?
18    A    Yes.
19    Q    And that was the issue in this
20  Discussion Planner.  And Mr. Prater's response
21  was he blamed the situation on the engineers and
22  Mr. Mun.  So in at least that particular
23  instance he blamed somebody else for the
                                                        78

1  problem; is that correct?
2    A    Yes.
3    Q    Then in the next Discussion Planner
4  Bates numbered 171, Mr. Prater's department is
5  experience significant downtime and there's a
6  side issue about communication problems between
7  Mr. Prater and his engineers and Team Members.
8  So that was the topic of that Discussion
9  Planner.  And he blamed this situation on the
10  engineers and the Team Members.  It wasn't his
11  fault.  Is that a correct assessment of what the
12  document says?
13        MR. JOHNSON:  Object to the form.
14    A    I'd have to read the document to be
15  sure.
16    Q    Okay.
17    A    Yes, in that particular one.
18    Q    The next one, Discussion Planner, Bates
19  number 173, actually relates to Mr. Dees
20  complaining that Mr. Prater was not treating him
21  fairly concerning his military duty.  He accused
22  Greg of requiring written orders when not
23  required and assigning him hard work as a form
                                                        79

1  of punishment.  Is this the same time period
2  where you would have had the meeting with
3  Mr. Dees, or is this some later time period?
4    A    No.  I believe it's the same time
5  period.
6    Q    You believe it's the same time period?
7    A    Yes.
8    Q    Well, as I understood your
9  characterization of this incident earlier, it
10  didn't seem to you to be that big of a deal.
11  Why did it result in a Discussion Planner?
12    A    Discussion Planners aren't
13  necessarily -- when you say that big of a deal,
14  they're to make sure and document in a form a
15  situation that is of concern.
16    Q    They are step 1 in the corrective
17  action process; correct?
18    A    No, they're not.
19    Q    They're not.  What's step 1?
20    A    I mean, there's a step 1, 2, 3, 4.
21  They are, I guess you'd say, a pre-step 1.
22        MR. JOHNSON:  Can we have a copy of
23  that if we're going to be talking about it?
                                                        80

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

1     MR. SPORT: Yeah. Absolutely. I
2 apologize. I just didn't have an extra copy of
3 that one.
4    Q  So we're looking at Bates number 173
5 here and the last section at the bottom of that
6 page is entitled Background Information. This
7 paragraph reads, Leon serves in the Guard and
8 fulfills his duties on the weekends and in the
9 summers. Greg feels that Leon is taking
10 advantage of his duty to get out of weekend work
11 and that he is a disruption in the team. Greg
12 has assigned Leon and others to unpopular jobs
13 within the shop, and Leon believes this is a
14 form of punishment. The main problem is that
15 Greg has a poor relationship with this Team
16 Members, which leads to this kind of
17 miscommunication. I take it that's your
18 assessment based on your conversation with
19 Mr. Prater?
20    A  Yes.
21    Q  And then if you'll flip over to Bates
22 number 174, Discussion Summary, met with Greg
23 for a brief discussion of the problem. He

81

1    blamed the situation on Leon. So there again,
2 he's blaming somebody else for his problem?
3    MR. JOHNSON: Object to the form.
4    Q  Correct?
5    A  He blamed Leon for this situation, yes.
6    Q  For that situation. Okay. If you
7 would, flip over to the next page, 175.
8    A  (Witness complied.)
9    Q  Corrective action phase 2. Well, if
10 this is phase 2 weren't the Discussion Planners
11 phase 1?
12    A  You don't have to go phase 1, 2, 3.
13    Q  Oh, you don't?
14    A  No.
15    Q  You don't have to follow the corrective
16 action plan?
17    A  No, not specifically. I mean, you can,
18 depending upon the discussion and severity and
19 what was happened before, you know, pick
20 whatever -- working with Team Relations you can
21 choose whatever is the appropriate level as far
22 as this one needed a formal discussion.
23    Q  Okay. And is that more serious than a

82

1    Discussion Planner?
2    A  Yes, sir.
3    Q  That is a -- is it a secondary
4 addressing of problems that have already been
5 addressed and not corrected?
6    A  Maybe not specifically a problem that
7 previously occurred, but something in the same
8 area, such as a performance issue. It may not
9 be the same performance issue but --
10    Q  Maybe a new problem but --
11    A  It's under the umbrella of a
12 performance issue.
13
14    (Whereupon, Plaintiff's Exhibit
15 Number 20 was marked for identification
16 and copy of same is attached hereto.)
17
18    Q  Okay. I'm going to mark as Exhibit
19 Number 20 the supplement that we got from
20 Mr. Johnson today relating to Mr. Prater's
21 personnel file, and I believe it is these
22 documents.
23    MR. SPORT: This is the only copy that

83

1    I have. Do you have a copy with you, Matt?
2    MR. JOHNSON: Yeah.
3    MR. SPORT: And I'll just read in for
4 the Record. These are Bates numbered documents
5 326 through 331.
6    Q  And these documents relate to primarily
7 his out processing after he terminated.
8    A  Okay.
9    Q  I want you to take a look at those. If
10 you would look at Bates number 329.
11    A  Okay.
12    Q  It indicates Mr. Prater -- this is a
13 document entitled Exit Interview Questionnaire
14 and Checklist. It indicates that the last day
15 Mr. Prater worked was the day 14th of September
16 of '07. Termination date, September 21st. And
17 the second section under those two dates I just
18 mentioned -- or the first section under that
19 section is entitled What Prompted You to Seek
20 Alternative Employment. And it appears that
21 Mr. Prater has marked every box except one.
22    A  Okay.
23    Q  Including Koreans. Do you have any

84

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

JOHN WAYNE APPLEGATE

1    idea what he's referring to there?
2        MR. JOHNSON: Object to the form of the
3    question.
4        A   I mean, I wasn't in on this interview,
5    so I'm not sure.
6        Q   I understand. But do you have any
7    knowledge of him being unhappy with the plant
8    being owned by and run by Koreans?
9        A   Not owned and run by Koreans. I don't
10   think that that was the issue.
11       Q   He didn't like working with Koreans?
12       A   No, I don't think that was the issue.
13   I think the issue was just a difference in style
14   between, you know, our parent company, which is
15   HMC, and then HMMA, which are two different
16   companies. It's just the HMC -- the
17   coordinators have a certain business style that,
18   you know, is the HMC style, and I think maybe he
19   had some difficulty with that style of
20   management.
21       Q   Would that be the harmonious style of
22   management versus Mr. Prater's style of
23   management?

                                            85

1        MR. JOHNSON: Object to the form.
2        A   I have no idea on that.
3        Q   He also marked quality of supervision
4    as a reason that he was leaving.
5        A   Uh-huh.
6        Q   Is that a dig at you?
7        A   Could be. I don't know what he -- I
8    didn't ask him about that.
9        Q   Did you tell him to quit or get quit?
10       MR. JOHNSON: Object to the form.
11       A   No.
12       Q   It says -- up at the top it says
13   supervisor, Duane Mun. Is that Mr. Mun?
14       A   Yes.
15       Q   Did he have any reporting
16   responsibility to Mr. Mun as the coordinator?
17       A   As coordinator mostly on the -- like I
18   say, the technical side, you know, technical
19   issues with the presses, how the maintenance
20   tasks are assigned, what task, what things are
21   done. Mr. Mun is more of a technical
22   coordinator.
23       Q   So that would be similar to like a

                                            86

1    dotted line reporting responsibility? Primarily
2    reports to you but Mr. Mun has input with
3    respect to that one area?
4        MR. JOHNSON: Object to the form.
5        A   That's one way of looking at it, yes.
6        Q   Well, I used that analogy because
7    Ms. Warner used that analogy during her
8    deposition, described a reporting relationship
9    as a dotted line. So I thought that might be
10   terminology within your company.
11       Flip over to page 330. He basically
12   declines to answer these questions. Would you
13   have any knowledge of why he might decline to do
14   that?
15       MR. JOHNSON: Object to the form.
16       A   No, he never discussed that with me.
17       Q   When he decided to leave, what was your
18   understanding of why that was?
19       A   My understanding was he got a better
20   job.
21       Q   Got a better job. So no reason for him
22   to be unhappy? He just got a better job? He
23   could go home? He's from the area where he

                                            87

1    returned to; is that correct?
2        A   Yes. And, again, as he explained to
3    me, better company, back where he came from.
4        MR. SPORT: Let's take just a short
5    break.
6
7        (Whereupon, a brief recess was had in
8    the proceeding.)
9
10   BY MR. SPORT:
11       Q   Mr. Applegate, do you recall a
12   situation where a young lady was terminated for,
13   in effect, doing a striptease on the Production
14   floor?
15       A   Not --
16       Q   She was taking off her clothes in front
17   of a group of people and...
18       A   I'm not being obtuse. Something sounds
19   familiar about that, but I don't know any of the
20   details.
21       Q   Well, it's a big plant. There's a
22   couple, 3,000 people working out there, so I
23   didn't know if that took place within your realm

                                            88

22  (Pages 85 to 88)

JOHN WAYNE APPLEGATE

1  of responsibility or not which is why I wanted
2  to ask you about it.
3      A    Again, I don't know any specifics about
4  it and I don't know that it was a striptease and
5  I don't know, you know, who the woman was.
6  There was something many, many, many, many
7  months ago where I heard someone had been
8  terminated.  But, again, I'm not -- I don't know
9  the details I guess is what I'm saying.
10     Q    That did not occur within Stamping
11  Operations?
12     A    Not on the Maintenance side.  I mean,
13  it wasn't anything in my area, the woman didn't
14  work for me.
15     Q    Well, we talked earlier -- and I
16  thought we established that Stamping was -- in
17  terms of geography was Stamping whether it was
18  Production or Maintenance; is that correct?
19     A    No.  We never said that.  As a matter
20  of fact, when you had said about Stamping
21  Production and Stamping Maintenance, those are
22  two separate, and I thought at the time we made
23  that clear that Stamping Maintenance is in my
                                                    89

1  area but the other operations, like Production
2  and that type of thing are not.
3      Q    No, no, no.  I know that you don't have
4  responsibility for them.
5      A    Right.
6      Q    I'm just talking about geographically
7  in the plant the maintenance occurs where the
8  operations occur?
9      A    Oh, yeah.  Yes.
10     Q    That's what I'm talking about.
11     A    Okay.
12     Q    And I was asking you about that
13  situation with the young lady.  I just wanted to
14  make sure that was not within the Stamping
15  area.  If it had been, whether she worked for
16  you, you probably would have heard about it?
17         MR. JOHNSON:  Object to the form.
18     Q    Would you not think so?
19     A    I may have heard about it; may not have
20  paid any attention to it if it wasn't something
21  to do with Stamping Maintenance.
22     Q    The reason I asked that question is
23  we've heard testimony already in this case that
                                                    90

1  she was caught for want of a better word by
2  management through the use of videotape having
3  her on film, and that's why I wanted -- you
4  testified earlier that the only cameras in your
5  are were on the machines.  And so I'm trying to
6  pinpoint where within the plant she was.
7      A    Okay.  Well, and, again --
8          MR. JOHNSON:  Object to the form.
9      A    In answer to your previous question,
10  the only cameras I'm aware of are the ones that
11  are on the machines.  You followed up and asked
12  if there were any security cameras, and I said
13  I'm not aware of any security cameras.  The only
14  ones I know of are the ones that are focused
15  on machines.  Those are the only ones I look at.
16     Q    Did anyone, either within security or
17  HR or anyone else within the company, ever come
18  to you and indicate to you that Mr. Prater had
19  disconnected their coax cable to their cameras
20  or other equipment?
21     A    No.
22     Q    Okay.  Mr. Brookshire earlier today
23  testified about an e-mail that either
                                                    91

1  distributed or referenced the publication of a
2  new policy relating to this whole Guard military
3  orders situation.  Are you aware of that e-mail?
4      A    No.
5      Q    You're not aware of that e-mail?
6      A    (Witness shakes head.)  No.  And I
7  don't know what time frame that's -- you know,
8  as far as is this something that happened in the
9  last few days or the last few weeks.
10     Q    As I understood it, it would have been
11  sometime either during the relevant time period
12  from when Mr. Dees had had the first
13  conversation with you and the time Ms. Warner
14  testified about the confusion regarding how all
15  this should be handled and sometime after
16  Mr. Dees was terminated.
17     A    Yeah.  I just don't recall that.  I
18  thought you were talking about the last few
19  weeks.
20     Q    I didn't understand it to be the last
21  few weeks.  Are you familiar with how any
22  revisions in policies or new policies are
23  communicated to employees?
                                                    92

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969

JOHN WAYNE APPLEGATE

1    A   I know -- I know there's a team advisor
2   that goes out from our Team Relations people
3   that announces, you know, like if there's, you
4   know, policy changes to benefits or something
5   like that. I mean, that's one way I know that
6   changes --
7    Q   A team advisor meaning an individual?
8    A   No.
9    Q   Or that's --
10   A   It's just an e-mail. A document that's
11  posted. You know, it says, okay, we have new
12  open enrollment period for BlueCross
13  BlueShield. So for changes to those kinds of
14  policies there's a team advisor.
15   Q   And you're not aware of any team
16  advisor that would have been issued relating to
17  some clarification or revision relating to this
18  military policy?
19   A   I don't recall.
20   Q   Are you aware that Mr. Prater was
21  previously in the Guard?
22   A   I didn't know which -- I can't recall
23  which branch of the military, but I knew he had

93

1   some previous military experience or some
2   military experience. Guard, Reserve, I don't
3   know.
4    Q   If he had been in the Guard would you
5   not agree that he was probably familiar with how
6   the process of orders worked on -- for the drill
7   weekends every month?
8    MR. JOHNSON: Object to the form.
9    A   I don't know how that all -- I've not
10  been in the Guard myself or Reserve. I don't
11  know from a Guard's standpoint or Reservist's
12  standpoint how that works.
13   Q   You haven't been in the Guard?
14   A   Right.
15   Q   Well, I'm asking you to assume that he
16  has been.
17   A   Uh-huh.
18   Q   So wouldn't you think that he would
19  understand how that process works?
20   MR. JOHNSON: Object to the form.
21   A   I really don't -- I mean, I can't
22  comment on that. I don't know if he's in the
23  same branch, different branch. I'm not going to

94

1   make an assumption on what he should or
2   shouldn't know.
3    Q   Mr. Applegate, are you aware of any
4   violations of the Serious Misconduct Policy by
5   Mr. Brookshire?
6    MR. JOHNSON: Object to the form.
7    A   I have no knowledge of that.
8    Q   You're not aware if he has any type of
9   substance abuse problem?
10   A   No, I have no knowledge of that.
11   Q   Would you agree with me that harassment
12  relating to military service ought to be taken
13  as seriously as sexual harassment or racial
14  harassment?
15   MR. JOHNSON: Object to the form.
16   Q   Assuming for the sake of argument that
17  it is harassment.
18   A   Again, the details of the harassment,
19  that's a very broad statement. You know, if --
20  details and specifics, it's hard to answer that
21  without knowing --
22   Q   Well, I haven't given you any facts.
23   A   Right.

95

1    Q   I'm just asking you to -- going back to
2   the harassment policy that we discussed earlier
3   that said actions, words, jokes, or comments
4   based on an individual's sex, race, ethnicity,
5   age, religion, or any other legally protected
6   characteristic will not be tolerated. Assuming
7   that military service is a protected class like
8   the others would you agree with me that
9   harassment based on that -- military service --
10  should be investigated and taken as seriously as
11  sexual harassment, racial discrimination?
12   MR. JOHNSON: Object to the form.
13   A   According to our policy, it should be
14  investigated. And I can't really comment on,
15  you know, the seriousness of one versus the
16  other.
17   MR. SPORT: All right. That's it.
18   EXAMINATION
19  BY MR. JOHNSON:
20   Q   Just a couple of things,
21  Mr. Applegate. After there was an incident
22  where Mr. Dees and Mr. Prater apparently had
23  some issues over how to handle a weekend leave

96

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

JOHN WAYNE APPLEGATE

1 and you, as you testified, went to Team
2 Relations and then came back -- that situation.
3 You know what I'm talking about?
4    A  Yes, sir.
5    Q  Is it your testimony that after that
6 Mr. Dees did not come to you with any issues
7 related to his service?
8    A  Correct. I don't recall any time after
9 that that the issue came up again.
10    Q  And had he previously come to you with
11 any issues related to his service?
12    A  Just that one time to my recollection
13 is all we discussed.
14    Q  And during the discussion on that one
15 time did he suggest that Mr. Prater was
16 harassing him because of his service, or was it
17 simply and issue of how to handle a situation?
18    A  I don't know. I don't remember him
19 ever using the term harassment. I know there
20 was a disagreement on how and what was required
21 to be submitted.
22    Q  Did you feel there was any potential
23 for harassment at that time?
97

1 your business practice. There was some
2 discussion of daily reports earlier?
3    A  Yes.
4    Q  Who completes those daily reports?
5    A  The Team Members are to complete daily
6 reports of what they do on the floor.
7    Q  And so would Mr. Dees have been one of
8 the people actually completing the daily
9 reports?
10    A  He should have been one of the people
11 completing the daily reports.
12    Q  From the time that you were informed
13 that Jim Brookshire alleges he saw Mr. Dees
14 sleeping up on the third level mezzanine, did
15 you ever become aware of any evidence to suggest
16 that he was not sleeping up there?
17    A  No.
18    Q  During the period in which you sat
19 in --
20    A  Let me go back to that. In the
21 discussion -- I think maybe one of the
22 e-mails -- it was reported that Mr. Dees said he
23 was on the cell phone, not sleeping. But that's
99

1    A  No. My understanding was just a, you
2 know, clarification of the company policy and
3 the legal requirement.
4    Q  Okay. Now, there was some discussion
5 about work down in the pit. I think your
6 testimony was that Mr. Dees had complained to
7 you about doing the work in the pit; is that
8 correct?
9    A  Yes.
10    Q  Okay. More specifically was his
11 complaint about actually having to do the work
12 period, or was his complaint that he had to do
13 it too often or more than his coworkers?
14    A  To my recollection a little bit of
15 both. I don't think he liked doing the work and
16 then he thought he was doing it more often than
17 other Team Members.
18    Q  Was there any evidence that he was, in
19 fact, doing it more often than his Team Members
20 to your knowledge?
21    A  No. To my knowledge he wasn't.
22 Everyone was required to do it.
23    Q  And just for sake of me understanding
98

1 the only -- that's the only thing that I
2 understood.
3    Q  Okay. Was there any evidence from
4 anybody other than Mr. Dees or any statements by
5 anybody else that would have made you think that
6 he was not sleeping?
7    A  No.
8    Q  During the discussion with the
9 termination committee was the fact that Mr. Dees
10 was in the service or a member of the Guard or
11 that he did Guard duty on the weekends or at
12 various points in the year ever raised as a
13 motivating factor or reason to terminate him?
14    A  No, that never came up.
15       MR. JOHNSON: Let's take a two-second
16 break. I think I'm done.
17
18       (Whereupon, a brief recess was had in
19 the proceeding.)
20
21       MR. JOHNSON: That's all.
22          FURTHER EXAMINATION
23 BY MR. SPORT:
100

25 (Pages 97 to 100)

JOHN WAYNE APPLEGATE

1    Q   Mr. Applegate, I'm going to show you
2  again what we've previously marked as
3  Plaintiff's Exhibit 19, which is, as I
4  understand it, Mr. Prater's Team Relations
5  file. I'm going to show you again document
6  Bates number 173, which is the Discussion
7  Planner relating to Mr. Leon Dees. When I asked
8  about you this document earlier, you indicated
9  that this was the same occurrence of when he
10  came to visit you and had the one discussion
11  that you've said that he had with you, and it's
12  now been characterized as merely a question, not
13  that big a deal. But the Discussion Planner
14  says in the situation block on 11-15-06, Leon
15  from the Press Shop complained that Greg was not
16  treating him fairly concerning his military
17  duty. He accused Greg of requiring written
18  orders when not required and assigning him hard
19  work as a form of punishment. I discussed the
20  situation with Greg and Leon. That seems like
21  he's accusing Mr. Prater of harassing him.
22      MR. JOHNSON: Object to the form.
23      A   Again, you know, as I state in there,
                                                          101

1  the purpose of that Discussion Planner is to
2  make sure Greg understands that he needs to
3  communicate better with Team Members and, you
4  know, perform his function better. At that
5  time, you know, the term harassment or was he
6  being harassed or that really didn't come up.
7  But, you know, it was to clarify a situation
8  that was a poor communication.
9      Q   Well, I understand that you didn't
10  consider it harassment because you say this is
11  another example of a communication problem in
12  Press Maintenance. But it sounds like Mr. Dees
13  considered it harassment and was communicating
14  the fact to you, and, in fact, it resulted in
15  this Discussion Planner.
16      MR. JOHNSON: Object to the form.
17      A   The Discussion Planner was for
18  communication. And Greg, if you look through
19  the Discussion Planners, had communication
20  difficulties, and that was the purpose of the
21  Discussion Planners.
22      Q   All right. Let me hand that to you and
23  look at the paragraph written under the
                                                          102

1  background section there. We discussed it
2  earlier. Leon serves in the Guard and fulfills
3  his duty on weekends and in the summers. Greg
4  feels that Leon is taking advantage of his duty
5  to get out of weekend work and that he's a
6  disruption to the team. Does that lend some
7  credence to what Mr. Dees was complaining of?
8      MR. JOHNSON: Object to the form.
9      A   No. Again, I interpret that more as a
10  communication problem again within the realm of
11  the concerns that he had about Greg as far as
12  inability to communicate.
13      Q   So if a female employee had come to you
14  and told you that Mr. Prater was pinching her on
15  the behind would that have been a communication
16  problem?
17      MR. JOHNSON: Object to the form.
18      A   That's a different situation.
19      Q   Mr. Johnson asked you a question
20  basically to the point of were you aware of
21  anyone providing any evidence that Mr. Dees was
22  not asleep, and you indicated that the only
23  thing that you had heard was that Mr. Dees
                                                          103

1  claimed that he was on the cell phone. I think,
2  in fact, he claimed he was trying to text
3  message his daughter because of the weather. I
4  asked you earlier do you know whether or not
5  Mr. Archer was questioned about this. I believe
6  you indicated that --
7      A   I didn't recall that he was.
8      Q   I have no evidence that he was either,
9  but I just wanted to confirm your earlier answer
10  to me.
11      In the review board meeting that you
12  attended, one of the things that you said that
13  that board did was looked at -- and Ms. Warner
14  confirmed this by the way -- was looked at
15  similar occurrences of this type of behavior and
16  determined how those were handled.
17      A   Yes.
18      Q   Do you recall the situation or
19  situations that were reviewed in the review
20  board meeting relating to Mr. Dees?
21      A   The one that I recall of a similar type
22  of a situation was a Team Member in the Engine
23  Shop who had, like Mr. Dees, gone out of the way
                                                          104

26 (Pages 101 to 104)

JOHN WAYNE APPLEGATE

1  create a little area to sleep in an
2  out-of-the-way spot and was caught by management
3  sleeping, and then based on that was terminated.
4      Q   And I believe that gentlemen was named
5  Ontario King?
6      A   That, I don't know.  I have no
7  knowledge of that from Team Relations because
8  they didn't share that with he.
9      Q   Are you aware of any of the facts of
10 that situation?
11     A   No.  That wasn't in -- he wasn't a
12 report to me.  And other than just the very
13 brief comparison, I don't know.
14     Q   **We can pull out documents, but for sake**
15 **of expediency I'll represent to Mr. King had, in**
16 **fact, gone and made a bed somewhere.  He was**
17 **discovered sleeping.  He told the individual**
18 **that discovered him that he was -- that he had**
19 **gone there to take a nap during his lunch and**
20 **had inadvertently slept over.  He had gone to a**
21 **late lunch and slept over.  That statement to**
22 **the individual that found him was refuted by one**
23 **of Mr. King's coworkers, and those are the**

105

1  **circumstances under which he was terminated.**
2  **There was another individual, a third-party,**
3  **that provided evidence that refuted what**
4  **Mr. King had said.  Is that situation similar to**
5  **this situation?**
6      MR. JOHNSON:  Object to the form.
7      Q   **Here it seems we have Mr. Brookshire**
8  **says one thing; Mr. Dees says another thing.**
9  **There's nobody else providing any evidence.**
10     A   Again, when I went to the review board
11 or termination review board, these were like
12 situations in that a Team Member was discovered
13 sleeping and intentionally had gone to some area
14 with the intention to sleep and that, you know,
15 based on that the appropriate response was
16 termination.
17     Q   **So the fact that there was other**
18 **evidence that proved that the Team Member in**
19 **that case was not telling the truth, that would**
20 **have had no bearing?**
21     MR. JOHNSON:  Object to the form.
22     A   Whether it has bearing or not, I don't
23 know.  But in -- you know, my recollection when

106

1  that came up, it was, you know, these are like
2  situations.
3      Q   **So the details of what happened with**
4  **Mr. King were not discussed in that meeting?**
5      A   I do not recall if the details --to
6  what extent the details were discussed.  My
7  recollection was very -- like I say, very
8  superficial.  You know, two instances, Team
9  Member intentionally off somewhere sleeping, and
10 this is the appropriate response.
11     MR. SPORT:  That's all I have got.
12
13
14
15
16
17
18
19
20
21
22
23     FURTHER DEPONENT SAITH NOT

107

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA     )
4
5  COUNTY OF AUTAUGA    )
6
7
8      I hereby certify that the above and
9  foregoing deposition was taken down by me in
10 stenotype, and the questions and answers thereto
11 were transcribed by means of computer-aided
12 transcription, and that the foregoing represents
13 a true and accurate transcript of the testimony
14 given by said witness upon said hearing.
15     I further certify that I am neither of
16 counsel, nor kin to the parties to the action,
17 nor am I in anywise interested in the result of
18 said cause.
19
20
21 ------------------------------
21 STACEY L. JOHNSON, Commissioner
22 Certified Court Reporter,
22 ACCR#: 386 - Expires 09-30-08
23 Commission Expires 06-22-2011

108

27 (Pages 105 to 108)

(FILED UNDER SEAL)

**Plaintiff's Exhibit 17 to John Applegate's Deposition**

**(John Applegate's Personnel File)**

**(FILED UNDER SEAL)**

**Plaintiff's Exhibit 18 to John Applegate's Deposition**

**(Greg Prater's Personnel File)**

(FILED UNDER SEAL)


Plaintiff's Exhibit 19 to John Applegate's Deposition

(Greg Prater's Team Relations File)

**(FILED UNDER SEAL)**

**Plaintiff's Exhibit 20 to John Applegate's Deposition**

**(Supplemental to Greg Prater's Personnel File)**

**WENDY SUSAN WARNER**

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | |
| 5 | CIVIL ACTION NO.: 2:07-00306-MHT-CSC |
| 6 | |
| 7 | JERRY LEON DEES, JR., |
| 8 | Plaintiff, |
| 9 | vs |
| 10 | HYUNDAI MOTOR MANUFACTURING |
| 11 | ALABAMA, L.L.C. and HYUNDAI MOTOR |
| 12 | AMERICA, INC., |
| 13 | Defendants. |
| 14 | |
| 15 | S T I P U L A T I O N S |
| 16 | |
| 17 | IT IS STIPULATED AND AGREED by and between |
| 18 | the parties, through their respective counsel, that the |
| 19 | deposition of WENDY SUSAN WARNER may be taken before |
| 20 | DONNA E. HENDERSON, CSR, Commissioner, at the law |
| 21 | offices of Copeland, Franco, Screws & Gill, P.A., 444 |
| 22 | South Perry Street, Montgomery, Alabama, on the 15th |
| 23 | day of November, 2007. |

2

| | |
|---|---|
| 1 | IT IS FURTHER STIPULATED AND AGREED that the |
| 2 | signature to and the reading of the deposition by the |
| 3 | witness is not waived, the deposition to have the same |
| 4 | force and effect as if full compliance had been had |
| 5 | with all laws and rules of Court relating to the taking |
| 6 | of depositions. |
| 7 | IT IS FURTHER STIPULATED AND AGREED that it |
| 8 | shall not be necessary for any objections to be made by |
| 9 | counsel to any questions except as to form or leading |
| 10 | questions, and that counsel for the parties may make |
| 11 | objections and assign grounds at the time of the trial |
| 12 | or at the time said deposition is offered in evidence |
| 13 | or prior thereto. |
| 14 | IT IS FURTHER STIPULATED AND AGREED that the |
| 15 | notice of filing of the deposition by the Commissioner |
| 16 | is waived. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

| | |
|---|---|
| 1 | INDEX |
| 2 | EXAMINATION BY:                    PAGE NUMBER |
| 3 | Mr. Kilborn . . . . . . . . . . . . . . .      6 |
| 4 | |
| 5 | EXHIBITS: |
| 6 | Plaintiff's Exhibit 1 . . . . . . . . . . .      81 |
| 7 | (Team relations investigation file - blue |
| 8 | folder) |
| 9 | Plaintiff's Exhibit 2 . . . . . . . . . . .      83 |
| 10 | (Team relations investigation file - green |
| 11 | folder) |
| 12 | Plaintiff's Exhibit 3 . . . . . . . . . . .      84 |
| 13 | (Team relations peer review file) |
| 14 | Plaintiff's Exhibit 4 . . . . . . . . . . .      85 |
| 15 | (Mr. Dees' personnel file) |
| 16 | Plaintiff's Exhibit 5 . . . . . . . . . . .      85 |
| 17 | (Notes, interview guide) |
| 18 | Plaintiff's Exhibit 6 . . . . . . . . . . .      95 |
| 19 | (Declaration) |
| 20 | Plaintiff's Exhibit 7 . . . . . . . . . . .      98 |
| 21 | (Defendant, HMMA, response objections to |
| 22 | Rule 30(b)(5) Exhibit A request attached |
| 23 | to amended deposition notice) |

3

| | |
|---|---|
| 1 | Plaintiff's Exhibit 8 . . . . . . . . . . .      121 |
| 2 | (Ms. Warner's personnel file) |
| 3 | Plaintiff's Exhibit 9 . . . . . . . . . . .      190 |
| 4 | (Hyundai file with Bates Numbers) |
| 5 | Plaintiff's Exhibit 10. . . . . . . . . . .      299 |
| 6 | (Scoring Matrix) |
| 7 | Plaintiff's Exhibit 11. . . . . . . . . . .      300 |
| 8 | (Scoring Matrix) |
| 9 | Plaintiff's Exhibit 12. . . . . . . . . . .      301 |
| 10 | (Letter to Leon Dees from Wendy Warner |
| 11 | dated 3-7-07) |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

4

1 (Pages 1 to 4)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

### WENDY SUSAN WARNER

| | | |
|---|---|---|
| 1 | A P P E A R A N C E S | |
| 2 | | |
| 3 | KILBORN & ROEBUCK, by Mr. Vincent F. Kilborn | |
| 4 | III and Mr. Jeffrey R. Sport, 1610 Old Government | |
| 5 | Street, Post Office Box 66710, Mobile, Alabama 36660, | |
| 6 | appearing on behalf of the Plaintiff, Jerry Leon Dees, | |
| 7 | Jr. | |
| 8 | | |
| 9 | KILBORN, ROEBUCK & McDONALD, by Mr. David A. | |
| 10 | McDonald, Post Office Box 832, Mobile, Alabama 36601, | |
| 11 | appearing on behalf of the Plaintiff, Jerry Leon Dees, | |
| 12 | Jr. | |
| 13 | | |
| 14 | OGLETREE, DEAKINS, NASH, SMOAK & STEWART, | |
| 15 | P.C., by Mr. J. Trent Scofield, One Federal Plaza, 1819 | |
| 16 | Fifth Avenue North, Suite 1000, Birmingham, Alabama | |
| 17 | 35203, appearing on behalf of the Defendants, Hyundai | |
| 18 | Motor Manufacturing Alabama, L.L.C. and Hyundai Motor | |
| 19 | America, Inc. | |
| 20 | | |
| 21 | Also present: Christopher N. Smith, Corporate Counsel | |
| 22 | for Hyundai Motor Manufacturing Alabama | |
| 23 | | |

5

| | |
|---|---|
| 1 | Q   And where do you live, Ms. Warner? |
| 2 | A   I live in ████████, Alabama, ████████ |
| 3 | ████████. |
| 4 | Q   And how long have you lived there? |
| 5 | A   Four years and six months. |
| 6 | Q   Previous to that, did you live in Montgomery |
| 7 | or another city? |
| 8 | A   Another city. |
| 9 | Q   Where was that? |
| 10 | A   ████████, Georgia, a suburb called ████████ |
| 11 | ███. |
| 12 | Q   Are you married? |
| 13 | A   I am. |
| 14 | Q   Do you have children? |
| 15 | A   I do not. |
| 16 | Q   How long have you been married? |
| 17 | BY MR. SCOFIELD: Object to the form. |
| 18 | You can answer. |
| 19 | THE WITNESS: Thirty-three years. |
| 20 | Q   (BY MR. KILBORN:) And your husband's name? |
| 21 | A   ████████ Warner. |
| 22 | Q   And what does — Does he live here in |
| 23 | Montgomery? |

7

| | |
|---|---|
| 1 | I, DONNA E. HENDERSON, CSR, a Court Reporter |
| 2 | of Mobile, Alabama, and Notary Public for the State of |
| 3 | Alabama at Large, acting as Commissioner, certify that |
| 4 | on this date, as provided by the Alabama Rules of Civil |
| 5 | Procedure and the foregoing stipulation of counsel, |
| 6 | there came before me at the law offices of Copeland, |
| 7 | Franco, Screws & Gill, P.A., 444 South Perry Street, |
| 8 | Montgomery, Alabama, beginning at 9:05 a.m., |
| 9 | WENDY SUSAN WARNER, witness in the above cause, for |
| 10 | oral examination, whereupon the following proceedings |
| 11 | were had: |
| 12 | WENDY SUSAN WARNER, |
| 13 | the witness, having been first duly sworn by the Court |
| 14 | Reporter, was examined and testified as follows: |
| 15 | |
| 16 | THE COURT REPORTER: Usual stipulations? |
| 17 | BY MR. SCOFIELD: We'll reserve the right to |
| 18 | read and sign her deposition transcript. |
| 19 | |
| 20 | EXAMINATION |
| 21 | BY MR. KILBORN: |
| 22 | Q   What's your full name? |
| 23 | A   Wendy Susan Warner. |

6

| | |
|---|---|
| 1 | A   He does. |
| 2 | Q   And what does Mr. Warner do? |
| 3 | A   He is a health care sales manager with ██. |
| 4 | |
| 5 | Q   Do you have a lawyer here today? |
| 6 | BY MR. SCOFIELD: Object to the form. |
| 7 | You can answer. |
| 8 | THE WITNESS: I think so yes, I have two. |
| 9 | Q   (BY MR. KILBORN:) Okay. And what would |
| 10 | their names be? |
| 11 | A   Their names would be Trent Scofield and |
| 12 | Chris Smith. |
| 13 | Q   Have you ever had your deposition taken |
| 14 | before? |
| 15 | A   I have. |
| 16 | Q   Tell me about that. |
| 17 | BY MR. SCOFIELD: Object to the form. |
| 18 | THE WITNESS: Keep answering? |
| 19 | BY MR. SCOFIELD: Sure. |
| 20 | THE WITNESS: I've been in human resources |
| 21 | for over twenty years and my role has been to represent |
| 22 | the company in several deposition hearings. |
| 23 | Q   (BY MR. KILBORN:) The Hyundai Company or |

8

2 (Pages 5 to 8)

## WENDY SUSAN WARNER

| | |
|---|---|
| 1  some other company? | 1      THE WITNESS: We won the case. In her |
| 2      A   Hyundai as well as other companies. | 2  opinion, a supervisor had promised her a job, but the |
| 3      Q   Okay. How many depositions have you given | 3  only person that can offer her a job is myself. |
| 4  while employed by Hyundai? And we'll get into the | 4      Q   (BY MR. KILBORN:)  Okay. Is that still the |
| 5  specifics of that in a minute. | 5  case? |
| 6      A   Probably five. | 6      A   That's correct. |
| 7      Q   Five. | 7      BY MR. SCOFIELD: I'm just objecting to the |
| 8      And other -- other companies or other | 8  form. I'm late. |
| 9  employers? | 9      Q   (BY MR. KILBORN:)  Do you remember the name |
| 10      A   Probably twenty. | 10  of the judge? |
| 11      Q   So roughly twenty-five depositions? | 11      A   I'm sorry, I don't. |
| 12      A   I would say that's a fair assessment. | 12      Q   And the second testimony? |
| 13      Q   And how about testimony in court as opposed | 13      A   Here? |
| 14  to a deposition? | 14      Q   Right, with Hyundai in court. |
| 15      A   Yes, I have. | 15      A   Not in court with Hyundai. |
| 16      Q   And how many times there? | 16      Q   Okay. It was just in court then? |
| 17      A   Two. | 17      A   It was with Toyota Motor Manufacturing. |
| 18      Q   Tell me about that. | 18      Q   Okay. What type of case was that? |
| 19      BY MR. SCOFIELD: Object to the form. | 19      A   ADA case. |
| 20      THE WITNESS: With Hyundai, I was asked to | 20      Q   What type? |
| 21  testify in a case of an applicant who was not hired by | 21      A   ADA. |
| 22  Hyundai. | 22      Q   What is that? |
| 23      Q   (BY MR. KILBORN:)  And that was a lawsuit | 23      A   Americans with Disabilities Act. |
| 9 | 11 |
| 1  here in Montgomery? | 1      Q   And was that in Montgomery? |
| 2      A   That's correct. | 2      A   It was in Georgetown, Kentucky. |
| 3      Q   Federal court or state court? | 3      Q   Okay. And the cases involving Hyundai in |
| 4      A   Federal. | 4  which you've given depositions as opposed to trial |
| 5      Q   What -- What was the name of that? | 5  testimony, could you give me the names of those and |
| 6      A   The applicant was Looney, Deborah Looney. | 6  just the general nature of those cases? |
| 7      Q   Okay. And how long ago was -- was your | 7      BY MR. SCOFIELD: Object to the form. |
| 8  testimony there? | 8      THE WITNESS: The individual most recently |
| 9      A   I don't recall. I believe it was two years | 9  was an ADA claim. And, again, an applicant. |
| 10  ago. | 10      Q   (BY MR. KILBORN:)  State or federal? |
| 11      Q   Okay. And what was the nature of that case? | 11      A   It was settled out of court. |
| 12      BY MR. SCOFIELD: Object to the form. | 12      Q   So there wasn't -- Was there a court case? |
| 13      THE WITNESS: The applicant felt that she | 13      A   No, no, just a deposition. |
| 14  should have been hired for a position and she was not. | 14      Q   In legal talk, which you may or may not |
| 15      Q   (BY MR. KILBORN:)  She was not. | 15  understand, you have to have some type of lawsuit to |
| 16      And did she -- What type of misconduct did | 16  give a deposition. Was that -- Was that just a |
| 17  she claim Hyundai did? | 17  non-lawsuit in which you testified and you called it a |
| 18      BY MR. SCOFIELD: Object to the form. | 18  deposition? |
| 19      THE WITNESS: That she was offered a position | 19      A   I can't help you there. I was just asked by |
| 20  and she felt that she should be employed by us. | 20  my counsel to come to a place like this and do my |
| 21      Q   (BY MR. KILBORN:)  What was the reason that | 21  thing. |
| 22  she felt like she should be employed? | 22      BY MR. SCOFIELD: Vince, if I may facilitate |
| 23      BY MR. SCOFIELD: Object to the form. | 23  without offering testimony on Ms. Warner's behalf, I |
| 10 | 12 |

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## WENDY SUSAN WARNER

1  believe it was a federal court lawsuit in which she
2  provided a deposition.
3      Q   (BY MR. KILBORN:) Who was the judge?
4          BY MR. SCOFIELD: If you know.
5          THE WITNESS: I don't know. I never met the
6  judge.
7      Q   (BY MR. KILBORN:) That was an ADA?
8      A   Uh-huh.
9      Q   And the next one you can recall where you
10 gave a deposition?
11     A   It was in the Looney case, so I also did the
12 deposition as well.
13     Q   Okay. I failed to ask you the name of the
14 plaintiff in the ADA case.
15     A   I'm sorry, I don't recall his name.
16     Q   Okay. What other depositions do you recall?
17     A   Here at Hyundai, that would be it.
18     Q   So that would be two depositions --
19     A   Yes.
20     Q   -- for Hyundai?
21     A   Uh-huh.
22     Q   And one trial testimony?
23     A   That's correct.

                                                    13

1      A   It's in the education area, but it does have
2  a heavy emphasis on the business and human resources
3  area.
4      Q   Okay. Is that the -- the final degree that
5  you received?
6      A   Yes.
7      Q   Did you ever study accounting?
8      A   I did have some accounting classes, but I did
9  not major in that.
10     Q   In college?
11     A   Uh-huh.
12     Q   Okay. Do you know what a financial statement
13 is?
14         BY MR. SCOFIELD: Object to the form.
15         THE WITNESS: Sure.
16     Q   (BY MR. KILBORN:) What is it?
17     A   A financial statement is a record of a
18 particular corporation and it does need to be filed on
19 a regular basis.
20     Q   Do you know how to read a financial
21 statement?
22         BY MR. SCOFIELD: Object to the form.
23         THE WITNESS: I never have really been tested

                                                    15

1      Q   Do you mind if I ask you a little bit about
2  your background?
3      A   No.
4      Q   Am I correct that you graduated in
5  psychology -- with a BS in psychology?
6      A   That's correct.
7      Q   And what year was that?
8      A   1977.
9      Q   What college?
10     A   Eastern Kentucky University in Richmond,
11 Kentucky.
12     Q   Did you go further in your psychology career?
13     A   In the educational aspect or in business? I
14 don't understand the question.
15     Q   Yeah, in the educational aspect.
16     A   I did pursue a Master's degree and received
17 that in 1981.
18     Q   Okay. Same college?
19     A   Yes.
20     Q   And what was the degree?
21     A   Industrial counseling.
22     Q   And for the benefit of myself, what is
23 industrial counseling?

                                                    14

1  in that.
2      Q   (BY MR. KILBORN:) Well, do you consider
3  yourself a person able to read a financial statement
4  since you studied it in college?
5      A   In 1977 --
6          BY MR. SCOFIELD: Object to the form.
7          THE WITNESS: -- I studied that, but I have
8  been in business and in the business world for several
9  years.
10     Q   (BY MR. KILBORN:) I noticed that you worked
11 at Price, Waterhouse, Cooper, but that was not in
12 regard to accounting work?
13     A   No, it was in human resources transformation.
14 I was a consultant with them.
15     Q   Have you ever worked in the field of
16 accounting or auditing?
17     A   No.
18     Q   Do you hold any degrees in accounting or
19 auditing?
20     A   No.
21     Q   Certifications?
22     A   No.
23     Q   Licenses?

                                                    16

                                        4 (Pages 13 to 16)

| | |
|---|---|
| 1     A   No. | 1     A   No. |
| 2     Q   Are you a member of any professional | 2     Q   And not a member of any legal professional |
| 3 organizations with regard to accounting? | 3 organizations? |
| 4     A   No. | 4     A   That would be correct. |
| 5     Q   Do you have -- Do financial statements have | 5     Q   Are you a member of any professional |
| 6 any part in your current job? | 6 organizations? |
| 7       BY MR. SCOFIELD:  Object to the form. | 7     A   The Society of Human Resource Management. |
| 8       THE WITNESS:  No. | 8     Q   Any other? |
| 9     Q   (BY MR. KILBORN:)  Same question with regard | 9     A   No. |
| 10 to tax returns? | 10     Q   What is your current job title? |
| 11     A   I do -- | 11     A   I'm the human resource manager for employment |
| 12       BY MR. SCOFIELD:  Same objection. | 12 and benefits. |
| 13       THE WITNESS: -- work with auditors and file | 13     Q   Do you have a number, like an employee |
| 14 5500s for all of our benefits claims and we do have | 14 number? |
| 15 audits for our 401K and nondiscrimination testing and | 15     A   Uh-huh. |
| 16 we do provide information to the auditors that come to | 16     Q   Is it 103? |
| 17 visit our CFO and our finance division, particularly in | 17     A   123. |
| 18 the areas of employment, personnel records, our HRIS | 18     Q   123? |
| 19 system and payroll. | 19     A   Uh-huh. |
| 20     Q   (BY MR. KILBORN:)  What is HRIS? | 20     Q   It started out as 103, right? |
| 21     A   Human resource information system.  It's our | 21     A   100123, it's always been that that I'm aware |
| 22 record keeping system electronically. | 22 of. |
| 23     Q   And the 5500, that's a form that you file | 23     Q   Okay.  And does that number have any meaning? |
| 17 | 19 |

| | |
|---|---|
| 1 with the IRS? | 1       BY MR. SCOFIELD:  Object to the form. |
| 2     A   That's correct, for all of our benefit plans | 2       THE WITNESS:  I don't think so, because I was |
| 3 that auditors need to come in and review that before | 3 the eleventh person hired.  I think it was just a |
| 4 filing. | 4 random number selected. |
| 5     Q   So does the benefit plan that the 5500s | 5     Q   (BY MR. KILBORN:)  The eleventh person hired |
| 6 relate to, does it have a name? | 6 and I don't see an eleven there. |
| 7     A   The benefit plan? | 7     A   No, I think it was a random number at that |
| 8     Q   Right. | 8 point.  We changed systems since that time, so when I |
| 9     A   The particular benefit plan, Blue Cross/Blue | 9 was first hired, there was a different payroll system |
| 10 Shield, the Hartford. | 10 to what we have now. |
| 11     Q   Okay.  And you -- To go back to your | 11     Q   You hired in 2004? |
| 12 education, have you ever studied law? | 12     A   Three. |
| 13     A   I believe I had some introduction to law | 13     Q   Three? |
| 14 classes when I was in school and I also attend a | 14     A   Uh-huh. |
| 15 national conference, Society of Human Resource | 15     Q   Was the plant built then? |
| 16 Management, that we do receive legal updates in regards | 16     A   No, it was not. |
| 17 to employment law, but to have said that I studied | 17     Q   You mentioned that you deal with accountants |
| 18 law -- | 18 sometimes, you mentioned the CFO. |
| 19     Q   So you haven't been to law school? | 19     A   Uh-huh. |
| 20     A   No, sir. | 20     Q   Who is that? |
| 21     Q   Don't hold a law license? | 21     A   That's Jason Lee. |
| 22     A   No. | 22     Q   And how do you spell Lee? |
| 23     Q   Never practiced law? | 23     A   L-E-E. |
| 18 | 20 |

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

WENDY SUSAN WARNER

```
 1    Q   Is he -- Is he Korean?
 2    A   That's correct.
 3    Q   Is that an American name?
 4        BY MR. SCOFIELD:  Object to the form.
 5        THE WITNESS:  They take American names.  His
 6    last name is correct, but that is the name he goes by.
 7    Q   (BY MR. KILBORN:)  Right.  And I realize they
 8    take American names, but do you know what his Korean
 9    name is?
10    A   Offhand I don't.  I'm so accustomed to
11    calling him that.
12        BY MR. SCOFIELD:  Object to the form.
13        THE WITNESS:  He works for headquarters in
14    Seoul, Korea.
15    Q   (BY MR. KILBORN:)  Headquarters in Seoul,
16    Korea?
17    A   Uh-huh.
18    Q   What company does he work for?
19    A   Hyundai Motor Corporation.
20    Q   Hyundai Motor Corporation?
21    A   HMC, uh-huh.
22    Q   Is it Hyundai Motor Corporation or Hyundai
23    Motor Company?
```
                                                        21

```
 1    A   Hyundai Motor Corporation.
 2    Q   You're sure about that?
 3    A   Not really.  It could be Hyundai Motor
 4    Company, Hyundai Motor -- It's probably Hyundai Motor
 5    Company, HMC, yes.
 6    Q   Headquartered in Seoul, South Korea?
 7    A   That's correct.
 8    Q   And what does Mr. Jason Lee do here in
 9    Montgomery, Alabama?
10        BY MR. SCOFIELD:  Object to the form.
11        THE WITNESS:  He has overall responsibility
12    for all of the finance departments.
13    Q   (BY MR. KILBORN:)  All of which departments?
14    A   Finance.
15    Q   Finance?
16    A   Uh-huh.
17    Q   Is there a department within, I'm going to
18    call it your employer, HMMA?
19    A   I'm sorry, I don't understand your question.
20    Q   What's the name of your employer?
21    A   Hyundai Motor Manufacturing Alabama.
22    Q   Hyundai Motor Manufacturing Alabama?
23    A   That's correct.
```
                                                        22

```
 1    Q   Can we call them HMMA for short or do you
 2    have another name for them?
 3    A   That would be it, HMMA.
 4    Q   Okay.  So he's in charge of all of the
 5    finances for HMMA?
 6        BY MR. SCOFIELD:  Object to the form.
 7        THE WITNESS:  That's correct.
 8    Q   (BY MR. KILBORN:)  When you say in charge of,
 9    what are his duties from your observation?
10    A   He oversees various sections in that
11    department.  And that would be treasury, accounts
12    payable, accounts receivable, tax, cost accounting,
13    budget.
14    Q   How about human resources?
15    A   He is not responsible for human resources.
16    Q   Okay.  And where does he live?
17    A   He lives here in Montgomery, Alabama.
18    Q   Do you see him every day?
19    A   Yeah, we both work on the same floor.
20    Q   All I know about the Hyundai plant is the
21    huge forty-foot tall sign on the side of the building.
22    Is that where you work?
23    A   Yes, I do.  Not on the billboard, but in the
```
                                                        23

```
 1    building, yes.
 2    Q   Not on the billboard, thank goodness.
 3        But you work in that big building with the
 4    sign that says Hyundai on the side?
 5    A   Yes, I do.
 6    Q   And so is that a manufacturing building and
 7    offices?
 8    A   The administration building is separate, but
 9    we are all in the same complex.  The administration
10    building is in front of the manufacturing area, yes.
11    Q   And his office is close to yours?
12    A   Uh-huh.
13    Q   Next door?
14    A   Across the hallway.
15    Q   Across the hall?
16    A   Uh-huh.
17    Q   So you, I guess, see him every day at work?
18    A   Yes, uh-huh.
19    Q   And does he -- does he audit the records of
20    HMMA?
21    A   He does not, but he does have auditors come
22    in and he reviews the reports.
23    Q   So he's in charge of the auditors?
```
                                                        24

                                      6  (Pages 21 to 24)

## WENDY SUSAN WARNER

1  BY MR. SCOFIELD:  Object to the form.
2      THE WITNESS:  We don't have an internal audit
3  group, but he does review the audits that come from
4  external sources.
5      Q  (BY MR. KILBORN:)  Okay.  And what's the name
6  of the external auditing firm?
7      A  We have several, but the one that he uses for
8  the finance side is KPMG.
9      Q  Do they have an office here in Montgomery?
10     BY MR. SCOFIELD:  Object to the form.
11     THE WITNESS:  Atlanta.
12     Q  (BY MR. KILBORN:)  So they -- Do they come
13  down from Atlanta?
14     A  Uh-huh, yes.
15     Q  Has KPMG been an outside firm since you've
16  been employed?
17     A  Yes.
18     Q  Has Mr. Jason Lee been the CFO conducting the
19  same duties that -- since you were employed?
20     A  Yes.
21     Q  So he was actually employed before you?
22     A  Uh-huh, he was.
23     Q  Is he employed by HMMA also?

25

1      A  An expatriate is someone that's been
2  dispatched from the corporate headquarters to serve a
3  period of time here to help us set up the facility.
4      Q  How did he get the name expatriate?
5      BY MR. SCOFIELD:  Object to the form.
6      THE WITNESS:  It's a financial term.
7      Q  (BY MR. KILBORN:)  Are there any other
8  expatriates?
9      A  There are.
10     Q  Who are they?
11     A  We have seventy-eight of them.
12     Q  All right.  And what -- Could you give me
13  their names?  And I don't want to go through all
14  seventy-eight, just the --
15     A  Well, you could start with a lot of Lees.
16  Lees, Parks, Jangs and Ahns and Ryus and you'd probably
17  have them all because their names are -- there's very
18  few names, so -- but we have vice president for human
19  resources, a president, a CFO, a COO, a -- several
20  directors, senior managers, coordinators, technical
21  coordinators.
22     Q  And they all work for Hyundai Motor Company?
23     A  That's correct.

27

1      A  He is not.  He's not on our payroll.
2      Q  So he doesn't come under your human resources
3  department?
4      A  In terms of -- I'm sorry, I don't understand.
5      Q  Well, do you handle his benefits or his
6  health insurance or --
7      A  Yes, they are covered under our health care
8  plans, but they are not paid by us.
9      Q  So Jason Lee, employed by Hyundai Motor
10  Company, is covered by HMMA's health insurance?
11     A  That's correct.
12     Q  That's Blue Cross?
13     A  Yes.
14     Q  But you don't have anything to do with --
15  Your department doesn't have anything to do with it?
16     BY MR. SCOFIELD:  Object to the form.
17     THE WITNESS:  His benefits?
18     Q  (BY MR. KILBORN:)  Right.
19     A  They do sign up themselves and their
20  dependents while they are here as an expat.
21     Q  As a what?
22     A  Expatriate.
23     Q  What's an expatriate?

26

1      Q  Headquartered in Seoul, South Korea?
2      A  That's right.
3      Q  And I don't want to go through all
4  seventy-eight because we only have seven hours for your
5  deposition.
6      A  Okay.
7      Q  So let's just start with the highest rank.
8      A  Sure.
9      Q  And would that be the president?
10     A  That's correct.
11     Q  And what would his name be?
12     A  Mr. Ahn, A-H-N.
13     Q  And that's his American name?
14     A  No, that is his name.
15     BY MR. SCOFIELD:  Object to the form.
16     Q  (BY MR. KILBORN:)  That's his real Korean
17  name?
18     A  Uh-huh.
19     Q  So he doesn't have an American name?
20     A  It's J. S. Ahn, but because of the level of
21  his position, he doesn't have an American name.  We
22  call him Mr. Ahn.
23     Q  Okay.  And the next ranking under him would

28

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

WENDY SUSAN WARNER

1  be who?
2      A   Probably the COO.
3      Q   Chief Operating Officer would be who?
4      A   H. I. Kim.
5      Q   That's K-I-M?
6      A   Uh-huh.
7      Q   And he is the chief operating officer --
8      A   That's correct.
9      Q   -- of HMMA?
10         BY MR. SCOFIELD: Object to the form.
11         THE WITNESS: He is of HMMA. He is the COO
12  of HMMA, but he is here dispatched as an expat.
13     Q   (BY MR. KILBORN:) Expat meaning expatriate?
14     A   Yes, sir.
15     Q   And Mr. Ahn, the president, he is the
16  president of HMMA, correct?
17     A   Yes.
18     Q   And he lives here in Montgomery?
19     A   He does.
20     Q   Along with Mr. Kim?
21     A   Yes.
22     Q   And I suppose all of the other seventy-eight
23  live around Montgomery?
                                                    29

1  than by their titles and job descriptions?
2          BY MR. SCOFIELD: Object to the form.
3          THE WITNESS: No, their performance reviews,
4  their pay increases, their promotions, everything is
5  communicated through HMC. Their human resources
6  division, everything is separate, they're just here on
7  loan in that regard. And it's a common practice, same
8  at Toyota when I worked there, Mercedes does the same
9  thing here in Alabama, Honda does the same thing, so
10  it's a very similar setup when you're having a startup
11  corporation in automotive with the transplants, all
12  same set up, but they're here to help, to coordinate,
13  to help the relationship building between the parent
14  company and the affiliate.
15     Q   (BY MR. KILBORN:) So HMMA would be a startup
16  corporation?
17     A   Yes, sir.
18     Q   With seventy-eight officers?
19     A   They're not officers. Not all of them are
20  officers.
21     Q   Well, executives?
22     A   Not all of them are executives. I mean,
23  you've got trainers, you've got manager level. There's
                                                    31

1      A   That's true.
2      Q   And they're all called expats?
3      A   Yes. Expatriates, yes.
4      Q   And they're all officers in one way or the
5  other of HMMA?
6          BY MR. SCOFIELD: Object to the form.
7          THE WITNESS: Yes.
8      Q   (BY MR. KILBORN:) But they all work for --
9      A   HMC.
10     Q   -- Hyundai Motor Company?
11     A   That's correct.
12     Q   Who pays them?
13     A   HMC.
14     Q   Hyundai Motor Company?
15     A   Yes.
16     Q   In Seoul, South Korea?
17     A   Yes, sir.
18     Q   So you've got seventy-eight officers of HMMA
19  who are paid by Hyundai Motor Company headquartered in
20  Seoul, South Korea?
21         BY MR. SCOFIELD: Object to the form.
22         THE WITNESS: Right.
23     Q   (BY MR. KILBORN:) Are they employees other
                                                    30

1  probably -- you know, the CFO, the COO and the
2  president, you have three or four that are considered
3  executives. The rest are in a training mode, trainers
4  or coordinators.
5      Q   So the seventy-eight expats who are employees
6  of Hyundai Motor Company and on loan to HMMA as far as
7  the officers of HMMA, do they have a name for that
8  group of people?
9          BY MR. SCOFIELD: Object to the form.
10     Q   (BY MR. KILBORN:) Just the, you know,
11  loanees or the expats or the --
12     A   Expatriates is what human resources has them
13  labeled.
14     Q   Do you know when the Hyundai -- HMMA will be
15  considered not a startup company and the expats will go
16  back to Korea?
17         BY MR. SCOFIELD: Object to the form.
18         THE WITNESS: I know there's been discussion,
19  but there's not a hard-and-fast rule as to when that
20  will occur. Toyota had over three hundred, so we
21  really have a very small group compared to previous
22  automotive companies that I've worked for.
23     Q   (BY MR. KILBORN:) And this is a similar
                                                    32

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

### WENDY SUSAN WARNER

| | |
|---|---|
| 1   setup, I think you said, with Toyota? | 1   benefits when they come in and audit? |
| 2   A   Yes, yes, it's very similar in nature. | 2   A   And employment and our record keeping system. |
| 3   Q   Do the -- I'll just call this group expats | 3   Q   And then you report to Mr. Jason Lee with |
| 4   rather than giving them some other name.  Do they have | 4   regard to KPMG audits of your department? |
| 5   their own human resources department? | 5   BY MR. SCOFIELD:  Object to the form. |
| 6   BY MR. SCOFIELD:  Object to the form. | 6   THE WITNESS:  I don't report to him, it's a |
| 7   THE WITNESS:  Not here at this location.  We | 7   dotted line though from the standpoint of any |
| 8   do have a coordinator though, an HR coordinator, that | 8   department that is requesting an audit that that |
| 9   is their contact point and he and I are at the same | 9   information be shared. |
| 10   level, so when they arrive, he does their orientation, | 10   Q   (BY MR. KILBORN:)  I want to talk about that |
| 11   he let's them know when they need to go home for | 11   dotted line since I'm not familiar with that concept. |
| 12   training, so he is their contact point here at HMMA. | 12   A   Okay. |
| 13   Q   (BY MR. KILBORN:)  Is the HR coordinator | 13   Q   Could you tell me about the concept of the |
| 14   employed by HMMA? | 14   dotted line? |
| 15   A   No, HMC. | 15   A   Well, I guess from a standpoint of human |
| 16   Q   HMC? | 16   resources, you play a variety of roles, you support a |
| 17   A   Uh-huh.  And each department has a | 17   variety of departments, so it's not an official dotted |
| 18   coordinator like that that supports the American | 18   line, but certainly when auditors are in your company |
| 19   management and the expats. | 19   and you're requested to provide information, Jason Lee |
| 20   Q   And name me the various departments. | 20   is responsible for signing off on those audits, but |
| 21   BY MR. SCOFIELD:  Object to the form. | 21   every department needs to cooperate and provide |
| 22   THE WITNESS:  We have divisions.  I assume | 22   information that's being requested by the audit. |
| 23   you want the divisions first and then we'll go from | 23   Q   When you say every department needs to |
| 33 | 35 |

| | |
|---|---|
| 1   there. | 1   cooperate, is that a verbal order, is that in a written |
| 2   Q   (BY MR. KILBORN.)  Sure. | 2   form? |
| 3   A   Production, then we have finance, human | 3   BY MR. SCOFIELD:  Object to the form. |
| 4   resources and administration.  There's one more. | 4   THE WITNESS:  It's kind of you know, I guess, |
| 5   There's four.  Let's see, you've got human resources | 5   having been in the business that when an audit is |
| 6   and administration, you've got the production division, | 6   conducted you need to comply with that request.  And |
| 7   you've got the finance division, and purchasing. | 7   also, in order to be able to file your own information |
| 8   Q   And the expats have that breakdown of | 8   and time to the government, it's your due diligence to |
| 9   divisions and then HMMA has that breakdown of | 9   be cooperative. |
| 10   divisions? | 10   Q   (BY MR. KILBORN:)  How do you know in your |
| 11   BY MR. SCOFIELD:  Object to the form. | 11   job -- Well, let me ask you another question first: |
| 12   THE WITNESS:  I guess from the expats you | 12   Are the expats running HMMA? |
| 13   mean are they in all of those divisions? | 13   BY MR. SCOFIELD:  Object to the form. |
| 14   Q   (BY MR. KILBORN:)  That's what I meant, yes, | 14   THE WITNESS:  I don't understand your |
| 15   ma'am. | 15   question, I'm sorry. |
| 16   A   Yes, uh-huh. | 16   Q   (BY MR. KILBORN:)  You have seventy-eight |
| 17   Q   To get back to the KPMG, which -- do you have | 17   expats with all of these various positions from the |
| 18   access to the KPMG financial records? | 18   president on down of HMMA.  The expats as a group of |
| 19   A   No. | 19   seventy-eight, or less if you want to tell me that, do |
| 20   Q   Do you have -- | 20   they run HMMA? |
| 21   A   I have the audits that pertain to benefits, | 21   BY MR. SCOFIELD:  Object to the form. |
| 22   but I don't have the whole company audit, no. | 22   THE WITNESS:  I think if you are familiar |
| 23   Q   So you interact with KPMG with regard to | 23   with Asian culture, it's consensus.  Certainly, whether |
| 34 | 36 |

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

1  that's Japanese or Korean, again, the same setup, it's
2  a collaborative effort. It's a one-billion-dollar
3  investment for this company and certainly they want to
4  have good information and they want this company to be
5  successful, so it is a collaboration. It's not the
6  Koreans making the ultimate decision, it's not the
7  Americans. Again, it's consensus building when we are
8  trying to accomplish any project or any activity.
9      Q   (BY MR. KILBORN:) Ultimately, if there's no
10 consensus, who has the final say?
11     BY MR. SCOFIELD: Object to the form.
12     THE WITNESS: Typically, just like in any
13 environment or any culture, you have to reach an
14 agreement. It's not usually one way or the other, you
15 come to a meeting of the minds of what -- what you both
16 can live with.
17     Q   (BY MR. KILBORN:) So you have to have a
18 consensus between seventy-eight expats --
19     A   Not all seventy-eight, but the executive
20 level.
21     Q   Okay. The executive level of the expats,
22 that would be the president, CEO -- I guess they don't
23 have a CEO, do they?

37

1      BY MR. SCOFIELD: Object to the form.
2      THE WITNESS: H. I. Kim is the COO.
3      Q   (BY MR. KILBORN:) Oh, the COO. Do they have
4  a CEO?
5      A   COO.
6      Q   But HMMA doesn't have a CEO?
7      BY MR. SCOFIELD: Object to the form.
8      THE WITNESS: That's the president.
9      Q   (BY MR. KILBORN:) All right. And that's
10 Mr. Kim?
11     A   It's Mr. Ahn.
12     Q   Mr. Ahn, okay, excuse me. I thought he was
13 the president. He must be the president and CEO?
14     BY MR. SCOFIELD: Object to the form.
15     THE WITNESS: That's right.
16     Q   (BY MR. KILBORN:) So the expats who are the
17 executives of HMMA, would that be basically Mr. Ahn,
18 president and CEO; Mr. Kim, COO; Mr. Jason Lee, CFO?
19     Anybody else?
20     A   That should do it.
21     Q   Would it be fair to say that you've really
22 got three top executives in HMMA that are in charge of
23 HMMA?

38

1      BY MR. SCOFIELD: Object to the form.
2      THE WITNESS: We do have vice president
3  levels that are Americans and they all sit on the Board
4  of Directors and meet weekly, so I'd say that they're a
5  part of the management team, but they're not the total
6  management team.
7      Q   (BY MR. KILBORN:) So you do have Americans
8  who sit on the -- who do hold a vice president
9  position?
10     A   That's correct.
11     Q   Are there seventy-eight of them?
12     A   We don't have seventy-eight expats that are
13 executives either, but we do have --
14     Q   So how many vice presidents does HMMA have?
15     A   On the American side, we have two.
16     Q   Two.
17     And how about on the Korean side?
18     A   The CFO, the -- I think we have two.
19     Q   And the Korean side work for Hyundai Motor
20 Company in Seoul?
21     A   Right.
22     Q   And the American side works for HMMA?
23     A   Yes.

39

1      Q   Okay. You mentioned the Board of Directors.
2  How many members of the HMMA Board of Directors are
3  there?
4      A   It's not a Board of Directors, it's called a
5  directors meeting. It's not the Board. It's a weekly
6  meeting that they go over production results and
7  departmental updates. It's not a true Board of
8  Directors, it's a directors meeting, but it's the
9  directors, the vice presidents are there.
10     Q   So HMMA doesn't have a Board of Directors?
11     A   No, not that I know of.
12     Q   In the complaint, there's a defendant called
13 Hyundai Motor Manufacturing Alabama, L.L.C. That's
14 what we've been referring to as HMMA?
15     A   Uh-huh.
16     Q   Do you know what an L.L.C. is?
17     A   Limited liability corporation.
18     Q   Outside of knowing what the letters stand
19 for, do you know what it is?
20     BY MR. SCOFIELD: Object to the form.
21     THE WITNESS: Not really, no. I know it's a
22 partnership, a corporation, that's utilized to begin a
23 business, but I don't have a lot of accurate

40

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969

## WENDY SUSAN WARNER

1  information on that, no.
2      Q   (BY MR. KILBORN:)  Do you have inaccurate
3  information on that?
4      A   Probably not.
5      Q   So you have no information?
6      A   Limited liability corporation, no.
7      Q   Outside of knowing what L.L.C. stands for,
8  you don't have any information, accurate or inaccurate?
9          BY MR. SCOFIELD:  Object to the form.
10         THE WITNESS:  I know that we were
11  incorporated in Delaware.  I know that we recorded that
12  with the Secretary of State here in Alabama.
13     Q   (BY MR. KILBORN:)  How do you know that?
14     A   That was shared with me with our lawyer when
15  I signed initial information in regards to HMMA and
16  HMA.
17     Q   So you were wanting to know in 2003 who you
18  were working for.
19         Who was the lawyer?
20         BY MR. SCOFIELD:  Object to the form.  And,
21  again, I'm going to -- up to the extent that this would
22  infringe on any attorney-client privilege, I'm going to
23  instruct the witness not to answer in order to preserve

41

1  that privilege.
2      If you care to identify the name of the
3  lawyer, that's fine, but the substance of the
4  conversation, I'm going to instruct you not to answer
5  in order to preserve the privilege.
6          THE WITNESS:  So the lawyer when I started or
7  the lawyer that I signed the --
8      Q   (BY MR. KILBORN:)  Yeah, the lawyer who said,
9  you know, HMMA is a Delaware company and we filed with
10  the Secretary of State, that simple information.
11         BY MR. SCOFIELD:  Again, I'm going to object
12  to the extent that that question characterizes any
13  information which was provided from counsel, but I will
14  let her identify the counsel to who she's referencing.
15         THE WITNESS:  That's Chad Griffon.
16     Q   (BY MR. KILBORN:)  How do you spell that?
17     A   G-R-I-F-F-O-N, C-H-A-D.
18     Q   Is he a Montgomery lawyer?
19     A   He was our in-house counsel.
20     Q   When you say our, you mean HMMA's?
21     A   Uh-huh.
22     Q   Is he still around?
23     A   No, he's left the company.

42

1      Q   You don't have any personal knowledge of
2  incorporation of HMMA or its qualification with the
3  Secretary of State or any other governmental body?
4          BY MR. SCOFIELD:  Object to the form.
5          THE WITNESS:  No, I just know, as I said, the
6  filing and that was shared with me.
7      Q   (BY MR. KILBORN:)  And that information was
8  2003 -- given to you in 2003?
9          BY MR. SCOFIELD:  Object to the form.
10         THE WITNESS:  Not 2003, just recently with
11  this particular case.
12     Q   (BY MR. KILBORN:)  Oh, with this particular
13  case --
14     A   Yes.
15     Q   -- that we're here on today?
16     A   Yes.
17     Q   Okay.  That was in 2007 --
18     A   Yes.
19     Q   -- for purposes of your affidavit that we'll
20  get to in a minute?
21     A   Right, right.
22     Q   Before that, did you know where HMMA was
23  incorporated?

43

1      A   Yes.
2      Q   And how did you find that out?
3      A   The person that I interviewed with.
4      Q   Who was that?
5      A   That was the director of human resources as
6  well as the vice president for HR and administration.
7      Q   Who was that?
8      A   B. M. Ahn and Greg Kimble.
9      Q   And who did they work for at the time?
10     A   HMMA and HMC.
11     Q   Both?
12     A   Uh-huh.  Mr. Ahn worked for HMC.  Mr. Kimble
13  worked for HMMA.
14     Q   Does Mr. Ahn work for HMMA?
15         BY MR. SCOFIELD:  Object to the form.
16         THE WITNESS:  No.
17     Q   (BY MR. KILBORN:)  How about the other
18  gentleman?
19     A   Mr. Kimble?
20     Q   Yeah.
21     A   HMMA.
22     Q   And when did Mr. Griffon leave?
23         BY MR. SCOFIELD:  Object to the form.

44

11 (Pages 41 to 44)

WENDY SUSAN WARNER

| | |
|---|---|
| 1    THE WITNESS: I'm sorry, I don't remember. | 1    A    Uh-huh. |
| 2    Q    (BY MR. KILBORN:)  Was that a voluntary | 2    Q    And you know what that is -- |
| 3  separation? | 3    A    Uh-huh. |
| 4      BY MR. SCOFIELD: Object to the form. | 4    Q    -- Board of Directors? |
| 5    THE WITNESS: Yes. | 5      And have you actually attended Board of |
| 6    Q    (BY MR. KILBORN:)  Are there any expats, | 6  Directors meetings of the corporation? |
| 7  particularly executives that we've talked about, who | 7    A    No, I have not. |
| 8  are employed both by HMC and HMMA? | 8    Q    And do you know that companies can have |
| 9    A    No. | 9  various numbers of Board members? |
| 10    Q    All employed by HMC? | 10    A    Uh-huh. |
| 11    A    That's correct. | 11    Q    Are you familiar with that? |
| 12    Q    Are there any Koreans employed by HMMA at | 12    A    Yes. |
| 13  all? | 13    Q    Are you also familiar with the fact that a |
| 14      BY MR. SCOFIELD: Object to the form. | 14  Board of Directors of a corporation would be a separate |
| 15    THE WITNESS: Do you mean from the standpoint | 15  level of authority from the officers of the |
| 16  if that was their mother country before they -- | 16  corporation? |
| 17    Q    (BY MR. KILBORN:)  Good question.  Are there | 17    A    Uh-huh. |
| 18  any expats -- Let me rephrase it.  Any expats employed | 18    Q    Do you know that? |
| 19  by HMMA? | 19      BY MR. SCOFIELD: Object to the form. |
| 20    A    No. | 20    THE WITNESS: Sure.  Yes, I know that. |
| 21    Q    All by HMC? | 21    Q    (BY MR. KILBORN:)  Don't agree with me if you |
| 22    A    Correct. | 22  don't know. |
| 23    Q    And are there any -- What do you call the | 23    A    I mean, I've heard of that before.  Yes, I |
| 45 | 47 |

| | |
|---|---|
| 1  American side, Americans? | 1  know that structure. |
| 2      BY MR. SCOFIELD: Object to the form. | 2    Q    All right.  What are the terms -- or the term |
| 3    THE WITNESS: Team members. | 3  or terms of the management or executives or any type of |
| 4    Q    (BY MR. KILBORN:)  Team members? | 4  authority that actually governs as a group the company |
| 5    A    Yes. | 5  known as HMMA? |
| 6    Q    So the Americans are called team members? | 6      BY MR. SCOFIELD: Object to the form. |
| 7    A    Uh-huh. | 7    THE WITNESS: It varies depending on the |
| 8    Q    And what are the expats called? | 8  needs of the corporation.  They have had presidents |
| 9      BY MR. SCOFIELD: Object to the form. | 9  that have been there one year, two years, three years |
| 10    THE WITNESS: HMC expats. | 10  and then they've returned back to HMC in a different |
| 11    Q    (BY MR. KILBORN:)  Expats. | 11  role or setting up another corporation. |
| 12      So for purposes of the deposition, if I use | 12    Q    (BY MR. KILBORN:)  So since 2003, there's |
| 13  the word team members, I'm talking about Americans; if | 13  been a constant flow of executives back and forth |
| 14  I use the name expats, I'm talking about the South | 14  between HMMA and HMC? |
| 15  Korean group. | 15    A    That's correct. |
| 16    A    That would be fine. | 16    Q    On all different levels? |
| 17    Q    Okay.  Do you know whether or not HMMA has | 17    A    Yeah. |
| 18  any type of governing board at all? | 18    Q    President, CEO? |
| 19      BY MR. SCOFIELD: Object to the form. | 19    A    Yes. |
| 20    THE WITNESS: I'm sorry, I don't understand | 20    Q    CFO, COO? |
| 21  your question. | 21    A    Yeah, except for the CFO, that's been |
| 22    Q    (BY MR. KILBORN:)  You've heard of a Board of | 22  constant.  All the others have moved and there have |
| 23  Directors, I'm sure. | 23  been different levels of executives and different |
| 46 | 48 |

12 (Pages 45 to 48)

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

### WENDY SUSAN WARNER

1  individuals filling those roles, yes.
2      Q   How is the ownership of HMMA held?
3      BY MR. SCOFIELD: Object to the form.
4      THE WITNESS: My understanding is that in
5  terms of the vehicles, we manufacture the cars, the
6  cars are money gated or not owned by us after they
7  leave the line and they are given to HMA to sell and
8  distribute, but our parent corporation is HMC Seoul,
9  Korea.
10     Q   (BY MR. KILBORN:) And I haven't heard that
11 term money gated. Could you tell me what that is?
12     A   My understanding is money gated is that after
13 the vehicle is at the end of the line, it is
14 transferred to HMA to be owned by them and sold and
15 distributed, so after it releases -- ends our line and
16 is produced, then the car is no longer owned by us, it
17 is owned by HMA and they are responsible for selling
18 and distributing the vehicle.
19     Q   You used the term given. Is that literally
20 true?
21     BY MR. SCOFIELD: Object to the form.
22     THE WITNESS: In terms of the team members,
23 the vehicle then goes into a vehicle processing center
                                                      49

1  called Glovis, which is next to us. It's put on the
2  rail cars or shipped by truck to the various
3  dealerships but paper-wise.
4      Q   (BY MR. KILBORN:) That's G-L-O-V-I-S?
5      A   G-L-O-V-I-S, yes.
6      Q   And what is the name of Glovis?
7      A   That is the name.
8      BY MR. SCOFIELD: Object to the form.
9      THE WITNESS: That is the name.
10     Q   (BY MR. KILBORN:) What is the legal name of
11 Glovis?
12     BY MR. SCOFIELD: Same objection.
13     THE WITNESS: Glovis, that's all I know.
14     Q   (BY MR. KILBORN:) Is Glovis the freight and
15 logistics company under the Hyundai umbrella?
16     A   It's a vehicle processing center.
17     Q   Vehicle processing?
18     A   Uh-huh. They get the vehicle ready to be
19 transported, shrink wrap.
20     Q   So from your understanding, once the vehicle
21 is completed -- has completed the manufacturing process
22 at the Hyundai plant in Montgomery by HMMA, it's then
23 money gated to HMA to sell and distribute and the
                                                      50

1  logistics of getting it from the Hyundai plant to HMA
2  for distribution is handled by Glovis, which is —
3      A   A vehicle processing center.
4      Q   — vehicle processing?
5      Is that another name for freight and
6  logistics?
7      BY MR. SCOFIELD: Object to the form.
8      THE WITNESS: I know that they prepare the
9  vehicle for shipment. I don't know if they are
10 actually the individuals that haul the cars.
11     Q   (BY MR. KILBORN:) Does -- Do you know
12 anything about whether or not HMA pays HMMA for the
13 vehicles that it manufactures?
14     BY MR. SCOFIELD: Object to the form.
15     THE WITNESS: I honestly don't know. I'm not
16 sure about the financials of that.
17     Q   (BY MR. KILBORN:) You have no knowledge of
18 the financial transactions between HMMA and HMA?
19     A   No.
20     Q   No, meaning you don't know anything about
21 that?
22     A   That's correct.
23     Q   So you don't know whether HMMA gives the
                                                      51

1  vehicles to HMA or whether HMA pays for them or how it
2  pays for them or what it pays for them or how that's
3  figured?
4      BY MR. SCOFIELD: Object to the form.
5      THE WITNESS: I don't.
6      Q   (BY MR. KILBORN:) And you don't know how
7  that's carried on the financial statements of HMA or
8  HMC or HMMA?
9      BY MR. SCOFIELD: Object to the form.
10     THE WITNESS: No.
11     Q   (BY MR. KILBORN:) Or Glovis?
12     A   No.
13     Q   Is it correct that you know zero about the
14 financial transactions between HMA, HMC and HMMA?
15     BY MR. SCOFIELD: Object to the form.
16     THE WITNESS: That would be true.
17     Q   (BY MR. KILBORN:) Do you know who does know
18 about the financial transactions between those three?
19     BY MR. SCOFIELD: Object to the form.
20     THE WITNESS: The chief financial officer,
21 Jason Lee.
22     Q   (BY MR. KILBORN:) Mr. Lee?
23     A   Yes, sir.
                                                      52

13 (Pages 49 to 52)

### WENDY SUSAN WARNER

| | |
|---|---|
| 1   Q   He would know it all? | 1   THE WITNESS: No. |
| 2       BY MR. SCOFIELD: Object to the form. | 2   Q   (BY MR. KILBORN:)  Do you know anything about |
| 3       THE WITNESS: I would think so. | 3   the financial relationships between HMC, HMMA and HMA? |
| 4   Q   (BY MR. KILBORN:)  Do you speak Korean? | 4       BY MR. SCOFIELD:  Object to the form. |
| 5   A   No. | 5       THE WITNESS: No. |
| 6   Q   Does Mr. Jason Lee speak Korean? | 6   Q   (BY MR. KILBORN:)  Do you know anything about |
| 7   A   Yes, very well. | 7   the business purposes of those three? |
| 8   Q   Does he speak English? | 8   A   Yes. |
| 9   A   Yes, very well. | 9   Q   And the business purposes of HMC would be |
| 10   Q   How about Mr. Ahn? | 10   what? |
| 11   A   Yes. | 11   A   They are the headquarters and they are the |
| 12   Q   How about Mr. Mun? | 12   parent company. |
| 13   A   Mr. Mun? | 13   Q   The parent company of who? |
| 14   Q   M-U-N, do you know him? | 14   A   HMMA and HMA. |
| 15   A   I do not. | 15   Q   How about Glovis? |
| 16   Q   He's got something to do with this case.  Do | 16   A   I do know that there is some sort of |
| 17   you know anything about a Mr. Mun? | 17   relationship with them, that there's a certain |
| 18       BY MR. SCOFIELD:  Object to the form. | 18   percentage that they own, but I don't know the actual |
| 19       THE WITNESS:  I've heard the name before, but | 19   percentage. |
| 20   I don't know him personally. | 20   Q   Well, the -- You refer to HMC as -- I think |
| 21   Q   (BY MR. KILBORN:)  Do you know whether or not | 21   you used the word parent? |
| 22   he telephoned Leon Dees, the plaintiff? | 22   A   Uh-huh. |
| 23       BY MR. SCOFIELD:  Object to the form. | 23   Q   What do you mean by parent? |
| 53 | 55 |
| 1       THE WITNESS:  I do not. | 1       BY MR. SCOFIELD:  Object to the form. |
| 2   Q   (BY MR. KILBORN:)  Did you ever talk to | 2       THE WITNESS:  They own HMMA, they own HMC. |
| 3   Mr. Mun -- I'm going to say Mun -- I think it's spelled | 3   And, again, with Asian culture, they utilize that term |
| 4   M-U-N.  Had anything to do with the plaintiff and his | 4   as a role that we're siblings so there is a |
| 5   employment during his employment, during his | 5   relationship, but they are the owner and corporate |
| 6   termination or after his termination? | 6   headquarters for all of the affiliates. |
| 7       BY MR. SCOFIELD:  Object to the form. | 7   Q   (BY MR. KILBORN:)  HMC? |
| 8       THE WITNESS:  I'm not familiar with that, no, | 8   A   Yes, sir. |
| 9   I don't know. | 9   Q   Do you know who owns HMC? |
| 10   Q   (BY MR. KILBORN:)  Now, Mr. Kim, does he | 10       BY MR. SCOFIELD:  Object to the form. |
| 11   speak English? | 11       THE WITNESS:  I would think Chairman Chung. |
| 12   A   Yes. | 12   Q   (BY MR. KILBORN:)  Have you met him? |
| 13   Q   The expats that you have dealings with on a | 13   A   Yes. |
| 14   daily basis, do they all speak English? | 14   Q   I have not met him, but I've read all about |
| 15   A   Yes.  They do have to take a test of English | 15   him.  When is the last time that you saw him? |
| 16   before they're allowed to pursue this type of | 16   A   Probably at our grand opening in 2005. |
| 17   opportunity, so that is a requirement before they're | 17   Q   And Chung Mong-koo, is that his Korean name? |
| 18   allowed to accept an assignment here in the U.S.  Some | 18   A   Yes. |
| 19   are better than others, but, yes, they do have to take | 19   Q   And does he have an American name? |
| 20   some English language training. | 20   A   No. |
| 21   Q   Do you know anything about the legal | 21   Q   And he's referred to as Chairman Chung? |
| 22   relationship between HMA, HMC or HMMA? | 22   A   That's correct. |
| 23       BY MR. SCOFIELD:  Object to the form. | 23   Q   Has he been, to your knowledge, to Montgomery |
| 54 | 56 |

14  (Pages 53 to 56)

WENDY SUSAN WARNER

1 since the opening?
2  A  Not that I'm aware of.  He may have come on
3 separate occasions, but my introduction to him was at
4 the grand opening that we had in 2005.
5  Q  And who do you understand him to be?
6  BY MR. SCOFIELD:  Object to the form.
7  THE WITNESS:  Chairman of the corporation,
8 HMC.
9  Q  (BY MR. KILBORN:)  HMC?
10  A  Yes.
11  Q  And what is his son's name?
12  BY MR. SCOFIELD:  Object to the form.
13  THE WITNESS:  Chung, Jr.  Honestly, I don't
14 recall.
15  Q  (BY MR. KILBORN:)  Have you ever met him?
16  A  Yes.
17  Q  Where did you meet him?
18  A  Same timeframe, at the grand opening.
19  Q  And what is his relationship, other than
20 father-son, to Hyundai Motor Company, father-son being
21 Chairman Chung?
22  BY MR. SCOFIELD:  Object to the form.
23  THE WITNESS:  None that I'm aware of.
57

1  Q  (BY MR. KILBORN:)  And is it your testimony
2 that as far as your understanding and your knowledge
3 that Chairman Chung owns HMC?
4  A  Yes.
5  Q  Any other family members of Chairman Chung
6 that you know of own HMC?
7  BY MR. SCOFIELD:  Object to the form.
8  THE WITNESS:  Not that I'm aware of.
9  Q  (BY MR. KILBORN:)  So that would mean
10 Chairman Chung not only owns HMC but he owns HMMA, HMA,
11 Glovis?
12  BY MR. SCOFIELD:  Object to the form.
13  THE WITNESS:  I know he owns the automotive
14 division.  I don't know if he owns all the others.
15 There's, you know, several other divisions of HMC as
16 you probably know.  I do know he owns the automotive
17 side, but there's several other; construction, retail,
18 shipbuilding.
19  Q  (BY MR. KILBORN:)  Let me give you some names
20 and tell me if you know about these companies who I
21 understand are some type of affiliated companies with
22 HMC, but I don't want you to agree with that, just tell
23 me.
58

1  BY MR. SCOFIELD:  Object to the form.
2  Q  (BY MR. KILBORN:)  Do you know anything about
3 Kia Motors Corporation?
4  A  Yes.
5  Q  What do you know about them?
6  BY MR. SCOFIELD:  Same objection.
7  THE WITNESS:  Plant being established in
8 Georgia about eighty-five miles north of us.
9  Q  (BY MR. KILBORN:)  Okay.  Do you have
10 anything to do with that?
11  A  Not in the standpoint of being -- of working
12 for them, but certainly exchange of information.
13  Q  And that's current?
14  A  Uh-huh.
15  Q  Are they sort of in the same spot that HMMA
16 was in when you began, a startup company --
17  A  Yes.
18  Q  -- in Georgia?
19  A  Yes.
20  Q  And do you know the relationship of Kia
21 Motors Corporation to HMC or HMMA or HMA?
22  BY MR. SCOFIELD:  Object to the form.
23  THE WITNESS:  I know that Hyundai purchased
59

1 Kia several years ago, but they are two totally
2 separate entities.
3  Q  (BY MR. KILBORN:)  And is Chairman Chung,
4 Jr. -- is that the --
5  A  Yeah.  Honestly, I don't know if that's the
6 right term, but yeah.
7  Q  How was he introduced?
8  A  We shook hands, he thanked us for our service
9 and it was at a dinner.
10  Q  Okay.  Is he in some fashion the head of Kia?
11  A  That's my understanding, yes.
12  Q  Does he own Kia?
13  BY MR. SCOFIELD:  Object to the form.
14  THE WITNESS:  Honestly, I don't know.
15  Q  (BY MR. KILBORN:)  How about Hyundai Steel
16 Company?
17  A  Does he own Hyundai Steel?
18  Q  Do you know anything about Hyundai Steel
19 Company?
20  A  I know that it's an affiliate of HMC, but I
21 don't have any working relationships with them.
22  Q  Other than knowing the name Glovis, you don't
23 know its relationship with any Hyundai related company?
60

15 (Pages 57 to 60)

WENDY SUSAN WARNER

1  BY MR. SCOFIELD: Object to the form.
2  THE WITNESS: No. We do have supplier
3  meetings with all of the tier one suppliers and Glovis
4  does attend, but they're human resources folks so we,
5  again, exchange information, support from a human
6  resources situation, but it's called a supplier meeting
7  that human resources and purchasing tries to support
8  the suppliers with information. And, again, same as we
9  did at Toyota, same as other transplants do to support
10  their suppliers in their base here.
11  Q  (BY MR. KILBORN:) You used a term and I
12  didn't write it down. Is there a term for these
13  meetings?
14  A  It's called a supplier meeting.
15  Q  Supplier meeting?
16  A  Uh-huh. They supply various components and
17  parts to build the vehicle and so you have to have a
18  real close relationship as well as a just-in-time type
19  of operation.
20  Q  And how often are these meetings held?
21  BY MR. SCOFIELD: Object to the form.
22  THE WITNESS: Quarterly.
23  Q  (BY MR. KILBORN:) Quarterly?

61

1  Automotive Group?
2  A  I've heard of it, yes.
3  Q  Do you know what it is?
4  A  No.
5  Q  Do you know anything about its structure?
6  A  Not really.
7  Q  Financial, legal, corporate, otherwise?
8  A  No.
9  BY MR. SCOFIELD: Object to the form.
10  Q  (BY MR. KILBORN:) Does HMMA, L.L.C. have
11  members?
12  A  Has members, does L.L.C. have members?
13  BY MR. SCOFIELD: Object to the form.
14  Q  (BY MR. KILBORN:) I was asking you that
15  question.
16  A  I don't understand. Obviously, I don't know,
17  so I don't understand the question.
18  Q  Does HMMA, L.L.C. have stock?
19  BY MR. SCOFIELD: Object to the form.
20  THE WITNESS: Not that I know of.
21  Q  (BY MR. KILBORN:) Explain to me then the
22  legal or business control of HMMA, L.L.C. How is it
23  controlled if it's not owned by stockholders and

63

1  A  Uh-huh.
2  Q  And the last one was when?
3  A  I didn't go, but team relations went and
4  purchasing, so let's see, this is November, I would say
5  probably the June timeframe.
6  Q  And who attends these meetings?
7  A  The human resources groups and sometimes
8  purchasing.
9  Q  Of the Hyundai companies?
10  A  Tier ones.
11  Q  Of the tier ones.
12  A  Uh-huh.
13  Q  Tell me what you mean by tier ones.
14  A  Tier one is a direct supplier. Tier two
15  could be providing support to the tier one, so it's
16  only tier one suppliers which is a direct supplier to
17  HMMA.
18  Q  And are all of the tier one companies Hyundai
19  companies?
20  A  No.
21  Q  How about tier two?
22  A  No. Conglomerations; some are, some aren't.
23  Q  Okay. Have you ever heard the name Hyundai

62

1  doesn't have a Board of Directors, it doesn't have
2  officers?
3  BY MR. SCOFIELD: Object to the form.
4  THE WITNESS: I honestly don't know.
5  BY MR. SCOFIELD: The witness can answer to
6  the extent that she knows.
7  Q  (BY MR. KILBORN:) Is it your understanding
8  that it's family-owned?
9  A  Uh-huh.
10  Q  You have to say yes or no.
11  A  Yes.
12  Q  Is that Chairman Chung?
13  A  Yes.
14  Q  Would that include his son?
15  A  I would think so, yes.
16  Q  Any other family members?
17  A  Not that I know of.
18  Q  Am I correct that having worked for Toyota
19  and then now having worked for Hyundai, both of which
20  are Asian companies, that you know something about the
21  Asian corporate mentality?
22  A  Somewhat?
23  Q  There's a Korean word that means family

64

16 (Pages 61 to 64)

WENDY SUSAN WARNER

1  controlled, a dynasty. Do you know what that word is?
2      BY MR. SCOFIELD: Object to the form.
3      THE WITNESS: In reading newspapers, I
4  believe it's called chaebol.
5      Q  (BY MR. KILBORN:) Right. Do you know how
6  that's spelled?
7      A  I'd be guessing.
8      Q  Okay. What is your understanding from your
9  reading what a chaebol is?
10     BY MR. SCOFIELD: Object to the form.
11     THE WITNESS: Just that it's a family-owned
12 company.
13     Q  (BY MR. KILBORN:) Is that what Hyundai is?
14     BY MR. SCOFIELD: Object to the form.
15     THE WITNESS: I'd be guessing. I don't know.
16     Q  (BY MR. KILBORN:) From what you know, what
17 you've seen at Hyundai and what you've read about a
18 chaebol is, do you think that Hyundai is a chaebol?
19     BY MR. SCOFIELD: Object to the form.
20     THE WITNESS: Again, I'd be guessing.
21     Q  (BY MR. KILBORN:) I've heard it referred to
22 as a chaebol. Have you heard that?
23     A  Just in newspapers that I've read.

65

1      Q  And what type of newspapers have you read?
2      A  I read some of the Korean newspapers to stay
3  current with Hyundai.
4      Q  Okay. Are they translated into English?
5      A  Yeah.
6      Q  Are they made available by the expats or HMA
7  or HMMA?
8      A  No, just my own research.
9      BY MR. SCOFIELD: Object to the form.
10     THE WITNESS: My own information.
11     Q  (BY MR. KILBORN:) Okay. And have you read
12 that Hyundai is an authoritarian management structure?
13     BY MR. SCOFIELD: Object to the form.
14     THE WITNESS: I have not read that.
15     Q  (BY MR. KILBORN:) Have you read anything
16 about the corporate structure of the various Hyundai
17 corporations?
18     A  No.
19     Q  Did you read about Chairman Chung's
20 indictment and conviction for embezzlement and other
21 crimes?
22     A  Yes.
23     BY MR. SCOFIELD: Object to the form.

66

1      Q  (BY MR. KILBORN:) And did you read where, I
2  think, he got six years in prison but then he was let
3  out because he was so important to the company?
4      A  Yes.
5      BY MR. SCOFIELD: Object to the form.
6      Q  (BY MR. KILBORN:) Or the country?
7      A  I did read that.
8      Q  Okay. And did you read where he apologized
9  to the country for his criminal acts?
10     BY MR. SCOFIELD: Object to the form.
11     THE WITNESS: Yes.
12     Q  (BY MR. KILBORN:) And did you read that he
13 and his son own sixty percent of Glovis?
14     A  I didn't remember that part.
15     Q  Did you -- Did you remember that his son and
16 he as part of this apology had given the sixty percent
17 of Glovis that they own to some charity?
18     BY MR. SCOFIELD: Object to the form.
19     THE WITNESS: No.
20     Q  (BY MR. KILBORN:) Would it be correct to say
21 then that you, Wendy Warner, have no knowledge about
22 the legal, financial structure of HMMA, HMA or HMC?
23     BY MR. SCOFIELD: Object to the form.

67

1      THE WITNESS: Yes.
2      Q  (BY MR. KILBORN:) And that you have no
3  knowledge about the business structure of those
4  companies except what you know about the human
5  resources --
6      A  Yes.
7      Q  -- department?
8      BY MR. SCOFIELD: Object to the form.
9      Q  (BY MR. KILBORN:) So you, Wendy Warner, are
10 strictly a human resources person within HMMA?
11     A  Yes.
12     Q  You don't have access to legal matters,
13 financial matters, accounting matters, supply
14 matters --
15     A  No.
16     BY MR. SCOFIELD: Object to the form.
17     Q  (BY MR. KILBORN) -- manufacturing matters,
18 any other operational matters at all?
19     BY MR. SCOFIELD: Object to the form.
20     THE WITNESS: Yes, that's correct.
21     Q  (BY MR. KILBORN:) And this isn't an
22 endurance test, so any time you want to get up and take
23 a break, let me know.

68

17 (Pages 65 to 68)

### WENDY SUSAN WARNER

```
 1       A   Thank you.
 2       Q   I'll be glad to accommodate you.
 3           I think a gentleman involved in the firing of
 4   Mr. Dees was Mr. Prater?
 5           BY MR. SCOFIELD:  Object to the form.
 6           THE WITNESS:  Mr. Prater was an assistant
 7   manager so my understanding is that he is -- was his
 8   supervisor, but he was not working the night in
 9   question.
10       Q   (BY MR. KILBORN:)  Okay.  And your lawyers
11   have been kind enough to give us his personnel file,
12   which I have, but we've asked that it be updated and I
13   haven't got that yet so I don't have to ask you about
14   that.
15           Is Mr. Prater no longer with the company?
16       A   That's correct.
17       Q   And when did he separate?
18       A   It's been recently, but it all kind of runs
19   together.  I'm sorry, I don't recall the exact date,
20   but it has been recently.
21       Q   What was the reason for his separation?
22           BY MR. SCOFIELD:  Object to the form.
23           THE WITNESS:  He was offered another
                                                          69
```

```
 1   opportunity in Tennessee closer to his family.
 2       Q   (BY MR. KILBORN:)  Okay.  And as far as you
 3   know, that's what happened?
 4       A   Yes, sir.
 5       Q   So Mr. Prater and HMMA departed on good terms
 6   as far as you know?
 7       A   Yes.
 8       Q   And there's a -- I think there's a
 9   Mr. Brookshire that has some knowledge?
10       A   Yes.
11       Q   Is he still with the company?
12       A   He is.
13       Q   And Mr. Applegate?
14       A   Yes, he is.
15       Q   Still with the company?
16       A   Uh-huh.
17       Q   Who is your immediate superior?
18       A   I report to a vice president for human
19   resources, B. W. Ryu, R-Y-U.
20       Q   D. W. R-Y-U?
21       A   B as in boy, W, Ryu, R-Y-U.
22       Q   Is he an expat?
23       A   He's an expat.
                                                          70
```

```
 1       Q   He's an expat.
 2           And what is his title?
 3       A   Vice president for human resources and
 4   administration.
 5       Q   And how long has he been your immediate
 6   superior?
 7       A   One year.
 8       Q   And before him?
 9       A   Director of human resources, Greg Kimble.
10       Q   K-I-M-B-L-E?
11       A   Uh-huh.
12       Q   Did he leave the company, Mr. Kimble?
13       A   He's on medical leave.
14       Q   Medical leave?
15       A   Uh-huh.
16       Q   And Mr. Ryu, is that his American name?
17       A   That's his formal Korean name.
18       Q   And what do you refer to him as?
19       A   Mr. Ryu.
20       Q   So he hasn't adopted an American name?
21       A   No.
22       Q   And who does Mr. Ryu work for?
23           BY MR. SCOFIELD:  Object to the form.
                                                          71
```

```
 1           THE WITNESS:  He works for the president.  He
 2   reports to the president, Mr. Ahn.
 3       Q   (BY MR. KILBORN:)  Mr. Ahn?
 4       A   Yes.
 5       Q   Okay.  What company employs Mr. Ryu?
 6       A   HMC.
 7       Q   You don't see his paycheck?
 8       A   No.
 9       Q   Do the expats get paid in U.S. dollars?
10           BY MR. SCOFIELD:  Object to the form.
11           THE WITNESS:  I don't do the payroll, but I
12   believe they do.
13       Q   (BY MR. KILBORN:)  Do the -- Do the suppliers
14   get paid in U.S. dollars?
15           BY MR. SCOFIELD:  Object to the form.
16           THE WITNESS:  I don't know.
17       Q   (BY MR. KILBORN:)  Do they get paid -- Strike
18   that.
19           What is the Korean -- South Korean form of
20   money?
21       A   Won.
22       Q   Does anybody get paid in Won?
23           BY MR. SCOFIELD:  Object to the form.
                                                          72
```

18 (Pages 69 to 72)

# WENDY SUSAN WARNER

1    THE WITNESS: Not that I'm aware.
2    Q  (BY MR. KILBORN:) Do you know anything about
3  any agreements of any type between HMC, HMA or HMMA?
4    BY MR. SCOFIELD: Object to the form.
5    THE WITNESS: I don't understand the
6  question, I'm sorry.
7    Q  (BY MR. KILBORN:) Do you have any knowledge
8  of any contracts or agreements between those three
9  companies?
10    A  No.
11    BY MR. SCOFIELD: Object to the form.
12    Q  (BY MR. KILBORN:) Do you have any knowledge
13  of any management agreements, stock option agreements,
14  labor agreements between any of those companies?
15    A  No.
16    BY MR. SCOFIELD: Object to the form.
17    Q  (BY MR. KILBORN:) Is the Hyundai plant
18  unionized?
19    A  No.
20    BY MR. SPORT: Congratulations.
21    THE WITNESS: Thank you.
22    Q  (BY MR. KILBORN:) So there's no collective
23  bargaining agreements?

73

1    A  That would be correct.
2    Q  Have you worked for a company that had
3  collective bargaining agreements?
4    A  Yes.
5    BY MR. SCOFIELD: Object to the form.
6    Q  (BY MR. KILBORN:) Do you know -- Do you have
7  any knowledge of any employment agreements between any
8  employees of HMA, HMC or HMMA outside of the team
9  member agreements which would be the Americans?
10    BY MR. SCOFIELD: Object to the form.
11    THE WITNESS: I'm sorry, I don't understand
12  the question.
13    Q  (BY MR. KILBORN:) Are there any employment
14  agreements between employees of HMC, HMA or HMMA?
15    BY MR. SCOFIELD: Object to the form.
16    THE WITNESS: Not that I'm aware of, no.
17    Q  (BY MR. KILBORN:) Do you know what the terms
18  of any of the expats are -- terms of employment of any
19  of the expats are?
20    BY MR. SCOFIELD: Object to the form.
21    THE WITNESS: I don't know what the terms
22  are. I do handle the Visas, but I -- just from the
23  terms of the time period that they're going to be with

74

1  us.
2    Q  (BY MR. KILBORN:) Okay. Are the expats only
3  by green cards?
4    A  No.
5    Q  What kind of Visa do they have?
6    A  L1s.
7    Q  L1?
8    A  Yeah.
9    Q  What's an L1?
10    A  An L1 is a particular period of time that
11  they're allowed to work here, but a green card would be
12  a permanent residence, which none of them are.
13    Q  So you handle the L1s for the expats?
14    A  I have a staff member that does, but it is
15  under my authority, yes.
16    Q  Okay. And the other types of things that you
17  handle for these expats are health insurance?
18    A  Yes.
19    Q  Retirement accounts?
20    A  They do not participate in our 401K.
21    Q  Any other types of things?
22    A  If they have questions about their health
23  insurance coverage, if they have questions about the

75

1  bills, we help them with that, but they primarily work
2  through our HR coordinator if they have other issues.
3    Q  Do you know whether or not HMC, HMA or HMMA
4  or any other Hyundai affiliate filed consolidated
5  income tax returns?
6    BY MR. SCOFIELD: Object to the form.
7    THE WITNESS: No, I do not know that.
8    Q  (BY MR. KILBORN:) Don't know that?
9    A  No.
10    Q  Do you know whether or not any of those three
11  companies or their affiliates filed -- or have
12  consolidated financial statements?
13    BY MR. SCOFIELD: Object to the form.
14    THE WITNESS: I would not know.
15    Q  (BY MR. KILBORN:) Do you know anything about
16  how HMC, HMA or HMMA finance or even if they finance
17  any of their operations?
18    BY MR. SCOFIELD: Object to the form.
19    THE WITNESS: No.
20    Q  (BY MR. KILBORN:) Do you know whether or not
21  any of those three companies borrowed money from each
22  other?
23    BY MR. SCOFIELD: Same objection.

76

19 (Pages 73 to 76)

WENDY SUSAN WARNER

1    THE WITNESS: I don't know.
2    Q   (BY MR. KILBORN:) Do you know anything about
3 the capital structure of any of those three companies?
4    BY MR. SCOFIELD: Object to the form.
5    THE WITNESS: No.
6    Q   (BY MR. KILBORN:) Do you know anything about
7 the corporate citizenship of any of those companies?
8    BY MR. SCOFIELD: Object to the form.
9    THE WITNESS: I don't understand the
10 question, corporate citizenship.
11    Q   (BY MR. KILBORN:) Where they are
12 incorporated?
13    A   No.
14    Q   Do you know where any of those companies are
15 qualified to do business?
16    BY MR. SCOFIELD: Object to the form.
17    THE WITNESS: Again, from the standpoint of
18 seeing the information from Chad Griffon that we were
19 incorporated in Delaware as well as HMA is incorporated
20 in Fountain Valley, California, which I have been
21 there, as well as also have visited HMC in Seoul, Korea
22 for three weeks so I have visually seen those
23 particular areas.

77

1    Q   (BY MR. KILBORN:) Okay. Do you know what
2 other states -- Strike that.
3    Does HMA have a phone number in Alabama?
4    BY MR. SCOFIELD: Object to the form.
5    THE WITNESS: Not that I'm aware of.
6    Q   (BY MR. KILBORN:) Does HMMA have a phone
7 number?
8    A   In Alabama, yeah, lots of phone numbers.
9    Q   What is it?
10    A   The main number, 387-8000.
11    Q   334?
12    A   Uh-huh.
13    Q   Does HMA use that phone number?
14    BY MR. SCOFIELD: Object to the form.
15    THE WITNESS: No.
16    Q   (BY MR. KILBORN:) Does HMA have an address
17 in Alabama?
18    A   No.
19    Q   How about HMC?
20    A   No.
21    Q   When, for instance, the expats get their
22 mail -- I assume they get mail?
23    A   Uh-huh.

78

1    Q   -- does it come to HMMA's post office box?
2    BY MR. SCOFIELD: Object to the form.
3    THE WITNESS: Initially, until they are
4 settled into their residence, 700 Hyundai Boulevard,
5 but once they get out of temporary housing and have
6 established a residence, they get their mail at the
7 address.
8    Q   (BY MR. KILBORN:) Their business mail?
9    A   Business mail, I'm sorry, I don't understand.
10    Q   Well, I assume Mr. Ahn or Mr. Kim or Mr. Ryu
11 would get business mail?
12    BY MR. SCOFIELD: Object to the form.
13    THE WITNESS: They would get mail from HMC or
14 business mail.
15    Q   (BY MR. KILBORN:) Or anybody?
16    A   They all have mailboxes that if they -- if
17 mail is delivered, it's delivered to their desk.
18    Q   To where?
19    A   To their desk.
20    Q   To their desk?
21    A   Uh-huh.
22    Q   So the mail of all of the expats is delivered
23 to --

79

1    A   Business mail.
2    Q   -- business mail is delivered to --
3    A   A mailroom and then distributed.
4    Q   -- 700 Hyundai Drive?
5    A   Uh-huh. But then personal would be delivered
6 to their home once they establish a residence.
7    Q   Sure. So the -- Strike that.
8    How about E-mail?
9    BY MR. SCOFIELD: Object to the form.
10    THE WITNESS: We have HMMA E-mail accounts.
11    Q   (BY MR. KILBORN:) Does HMA have E-mail
12 accounts?
13    BY MR. SCOFIELD: Object to the form.
14    THE WITNESS: Yes.
15    Q   (BY MR. KILBORN:) And HMC?
16    A   Yes.
17    Q   I didn't see -- Maybe I'm wrong, but I didn't
18 see E-mails in Mr. Dees' personnel file. Are there
19 E-mail transmissions regarding Mr. Dees?
20    BY MR. SCOFIELD: Object to the form.
21    THE WITNESS: It would be in the team
22 relations file.
23    Q   (BY MR. KILBORN:) Team relations file?

80

20  (Pages 77 to 80)

### WENDY SUSAN WARNER

1    A    Uh-huh.
2    Q    Can we actually identify that and mark that?
3    A    That's the maintenance file, that's the team
4 relations file -- That's the team relations file there.
5    Q    Why don't you hand us this and we'll mark it
6 as an exhibit and then you can tell me what it is.
7    A    Okay.
8    Q    So you've handed me a blue file and we'll
9 mark that as Exhibit 1.
10        And tell me what that is.
11
12    (Whereupon, Plaintiff's Exhibit 1 was marked
13    for identification and copy of same is
14    attached hereto.)
15
16        THE WITNESS:  This is a file that's
17 maintained by team relations.  It's a separate section
18 within human resources.  It's the investigation notes
19 pertaining to Mr. Dees.  This is an E-mail from the
20 senior manager in plant engineering, the head of
21 department to the assistant manager in team relations.
22 This is a memo from the team rep -- the team relations
23 representative that oversaw the stamping area regarding
                                                    81

1    Q    (BY MR. KILBORN:)  I'm marking as Exhibit 2 a
2 green folder.
3        Could you identify that, just what is it?
4
5    (Whereupon, Plaintiff's Exhibit 2 was marked
6    for identification and copy of same is
7    attached hereto.)
8
9        THE WITNESS:  Again, it appears to be notes
10 regarding the investigation from our team relations
11 section in human resources.
12    Q    (BY MR. KILBORN:)  Rather than going through
13 each document in there, does that green file, Exhibit
14 2, have a name?
15    A    It's a team relations folder that is
16 maintained in team relations.
17    Q    And how is that different than Exhibit 1?
18    A    I don't know.  It looks like to me like one is a
19 copy and one is the original.
20    Q    And you don't know how that happened?
21    A    No, sir.
22    Q    And there's no significance to the colors?
23    A    Not that I'm aware of, no.
                                                    83

1 the interview that he had.  These are notes also
2 pertaining to the investigation.
3    Q    (BY MR. KILBORN:)  I believe those are
4 Mr. Brookshire's notes; is that right?
5    A    It looks like it's Applegate, that he had an
6 interview with Jim Brookshire.
7        This is, again, an E-mail from the senior
8 manager in engineering to the AM in team relations,
9 same thing.
10    Q    I tell you what, since the record won't
11 reflect what you're referring to, why don't we just
12 mark the files and then I'll go --
13    A    That's fine.
14    Q    And each document will have a Bates Number
15 ultimately and then I'll refer to that.
16    A    Sure.
17        BY MR. SCOFIELD:  Vince, if I may interject,
18 it appears that this is another team relations file
19 which contains the same information but does include
20 the original handwritten statement and it's in a green
21 jacket and I would suggest that you mark that as
22 Exhibit Number 2.
23        BY MR. KILBORN:  I'll do that.  Thank you.
                                                    82

1    Q    And why don't we mark the next file as
2 Exhibit 3.  This is a Manila file folder.
3        Could you tell me what Exhibit 3 is?  It's
4 got a little sticky on the front.
5
6    (Whereupon, Plaintiff's Exhibit 3 was marked
7    for identification and copy of same is
8    attached hereto.)
9
10        THE WITNESS:  Again, this is a team relations
11 file in regards to the peer-review board.
12    Q    (BY MR. KILBORN:)  Generally, how is that
13 different from Exhibits 1 and 2?
14    A    This is the investigation.  And then the team
15 member has the option to request a peer review, so this
16 isn't a mandatory situation.  This is the documents
17 from the investigation, this is the initial request for
18 the team-review board, but the team member did not
19 pursue that request.
20    Q    All right.  And the one that you're referring
21 to now is Exhibit 3?
22    A    Yes, sir.
23
                                                    84

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

### WENDY SUSAN WARNER

1    (Whereupon, Plaintiff's Exhibit 4 was marked
2    for identification and copy of same is
3    attached hereto.)
4
5    **Q   (BY MR. KILBORN:)  And then Exhibit 4 is**
6    **another green file, what is that?**
7    A    This is the personnel record and this is kept
8    in the employment section as the -- Mr. Dees' official
9    personnel file.
10    **Q    And that's kept under your control and**
11    **supervision?**
12    A    That's correct.
13
14    (Whereupon, Plaintiff's Exhibit 5 was marked
15    for identification and copy of same is
16    attached hereto.)
17
18    **Q   (BY MR. KILBORN:)  And Exhibit 5 is something**
19    **that your counsel handed me this morning.  It says:**
20    **For Jeff, additional documents, Bates numbers to**
21    **follow.**
22    **Could you just identify that stack for me?**
23    BY MR. SCOFIELD:  And, Vince, I'll interject

85

1    **Q   (BY MR. KILBORN:)  And you say we, who do you**
2    **mean?**
3    A    HMMA.
4    **Q    And who approves that?**
5    A    Quality has the responsibility for the system
6    and then each department is responsible for updating,
7    correcting the policies, procedures or forms.
8    **Q    When you say quality, is that a --**
9    A    It's a department.
10    **Q    A department --**
11    A    Quality assurance is the department.
12    **Q    Does that have an expat as the --**
13    A    No, it has an American director.
14    **Q    Okay.  The various forms like this, who**
15    **developed those originally?**
16    BY MR. SCOFIELD:  Object to the form.
17    THE WITNESS:  The original forms were
18    developed by the folks that were hired early on, so
19    myself, the team relations manager, the director of HR,
20    the vice president for the plant and then in an
21    advisory role, our legal counsel.
22    **Q   (BY MR. KILBORN:)  Okay.  The vice president**
23    **of the plant --**

87

1    that to the extent that it appeared that any original
2    document had not been produced from the stacks which
3    you've previously marked, I photocopied them and am
4    producing them today.  We'll follow with official Bates
5    numbers as soon as I get back to my office.
6    BY MR. KILBORN:  That's fine.  And I'm sure
7    that was an oversight.  I don't have any problem with
8    that.
9    THE WITNESS:  These appear to be some notes
10    from team relations.  The back area is the interview
11    guide for initial employment that's in the personnel
12    file.
13    **Q   (BY MR. KILBORN:)  Thank you.**
14    **I notice in referring to Exhibit 1, that's a**
15    **team relations file, it looks like printouts called**
16    **team relations memo.  It appears that this is part of**
17    **some manual or something.  It's a printed form.  Am I**
18    **guessing right at that?**
19    BY MR. SCOFIELD:  Object to the form.
20    THE WITNESS:  It's not a manual.  We have a
21    document control system that all documents need to have
22    this header and it has to be an approved document for
23    us to be able to use it.

86

1    A    For production.
2    **Q    -- what's his name?**
3    A    John Kalson.
4    **Q    Did any of the expats participate in**
5    **developing that?**
6    BY MR. SCOFIELD:  Object to the form.
7    THE WITNESS:  They reviewed it and provided
8    input, but really didn't have a lot of familiarity with
9    most of the policies and procedures that were
10    developed.
11    **Q   (BY MR. KILBORN:)  And was the Hyundai plant**
12    **here in Montgomery the first plant that Hyundai built**
13    **in the United States?**
14    A    Yes, in the United States.
15    **Q    So from your observation, did it appear to**
16    **you that the expats that you spoke to early on did not**
17    **have much familiarity with United States laws,**
18    **regulations regarding your specialty, human resources?**
19    BY MR. SCOFIELD:  Object to the form.
20    THE WITNESS:  Again, just as we have
21    Americans that have more familiarity than others, it's
22    the same situation; some very knowledgeable, others not
23    so knowledgeable.

88

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

WENDY SUSAN WARNER

1  Q   (BY MR. KILBORN:) Ultimately, were all of
2  the employment related forms approved by HMC?
3  A   HMC did not --
4  BY MR. SCOFIELD: Object to the form.
5  THE WITNESS: -- review the forms. It was
6  reviewed by our management team, again, and our legal
7  counsel. They did have the opportunity to review it
8  and provide input, but they never went to HMC to be
9  approved.
10  Q   (BY MR. KILBORN:) Did they provide a comment
11  back?
12  BY MR. SCOFIELD: Object to the form.
13  THE WITNESS: Sure, comments as well as
14  wanting to understand because that's one of the roles
15  that they're here for, is to learn and to be able to
16  have a good understanding of American law. That's one
17  reason why they're here, to learn.
18  Q   (BY MR. KILBORN:) And that would be even
19  true today?
20  A   Of course.
21  Q   Do you teach them employment law?
22  BY MR. SCOFIELD: Object to the form.
23  THE WITNESS: I do have orientation with all

89

1  Q   (BY MR. KILBORN:) And is that like a tree
2  with a person at the top coming down?
3  A   Sure.
4  Q   You're in the middle of the tree somewhere?
5  A   Yes.
6  Q   Who's at the top where the star of the
7  Christmas tree goes?
8  BY MR. SCOFIELD: Object to the form.
9  THE WITNESS: President.
10  Q   (BY MR. KILBORN:) That would be Mr. Ahn?
11  A   Mr. Ahn.
12  Q   Okay. But he's not employed by HMMA?
13  A   Correct.
14  Q   Why is he at the top of the organizational
15  chart of HMMA?
16  BY MR. SCOFIELD: Object to the form.
17  THE WITNESS: He's been assigned to this
18  facility to oversee HMMA.
19  Q   (BY MR. KILBORN:) Any other non-HMMA
20  employees in that organizational chart?
21  A   CFO, Jason Lee; H. I. Kim, the COO. And then
22  there's coordinators at each level.
23  Q   What is the purpose of making up the

91

1  of our coordinators that come in in terms of what our
2  policies and procedures are and what is acceptable at
3  HMMA. They do go over -- We go over the handbook as
4  well as all of our policies and procedures, they sign
5  up for benefits just like all of our folks do before
6  joining.
7  Q   (BY MR. KILBORN:) Do you have any knowledge
8  of any financial or other filings that HMC, HMMA or HMA
9  have made with any state or federal authority?
10  BY MR. SCOFIELD: Object to the form.
11  THE WITNESS: I don't.
12  Q   (BY MR. KILBORN:) Have you ever seen any
13  type of organizational chart related to the three
14  companies that I just mentioned?
15  A   No. I'm responsible for the organizational
16  charts for HMMA only.
17  Q   Okay. So there are organizational charts for
18  HMMA?
19  A   Yes.
20  Q   And when did you develop those?
21  BY MR. SCOFIELD: Object to the form.
22  THE WITNESS: They are ongoing. As changes
23  are made, we update them all the time.

90

1  organizational chart?
2  BY MR. SCOFIELD: Object to the form.
3  THE WITNESS: It's tied primarily to our open
4  headcount, so we do it as a way of knowing which
5  positions are open as well as within our system. We
6  can't enter a new hire without a particular code that
7  shows that that position is open and available to be
8  filled, so it's a tracking mechanism for headcount
9  purposes.
10  Q   (BY MR. KILBORN:) Is there an organizational
11  chart which governs the entire Hyundai Automotive
12  Group?
13  BY MR. SCOFIELD: Object to the form.
14  THE WITNESS: Not that I have seen. As I
15  said, I only -- my scope is HMMA.
16  Q   (BY MR. KILBORN:) Okay. Were you told to
17  make the organizational chart or was that something
18  that you did on your own?
19  BY MR. SCOFIELD: Object to the form.
20  THE WITNESS: It's a normal practice within
21  human resources, but in order to be able to track
22  headcount, it's a normal business practice that I
23  started when I arrived.

92

23 (Pages 89 to 92)

## WENDY SUSAN WARNER

1    Q   (BY MR. KILBORN:) Okay. Is that a
2  confidential chart?
3         BY MR. SCOFIELD: Object to the form.
4         THE WITNESS: It is confidential from the
5  standpoint of external. And management typically has
6  that information, but below that, it is considered
7  confidential. It's available, but it is confidential.
8    Q   (BY MR. KILBORN:) We've got a confidential
9  protective order in this case that protects
10  confidential, sensitive type information. Would you
11  have any objection to producing that under that?
12        BY MR. SCOFIELD: Object to the form. That's
13  not Ms. Warner's decision to make. You can ask her the
14  question, but it's not --
15        BY MR. KILBORN: Are you instructing her not
16  to answer.
17        BY MR. SCOFIELD: I'm not instructing her not
18  to answer, I'm just informing you that it's not her
19  decision to make.
20    Q   (BY MR. KILBORN:) Would you, Wendy Warren,
21  have any objection?
22    A   I would not.
23    Q   Do you keep the personnel files of the people
                                                            93

1  in that organizational chart who are not employed by
2  HMMA?
3         BY MR. SCOFIELD: Object to the form.
4         THE WITNESS: We keep a separate file for
5  their Visas and immigration information and personal
6  information in case of an emergency.
7    Q   (BY MR. KILBORN:) How about, for instance,
8  their employment application?
9    A   No.
10    Q   So it would be a very limited personnel file?
11    A   Yes.
12    Q   Where is the real personnel file kept?
13        BY MR. SCOFIELD: Object to the form.
14        THE WITNESS: HMC.
15    Q   (BY MR. KILBORN:) In Seoul, South Korea?
16    A   That's correct.
17    Q   Do you know why you don't keep that?
18        BY MR. SCOFIELD: Object to the form.
19        THE WITNESS: One, I wouldn't be able to read
20  it, it's all in Korea, but, two, those individuals work
21  for HMC so their personnel files are retained at their
22  headquarters.
23    Q   (BY MR. KILBORN:) Is Mr. Mun in that
                                                            94

1  organizational chart?
2    A   I don't know him. I'm sorry, I'd have to
3  check that. I'm not familiar with that particular
4  coordinator.
5    Q   So would it be true that you keep a limited
6  personnel file on the expats?
7    A   Yes.
8    Q   Limited by what you told me about a minute
9  ago?
10    A   Yes.
11    Q   And as far as you know, HMC keeps the main
12  personnel file?
13    A   That's correct.
14    Q   Let's mark, if we can, your declaration.
15  Take a look at that declaration, Ms. Warner. I'm going
16  to mark that as Exhibit 6.
17         And is that your signature?
18
19  (Whereupon, Plaintiff's Exhibit 6 was marked
20   for identification and copy of same is
21   attached hereto.)
22
23         THE WITNESS: Yes.
                                                            95

1    Q   (BY MR. KILBORN:) And did you draft this?
2    A   No.
3    Q   Who drafted this?
4    A   Chad Griffon.
5    Q   Who?
6    A   Chad Griffon, legal counsel, internal.
7    Q   You told me about him.
8         Did you know why you were presented with
9  this?
10        BY MR. SCOFIELD: Object to the form.
11        THE WITNESS: Yes.
12    Q   (BY MR. KILBORN:) Why?
13    A   He told me that it had been requested and it
14  was a declaration and he went over the information with
15  me and also shared with me the information in terms of
16  the incorporation and the state department here in
17  Alabama.
18        BY MR. SCOFIELD: Again, Wendy, with regard
19  to any specific communication made by Mr. Griffon, I'm
20  going to instruct you not to answer in order to
21  preserve any applicable privilege.
22        THE WITNESS: Yes, sir.
23    Q   (BY MR. KILBORN:) Were you shown any
                                                            96

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## WENDY SUSAN WARNER

1  documents?
2      A   No.
3      Q   So whatever Mr. Griffon told you about the
4  corporations which you've told us about, that came from
5  him verbally, not through documents that you saw?
6      A   He did share with me the sheet and showed it
7  to me, that it was printed off the Internet.
8      Q   The sheet?
9      A   That showed the declaration.
10      BY MR. SPORT:  They gave me this this morning
11  which is in response to our duces tecum and provided
12  these documents.  You want to take a five-minute break
13  and look at them?
14      BY MR. KILBORN:  Is this something new?
15      BY MR. SCOFIELD:  In response to the duces
16  tecum request.
17      BY MR. KILBORN:  They have been Bates
18  numbered.  Why don't we just mark these as our next
19  exhibit, 7.
20      BY MR. SPORT:  Mark it with the written
21  response, too?
22      BY MR. KILBORN:  Yeah, we can do that.
23      Q   (BY MR. KILBORN:)  I'm going to mark as
                                                        97

1  Exhibit 7 a document called Defendant, HMMA, response
2  objections to Rule 30(b)(5) Exhibit A request attached
3  to amended deposition notice of Wendy Warner which has
4  some attachments.
5      And, Ms. Warner, I've just been handed this.
6  If you don't mind, I want to just show it to you.  I'll
7  leave the sticky that says:  To Jeff.  That's this
8  handsome gentleman next to me.  I'll just ask you to
9  look at the attachments and tell me if those may be
10  things that you were talking about that you were shown.
11
12      (Whereupon, Plaintiff's Exhibit 7 was marked
13      for identification and copy of same is
14      attached hereto.)
15
16      BY MR. SCOFIELD:  Object to the form.
17      THE WITNESS:  Yes, that's what was shared,
18  yes.
19      Q   (BY MR. KILBORN:)  Take your time.
20      A   This looks like our handbook.
21      BY MR. SCOFIELD:  And, Vince, for the record,
22  I'll state with regard to that exhibit, the documents
23  were prepared by -- or compiled by me as counsel for
                                                        98

1  the defendant.
2      THE WITNESS:  This is our whole handbook.
3  That's the handbook and then the two forms for what I
4  was describing earlier.
5      Q   (BY MR. KILBORN:)  For purposes of our
6  deposition and clarity in the record, why don't we
7  give us these little Bates numbers down at the bottom?
8      A   The 0004?
9      Q   Yes.
10      Could you just give us those Bates numbers of
11  those documents?
12      A   The ones that we just talked about?
13      Q   Yes.
14      A   0001 and 0004.
15      Q   1, and what was the other one?
16      A   0004.
17      Q   0001 and 0004?
18      A   Uh-huh.
19      BY MR. SCOFIELD:  And to clarify, Wendy, are
20  those the Secretary of State filings that you
21  referenced?
22      THE WITNESS:  Yes, sir.
23      Q   (BY MR. KILBORN:)  Okay.  And those two, 001
                                                        99

1  and 004, were Secretary of State filings that
2  Mr. Griffon showed you --
3      A   Yes.
4      Q   -- that you based your affidavit on --
5      A   That's right.
6      Q   -- or your declaration?
7      BY MR. SCOFIELD:  Object to the form.
8      Q   (BY MR. KILBORN:)  Now, the balance of the
9  documents in there, did you identify them as a manual?
10      A   Yeah, it's our handbook as well as --
11      Q   Handbook?
12      A   Yeah.
13      -- information taken off of our web site.
14      This here is 002.  That's taken off of our
15  web site.
16      Q   Were you shown that by --
17      BY MR. SCOFIELD:  Object to the form.
18      Q   (BY MR. KILBORN) -- Mr. Griffon?
19      A   No.  I helped create this.
20      Q   Okay.  And then flip a page and let's get the
21  next one.
22      A   This is also off of the web page.
23      Q   And that is what number?
                                                        100

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## WENDY SUSAN WARNER

| | |
|---|---|
| 1  A  0003. | 1      BY MR. SCOFIELD:  Object to the form. |
| 2  Q  3, okay. | 2      THE WITNESS:  No. |
| 3      Did you help create that? | 3      Q   (BY MR. KILBORN:)  You don't know if it's a |
| 4  A  Yes. | 4  corporation partnership or what it is? |
| 5      And then the handbook is 0005. | 5      BY MR. SCOFIELD:  Object to the form. |
| 6  Q  And the handbook goes from 5 to what number? | 6      THE WITNESS:  No. |
| 7  A  All the way to the end, 0054. | 7      Q   (BY MR. KILBORN:)  You don't even know if it |
| 8  Q  0001, which is the Secretary of State form, | 8  exists? |
| 9  you didn't know of the existence of that until you were | 9      BY MR. SCOFIELD:  Object to the form. |
| 10  given that by Mr. Griffon? | 10      THE WITNESS:  As I said, I did visit Seoul. |
| 11      BY MR. SCOFIELD:  Object to the form. | 11  I do know that there is a Hyundai Kia corporate |
| 12      THE WITNESS:  Yes. | 12  headquarters and that Chairman Chung oversees the |
| 13      Q   (BY MR. KILBORN:)  And you didn't know the | 13  Hyundai Automotive Group.  That's all I know. |
| 14  information on here except by looking at it? | 14      Q   (BY MR. KILBORN:)  Is there a sign on the |
| 15  A  Yes. | 15  building that says Hyundai Automotive Group? |
| 16  Q  And the next document, which is the -- which | 16  A  Hyundai Kia, Hyundai Kia all the way around. |
| 17  is 2, is that what you call the web site? | 17  Q  How about the name Hyundai Automotive Group? |
| 18  A  Yes.  It's a fact sheet about our company. | 18  A  As I mentioned, Hyundai Automotive Group is |
| 19  Q  Okay.  And in that web site, I think you said | 19  just one division.  There's many other divisions |
| 20  that you assisted in creating it, it talks about | 20  besides that. |
| 21  Hyundai Automotive Group? | 21  Q  A division of what company? |
| 22  A  The other page, it talks about HMMA and the | 22  A  Hyundai, HMC. |
| 23  number of people hired. | 23  Q  HMC. |
| 101 | 103 |

| | |
|---|---|
| 1  Q  I apologize for trying to share this with you | 1      Do you know if -- how it's owned? |
| 2  upside-down, but did you help create 0002? | 2  A  No. |
| 3  A  Well, we helped with determining the pictures | 3  Q  Do you know who owns it? |
| 4  from a recruitment standpoint, but the facts would have | 4      BY MR. SCOFIELD:  Object to the form. |
| 5  come from PR but we did review it in terms of how it | 5      THE WITNESS:  No. |
| 6  would be perceived by applicants and -- from a | 6      Q   (BY MR. KILBORN:)  Do you know any of the |
| 7  recruiting and employment perspective, yes, but the | 7  officers or directors of it? |
| 8  facts would have come from public relations.  We did | 8  A  No. |
| 9  review it before it was posted. | 9  Q  Do you know of any other employees of Hyundai |
| 10  Q  Who is public relations? | 10  Automotive Group? |
| 11  A  It's a department that is responsible for | 11      BY MR. SCOFIELD:  Object to the form. |
| 12  internal and external communication and media | 12      THE WITNESS:  No. |
| 13  relations. | 13      Q   (BY MR. KILBORN:)  It refers also on Bates |
| 14  Q  And who's over that? | 14  0002 to Hyundai Motor America.  Do you know if Hyundai |
| 15  A  Robert Burns. | 15  Motor America is a corporation? |
| 16  Q  Is he an employee of HMMA? | 16      BY MR. SCOFIELD:  Object to the form. |
| 17  A  Yes. | 17      THE WITNESS:  In terms of the declaration |
| 18  Q  It mentioned -- It mentions Hyundai -- | 18  that I signed and the information that was shared with |
| 19  Hyundai Automotive Group in the fourth bullet point. | 19  me, I do know that it is incorporated in California and |
| 20  That's the company -- That's whatever entity I asked | 20  I have visited their facility and do have communication |
| 21  you about earlier. | 21  and working relationships with their HR department. |
| 22  A  I see. | 22  Q   (BY MR. KILBORN:)  What was the purpose of |
| 23  Q  You don't know what that is? | 23  you going to California? |
| 102 | 104 |

26 (Pages 101 to 104)

WENDY SUSAN WARNER

1    A  Benchmarking, they were interested in
2  learning what we were doing, and information sharing,
3  vice-versa.
4    Q  And you call it benchmarking?
5    A  Uh-huh.
6    Q  Do you know if it is incorporated anywhere
7  else?
8    A  I don't.
9    BY MR. SCOFIELD: Object to the form.
10    Q  (BY MR. KILBORN:) Do you know if it is
11  qualified to do business anywhere else?
12    BY MR. SCOFIELD: Object to the form.
13    THE WITNESS: I don't.
14    Q  (BY MR. KILBORN:) Do you even know if it's
15  qualified to do business in California?
16    BY MR. SCOFIELD: Object to the form.
17    THE WITNESS: Just based on that form that I
18  saw.
19    Q  (BY MR. KILBORN:) Are any HMA employees or
20  personnel in Montgomery?
21    A  Not at this time, no.
22    Q  What happened to them?
23    BY MR. SCOFIELD: Object to the form.

105

1    Q  It was information sharing?
2    A  Yeah.
3    Q  And you mentioned that he was on loan?
4    A  Yes, from HMA.
5    Q  That's, I think, an employment term. What
6  does that mean?
7    A  That they are able to provide expertise in
8  subject matter, expert information, but their benefits
9  and pay are still paid and compensated by the home
10  company, which HMA paid for all of those services.
11    Q  Have there been other employees loaned from
12  either HMA or HMC?
13    BY MR. SCOFIELD: Object to the form.
14    THE WITNESS: HMA, that was the only one. As
15  you know, HMC is the expatriates.
16    Q  (BY MR. KILBORN:) Got you. That's sort of a
17  wholesale loan?
18    BY MR. SCOFIELD: Object to the form.
19    Q  (BY MR. KILBORN:) Do you agree?
20    A  I don't understand what wholesale means.
21    Q  En masse?
22    BY MR. SCOFIELD: Object to the form.
23    THE WITNESS: Again, very familiar with that

107

1    THE WITNESS: There was one, Keith Duckworth,
2  that was on loan from HMA that assisted us in the last
3  two years, he left in August, primarily to help bridge
4  the gap between the Koreans and Americans and also to
5  support our union avoidance campaign.
6    Q  (BY MR. KILBORN:) Which campaign?
7    A  Our labor relations.
8    Q  So union avoidance campaign.
9    A  Or union free. HMMA is union free.
10    Q  Right.
11    A  We wanted to continue to stay that way. He
12  had some expertise in that area and he was here to
13  support human resources in developing a campaign.
14    Q  And you call it the union avoidance campaign?
15    A  Yes, sir.
16    Q  He stayed here two years?
17    A  Yes.
18    Q  Had offices next to you?
19    A  Yes.
20    Q  Lived in Montgomery?
21    A  Yes. He lived in temporary housing. He went
22  home on the weekends, but he lived in our temporary
23  housing area where we put our relocatees.

106

1  concept and normal with startup operations.
2    Q  (BY MR. KILBORN:) Do you know if HMA has a
3  Board of Directors?
4    BY MR. SCOFIELD: Object to the form.
5    THE WITNESS: No.
6    BY MR. SCOFIELD: Asked and answered.
7    BY MR. KILBORN: I didn't ask you questions
8  about, I don't think, HMA. If I did, I apologize.
9    BY MR. SCOFIELD: Oh, if I misunderstood,
10  then my apology to you, Vince.
11    Q  (BY MR. KILBORN:) Does HMA have officers?
12    A  I don't know.
13    Q  So you wouldn't know the names of any
14  officers if it had them?
15    A  No, sir.
16    Q  Does HMA have any directors?
17    A  I don't know.
18    Q  So you wouldn't know the names if it did?
19    A  No.
20    Q  Does HMA have any members?
21    A  I don't know.
22    Q  So you wouldn't know the names if there were
23  any?

108

27 (Pages 105 to 108)

### WENDY SUSAN WARNER

1   A   No, sir.

2   Q   Does HMA have bylaws?

3   A   I don't know.

4   Q   Does HMMA have bylaws?

5   A   I guess I would need more of a definition. I

6   would be guessing. I don't know what you mean by

7   bylaws.

8       BY MR. SCOFIELD: Please, don't guess.

9   Q   (BY MR. KILBORN:) And does HMC have bylaws?

10  A   I don't know.

11  Q   Okay. Do you know whether or not HMA, HMC

12  and/or HMMA have any common officers?

13  A   No.

14      BY MR. SCOFIELD: Object to the form.

15  Q   (BY MR. KILBORN:) Do you know whether or not

16  they have any common board members?

17  A   No.

18  Q   The web site, Bates Number 0002, which you

19  helped create?

20  A   Pictures.

21  Q   The pictures.

22  A   And reviewed.

23  Q   I think you did make that clear.

109

1       You helped with the photographs?

2   A   Yes, and reviewed the material before it was

3   posted on the web site.

4   Q   And that's called HMC fact sheet?

5   A   Uh-huh.

6   Q   Do you know whether or not this information

7   on the fact sheet is correct?

8   A   No.

9       BY MR. SCOFIELD: Object to the form.

10  Q   (BY MR. KILBORN:) And it's a Hyundai Motor

11  Company fact sheet, isn't it?

12  A   It's an HMMA fact sheet, HMMA USA. See that?

13  Q   Why does it say HMC fact sheet?

14  A   Because it's a piece of it to talk about what

15  our company is, just like all other companies. Whether

16  it's Mercedes or Toyota, they talk about their home

17  company. They talk about where it was created and how

18  it was founded. Very similar concept at all of our

19  other transplants. If you look at Honda, Mercedes,

20  Toyota, same scenario.

21  Q   So this is an HMMA web site --

22  A   Yes.

23  Q   -- which is giving facts about HMC?

110

1   A   Uh-huh.

2   Q   And do you know why HMMA is giving facts

3   about HMC?

4       BY MR. SCOFIELD: Object to the form.

5       THE WITNESS: Just as -- from a knowledge

6   perspective to understand -- a lot of interest in

7   Hyundai and wanting to understand how it was founded

8   and how we arrived here in Alabama.

9   Q   (BY MR. KILBORN:) And I think, what,

10  Chairman Chung's father founded Hyundai?

11  A   That's my understanding, yes.

12  Q   1967, does that sound about right?

13      BY MR. SCOFIELD: Object to the form.

14      THE WITNESS: I'd be guessing.

15  Q   (BY MR. KILBORN:) It's been referred to as a

16  family dynasty. Would you agree with that?

17      BY MR. SCOFIELD: Object to the form.

18      Asked and answered.

19      THE WITNESS: I would be guessing.

20  Q   (BY MR. KILBORN:) And when you say that

21  you'd be guessing, what do you mean?

22  A   It's not -- I have not been totally ingrained

23  in HMC. I was there for three weeks, but don't have a

111

1   total grasp of the whole history of HMC.

2   Q   And why were you at HMC in Seoul?

3   A   All team members were invited to visit for a

4   cultural training and I was there with a team of

5   thirty, as a chaperone as well as my own learning and

6   understanding of HMC as well as their plants, Asan and

7   Ulsan.

8   Q   Other team members from Montgomery went to?

9   A   Yes. About three hundred a year go.

10  Q   Team members?

11  A   Uh-huh.

12  Q   Is that paid for by human resources of HMMA?

13      BY MR. SCOFIELD: Object to the form.

14      THE WITNESS: My understanding is it's paid

15  by HMMA. Initially, it was part of the incentive

16  package of Alabama.

17      BY MR. SCOFIELD: Vince, not to interrupt

18  you, but we've been going approximately two hours so

19  when you care to take a short break, I would really

20  appreciate it.

21      BY MR. KILBORN: That's fine. Do you want to

22  just take a short break?

23      BY MR. SPORT: That's fine.

112

28 (Pages 109 to 112)

### WENDY SUSAN WARNER

1    BY MR. SCOFIELD:  Thank you.

2

3    (Whereupon, there was a recess held in the
4       deposition.)

5

6    Q    (BY MR. KILBORN:)  Ms. Warner, I apologize
7    for skipping around.  We've got a bunch to cover.
8         This thing on the exhibit, Plaintiff's
9    Exhibit 7, we talked about the web site.  And the next
10   document which has got Bates Number 3, Warner depo doc,
11   it's called:  Hyundai Motor Manufacturing, Inc.
12   information sheet.  Is that something that you know
13   something about?
14        BY MR. SCOFIELD:  Object to the form.
15        THE WITNESS:  Again, that would be
16   information that was shared on the web site and I would
17   have reviewed it for clarity for applicants as well as
18   the number of team members that we have.
19   Q    (BY MR. KILBORN:)  So the factual part that
20   you had knowledge of would be the team member part?
21        BY MR. SCOFIELD:  Object to the form.
22        THE WITNESS:  The population, yes, of HMMA.
23   Q    (BY MR. KILBORN:)  Right.  The balance you

113

1    would not have personal knowledge of, that would be
2    somebody else?
3         BY MR. SCOFIELD:  Object to the form.
4         THE WITNESS:  PR would have written that,
5    yes.
6    Q    (BY MR. KILBORN:)  And PR would be who again?
7    A    Robert Burns.
8    Q    And he works for what company?
9    A    HMMA.
10   Q    Okay.  In the introductory paragraph in Bates
11   Number 3, right here, it says:  In the United States,
12   sales are managed by Hyundai Motor America and are sold
13   and serviced by seven hundred and fifty-four Hyundai
14   dealerships nationwide.
15        Do you know if that's true?
16   A    I don't know.
17   Q    And as you told me before, you don't really
18   know what Hyundai Motor America does?
19        BY MR. SCOFIELD:  Object to the form.
20        THE WITNESS:  I do know that they sell and
21   deliver vehicles for Hyundai.
22   Q    (BY MR. KILBORN:)  Do you know that the sales
23   are managed by HMA?

114

1    A    I would know that, yes, but the seven hundred
2    and fifty-four dealers, I don't know if that's an
3    accurate number or not.
4    Q    Do you know who the seven hundred and
5    fifty-four dealers have contracts with?
6    A    No.
7         BY MR. SCOFIELD:  Object to the form.
8    Q    (BY MR. KILBORN:)  Do you know if they're
9    independent or if they're company-owned dealerships?
10        BY MR. SCOFIELD:  Same objection.
11        THE WITNESS:  I don't know.
12   Q    (BY MR. KILBORN:)  So they could all seven
13   hundred and fifty-four be company or seven hundred and
14   fifty-four be independently owned?
15        BY MR. SCOFIELD:  Object to the form.
16        THE WITNESS:  I don't know.
17   Q    (BY MR. KILBORN:)  Okay.  Does Hyundai have
18   company-owned dealerships?
19   A    I don't know.
20   Q    Do you know what a company-owned dealership
21   is?
22   A    No.
23   Q    So you don't know whether they do or don't?

115

1    A    I don't have any relationship or working
2    knowledge of the dealers.
3    Q    And the payroll of HMMA, you would have some
4    knowledge of that?
5    A    Yes.
6    Q    Do you cut the checks?
7         BY MR. SCOFIELD:  Object to the form.
8         THE WITNESS:  No.
9    Q    (BY MR. KILBORN:)  Who does that?
10   A    The section manager for payroll.
11   Q    Who is that?
12   A    Scott Gordy.
13   Q    Is he a vice president?
14   A    He's the same title as myself, section
15   manager.
16   Q    And what bank are those payroll checks cut
17   on?
18   A    Wachovia.
19   Q    Is that through a local branch of Wachovia?
20   A    Yes.
21   Q    In Montgomery?
22   A    Yes.
23   Q    Do you have any knowledge of the bank account

116

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

WENDY SUSAN WARNER

| | |
|---|---|
| 1   or accounts? | 1     THE WITNESS: I don't know that. |
| 2     A  No, I just know that we have an ACH, | 2     Q  (BY MR. KILBORN:) So you don't know, for |
| 3  electronically transferred to Wachovia. And then | 3  instance, which company's money is put into the HMMA |
| 4  depending on the routing numbers the team members give | 4  bank accounts? |
| 5  us, it's deposited into their accounts each Tuesday | 5     A  No. |
| 6  every two weeks. | 6     Q  As far as you know, Chairman Chung could be |
| 7     Q  You used some letters there. You said ACH. | 7  wiring the money into there? |
| 8     A  ACH, it's an electronic wire. | 8     BY MR. SCOFIELD: Object to the form. |
| 9     Q  So the money is wired into the payroll | 9     THE WITNESS: I do know that our files all go |
| 10  account? | 10  over to HMMA's finance department. I do know that |
| 11     A  Yes, from finance. | 11  there's deadlines that they need to be able to send the |
| 12     Q  From who? | 12  wire. I do know that there's money in my checking |
| 13     A  Finance. | 13  account every two weeks from HMMA. |
| 14     Q  Finance? | 14     Q  (BY MR. KILBORN:) But you don't know how |
| 15     A  Finance, treasury department. | 15  HMMA actually derives any of its revenue? |
| 16     Q  Of what company? | 16     A  No, sir. |
| 17     A  HMMA. | 17     Q  In fact, you don't even know if HMMA even |
| 18     Q  All right. And is that wire from an HMMA | 18  reports revenue on a United States income tax return? |
| 19  account? | 19     BY MR. SCOFIELD: Object to the form. |
| 20     A  Yes. | 20     THE WITNESS: I don't. |
| 21     Q  At Wachovia? | 21     Q  (BY MR. KILBORN:) Or a Form 1040, do you? |
| 22     A  Yes. | 22     A  No. |
| 23     Q  Do you know how the money gets into that | 23     Q  You don't even know whether it files a 1040? |
|                   117 |                   119 |
| 1  account? | 1     A  I do not. |
| 2     A  It's electronically wired from our finance | 2     Q  Because if a corporation or an L.L.C. doesn't |
| 3  department. | 3  have revenue, then it normally wouldn't have to file, |
| 4     Q  Do you know how the money gets in there, | 4  would it? |
| 5  other than how it electronically gets in there? In | 5     BY MR. SCOFIELD: Object to the form. |
| 6  other words, whose money is it? | 6     THE WITNESS: I'm not a finance expert, I |
| 7     BY MR. SCOFIELD: Object to the form. | 7  would be guessing. |
| 8     THE WITNESS: Don't know. | 8     Q  (BY MR. KILBORN:) So you don't even know |
| 9     Q  (BY MR. KILBORN:) Do you know who puts the | 9  whether or not HMMA or HMA is broke, do you? |
| 10  money in the payroll account, what company? | 10     BY MR. SCOFIELD: Object to the form. |
| 11     A  HMMA, we send the information over to the | 11     THE WITNESS: I do not. |
| 12  HMMA finance department and it is sent from HMMA | 12     Q  (BY MR. KILBORN:) Now, we know that |
| 13  treasury department to Wachovia. | 13  Chairman Chung is not broke? |
| 14     Q  Do you know how HMMA gets the money that it | 14     BY MR. SCOFIELD: Object to the form. |
| 15  puts in the payroll account? | 15     Q  (BY MR. KILBORN:) Or do we? |
| 16     A  No. | 16     BY MR. SCOFIELD: Object to the form. |
| 17     Q  Well, if you don't know how -- if you don't | 17     THE WITNESS: I do not know him personally. |
| 18  know whether or not HMMA gets paid for the vehicles | 18     Q  (BY MR. KILBORN:) Okay. In your personnel |
| 19  that are money gated and the business of HMMA is | 19  file, which -- |
| 20  manufacturing Hyundai vehicles, how do you know that | 20     BY MR. KILBORN: Have we marked that? I |
| 21  HMMA derives any revenue from the manufacturing of | 21  don't think we have, her personnel file. |
| 22  those vehicles? | 22     Q  (BY MR. KILBORN:) We'll mark your personnel |
| 23     BY MR. SCOFIELD: Object to the form. | 23  file as Exhibit 8, Ms. Warner. Let me just show you |
|                   118 |                   120 |

30 (Pages 117 to 120)

### WENDY SUSAN WARNER

1  that.
2       **Is that your personnel file?**
3
4     (Whereupon, Plaintiff's Exhibit 8 was marked
5       for identification and copy of same is
6       attached hereto.)
7
8     THE WITNESS: I don't think I've ever looked
9  at it, but let's see here.
10    It looks like the letter I sent, yes.
11    BY MR. SCOFIELD: So I'm keeping track, 7 was
12  the documents produced today?
13    BY MR. SPORT: Yes, sir, that's correct.
14    BY MR. KILBORN: Plus the pleadings that were
15  attached to it.
16    BY MR. SCOFIELD: Right.
17    THE WITNESS: Yes, it all looks accurate.
18    **Q  (BY MR. KILBORN:) Let me ask you a few**
19  **questions. The first page, which has Bates Number 94,**
20  **it looks like a letter to you regarding your**
21  **employment, January 14th, 2003.**
22    A  Yes.
23    **Q  And it refers to Mr. I. B. Jang, J-A-N-G. Is**

                                      121

1  A  No.
2  **Q  He had dual employment?**
3    BY MR. SCOFIELD: Object to the form.
4    THE WITNESS: He was not paid by HMMA. His
5  duties here was that, but he was an employee of HMC.
6  **Q  (BY MR. KILBORN:) So he was an employee of**
7  **HMC, but he held the title of manager of human**
8  **resources and team relations with HMMA?**
9  A  He was the HR coordinator, yes.
10  **Q  Right. And this would be typical of how the**
11  **other expats have a relationship?**
12    BY MR. SCOFIELD: Object to the form.
13    THE WITNESS: Correct.
14  **Q  (BY MR. KILBORN:) And I notice that the**
15  **address is 7515 it looks like Halcyon --**
16  A  Halcyon.
17  **Q  Halcyon Summit Drive. Was the current**
18  **location just not in existence?**
19  A  The plant was not here, it was dirt and pecan
20  trees so we were in an office building.
21  **Q  Then you moved from the office building to**
22  **the plant?**
23  A  Yes, uh-huh.

                                      123

1  he the gentleman who you dealt with?
2  A  He's the HR coordinator -- was, he has moved
3  on, but he was the HR coordinator when I was hired.
4  **Q  Okay. Does he still work for some Hyundai**
5  **company?**
6    BY MR. SCOFIELD: Object to the form.
7    THE WITNESS: He does.
8  **Q  (BY MR. KILBORN:) Which one?**
9  A  Kia.
10  **Q  Is he on loan to Kia?**
11    BY MR. SCOFIELD: Object to the form.
12    THE WITNESS: He left HMC and was hired to
13  Kia.
14  **Q  (BY MR. KILBORN:) So at this time, in 2003**
15  **when you got hired, he was an expat?**
16  A  Yes.
17  **Q  And he held the title of manager of human**
18  **resources and team relations, Hyundai Motor**
19  **Manufacturing Alabama, L.L.C.?**
20  A  Yes.
21  **Q  What title did he hold with HMC?**
22  A  He was a manager.
23  **Q  Was he a vice president?**

                                      122

1  **Q  And if you'd turn to Bates Number 1 -- 00106,**
2  **it's called grant of license and release of claim.**
3  A  Okay.
4  **Q  And it looks like you signed that on December**
5  **8th, 2003 or '5?**
6  A  Five. It looks like 12-6-05.
7  **Q  And then it looks like a similar document two**
8  **pages over on 00108. Do you know why there are two of**
9  **them, one's dated December and one's dated October '05?**
10    BY MR. SCOFIELD: Object to the form.
11    THE WITNESS: I don't know, unless maybe it
12  was misplaced, but I'd be guessing. I don't know.
13  **Q  (BY MR. KILBORN:) And I believe that each**
14  **team member has to sign such a document?**
15  A  Yes.
16  **Q  In laymen's terms, what is that?**
17    BY MR. SCOFIELD: Object to the form.
18    THE WITNESS: Basically, it's information
19  that if we are in any type of commercials or film or
20  photos or videos we would not receive additional
21  compensation for that.
22  **Q  (BY MR. KILBORN:) And all team members are**
23  **required to sign that?**

                                      124

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969

## WENDY SUSAN WARNER

| | |
|---|---|
| 1  A  Yes. | 1  respective subsidiaries and affiliate companies, |
| 2  Q  How about expats? | 2  associate agencies, successors and assigns into each |
| 3     BY MR. SCOFIELD: Object to the form. | 3  other person as they may designate from time to time |
| 4     THE WITNESS: I don't know. | 4  collectively the, quote, company, closed quote, an |
| 5  Q  (BY MR. KILBORN:) And in that document, it | 5  unconditional royalty from royalty free license giving |
| 6  says in the second sentence: I fully understand and | 6  them the absolute right and permission to use my name |
| 7  agree that such photographs, films or videotapes may be | 7  And then it goes on to describe various things. |
| 8  freely used for public display in any form of media for | 8     Again, are the three companies, HMC, HMA and |
| 9  the purpose of furthering the business interest of | 9  HMMA, referred to in this document collectively as the |
| 10  Hyundai Motor Manufacturing Alabama, L.L.C., Hyundai | 10  company because of the common business purpose -- |
| 11  Motor America, Inc. and/or Hyundai Motor Company | 11     A  Of advertising, commercials. |
| 12  through advertising, publicity, trade or any lawful | 12  Q  -- of advertising; is that correct? |
| 13  purpose whatsoever. | 13     BY MR. SCOFIELD: Object to the form. |
| 14     Are those words that you assisted in | 14     THE WITNESS: Yes. |
| 15  drafting? | 15  Q  (BY MR. KILBORN:) And it refers not only to |
| 16     BY MR. SCOFIELD: Object to the form. | 16  those three named companies, but it refers to their |
| 17     THE WITNESS: No. | 17  respective subsidiaries and affiliated companies. What |
| 18  Q  (BY MR. KILBORN:) Do you know who drafted | 18  would be the respective subsidiaries? |
| 19  this? | 19     BY MR. SCOFIELD: Object to the form. |
| 20     A  I do not. | 20     THE WITNESS: I do not know. |
| 21  Q  When you signed it, did you fully understand | 21  Q  (BY MR. KILBORN:) And what would be the |
| 22  what you were signing? | 22  respective affiliated companies? |
| 23     A  Yes. | 23     BY MR. SCOFIELD: Object to the form. |
| 125 | 127 |

| | |
|---|---|
| 1  Q  And did you know what the business interest | 1     THE WITNESS: I do not know. |
| 2  of Hyundai Motor Manufacturing Alabama, Hyundai Motor | 2  Q  (BY MR. KILBORN:) What would be the |
| 3  America and/or Hyundai Motor Company were? | 3  respective associated agencies? |
| 4     BY MR. SCOFIELD: Objection to the form. | 4     BY MR. SCOFIELD: Object to the form. |
| 5     THE WITNESS: In terms of requesting this | 5     THE WITNESS: I don't know. |
| 6  information, yes. | 6  Q  (BY MR. KILBORN:) How would you be expected |
| 7  Q  (BY MR. KILBORN:) And what were their | 7  to know what you were signing if you didn't know that? |
| 8  business interests? | 8     A  As I said, the purpose of this was for |
| 9     BY MR. SCOFIELD: Same objection. | 9  filming advertisements and they were on-site for the |
| 10     THE WITNESS: Advertising, commercials, that | 10  grand opening as well as ads that were going to be |
| 11  the HMA and HMC were on-site to take pictures for | 11  produced. |
| 12  commercials. | 12  Q  Can you name me any subsidiary of any of |
| 13  Q  (BY MR. KILBORN:) And that would be a common | 13  those three companies? |
| 14  business interest among the three? | 14     A  No. |
| 15     A  Yes, that's correct. | 15  Q  Can you name me any affiliated company with |
| 16  Q  And that's why all three are referred to in | 16  any of those three companies? |
| 17  one document? | 17     A  No. |
| 18     BY MR. SCOFIELD: Object to the form. | 18  Q  Can you name any associated agency with any |
| 19     THE WITNESS: That's right. | 19  of those companies? |
| 20  Q  (BY MR. KILBORN:) And then the next | 20     BY MR. SCOFIELD: Object to the form. |
| 21  paragraph says: By signing below, I hereby grant to | 21     THE WITNESS: No. |
| 22  Hyundai Motor Manufacturing Alabama, L.L.C., Hyundai | 22  Q  (BY MR. KILBORN:) In other documents, have |
| 23  Motor America, Inc. and Hyundai Motor Company and their | 23  you seen where the three companies, HMC, HMA and HMMA, |
| 126 | 128 |

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## WENDY SUSAN WARNER

1  have been referred to collectively as the company?
2      BY MR. SCOFIELD: Object to the form.
3      THE WITNESS: I don't recall.
4      Q   (BY MR. KILBORN:) And turning to the
5  declaration of Wendy Warner, Plaintiff's Exhibit 6 that
6  we marked earlier, were you aware that this declaration
7  was going to be filed in this case?
8      A   Yes.
9      Q   And were you aware that the declaration was
10 going to be filed to support a motion to dismiss?
11     BY MR. SCOFIELD: Object to the form.
12     THE WITNESS: No.
13     Q   (BY MR. KILBORN:) Did you know why it was
14 going to be filed?
15     BY MR. SCOFIELD: Object to the form.
16     THE WITNESS: No.
17     Q   (BY MR. KILBORN:) Were you given a draft of
18 it and made changes to the draft or were you simply
19 given the original declaration and you signed it as is?
20     BY MR. SCOFIELD: Object to the form.
21     THE WITNESS: As is, the original
22 declaration.
23     Q   (BY MR. KILBORN:) So you weren't given a

129

1  So in the chain of command, as far as you're
2  concerned, you're third in line?
3      BY MR. SCOFIELD: Object to the form.
4      THE WITNESS: In human resources.
5      Q   (BY MR. KILBORN:) Right, human resources.
6      And in the declaration, you state in
7  paragraph two: As manager of HMMA's employment
8  department, I have access to and regularly utilize the
9  personnel records of individuals employed by HMMA.
10     Is that correct?
11     A   Yes.
12     Q   The next sentence says: I also have personal
13 knowledge regarding HMMA's operations as well as its
14 relationship to Hyundai Motor America, Inc.
15     Now, you state in there that you have
16 personal knowledge; is that a true statement?
17     A   Yes.
18     Q   All right. And tell me of your own personal
19 knowledge what you know about the relationship between
20 HMMA and Hyundai Motor America, Inc.
21     A   At HMMA, we build vehicles, two of them, a
22 Sonata, which is a sedan, and a small sports utility
23 vehicle called the Santa Fe. At HMA, they sell the

131

1  draft ahead of time and made corrections or asked to
2  comment?
3      A   No.
4      Q   You just were handed the declaration and you
5  signed it?
6      BY MR. SCOFIELD: Object to the form.
7      THE WITNESS: I was given the declaration and
8  told to review it and when -- if I had questions and I
9  was given time to review it and then I returned it to
10 legal.
11     Q   (BY MR. KILBORN:) Why didn't you write it
12 yourself?
13     A   I'm not a lawyer.
14     BY MR. SCOFIELD: Object to the form.
15     Q   (BY MR. KILBORN:) In the chain of command, I
16 think you said that you reported to Mr. Ryu?
17     A   Correct.
18     Q   And he is the vice president for human
19 resources and administration?
20     A   Yes.
21     Q   Do you know who his immediate superior is?
22     A   He reports to President Ahn.
23     Q   President Ahn, okay.

130

1  vehicles and distribute them to various dealerships.
2      Q   Is that the extent of your knowledge?
3      A   Yes.
4      Q   You don't know the legal relationship?
5      A   I do not.
6      BY MR. SCOFIELD: Object to the form.
7      Q   (BY MR. KILBORN:) You don't know the
8  financial relationship?
9      A   No, sir.
10     Q   You don't know the accounting relationship?
11     BY MR. SCOFIELD: Object to the form.
12     THE WITNESS: No, sir.
13     Q   (BY MR. KILBORN:) You don't know the
14 intercompany personnel relationships insofar as whether
15 or not they have common executives, officers, directors
16 or members?
17     A   No.
18     BY MR. SCOFIELD: Object to the form.
19     Q   (BY MR. KILBORN:) And you don't know the
20 financial relationship insofar as you don't know if any
21 money is exchanged in any form between either company?
22     A   No.
23     Q   And you don't know if any money is exchanged

132

33 (Pages 129 to 132)

### WENDY SUSAN WARNER

| | |
|---|---|
| 1  between either company? | 1      BY MR. SCOFIELD: Object to the form. |

1  between either company?

2    A  No.

3    Q  And what you know about HMA is that you

4  visited, I think you said, there on your human

5  resources?

6    A  Benchmarking.

7    Q  Benchmarking.

8      Do you know whether or not they share, for

9  instance, journals?

10     BY MR. SCOFIELD: Object to the form.

11     THE WITNESS: I don't understand the

12  question.

13    Q  (BY MR. KILBORN:) Well, do you know anything

14  about bookkeeping?

15    A  No.

16    Q  Do you do your own personal bookkeeping?

17    A  A balance a checkbook.

18    Q  Do you know who maintains the books and

19  records and the finances of either company?

20    A  No.

21    Q  Do you know whether they have any common

22  employees?

23     BY MR. SCOFIELD: Object to the form.

133

1     BY MR. SCOFIELD: Object to the form.

2     THE WITNESS: No.

3    Q  (BY MR. KILBORN:) Do you know who the

4  outside auditors are of HMA?

5    A  I do know that KPMG is our financial

6  auditors.

7    Q  When you say our, who do you mean?

8    A  HMMA.

9    Q  How about HMA?

10    A  I don't know.

11    Q  Okay. Would you say that it's fair to say

12  that your personal knowledge on what you call in your

13  declaration the relationship between HMMA and Hyundai

14  Motor America is very limited?

15     BY MR. SCOFIELD: Object to the form.

16     THE WITNESS: You need to be more specific.

17  I'm not clear.

18    Q  (BY MR. KILBORN:) Well, you told me what you

19  know about the relationship.

20    A  Yes.

21    Q  And then you've told me what you don't know

22  about the relationship. Would you agree with me that

23  what you do know that you told me about is a very

135

1     THE WITNESS: I am not aware that they have

2  any common employees. And based on the position that I

3  hold, I would have that information.

4    Q  (BY MR. KILBORN:) Okay. Do you know whether

5  or not they have any common officers?

6    A  I do not.

7    Q  Do you know Chairman Chung's relationship to

8  either company?

9    A  No.

10     BY MR. SCOFIELD: Object to the form.

11    Q  (BY MR. KILBORN:) Do you know Chairman

12  Chung, Jr.'s relationship to either company?

13     BY MR. SCOFIELD: Object to the form.

14     THE WITNESS: No.

15    Q  (BY MR. KILBORN:) I may have asked you this

16  and I apologize if I did: Do you know if they have

17  any -- joint or common financial or accounting

18  relationships?

19     BY MR. SCOFIELD: Object to the form.

20     THE WITNESS: I don't know.

21    Q  (BY MR. KILBORN:) Do you know whether or not

22  either HMA or HMMA filed state or federal income tax

23  returns?

134

1  limited knowledge in an overall relationship between

2  companies?

3     BY MR. SCOFIELD: Object to the form.

4     THE WITNESS: In the scope of my

5  responsibility, I know what I need to know within my

6  position.

7    Q  (BY MR. KILBORN:) So your knowledge is

8  limited to the human resources subject matter?

9    A  That would be correct.

10    Q  And other subject matters, everything from

11  legal to financial, you don't know as you've told me?

12     BY MR. SCOFIELD: Object to the form.

13     THE WITNESS: That's correct.

14    Q  (BY MR. KILBORN:) Why wasn't that limitation

15  on your personal knowledge stated in your declaration?

16     BY MR. SCOFIELD: Object to the form.

17     THE WITNESS: I don't have an answer for you

18  there.

19    Q  (BY MR. KILBORN:) That sentence should read

20  that you have knowledge of the human resources

21  relationship, shouldn't it?

22     BY MR. SCOFIELD: Object to the form.

23     THE WITNESS: I don't know, it's not -- I did

136

34 (Pages 133 to 136)

## WENDY SUSAN WARNER

| | |
|---|---|
| 1   not create this document. I interpreted that to be | 1       THE WITNESS: I don't understand your |
| 2   within the scope of my responsibility. | 2   question, I'm sorry. |
| 3       Q   (BY MR. KILBORN:) That was your reading, but | 3       Q   (BY MR. KILBORN:) Well, did you see |
| 4   it's not stated here? | 4   relationships with various Toyota affiliates? |
| 5       A   That was my understanding when I read it. | 5       A   Suppliers, yes. |
| 6       Q   That's what you were told? | 6       Q   Any other ones? |
| 7       BY MR. SCOFIELD: Object to the form. | 7       A   Not that I recall. |
| 8       THE WITNESS: It was my understanding when I | 8       Q   In paragraph three of your declaration, it |
| 9   read it. | 9   says: HMMA is organized in the State of Delaware as a |
| 10      Q   (BY MR. KILBORN:) Right. And do you agree | 10  limited liability company and has its principal place |
| 11  that the relationship between HMMA and HMA could | 11  of business in Montgomery, Alabama. |
| 12  encompass a lot of other areas, other than human | 12       Is that information that you base on Exhibit |
| 13  resources, as we've talked about? | 13  7, Bates Number 0001? |
| 14      BY MR. SCOFIELD: Object to the form. | 14      A   Yes. |
| 15      THE WITNESS: I don't know that for a fact. | 15      BY MR. SCOFIELD: I'm just going to allow her |
| 16  I would be guessing. | 16  to confirm that. |
| 17      Q   (BY MR. KILBORN:) So you just don't know, | 17      THE WITNESS: Thank you. |
| 18  period? | 18      Yes. |
| 19      A   That would be correct. | 19      Q   (BY MR. KILBORN:) And you told me that you |
| 20      Q   So outside of human resources, they could | 20  don't know what a limited liability company is, |
| 21  have a very tight relationship or no relationship at | 21  correct? |
| 22  all? | 22      A   As I said, it's a partnership, a corporate |
| 23      BY MR. SCOFIELD: Object to the form. | 23  partnership, but to say that I'm an expert on that, no. |
| 137 | 139 |
| 1       THE WITNESS: That would be speculation on my | 1       Q   Who is it a partnership with? |
| 2   part. | 2       BY MR. SCOFIELD: Object to the form. |
| 3       Q   (BY MR. KILBORN:) But it could be anywhere | 3       THE WITNESS: Again, it's a corporate |
| 4   in between, a tight or no relationship outside of human | 4   partnership, that's all I know. |
| 5   resources? | 5       Q   (BY MR. KILBORN:) Do you know that a |
| 6       BY MR. SCOFIELD: Same objection. | 6   partnership requires two partners? |
| 7       THE WITNESS: Again, based on the scope of my | 7       A   I don't. |
| 8   responsibility, I do know that there is no relationship | 8       Q   You can't be a partner with yourself, can |
| 9   between HMA and HMMA from an employee perspective. | 9   you? |
| 10      Q   (BY MR. KILBORN:) And you mean human | 10      A   I'd be speculating. |
| 11  resources? | 11      Q   All right. Well, let's just take a marriage. |
| 12      A   That would be correct. | 12  You've got two spouses who are marriage partners. |
| 13      Q   And you acknowledge that there are many other | 13  Wouldn't the partnership as you use the word mean or |
| 14  types of relationships that companies can have? | 14  imply two entities? |
| 15      A   Based on what you've discussed. | 15      BY MR. SCOFIELD: Object to the form. |
| 16      Q   Well, you've seen that from the different | 16      THE WITNESS: Again, it would be speculation |
| 17  companies that you've worked for, haven't you? | 17  on my part. |
| 18      BY MR. SCOFIELD: Object to the form. | 18      Q   (BY MR. KILBORN:) Well, you used the term. |
| 19      THE WITNESS: That would be speculation on my | 19  What did you mean by it? |
| 20  part. | 20      A   The partnership? |
| 21      Q   (BY MR. KILBORN:) Well, you saw that at | 21      BY MR. SCOFIELD: Object to the form. |
| 22  Toyota, didn't you? | 22      THE WITNESS: It's a corporate structure. |
| 23      BY MR. SCOFIELD: Object to the form. | 23      Q   (BY MR. KILBORN:) Well, who are the partners |
| 138 | 140 |

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

### WENDY SUSAN WARNER

1  in the partnership?
2      A   I don't know.
3      Q   And what is the corporate structure?
4          BY MR. SCOFIELD: Object to the form.
5          THE WITNESS: I don't know.
6      Q   (BY MR. KILBORN:) You don't even know if
7  there is a corporate structure, do you?
8          BY MR. SCOFIELD: Object to the form.
9          THE WITNESS: I don't.
10     Q   (BY MR. KILBORN:) As a matter of fact, you
11  don't know what a corporate structure is, do you?
12         BY MR. SCOFIELD: Object to the form.
13         THE WITNESS: I do not.
14     Q   (BY MR. KILBORN:) The -- Bates Number 0001,
15  corporate details, Office of the Secretary of State,
16  State of Alabama, it looks like it's got a print date
17  of November 13, 2007. Can you explain to me how you
18  saw that before your declaration which is dated May
19  2nd, 2007 and yet it was printed yesterday?
20         BY MR. SCOFIELD: Vince, that was printed by
21  me as counsel.
22         THE WITNESS: I do recall seeing it, but I
23  don't recall the particular date that it was shared

                                                    141

1          BY MR. SCOFIELD: Object to the form.
2      Q   (BY MR. KILBORN:) Was it shredded?
3      A   I would be speculating. I don't know.
4      Q   Do you have a copy of your declaration?
5      A   No.
6      Q   So you signed it, then it was taken away and
7  you didn't even retain a copy; is that correct?
8      A   That's correct.
9      Q   And you didn't retain what you looked at?
10     A   That's correct.
11     Q   Where is that thing that goes on top of here?
12     Is this it?
13     Q   Oh, you've got it.
14         The same question with regard to Bates Number
15  0002, that's the -- is that the web site?
16     A   Yes.
17     Q   And that was also printed actually today,
18  wasn't it, November 14th, 2007?
19         BY MR. SPORT: Today is the 15th.
20         BY MR. SCOFIELD: Again, Vince, I'll
21  stipulate that I'm the one that prepared and filed
22  those documents responsive to the duces tecum request.
23     Q   (BY MR. KILBORN:) Today is the 15th of

                                                    143

1  with me. I do know that Chad Griffon when he asked me
2  to sign that he shared both of those with me.
3      Q   (BY MR. KILBORN:) Well, the document that
4  I'm looking at here that was given to me this morning,
5  Bates Number 0001, we know that you didn't look at that
6  piece of paper before your declaration, don't we?
7      A   Not that particular one, but this document,
8  yes.
9      Q   All right. Well, where is the document that
10  you looked at?
11     A   I can't answer that for you. I don't know.
12     Q   Was it taken back after you looked at?
13     A   Yes, uh-huh, the document that I signed as
14  well as those pieces of paper.
15     Q   And are you telling us under oath that the
16  two are identical?
17     A   Yes.
18     Q   You remember what you saw then?
19     A   I do.
20     Q   Do you know why the document itself was not
21  produced?
22     A   I don't.
23     Q   Well, somebody has it, don't they?

                                                    142

1  November?
2      A   Yes.
3      Q   Okay. That was printed yesterday, wasn't it?
4      A   I don't know if it was printed or not
5  yesterday.
6      Q   Well, what day does it say that it was
7  printed?
8      A   November 14th.
9      Q   Yesterday.
10         So this piece of paper is not the one that
11  you looked at?
12     A   And I never looked at this in terms of
13  signing the declaration, just the Delaware
14  incorporation pages.
15     Q   So the only piece of paper that you looked at
16  was Bates Number 2?
17     A   And then the other one for HMA.
18     Q   Excuse me, I. That's the Secretary of State
19  document.
20     A   There's two of those, one for HMMA and one
21  for HMA.
22         BY MR. SCOFIELD: Keep on going.
23         THE WITNESS: Keep going.

                                                    144

                              36 (Pages 141 to 144)

WENDY SUSAN WARNER

1  Q   (BY MR. KILBORN:) I apologize. There's a --
2  Bates Number 4 is for the company Hyundai Motor
3  America, Inc. and that was printed on the same date,
4  November 13th, 2007?
5  A   But I had been shown those when I signed that
6  declaration by Chad Griffon.
7  Q   You anticipated my question.
8      Is it true that this document that I'm
9  looking at was printed two days ago?
10  A   I did not print it.
11      BY MR. SCOFIELD: We'll stipulate that it was
12  printed two days ago by counsel.
13  Q   (BY MR. KILBORN:) I just want you to say
14  whether it was or not.
15  A   I did not print it.
16  Q   So you don't know?
17  A   That looks normal. When you do print, the
18  date is on there, but I did not print it so I can't
19  tell you that.
20  Q   Okay. So your knowledge when you signed the
21  declaration, Plaintiff's Exhibit 6, about the -- what
22  you state is a relationship between HMMA and HMA, as
23  far as the -- any of the corporate structure is based

145

1  corporations file documents with Secretaries of State?
2  A   To -- I honestly don't know. I'd be
3  guessing.
4  Q   Does HMA do any business whatsoever in the
5  State of Alabama?
6      BY MR. SCOFIELD: Object to the form.
7      THE WITNESS: I don't work for HMA, so I
8  don't know.
9  Q   (BY MR. KILBORN:) So as far as your personal
10  knowledge is concerned, it could do a lot of business
11  in Alabama or none?
12  A   At HMMA is the scope of my responsibility.
13  Q   Well, you do in your declaration talk about
14  HMA, don't you?
15  A   In terms of my basic knowledge of the
16  operations, yes.
17  Q   But other than what -- Other than what's on
18  Bates Number 0004, you don't know anything about HMA,
19  do you?
20      BY MR. SCOFIELD: Object to the form.
21      THE WITNESS: No, huh-uh.
22  Q   (BY MR. KILBORN:) Does -- You don't even
23  know if HMA files any type of annual reports with the

147

1  on what you looked at, Bates Numbers 2 and 4 in Exhibit
2  6?
3  A   Yes.
4  Q   So anybody could have printed that off?
5      BY MR. SCOFIELD: Object to the form.
6      THE WITNESS: I don't understand the
7  question.
8  Q   (BY MR. KILBORN:) Well, it was public
9  information, or was it?
10  A   My understanding was it was public
11  information, yes.
12  Q   Okay. Did you see the -- Strike that.
13      Did you see any of the corporate documents
14  that were filed with the Secretary of State?
15  A   No.
16  Q   Why is it that -- Why is it that HMA, Hyundai
17  Motor America, Inc., on Bates Number 0004 -- Strike
18  that.
19      Why is it that HMA has filed corporate
20  information with the Alabama Secretary of State?
21      BY MR. SCOFIELD: Object to the form.
22      THE WITNESS: I don't know.
23  Q   (BY MR. KILBORN:) Do you know why

146

1  Alabama Secretary of State, do you?
2  A   No.
3      BY MR. SCOFIELD: Object to the form.
4  Q   (BY MR. KILBORN:) Do you know if HMMA does?
5  A   I do not.
6  Q   Do you know if HMC does?
7  A   I don't.
8  Q   Do you know if HMC does business in Alabama?
9  A   I do not.
10  Q   Do you know if it's qualified to do business
11  in Alabama?
12  A   No.
13  Q   Do you know if HMMA has qualified to do
14  business in Alabama?
15  A   Based on that information that was shared
16  with me.
17  Q   Well, that doesn't say whether they're
18  qualified to do business or not, does it?
19      BY MR. SCOFIELD: Object to the form.
20      THE WITNESS: Again, I'm in human resources.
21  Q   (BY MR. KILBORN:) And you don't know whether
22  HMA is qualified to do business in Alabama, do you?
23  A   No.

148

37 (Pages 145 to 148)

## WENDY SUSAN WARNER

| | |
|---|---|
| 1     Q   On Bates Number 0004, it says: Registered | 1     Q   Do they have any type of office in Colorado? |

1    Q   On Bates Number 0004, it says:  Registered
2   agent, National Registered Agents, Inc., 150 South
3   Perry Street, Montgomery, Alabama.
4        Do you know what that means?
5        BY MR. SCOFIELD:  Object to the form.
6        THE WITNESS:  No.
7    Q   (BY MR. KILBORN:)  What is located at that
8   address?
9    A   I don't know.
10   Q   We're on South Perry right now, aren't we?
11   A   Yeah.
12   Q   And so as a registered agent of this company,
13  HMA is right down the street here, isn't it?
14   A   I'd be speculating.
15   Q   Have you ever been there?
16   A   No, sir.
17   Q   Do you know what is there?
18   A   No, sir.
19   Q   I see where Hyundai Motor Manufacturing
20  Alabama has a registered agent called Neal --
21  Richard E. Neal, 700 Hyundai Boulevard, Montgomery,
22  Alabama 36105.  You know who he is?
23   A   Yes.

149

1    Q   Who is he?
2    A   He's our vice president for legal.
3    Q   Okay.  And how long has he been there?
4    A   He was hired before me, I believe, September
5   of '02.
6    Q   Is he a team member?
7    A   He is.
8    Q   Excuse me?
9    A   Yes.
10   Q   Why does HMMA's registered agent have a
11  different name and address than HMA?
12       BY MR. SCOFIELD:  Object to the form.
13       You can answer if you know.
14       THE WITNESS:  Because their main office is in
15  California and our production of vehicles is in
16  Alabama.
17   Q   (BY MR. KILBORN:)  Well, name me every other
18  location HMA has an office of any type.
19       BY MR. SCOFIELD:  Object to the form.
20       THE WITNESS:  I could not.
21   Q   (BY MR. KILBORN:)  Do they have any type of
22  office in New Jersey?
23   A   I don't know.

150

1    Q   Do they have any type of office in Colorado?
2    A   I don't know.
3    Q   Do they have any type of office or location
4   in any other place within California?
5    A   HMA?
6    Q   Right.
7    A   I don't know.
8    Q   Do they have an office in any other country,
9   other than the United States?
10       BY MR. SCOFIELD:  Object to the form.
11       THE WITNESS:  It would be speculation on my
12  part.
13   Q   (BY MR. KILBORN:)  Don't know?
14   A   No, sir.
15   Q   And your affidavit -- excuse me, your
16  declaration, Exhibit 6, item five -- paragraph five
17  says:  HMMA is an independent manufacturing operation
18  of Hyundai Motor Company based in Seoul, Korea.
19       What is meant by the word independent?
20   A   You want the definition of independent?
21   Q   I want to know what you meant in your
22  declaration by that word.
23   A   HMMA is an independent manufacturing

151

1   operation of Hyundai Motor Company based in Seoul,
2   Korea.  Hyundai Motor Manufacturing Alabama is a
3   manufacturing company that reports to Hyundai Motor
4   Company in Seoul, Korea.
5    Q   My question was:  What did you mean by the
6   word independent?
7    A   Independent means unique, independent means
8   solely, but that would be, you know, my definition of
9   what independent means.
10   Q   What factors do you consider and what
11  training do you base it upon to determine if one
12  corporation is independent of another?
13   A   I'm sorry, I don't understand your question.
14   Q   What factors have you used in your own mind
15  to conclude that one company, HMMA, is independent of
16  another company, HMC?
17       BY MR. SCOFIELD:  Object to the form.
18       THE WITNESS:  Could you be more specific?
19   Q   (BY MR. KILBORN:)  Yeah.  Rather than using
20  the adjective independent, what do you -- what facts do
21  you have to support that?
22   A   I'm sorry, I don't understand your question.
23   Q   Okay.  Well, you used the word independent.

152

38  (Pages 149 to 152)

WENDY SUSAN WARNER

1    A  I did not use the word independent, I
2  reviewed it and read it and agreed that that was the
3  information that I was aware of in the scope of my
4  responsibility as a human resource manager for HMMA.
5    Q  So independent as contained in paragraph five
6  was not your word?
7    A  I did not write this, no.  I agreed that the
8  information was correct.
9    Q  I got that.  You agree?
10    A  Yes.
11    Q  But that independent is not your word?
12    A  I did not write this, no.
13    Q  Okay.  Well, what in your mind did you use to
14  agree to the word independent?
15      BY MR. SCOFIELD:  Object to the form.
16      THE WITNESS:  As I said, solely, unique.
17  Independent means separate.  Independent means solely,
18  separate, unique.
19    Q  (BY MR. KILBORN:)  Those are all adjectives.
20  What facts as far as a relationship between the two
21  companies do you know of that would support that
22  adjective independent?
23      BY MR. SCOFIELD:  Object to the form.
                                              153

1  team relations and all managers attended the off-site.
2    Q  And you don't know based on spirit training
3  or anything else that you have personal knowledge of
4  whether or not HMA and -- excuse me, HMMA or HMC are
5  legally, financially independent at all, do you?
6    A  No.
7      BY MR. SCOFIELD:  Object to the form.
8    Q  (BY MR. KILBORN:)  As far as you know,
9  Chairman Chung could completely own and control both
10  companies, couldn't he?
11      BY MR. SCOFIELD:  Object to the form.
12      THE WITNESS:  It would be speculation on my
13  part.
14    Q  (BY MR. KILBORN:)  But as far as you know,
15  you don't know?
16    A  I don't know one way or the other.
17    Q  All right.  And have you heard the phrase top
18  down operating style?
19      BY MR. SCOFIELD:  Object to the form.
20      THE WITNESS:  Yes.
21    Q  (BY MR. KILBORN:)  Did you hear it in
22  relation to Hyundai?
23    A  No.
                                              155

1      THE WITNESS:  My tenure with the company
2  having been there since startup.
3    Q  (BY MR. KILBORN:)  Which company?
4    A  HMMA.  Having visited HMC, training that was
5  received in terms of explanation of HMC and HMMA and
6  HMA.
7    Q  And when's the last time that you got that
8  explanation?
9      BY MR. SCOFIELD:  Object to the form.
10      THE WITNESS:  Spirit training.  We had a
11  managers forum probably --
12    Q  (BY MR. KILBORN:)  Who is we?
13    A  -- thirty days ago.
14      HMMA managers.
15    Q  Spirit training?
16    A  Uh-huh.
17    Q  And that was within HMMA?
18    A  Yes, sir.
19    Q  And who conducted that?
20    A  Our team relations department.
21    Q  That would be who?
22    A  That would be Auddie Swagman who is our team
23  relations manager and one of our assistant managers in
                                              154

1    Q  Do you know what it means?
2    A  Top down means a hierarchical type of
3  environment that would be -- the terms of structure
4  would be a vertical structure versus a horizontal
5  structure.
6    Q  Is there a vertical structure?
7    A  It is hierarchical, yes, and it is top down.
8    Q  It, you mean Hyundai?
9    A  HMMA.
10    Q  HMMA?
11    A  Yeah.  I can only speak for HMMA.
12    Q  How about HMC?
13    A  I don't know that, I've never worked for HMC.
14  I've never been in their environment.
15    Q  Well, you did learn the culture, didn't you?
16    A  Yes.
17    Q  You took three weeks in Seoul to do that?
18    A  It was more of a cultural and it was more of
19  a touring and more traveling, it wasn't really
20  organizational training.
21    Q  It was just a vacation?
22    A  It wasn't a vacation.
23      BY MR. SCOFIELD:  Object to the form.
                                              156

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

WENDY SUSAN WARNER

```
 1        THE WITNESS: It certainly was not
 2   instructional of HMC, it was more exposure to the
 3   culture and to the environment and to visually see the
 4   locations but not structured training.  Again, with the
 5   language barrier, that's somewhat difficult for
 6   exchange of information.
 7      Q   (BY MR. KILBORN:)  Did you tell me that you
 8   did know who the president and CEO of HMA is?
 9        BY MR. SCOFIELD: Object to the form.
10        THE WITNESS: I don't.
11      Q   (BY MR. KILBORN:)  If I remember correctly,
12   you said that you didn't know any of the officers or
13   directors or employees or anybody?
14      A   I said Keith Duckworth.
15      Q   That's the only one?
16      A   And I know the vice president for human
17   resources.
18      Q   And his name is?
19      A   Kathy Parker.
20      Q   Kathy?
21      A   Parker.
22      Q   How many vice presidents does HMA have?
23      A   I don't know.
                                                    157
```

```
 1   talked about, Bates Number 4, that's the one that
 2   refers to HMA.  I'll hand that to you.
 3        Is that where you got the information that
 4   you put in paragraph seven?
 5      A   That and my visit to California for
 6   benchmarking.
 7      Q   And you say in there that HMA's principal
 8   place of business is in Fountain Valley, California?
 9      A   Yes.
10      Q   Do you know what principal place of business
11   mean?
12        BY MR. SCOFIELD: Object to the form.
13        THE WITNESS: Principal place of business
14   means it's the primary place of where they conduct
15   business.
16      Q   (BY MR. KILBORN:)  Does HMA conduct any
17   business in South Korea?
18        BY MR. SCOFIELD: Object to the form.
19        THE WITNESS: I don't know.
20      Q   (BY MR. KILBORN:)  Does it conduct any
21   business in any other country?
22        BY MR. SCOFIELD: Object to the form.
23        THE WITNESS: I don't know.
                                                    159
```

```
 1      Q   Do they have any other than Ms. Parker?
 2        BY MR. SCOFIELD: Object to the form.
 3        THE WITNESS: It would be speculation on my
 4   part.  I'd be guessing.
 5      Q   (BY MR. KILBORN:)  And in your declaration,
 6   Exhibit 6, paragraph seven, you say:  It is my
 7   understanding that Hyundai Motor America, Inc., HMA,
 8   was organized as a corporation in the State of
 9   California and has its principal place of business in
10   Fountain Valley, California.  Is that based on
11   Exhibit --
12        Let me put that together with this, excuse
13   me.
14        BY MR. SCOFIELD: Just for housekeeping, I
15   think the top of the exhibit which contains the
16   documents is going to be the objections and responses
17   to the document request, not Wendy Warner's
18   declaration.
19
20        (Whereupon, a discussion was held off the
21        record.)
22
23      Q   (BY MR. KILBORN:)  And Exhibit 7, which we've
                                                    158
```

```
 1      Q   (BY MR. KILBORN:)  How do you know that it
 2   still exists?
 3      A   My visit there was less than a year ago and I
 4   recently met with the vice president and the national
 5   sales manager at a meeting in Colorado last week.
 6      Q   And what was the national sales manager's
 7   title?
 8      A   Compensation of benefits.
 9      Q   Compensation of benefits?
10      A   Human resources.
11      Q   He's a human resources guy?
12      A   She.
13      Q   She, okay.
14        Did you meet with other than human resources
15   people?
16      A   No, just human resources.
17      Q   In paragraph nine of your declaration, you
18   say: HMA and HMMA are legally distinct and separate
19   corporate entities.
20        What background and qualifications do you
21   have to express what is a legally distinct and separate
22   corporate entity?
23      A   Again, I did not write this, my legal --
                                                    160
```

40 (Pages 157 to 160)

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969

## WENDY SUSAN WARNER

1  in-house legal counsel did. They are the subject
2  matter experts in those areas and they confirmed that
3  before I signed it.
4      Q  So that's their opinion?
5      BY MR. SCOFIELD: Object to the form.
6      THE WITNESS: That's correct.
7      Q  (BY MR. KILBORN:) You don't have the
8  qualifications to express an opinion, do you?
9      BY MR. SCOFIELD: Object to the form.
10     THE WITNESS: I guess that would be your
11 opinion, not mine.
12     Q  (BY MR. KILBORN:) Well, what are your
13 qualifications to express an opinion on what's legally
14 distinct and separate corporate entities?
15     A  As I said in the scope of my position, the
16 bulk of the material in here pertains to human
17 resources issues and the subject matter expert in that
18 area affirmed that that information was correct before
19 I signed it.
20     Q  That's the legal counsel?
21     A  That's correct.
22     Q  Well, this is your declaration.
23     A  In consultation with my in-house counsel.
    161

1      Q  Well, where does that say that in this
2  declaration?
3      BY MR. SCOFIELD: Object to the form.
4      THE WITNESS: Again, this information was
5  drafted by in-house counsel, not myself.
6      Q  (BY MR. KILBORN:) Is this your declaration
7  or somebody else's?
8      A  It's mine to confirm it, but I did not write
9  it, I did not draft it.
10     Q  Well, what qualifications do you,
11 Wendy Warner, have to confirm what is a legally
12 distinct corporation?
13     BY MR. SCOFIELD: Object to the form.
14     THE WITNESS: The legal department felt that
15 I was the best expert to do that and they requested
16 that I sign it.
17     Q  (BY MR. KILBORN:) That's not my question.
18 What qualifications do you, Wendy Warner, have to
19 express an opinion on what is a legally distinct and
20 separate corporate entity?
21     BY MR. SCOFIELD: Object to the form.
22     THE WITNESS: My information was to gather
23 the best resources, to confirm this information and I
    162

1  felt that I did.
2      Q  (BY MR. KILBORN:) Your information was to
3  gather the best resources?
4      A  That is one of my duties, yes, in terms of
5  being a manager of the company.
6      Q  Well, what best resources on the subject of
7  what is a legally distinct and separate corporate
8  entity --
9      A  My legal department.
10     Q  Well, why didn't your legal department sign
11 this?
12     BY MR. SCOFIELD: Object to the form.
13     THE WITNESS: Because the bulk of the
14 information has to do with human resources.
15     Q  (BY MR. KILBORN:) But nine does not at all,
16 does it?
17     BY MR. SCOFIELD: Object to the form.
18     THE WITNESS: It was discussed with me and it
19 was reviewed and I did confirm it.
20     Q  (BY MR. KILBORN:) What does nine have to do
21 with human resources?
22     BY MR. SCOFIELD: Object to the form.
23     THE WITNESS: Human resources is a function
    163

1  of the whole company. And certainly we're not experts
2  in all areas, but we do touch just about every piece of
3  information in the company throughout HMMA.
4      Q  (BY MR. KILBORN:) But you didn't say HMMA
5  and HMA are distinct and separate insofar as human
6  resources, did you?
7      BY MR. SCOFIELD: Object to the form.
8      THE WITNESS: In terms of my experience, in
9  terms of the scope of work, yes.
10     Q  (BY MR. KILBORN:) You didn't -- You
11 specifically used the word legally, didn't you?
12     A  I did not write this. I did review it, I did
13 confirm with the information.
14     Q  Listen to my question: You specifically used
15 the word legally, didn't you?
16     A  I did not.
17     Q  Well, your declaration specifically used that
18 word and you signed it, didn't you?
19     A  I did sign it, yes.
20     Q  And then you went further and wrote in the
21 last sentence of your declaration these words:
22 Pursuant to 28 USC, Section 1746, I declare under
23 penalty of perjury that the foregoing information is
    164

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969

WENDY SUSAN WARNER

1  true and correct. You signed that, didn't you?
2      A  I did, yes.
3      Q  Are those your words?
4      A  Those are the words that were drafted by my
5  legal counsel and I reviewed it thoroughly and, yes, as
6  a manager of HMMA, in good faith, I did sign it.
7      Q  Well, are these your words?
8          BY MR. SCOFIELD: Object to the form.
9          THE WITNESS: These are not my words that I
10 wrote this. As I've told you at least ten times, I did
11 not write this.
12     Q  (BY MR. KILBORN:) I understand that.
13     A  Uh-huh.
14     Q  But you're telling the court based on
15 personal knowledge everything that you say in this
16 declaration is true, aren't you?
17     A  That is correct, yes, sir.
18     Q  And you didn't have the personal knowledge to
19 put this information in here, did you?
20         BY MR. SCOFIELD: Object to the form.
21         THE WITNESS: As I said, I did have the
22 information from the experts that gathered it, I
23 confirmed it and I did sign it based on good faith.
                                                    165

1      Section 1746 before May 2nd, 2007, had you?
2          BY MR. SCOFIELD: Object to the form.
3          THE WITNESS: I'm not a lawyer and I don't
4  profess to be a lawyer.
5      Q  (BY MR. KILBORN:) I know you're not a
6  lawyer. We've established that.
7          Had you ever heard of that before?
8          BY MR. SCOFIELD: Object to the form.
9          THE WITNESS: No, sir.
10     Q  (BY MR. KILBORN:) Your understanding of
11 personal knowledge includes what other people tell you
12 like the lawyers?
13     A  I do have subject matter experts in a variety
14 of areas. I'm not a financial expert, I'm not a legal
15 expert, but in terms of representing the company in a
16 variety of different roles, yes.
17     Q  My question is: In your use of the word my
18 personal knowledge, do you include what other people
19 have told you?
20     A  Of course.
21     Q  All right. Do you include what the lawyers
22 told you before you signed this declaration?
23         BY MR. SCOFIELD: Object to the form.
                                                    167

1      Q  (BY MR. KILBORN:) That's not personal
2  knowledge, is it?
3          BY MR. SCOFIELD: Object to the form.
4      Q  (BY MR. KILBORN:) That's not personal
5  knowledge, is it?
6      A  That is certainly your opinion.
7          BY MR. SCOFIELD: Object to the form.
8      Q  (BY MR. KILBORN:) Well, are you telling the
9  court today since you're under oath in this deposition
10 that all of this information in here is based on your
11 personal knowledge?
12         BY MR. SCOFIELD: Object to the form.
13         THE WITNESS: In good faith with subject
14 matter experts that I confirmed this information is
15 correct, yes, to the scope of my work, yes, sir.
16     Q  (BY MR. KILBORN:) In good faith and with
17 subject matter experts?
18     A  That's correct.
19     Q  And the subject matter experts would be the
20 lawyers?
21         BY MR. SCOFIELD: Object to the form.
22         THE WITNESS: That's right.
23     Q  (BY MR. KILBORN:) You never heard of 28 USC
                                                    166

1          THE WITNESS: Do you want me to answer?
2          BY MR. SCOFIELD: Can you read back the
3  question?
4
5          (Whereupon, the last question was read back by
6          the court reporter.)
7
8          BY MR. SCOFIELD: And certainly that doesn't
9  call for the revelation of what was told, but if you
10 relied on representations made by counsel, you can
11 certainly testify to that.
12         THE WITNESS: Yes.
13     Q  (BY MR. KILBORN:) So you include in the
14 words my personal knowledge what your lawyers told you
15 was true?
16     A  That's right.
17     Q  And you did not independently verify --
18 Whether or not the lawyer stating that HMA and HMMA are
19 legally distinct and separate corporate entities in
20 paragraph nine, you did not independently verify that,
21 did you?
22         BY MR. SCOFIELD: Object to the form.
23         THE WITNESS: No, sir.
                                                    168

42 (Pages 165 to 168)

## WENDY SUSAN WARNER

1    Q   (BY MR. KILBORN:)  As a matter of fact, you
2  wouldn't know how to independently verify that, would
3  you?
4    A   No, sir.
5        BY MR. SCOFIELD:  Object to the form.
6    Q   (BY MR. KILBORN:)  That is totally beyond
7  your expertise, isn't it?
8    A   I don't think my expertise, but it certainly
9  isn't within the scope of my work.  And I do have
10  subject matter experts that are much better at it than
11  I am.
12    Q   Well, where would you go to to find whether
13  or not HMMA and HMA are legally separate and distinct
14  corporate entities?  Where would you start?
15    A   I would start with my in-house counsel --
16    Q   Somebody else?
17    A   -- that are experts in that field as well as
18  they come to me for expert information in human
19  resources.
20    Q   Did anyone -- Strike that.
21        Did any expats have anything to do with in
22  any way, shape or form the decision to terminate the
23  plaintiff?

169

1  certainly you can describe Mr. Neal's role in the
2  process, but because he is a vice president general
3  counsel in the company, I'm instructing the witness not
4  to provide any information with regard to any advice
5  rendered by Mr. Neal based on attorney-client
6  privilege.
7    Q   (BY MR. KILBORN:)  What did Mr. Neal have to
8  do with Mr. Dees' termination?
9    A   Mr. Neal --
10        BY MR. SCOFIELD:  Same objection.
11        THE WITNESS:  -- sits on our termination
12  committee meeting, but he serves as an adviser.  He is
13  not involved in the decision making, he merely provides
14  legal advice in that form.
15    Q   (BY MR. KILBORN:)  So you've got a
16  termination committee?
17    A   Uh-huh.
18    Q   And who is on that committee?
19    A   Myself, my assistant manager of employment,
20  the manager for team relations, the assistant manager
21  for team relations and it varies depending on which
22  department, but it's the head of departments that
23  participates.  And the vice president of the division

171

1        BY MR. SCOFIELD:  Object to the form.
2        THE WITNESS:  You're speaking of Mr. Dees?
3    Q   (BY MR. KILBORN:)  Yes.
4    A   Did any expats?  Repeat the question.
5    Q   I'll ask it again.  It's a very broad
6  question intentionally.
7        Did any of the expats have anything to do
8  with in any way, shape or form the decision to
9  terminate the plaintiff?
10        BY MR. SCOFIELD:  Object to the form.
11        THE WITNESS:  No.
12    Q   (BY MR. KILBORN:)  Did any expats in any way,
13  shape or form have anything to do with anything
14  subsequent to that regarding his termination before
15  this lawsuit was filed?
16        BY MR. SCOFIELD:  Object to the form.
17        THE WITNESS:  Not that I'm aware of of my own
18  knowledge, no.
19    Q   (BY MR. KILBORN:)  Do -- Well, I know
20  Mr. Neal has stated to have discoverable information
21  about Mr. Dees' termination.  What did Mr. Neal have to
22  do with his termination?
23        BY MR. SCOFIELD:  Object to the form.  Again,

170

1  is invited if he chooses to attend.
2    Q   What's his name?
3    A   It depends on the division.  Typically, the
4  bulk of them are production.  The bulk of our staff is
5  in production, so in this particular case, as well as
6  most of them, is the vice president for production who
7  is John Kalson.
8    Q   What's his name?
9    A   John Kalson, K-A-L-S-O-N.
10        And then the head of department depending on
11  which department it is, so that would rotate depending
12  on the individual that's being recommended for
13  termination, but the constant members are the human
14  resource people.
15    Q   Are the actions of the termination committee
16  visible to any of the expats?
17        BY MR. SCOFIELD:  Object to the form.
18        THE WITNESS:  I'm not sure I understand,
19  let's try again.
20    Q   (BY MR. KILBORN:)  Are the actions of the
21  termination committee visible, that is known by or do
22  they have access to, to any expats?
23        BY MR. SCOFIELD:  Object to the form.

172

43 (Pages 169 to 172)

WENDY SUSAN WARNER

1    THE WITNESS:  As a courtesy, we inform the
2  vice president for human resources, my boss, and my HR
3  coordinator in case the department Korean coordinators
4  have a question about the decision.  We do let them
5  know of the outcome, but they don't have any decision
6  making in what the outcome is.
7    Q   (BY MR. KILBORN:)  And so you would have
8  notified your boss as a courtesy?
9    A   Yes, I would have told him.
10   Q   And that would have been Mr. Ryu?
11   A   Correct.  And then my coordinator, who is
12  also named Mr. Ryu.
13   Q   Would you have notified verbally or in
14  writing or E-mail?
15       BY MR. SCOFIELD:  Object to the form.
16       THE WITNESS:  I would have verbally told him.
17   Q   (BY MR. KILBORN:)  Do you routinely just do
18  everything verbally?
19   A   With our coordinators, with the English
20  barrier, we do communicate verbally a lot.  In terms of
21  policies or approval, certainly it's in writing, but
22  that type of information would have been discussed in a
23  confidential room but verbally told to them.
                                                    173

1    Q   A confidential room?
2    A   We are in an open concept.  All of our desks
3  are in cubes.  We would have discussed that in a
4  conference room.
5    Q   Is that routine to do that?
6    A   Yes, sir.
7    Q   So whenever there's a termination, you meet
8  with your boss, Mr. Ryu --
9    A   And inform him of the decision.
10   Q   -- in a confidential room?
11   A   Yes.
12   Q   And inform him of a termination?
13   A   Yes, pending.
14   Q   And you did that with Mr. Dees?
15   A   Yes, I did.
16   Q   Anybody else -- Any other expat, other than
17  Mr. Ryu?
18   A   And my coordinator -- HR coordinator as well.
19   Q   So there's no written record or electronic
20  record of you informing Mr. Ryu of any termination?
21   A   No, sir.
22   Q   Is that routine, that there is no written
23  record of that?
                                                    174

1       BY MR. SCOFIELD:  Object to the form.
2       THE WITNESS:  Because of the language
3  barrier, yes, it would be hard for them to read it and
4  the sense of urgency, we would want to tell them right
5  away.
6    Q   (BY MR. KILBORN:)  Mr. Ryu is not able to
7  read English?
8       BY MR. SCOFIELD:  Object to the form.
9       THE WITNESS:  He can read it, but it does
10  take him more time.  He may have questions, so it's
11  easier to explain it to him face-to-face.
12   Q   (BY MR. KILBORN:)  And Mr. Neal is a standing
13  member of the termination committee?
14   A   As an adviser, yes.
15   Q   He attends all termination committee
16  meetings?
17   A   Yes, sir.
18   Q   Does he have a boss within HMMA?
19   A   The president.
20       BY MR. SCOFIELD:  Object to the form.
21   Q   (BY MR. KILBORN:)  Excuse me?
22   A   The president.
23   Q   Mr. Ahn?
                                                    175

1    A   Yes.
2    Q   But Mr. Ahn works for HMC?
3    A   But he does report to the president on all
4  legal matters.
5    Q   But he does work for HMC, Mr. Ahn?
6    A   Yes.
7    Q   And he also works for HMMA, too, doesn't he?
8       BY MR. SCOFIELD:  Object to the form.
9       THE WITNESS:  He does, as an expat.
10   Q   (BY MR. KILBORN:)  Like Mr. Kim and Mr. Ryu?
11   A   Yes.
12   Q   What other Hyundai affiliates does Mr. Ahn,
13  Mr. Kim and Mr. Ryu work for?
14       BY MR. SCOFIELD:  Object to the form.
15       THE WITNESS:  None that I know except their
16  parent company which is HMC.
17   Q   (BY MR. KILBORN:)  And I'll include Mr. Jason
18  Lee in that group, too.  Mr. Ahn, Kim, Lee and Ryu?
19       BY MR. SCOFIELD:  Object to the form.
20       THE WITNESS:  HMC.
21   Q   (BY MR. KILBORN:)  So you definitely know
22  that those four work for HMC and HMMA?
23   A   Uh-huh.
                                                    176

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## WENDY SUSAN WARNER

1  Q   And you don't know if there are any others
2  that work for both those corporations?
3  A   They all do.
4  Q   They all do?
5  A   Yes, sir.
6  Q   Do you know of any other Hyundai affiliates
7  that those four work for outside of HMC and HMMA?
8  A   No.
9  Q   They could work for, for instance, any other
10 Hyundai affiliate?
11 A   Not that I'm aware of.
12 Q   But they could?
13 A   I would not have that knowledge if they did.
14 Q   You don't know one way or the other?
15 A   My understanding is that they work for HMC.
16 That's where we get all of their information, when
17 they're coming, when they're leaving, when they're
18 going for training, when their move is pending. I only
19 communicate with HMC in regards to those expats.
20 Q   Does Mr. Chung, Sr. or Jr. work for HMMA?
21    BY MR. SCOFIELD: Object to the form.
22    THE WITNESS: I wouldn't know.
23 Q   (BY MR. KILBORN:) How about HMA?

177

1  A   They're not on our payroll, HMMA. There's no
2  Mr. Chung on my payroll.
3  Q   In describing to the court the relationship
4  between HMMA, HMC or HMA, did you think it not
5  important to state that you got seventy-eight expats
6  who work for both HMC and HMMA?
7    BY MR. SCOFIELD: Object to the form.
8    THE WITNESS: I guess I'm not understanding
9  your question.
10 Q   (BY MR. KILBORN:) Why didn't you think it
11 important to tell the court in this declaration that
12 you have seventy-eight expats that work for both
13 companies?
14    BY MR. SCOFIELD: Object to the form.
15    THE WITNESS: I'm not certain what the
16 relevance would have been.
17 Q   (BY MR. KILBORN:) Well, do you think -- do
18 you think the fact that you've got seventy-eight people
19 working for two companies would be an irrelevant fact
20 to a declaration under oath about whether or not the
21 two companies had any relationship?
22    BY MR. SCOFIELD: Object to the form.
23    THE WITNESS: Again, in my experiences as

178

1  well as all the other automotive companies, it's the
2  same scenario. Many of the original team members from
3  the parent company come to train and to support the
4  plant startup and it didn't seem out of the ordinary
5  for me. As I said, we had over three hundred at
6  Toyota. And I know Mercedes, we benchmarked with
7  Mercedes and Honda, it's the same format and setup, so
8  I didn't see that that was out of the ordinary.
9  Q   (BY MR. KILBORN:) Do you remember my
10 question?
11 A   Yes, your question was why I didn't put
12 seventy-eight expats in here in the -- on the page.
13 Q   Here's my question --
14 A   Uh-huh.
15 Q   -- in filing a declaration with the federal
16 court under oath under penalty of perjury on the
17 subject of relationships with two corporations, don't
18 you think that it would be relevant to state that
19 you've got seventy-eight people that work for both
20 companies?
21    BY MR. SCOFIELD: Object to the form.
22    THE WITNESS: But they're only here on loan.
23 They're not working for both companies, they're just

179

1  here on loan.
2    BY MR. SCOFIELD: Object to the form.
3    To clarify, Ms. Warner, and correct me if I'm
4  wrong --
5    BY MR. KILBORN: I don't want you testifying.
6  If y'all want to go outside and discuss her testimony,
7  just ask me and I'll --
8    BY MR. SCOFIELD: Well, then, give me a
9  standing objection.
10 Q   (BY MR. KILBORN:) How many expats work at
11 HMA?
12 A   I don't know.
13 Q   Could be seventy-eight, couldn't it?
14    BY MR. SCOFIELD: Object to the form.
15    THE WITNESS: I'd be guessing.
16 Q   (BY MR. KILBORN:) Could be three hundred and
17 seventy-eight, couldn't it?
18    BY MR. SCOFIELD: Same objection.
19    THE WITNESS: Doubtful.
20 Q   (BY MR. KILBORN:) Could be none, couldn't
21 it?
22    BY MR. SCOFIELD: Object to the form.
23    THE WITNESS: I'd be speculating.

180

45 (Pages 177 to 180)

WENDY SUSAN WARNER

1     Q   (BY MR. KILBORN:) Have you ever created an
2  L.L.C. or a corporation?
3         BY MR. SCOFIELD: Object to the form.
4         THE WITNESS: No.
5     Q   (BY MR. KILBORN:) Have you ever created any
6  kind of legal entity?
7     A   No.
8     Q   When you say in your declaration, for
9  instance, in paragraphs seven and eight, it is my
10 understanding, what you're telling us is that this is
11 what somebody else has told you?
12        BY MR. SCOFIELD: Object to the form.
13        THE WITNESS: It's based on the observation
14 of that form as well as my own visit to Hyundai Motor
15 America and exchanging information and having knowledge
16 of what their key responsibilities are, yes.
17    Q   (BY MR. KILBORN:) Whose key
18 responsibilities?
19    A   HMA. As I told you, I visited HMA and I have
20 regular meetings with their human resources department,
21 so we certainly discuss what roles and responsibilities
22 each group has.
23    Q   And when you use the words in this deposition
181

1  means?
2         BY MR. SCOFIELD: Object to the form.
3         THE WITNESS: No.
4     Q   (BY MR. KILBORN:) With regard to the
5  manufacture of automobiles by HMMA, are those
6  automobiles sold to any other entity, other than
7  through the money gating operation that you described
8  where those cars are money gated to HMA?
9     A   Not to my knowledge, no.
10    Q   So is it correct that the sold buyer or
11 receiver of manufactured vehicles would be HMA?
12        BY MR. SCOFIELD: Object to the form.
13        THE WITNESS: Yes, sir.
14    Q   (BY MR. KILBORN:) And does HMA only buy
15 Hyundai vehicles from HMMA?
16        BY MR. SCOFIELD: Object to the form.
17        THE WITNESS: I don't know that.
18    Q   (BY MR. KILBORN:) Why wouldn't you know
19 that?
20    A   Because I don't work for HMA. I would assume
21 that they buy them from all the other manufacturing
22 plants throughout the world, but I don't know that for
23 a fact.
183

1  roles and responsibilities or similar type words,
2  you're limiting your answers to human resources --
3     A   Yes, that's right.
4     Q   -- because that's what you know about?
5         BY MR. SCOFIELD: Object to the form.
6     Q   (BY MR. KILBORN:) You are not speaking
7  outside of human resources, are you?
8     A   That would be correct, except my general
9  knowledge about Hyundai and having been with the
10 company for almost five years.
11    Q   Which you've told us about?
12    A   Yes, sir, uh-huh.
13    Q   Do you want to add any other experiences that
14 you want to base your personal knowledge on?
15        BY MR. SCOFIELD: Object to the form.
16        THE WITNESS: I think I've covered it.
17    Q   (BY MR. KILBORN:) Okay. Do you know what
18 the term subsidiary means?
19    A   Yeah, subsidiary is something that's
20 underneath a particular corporation. It's still a part
21 of the organization, but it's a subset of the original
22 company.
23    Q   Do you know what the term capitol stock
182

1     Q   You believe that HMA buys Hyundais from other
2  manufacturing plants throughout the world?
3     A   That are Hyundai built, yes.
4     Q   And what do you base that on?
5     A   That would be just my supposition. I don't
6  have actual knowledge of that, but that would be my
7  supposition. I do know for a fact that they do buy our
8  vehicles, our Sonatas and our Santa Fes.
9     Q   You're guessing at that, aren't you?
10        BY MR. SCOFIELD: Object to the form.
11        THE WITNESS: On the Santa Fes and Sonatas, I
12 wouldn't be guessing on that, no.
13    Q   (BY MR. KILBORN:) No, you're guessing on the
14 subject. Does HMA buy other Hyundai vehicles?
15    A   I don't know that for a fact.
16    Q   You're guessing?
17    A   That would be true.
18    Q   When you say supposition, you're guessing?
19    A   Yes.
20    Q   You don't know one way or the other?
21    A   Only my experience with Toyota, I would
22 assume that would be a normal structure, but I don't
23 have that guarantee that that's the way it's done at
184

46 (Pages 181 to 184)

**WENDY SUSAN WARNER**

1  Hyundai.
2     **Q**   **Assuming means you don't know?**
3     A   That would be correct.
4       BY MR. SCOFIELD: Object to the form.
5     **Q**   **(BY MR. KILBORN:) And we're not talking**
6  **about Toyota, are we?**
7     A   No, we're not.
8     **Q**   **Who does HMMA buy its parts from?**
9       BY MR. SCOFIELD: Object to the form.
10       THE WITNESS: I don't know, it's handled by
11  our purchasing department.
12     **Q**   **(BY MR. KILBORN:) Does HMA sell parts to**
13  **HMMA?**
14     A   I don't know.
15     **Q**   **Does HMC sell parts to HMA?**
16     A   I don't know.
17     **Q**   **Do HMC, HMA and HMMA buy and sell goods to**
18  **each other?**
19       BY MR. SCOFIELD: Object to the form.
20       THE WITNESS: I don't know.
21     **Q**   **(BY MR. KILBORN:) You do know that they loan**
22  **employees to each other?**
23       BY MR. SCOFIELD: Object to the form.

185

1       THE WITNESS: I know that Keith Duckworth was
2  on loan from HMA for two years and he left in August to
3  return to HMA.
4     **Q**   **(BY MR. KILBORN:) How many employees are on**
5  **loan from HMC to HMA?**
6       BY MR. SCOFIELD: Object to the form.
7       THE WITNESS: We don't have on loan, they're
8  expats. There's seventy-eight of them.
9     **Q**   **(BY MR. KILBORN:) I'm talking about HMMA.**
10  **How many employees are on loan from HMC in**
11  **Seoul to HMA?**
12     A   I don't work for HMA. I don't know.
13     **Q**   **Do you know whether or not there is any**
14  **properties like land or personal property —**
15     A   No, sir.
16       BY MR. SCOFIELD: Object to the form.
17       Let him finish his question.
18       THE WITNESS: Okay.
19     **Q**   **(BY MR. KILBORN:) Do you know if there's any**
20  **property, land or personal property, from computers to**
21  **paper clips to automobiles to whatever that is used by**
22  **in one way or another one of those three corporations?**
23  **In other words, is there any usage by HMC or HMA or**

186

1  **HMMA of property of any type that's owned by the other?**
2       BY MR. SCOFIELD: Object to the form.
3       THE WITNESS: I don't know.
4     **Q**   **(BY MR. KILBORN:) If, for instance,**
5  **automobiles are money gated to HMA in California — And**
6  **I notice that some of your — all of your team members**
7  **have the ability to lease a Hyundai, I suppose at a**
8  **better rate than some of us would —**
9     A   Uh-huh.
10     **Q**   **— how does that work?**
11       BY MR. SCOFIELD: Object to the form.
12       THE WITNESS: We have a vehicle services
13  group in our general affairs area and they will analyze
14  what the cost of the vehicle would be and they can
15  purchase it for the team member at a discounted rate,
16  but I don't know how the car is ordered and who pays
17  for that — the team member pays for it, but I do know
18  that we do offer that service to our team members.
19     **Q**   **(BY MR. KILBORN:) Well, if the vehicle is —**
20  **once the manufacture is completed or money gated to**
21  **HMA, does HMA then own them?**
22     A   Yeah. Yes.
23     **Q**   **And does HMA then lease them back to the HMMA**

187

1  employees?
2     A   That's right.
3     **Q**   **Okay. And you've seen the leases?**
4     A   My husband has a lease, yes, through HMA.
5     **Q**   **And his lease on his Hyundai is with HMA?**
6     A   Right.
7     **Q**   **Do you know if HMA paid any money for that**
8  **automobile?**
9       BY MR. SCOFIELD: Object to the form.
10       THE WITNESS: No.
11     **Q**   **(BY MR. KILBORN:) Since you don't know the**
12  **capitalization of HMA or HMMA, you don't know what —**
13  **the capitalization requirements of those two companies**
14  **are, do you?**
15       BY MR. SCOFIELD: Object to the form.
16       THE WITNESS: No, sir.
17       BY MR. SCOFIELD: Did this come from that
18  green folder?
19       BY MR. SPORT: Yes.
20       BY MR. KILBORN: It's 12:30, we definitely
21  are going to be here this afternoon. What's your
22  pleasure, you want to take a lunch break?
23       BY MR. SCOFIELD: It's up to Ms. Warner. We

188

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969**

## WENDY SUSAN WARNER

1  can go through or we can take a break.
2        THE WITNESS:  How much longer do you
3  anticipate?
4        BY MR. KILBORN:  Several hours I'd say.
5        THE WITNESS:  We probably need to break then.
6
7    (Whereupon, there was a recess held in the
8      deposition.)
9
10       BY MR. KILBORN:  Trent, I'm just going to
11  mark that Hyundai file that you gave me.  I think it's
12  1 through 93.
13       BY MR. SCOFIELD:  The one in connection with
14  our original document production?
15       BY MR. KILBORN:  This is just the format that
16  you gave it to me.
17       BY MR. SCOFIELD:  Okay.
18       BY MR. KILBORN:  I just thought it was easier
19  to just refer to Bates Number.
20       BY MR. SCOFIELD:  That's fine.
21       BY MR. KILBORN:  And once we copy the
22  personnel file, then I'll be able to identify what part
23  of this is personnel.  I think it's 1 through 75.

189

1  an individual that purposefully was sleeping on the
2  job, yes.
3        Q   (BY MR. KILBORN:)  And what is it about
4  sleeping on the job with Mr. Dees that lifted it to a
5  firing offense?
6        A   He was not in the location where he should
7  have been working.  He was sitting in a chair with two
8  of the doors opened to allow him privacy to sleep and
9  it was observed by a member of our management.
10       Q   So he was in the wrong location and what
11  else?
12       A   Sitting in a chair sleeping with a pillow and
13  two of the doors that were open to an area that is only
14  used very rarely.  He was on the third floor of the
15  building, not on the first floor where the stamping
16  presses are in the department where he works.
17       Q   And you said that he had pillows?
18       A   My understanding was that he did have a
19  pillow that was propped up.
20       Q   Like what kind of pillow?
21       A   Something to -- for his head.  I don't know
22  if it was pillow, but it was something propped up to
23  hold his head up to sleep.

191

1        BY MR. SCOFIELD:  Whatever works with you
2  guys.
3        BY MR. KILBORN:  I'm just trying to be
4  efficient.
5
6    (Whereupon, Plaintiff's Exhibit 9 was marked
7      for identification and copy of same is
8      attached hereto.)
9
10       Q   (BY MR. KILBORN:)  Ms. Warner, are you ready?
11       A   Yes, sir.
12       Q   Ms. Warner, I understand that Mr. Dees was
13  terminated because he slept on the job; is that
14  correct?
15       A   Yes, sir.
16       Q   Is sleeping on the job always a firing
17  offense at HMMA?
18       BY MR. SCOFIELD:  Object to the form.
19       You can answer.
20       THE WITNESS:  To the degree that he was found
21  sleeping on the job, yes.  We have had situations that
22  individuals had sleep apnea or they fell asleep, just
23  nodded off, that would not constitute termination, but

190

1        Q   So basically HMMA determined that you had a
2  deliberate, willful, egregious sleeping on the job?
3        BY MR. SCOFIELD:  Object to the form.
4        THE WITNESS:  Yes, sir.
5        Q   (BY MR. KILBORN:)  Okay.  Why is it that
6  that's the standard and Mr. Chung -- Chairman Chung
7  gets convicted of wrongfully diverting money from
8  financially healthy members of Hyundai Motor Group,
9  he's sentenced to, I think, six years in prison and
10  he's welcomed back with open arms in the company and
11  yet here you've got a war hero named Leon Dees who
12  sleeps on the job and he's terminated?  How do those
13  two standards fit?
14       BY MR. SCOFIELD:  Object to the form.
15       THE WITNESS:  Again, there's no correlation
16  because Mr. Chung doesn't work for HMMA.  Leon Dees
17  does work for HMMA and we have policies and procedures
18  pertaining to this particular plant that he did not
19  follow.
20       Q   (BY MR. KILBORN:)  But Mr. Chung basically
21  started the company, started the plant, started HMMA
22  and controls it, doesn't it?
23       BY MR. SCOFIELD:  Object to the form.

192

48  (Pages 189 to 192)

WENDY SUSAN WARNER

1    THE WITNESS: He doesn't fall under the
2  jurisdiction of our policies and procedure, Leon Dees
3  does.
4    Q  (BY MR. KILBORN:) Why doesn't he?
5    BY MR. SCOFIELD: Object to the form.
6    THE WITNESS: Because Mr. Chung doesn't work
7  for HMMA.
8    Q  (BY MR. KILBORN:) So Mr. Chung has a
9  different standard?
10    BY MR. SCOFIELD: Object to the form.
11    THE WITNESS: I would assume so. Again, he
12  is not one of my employees, Mr. Dees is.
13    Q  (BY MR. KILBORN:) You think Mr. Chung if
14  called to testify in this case would say I sure do
15  think he should have been fired?
16    BY MR. SCOFIELD: Object to the form.
17    THE WITNESS: It would be speculation on my
18  part. I don't know what he would say.
19    Q  (BY MR. KILBORN:) Well, he'd probably be
20  outraged that Mr. Dees got fired, wouldn't he?
21    BY MR. SCOFIELD: Object to the form.
22    THE WITNESS: I wouldn't know. I'd be
23  speculating on what someone would think or feel or say.

193

1  reality.
2    Q  (BY MR. KILBORN:) Or just assume that he
3  did, would that be a firing offense?
4    A  Of course.
5    BY MR. SCOFIELD: Same objection.
6    Q  (BY MR. KILBORN:) To your knowledge, have
7  any expats been terminated for sleeping on the job?
8    A  Not that I'm aware of, no. And, again, that
9  would have been under the HR coordinator's rule of
10  engagement.
11    Q  Have any of the expats been terminated,
12  period, to your knowledge?
13    A  Not that I'm aware of, no.
14    Q  And you've been there, what, a little over
15  four years?
16    A  Uh-huh.
17    Q  Have you ever seen any of them sleeping on
18  the job?
19    A  No, sir.
20    Q  Take a look at Exhibit 9. This is a
21  collection of documents produced by Hyundai, Bates
22  Numbered 1 through 93. I'll just refer to them by
23  Bates Number.

195

1    Q  (BY MR. KILBORN:) But you did meet him,
2  right?
3    A  Mr. Chung?
4    Q  Right.
5    A  Yes, at a dinner.
6    Q  And you did speak to him?
7    A  He thanked me for my service and I thanked
8  him as well.
9    Q  Well, let's just assume that Mr. Chung did
10  work at HMMA and, say, embezzled a hundred million
11  dollars, what would you do to him as an HMMA HR person?
12    A  I would have to --
13    BY MR. SCOFIELD: Object to the form.
14    THE WITNESS: -- investigate it before I
15  would make any kind of conclusion or supposition about
16  it.
17    Q  (BY MR. KILBORN:) Well, let's say you
18  investigate it and you found that he diverted -- you
19  know, he criminally diverted over a hundred million
20  dollars?
21    A  Supposition on my part again.
22    BY MR. SCOFIELD: Object to the form.
23    THE WITNESS: It's not something that's

194

1    A  Okay.
2    Q  The first document, document number 1, is a
3  letter that you wrote to Mr. Dees dated March 7, 2007.
4  Did you write that letter yourself?
5    A  It's a standard letter that's drafted by our
6  team relations group, but I did review it and did know
7  that it was being sent out.
8    Q  But my question is: Did you draft it?
9    A  No.
10    Q  Do you have personal knowledge of the
11  information in there?
12    A  Yes.
13    Q  And how do you know that he was, quote, left
14  a phone message on March 2nd, 2007?
15    A  My assistant manager in team relations,
16  Rob Clevenger, informed me of that.
17    Q  So it's what somebody told you?
18    A  That's correct.
19    Q  Well, is there anything in there that you
20  know of of your own personal knowledge as opposed to
21  hearsay?
22    BY MR. SCOFIELD: Object to the form.
23    THE WITNESS: This information was given to

196

49 (Pages 193 to 196)

## WENDY SUSAN WARNER

1  me by an assistant manager in team relations. I the
2  letter and agreed that it needed to be sent out.
3      Q   (BY MR. KILBORN:) My question was: Is there
4  information in here other than hearsay?
5          BY MR. SCOFIELD: Object to the form.
6          THE WITNESS: I don't believe it was hearsay.
7  I object to the statement that it was hearsay.
8      Q   (BY MR. KILBORN:) You object to that, okay.
9      Do you know what hearsay is?
10     A   I do.
11     Q   Hearsay is what somebody else told you.
12         Is there anything in here other than what
13 somebody told you?
14     A   Hearsay in my opinion sounds more of the
15 comment that it's not accurate.
16     Q   And who told you that?
17     A   It's my own belief of what hearsay means.
18     Q   Well, let's change the term. Let's just say
19 what somebody else told you.
20     A   That would be correct.
21     Q   Is there anything in here that you know
22 personally yourself other than what somebody else told
23 you?
                                                197

1  head of department, Mr. Applegate, and a team relations
2  representative was there. And he was escorted over
3  when he arrived at work with his supervisor,
4  Mr. Applegate. And then I let Mr. Dees know what the
5  situation was. We collected his personal property and
6  he was escorted out by security.
7      Q   Did he know when he got to work that he was
8  going to be escorted over to security?
9          BY MR. SCOFIELD: Object to the form.
10         THE WITNESS: He would not have known that,
11 no.
12     Q   (BY MR. KILBORN:) Why wasn't he given
13 advance notice?
14     A   When he arrived, he was given that notice.
15     Q   By who?
16     A   At the turnstiles, security would have
17 escorted him to a vehicle and the department head
18 would have escorted him back over to the security
19 building.
20     Q   These security, are these Hyundai employees?
21     A   They're not.
22     Q   Who are they?
23     A   They're a contracted group, outsourced, to
                                                199

1      A   No.
2      Q   Was the meeting with the termination
3  committee that you told me about already held when this
4  letter was written?
5      A   Yes.
6      Q   Now, Mr. Dees had already been fired at this
7  time, hadn't he?
8      A   Yes.
9      Q   And are you aware of the circumstances of his
10 firing --
11     A   Yes.
12     Q   -- how he was fired?
13         Tell me how he was fired.
14         BY MR. SCOFIELD: Object to the form.
15         THE WITNESS: I need more information. Are
16 you speaking directly of the meeting that we had with
17 him or are you speaking directly to the -- how the
18 decision was made?
19     Q   (BY MR. KILBORN:) Well, tell me about the
20 meeting that you had with Mr. Dees.
21     A   The meeting was held with Mr. Dees after the
22 termination committee met. It was held over in the
23 security building. Myself, my assistant manager, the
                                                198

1  provide security.
2      Q   Are they in uniform?
3      A   Yes.
4      Q   What types of things do they carry, badges or
5  anything like that?
6          BY MR. SCOFIELD: Object to the form.
7          THE WITNESS: They do have a badge, yes.
8  They drive a Hyundai vehicle that says security on it.
9      Q   (BY MR. KILBORN:) Do they have any weapons?
10     A   No.
11     Q   Was that standard company policy as to how to
12 inform somebody?
13     A   Yes, sir.
14         BY MR. SCOFIELD: Let him finish his
15 question.
16     Q   (BY MR. KILBORN:) It was a surprise?
17         BY MR. SCOFIELD: Object to the form.
18         THE WITNESS: They are aware of the fact that
19 it's under investigation, but it could have been a
20 surprise that it was that particular day that the
21 decision was made and they're escorted over, yes.
22     Q   (BY MR. KILBORN:) So Mr. Dees arrived
23 thinking he was going to go to work and Hyundai
                                                200

                                    50 (Pages 197 to 200)

## WENDY SUSAN WARNER

1  surprised him by saying you're not going to work,
2  you're going to go with these security guards over to
3  the security building?
4      BY MR. SCOFIELD:  Object to the form.
5      THE WITNESS:  Yes.
6      Q   (BY MR. KILBORN:)  What's the purpose of
7  that?
8      A   In an effort to ensure the safety and
9  security of the rest of our employees, once someone is
10  terminated, we don't want them back on-site.
11      Q   So when you say escorted, in other words,
12  Mr. Dees was in the custody of security because you
13  didn't want him to be a danger to other employees?
14      BY MR. SCOFIELD:  Object to the form.
15      THE WITNESS:  It's not the best procedure to
16  have someone who's already left the company to be in
17  the building with other team members and other
18  employees.  We feel this is the safest way, yes.
19      Q   (BY MR. KILBORN:)  But that's why it's done?
20      A   Yes.
21      Q   So he's not free to go, he's in the custody
22  of security?
23      BY MR. SCOFIELD:  Object to the form.
                                                    201

1      THE WITNESS:  He's free to leave, he just is
2  not able to come into the building.  If he chose to
3  leave, he could have left, but he was asked to come
4  over to security to speak to me so that he would have a
5  better understanding of the situation, as well as
6  collect company property.
7      Q   (BY MR. KILBORN:)  So the security guards are
8  instructed what to tell him?
9      A   Yes.
10      Q   Did you instruct them?
11      A   My assistant manager for employment did, yes,
12  spoke with the security manager.
13      Q   What would her name be?
14      A   Scott Corriday.
15      Q   Scott's a man?
16      A   Yes.  And he would have spoken to Larry Pugh
17  who is the security manager who he in turn would have
18  discussed it with the guards what the situation was,
19  where to pick the person up and what time that I would
20  be meeting with them.
21      Q   You had his telephone number at home, didn't
22  you?
23      A   Yes.
                                                    202

1      Q   Why not call him and just tell him not to
2  come in?
3      A   That's not our procedure.
4      Q   I know that.  Well, why not?
5      A   We feel that we do want to talk with the
6  person.  We don't feel that it's appropriate for him
7  not to understand the situation, as well as if he had
8  other property that we needed to understand what was
9  personal property, give him information about COBRA,
10  give him information about his last paycheck.
11      Q   Well, you could have done that on the phone,
12  couldn't you?
13      A   We feel that's fairly impersonal to do that.
14      Q   Impersonal?
15      A   Yes, sir.
16      Q   So you did it in what you think was personal?
17      A   That's right.  Certainly if he had questions
18  that he needed more information about his benefits or
19  about his pay, we want to be able to speak to him
20  face-to-face about that.
21      Q   So this was the gentlemanly way to do it?
22      BY MR. SCOFIELD:  Object to the form.
23      THE WITNESS:  It's our procedure.
                                                    203

1      Q   (BY MR. KILBORN:)  But it's the gentlemanly
2  way to do it?
3      BY MR. SCOFIELD:  Object to the form.
4      THE WITNESS:  Yes.
5      Q   (BY MR. KILBORN:)  It's the way that you
6  would like to be treated if you were being terminated?
7      A   That's exactly right.
8      Q   It's the way that Mr. Chung would like to be
9  treated if he was being terminated?
10      BY MR. SCOFIELD:  Object to the form?
11      THE WITNESS:  I wouldn't be able to answer
12  that for you.
13      Q   (BY MR. KILBORN:)  So then you did not have
14  him escorted to your office to tell him all of this?
15      A   I don't have an office.
16      Q   You don't?
17      A   No, sir.
18      Q   Well, tell me where -- Do you have a desk?
19      A   We do.  We all work in an open environment.
20      Q   Okay.  And you have these confidential rooms
21  that you told me about?
22      A   We have conference rooms.
23      Q   Why wasn't it done there?
                                                    204

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## WENDY SUSAN WARNER

1  A  We don't feel that it's appropriate to bring
2  a person all the way through the building up the stairs
3  for all the other team members to see the situation, we
4  feel it's more appropriate and more -- the ability to
5  have a conversation with him without having all the
6  other team members involved and observing that
7  situation. As I said, we're a totally open office
8  environment, so it's very uncomfortable for that person
9  to have to walk through probably sixty cubes to get to
10  me.
11  Q  How is being escorted by security into the
12  security building any better than being escorted by
13  security into a -- say, a conference room?
14  BY MR. SCOFIELD: Object to the form.
15  THE WITNESS: It's our opinion, again, from a
16  safety and security situation for our team members, for
17  him and it is more discreet and confidential to be able
18  to do that.
19  Q  (BY MR. KILBORN:) How many security guards
20  did you assign?
21  A  Two.
22  Q  Why two?
23  A  One drives and one waits for the other person

205

1  at the turnstile.
2  Q  And an employee like Mr. Dees sits in the
3  back seat?
4  A  Yes, with his manager.
5  Q  With his manager?
6  A  Yeah, Mr. Applegate.
7  Q  So Mr. Applegate was there with the two
8  security guards?
9  A  That's right.
10  Q  Sort of a good morning type of an
11  arrangement?
12  BY MR. SCOFIELD: Object to the form.
13  THE WITNESS: As I said, we take our
14  terminations very seriously, but we certainly want to
15  treat that person with respect and dignity. It's much
16  easier to call the person or to send a letter, but we
17  don't feel that's the right thing to do.
18  Q  (BY MR. KILBORN:) When you say we, who do
19  you mean?
20  A  I use we collectively, we as HMMA, our
21  values, our policies and procedures.
22  Q  You said values?
23  A  Yeah.

206

1  Q  So where are these values written down?
2  A  Handbook.
3  Q  In a handbook?
4  A  Yes, sir.
5  Q  All right. So basically when he was escorted
6  into the security building, you were conducting this
7  thing in accordance with HMMA's values?
8  A  With our policy on how to terminate people,
9  yes.
10  Q  But you said values.
11  A  Respect and dignity.
12  Q  They are the values though, right?
13  A  How we treat our team members, yes.
14  Q  Okay. So what we've got going on in the
15  security building is respect and dignity --
16  BY MR. SCOFIELD: Object to the form.
17  Q  (BY MR. KILBORN:) -- is that right?
18  A  How we handle our terminations and how we
19  handle our team members from when they enter HMMA as
20  when they leave HMMA.
21  Q  And so you are sitting in the security
22  building?
23  A  Yes.

207

1  Q  And it's a special room there for purposes of
2  having a termination?
3  A  It's a conference room.
4  Q  That's where it all happens?
5  A  Uh-huh.
6  Q  Does it have windows?
7  A  No.
8  Q  Why not?
9  BY MR. SCOFIELD: Object to the form.
10  THE WITNESS: The building is just built that
11  way. They have another room next to it that has all of
12  the security systems and electronics, so that may be
13  the reason, but that's just the way it was built. Now,
14  right outside the door there's windows, but not in that
15  conference room.
16  Q  (BY MR. KILBORN:) Does it have a door?
17  A  Yeah.
18  Q  Is the door shut?
19  A  The door is open when he comes in and the
20  door is shut when he arrives in there, again, because
21  there's desks right outside the area that we want to
22  have a confidential conversation with him, yes.
23  Q  The security people?

208

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## WENDY SUSAN WARNER

1    A    Yeah, uh-huh.
2    Q    Are the security people inside the room?
3    A    No.
4    Q    They stand outside the room?
5    A    Yes.
6    Q    So they're guarding the door?
7        BY MR. SCOFIELD: Object to the form.
8        THE WITNESS: They're in another room where
9    they have roll call and things along those lines.
10    Q    (BY MR. KILBORN:) But they're watching the
11    door?
12    A    Uh-huh, sure.
13    Q    They're watching Dees?
14        BY MR. SCOFIELD: Object to the form.
15        THE WITNESS: They're ensuring that that
16    person is going to follow our procedure. And if he
17    does leave the area, they're going to escort him and
18    take him to his vehicle.
19    Q    (BY MR. KILBORN:) So you don't want him
20    making a get away? In other words, if he's going to
21    leave that room, they're going to be on him?
22    A    That or if they hear me scream.
23    Q    If they hear you scream?

                                            209

1    A    Yes.
2    Q    Now, you knew that you were talking with a
3    gentleman who was a member of the United States Armed
4    Forces, right?
5    A    I did not.
6    Q    Did not know that?
7    A    Huh-uh.
8    Q    Okay. You did not know that he was -- he had
9    served tours in both Iraq wars, did you?
10    A    No, sir.
11    Q    You didn't know that he was a member of
12    the -- his combat commander's personal body guard, did
13    you?
14    A    No, sir.
15    Q    You did not know that he had been recommended
16    for the Bronze Star for bravery in combat, did you?
17    A    No, sir.
18    Q    You did not know that his job as combat MP
19    was to basically provide security to the Armed Forces,
20    did you?
21    A    No, sir, I did not.
22    Q    Well, why didn't you bother to find out who
23    you were talking to?

                                            210

1        BY MR. SCOFIELD: Object to the form. It's
2    argumentative.
3        And, Vince, just for the record, I'd ask that
4    you lower your voice to the witness.
5        THE WITNESS: I would have evaluated him as a
6    maintenance team member. I would have evaluated him
7    for hire based on his skills as a maintenance team
8    member.
9    Q    (BY MR. KILBORN:) But you found a
10    credibility issue because you didn't believe him and
11    you did believe the team members; isn't that true?
12        BY MR. SCOFIELD: Object to the form.
13        THE WITNESS: I believe the member of
14    management that observed him sleeping, yes.
15    Q    (BY MR. KILBORN:) Applegate?
16    A    No.
17    Q    Who?
18    A    Jim Brookshire.
19    Q    Brookshire?
20    A    Yes.
21    Q    You found Brookshire more credible than Dees?
22    A    Based on the information that was shared with
23    me, based on the time period, based on what his duties

                                            211

1    were, yes.
2    Q    And how much time had Brookshire served in
3    the military?
4        BY MR. SCOFIELD: Object to the form.
5        THE WITNESS: Again, that would not have been
6    in my realm. I would have based his hiring again on
7    his qualifications to be a manager for stamping.
8    Q    (BY MR. KILBORN:) Well, how many clusters
9    for valor did Brookshire get?
10        BY MR. SCOFIELD: Object to the form.
11        THE WITNESS: I don't know, sir. Again, that
12    would not have been in my decision making to hire
13    Mr. Brookshire as a manager to have known that.
14    Q    (BY MR. KILBORN:) So you didn't think that
15    it was important in deciding a credibility issue to
16    find out who the person really was that you were
17    talking to, did you?
18        BY MR. SCOFIELD: Object to the form.
19        THE WITNESS: Based on the information, he
20    did not follow a very important policy and, therefore,
21    based on the evidence that was given to me, the
22    decision was made to terminate him for sleeping on the
23    job.

                                            212

53 (Pages 209 to 212)

## WENDY SUSAN WARNER

1    Q   (BY MR. KILBORN:) You didn't believe him,
2    did you?
3        BY MR. SCOFIELD: Object to the form.
4        THE WITNESS: I don't ever have -- I
5    didn't -- I don't understand the question from the
6    belief part frankly.
7    Q   (BY MR. KILBORN:) You had made the decision
8    to terminate him before he ever got in that room,
9    didn't you?
10       BY MR. SCOFIELD: Object to the form.
11       THE WITNESS: The decision was already made,
12   that's correct.
13   Q   (BY MR. KILBORN:) But you hadn't interviewed
14   him, had you?
15   A   Team relations already did.
16   Q   But you had not?
17   A   I'm part of the termination committee.
18   That's not my role.
19       BY MR. SCOFIELD: Just answer his question.
20   Q   (BY MR. KILBORN:) You had not interviewed
21   Mr. Dees, had you?
22   A   No.
23   Q   So that was the first time that you had ever

213

1    talked to him?
2        BY MR. SCOFIELD: Object to the form.
3        THE WITNESS: Yes.
4    Q   (BY MR. KILBORN:) And you were the human
5    relations manager, weren't you?
6        BY MR. SCOFIELD: Object to the form.
7        THE WITNESS: I'm the human resource manager
8    for employment.
9    Q   (BY MR. KILBORN:) Right. And you were the
10   person in charge of this meeting in this room, weren't
11   you?
12   A   For the termination meeting, yes.
13   Q   So you sit at the head of the table?
14   A   Yes.
15   Q   All right. You had never met or talked to
16   Dees in your life?
17   A   Probably not, no.
18   Q   Okay. But you had already made a decision to
19   fire him taking the word of Brookshire over Dees,
20   hadn't you?
21       BY MR. SCOFIELD: Object to the form.
22       THE WITNESS: As well as the team relations
23   investigation, as well as the termination committee

214

1    compromised of several individuals, as well as the head
2    of the department and the vice president for
3    production, yes.
4    Q   (BY MR. KILBORN:) Well, don't you think
5    following this Hyundai values for respect and dignity
6    that he deserved at least five minutes of your valuable
7    time, number one, to see if he was a credible person?
8        BY MR. SCOFIELD: Object to the form.
9        THE WITNESS: The investigation was already
10   completed. That's not my role.
11   Q   (BY MR. KILBORN:) That's not my question.
12   Don't you think that he deserved five minutes of your
13   valuable time for a one-on-one conversation before you
14   agreed with the decision of terminating?
15       BY MR. SCOFIELD: Object to the form.
16       THE WITNESS: That's not our procedure.
17   Q   (BY MR. KILBORN:) Not your procedure?
18   A   No, sir.
19   Q   So you were not there to evaluate his
20   position, you were just there to fire him and get him
21   off the property as fast as possible?
22       BY MR. SCOFIELD: Object to the form.
23       THE WITNESS: My responsibility is to

215

1    communicate the decision, share with the team member
2    his rights, his benefits, when he's going to be
3    receiving his pay, make sure that we have all the
4    correct information for his W2 and collect company
5    property.
6    Q   (BY MR. KILBORN:) So how did you open the
7    conversation?
8        BY MR. SCOFIELD: Object to the form.
9        THE WITNESS: How did I overcome the
10   conversation?
11   Q   (BY MR. KILBORN:) Did you say Mr. Dees, have
12   a seat or what?
13   A   I'm sorry, I don't understand.
14       BY MR. SCOFIELD: I don't think she
15   understood your question.
16       THE WITNESS: I'm sorry, I didn't understand
17   your question.
18   Q   (BY MR. KILBORN:) You're in the termination
19   room in the security building, you've got two security
20   guards outside the door, right?
21   A   Just one.
22   Q   You've got one outside the door?
23   A   Uh-huh.

216

54   (Pages 213 to 216)

### WENDY SUSAN WARNER

| | |
|---|---|
| 1    Q   They also make sure Dees wouldn't make a | 1    Q   So what, four? |
| 2   getaway? | 2    A   Uh-huh. |
| 3        BY MR. SCOFIELD: Object to the form. | 3    Q   And the door was shut? |

1    Q   They also make sure Dees wouldn't make a
2   getaway?
3        BY MR. SCOFIELD:  Object to the form.
4        THE WITNESS:  Again, for our procedures, to
5   make sure that everything is followed, as well as that
6   he would be escorted off the property, but he could
7   have left any time he wanted to and he did.
8        Q   (BY MR. KILBORN:)  So who started -- Did you
9   ask him to sit down?
10       A   I certainly did.
11       Q   Did he sit down?
12       A   He did.
13       Q   And you sat down?
14       A   Yes.
15       Q   You certainly introduced yourself first?
16       A   I did.  I introduced everyone there.  I made
17  sure that he knew who everyone was and I told him why
18  he was there.
19       Q   And they were all seated?
20       A   They all stood up and shook his hand, yes.
21       Q   And when they were shaking his hand, he
22  didn't know yet why he was there?
23       BY MR. SCOFIELD:  Object to the form.

      217

1        So what, four?
2        A   Uh-huh.
3        Q   And the door was shut?
4        A   It was open when he came in and then I shut
5   it when I introduced myself and told him why he was
6   here.
7        Q   Okay.  And did anybody do the talking besides
8   you?
9        A   No.
10       Q   What time of day or night was it?
11       A   It was in the evening.  I do know that it was
12  late.  It was beginning of second shift, so probably
13  quarter to six, 6:00.
14       Q   Do you have standard hours yourself?
15       A   I work first shift, but I normally work 7:00
16  to 7:00.
17       Q   And this was -- How many terminations had you
18  done like this before?
19       A   At HMMA?
20       Q   Sure.
21       A   Let's see, probably forty.
22       Q   And before that?
23       A   Hundreds.

      219

1        THE WITNESS:  I told him as he entered the
2   room that he was here -- that we needed to discuss his
3   employment and that as he knows, an investigation was
4   done in regards to the complaint that he had been
5   sleeping on the job and I was here to share with him
6   the decision of that, as well as discuss his
7   employment.
8        Q   (BY MR. KILBORN:)  You said all of that
9   before you introduced him?
10       BY MR. SCOFIELD:  Object to the form.
11       THE WITNESS:  I introduced him to everyone
12  first.  I told him we were here to discuss the decision
13  of him sleeping on the job.  And then he was
14  introduced.  He said he knew everyone except myself and
15  Scott.
16       Q   (BY MR. KILBORN:)  I'm a little confused.
17  Did you introduce yourself and the other team members
18  who were there before you told him what was going to
19  happen?
20       A   Yes, I did.
21       Q   How many team members were there besides you?
22       A   The team rep, myself and Scott Gordy, the AM,
23  and Mr. Applegate.

      218

1        Q   Hundreds.
2            Five hundred?
3        A   Two hundred.
4        Q   Two hundred.
5            So you were the expert on handling
6   terminations?
7        BY MR. SCOFIELD:  Object to the form.
8        THE WITNESS:  I've had a lot of experience
9   handling terminations and exit interviews, yes.
10       Q   (BY MR. KILBORN:)  And you told Mr. Dees what
11  you just told me?
12       A   Yes, sir.
13       Q   Mr. Dees, you've been under investigation for
14  sleeping on the job; is that right?
15       A   Yes, sir.
16       Q   And, Mr. Dees, the termination committee has
17  met, right?
18       A   Yes, sir.
19       Q   And they decided to terminate you?
20       A   Yes.
21       Q   And it's my job to carry it out?
22       A   That's correct.
23       Q   And then what did you tell him, give me all

      220

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

the company property?
A   We have a list that we go over.  His badge,
he had his lockout/tagout.  We go over a list of
anything else that he might have.  We also asked him if
he had any personal property that we needed to collect
for him.  And then we discussed his -- if he had 401K.
We discussed that COBRA coverage would be mailed to
him.  We wanted to confirm his address.  We also talked
about his health insurance, that it was good until the
end of the month, that he could continue to use it.
And then we asked him about his parking pass, if he had
that in his vehicle, and that security would escort him
out.
Q   **When you talked about his personal property,**
**did he say that he had some personal property that he**
**needed to get?**
A   I don't recall.  I do know that, you know, in
our conversation we always ask the team member is there
anything -- since he hadn't gotten into work yet, he
had his keys and his lunch and things along those
lines, but if he had any other personal property, to,
please, let us know and we gave him the number to
contact the team rep.  And then typically the team
221

relations rep will clean out the locker or the desk and
anything that's personal would be packed up and mailed
to the person, anything that's company property would
be retained.
Q   **So he told you that he had some property in**
**his locker, didn't he?**
BY MR. SCOFIELD:  Object to the form.
THE WITNESS:  I don't recall, I'm sorry.  I
don't recall that he had told me that.
Q   **(BY MR. KILBORN:)  Did he have a locker?**
A   He should have had a locker, yes.
Q   **Does the locker have a lock on it?**
A   Yeah.
Q   **Does Hyundai have a key?**
A   I would assume they do, yeah.
Q   **Okay.  Did HMMA go in his locker?**
BY MR. SCOFIELD:  Object to the form.
THE WITNESS:  I don't know.  I don't know if
they did or not, but that's the normal practice, that
they are supposed to go in and clean out the locker and
then box up anything that's the individual's personal
property, mail it to them and then retain anything
that's the company's.
222

Q   **(BY MR. KILBORN:)  So the employee who is**
**getting fired or getting told that he's fired was not**
**permitted to go to the locker and get his personal**
**property?**
A   That's right.  Again, for security purposes.
But anything that he would have asked us to retain or
send to him, we would have done.
Q   **If you did all of the talking and you had the**
**experience of, say, several hundred firings, why was it**
**necessary to have three other Hyundai executives in the**
**room?**
BY MR. SCOFIELD:  Object to the form.
THE WITNESS:  They're not executives, but it
was our policy.  The assistant manager is with me to go
over that information, the team rep is there for the
team member and then the member of management is there
because they want to reinforce the fact that they took
part in helping, unfortunately, having to make that
decision, that it wasn't just an arbitrary decision
made by human resources.  Again, it's our practice.
Q   **(BY MR. KILBORN:)  Did you tell him that you**
**had taken the word of Brookshire over his word?**
BY MR. SCOFIELD:  Object to the form.
223

THE WITNESS:  He didn't ask.
Q   **(BY MR. KILBORN:)  Did you tell him?**
A   Of course not, no.
Q   **Did you say I'd like to personally hear your**
**side of the story?**
A   At that point in time, again, that is not the
role -- that is not the purpose of that meeting, the
decision has already been made.
Q   **So there's nothing that can be done to**
**reverse that at that time?**
BY MR. SCOFIELD:  Object to the form.
THE WITNESS:  That's right.  He can ask for a
peer review and he did, but there's nothing from my
perspective that I'm able -- certainly I'll listen, but
the decision can't be changed at that point.
Q   **(BY MR. KILBORN:)  And you say there was a**
**team rep there?**
A   Yes, a team relations rep.
Q   **And who was that?**
A   I believe it was Lucas Coomer, but they have
first shift and second shift reps there and they're
always there to be with the team member as their
advocate.
224

## WENDY SUSAN WARNER

**Page 225**

1  Q  Advocate?
2  A  Yes, sir.
3  Q  What does advocate mean?
4  A  Advocate means that they are there if the
5  team member has any further questions or needs any
6  guidance, but as the manager of human resources, I am
7  conducting the termination meeting. The team rep is
8  there for really comfort for the individual.
9  Q  Comfort?
10  A  Uh-huh.
11  Q  Why would comfort be necessary?
12  BY MR. SCOFIELD: Object to the form.
13  THE WITNESS: I think in any emotional
14  situation like that, termination, that's severe for the
15  person's psyche. It's important to have someone there
16  that they know and that they feel that they can have
17  someone there that will sit with them and talk with
18  them about any issues or concern that they have.
19  Q  (BY MR. KILBORN:) So that's recognition as
20  an extremely distressful and emotional, traumatic
21  situation?
22  BY MR. SCOFIELD: Object to the form.
23  THE WITNESS: For all terminations, yes.

**Page 226**

1  Q  (BY MR. KILBORN:) And particularly in this
2  case for Mr. Dees?
3  BY MR. SCOFIELD: Object to the form.
4  THE WITNESS: I think any. It's always a
5  very stressful situation for the person that's having
6  to deliver it as well as for the person being
7  terminated.
8  Q  (BY MR. KILBORN:) Well, let's just talk
9  about Mr. Dees. It was particularly stressful for
10  Mr. Dees, wasn't it?
11  BY MR. SCOFIELD: Object to the form.
12  THE WITNESS: He was distressed. He was very
13  professional, but he was noticeably upset and surprised
14  and was concerned and asked again what he could do to
15  change or alter that decision, but, yes, he was visibly
16  upset.
17  Q  (BY MR. KILBORN:) And how did you know that
18  he was visibly upset?
19  A  His face became red, he tensed up, just his
20  body language.
21  Q  And so the team rep was there to, as you
22  phrased it, comfort him?
23  BY MR. SCOFIELD: Object to the form.

**Page 227**

1  THE WITNESS: Advocate for the team member.
2  We do it in all of them.
3  Q  (BY MR. KILBORN:) If the decision was -- had
4  been made and there's nothing that could be said or
5  done, what's the good of having an advocate there?
6  A  I think -- As I said, it's our policy, it's
7  our practice, it's our procedure. That's the role of
8  our team relations group, to be an advocate for the
9  team.
10  Q  I know, but if the decision has already been
11  made and it's irrevocable at that time, why is the
12  advocate there to advocate his position?
13  BY MR. SCOFIELD: Object to the form.
14  THE WITNESS: Not to advocate the position,
15  but to be there for the individual. That's our
16  process.
17  Q  (BY MR. KILBORN:) Sort of a company
18  psychologist, counselor?
19  BY MR. SCOFIELD: Object to the form.
20  THE WITNESS: As I said, the team rep is in
21  the role of the advocate of the team member and they
22  work out on the floor with them. Even though they're
23  human resources, they're with the individuals

**Page 228**

1  day-to-day, so they have a much closer working
2  relationship than other members of HR.
3  Q  (BY MR. KILBORN:) So HR leads the person to
4  be fired to believe that this is an advocate, but
5  that's a fraud, isn't it, because nothing can be done
6  and there's no advocacy that will be heard; isn't that
7  true?
8  BY MR. SCOFIELD: Object to the form.
9  You can answer if you know.
10  THE WITNESS: Maybe it's not clear what the
11  advocate means, but the person that is the team
12  relations rep works on the floor, knows the team
13  members, works with them on a daily basis. We are more
14  removed with three thousand people to not know them as
15  intimately as the team rep would.
16  Q  (BY MR. KILBORN:) But advocate means
17  somebody to basically advocate the position of the
18  person that is being terminated if he thinks that he's
19  being wrongfully terminated, isn't it?
20  BY MR. SCOFIELD: Object to the form.
21  THE WITNESS: That may be how you define it,
22  but in our realm, that's the role of our team relations
23  person.

57 (Pages 225 to 228)

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## WENDY SUSAN WARNER

1    Q   (BY MR. KILBORN:)  So are they called
2  advocates?
3    A   They're called a team relations
4  representative.
5    Q   Well, where did you get this term advocate?
6    A   That's my term of how, you know, the person's
7  role is.
8    Q   And this was a clear surprise to Mr. Dees?
9        BY MR. SCOFIELD:  Object to the form.
10       THE WITNESS:  He said he knew about the
11  investigation, but he did not know that this was the
12  day that the decision was made, yes.
13   Q   (BY MR. KILBORN:)  And he said, I think you
14  said, what can I do?
15   A   Uh-huh.
16   Q   All right.  And you said nothing?
17   A   I said that the decision was made but that he
18  could contact team relations for a peer review and the
19  team relations rep would give him the information as to
20  who to contact for that.
21   Q   Well, did he attempt to find out why the
22  decision had been made?
23       BY MR. SCOFIELD:  Object to the form.
                                                     229

1        THE WITNESS:  No, he did not.  He seemed that
2  he was finished with the conversation.  He got up and
3  walked out.
4    Q   (BY MR. KILBORN:)  So based on all of your
5  information, you did not know that Mr. Dees had any
6  military obligation whatsoever?
7    A   No, sir.
8    Q   All right.  And all of the information that
9  you got, including what was discussed at this
10  termination committee meeting, the subject of Mr. Dees'
11  National Guard obligation was never discussed?
12       BY MR. SCOFIELD:  Object to the form.
13       THE WITNESS:  Not with me, no.
14   Q   (BY MR. KILBORN:)  There are references in
15  the file to Mr. Dees' National Guard duty and I'm
16  wondering why that wasn't discussed?
17       BY MR. SCOFIELD:  Object to the form.
18       THE WITNESS:  As I said, the team relations
19  would have done the investigation.  And that's what we
20  would have discussed, was the serious misconduct in
21  that particular meeting.
22   Q   (BY MR. KILBORN:)  What was HMMA's policy
23  regarding what type of documentation a National Guard
                                                     230

1  Reservist had to present to HMMA to go to monthly
2  drill?
3        BY MR. SCOFIELD:  Object to the form.
4        THE WITNESS:  I do know we have a policy
5  pertaining to that and I do know that there's a form
6  that the person has to fill out for it to be entered
7  into payroll because we do pay the individual the
8  difference between the rate that they receive in the
9  military versus the pay and so we do reimburse them for
10  that.  I believe the orders are requested, but I do
11  know now that you can also have just a verbal request
12  to allow that person to be off.
13   Q   (BY MR. KILBORN:)  Now, when did that policy,
14  that a verbal request would be sufficient over written
15  orders, take place?
16       BY MR. SCOFIELD:  Object to the form.
17       THE WITNESS:  I think it was always there.  I
18  think it was just confusing for our supervisors.  Maybe
19  it wasn't clear at one point in time.
20   Q   (BY MR. KILBORN:)  And did that confusion
21  come about because of this case?
22       BY MR. SCOFIELD:  Object to the form.
23       THE WITNESS:  No, I don't think so.
                                                     231

1    Q   (BY MR. KILBORN:)  When did it come about?
2    A   I don't recall, but as I said, the whole area
3  of that responsibility is in team relations, but I know
4  that we have had conversations about what the procedure
5  is and how that's followed.
6    Q   When did you have those?
7    A   I don't recall, I just know that it's back
8  here in my head.
9    Q   What month?
10   A   I don't know.
11   Q   Was it in 2007?
12   A   I really -- I honestly don't recall.  I'd be
13  guessing.
14   Q   Is that change documented anywhere?
15   A   I don't think so.  I think the policy is the
16  same.  I think it was just communication with our group
17  leaders and supervisors as to what was the proper
18  methodology with that.
19   Q   Did you conduct that?
20   A   No.
21   Q   Did you participate?
22   A   No, we have HR managers meetings and it was
23  just reported in one of our managers meetings, so
                                                     232

58  (Pages 229 to 232)

## WENDY SUSAN WARNER

1  that's why it rings a bell.
2    **Q  To you?**
3    A  To Mr. Ryu.
4    **Q  Mr. Ryu?**
5    A  Yeah. He has weekly meetings with all of the
6  HR managers.
7    **Q  So how did you find out that it had been**
8  **reported to Mr. Ryu that there was some confusion among**
9  **the managers about what type of documentation was**
10  **needed for a National Guard Reservist to go to drill on**
11  **a weekend?**
12    BY MR. SCOFIELD: Object to the form.
13    THE WITNESS: It came through our team
14  relations group.
15    **Q  (BY MR. KILBORN:) Team relations group, who**
16  **is that?**
17    A  It's Auddie Swagman, our manager for team
18  relations.
19    **Q  Who told you?**
20    A  He made mention of it in our managers
21  meeting.
22    **Q  So it's always been the policy of HMMA that**
23  **verbal communication about National Guard weekend drill**

233

1  **is sufficient?**
2    BY MR. SCOFIELD: Object to the form.
3    THE WITNESS: That's my understanding, yes.
4    **Q  (BY MR. KILBORN:) And that written orders**
5  **are not necessary?**
6    A  Yes, sir.
7    **Q  Then you found out that there was some**
8  **confusion about that?**
9    A  We have group leaders that are first line
10  supervisors out in the plant and I believe they thought
11  that that was a requirement, so it required some
12  additional education of our group leaders to make sure
13  that they enforced the procedure correctly.
14    **Q  So the managers thought orders were the**
15  **problems?**
16    A  Group leaders.
17    BY MR. SCOFIELD: Object to the form.
18    **Q  (BY MR. KILBORN:) Group leaders?**
19    A  I believe there were a few instances.
20    **Q  Which group leaders thought that?**
21    A  I couldn't tell you.
22    **Q  Well, how many group leaders would there be?**
23    A  About a hundred and forty.

234

1    **Q  So was it confusion among all of them?**
2    BY MR. SCOFIELD: Object to the form.
3    THE WITNESS: Not that I'm aware of, but we
4  were as always trying to make sure that we're
5  consistent with all of our policies and procedures and
6  that had come up as an inconsistency.
7    **Q  (BY MR. KILBORN:) And who was Dees' group**
8  **leader?**
9    A  I'm sorry, I don't know. I know who his
10  assistant manager is, but I don't know -- I don't think
11  he has one. I think in that group it goes to an
12  assistant manager. Some areas don't have them because
13  they're smaller. I think he just has an assistant
14  manager.
15    **Q  If I wanted to look at documentation for some**
16  **written evidence as to when this issue came up, what**
17  **evidence would there be?**
18    BY MR. SCOFIELD: Object to the form.
19    THE WITNESS: I'm sorry, I don't know.
20    **Q  (BY MR. KILBORN:) Was it before or after**
21  **Dees was terminated?**
22    BY MR. SCOFIELD: Object to the form.
23    THE WITNESS: I honestly can't recall.

235

1    **Q  (BY MR. KILBORN:) Who would be the person**
2  **most knowledgeable of that confusion and how it was**
3  **corrected?**
4    A  Our team relations manager or one of the
5  assistant managers in team relations.
6    **Q  Who would that be?**
7    A  Rob Clevenger.
8    **Q  I believe his name is in the file, isn't it?**
9    A  Yes, sir.
10    BY MR. SPORT: Yeah, it's in there.
11    **Q  (BY MR. KILBORN:) And Rob Clevenger would be**
12  **the same Rob Clevenger that wrote the memo which is**
13  **Bates Number 33 in Exhibit 9 dated February 23, 2007?**
14    A  Yes.
15    **Q  So he would be the person in charge of**
16  **straightening out the confusion?**
17    BY MR. SCOFIELD: Object to the form.
18    THE WITNESS: He would have called the
19  attention to the fact that there was some confusion and
20  we would have asked for clarity on that particular
21  piece, but, yes, he would have been the individual.
22    **Q  (BY MR. KILBORN:) Well, I notice that it**
23  **looks like there are quite a few forms and documents**

236

59 (Pages 233 to 236)

### WENDY SUSAN WARNER

1  that HMMA followed. Do you think that that
2  clarification of such an important matter would be put
3  in writing?
4      BY MR. SCOFIELD: Object to the form.
5      THE WITNESS: It's possible, but as I said,
6  it's not under my supervision, so I don't really know
7  how they follow that procedure.
8      Q   (BY MR. KILBORN:) In your position, is it
9  important for you to know what the procedures or rules
10 of HMMA are with regard to what's required for a
11 National Guard Reservist to not be punished for
12 attending military duties?
13     BY MR. SCOFIELD: Object to the form.
14     THE WITNESS: Again, the overseer of the
15 policies and procedures would be team relations. In
16 the employment section, we do have particular policies
17 and procedures pertaining to employment matters, but in
18 that regard, that would have been handled by team
19 relations.
20     BY MR. KILBORN: We would like to request,
21 and we'll put in a letter, any documentation
22 regarding this confusion about what type of
23 documentation is required and any straightening out of
                                                   237

1  the confusion by anybody, including Mr. Clevenger.
2      Q   (BY MR. KILBORN:) You probably told me, and
3  I apologize for repeating myself if you did, how did
4  this come to your attention?
5      A   We were in a human resources managers meeting
6  and it was reported by one of our managers in our
7  weekly meeting.
8      Q   But you don't remember who?
9      A   As I said, it was a team relations member of
10 management, but I don't know exactly who it was. It
11 could have either been Rob or Auddie.
12     Q   Had that issue come about with regard to
13 other employees?
14     A   Not that I'm aware of, just basically
15 notification of reinforcing the current policy and
16 making sure that our group leaders were aware of how to
17 practice that policy.
18     Q   That was done by, you think, Mr. Clevenger?
19     A   I know that he would have had some
20 responsibility for that, but I'm not sure if it was
21 reported by Auddie or by Rob.
22     Q   Do you recall when and how you found out
23 about this particular lawsuit?
                                                   238

1      A   I think maybe when I -- I'd be guessing.
2      BY MR. SCOFIELD: Don't guess.
3      THE WITNESS: I'd be guessing. Honestly, I
4  don't recall.
5      Q   (BY MR. KILBORN:) Well, I don't want you to
6  guess, but if you have a best judgment about it, I'd
7  like that.
8      A   It would have been when I received the
9  notification to review that declaration.
10     Q   Outside of a discussion with HMMA's lawyers,
11 have you discussed the matters involved in this case
12 with any other person?
13     BY MR. SCOFIELD: Object to the form.
14     THE WITNESS: No.
15     Q   (BY MR. KILBORN:) Not with Mr. Ryu?
16     A   Huh-uh. Sorry, no.
17     Q   So after Mr. Dees was informed that it had
18 already been decided to be terminated and he asked
19 anything I could do, did any of the other team members
20 or Hyundai employees in the room say anything?
21     A   They all felt badly for the individual, that
22 he was a good maintenance team member, and they felt
23 badly of the choices that he had made. And as I said,
                                                   239

1  we take our terminations very seriously. We always
2  feel badly when someone is not successful with our
3  company. We did feel badly about the whole situation,
4  but unfortunately it was the right decision to make.
5      Q   What did Dees do, just sort of sit there in
6  the chair stunned?
7      BY MR. SCOFIELD: Object to the form.
8      THE WITNESS: He got up and walked out after
9  we had our discussion and security took him to his
10 vehicle and picked up his parking pass.
11     Q   (BY MR. KILBORN:) He was escorted to his
12 vehicle?
13     A   Yes, sir.
14     Q   And escorted off the property?
15     A   He would have driven off the property
16 himself.
17     Q   What did you do to make sure that his
18 personal property in his locker was delivered back to
19 him?
20     A   We instructed the team rep to go back to the
21 locker, to pull all the personal property out, box it
22 and mail it to the individual.
23     Q   And who did you instruct to do that?
                                                   240

60 (Pages 237 to 240)

## WENDY SUSAN WARNER

1    A    That would be Lucas Coomer.
2    Q    That's C-U-M-E-R?
3    A    C-O-O-M-E-R.
4    Q    So do you think Mr. Dees took this pretty
5  hard?
6        BY MR. SCOFIELD: Object to the form.
7        THE WITNESS: I think he was distraught as
8  most people are when they lose their job, yes.
9    Q    (BY MR. KILBORN:) But he was particularly
10  distraught because of the surprise?
11       BY MR. SCOFIELD: Object to the form.
12       THE WITNESS: Not any more than anyone else
13  that I've met. Not any less, not any more.
14   Q    (BY MR. KILBORN:) You said his face turned
15  color?
16   A    Yes.
17   Q    Red?
18   A    Yes.
19   Q    Then you wrote him the letter, Bates Number
20  1. That's just a form letter I think you said?
21   A    The March 7th one about the peer review?
22   Q    Right.
23   A    Yes.
                                              241

1    Q    So you're telling him he must meet with
2  Rob Clevenger?
3    A    Yes.
4    Q    So that was mandatory?
5    A    That's part of the peer-review process, yes.
6    Q    Take a look at Bates Number 5 in that same
7  exhibit. It's called an exit checklist.
8    A    Yes, sir.
9    Q    Did you fill that out in the termination
10  room?
11   A    Scott Gordy did, see the signature down
12  there, my assistant manager.
13   Q    So that was handed to Mr. Dees to sign?
14   A    Yes, after we went over all of the company
15  property that was returned and the information on the
16  paycheck and vacation, that he is not obligated to
17  sign, but if he wanted to, he could. These were the
18  things that he did return. And he said he did not want
19  to sign it. And I said that was fine.
20   Q    You got the word destroy it looks like to the
21  right. What does that mean?
22   A    The team member does not have to return his
23  uniforms, but we have had situations that if people
                                              242

1  throw the team wear in the trash, sometimes people do
2  still wear them and we want the insignia and the name
3  cut out so that no one else would wear the team wear.
4  That requested that he do that. And our handbook, we
5  also said it's not mandatory for you to return it but
6  to just destroy it if you have it at home.
7    Q    Was the date of this termination meeting
8  you've described the date on document Bates Number 5,
9  2-26-07?
10   A    Yes.
11   Q    And that was the first date Mr. Dees had any
12  notice that HMMA decided to terminate him?
13   A    Yes, sir.
14   Q    And you always do that in person because of
15  respect and dignity?
16   A    We do it in person unless the person was no
17  call, no show and hasn't come back at all.
18   Q    Take a look at Bates Number 6, a letter
19  signed by you on February 26th, 2007 --
20   A    Yes.
21   Q    -- to Mr. Dees. That's the same day as the
22  termination?
23   A    Yes.
                                              243

1    Q    Did you mail that letter?
2    A    No, I read it to him and gave him a copy.
3    Q    So this letter had already been typed and
4  signed?
5    A    Yes.
6    Q    Wasn't anything that the advocate could do to
7  change that, was there?
8        BY MR. SCOFIELD: Object to the form.
9        THE WITNESS: No, sir.
10   Q    (BY MR. KILBORN:) Is this just a form
11  letter?
12       BY MR. SCOFIELD: Object to the form.
13       THE WITNESS: It's not a form letter, I mean,
14  it's the same information, but the date and the reason
15  that person is being terminated is changed, but the
16  basic content is the same, yes.
17   Q    (BY MR. KILBORN:) Are the facts stated in
18  this letter of February 26th, 2007, Bates Number 6,
19  accurate?
20   A    Yes.
21   Q    You say in the first sentence: It has been
22  brought to my attention on February 14th, 2007 that you
23  were found by a member of HMMA management in the third
                                              244

61 (Pages 241 to 244)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969**

WENDY SUSAN WARNER

1  floor overhead sleeping.
2      A   Yes.
3      Q   And is the February 14th date the date that
4  it was brought to your attention?
5      A   That was the date that it occurred.
6      Q   Is he given anything else besides this
7  letter?
8          BY MR. SCOFIELD:  Object to the form.
9          THE WITNESS:  No, sir.
10     Q   (BY MR. KILBORN:)  Well, how did the meeting
11  end?
12     A   He got up and walked out.
13     Q   What did you say, have a good day or have a
14  good life or what?
15         BY MR. SCOFIELD:  Object to the form.
16         THE WITNESS:  I opened the door for him and I
17  said that security would escort him out and if he had
18  any further questions to, please, feel free to contact
19  me.
20     Q   (BY MR. KILBORN:)  Have you ever had anybody
21  in your family in the military?
22         BY MR. SCOFIELD:  Object to the form.
23         THE WITNESS:  Yes.
                                                    245

1      Q   (BY MR. KILBORN:)  Who?
2      A   My nephew is a Marine.
3      Q   Reserve?
4      A   Yes.
5      Q   National Guard?
6      A   Yes.  I think he is.
7      Q   Who does he work for?
8      A   He is a deputy sheriff in Ohio.
9      Q   In Hawaii?
10     A   Ohio.  I wish Hawaii, I'd rather go to Hawaii
11  than Ohio to visit him.
12     Q   Amen.
13         Combat experience?
14     A   He's had a lot of experience.  No, he hasn't
15  been outside of the states yet.  They keep saying he's
16  going to be called up, but he hasn't yet.
17     Q   And why would you think that a man who would
18  sleep with a pillow behind his head in a sneaky
19  position on the third floor, his character is that he
20  is an honorable soldier with combat duties, with men's
21  life under him on the commander security detail, why
22  would you think a gentleman of that character would do
23  something so stupid --
                                                    246

1          BY MR. SCOFIELD:  Object to the form.
2      Q   (BY MR. KILBORN:)  -- and willful?
3          BY MR. SCOFIELD:  Same objection.
4          THE WITNESS:  Poor decision on his part
5  unfortunately.  We all make them.  Unfortunately he
6  did.
7      Q   (BY MR. KILBORN:)  And you've never made any
8  poor decisions yourself?
9          BY MR. SCOFIELD:  Object to the form.
10         THE WITNESS:  I certainly have.
11     Q   (BY MR. KILBORN:)  Have you ever been fired?
12     A   No, sir.
13     Q   So you've been on the giving end but not the
14  receiving end?
15         BY MR. SCOFIELD:  Object to the form.
16     Q   (BY MR. KILBORN:)  Is that correct?
17     A   Yes.
18     Q   Well, where were the Koreans when all of this
19  termination is going on?  Any expats in the room?
20     A   No, sir.
21         BY MR. SCOFIELD:  Object to the form.
22     Q   (BY MR. KILBORN:)  Any expats know about it?
23     A   After the decision was made, I did discuss it
                                                    247

1  with my supervisor, Mr. Ryu, and the HR coordinator to
2  make them aware of the decision.
3      Q   Did you tell him why?
4          BY MR. SCOFIELD:  Object to the form.
5          THE WITNESS:  Yes.
6      Q   (BY MR. KILBORN:)  Did Mr. Ryu know that
7  Mr. Dees had military obligations while working at
8  HMMA?
9          BY MR. SCOFIELD:  Object to the form.
10         THE WITNESS:  No.
11     Q   (BY MR. KILBORN:)  No?
12     A   He did not.
13     Q   There are various it looks like pages in
14  these documents, like Bates Number 18 called receipt of
15  handbook acknowledgment --
16     A   Uh-huh.
17     Q   -- why are these pages in here?
18         BY MR. SCOFIELD:  Object to the form.
19         THE WITNESS:  It's part of the personnel
20  file.  Once the person gets the handbook, this is an
21  acknowledgment.  It's in the back of the handbook that
22  they sign it at orientation that they received the
23  handbook and then we keep that in the personnel file.
                                                    248

62  (Pages 245 to 248)

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

### WENDY SUSAN WARNER

1    Q   (BY MR. KILBORN:) And if you look at Bates
2    Number 19, that's that same grant of license and
3    release of claim that you signed --
4    A   Yes, sir.
5    Q   -- that we talk about before?
6    A   Uh-huh.
7    Q   You got Dees to sign something that says: I,
8    meaning Dees, fully understand and agree. And it goes
9    on about the furthering of the business interest of
10   Hyundai Motor Manufacturing Alabama, L.L.C., Hyundai
11   Motor America, Inc. and Hyundai Motor Company.
12   Mr. Dees wouldn't have any clue about what the business
13   interest of those companies were, would he?
14         BY MR. SCOFIELD: Object to the form.
15         THE WITNESS: I would not think so.
16   Q   (BY MR. KILBORN:) No. What you have him do
17   is sign something that says he fully understands about
18   the business interest of those three companies and you
19   particularly and everybody at HMMA knows that's not
20   true, don't they?
21         BY MR. SCOFIELD: Object to the form.
22         THE WITNESS: As I said, it's part of our
23   procedure that we do have all of our team members

                                                    249

1    complete this in case we do want to do any kind of
2    publicity, media, commercials, prints that we do have
3    this release.
4    Q   (BY MR. KILBORN:) But you've got everybody
5    signing that they fully understand the business
6    interests of these three companies knowing that they
7    don't have a clue what they are; isn't that true?
8         BY MR. SCOFIELD: Object to the form.
9         THE WITNESS: As I said, it is a form that
10   all of our team members do complete.
11   Q   (BY MR. KILBORN:) I know it's a form,
12   Ms. Warner. I'm trying to get past that.
13   A   Yes, sir.
14   Q   Isn't it true that this form that you always
15   use has the employee -- the new employee agree that he
16   fully understands the business interests of three
17   companies, one of whom is headquartered in Seoul, South
18   Korea, and you know, in fact, that that's not true?
19         BY MR. SCOFIELD: Object to the form.
20         THE WITNESS: They're not in Seoul, South
21   Korea?
22   Q   (BY MR. KILBORN:) They don't fully
23   understand any of that, do they?

                                                    250

1         BY MR. SCOFIELD: Object to the form.
2         THE WITNESS: I couldn't say what each team
3    member understands. I do know that each form is
4    explained to them in orientation. They do see a video
5    about Hyundai. I couldn't say whether he understood it
6    or didn't understand it.
7    Q   (BY MR. KILBORN:) Well, it says fully
8    understand, doesn't it?
9    A   That was his choice to sign it and he could
10   have asked questions, but I was not there when he did
11   sign this form.
12   Q   Well, you know he didn't fully understand it,
13   don't you?
14         BY MR. SCOFIELD: Object to the form.
15         THE WITNESS: I can't say what he thought or
16   didn't think at that time.
17   Q   (BY MR. KILBORN:) Well, you didn't fully
18   understand it when you signed it, did you?
19         BY MR. SCOFIELD: Object to the form.
20         THE WITNESS: I understood that it was for an
21   advertisement, yes.
22   Q   (BY MR. KILBORN:) But you didn't fully
23   understand what the business interest of those three

                                                    251

1    companies were, did you?
2         BY MR. SCOFIELD: Object to the form.
3         THE WITNESS: As I said, I knew what the
4    purpose of the form was.
5    Q   (BY MR. KILBORN:) I didn't ask you that.
6    You knew -- You didn't have a clue what the business
7    interest of those three companies were, did you?
8         BY MR. SCOFIELD: Object to the form.
9         THE WITNESS: I believe that I do understand
10   what the form was and why I signed it.
11   Q   (BY MR. KILBORN:) So you're going to tell
12   the jury that tries this case that you fully understood
13   that when you signed it?
14         BY MR. SCOFIELD: Object to the form.
15         THE WITNESS: Yes.
16   Q   (BY MR. KILBORN:) Are you going to tell them
17   that Dees fully understood it when he signed it?
18         BY MR. SCOFIELD: Object to the form.
19         THE WITNESS: I can't speak for him, I can
20   speak for myself.
21   Q   (BY MR. KILBORN:) And you would stand on
22   that answer if I asked you that in front of a jury?
23         BY MR. SCOFIELD: Object to the form.

                                                    252

63 (Pages 249 to 252)

1    THE WITNESS: Yes, sir.
2    Q   (BY MR. KILBORN:) Take a look at page number
3    26. That's called application notification release of
4    information.
5    BY MR. SCOFIELD: Vince, would you repeat the
6    Bates Number?
7    BY MR. KILBORN: Yeah, it's 26.
8    BY MR. SCOFIELD: Thank you.
9    Q   (BY MR. KILBORN:) In the fine print down at
10   the bottom, there's an asterisk. It says: HMMA fully
11   complies with the spirit and intent of laws regarding
12   nondiscrimination for employment because of sex, race
13   creed, color, national origin, age, disability or
14   Vietnam veteran status. Do you see that?
15   A   Uh-huh.
16   Q   And this form was signed by Mr. Dees in what,
17   August 26, 2005?
18   A   Yes.
19   Q   And was that the company policy at that time?
20   A   Yes. It's in order to be able to do a
21   background check on the individual.
22   Q   Where is the reference to USERRA in that
23   company compliance policy on the bottom of your form?

253

1    A   As I said, this is a background check that is
2    used.
3    Q   I didn't ask you that. You told me that and
4    I believed you.
5    Where is the company policy in this form in
6    2005 regarding USERRA?
7    BY MR. SCOFIELD: Object to the form.
8    THE WITNESS: This form is utilized to do a
9    background check. We put that on the application, but
10   this is just a form for a background.
11   Q   (BY MR. KILBORN:) Just a form.
12   Well, where is the reference to USERRA since
13   you mentioned race, creed, sex, color, national origin,
14   age, disability, Vietnam veteran status? Where is
15   USERRA?
16   A   All of our forms are reviewed by legal and
17   this is the phrases and information that have been
18   recommended that we use for our company.
19   BY MR. KILBORN: Would you instruct her to
20   answer my question?
21   BY MR. SCOFIELD: I think she's doing the
22   best to answer it. I respond, Vince, that the document
23   speaks for itself.

254

1    BY MR. KILBORN: It certainly does.
2    Q   (BY MR. KILBORN:) I'm asking you: Where is
3    the reference to USERRA? And if you don't see any, why
4    is there no reference to USERRA?
5    BY MR. SCOFIELD: Object to the form.
6    THE WITNESS: Is that a requirement? Is that
7    a law?
8    Q   (BY MR. KILBORN:) Answer the question.
9    BY MR. SCOFIELD: Just answer the question to
10   the best of your ability.
11   THE WITNESS: All right. It's not there.
12   Q   (BY MR. KILBORN:) And why isn't it there?
13   A   Because based on our legal review of all of
14   these forms, it has not been stated as a requirement to
15   this.
16   Q   This form doesn't even recognize the
17   existence of USERRA, does it?
18   A   Does not.
19   Q   It does recognize the existence of some
20   Vietnam veteran status, doesn't it?
21   A   Yes.
22   Q   What is that?
23   A   The Vietnam veteran status?

255

1    Q   Yes.
2    A   This information and phrase was put on this
3    form by our legal counsel.
4    Q   Well, what is it since you're an employment
5    specialist?
6    BY MR. SCOFIELD: Object to the form.
7    THE WITNESS: What is a Vietnam veteran
8    status?
9    Q   (BY MR. KILBORN:) Right.
10   A   In terms of nondiscrimination, that is an
11   area that we do not discriminate against.
12   Q   What happened to World War II, the first Iraq
13   War and the Korean War?
14   BY MR. SCOFIELD: Object to the form.
15   THE WITNESS: Again, this is a phrase that
16   was put on by our legal counsel and I defer to them for
17   the correct verbiage on all these forms.
18   Q   (BY MR. KILBORN:) But you're an employment
19   specialist in particular and you're in charge of making
20   sure that there's no discrimination in employment for
21   various protective classes, right?
22   A   Uh-huh.
23   BY MR. SCOFIELD: Object to the form.

256

64 (Pages 253 to 256)

## WENDY SUSAN WARNER

1    Q   (BY MR. KILBORN:)  And National Guard is a
2  protective class, right?
3        BY MR. SCOFIELD:  Object to the form.
4        THE WITNESS:  Not that I'm aware of, no.
5    Q   (BY MR. KILBORN:)  Okay.  What class does
6  USERRA protect?
7    A   It protects all of the military, anyone that
8  needs to serve.
9    Q   Isn't National Guard military?
10   A   Certainly.
11   Q   Well, what law on this form did Hyundai have
12 Dees sign that references the protection of a National
13 Guard Reservist?
14   A   This form isn't used for that, it's used to
15 do background checks.
16   Q   But where on this form is that noted?
17       BY MR. SCOFIELD:  Object to the form.
18       THE WITNESS:  This is a phrase that was put
19 on by our legal counsel, so I can't answer that for
20 you.
21   Q   (BY MR. KILBORN:)  As a matter of fact, there
22 is no such thing as a Vietnam veteran status law, is
23 there?

257

1    Q   And you're responsible for the content of
2  these forms, aren't you?
3    A   Yes, I am.
4    Q   As a matter of fact, Dees isn't the first one
5  or the last one to sign this form, is he?
6    A   I would think not.
7    Q   And this is supposed to notify the person
8  signing it like Dees, the applicant, as to what Hyundai
9  complies -- I mean, HMMA fully complies with, isn't it?
10       BY MR. SCOFIELD:  Object to the form.
11       THE WITNESS:  It's a form used to gather
12 information for background checks.
13   Q   (BY MR. KILBORN:)  And, obviously, the legal
14 counsel that drew up this form didn't know what he was
15 talking about, did he?
16       BY MR. SCOFIELD:  Object to the form.
17       THE WITNESS:  I'm not a lawyer, I can't say.
18   Q   (BY MR. KILBORN:)  Well, he cited some law
19 that doesn't exist, didn't he?
20       BY MR. SCOFIELD:  Object to the form.
21       THE WITNESS:  As I said, that was the phrase
22 that was asked to be put on by our legal counsel.
23   Q   (BY MR. KILBORN:)  But you don't -- Have you

259

1    A   No.
2        BY MR. SCOFIELD:  Object to the form.
3    Q   (BY MR. KILBORN:)  That's just some poppycock
4  that somebody put in that form, isn't it?
5        BY MR. SCOFIELD:  Same objection.
6        THE WITNESS:  Again, that information was put
7  on by our legal counsel.
8    Q   (BY MR. KILBORN:)  But you review it, don't
9  you?
10       BY MR. SCOFIELD:  Object to the form.
11       THE WITNESS:  Sure.
12   Q   (BY MR. KILBORN:)  And you're in charge of
13 having people sign it, aren't you?
14   A   For background checks, yes.
15   Q   So what y'all did was y'all made up some
16 bogus law that doesn't exist and gave it a bogus name
17 called Vietnam veteran status and stuck if on a form,
18 didn't you?
19       BY MR. SCOFIELD:  Object to the form.
20       THE WITNESS:  I personally did not, no.
21   Q   (BY MR. KILBORN:)  No, but you oversaw it,
22 didn't you?
23   A   It is on there.

258

1  ever heard -- Well, let me ask you this:  Does legal
2  counsel at HMMA make a practice of inventing the names
3  of laws that do not exist?
4        BY MR. SCOFIELD:  Object to the form.
5        THE WITNESS:  I can't answer that for you.  I
6  don't know.
7    Q   (BY MR. KILBORN:)  Have you heard of any
8  other ones other than this one?
9        BY MR. SCOFIELD:  Object to the form.
10       THE WITNESS:  Of what?
11   Q   (BY MR. KILBORN:)  Any other laws that --
12 bogus names of laws that the legal counsel invented?
13       BY MR. SCOFIELD:  Object to the form.
14       THE WITNESS:  I'm sorry, I don't understand
15 your question.
16   Q   (BY MR. KILBORN:)  It looks like to me, and
17 maybe I'm a fool, but it looks like to me that somebody
18 invented a law that doesn't exist and stuck it on this
19 form, would you agree to that?
20       BY MR. SCOFIELD:  Object to the form.
21       THE WITNESS:  No, sir.
22   Q   (BY MR. KILBORN:)  Well, where did these
23 words come from?

260

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

WENDY SUSAN WARNER

| | |
|---|---|
| 1     BY MR. SCOFIELD: Object to the form. | 1     **Q**   **So you're not aware of any federal law that** |
| 2     THE WITNESS: Again, as I said, all of our | 2   **protects against discrimination for Korean veterans?** |

1     BY MR. SCOFIELD: Object to the form.
2     THE WITNESS: Again, as I said, all of our
3 forms -- all of our documents are reviewed by our legal
4 counsel and that was put on there.
5     **Q**   **(BY MR. KILBORN:) Well, you do know that**
6 **there is an anti-discrimination because of sex, don't**
7 **you?**
8     A   Uh-huh.
9     **Q**   **Race?**
10    A   Yes.
11    **Q**   **Creed?**
12    A   Yes.
13    **Q**   **Color?**
14    A   Yes.
15    **Q**   **National origin, correct?**
16    A   Yes.
17    **Q**   **Age?**
18    A   Yes.
19    **Q**   **Disability?**
20    A   Yes.
21    **Q**   **And then this word Vietnam veteran status**
22 **pops up, doesn't it?**
23    A   Yes.

261

1     **Q**   **So you're not aware of any federal law that**
2 **protects against discrimination for Korean veterans?**
3     BY MR. SCOFIELD: Object to the form.
4     THE WITNESS: From the USERRA standpoint,
5 yes, but not that there's a protected class for
6 veterans.
7     **Q**   **(BY MR. KILBORN:) All right. How about Iraq**
8 **War veterans?**
9    A   From the USERRA perspective, yes, but not
10 from a protected class.
11    **Q**   **How about National Guard?**
12    A   Same.
13    **Q**   **What's the answer?**
14    A   The answer is the same, that you have a
15 USERRA law that protects everyone in the military from
16 an employment perspective.
17    **Q**   **Is that an important law?**
18     BY MR. SCOFIELD: Object to the form.
19     THE WITNESS: Of course.
20    **Q**   **(BY MR. KILBORN:) Probably the most**
21 **important law, isn't it?**
22     BY MR. SCOFIELD: Object to the form.
23     THE WITNESS: I think they're all important.

263

1     **Q**   **Okay. Well, why would you refer to Vietnam**
2 **veteran status and not include Korean veterans?**
3     BY MR. SCOFIELD: Object to the form.
4     THE WITNESS: I don't have an answer for you.
5 I don't know.
6     **Q**   **(BY MR. KILBORN:) Why would you not include**
7 **the first Iraq War combat veterans?**
8    A   I don't know.
9     BY MR. SCOFIELD: Object to the form.
10    **Q**   **(BY MR. KILBORN:) Were they protected?**
11     BY MR. SCOFIELD: Object to the form.
12     THE WITNESS: As I said, this form and this
13 statement was put on by our legal counsel.
14    **Q**   **(BY MR. KILBORN:) That's not my question.**
15 **Are they protected?**
16    A   Are they protected?
17     BY MR. SCOFIELD: Object to the form.
18    **Q**   **(BY MR. KILBORN:) Yes, are they a class of**
19 **protected people?**
20    A   Everyone is protected in one way, shape or
21 form.
22    **Q**   **But what about by a federal law?**
23    A   Not that I'm aware of, no.

262

1     **Q**   **(BY MR. KILBORN:) Yeah, but people who are**
2 **in charge of protecting America from, say, terrorist**
3 **attacks are even more important than those who are**
4 **protected because of, let's say, disability or sex? I**
5 **mean, these are people who keep us from getting killed,**
6 **aren't they?**
7     BY MR. SCOFIELD: Object to the form.
8     THE WITNESS: That's certainly a personal
9 opinion.
10    **Q**   **(BY MR. KILBORN:) Do you disagree with that?**
11    A   As I said, I agree that all the laws are
12 important to protect everyone.
13    **Q**   **Well, why is this very important law missing**
14 **from this form?**
15     BY MR. SCOFIELD: Object to the form.
16     THE WITNESS: I don't have an answer for you.
17 I don't know.
18    **Q**   **(BY MR. KILBORN:) Well, it's not going to**
19 **stay missing for long once you get back, is it?**
20     BY MR. SCOFIELD: Object to the form.
21     THE WITNESS: Again, that's not something
22 that I would be able to answer.
23    **Q**   **(BY MR. KILBORN:) Well, you're not going to**

264

66 (Pages 261 to 264)

### WENDY SUSAN WARNER

1  make a recommendation to make sure that Hyundai's
2  employment discrimination forms are correct?
3      BY MR. SCOFIELD: Object to the form.
4      THE WITNESS: I would take that under
5  advisement.
6      Q  (BY MR. KILBORN:) Look at Bates Number 33.
7  It's February 23, 2007. It looks like a memo from
8  Rob Clevenger to Greg Kimble. Did you read that before
9  this termination meeting in this termination room?
10     A  This was presented at the termination
11  committee meeting.
12     Q  By who?
13     A  Rob Clevenger.
14     Q  It was a decision made based on this memo?
15     BY MR. SCOFIELD: Object to the form.
16     THE WITNESS: This memo, as well as all of
17  the other investigation information and meetings with
18  Mr. Dees, as well as the witness.
19
20     (Whereupon, a discussion was held off the
21     record.)
22
23     Q  (BY MR. KILBORN:) Take a look at the next

                                              265

1      Q  Do you know who put it in there?
2      A  My understanding is that this was showing
3  past practice. This gentleman was sleeping on the job
4  and so it was showing the past practice of what we had
5  done.
6      Q  Why was it put in the termination file?
7      BY MR. SCOFIELD: Object to the form.
8      THE WITNESS: It was put in the team
9  relations file as consistency in terms of what we had
10  done in the past.
11     Q  (BY MR. KILBORN:) Evidence of consistency?
12     A  Yes, sir.
13     Q  Okay. So what you did was you -- somebody at
14  HMMA put in the team relations file some evidence of
15  consistency to bolster the defense of the Dees matter?
16     BY MR. SCOFIELD: Object to the form.
17     THE WITNESS: This was also part of our
18  termination committee meeting, so the team relations
19  will bring in all similar cases and share what the
20  outcome of that particular investigation was.
21     Q  (BY MR. KILBORN:) So this was presented --
22     A  Yes.
23     Q  -- at the team relations committee?

                                              267

1  page, Bates Number 34.
2      A  Uh-huh.
3      Q  It says team relations memo. It's got a big
4  stamp in the middle that says: Redacted-privileged.
5      Do you know what this is doing in Mr. Dees'
6  personnel file?
7      BY MR. SCOFIELD: Object to the form.
8      THE WITNESS: I don't believe this piece was
9  in his personnel file. This was a team relations
10  piece, but we can check and see because once he was
11  termed it may have been put in there.
12     BY MR. SCOFIELD: It's in the team relations.
13  Just for purposes of the record, as far as the
14  document, which we've redacted based on attorney-client
15  privilege, I've withheld it. And I think we identified
16  in our discovery responses that it's a notation by
17  Mr. Neal and we've redacted based on attorney-client
18  communication.
19     BY MR. KILBORN: What file is it in?
20     BY MR. SCOFIELD: Team relations file.
21     Q  (BY MR. KILBORN:) Did you, Ms. Warner, put
22  it in the team relations file?
23     A  No, I wouldn't have done that.

                                              266

1      A  Termination committee meeting. That's part
2  of our procedure.
3      Q  Was it redacted as privileged at that
4  meeting?
5      BY MR. SCOFIELD: Object to the form.
6      THE WITNESS: No, I've not seen that before.
7      Q  (BY MR. KILBORN:) So it was part of the
8  evidence presented to justify termination before it was
9  decided?
10     BY MR. SCOFIELD: Object to the form.
11     THE WITNESS: To substantiate our past
12  practice if someone was sleeping on the job. This
13  person intentionally had made a bed above the line in
14  engine and was found sleeping in the bed, so it was a
15  similar case.
16     Q  (BY MR. KILBORN:) So Dees hadn't been
17  terminated yet, had he?
18     A  No, but we do look at past practice from a
19  consistency perspective and all similar cases.
20     Q  Well, how many other similar cases, other
21  than this one at Bates 34?
22     A  This particular one, there was just one.
23     Q  Just one?

                                              268

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## WENDY SUSAN WARNER

| | |
|---|---|
| 1  A  Yes. | 1    THE WITNESS: No, just the top part. |

**Column 1 (Page 269)**

1    A  Yes.
2    Q  Out of how many employees?
3    A  That have been terminated or that are
4  employed.
5    Q  Yeah, that have been terminated.
6    A  As I said, thirty to forty a year.
7    Q  For sleeping?
8    A  No, total.
9    Q  How many cases were presented at the
10  termination committee meeting, other than this one on
11  Number 34?
12    A  For sleeping?
13    Q  Right.
14      One?
15    A  And the other ones as I mentioned to you were
16  not intentional, there was dozing at the desk or a
17  sleep apnea case, but this individual was actually
18  sleeping intentional.
19    Q  Intentional?
20    A  Yes.  Made a bed above the line in a
21  cardboard box.
22    Q  And you terminated this individual?
23    A  Yes.

269

**Column 2 (Page 271)**

1    THE WITNESS: No, just the top part.
2    Q  (BY MR. KILBORN:)  So there was writing down
3  here which said redacted-privileged?
4    BY MR. SCOFIELD: Object to the form.
5    THE WITNESS: I don't know about that, I just
6  know that this was presented in the block like that of
7  all past practices.  And that's our normal procedure
8  that we do at each meeting.
9    Q  (BY MR. KILBORN:)  Well, did Mr. Neal state
10  something about this case?
11    BY MR. SCOFIELD: Object to the form. I'm
12  going to instruct her not to answer based on
13  attorney-client.
14    Q  (BY MR. KILBORN:)  And who was in the meeting
15  where this was done?
16    A  Same people.
17    Are you talking about the actual termination
18  or the termination committee?
19    Q  The meeting where this document, Bates Number
20  34, was presented.
21    BY MR. SCOFIELD: To clarify that, would be
22  the termination committee meeting.
23    THE WITNESS: The committee meeting?

271

**Column 1 (Page 270)**

1    Q  So you are personally familiar with it?
2    A  Yes.
3    Q  What was the person's name?
4    A  This individual?
5    Q  Right.
6    A  Ontario King.
7    Q  Ontario King?
8    A  Uh-huh.
9    Q  And when was he terminated?
10    A  January 3rd of '06.
11    Q  All right.  Was he a member of a protected
12  class?
13    A  Yes.
14    Q  What class?
15    A  He was a minority, a black male.
16    Q  Was there a note on here when it was
17  presented to the termination committee?
18    BY MR. SCOFIELD: Object to the form.
19    THE WITNESS: It was presented just like
20  this.
21    Q  (BY MR. KILBORN:)  It was presented with the
22  words redacted-privileged?
23    BY MR. SCOFIELD: Object to the form.

270

**Column 2 (Page 272)**

1    Q  (BY MR. KILBORN:)  Yeah.
2    A  The same people as were in on the meeting on
3  the front page.
4    Q  The front page?
5    A  Yeah.
6    Q  So 34 is part of 33?
7    A  That would be my take.
8    Q  All right.  And the people listed on 33 are
9  Kimble, Clevenger.  I don't see any other people.  I
10  see people's names, but I don't see who else was in the
11  meeting.
12    BY MR. SCOFIELD: I don't want you to get
13  confused.  I believe the question on the table is who
14  was present at the termination committee meeting.
15    THE WITNESS: Right.
16    BY MR. SCOFIELD: Okay.
17    THE WITNESS: The same people as we talked
18  about.  It was myself, the assistant manager for
19  employment, Mr. Neal as the adviser, the head of the
20  department, John Applegate, the vice president for
21  production and the team relations manager, Auddie
22  Swagman, and Rob Clevenger.
23    Q  (BY MR. KILBORN:)  And who, Clevenger?

272

68  (Pages 269 to 272)

# WENDY SUSAN WARNER

1  A  Yes, sir.

2  Q  So the only lawyer in the room was Mr. Neal?

3  A  Yes.

4  Q  And he's in every termination meeting?

5  A  Yes.

6      BY MR. KILBORN:  Trent, I think we've asked

7  for the unredacted document, but we'll deal with that

8  later.

9      Q  (BY MR. KILBORN:)  And how many people were

10 employed at the plant on the termination date?

11     A  January 6th or January 7th?

12     Q  February 26th, 2007.

13     BY MR. SCOFIELD:  How many people were

14 employed at the plant?

15     BY MR. KILBORN:  At HMMA, yes.

16     THE WITNESS:  It hasn't changed much since

17 now.  I wouldn't know exactly, but I could give you a

18 ballpark, twenty-eight hundred.

19     Q  (BY MR. KILBORN:)  The next document is

20 Number 35.  It's a February 21st, 2007 memo from

21 Mr. Applegate who was in the termination committee

22 meeting to Mr. Clevenger who was in the termination

23 committee meeting.  Are you familiar with that?

273

1  A  This memo?

2  Q  Right.

3  A  No, I have not seen this memo.

4  Q  You haven't seen it before now?

5  A  No.

6  Q  In the middle of the page there, it -- Prater

7  is apparently saying to Applegate:  I explained that

8  what you do if you were a forward observer on lookout

9  and on guard duty and you had someone officer come by

10 where you have done the same.  His reply was:  That's

11 totally different, you can't compare that with this.

12 And he goes on about his war stories and then back to

13 the point.

14     Do you know why that subject was brought up?

15     BY MR. SCOFIELD:  Object to the form.

16     THE WITNESS:  Sorry, I don't.  I've not seen

17 this E-mail.

18     Q  (BY MR. KILBORN:)  Why was Prater referring

19 to an analogy to Dees' work as a forward observer on

20 guard duty?

21     BY MR. SCOFIELD:  Object to the form.

22     THE WITNESS:  I'm sorry, I don't know.

23     Q  (BY MR. KILBORN:)  Obviously, Prater knew he

274

1  was a member of the National Guard, didn't he?

2      BY MR. SCOFIELD:  Object to the form.

3      THE WITNESS:  Based on this, I would assume

4  so.  And I know Greg was, too.  Mr. Prater was as well

5  in the military.

6      Q  (BY MR. KILBORN:)  How do you know that?

7      A  I know Greg just in terms of his conversation

8  and his military experience.

9      Q  What did he tell you about that?

10     A  That he had served in the military.

11     Q  What theatre?

12     A  I don't know, but my take would be they were

13 talking the same genre, that they perhaps had had the

14 same experience.

15     Q  It talks about text messaging his daughter in

16 there.  Was that discussed at the termination committee

17 meeting?

18     A  Yes, in terms of when they asked Mr. Dees why

19 he was up there on the third floor, he said that he was

20 text messaging his daughter because he had been

21 concerned about the weather and wanted to make sure she

22 was all right.

23     Q  Okay.  You didn't believe that?

275

1      BY MR. SCOFIELD:  Object to the form.

2      THE WITNESS:  In terms of the time that the

3  supervisor said that he observed him up there and the

4  time that he said he did that and just the logical

5  reason why he would have gone up there as opposed to

6  many other places to do that did not seem correct.

7      Q  (BY MR. KILBORN:)  You didn't ask him about

8  that?

9      BY MR. SCOFIELD:  Object to the form.

10     THE WITNESS:  The team relations person did.

11     Q  (BY MR. KILBORN:)  But you didn't?

12     A  In terms of the investigation, I did not do

13 that, no.  It is not my role to do that.

14     Q  The document which is Bates Number 36 is a --

15 it looks like a memo from William Ware to

16 Rob Clevenger.  Did you have that in front of the

17 termination committee?

18     A  Yes, it was included in the notes.

19     Q  How about document numbers 37 and 38?  That

20 looks like the handwritten document called interview

21 with Jim Brookshire.

22     A  Yes.

276

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

WENDY SUSAN WARNER

1  (Whereupon, a discussion was held off the
2  record.)
3
4  Q  (BY MR. KILBORN:) Whose notes are these, 37
5  and 38?
6  A  The interview is with Jim Brookshire, but it
7  appears that's John Applegate.
8  Q  And how many interviews are shown there --
9  BY MR. KILBORN:  Object to the form.
10  Q  (BY MR. KILBORN) -- on 37 and 38?
11  A  How many interviews with Jim Brookshire?
12  Q  Yes.
13  A  Just one interview with him.
14  Q  Let's see, on the bottom of the first page,
15  it's dated 2-15-07, and on the bottom of the second
16  page, it's --
17  A  2-19.
18  Q  -- 2-19. It looks like two different dates.
19  A  I don't know, I'm sorry, I can't tell you.
20  Q  And you said that he was -- he basically made
21  a bed, I think he had a pillow.  Where is the reference
22  to that?
23  A  He was in a chair.

277

1  Q  Where is the reference to the pillow that you
2  talked about?
3  A  He was sleeping on a piece of material or
4  something that his head -- whether it was a jacket, but
5  his head was down and sleeping.
6  Q  But you said the word pillow, didn't you?
7  A  I did.
8  Q  And where is that in here?
9  A  It's not in here.
10  Q  Where is the reference to he had a jacket?
11  A  His head was facing toward the floor with his
12  chin tucked to his chest, so the jacket as a pillow
13  that he was sleeping on his shoulder.
14  Q  Read to me where it says that he had made
15  some type of pillow out of a jacket.
16  A  There is not anything in here that says a
17  pillow.
18  Q  Well, where did you get that from?
19  A  I said that he was sleeping on his chest like
20  a pillow, but that's what I was interpreting to say.
21  There's nothing in here that says it was a pillow.
22  Q  So his chest was the pillow?
23  A  The jacket that he was in, yes, sleeping with

278

1  his head down like this.
2  Q  So when you referred to a pillow earlier,
3  that was just a -- you just misspoke?
4  A  Yes, sir.
5  Q  I don't even see any reference to a jacket.
6  Where is that?
7  A  Most of the time it is cold in there and
8  especially in February and they have a jacket on
9  because they're going in and out, but I believe he had
10  a jacket on with his shirt so the material and
11  everything, you know, was heavy.
12  Q  Where does it say that he had a jacket on?
13  A  That is not in this description, but that's
14  what I recalled in terms of the meeting, that he had a
15  shirt on as well as a jacket.
16  Q  Well, where does it say that he had a shirt
17  on as well as a jacket?
18  A  It doesn't say that in here.
19  Q  Well, Jim Brookshire didn't appear before the
20  committee, did he?
21  A  No, he did not.
22  Q  So all you had was to read this as his
23  version and it doesn't say anything like that, does it?

279

1  A  No, it doesn't.
2  Q  So you're just making up the fact that he had
3  a jacket on and he was using a jacket like a pillow,
4  aren't you?
5  BY MR. SCOFIELD:  Object to the form.
6  THE WITNESS:  That was my interpretation the
7  way it was described to me.
8  Q  (BY MR. KILBORN:) Well, it was described in
9  this document.  It wasn't described verbally, was it?
10  A  Mr. Applegate was there and reiterated the
11  situation as it was explained to him by Mr. Brookshire.
12  Q  Well, we can agree that Brookshire didn't say
13  anything like that on 37 and 38, can't we?
14  BY MR. SCOFIELD:  Object to the form.
15  Q  (BY MR. KILBORN:) We can agree on that,
16  can't we?
17  A  Yes.
18  Q  And we can agree that nothing like that
19  appears on Bates Number 36, the February 21, 2007
20  interview with the Dees, Ware and Prater, can't we?
21  A  That would be correct.
22  Q  And we can agree that nothing like that
23  appears on Praytor's memo to Applegate, which is Bates

280

70 (Pages 277 to 280)

### WENDY SUSAN WARNER

1  Q   Number 35, can't we, dated February 21, 2007?
2  A   Yes.
3  Q   And we can agree that nothing like that
4  appears on the memo from Clevenger to Kimble dated
5  February 23rd, 2007 based on Number 33, can't we?
6  A   In regards to the pillow part?
7  Q   The jacket or the pillow.
8  A   Yes.
9  Q   And none of the witnesses like Brookshire or
10 Applegate or Prater were at this meeting -- team
11 termination committee meeting, were they?
12      BY MR. SCOFIELD:  Object to the form.
13      THE WITNESS:  Mr. Applegate was, yes.
14 Q   (BY MR. KILBORN:)  Oh, Mr. Applegate was?
15 A   Yes, sir.
16 Q   He presented this information here?
17 A   Yes, sir.
18 Q   These documents?
19 A   Yes, sir.
20 Q   He wasn't an eyewitness to anything, was he?
21 A   No.
22 Q   The only eyewitness was Brookshire?
23 A   Correct.

281

1  Q   And the only way Brookshire's information got
2  before the committee was in his interview?
3  A   Yes.
4  Q   And the next Bates Number is 39.  It looks
5  like a memo from Prater to Applegate dated February 8,
6  2007.  Does this have anything to do with the sleeping
7  incident?
8      BY MR. SCOFIELD:  Object to the form.
9      THE WITNESS:  No, sir.
10 Q   (BY MR. KILBORN:)  This was -- What was the
11 date of the sleeping incident, February 8th?
12 A   February 14th.
13 Q   February 14th.
14     So this Bates Number 39 is six days before;
15 is that correct?
16 A   I am not familiar with this E-mail.  This
17 appears to have come from team relations, but it does
18 say February 8th on it.
19 Q   And it's -- The original message was from
20 Ware to Clevenger, wasn't it?
21 A   Yes.
22 Q   And it was about Leon Dees, wasn't it?
23 A   Subject says Leon Dees.

282

1  Q   It doesn't say anything about sleeping, does
2  it?
3  A   No.
4      BY MR. KILBORN:  Let's just take one more
5  break and then we'll finish this.
6
7      (Whereupon, there was a recess held in the
8       deposition.)
9
10     BY MR. KILBORN:  During the break, we've
11 got -- counsel and I discussed the copying of Exhibits
12 1 through 4, which are the original records, and we
13 requested that the court reporter be allowed to take
14 these and copy them and Federal Express them back to
15 counsel.  Hyundai does not want to do that so I have
16 agreed in the alternative to return these to counsel to
17 copy and get copies back to the court reporter.
18     BY MR. SCOFIELD:  That's our agreement.
19 Q   (BY MR. KILBORN:)  Ms. Warner, turn to
20 document number 39, the February 9, 2007 E-mail that
21 has an original message dated the 7th of February,
22 2007.  You got that?
23 A   I think so, yes.  39 you said?

283

1  Q   Yes, ma'am.
2  A   Yes.
3  Q   Have you ever seen this before?
4  A   I don't recall seeing this.
5  Q   Was it part of the termination committee
6  meeting that made the decision to terminate?
7  A   No.
8  Q   William Ware, who wrote the original E-mail
9  to Mr. Clevenger with copies to Greg Prater, he was a
10 team relations specialist?
11 A   Uh-huh.
12 Q   Was he on the committee?
13 A   No.
14 Q   But Mr. Clevenger who got this E-mail was?
15 A   Yes, and he's Mr. Ware's supervisor.
16 Q   Right.  And in that, it discusses an
17 incident.  He says:  Greg P. and I met with all the TMs
18 in question about Leon leaving for lunch while the lift
19 was done.  And it goes on.  I won't read it all, you're
20 welcome to read it.  It says:  TMs performing the
21 repair should have waited until help arrived to take
22 over the repair.  Let's see, what's that say, T -- I
23 put a mark over it, I can't read it.  TL, is that --

284

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

WENDY SUSAN WARNER

1    A   Yes.
2    Q   The TL, who would that be?
3    A   The team leader.
4    Q   Team leader, that would be who?
5    A   I don't know who it would be, but it would be
6    the lead team member in a group out on the plant floor.
7    Q   Okay. The TL and Leon are not on speaking
8    terms and it appears that he blew the incident out of
9    proportion and he only singled Leon but for no apparent
10   reason.
11       BY MR. SCOFIELD: Object to the form.
12   Q   (BY MR. KILBORN:) Singled out -- Singled
13   Leon out for no apparent reason. Proper communication
14   and test transfer will be the topics of the discussion
15   planners.
16       Do you know anything about that?
17   A   I'm sorry, I don't.
18   Q   What would that mean to you as a human
19   relations -- human resources person that an employee
20   was singled out for no apparent reason?
21       BY MR. SCOFIELD: Object to the form.
22       THE WITNESS: As I said, I don't know what
23   the context of this was. I do know that in maintenance
                                                    285

1    when the production team members are at lunch, that's
2    when they're repairing on the lines and the stamping
3    presses and it is protocol in maintenance that the
4    person that has something to do in terms of a project
5    refers it back to another person, but I don't know
6    about this particular situation.
7        As I said, I'm not familiar with this
8    particular situation. I don't know what it means.
9    Q   (BY MR. KILBORN:) Do you know why -- what
10   it's referring to when it says that the TL and Leon are
11   not on speaking terms?
12   A   I'm sorry, I don't know. Not clear.
13   Q   Prior to the termination on February 26th,
14   2007, did Mr. Dees have a good employment record with
15   HMMA?
16       BY MR. SCOFIELD: Object to the form.
17       THE WITNESS: My understanding is that there
18   were some discussion planners but no other concerns in
19   that regard.
20   Q   (BY MR. KILBORN:) And discussion planner is
21   what?
22   A   First level of corrective action but not
23   severe, just counseling.
                                                    286

1    Q   Previous discussion planners weren't brought
2    up in the termination committee meeting?
3    A   No.
4    Q   So his past employment relationships with
5    HMMA were not a consideration?
6    A   It's a factor in all the cases, yes.
7    Q   You said it is a factor?
8    A   Yes, to review all of the information of
9    corrective actions. These were discussion planners so
10   that wasn't a form of corrective action. But if the
11   individual had been on any other corrective action, it
12   would have been discussed in the termination meeting.
13   Q   Look at Bates Number 70. That's a request
14   for leave form signed by Mr. Dees September 28th, 2005.
15   A   Uh-huh.
16   Q   Is that a mandatory form?
17       BY MR. SCOFIELD: Object to the form.
18       THE WITNESS: This is a form that goes to
19   payroll to pay the person.
20   Q   (BY MR. KILBORN:) Is that mandatory?
21   A   If the person wants to be paid the difference
22   between his rate of his military pay and his pay with
23   the HMMA, this form does need to be turned into
                                                    287

1    benefits and then processed for payroll.
2    Q   And if he doesn't, then it's not necessary?
3    A   That's right.
4    Q   And Bates Number 76 is a letter from
5    Melanie McCormick to Mr. Dees about his military leave
6    and his military orders?
7    A   I'm sorry, what page?
8    Q   76.
9    A   Yes.
10   Q   She states that she hasn't received a copy of
11   his military orders. Was that mandatory?
12       BY MR. SCOFIELD: Object to the form.
13       THE WITNESS: Again, for pay.
14   Q   (BY MR. KILBORN:) The copy of the orders was
15   mandatory?
16   A   For pay.
17   Q   For pay, but not for permission to have drill
18   duty?
19   A   Correct.
20   Q   Did you talk to -- Prior to the termination
21   on February 26th, 2007, did you talk to Mr. Brookshire
22   or Mr. Prater about the alleged sleeping incident?
23       BY MR. SCOFIELD: Object to the form.
                                                    288

72 (Pages 285 to 288)

WENDY SUSAN WARNER

1    THE WITNESS: No.
2    Q    (BY MR. KILBORN:) Had you ever met either
3    one of them?
4    A    Yes.
5    Q    And is there a place where Mr. Dees worked
6    called the pit?
7    A    Those are where the stamping presses are, so
8    that's called the pit.
9    Q    Have you been there?
10   A    I've been there before. I don't regularly go
11   there, but, yeah, I've been there.
12   Q    How would you describe that, working in the
13   pit?
14   BY MR. SCOFIELD: Object to the form.
15   THE WITNESS: How would I describe working in
16   the pit, it's loud because the presses are pounding the
17   steel. It is a dangerous area where a lot of safety is
18   important and safety training is important and it is
19   the first area that the steel comes in to make the
20   various body parts for the vehicle.
21   Q    (BY MR. KILBORN:) And I suppose when there's
22   the stamping of the steel by the presses going on, it's
23   dangerous because of the flying metal?

289

1    BY MR. SCOFIELD: Object to the form.
2    THE WITNESS: I don't know about the flying
3    metal, it's just dangerous from the size -- the
4    hugeness of the particular press and you have to be
5    careful that if you are in there repairing that others
6    are aware that that's occurring and lockout/tagout
7    principles are followed.
8    Q    (BY MR. KILBORN:) Is that duty of doing work
9    in the pit considered an undesirable duty?
10   BY MR. SCOFIELD: Object to the form.
11   THE WITNESS: Any maintenance team member job
12   is considered a pretty desirable job because it's a
13   higher pay than the production positions.
14   Q    (BY MR. KILBORN:) Well, how about with the
15   danger and the noise?
16   A    I think in all areas if you're in an assembly
17   plant it does have a degree of noise and a degree of
18   danger.
19   Q    So you don't think that's a particularly bad
20   job?
21   BY MR. SCOFIELD: Object to the form.
22   THE WITNESS: Not as a maintenance team
23   member, no.

290

1    Q    (BY MR. KILBORN:) Was Mr. Dees' personnel
2    file available at the termination committee meeting?
3    A    Yes.
4    Q    So the references to his military obligations
5    were in the file?
6    A    I don't think so.
7    BY MR. SCOFIELD: Object to the form.
8    THE WITNESS: The personnel file would just
9    have had his offer letter and the employment interview
10   guide, that background check form. Those kinds of
11   things would have been in there.
12   Q    (BY MR. KILBORN:) For instance, Bates Number
13   74, that's a team member change notice. Bates Number
14   73, another team member change notice referring to
15   military duty. Bates Number 72, military orders.
16   Bates Number 71, military orders. Bates Number 70,
17   request for military leave.
18   A    Those are kept in the benefits files. We
19   have separate benefits file, obviously for
20   confidentiality purposes. My understanding is these
21   are all benefit forms, so they would have been kept in
22   a benefit file, not the employment file, so we have
23   separate files for benefits and for employment.

291

1    Q    Well, how was his personnel file -- How did
2    his personnel file reflect that he was a member of a
3    protected class under USERRA?
4    BY MR. SCOFIELD: Object to the form.
5    THE WITNESS: How would it have what?
6    Q    (BY MR. KILBORN:) Reflected that he was a
7    member of a protected class under USERRA?
8    A    I can look in the file, but I don't think
9    it's in there.
10   Q    Well, let's take a look.
11   A    Yeah.
12   Q    How was it noted in his personnel file that
13   he was a member of a protected class?
14   BY MR. SCOFIELD: Object to the form.
15   THE WITNESS: We have a self-identifying
16   piece for any type of protective classes that's handled
17   by our diversity section, so that would have been done
18   during orientation and that information would have been
19   collected by our diversity group. It wouldn't have
20   been in here is my take.
21   Q    (BY MR. KILBORN:) So it would be a separate
22   file called a diversity group file?
23   A    There wouldn't have been a file because it's

292

73 (Pages 289 to 292)

## WENDY SUSAN WARNER

1  self-identifying. The person doesn't have to disclose
2  who they are, they can just state that they are a
3  protected class for this reason or that reason. They
4  can put their name down, but they're not required to.
5      Q  So take a look at the documents that we just
6  referred to. Who within HMMA would have known of Dees'
7  National Guard Reservist obligations?
8          BY MR. SCOFIELD: Object to the form.
9          THE WITNESS: I'd be guessing.
10      Q  (BY MR. KILBORN:) You don't have to guess
11  with Mr. Prater, do you?
12      A  A supervisor would know, sure.
13      Q  You don't have to guess with Mr. Ware, do
14  you?
15          BY MR. SCOFIELD: Object to the form.
16          THE WITNESS: A team relations rep, that
17  would be correct.
18      Q  (BY MR. KILBORN:) You don't have to guess
19  with Mr. Clevenger, do you?
20      A  Clevenger, he would know, yes.
21      Q  Okay.
22      A  It's not in the personnel file.
23      Q  You wouldn't have to guess with Ms. Melanie
                                                      293

1  McCormick, would you?
2      A  She is in benefits -- or was in benefits.
3  She's no longer with us.
4      Q  And if you take a look at Bates Number 70,
5  that's the manager's signature. Whose signature would
6  that be?
7      A  Number 70?
8      Q  70, yes, ma'am. That's a request for leave
9  form.
10      A  Good question. Manager not available, but I
11  have -- I don't know whose initials those are. I
12  certainly can see Mr. Dees' signature, but I don't
13  know. There's no signature, it's just initials.
14      Q  Look at 73. That's a team member change
15  notice noted in handwriting, return from military
16  leave. It looks like it's got somebody's initials with
17  the hiring department?
18      A  Yes. I don't know who the little one is. I
19  know the bottom would be Scott Gordy in terms of
20  confirming if this information is correct before it
21  goes in the system, but this -- I don't know who that
22  smaller signature is.
23      Q  Are the personnel files scanned and
                                                      294

1  computerized?
2      A  No.
3          BY MR. KILBORN: I do want to identify this
4  manual.
5      Q  (BY MR. KILBORN:) Let's take a look at --
6  I'm calling it a team member manual or handbook. It's
7  Dees 9-65.
8      A  Uh-huh.
9          BY MR. SCOFIELD: And, Vince, I think those
10  are documents you produced to us so she's not going to
11  have a copy in front of her.
12
13      (Whereupon, a discussion was held off the
14       record.)
15
16      Q  (BY MR. KILBORN:) Looking at your records,
17  it looks like the first Bates Number is 5, but I don't
18  see a cover page. Is that the team member handbook?
19      A  Yes, sir.
20      Q  Does it have a cover page?
21      A  It's a hard copy, so maybe the cover is not
22  copied because it's a hard copy on the front and the
23  back and this is all the contents that are paper. It's
                                                      295

1  got a cover on it, hard cover.
2      Q  Well, just give me the Bates Numbers of the
3  team member handbook.
4          BY MR. SCOFIELD: It look like it runs Number
5  5 through --
6          THE WITNESS: Sorry.
7          BY MR. SCOFIELD: -- 54 and it says just for
8  clarifying --
9          THE WITNESS: That's not it. 53.
10          BY MR. SCOFIELD: -- Warner depo doc. That's
11  the Bates Number on the bottom.
12      Q  (BY MR. KILBORN:) We marked 5 and I didn't
13  ask you about it. These are some additional documents
14  that were produced today.
15      A  You want this back?
16      Q  Yes, ma'am.
17          This is a memo of March 2nd, 2007 from Nancy
18  Powers to Mr. Clevenger. Have you got any familiarity
19  with that?
20      A  Nancy Powers was executive assistant to
21  Mr. Kimble, so it appears that Nancy was informing
22  Mr. Clevenger that Mr. Dees had called Mr. Kimble's
23  number and Mr. Kimble was out on medical leave. This
                                                      296

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## WENDY SUSAN WARNER

1 would have been after he was terminated, but I had not
2 seen it.
3     Q   It says -- It looks like they write in the
4 second paragraph: I asked if he had talked to team
5 relations. He said, quote: They terminated me
6 yesterday at five o'clock and I haven't talked to
7 anybody. He said: They didn't give me a warning or a
8 letter or ten days.
9         Do you remember that conversation?
10     A   No, sir.
11         BY MR. SCOFIELD: Object to the form.
12     Q   (BY MR. KILBORN:) And then there's a sketch.
13 Do you know what that sketch is?
14     A   That's a sketch of where Mr. Dees was located
15 up on the third floor.
16     Q   And what is this object here?
17     A   I don't recall.
18     Q   That's a chair obviously?
19     A   Yes, sir.
20     Q   And are these supposed to be doors?
21     A   Yes, sir.
22     Q   Hiding place?
23         BY MR. SCOFIELD: Object to the form.

297

1         attached hereto.)
2
3         THE WITNESS: This is an interview guide that
4 we use for all of our production and maintenance team
5 members and it's a standardized interview questions
6 that we ask of all our team members. And this would
7 have been the maintenance team member interview guide
8 that was conducted by a member of HR and a member of
9 the maintenance department.
10     Q   (BY MR. KILBORN:) After he was employed?
11     A   Before.
12     Q   Before?
13     A   Yeah.
14     Q   And does it look normal?
15     A   Yes.
16     Q   And is it very committed?
17     A   Limited.
18     Q   What else does it?
19     A   Very committed, I'm sorry. Knowledge of
20 PLCs, which are the program logical -- programmable
21 logic computers, good mechanical skills for HMMA.
22     Q   So at least on this occasion he was found to
23 be a committed person?

299

1         THE WITNESS: The doors were open and this
2 was equipment to repair.
3     Q   (BY MR. KILBORN:) Was this presented to the
4 termination committee meeting?
5     A   I believe so. I believe we have seen this,
6 yes.
7     Q   Were any photographs produced?
8     A   No.
9     Q   Are there minutes of the termination
10 committee meeting?
11     A   No.
12     Q   Is it recorded?
13     A   No.
14     Q   Are telephone calls recorded?
15     A   No.
16     Q   This document, it's got a page fifteen at the
17 bottom. It says at the top scoring matrix. I guess we
18 ought to put Exhibit 10 on it separately even though
19 it's an exhibit within an exhibit.
20         What does that show you?
21
22         (Whereupon, Plaintiff's Exhibit 10 was marked
23          for identification and copy of same is

298

1     A   Threes is meets and twos is has potential,
2 but it's just the explanation of the checklist and
3 the --
4     Q   And then the next, I'll just mark it as 11.
5 This is an exhibit within an exhibit. For clarity
6 purposes, is this just another --
7
8         (Whereupon, Plaintiff's Exhibit 11 was marked
9          for identification and copy of same is
10         attached hereto.)
11
12         THE WITNESS: This is the -- The first one
13 was Anthony Johnson who was HR and this is Danny Blue
14 who was the representative from maintenance and his
15 assessment then they -- the HR and the maintenance
16 interviewee gain consensus on the front page, so this
17 was his opinion of his interview.
18     Q   (BY MR. KILBORN:) So you get double checks
19 in the interview process?
20     A   From department as well as HR.
21     Q   And let's see, the next one is dated November
22 18, '07. Let's mark it as Exhibit 12. It's an exhibit
23 within an exhibit. It looks like it's a March 7, 2007

300

75 (Pages 297 to 300)

**WENDY SUSAN WARNER**

1  letter that we've seen before, but there are some
2  handwritten notes on it. Do you know what that's
3  about?
4
5      (Whereupon, Plaintiff's Exhibit 12 was marked
6      for identification and copy of same is
7      attached hereto.)
8
9      THE WITNESS: Team member did not attend this
10 meeting. He left a phone message on Saturday, March
11 10th stating he received the letter, but could not
12 attend. No further con- -- contact from Mr. Dees.
13      Q  (BY MR. KILBORN:) And who would be the team
14 member that didn't attend?
15      A  Would have been Mr. Dees.
16      Q  Okay. So Mr. Dees didn't attend a team
17 member review?
18      A  He didn't meet with Rob Clevenger to
19 coordinate the review meeting.
20      Q  Was the review held without him?
21      A  No, he would have needed to have been there
22 and wanted to pursue it.
23      BY MR. KILBORN: I believe that's all. Thank

301

1  you, Ms. Warner.
2      FURTHER DEPONENT SAITH NOT
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

302

1           ERRATA SHEET
2
3      As you read your deposition, if you have any
4  corrections to make, please itemize them below.  Upon
5  completion, please sign your name to the signature line
6  of this errata sheet so that we may attach it to your
7  deposition to be returned to the respective Court.
8      However, if you do not have any corrections to
9  make, please sign your name on the signature line
10 location on the last page of your deposition.  Thank
11 you.
12      CORRECTIONS TO DEPOSITION
13 PAGE    LINE    EXPLANATION
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21
22      _____
23      WENDY SUSAN WARNER

303

1      SIGNATURE OF WITNESS
2      I _____, do hereby
3  certify that on this, the _____ day of _____,
4  2007, I have read the foregoing transcript and, to the
5  best of my knowledge, it constitutes a true and
6  accurate transcript of my testimony taken on oral
7  deposition on the 15th day of November, 2007.
8
9      _____
10     WENDY SUSAN WARNER
11
12
13
14
15
16
17
18
19
20
21
22
23

304

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

WENDY SUSAN WARNER

```
1           C E R T I F I C A T E
2
3    STATE OF ALABAMA  )
4    MOBILE COUNTY     )
5
6         I hereby certify that the above and foregoing
7    deposition was taken down by me in stenotype, and the
8    questions and answers thereto were transcribed by means
9    of computer-aided transcription, and that the foregoing
10   represents a true and correct transcript of the
11   testimony given by said witness upon said hearing.
12        I further certify that I am neither of
13   counsel nor of kin to the parties to the action, nor am
14   I in anywise interested in the result of said cause.
15
16
17   _____
         DONNA E. HENDERSON, CSR, NOTARY PUBLIC
18       My commission expires on the 31st day
         of July, 2010.
19
20
21
22
23                                    305
```

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CASE NO.** |
| | ) | **2:07-cv-00306-MHT-CSC** |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, and HYUNDAI MOTOR | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF WENDY WARNER

1.      I, Wendy Warner, am the Manager of the Employment Department of Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). I am over the age of 18 and have personal knowledge of the information contained in this Declaration.

2.      As the Manager of HMMA's Employment Department, I have access to and regularly utilize the personnel records of individuals employed by HMMA. I also have personal knowledge regarding HMMA's operations, as well as its relationship to Hyundai Motor America, Inc.

3.      HMMA was organized in the state of Delaware as a limited liability company and has it principal place of business in Montgomery, Alabama.

4      HMMA is in the business of manufacturing automobiles.

5.      HMMA is an independent manufacturing operation of Hyundai Motor Company, based in Seoul, Korea.

6.   Plaintiff Jerry Leon Dees, Jr. ("Plaintiff") was formerly employed by HMMA.

7   It is my understanding that Hyundai Motor America, Inc ("HMA") was organized as a corporation in the state of California and has its principal place of business in Fountain Valley, California.

8.   It is my understanding that HMA is in the business of distributing Hyundai brand automobiles and parts in the United States.

9.   HMA and HMMA are legally distinct and separate corporate entities

10.   Plaintiff was not employed by HMA at any time relevant to the allegations contained in the Complaint or, to my knowledge, at any other time.

11.   Plaintiff did not receive pay, salary, or benefits from HMA at any time relevant to the allegations contained in the Complaint or at any other time.

12.   HMA had no control over Plaintiff's employment opportunities  In other words, the decision to retain or terminate Plaintiff was solely the decision of HMMA, over which HMA had no influence or control.

13.   Indeed, HMA had no employment, legal, or other relationship with Plaintiff.

14.   Similarly, HMA had no employment, legal, or other relationship with, or right to control or direct, the other individual employees identified in Plaintiff's Complaint, all of whom were employed by HMMA, not HMA.

THIS SPACE INTENTIONALLY LEFT BLANK

Pursuant to 28 U S C § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this the _2nd_ day of May, 2007

_____

Wendy Warner

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY LEON DEES, JR.,        )
                                  )
    Plaintiff,           )
                                  )
vs.                            )        **CASE NO.**
                                  )    **2:07-cv-00306-MHT-CSC**
HYUNDAI MOTOR MANUFACTURING  )
ALABAMA, LLC, and HYUNDAI MOTOR  )
AMERICA, INC.,        )
                                  )
    Defendants.       )

## DECLARATION OF WENDY WARNER
## (SECOND DECLARATION)

1.      I, Wendy Warner, am the Manager of the Employment & Benefits Section of Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). I am over the age of 18 and have personal knowledge of the information contained in this Declaration.

2.      As the Manager of HMMA's Employment & Benefits Section, I manage and have personal knowledge regarding HMMA's human resources matters including policies and procedures, and I have access to and regularly utilize the personnel records of individuals employed by HMMA.

3.      Plaintiff Jerry Leon Dees, Jr. ("Plaintiff") was formerly employed by HMMA.

4.      After reviewing Plaintiff's personnel files maintained by HMMA, I found no evidence that Plaintiff was employed by Hyundai Motor America, Inc. ("HMA"), or that he was employed by HMA at any other time.



5.    Plaintiff's personnel records, and my consultation with the Payroll Section's records, also reveal that Plaintiff's pay, salary, and benefits were received solely from HMMA during Plaintiff's employment with HMMA. I am not aware of any situation where a HMMA employee receives salary, wages, or other benefits of employment from HMA.

6.    HMA had no control over Plaintiff's employment opportunities. In other words, the decision to hire, retain or terminate Plaintiff was solely the decision of HMMA, over which HMA had no influence or control.

7.    Upon personal knowledge, HMA did not draft any of HMMA's policies or procedures and did not have input in that process.

8.    I sat on the termination committee ("Termination Committee") that considered the information presented by HMMA's Team Relations Section regarding Plaintiff's termination.

9.    The individuals that sat on the Termination Committee were HMMA Team Members, and were not employed by HMA. Similarly, HMA had no input or right to control the investigation leading up to Plaintiff's termination, the Termination Committee's review and analysis, the Termination Committee's ultimate decision, or the manner in which the termination was carried out by HMMA. Indeed, no HMA employee was at all involved in any of these steps.

10.    There are a number of Korean expatriates on loan at HMMA from Hyundai Motor Company in Korea who have assisted in the start-up of operations at HMMA. However, none of these Korean expatriates were involved in the investigation leading up to Plaintiff's termination, the Termination Committee's review and analysis, the Termination Committee's ultimate decision, or the manner in which the termination was carried out by HMMA and, further, these Korean expatriates were not employed by HMA.



11      It is customary practice during the termination committee process at HMMA for members of the termination committee to review and consider statements or written memoranda from Team Relations. Such documents were considered by the Termination Committee in this case. It is also regular practice for Termination Committees to review any relevant past practice when evaluation termination decisions. The Termination Committee reviewed other instances of sleeping on the job when considering whether to terminate Plaintiff's employment. After conducting an analysis of information received from Team Relations, the Termination Committee makes a decision and takes appropriate action.

12.     Prior to the Termination Committee meeting regarding Plaintiff, I did not review any information and had no information concerning the underlying facts or investigation, or Plaintiff's employment or background.

13.     The Termination Committee meeting included a presentation by Team Relations concerning Team Relations' investigation and findings after it received a report from a member of HMMA management, Jim Brookshire, that Plaintiff was intentionally sleeping on the job. Team Relations had no reason to doubt Jim Brookshire's report and version of events, nor did the Termination Committee. The only evidence to the contrary was Plaintiff's denial that he had been sleeping. Plaintiff admitted that he was seated in a chair in the same location where Jim Brookshire stated he saw Plaintiff sleeping (in front of a control panel on the isolate third floor mezzanine on a solid floored surface that impaired visual access from lower levels) However, Plaintiff stated he was text messaging his daughter at that time. Regardless, the Termination Committee felt that Brookshire's testimony that Plaintiff was sleeping was unbiased and credible.



14.    The Termination Committee based its decision to terminate Plaintiff's employment solely on the facts relating to Plaintiff sleeping on the job. Intentionally sleeping during working hours was deemed by the Termination Committee to be a violation of HMMA's serious misconduct policy, contained in HMMA's Team Member Handbook, meriting immediate termination.

15.    To ensure consistency in its decision-making, the Termination Committee considered information on past practice, including another report of an employee intentionally sleeping during work hours, from Team Relations. There was simply no evidence to suggest HMMA had previously, or should currently, consider any action other than termination under the circumstances.

16.    A true and accurate copy of the HMMA Team Member Handbook in effect during Plaintiff's employment is attached as **Attachment A**. HMMA's Corrective Action and Serious Misconduct policies contained within the Team Member Handbook were the basis of Plaintiff's termination. Although Plaintiff may suggest that HMMA improperly implemented the various steps of the Corrective Action policy, a clear reading of the policy and HMMA's past practice reflects this is simply untrue. Although the Corrective Action policy contains suggestions as to steps (Discussion Planner, Informal Discussion–Phase I, Formal Discussion–Phase II, Commitment Discussion–Phase III, Decision Leave–Phase IV, and Termination), the language of the policy states that:

> Specific performance-related issues regarding performance, quality, and conduct, will be evaluated on a case-by-case basis, and corrective action may be applied based on the severity of the performance issue. (Handbook, p. 33).

17.    In practice, and as allowed by policy on a case-by-case basis, HMMA has routinely implemented Corrective Action at various steps in this process depending on the particular facts of each situation. As with the past incident of intentional sleeping discussed by the Termination Committee, immediate termination was warranted and appropriate.

18.    The Serious Misconduct Policy specifically states that certain acts may place a Team Member outside the Corrective Action process that may subject him or her to immediate termination. (Handbook, p. 34). The non-inclusive list of examples of serious misconduct includes, "Serious and/or excessive violations of HMMA's performance standards." (Handbook, p. 34). Plaintiff's actions were deemed by the Termination Committee to be a serious misconduct violation and, therefore, termination was an appropriate consideration.

19.    Further, the Corrective Action Policy confirms that every Team Member's employment is "voluntary" and "is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time." (Handbook, p. 33).

20.    Likewise, each HMMA Team Member signs a "Receipt of Handbook Acknowledgement." A true and accurate copy of the receipt signed by Plaintiff and contained in his Human Resources file is attached as **Attachment B**. By signing this receipt, Plaintiff acknowledged receipt of the Team Member Handbook and, consequently, the policies contained therein, as well as acknowledging a duty to read the Handbook and to ask questions if he failed to understand any portion thereof. (Receipt, ¶ 5). The Receipt further confirms that the Handbook is "not a contract of any kind" and that employment is "at will" and subject to termination "for any reason or for no reason at any time." (Receipt, ¶ 4).

21.    Through the conclusion of the Termination Committee meeting and Plaintiff's termination, I was unaware that Plaintiff was a member of the uniformed services as defined by

WSW

the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301, *et seq.* ("USERRA"). Indeed, whether or not Plaintiff was a member of the uniformed services or otherwise was protected by USERRA in any way was not considered by the Termination Committee.

22.    Further, Plaintiff's USERRA status would have been irrelevant to the termination committee's analysis because it determined that intentional sleeping on the job was a violation of HMMA's serious misconduct policy meriting immediate termination.

23.    As Manager of the Employment & Benefits Section I am also responsible for conducting termination sessions of HMMA Team Members. I personally conducted the termination session for Plaintiff.

24.    Plaintiff was escorted to HMMA's security building, which is away from the main production area and, consequently, Plaintiff's co-workers. Part of his escort included unarmed security guards who are present as a matter of HMMA policy and practice in every similar situation to ensure the safety of all HMMA Team Members. Team Members, including Plaintiff, are escorted to the security building in order to conduct such sensitive personnel matters with as much sensitivity and privacy for the Team Member as possible. Likewise, the final steps of termination are carried out in a private conference room, again to ensure the utmost sensitivity and privacy for the Team Member.

25.    As with all similar situations, Plaintiff met with me and others to complete the termination session. When Plaintiff was brought into the security building conference room, I introduced him to the other HMMA Team Members who ordinarily play a role in the termination process and explained the purposes of the meeting. I told Plaintiff the Termination Committee decided to terminate his employment based on a report by Team Relations that Plaintiff was



asleep during work hours. Scott Gordy reviewed an "Exit Interview Questionnaire and Checklist" and "Exit Checklist" with Plaintiff to ensure company property was returned, that Plaintiff received his personal property, and that information concerning final paychecks and benefits was exchanged as necessary.

26.    I reviewed a termination letter explaining the basis for his termination, dated February 26, 2007, with Plaintiff and later mailed it to his home address.

27    I also explained to Plaintiff that he could contact Team Relations to initiate the Peer Review process when he was asked if there was anything he could do about his termination. To my knowledge, Plaintiff never attempted to take advantage of the Peer Review process.

28.    Although Plaintiff suggested an interest in talking to Team Relations about getting his job back, he did not question the basis of the termination decision or otherwise deny the facts surrounding his termination at that time.

29.    During the termination session, although locker contents and personal belongings are customarily a point of discussion, and were in this case, Plaintiff never suggested that he might have additional personal belongings in his locker or that HMMA might have other personal belongings that needed to be returned to him.

30.    More importantly, at that time, Plaintiff did not raise the issue of his uniformed service or suggest that he might have protection from termination for any reason under USERRA.

31.    HMMA maintains a policy honoring military leave obligations in its Team Member Handbook, and has maintained such a policy since the plant opened in 2005. A true and accurate copy of HMMA's military leave policy existing during Plaintiff's employment is contained on page 22 of the Team Member Handbook, attached hereto as Attachment A.

Page 7 of 8



Specifically, HMMA's Team Member Handbook recognizes "leaves of absence for military service, training, or other obligations in compliance with state and federal laws." (Handbook, p. 22). Indeed, HMMA's uniformed service policy even provides for differential pay between military pay and regular wages/salary for up to one month. (Handbook, p. 22).

32.    Also, I have personal knowledge that Greg Prater, Plaintiff's supervisor, also served in the military. Prater informed me of his military service on at least one occasion. At no point has Prater given any indication that he would have any animus against the uniformed services or anyone who served in the uniformed services.

33.    Greg Kimble is the Director of Human Resources at HMMA. Kimble has not worked at HMMA since January 12, 2007 because he has been on medical leave. Kimble did not attend the Termination Committee to discuss the termination of Plaintiff, and he did not have any input or involvement in the decision to terminate Plaintiff's employment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this the _14th_ day of December, 2007.

_Wendy S. Warren_    12/14/07

Wendy Warner



## CONTENTS

HMMA History ................................................................. Page 1
HMMA Vision Statement ................................................... Page 1
HMMA Mission Statement .................................................. Page 1
HMMA's Team Values and Standards ................................... Page 1
    Safety
    Quality
    Team Diversity
    Efficiency
    Stewardship
Equal Employment Opportunity .......................................... Page 2
Unlawful Harassment ....................................................... Page 2
HMMA's Position on Unions ............................................... Page 3
Purpose of the Handbook .................................................. Page 3
Employment Statement ..................................................... Page 3
Team Member Records ...................................................... Page 4
Probation Period ............................................................. Page 4
Length of Service ............................................................ Page 5
Employment of Relatives .................................................. Page 6
Temporary Workers and Replacement Workers ..................... Page 6
Team Member Orientation ................................................. Page 6
Hours of Work ................................................................ Page 6
Breaks/Communication Period ........................................... Page 7
    Break Periods
    Communication Period
Attendance .................................................................... Pages 7-10
Work Week ..................................................................... Page 10
Overtime ....................................................................... Page 10
    Non-Exempt Team Members
    Exempt Team Members
Pay .............................................................................. Page 11
Payday .......................................................................... Page 11
Direct Deposit ................................................................ Page 11
Questions Regarding Pay .................................................. Page 11
"Call In" Pay .................................................................. Page 11
"Report In" Pay .............................................................. Page 11
Statement of Earnings ..................................................... Page 12
Garnishments ................................................................. Page 12
Benefits ........................................................................ Pages 12-20
    Attendance Incentive Program
    Family and Medical Act (FMLA)
    Holidays
    Vacation Non-Exempt/Exempt Team Members
    Scheduling Vacation
    Summer Shutdown
        Soliciting Volunteers
        Required Work
        Medical Leave

i

Canceling Vacation
Personal Days
Scheduled Personal Days
Unscheduled Personal Days
Transfers
Unscheduled Vacation
Vacation Eligibility
Unused Vacation Time
Personal Leave
Bereavement Leave................................................................Page 20-22
Jury Duty..............................................................................Page 22
Military Leave.......................................................................Page 22
Team Wear ...........................................................................Pages 22-24
Safety ...................................................................................Page 24-25
Safety Committees
Safety Wear
Hard Hats and Bump Caps
Shoes
Safety Glasses
Personal Protective Equipment (PPE)
Housekeeping
Lock Out/Tag Out Procedures
Special Authorization Permits ...............................................Page 26
Confined Space Entry Permits
Hot Work
Area Specific Safety Rules
Security ................................................................................Page 26 -27
Foreign Trade Zone (FTZ)
Video Surveillance
HMMA Identification Badges (ID)
Parking/Traffic Control
Career Opportunity Program .................................................Page 27-28
Transfers  .............................................................................Page 28-29
Solicitation, Distribution, and Postings ..................................Page 29-30
Team Member Work Conduct..................................................Page 30-31
Corrective Action...................................................................Page 31-33
Discussion Planner
Informal Discussion
Formal Discussion
Commitment Discussion
Decision Leave
Termination
Serious Misconduct................................................................Page 34-35
Workplace Threats and Violence ...........................................Page 35-36
Team Member Resolution Program and Procedure................Pages 36-38
Step 1: Supervisory Level
Step 2: Resolution Request
Step 3: Resolution Appeal
Step 4: Resolution Final Appeal

ii

Dees v. HMMA, et al.   0006
Warner Depo Doc.

Team Member Review Board............................................Page 38
Drugs, Alcohol and Weapons.................................. Page 38-40
For Cause Testing and Random Testing ............................ Page 40-41
Public Relations ...................................................................Page 41
Internal Communications.........................................Pages 42-44
Open-Door Policy
    Bulletin Board
    President's Roundtable
    Group Leader/Manager One-on-Ones
    Manager's Lunches
    Team Advisor
    Hyundai Communication System (HCS)
    HMMA Closed Circuit Television System
    HMMA Weekly News
    Hyundai Insights
    Five Minute Communication Meetings
Community Relations ............................................. Page 44-45
    Speeches
    Tours
General Information................................................. Page 45-46
    Electronic Devices
    Camera/Video Camera
    Cell Phones/Pagers
    Audio Tape Recorders
HMMA Tools...........................................................Page 46
Lockers.............................................................. Page 46-47
Cafeteria...............................................................Page 47
Smoking ................................................................Page 47
Telephone Calls.......................................................Page 47

iii

Dees v. HMMA, et al.   0007
Warner Depo Doc.

## HMMA HISTORY

Hyundai Motor Company (HMC) was established in 1967. By 1974, HMC produced the Pony as their first independently designed and manufactured model.

In 1985 HMC established Hyundai Motor America (HMA) and launched the Excel which was the best selling import sub-compact in the US for three years. Eight years later Hyundai launched the Sonata II and started assembly of the Excel in Thailand.

Over the last 35 years Hyundai has established its place in a global marketplace. On April 2, 2002, Hyundai announced it had chosen Montgomery, Alabama to build its first U. S. manufacturing facility which will produce the next generation Sonata and Santa Fe.

## HMMA's VISION STATEMENT

Our Team provides value for your future

## HMMA's MISSON STATEMENT

To create exceptional automotive value for our customers by harmoniously blending safety, quality, and efficiency. With our diverse team, we will provide responsible stewardship to our community and environment while achieving stability and security now and for future generations.

## HMMA's TEAM VALUES

**SAFETY:** HMMA is committed to providing a safe working environment to preserve and enhance the health and personal safety of our Team Members. We will achieve this through the implementation of safety policies, safe work practices, a drug free workplace, and by daily commitment of all Team Members.

**QUALITY:** HMMA's commitment to Quality begins with its ability to achieve continuous improvement in its product by always listening to our customers. HMMA works with its suppliers to ensure high standards are continually maintained. All HMMA Team Members have an active role in maintaining and improving both the manufacturing process and quality.

**TEAM DIVERSITY:** HMMA's success depends on treating each Team Member with dignity and respect and utilizing our Team's diversity to its maximum potential. HMMA's definition of Team Diversity is accepting our differences and learning from each Team Member's unique perspective in order to achieve a new standard of excellence in society, at home and at work. We must all work as a Team, practicing integrity as we deal with our customers while listening and learning from one another, sharing in our successes, and helping one another succeed.

**EFFICIENCY:** In order to provide job stability and maintain profitability to HMMA we must all act effectively to minimize all aspects of waste.

1

Dees v. HMMA, et al.    0008
Warner Depo Doc.

To achieve continuous growth and innovation, each Team Member has the responsibility to find more efficient ways to produce our products for our internal and external customers.

STEWARDSHIP: At HMMA we are committed to the stewardship of our environment and our community. Stewardship simply means managing responsibly. We are committed to conserving energy, recycling, and eliminating elements that could cause harm to the environment. HMMA is also committed to being actively involved in our community in order that it may grow for the benefit of our Team Members and their families.

## EQUAL EMPLOYMENT OPPORTUNITY

HMMA is committed to providing an environment that is free of unlawful discrimination and providing equal employment opportunities and promotional opportunities to all Team Members.

Equal employment opportunity means eliminating any practice of unlawful discrimination from employment - in recruitment, application, qualification, hiring, training and education, promotions, corrective action, layoffs, terminations, and all other conditions of employment.

HMMA makes all decisions with regard to employment without discriminating on the basis of race, color, religion, national origin, age, sex, disability, veteran status or any other unlawful basis. Additionally, HMMA will make reasonable accommodations for qualified job applicants and Team Members with disabilities, in accordance with the Americans with Disabilities Act.

HMMA's team relations manager has the appropriate authority and the responsibility to administer the EEO programs with regard to employment and promotional opportunities. Any Team Member who feels he/she has been discriminated against may express such concerns to his/her group leader/manager, the team relations representative, and/or the Human Resources Director. HMMA's team relations manager will be responsible for administering HMMA's EEO policy and insuring that any reported EEO violations are investigated promptly and handled according to all federal and state laws as well as HMMA's policies and procedures.

## UNLAWFUL HARASSMENT

In order for all HMMA Team Members to enjoy a work environment free from all forms of unlawful discrimination, including sexual harassment, no Team Member - male or female - should be subject to unsolicited and unwelcome sexual advances or conduct, whether verbal, physical, explicit, or implied. This includes verbal innuendoes, suggestive comments, off-color jokes, gestures or physical contact. Such embarrassing, demeaning or intimidating behaviors interfere with a Team Member's work performance and may create a hostile, offensive work environment. It is also unlawful sexual harassment when submission to sexual

2

Dees v. HMMA, et al.    0009
Warner Depo Doc.

advances is a condition of getting or keeping one's job or when it influences personnel decisions. Furthermore, it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, veteran's status, or any other unlawful basis. Cases of such unlawful harassment should be reported to your group leader/manager, team relations representative, or the team relations manager.

## HMMA's POSITION ON UNIONS

HMMA's team concept and creating a team environment is based on faith in each Team Member and recognizes our commitment to ensure a positive working environment. HMMA has developed its policies, wage structure and benefits plans with our Team Members' best interests in mind. Additionally, HMMA is committed to providing all Team Members with a safe place to work by utilizing state of the art equipment, technologies, as well as work practices to ensure safety.

By joining together as a team, we can accomplish our mutual goals assuring the success of Hyundai Motor Manufacturing Alabama, LLC and providing greater opportunities and job security for all Team Members and their families. Because of HMMA's commitment to every Team Member we do not believe that a third party such as a union is necessary at HMMA.

## PURPOSE OF THE HANDBOOK

HMMA's handbook is intended as a summary of HMMA's policies and procedures. We ask each Team Member to read the handbook and familiarize themselves with HMMA's policies and procedures in order for you to understand HMMA's responsibilities to you and your responsibilities to HMMA.

This handbook is not a contract. We ask each Team Member to understand that in order for HMMA to remain competitive in a global market there may be times when changes are necessary. HMMA reserves the right to change policies and procedures when it becomes necessary, either in whole or in part, with or without notice. When it is determined that a policy or procedure needs to be changed, all Team Members will be notified by their manager and/or a video or other printed material to communicate such changes.

If Team Members have any questions concerning these policies and procedures they should ask their group leader/manager. If the Team Member is still unclear about the policies and procedures they should contact their team relations representative for clarification.

## EMPLOYMENT STATEMENT

Every Team Member's employment with HMMA is a voluntary one and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this

3

Dees v. HMMA, et al.    0010
Warner Depo Doc.

handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA Team Members.

This policy of employment-at-will may not be modified by any officer or Team Member and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the president or the board of directors, whichever is applicable.

This handbook or any policies or procedures are not contracts of employment.

## TEAM MEMBER RECORDS

Team Member records will be kept for information and business purposes only. Any of the following changes to your status must be reported to Human Resources:

- Name, address, or telephone number
- Marital Status
- Birth date, total number of dependents, their relationship to you
- Citizenship status
- Benefit - plan beneficiary designation
- Person(s) to be notified in case of emergency
- Formal education, courses completed, other training or professional skills acquired

Upon request, you may examine your own personnel file and indicate to Human Resouces any information you think is inaccurate. Any Team Member wishing to view his/her personnel file must make a written request specifically stating what he/she wants to review and why they want to review the record on file. All personnel files are confidential information and can only be accessed by HMMA Team Members who have authorization. All personnel folders are located in Human Resources.

## PROBATION PERIOD

The probationary period is 90 calendar days. This probationary period is a time for evaluation, both by you and by HMMA. The probationary Team Member needs to evaluate HMMA's policies, procedures and overall working environment. The automotive industry is highly competitive. The work is fast-paced, physically demanding, high volume production which demands high standards of quality and safety. Learning to meet performance standards, working in a fast-paced manufacturing environment while meeting the guidelines which govern our conduct, and becoming acquainted with our team approach are also a part of the evaluation new Team Members need to make of HMMA.

HMMA needs to evaluate your progress during this period as well. Three performance evaluations are conducted during the probationary period.

4

Dees v. HMMA, et al.   0011
Warner Depo Doc.

These evaluations occur at the following intervals:

1    30 days
2    60 days
3    85 days

If any new Team Member is off due to an approved leave of absence, the number of days absent will be added to the probation period.

Your overall progress is evaluated during the probation period. Strengths and weaknesses are discussed and helpful feedback regarding your development and progress is given during each of the aforementioned reviews.

In the event progress is less than acceptable or violations of standards of conduct occur, a probationary Team Member's employment may be terminated prior to the end of the 90 day period.

Before any new Team Member is terminated, a review of the facts and approvals by the department manager, team relations manager, director of human resources are required.

Once the probationary period is completed, the new Team Member becomes eligible for the following programs:

Equal Treatment Procedure
Peer Review Panel
Corrective Action Program
Attendance Incentive

**LENGTH OF SERVICE**

HMMA considers "length of service" (LOS) as the period of continuous employment, starting from your date-of-hire and applies to all full-time Team Members. Length of service will be broken when a Team Member:

- resigns from employment (leaving the plant without proper authorization is considered voluntary resignation)
- is terminated from employment
- fails to return to work on the day following the end of a personal, medical, military, or other leave of absence, unless unusual conditions or circumstances exist that would prevent the Team Member from returning on the scheduled day
- retires
- fails to communicate with HMMA regarding an absence of three (3) consecutive days or longer (subject to the Family and Medical Leave Act and regulations)
- is not actively employed with HMMA for 12 consecutive months or length of service, whichever is the lesser.

A Team Member who voluntarily terminated his/her employment, and who is rehired, will not have any prior service restored. The date of rehire

5

Dees v. HMMA, et al.    0012
Warner Depo Doc.

will become the new service date. Computation of service, for retirement purposes and the effect of breaks in service for retirement rights, however, will be determined in accordance with the Employee Retirement Income Security Act of 1974 (ERISA).

Transfer opportunities will be awarded based on LOS. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

Position Advancement Opportunities will be based on qualifications. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

## EMPLOYMENT OF RELATIVES

Relatives of Team Members may be employed at HMMA; however, they may not work or come under the direct supervision of another relative. Relatives are defined as those people who are related either by birth, adoption, or marriage.

The employment of relatives at certain levels of HMMA in positions where one might have influence over another will not be allowed.

## TEMPORARY WORKERS AND REPLACEMENT WORKERS

HMMA intends to utilize temporary and replacement workers to reduce temporary peaks of excess overtime, perform special projects, and fill vacancies while Team Members are on military leave, personal leave, or medical leave of absence. Use of temporary replacement workers also helps HMMA avoid potential layoffs.

## TEAM MEMBER ORIENTATION

HMMA will provide every Team Member with the training needed to understand HMMA's philosophies. Each Team Member will receive an orientation outlining HMMA team concepts, policies, benefits, and all other aspects related to their employment at HMMA.

## HOURS OF WORK

### Hours of Work

HMMA's normal work week for all production and administrative (non-exempt) Team Members consists of forty (40) hours per week based on an 8 hour work day five days per week. HMMA's normal work week for all administrative exempt Team Members consists of forty-five (45) per week based on an 8 hour work day and 5 hours of casual time per week. All production and maintenance Team Members will rotate shifts every 4 months. Production, maintenance, and administrative shift hours will

6

Dees v. HMMA, et al.    0013
Warner Depo Doc.

be as follows:

| SHIFT | SHIFT START TIME | SHIFT END TIME |
|---|---|---|
| Production | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 a.m. |
| Maintenance | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 p.m. |
| 3rd Shift | 10:00 p.m. | 6:45 a.m. |
| Administration | | |
| 1st Shift | 8:00 a.m. | 4:45 p.m. |

There may be times when Team Members will be asked to work irregular hours due to production requirements. Any deviation in HMMA's weekly scheduled hours must be reviewed and approved by the payroll and benefits manager or his/her designee prior to any change in HMMA's normal work schedule. Any permanent adjustment to any HMMA Team Members regularly scheduled work hours must have approval by the director of Human Resources.

## BREAKS AND COMMUNICATION PERIODS

### Break Periods

HMMA provides all Team Members with two (2) ten (10) minute paid break periods per day. The first break period will be given in the first half of the Team Members shift; the second break period will be given in the second half of the Team Members shift. All Production Team Members will be provided specific time for each of the described breaks. Due to the nature of Maintenance Team Members responsibilities their breaks will be given at their convenience. In order to allow Administrative Team Members the ability to maintain the continuity of their responsibilities they may take their breaks at their convenience.

There will be times when HMMA schedules overtime. In these situations the Team Member will be given a 5 minute break for every hour of scheduled overtime. These breaks must be given at the end of the eighth hour of work.

### Communication Period

Each Team will have a five minute paid communication meeting at the beginning of each shift. This meeting is for the manager, group leader, or team leader to communicate important information to the team.

## ATTENDANCE

Regular attendance is the cornerstone for the success of HMMA. A Team Member's absenteeism can reduce the quality and effect of the overall efficiency of HMMA's operations, as well as cause hardship on fellow Team Members who report to work regularly. Regular attendance

7

Dees v. HMMA, et al.    0014
Warner Depo Doc.

is every Team Member's responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.

The minimum acceptable standard of attendance is 98%.

Any scheduled workday missed is considered an absence. However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, short-term disability, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

If a Team Member is absent due to a catastrophic event that results in a legally declared emergency which results in the closure of all major roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences will not count against the Team Member's attendance for the purpose of calculating the acceptable standard of attendance, nor be cause for corrective action. Final approval as to the declaration of a "Catastrophic Event" shall be made by the director of Human Resources.

Team Members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God which result in Team Members being tardy will be evaluated on a case by case basis. If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy shall not affect a Team Member's attendance record.

Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early. A leave early will be considered as one-half day of absence for purposes of attendance calculation.

Any situation where a Team Member leaves the facility during scheduled work time (including overtime whether scheduled or voluntary) **without** their group leader, manager, senior manager, or any other member of management's **authorization**, the Team Member **will be considered to have voluntarily resigned** from his/her employment at HMMA.

Attendance will be calculated using a rolling calendar year using the following formula:

- Calculate the number of scheduled workdays. Scheduled workdays will include all excused scheduled workdays.
- Calculate the number of unexcused workdays.
- Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team Member's attendance percentage.

8

Dees v. HMMA, et al.    0015
Warner Depo Doc.

o  Example:

237 Scheduled workdays
- 5   unexcused workdays
232/237 = 97.9%

When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve- month period, corrective action will be considered. The rolling twelve-month period is a 365-day period.

Every Team Member is expected to notify his/her group leader and/or manager, in advance, of any known absence or future absence. When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift.

Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

The following will be considered:

- Cause
- Frequency
- Patterns
- Failure to report
- Time pattern of reporting

A Team Member that **does not communicate** to his/her group leader and/or manager regarding his/her absence **for a period of three (3) consecutive days** or longer is **considered to have voluntarily resigned** his/her employment at HMMA.

All Team Member Attendance records will be maintained by the group leader and/or manager. Any corrective action necessary is taken by the group leader and/or the manager. The appropriate team relations representative will be in attendance.

The corrective action process is intended to help Team Members correct any attendance problems. However, if the Team Member's attendance continues to be unacceptable it could result in further corrective action up to and including termination.

When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when corrective action is taken, the following steps must be followed:

1     Informal Discussion
2     Formal Discussion
3     Commitment Discussion
4     Decision Leave

9

Dees v. HMMA, et al.   0016
Warner Depo Doc.

The team relations representative will be consulted for guidance at each step of the aforementioned corrective action steps. The team relations representative will also attend each step as it occurs.

When corrective action is required beyond the four steps above, the Team Member's group leader and/or manager will contact the team relations manager and request a review of the Team Member's record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and director of Human Resources.

## WORK WEEK

HMMA's work week begins at 12:01 a.m. Monday and ends on Sunday at 11:59 p.m.

## OVERTIME

### Non-exempt Team Members

Due to the nature of the automotive industry there will be times when we will be required to work overtime in order to meet our customer's needs. Overtime will be paid in one-tenth hour increments; any overtime worked will be paid during the normal pay cycle and included in the regular payroll check.

Overtime is calculated using the base rate of pay plus shift premium and team leader premium, if applicable. Overtime will be paid at 1.5 times the Team Member's regular rate of pay for any time worked in excess of eight hours during the normally scheduled work day as long as 40 hours of work has been achieved for that work week. Team Members will be paid at 1.5 times their regular rate of pay for time worked on Saturday or the sixth work day. Additionally, Team Members will be paid 2 times their regular rate of pay for time worked on Sunday or the seventh day of continuous work. Team Members who work on an approved HMMA holiday will be paid at 2 times their rate of pay. Vacation time will count as hours worked when calculating overtime.

### Exempt Team Members

Assistant managers and specialist Team Members wages are based on a 40 hour work week and 5 hours of casual overtime. Casual overtime is time that is worked without approval. Assistant managers and specialists will be paid at 1.5 times their calculated regular hourly rate for all pre-approved overtime.

In situations where the assistant manager and/or specialist Team Member is required to work because of scheduled production overtime they will be paid at 1.5 times their calculated hourly rate. Due to the fact that production overtime is scheduled and the assistant manager and/or specialist is required to work in order to support production needs the overtime will be considered as pre-approved. Additionally, the casual overtime rule

10

will not apply in this situation.

## PAY

HMMA reviews wages each year and makes appropriates changes to the wage scale based on several factors, such as: automotive industry, HMMA's performance, and the cost of living. Each Production and Maintenance Team Member will receive a base rate when joining the HMMA family and will receive a rate increase periodically over a 24 month period until they reach the top pay rate.

## PAYDAY

All Team Members will be paid on Tuesday on a biweekly basis.

## DIRECT DEPOSIT

All HMMA Team Members are required to use direct deposit. Each Team Member will receive an advice stub which will itemize pay and deductions in detail. Any questions regarding direct deposit should be directed to the Payroll and Benefits Department.

## QUESTIONS REGARDING PAY

If any Team Member has a question regarding pay, they are to contact their manager/assistant manager/group leader. The manager/assistant manager/group leader will notify the payroll department of any issues concerning pay and report back to the Team Member or arrange a meeting with the payroll department for the Team Member.

## "CALL IN" PAY

HMMA will pay for a minimum of four hours work at the regular straight time hourly rate for those Team Members who are called to work at a time other than their regularly scheduled work hours (before or after, but not continuous with their regularly scheduled shift). If there is at least four hours work available and the Team Members are given the option to work less hours, they will be paid only for the hours worked if they exercise the option to leave early.

## "REPORT IN" PAY

If the scheduled production is canceled due to any emergency, prior to the start of the shift and at least one hour of notification has been provided to the Team Members, no work will be available and no pay made to the Team Members.

If the scheduled production is canceled due to any emergency and less than one hour of notification is provided, Team Members will have the option of leaving and receiving pay only for the time worked or staying for a total of four hours. If the Team Member elects to remain at work, he or she must leave the plant at the end of this period.

11

Dees v. HMMA, et al.    0018
Warner Depo Doc.

If the notification of canceled production is made after four hours of work from the normal scheduled starting time of the shift have been completed, Team Members will have the option of leaving and receiving pay only for the time worked or staying until the end of the regular shift. Team Members that have not been given their options and have been forced to leave will be paid for 8 hours.

Anytime a Team Member volunteers to go home early or is required to go home early, the Team Member may elect to use any available vacation time to make up for lost income. This time will always be excused and the lost time will not count against the Team Member's attendance.

## STATEMENT OF EARNINGS

Each Team Member will receive a yearly statement of earnings. The yearly statement of earnings is known as a W-2 Withholding Statement which provides the amount earned and the taxes that have been withheld. The W-2 will be issued in January each year for use in filing income tax forms.

## GARNISHMENTS

HMMA respects every Team Member's right to privacy with regard to personal and confidential information. However, HMMA may be required, by law, to withhold a portion of your pay if served with a court notice of a garnishment, wage assignment, wage deduction, or government levy. When situations such as this occur HMMA's payroll department will notify you of any pending action involving such matter that requires a wage withholding situation.

## BENEFITS

HMMA benefits are described in the Summary Description Plan.

## ATTENDANCE INCENTIVE PROGRAM

HMMA will pay a premium of $100.00 to non-exempt and exempt Team Member's up to assistant manager for perfect attendance for each 4-week period. All regular, full-time, non-exempt and exempt Team Members up to assistant manager are eligible to participate in the Attendance Incentive Program.

During the probationary period, a Team Member is not eligible to participate in the Attendance Incentive Program. A Team Member becomes eligible the first full 4-week attendance period following the end of his/her probation period.

The Team Member must maintain a perfect attendance record for a four (4) week attendance period to receive an attendance incentive. Perfect attendance is defined as **no absences**, including tardiness, early leave, lost time including scheduled overtime, or personal leaves.

The only exceptions to this policy are:

12

Dees v. HMMA, et al.   0019
Warner Depo Doc.

- HMMA observed holiday, unless the Team Member is scheduled to work on the holiday
- Scheduled Vacation
- Personal Days (HMMA may require documentation)
- Jury Duty
- Military Leave. Military leave shall be considered in accordance with applicable law.
- Bereavement Leave
- The balance of a shift lost due to an occupational illness/injury.
- Workers Compensation related doctor appointments. (When a Team Member misses part of a day due to a workrelated injury/illness doctor appointment **scheduled** by the HMMA Medical Clinic.)
- Any work-related activities away from the plant
- Any medical leave, either work-related or non-work related that is determined to be FMLA
- Any leave that is determined to be FMLA

## FMLA

### General Provisions

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12 month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be unpaid, paid, or a combination of unpaid and paid leave, depending on the circumstances of the leave and as specified in the policy.

A Team Member must have worked for HMMA for 12 months, or 52 weeks. In addition a Team Member must have worked at least 1250 hours during the 12 month period immediately before the date when the leave is requested to commence.

In order for the leave to qualify under the policy, the Team Member must be taking leave for one of the reasons listed:

- The birth of a child and in order to care for that child;
- The placement of a child for adoption or foster care, and to care for the newly placed child;
- The care of a spouse, child, or parent with a serious health condition; or
- The serious health condition of the Team Member.

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the medical certification form. Request for medical certification must be made in writing as part of

13

Dees v. HMMA, et al.   0020
Warner Depo Doc.

HMMA's response to the Team Member's request for leave.

All Team Members requesting leave under the policy must provide verbal notice with an explanation of reason(s) for the needed leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reason(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

### HOLIDAYS

HMMA observes paid holidays each calendar year. HMMA will review the holiday schedule each year and communicate to all Team Members the holiday schedule for the coming year in November. All full time Team Members and team leaders are eligible for holiday pay, which includes shift premium if applicable. All full time Team Members will be eligible for holiday pay as of their first day of employment.

All Team members must work his/her last full scheduled workday before the holiday and the first full scheduled workday following the holiday in order to receive holiday pay.

All non-exempt Team Members and exempt Team Members up to assistant manager will be paid double time for hours worked on a designated HMMA holiday.

### VACATION NON-EXEMPT/EXEMPT TEAM MEMBERS

HMMA realizes that vacation is an important benefit for all Team Members. HMMA's intention is to provide Team Members with a means to take a scheduled vacation without loss of pay. Vacation does not apply to holidays, bereavement leave, jury duty or military leave pay. The vacation allowance is granted for the calendar year only. Once it is used for the year, it is not renewed until January 1st of the next calendar year.

A Team Member's vacation eligibility is determined based on his/her length of service with HMMA and is to be used during the calendar year January 1st through December 31st. Any Team Member that has not worked hours for the year in which the vacation is scheduled will not be paid until at least one day has been worked in the qualifying year. Although Team Members must actually perform work in a new calendar year before qualifying for vacation, Team Members may use their vacation in January if it is connected with vacation or a holiday from the previous year. Five vacation days are reserved and must be used during HMMA's summer shutdown. However, a Team Member may use these days prior to shutdown for Family Medical Leave or if the Team Member is scheduled to work the vacation days that are reserved for the summer shutdown period. Anticipated unused shutdown vacation days may not be scheduled for dates before the actual shutdown occurs.

Starting the year of the Team Member's second anniversary, the Team

14

Dees v. HMMA, et al.    0021
Warner Depo Doc.

Member is eligible for vacation according to the following schedule. (The Team Member's vacation allowance is available as of January 1st each year)

Team Members with:

- Less than one year will receive a prorated vacation based on the following
  - o January     – 10 days vacation
  - o February    – 9 days vacation
  - o March       – 8 days vacation
  - o April       – 7 days vacation
  - o May         – 6 days vacation
  - o June        – 5 days vacation
  - o July        – 4 days vacation
  - o August      – 3 days vacation
  - o September   – 2 days vacation
  - o October     – 1 days vacation
  - o November & December – 0 days vacation

- Beginning January of the next year Team Members will receive:
  - o 1st year    – 10 days vacation
  - o 2nd year    – 11 days vacation
  - o 3rd year    – 12 days vacation
  - o 4th year    – 13 days vacation
  - o 5th year    – 14 days vacation
  - o 6th year    – 15 days vacation
  - o 7th year    – 16 days vacation
  - o 8th year    – 17 days vacation
  - o 9th year    – 18 days vacation
  - o 10th year   – 19 days vacation
  - o 11th year   – 20 days vacation
  - o 12th year   – 21 days vacation
  - o 13th year   – 22 days vacation
  - o 14th year   – 23 days vacation
  - o 15th year   – 25 days vacation

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

## SCHEDULING VACATION

In order for HMMA to plan proper coverage for Team Member vacations, the scheduling period for the subsequent year's vacations will be during November and December as follows:

- Full week and single days of vacation for January and/or February must be scheduled between November 1 and

15

Dees v. HMMA, et al.    0022
Warner Depo Doc.

November 30 of the preceding year.
- Full weeks and single days of vacation for the remainder of the year - March through December - must be scheduled between December 1 and December 22 of the preceding year.
- Full weeks take precedence over single day vacation requests.
- Single days take precedence over 1/2 day vacation requests.
- When two (2) or more Team Members with the same length of service request the same dates for time off, the last letter of the Team Members' names will be used to determine who has first preference.

## SUMMER SHUTDOWN

HMMA reserves the right to schedule a plant shutdown each year. When a plant shutdown is planned, HMMA will inform Team Members of the planned shutdown by the end of December the prior year. HMMA reserves the right to require the Team Members to use up to 5 days of his or her vacation if needed during the shutdown period.

There may be occasions when it is necessary to schedule work during HMMA's summer shutdown period. When it is necessary to schedule work, each department will notify Team Members 30 days prior to the planned summer shutdown, which they will be required to work.

### Procedure

The manager and/or group leader will solicit volunteers and/or require Team Members to work during the shutdown period using the following criteria:
- **Soliciting Volunteers:**
  - Solicit volunteers based on length of service for shut down days that are not holidays. The Team Member volunteering with the longest length of service will be awarded the work. If two or more Team Members volunteer with the same length of service, the first letter of their last names will determine which Team Member is awarded the work.
  - If the voluntary work being offered is an HMMA holiday, the manager and/or group leader will use the overtime equalization chart to determine which Team Member will be awarded the overtime, as stated in the Equalization of Overtime Policy.
- **Required Work:**
  - When requiring Team Members to work on shutdown days that are not holidays, start from the bottom of the length of service list until the required manning is obtained.
  - All Team Members who volunteer or that are required to work during an HMMA shutdown that involves reserved vacation days will be eligible to reschedule

16

Dees v. HMMA, et al.    0023
Warner Depo Doc.

the vacation days.
- **Skills Requirement**
  - o In overtime situations that require a specific skill and or qualifications to accomplish this job task. Skill will take precedence over length of service.
  - o If more than one Team Member has the skill and qualifications, overtime equalization should be used as a determining factor and then length of service if applicable.

### Medical Leaves During Shutdown Periods

All Team Members that are on an approved medical leave, or personal leave during the shutdown period will be paid for any vacation reserved for the shutdown period, and will not be eligible to reschedule vacation days reserved for the shutdown period.

### Canceling Vacation

Team Members who choose to cancel their scheduled vacation must notify their manager and/or group leader as soon as possible. Team Members may only cancel a scheduled vacation one time per scheduled year.

When a Team Member cancels a scheduled vacation week or day, he/she may reschedule the canceled vacation to any open block of available vacation time. The opportunity for the canceled week or day will be posted in a central area for the entire group or department, whichever is applicable, for 48 hours following the cancellation.

### Personal Days

All Team Members will be given three Personal Days each year. HMMA encourages its Team Members to schedule their Personal Days in advance if possible. However a Team Member may use Personal Days at their discretion for emergency situations or unforeseen circumstances (HMMA may require documentation) that prevent them from reporting to work, leaving early, or reporting late to work.

If a Team Member is already at work and needs to leave, the Team Member must contact his/her manager and/or group leader and get approval before leaving the plant. If the Team Member does not contact his/her manager and/or group leader or another member of management and leaves without proper authorization, he/she will be considered to have voluntarily resigned.

### Personal Day Limitations

- Personal Days were not developed to extend vacation periods or to be utilized in lieu of vacation

- Personal Days were not intended to be used to extend a holiday period, however if a verifiable unforeseen circumstance were to arise the Team Member would be

17

Dees v. HMMA, et al.   0024
Warner Depo Doc.

allowed to utilize a personal day to cover his/her absence.

- Can not be used during the New Hire 90 day probation period.

- If a Team Member uses a Personal Day on a Saturday or Sunday for a verifiable emergency he/she will not be eligible for compensation at a premium rate, but will be compensated at a straight time rate and may be required to provide documentation.

### Scheduled Personal Days

- Must be scheduled in advance of the day taken (before close of previous shift).

- Must be approved in advance by immediate supervisor (may also be denied by immediate supervisor if manning not sufficient).

- Does not require documentation or explanation.

- Scheduled Personal Day will not effect attendance percentage.

- Scheduled Personal Day will remain eligible for attendance bonus.

- Scheduled Personal Day before a holiday will not disqualify holiday pay.

- Scheduled Personal Day before "scheduled Saturday/ Sunday" does not allow for missing Saturday/Sunday if scheduled.

- Scheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Scheduled Personal Day will be paid at straight time (regardless of day requested).

### Unscheduled Personal Days

- Must only be used for emergency purposes.

- Emergency reason may be required to be documented.

- Documented emergency will still be eligible for attendance bonus.

- Un-documented emergency will disqualify for attendance bonus.

18

Dees v. HMMA, et al.    0025
Warner Depo Doc.

- Non-emergency use will disqualify for attendance bonus.

- Un-documented/non-emergency use before a holiday will disqualify holiday pay.

- Un-documented/non-emergency use will not count against attendance percentage.

- Un-documented/non-emergency use to cover tardy will disqualify attendance bonus.

- Utilizing to cover tardy will not count against attendance percentage.

- Unscheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Unscheduled Personal Day will be paid at straight time (regardless of day requested).

### Transfers

If a Team Member transfers to a new Team, the Team Member will be required to reschedule his or her vacation.

### Unscheduled Vacation

A Team Member's vacation allowance does not accumulate and must be taken in the calendar year in which it is earned. Team Members will be paid for any unscheduled vacation on the first pay period in February of the following year.

### Vacation Eligibility

All regular, full time, exempt Team Members are eligible for vacation.

Vacation is earned by the Team Member each January. In order for the Team Member to be eligible for vacation he/she must have reported for work in the year of eligibility.

Requests for vacation days must be submitted to the supervisor one week in advance. The supervisor is required to approve or deny the request within 48 hours.

### Unused Vacation Time

A Team Member will not be allowed to carry over unused vacation into the next year. Team Members that have vacation days remaining after the close of the calendar year (December) will be paid for any remaining vacation time by the first pay period in February.

Upon separation from employment with HMMA, the Team Member's vacation will be prorated and the Team Member will receive pay for any unused vacation during the year in which the termination occurs. If a

19

Dees v. HMMA, et al.    0026
Warner Depo Doc.

Team Member should die during the term of employment, pay for unused vacation will be paid in a lump sum to the Team Member's beneficiary (as designated for retirement plan).

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

### Personal Leave

In an effort to recognize the need of Team Members who require time off in addition to personal days or vacation, HMMA may consider a personal leave of absence without pay for up to a maximum of thirty (30) days.

All regular permanent, full time Team Members employed by HMMA for a minimum of ninety (90) days are eligible to apply for an unpaid personal leave of absence. Departmental requirements will all be taken into consideration before a request is approved. Requests for unpaid personal leave may be denied or granted by HMMA. Approvals of the immediate supervisor, department director, and Director of Human Resources are required. All personal leaves are unpaid leaves.

An eligible Team Member should submit a request in writing to his/her immediate supervisor.

A Team Member is required to return from the unpaid personal leave on the originally scheduled return date. If the Team Member is unable to return, he/she must request in writing the extension of the leave.

If HMMA does not extend the leave, the Team Member must then return to work on the originally scheduled return date or be **considered to have voluntarily resigned** from his or her employment. Extensions of leave will be considered on a case-by-case basis.

### BEREAVEMENT LEAVE

The bereavement leave policy was developed to provide Team Members with a suitable period of time away from work, with pay, in order to properly attend to the arrangements required when a death in the Team Member's family occurs.

The Team Member's group leader or management Team Member should be immediately notified when such leave is needed.

A bereavement leave of absence, with pay, for a period not to exceed five workdays shall be granted to a Team Member when death occurs to the Team Member's:

- parent
- stepparent
- spouse

20

Dees v. HMMA, et al.    0027
Warner Depo Doc.

- child or stepchild

A bereavement leave of absence, with pay, for a period not to exceed three workdays shall be granted to a Team Member when death occurs to a member of a Team Member's family.

For the purpose of this policy, the Team Member's family shall be defined as follows:

- In the event of a miscarriage, if a death certificate is issued, then the above policy will apply
- Mother-In-Law/Father-In-Law
- Sister/Brother
- Grandparent/Grandchildren
- Stepsister/Stepbrother
- Grandparent-In-Law
- Half-sister/Half-brother
- Great Grandparents
- Son-In-Law/Daughter-In-Law

Exceptions may be made to the "Team Member's family" provisions if the deceased was a relative or foster parent and the Team Member resided with or was reared by the deceased.

In the event of the death of a Team Member's relative not mentioned above the Team Member will be excused, with pay, for up to one day (8 hours). This applies to the following family members only:

- Aunts
- Uncles
- First cousins
- Nephews
- Nieces
- Brother-In-Law and Sister-In-Law

When a Team Member is on vacation and a member of the Team Member's family dies, the time off will be considered as bereavement leave. Vacation time missed because of the death may be utilized at a later time. If an official HMMA holiday occurs during time considered as bereavement leave, the Team Member's bereavement will begin the day following the holiday. In addition, Saturdays, Sundays and holidays are not considered as bereavement. Any Team Member who is off on a Friday for an approved bereavement leave will not be expected to work on the Saturday or Sunday after the approved bereavement leave.

All bereavement leaves of more than one day must be taken on consecutive work days. (For example: Tuesday, Wednesday, Thursday, or Friday, Monday, Tuesday).

A Team Member who leaves during his or her shift due to the death of a family member that qualifies for bereavement leave will receive eight hours of total pay for that day. By leaving during the shift, the Team

21

Dees v. HMMA, et al.   0028
Warner Depo Doc.

Member has started his/her bereavement leave and the partial day will count as a full day of the allowable bereavement leave.

HMMA may request documentation for verification to be retained with the leave of absence request.

## JURY DUTY

HMMA will provide income protection while a Team Member carries out his/her civic responsibility regarding jury duty.

Upon receipt of notification from the state or federal courts of an obligation to serve on a jury, the Team Member should notify his/her supervisor. The Team Member is required to provide copies of the jury subpoena or jury summons to his/her supervisor and to the Payroll Department.

Any Team Member appearing as a plaintiff, defendant, and/or witness in any legal proceeding, or for other appearances related to legal proceedings or court cases (e.g. deposition testimony), whether or not pursuant to a court-issued subpoena will not receive paid time off. Vacation, personal time, or unpaid time should be used for these instances.

## MILITARY LEAVE

Team Members who are inducted into the U.S. Armed Forces or who are reserve members of the U.S. Armed Forces or state militia groups will be granted leaves of absence for military service, training, or other obligations in compliance with state and federal laws. These Team Members may use accrued vacation leave but are not required to do so. At the conclusion of the leave, Team Members generally have the right to return to the same position they held prior to the leave or to a position with equivalent seniority, pay and benefits. HMMA will pay the difference between military pay and regular wages/salary for up to one month. Team Members are requested to notify their supervisor as soon as they are aware of the military obligation. Questions regarding HMMA military leave policy, applicable state and federal laws, and continuation of benefits should contact the Human Resources Department.

## TEAM WEAR

The purpose of *Team Wear* is to support the spirit of team work, build open communication, ensure safety for Team Members, protect product finish, ensure proper security and identify visitors.

*Team Wear* will be worn by all Team Members in a neat and appropriate manner during normal business hours, except when a special business meeting requires other clothing. *Team Wear* may be worn to and from work. The *Team Wear* concept also applies to interns & co-op Team Member who are issued *Team Wear* by HMMA.

Other HMMA apparel is not considered *Team Wear* and should not be worn during normal working hours. Likewise, jackets, sweaters and

Dees v. HMMA, et al.   0029
Warner Depo Doc.

sweatshirts not issued or purchased through the *Team Wear Collection* should not be worn over *Team Wear* during business hours.

The color choices at the present time are:

- pants/skirts in khaki, navy, grey, olive and black
- shirts in tan, white, blue & blue/white, herringbone, green, slate blue, denim, khaki, and black.

Team Members will also have choices of sweatshirts and sweaters which are also embroidered with the company logo.

Skirts may be hemmed to no more than 3 inches above the top of the knee.

All alterations will be done at Team Member expense. Safety issues and mutilation hazards for clothing should be kept in mind when altering clothes.

Team Wear is provided to Team Members once each 18 months. During orientation each Team Member will order his/her initial set of:

- 5 pants/skirts
- 5 tops
- 1 hat
- 1 belt

Every 18 months Team Members will receive a full replacement set of *Team Wear* due to wear and tear. Team Members will also have the option to purchase, at their own expense, pants/skirts in the same approved colors as those provided by HMMA.

Jeans (blue, black or any other color) are not considered appropriate for work at HMMA and are not to be worn during normal working hours. All items must conform to the Team Wear concept. Safety issues and protecting the finish of the vehicle should be taken into consideration when choosing Team Wear (100% cotton clothing is required in some areas and loose clothing is not allowed on production lines).

Team Wear which is damaged during work hours at HMMA will be replaced.

Maternity wear is available upon request. The choices will include a navy jumper, navy slacks and a white blouse. The jumper must be dry cleaned at the Team Member's expense. Due to changes in sizes, maternity clothing may be requested twice during pregnancy. Team Members may choose to wear maternity clothing of their own choosing (and expense) if the colors match those outlined above.

Additional HMMA apparel from the HMMA Team Wear Collection may be purchased by the Team Member through the supplier for Team Member use only. Team Wear may not be purchased for family members, however, Hyundai logo items may be purchased through the HMMA

23

Dees v. HMMA, et al.    0030
Warner Depo Doc.

Gift Shop. Team Members will bear the expense of tax and shipping for individual purchases.

Note: No pins, buttons, or other items may be worn on HMMA Team Wear unless it is issued by HMMA. Furthermore, only HMMA issued hats may be worn at HMMA. All HMMA head wear must be worn as issued and may not be altered. The only acceptable alteration is the addition of the Team Members name.

## SAFETY

HMMA's goal is to eliminate potential hazards before they become an accident. Every Team Member is responsible for safety not only for themselves but for others. We can all prevent incidents by avoiding unsafe acts, reporting unsafe acts and conditions and by learning and following the policies and procedures that have been developed to keep our facility safe.

### Safety Committees

HMMA's safety committees provide Team Members an opportunity to participate in safety improvements in their areas. The safety committees will conduct area audits, identify safety training needs and support safety awareness programs in the facility.

### Safety Wear

As part of HMMA's total Team Member safety program, special clothing and other apparel designated by department managers and the Safety/ Environmental Department must be worn by Team Members, when and where required, to help guarantee your personal safety.

### Hard Hats and Bump Caps

Hard hats (heavy-duty, impact-resistant hats) must be worn in work areas where there is danger of falling objects or hazardous conditions. Bump caps (lighter weight hats) may be required in some areas as an additional means of protection. Team Members are reminded to obey signs or directions in areas where such protective devices must be worn.

HMMA will issue all bump caps and hard hats. Only HMMA-issued hats may be worn. Additionally, safety caps may not be altered in any way. The only exception is the addition of the Team Members name.

### Shoes

HMMA safety-approved shoes are required in many areas of the plant and are necessary to safeguard your health. HMMA has established a specified dollar amount it will pay toward the purchase of safety shoes. Contact the safety department for the exact amount.

### Safety Glasses

All Team Members, vendors and visitors at HMMA are required to

24

wear OSHA-approved safety glasses in the production areas. Safety glasses are provided by HMMA and can be ordered through the Safety Department. Eye examination charges are not covered under this program. Safety glasses do not have to be worn when entering, exiting, or during breaks and lunch.

**Personal Protective Equipment (PPE)**

When it is required, use of special safety equipment by Team Members shall be regarded as a condition of employment. Further information will be given to you during your training regarding equipment needed for your job. If you are not sure of the PPE required in your work area, please contact your group leader.

**Housekeeping**

Good housekeeping habits allow all HMMA Team Members to be safe in their work areas as well as the ability to work more efficiently. Each Team Member is responsible for maintaining their work area. If we allow dust and dirt to accumulate or if we do not regularly maintain the work area safety hazards may occur. Team Member is responsible for disposing of trash both inside and out into the proper receptacle. Failure to adhere to the aforementioned is considered to be a performance issue and could result in corrective action.

**Lock-out/ Tag-out Procedures**

The safety of all HMMA Team Members is a primary concern. In order to protect all Team Members from danger, we have established a Lock-out/Tag-out procedure to protect all those who enter machinery, work within machinery, or use machinery as part of their job duties at HMMA. Only authorized Team Members who have completed lock-out/tag-out training may work within machine guarding or enter machinery. Strict compliance with the lock-out/tag-out procedures and rules are required from all HMMA Team Members and contractors at all times.

HMMA will issue each trained and authorized Team Member a personal safety lock along with an identification tag. The Team Members lock and tag is required to be properly attached to the lock-out devices located on each piece of machineries control panel before entering. In situations where multiple persons must enter a piece of machinery requiring lock-out/tag-out, each person must attach his/her lock and tag to the lock-out device with a multi-lock hasp. All locks and tags must be removed before the equipment is restarted.

Because of the differences in each machine or piece of equipment, the Team Member should learn the proper method of locking and tagging each piece of equipment they operate, repair or maintain. If a Team Member is unsure about the procedures for locking out the equipment, the Team Member must ask their manager and/or call the Safety Department for assistance.

25

Dees v. HMMA, et al.   0032
Warner Depo Doc.

## SPECIAL AUTHORIZATION PERMITS

Because of the varied types of work required, certain types of work require special authorization and/or training. Areas designated as confined space or certain welding operations require a permit prior to beginning work.

### Confined Space Entry Permits

When a location is designated a "confined space" it requires specialized training before a Team Member can work in the designated area. Confined spaces present characteristics of an atmosphere or have the potential for serious safety and/or health hazards.

Lack of oxygen or contamination of the air is possible in confined spaces. No Team Member or contractor is allowed to enter a "permit required" confined space unless they have received the proper training and the area has been adequately tested and a confined space entry permit has been issued. When training and/or a permit is needed contact the Safety Department to obtain training and/or a permit.

### Hot Work

There are areas within our facility that are susceptible to fire and explosions. Because of these dangers Team Members planning to do "hot work" in these areas must obtain a hot work permit before performing cutting, welding and/or spark producing work. Hot work being done on welding lines and in authorized maintenance areas does not require a hot work permit unless otherwise posted. All hot work permits must be obtained from the Safety Department.

### Area Specific Safety Rules

Individual areas within our facility will have area specific safety requirements. These include but are not limited to:

- Rules for the proper use of different kinds of tools and equipment
- Rules for performing different kinds of operations
- Proper techniques for lifting or performing other physical activity

Each department will be responsible for communicating the safety rules that apply to your particular job function. If a Team Member is unsure of the safety requirements for their work area they are to contact the manager for the department or the Safety Department.

## SECURITY

### Foreign Trade Zone (FTZ)

HMMA is designated as a FTZ under the Foreign Trade Zone Act of 1934.

26

The FTZ makes it possible for HMMA to receive parts from other countries without paying the required duty tax until the parts leave the FTZ as part of a completed vehicle. Operation of the FTZ is under the supervision of U.S. Customs Service and therefore HMMA is required to operate under stricter security than you may be accustomed.

### Video Surveillance

At HMMA the security of our Team Members as well as our product is important to us.

In order to ensure our Team Member's safety, protect our product, and maintain the FTZ zone, HMMA uses video surveillance throughout our facilities.

### HMMA Identification Badges

HMMA identification ("ID") badges are issued on the first day of employment. All HMMA Team Members are required to wear their ID badges, and have them visible when entering and exiting HMMA. Team Members do not have to have their badges visible when they are in their assigned work area. However, the Team Member must wear, and have their badge visible when traveling between HMMA facilities. Personal identification from your ID badge is an FTZ requirement. Security personnel may periodically inspect badges. All Team Members will be required to return his/her badge to security on their last day of employment. If any Team Member loses their identification badge, the Team Member is to notify Security immediately so that a new badge can be issued and activated.

### Parking/Traffic Control

The ability to park on HMMA premises is allowed during scheduled work times. At HMMA we have reserved parking spaces for visitors as well as for the disabled. Here at HMMA, all other Team Members have equal access to parking and parking spaces on a first come first serve basis. All Team Members are responsible for parking in the proper parking spaces and for respecting the visitors and disabled parking areas.

Additionally, HMMA has a posted speed limit as well as designated lanes which allow for smooth traffic flow in and out of the facility. All Team Members are required to follow all posted limits, as well as safe driving habits, to ensure the safety of all HMMA Team Members and visitors. Any Team Member found in violation of these rules is subject to corrective action up to and including termination.

### CAREER OPPORTUNITY PROGRAM

The purpose of the HMMA Career Opportunity Program (COP) is to encourage promotion from within HMMA and to ensure that all qualified Team Members have an equal opportunity for job advancement. This program is designed to provide an effective means of communication to Team Members of specific job vacancies within HMMA. This policy will

27

Dees v. HMMA, et al.   0034
Warner Depo Doc.

be administered by the Employment Department.

It is the intent of HMMA to fill job vacancies from within the organization when Team Members with the skills and qualifications for the positions are available. In the event a posted position cannot be filled from within HMMA due to a lack of qualified Team Members external sources can and will be utilized to fill the position. Job advancement and transfers will be made without regard to race, color, religion, sex, age, national origin, veteran status, or disability.

This program will be used for exempt and non-exempt positions excluding the following: production Team Member, team leader, entry level support staff Team Member, management Team Member and above.

A manager may fill a vacancy internally within his/her section and within the same salary classification without posting the position by realigning a Team Member into the position. The position vacated will then be posted.

All full-time Team Members who have completed the probationary period at HMMA are eligible to apply for vacancies posted under this policy. In the interest of stability and continuity, a Team Member who accepts a promotion will be expected to remain in the new position for a period of twenty-four (24) months and will be prohibited from applying for another promotional opportunity during that twenty-four (24) month period.

A Team Member will be disqualified from consideration for any Career Opportunity Posting if he/she has active corrective actions at the Formal Discussion level or above. Any conflict with the Employment of Relatives Policy may also prohibit a Team Member from being considered eligible for the posted position.

Vacancies to be filled by the Career Opportunity Program will be announced via closed circuit television and/or on the Career Opportunity Bulletin Boards. Vacancies will remain posted for five (5) working days following the first date of the announcement.

All Team Members who have filed a Career Opportunity Application but do not meet the minimum eligibility requirements will be notified in writing by the Employment Department. Candidates may be contacted for a screening interview to verify and/or clarify experience. Applicants not selected will be notified of their status, in writing, by the Employment Department.

A Team Member who has been awarded job advancement will be transferred within thirty (30) days of the selection decision. The Director of Human Resources must authorize any decision to delay the transfer.

TRANSFERS

HMMA wants all of its Team Members to become multi-talented. In order to achieve this goal HMMA Team Members will have the ability to

28

Dees v. HMMA, et al.    0035
Warner Depo Doc.

request an assignment to another work area of their choice. Not only does this allow the Team Members to gain important job experience but it also helps HMMA to develop Team Members for other responsibilities.

Team Members with permanent medical restrictions, either off work or on a temporary work assignment, will be considered for placement, with or without accommodation, as required by the Americans with Disabilities Act. Placements of Team Members with permanent medical restrictions will take priority over transfer requests.

When a vacancy is declared, it shall be posted for department or group transfer, provided the position cannot be filled by a Team Member with permanent medical restrictions. This vacancy will be posted plant wide denoting the department and group. The requesting eligible Team Member with the longest length of HMMA service shall be placed in the open position. The job posting will be posted in designated areas of the facility for a period of three (3) working days, excluding weekends and holidays. All requests received by the end of the posting period shall be reviewed to determine which candidate has the longest length of service and is eligible for transfer.

The requesting Team Member must be a full-time, non-probationary Team Member with at least 12 months of HMMA service as of the date of the posting. The Team Member requesting transfer must not have transferred within the last twelve (24) months.

Any corrective action at the Commitment Discussion level or above will result in the denial of a Team Member's transfer request or promotional request. When two or more Team Members have identical length of service dates, the Team Member identification number will be used as the tie breaker. The Team Member with the lowest Team Member identification number will be awarded the transfer. Team Members will not be considered for any transfer that would result in conflict with the HMMA Employment of Relatives Policy.

To assure that adequate skill levels are maintained in each department, no more than 5% of the authorized full-time staffing in a department will be allowed to transfer out of the department in a calendar year.

Any Team Member who submits and is awarded a transfer request must accept the transfer. The Team Member who receives a transfer shall be prohibited from another transfer for a period of twenty-four (24) calendar months. This period shall begin as of the actual date the award of transfer notification is given. A Team Member who transfers will be required to reschedule vacation time previously approved. A Team Member who transfers to a new department will assume high overtime hours on that team for overtime equalization purposes.

## SOLICITATION, DISTRIBUTION, & POSTINGS

HMMA prohibits the solicitation, distribution and posting of materials on or at HMMA property by any Team Member or non-HMMA Team

29

Dees v. HMMA, et al.    0036
Warner Depo Doc.

Members, except as may be permitted by this policy. The sole exceptions to this policy are charitable and community activities supported by HMMA and HMMA-sponsored programs related to HMMA products and services.

Non-HMMA Team Members may not solicit Team Members or distribute literature of any kind on HMMA premises at any time. Team Members may only admit non-HMMA Team Members to work areas with HMMA approval or as part of a HMMA-sponsored program. These visits should not disrupt workflow. The HMMA Team Member must accompany the non-HMMA Team Member at all times. Former Team Members are not permitted onto HMMA property except for official company business. Team Members may not solicit other Team Members during work times, except in connection with a HMMA-approved or sponsored event. Team Members may not distribute literature of any kind during work times, or in any work area at any time, except in connection with a HMMA-sponsored event

The posting of materials or electronic announcements are permitted with approval from the Director of Human Resources. All team communication boards located in team areas are intended for team related instruction and production-related materials only. Violations of this policy should be reported to the Director of Human Resources.

## TEAM MEMBER WORK CONDUCT

It is the policy of HMMA that Team Members maintain a working environment that encourages mutual respect, maintains fellow Team Members dignity, promotes civil and congenial relationships among Team Members and is free from all forms of harassment and violence.

Team Members are expected to conduct themselves in an appropriate manner as judged by a reasonable person at work, at all HMMA functions, and also in the community. Team Members have the right to conduct their work without disorderly or undue interference from other Team Members. HMMA prohibits Team Members from violating the rights of their co-workers.

HMMA encourages a congenial work environment of dignity and respect as well as professionalism. Therefore, HMMA prohibits Team Members from intentionally harming or threatening to harm other Team Members, clients, vendors, visitors or property belonging to any of these parties.

Team Members are responsible for maintaining their work area in a neat and professional manner.

Team Members are responsible for assuring the security of HMMA confidential/proprietary material in their possession and similarly maintaining the security of HMMA provided equipment. Team Members concerned for the security of their work area or equipment must inform their supervisor of such concerns.

Dees v. HMMA, et al.   0037
Warner Depo Doc.

HMMA reserves the right to search locked, unlocked and/or publicly used HMMA property at any time without consent. HMMA may request a search of personal property at the worksite or locked HMMA property assigned to an individual if there is reasonable suspicion that evidence of illegal or prohibited activities resides therein. Refusal of such a request may result in corrective action up to and including termination.

## CORRECTIVE ACTION

The intent of corrective action is to provide a consistent way to address unacceptable attendance, performance, or conduct. Corrective action is designed to allow Team Members formal notice and the opportunity to correct any performance deviations from HMMA's acceptable standards.

The following corrective action procedures will be taken by HMMA's management in order to address a Team Members' inability to meet HMMA's standards regarding attendance, performance, or conduct. Corrective action applies to exempt Team Members at the specialist level and below, non-exempt administrative Team Members and all production Team Members, including maintenance Team Members. A team relations representative will be available and must attend each phase of the corrective action procedure. The steps are as follows:

### Discussion Planner

Once it has come to the group leader and/or manager's attention that a Team Member's performance does not meet HMMA's performance standards, the group leader and/or manager will meet with the Team Member. This discussion is designed to gather facts about the performance issue and is to be a two-way conversation. The group leader and/or manager is to explore whether the performance issue is failure in the process, equipment, or with the Team Member.

- Equipment Problem. The group leader and/or manager will investigate and seek help in resolving any equipment problems.
- Process Problem. The group leader and/or manager will investigate and seek help in resolving any process problems.
- Team Member's Performance. Inform the Team Member of performance expectations and explain potential ramifications if the poor performance continues.

### Informal Discussion – Phase I

Phase I of corrective action is to address minor performance problems. The intent of Phase I is to bring the performance problem to the Team Member's attention through an Informal Discussion. The group leader and/or manager is responsible for conducting the Informal Discussion. The team relations representative will attend the Informal Discussion and serve as a witness. The Informal Discussion is an open discussion between the Team Member and the group leader and/or manager that

31

Dees v. HMMA, et al.     0038
Warner Depo Doc.

identifies the nature of the problem and the possible solution.

If the performance problem is corrected and no additional problems develop during the following twelve months, the documented Informal Discussion will be removed from the Team Member's file and will not be used for any future corrective action.

### Formal Discussion – Phase II

The Formal Discussion is the 2nd phase of corrective action and is to be used for more serious performance issues, or if a Team Member fails to correct an existing performance issue after receiving an Informal Discussion, or if it is decided that a Team Member's performance issue is serious enough that it warrants a higher phase of corrective action. The Team Member will be given a Formal Discussion letter. Attendees at the Formal Discussion phase are the group leader and/or a member of management, team relations representative and the Team Member. The group leader and/or production management Team Member will prepare a Formal Discussion document addressed to the Team Member summarizing the performance issue. If the performance issue is corrected and no additional performance issues arise during the following twelve (12) months, the Formal Discussion letter will be removed from the Team Member's file and will not be used for any future corrective action.

### Commitment Discussion – Phase III

The Commitment Discussion is the 3rd phase of corrective action. This phase will be used if a Team Member's performance continues to be unacceptable or the Team Member commits a serious action that requires a higher level of corrective action.

A Commitment Discussion is a formal meeting, which is conducted with the affected Team Member; his/her group leader and/or manager, team relations representative, the team relations manager, and the appropriate production management Team Member. The purpose of this phase of corrective action will be to determine what aspects of the Team Member's performance are unacceptable, why they are unacceptable, and the reasons behind the Team Member's performance problem. The Team Member will be required to write an action plan stating what actions he or she will take to resolve the performance problem.

The Commitment Discussion letter and the Team Member's commitment letter will remain in the Team Member's personnel file for a period of 24 months. If the Team Member is able to correct the performance problem and no additional problems develop, the Commitment Discussion letter and the Team Member's action letter will be removed from the Team Member's personnel file and will not be used for any future corrective action.

### Decision Leave – Phase IV

The Decision Leave is the 4th phase of corrective action. This phase may be taken if the Team Member fails to correct the performance problem

32

Dees v. HMMA, et al.    0039
Warner Depo Doc.

after the Commitment Discussion or if it is determined that the Team Member's performance is serious enough to warrant action beyond a Commitment Discussion.

The affected Team Member will meet with his/her group leader and/or manager, team relations representative, team relations manager and the appropriate production management Team Member for a formal meeting. The Team Member will be given the following day off with pay. The Team Member will be asked to use this time to make a final decision whether or not he/she wants to remain employed by HMMA.

If the Team Member decides to return to work and commit to correcting his/her performance, the day off will be excused with pay.

Information regarding a decision leave will remain in the Team Member's personnel file for a period of twenty-four (24) months. If the Team Member is able to correct the performance problem, and no additional performance problems develop, it will be removed from the Team Member's personnel file and will not be used for any future corrective action.

Corrective action will be administered sequentially with regard to all attendance performance situations. Specific performance-related issues regarding performance, quality, and conduct will be evaluated on a case-by-case basis, and corrective action may be applied based on the severity of the performance issue. Any Team Member whose employment is terminated by HMMA may be entitled to request a Peer Review Panel Hearing.

**Termination**

HMMA and its Team Members have a mutual interest in maintaining job security and stability in our organization. Because of our mutual interest, HMMA and its management team hope that we never have to terminate a Team Member's employment. However, in situations where a Team Member refuses to respond to the steps in the "Corrective Action Program" outlined above, or if a Team Member's actions are such that HMMA feels his/her employment cannot be continued, the Team Member will be terminated. Every termination decision will be reviewed by the team relations manager, the Team Member's manager, and the Director of Human Resources to review all facts and information before a termination decision is made.

Notwithstanding anything to the contrary contained in this handbook, every Team Member's employment with HMMA is voluntary and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA.

33

Dees v. HMMA, et al.   0040
Warner Depo Doc.

## SERIOUS MISCONDUCT

HMMA requires a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment immediately.

In serious misconduct cases where it is determined that termination is not appropriate, the Team Member will receive a Letter of Conditional Employment which will remain in the Team Member's file for 36 months. Upon issuance of a letter of conditional employment, the affected Team Member, group leader, team relations representative, team relations manager and the appropriate management Team Member will have a formal meeting. Following this meeting, the Team Member will develop an action plan and make a written commitment to successfully implement that plan.

Listed below are some examples of activities that constitute serious misconduct at HMMA:

- Serious and/or excessive violations of HMMA's attendance program.
- Serious and/or excessive violations of HMMA's performance standards.
- Threatening or fighting on HMMA's premises, at HMMA sponsored functions, or while conducting business away from the plant.
- Disclosing, misusing or removing from the premises any HMMA or fellow Team Member's property unless authorized.
- Use, possession, sale, transfer of or being under the influence of illegal drugs, alcohol or any other intoxicating substance at any time on HMMA property. Gifts of alcohol and/or coolers containing alcohol are also prohibited at HMMA.
- Deliberate damage to HMMA property or the property of a fellow Team Member.
- Intentionally misrepresenting or falsifying any information concerning employment or any report or HMMA record.
- Engaging in any form of discrimination in the workplace, including racial or sexual harassment of a fellow Team Member or harassment by a person in a supervisory position of a Team Member under the supervisor's authority.
- Insubordination, including refusing to perform a work assignment or refusing to follow direction of HMMA security or safety personnel.
- Deliberately trying to conceal serious quality problems in HMMA products.
- Deliberately using unsafe work practices that might seriously

34

Dees v. HMMA, et al.    0041
Warner Depo Doc.

jeopardize the health or safety of the Team Member or a fellow Team Member.

- Use, possession, sale or transfer of a weapon at any time on HMMA property.
- Engaging in illegal activities such as gambling or trafficking stolen goods.
- Deliberately violating HMMA's Solicitation and Distribution Policy.
- Deliberately spreading false or malicious rumors or slandering or libeling a fellow Team Member, HMMA or an HMMA product.
- Leaving the plant without proper authorization (note: this is also considered a voluntary resignation).
- Chronic violations of HMMA's Safety Rules or Procedures.
- Willful violations of HMMA's Lockout/Tag out, Confined Space Procedures or other situations where the violation places the Team Member or others in immediate danger.

The aforementioned list is not all inclusive.

## WORKPLACE THREATS AND VIOLENCE

This policy applies to any Team Member and/or person that make substantial threats, exhibits threatening behavior, or engages in violent acts on HMMA property or makes threats, exhibits threatening behavior, or engages in violent acts relating directly or indirectly to any work activities.

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors, or other individuals by anyone on HMMA property will not be tolerated (zero tolerance).

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors or other individuals relating directly or indirectly to work activities including  phone calls, written materials, behavior at HMMA-sponsored activities will not be tolerated. Firearms, ammunitions, knives, bows or any other types of weapons are not permitted on HMMA property which includes the parking area(s).

In the event that violations of this policy are substantiated, HMMA will initiate a decisive and appropriate response.  This response may include, but is not limited to: suspension or termination of any business relationship, reassignment of job duties, suspension or termination of employment, and/or seeking arrest and prosecution of the person or persons involved.  Any violation of this policy will be considered serious misconduct.  Any Team Member terminated pursuant to violations of this policy shall not be subject to the Team Member Review Board process.

Any Team Member that has knowledge of or witnesses threats, threatening behavior or an actual incident or violations of this policy is required to report the information to his/her immediate supervisor and/or the man-

35

Dees v. HMMA, et al.    0042
Warner Depo Doc.

ager of security and/or his/her Team Member relations representative.

## TEAM MEMBER RESOLUTION PROGRAM AND PROCEDURE

In any organization there can be differences of opinion about working conditions, work rules and policies, and other work-related issues. To resolve these differences effectively, communication is essential. This program is designed to enhance communication by providing a formal process to resolve legitimate disputes. HMMA will provide a prompt, orderly means of receiving and responding to Team Members' concerns. This program and procedure is intended to supplement, rather than discourage or replace, informal discussions between supervisors and Team Members. A supervisor should make every reasonable effort to resolve Team Members' concerns outside the formal Team Member Resolution Procedure.

The Team Member Resolution Program and Procedure is available to all full-time Team Members who have successfully completed their probation period. The Team Member Resolution Program and Procedure is not available to individuals employed in a temporary status or to employees of any contracted services provided to HMMA. The initiation of the Team Member Resolution Procedure in good faith by Team Members shall not adversely affect their standing as Team Members.

The Team Member Resolution Program consists of <u>four steps</u>, which are outlined below.

Outside counsel will not be permitted to attend any of the meetings. However, appropriate witnesses may be permitted to attend with approval from the manager of team relations.

### Step 1: Supervisory Level

<u>Team Member's Role</u>

The Team Member should contact the team relations representative to coordinate a meeting in order for the Team Member to verbally present the concern to his/her supervisor within five (5) working days of the original cause for the appeal, or from the date the Team Member learned the cause for the appeal.

<u>Supervisor's Role</u>

The supervisor will meet with the Team Member and the team relations representative and respond verbally to the concerned Team Member within five (5) working days.

36

Dees v. HMMA, et al.    0043
Warner Depo Doc.

**Step 2: Resolution Request**

<u>Team Member's Role</u>

If a Team Member does not agree with the supervisor's verbal response, he/she should contact a team relations representative for a Resolution Request Form. The team relations representative will give the Team Member the form and assist the Team Member in filing the form if necessary. The team relations representative will forward the Resolution Request form to the Team Member's section manager and coordinate within five (5) working days of receiving the answer to Step 1. The team relations representative will attend the meeting.

<u>Section Manager's Role</u>

The section manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The department manager will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the department manager will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

**Step 3: Resolution Appeal**

<u>Team Member's Role</u>

If a Team Member does not agree with the department manager's response, he/she should contact a team relations representative. The Team Member must make a written request stating he/she does not agree with the department manager's response and request to go to the next step. The team relations representative will forward the request to the team relations manager and coordinate a meeting within five (5) working days of receiving the answer to Step 2. The team relations representative will attend the meeting.

<u>Manager of Team Relations Role</u>

The team relations manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The manager of team relations will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the manager of team relations will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

**Step 4: Resolution Final Appeal**

The Resolution Final Appeal is the last step of the process. The commit-

37

Dees v. HMMA, et al.    0044
Warner Depo Doc.

Any refusal by a Team Member to submit to a search or testing procedure may, however, constitute grounds for termination. The primary purpose of this policy is to promote the safety and well-being of all Team Members. It would be inconsistent to promote a strong safety effort while allowing the use of drugs and alcohol or the possession of drugs, alcohol and/or weapons on HMMA property to undermine the safe and effective performance of Team Members on the job.

Each applicant for employment will be required, as a condition of employment, to undergo a urine drug screen/hair analysis. Applicants will be asked to read the policy and sign the post offer employment offer and Team Member consent to alcohol and drug screening. If an applicant tests positive and is determined to be in violation of this policy, applicant will be ineligible for employment.

## FOR CAUSE TESTING AND RANDOM TESTING

Each Team Member, as a condition of continued employment, is subject to medical or physical examination or tests, including urine drug screen and/or a drug screen using hair, at the determination of the responsible group leader, department manager and concurrence of the HMMA team relations manager and/or his/her designee, providing the following conditions are met:

- If the Team Member's group leader and/or manager has reasonable cause to suspect that the Team Member is in violation of this policy; or
- If the Team Member's job performance is deficient in a manner which suggests a possible violation of this policy; or
- If the position is designated as a safety sensitive and/or high risk occupation; or
- If the Team Member is selected at random for testing in order to monitor and ensure compliance by all Team Members with this policy. The random selection will be done centrally by HMMA's medical facility. Team Members will be asked to sign the Pre-Employment Offer and Team Member Consent to Alcohol and Drug Screening form.

If a Team Member tests positive for a random and/or for-cause testing and is determined to be in violation of this policy, the Team Member will be required to:

- attend a substance abuse program
- follow the attending physician and/or a qualified substance abuse counselor's guidance
- agree to random testing over the next 12 months
- supply HMMA's medical clinic with documentation of treatment and/or documentation that no further treatment is necessary
- agree to remain substance free as a condition of employment
- be responsible for any cost incurred that is not covered

40

Dees v. HMMA, et al.    0045
Warner Depo Doc.

by HMMA's medical plan for treatment
- voluntarily resign if the Team Member subsequently tests positive for any subsequent illegal or un-prescribed substance and or being under the influence of alcohol.

Any adulterated specimen will be viewed as falsification and will result in immediate termination.

Any Team Member requesting rehabilitation assistance will be referred to the Team Member Assistance Program (TMAP) provider for assessment and treatment recommendations. The TMAP provider will monitor the program and advise HMMA of the Team Member's progress. Should the Team Member fail to maintain satisfactory progress or discontinue the program, the Team Member will be subject to termination.

Any Team Member who refuses to submit to drug testing will be considered to be insubordinate and will be terminated. Additionally, if a Team Member refuses to submit to or cooperate with a post-accident blood or urine test, he/she may forfeit his/her right to recover workers' compensation benefits.

HMMA recognizes that drug abuse and/or dependency are medical/behavioral conditions that can be successfully treated. Team Members with drug problems are encouraged to request assistance from the Team Member Assistance Program. Participation in TMAP is totally voluntary and completely confidential; however, a request for assistance or participation in a TMAP does not excuse a Team Member from violation of this policy.

HMMA reserves the right to conduct unannounced searches of its property, vehicles, and facilities, including Team Member's vehicles, work areas, desks and lockers assigned to Team Members, at any time. No Team Member has the right to interfere with or object to such searches of HMMA property based on expectations of privacy or otherwise. HMMA reserves the right to search personal property belonging to its Team Members, such as, but not limited to, lunch boxes or bags, pocketbooks or briefcases if such property is brought onto HMMA premises or into HMMA vehicles.

All Team Members will be required to sign a statement acknowledging their understanding of and compliance with HMMA policy.

## PUBLIC RELATIONS

To ensure that all information given to the public and the media is consistent, beneficial and accurate, it is important that the Public Relations Department coordinates and controls all information going out externally. If you are contacted by the news media and asked for information about HMMA or if you are asked to comment about HMMA, you are to refer the interviewer to the Public Relations Department. You may not release any information about HMMA business or activities unless you have been specifically authorized by the Public Relations Department.

41

Dees v. HMMA, et al.    0046
Warner Depo Doc.

## INTERNAL COMMUNICATIONS

Communication at HMMA is a key factor to our success. In order to maintain good communications, HMMA has established various avenues of communicating information to the Team Members. Additionally, and just as important, are the avenues that have been created to allow you, the Team Member, to communicate to HMMA. It is important to keep the avenues of communication open. By communicating we can all be successful. Even though we have many avenues for communication at HMMA all Team Members are encouraged to communicate with their group leaders and managers. Some of those methods are:

### Open-Door Policy

HMMA believes that each Team Members should have the ability to address problems as they arise personally. As with all companies, misunderstandings, differences of opinions and disagreements occur. If issues and concerns are not addressed in a timely manner those issues of concern can damage your relationships and affect all the parties involved. HMMA wants, and encourages all Team Members to openly communicate with one another to resolve misunderstandings, differences of opinion and disagreements. One way that we can resolve these issues is by having open communications with one another and the ability to discuss issues and concerns openly.

Unfortunately, there may be times when an agreement cannot be reached. In these situations HMMA wants every Team Member to know that through the Open-Door Policy they can address these issues in order to achieve a fair and practical solution.

Any member of the team relations department will assist you should a concern or issue were to arise.

Again, HMMA encourages all Team Members to discuss the situation in a respectful manner with the party involved. If a resolution is not reached, discuss the situation with the next level of management. The Open-Door Policy is meant to be used in a systematic fashion and may be pursued to the top levels of HMMA's management.

### Bulletin Board

HMMA has bulletin boards at all entrances and exits. These bulletin boards are for communicating work related information, information required by law, and job postings. Additionally, each team will have a bulletin board; these boards are for work related communications only. Team Members are prohibited from posting any information or notices directly on any bulletin board at HMMA.

42

Dees v. HMMA, et al.   0047
Warner Depo Doc.

## President's Roundtables

The President's Roundtables provide HMMA's Team Members an opportunity to meet and talk with HMMA's President as well as our Executive Vice Presidents. Team Members will be selected randomly on a bi-monthly basis and sent invitations to attend the meetings. Participation is voluntary; however each Team Member is encouraged to attend so that they can communicate directly with the President.

## Group Leader/Managers One-on-Ones

Each group leader/manager will meet with each Team Member twice a year. In a company the size of HMMA it is difficult at times for the two to get together and have a casual conversation. HMMA feels that developing these relationships is important and helps foster open communication. These meetings will be held away from the production work areas and are meant to be an opportunity for The Team Member and group leader/manager to have a 15 minute casual conversation.

## Manager Lunches

The managers lunches are another opportunity for a team to get together in a casual setting were the manager/assistant manager of the department meets with each team in their department every six months and provides lunch. Participation is voluntary. The purpose of these meetings is to continue to foster open communication, and promote a team spirit as well a felling of family within the department. The meeting is held during the normal lunch period and is unpaid time.

## Team Advisor

The Team Advisor is a bulletin that will be issued to the team to communicate important information to the teams. The Team Advisor will be issued on an as needed basis to each team leader so they can read the information during the Five Minute Communication meeting. Once the bulletin has been read it will be posted for a specified time in order to allow Team Members to read it at their leisure.

## Hyundai Communication System (HCS)
## 334-387-8008

HMMA has established the HCS in order to allow Team Members an opportunity to ask questions in the event their group leader, team relations representative or another member of management has been unable to answer your question or concern. This means of communication is done anonymously, by calling the HCS. The HCS does not record the extension or phone number from which the call came. HMMA encourages Team Members to talk with their managers first, but in the event you need to ask a question, make a comment, or voice a concern on a confidential basis, we also encourage you to call the HCS.

The HCS will be available 24 hours a day, seven days a week. Your call

43

Dees v. HMMA, et al.     0048
Warner Depo Doc.

will be directed to the Director of Human Resources and or his designee. The Director of Human Resources will review the question and/or comment and direct them to the most qualified person. If you leave your name and want a personal response, a meeting will be scheduled if you request one. Every effort will be made to make sure all replies are given within ten working days of receiving the call.

Anonymous calls will be posted with the answeres on the HCS boards for a period of five days. We also ask everyone to be patient. Some calls may contain complex issues that require more time in order to answer them accurately.

### HMMA Closed Circuit Television System (CCTV)

HMMA CCTV System is an internal video system that will be used to broadcast HMMA information to all Team Members daily.

### HMMA Weekly News

HMMA Weekly News is a weekly summary of company-related information. The HMMA Weekly News will be distributed every Monday on a weekly basis.

### HYUNDAI Insights

Hyundai Insights is a newsletter that will be sent to the Team Members home on a biweekly basis. This news letter will keep you and your family informed about what is going on at HMMA as well as what is going on at HMC and HMA.

### Five Minute Communication Meetings

Each team will have a five minute communication meeting at the start of each shift. The purpose of this meeting is to provide the Team Members with information pertaining to production, quality, or safety. These meetings may also be used to discuss sales, benefits, policy updates, or other pertinent information the team may need to know. All Team Members must be in their assigned meeting area ready for work at the start of their shift.

### COMMUNITY RELATIONS

### Speeches

HMMA receives many requests for speeches about our company from a variety of groups. If your organization is not-for-profit and would like a representative from HMMA to speak to a group, you or your organization needs to submit in writing the following information: All requests must be on the group's letterhead.

- Requested date of speech
- Time
- Location

44

Dees v. HMMA, et al.    0049
Warner Depo Doc.

- Name of Group
- Topic you would like covered
- Background information on the organization
- Person to contact with their phone number or email address

All requests must be turned in at least one month prior to the requested date for the speech and should be addressed to the manager of public relations.

**Tours**

All family and public tours must be scheduled through the Public Relations Department.

## GENERAL INFORMATION

### Electronic Devices

HMMA has a responsibility to protect every Team Member as well as to protect HMMA assets. The automotive industry is a very competitive industry, and in order to protect its Team Members and proprietary information, HMMA must control what types of electronic devices are allowed in the workplace.

In order to ensure the health and safety of all Team Members, personal radios, televisions, tape recorders, and tape/CD/mp3 players are not permitted anywhere in the facility.

### Camera/Video Camera

In situations where a department uses a camera/video camera in order to conduct investigations, the department must have approval by the Security Department and must have a camera/video camera pass attached to the camera/video camera at all times. If a supplier has a need that requires the use of a camera/video camera in order to conduct an investigation or to assist in the function of their job duties, he/she must gain written approval from the responsible department. The written approval must be submitted to the Security Department for approval and verification from the responsible department. Once the Security Department has approved the use of a camera/video camera, Security personnel will issue a temporary camera/video camera pass. The camera/video camera pass must be attached to the camera/video camera.

Any camera/video camera without a camera/video camera pass will be confiscated, held in security and returned to the owner as they exit HMMA's premises, minus its film.

Personal camera/video cameras and camera/video phones are not permitted within the plant, nor will pictures be allowed during general tours. Business situations may require photos to be taken in the plant, but when these situations occur, only Team Members with an approved camera/

45

Dees v. HMMA, et al.     0050
Warner Depo Doc.

video camera pass using a HMMA-owned camera/video camera will be allowed to do so.

### Cell Phones/Pagers

HMMA reserves the right to issue cell phones and/or pagers for business reasons to those individuals that have been approved in order to conduct HMMA business matters.

Personal cell phones and pagers will be allowed in the facility. However, cell phones and pagers must be kept in the Team Member's locker or desk during work times. In addition, the devices must have the volume muted while being stored. Team Members may use their cell phones and/or pagers during breaks and lunch periods only, and the Team Member must be in a designated break area.

### Audio Tape Recorders

Audio tape recorders are prohibited on HMMA premises. In situations where an audio tape recorder is needed a request for approval must be submitted to and approved by the Director of Human Resources or his/her designee.

Any violation of the aforementioned could result in corrective action up to and including termination. Any violation by a non-HMMA Team Member could result in their being asked to leave the premises and the film, tape, disk, and/or any other type of device capable of storing audio or video information will be confiscated and/or memory erased.

### HMMA TOOLS

HMMA has supplied each Team Member with the tools as well as state of the art equipment needed to perform their daily job functions. Each Team Member is responsible for the care and upkeep, and inventory of tools and other equipment issued by HMMA. These tools and equipment are not to be removed from the appropriate HMMA work area. Personal tools must not be brought into HMMA.

Intentional damage to any HMMA tooling or equipment is subject to corrective action up to and including termination.

### LOCKERS

HMMA will provide each Team Member with a locker so that they may store personal items. However, these lockers should not be used to store money or valuables. HMMA will not be responsible for anything that is destroyed, lost or stolen from any locker.

Lockers will remain the property of HMMA at all times. HMMA maintains the right to inspect any locker and its contents at any time with or without notice if it is believed the locker (s) contain items contrary to HMMA policy. This includes but is not limited to items such as firearms, explosives, dangerous or lethal weapons, alcohol, illegal drugs, or miss-

46

Dees v. HMMA, et al.    0051
Warner Depo Doc.

ing HMMA property.

## CAFETERIA

HMMA provides two dining facilities for our Team Member's convenience. HMMA has designed each of our dining facilities so that you can experience a clean and pleasant area while dinning. Prepared meals will be served daily. However if you choose to bring your own meal our dining facilities have ample seating for everyone. Team Members will also find vending machines located throughout the facility if you wish to purchase food or drink.

## SMOKING

In an effort to provide safe and comfortable work conditions, HMMA prohibits smoking and/or the use of smokeless tobacco products in all production facilities and administrative areas. Team Members who use tobacco products should respect all areas designated as "no smoking," limit their tobacco use to those areas where and when smoking is permitted (outside of the facility and only during breaks and dinner/lunch), and dispose of all smoking materials/smokeless tobacco products in proper containers.

Smoking or the use of smokeless tobacco is only permitted during non-work times. This is outlined as follows: one 10-minute paid rest period in the first half of the shift, one 10-minute paid rest period in the second half of the shift and during the unpaid lunch period. In case of overtime work, an additional 5-minute rest period for each full hour (60 minutes) of overtime can be taken. There are some jobs where there are no set scheduled break times, such as maintenance, administration, etc. It is understood that these Team Members still fall with the guidelines of taking only a 10-minute break in the first half of the shift, and a 10-minute break in the second half of the shift.

HMMA intends to consistently enforce the smoke free environment policy described in this document. Any HMMA Team Member violating this policy is subject to corrective action up to and including termination.

## TELEPHONE CALLS

All HMMA phones are for business purposes only. Team Members are not allowed to use HMMA phones for personal business. However, if an emergency situation should arise, the Team Member is to contact their group leader/manager and/or another member of management in order to use a HMMA phone.

All emergency phone calls into HMMA will be forwarded to the appropriate area. HMMA's Team Members and their families are very important and considered HMMA's extended family. Each Team Member should supply their family members with an emergency contact number for their work area, as well as the department they work in, the group leader/ manager's name, and make sure their family knows that the contact information is for emergencies only.

47

Dees v. HMMA, et al.    0052
Warner Depo Doc.

## ACKNOWLEDGMENT

The information contained in the Team Member Handbook of Hyundai Motor Manufacturing Alabama, LLC has been prepared as an aid and a guideline to give you a summary of the benefits, policies, and procedures at HMMA. It contains information about what you can expect from HMMA, and in turn, what HMMA expects of you.

If, in this Handbook, we have inadvertently said or implied anything that is different from the actual provisions of any HMMA policy or benefit plan document, the actual provisions of the policy or benefit plan will govern.

If at any time you have any questions regarding policies, you may talk to your group leader, assistant manager, manager, or team relations representative.

The policies and statements contained in this Handbook, and in other provisions that may be added in the future, are not a contract of any kind, but are rather a description of company policies. Employment with HMMA is at will and is not offered, contracted, or promised for any specific length of time. You have the right at HMMA to quit for any reason or for no reason at any time. Conversely, HMMA may terminate your employment on the same basis. Although this Handbook reflects current policies, these policies may be unilaterally changed or rescinded by HMMA at any time.

I, _____, acknowledge that I have received the handbook and that it is my responsibility to read the handbook and ask questions if needed in order to gain understanding.

_____          _____
Signature                         Number

_____
Date

49

Dees v. HMMA, et al.    0053
Warner Depo Doc.

### GRANT OF LICENSE AND RELEASE OF CLAIMS

I acknowledge that while employed with HMMA, I may, either individually or in a group setting, be photographed, filmed, or videotaped from time to time, and I voluntarily agree to be photographed, filmed, and/or videotaped. I fully understand and agree that such photographs, films, or videotapes may be freely used for public display in any form of media for the purpose of furthering the business interests of Hyundai Motor Manufacturing Alabama, LLC, Hyundai Motor America, Inc., and/or Hyundai Motor Company through advertising, publicity, trade, or any lawful purpose whatsoever. I further acknowledge and agree that I shall not be entitled to, nor shall I demand, compensation for such use.

By signing below, I hereby grant to Hyundai Motor Manufacturing Alabama, LLC, Hyundai Motor America, Inc., and Hyundai Motor Company, and their respective subsidiaries and affiliated companies, associate agencies, successors, and assigns, and to such other persons as they may designate from time to time (collectively the "Company"), an unconditional, royalty free license giving them the absolute right and permission to use my name, image, and/or likeness in such photographs, film, videotape, or other medium for the purposes set forth above without any entitlement to compensation for such use. This license shall be of unlimited duration and shall survive the cessation of my employment with HMMA.

In consideration for allowing me to participate in any photo, film or video shoot, I, for myself, my heirs, executors, administrators, and assigns, and all those who might claim through me, hereby release and discharge the Company and its/their officers, employees, agents, and representatives, from any and all claims, demands, damages, loss, expenses, and liability (specifically including but not limited to claims for compensation, royalties, or fees for use of my name, image, or likeness), whether known or unknown or presently existing, formerly existing, and which may hereafter arise, as a direct or indirect result of the use of my name, image, or likeness.

TEAM MEMBER:

_____        _____
Signature                                Date


_____        _____
Printed Name                             Number

50

Dees v. HMMA, et al.    0054
Warner Depo Doc.



| ![Hyundai] HYUNDAI Hyundai Motor Manufacturing Alabama | RECEIPT of HANDBOOK ACKNOWLEDGEMENT | HR-AL-HR-TR-F-00021 |
|---|---|---|
| Rev Date: 01/10/06 | Owner: Team Relations | Revision Level: 00 |

The information contained in the Team Member Handbook of Hyundai Motor Manufacturing Alabama, LLC has been prepared as an aid and a guideline to give you a summary of the benefits, policies, and procedures at HMMA. It contains information about what you can expect from HMMA, and in turn, what HMMA expects of you.

If, in this Handbook, we have inadvertently said or implied anything that is different from the actual provisions of any HMMA policy or benefit plan document, the actual provisions of the policy or benefit plan will govern.

If at any time you have any questions regarding policies, you may talk to your group leader, assistant manager, manager, or team relations representative.

The policies and statements contained in this Handbook, and in other pro-visions that may be added in the future, are not a contract of any kind, but are rather a description of company policies. Employment with HMMA is at will and is not offered, contracted, or promised for any specific length of time. You have the right at HMMA to quit for any reason or for no reason at any time. Conversely, HMMA may terminate your employ-ment on the same basis. Although this Handbook reflects current policies, these policies may be unilaterally changed or rescinded by HMMA at any time.

I, _Jerry L Dees Jr_____, acknowledge that I have received, the Handbook and that it is my responsibility to read the handbook and ask questions if needed in order to gain understanding.

Signature: _Jerry Dees_

Team Member Number: _103039_

Date: _10 Jan 06_

DEES V HMMA 00018 DOCS PRODUCED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **CIVIL ACTION NO.:** |
| v. | ) | **2:07-cv-00306-MHT-CSC** |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, and HYUNDAI MOTOR | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ROB CLEVENGER

1. My name is Robert A. Clevenger. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2. I am employed by Hyundai Motor Manufacturing Alabama, LLC as Assistant Manager, Team Member Relations in the Team Relations Department.

3. My responsibilities as Assistant Manager, Team Member Relations include overseeing the investigation of potential disciplinary issues involving Team Members, overseeing the maintenance of documents, information, and files concerning such investigations, and making a presentation to a termination committee on behalf of Team Relations concerning its investigation and related information in situations where an employee is being considered for termination.

Page 1 of 5

4.    In particular, I was directly involved in the investigation of Plaintiff Jerry Leon Dees, Jr., with respect to allegations that Jim Brookshire, HMMA's Stamping Production Manager, reported seeing Plaintiff asleep during his shift on February 14, 2007.

5.    Under my supervision and instruction, Team Relations Specialist William Ware interviewed Brookshire on February 15, 2007, and prepared a handwritten statement for Brookshire to sign confirming their discussion. A true and accurate copy of the handwritten statement is attached as **Attachment A**.

6.    Upon reviewing this initial statement, it was determined that additional confirming information would be helpful in the investigative process and, accordingly, under my supervision and instruction, William Ware interviewed Brookshire again on February 19, 2007, and prepared a handwritten statement for Brookshire to sign confirming their discussion. A true and accurate copy of the handwritten statement is attached as **Attachment B**.

7.    Additionally, Team Relations received information from Plaintiff following an interview of Plaintiff conducted by Plaintiff's supervisor, Greg Prater, and attended by William Ware. A Team Relations Memo is customarily prepared following such a meeting and William Ware did in fact prepared such a memo, dated February 21, 2007, which was made part of Team Relations' file materials. A true and accurate copy of this Team Relations Memo is attached as **Attachment C**.

8.    On February 23, 2007, I prepared a Team Relations Memo summarizing Team Relations' findings, Plant Engineering Department's recommendation, and information on relevant past practice. In sum, Plant Engineering Department's recommendation was termination given the circumstances, including Brookshire's statements, the fact that the area where Plaintiff was observed is an isolated area suggestive of intent, and, further, given that

Plaintiff's response contained inconsistencies with other evidence and because his response suggested a lack of concern about his job. The past practice considered in this situation involved another employee who, similar to Plaintiff, was discovered sleeping during working hours and was terminated as a result. A true and accurate copy of this Team Relations Memo is attached as **Attachment D**.

9.    On February 26, 2007, I attended the termination committee meeting and presented Team Relations' findings, recommendations, and the above-referenced documents to the committee for consideration.    Others that attended the termination committee included Wendy Warner, John Kalson, John Applegate, Rick Neal, and Scott Gordy. A true and accurate copy of the electronic appointment that I sent to these individuals scheduling the termination committee meeting held on February 26, 2007, and listing all of the attendees of termination committee, is attached as **Attachment E**.

10.    My role in the termination committee process is simply to provide information for the termination committee to consider. Although Team Relations does ordinarily make a recommendation based on its findings, I do not technically have a "vote" on the termination committee and the termination committee is free to disregard Team Relations' findings or request further information before taking action.

11.    The information and statements received by Team Relations, including information received from Plaintiff, and the memoranda prepared by Team Relations, contained no information suggesting that Plaintiff was a member of the uniformed services or that he felt he was being harassed by any HMMA Team Member, or that he was otherwise protected by the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301, et seq. ("USERRA") in any relevant aspect.    At the time the termination committee met, the

information and documents presented and upon which Plaintiff's termination was based contained no suggestion that Plaintiff was a member of the uniformed service. Likewise, whether or not Plaintiff was a member of the uniformed service was not raised or discussed during the termination committee process and was not a basis or motivating factor related to the discussion, analysis, or decision surrounding his termination.

12. After Plaintiff's employment was terminated, Wendy Warner, the Manager of HMMA's Employment & Benefits Section, instructed me to write a letter to Plaintiff for her signature regarding HMMA's Team Member Review Board process. A true and accurate copy of the letter I wrote to Plaintiff is attached as **Attachment F**.

13. The Team Member Review Board process allows Team Members who feel they have been wrongfully terminated to request a review of that termination by a random selection of trained and qualified Team Members.

14. I left Plaintiff separate telephone messages to contact me regarding the Team Member Review Board process on March 2, 2007, March 5, 2007, and March 7, 2007. In the March 7th letter described in paragraph 12 above, I informed Plaintiff that to continue the Team Member Review Process he would have had to attend a meeting with me on March 12, 2007 at 10:00 a.m. to review the process and select a Team Member panel.

15. Plaintiff telephoned and left a message on March 10, 2007 stating that he received the May 7th letter described in paragraph 12 above and that he could not attend the meeting on March 12, 2007.

16. I received no further contact from Plaintiff and am not aware of any additional contact from Plaintiff about his desire to participate in the Team Member Review Process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this the __14__ day of December, 2007.

_____
Robert A. Clevenger

EXHIBIT

A

Interview with Jim Brookshire

On Feb 14 at approx. 1:00 AM, Jim went upstairs to check on some quality issues in the SOP. (Side outer)

Jim went up to the 3rd floor where he noticed Leon Dees sitting at operating station. Leon was positioned with his head down and his back was towards the cabinet.

Jim observed Leon sitting in this position for approx. 2 minutes.

At this time Jim turned up his radio and let it chirp about 4 times before Leon responded.

Whenever Leon woke up he grabbed a pole and began to act like he was pulling trolleys.

Jim went around to check some panels and when he approached the area again he noticed Leon sitting in the same chair; however, this time he was alert. Not long after this Jim witnessed Leon walking down the stairs.

About 30 minutes passed by before Jim talked to TL Kevin Hughes. During this time Kevin did not know where Leon was.

J A Bl — 2-15-07

DEES V HMMA 00037 DOCS PRODUCED

EXHIBIT

tabbies'

B

Jim was approximately 25 feet away from
Leon when he noticed that he was
asleep.

Jim walked towards Leon and began
Chirping his radio at a distance approx 13
feet.

Due to Leon's hat being on his head
Jim did not see his eyes closed; however
he (Jim) stated that his head was facing
towards the floor, with his chin tucked to
his chest)

Q. A. B
2-19-07

DEES V HMMA 00038  DOCS PRODUCED



EXHIBIT

| (Hyundai logo) HYUNDAI | TEAM RELATIONS MEMO | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date:  05/26/06 | Owner: Team Relations | Revision Level: 02 |

**TO:**       Rob Clevenger

**FROM:**     William Ware

**DATE:**     February 21, 2007

**SUBJECT:**  Leon Dees

**Inteeview with Leon Dees, William Ware, and Greg Prater**

Greg began our talk with Leon by informing him that a member of management noticed him on the third floor asleep on the morning of February 8th  Leon responded, "I was not asleep, I know exactly who you are talking about, call Jim Brookshire in here and I will confront him right now." Greg calmed Leon down and explained that the reason why we had assembled into the room was so that we could get his side of the story. Leon stated that he was sitting in a chair text messaging his daughter due to the bad weather outside. His location was at the RO 1 station.  Leon stated that this event took place around 10:30-11:30 pm  Leon also contends that Jim never approached him.  In fact when asked what was the closest Jim came to him he replied about "55 feet."  Leon made the following comment several times; he sat and watched Jim walk around on the third floor; however, he is to the point where he does not care about what people say.  He went on to say that we complain over and over again but nothing happens, so I just don't care anymore  "If something breaks then I will fix it but I will not run the shop like I used to."

DEES V HMMA 00036  DOCS PRODUCED



EXHIBIT

tabbies

| HYUNDAI Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

**TO:**      Greg Kimble

**FROM:**    Rob Clevenger

**DATE:**    February 23, 2007

**SUBJECT:**    Leon Dees/ Term

Summary: On February 14, 2007 at approximately 1am, Jim Brookshire (mgr, stamping) was in the stamping third level looking at a quality issue. The third level overhead is approximately 75ft off the ground  It is an isolated area  This is where the side outer panels are warehoused in overflow

Jim noticed Leon sitting in front of a panel in a chair. Jim states Leon was asleep with his head down and his chin tucked to his chest  Jim states he was 25ft away when he first noticed Leon. Two doors of the panel were open which served as a blind and hide Leon from most views.  He moved to within 15ft of Leon and observed him for approximately Two (2) minutes  At that time Jim keyed the mike on his radio and it made a chirping sound several times  At this sound Leon lifted his head then got up and picked up a tool used to clear carrier when they become inoperable

Leon did not speak to Jim or explain his presence in the overhead. Jim also noted there were no carriers that were in need of service. There is no reason for a maintenance person to be in the overhead unless there is an immediate need for carrier repair.

In Leon's statement he says the time was 10:30pm to 11:30pm  He also states he was sitting in the overhead text messaging his daughters regarding the weather and was not asleep  Leon state Jim never got closer than 50ft from him  Leon became agitated and stated he didn't give a damn and was tired of this shit

Conclusion: Leon's statement does not match the timeline or the proximity described by the stamping manager. I believe we must give weight to the manager's account and assume that the event took place at 1am on Wednesday morning  The storms had passed our area by 7:15pm on Tuesday evening. I have a signed statement by the stamping manager that he was 15ft from Leon and observed him for 2 minutes. There was a chair placed in between the two open doors  The area is several feet off the floor and is an area that a maintenance man would enter fix a carrier and then leave. There is not a need or a practice where a person would need a chair and be waiting in that area for a breakdown to occur. The department is asking for termination

DEES V HMMA 00033  DOCS PRODUCED

| ⟨HYUNDAI⟩ Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

Past Practice:

| 102705 | King | Ontario | Engine | 3-Jan-06 | Inappropriate conduct | Sleeping during work hours |
|---|---|---|---|---|---|---|

# REDACTED - PRIVILEGED

DEES V HMMA 00034  DOCS PRODUCED

EXHIBIT

E

Dees v. HMMA    0351
Docs Produced



# HYUNDAI

Motor Manufacturing Alabama, LLC
700 Hyundai Blvd.
Montgomery, Al 36105



March 7, 2007

Jerry Leon Dees Jr.

14808 US Hwy 82

Maplesville, Al 36750

Dear Leon:

You were left a phone message on March 2, 2007, stating you had met the contact requirement for Team Member Review. On March 5, 2007 and again on March 7, 2007 you were contacted but a phone-answering machine was reached.

To continue the Team Member Review process you must meet with Rob Clevenger on Monday March 12, 2007 at 10:00am to review the process and select your panel. At that time you will be given the date and time of your review panel meeting. Please come to the security building at gate 3 at the specified time above.

Sincerely,

*Wendy J. Warner*

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

*TM DID NOT ATTEND THIS MEETING. HE LEFT A PHONE MSG ON SATURDAY 3/10/07 STATING HE RECEIVED THE LETTER BUT COULD NOT ATTEND. NO FURTHER CONTACT FROM MR. DEES*

Dees v. HMMA    0321
Docs Produced

*11/15/07*

*Additional Doc Produced    JTS*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY LEON DEES, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.** |
| | ) | **2:07-cv-00306-MHT-CSC** |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, and HYUNDAI MOTOR** | ) | |
| **AMERICA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF KATHY PARKER

1.      I, Kathy Parker, am the Vice President, Human Resources and Administrative Services for Hyundai Motor America, Inc. ("HMA"). I am over the age of 18 and have personal knowledge of the information contained in this Declaration.

2.      As the Vice President, Human Resources and Administrative Services for HMA, I, among other things, oversee the human resource and administration functions of HMA. As part of this role, I manage and supervise hiring, terminations, employee relations, benefits, and compensation for HMA, and I have access to and regularly review the personnel records of individuals employed by HMA. I also manage and supervise administrative issues related to HMA and its operations, and I have personal knowledge regarding HMA's relationship to Hyundai Motor Manufacturing Alabama, LLC ("HMMA") with respect to personnel and human resources matters.

3.      HMA is organized as a corporation in the state of California and has its principal place of business in Fountain Valley, California.

4.      HMA is in the business of marketing, selling, and distributing Hyundai-branded automobiles and parts in the United States.

5.      HMA and HMMA operate and function as separate companies.  Indeed, HMA and HMMA have completely separate human resources departments, and separate employment and business policies and procedures.

6.      Jerry Leon Dees, Jr. was <u>not</u> employed by HMA at any time.

7.      Mr. Dees did <u>not</u> receive pay, salary, or benefits from HMA at any time.

8.      HMA had <u>no</u> influence or control over Mr. Dees' employment opportunities.

9.      In other words, HMA had <u>no</u> involvement, influence, or control in the decision to retain or terminate Mr. Dees or any other decision regarding his employment.

10.      Similarly, HMA had <u>no</u> involvement, influence, or control in the establishment of policies or procedures at HMMA, including those related to Mr. Dees' employment.

11.      HMA had <u>no</u> employment or other relationship with Mr. Dees.

12.      Similarly, HMA had no employment or other relationship with, or right to control or direct, any employees of HMMA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct.  Executed this the _10_ day of December, 2007.

_____
Kathy Parker

# Exhibit I

**Tom Hurst and Linda Hurst v. Mike Cook and Carrie Cook**

**2060351**

**COURT OF CIVIL APPEALS OF ALABAMA**

*2007 Ala. Civ. App. LEXIS 635*

**September 28, 2007, Released**

**NOTICE:**

THIS OPINION IS SUBJECT TO FORMAL RE-VISION BEFORE PUBLICATION IN THE ADVANCE SHEETS OF THE SOUTHERN REPORTER.

**PRIOR HISTORY: [*1]**
Appeal from Cullman Circuit Court. (CV-05-45).
*Ex parte Hurst, 914 So. 2d 840, 2005 Ala. LEXIS 73 (Ala., 2005)*

**DISPOSITION:**    AFFIRMED IN PART; CERTIFI-CATION SET ASIDE IN PART; AND REMANDED.

**CORE TERMS:** counterclaim, summary judgment, written agreement, breach-of-contract, certification, life estate, convey, personal property, real property, tort-of-outrage, malicious-prosecution, abuse-of-process, father-in-law's, outrage, police report, summary-judgment, pu-nitive damages, oral agreement, unenforceable, convey-ance, wantonness, signature, final judgment, inappropri-ate, intertwined, defamation, forgery, quiet, injunctive relief, jury question

**JUDGES:** THOMAS, Judge. Thompson, P.J., Pittman and Moore, JJ., concur. Bryan, J., concurs in the result, without writing.*

\*    *Note from the reporter of decisions: When the opinion in this case was released on Septem-ber 28, 2007, Judge Bryan was inadvertenly shown as voting to concur. He actually concurred in the result.

**OPINION BY:** THOMAS

**OPINION**

THOMAS, Judge.

Tom Hurst and Linda Hurst and Mike Cook and Carrie Cook had a long-standing friendship that began more than 11 years ago when the Hursts and the Cooks lived in Florida. The Hursts moved to Alabama in 1995, and, later, the Cooks also made Alabama their home. In August 2003, the Cooks offered to allow the Hursts to live in the Cooks' former house in Hanceville rent free. The Cooks further offered the Hursts the use of the fur-nishings remaining in the house. According to the Hursts, however, the Cooks told the Hursts that any per-sonal property remaining in the house was the Hursts to do with as they saw fit. The Cooks admit that they con-sidered the possibility of deeding a life estate in the property to the Hursts; however, the Hursts contend that the Cooks promised to deed a life estate in the property to the Hursts. No deed was ever prepared. The Hursts moved into the Cooks' former house in September 2003.

At some point before December 2004, the Cooks decided to sell their former house  **[*2]**  and the property surrounding it. In December 2004, the Cooks notified the Hursts that they would need to vacate the premises by February 15, 2005. On or about December 6, 2004, the Hursts filed in the Cullman County Probate Court a writ-ten agreement signed by them and Mike Cook. That writ-ten agreement read as follows:

"WITNESSETH: That in consideration of the mutual covenants and agreements to be kept and performed upon the part of said parties hereto, respectively as herein stated, [Mike Cook] does hereby covenant and agree that ...:

"I. As of [March 10, 2004], the House and Lower-Apt. and Garage Buildings at 1220 Co. Rd. 548 Hanceville, AL 35077, has my permission to take possession of and to occupy by [sic] my good friends Thomas and Linda Hurst until their deaths. This agreement is a precursor of a Life Estate Agreement promised by [Mike

Cook] to [the Hursts], of which [sic] will be issued on or before 6/1/04.

"II. And [the Hursts] covenant[] and agree[] that [they] shall: Pay $ 1.00 a month in consideration of said agreement. Therefore, $ 100.00 in cash is given at this time by [the Hursts] to [Mike Cook] in consideration of this agreement. Also, [the Hursts] will have responsibility [*3] of utilities of house and their Apt.-Garage Bldg. only. Also, [the Hursts] will have access to use workshop that is located on the 3rd Acre of said Property.

"III. Other terms to be observed between the parties: When and if the Upper Apt., of said Apt.-Garage Bldg. which will be occupied by Father Robert Cox is ever vacated by him; the entire said Apt.-Garage Bldg. will there-with be solely occupied by the Hurst family. And separately, all home furnishings, appliances, i.e. contents of which were left in Apt.-Garage Bldg. and house by [Mike Cook] are hereby given unconditionally to [the Hursts]."

The Cooks contend that the agreement the Hursts filed is a forgery. Mike Cook made a police report alleging that the Hursts had forged his signature on the written agreement. Although the police began an investigation of the alleged forgery, the police made no arrests as a result of the investigation.

According to the Hursts, while they were moving out of the house on February 16 and 17, 2005, the Cooks orally harassed them and physically threatened them. In addition, the Hursts allege that Carrie Cook, or someone acting on her behalf, broke into the house by breaking a window. The Hursts accused [*4] Carrie Cook of taking some of the Hursts' property, including their telephone-answering machine. The Hursts said that they telephoned the police about the break-in and that the police made Carrie Cook return the stolen items.

Based on the filing of the written agreement in the probate court and the difficulties that ensued in having the Hursts move from the house, the Cooks filed, on January 28, 2005, an action alleging that the Hursts had slandered title to the property, had conspired to defraud the Cooks by forging Mike Cook's signature on the written agreement, and had converted the Cooks' personal property. The Cooks further sought to quiet title to the property, to set aside any purported conveyance to the Hursts, and to eject the Hursts from the property. The

Hursts answered the complaint and asserted malicious-prosecution, abuse-of-process, fraud, negligence, wantonness, intentional-infliction-of-emotional-distress (referred to hereinafter as "the tort-of-outrage"), defamation, and breach-of-contract counterclaims.

The Cooks moved for a summary judgment on their requests to quiet title and to set aside any purported conveyance to the Hursts and on the Hursts' counterclaims. The [*5] trial court entered a summary judgment in favor of the Cooks on the quiet-title claim, determined that the request that any purported conveyance be set aside was moot, and entered a summary judgment in the Cooks' favor on the abuse-of-process, malicious-prosecution, tort-of-outrage, negligence, wantonness, and fraud counterclaims asserted by the Hursts. In addition, although it did not recite in the conclusion of the summary-judgment order that the breach-of-contract counterclaim, which related to both the real property and the personal property mentioned in the written agreement, was being adjudicated, the trial court clearly stated in the summary-judgment order that the Hursts' breach-of-contract counterclaim regarding both the real property and the personal property "must fail" and stated, in regard to the breach-of-contract counterclaim relating to the personal property, that "the Hursts have, at most, an affirmative defense to the Cooks' conversion claim." Finally, the summary-judgment order states that the Hursts are precluded from recovering punitive damages on that portion of their defamation counterclaim based on allegedly libelous statements made by the Cooks. The trial court [*6] certified the summary judgment as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P. The Hursts appealed the summary judgment to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to *Ala. Code 1975, § 12-2-7(6)*.

The Hursts initially challenge the propriety of the trial court's certification of the summary judgment as a final judgment pursuant to Rule 54(b). If the certification of the summary judgment is inappropriate with respect to a particular claim, this court does not have jurisdiction to consider that particular claim on appeal. *Ex parte Simmons, 791 So. 2d 371, 381 (Ala. 2000)* (holding that an interlocutory order disposing of only part of a claim was not subject to being certified pursuant to Rule 54(b) and therefore vacating that portion of this court's judgment purporting to affirm that interlocutory order and, further, considering other issues raised in the appeal and cross-appeal).

The rule itself reads, in pertinent part:

"When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are in-

volved, the court may direct the entry of a final judgment [*7] as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. ..."

Rule 54(b). Both this court and our supreme court have considered several times the propriety of a Rule 54(b) certification, and several principles governing the appropriateness of such certifications have been developed.

"In *Moss v. Williams, 747 So. 2d 905, 907 (Ala. Civ. App. 1999),* this court stated:

"'Not every order has the requisite element of finality that can trigger the operation of Rule 54(b), Ala. R. Civ. P. *James v. Alabama Coalition for Equity, Inc., 713 So. 2d 937 (Ala. 1997).* "Rule 54(b) certifications should be made only in exceptional cases and should not be entered routinely." *Parrish v. Blazer Financial Services, Inc., 682 So. 2d 1383 (Ala. Civ. App. 1996).'*

"Further, "'[a]ppellate review in a piecemeal fashion is not favored, and trial courts should certify a judgment as final, pursuant to Rule 54(b), *only in a case where the failure to do so might have a harsh effect.*'" *Point Clear Landing Ass'n, Inc. v. Point Clear Landing, Inc., 864 So. 2d 369, 371 (Ala. Civ. App. 2003)* [*8] (quoting *Harper Sales Co. v. Brown, Stagner, Richardson, Inc., 742 So. 2d 190, 192 (Ala. Civ. App. 1999))."*

*First Southern Bank v. O'Brien, 931 So. 2d 50, 52-53 (Ala. Civ. App. 2005).*

Our supreme court has further explained that in cases in which an adjudicated claim and a unadjudicated counterclaim are "so closely intertwined that separate adjudication would pose an unreasonable risk of inconsistent results," *Branch v. SouthTrust Bank of Dothan, N.A., 514 So. 2d 1373, 1374 (Ala. 1987).* In *Branch* the trial court certified a summary judgment on a claim alleging that an obligor had defaulted on a promissory note as a final judgment pursuant to Rule 54(b); the obligor's fraud counterclaim relating to the conduct of the loan officer in securing his signature on the note remained pending in

the trial court. *Branch, 514 So. 2d at 1373.* The supreme court noted:

"Rule 54(b) is properly applied in a situation where the claim and the counterclaim present more than one claim for relief, either of which could have been separately enforced. *Cates v. Bush, 293 Ala. 535, 307 So. 2d 6 (1975).* Under 'appropriate facts,' a partial summary judgment on an original [*9] claim may be finally adjudicated pursuant to Rule 54(b), leaving a counterclaim undecided so that the parties can further litigate the issues presented by the counterclaim."

*Id. at 1374.* Because the claim for recovery under the promissory note and the counterclaim of fraud in the inducement of the execution of the promissory note were "closely intertwined," the supreme court determined that the situation in *Branch* was not a situation that Rule 54(b) had been designed to cover, and, thus, it set aside the Rule 54(b) certification of the summary judgment. *Id.*

Our supreme court relied on *Branch* recently to set aside another Rule 54(b) certification. *Summerlin v. Summerlin, 962 So. 2d 170 (Ala. 2007).* In *Summerlin* a wife petitioned for injunctive relief to have her husband's remains disinterred from the cemetery in which he had been buried, Serenity Memorial Gardens Cemetery; she claimed that her father-in-law had "unduly pressured" her into agreeing to bury her husband at Serenity Memorial Gardens instead of at Mobile Memorial Gardens, where their son was buried. *Summerlin, 962 So. 2d at ___, 2007 Ala. LEXIS 11 at *2.* The father-in-law filed a breach-of-contract counterclaim [*10] against the wife, alleging that she had entered into a oral contract in which she had agreed to have the husband's remains interred at Serenity Memorial Gardens in exchange for the father-in-law's payment of the burial expenses, that she had later agreed to leave the husband's remains undisturbed in exchange for the father-in-law's allowing her to retain certain personal property for which the husband owed the father-in-law, and that she had breached those agreements by filing her petition for injunctive relief. *Id. at ___, 2007 Ala. LEXIS 11 at *4.* The wife had already moved for a summary judgment at the time the father-in-law filed his counterclaim; the trial court subsequently entered a summary judgment in the wife's favor, ordering that the husband's remains be disinterred from Serenity Memorial Gardens and that they be reinterred at Mobile Memorial Gardens. *Id. at ___, 2007 Ala. LEXIS 11 at *6.* The trial court certified that summary judgment as a final judgment pursuant to Rule 54(b). *Id.*

Our supreme court considered the issue of the appropriateness of the Rule 54(b) certification *ex mero motu*. *Id. at ___, 2007 Ala. LEXIS 11 at \*6.* After a discussion of the principles regarding Rule 54(b) certification, the court pointed out that the wife's claim seeking [\*11] injunctive relief *appeared* to be a separate and distinct claim from the father-in-law's counterclaim alleging breach of contract. *Id. at ___, 2007 Ala. LEXIS 11 at \*10.* The court then stated: "If one looks beyond form, however, [the father-in-law's] breach-of-contract counterclaim is, in substance, a defense to [the wife's] petition for injunctive relief." *Id. at ___, 2007 Ala. LEXIS 11 at \*9.* Thus, the court concluded, "[i]n short, the issues presented in [the father-in-law's] counterclaim and those in [the wife's] petition for injunctive relief 'are so closely intertwined with other claims that separate adjudication would pose an unreasonable risk of inconsistent results.'" *Id. at ___, 2007 Ala. LEXIS 11 at \*10* (quoting *Branch,* 514 So. 2d at 1374).

The *Summerlin* court cited *Automatic Liquid Packaging, Inc. v. Dominik, 852 F.2d 1036, 1038 (7th Cir. 1988),* as support for its conclusion that certain counterclaims can be so intertwined as to be inappropriate for Rule 54(b) certification. *Id.* In *Dominik* the federal court considered whether a Rule 54(b) certification on a summary judgment entered on a claim requesting enforcement of a contract was appropriate in light of the pendency of a counterclaim requesting that the contract be voided because it had expired. *Dominik, 852 F.2d at 1038.* [\*12] The *Dominik* court concluded that the certification was inappropriate because "[the two claims] are the same claim, expressing the parties' opposed interpretations of the [contract], though configured as a plaintiff's claim in the complaint and as a defense masquerading as a positive claim for relief in the counterclaim." *Id.* Thus, when a counterclaim is in the nature of a defense to a claim raised by the plaintiff, Rule 54(b) certification of a summary judgment on one of those claims is likely inappropriate.

Likewise, certification of a decision addressing only the type of damages recoverable on a certain claim is inappropriate. *Haynes v. Alfa Fin. Corp., 730 So. 2d 178, 181 (Ala. 1999).* Although Rule 54(b) permits the "entry of a final judgment as to one or more but fewer than all of the claims or parties," it does not permit the trial court to make final an order that does not dispose of an entire claim. *Haynes, 730 So. 2d at 181.* As the court said, "'there is no such thing as a "claim for punitive damages."' Rather, there are claims on which our law authorizes the trier of fact to impose punitive damages if certain wrongfulness is proved by a sufficient weight of the evidence.'" *Id.* [\*13] (quoting *Hines v. Riverside Chevrolet-Olds, Inc., 655 So. 2d 909, 925 (Ala. 1994), overruled on other grounds, State Farm Fire & Cas. Co. v.*

*Owen, 729 So. 2d 834 (Ala. 1998)).* Thus, a determination that punitive damages are not recoverable on a certain claim does not dispose of a substantive claim and does not give the trial court authority to certify the judgment as final pursuant to Rule 54(b). *Haynes, 730 So. 2d at 181.*

The summary judgment in the present case disposes of a number of claims. It quiets title in the subject property in the Cooks and rejects the malicious-prosecution and abuse-of-process counterclaims asserted by the Hursts against the Cooks that arose out of Mike Cook's swearing out a warrant against the Hursts alleging forgery. The trial court further rejected the Hursts' tort-of-outrage counterclaim based on the various actions taken by the Cooks. The summary judgment also disposed of the negligence, wantonness, and fraud counterclaims asserted by the Hursts. In addition, the trial court determined that the Hursts could not seek punitive damages for that part of their defamation counterclaim that was based on allegedly libelous statements made by the Cooks. Finally, [\*14] the trial court rejected the Hursts breach-of-contract counterclaim regarding both the real property and the personal property. [1] The claims remaining in the trial court for later adjudication are the Cooks' slander-of-title, ejectment, conspiracy-to-defraud, and conversion claims and the Hursts' defamation counterclaim.

1  The Hursts argue that the trial court did not actually enter a summary judgment on their breach-of-contract counterclaim because the trial court failed to list that counterclaim in the conclusion of the order as one of the claims it had adjudicated. The Cooks contend, however, that the substance of the summary-judgment order makes it clear that the trial court intended to adjudicate the breach-of-contract counterclaim by indicating that the counterclaim "must fail." Rule 58(b), Ala. R. Civ. P., states:

> "An order or a judgment need not be phrased in formal language nor bear particular words of adjudication. A written order or a judgment will be sufficient if it is signed or initialed by the judge ... and indicates an intention to adjudicate, considering the whole record, and if it indicates the substance of the adjudication."

Thus, we agree with the Cooks that the breach-of-contract [\*15] counterclaim was adju-

dicated by the trial court in their favor in the summary-judgment order.

The trial court's summary-judgment order indicates in its very text that the Hursts' breach-of-contract counterclaim, insofar as it relates to the personal property that was the subject of both the oral and the written agreements, is more appropriately a defense to the Cooks' conversion claim, which seeks damages for the Hursts' conversion of that very property. Thus, we cannot see how the trial court's certification of the summary judgment on the Hursts' breach-of-contract counterclaim insofar as it relates to the personal property does not run afoul of the standard set out in *Branch*, and more recently in *Summerlin*, that a judgment disposing of counterclaims that are in the nature of defenses to an unresolved original claim should not be certified pursuant to Rule 54(b). *Summerlin, 962 So. 2d at ___, 2007 Ala. LEXIS 11 at *8; Branch, 514 So. 2d at 1374.* Because the trial court's judgment as to the breach-of-contract counterclaim relating to the personal property was not properly certified, and because the negligence, wantonness, and fraud counterclaims arising from the alleged breach of either the oral or written agreement **[*16]** to gift the personal property to the Hursts are inextricably intertwined with the breach-of-contract counterclaim relating to the personal property and the conversion claim, the certification of the judgment as to those counterclaims was error as well. In addition, the trial court's judgment regarding the availability of punitive damages on that portion of the Hursts' defamation counterclaim based on allegedly libelous statements made by the Cooks is clearly not subject to being certified as final pursuant to Rule 54(b). *Haynes, 730 So. 2d at 181.*

Because the summary judgment as to those counterclaims was not properly certified, we set aside the certification of finality pursuant to Rule 54(b) insofar as it pertains to the defamation-damages determination and both the breach-of-contract counterclaim and the related tort counterclaims insofar as they relate to the oral or written agreements to gift the personal property, and we remand those counterclaims to the trial court. However, because the other counterclaims resolved by the trial court's summary-judgment order do not appear to be so closely intertwined with the remaining claims that a risk of inconsistent judgments is created by **[*17]** the certification, we will address the summary judgment on the Cooks' claim seeking to quiet title and on the malicious-prosecution, abuse-of-process, and tort-of-outrage counterclaims asserted by the Hursts. In addition, we will address the Hursts' negligence, wantonness, fraud, and breach-of-contract counterclaims insofar as they relate to the agreement to convey a life estate in the real property.

We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3); *see Lee v. City of Gadsden, 592 So. 2d 1036, 1038 (Ala. 1992).* If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by 'substantial evidence.'" *Lee, 592 So. 2d at 1038* (footnote omitted). "[S]ubstantial evidence is evidence of such weight **[*18]** and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989); see Ala. Code 1975, § 12-21-12(d).* Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant, and must entertain all reasonable inferences from the evidence that a jury would be entitled to draw. *See Nationwide Prop. & Cas. Co. v. DPF Architects, P.C., 792 So. 2d 369, 372 (Ala. 2000);* and *Fuqua v. Ingersoll-Rand Co., 591 So. 2d 486, 487 (Ala. 1991).*

We first note that the Hursts do not make any specific argument that the trial court erred in entering a summary judgment in favor of the Cooks on their claim seeking to quiet title, thus indicating that they have elected to not pursue a reversal of the summary judgment on that claim. *See Tucker v. Cullman-Jefferson Counties Gas Dist., 864 So. 2d 317, 319 (Ala. 2003).* In fact, the Hursts concede that the written agreement does not meet the requirements of *Ala. Code 1975, § 35-4-20*, which generally requires conveyances to be in writing, signed **[*19]** by the contracting party, and attested by one witness, to pass title to the property. [2] Because the written agreement does not meet the requirements of *§ 35-4-20*, it did not operate to pass title to the real property to the Hursts. *Mississippi Valley Title Ins. Co. v. Hardy, 541 So. 2d 1057, 1061 (Ala. 1989); see also Smith v. Smith, 892 So. 2d 384, 388 (Ala. Civ. App. 2003).* The summary judgment on the Cooks' quiet-title claim is therefore affirmed.

2 *Section 35-4-20* reads in its entirety:

"Conveyances for the alienation of lands must be written or printed, or partly written and partly printed, on parchment or paper, and must be signed at their foot by the contracting party or his agent having a written authority; or, if he is not able to sign his

name, then his name must be written for him, with the words 'his mark' written against the same, or over it; the execution of such conveyance must be attested by one witness or, where the party cannot write, by two witnesses who are able to write and who must write their names as witnesses; or, if he can write his name but does not do so and his name is written for him by another, then the execution must be attested by two witnesses who can [*20] and do write their names."

In addition, the Hursts make no cognizable argument regarding the summary judgment entered in the Cooks' favor on the malicious-prosecution and abuse-of-process counterclaims. The Hursts' brief argues for a reversal of the summary judgment entered on all of their counterclaims in the aggregate while focusing primarily on the reasons the trial court erred in entering a summary judgment on the breach-of-contract and related tort counterclaims on the basis that the written agreement was unenforceable. Because the malicious-prosecution and abuse-of-process counterclaims are based on Mike Cooks' making a police report reporting the Hursts' alleged forgery of his signature and because the forgery allegation was not at issue in the summary-judgment proceedings, the validity of the written agreement has no bearing on the malicious-prosecution and abuse-of-process counterclaims.

Although the Hursts, in contravention of Rule 28(a)(10), Ala. R. App. P., fail to make any legal argument supported by authority specifically concerning the malicious-prosecution and abuse-of-process counterclaims, we will briefly address the legal merits of the summary judgment on those counterclaims. [*21] See Kirksey v. Roberts, 613 So. 2d 352, 353 (Ala. 1993) (explaining that an appellate court may consider an argument that is not compliant with Rule 28(a)(10) if the court is able to adequately discern the issues presented); Bishop v. Robinson, 516 So. 2d 723, 724 (Ala. Civ. App. 1987) (explaining that an appellate court may consider an argument that is not compliant with Rule 28(a)(10) when the appellee adequately responds to the issues raised by the appellant in brief despite the noncompliance); and Thoman Eng'rs, Inc. v. McDonald, 57 Ala. App. 287, 289, 328 So. 2d 293, 295 (Civ. 1976) (explaining that an appellate court may consider an argument that is not compliant with the predecessor to Rule 28(a)(10) when the argument "has been raised in a manner which is fair to all concerned"). To recover for the tort of malicious prosecution, a plaintiff is required to prove that the defendant, without probable cause and with malice, initiated legal proceedings against the plaintiff and that the legal proceedings terminated in the plaintiff's favor, yet caused the plaintiff damage. See Fina Oil & Chem. Co. v. Hood, 621 So. 2d 253, 256 (Ala. 1993). "The tort of abuse of process differs from [*22] the tort of malicious prosecution; the tort of abuse of process is concerned with 'the wrongful use of process after it has been issued,' while the tort of malicious prosecution is concerned with 'the wrongful issuance of process.'" Shoney's, Inc. v. Barnett, 773 So. 2d 1015, 1024 (Ala. Civ. App. 1999). To establish the tort of abuse of process, a plaintiff must prove the existence of an ulterior purpose, the wrongful use of process, and malice. Barnett, 773 So. 2d at 1024 (citing C.C. & J., Inc. v. Hagood, 711 So. 2d 947 (Ala. 1998)). The only action Mike Cook undertook was to make a police report. No process was issued and no legal proceedings were instituted as a result of the making of the police report. Thus, even viewing the facts in the light most favorable to the Hursts, as we must when reviewing a summary judgment, Nationwide Prop. & Cas. Co., 792 So. 2d at 372, the Hursts simply cannot establish the elements of either tort, and the summary judgment in the Cooks' favor on those counterclaims is therefore affirmed.

The trial court entered a summary judgment in favor of the Cooks on the Hursts' breach-of-contract counterclaim relating to the alleged breach of that portion of [*23] the written agreement pertaining to the real property. The fact that Carrie Cook was not a party to the written agreement formed the basis for the summary judgment in her favor; this undisputed fact precludes any breach-of-contract counterclaim against Carrie Cook. See generally Ligon Furniture Co. v. O.M. Hughes Ins. Co., 551 So. 2d 283, 285 (Ala. 1989) (affirming a summary judgment on a breach-of-contract claim when the defendants were not parties to the contract). The basis of the trial court's summary judgment in Mike Cook's favor was that the written agreement violated the Statute of Frauds, codified at Ala. Code 1975, § 8-9-2, which requires that certain agreements be in writing to be enforceable. [3]

3 The Statute of Frauds states, in pertinent part:

"In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:

"....

"(5) Every contract for the sale of lands, tenements or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase [*24] money, or a portion thereof is paid and the purchaser is put in possession of the land by the seller ...."

§ 8-9-2.

However, the written agreement, although not in compliance with § 35-4-20, and therefore unable to convey any title to the property due to this deficiency, meets the requirements of the Statute of Frauds: it is an agreement regarding the intent to convey a life estate in real property that lists the consideration for the agreement and is signed by the party to be charged. The trial court's conclusion that the written agreement runs afoul of the Statute of Frauds appears to be based on the trial court's determination that the written agreement is unenforceable because it is merely an agreement to agree. *See Muscle Shoals Aviation, Inc. v. Muscle Shoals Airport Auth., 508 So. 2d 225, 226 (Ala. 1987)* (quoting *Clanton v. Bains Oil Co., 417 So. 2d 149, 151 (Ala. 1982)*) (stating the general rule that "'"agreements to later agree are not enforceable"'"). Although an agreement to agree is generally unenforceable, such an agreement is enforceable when it is "definite and certain in all of its terms and conditions so that the court can know what the parties agreed upon." *Muscle Shoals Aviation, Inc., 508 So. 2d at 228.* [*25] The written agreement, which is set out earlier in this opinion, does have terms that are definite and certain and therefore appears to meet the requirements of the exception to the principle that agreements to agree are unenforceable. *See Mobil Oil Corp. v. Schlumberger, 598 So. 2d 1341, 1345 (Ala. 1992).*

However, in a case with marked similarity to this case, our supreme court determined that an action for breach of contract would not lie when only one of the parties holding a joint interest in land was a signatory to the contract. *Obermark v. Clark, 216 Ala. 564, 114 So. 135 (1927).* In *Obermark* F.L. Clark sought to purchase property owned jointly by A.F. Obermark and his sister, Sarah J. Gates. Obermark entered into a contract to sell the property to Clark based, in part, on Clark's assurance that he would secure a similar contract from Gates. Clark failed to secure from Gates a contract to sell her interest in the property. When the property was not conveyed to him, Clark sued Obermark. The supreme court explained why Obermark could not have breached the contract to sell the property.

"It is a well-settled principle of law that:

"'Contracts must be interpreted in the light of the [*26] facts surrounding the parties when they were made. There cannot be a departure from the words of a written contract, they must have their full import and force; but to arrive at the true sense in which the parties employed them, courts of necessity consider the occasion which gave rise to the contract, the relation of the parties, and the object to be accomplished. *Pollard v. Maddox, 28 Ala. 321 [(1856)].* As is said by Bishop: "The parties speak in their contract from the fountain of their mutual knowledge and if we would properly interpret their words, we must put ourselves exactly in their position, and know just what they mutually know, with neither addition nor abatement." Bishop on Contracts, § 370.' *McGhee et al. v. Alexander et al., 104 Ala. 116, 16 So. 148 [(1894)].*

"When the contract is considered in the light of the principle just stated, and the pleaded facts, it is clear that the plaintiff, Clark, did not contemplate nor intend to purchase merely the individual half interest of Obermark, but it was his purpose to purchase the entire title. It is equally as clear that Obermark, when he affixed his signature to the alleged contract, did not intend to acquire the interest of [*27] Mrs. Gates, but merely intended to sell his interest in the property and contemplated that Mrs. Gates would become a party to the agreement as to her interest. Under these circumstances it was impossible for Obermark to convey the entire title, and it would be unjust to hold him responsible for a failure to convey the entire title. The contract contemplated and intended to be made was a tripartite contract or agreement to sell, and *it was as essential to the finality and completeness of assent that all the parties intended should be bound as it was that all of the terms should be definitely agreed upon.* 6 R.C.L. pp. 616, 617, § 37, and authorities cited in note 110 Am. St. Rep. 747."

*Obermark, 216 Ala. at 566, 114 So. at 136* (emphasis added). *See also Jones v. McGivern, 274 Ala. 232, 234, 147 So. 2d 813, 814 (1962)* (affirming a trial court's refusal to order specific performance of a husband's contract to sell property jointly owned by him and his wife when the wife never agreed to the sale because to require the husband to convey his interest "would be to require the husband to perform a contract he did not make").

The Hursts state in their affidavits that Mike Cook told them he would **[*28]** have Carrie Cook sign the written agreement, and it can be reasonably inferred that the Hursts knew that Carrie Cook would also be required to execute the deed to the life estate together with her husband. The Hursts never received a copy of the written agreement with Carrie Cook's signature on it. Nor did the Hursts ever receive a deed conveying a life estate in the property. The written agreement evidences an agreement between Mike Cook and the Hursts that Mike Cook would convey a life estate in the property; it does not indicate that Mike Cook was to convey only his interest in a life estate in the property. Mike Cook cannot convey a life estate in the property to the Hursts; he can convey only his interest in the jointly held property. *Crommelin v. Fain, 403 So. 2d 177, 181 (Ala. 1981)*. Mike Cook contracted, however, to convey a life estate in the property in the future by executing a document to that effect, which, to be effective, also required the signature of his wife. Thus, based on *Obermark* and *Jones*, to hold Mike Cook responsible for the breach of a contract to convey a life estate in the property would be unjust; the trial court's summary judgment regarding the Hursts' **[*29]** breach-of-contract counterclaim as to the real property is affirmed. [4]

> 4  The Cooks argue in their brief on appeal that the written agreement is unenforceable because of a failure of consideration. The written agreement itself, however, recites consideration for both the future conveyance and the written agreement.

The negligence, wantonness, and fraud counterclaims asserted by the Hursts are based in part on the failure of the Mike Cook to honor the written agreement to convey a life estate in the real property and in part on the failure of the Cooks to honor an oral agreement regarding a life estate in the real property made to the Hursts before the execution of the written agreement. [5] The trial court based its summary judgment on the tort counterclaims arising out of the written agreement in favor of Carrie Cook on the undisputed fact that she had not signed the agreement and therefore was under no duty to perform under the written agreement. Regarding the tort counterclaims against Mike Cook, the trial court concluded that, because the written agreement was unen-

forceable under the Statute of Frauds, the tort counterclaims were barred by the Statute of Frauds as well. *See Holman v. Childersburg Bancorporation, Inc., 852 So. 2d 691, 699-701 (Ala. 2002)* **[*30]** (explaining that the plaintiff's tort claims, including those alleging negligence and fraud, were barred by the Statute of Frauds because to allow a plaintiff to recover in tort the benefit of the bargain he would have obtained had an oral promise running afoul of the Statute of Frauds been performed would render the statute meaningless). Because we have determined that the summary judgment on the breach-of-contract counterclaim relating to the real property should be affirmed, albeit for a slightly different reason than that relied on by the trial court, we affirm the trial court's judgment on the tort counterclaims arising from the breach of the written agreement to convey a life estate in the real property.

> 5  We note the inconsistencies in the arguments made by the Hursts regarding the tort counterclaims. On the one hand, the Hursts insist that their tort counterclaims are not based on any oral promises that run afoul to the Statute of Frauds, but, on the other hand, they argue that the injuries upon which they base those counterclaims do not stem solely from the execution of and breach of the written agreement but also flow from the Cooks' conduct and representations that induced **[*31]** the Hursts to abandon their other living arrangements and move into the Cooks' former house before the execution of the written agreement. We will therefore address the tort counterclaims insofar as they relate to both the alleged breach of the written agreement and the alleged breach of the oral promises made by the Cooks before the execution of the written agreement.

Insofar as the negligence, wantonness, and fraud counterclaims arose out of the oral agreement made by the Cooks, we agree with the trial court that the oral agreement to convey a life estate is unenforceable because it violates the Statute of Frauds and that any tort counterclaims based on the oral agreement must fail on that basis. *Holman, 852 So. 2d at 699-701*. Thus, we affirm the trial court's summary judgment on the tort counterclaims insofar as they are based on any oral agreement to convey a life estate made by the Cooks.

The Hursts' tort-of-outrage counterclaim is more difficult to analyze because it is not entirely clear upon which actions taken by the Cooks the counterclaim is premised. As noted above in the discussion about the other tort counterclaims arising out of the Hursts' allegations that the Cooks induced **[*32]** them to move into the Cooks' former house with an oral agreement that the Cooks would deed a life estate in the real property to the

Hursts, any recovery by the Hursts in tort would be barred because the Cooks' oral agreement would run afoul of the Statute of Frauds. *See Holman, 852 So. 2d at 699.* Insofar as the Hursts' tort-of-outrage counterclaim is based on Mike Cook's making a police report alleging that the Hursts had forged his name to the written agreement, the Hursts' tort-of-outrage counterclaim also fails.

A plaintiff seeking to establish the tort of outrage bears a heavy burden. "The tort of outrage was not developed to provide a person with a remedy for the trivial emotional distresses that are common to each person in his everyday life." *U.S.A. Oil, Inc. v. Smith, 415 So. 2d 1098, 1101 (Ala. Civ. App. 1982).* As our supreme court has explained:

> "This Court first recognized the tort of outrage, or intentional infliction of emotional distress, in *American Road Service Co. v. Inmon, 394 So. 2d 361 (Ala. 198[0]).* In *Inmon,* the Court held that to present a jury question the plaintiff must present sufficient evidence that the defendant's conduct (1) was intentional or reckless; [*33] (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it. The Court defined the second element of the tort of outrage as follows: 'By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.' *Inmon, 394 So. 2d at 365* (quoting *Restatement (Second) of Torts, § 46 cmt. d, at 72 (1948)).*
>
> "....
>
> "This court has consistently held that the tort of outrage is a very limited cause of that is available only in the most egregious circumstances.... In fact, in the 12 years since *Inmon* was decided, all cases in which this Court has found a jury question on an outrage claim have fallen within only three categories: 1) cases having to do with wrongful conduct in the context of family burials, see *Whitt v. Hulsey, 519 So. 2d 901 (Ala. 1987)* (reckless desecration of family burial ground by adjacent landowner sufficient to present a jury question as to claim of outrage), *Levite Undertakers Co. v. Griggs, 495 So. 2d 63 (Ala. 1986)* (defendant undertaker's wrongful retention of the re-

mains [*34] of plaintiff's husband to force payment of funeral expenses sufficient to present a jury question as to claim of outrage), and *Cates v. Taylor, 428 So. 2d 637 (Ala. 1983)* (defendant's withdrawal of permission to use a burial plot 30 minutes before the planned burial sufficient to present a jury question on claim of outrage); 2) a case where insurance agents employed heavy-handed, barbaric means in attempting to coerce the insured into settling an insurance claim, *National Security Fire & Cas. Co. v. Bowen, 447 So. 2d 133 (Ala. 1983)*; and 3) a case involving egregious sexual harassment, *Busby v. Truswal Systems Corp., 551 So. 2d 322 (Ala. 1989).*"

*Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1043-44 (Ala. 1993).*

Even if Mike Cook's decision to make a police report was motivated by malice and his allegation of forgery was entirely false, such actions would not rise to the level of being a proper basis for the tort-of-outrage counterclaim. The circumstances surrounding the making of the police report and the subsequent investigation are far from the most egregious of circumstances, and it is impossible to conclude that Mike Cook's "'conduct [was] so outrageous in character and [*35] so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Thomas, 624 So. 2d at 1043-44.* In addition, the Hursts failed to present substantial evidence of any severe emotional distress they suffered as a result of Mike Cook's making of the police report.

The other actions by the Cooks that could form the basis of the Hursts' tort-of-outrage counterclaim are the Cooks' alleged harassment of the Hursts as they moved out of the house and the alleged burglary of the house by Carrie Cook or someone acting on her behalf. The Hursts' description of the harassment they suffered at the hands of the Cooks in their affidavits is generic and does not present substantial evidence creating a fact question regarding whether the conduct of the Cooks was "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Thomas, 624 So. 2d at 1043-44.* Even if we were to consider the allegation that Carrie Cook or a person acting on her behalf burglarized the house as being sufficient to reach the [*36] level of outrageousness necessary under *Inmon* and its progeny, the Hursts have still failed to present substantial evidence indicating that

2007 Ala. Civ. App. LEXIS 635, *

the Cooks' actions "caused emotional distress so severe that no reasonable person could be expected to endure it." *Thomas, 624 So. 2d at 1043*. Thus, we affirm the summary judgment in favor of the Cooks on the Hursts' tort-of-outrage counterclaim.

In conclusion, we set aside the certification of the judgment as to the breach-of-contract counterclaims based on the breach of either the oral or written agreement to gift the personal property remaining in the house to the Hursts, the related tort counterclaims based on the breach of either the oral or written agreement to gift the personal property, and the determination that the Hursts are not entitled to punitive damages on that part of their defamation counterclaim based on allegedly libelous statements made by the Cooks. We affirm the judgment in favor of the Cooks on their claim seeking to quiet title to the property. We also affirm the judgment on the breach-of-contract counterclaim and related tort counterclaims relating to the oral and written agreements regarding the Cooks' promise to convey [*37] a life estate in the real property to the Hursts. Finally, we affirm the judgment on the malicious-prosecution, abuse-of-process, and tort-of-outrage counterclaims as well.

AFFIRMED IN PART; CERTIFICATION SET ASIDE IN PART; AND REMANDED.

Thompson, P.J., and Pittman and Moore, JJ., concur.Bryan, J., concurs in the result, without writing.*

# Exhibit J

1 of 1 DOCUMENT

**ANTONIO R. DAGGETT, SR., Plaintiff, v. CHICAGO TRANSIT AUTHORITY, Defendant.**

**Civil No. 96 CV 05348**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1998 U.S. Dist. LEXIS 18723*

**November 18, 1998, Decided
November 25, 1998, Docketed**

**DISPOSITION:** [*1] Motion for summary judgment filed by defendant Chicago Transit Authority on October 2, 1998 GRANTED. JUDGMENT ENTERED IN FAVOR of defendant Chicago Transit Authority and AGAINST plaintiff Antonio R. Daggett, Sr.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant former employer moved for summary judgment in plaintiff former employee's action alleging sex discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and the Uniformed Services and Reemployment Rights Act, *38 U.S.C.S. § 4301 et seq.*

**OVERVIEW:** Plaintiff former employee brought an action against defendant former employer alleging sex discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.*, and the Uniformed Services and Reemployment Rights Act (USERRA), *38 U.S.C.S. § 4301 et seq.*, following his termination. Defendant moved for summary judgment, claiming that it had a legitimate non-discriminatory reason for plaintiff's discharge and that plaintiff has failed to show that the reason given was pretextual. The court granted summary judgment for defendant, holding that plaintiff failed to establish a violation of Title VII or USERRA. The court concluded that defendant presented sufficient evidence to show that on numerous occasions plaintiff was insubordinate, which was the legitimate non-discriminatory reason for his termination.

**OUTCOME:** Summary judgment was granted for defendant former employer because plaintiff former employee failed to show a violation of Title VII of the Civil Rights Act of 1964 or the Uniformed Services and Reemployment Rights Act.

**CORE TERMS:** insubordination, termination, summary judgment, military, hostile, warned, audit, suspended, work environment, sexual harassment, prima facie case, suspension, misconduct, harassment, non-moving, terminated, causal, sex, assigned, discriminatory, retaliation, motivating, pervasive, workplace, genuine, notice, sexual, severe, warning, employment decisions

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. However, *Fed. R. Civ. P. 56(c)* is not a requirement that the moving party negate his opponent's claim. *Fed. R. Civ. P. 56(c)* mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts*
[HN2] The standard for granting summary judgment mirrors the directed verdict standard under *Fed. R. Civ. P. 50(a)*, which requires the court to grant a directed verdict where there can be but one reasonable conclusion. A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. No genuine issue for trial exists where the record as a whole could not lead a rational trier of fact to find for the nonmoving party.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN3] On a motion for summary judgment, initially, *Fed. R. Civ. P. 56* requires the moving party to inform the court of the basis for the motion, and to identify those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact. The non-moving party may oppose the motion with any of the evidentiary materials listed in *Fed. R. Civ. P. 56(c)*, but reliance on the pleadings alone is not sufficient to withstand summary judgment.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN4] On a motion for summary judgment, to establish a genuine issue of fact, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. A summary judgment determination is essentially an inquiry as to whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Civil Procedure > Summary Judgment > General Overview*
*Labor & Employment Law > Discrimination*

[HN5] In employment discrimination matters, the standard on summary judgment is applied with added rigor.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employment Practices > Compensation*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Quid Pro Quo*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN6] Under Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.*, it is an unlawful employment practice for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin. *42 U.S.C.S. § 2000e-2(a)(1)*. Within this statutory definition, Title VII prohibits two forms of sexual harassment in the workplace: (1) quid pro quo and (2) hostile environment.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*
[HN7] To make out a hostile work environment claim, the conduct at issue must have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. To determine whether the plaintiff's work environment is hostile within the meaning of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, courts consider a variety of factors, including, the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The focus is necessarily on the totality of the circumstances, no single factor is required.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Coercion > Elements*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Severe & Pervasive Standards*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN8] Not all workplace conduct that may be described as harassment affects a term, condition or privilege of employment within the meaning of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.* For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment. Thus, relatively isolated instances of non-severe misconduct will not support a hostile environment claim.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment*

[HN9] Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would not find hostile or abusive -- is beyond Title VII of the Civil Rights Act of 1964's (Title VII), *42 U.S.C.S. § 2000e et seq.*, purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Employee Burdens*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Coverage & Definitions > Sexual Harassment*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employment Practices > General Overview*

[HN10] In a case of quid pro quo harassment, submission to a supervisor's sexual demands is made a condition of tangible employment benefits. A test which is useful in analyzing such claims requires asking whether the plaintiff has shown (1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's reaction affected a tangible aspect of her employment, and (5) respondeat superior has been established.

*Labor & Employment Law > Discrimination > Disparate Treatment > General Overview*

[HN11] The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers. Pretext means a lie, specifically some phony reason for some action. A plaintiff may accomplish this showing with evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the decision in question, or were insufficient to motivate the decision. These formulations are simply different ways of recognizing that when the sincerity of an employer's asserted reasons for an adverse

decision is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation: if the only reason an employer offers is a lie the inference that the real reason was a forbidden one may rationally be drawn.

*Labor & Employment Law > Discrimination > Disparate Treatment > General Overview*
*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Circumstantial & Direct Evidence*

[HN12] Where there is no direct evidence which would support such a contention, to establish a sexual discrimination claim, a plaintiff would have to successfully navigate the course of the McDonnell Douglas shifting burdens analysis. Under the burden shifting approach, plaintiff must initially establish a prima facie case which includes a showing that (1) he was a member of a protected group; (2) he was doing his work well enough to meet defendant's legitimate expectation; (3) he was discharged despite his performance; and (4) defendant sought a replacement for him.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Evidence > Procedural Considerations > Burdens of Proof > Ultimate Burden of Persuasion*
*Labor & Employment Law > Discrimination > Disparate Treatment > General Overview*

[HN13] To raise an inference of discrimination, the fundamental requirement is that a Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, plaintiff must show that as a member of a protected class he was treated differently than similarly situated others outside the class. If the plaintiff is successful in establishing a prima facie case, a rebuttable presumption of discrimination is created and the burden of production shifts to the defendant to produce some legitimate nondiscriminatory reason for the challenged employment decision. If the defendant produces the legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for discrimination. Of course, the ultimate burden of persuasion (not production) rests with the plaintiff at all times.

*Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities*
*Labor & Employment Law > Discrimination > Actionable Discrimination*

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN14] Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, prohibits retaliation for opposing practices which are discriminatory. It does so by making it an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under the subchapter. *42 U.S.C.S. § 2000e-3*. To establish a prima facie case of retaliation, plaintiff must show (1) that he engaged in protected activity; (2) that an adverse employment action occurred; and (3) that there exists a causal link between the protected activity and the adverse employment action.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
[HN15] Generally, a plaintiff claiming retaliation may establish a causal connection through evidence that the discharge took place on the heels of the protected activity. However, as the temporal distance between the claimant's protected expression and the adverse action increases, it is less likely that there is a causal link between the two events. The causal nexus is sufficiently demonstrated when the time period between the filing of the complaint and the adverse action is one day or one week.

*Labor & Employment Law > Discrimination > Actionable Discrimination*
*Military & Veterans Law > Veterans > Benefits > Employment*
*Pensions & Benefits Law > Equal Protection > Veterans*
[HN16] The Uniformed Services and Reemployment Rights Act (USERRA), *38 U.S.C.S. § 4301 et seq.*, forbids employment discrimination on the basis of membership in the armed forces, *38 U.S.C.S. § 4311(a)*, and authorizes private suits for damages or injunctive relief against the employer. An employer violates USERRA by denying an employment benefit where the employee's membership or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership or obligation for service. *38 U.S.C.S. § 4311(c)(1)*.

*Labor & Employment Law > Discrimination > Actionable Discrimination*

*Military & Veterans Law > Veterans > Benefits > Employment*
*Pensions & Benefits Law > Equal Protection > Veterans*
[HN17] The burden-shifting scheme applicable to cases under the National Labor Relations Act applies to Uniformed Services and Reemployment Rights Act (USERRA), *38 U.S.C.S. § 4301 et seq.*, claims. Under that scheme the plaintiff must initially prove that his military status was a motivating factor in the defendant's adverse employment decision. Upon such a showing, the burden then shifts to the defendant to prove that it would have made the same decision regardless of plaintiff's military status.

**COUNSEL:** ANTONIO R DAGGETT, SR, plaintiff, Pro se, Chicago, IL.

For CHICAGO TRANSIT AUTHORITY, defendant: Kathleen Hope Herrmann, Julie Lynn Trester, Patience R. Nelson, Chicago Transit Authority, Corporate Law Department, Chicago, IL.

**JUDGES:** William C. Lee, Visiting Judge, United States District Court.

**OPINION BY:** William C. Lee

**OPINION**

**MEMORANDUM OF DECISION AND ORDER**

This matter is before the Court on a motion for summary judgment filed by the defendant Chicago Transit Authority on October 2, 1998. [1] Plaintiff pro se responded to that motion with an "Affidavit of Antonio R. Daggett, Sr. In Support of Plaintiff's Motion for Jury Trial and Denial of Defendant's Motion for Summary Judgment In Favor of Defendant." For the following reasons, defendant's motion will be granted.

> 1    Accompanying its motion for summary judgment, the defendant filed a "Notice of Motion for Summary Judgment" pursuant to *Lewis v. Faulkner, 689 F.2d 100 (7th Cir. 1982)* which informed plaintiff of his opportunity to respond with affidavits or other documentary evidence.

**[*2] Factual Background**

The following are the relevant facts as set forth by the defendant and to which plaintiff in his response to the motion for summary judgment has not objected:

Plaintiff is a male and an officer in the United States Army Reserves. He was hired by the defendant in April 1991 as a Senior Internal Auditor. His immediate super-

visor was Alex R. Petska, Manager of Internal Audit Department with ultimate supervisory authority being in the hands of Dorothy A. Brown, General Auditor. [2]

2 Petska reported to Brown.

The defendant has a General Rule Book which is given to all employees. Among other things, the rule book requires employees to know the rules and obey all orders, rules bulletins and instructions. Additionally the rule book specifically prohibits insubordination.

Almost from the inception of his employment until the time of his termination on May 31, 1995, plaintiff was disciplined repeatedly for refusing to obey directives and for insubordination. Chronologically, the prohibited [*3] acts and discipline were as follows:

-->On January 28, 1992, plaintiff received a three day suspension as a result of insubordination for his refusal to perform assigned duties. He was informed that continued insubordination could result in discharge.

-->Less than two months later, on March 23, 1992, plaintiff was suspended for four days as a result of his refusal to provided requested audit plan schedules. Said suspension was to take effect after a meeting on the morning of March 24, 1992.

-->On March 25, 1992, plaintiff's suspension was extended by an additional day because he did not attend the meeting of the previous day. Plaintiff was instructed to report to the General Auditor's office on March 31, 1992.

-->On March 31, 1992, the time his most recent suspension was to terminate, plaintiff did not report to work and was considered absent without leave. He was sent a letter requesting that he report and explain his absence.

-->On April 1, 1992, plaintiff was suspended for two days as a result of insubordinate actions during a meeting with the General Auditor. He left the meeting prior to their being a discussion about his AWOL status and other matters.

-->As [*4] a result of his AWOL status and repeated insubordination, plaintiff was placed on probation for ninety days commencing April 6, 1992. He was warned that future insubordination or

similar misconduct could result in termination.

-->On September 9, 1993, plaintiff was again given a written warning for insubordination as a result of his refusal to complete an assignment and *again he* was warned that insubordination or failure to follow directives could result in termination.

-->Approximately three months later, on December 8, 1993, plaintiff was given another written warning for insubordination as a result of his failure to complete an assignment. He was once again warned that future such dereliction of duties could result in termination.

-->Less than two weeks later, on December 21, 1993 plaintiff was warned again in writing about insubordination and told that such conduct could result in termination because of his continued refusal to work on the Data Center Audit.

-->The following day, December 22, 1993, plaintiff was suspended one day for insubordination as a result of his refusal to work on the Data Center Audit and he was again warned that such insubordination [*5] could result in termination.

-->Three days later, December 24, 1993, plaintiff was suspended for five days for insubordination as a result of his failure to work on the Data Center Audit. He was again warned that continued refusal to perform assigned tasks could result in termination.

-->On January 3, 1994 both Brown and Petska met with plaintiff about his insubordination. Plaintiff agreed to work with an outside consultant on the Data Center Audit and was told that further failure to cooperate would constitute insubordination.

-->On December 16, 1994, plaintiff walked out on a meeting with Brown and Petska. Petska informed plaintiff that such conduct constituted insubordination but that if he immediately returned to the meeting he would not be suspended. Plaintiff did not return to the meeting. Three days later plaintiff was given a "Notice of Pre-Disciplinary Hearing" as a result of his walking out of the meeting.

-->On December 21, 1994, a hearing was held to allow plaintiff to provide an explanation for his walking out of the meeting. On December 28, 1994, as a result of the hearing, plaintiff was suspended for thirty days and again advised that future insubordination [*6] could result in termination.

-->Beginning in February 1995, plaintiff was asked to prepare a memorandum summarizing his work on a Transportation Displays Incorporated audit. That memorandum was not done by April 7, 1995 and Petska then asked in writing that the memorandum be completed by April 14, 1995. On May 26, 1995, the memorandum had still not been supplied and a new deadline of May 30, 1995 was imposed. On May 30, 1995, the memorandum was not completed and that morning plaintiff was reminded that he had until the end of the day to complete it. When he did not he was given a "Notice of Hearing" for insubordination.

-->On May 31, 1995 a disciplinary hearing was held to determine why plaintiff did not complete the Transportation Display Incorporated memorandum given the repeated extensions of deadlines he had been afforded. At the conclusion of the hearing, Brown decided to terminate plaintiff's employment as a result of his insubordination and refusal to perform assigned work.

As indicated, plaintiff was a member of the Army Reserves and over the years he requested leave to fulfill his military obligations. Except for his last request, all were granted: plaintiff [*7] requested and received seven days of leave in 1991, requested and received twelve days of leave in 1992, requested and received another twelve days leave later in 1992, requested and received eighty-eight days of leave in 1993 and requested and received fifty days in 1994. On May 25, 1995, he submitted a leave request but that application did not contain the original military orders as required by defendant's regulations and accordingly was returned with a request that the original military orders accompany the application. Plaintiff was fired shortly thereafter.

In his filing in opposition to the motion for summary judgment, plaintiff does not dispute the foregoing dismal work history nor does he dispute that he had been granted leave for reserve duty on all occasions save his last request. Indeed, omitting caption and prefatory language, his affidavit in response to the motion for summary judgment reads as follows:

2. I was employed by the Chicago Transit Authority ('CTA') as a Senior Internal Auditor in the Internal Auditing Department. I was employed there from April 91 to May 95.

3. At all time relevant to the matters in above-mentioned case, Dorothy A. Brown ('Ms. [*8] Brown') directly supervised, and consistently barred me (Plaintiff) from the office to which I was assigned and hired to work; because I refused to have sex with her to maintain my employment with 'CTA.'

4. In not one but on two occasions, September 1995 and January 1996, verbal sworn testimony was taken from plaintiff, and the attorneys and witnesses for CTA (under oath) before a State of Illinois Hearing Judge (or Officer); and it was determined that no misconduct on my (plaintiff's) part has led to the termination of my employment with CTA. It was also determined that my testimony of the facts about the nature of Ms. Brown's pervasive sexual harassment of me, was that the nature of the harassment was one-on-one and therefore could only speak to the issue of the credibility on the part of each litigant. In both of the scheduled hearings my testimony was found to be credible. (See Discovery Document for the rulings on both hearings).

(Daggett Aff. PP 2-4). [3] As will be seen, such a response is wholly insufficient to overcome defendant's motion for summary judgment.

3   What "Discovery Documents" plaintiff is referring to is unclear. In any event, whatever determination may or may not have been made by a "Illinois Hearing Judge (or Officer)" would not appear to be directly related to the issue before the court--to wit whether plaintiff was the subject of discrimination in violation of federal law and moreover would not absolve plaintiff of his responsibility of setting forth facts sufficient to

withstand the presently pending motion for summary judgment.

## [*9] Application of Law

Plaintiff's complaint in this Court alleges violations of Title VII by asserting that he was the subject of sex discrimination and sexual harassment and that his refusal to have sexual relations with Brown was the motivating factor in his termination. He also asserts that he was discharged in retaliation for opposing discriminatory treatment. Finally he asserts that defendant's conduct violated the Uniform Services Employment and Reemployment Act of 1994. After a review of the standards governing summary judgment, plaintiff's substantive claims will be considered in turn.

### I. Summary Judgment Standards

[HN1] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. However, *Rule 56(c)* is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990)*. *Rule 56(c)* mandates the entry of summary judgment, after adequate [*10] time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)*. [HN2] The standard for granting summary judgment mirrors the directed verdict standard under *Rule 50(a)*, which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986)*. A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *106 S. Ct. at 2512*; *In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988)*; *Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988)*; *Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986)*. No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." [*11] *Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)*(quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)*).

[HN3] Initially, *Rule 56* requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, *Celotex, 477 U.S. at 323, 106 S. Ct. at 2553*. The non-moving party may oppose the motion with any of the evidentiary materials listed in *Rule 56(c)*, but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988)*; *Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988)*; *Posey v. Skyline Corp., 702 F.2d 102, 105* (7th Cir.), *cert. denied, 464 U.S. 960, 78 L. Ed. 2d 336, 104 S. Ct. 392 (1983)*. In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, [*12] and does not weigh the evidence or the credibility of witnesses. *Anderson, 477 U.S. at 249-251, 106 S. Ct. at 2511*. However, "it is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983)*.

[HN4] To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita, 475 U.S. at 586, 106 S. Ct. at 1356*; *First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988)*. The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id*. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson, 477 U.S. at 251-252, 106 S. Ct. at 2512*. [HN5] In employment discrimination matters, the standard on summary judgment is applied with [*13] "added rigor." *Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir. 1993)*.

## II. Title VII

### A. Sexual Harassment

[HN6] Under Title VII it is an unlawful employment practice for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin. *42 U.S.C. § 2000e-2(a)(1)*. Within this statutory definition, Title VII prohibits two forms of sexual harassment in the workplace: (1) *quid pro quo* and (2) hostile envi-

ronment, *see Meritor Sav. Bank v. Vinson, 477 U.S. 57, 64-65, 106 S. Ct. 2399, 2404, 91 L. Ed. 2d 49 (1986)*.

[HN7] To make out a hostile work environment claim, the conduct at issue must "'have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.'" *Saxton v. American Tel. Tel. Co., 10 F.3d 526, 533 (7th Cir. 1993)* (citing *Meritor Sav. Bank, 477 U.S. at 65, 106 S. Ct. at 2404-05*(quoting *29 C.F.R. § 1604.11(a)(3) (1985))*). [4] To determine whether the plaintiff's work environment is hostile [*14] within the meaning of Title VII, courts consider a variety of factors, including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Saxton, 10 F.3d at 534*. The focus is necessarily on the totality of the circumstances, "no single factor is required." *Id.* [5]

    4    As the United States Supreme Court in *Meritor* explained:

> Of course...not [HN8] all workplace conduct that may be described as "harassment" affects a "term, condition or privilege" of employment within the meaning of Title VII. For sexual harassment to be actionable, it must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

*Meritor Sav. Bank, 477 U.S. at 67, 106 S. Ct. at 2405* (citations omitted). Thus, "relatively isolated" instances of non-severe misconduct will not support a hostile environment claim. *Weiss, 990 F.2d 333, 337* (citations omitted).

    5    The above-mentioned factors are analyzed both subjectively and objectively. Courts will consider not only the effect the discriminatory conduct actually had on the plaintiff, but also the impact it likely would have had on a reasonable employee in her position. *Saxton, 10 F.3d at 534*, citing *Harris, 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 at 370*. [HN9] Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would not find hostile or abusive -- is beyond Title VIII's purview. Likewise, if the victim does not subjec-

tively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation. *Id. See also, Daniels v. Essex Group, Inc., 937 F.2d 1264, 1271-72 (7th Cir. 1991); King v. Board of Regents of the Univ. of Wis. Sys., 898 F.2d 533, 537 (7th Cir. 1990); Brooms v. Regal Tube Co., 881 F.2d 412, 419 (7th Cir. 1989)*(footnote omitted).

[*15] In the present matter, plaintiff has wholly failed to show that the atmosphere at his place of employment was severe or pervasive enough to create an objectively hostile environment. There are but two instances of alleged harassment by his supervisor--May 23 and May 26, 1995 [6] and both of those relate to innocuous comments.

    6    Allegations of sexual harassment preceding May 17, 1995 were ordered stricken by Minute Order of Judge Manning dated February 23, 1998.

Yet even if what plaintiff alleges was said to him is true and Brown did "indicate[] [that] if I was willing to sleep with her, then I would not be terminated," this would not constitute a "hostile work environment" within the meaning of Title VII. This is so because the alleged conduct of Brown was not sufficiently severe or pervasive enough to alter plaintiff's employment conditions or unreasonably interfere with his work performance.

The concept of sexual harassment is designed to protect employees from the kind of attentions "that can make the [*16] workplace hellish...." and "is not designed to purge the workplace of vulgarity." *Baskerville v. Culligan International Co., 50 F.3d 428, 430 (7th Cir. 1995)*. The two incidents, days apart, wholly fail to establish a "hellish workplace" or that the conduct at issue was "severe or persuasive enough to create an objectively hostile or abusive work environment." *Saxton, 10 F.3d at 534*. [7] This case present much less in the way of evidence than cases such as *Koelsch v. Beltone Electric Corp., 46 F.3d 705 (7th Cir. 1995), Saxton, supra* and *Weiss v. Coca-Cola Bottling Co., 990 F.2d 333 (7th Cir. 1993)* where the allegations were found to be insufficient to support a hostile work environment claim. [8]

    7    Plaintiff's claim also falters because he has failed to link the allegedly offensive conduct to his sex by anything other than his own self-serving allegations. *See, Cliff v. Board of School Comm'n, 42 F.3d 403, 408 (7th Cir. 1994)*.

    8    In *Koelsch*, plaintiff asserted a hostile work environment claim by alleging that the company's president on one occasion took his shoe off and

rubbed his foot against her leg, that he once grabbed her buttocks, that he asked her to accompany him for dinner and drinks, and that he once explained he could not help himself when he was in her presence. In *Saxton*, the conduct involved two incidents of alleged inappropriate remarks and touching. In *Weiss*, the alleged conduct included several incidents of unwanted touching, attempts to kiss plaintiff, asking her out on dates and placing "I love you" signs on her work station.

[*17] Nor can it be said that the activity of which plaintiff complains amounted to *quid pro quo* harassment. [HN10] In a case of *quid pro quo* harassment, "submission to a supervisor's sexual demands is made a condition of tangible employment benefits." *Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997).* It has been indicated by the Seventh Circuit that a test which is useful in analyzing such claims requires "asking whether the plaintiff has shown (1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's reaction affected a tangible aspect of her employment, and (5) respondeat superior has been established." *Bryson v. Chicago State University, 96 F.3d 912, 915 (7th Cir. 1996).*

For present purposes, defendant has assumed that plaintiff can establish a prima facie case. It argues, however, that there was a legitimate non-discriminatory reason for his discharge and that plaintiff has failed to show that the reason given was pretextual. This Court agrees.

There is no doubt that insubordination is a legitimate reason for discharge. *See, McClendon* [*18] *v. Indiana Sugars Inc., 108 F.3d 789 n. 7 (7th Cir. 1997)*("In the past we [the Seventh Circuit] have agreed with assessments by the district courts that insubordination can be a valid non-discriminatory reason for discharge)(collecting cases); *Edwards v. Interboro Institute, 840 F. Supp. 222, 230 (E.D.N.Y. 1994)*("blatant employee insubordination is a legitimate reason for terminating employment"); *Futrell v. J.I. Case, 838 F. Supp. 401, 407 (E.D.Wis. 1993)*(same) *rev'd. on other grounds, 38 F.3d 342 (7th Cir. 1994); Bills v. Sunshine Wireless Co., 824 F. Supp. 60, 63 (E.D. Va. 1993)*(same) *aff'd. 14 F.3d 593 (4th Cir. 1994).* [9] Here there is ample evidence that on numerous occasions, plaintiff was insubordinate.

> 9  It should further be noted that "an employee's 'performance' is not necessarily confined to an appraisal of his or her substantive work." *Oates v. Discovery Zone, 116 F.3d 1161, 1171 (7th Cir. 1997).* "It almost goes without saying that an employer has a legitimate interest in insuring that

each employee's work continues at a steady pace to meet the employer's production needs. Reliability and promptness are important considerations in maintaining a work force." *Rush v. McDonald's Corp., 966 F.2d 1104, 1114 (7th Cir. 1992).*

[*19] The record before the Court reflects that from the beginning 1992 until the end of 1994, plaintiff was suspended for refusing to perform assigned duties on seven occasions. During that period he received over 45 days of suspension. He received numerous warning during this period that future acts of insubordination could result in discharge or discipline. Nonetheless, his work performance did not improve.

On February 9, 1995, plaintiff was requested to submit a memorandum for the Transportation Displays Incorporated audit. When that work was not forthcoming by April 7, 1995, plaintiff was given until April 14, 1995 to complete the project. More than one month later the work had not been done and so, on May 26, 1995, plaintiff was given a copy of the April 7 written request, told to do the project, and given until May 30, 1995. On that day he was again approached and reminded that the project was to be completed by the end of the day. It was not completed and plaintiff was given a "Notice of Hearing" which stated that a hearing would be held on May 31, 1995 but further provided that if the memorandum was brought to the hearing, "it will cure this notice." He failed to bring the memorandum [*20] to the hearing and was fired that same date.

Clearly the foregoing facts present a legitimate non-discriminatory reason for plaintiff's discharge. On numerous occasions he was suspended for insubordination, he was repeatedly warned that such misconduct could result in termination and despite such suspensions and warnings he continued to fail to complete assigned tasks. Plaintiff has wholly failed to show that the stated reasons were, in fact, pretextual.

"[HN11] The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions." *Kralman v. Ill. Dept. of Veterans Affairs, 23 F.3d 150, 156 (7th Cir. 1994).* "Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *Id.*

"Pretext...means a lie, specifically some phony reason for some action." *Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995).* "[A] plaintiff may accomplish this showing with evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the [decision] in question, or were insufficient to motivate the [decision]." *Testerman v. EDS Technical Products Corp.,* [*21] *98 F.3d 297, 301 (7th Cir. 1996).* "These formulations are

simply different ways of recognizing that when the sincerity of an employer's asserted reasons for [an adverse decision] is cast into doubt, a factfinder may reasonably infer that unlawful discrimination was the true motivation: 'If the only reason an employer offers... is a lie the inference that the real reason was a forbidden one... may rationally be drawn.'" *Id.* (quoting *Shager v. Upjohn Co., 913 F.2d 398, 401 (7th Cir. 1990).*

Here, there is no showing that the employer's proffered reason--insubordination--was factually baseless in that plaintiff has forwarded no evidence which would suggest that the record of his work (or lack thereof) was inaccurate or that it would be insufficient to form the basis for a discharge. Nor has he presented any evidence other than conclusory statements which would support his apparent contention that the real reason for his termination was his failure to engage in a sexual relationship with his boss. [10]

> 10    In his deposition, plaintiff suggested that he thwarted the advances of Brown on May 23 and May 26 and that it was those actions which served as the real reason for his discharge. As defendants suggest, however, this is too tenuous to establish pretext particularly when it is considered that it was Brown who gave plaintiff until the hearing on May 31, 1995 to cure his deficiency regarding the memorandum when she very well could have terminated him when he missed the May 30, 1995 deadline. By giving him an additional day, a lack of animus on her part is suggested.

## [*22] B. Sex Discrimination

Insofar as plaintiff is more generally asserting that he was the subject of sexual discrimination in that he was treated differently because he was male, it is clear that that claim must fail. [HN12] Since there is no direct evidence which would support such a contention, to establish such this claim, plaintiff would have to "successfully navigate the course of shifting burdens authorized by *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." Mojica v. Gannett Co., Inc., 7 F.3d 552, 561 (7th Cir. 1993).* Under the burden shifting approach, plaintiff must initially establish a prima facie case which includes a showing that (1) he was a member of a protected group; (2) he was doing his work well enough to meet defendant's legitimate expectation; (3) he was discharged despite his performance; and (4) defendant sought a replacement for him. *See, Sample v. Aldi, Inc., 61 F.3d 544, 548 (7th Cir. 1995); Cherry v. American Tel. & Tel. Co., 47 F.3d 225, 228 (7th Cir.1995); Pilditch v. Board of Education of Chicago, 3 F.3d 1113, 1116 (7th Cir. 1993).* [HN13] To

raise an inference of discrimination, the fundamental requirement [*23] is that a Title VII plaintiff must show that as a member of a protected class he was treated differently than similarly situated others outside the class. *Id; accord, Chambers v. American Trans Air, Inc., 17 F.3d 998, 1003-4 (7th Cir. 1994).*

If plaintiff is successful in establishing a *prima facie* case, a rebuttable presumption of discrimination is created and "the burden of production shifts to the defendant...to produce some legitimate nondiscriminatory reason for the challenged employment decision." *Kirk, 22 F.3d 135, 138.* "If the defendant produces the legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for discrimination." *Id.* "Of course, the ultimate burden of persuasion (not production) rests with the plaintiff at all times." *Id.*

Plaintiff has wholly failed to successfully navigate the shifting burdens under *McDonnell Douglas.* In the first place, he has not established a prima facie case because he failed to establish that he was performing his work up to his employer's expectations. As indicated previously, plaintiff repeatedly [*24] was asked to perform work which he did not do, he was repeatedly warned about his misconduct and he was repeatedly told that such misconduct could result in termination. Notwithstanding all of his chances plaintiff failed to do his work in a timely fashion (if at all) and hence failed to meet his employer's expectations.

Because plaintiff did not establish a prima facie case, his claim of sex discrimination must fail. Yet even if he had successfully cleared this initial hurdle, his claim must fail because defendant has adequately set forth a legitimate, nondiscriminatory reason for the adverse employment action--a reason which plaintiff has failed to demonstrate was pretextual. As already noted, insubordination is certainly a legitimate reason for discharge. Here the evidence is replete with instances of plaintiff's insubordination and plaintiff has failed to show that that was not the true reason for his discharge. Even more, plaintiff has failed to point to any *similarly situated* females who were treated differently such that some inference could be drawn from dissimilar treatment.

## C. Retaliation

Plaintiff also claims that he was the subject of retaliation. In this [*25] vein he points to two instances where he allegedly complained of discriminatory treatment--the first being when his desk was allegedly broken into while he was on a thirty day suspension and the second being when his computer was allegedly taken home by Brown and all of his work erased. The first instance

occurred in December 1994 while the second occurred at some point prior to March 1992.

[HN14] Title VII prohibits retaliation for opposing practices which are discriminatory. It does so by making it "an unlawful employment practice for an employer to discriminate against any of his employees...because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under the subchapter." *42 U.S.C. § 2000e-3.* To establish a *prima facie* case of retaliation, plaintiff must show (1) that he engaged in protected activity; (2) that an adverse employment action occurred; and (3) that there exists a causal link between the protected activity and the adverse employment action. *Roth v. Lutheran General Hospital, 57 F.3d 1446, 1459 (7th Cir. 1995).* [*26]

Plaintiff has failed to make that showing. Assuming for present purposes that his complaining about the entry into his desk and about the matters being deleted from his computer constituted protected activity, there is no showing of a causal link between that activity and his termination.

"[HN15] Generally, a plaintiff may establish [a causal connection] through evidence that the discharge took place on the heels of the protected activity." *Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1458 (7th Cir. 1994).* "However, 'as the temporal distance between [the claimant's] protected expression and the adverse action increase[s], it is less likely that there is a causal link between the two events.'" *McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 797 (7th Cir. 1997).* The Seventh Circuit "has found the causal nexus sufficiently demonstrated when the time period between the filing of the complaint and the adverse action was one day or one week." *Id.* (footnotes omitted)(finding temporal link between filing of complaint and termination spanning 2-3 day period). Certainly the allegations in this case which relate to complaints five months and years before his termination fall way [*27] beyond the pale of that considered sufficient to support an inference of a causal link.

### III. USEERA

Finally, plaintiff asserts that his termination was in violation of the Uniformed Services and Reemployment Rights Act (USERRA), *38 U.S.C. §§ 4301, et. seq.* This is so, he asserts, because he was terminated just one day before he was to fulfill his military obligation for 1995.

"[HN16] USERRA forbids employment discrimination on the basis of membership in the armed forces, *§ 4311(a),* and authorizes private suits for damages or injunctive relief against the employer...." *Velasquez v. Frapwell, 160 F.3d 389, 390, 1998 U.S. App. LEXIS*

*28384 (7th Cir. 1998).* An employer violates USERRA by denying an employment benefit where the employee's "membership...or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership...or obligation for service." *38 U.S.C. § 4311(c)(1).*

It has been held that [HN17] the burden-shifting scheme applicable to cases under the National Labor Relations Act applies to USERRA claims. *See, e.g., Gummo v. Village of Depew,* [*28] *75 F.3d 98, 106 (2nd Cir. 1996),* cert. denied, *517 U.S. 1190, 116 S. Ct. 1678, 134 L. Ed. 2d 780 (1996); Smith v. Thomas Lighting, 1998 U.S. Dist. LEXIS 12601, 1998 WL 527307, *2* (N.D. Miss. Aug. 5, 1998); *Chance v. Dallas County Hospital District, 1998 U.S. Dist. LEXIS 5110, 1998 WL 1777963, *3* (N.D. Tex. Apr. 6, 1998). Under that scheme plaintiff must initially prove that his military status was a motivating factor in the defendant's adverse employment decision. Upon such a showing, "the burden then shifts to the defendant to prove that it would have made the same decision regardless of plaintiff's military status." *Chance* at *3.

Here, plaintiff has failed to show that his military status was a motivating factor in the defendant's adverse employment decision. "Military status is a motivating factor if the defendant relied on, took into account, considered or conditioned its decision on that consideration." *Id.*

By the time plaintiff was terminated he had complied a long history of insubordination and failure to complete assignments. Most recently he was very long over due on his work in the Transportation Displays Incorporated audit, had oft-been warned about his dereliction in that regard, and had nonetheless failed [*29] to complete the project despite repeated requests and extensions. The only thing which would suggest some correlation between his military status and his termination was the temporal connection--he was terminated the day before he was to begin his military endeavors. But that totally ignores the fact that on every other occasion, over the span of several years, he was granted the time he sought so that he could fulfill his military duties, clearly negating any suggestion that defendant had an animus towards plaintiff's military status and his obligations relating thereto.

Even if the record supports the conclusion that plaintiff has established a prima facie case under USERRA, defendant has met its burden of showing that it would have made the same decision regardless of plaintiff's military status. While the standard here requires more than a simple articulation of a legitimate nondiscriminatory reason for its decision, "typically, the defendant sat-

isfies this burden by presenting objective evidence as to its probable decision in the absence of any impermissible motivation." *Id.*

In the present matter, defendant has presented evidence that its probable decision would have been **[*30]** to terminate plaintiff's employment even without regard to his status as a reserve officer. Indeed, the record suggests that his termination was an all but foregone conclusion given his repeated insubordination. Plaintiff was continuously warned that his insubordination was unacceptable and that it could lead to termination. Those warnings continued as plaintiff repeatedly failed to submit the information requested on the Transit Display Incorporated audit. Clearly given his work history defen-

dant would have terminated plaintiff regardless of his military status.

**Conclusion**

On the basis of the foregoing, the motion for summary judgment filed by the defendant Chicago Transit Authority on October 2, 1998 is GRANTED. JUDGMENT shall be ENTERED IN FAVOR of defendant Chicago Transit Authority and AGAINST the plaintiff Antonio R. Daggett, Sr.

SO ORDERED this 18 day of November 1998.

William C. Lee, Visiting Judge

United States District Court

# Exhibit K

1 of 1 DOCUMENT

**HALLAM BYER, Plaintiff, vs. DTG OPERATIONS, INC., Defendant.**

**CASE NO. 07-80033-CIV**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA**

*2007 U.S. Dist. LEXIS 68822*

**September 18, 2007, Decided**
**September 18, 2007, Entered**

**CORE TERMS:** sleeping, termination, pretext, retaliation, manager, bus, summary judgment, prima facie case, age discrimination, rental, retaliatory, supervisor, notice, fired, shuttle, proffered reason, non-discriminatory, causation, proffered, slouched, protected activity, causal relationship, temporal proximity, similarly situated, terminated, non-moving, deposition, comparator, interval, firing

**COUNSEL:** [*1] For Hallam Byer, Plaintiff: Robert Anthony Bogdan, LEAD ATTORNEY, Robert Anthony Bogdan, Pompano Beach, FL.

For DTG Operations, Inc., Defendant: John Edmund Phillips, Jr., LEAD ATTORNEY, Phelps Dunbar LLP, Tampa, FL; Jolee Land, LEAD ATTORNEY, Phelps Dunbar, Tampa, FL.

**JUDGES:** DONALD M. MIDDLEBROOKS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** DONALD M. MIDDLEBROOKS

**OPINION**

***ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT***

This Cause comes before the Court on Defendant's Motion for Summary Judgment (DE 8), filed July 9, 2007. The Court has reviewed the record and is fully advised in the premises.

**I. Background**

Plaintiff Hallam Byer ("Byer") filed the instant action alleging violations of the Age Discrimination Employment Act of 1967, *29 U.S.C. § 621 et seq.* ("ADEA") and the Florida Civil Rights Act of 1992, *Fla. Stat. § 760*

*et seq.* ("FCRA"). Specifically, Byer alleges that his former employer, DTG Operations, Inc. ("DTG"), retaliated against him by terminating his employment on March 16, 2006 as a result of his filing an age discrimination claim with the Equal Employment Opportunity Commission ("EEOC") against DTG in 2004. [1] Byer's position is that, contrary to DTG's claim that it fired him for sleeping on the job [*2] twice, he was actually fired for filing the 2004 age discrimination claim and that any other reasons DTG offers for firing him are pretextual. Byer timely filed a charge of discrimination with the EEOC, again claiming age discrimination and retaliation. After receiving a right to sue letter, Byer filed the instant suit.

> 1   In his complaint, Byer also alleged discrimination on the basis of age discrimination, in addition to his retaliation claim; however, in its Motion for Summary Judgment, Defendant noted that Plaintiff's counsel agreed that any age discrimination claim is time-barred. Def.'s Mot. Summ. J. n.1. Additionally, the parties have since stipulated that Plaintiff has abandoned the count of age discrimination in the Complaint and the sole remaining issue to be litigated is Plaintiff's claim of retaliation.

**II. Facts**

DTG, a rental car company with its headquarters in Tulsa, Oklahoma, operates rental car facilities under both the Dollar Rent A Car ("Dollar") and Thrifty Car Rental ("Thrifty") brands. (Berroteran Aff. P 5.) DTG rents vehicles on a temporary basis to tourists, business travelers, and other individuals requiring the use of a vehicle. (Berroteran Aff. P 5.) DTG maintains [*3] a facility in West Palm Beach, Florida that consists of a rental counter and a maintenance facility. (Berroteran Aff. P 6.) Henrietta Berroteran was the Director of Field Employee Relations. (Berroteran Aff. P 2.) At all times relevant, the

management structure at DTG's West Palm Beach facility was as follows: General Manager Paul Kobis ("Kobis") supervised and managed operations and was ultimately responsible for the supervision of all West Palm Beach employees. (Kobis Aff. P 2.) Additionally, he was involved in or reviewed all hiring, termination, and disciplinary decisions. (Kobis Aff. P 2.) Todd Kushner ("Kushner"), Maintenance Manager, and Kristin Tennant ("Tennant"), Operations Manager, assisted Kobis in supervising West Palm Beach employees. (Berroteran Aff. P 6.) Kushner's predecessor was Ed Ryan ("Ryan"). (Kobis Aff. P 3.)

Effective January 3, 1995, DTG hired Byer as a part-time mechanic at its Fort Lauderdale facility. (Byer Dep. at 35.) At that time, Byer was fifty-three years old. (Byer Dep. at 11.) This position was eliminated in June 1995. (Berroteran Aff. Ex. 4.) In September 1995, DTG re-hired Byer as a full-time Auto Technician at its West Palm Beach facility. (Berroteran [*4] Aff. Ex. 5.) In September 1996, Byer transferred to DTG's Fort Lauderdale facility, where he worked on DTG's fleet of rental cars as a Master Mechanic, and then on shuttle buses used to transport customers to and from the airport terminal and DTG's rental locations as a Bus Technician, until January 2004. (Berroteran Aff. P 9, Ex. 6.)

In 2003, Byer began experiencing some problems with his co-workers and supervisors at the Fort Lauderdale location. Specifically, Byer was upset because he felt other mechanics were blocking his access to the repair bays and harassing him. (Byer Dep. at 38-44.) Thus, Byer requested a transfer to the West Palm Beach facility. DTG transferred Byer back to the West Palm Beach location in January 2004. (Kobis Aff. PP 4, 5.) Shortly after this transfer, Kobis and Ryan asked Byer if he would be willing to work as a Bus Technician, because DTG had recently acquired several new buses and the location had no other mechanics with the requisite knowledge or experience to maintain the shuttle bus fleet. (Kobis Aff. P 5.)

In April 2004, Byer complained to Kobis that he was having problems with his supervisor, Ryan. Specifically, Byer felt Ryan was "short" with him, [*5] not treating him fairly, had used foul language on two occasions, including one occasion in which Ryan stated Byer was "too f-ing old." (Kobis Aff. P 7, Ex. 1.) Kobis promptly responded by coordinating a meeting with Byer and Ryan on April 28, 2004. (Kobis Aff. P 8.) Byer was unable to identify any witnesses to the alleged comments and Ryan denied making these comments. (Kobis Aff. P 8.) Kobis counseled Ryan regarding DTG's intolerance of unprofessional language and conduct, and counseled Ryan and Byer regarding their working relationship. (Kobis Aff. P 9.) Shortly after the meeting, Kobis instructed Ryan to reconfirm with Byer that he was interested in focusing on repairing DTG's buses. (Kobis Aff. P 9.) Byer confirmed he was interested, and Ryan began assigning all bus-related maintenance and repair jobs to Byer. (Kobis Aff. P 10, Ex. 1.)

In 2004, Byer filed a charge of age discrimination and retaliation with the EEOC. (Byer Aff. P 8.) DTG received notice that Byer filed the charge on June 2, 2004. (Berroteran Aff. P 10.) DTG Human Resources, Kobis, and Byer had a series of discussions throughout Fall 2004, during which Byer indicated the harassment had stopped and that he was happy [*6] with his job as a Bus Technician. (Berroteran Aff. P10.) In December 2004, Byer voluntarily withdrew his charge prior to the conclusion of the EEOC's investigation and prior to any findings by the EEOC. (Berroteran Aff. Ex. 9.)

Following the withdrawal of the 2004 charge of discrimination and until November 2005, Byer continued to work without incident. The conditions at work improved. (Byer Dep. at 55.)

On March 16, 2006, DTG terminated Byer's employment for sleeping on the job, in violation of company policy. (Byer Dep. at 57-58; Berroteran Aff. P 13.)

Byer filed a charge of discrimination with the EEOC shortly after his termination, in which he alleged that he was retaliated and discriminated against because of his the 2004 charge in which he alleged age discrimination. (Berroteran Aff. Ex. 16.) Following its investigation, the EEOC issued a "right to sue" letter and concluded that the information obtained did not appear to establish violations of the ADEA.

### III. Summary Judgment Standard

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* [*7] The moving party bears the burden of meeting this exacting standard. *See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).* In applying this standard, the evidence, and all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Arrington v. Cobb County, 139 F.3d 865, 871 (11th Cir. 1998); Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).* The non-moving party, however, bears the burden of coming forward with evidence of each essential element of their claims, such that a reasonable jury could find in their favor. *See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990).* The non-moving party "[m]ay not rest upon the mere allegations and denials of [its] pleadings, but [its] response . . . must set forth specific facts showing that there is a genuine issue for trial."

*Fed. R. Civ. P. 56(e)*. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Further, conclusory, uncorroborated allegations **[*8]** by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment. *See Earley, 907 F.2d at 1081*. The failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *See Celotex, 477 U.S. at 322*.

**IV. Legal Analysis**

**A. Elements of an ADEA Retaliation Claim**

For claims arising under the ADEA, the Eleventh Circuit has adopted the principles of law applicable to cases arising under the very similar provisions of Title VII, *42 U.S.C. § 2000e et seq. Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)* (citing *Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)*. It is well established that courts evaluate ADEA cases using the same burden-shifting framework described in *McDonnell Douglas Corp. v. Green. Id; see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. Furthermore, the same legal analysis also governs Byer's FCRA claim, as it has been uniformly held that federal case law regarding Title VII is applicable **[*9]** when construing FCRA claims. *Albra v. Advan, Inc., 490 F.3d 826, 834 (11th Cir. 2007); Chanda v. Engelhard/ICC, 234 F.3d 1219, 1221 (11th Cir. 2000); Brand v. Florida Power Corp., 633 So.2d 504, 509 (Fla. 1st DCA 1994); Florida Dep't of Community Affairs v. Bryant, 586 So.2d 1205 (Fla. 1st DCA 1991)*. Accordingly, I turn to my analysis regarding Byer's retaliation and FCRA claims under this standard.

Under the *McDonnell Douglas* framework, a plaintiff claiming must first establish a prima facie case of retaliation. *McDonnell Douglas, 411 U.S. at 802*. Once a plaintiff establishes the *prima facie* case, there arises a presumption of discrimination. *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. The burden then shifts to the employer to state a legitimate, nondiscriminatory reason for the employment decision. *Id. at 802-803*. If the employer successfully does so, the burden shifts back to the plaintiff to show that the reason offered by the employer was pretextual. *Id. at 804*. The employer's burden to proffer a legitimate reason for the action has been described as one of production, not persuasion, and it can

involve no credibility assessment. *See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*. **[*10]** It is the plaintiff who bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct. *See Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)*.

To establish a prima facie case of retaliation, therefore, Byer must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events. *See Drago, 453 F.3d at 1307*. The Eleventh Circuit has noted that the causal link requirement under Title VII must be construed broadly; "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chems., Inc., 988 F.2d 1564, 1571-72 (11th Cir.1993)*.

**B. Plaintiff's Prima Facie Case**

It is uncontested that Plaintiff has satisfied the first two requisite elements of a valid retaliation claim. Specifically, Byer's 2004 EEOC claim constitutes statutorily protected expression, and his 2006 termination constitutes an adverse employment action. It is then necessary to determine whether Byer has established the third element **[*11]** of his claim - whether there is a causal relationship between the 2004 filing and his 2006 termination. DTG disputes the third element of the prima facie case. DTG contends that Byer has failed to establish a causal relationship between his 2006 discharge and his 2004 filing.

In order to establish this causal relationship, Byer must prove that: 1) the decision-makers responsible for the adverse employment action were aware of the protected conduct, and 2) the adverse acts were at least somewhat related and in close temporal proximity to the protected activity. *Higdon v. Jackson, 393 F.3d 1211 (11th Cir. 2004); Murry v. Gonzales, 2006 U.S. Dist. LEXIS 60935 at *33 (M.D. Fla. Aug. 28, 2006)*. "At a minimum, [a plaintiff] must show that the adverse act followed the protected conduct." *Hammons v. George C. Wallace State Cmty. College, 174 Fed. Appx. 459, 464 (11th Cir. 2006)* (quoting *Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1284 (11th Cir. 1999)*) "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon, 393 F.3d at 1220*.

Byer argues that **[*12]** the decision-makers involved - Berroteran, Kobis, Sturdivant, and Tennant - knew of his 2004 EEOC charge and were involved in his

2006 firing. The evidence establishes that Henrietta Berroteran, the Director of Field Employee Relations was involved in preparing DTG's response to Byer's 2004 EEOC charge and was involved in Byer's termination in 2006. She reviewed and approved the request from West Palm Beach to terminate Byer's employment for sleeping on the job (Berroteran Aff. P 3.) Kobis is ultimately responsible for the supervision of all West Palm Beach employees and either is involved in or reviews all hiring, termination, and disciplinary decisions.

According to DTG, on March 15, 2006, Fleet Manager Steve Sturdivant ("Sturdivant") observed Byer slouched over and apparently asleep in the back of a shuttle bus around 1:40 pm. (Berroteran Aff. P 12; Ex. 12.) Sturdivant called Kushner and Tennant to report his observation. Kushner arrived at the location approximately twenty minutes later and observed Byer still slouched over in the back of the bus. (Berroteran Aff. Ex. 12, 13.; Kushner Aff. P 6, Ex. 1.) Kushner then spoke with Art Owens ("Owens"), one of Byer's co-workers in the [*13] maintenance department, who stated that, sometime during their lunch break, which was from 12:30 pm until 1:00 pm, Byer left the break room and Owens saw him get on the shuttle bus and sit down in the backseat. (Kushner P 7, Ex. 2.) Later that day, Kushner and Tennant informed Byer that he was being suspended pending an investigation of his sleeping on the job. Tennant reminded Byer that sleeping on the job was a violation of company policy. (Berroteran Aff. Ex. 14, 15; Kushner Aff. P 8.) Kushner spoke with Kobis and recommended Byer's termination for violating company policy by sleeping on the job. (Kushner Aff. P 9.) Kobis agreed and forwarded the recommendation to DTG's corporate Human Resources department, which ultimately approved the termination. (Berroteran Aff. P 14.)

The evidence establishes that Kushner initiated Byer's termination proceedings. DTG did not employ Kushner until September 2005, after Byer's 2004 EEOC charge. Byer has provided no evidence indicating that Kushner was even aware of the 2004 charge; thus, he fails to establish that the individual responsible for commencing his termination proceedings had any knowledge of his 2004 charge, and so, I find that he has [*14] failed to establish a causal relationship between his 2006 termination and his 2004 EEOC charge.

However, I note that even if Byer established that all of the individuals responsible for his termination did have knowledge of his 2004 filing, his claim would still fail because he has not established that his termination was at least somewhat related and in close temporal proximity to the protected activity. *Higdon, 393 F.3d at 1220.* The record is uncontroverted and establishes that there is a nearly twenty-two month temporal span between Byer's 2004 charge and his 2006 termination. This

time frame exceeds those intervals of time that courts have found appropriate temporal proximity sufficient to establish causation. *See, e.g., Clark County School Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)* (finding that a three-month interval was insufficient to establish causation); *Drago, 453 F.3d at 1307-08* (finding that a three-month interval between adverse actions and protected act is too long to establish causation). It is clear that a time period of nearly two years is too far removed in time to establish that the "adverse act followed the protected conduct." *Griffin v. GTE Fla., Inc., 182 F.3d 1279, 1284 (11th Cir. 1999).* [*15] Moreover, Byer has not established that the two incidents were at least somewhat related. Byer's protected activity took place in May 2004 and he was discharged in March 2006. He attempts to narrow the period of time between the 2004 and an adverse act by claiming that after the 2004 charge he was subjected to disparate treatment because he was subjected to closer monitoring and scrutiny than younger employees and than employees who had not complained to the EEOC about discrimination. (Compl. P 21.) Byer had included this claim in his 2006 charge. However, Byer fails to indicate what record evidence supports this allegation, and the Court is unaware of any such evidence.

Byer provides only one specific event he believed to be retaliatory which occurred prior to his termination. Specifically, he alleges that Ryan, his immediate supervisor, told him that on numerous occasions he, Ryan, was being pressured and asked by management Fort Lauderdale management to find reasons to write him up and fire him. (Byer Dep. at 55.) Ryan later denied making these statements, and the record is devoid of any evidence corroborating that Ryan made such statements. However, even if Byer could prove that [*16] Ryan did, in fact, make such statements, the fact remains that the record simply contains no evidence connecting the statements, which occurred from December 2004 to August 2005, to either 2004 charge or the 2006 termination. In fact, the record belies any such relationship. This time frame also exceeds those intervals of time that courts have found temporal proximity sufficient to establish causation. In his deposition, Byer stated that, after he filed his 2004 charge, the situation with DTG improved. (Byer Dep. at 55.) I find that Byer has not established a causal connection between his 2004 charge and his 2006 termination and, as such, he has failed to establish a *prima facie* case of retaliation.

## C. Pretext

Even were it to be assumed that Plaintiff had established a prima facie case of retaliation, DTG has offered a non-discriminatory, legitimate reason for Byer's termination, that he was sleeping on the job. The burden

would shift to Byer to establish that such proffered reason is merely a pretext. I find that Byer has not met this burden.

It is well established that in order to avoid summary judgment a plaintiff must introduce significantly probative evidence showing that the asserted [*17] reason is merely a pretext for discrimination. If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. The plaintiff can show pretext through evidence that (1) a discriminatory reason more likely motivated the employer or (2) the employer's reasons are unworthy of credence. The plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence. *Champ v. Calhoun County Emergency Mgmt. Agency, 226 Fed. Appx. 908, 2007 U.S. App. LEXIS 7037, *12 (11th Cir. 2007).*

In examining DTG's proffered non-discriminatory reason for the adverse employment action, I note that

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. Federal courts [*18] do not sit as a super-personnel department that reexamines an entity's business decisions.

*Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)* (internal citations omitted).

With this in mind I turn to DTG's proffered non-discriminatory reason for Byer's 2006 termination. The record reflects that on November 17, 2005, Dispatcher Marie Harrison ("Harrison") and Lead Service Agent George Aleman ("Aleman") reported that they had observed Byer sleeping in a rental car. (Berroteran Aff. P 11; Ex. 10.) Aleman immediately told Kushner, Byer's supervisor at the time, and asked him to come see for himself; however, Byer had already exited the car when Kushner arrived. (Berroteran Aff. P 11; Ex. 10, 11.) Although the incident was written up, DTG decided not to discipline Byer at that time, because Kushner did not personally observe Byer sleeping in the car. (Berroteran Aff. P 11.)

On March 15, 2006, Fleet Manager Steve Sturdivant ("Sturdivant") observed Byer slouched over and apparently asleep in the back of a shuttle bus. (Berroteran Aff. P 12; Ex. 12.) Sturdivant called Kushner and Tennant to report this and Kushner arrived at the location approximately twenty minutes later and personally [*19] observed Byer slouched over in the back of the bus. (Berroteran Aff. Ex. 12, 13.; Kushner Aff. P 6, Ex. 1.) Kushner then spoke with Art Owens ("Owens"), one of Byer's coworkers in the maintenance department, who stated that, sometime during their lunch break, which was from 12:30 pm until 1:00 pm, Byer left the break room and Owens saw him get on the shuttle bus and sit down in the backseat. (Kushner P 7, Ex. 2.)

Later that day, Kushner and Tennant informed Byer that he was being suspended pending an investigation of his sleeping on the job. Byer was informed that sleeping on the job was a violation of company policy. (Berroteran Aff. Ex. 14, 15; Kushner Aff. P 8.) Both Kushner and Tennant state that Byer admitted he may have "dozed off" while on the bus that day. (Berroteran Aff. Ex. 14, 15.) Kushner spoke with Kobis and recommended Byer's termination for violating company policy by sleeping on the job. (Kushner Aff. P 9.) Kobis agreed and forwarded the recommendation to DTG's corporate Human Resources department, which ultimately approved the termination. (Berroteran Aff. P 14.)

DTG contends that this evidence, consisting of reports from multiple employees that Byer was sleeping on [*20] the job on two occasions, demonstrates that DTG believed in good faith that Byer was sleeping on the job, in violation of company policy, and, motivated by that belief, terminated his employment. There is sufficient evidence to support this assertion. Accordingly, I find that DTG has satisfied its burden of articulating a nondiscriminatory reason for Byer's 2006 termination.

As outlined above, having found that DTG has satisfactorily articulated a legally sufficient nondiscriminatory reason for Byer's 2006 termination, the burden shifts to Byer to establish, by a preponderance of the evidence, that DTG's proffered reason was in fact merely a pretext for prohibited, retaliatory conduct.

In support of his claim of pretext, Byer points the Court to his Statement of Material Facts in which he stated that he was not sleeping and that he was not slouched over for a twenty-minute period, as DTG stated. (Def. Statement of Material Facts PP 1, 2.) He contends that, in his deposition, he testified that he said nothing when confronted with the allegation he was sleeping on the job. (Byer Dep. at 70-73.) This contradicts record evidence by multiple DTG employees that Byer had stated that he may [*21] have "dozed off." Byer further contends that DTG, during the course of its

investigation, never asked him whether he had been sleeping, and that therefore a jury could choose to believe him and not DTG regarding the statements and so find that, because he disputes whether he admitted to sleeping, that DTG's managers are lying, and determine that DTG's proffered reason of Byer sleeping on the job was a pretext for retaliatory discharge. Byer further asserts that a jury could choose to believe that the "Corrective Action Notice" DTG issued to Byer informing him that he had been sleeping on the job on November 16, 2005. Byer alleges that he never received the "Corrective Action Notice" dated November 17, 2005, and so there is a dispute as to whether DTG fabricated the Notice, which would allow a jury to reasonably conclude that DTG's stated reason for firing Byer is "a sham."

However, it is well established that "the factual issue to be resolved is not the wisdom or accuracy of [an employer's] conclusion" that an employee's termination is justified. *Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)*. Thus, while Byer may quarrel with whether he was, in fact, sleeping, and whether he [*22] should have, but did not, receive the 2005 Corrective Action Notice, his dispute is legally insufficient to establish pretext. To establish pretext, Byer must address whether DTG's *belief* that he was sleeping on the job was a reasonable basis for DTG's action. Byer fails to address this issue. In essence, Byer's argument is that DTG fabricated all incidents relating to him sleeping on the job, that he never did sleep on the job and that a jury could infer he was terminated for a retaliatory reason.

Byer cites to *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* to support his contention that he has established a genuine issue of material fact sufficient to go forward to a jury since a jury could choose to believe Byer, that DTG's proffered reason false. In *Reeves*, the plaintiff employee claimed he was fired because of age discrimination. *Reeves, 530 U.S. at 138*. The employer in *Reeves* submitted evidence indicating the employee had been fired for failure to maintain adequate attendance and time-keeping reports. *Id. at 137*. Plaintiff introduced evidence that he had accurately maintained the records and that his supervisor had demonstrated age-based animus toward the plaintiff. **[*23]** *Id. at 138*. The jury found in favor of the plaintiff, but the Fifth Circuit reversed. The Supreme Court granted *certiorari* and held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id. at 148*. In *Reeves*, the Court noted that the plaintiff introduced substantial evidence demonstrating that the employer's explanation was false, including evidence showing he had properly maintained attendance records and that er-

rors in monthly reports were not attributable to the plaintiff. *Id. at 145*.

As other Courts in this Circuit have noted, "*Reeves* does not stand for the proposition that any evidence of falsity, regarding the reason for termination, combined with a prima facie case is sufficient to withstand summary judgment." *See, e.g., Sonnier v. Computer Programs & Sys., Inc., 168 F. Supp. 2d 1322, 1331 (S.D. Ala. 2001)*. *Reeves* itself provided factors for courts to consider, such as the "strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence **[*24]** that supports the employer's case." *Reeves, 530 U.S. at 149*.

Here, unlike in *Reeves*, DTG has provided substantial evidence in the record from its employees and managers affirming that they had seen Byer sleeping on the job. DTG also provides testimony about the investigation and Corrective Notice. In opposition, Byer offers only his own conclusory statements that the investigation was a "sham" and that he was told "on numerous occasions" by his immediate supervisor, Ed Ryan, that Ryan was being pressured by Fort Lauderdale management to find reasons to "write [Byer] up and fire [him]." (Byer Dep. at 55.) Such conclusory statements are not supported by any other evidence. Byer did not submit any deposition or affidavit by Ed Ryan. Even if Ryan's statements could be proven, they fail to support Byer's claim that his termination was based on retaliation for filing the 2004 charge. He alleges that these comments occurred in late 2004 through August 2005, but Byer was not terminated until March 2006. There is no other evidence of any connection between Ryan's statements and the 2004 charge or his 2006 termination. At best, Ryan's alleged statement would show that DTG may have had "undisclosed **[*25]** motives for firing [Byer]." *Sonnier, 168 F. Supp. 2d at 1332*. Pretext is only proven if it is "shown *both* that DTG's reason was false, and that discrimination was the real reason behind the challenged action." *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*. To overcome summary judgment, Byer needs to demonstrate that these lies were a pretext *for retaliation*. This Byer has failed to do.

Byer next attempts to establish pretext by introducing his statement that, in January 2006, a DTG manager told Byer he had caught another employee sleeping on the job, but that that employee was not fired. (Byer Dep. at 65-66.)

A plaintiff may establish pretext by establishing that a similarly situated employee - a comparator - was treated differently. To demonstrate that another employee is similarly situated to the plaintiff, the Eleventh Circuit requires "that the quantity and quality of the

2007 U.S. Dist. LEXIS 68822, *

comparator's misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples with oranges." *Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999).* Byer must show that he and the comparator employee are similarly situated "in all relevant **[*26]** respects, including [] past performance and disciplinary history." *Bazemore v. Ga. Tech. Auth., No. 05-cv-1850,2007 U.S. Dist. LEXIS 20780 (N.D. Ga. Mar. 23, 2007).*

Here, Byer argues that a manager named Todd told him that another employee, Fritz, also at the West Palm Beach facility, had been sleeping on the job and was not fired. (Byer Dep. at 65-66.) Byer did not depose the manager and there is no other evidence supporting this assertion. The record is devoid of any evidence which would allow the Court to find that Fritz is a similarly situated employee. There is absolutely nothing in the record regarding: the position held; how many witnesses had seen Fritz sleeping; whether anyone besides Todd, the manager, had seen Fritz sleeping; whether there was

an inquiry into the incident; whether Fritz had been caught sleeping before; or whether Fritz is within the same protected class as Byer. Accordingly, I find that Byer has failed to establish pretext by use of a comparator.

**V. Conclusion**

For the reasons set forth above, I find that Byer's claim of retaliatory discrimination under the ADEA and FCRA fails as a matter of law and so, it is accordingly,

ORDERED AND ADJUDGED that Defendant's **[*27]** Motion for Summary Judgment (DE 8) is GRANTED.

DONE AND ORDERED in Chambers at West Palm Beach, FL, this 18th day of September, 2007.

DONALD M. MIDDLEBROOKS

UNITED STATES DISTRICT JUDGE

# Exhibit L

1 of 1 DOCUMENT

**NICKIE CHRISTOPHER CHANCE, Plaintiff, VS. DALLAS COUNTY HOSPITAL DISTRICT d/b/a PARKLAND MEMORIAL HOSPITAL, Defendant.**

**NO. 3-96-CV-2842-BD(X)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

*1998 U.S. Dist. LEXIS 5110*

**April 6, 1998, Decided**
**April 6, 1998, Filed**

**DISPOSITION:** [*1] Defendant's motion for judgment as a matter of law granted and plaintiff's motion for entry of judgment on the verdict denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer filed a motion to set aside the verdict awarded by a jury to plaintiff employee in his action under the Uniformed Services Employment and Re-employment Rights Act (USERRA), in which he alleged that his military obligation was a "motivating factor" in the employer's decision to fire him.

**OVERVIEW:** The employee was awarded a jury verdict in his action against the employer under USERRA in which he alleged that his military obligation was a "motivating factor" in the decision to fire him. The court granted the employer's motion to set aside the verdict finding that the evidence was not legally sufficient to support the employee's claim because the employer had legitimate concerns that the employee's leave of absence created a hardship where many of his co-workers had requested time off for Christmas, and nothing in the record linked these staffing considerations to adverse employment actions. The court agreed with the employer that a reasonable jury could not have inferred hostility from the employer's actions in calling the naval base to verify the legitimacy of employee's duty orders. The court concluded that any causal link that could have been inferred by the proximity in time between his return from military service and his termination was completely undermined by the intervening incident of his angry and abusive altercation with his supervisor upon his return, which warranted immediate termination under the employer's policy without regard to his military status.

**OUTCOME:** The employer's motion to set aside the employee's jury verdict in his USERRA action alleging termination based on his military obligation was granted.

**CORE TERMS:** military, termination, motivating, decision to terminate, threatening, purchasing, membership, co-worker, employment decision, supervisor, reservist, hostility, abusive, naval, matter of law, military obligation, motivation, notice, uniformed, proximity, fired, cold, phone, Re-employment Rights Act USERRA, prior to trial, reasonable jurors, reasonable inference, standing alone, re-employment, impermissible

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
[HN1] A party is entitled to judgment as a matter of law if there is no legally sufficient evidentiary basis to submit an issue to a jury. *Fed. R. Civ. P. 50(a)(1)*. A mere "scintilla" of evidence is insufficient. There must be a conflict in substantial evidence to create an issue of material fact. The motion should be granted only if the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not have arrived at a contrary verdict. The entire record must be viewed in the light most favorable to the party opposing the motion.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > Leaves of Absence > Military Leave*

1998 U.S. Dist. LEXIS 5110, *

*Military & Veterans Law > Veterans > Benefits > General Overview*

[HN2] The Uniformed Services Employment and Re-employment Rights Act (USERRA) prohibits an employer from denying any benefit of employment to a member of the armed services on the basis of his military obligation. *38 U.S.C.S. § 4311*. USERRA is meant to clarify, simplify, and where necessary, strengthen the existing veterans' employment and re-employment rights provisions of the former Veterans Re-employment Rights Act. The statute is to be liberally construed for the benefit of military reservists.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > Leaves of Absence > Military Leave*
*Military & Veterans Law > Veterans > Benefits > Employment*

[HN3] *38 U.S.C.S. § 4311(a)* provides in part that a person who is a member of a uniform service shall not be denied retention in employment or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation. *38 U.S.C.S. § 4311(c)(1)* provides that an employer shall be considered to have engaged in actions prohibited under subsection (a) of the Uniformed Services Employment and Re-employment Rights Act, if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

*Labor & Employment Law > Discrimination > Disparate Treatment > General Overview*
*Labor & Employment Law > Leaves of Absence > Military Leave*
*Military & Veterans Law > Veterans > Benefits > Employment*

[HN4] The burden-shifting scheme applicable to cases under the National Labor Relations Act also applies to the Uniformed Services Employment and Re-employment Rights Act (USERRA) claims. Plaintiff initially must prove that his military status was a motivating factor in the defendant's adverse employment decision. *38 U.S.C.S. § 4311(c)*. Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration. The burden then shifts to the defendant to

prove that it would have made the same decision regardless of plaintiff's military status. This is an affirmative defense under USERRA. *Section 4311(c)*. In order to meet this burden, the defendant must do more than simply articulate a legitimate, nondiscriminatory reason for its decision. Proving that the same decision would have been justified is not the same as proving that the same decision would have been made. An employer may not prevail by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. The employer instead must show that its legitimate reason, standing alone, would have induced it to make the same decision. The defendant satisfies this burden by presenting objective evidence as to its probable decision in the absence of any impermissible motivation.

**COUNSEL:** For NICKIE CHRISTOPHER CHANCE, plaintiff: Russell Wilson, II, Attorney at Law, Law Office of Russell Wilson II, Dallas, TX USA.

For DALLAS COUNTY HOSPITAL DISTRICT, defendant: Marigny A Lanier, Attorney at Law, Maris & Lanier, Dallas, TX USA.

**JUDGES:** JEFF KAPLAN, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JEFF KAPLAN

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nickie Christopher Chance obtained a $ 6,627.78 verdict against Defendant Dallas County Hospital District d/b/a Parkland Memorial Hospital on his claim under the Uniformed Services Employment and Re-employment Rights Act ("USERRA"). Defendant has filed a renewed motion for judgment as a matter of law and plaintiff has filed a motion for entry of judgment on the verdict. For the reasons stated herein, defendant's motion is granted and plaintiff's motion is denied.

I.

Plaintiff worked as a procurement assistant in the purchasing department at Parkland Memorial Hospital. In December 1995, plaintiff volunteered for active reserve duty in the United States Navy. His reserve unit had been asked to [*2] fill positions occupied by civilian personnel because of a deadlock in Congress over the national budget. On December 11, 1995, plaintiff gave oral and written notice of his intent to take military leave effective December 13, 1995. Jack Parker, director of the purchasing department, acknowledged that this created a

hardship on the other employees. The department was already understaffed due to the Christmas holidays and plaintiff's duties would need to be redistributed among a reduced number of co-workers. Parker held a meeting with Cassandra Miller, Walt Majkut and Mariah Scott to discuss this situation. [1] He also asked plaintiff how often he might be called for military reserve duty on short notice.

> 1    Plaintiff, Walt Majkut and Mariah Scott worked as part of a three-member "team." Cassandra Miller was the department manager and their immediate supervisor.

Plaintiff did not provide Parker with a copy of his active duty orders when he first gave notice of his intent to take military leave. Parker directed [*3] Majkut to call the Naval Air Station to determine whether any such orders had been issued. Plaintiff eventually obtained a copy of his orders and delivered them to his employer on December 14, 1995. Majkut questioned the validity of the orders because they were printed on plain, white paper rather than on official letterhead. He telephoned the naval base a second time to inquire into the matter. Officer Joseph Black received this call and testified that the caller seemed suspicious that the orders had been falsified. Black confirmed the validity of the orders.

Plaintiff became upset when he learned about these phone calls and wrote a memo to Jack Parker on December 18, 1995. He complained that the repeated inquiries about his military status constituted harassment. Plaintiff admitted that he gave Parker the telephone number for the naval base so he could call with any questions. However, he believed that Parker had no right to delegate this task to Majkut. The hospital investigated the complaint and determined that the phone calls were appropriate.

Plaintiff remained on military leave until January 4, 1996. When he returned to work, he felt that Parker, Miller, Majkut and Scott were [*4] "cold" towards him. Their working relationship continued to deteriorate over the next few days. On January 8, 1996, plaintiff criticized Scott in a memo for sending a confirmation to a purchase order that had not been placed. Later that same day, plaintiff overheard Scott discussing the memo with another employee, Takisha Thompson. An argument ensued and plaintiff raised his voice. He refused to leave Scott's cubicle area and shouted, "You put me out." Scott and Thompson testified that plaintiff was screaming and clenching his fists. Both said that they feared plaintiff might hit them.

Miller intervened after the confrontation escalated. She ordered plaintiff and Scott into her office. Miller testified that plaintiff continued to scream at Scott. She felt he was "out of control" and trying to pick a fight.

Plaintiff verbally taunted Scott as she left the office, saying "Go on, get, get, get." He also used gestures and body language that Miller interpreted as "street stuff." Plaintiff admitted raising his voice to Scott in the cubicle area. However, he said that the argument was merely a "communication problem."

Miller investigated the incident and took statements from Majkut, Scott [*5] and Thompson. She found that plaintiff had yelled at Scott in a loud voice and rude manner and that his tone was abusive and threatening. This behavior warranted immediate termination pursuant to hospital policy. [2] Miller discussed her findings with Parker and the vice president of the purchasing department who concurred that dismissal was warranted. Plaintiff was fired on January 12, 1996.

> 2    PMH Policy No. 6000-700 contemplates immediate termination for "threatening, intimidating, coercing or interfering with other employees" or "directing abusive/threatening or other acts of disrespect toward a . . . employee." (Dx. 17).

Plaintiff subsequently sued the hospital under a variety of legal theories for discrimination, harassment, retaliation and civil rights violations. All of his claims were dismissed prior to trial except for his claim under USERRA. [3] The case was tried to a jury on December 8-11, 1997. The jury found that: (1) plaintiff's military reserve status was a motivating factor in the defendant's [*6] decision to terminate him from employment; and (2) defendant would not have reached the same decision without regard to his military status. Plaintiff was awarded actual damages in the amount of $ 6,627.78. Defendant has renewed its motion for judgment as a matter on the ground that there is no evidence to support these findings. Plaintiff seeks entry of a judgment on the verdict. The issues have been fully briefed by the parties and these motions are ripe for determination.

> 3    The Court granted summary judgment in favor of defendant on the claims for: (1) race discrimination and retaliation under Title VII of the Civil Rights Act and the Texas Commission on Human Rights Act; (2) violations of the Texas Whistleblower Act; and (3) violations of his constitutional rights to due process and free speech under *42 U.S.C. § 1983. See* ORDER, 11/7/97. Plaintiff voluntarily dismissed his claim under the Equal Pay Act prior to trial.

II.

[HN1] A party is entitled to judgment as a matter of law if "there is no legally sufficient [*7] evidentiary basis" to submit an issue to a jury. *FED. R. CIV. P.*

1998 U.S. Dist. LEXIS 5110, *

*50(a)(1)*; *Conkling v. Turner, 18 F.3d 1285, 1300 (5th Cir. 1994).* A mere "scintilla" of evidence is insufficient. There must be a conflict in substantial evidence to create an issue of material fact. *Rhodes v. Guiberson Oil Tools, Inc., 75 F.3d 989, 993 (5th Cir. 1996), citing Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir. 1969).* The motion should be granted only "if the facts and inferences point so strongly and overwhelmingly in favor of the moving party . . . that reasonable jurors could not have arrived at a contrary verdict." *Crist v. Dickson Welding, Inc., 957 F.2d 1281, 1285 (5th Cir.), cert. denied, 506 U.S. 864, 113 S. Ct. 187, 121 L. Ed. 2d 132 (1992); Boeing, 411 F.2d at 374.* The entire record must be viewed in the light most favorable to the party opposing the motion. *Resolution Trust Corp. v. Cramer, 6 F.3d 1102, 1109 (5th Cir. 1993); Barnett v. IRS, 988 F.2d 1449, 1453 (5th Cir.), cert. denied, 510 U.S. 990, 114 S. Ct. 546, 126 L. Ed. 2d 448 (1993).*

III.

[HN2] The Uniformed Services Employment and Re-employment Rights Act ("USERRA") prohibits an employer from denying any [*8] benefit of employment to a member of the armed services on the basis of his military obligation. *38 U.S.C. § 4311.* [4] USERRA was enacted to "clarify, simplify, and where necessary, strengthen the existing veterans' employment and re-employment rights provisions" of the former Veterans Re-employment Rights Act. *Gummo v. Village of Depew, New York, 75 F.3d 98, 105 (2d Cir.), cert. denied, 517 U.S. 1190, 116 S. Ct. 1678, 134 L. Ed. 2d 780 (1996), quoting from* H.R.Rep. No. 65, 103d Cong., 2d Sess. 19 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2449, 2451. The statute is to be liberally construed for the benefit of military reservists. *Coffy v. Republic Steel Corp., 447 U.S. 191, 196, 100 S. Ct. 2100, 2104, 65 L. Ed. 2d 53 (1980); Cole v. Swint, 961 F.2d 58, 59 (5th Cir. 1992).*

> 4 [HN3] Subsection (a) of the statute provides, in relevant part:

> > A person who is a member of . . . a uniform service shall not be denied . . . retention in employment or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

> Subsection (c) provides:

> > An employer shall be considered to have engaged in actions prohibited under subsection (a) [of USERRA], if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

> *38 U.S.C. § 4311(a) & (c)(1).*

[*9] [HN4] The burden-shifting scheme applicable to cases under the National Labor Relations Act also applies to USERRA claims. *Gummo, 75 F.3d at 106, citing NLRB v. Transportation Management Corp., 462 U.S. 393, 401, 103 S. Ct. 2469, 2474, 76 L. Ed. 2d 667 (1983); see also Robinson v. Morris Moore Chevrolet-Buick, Inc., 974 F. Supp. 571, 575 (E.D.Tex. 1997).* Plaintiff initially must prove that his military status was a motivating factor in the defendant's adverse employment decision. *38 U.S.C.§ 4311(c); Gummo, 75 F.3d at 106; Robinson, 974 F. Supp. at 575.* Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration. *Robinson, 974 F. Supp. at 576, citing Price Waterhouse v. Hopkins, 490 U.S. 228, 241-42, 109 S. Ct. 1775, 1786, 104 L. Ed. 2d 268 (1989).*

The burden then shifts to the defendant to prove that it would have made the same decision regardless of plaintiff's military status. This is an affirmative defense under USERRA. *38 U.S.C. § 4311(c); Gummo, 75 F.3d at 106; Robinson, 974 F. Supp. at 576.* In order to meet this burden, the defendant must do more than simply [*10] articulate a legitimate, nondiscriminatory reason for its decision:

> > Proving that the same decision would have been justified . . . is not the same as proving that the same decision would have been made. An employer may not . . . prevail . . . by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision. . . . The employer instead must show that its legitimate reason,

standing alone, would have induced it to make the same decision.

*Price Waterhouse, 109 S. Ct. at 1791-92* (internal quotation marks and citations omitted). *See also Robinson, 974 F. Supp. at 576* (applying burden of proof developed in *Price Waterhouse* for Title VII "mixed motives" cases to claim under USERRA). Typically, the defendant satisfies this burden by presenting objective evidence as to its probable decision in the absence of any impermissible motivation. *Price Waterhouse, 109 S. Ct. at 1791; Burrell v. Board of Trustees of Georgia Military College, 125 F.3d 1390, 1395 (11th Cir. 1997); Foster v. University of Arkansas, 938 F.2d 111, 114 (8th Cir. 1991).*

IV.

Defendant challenges the jury verdict on two grounds: [*11] (1) plaintiff failed to prove that his military obligation was a motivating factor in the decision to terminate his employment; and (2) defendant established as a matter of law that it would have reached the same decision without regard to plaintiff's military status. The Court will address each argument in turn.

A.

The first issue is whether there is legally sufficient evidence that plaintiff's military obligation was a "motivating factor" in the defendant's decision to fire him. Plaintiff argues that evidence of hostility toward his military leave and the proximity in time between his leave and termination show impermissible motivation. Defendant disagrees and submits that the only reasonable inference to be drawn from the evidence is that the hospital was legitimately concerned about the needs of the purchasing department while plaintiff was on leave.

Jack Parker and Cassandra Miller admitted that they were concerned about the hardship created as a result of plaintiff's military leave. It was the Christmas season and many employees had already requested time off for the holidays. Plaintiff's workload would have to be redistributed among a reduced number of co-workers. Parker [*12] held a meeting with Miller, Walt Majkut and Mariah Scott to discuss how this work should be handled. He also asked plaintiff how often he might be called for reserve duty on short notice.

The Court finds that no reasonable juror could have construed this evidence as indicating hostility toward plaintiff's military status. It does not even remotely approach the type of conduct found to support such an inference in *Gummo*. In that case, the supervisor believed that military reservists abused their rights under USERRA. He also felt that reservists should not be entitled to full pay while on military leave and had written to

a local official seeking legislation to prevent such "double dipping." Finally, the supervisor was openly hostile to a Department of Labor investigation into another reservist's complaint of USERRA violations. *Gummo, 75 F.3d at 103.* By contrast, the evidence in the instant case shows nothing more than a valid concern about how to handle an increased workload while plaintiff was out on military leave. Even plaintiff admitted that this concern was legitimate.

Moreover, nothing in the record ties these staffing considerations to an adverse employment decision. [*13] Although plaintiff testified that his supervisor and co-workers were "cold" towards him, such vague and unsubstantiated characterizations are not sufficient to establish a USERRA violation. [5] *See Swanson v. General Services Administration, 110 F.3d 1180, 1186-89 (5th Cir.), cert. denied, 139 L. Ed. 2d 284, 118 S. Ct. 366 (1997).* The only evidence that came close to establishing the requisite degree of hostility was Majkut's testimony that he was "resentful" of plaintiff for taking military leave. However, Majkut was not involved in the decision to terminate plaintiff. His feelings on this issue are irrelevant do not constitute evidence of improper motivation.

> 5 Mariah Scott testified that she was on vacation until January 8, 1996--four days after plaintiff returned from military leave. This testimony was uncontroverted. It is difficult to envision how Scott could be "cold" to plaintiff if she was not even in the office.

Plaintiff also points out that Majkut called the Naval Air Station twice to verify [*14] the legitimacy of his duty orders. The first call was made before plaintiff provided the hospital with a copy of his orders. Plaintiff testified that he gave Parker the phone number so he could call the naval base if he had any questions. Parker asked Majkut to determine whether any such orders had been issued. The Court finds that no reasonable jury could legitimately infer hostility under these circumstances. On the other hand, Majkut called the base again after plaintiff provided a copy of his orders. This could be viewed as evidence of hostility. However, Majkut made that call of his own volition. As previously noted, Majkut was not involved in the decision to terminate plaintiff and his unilateral actions do not constitute evidence of a USERRA violation.

Plaintiff is left to rely on the proximity in time between his military leave and his termination. This can be evidence of improper motivation. *Robinson, 974 F. Supp. at 576-77, citing Armstrong v. City of Dallas, 997 F.2d 62, 67 (5th Cir 1993).* However, the circumstances presented in this case do not support such a conclusion. *Rhodes, 75 F.3d at 993.* As discussed more fully below,

plaintiff was involved in an angry [*15] and abusive altercation with Scott soon after his return from military leave. This altercation was independently sufficient to warrant his termination. Whatever causal link could otherwise be inferred by the proximity in time between these two events was completely undermined by this intervening incident. *Cf. Robinson, 974 F. Supp. at 578* ("synergistic effect" of plaintiff's violations of workplace rules insufficient to overcome suspicious timing of termination).

B.

The evidence also conclusively establishes that defendant would have fired plaintiff without regard to his military status. Plaintiff was involved in a heated and unprofessional exchange with Mariah Scott. Co-workers found his behavior threatening and embarrassing. Cassandra Miller had previously made clear that such conduct would not be tolerated in the purchasing department. This conduct warranted immediate termination under hospital policy. Such policies are objective evidence that defendant would have made the same employment decision even if plaintiff had not been a reservist. *See Foster, 938 F.2d at 114.*

Plaintiff disputes the particulars of this incident and attempts to minimize its significance. However, [*16] these distinctions are irrelevant. The employment discrimination laws do not protect employees from mistaken, ill-advised, unfair, or even arbitrary decisions. *Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995)*; *Bienkowski v. American Airlines, Inc., 851 F.2d 1503, 1507-08 (5th Cir. 1988)*. Like its counterparts, USERRA "was not intended to be a vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers." *Bienkowski, 851 F.2d at 1507-08*. The only relevant question is whether Miller and Parker *honestly* believed that plaintiff's behavior warranted his termination. *Mayberry, 55 F.3d at 1091*; *Little v. Republic Refining Co., 924 F.2d 93, 97 (5th Cir. 1991)*. Miller's firsthand observations and statements she received from other witnesses supported her conclusion that plaintiff was threatening and abusive toward Scott. Nothing in USERRA compels an employer to tolerate this type of misconduct in the workplace. *See Mararri v. WCI Steel, Inc., 130 F.3d 1180, 1183 (6th Cir. 1997)*; *Smith v. Texas Department of Water Resources, 818 F.2d 363, 366 (5th Cir. 1987), cert. denied,* [*17] *484 U.S. 1059, 108 S. Ct. 1012, 98 L. Ed. 2d 977 (1988)*.

Plaintiff argues that two other employees engaged in similar conduct but were not terminated. Linda Germany, his former girlfriend, was not fired after she stabbed plaintiff in the office during business hours. Carla Norman cursed at a co-worker but was able to keep her job. Significantly, neither Parker nor Miller were involved in making these decisions. *See, e.g. Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996)* (liability in employment discrimination case is predicated on wrongful intent of supervisory employees). Germany was not even employed in the purchasing department. The incident involving Norman occurred under prior management when hospital policies were not strictly enforced.

Moreover, the circumstances surrounding these other incidents are not substantially similar to those presented in the instant case. The confrontation between plaintiff and Linda Germany was essentially a lover's quarrel that got out of hand. Plaintiff refused to press charges against his former girlfriend. Carla Norman directed vulgar language at Artis Jackson. However, there is no evidence that Jackson felt threatened by this [*18] behavior. By contrast, Mariah Scott testified that she was afraid of plaintiff and had "never been more scared in my life." Plaintiff blocked the entrance to her work area and refused to leave. He continued to scream at her even after a supervisor intervened. This hardly equates to cursing at a co-worker.

The Court finds that the only reasonable inference to be drawn from the evidence is that the decision to terminate plaintiff was actually motivated by his threatening and abusive behavior toward Mariah Scott. That reason, standing alone, would have induced the defendant to make the same employment decision without regard to plaintiff's military status. *Price Waterhouse, 109 S. Ct. at 1791-92.*

Plaintiff has failed to prove that his military obligation was a motivating factor in the decision to terminate his employment. Moreover, defendant has established as a matter of law that it would have reached the same decision without regard to plaintiff's military status. The jury verdict must be set aside. The Court will enter a take-nothing judgment in favor of defendant.

SO ORDERED.

DATED: April 6, 1998.

JEFF KAPLAN

UNITED STATES MAGISTRATE JUDGE

# Exhibit M

1 of 1 DOCUMENT

**JERRY LEON DEES, JR., Plaintiff, v. HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, and HYUNDAI MOTOR AMERICA, INC., Defendants.**

**CIVIL ACTION NO. 2:07cv306-MHT (WO)**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

*2007 U.S. Dist. LEXIS 87875*

**November 30, 2007, Decided**
**November 30, 2007, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendants, his former employer (car maker) and car wholesaler, for allegedly discharging him in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), *38 U.S.C.S. §§ 4301-4334*. The employee objected to a magistrate judge limiting a discovery order to compel defendants to produce additional information concerning other alleged violations of employees' civil rights.

**OVERVIEW:** The magistrate judge granted the order only to the extent the employee requested documents and other information relating to any car maker's employee in the military who submitted a complaint to members of the car maker's management, the Equal Employment Opportunity Commission, or a court regarding treatment at the car maker that violated the complainant's civil rights. At the heart of the discovery issue was whether evidence of other civil rights complaints were properly relevant to the employee's USERRA claim. The cases cited by the employee for more expansive discovery did not show the requisite relevance between discrimination claims brought under Title VII of the Civil Rights Act of 1964 (Title VII), as amended, *42 U.S.C.S. §§ 1981a* and *2000e through 2000e-17*, and those under USERRA. The employee had not shown that the magistrate judge was clearly erroneous in his conclusion that the information he sought was not relevant to the claim or defense of any party in the case. Nowhere in the record did he make a specific showing to the magistrate judge of circumstances in the case where the comparison between USERRA and Title VII discrimination claims might bear relevance.

**OUTCOME:** The former employee's objection to the magistrate judge's order was overruled.

**CORE TERMS:** discovery, civil rights, armed services, relevance, uniformed, discovery order, broad discretion, legislative purpose, categorically, discoverable, admissible, religion, civilian, abused, hire, sex, discrimination claims

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Judicial Officers > Magistrates > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN1] *Fed. R. Civ. P. 26(b)(1)* permits discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. That phrasing of the rule was adopted in 2000 to limit the scope of discovery to, in general, the actual claims and defenses involved in the action. *Fed. R. Civ. P. 26(b)(1)* advisory committee's note. Because whether a matter is relevant for discovery purposes is ultimately a fact-specific inquiry defying efforts to define it precisely, it follows that a magistrate judge or a district court judge hearing a discovery dispute must have a broad range of discretion to determine relevance.

*Civil Procedure > Judicial Officers > Magistrates > Pretrial Orders*
*Civil Procedure > Discovery > General Overview*

[HN2] A district court reviewing a magistrate judge's discovery order is, in general, limited by statute and rule to reversing that order only if it is clearly erroneous or contrary to law. *28 U.S.C.S. § 636(b)(1)(A)* and *Fed. R. Civ. P. 72(a)*. To put it another way, in the absence of a legal error, a district court may reverse only if there is an abuse of discretion by the magistrate judge.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > Leaves of Absence > Military Leave*
[HN3] While both the Uniformed Services Employment and Reemployment Rights Act of 1994, *38 U.S.C.S. §§ 4301-4334*, and Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C.S. §§ 1981a and 2000e through 2000e-17*, are similar in that they generally seek to prevent workplace discrimination, they are also materially dissimilar.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > Leaves of Absence > Military Leave*
[HN4] The Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), *38 U.S.C.S. §§ 4301-4334*, and Title VII of the Civil Rights Act of 1964 (Title VII), as amended, *42 U.S.C.S. §§ 1981a and 2000e through 2000e-17*, are, in a broad sense, animated by fundamentally different goals. Congress enacted Title VII to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group. USERRA, on the other hand, states that its goals include encouraging noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service and minimizing the disruption to the lives of persons performing service in the uniformed services as well as to their employers. *38 U.S.C.S. § 4301(a)*.

*Labor & Employment Law > Leaves of Absence > Military Leave*
[HN5] Congress did not enact the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), *38 U.S.C.S. §§ 4301-4334*, primarily to combat an ignorant or vicious stereotyping of members of the armed services as undependable employees, but intended only to encourage people to join the armed services. USERRA's primary focus is thus not on negative opinions of certain groups but on the reality that employers may not wish to hire employees who, as members of

the armed services, could frequently be absent for long periods of time.

*Civil Procedure > Discovery > Relevance*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > Leaves of Absence > Military Leave*
[HN6] Because of the differing legislative purposes, evidence in a Uniformed Services Employment and Reemployment Rights Act of 1994, *38 U.S.C.S. §§ 4301-4334*, case of past discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), as amended, *42 U.S.C.S. §§ 1981a and 2000e through 2000e-17*, may not have the probative value it might have in a Title VII case, where an employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination. There is no reason, however, to believe that unlawful discrimination against employees on the basis of race, sex, or religion necessarily correlates with discrimination on the basis of being a member of the armed services. The latter group is, for the most part, protected not as an effort to overcome the effects of historical discrimination but to ensure that citizens will not refrain from joining the armed services for fear of losing their civilian jobs.

*Civil Procedure > Judicial Officers > Magistrates > Pretrial Orders*
*Civil Procedure > Discovery > Relevance*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > Leaves of Absence > Military Leave*
[HN7] The United States District Court for the Middle District of Alabama, Northern Division, cannot categorically, that is, as a matter of law, hold that evidence of all forms of discrimination by an employer under Title VII of the Civil Rights Act of 1964 (Title VII), as amended, *42 U.S.C.S. §§ 1981a and 2000e through 2000e-17*, is always relevant and discoverable in a claim under the Uniformed Services Employment and Reemployment Rights Act of 1994, *38 U.S.C.S. §§ 4301-4334*, claim against that employer. However, the court also cannot categorically hold that evidence of forms Title VII discrimination by an employer is never relevant and discoverable in an USERRA claim against that employer. For, there may circumstances where the comparison between USERRA and Title VII discrimination claims might bear relevance. The relevance issue must instead be decided on a case-by-case basis, and the question for a court reviewing a magistrate judge's order on the issue is

2007 U.S. Dist. LEXIS 87875, *

whether the magistrate judge was clearly erroneous, that is, abused his discretion.

### Governments > Legislation > Interpretation
### Labor & Employment Law > Leaves of Absence > Military Leave

[HN8] The Uniformed Services Employment and Reemployment Rights Act of 1994, *38 U.S.C.S. §§ 4301-4334*, should be liberally construed for the benefit of those who left private life to serve their country.

**COUNSEL:** [*1] For Jerry Leon Dees, Jr., Plaintiff: David Allen McDonald, LEAD ATTORNEY, Jeffrey Rayborn Sport, LEAD ATTORNEY, Vincent F. Kilborn, III, LEAD ATTORNEY, Kilborn Roebuck & McDonald, Mobile, AL; W. Perry Hall, Kilborn Roebuck & McDonald, Mobile, AL.

For Hyundai Motor Manufacturing Alabama, LLC, Defendant: Joseph Trent Scofield, LEAD ATTORNEY, Matthew Kinard Johnson, LEAD ATTORNEY, Thomas Scott Kelly, LEAD ATTORNEY, Ogletree, Deakins, Nash, Smoak & Stewart, Birmingham, AL.

For Hyundai Motor America, Inc., Defendant: Joseph Trent Scofield, LEAD ATTORNEY, Matthew Kinard Johnson, LEAD ATTORNEY, Thomas Scott Kelly, LEAD ATTORNEY, Ogletree, Deakins, Nash, Smoak & Stewart, Birmingham, AL.

**JUDGES:** Myron H. Thompson, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Myron H. Thompson

## OPINION

### OPINION AND ORDER

Plaintiff Jerry Leon Dees, Jr., brings this suit against defendants Hyundai Motor Manufacturing Alabama, LLC (HMMA) and Hyundai Motor America, Inc. (HMA), for allegedly discharging him in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, *38 U.S.C. §§ 4301-4334* (USERRA). During discovery, Dees requested that the court issue an order to compel HMMA and HMA to produce additional information concerning [*2] other alleged violations of employees' civil rights. The United States Magistrate Judge granted the order only "To the extent the plaintiff requests documents and other information relating to any HMMA employee in the military who submitted a complaint to members of HMMA management, the EEOC, or a court regarding treatment at HMMA that violated the complainant's civil rights." Order (Doc. No. 38), at 2.

This case is now before the court on Dees's objection to the magistrate judge's order.

## I. APPLICABLE STANDARDS

[HN1] *Fed. R. Civ. P. 26(b)(1)* permits discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party. ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." This phrasing of the rule was adopted in 2000 to limit the scope of discovery to, in general, "the actual claims and defenses involved in the action." *Fed. R. Civ. P. 26(b)(1)* committee note. Because "[w]hether a matter is 'relevant' for discovery purposes is ultimately a fact-specific inquiry defying efforts to define it precisely," 6 James Wm. Moore, et al., *Moore's Federal Practice § 26.41 [7][a]* [*3] (3d ed.), at 26-121, it follows that the magistrate judge hearing a discovery dispute "must have a broad range of discretion to determine relevance." *Id.; see Williams v. City of Dothan, 745 F.2d 1406, 1415 (11th Cir. 1984)* (a judge has "broad discretion in shaping the scope of discovery under *Fed. R. Civ. P. 26(b)*").

[HN2] A district court reviewing a magistrate judge's discovery order is, in general, limited by statute and rule to reversing that order only if it is "clearly erroneous or contrary to law," *28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a)*--or, to put it another way in the absence of a legal error, only if there was an "abuse of discretion" by the magistrate judge. *Cf. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 401, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)* ("When an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: A court of appeals would be justified in concluding that a district court had abused its discretion in making a factual finding only if the finding were clearly erroneous.").

## II. DISCUSSION

In his motion to compel, Dees requested (1) documents relating to any other allegations that HMMA or HMA violated employees' [*4] civil rights in the State of Alabama; (2) identification of all employees who had complained regarding violations of their civil rights; and (3), for all such employees, personnel files and a statement explaining why they are no longer employed. HMMA and HMA assert that they have already fully responded with discovery by providing all documents concerning other USERRA complaints. The remaining requests, they argue, are overly broad and irrelevant, since other civil rights complaints--such as discrimination on the basis of sex, national origin, and religion--have no relation to Dees's USERRA claim. At the heart of this discovery issue is whether evidence of other civil

rights complaints are properly relevant to Dees's USERRA claim.

Dees cites a variety of cases where courts considering a discrimination lawsuit have permitted discovery concerning other types of discrimination. *See, e.g., Feingold v. New York, 366 F.3d 138, 151-52 (2d Cir. 2004)* ("[A]llegations of racial animosity can ... be considered by a trier-of-fact when evaluating [a] religion-based claim."); *Hafford v. Seidner, 183 F.3d 506, 515 (6th Cir. 1999)* (evidence of religious harassment could support racially hostile work-environment [*5] claim). These cases, however, show only that evidence regarding one type of claim under Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. §§ 1981a, 2000e through 2000e-17*, may be relevant in another Title VII claim; they do not show the requisite relevance between discrimination cases under Title VII and those under USERRA. [HN3] While both statutes are similar in that they generally seek to prevent workplace "discrimination," they are also materially dissimilar.

[HN4] USERRA and Title VII are, in a broad sense, animated by fundamentally different goals. Congress enacted Title VII "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group." *Griggs v. Duke Power, 401 U.S. 424, 430-31, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971)*. USERRA, on the other hand, states that its goals include "encourag[ing] noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service" and "minimiz[ing] the disruption to the lives of persons performing service in the uniformed services as well as to their employers." *38 U.S.C. § 4301(a)*. As stated in the legislative history [*6] of a predecessor statute, "If these young men are essential to our national defense, then certainly our Government and employers have a moral obligation to see that their economic well being is disrupted to the minimum extent possible." H.R. Rep. No. 1303, 89th Cong. (1966) (quoted in *Monroe v. Standard Oil Co., 452 U.S. 549, 561, 569, 101 S. Ct. 2510, 69 L. Ed. 2d 226 (1981)*).

This evidence of legislative purpose suggests that [HN5] Congress did not enact USERRA primarily "to combat an ignorant or vicious stereotyping of [members of the armed services] as undependable employees" but intended only "to encourage people to join" the armed services. *Velasquez v. Frapwell, 160 F.3d 389, 392 (7th Cir. 1998), vacated in part on other grounds, 165 F.3d 593 (1999)* (citing *Monroe v. Standard Oil Co., 452 U.S. 549, 101 S. Ct. 2510, 69 L. Ed. 2d 226 (1981)*). USERRA's primary focus is thus not on negative opinions of certain groups but on the reality that employers may not wish to hire employees who, as members of the armed services, could frequently be absent for long periods of time. [HN6] Because of these differing legislative purposes, evidence in a USERRA case of past discrimination under Title VII may not have the probative value it might have in a Title VII case, where [*7] "an employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination." *Hawkins v. Hennepin Tech. Ctr., 900 F.2d 153, 155-56 (8th Cir.), cert. denied, 498 U.S. 854, 111 S. Ct. 150, 112 L. Ed. 2d 116 (1990)*. There is no reason, however, to believe that unlawful discrimination against employees on the basis of race, sex, or religion necessarily correlates with discrimination on the basis of being a member of the armed services. The latter group is, for the most part, protected not as an effort to overcome the effects of historical discrimination but to ensure that citizens will not refrain from joining the armed services for fear of losing their civilian jobs. Therefore, [HN7] the court cannot categorically, that is, as a matter of law, hold that evidence of all forms of Title VII discrimination by an employer is always relevant and discoverable in an USERRA claim against that employer.

However, the court also cannot categorically hold that evidence of forms Title VII discrimination by an employer is never relevant and discoverable in an USERRA claim against that employer. For, there may circumstances--such as, for [*8] example, an employer's reticence to hire women because of concerns that they would take too much time off for child-rearing--where the comparison between USERRA and Title VII discrimination claims might bear relevance. The relevance issue must instead be decided on a case-by-case basis, and the question for a court reviewing a magistrate judge's order on the issue is whether the magistrate judge was clearly erroneous, that is, abused his discretion. Here, Dees has not shown that the magistrate judge, in the exercise of his broad discretion, was clearly erroneous in his conclusion that the information Dees seeks is not relevant to the claim or defense of any party in this case. Nowhere in the record does Dees make a specific showing to the magistrate judge of circumstances in this case where the comparison between USERRA and Title VII discrimination claims might bear relevance.

The court acknowledges that [HN8] USERRA should "be liberally construed for the benefit of those who left private life to serve their country," *Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1238 (11th Cir. 2005)*. But, in this case, such a liberal interpretation cannot overcome the fact that Dees has failed [*9] to show that the magistrate judge's discovery order is clearly erroneous. In other words, while evidence of other types of discrimination may be relevant in other USERRA cases, Dees has not shown that *28 U.S.C. §*

2007 U.S. Dist. LEXIS 87875, *

*636(b)(1)(A)* and *Fed. R. Civ. P. 72(a)* warrant rejecting the magistrate judge's contrary conclusion in this case.

\*\*\*

For the above reasons, it is ORDERED that plaintiff Jerry Leon Dees, Jr.'s objection to order (Doc. No. 39) is overruled.

DONE, this the 30th day of November, 2007.

/s/ Myron H. Thompson

UNITED STATES DISTRICT JUDGE

# Exhibit N

LEXSEE 1999 US APP. LEXIS 2068

**JEFFREY CHURCH, on behalf of himself and all others similarly situated, Plaintiff-Appellant, v. CITY OF RENO, a Municipal corporation; ROBERT V. BRADSHAW, in his official capacity as Chief of Police of the City of Reno and individually; RICHARD KIRKLAND, in his capacity as Captain in the City of Reno Police Department, and individually; JAMES WESTON, in his official capacity of Lieutenant of the City of Reno Police Department, and individually; STEVEN G. TURNER, in his official capacity as Sergeant in the City of Reno Police Department, and individually, Defendants-Appellees.**

No. 97-17097

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*1999 U.S. App. LEXIS 2068*

**December 9, 1998, Argued and Submitted, San Francisco, California
February 9, 1999, Filed**

**NOTICE:** [*1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1999 U.S. App. LEXIS 6724.*

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Nevada. D.C. No. CV-83-00415-ECR. Edward C. Reed, Jr., District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff appealed from a decision of the United States District Court for the District of Nevada, which denied plaintiff's motion to show cause why defendants should not be held in contempt of a prior consent decree for subjecting plaintiff to a hostile work environment.

**OVERVIEW:** Plaintiff appealed a district court's order denying his motion to show cause why defendants should not be held in contempt of a prior consent decree for subjecting him to a hostile work environment. The consent decree prohibited acts that either violated the Uniformed Services Employment and Reemployment Rights Act, *38 U.S.C.S. § 4301 et seq.*, (USERRA), or

violated the specific language of the consent decree. The appellate court affirmed the district court's decision. The court found that plaintiff had pointed to no employment contract, agreement, policy, plan or practice that specifically provided the benefit of being free from caustic comments by coworkers. The court also found that the USERRA did not specifically include a non-hostile work environment in its definition of "benefit of employment." The court further found that the consent decree did not define the term "otherwise discriminate" to include protecting employees from a hostile work environment. The court held, therefore, that defendants could not be held in contempt of the consent decree for failing to protect plaintiff from the caustic comments of his coworkers.

**OUTCOME:** The appellate court affirmed a district court decision, which denied plaintiff's motion to show cause why defendants should not be held in contempt of a prior consent decree for subjecting plaintiff to a hostile work environment. The court held that the consent decree did not include protecting plaintiff from caustic comments by coworkers.

**CORE TERMS:** consent decree, work environment, hostile, contempt, coworkers, caustic, reemployment, uniformed, discriminate, specific language, employment contract, notoriously, ambiguous, specifically provides

**LexisNexis(R) Headnotes**

1999 U.S. App. LEXIS 2068, *

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Labor & Employment Law > Affirmative Action > Consent Decrees*
[HN1] The consent decree is an injunction. It must therefore be specific in terms and describe in reasonable detail the acts sought to be restrained.

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Labor & Employment Law > Affirmative Action > Consent Decrees*
[HN2] Specificity in the terms of consent decrees is a predicate to a finding of contempt.

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Labor & Employment Law > Affirmative Action > Consent Decrees*
[HN3] If a consent decree does not clearly describe the prohibited conduct, it is not enforceable by contempt.

*Labor & Employment Law > Affirmative Action > Enforcement*
*Military & Veterans Law > Veterans > Benefits > Employment*
*Pensions & Benefits Law > Equal Protection > Veterans*
[HN4] In 1994 the Veterans Reemployment Retirement Rights Act, *38 U.S.C.S. § 2021* was replaced by the Uniformed Services Employment and Reemployment Rights Act, *38 U.S.C.S. § 4301 et seq.*

*Labor & Employment Law > Affirmative Action > Enforcement*
*Military & Veterans Law > Veterans > Benefits > Employment*
*Pensions & Benefits Law > Equal Protection > Veterans*
[HN5] The Uniformed Services Employment and Reemployment Rights Act, *38 U.S.C.S. § 4301 et seq.*, provides that persons serving in the uniformed services shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of their membership in the uniformed services. See *38 U.S.C.S. § 4311(a)*.

*Labor & Employment Law > Disability & Unemployment Insurance > Unemployment Compensation > Coverage & Definitions*
*Military & Veterans Law > Veterans > Benefits > Employment*
*Pensions & Benefits Law > Employee Benefit Plans > Employee Stock Ownership Plans*
[HN6] The Uniformed Services Employment and Reemployment Rights Act, *38 U.S.C.S. § 4301 et seq.*, defines "benefit of employment" as: any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment. See *38 U.S.C.S. § 4303(2)*.

*Civil Procedure > Judgments > Entry of Judgments > Consent Decrees*
*Environmental Law > Litigation & Administrative Proceedings > Consent Decrees*
*Labor & Employment Law > Affirmative Action > Consent Decrees*
[HN7] To hold a party in contempt, the prohibitions of a consent decree must be clear enough that those who must obey them know what the court intends to require and what it means to forbid.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Amendments*
[HN8] The term "discrimination" is notoriously ambiguous. In the context of Title VI actions, the precise meaning of the term has generated more than 30 years of litigation.

**COUNSEL:** For JEFFREY CHURCH, Plaintiff - Appellant: James Andre Boles, Esq., Reno, NV.

For CITY OF RENO, ROBERT V. BRADSHAW, RICHARD KIRKLAND, JAMES WESTON, STEVEN G. TURNER, Defendants - Appellees: Donald L. Christensen, Esq., Reno, NV.

**JUDGES:** Before: D.W. NELSON, RYMER, and T.G. NELSON, Circuit Judges.

**OPINION**

MEMORANDUM [1]

1   This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by *Ninth Circuit Rule 36-3.*

Jeffrey Church appeals the district court's order denying his motion to show cause why the City of Reno and certain City employees should not be held in contempt of a 1987 consent decree for subjecting Church **[\*2]** to a hostile work environment. We have jurisdiction pursuant to *28 U.S.C. § 1291.* We affirm the district court.

[HN1] "The consent decree is an injunction." *Gates v. Shinn, 98 F.3d 463, 468 (9th Cir. 1996).* It must therefore be "'specific in terms' and describe 'in reasonable detail' the acts sought to be restrained." *Id. at 467.* [HN2] "Specificity in the terms of consent decrees is a predicate to a finding of contempt." *Id.* [HN3] "If [a consent decree] does not clearly describe [the] prohibited . . . conduct, it is not enforceable by contempt." *Id.*

The consent decree at issue in the present case prohibits acts that either (1) violate the Uniformed Services Employment and Reemployment Rights Act, *38 U.S.C. § 4301 et seq.* ("USERRA") [2]; or (2) violate the specific language of the consent decree.

> 2   The consent decree actually incorporates by reference the Veterans Reemployment Rights Act, *38 U.S.C. § 2021* ("VRRA"). [HN4] In 1994 the VRRA was replaced by the USERRA. The district court held that the USERRA rather than the VRRA applies to this case, and neither party has appealed that holding. We therefore apply the USERRA rather than the VRRA.

**[\*3]** A. *The USERRA*

[HN5] The USERRA provides that persons serving in the uniformed services "shall not be denied initial employment, reemployment, retention in employment, promotion, or *any benefit of employment*" by an employer on the basis of" their membership in the uniformed services. *38 U.S.C. § 4311(a)* (emphasis added). Church argues that the City should be held in contempt of the consent decree because it violated the USERRA's prohibition against denying a "benefit of employment" when it subjected Church to a hostile work environment.

[HN6] The USERRA defines "benefit of employment" as:

> any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an *employment contract or agreement or an employer policy,*

*plan, or practice* and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

*38 U.S.C. § 4303(2)* (emphasis added).

Church has pointed to no "employment contract or **[\*4]** agreement or an employer policy, plan, or practice" that specifically provides the "benefit" of being free from caustic comments by coworkers. *See id.* Rather, analogizing to other antidiscrimination statutes, Church argues that the term "benefit of employment" should be interpreted to include freedom from a hostile work environment.

We need not reach the issue of whether a hostile work environment claim is congnizable under the statute, however, because [HN7] to hold a party in contempt, the prohibitions of a consent decree must be clear enough that "those who must obey them will know what the court intends to require and what it means to forbid." *Gates, 98 F.3d at 468.* While the consent decree prohibits violations of reservists' statutory rights, the USERRA does not specifically include a nonhostile work environment in its definition of "benefit of employment." In addition, neither the Ninth Circuit nor the U.S. Supreme Court has interpreted either the USERRA or the VRRA to create liability for a hostile work environment. The City cannot, therefore, be held in contempt of the consent decree for failing to protect Church from the caustic comments of his coworkers. [3]

> 3   We recognize that the Merits Systems Protection Board has interpreted the USERRA to create liability for a hostile work environment. *See Petersen v. Department of Interior, 71 M.S.P.R. 227 (1996).* The M.S.P.B.'s interpretation of the USERRA is not, however, binding on the City.

**[\*5]** B. *The Specific Language of the Consent Decree*

The consent decree itself specifically provides that the City will not "terminate, demote, punish, restrict or withhold accrual of benefits . . . or otherwise discriminate against an employee as a result of his participation in the Military Reserve or National Guard." Church argues that the City should be held in contempt of the consent decree because the language "otherwise discriminate" includes a prohibition on hostile work environments. We disagree.

The consent decree does not define the term "otherwise discriminate" to include protecting employees from a hostile work environment, or otherwise indicate that the City was required to protect employees from caustic comments by coworkers. Moreover, nothing in the prior lawsuit or proceedings that resulted in the consent decree mentions "hostile work environment" or otherwise indicates that the parties intended the consent decree to include a prohibition on caustic comments by coworkers.

Finally, as we recently recognized, [HN8] the term "discrimination" is "notoriously ambiguous." *See Mon-*teiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1033 (9th Cir. 1998)*. In the context [*6] of Title VI actions, the precise meaning of the term has generated "more than thirty years of litigation." *Id.* The City cannot be held in contempt of the consent decree for failing to interpret this "notoriously ambiguous" term to include a duty to protect Church from a hostile work environment. *See Gates, 98 F.3d at 467-68*.

AFFIRMED.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1992 WL 150160 (M.D.Ga.), 58 Fair Empl.Prac.Cas. (BNA) 817
**(Cite as: Not Reported in F.Supp.)**

Ⓒ McKie v. Miller Brewing Co.
M.D.Ga.,1992.

United States District Court, M.D. Georgia, Albany
and Americus Divisions.
David W. McKIE and James Donald Harris,
Plaintiffs,
v.
MILLER BREWING COMPANY, Defendant.
**Civ. No. 90-46-ALB/AMERDF.**

March 6, 1992.

James Norman Finkelstein, Albany, Ga., for
plaintiffs.
John M. Capron, Burton Freeman Dodd, James
Edward Rollins, Jr., Atlanta, Ga., for defendant.

*ORDER*
FITZPATRICK, District Judge.
*1 Pending before the court is a series of motions,
including, most importantly, the defendant's motion
for summary judgment. Before this motion can be
examined, however, the court must consider the
defendant's motion to strike the plaintiff's response as
untimely.

During a telephone conference on June 21, 1991, the
court allowed the defendant fifteen days, including
the July 4 holiday, to file its motion for summary
judgment. The plaintiffs were given twenty-four days
to respond in order to accommodate plaintiffs'
counsel's desire for a two-week vacation. The
defendant was then given until August 15 to reply.

The defendant timely filed its motion. Afterwards,
during a July 10 deposition, plaintiffs' counsel
requested defense counsel to agree to an extension.
The request was denied. The plaintiffs filed no
motion requesting an extension with the court, nor
did they ask the court reporter to expedite the
transcription of the deposition. The plaintiffs did not
file their response within the time period allowed,
and in fact made no response until receiving a letter
from defense counsel drawing the court's attention to
their inaction. Plaintiff's counsel contacted Ms.
Wanda Donihoo, the undersigned judge's courtroom
deputy, and asked for an extension. Ms. Donihoo
tentatively granted the extension contingent upon the

court's approval. Plaintiffs' counsel then filed a
response which can only be read as assuming that
approval had been granted. A motion for an extension
of time was not filed until *after* the response was
sent.

While these circumstances would certainly justify
striking the plaintiffs' response, the court will not do
so. In an abundance of generosity and out of a desire
to reach the merits of this case, however, the court
will give plaintiff's counsel the benefit of the doubt.
While it is evident that he has failed to meet with the
court's deadline, failed to comply with the Federal
Rules of Civil Procedure and failed to offer a
sufficient explanation for his actions, the court will
nonetheless deny the defendant's motion to strike and
consider the plaintiffs' response.

The standards for considering a motion for summary
judgment are well known. Under Rule 56(c) of the
Federal Rules of Civil Procedure, the party moving
for summary judgment bears the initial burden of
showing there are no genuine issues of material fact
that should be decided at trial and that it is entitled to
judgment as a matter of law. When this has been
done, the burden shifts to the non-moving party to
demonstrate that there is indeed a material issue of
fact or law precluding summary judgment. *Clark v.
Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th
Cir.1991). Where relevant facts are in controversy,
"all reasonable doubts ... are to be resolved and all
inferences ... are to be drawn in favor of the party
opposing the motion." *Mack v. W.R. Grace Co.,* 578
F.Supp. 626, 630 (N.D.Ga.1983). After considering
the law and the facts, the court has decided to grant
the motion.

*BACKGROUND*

*2 Plaintiffs David W. McKie and James Donald
Harris, white males, are former employees of the
defendant. Both worked as instrument technicians at
Miller's plant in Albany, Georgia. Miller is a federal
contractor as specified in Executive Order 11,246,
and so has an affirmative action plan. Miller's
production and maintenance employees are
represented by Local 2699 of the International
Association of Machinists and Aerospace Workers,
AFL-CIO. The plaintiffs were not covered by this

Not Reported in F.Supp.                                                                                Page 2
Not Reported in F.Supp., 1992 WL 150160 (M.D.Ga.), 58 Fair Empl.Prac.Cas. (BNA) 817
**(Cite as: Not Reported in F.Supp.)**

collective bargaining agreement, but were at-will employees under Georgia law. (Potratz Affidavit, paras. 3, 5, attached to Defendant's Reply in Support of Summary Judgment).

At about 3:30 a.m. on October 28, 1988, John P. Jones, a Miller Instrumentation Supervisor, found McKie asleep in a control room. McKie was found in a chair with his feet propped up behind a control panel. The door to the control room was locked, but this was in accord with normal procedures. McKie admitted that he had committed the violation. (McKie Depo., pp. 15-17). Following an investigation, Miller terminated McKie under a plant rule prohibiting the misuse of time, including sleeping on the job. McKie was replaced by a black male. (Potratz Aff., paras. 8-11).

At about 5:00 a.m. on March 18, 1988, David Adcock, a Miller Maintenance Supervisor, found Harris asleep in a control room behind a barricaded door. Adcock awakened Harris and immediately suspended him. Harris denied that he was asleep. (Harris Depo., pp. 24-25). Following an investigation, Harris was also discharged for an intentional misuse of time. He was replaced by a white female. (Potratz Aff., paras. 13-17; Smith Aff., paras. 3-6).

The plaintiffs are the only employees not covered by the collective bargaining agreement Miller has discovered sleeping on the job and discharged. (Potratz Aff., para. 11). Other employees, covered by the union's bargaining agreement, were suspended when caught sleeping.

The plaintiffs then filed complaints with the Equal Employment Opportunity Commission. On January 2, 1990, the EEOC determined that there was no discrimination in McKie's termination. On March 14, 1990, the EEOC issued a right-to-sue letter to Harris at his request, pre-empting the agency's consideration of his claim. (Exhibits to Potratz Aff.).

The plaintiffs then filed this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* They allege that Miller fired them while other employees guilty of the same offense were merely suspended. They contend that Miller discriminated against them due to their race and sex in order to replace them with minority or female workers in accord with its affirmative action plan.

*DISCUSSION*

It is important to distinguish between the two theories of this case. Miller contends that this is a case of allegedly discriminatory discipline. The plaintiffs claim they are proceeding under *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), where the Supreme Court upheld the affirmative action plan in question in part by noting that it did not require the discharge of white workers and their replacement with minorities. 443 U.S. at 208, 99 S.Ct. at 2730. The plaintiffs contend that this is exactly what happened to them, i.e. they were fired for an offense usually resulting in a suspension in order to make room for minorities and women under Miller's affirmative action plan.

**\*3** The plaintiffs cannot make a case under *Weber* and there is no need to undertake an examination of Miller's affirmative action plan. Even under *Weber,* the plaintiffs bear the burden of making out a prima facie case of discrimination using the framework given in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The criteria for judging an affirmative action plan given in *Weber* come into play only if an employer uses the plan as a justification for its decision. *Johnson v. Transp. Agency,* 480 U.S. 616, 625-27, 107 S.Ct. 1442, 1448-47, 94 L.Ed.2d 615 (1987). Here, Miller has not raised the plan as a justification for its actions and even if it had the plaintiffs would still have to show a prima facie case in order to attack the plan in support of their own theory.

In a disparate treatment case such as this one, the plaintiffs bear the ultimate burden of showing that the defendant acted with a discriminatory purpose. The plaintiffs must first establish a prima facie case, after which the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. The plaintiffs may then present evidence to show that the employer's reason is pretextual or that a discriminatory reason was more likely than not the cause of the employer's actions. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984). In this case, the plaintiffs have failed to establish a prima facie case of discrimination to support any of their claims.

1. A Prima Facie Case

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1992 WL 150160 (M.D.Ga.), 58 Fair Empl.Prac.Cas. (BNA) 817
**(Cite as: Not Reported in F.Supp.)**

In order to establish a prima facie case, the Eleventh Circuit has held that:

> in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Jones v. Gerwens,* 874 F.2d 1534, 1539-40 (11th Cir.1989).

Leaving aside the question of whether they are in a protected class,[FN1] the plaintiffs cannot meet either of the *Gerwens* tests. McKie admits that he was asleep on the job. (McKie Depo., pp. 15-17). Although Harris denied being asleep (Harris Depo., pp. 24-25), Miller's investigation led it to believe otherwise. (Potratz Aff., paras. 8-11, 13-17; Smith Aff., paras. 3-6). There is no reason to believe that Miller's belief was not held in good faith, meaning that Miller has successfully rebutted any possible prima facie case established by Harris under this part of *Gerwens.* "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Gerwens,* 874 F.2d at 1540. The first *Gerwens* test is therefore unsatisfied by either plaintiff.

**\*4** The second *Gerwens* test is analogous to a requirement that the plaintiffs show that similarly situated employees were treated differently than they were. They cannot do this, however, because it is uncontested that the other employees caught sleeping on the job were union members covered by a collective bargaining agreement while the plaintiffs had no such protection. The law is unequivocal that in a Title VII race discrimination claim, "[f]irst and foremost, because of their unique status in the workplace, bargaining unit employees are *never* similarly situated with non-bargaining unit employees." *Marshall v. Western Grain Co., Inc.,* 838 F.2d 1165, 1170 (11th Cir.1988), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988) (emphasis in original).

The reason for the distinction is clear. An employer must often go through a complex process in order to discipline an employee covered by a collective bargaining agreement which frequently involves grievance and appeal procedures. *See, Marshall,* 838 F.2d at 1170-71. At-will employees, by contrast, may be disciplined or discharged for virtually any reason, subject to a few exceptions such as discrimination. "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix,* 738 F.2d at 1187. Because of this fundamental difference, employees in these two groups are never similarly situated and cannot be compared in Title VII lawsuits to show discrimination. The only employees with whom the plaintiffs could compare themselves would be others not protected by the collective bargaining agreement, but there has been no evidence of this nature.

Likewise, the plaintiffs were not similarly situated to the other employees caught sleeping on the job because it appears that the supervisory decisionmakers were different. "[D]isciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Gerwens,* 874 F.2d at 1541.

### 2. A Legitimate, Non-discriminatory Reason

Alternatively, if by some chance the plaintiffs could be considered to have established a prima facie case, there is no doubt that Miller has successfully rebutted it. It is not contested that McKie was sleeping on the job or that Miller honestly believed that Harris had been. Miller conducted an extensive investigation before reaching these conclusions. Sleeping on the job is without doubt a legitimate, non-discriminatory reason for discharging employees.

### 3. Pretext

Finally, there is absolutely no reason to believe that Miller's reason for discharging the plaintiffs was pretextual. The mere existence of Miller's affirmative action plan is in no way evidence of discrimination, *Christensen v. Equitable Life Assurance Soc'y,* 767 F.2d 340, 343 (7th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 885, 88 L.Ed.2d 920 (1986), and the plaintiffs' attempts to compare themselves with other employees prove nothing since they and the other workers are not similarly situated.

Not Reported in F.Supp.                                                                                                                    Page 4
Not Reported in F.Supp., 1992 WL 150160 (M.D.Ga.), 58 Fair Empl.Prac.Cas. (BNA) 817
**(Cite as: Not Reported in F.Supp.)**

*CONCLUSION*

**\*5** The remainder of the arguments raised by the plaintiffs are immaterial to the questions at hand. They have not carried their burden and their case cannot survive. The defendant's motion to strike is DENIED. The defendant's motion for summary judgment is GRANTED. The remaining motions are moot.

SO ORDERED.

> FN1. The defendant has contended that since the plaintiffs are white males, they should be required to show evidence of background circumstances giving rise to an inference of discrimination in lieu of showing minority status. There is a split of authority on this question. *Lucas v. Dole, 835 F.2d 532, 534 n. 9 (4th Cir.1987)*. Although no Eleventh Circuit authority has been presented to the court to resolve this matter, it is of no major importance since the plaintiffs have failed to make a prima facie case even if this factor were to be counted in their favor.

M.D.Ga.,1992.
McKie v. Miller Brewing Co.
Not Reported in F.Supp., 1992 WL 150160 (M.D.Ga.), 58 Fair Empl.Prac.Cas. (BNA) 817

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**HYUNDAI**
Motor Manufacturing Alabama, LLC
700 Hyundai Blvd.
Montgomery, Al 36105

February 26, 2007

Jerry Leon Dees



Dear Leon:

It has been brought to my attention on February 14, 2007 you were found, by a member of
HMMA management, in the third floor overhead sleeping.

HMMA policy states, "Serious and excessive violations of HMMA's performance
standards", is a serious misconduct violation. When a person commits such an action
against HMMA and/or his/her fellow Team Members, he/she may be terminated from
employment. HMMA considers you action to be in violation of the aforementioned policy

Based on the aforementioned, I regret that I have no alternative but to terminate your
employment, effective immediately

Sincerely,

*Wendy J. Warner*

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

DEES V HMMA 00006  DOCS PRODUCED