IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY LEON DEES, JR.,

     Plaintiff,

v.

HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC, and HYUNDAI
MOTOR AMERICA, INC.,

     Defendants.

CIVIL ACTION NO.:
2:07-cv-00306-MHT-CSC

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     STATEMENT OF UNDISPUTED FACTS ......................................................... 2

    A.      The Relationship Between HMMA and HMA ................................................. 2

    B.      Dees' Employment with HMMA ..................................................................... 4

    C.      HMMA's Relevant Policies and Procedures ................................................... 5

        1.      HMMA's Serious Misconduct Policy ................................................ 5

        2.      HMMA's Military Leave Policy and Practices .................................... 5

        3.       HMMA's Anti-Harassment Policy ..................................................... 6

        4.      HMMA's Equal Employment Opportunity Policy .............................. 6

        5.      At-Will Employment .......................................................................... 7

        6.      HMMA's Locker Policy ..................................................................... 7

    D.      Dees' Uniformed Service ................................................................................. 7

    E.      Dees' Allegations of Harassment Due to His Uniformed Service ................... 8

    F.      HMMA's Termination of Dees for Sleeping During Working Hours ........... 11

        1.      Dees' Misconduct and Investigation ................................................ 11

        2.      The Termination Committee Meeting ............................................... 12

        3.      Termination Decision Communicated to Dees .................................. 14

    G.      Dees' Outrage Allegations ............................................................................. 15

    H.      Dees' Conversion Allegations ........................................................................ 15

III.    SUMMARY JUDGMENT STANDARD ........................................................... 16

IV.    ARGUMENT ............................................................................................ 18

    A.    **HMA Was Not Dees' "Employer" as Defined Under USERRA and Is Therefore Not Liable to Dees** ........................................ 18

    B.    **Dees' Termination Claim Under USERRA Fails as a Matter of Law** ......... 20

        1.    **Dees' Military Service Was Not A "Motivating Factor" in HMMA's Termination Decision** .......................................... 22

            a.    **Proximity in time** .......................................................... 23

            b.    **There are no inconsistencies in HMMA's reason for terminating Dees' employment.** ..................................... 25

            c.    **HMMA did not express hostility toward members of the uniformed service protected by the statute** ............................. 28

            d.    **Dees' termination for sleeping at work is consistent with HMMA's past practice** ........................................ 28

        2.    **HMMA Would Have Terminated Dees Regardless of His Military Status** ........................................................................ 29

    C.    **Dees' USERRA Harassment Claim Fails as a Matter of Law** ...................... 31

        1.    **Harassment is not a cognizable claim under USERRA** ...................... 31

        2.    **The Alleged Harassment Was Not Severe and Pervasive** .................. 33

    D.    **Dees' State Law Outrage Claim Fails as a Matter of Law** .............................. 36

    E.    **Dees' State Law Conversion Claim Fails as a Matter of Law** ........................ 39

V.    **CONCLUSION** ................................................................................ 41

## I.    INTRODUCTION

Plaintiff Jerry Leon Dees' ("Dees") Complaint, filed April 10, 2007, alleges violations of his rights as set forth by the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301, et seq. ("USERRA").    Specifically, Dees alleges that employees of HMMA harassed him because of his uniformed service and, subsequently, that he was terminated as a result of his uniformed service.  (Complaint, ¶¶ 20-22).

Defendants have denied liability and have asserted additional defenses including, but not limited to, the fact Dees' employment was terminated based upon a good faith basis for legitimate, non-discriminatory reasons.  (HMMA Answer, ¶¶18-29, 34-36; HMA Answer, ¶¶18-29, 38).    Indeed, Dees was lawfully terminated for sleeping on the job, which is considered serious misconduct by HMMA.  (Second Declaration of Wendy Warner "Second Warner Decl." attached to Evidentiary Submission "Evid. Sub." at Ex. F at  ¶¶ 13-14).

Dees also alleges a state law claim for outrage related to "harassment" by certain HMMA employees.  (Complaint, ¶ 24-27).   In his deposition, Dees also seems to suggest that facts related to the manner in which his termination was conducted may support his outrage claim. (Deposition transcript of Jerry Leon Dees, Jr. "Dees Depo." attached to Evid. Sub. as Ex. A at 248: 17-23; 249: 1-23; 250: 1-23; 251: 1-22).   Even assuming the facts are as alleged by Dees are taken as true, HMMA's actions were not sufficient to support a claim for outrage under Alabama law.

Finally, Dees has also alleged a state law claim for conversion of personal belongings contained in his locker at HMMA at the time of his termination.  (Complaint, ¶ 29).  Defendants deny these allegations but, assuming them as true, Dees' conversion claim fails as a matter of law because under the terms of HMMA's Team Member Handbook, Dees cannot show a legal

title and immediate right of possession of the contents of the locker, if any.  There is also no

evidence that any HMMA employee took any personal belongings from Dees or, more

importantly, that HMMA ratified such conduct.  HMMA would also respectfully submit that any

conversion in this case, if any, was de minimis.

## II.     STATEMENT OF UNDISPUTED FACTS[1]

### A.     The Relationship Between HMMA and HMA

Dees' Complaint alleges that HMMA and HMA are equally liable upon an "alter ego" or

"mere instrumentality" theory of liability. (Complaint, ¶ 4).   However, Dees provides no

additional factual support for this proposition other than to say that HMA "owns" HMMA and

that HMMA, HMA, and Hyundai Motor Company were "all one company."  (Dees Depo. at

339:20-23; 340: 1-23).   Dees offers no additional facts to support any relationship between

HMMA and HMA with respect to his employment, control over the employees allegedly

involved in "harassing" him, the termination process, or the policies and procedures related to his

employment at HMMA.

HMMA and HMA are "related" in some sense.   HMMA is a single member limited

liability company of which HMA is the single member.   (See Doc. 14: HMMA's Corporate

Disclosure Statement).  HMA is a wholly owned subsidiary of Hyundai Motor Company. (Id.)

HMMA and HMA are otherwise distinct and separate.  HMMA is a Delaware limited liability

company with its principal place of business in Montgomery County, Alabama. (Complaint,

¶¶ 2, 6; First Declaration of Wendy Warner "First Warner Decl." attached to Evid. Sub. as Ex. E

at  ¶ 3; Deposition transcript of Wendy Warner "Warner Depo." attached to Evid. Sub. as Ex. D

---

[1] Defendants set forth the following statement of undisputed facts for purposes of this motion
only and bearing in mind that this Court must construe the evidence in a light most favorable to
Plaintiff at the summary judgment stage.

at 41: 10-16).  HMMA manufactures automobiles.  (Complaint, ¶ 2; First Warner  Decl. at ¶ 4).

On the other hand, HMA is a California corporation with principal offices in California and is

engaged in the distribution, marketing, and sale of Hyundai brand automobiles and parts in the

United States.  (Complaint, ¶ 3; Declaration of Kathy Parker "Parker Decl." attached to Evid.

Sub. as Ex. H at ¶¶ 3-4).

     Further testimony concerning HMA's role is contained in the Declaration of Kathy

Parker, the Vice President, Human Resources and Administrative Services for HMA.  (Parker

Decl. at ¶ 1).   HMA and HMMA operate and function as separate companies with separate

human resources departments, and separate employment and business policies and procedures.

(Parker Decl. at ¶ 5).  HMA never employed Dees and never provided him with pay, salary, or

benefits.   (Parker Decl. at ¶¶ 6-7).   HMA had no involvement, influence, or control in the

establishment of policies or procedures at HMMA, including those related to Dees' employment.

(Parker Decl. at ¶ 10).  Further, HMA had no employment or other relationship with, or right to

control or direct, any employees of HMMA, including those employees identified in Dees's

Complaint.  (Parker Decl. at ¶ 12).

     HMMA's testimony on the subject of Dees' employment is equally clear.   Wendy

Warner is HMMA Manager of the Employment & Benefits Section.  (Warner Depo. at 19:10-11;

Second Warner Decl. at ¶ 1).  Warner testified that there is no relationship between HMMA and

HMA from a human resources standpoint.  (Warner Depo. at 138:7-12; Second Warner Decl. at

¶¶ 5, 6, 7).  Warner's sworn testimony further confirms that Dees was not employed by HMA,

and that HMA had no influence or control over HMMA's decision to terminate Dees'

employment.  (First Warner Decl. at ¶¶11-13).

Thus, as contemplated in 38 U.S.C. § 4303(4)(A) of USERRA, HMA did not pay Dees' salary or wages, and HMA had no control over Dees' employment opportunities.

**B.    Dees' Employment with HMMA**

Dees alleges he was an employee of HMMA. (Complaint, ¶ 1). Dees alleges he "began working at Hyundai[2] on or about November 21, 2005, as a maintenance technician in the Stamping Department.…" (Complaint, ¶ 7; Dees Depo. at 133: 9-18). Greg Prater, Assistant Manager, was Dees' direct supervisor. (Dees Depo. at 134: 1-8). Significantly, while Dees claims Prater harassed him because of his uniformed service, Dees recognizes that Prater was also a member of the uniformed services, although he may question the details of Prater's service. (Dees Depo. at 139:10-23; 140:1-23; 141:1-3). Further, Ms. Warner also confirmed that Prater was a member of the uniformed service. (Warner Depo., at 274: 3-23; 275: 1-5). Dees' Team Leader was Kevin Hughes. (Dees Depo. at 133:19-23).[3]

Dees testified that at the time he was hired by HMMA, he was interviewed by an HMMA employee named Danny Blue, a Manager of Plant Engineering. (Dees Depo. at 70: 14–22). As was Dees' customary practice with potential employers, Dees informed HMMA through Danny Blue that he "was in the National Guard, was an active member in the Guard and [had] a commitment to the Guard." (Dees Depo. at 68:19-23; 69: 1-2; 70:14–18). Danny Blue stated that no one at HMMA would have a problem with his National Guard duty. (Dees Depo. at 71: 21-23).

---

[2] Plaintiff subsequently refers to both Defendants merely as "Hyundai" in his Complaint.
[3] A Team Leader is not a supervisor or a member of management, but is responsible for directing the activities and job assignments for the Team Members in their area.

4

C.    **HMMA's Relevant Policies and Procedures**

1.    **HMMA's Serious Misconduct Policy**

HMMA's Serious Misconduct Policy specifically states that certain acts may place a Team Member outside its "Corrective Action" process, thereby subjecting him or her to <u>immediate</u> termination.  (Second Warner Decl. at ¶ 18 and Attachment A "Handbook" at 34). The non-inclusive list of examples of serious misconduct includes, "Serious and/or excessive violations of HMMA's performance standards."  (Second Warner Decl. at ¶ 18; Handbook at 34).  As discussed further below, Dees' actions, intentionally sleeping on the job, were deemed by HMMA's Termination Committee to be a serious misconduct violation and, therefore, termination was an appropriate form of discipline.  (Second Warner Decl. at ¶ 18).

2.    **HMMA's Military Leave Policy and Practices**

HMMA has a policy that addresses military leave.  The policy provides:

> Team Members who are inducted into the U.S. Armed Forces or who are reserve members of the U.S. Armed Forces or state militia groups will be granted leaves of absence for military service, training, or other obligations in compliance with state and federal laws.

(Handbook at 22).[4]  The Military Leave Policy also provides that HMMA will pay the difference between military pay and regular wages/salary for up to one month, which is not required by law. (Handbook at 22).

Pursuant to the Policy, employees are "requested to notify their supervisors as soon as they are aware of the military obligations."  (Handbook at 22).  While Team Members can satisfy

---

[4] A copy of the Team Member Handbook is attached as Exhibit A to the Second Declaration of Wendy Warner.

this requirement by providing oral or written notice, written notice is preferred.  (Warner Depo. at 233: 22-23; 234: 1-6).[5]

### 3.    HMMA's Anti-Harassment Policy

HMMA's Anti-Harassment Policy, a summary of which is in HMMA's Team Member Handbook, clearly prohibits unlawful harassment.  (Handbook at 2-3).  Specifically, the Policy states, "it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, *veteran's status, or any other unlawful basis*.  (Handbook at 2-3) (emphasis added).  The Policy also encourages Team Members to report harassment to their "group leader/manager, team relations representative, or the team relations manager."  (Handbook at 2-3).  As such, the Policy provided for alternative avenues of reporting harassment.

### 4.    HMMA's Equal Employment Opportunity Policy

HMMA's Equal Employment Opportunity Policy, a summary of which is also in its Team Member Handbook, affirmatively states that HMMA will make all decisions with regard to employment without discriminating on the basis of race, color, religion, national origin, age, sex, disability, *veteran status or any other unlawful basis*." (Handbook at 2) (emphasis added). In addition, HMMA encourages all of its Team Members to report any claims of discrimination to HMMA. (Handbook at 2).

---

[5] Rob Clevenger testified to this fact when his deposition was taken on December 13, 2007.  At the time this Brief was filed, the transcript from Clevenger's deposition was not available. Defendants respectfully request permission to supplement the Evidentiary Submission with the deposition transcript of Clevenger when it becomes available.

### 5.    At-Will Employment

HMMA Team Members are "at-will" employees.  The Corrective Action policy confirms that every Team Member's employment is "voluntary" and "is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time." (Second Warner Decl. at ¶ 19; Handbook at 33).  Each HMMA Team Member also signs a "Receipt of Handbook Acknowledgement" in which they acknowledge receipt of the Team Member Handbook, the policies therein, and a duty to read the Handbook and to ask questions if they failed to understand any portion thereof.  (Second Warner  Decl. at ¶ 20 and Attachment B ("Receipt") at ¶ 5).  The Receipt further confirms that the Handbook is "not a contract of any kind" and that employment is "at will" and subject to termination "for any reason or for no reason at any time." (Second Warner Decl. at ¶ 20; Receipt at ¶ 4).  Dees' Receipt indicates it was signed on January 10, 2006.  (Receipt; Dees Depo. at 72: 18-23; 73: 1-6).

### 6.    HMMA's Locker Policy

HMMA's Locker Policy defines Team Members usage of HMMA lockers.  It states:

> HMMA will provide each Team Member with a locker so that they may store personal items.  However, these lockers should not be used to store money or valuables.  HMMA will not be responsible for anything that is destroyed, lost or stolen from any locker.  Lockers will remain the property of HMMA at all times.  HMMA maintains the right to inspect any locker and its contents at any time with or without notice if it is believed the locker(s) contain items contrary to HMMA policy.  This includes but is not limited to items such as firearms, explosives, dangerous and lethal weapons, alcohol, illegal drugs and missing HMMA property.

(*See* Handbook at 46) (emphasis added).

### D.    Dees' Uniformed Service

Dees' Complaint states that he served in the Alabama Army National Guard and that he served in Iraq. (Complaint at ¶ 1).  For purposes of this motion, these allegations are admitted

and, further, it is admitted that Dees performed "service in the uniformed service" as defined in 38 U.S.C. § 4303(13).

### E.    Dees' Allegations of Harassment Due to His Uniformed Service

Dees alleges that he was "harassed" because of his uniformed service. Dees admits that the only two people at HMMA that "harassed" him were Prater and John Applegate, Senior Manager of Plant Engineering. (Dees Depo. at 146: 13-19; Deposition transcript of John Applegate "Applegate Depo." attached to Evid. Sub. as Ex. C at 11: 20-23).

Examples of Dees' harassment allegations are as follows:

Q:    … Did Greg Prater – How Did Greg Prater harass you because you were a member of the Guard or because you served to tours in Iraq?

A:    He said that – He made the comment that he had been in Baghdad, he had killed people, he had been a Navy Seal, he had been a tank commander. And when I asked him where he was at in Baghdad, he says – when I asked him where he was in Iraq, I was on the southside of Baghdad. I said, what compound? I don't remember, there was so many. I said, what was the name of the compound? I don't remember. You know how it was there was compounds all over the southside of Baghdad. I said, no, there wasn't, there was one, the one I lived in.
And I had put him on the spot because I listened to him six or eight months, him and Applegate come around and Prater start running up and talking about how he been in combat and killed so many people. And Applegate was like, yeah, that is my boy. And I got friends that died in Iraq, I've killed people in Iraq, and my friends served proudly in Iraq. And Applegate and HR and everybody was making a disgrace of what we had done.

Q:    Well, what ---

A:    When I went to them with my complaints about my Guard duty, being forced to produce military orders, they were like, well, we'll look into the regulations.

Q:    Did Applegate ever demean you or try to diminish your service in Iraq in any way?

> A:     He basically sat there the last – said, well, I know Prater is a hero.  And
> he's – like I said, basically he's my man, he's my boy.

(Dees Depo. at 139:10-23; 140:1-23; 141:1-3).

Dees' general allegations against Prater are in two areas: (1) allegations regarding demands and threats concerning his uniformed service, and (2) statements concerning the nature of his service.  Specifically, Dees stated Prater accused him of "partying" during his guard duty and made fun of what Dees did while on guard duty.  (Dees Depo. at 121: 22-23; 122: 1-14; 142: 1-23; 143: 1-23).  Dees also complains that Prater requested copies of his military orders on numerous occasions.  (Dees Depo. at 128:1-23; 129:1-23).  Dees cannot recall specific dates or times that Prater requested his military orders but generally recalled that the requests started sometime in 2006.  (*Id*.).  Dees admits that Prater never disciplined him for participating in military guard duty or Dees' failure to provide military orders.  (Dees Depo. at 147: 22-23; 148: 1-23.)  Dees further admits that he cannot recall ever missing guard duty because of a work obligation.  (Dees Depo. at 149: 6-15).  Dees also claims that Prater told a co-employee to falsely state that Dees created a hostile work environment after there was a breakdown in production.  (Dees Depo. at 149: 21-23; 150: 1-23; 151: 1-23; 152: 1-23; 153: 1-23; 154: 1-4).  However, Dees admits that he was not disciplined or written up for this incident.  (Dees Depo. at 154: 5-8).

Dees faults Applegate for his support of Prater.  (Dees. Depo. at 98:12-23; 99: 1-11, 19-22).  However, Dees alleges that the worst thing Applegate said to him was a comment about "partying" while on guard duty.  (Dees Depo. at 142; 8-21).  Applegate did not demand military orders from Dees, and there is no other evidence that Applegate directly "harassed" Dees.  (Dees Depo. at 99: 23; 100: 1-2).

Dees also alleges that he was required (by Prater) to clean "the pit" in order to "harass" him.  (Complaint, ¶ 9.f.).  "The pit" is actually at least two areas under each stamping press at the

HMMA plant through which scrap metal is move on a conveyor to an area where it is crushed and sold for scrap. (Dees Depo. at 156: 2-23; 157: 1-6). Cleaning the pit involved picking up scrap metal that falls off the conveyor. (Dees Depo. at 311: 16-22). Dees believed he had to clean the pit with greater frequency than his co-workers. (Dees Depo. at 159: 13-23; 160: 1-23; 162: 20-23; 163: 1-23: 164: 1-2)). Dees has suggested that cleaning the pit was dangerous, but he could not cite any injuries related to cleaning the pit other than to say he "believed" someone had been, although he could not recall the individual's name. (Dees Depo. at 314: 5-9).

Dees testified he went to Human Resources to complain about harassment related to his military leave on two occasions. (Dees Depo. at 174:20 – 175:3). On one occasion he believes he spoke to Greg Kimble, HMMA's Director of Human Resources. (Dees Depo. at 137: 8-23; 138: 1; Second Warner Decl. at ¶ 33). Although Dees suggests Human Resources did nothing in response, Dees sent an e-mail to Greg Kimble on February 6, 2007 in which he states he had spoken to Human Resources twice previously with "positive results from both meetings," but requested a meeting to discuss apparently more recent issues. (Dees Depo. at Ex. 4). After sending this e-mail, Dees alleged he got no response from Kimble. However, Kimble's lack of response due to the fact that he was on medical leave at that time.[6] (Second Warner Decl. at ¶ 33).

Dees' allegations concerning Prater's demands for copies of military orders was addressed by Applegate. Applegate testified that Dees spoke to him about this issue and that he spoke to Team Relations.[7] (Applegate Depo. at 19: 6-23; 20: 1-9). Applegate stated that Team Relations confirmed that verbal confirmation of orders was sufficient, which he explained to

---

[6] Kimble has been on medical leave since January 12, 2007. (Second Warner Decl. at ¶ 33).
[7] HMMA's Team Relations Department serves as a regular resource for all Team Members and assists in workplace investigations.

Prater. (*Id*.). Dees was never disciplined for not providing written copies of his military orders. (Dees Depo. at 147: 22-23, 148: 1-23).

      F.      **HMMA's Termination of Dees for Sleeping During Working Hours**

      The following is a summary of the undisputed facts which led to Dees' termination of employment.

      1.      <u>**Dees' Misconduct and Investigation**</u>

      As set forth in his written statements, and as confirmed in his deposition, Jim Brookshire, Stamping Production Manager,[8] observed Dees sleeping in a chair on the third floor level at approximately 1:00 a.m. on the morning of February 14, 2007. (Declaration of Rob Clevenger, attached to Evid. Sub. as Exh. G, *see* Attachments A and B contained therein).[9]

      Brookshire observed Dees located on the third floor, sitting in a chair next to a control cabinet. (Clevenger Decl., Attachment A). According to Brookshire, Dees had his head down and his legs extended. (Brookshire Depo., 123: 3-10; 129: 11-12). Brookshire estimated that he observed Dees in this position for approximately 2 minutes. (Brookshire Depo., p. 129: 1-2). Brookshire states he was as close as 15-20 feet from Dees. (Brookshire Depo., p. 120, 9-13). While observing Dees, Brookshire "squelched" his radio to alert Dees and Dees did not move. (Brookshire Depo., 124: 1-23).

      Although Dees' Complaint suggests Prater had Brookshire falsely accuse him of sleeping, Dees has no evidence to support this allegations. Indeed, Dees has admitted he has no personal knowledge in this regard. (Dees Depo., at 193:19 – 194:15; 197:12 – 198:1). Furthermore, when asked about Brookshire, Dees testified:

      Q.      Did you know Jim Brookshire well?

---

[8] As noted above, Dees worked in maintenance and did not report to Brookshire.
[9] HMMA acknowledges that Dees disputes Brookshire's account that he was asleep.

A.    He was -- Yeah.  Working with him every day near about.

Q.    Okay.  Did you ever have any problems with him?

A.    No.  Not like with everyone else, no.

(Dees Depo. at 228: 6-13).

Brookshire first reported his observation of Dees asleep on the job to Kevin Hughes, Dees' Team Leader, and to Brookshire's own supervisor, Craig Stapley, as well as Dees' supervisor, Greg Prater, the next day.  (Brookshire Depo. at 14: 6-14).  The matter was then turned over to Team Relations.

HMMA's Team Relations department is responsible for, among other things, overseeing the investigation of potential disciplinary issues involving Team Members. (Clevenger Decl., ¶ 3).   The investigation regarding Dees was overseen by Rob Clevenger, Assistant Manager for Team Relations.   (*Id*. at ¶¶ 4, 5).   In connection with Team Relations' investigation, both Brookshire and Dees were interviewed and their respective version of events were reduced to written form.  (Clevenger Decl. at ¶¶ 5, 6, 7 and Attachments A, B, C).

## 2.    The Termination Committee Meeting

At HMMA, if an individual is found to be purposely sleeping on the job, that Team Member is subject to termination under the Serious Misconduct Policy.  (Warner Depo. at 190: 20-23, 191: 1-2).  HMMA has a committee designated to decide discipline cases that may result in termination (hereinafter "Termination Committee").  (Warner Depo. at 171:  15-17).

The Termination Committee that considered the Dees incident consisted of Ms. Warner, John Kalson (Vice President for Production), John Applegate (Dees' Department Manager), Scott Gordy (Employment Department, Assistant Manager), Rob Clevenger (Assistant Manager, Team Relations), and Rick Neal (Vice President and General Counsel).  (*See* Clevenger Decl., at

¶ 9 and Attachment E).  Neal was present to provide legal advice and was not involved in the decision-making process.  (Warner Depo. at 171: 6-13).

This particular termination committee met on February 26, 2007.  (Clevenger Decl. at ¶ 9 and Attachment E).  Three days before the termination committee meeting, Clevenger prepared a Team Relations Memo that summarized the findings of the investigation, the discipline recommendation (i.e., termination), and relevant past practice regarding similar acts of misconduct.  (Clevenger Decl. at ¶ 8 and Attachment D).

At the Dees' Termination Committee meeting, Clevenger presented his written summary, as well as the statements that had been collected, to the committee.  (Clevenger Decl. at ¶ 9 and Exhs. A – D).  Clevenger also provided the Termination Committee with Plant Engineering's recommendation that Dees' misconduct result in termination of employment.  (*Id*. at ¶ 8).  This recommendation was based on Brookshire's statements, the fact the area where Dees was observed (by Brookshire) is an area isolated and suggestive of intent to sleep.  (*Id*.).  Further, Dees' statement contained inconsistencies with other evidence gathered in the investigation and suggested a lack of concern regarding his job.  (*Id*.).  The past practice presented to the Committee consisted of another Team Member (i.e., Ontario King) who was discovered intentionally sleeping on the job and was terminated as a result.  (*Id.* and Attachment D).

The information and statements received by Team Relations, including information received from Dees, contained no reference to Dees as a member of the uniformed services.  (*Id.* at ¶ 11).  The fact that Dees was a member of the uniformed services was not discussed at all at the Termination Committee meeting and was not a basis or motivating factor related to the

discussion, analysis, or decision regarding Dees' termination.[10]  (*Id.*).  In fact, Wendy Warner had no knowledge that Dees was in the uniformed service.  (Warner Depo. at 210, *passim*).

Based on the information presented, the Termination Committee concluded that termination was the appropriate action to take in this case.  The Termination Committee based its decision based solely on the facts presented related to Dees' sleeping on the job.  (Second Warner Decl., ¶ 14).  As noted above, intentionally sleeping on the job was deemed by the Termination Committee to be a violation of HMMA's Serious Misconduct Policy and warranted the penalty of termination.  (Second Warner Decl., ¶ 14).

Dees testified in his deposition that he had no evidence that his uniformed service was considered in the termination process or that his uniformed service could have been an issue otherwise with the exception of his belief that it "seemed" that way because "every bit of it stemmed from my prior duty commitment.  Everything stemmed around my drill weekends." (Dees Depo. at 223: l, 9-18).  However, Dees admitted that he did not know a meeting had taken place and he had no information as to who participated.  (Dees Depo. at 224: 9-13, 21-23; 225: 1-3; 226: 1-3).  Dees also admitted he had no idea who made the decision to terminate his employment.  (Dees Depo. at 177: 4-7).

### 3.     Termination Decision Communicated to Dees

On February, 26, 2007, Warner met with Dees to communicate the termination decision and provide him with a termination letter.  (Second Warner Decl. at ¶ 26).  The letter states that Dees was "found by a member of HMMA management, in the third floor overhead sleeping." (Termination Letter "Term Letter" attached to Evid. Sub. at Ex. P).  The letter further states that

---

[10] Indeed, Ms. Warner testified at the time she conducted Mr. Dees' termination meeting, she did not know he was a member of the military.  (Warner Depo. at 210, *passim*).  Ms. Warner further testified she was the "person in charge" at the Termination Committee meeting.  (Warner Depo., at 214: 9-12).

such action is considered a violation of HMMA's Serious Misconduct policy, and that Dees' employment would be terminated, effective immediately. (*Id.*)

This termination meeting took place at HMMA's security building, which is consistent with manner in which HMMA handles all Team Member terminations. (Warner Depo. at 207: 5-19).

### G.    Dees' Outrage Allegations

Dees relies upon "harassment" outlined above to form the basis of his outrage claim. (*See* Complaint, ¶ 27). However, Dees' own deposition testimony reveals that he did not suffer "severe emotional distress" as a result of this conduct. For instance, Dees testified he never sought counseling or help for emotional distress because he said he was a "soldier" and because he did not "have time to talk to nobody." (Dees Depo. at 254: 4-10). He further states he never cried and only lost sleep for a few nights. (Dees Depo. at 254:15-23; 255: 1-10). Dees also testified he has had problems with the fact the he has to tell potential employers Dees was terminated. (Dees Depo. at 255: 11-17). In general, there is no evidence of any severe emotional distress.

Dees fails to suggest any facts upon which one could conclude that HMA, as distinct from HMMA, was involved in or could be liable under his outrage theory except to the extent he argues that HMA and HMMA are "alter egos," a theory for which Dees has no factual or evidentiary support and for which Defendants have provided evidence to the contrary.

### H.    Dees' Conversion Allegations

Dees alleges that at the time of his termination his personal belongings were "confiscated." (Complaint, ¶ 29). Dees testified that his locker contained a jacket, an mp3 player, personal tools, two or three military pay stubs, and handwritten notes in his HMMA

locker at the time his employment was terminated.  (Dees Depo. at 305: 10-23; 306: 1).[11]

HMMA returned his jacket and mp3 player to Dees at the time of his termination.  (Dees Depo. at 96: 2-3; 104: 3-4, 23105: 1-2).  Dees' co-worker returned his personal tools to him.  (Dees Depo. at 256: 16-23; 257: 1-16).  Therefore, at most the personal belongings Dees alleges were taken were several pages of handwritten notes[12] and two or three military pay stubs.  Dees believes that Prater took these items, but offers no evidence to confirm this suspicion.  (Dees Depo. at 95: 19-23; 96: 1-4).

Dees realized that these items were missing when Greg Prater returned Dees' jacket in the Maintenance Shop before Dees' met with Wendy Warner when the termination was conducted.  (Dees Depo. at 111: 4-8; 113: 7-11).  Despite his belief that these items had not been returned to him, Dees testified that he did not mention to Wendy Warner that his notes were missing from his jacket or that any specific items had not been returned.  (Dees Depo. at 111: 15-23; 112: 1-8). Dees presents no evidence that anyone at HMMA was aware that Prater took the notes and stubs or ratified Prater's actions.  Indeed, Wendy Warner testified that it is her custom during the termination process to ask whether employees have personal belongings that need to be returned.  (Warner Depo. at 221: 4-6, 14-23; 222: 1-4: 4; Second Warner Decl. at ¶¶ 25, 29).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper under Federal Rule of Civil Procedure 56(c) where the movant shows there is no genuine issue of material fact and that, based upon the undisputed

---

[11] Dees also reviewed a list of smaller items that were his locker at the time of his termination and that were provided to Dees at his deposition.  (Dees Depo. at 301: 4-23; 302: 1-17).  However, Dees stated that these items did not belong to him.  (Dees Depo. at 302:15–17).

[12] Dees testified that the notes only were "[p]robably two or three" pages.  (Dees Depo. at 305: 21-23).

facts, it is entitled to judgment as a matter of law. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; see Fed.R.Civ.P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex,* 477 U.S. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (citations omitted); *accord Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in her favor. *Anderson,* 477 U.S. at 255. However, the court is only required to resolve reasonable doubts in the non-movant's favor; it is not required to resolve all doubts in his favor. *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995);

17

*Barnes v. Southwest Forest Ind., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987); *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

IV.    **ARGUMENT**

    A.    **HMA Was <u>Not</u> Dees' "Employer" as Defined Under USERRA and Is Therefore Not Liable to Dees**

        Dees' claims against HMA should be dismissed as a matter of law because HMA did not employ Dees and had no involvement or input in any decisions regarding his employment or termination. The undisputed facts demonstrate that Dees was not and has not ever been an employee of HMA. (First Warner Decl. at ¶¶ 10-13; Second Warner Decl. at ¶¶ 4-6; Parker Depo. at ¶ 6). HMA never paid a salary or wages for work performed to Dees and HMA never controlled Dees' employment opportunities. (Parker Decl. at ¶¶ 7-8). Further, HMA had <u>no</u> involvement, influence, or control in the decision to retain or terminate Dees or any other decision regarding his employment. (Parker Decl. at ¶ 9). Accordingly, HMA was not Dees' "employer" for purposes of 38 U.S.C. § 4303 and, therefore, cannot be liable to Dees given that USERRA allows for liability in the denial of "initial employment, reemployment, retention in employment, promotion, or any benefit of employment <u>by an employer</u>" and prevents discrimination only by an "employer." 38 U.S.C. § 4311(a) & (b) (emphasis added).

        Dees makes no allegations to suggest that he had any employment relationship with HMA, or any other relationship sufficient for liability under USERRA. His only connection to HMA was that he was an HMMA employee and HMA is the single member of HMMA's limited liability company. Barring further evidence of HMA's involvement, HMA should be dismissed as a matter of law.

        The undisputed facts indicate that no HMA employee played any role in the decision to terminate Dees' employment. The individuals who attended the termination committee that

considered evidence pertaining to Dees' termination, and those members of the termination committee who ultimately decided to terminate Dees, were all HMMA employees. (Second Warner Decl. at ¶¶ 9-10)). Therefore, the only way Dees could recover damages from HMA, under an alternate theory, is by demonstrating that HMA and HMMA should be treated as either a single or joint employer. *See Lyes v. City of Riviera Beach, Florida*, 166 F.3d 1332, 1341-42 (11th Cir. 1999). The predominant trend in discrimination actions to determine whether two or more businesses should be treated as a single or joint employer is to apply the standards promulgated by the National Labor Relations Board ("NLRB"). *See Lyes*, 166 F.3d at 1341-42; *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987) (citations omitted). The NLRB factors are: (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *See Lyes*, 166 F.3d at 1341. While each of the NLRB factors is "indicative of interrelation and while control over the elements of labor relations is a central concern, ... the presence of any single factor in the Title VII context is not conclusive." *Lyes*, 166 F.3d at 1341 n.5 (citing *Ambruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983).

The centralized control of labor relations prong of the NLRB test is the most critical of the four. *See Fike*, 514 F. Supp. at 727. To satisfy this prong, Dees needs to show more than a parent's broad general policy statements regarding employment matters of the subsidiary. *See Frank*, 3 F.3d at 1363. Rather, Dees must show the parent's day-to-day actual and active control of the subsidiary's employment decisions. *See id.* "It is well settled that the 'control' required to meet ... [this prong] is not potential control, but rather actual and active control of day-to-day labor practices." *Fike*, 514 F. Supp. at 727 (emphasis added). The critical inquiry under this

19

prong is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir. 1983).

Notwithstanding Dees's attempt to add HMA to this dispute, no facts exist to support a claim that HMA played any role in the matters at issue. Significantly, all of the people involved in the decision to terminate Dees' employment are HMMA employees. *See Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998) (rejecting single or joint employer theory because condominium association played no role in adverse employment decision and "made no decisions that affected the terms and conditions of [plaintiffs] employment ...").

Dees offers no evidence to show that HMA controls HMA actual day-to-day implementation of policies. The evidence does not show that HMA exercises a degree of control that exceeds the control normally exercised by a parent corporation that is separate and distinct from its subsidiary. *See Fike*, 514 F. Supp. at 727.

Application of the NLRB factors in this case does not reveal the highly integrated ownership and operations which is necessary to find single or joint employer status. *See Lyes*, 166 F.3d at 1341-42; *McKenzie*, 834 F.2d at 933. Accordingly, Dees' claims against HMA are due to be dismissed.

**B.    Dees' Termination Claim Under USERRA Fails as a Matter of Law**[13]

Congress enacted USERRA in 1994 to "prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a)(3). USERRA provides that "[a] person who is a member of … or has an obligation to perform service in a uniformed service shall not be denied … retention in employment … by an employer on the basis of that

---

[13] As discussed in Section IV.A. herein, HMA did not employ Dees and as such is not a proper party to this lawsuit. Nonetheless, out an abundance of caution and for ease of reference in the remainder of this Brief, all references to HMMA and HMMA will be made by stating "HMMA" as both HMMA and HMA seek summary judgment as to Dees' claims in this present lawsuit.

20

membership … or obligation."  38 U.S.C. § 4311(a), (c)(1); *see also Hill v. Michelin North America, Inc.*, 252 F.3d 307, 311 (4th Cir. 2001).  An employer violates Section 4311 of USERRA "if the person's membership, application for service, or obligation for service in the uniformed services is a <u>motivating</u> <u>factor</u> in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service."  38 U.S.C. § 4311(c) (emphasis added).  As explained by the U.S. Court of Appeals for the Sixth Circuit:

> Section 4311 is a congressional response to the Supreme Court's decision in *Monroe v. Standard Oil Co.*, 452 U.S. 539, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981).  In *Monroe*, the Supreme Court held that USERRA's antecedent, the Vietnam Era Veterans' Readjustment Assistance Act of 1974 ["VEVRAA"] "was enacted for the significant but limited purpose of protecting the employee-reservist against discriminations like discharge and demotion, motivated solely by reserve status."  *Id.* at 559, 101 S.Ct. 2510 (emphasis added).  Congress amended the statute in 1994 to provide that a violation occurs when a person's membership in the uniformed services in a motivating factor, even if not the sole factor.  *See Newport v. Ford Motor Co.*, 91 F.3d 1164, 1167 (8th Cir. 1996) (noting that USERRA was enacted in response to *Monroe* and changed *Monroe's* "sole cause" standard to a "motivating factor" standard.)

*Curby v. Achon*, 216 F.3d 549, 556 (6th Cir. 2000) (emphasis added); *see also Sheehan v. Dept. of Navy*, 240, F.3d 1009, 1012-13 (Fed. Cir. 2001).

"Section 4311 clearly mandates proof of discriminatory motive." *Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005).  Therefore, Dees bears the initial burden of showing *by a preponderance of the evidence* that his military service was "a substantial or motivating factor" in the adverse employment action.  *Id.*; *see also, Sanguinetti v. UPS*, 114 F. Supp. 3d 1313, 1318 (S.D. Fla. 2000) ("To recover under USERRA, a [plaintiff] must initially establish a *prima facie* case of discrimination by showing that his military status was a substantial or motivating factor in the [employer's] decision to terminate").  If Dees

21

successfully bears this burden, the burden then shifts to HMMA to establish by a preponderance of the evidence, that legitimate reasons, standing alone, would have induced HMMA to take the same adverse action.[14]  *Id.* at 1238-39.  Thus, USERRA provides that "even if the prohibited discrimination was a factor, the employer does not violate the statute if 'the employer can prove that the action would have been taken in the absence of [military status]."  *See Sheehan*, 240 F.3d at 1013-14 (citing *National Labor Relations Bd. v. Transportation Management Corp.*, 462 U.S. 393, 400, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983)).[15]

### 1.  Dees' Military Service Was Not A "Motivating Factor" in HMMA's Termination Decision

For Dees to prove that military status was a "motivating factor" in his termination, he must prove that HMMA "relied on, took into account, considered, or conditioned its decision on that consideration."  *Coffman*, 411 F.3d at 1238; *see also Sanguinetti*, 114 F. Supp. 2d at 1318. Here, Dees essentially admitted in his deposition that he has no evidence that his uniformed service was considered during the termination process (or whether his uniformed service could have been an issue otherwise) with the exception of his belief that it "seemed" that way because "every bit of it stemmed from my prior duty commitment.  Everything stemmed around my drill weekends."  (Dees Depo. at 223: l, 9-18).  However, Dees was not aware of the evidence that clearly rules out his uniformed service as being a motivating factor in his termination – Dees did not know the termination committee meeting occurred and he did not know who was on the

---

[14] The burden-shifting under USERRA has been held to be different from that in discrimination cases under Title VII because the Title VII *McDonnell Douglas* framework "does not shift the burden of persuasion to the employer." *Sheehan*, 240 F.3d at 1014-15.

[15] The burden-shifting framework applies in both so-called "dual motive" cases – those cases in which the employer defends on the ground that, even if an invalid reason played a part in the adverse action, the same action would have been taken in absence of the invalid reason – and so called "pretext" cases –where the employer defends on the ground that it acted for a valid reason. *See Coffman*, 411 F.3d at 1239 (citing *Sheehan*, 240 F.3d at 1014).

termination committee.  (Dees Depo. at 224: 9-13; 225: 9–23; 226: 1-3).  Dees' uniformed

service was not discussed during the termination committee meeting. (Clevenger Decl. at ¶ 11;

Second Warner Decl. at ¶ 21). In fact, it appears that the decision-makers may not have known of

his uniformed service.  (Second Warner Decl. at ¶¶ 21, 22).  Indeed, Dees admitted that he did

not even know a meeting had taken place and he had no information as to who participated.

(Dees Depo. at 224:9-13, 21-23; 225:1-3; 226:1-3).

Even so, noting that discrimination is seldom open or notorious, the Eleventh Circuit has

recognized that circumstantial evidence plays a critical part in USERRA cases.  *Coffman,* 411

F.3d at 1238 (*citing Sheehan*, 240 F.3d at 1014).  The *Coffman* Court held that discriminatory

motivation under USERRA can be inferred from a variety of considerations such as: (1)

proximity in time between employee's military activity and the adverse employment action; (2)

inconsistencies between the proffered reason and other actions of the employer; (3) employer's

expressed hostility toward members protected by the statute, together with knowledge of the

employee's military activity; and (4) disparate treatment of certain employees compared to other

employees with similar work or offenses.  *Id*.  As discussed below, examining each of these

factors reveals that Dees fails to establish that HMMA had the requisite discriminatory animus

when it terminated his employment for sleeping on the job.

### a.    Proximity in time

Here, the "proximity in time" argument is arguably inapplicable.  Although Dees

suggests he continued to be harassed by Prater, and that the he was harassed by Applegate (or

that Applegate was complicit in Prater's actions) and that he received no help from the Human

Resources Department, until shortly before his termination, this argument is irrelevant given that

none of the individuals against whom he complains were decision-makers with respect to his

termination.  Indeed, Prater did not attend the termination committee meeting and Applegate was not a decision-maker.  (Applegate Depo. at 55: 19-23; 56: 1-15; 58: 22-23; 59: 1-17; 67: 14-23; 68: 1-20.)[16]  Dees has not suggested any harassment or discrimination on the part of any other termination committee members.

Furthermore, Dees' arguments that he was harassed or discriminated against as a result of his uniformed service are illogical on other factual grounds.  Dees' complaints center around his relationship with his supervisor, Greg Prater.  Dees himself admits that Prater was a member of the military.  (Dees Depo. at 68: 16-18; 124: 16-23; 125: 1-7; 139: 10-23; 140: 1-14).  Further, Warner testified her understanding that Prater was formerly in the military.  (Warner Depo. at 274: 23; 275: 1-5; Second Warner  Decl. at ¶ 32).  To suggest Prater had anti-military animus given his own record of military service makes no sense.  *See, e.g., Elrod v. Sears*, 939 F.2d 1466, 1471 (11th Cir. 1991) (ADEA case; recognizing strong presumption against discrimination when those accused of discrimination were also within the protected class).

Similarly, by Dees' own testimony, HMMA knew he was a member of the military when he was hired in 2005.  (Dees Depo. at 70: 2-23; 71: 1-23; 72: 1-9; 76: 3-22).  Perhaps even more devastating to Dees' claims, Prater knew of Dees' military status when Dees was "first hired on." (Dees Depo. at 127: 6-23; 128: 1-23.).  Over the course of his employment at HMMA, Dees took a  number of military leaves without incident, before his problems began in Fall 2006.  (See, Dees Depo., 103: 3-9; 127: 6-16; and Ex. 8).  Also, Dees received salary increases while at HMMA—he testified he made $19.56 per hour when he started and was earning $23.35 per hour at the conclusion of his employment. (Dees Depo. at 30: 11-17).  *See Daggett v. Chicago Transit Authority*, 1998 WL 831843 at * 10 (N.D. Ill. 1998) (holding that even when plaintiff was

---

[16] Applegate testified it is outside Prater's authority to terminate a Team Member.  (Applegate Depo. at 68: 7-20).

terminated the day prior to his military obligations, the *prima facie* case was not established because plaintiff's prior military leaves "negat[ed] any suggestion that defendant had an animus towards plaintiff's military status and his obligations relating thereto.").[17]  As discussed below, only when HMMA believed that Dees had slept during work hours did it terminate his employment.

### b.    There are no inconsistencies in HMMA's reason for terminating Dees' employment.

There is no dispute as to the reason that HMMA terminated Dees: HMMA had an honest, good faith belief Dees was seen asleep during work hours.  Specifically, as stated above: (1) Brookshire, a member of management, witnessed Dees sleeping and reported this misconduct; (2) an investigation was conducted by Team Relations, including statements being taken from both Dees and Brookshire; and (3) HMMA's termination committee deliberated and concluded that Dees was intentionally sleeping during work hours. (Second Warner    Decl. 13-14; Brookshire Depo. at 13: 23; 14: 12–15; 16: 7-14, 23; 17: 1-4; Clevenger Decl. at 2, ¶¶ 4, 5, 6). "Sleeping on the job is without a doubt a legitimate, non-discriminatory reason for discharging employees." *McKie v. Miller Brewing Co*., 1992 WL 150160 *4 (M.D. Ga. March 16, 1992).[18] Dees' self-serving denial of the statement that he was asleep at work is not enough to create a genuine issue of material fact. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1991) (Self-serving conclusory allegations will not defeat properly supported motion for summary judgment).  While Dees quarrels with whether he was, in fact, sleeping during his shift, and whether his employment should have been terminated, his dispute is legally insufficient to establish that HMMA's decision was based on his military status. *See Byer v. DTG Operations,*

---

[17] A copy of this opinion is attached to Evid. Sub. as Ex. J.
[18] A copy of this opinion is attached to Evid. Sub. as Ex. O.

*Inc.*, 2007 WL 2746619 *8 (S.D. Fla. September 18, 2007) (court granted employer's summary judgment on plaintiff's ADEA claim where evidence shows that employees and managers observed plaintiff sleeping on the job)[19]; *see also*, *Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir. 2002) (finding it is well established in the Eleventh Circuit that "the factual issue to be resolved is not the wisdom or accuracy of [an employer's] conclusion" that an employee's termination is justified).

Additionally, Dees will likely point to Jim Brookshire's <u>subsequent</u> medical and/or psychological condition[20] as evidence that HMMA should have not have believed Dees was asleep on the job or that Brookshire otherwise lacked credibility. However, any efforts to discredit Brookshire's reporting of Dees sleeping on the job are misplaced because HMMA had a good faith belief in Brookshire's statements. *See Jones v. Gerwins*, 874 F.2d 1534, 1540 (11th Cir. 1989) ("The law is clear that, even if a … claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any *prima facie* case of disparate treatment by showing that it honestly believed the employee committed the violation.") It is well-settled in the Eleventh Circuit that "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999); *EEOC v. Total Systems Services, Inc.*, 221 F.3d 1171, 1175 (11th Cir. 2000) ("an employer is entitled to rely on its good faith belief about falsity, concealment, and so forth in an internal investigation and can properly discharge an employee who it believes has lied in an internal investigation") (internal citations omitted); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)

---

[19] A copy of this opinion is attached to Evid. Sub. as Ex. K.

[20] Brookshire failed a drug test, in connection with a post-accident screen, in late March 2007. (Brookshire Depo. at 48: 15-19). This was approximately six (6) weeks after Brookshire observed and reported Dees' misconduct.

(proper inquiry is whether the employer in good faith believed that the employee had done wrong and whether this belief was the reason for the termination).

There is no evidence to suggest that HMMA had any reason to doubt Brookshire's credibility at the time of Dees' termination.  There is no evidence that Brookshire failed a drug screen at HMMA previously, despite the fact that Brookshire was required to take one at the time he was hired.  (Brookshire Depo. at 72: 23; 73; 1-2).  The only evidence shows that Brookshire never used drugs or alcohol on HMMA property and was never under the influence of drugs or alcohol on HMMA property.  (Brookshire Depo. at 47: 1-2; 179: 11-14; 180: 5-9).  The Termination Committee had no reason to doubt Brookshire's credibility or suspect that Brookshire was using drugs when he saw Dees sleeping. Indeed, there is no evidence that Brookshire had any substance abuse issues during the investigation period, at the time of termination, or for some time after Dees' termination.

Not only was Brookshire's report was credible, Dees admitted he had no problems with Brookshire.  (Dees Depo. at 228: 5-23).  Brookshire did not attend the termination committee meeting; his only involvement stems from his initial report of Dees' sleeping to Team Relations. (Clevenger Decl. at ¶ 9).  On behalf of the Team Relations Department, Clevenger reported its finding that Dees was sleeping at work to the termination committee, which made the decision to terminate Dees' employment. (Second Warner Decl. at ¶ 13-22).  HMMA's reason for terminating Dees' employment has not changed: it did so because he was asleep at work. Therefore, Dees cannot prove his military status was a motivating factor in the decision.

27

c.    **HMMA did not express hostility toward members of the uniformed service protected by the statute**

There is no evidence that anyone at HMMA expressed hostility toward members of the uniformed service, with the exceptions of Dees' allegations concerning Prater's actions and Applegate's alleged comments, which have been addressed above.  Even if Prater or Applegate possessed some animus toward Dees, the fact that they were not involved in the ultimate decision to terminate Dees diminishes any argument that animus on their part contributed to the adverse employment action.  *See Sanguinetti*, 114 F.Supp.2d at 1319 (summary judgment granted where a plaintiff's supervisor, who plaintiff claimed harassed him because of plaintiff's military service, was not involved in the adverse employment decision at issue).  Also, circumstantial evidence of discrimination under this analysis requires that the express hostility be coupled with knowledge of the employee's military activity.  As argued previously, the termination committee had no such prior knowledge.

Any "alleged hostility" argument is further negated by the undisputed facts that HMMA's policies expressly provide for military leave and recognize military service as a protected activity under the Company's equal employment opportunity statement.  (Handbook).

d.    **Dees' termination for sleeping at work is consistent with HMMA's past practice**

The only evidence of disparate treatment of certain employees compared to other employees with similar work or offenses relevant to this case is the termination of Ontario King. As with Dees, it was determined that King was intentionally sleeping during working hours and his employment was terminated.  (Second Warner Decl. at ¶ 15; Warner Depo. at 268: 18-23; 269: 1-23; 270: 1-10; Clevenger Decl. at Attachment D (past practice)).  Accordingly, given the identical treatment for similar offenses, disparate treatment is not an issue.  Dees has offered no

28

evidence that any other Team Member accused of substantially similar misconduct was given lesser discipline.

### 2. HMMA Would Have Terminated Dees Regardless of His Military Status

As set forth above, Dees cannot state a *prima facie* case under USERRA.  However, even assuming for the sake of argument that Dees had established the requisite elements, HMMA still prevails under USERRA because a preponderance of the evidence demonstrates that it would have terminated Dees' regardless based upon its good faith belief that he had been intentionally sleeping during work hours.  *See* 38 U.S.C. § 4311 (c)(1).  "While the standard here requires more than a simple articulation of a legitimate non-discriminatory reason for its decision, '[t]ypically, the defendant satisfies this burden by presenting objective evidence as to its probable decision in the absence of any impermissible motivation.'"  *Daggett*, 1998 WL 831843 at *10[21] (quoting *Chance v. Dallas Co. Hosp. Dist*., 1998 WL 177963, *3 (N.D. Tex. 1998).[22]

Here, the evidence unequivocally demonstrates that HMMA terminated Dees because it believed he was sleeping on the job.[23]  HMMA relied upon objective evidence and past practice in deciding to terminate Dees at the termination committee stage.  Notably, the ultimate decision-makers with respect to Dees' termination were unaware of his military record.  Further, even if Dees' uniformed service status had been raised in the course of the termination committee

---

[21] *See* Ex. J.

[22] A copy of this opinion is attached to Evid. Sub. as Ex. L.

[23] Out of an abundance of caution, HMMA points out that Dees' employment was subject to the at-will doctrine and it was free to terminate Dees' employment at any time for any reason because the presumption exists in Alabama that an employment relationship of indefinite duration is "at the will of either party." *See Wesson v. Huntsman Corp*., 206 F.3d 1150, 1154-55 (11th Cir. 2000) (citing *Wright v. Dothan Chrysler Plymouth Dodge, Inc*., 658 So.2d 428, 430 (Ala. 1995).

process, he would have been terminated without regard to his uniformed service, which was ultimately irrelevant to the analysis. (Second Warner Decl. at ¶ 22).

Accordingly, Defendants cannot be held liable, because HMMA would have made the same decision to terminate Dees' employment regardless if it had or had not considered Dees' military status. *See Smith v. School Board of Polk County, Fla.*, 205 F. Supp. 2d 1308, 1315 (M.D. Fla. 2002) (finding that plaintiff had not adequately completed a required program as legitimate non-discriminatory reason for not recommending plaintiff for principal position; *see also Fink v. City of New York*, 129 F. Supp. 2d 511, n. 2 (E.D.N.Y. 2001) (noting that "it is not sufficient to find that an employment decision was simply wrong" and that it is not proper to second guess business decisions just because the trier of fact disagrees with them).

Dees, therefore, has failed to establish that his military status was a motivating factor in the decision to discharge him. Because Dees has failed to establish the threshold elements of a USERRA claim, summary judgment should be granted in favor of Defendants. *See Curby v. Archon*, 216 F.3d 549, 556-57 (6th Cir. 2000) (affirming summary judgment for defendants where plaintiff did not meet his burden of showing that his military service was a motivating factor in the employment action at issue); *Sanguinetti*, 114 F. Supp. 2d at 1319 ("[S]ince plaintiff has failed to present a prima facie case of discrimination based upon his military obligations, summary judgment is granted in favor of defendant on plaintiff's USERRA claim."); *Barreto v. ITT World Directories, Inc.*, 62 F. Supp. 2d 387, 392 (D.P.R. 1999) (granting summary judgment for employer in USERRA action where there was "no evidence indicative that plaintiffs military status was a motivating factor for his dismissal."); *Palmatier v. Michigan Dept. of State Police*, 981 F. Supp. 529, 533 (W.D. Mich. 1997) (granting summary judgment in favor of defendants where "[t]he record is devoid of evidence that plaintiffs military involvement was 'a substantial

or motivating factor' in the minds of defendants ... as they participated in the decision [at issue].").

**C.    Dees' USERRA Harassment Claim Fails as a Matter of Law**

       **1.    Harassment is not a cognizable claim under USERRA**

USERRA prohibits the denial to members of the uniformed service of "initial employment, reemployment, retention in employment, promotion, or <u>any benefit of employment</u> by an employer." 38 U.S.C. § 4311(a) (emphasis added). The statute does not specifically prohibit an employer from subjecting an employee to harassment or a hostile work environment due to the employee's uniformed service. A "benefit of employment" contemplates benefits of a nature altogether different than the "benefit" claimed by Dees in this case and is defined as:

> any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. § 4303(2).

If Congress intended to provide protection to members of the uniformed services from harassment, it would have included such a provision in the statute. Moreover, USERRA's legislative purpose does not support a claim for harassment. Indeed, Congress did not enact USERRA primarily "to combat an ignorant or vicious stereotyping of [members of the armed services] as undependable employees" but intended only "to encourage people to join" the armed services. *Velasquez v. Frapwell*, 160 F.3d 389, 392 (7th Cir. 1998), *vacated in part on other grounds*, 165 F.3d 593 (1999) (citing *Monroe v. Standard Oil Co*., 452 U.S. 549 (1981). As this Court has recognized, "USERRA's primary focus is not on negative opinions of certain

31

groups but on the reality that employers may not want to hire employees who, as members of the armed services, could frequently be absent for long periods of time." *Dees v. Hyundai Motor Mfg. Alabama*, LLC, ___ F.Supp.2d ___, 2007 WL 4215884 * 2 (M.D.Ala. November 30, 2007)[24] (*citing* 38 U.S.C. § 4301(a)).   A review of USERRA's goals, which include "encourag[ing] noncareer service in the uniformed services by eliminating or minimizing the disadvantage to civilian careers and employment which can result from such service" and "minimize[ing] the disruption to the lives of persons performing service in the uniformed services as well as to their employers," also do not reveal any specific protections from harassing conduct. *Id.*

While some district courts in other circuits have held that hostile work environment claims are cognizable under USERRA, no federal circuit courts have so held and the Eleventh Circuit and its district courts have yet to recognize such a claim.[25]   The few courts that have found cognizable hostile work environment claims under USERRA have relied upon precedent established by the Merit Systems Protection Board ("MSPB") in *Peterson v. Department of Interior,* 71 M.S.P.R. 227 (M.S.P.B. 1996).   However, other courts have not found the MSPB decision persuasive against a lack of precedent from the Supreme Court or federal circuit court decisions. *Church v. City of Reno*, 1999 U.S. App. LEXIS 2068 (9th Cir. Nev. Feb. 9, 1999)[26]; *see also Figueroa Reyes v. Hosp. San Pablo del Este*, 389 F. Supp. 2d 205 (D.P.R. 2005).

---

[24] A copy of this opinion is attached to Evid. Sub. as Ex. M.

[25] Without addressing whether USERRA provides a claim for harassment, the Seventh Circuit found that plaintiff firefighters' own conclusory statements of alleged harassment alone were insufficient to establish a claim of harassment. *See Miller City of Indianapolis*, 281 F.3d 648, 653 (7th Cir. 2002) (affirming employer's summary judgment pursuant to doctrine of laches and recognizing that any harassment claims must be supported by evidence that conduct was sufficiently severe and pervasive to alter the conditions of employment and create an abusive work environment).

[26] A copy of this opinion is attached to Evid. Sub. as Ex. N.

32

Based on the fact that no court in this Circuit has found a hostile work environment claim cognizable under USERRA, and given that the statute does not specifically allow for such a claim, Dees' USERRA harassment claim fails and Defendants are entitled to judgment as a matter of law.

### 2.    The Alleged Harassment Was Not Severe and Pervasive

Assuming *arguendo* that this Court finds a harassment claim cognizable under USERRA, Dees' cannot meet his burden to prove the conduct of which he complains is severe and pervasive so as to establish a valid claim.  To assert a hostile work environment claim under an analogous federal statute, such as Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e to 2000e-17 (1994 & Supp. 2003), a plaintiff must show that he was subjected to severe and pervasive harassment that materially altered the conditions of his employment.  *See Baldwin v. Blue Cross Blue Shield of Ala.*, 480 F.3d 1287, 1301 (11th Cir. 2007) (setting forth *prima facie* case for harassment pursuant to Title VII).  Courts determine whether an environment is sufficiently and objectively hostile or abusive by looking at all the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Even assuming that Dees' testimony concerning harassment or discrimination are taken as true, such allegations are not severe and pervasive enough to sustain a hostile work environment claim.  *See e.g., Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003) (finding that a disabled employee who was told by her employer that "she better get better

33

this time" and that he would "no longer tolerate her health problems" was not subjected to a hostile work environment under the ADA); *McConathy v. Dr. Pepper/Seven-Up Corp.*, 131 F.3d 558, 564 (5th Cir. 1998) (finding that an employer's boorish behavior toward an employee regarding the slow pace of the employee's recovery from a disease, his reassignment of work away from her, and his insensitivity toward her need from surgery and time to recuperate was not sufficient as a matter of law to state a claim of hostile environment harassment); *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1247 (11th Cir. 1999) (en banc) (no sex-based hostile work environment where male supervisor (1) told female employee he was "getting fired up;" (2) rubbed his hip against employee's hip while smiling and touching her shoulder; (3) twice made a sniffing sound while looking at employee's groin area; and (4) constantly followed employee and stared at her in a very obvious manner), *cert. denied,* 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000); *Hill v. Winn-Dixie Stores*, 934 F.2d 1518, 1527 (11th Cir. 1991) (affirming district court's grant of judgment notwithstanding the verdict because evidence of reprimands, criticism, and supervisor's withdrawal of support was insufficient to prove constructive discharge, especially in light of employer's efforts to remedy the situation after plaintiff's resignation); *Wardell v. Sch. Bd. of Palm Beach County*, 786 F.2d 1554, 1557-58 (11th Cir. 1986) (reversing as clearly erroneous the district court's finding of sex-based constructive discharge where female plaintiff was passed over for promotion in favor of less experienced male and was assigned extra duties).

Indeed, Dees' complaints that Applegate told Dees to "focus on his job," that Applegate gave Prater more respect for Prater's role in the military, and that Prater was Applegate's "boy" do not rise to actionable harassment under any statute. (Dees Depo. at 141:1-15; 142: 1-21) Courts have held that similar conduct, including shunning or ostracism by co-workers and

supervisors is insufficient to sustain a harassment claim. *See Wu v. Thomas,* 996 F.2d 271, 273 n. 3 (11th Cir. 1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994) ("we cannot find any case that clearly established that retaliatory harassment, as opposed to sexual or racial harassment, could violate Title VII where the employer caused the employee no tangible harm, such as loss of salary, benefits or position");  *see also Williams v. City of Kansas City*, 223 F.3d 749, 754 (8th Cir. 2000) (supervisor's "silent treatment is at most ostracism, which does not rise to the level of an actionable adverse employment action"); *Munday v. Waste Management of North America, Inc.,* 126 F.3d 239, 243 (4th Cir. 1997), *cert. denied*, 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998) (yelling at the employee and telling others to ignore and spy on her does not constitute an adverse employment action); *Metclaf v. Metropolitan Life, Inc*., 961 F.Supp. 1536, 1544 (D. Utah 1997) ([b]eing treated "almost contemptuously" by fellow employees, the "isolation treatment," and publicly criticizing an employee's work performance without just cause does not constitute adverse employment action by an employer); *Scusa v. Nestle USA Co., Inc*., 181 F.3d 958, 969-70 (8th Cir. 1999) ("general allegations of co-worker ostracism" are not actionable); *Reynolds v. Golden Corral Corp*., 106 F.Supp.2d 1243, 1255 (M.D. Ala. 1999) (shunning and not speaking to the plaintiff did not support harassment claim); *Kortan v. California Youth Auth*., 217 F.3d 1104, 1112 (9th Cir. 2000) (finding that a supervisor who reacted plaintiff's complaint about him by being less civil, staring at her in a hostile fashion, and being more critical of her performance did not constitute an adverse employment action within the meaning of Title VII); *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000) ("[M]ere ostracism by co-workers does not constitute an adverse employment action") (citation omitted); *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir. 1998) (terms and conditions of plaintiff's employment were not affected by co-workers' shunning).

Dees' statements of subjective belief that Prater assigned him to more frequently clean "the pit" likewise do not constitute actionable harassment. *See, e.g., Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1991) (conclusory allegations will not defeat properly supported motion for summary judgment). Applegate testified that this assignment was required for all Dees' co-workers. (Applegate Depo. at 98: 18-22). Additionally, Dees' allegations that harassment was initiated and directed by Prater are negated by the undisputed fact that Prater **also** was a member of the uniformed services. Fair employment statutes, such as Title VII, prohibit harassment "because of" a protected classification of activity. 42 U.S.C. § 2000e-2 to e-3. Here, no reasonable jury could conclude that Prater harassed Dees because of his military service, especially when Prater too was a member of the military. *See Elrod,* 939 F.2d at 1471.

Finally, Dees' harassment clam is barred by the fact that Dees did not take advantage of HMMA's policy that prohibits unlawful harassment and sets forth a reporting procedure.

## D.    Dees' State Law Outrage Claim Fails as a Matter of Law

The burden for proving that HMMA, or its agents or employees, engaged in any activity that constitutes outrage under Alabama law is a high standard that Dees cannot meet.[27] To maintain an outrage claim in Alabama, Dees must show that HMMA's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." *Harrelson v. R.J.,* 882 So.2d 317, 321 (Ala. 2003) (quoting *Thomas v. BSE Indus. Contractors, Inc.,* 624 So.2d 1041, 1044 (Ala. 1993). Indeed, the conduct involved must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and ... be regarded as atrocious and

---

[27] The Alabama Supreme Court has stated that a plaintiff must meet a high standard to prove an outrage claim. *Ex parte Mutual Sav. Life Ins. Co.*, 698 So. 2d 772,775 (Ala. 1997).

utterly intolerable in a civilized society." *American Road Service Co. v. Inmon*, 394 So. 2d 361,

365 (Ala. 1980); *citing* RESTATEMENT (SECOND) OF TORTS § 46, Comment d., at 73 [1965].

Outrage is "a very limited cause of action that is available only in the most egregious

circumstances." *BSE Indus. Contactors, Inc*., 624 So.2d at 1044 (noting that the Alabama

Supreme Court "has held in a large majority of the outrage cases reviewed that no jury question

was presented"). In fact, the Alabama Supreme Court has only allowed outrage claims in three

limited circumstances: (1) cases dealing with wrongful conduct in the context of family burials;

(2) cases where insurance agents employed heavy-handed, barbaric means to coerce a settlement;

and (3) cases involving egregious sexual harassment.**[28]** *Lee v. Sea Breeze Health Care Center,*

*Inc.*, 391 F. Supp. 2d 1103, 1106, n. 1 (S.D. Ala. 2005); (*citing Carter v. Harris*, 64 F.Supp.2d

1182, 1194 (M.D. Ala. 1999)).

Dees cannot establish a *prima facie* case of outrage because he can present no evidence

that HMMA acted intentionally or recklessly or with "egregious cruelty or venality." The

previously enumerated acts or omissions by Prater, Applegate, or those involved in the

termination process are at worst unwanted by Dees or undesirable. Further, under Alabama law,

"the discharge of an employee rises to the level of the tort of outrage only if the discharge

violates public policy." *Wyatt v. Bellsouth Inc*., 998 F. Supp. 1303, 1312 (M.D. Ala. 1998). The

---

[28] In the context of sexual harassment allegations, the Alabama Supreme Court has held that only egregious sexual harassment will rises to the level of outrage necessary to maintain a claim. *Busby v. Truswal Systems Corp*., 551 So. 2d 322, 328 (Ala. 1989). Outrage is "a limited remedy to be applied only in egregious circumstances," and "should not ordinarily be imposed against an employer for the personal sexual transgressions of its employees." *Id.* "[M]ere insults, indignations, threats, annoyances, petty oppressions or other trivialities [do not constitute outrageous conduct]." *Mills v. Wex-Tex Industries, Inc.*, 991 F. Supp. 1370, 1386 (M. D. Ala. 1997). Only when sexual suggestions rise to the level of involving use of physical force, does outrage become a viable claim. *Id.* "When the sexual impositions are not merely verbal or economic, but become physical impositions, the harasser is no longer attempting to request sexual favors (in exchange for job security), but is instead attempting to force sexual liberties." *Brewer v. Petroleum Suppliers, Inc*., 946 F. Supp. 926 (N.D. Ala. 1996).

37

undisputed evidence reveals that HMMA terminated Dees' employment because the members of the termination committee had a good faith belief that the evidence that Dees was sleeping on the job was credible, which is not in contravention of public policy.

Dees' own testimony demonstrates that he cannot meet his *prima facie* burden of proving that he suffered severe emotional distress. At most, Dees claims after HMMA terminated his employment that he lost sleep for a few days, was extremely upset about having his "record" ruined, his military record tarnished and essentially was embarrassed for people at church and in the community knowing he had been terminated. (Dees Depo. at 248: 17-23; 249: 1-23; 250: 1-23; 251: 1-23; 252: 1-23; 253: 1-6). Hardly extreme, these experiences are likely typical for anyone that has been terminated for sleeping on the job. *See Hurst v. Cook*, ___ So. 2d ___, 2007 WL 2812150 * 10 (Ala. Civ. App. September 28, 2007)[29] ("The tort of outrage was not developed to provide a person with a remedy for the trivial emotional distresses that are common to each person in his everyday life") (citing *U.S.A. Oil, Inc. v. Smith*, 415 So.3d 1098, 1101 (Ala. Civ. App. 1982); *see also Inmon*, 394 So.2d at 364-65 ("It should also be noted that this tort [outrage] does not recognize recovery for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.").

As to emotional impact, Dees testified that he never received medical/psychiatric treatment as a result of this incident, and he also states the conduct never caused him to cry or lose sleep for more than "several nights." (Dees Depo. at 254: 15-23; 255: 1-8). Indeed, Dees had returned to work for another employer within days of his termination. (Dees Depo. at 14: 10-15). This simply is not sufficient evidence to support Dees' claim that this situation caused

---

[29] A copy of this opinion is attached to Evid. Sub. as Ex. I.

38

severe emotional distress as a matter of law, particularly where Dees testified to his past experience in combat situations in Iraq. (Dees Depo. at 52: 1-23).

Simply put, the alleged conduct Dees complains of does not "approximate the tort of outrage" and certainly does not support a finding of intentional or reckless conduct or egregious cruelty or venality. Dees has failed to point to any evidence that HMMA's conduct was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized society." *Fitch v. Voit*, 624 So. 2d 542, 544 (Ala. 1993) (quoting *Inmon*, 394 So. 2d at 361). Accordingly, Dees' outrage claim fails as a matter of law as to both Defendants.

### E.    Dees' State Law Conversion Claim Fails as a Matter of Law

Dees' claim for conversion arises out of his claims that HMMA did not provide him with all of the contents of his HMMA locker when it terminated his employment. In particular, Dees testified that he had a jacket, mp3 player, personal tools, military pay stubs and handwritten notes in his HMMA locker at the time his employment was terminated. HMMA returned his jacket and mp3 player to Dees at the time of his termination. (Dees Depo. at 96: 2-3; 104: 3-4, 23; 105: 1-2). Dees' co-worker returned his personal tools to him. (Dees Depo. at 256: 16-23; 257: 1-16). One of the points of discussion in an HMMA termination session is to address such issues and Dees did not identify any personal belongings in his HMMA locker or elsewhere, including in his jacket, that he believed HMMA should return. (Second Warner Decl. at ¶ 29). Further, there is no evidence that Dees made a subsequent request until such time as he filed this lawsuit. (Second Warner Decl. at ¶ 29).

Even if it is assumed that Prater (or anyone else at HMMA) removed handwritten notes from his jacket or military pay stubs from Dees' locker is taken as true, there is no evidence that

39

HMMA knew of this fact or ratified Prater's actions.  For HMMA to be liable for conversion for the alleged failure to return Dees' property, Dees must establish that the employee's wrongful acts were (1) in the line and scope of his employment; or (2) that the employee's actions were in the furtherance of HMMA's business; or (3) that HMMA participated in, authorized or ratified Prater's action.  *See Joyner v. AAA Cooper Transportation*, 477 So.2d 264, 365 (Ala. 1985);  *see also Todd v. Modern Woodmen of America*, 620 So.2d 591, 593 (Ala. 1993).

Dees has presented no evidence to support a finding of liability on any of these grounds. *See Hendley v. Springhill Mem'l Hosp.*, 575 So.2d 547, 550 (Ala. 1990) (affirming a summary judgment for the hospital and holding that even if the vendor of a "TENS" pain-relief unit was an employee or agent of the hospital, the hospital was not liable when the vendor, posing as a gynecologist, performed a "vaginal examination" of a patient because "[a] tort committed by an agent, even if committed while engaged in the employment of the principal, is not attributable to the principal *if it emanated from wholly personal motives of the agent and was committed to gratify wholly personal objectives or desires of the agent* " (emphasis added)).  Thus, Dees' failure to prove HMMA ratified Prater's conduct requires the dismissal of his intentional tort claims.  *See Joyner v. AAA Cooper Transp., Inc.*, 477 So. 2d 364 (Ala. 1985).

For Dees to prove a *prima facie* case of conversion, he must show that he has a "general or special title to the property" in the HMMA locker or the "immediate right to possession of the property." *Lapeyrouse Grain Corp. v. Tallant*, 439 So.2d 105, 108 n.1 (Ala. 1983).  Conversion requires "a wrongful exercise of dominion over property in exclusion or defiance of a plaintiff's rights, where said plaintiff has … the immediate right of possession." *Empiregas Inc. of Gadsden v. Geary*, 431 So.2d 1258, 1260 (Ala. 1983).  "In order for there to be a conversion it must appear that a wrongful taking, detention or an illegal assumption of ownership or use of

40

another's property has taken place." *Citizens Bank v. Coffee County Bank*, 431 So.2d 1203, 1207 (Ala. 1983) (citing *Ott v. Fox*, 362 So.2d 836 (Ala. 1978). Where the original taker acquires possession of the property rightfully and has neither asserted legal title to it nor exercised dominion over it inconsistent with the rights of the owner, ordinarily a demand and refusal to deliver the property are necessary. *Citizens Bank*, 431 So.2d at 1207, (citing *Shriner v. Meyer*, 171 Ala. 112, 55 So. 156 (1911). "The bare possession of property without some wrongful act in the acquisition of possession, or its detention, and without illegal assumption of ownership or illegal user or misuser, is not conversion." *L.L. Cardy v. Capital City Asphalt Co*., 477 So.2d 350, 354 (Ala. 1985) (*citing Bolling v. Kirby*, 90 Ala. 215, 7 So. 914, 24 Am.St.Rep. 789 (1890).

Under HMMA's locker policy, Dees did not have an expectation of privacy in the HMMA locker. The locker policy put Dees on notice that the HMMA locker was the property of HMMA, not his. *(See* Handbook at 46). Therefore, Dees cannot prove that he had an immediate right of possession of the materials in the locker belonging to HMMA. *See Rice v. Birmingham Coal & Coke Co*., 608 So.2d 713 (Ala. 1992) ("general or specific title and actual possession or the entitlement to immediate possession of the property" required to establish conversion); *see also Thompson v. Ford Motor Credit Co*., 550 F.2d 256 (5th Cir. 1977) (To sustain an allegation of conversion, a plaintiff must be able to show a legal title and immediate right of possession.). Accordingly, Dees' conversion claims are due to be dismissed as a matter of law.

## V.    <u>CONCLUSION</u>

Based upon the foregoing arguments, supporting evidence, and supporting case law and statutory law, Defendants' Motion for Summary Judgment as to each of Dees' claims, including Dees' claims for harassment under USERRA, unlawful termination under USERRA, state law

41

outrage, and state law conversion, should be GRANTED and an order and memorandum opinion consistent with this brief should be entered dismissing Dees' claims.

Respectfully submitted this 14th day of December, 2007.

/s/ J. Trent Scofield
J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of December, 2007, I electronically filed the foregoing *Defendants' Brief in Support of Their Motion for Summary Judgment* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: W. Perry Hall, Vincent F. Kilborn, III, David Allen McDonald, Jeffrey Rayborn Sport, T. Scott Kelly, and Matthew K. Johnson.

/s/ J. Trent Scofield
J. Trent Scofield (SCO-024)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
E-mail: trent.scofield@odnss.com