**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Vs. | * | **CASE NO.** |
| | * | **2:07-cv-00306-MHT-CSC** |
| HYUNDAI MOTOR MANUFACTURING | * | |
| ALABAMA, LLC, and HYUNDAI | * | |
| MOTOR AMERICA, INC., | * | |
| | * | |
| Defendants. | * | |

**RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO QUASH NON-PARTY SUBPOENA TO ALABAMA PSYCHIATRIC SERVICES AND SAEED A. SHAH, M.D.**

COMES NOW the Plaintiff, Jerry Leon Dees, Jr., ("Dees") and files this Response in Opposition to Defendants' Motion to Quash Non-Party Subpoena to Alabama Psychiatric Services and Saeed A. Shah, M.D. In support thereof, Dees states as follows:

1.      Defendants have no standing to object to the issuance of the subpoena;

2.      Even if Defendants have standing, the subpoenas should be upheld because the privilege has been waived; and

3.      Plaintiff has complied with local rule 45.2, the Federal Rules of Civil Procedure, and the basic rule of fairness with respect to the issuance of the non-party subpoenas.

**ARGUMENT**

**I.   Defendants Have No Standing to Object to the Issuance of the Non-Party Subpoena**

In the Eleventh Circuit, a party has no standing to move to quash a subpoena "unless the party is in possession of the subpoenaed materials *and* has a personal right or privilege that should be enforced to prevent the third-party witness from violating that right or privilege." *In.*

- 1 -

*re Rum Marketing International, Ltd.*, 2007 WL 2702206, *4 (S.D. Fla.) (emphasis in original), quoting *Brown v. Braddick*, 595 F.2d 961, 967 (5th Cir. 1979).

Here, HMMA and HMA have neither possession of the subpoenaed materials nor a personal right or privilege to assert. The materials subpoenaed are records relating to the drug and alcohol treatment of James A. Brookshire in the possession of the third-parties, Alabama Psychiatric Services and Saeed A. Shah, M.D. Any personal right or privilege belongs to Mr. Brookshire, the patient treated; not the movants, HMMA and HMA.

Based on the foregoing, the Defendants have no standing to move to quash the subpoena, and their motion, therefore, should be denied.

## II.  Even if Defendants Have Standing to Object, the Subpoenas Should Be Upheld

### A.  Waiver of the Privilege

Even assuming, *arguendo*, that Defendants have standing to move to quash the subpoenas, which they do not, the subpoenas should still be upheld because Brookshire waived the privilege.

Defendants are correct that the U.S. Supreme Court recognized a psychotherapist/patient privilege in *Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923 (1996). In *Jaffee*, the survivors of a man fatally shot by a police officer sued the officer and the city, claiming violation of the decedent's constitutional rights by the use of excessive force. *Id.* Even though several eyewitnesses saw the shooting, plaintiff attempted to discover the contents of the officer's records of counseling undergone because of the incident. When the licensed clinical social worker and the officer both refused to produce the records, the trial court allowed a jury charge whereby the jury could "presume that the contents of the [un-produced records] would have been unfavorable to [the officer]." *Id.* at 4-5, 116 S.Ct. at 1925-26. After a verdict for Plaintiff, the

Court of Appeals for the Seventh Circuit reversed and remanded. The U.S. Supreme Court affirmed, noting the "reason and experience" of the consensus of all fifty states in recognizing a psychotherapist privilege. *Id.* at 13, 116 S.Ct. at 1930. The Court further pointed out that the privilege "serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem." *Id.* at 11, 116 S.Ct. at 1929. The Supreme Court also recognized that the psychotherapist privilege and the attorney-client privilege are both "rooted in the imperative need for confidence and trust." *Id.* at 10, 116 S.Ct. at 1928 (citations omitted).

The Court further noted that "the policy decisions of the States bear on the question whether federal courts should recognize a new privilege or amend the coverage of an existing one." *Id.* at 12-13, 116 S.Ct. 1929-30, citing *Trammel v. United States*, 445 U.S. 40, 48-50, 100 S.Ct. 906, 911-912 (1980); *United States v. Gillock*, 445 U.S. 360, 368, n. 8, 100 S.Ct. 1185, 1191, n. 8 (1980).

The Supreme Court, however, did not define the limits of or exceptions to the psychotherapist privilege, noting that "(b)ecause this is the first case in which we have recognized a psychotherapist privilege, it is neither necessary or feasible to delineate its full contuours in a way that would govern all conceivable future questions in this area." *Id.* at 18, 116 S.Ct. at 1932. The Court further observed that "(a)lthough it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way…" *Id.*, n. 19, 116 S.Ct. at 1932, n. 19.

The courts since *Jaffee* have carved out various exceptions to the psychotherapist privilege. The privilege is waived if a party discloses privileged material himself. *Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 228 (D. Mass. 1997). The privilege is waived if protected

materials are intentionally disclosed to third parties. *Doe v. Ensey*, 220 F.R.D. 422, 426 (M.D. Pa. 2004). The privilege is also waived if a party makes his mental state an issue. *Kelly v. Owens*, 2007 WL 258042 (M.D. Ala.).

Here, any privilege relating to the records of the diagnosis and treatment of Mr. Brookshire with respect to his HMMA-mandated substance abuse treatment has been waived. First, records and or reports of Mr. Brookshire's diagnosis and treatment have been disclosed to the HMMA medical clinic. As indicated in Mr. Brookshire's Conditional Letter of Employment, attached hereto as Exhibit A, Mr. Brookshire agreed to the release of his treatment records to the HMMA medical clinic so that it could monitor his progress and communicate with his treatment providers. (Ex. A, numbered ¶ 3.) This monitoring and release of treatment records was confirmed by Mr. Brookshire and his counsel during his deposition. See excerpts of Mr. Brookshire's deposition at Exhibit B hereto, pp. 84-85, 96-97. Since any records that might have been protected by the privilege have been voluntarily released to the HMMA medical clinic, a third party to the psychotherapist/patient relationship, the privilege has been waived.

Second, Mr. Brookshire waived any privilege relating to his diagnosis and treatment by voluntarily disclosing the details of same during his deposition. Mr. Brookshire was represented by two attorneys at the deposition (Ex. B, pp. 8-10), and his attorneys instructed him not to answer certain questions to protect his right against self-incrimination (Ex. B, pp. 69-71). When asked detailed questions about his diagnosis and treatment in the program HMMA mandated Mr. Brookshire attend, however, Mr. Brookshire testified in detail. See Ex. B, pp. 79-83. As made clear in *Vanderbilt*, supra, if a party discloses privileged material himself, privilege is waived. Therefore, Mr. Brookshire waived any privilege regarding his diagnosis and treatment at APS.

B. **The Protective Order**

Further, contrary to Defendants' statements regarding the inadequacy or intent of the protective order already entered into by the parties in this cause (Doc. 27), the protective order clearly contemplated the disclosure and protection of employees' medical records. As stated in paragraph 3 of the protective order,

> "'Protected documents' as used in this Stipulated Protective Order shall mean those documents obtained via requests for production or **subpoena to a non-party** which contain information of a sensitive, confidential or proprietary nature, such as personnel files, tax returns and other tax information, **medical records**, information protected from disclosure by statute, sensitive personal information, trade secrets as defined by the Alabama Trade Secrets Act, financial information, or commercial information from which HMMA or HMA derive a commercial or competitive advantage and that are not known or available to the public."

(Doc. 27, ¶ 3).

Therefore, the protective order entered in this case is sufficient to adequately address any privacy concerns.

C. **Relevancy**

Mr. Brookshire's medical and psychiatric records are completely relevant to Plaintiff's claims. Defendants have mischaracterized Plaintiff's need for the records in an attempt to make the records appear irrelevant. Plaintiff, however, believes that the records are relevant not only to the reliability of what Mr. Brookshire claims to have seen on the night he allegedly witnessed Plaintiff sleeping, but also to why Mr. Brookshire would lie about seeing Mr. Dees asleep when Mr. Dees was not asleep.

Defendants' reliance on *Jones v. Gerwins*, 874 F.2d 1534 (11th Cir. 1989) is misplaced. In *Jones*, the Plaintiff had previously admitted all the rules violations he had been accused of before later deciding to dispute the charges and allege racial discrimination. These admissions provided the "sufficient foundation for an employer's good faith belief that [Jones had] engaged in

misconduct." *Jones*, 874 F.2d at 1540. Here, Dees has never admitted being asleep. Quite to the contrary, Dees has consistently and vehemently denied being asleep on the job. Defendants, therefore, do not have the "sufficient foundation" described in *Jones* upon which to rely in the case at bar.

**III.** **Plaintiff Has Complied with the Rules and Principle of Fairness in Issuing Subpoenas**

Plaintiff has complied with the Federal Rules of Civil Procedure and the local rules of the Middle District of Alabama in issuing these subpoenas, including Rule 11. Furthermore, Plaintiff has complied with the principle of fairness in issuing the subpoenas. Defendants were served by fax on the same day the subpoenas were served on the non-parties, in order to ensure that Defendants had time to review the subpoenas before the non-parties responded.

This is in stark contrast to Defendants violating Mr. Dees constitutional right to privacy by issuing a non-party subpoena to Mr. Dees' cell phone provider. After objections by Plaintiff's counsel to disclosure of the name of the provider and subsequent assurances by Defendants' counsel in Mr. Dees' deposition that revealing the name of the provider would cause no harm and go no further, and production of the entire month's cell phone bill containing the time period relevant to the incidents made the basis of this suit with the provider's name and account number data redacted, Defendants' counsel issued a non-party subpoena to the service provider by ***faxing*** the subpoena to the service provider, Unicel, on November 21, 2007, the day before Thanksgiving. Unicel's personnel specifically asked if Mr. Dees was aware of the subpoena, to which counsel for Defendants responded affirmatively. See e-mail from Unicel to Plaintiff's counsel at Exhibit C hereto. Defendants, however, then delayed ***mailing*** Plaintiff's copy of the subpoena, so that it did not arrive until several days after the provider had supplied the subpoenaed documents. "Failure to serve a copy of a subpoena upon an opposing party or to give

notice of its content deprives that party of any meaningful **right** to **object** or to otherwise protect its interests." *Will-Drill Resources, Inc. v. J.R. Pounds, Inc.*, 2007 WL 609791 (S.D.Miss.) (emphasis in original).

By failing to serve Plaintiff with a copy of the subpoena in the same manner it was served on the non-party, Defendants deprived Plaintiff of his right to object to the subpoena's issuance because Defendants' counsel had received the subpoenaed documents by the time Plaintiff received the subpoena.

WHEREFORE, the PREMISES CONSIDERED, Defendants' Motion to Quash Non-Party Subpoena to Alabama Psychiatric Services and Saeed A. Shah, M.D. should be denied.

s/ Vincent F. Kilborn, III
Vincent F. Kilborn, III (KILBV4484)

s/ David A. McDonald
David A. McDonald (MCDOD5329)

s/ W. Perry Hall
W. Perry Hall (HALLW9043)

s/ Jeffrey R. Sport
Jeffrey R. Sport (SPORJ5390)

OF COUNSEL:

KILBORN, ROEBUCK & McDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747
E-mail: vfk@krmlaw.us
E-mail: dam@krmlaw.us
E-mail: wph@krmlaw.us
E-mail: jeff.sport@sportlaw.us

**Attorneys for Plaintiff**

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on the 17th day of December, 2007, electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

J. Trent Scofield, Esq.
T. Scott Kelly, Esq.
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118

Matthew K. Johnson, Esq.
Ogletree, Deakins, Nash,
 Smoak & Stewart, P.C.
Post Office Box 2757
Greenville, SC  29602


s/ Jeffrey R. Sport_____
COUNSEL

*DEES v. HYUNDAI MOTOR MANUFACTURING, LLC, et al.*
*Case No. 2:07-cv-00306-MHT-CSC*

## RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO QUASH NON-PARTY SUBPOENAS TO APS AND DR. SHAH

# EXHIBIT A



### HYUNDAI
Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard
Montgomery, Al 36105



Date: April 12, 2007
To: James A. Brookshire, # 102768
From: Wendy Warner
Re: Conditional Letter of Employment

On March 27, 2007 HMMA received the confirmation as a result of your random drug screen. After receiving the results it was determined that you tested positive for the presence of Cocaine in your system

Due to the seriousness of this matter, the following are conditions of your continued employment.

1. You are required to attend a substance abuse assessment session that will be scheduled through the HMMA's Medical Clinic.

2. You are required to comply with all aspects of any prescribed rehabilitation program. Failure to comply with the aforementioned assessment and/or the prescribed rehabilitation will result in your voluntary resignation

3. You must agree to allow the HMMA Medical Clinic to monitor your progress and to communicate with the assessment and rehabilitation provider. This requires you to sign the necessary forms authorizing the release of your medical information.

4. Any future use or possession of illegal and/or non-prescription drugs, or being under the influence of alcohol or non-prescription and/or illegal drugs while on HMMA premises, will subject you to corrective action, up to and including termination.

Your signature will indicate that you understand and will fully comply with the above stated conditions.

This Letter of Conditional Employment will remain in your file for a period of twenty-four (24) months.

Team Member: _____ Date 4/12/07

Mgmt. TM: _____ Date 4/12/07

Mgr. TM Rel: _____ Date 4-12-07

Page 1                                                    4/12/2007

CONFIDENTIAL

DEES V HMMA 00282  DOCS PRODUCED

*DEES v. HYUNDAI MOTOR MANUFACTURING, LLC, et al.*
*Case No. 2:07-cv-00306-MHT-CSC*

## RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO QUASH NON-PARTY SUBPOENAS TO APS AND DR. SHAH

# EXHIBIT B

JAMES ALLEN BROOKSHIRE

Page 8

```
1      Q     Safety, quality?

2      A     Production.

3      Q     Production.

4      A     Scheduling, tool and die, and

5   day-to-day personnel Team Member issues or Team

6   Relations problems.

7      Q     Do you have a work schedule?

8      A     The start time and stop time?

9      Q     Right.

10     A     I start at 5:45 in the morning and

11  usually finish up about 5:30 in the evening.

12     Q     And do you have a lawyer here today?

13     A     Yes, I do.

14     Q     Who is your lawyer?

15     A     Matt and our company lawyer, Chris.

16     Q     And what are your lawyers' last names?

17     A     Chris' last name is Smith.  Matt, I'm

18  rusty on that.

19     Q     What's your other lawyer's last name?

20     A     I'm not sure.

21     Q     So you've got one lawyer here you know

22  his real name and one lawyer here you only know

23  his first name?
```

JAMES ALLEN BROOKSHIRE

Page 9

```
 1      A      That's correct.

 2      Q      And when did the lawyer that you've

 3   identified as Matt become your lawyer?

 4      A      His official start date with the case,

 5   that was back -- I'm trying to remember the

 6   first encounter I had.  That was probably back

 7   in April, April time frame.

 8      Q      And how about the lawyer that you've

 9   identified as Chris Smith?  When did he become

10   your lawyer?

11      A      He's been part of our legal counsel

12   since probably at least about a year I've known

13   him.

14      Q      Well, I don't want to know just how

15   long he's been legal counsel.  I want to know

16   how long has Chris Smith been your lawyer.

17              MR. JOHNSON:  Just for the Record,

18   object to the form.  I don't see the relevance

19   of asking when Chris Smith's start date with

20   HMMA was.

21              MR. KILBORN:  I don't want his start

22   date.  I want to know when Chris Smith became

23   Jim Brookshire's lawyer.
```

Page 10

1          MR. JOHNSON:  And obviously that would

2     be attorney-client privilege.

3          MR. KILBORN:  Not today it would not

4     be.

5          MR. JOHNSON:  When Chris became

6     involved in representing Mr. Brookshire -- the

7     way you phrased the question -- would certainly

8     be.

9          MR. KILBORN:  Well, you can instruct

10    him not to answer.

11         MR. JOHNSON:  I instruct you not to

12    answer that.

13     Q    Are you going to follow your lawyer's

14    instructions?

15     A    Yes, sir.

16     Q    And you're going to refuse to tell me

17    the date that Mr. Chris Smith became your

18    lawyer; is that right?

19     A    Yes, sir.

20         MR. JOHNSON:  I mean, Mr. Kilborn, if

21    you'll explain to me why it's relevant and

22    necessary, I'm certainly willing to reconsider,

23    but based on the way you've asked the question

JAMES ALLEN BROOKSHIRE

Page 69

1    enforcement?

2        A    I have no idea.

3        Q    Have you ever bought the cocaine?

4        A    In the past when I was younger, I --

5        MR. JOHNSON:  Just a second.

6    Obviously, object to the form of the question.

7    I'm not sure it's relevant here.  But

8    additionally to the extent that I don't want him

9    to make any statements that might get him into

10   criminal jeopardy.

11       MR. KILBORN:  Well, he can take the

12   Fifth Amendment.  But I want to know the answer

13   to that question.  This is the eye witness to

14   this case who has been caught red handed using

15   cocaine, showed up at the Hyundai plant with it

16   in his system in a managerial position, given a

17   pass, wasn't terminated, around the time that

18   these incidents occurred.  I want to go into

19   that.  I think it's a credibility issue.

20       MR. JOHNSON:  And I understand your

21   point.  However -- and we've allowed him to

22   testify fully about his cocaine usage and you've

23   asked him plenty of questions about what

JAMES ALLEN BROOKSHIRE

Page 70

1    happened at work.  But beyond that, I see no

2    relevance, and I can't imagine anything -- I'm

3    not a criminal lawyer, and my recommendation to

4    him is to seek criminal counsel if he's going to

5    testify beyond what he's already testified to.

6         MR. SPORT:  Well, he indicated he was

7    represented by counsel today, so direct him not

8    to answer.

9         MR. JOHNSON:  Well, then, I direct him

10   not to answer that question.

11        MR. KILBORN:  Well, I'm going to pursue

12   this.  You can direct him not to answer.

13   Q    Are you refusing to answer whether or

14   not you have ever purchased cocaine?

15        MR. JOHNSON:  Under my advice, he is.

16   Q    All right.  Have you ever sold cocaine?

17        MR. JOHNSON:  Again, we would also --

18   my advice is that he not answer that and he will

19   not answer that.

20        MR. KILBORN:  Is he taking the Fifth

21   Amendment?

22        MR. JOHNSON:  Yes.

23   Q    Have you ever had possession of

JAMES ALLEN BROOKSHIRE

Page 71

1    cocaine?

2            MR. JOHNSON:  Again, same response

3    there.  My advice is that he not answer.  He

4    pleads the Fifth Amendment and is not answering.

5        Q    Have you ever had possession of drug

6    paraphernalia?

7            MR. JOHNSON:  Again, same response to

8    that issue.

9        Q    Are you taking the Fifth Amendment on

10   that, too?

11       A    Yes.

12       Q    Well, you committed a felony, right,

13   prior to showing up at work, didn't you?

14           MR. JOHNSON:  Object to the form.  And

15   same response to that question.

16       Q    You take the Fifth Amendment on that?

17       A    Yes.

18       Q    Well, don't you think commission of a

19   felony would be willful misconduct under

20   anybody's definition?

21           MR. JOHNSON:  Object to the form.

22       A    I think that condition lies within the

23   company's policies.  That's not something that I

JAMES ALLEN BROOKSHIRE

Page 79

```
 1      to let me know that it was policy; that they

 2      needed to follow protocol; that I either needed

 3      to self-admit or they would admit me to a

 4      program.  And failure to complete or admit

 5      myself to the program would end in termination

 6      of employment.

 7          Q     Is this program on the premises of

 8      Hyundai?

 9          A     No.

10          Q     Where is it?

11          A     It's -- I think they have a couple

12      different places, but the one I went to is

13      Alabama Psych.

14          Q     Give me the name of that.

15          A     I think they call it APS.

16          Q     APS.  And you attended that daily?

17          A     Yeah, every day for three weeks.

18          Q     All day?

19          A     Yeah.

20          Q     Where is it located?

21          A     Carmichael Parkway.

22          Q     In Prattville?

23          A     Montgomery.
```

Page 80

```
 1      Q     And it's called APS?

 2      A     Yeah.

 3      Q     How many other people were in that

 4   program?

 5      A     At the time I had started, there was

 6   four other people, but they weren't from

 7   Hyundai.  They were other people in the program.

 8      Q     Right.  And did you get drug screens

 9   during that program?

10      A     Oh, yeah.

11      Q     Every day?

12      A     It varied.  They wouldn't tell you.

13   They wouldn't tell you.  It would be in the

14   morning, in the afternoon, lunchtime.

15      Q     Did you tell them about your alcohol

16   abuse?

17      A     Yeah.

18            MR. JOHNSON:  Object to the form.

19      A     Yes, I did.

20      Q     Is that a 12 Step program?

21      A     Yeah.

22      Q     And what step are you in right now?

23      A     I had -- part of that program was I had
```

JAMES ALLEN BROOKSHIRE

Page 81

1    to attend AA meetings as well and get signatures

2    from representatives of AA meetings.

3        Q    So you were simultaneously going to the

4    drug rehab program with APS as well as AA?

5        A    Yeah.

6        Q    And how did you end up in AA?

7        A    Because the position that was given by

8    my therapist and the psychiatric doctors that

9    were there, they had clinically diagnosed that

10   it wasn't a substance abuse problem that I

11   have.  They had seen with the disposition of my

12   family in the past with my mother being an

13   alcoholic and my grandfather being an alcoholic

14   and -- and I had admitted to them that I would

15   drink on weekends but I did not drink during the

16   week while I was working.  But I admitted it to

17   them.  And they had ran me through, like I said,

18   with the psychiatrist and the therapist that's

19   what they deemed the most important thing was

20   for me to attend AA meetings.

21       Q    What was the name of the psychiatrist?

22       A    Dr. Shaw, I believe.

23       Q    Is he a medical doctor?

JAMES ALLEN BROOKSHIRE

Page 82

```
 1      A     I don't know what -- all of his
 2   classifications.  I believe he was a
 3   psychiatrist.  I know that much.
 4      Q     And what's the name of the therapist?
 5      A     Jena Empy.
 6      Q     E-M-B-Y?
 7      A     E-M-P-Y.
 8      Q     And what is she?
 9      A     She's a licensed therapist.  And I
10   don't know what all of her credentials were, but
11   she was a licensed therapist.
12      Q     And the first step in either the 12
13   point drug abuse program or the 12 point alcohol
14   abuse program is admission that you are addicted
15   to alcohol and/or drugs, isn't it?
16           MR. JOHNSON:  Object to the form.
17      A     The AA meeting it was admitting that
18   alcohol could have control over your life.
19   Meaning that it can be a problem in your life.
20      Q     Well, you have to get up there and say
21   my name is Jim Brookshire and I'm an alcoholic.
22   You have to make that admission, don't you?
23           MR. JOHNSON:  Object to the form.
```

JAMES ALLEN BROOKSHIRE

Page 83

1      A      That's part of their meetings.  That's

2    part of their protocol.  There's people there

3    that hadn't drank in ten years and they've still

4    got to stand up and say that.

5      Q      Well, you had to stand up and say that,

6    didn't you?

7      A      That would be correct.

8      Q      And you had to stand up and say that in

9    the drug abuse program, too, regarding drugs,

10   didn't you?

11           MR. JOHNSON:  Object to the form.

12     A      What do you mean?  Stand up in the drug

13   program?

14     Q      Well, you had to admit that you were

15   addicted to drugs, that's why you were there.

16     A      That wasn't the clinical analysis that

17   was done by the doctor or the therapist.

18           MR. JOHNSON:  Object to the form.

19     Q      Did you stand up and admit that?

20     A      Admit what?

21     Q      That you were addicted to drugs?

22     A      No.  I admitted I made a stupid

23   decision one night.

JAMES ALLEN BROOKSHIRE

Page 84

```
 1        Q      One night; right?

 2        A      That would be correct.

 3        Q      Okay.  And let's go back to this Bates

 4   number 282, Plaintiff's Exhibit 14.  At the time

 5   of this -- well, it says on March 27, 2001, HMMA

 6   received confirmation as a result of your random

 7   drug screen.  When was the actual date that you

 8   were caught?

 9        A      It was somewhere around March the 25th,

10   26th.  Somewhere right around there.  I can't

11   remember.  It was on a Tuesday or Wednesday.

12        Q      And it says in here that it's got four

13   conditions; is that correct?

14        A      Yeah.

15        Q      One, you had to attend a substance

16   abuse assessment session scheduled through

17   HMMA's Medical Clinic.  Was that done?

18        A      Yes.

19        Q      Said you were required to comply with

20   all aspects of the prescribed rehab program.

21   Was that done?

22        A      Yeah.

23        Q      Said you must agree to allow HMMA
```

JAMES ALLEN BROOKSHIRE

Page 85

1    Medical Clinic to monitor your progress and

2    communicate with the assessment and

3    rehabilitation provider.

4        A    Yeah.

5        Q    That was accomplished?

6        A    Yeah.

7        Q    And then it said any future use or

8    possession of illegal and/or nonprescription

9    drugs or being under the influence of alcohol or

10   nonprescription drugs and/or illegal drugs while

11   on HMMA premises will subject you to corrective

12   action up to and including termination.  You

13   understood that?

14       A    Yeah.  They told me that without a

15   doubt I'd be -- anything happened again I'd be

16   terminated.  And I've been -- part of their

17   process also is I'm subjected to random

18   drug/alcohol tests every month.  I get two to

19   three tests every month.  It's been going on

20   since then.

21       Q    Outside of Ms. Warner and Mr. Clevenger

22   who else at the Hyundai plant knows that?

23       A    I couldn't tell you.  I don't know.

JAMES ALLEN BROOKSHIRE

Page 96

1    in the case and the presence of cocaine in his

2    system was a short time after this incident took

3    place.  As I understand, counsel has refused to

4    produce that on the grounds that, one, it hasn't

5    been requested and, two, that it's in the

6    possession of some other company called ICM.

7    And my position on the latter would be that it's

8    within Hyundai's possession, custody, or

9    control.  Control being the operative word.  And

10   I'm requesting it now so that I will not have to

11   come back and redepose the witness on the

12   subject matter of that since he's such a

13   critical witness in the case.

14          MR. JOHNSON:  Is that -- are you --

15   have you stated your case?

16          MR. KILBORN:  Yes.

17          MR. JOHNSON:  And just for the Record,

18   again, as Mr. Kilborn has stated, medical

19   records or anything related to the personal

20   health information of Mr. Brookshire or any

21   other witness in the case has not been requested

22   and as such has not been identified or produced

23   in discovery in this case.  To the extent a

JAMES ALLEN BROOKSHIRE

Page 97

1    request is made, it will be addressed

2    appropriately and in a timely fashion.  We do

3    not have that information here today in part

4    because it wasn't requested and as such we are

5    not in a position to produce it today.

6            Secondly, and perhaps of equal

7    practical importance, it is our understanding

8    that the Medical Department information is kept

9    on an outsource basis by a third-party and those

10   documents would not be available on site at HMMA

11   today.  It may be possible to get them if they

12   had been timely and appropriately requested, but

13   it's our understanding that is likely not the

14   case.

15           MR. KILBORN:  Will you state on the

16   Record whether or not Hyundai does have control

17   of those documents such that if they requested

18   them they could get them?

19           MR. JOHNSON:  Had they been timely

20   requested, we could have gotten them and

21   responded appropriately.

22           MR. KILBORN:  Well, I'm going to

23   continue.

*DEES v. HYUNDAI MOTOR MANUFACTURING, LLC, et al.*
*Case No. 2:07-cv-00306-MHT-CSC*

## RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO QUASH NON-PARTY SUBPOENAS TO APS AND DR. SHAH

# EXHIBIT C

## Jeffrey Sport

**From:** "Karen Arbo" <KarenAA@unicel.com>
**To:** <jeff.sport@sportlaw.us>
**Sent:** Monday, December 03, 2007 6:31 AM

Dear Mr. Sport,

It was nice speaking with you on Friday.  In regards to our conversation, if both parties have been notified phone records have been subpoenaed, we don't need to send a letter to the person whose records have been subpoenaed.  If we don't get clarification of such, we would send a certified letter along with the subpoena stating their records have been Subpoenaed.  After 5 business days, the documents would then be mailed to the requestor.

Along with the subpoena, we received clarification from Glenda Coppock all parties involved were aware the records were Subpoenaed.

Best Regards,

Karen

Karen Arbo
Sr. Quality Data Specialist
Subpoena Compliance Team
Office 334-308-5595
Direct 207-974-0151
Mobile 207-852-5858
Fax 207-973-3497
karenaa@unicel.com

All information contained within this document, including the information contained in any attachments, is strictly private and belongs to Rural Cellular Corporation (RCC). It is to be treated as being marked "Proprietary and Confidential" and is intended only for the recipients to whom it has been sent by RCC. Unauthorized use, disclosure, or copying is strictly prohibited and may be unlawful. If you received this communications in error, please notify us immediately by replying to this message or telephoning. Thank you