**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY LEON DEES, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:07-cv-00306-MHT-CSC** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, and HYUNDAI MOTOR** | ) | |
| **AMERICA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION FOR LEAVE TO REPLY TO PLAINTIFF'S RESPONSE IN
OPPOSITION TO DEFENDANTS' MOTION TO QUASH NON-PARTY
SUBPOENA TO ALABAMA PSYCHIATRIC SERVICES AND SAEED A. SHAH, MD.**

Defendants Hyundai Motor Manufacturing Alabama, LLC (HMMA) and Hyundai Motor
America, Inc. ("HMA") (collectively "Defendants"), move this Honorable Court to allow
Defendants to reply *Plaintiff's Response in Opposition to Defendants' Motion to Quash Non-
Party Subpoena to Alabama Psychiatric Services and Saeed A. Shah, M.D.* (Doc. No. 74). In
support of this motion, Defendants state as follows:

      1.    *Plaintiff's Response in Opposition to Defendants' Motion to Quash Non-Party
Subpoena to Alabama Psychiatric Services and Saeed A. Shah, M.D.* was filed on December 17,
2007.

      2.    Defendants ask this Court to allow them to reply and consider their *Reply to
Plaintiff's Response in Opposition to Defendants' Motion to Quash Non-Party Subpoena to
Alabama Psychiatric Services and Saeed A. Shah, M.D.*

WHEREFORE, PREMISES CONSIDERED, Defendants request this Honorable Court to consider Defendants' *Reply to Plaintiff's Response in Opposition to Defendants' Motion to Quash Non-Party Subpoena to Alabama Psychiatric Services and Saeed A. Shah, M.D.*, and, if necessary, enter an Order allowing Defendants' to respond considering the attached Exhibit A as Defendants' response.

Respectfully submitted this 20th day of December, 2007.

<div style="margin-left:40%">

/s/  T. Scott Kelly
J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

</div>

2

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of December, 2007, I electronically filed the foregoing *Defendants' Motion to Quash Non-Party Subpoena to Industrial Care Management* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: W. Perry Hall, Vincent F. Kilborn, III, David Allen McDonald, Jeffrey Rayborn Sport, Trent Scofield, and Matthew K. Johnson.

/s/ T. Scott Kelly
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
E-mail: trent.scofield@odnss.com

5394059.1

5394059.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY LEON DEES, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:07-cv-00306-MHT-CSC** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, and HYUNDAI MOTOR** | ) | |
| **AMERICA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO QUASH NON-PARTY
SUBPOENA TO ALABAMA PSYCHIATRIC SERVICES AND SAEED A. SHAH, MD.**

Defendants Hyundai Motor Manufacturing Alabama, LLC (HMMA) and Hyundai Motor America, Inc. ("HMA") (collectively "Defendants"), reply to *Plaintiff's Response in Opposition to Defendants' Motion to Quash Non-Party Subpoena to Alabama Psychiatric Services and Saeed A. Shah, M.D.* (Doc. No. 74) as follows:

I.    **Mr. Brookshire's Medical And/or Psychiatric Records Are Irrelevant.**

A closer examination of Mr. Brookshire's role in this litigation supports Defendants' position that Plaintiff is not entitled to the records requested in his subpoena. Mr. Brookshire is not a party and his only involvement in this case stems from his observation and report to HMMA management of Plaintiff sleeping at work. Mr. Brookshire observed Plaintiff sleeping with his head down and his legs extended for approximately 2 minutes during the early morning hours of February 14, 2007. (Deposition Transcript of Jim Brookshire attached hereto as Exhibit 1 at 123: 3-10; 129: 1-2, 11-12).

After receiving this report, HMMA investigated the incident and ultimately terminated Plaintiff's employment on February 26, 2007. HMMA's investigation into Plaintiff's misconduct was comprehensive. Both Mr. Brookshire and Plaintiff were interviewed and their respective versions of events were reduced to written form. (*See* Declaration of Rob Clevenger attached hereto as Exhibit 2 at ¶¶ 5, 6, 7 and Attachments A, B, C)[1].

Approximately six weeks after he reported Plaintiff sleeping on the job, Mr. Brookshire failed a drug screen in connection with a post-accident screen. (Exhibit 1 at 48: 15-19). However, Mr. Brookshire testified he never used and was not under the influence of drugs or alcohol while on HMMA property. (Exhibit 1 at 47: 1-2; 179: 11-14; 180: 5-9).

The timing of Mr. Brookshire's report of Plaintiff sleeping and Mr. Brookshire's subsequent positive drug screen support HMMA's position that it had no reason to doubt Mr. Brookshire's version of events. Additionally, Plaintiff's own testimony reveals that Mr. Brookshire had no discriminatory animus towards Plaintiff's military status. For example, Plaintiff testified:

> Q.    Did you know Jim Brookshire well?
> A.    He was -- Yeah. Working with him every day near about.
> Q.    Okay. Did you ever have any problems with him?
> A.    No. Not like with everyone else, no.

(Deposition Transcript of Plaintiff attached hereto as Exhibit 3 at 228: 6-13). Plaintiff's own self-serving conclusions that another HMMA employee, Greg Prater[2], convinced Mr. Brookshire to falsely accuse Plaintiff of sleeping on the job are unsupported. Indeed, Plaintiff admitted he possessed no personal knowledge or evidence of this allegation. (Exhibit 3 at 193: 19-23; 194: 1-15; 197: 12-23; 198: 1).

---

[1] This Declaration was filed in connection with Defendants' pending Motion for Summary Judgment.
[2] Plaintiff admits that Greg Prater, his supervisor, also served in the military.

HMMA had no reason to doubt Mr. Brookshire's credibility at the time he reported that Plaintiff was asleep at work or on February 26, 2007, when it terminated Plaintiff's employment. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *EEOC v. Total Systems Services, Inc.*, 221 F.3d 1171, 1175 (11th Cir. 2000) ("an employer is entitled to rely on its good faith belief about falsity, concealment, and so forth in an internal investigation and can properly discharge an employee who it believes has lied in an internal investigation") (internal citations omitted); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (proper inquiry is whether the employer in good faith believed that the employee had done wrong and whether this belief was the reason for the termination).

Therefore, Mr. Brookshire's sensitive and confidential medical and/or psychiatric records clearly are not relevant to Plaintiff's claims of discrimination. Accordingly, this Court should quash the subpoenas to Alabama Psychiatric Services and Dr. Shah.

## II.    Mr. Brookshire Is Not A Party To This Lawsuit And Has Not Waived The Privilege

Plaintiff argues that Mr. Brookshire has waived the psychiatric-patient privilege. However, Plaintiff misses the point here because to waive the privilege in this lawsuit, Mr. Brookshire must be a party to the current litigation. Mr. Brookshire is not; he is a non-party fact witness that observed and then reported that Plaintiff was asleep at work. Also, at no point in this litigation has Mr. Brookshire used his alleged medical and/or psychiatric condition as evidence in this case. Instead, Plaintiff has attempted to capitalize on Mr. Brookshire's positive drug screen in effort to distort the fact that he was discovered asleep at work.

3

The cases Plaintiff cites on wavier in his opposition are inapposite to the current situation. For example, in *Vanderbilt v. Town on Chilmark*, 174 F.R.D. 225 (D. Mass 1997), the **plaintiff** alleged she suffered emotional distress damages as a result of the alleged discrimination and retaliation she suffered by her former employer. *Id.* at 226. The employer filed a motion to compel for the plaintiff to produce, among other things, her psychiatric and psychotherapeutic records arguing that by putting her emotional state at issue, plaintiff waived the privilege. *Id.* at 228. The *Vanderbilt* court upheld the psychiatric-patient privilege and denied the employer's motion to compel. *Id.* at 230.

In *Kelly v. Owens*, 2007 WL 2580492 (M.D. Ala. Sept. 4, 2007), the **plaintiff** alleged inadequate medical care and physical abuse during his pretrial detention in the Coosa County Jail. *Id.* at *1. The *Kelly* court held that psychiatric-patient privilege had been waived when **plaintiff** placed his mental health at issue by alleging an existing mental illness when he was first detained and developed a new mental illness as a result of his treatment while detained. 2007 WL 2580492 at *3.

Finally, in *Doe v. Ensey*, et al., 220 F.R.D. 422 (M.D. Pa. 2004), the court held that any discussions between defendants, who were priests accused of sexual molestation by plaintiff, and their psychologists were protected by the federal privilege recognized in *Jaffe* but that under Pennsylvania law the privilege was waived because of the priests disclosure of the protected information to third parties.

In all three of these cases, the courts analyzed the application of the privilege to the parties, not non-party witnesses. Mr. Brookshire has not waived the privilege in this case and, therefore, his records should be protected from disclosure.

4

### III.     Defendants Have Standing

Plaintiff fails to recognize that Alabama Psychiatric Services and Dr. Saeed Shah have also filed a Motion to Quash the subpoenas. These parties certainly have standing.  HMMA also has standing to challenge the subpoena due to its relationship with Mr. Brookshire.   As his employer, HMMA has a right and an obligation to protect the privacy interests of Mr. Brookshire.   The court should not allow Plaintiff to invade Mr. Brookshire's privacy rights so Plaintiff can conduct a fishing expedition on Mr. Brookshire when it is clear that HMMA had no reason at the time to doubt Mr. Brookshire's version of events.  Defendants' Motion to Quash is due to be granted.

WHEREFORE, PREMISES CONSIDERED, Defendants request this Honorable Court to order the Clerk of Court to deny issuance of the Plaintiff's proposed subpoena directed to the Custodian of Records of Alabama Psychiatric Services and Saeed A. Shah, M.D.

Respectfully submitted this 20th day of December, 2007.

/s/  T. Scott Kelly
J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602

Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of December, 2007, I electronically filed the foregoing  *Defendants' Motion to Quash Non-Party Subpoena to Industrial Care Management* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: W. Perry Hall, Vincent F. Kilborn, III, David Allen McDonald, Jeffrey Rayborn Sport, Trent Scofield, and Matthew K. Johnson.

/s/ T. Scott Kelly
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
E-mail: trent.scofield@odnss.com

5394081.1

6

# EXHIBIT 1

### JAMES ALLEN BROOKSHIRE

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE MIDDLE DISTRICT OF ALABAMA |
| 3 | NORTHERN DIVISION |
| 4 | CASE NO.: 2:0cv00306-MHT-CSC |
| 5 | |
| 6 | JERRY LEON DEES, JR., |
| 7 | Plaintiff, |
| 8 | V. |
| 9 | HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and |
| 10 | HYUNDAI MOTOR AMERICA, INC., |
| 11 | Defendants. |
| 12 | |
| 13 | S T I P U L A T I O N S |
| 14 | |
| 15 | |
| 16 | IT IS STIPULATED AND AGREED by and |
| 17 | between the parties, through their respective |
| 18 | counsel, that the deposition of JAMES ALLEN |
| 19 | BROOKSHIRE may be taken before STACEY L. |
| 20 | JOHNSON, Commissioner, at the Marriott |
| 21 | Prattville at Capitol Hill, 2500 Legends Circle, |
| 22 | Prattville, Alabama, on the 29th day of |
| 23 | November, 2007. |

1

| | |
|---|---|
| 1 | INDEX |
| 2 | EXAMINATION BY:              PAGE NUMBER |
| 3 | Mr. Kilborn.............................5-177 |
| 4 | Mr. Johnson............................177-182 |
| 5 | Mr. Kilborn.............................182-186 |
| 6 | Mr. Johnson.................................186 |
| 7 | |
| 8 | EXHIBITS: |
| 9 | Plaintiff's Exhibit 13......................12 |
| 10 | (two handwritten statements) |
| 11 | Plaintiff's Exhibit 14......................33 |
| 12 | (employment application) |
| 13 | Plaintiff's Exhibit 15......................38 |
| 14 | (Team Member Handbook) |
| 15 | Plaintiff's Exhibit 16......................98 |
| 16 | (Team Relations Memo) |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

3

| | |
|---|---|
| 1 | IT IS FURTHER STIPULATED AND AGREED |
| 2 | that the signature to and the reading of the |
| 3 | deposition by the witness is hereby waived, the |
| 4 | deposition to have the same force and effect as |
| 5 | if full compliance had been had with all laws |
| 6 | and rules of Court relating to the taking of |
| 7 | depositions. |
| 8 | IT IS FURTHER STIPULATED AND AGREED |
| 9 | that it shall not be necessary for any |
| 10 | objections to be made by counsel to any |
| 11 | questions except as to form or leading |
| 12 | questions, and that counsel for the parties may |
| 13 | make objections and assign grounds at the time |
| 14 | of trial, or at the time said deposition is |
| 15 | offered in evidence, or prior thereto. |
| 16 | IT IS FURTHER STIPULATED AND AGREED |
| 17 | that the notice of filing of the deposition by |
| 18 | the Commissioner is waived. |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

2

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | FOR THE PLAINTIFF, JERRY LEON DEES, JR.: |
| 3 | KILBORN, ROEBUCK & McDONALD |
| 3 | Jeffrey R. Sport |
| | (SPORJ5390) |
| 4 | jeff.sport@sportlaw.us |
| 5 | |
| 5 | Vincent F. Kilborn, III |
| | (KILBV4484) |
| 6 | 1810 Old Government Street |
| 7 | Mobile, Alabama 36606 |
| | (251) 479-9010 |
| 8 | |
| 9 | FOR THE DEFENDANTS, HYUNDAI MOTOR MANUFACTURING |
| 10 | ALABAMA, LLC and HYUNDAI MOTOR AMERICA, INC: |
| 11 | OGLETREE, DEAKINS, NASH, SMOAK |
| | & STEWART, P.C. |
| 11 | Matthew K. Johnson |
| 12 | P. O. Box 2757 |
| 13 | Greenville, South Carolina 29602 |
| 13 | |
| 14 | HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC |
| 14 | Christopher N. Smith |
| 15 | chrissmith@hmmausa.com |
| 15 | 700 Hyundai Boulevard |
| 16 | Montgomery, Alabama 36105 |
| 16 | (334) 387-8057 |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |

4

### JAMES ALLEN BROOKSHIRE

1    I, STACEY L. JOHNSON, a CCR of Deatsville,
2  Alabama, and Notary Public for the State of
3  Alabama at Large, acting as Commissioner,
4  certify that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there came
7  before me at 2500 Legends Circle, Prattville,
8  Alabama, beginning at 9:25 a.m., JAMES ALLEN
9  BROOKSHIRE, witness in the above cause, for oral
10  examination, whereupon the following proceedings
11  were had:
12    JAMES ALLEN BROOKSHIRE,
13  the witness, after having been first duly sworn
14  to speak the truth, the whole truth, and nothing
15  but the truth, testified as follows:
16    EXAMINATION
17  BY MR. KILBORN:
18    Q   State your full name, Mr. Brookshire.
19    A   James Allen Brookshire.
20    Q   How old are you?
21    A   35.
22    Q   Are you married?
23    A   Yes, sir.

5

1    Q   Any children?
2    A   Two of my own and two stepchildren.
3    Q   And just for background information,
4  how old are your own children?
5    A   My little one just turned seven months
6  and the other one is 19 months.
7    Q   Seven months and 19 months?
8    A   Driving my wife nuts.
9    Q   Okay.  And your wife's name?
10    A   Stephanie Lynn Brookshire.
11    Q   And where do you live?
12    A   Where did I live or where do I live
13  currently?
14    Q   Where do you live currently?
15    A   1048 East Poplar Street here in
16  Prattville.
17    Q   Are you currently employed?
18    A   Yes, sir.
19    Q   By who?
20    A   Hyundai Motor Manufacturing.
21    Q   What's your current employment status?
22    A   What do you mean by that?  My
23  position?

6

1    Q   Well, I'm going to let that question
2  stand.  What is your current employment status?
3    A   I'm employed if that's...
4    Q   All right.  You're employed?
5    A   Yeah.
6    Q   How long have you been employed?
7    A   I've been working at Hyundai since
8  August of '05.
9    Q   So you've been employed by -- we'll
10  call it HMMA?
11    A   Yes, sir.
12    Q   Hyundai Motor Manufacturing?
13    A   Yes, sir.
14    Q   Since August of 2005?
15    A   Yes, sir.
16    Q   And what is your current job title?
17    A   Stamping Production Manager.
18    Q   What is that?  What are your job duties
19  as Stamping Production Manager?
20    A   I oversee all the day-to-day operations
21  in the Stamping Shop, whether it be safety,
22  quality, tool and die, scheduling, and any HR
23  Team Member concerns or Team Relations problems.

7

1    Q   Safety, quality?
2    A   Production.
3    Q   Production.
4    A   Scheduling, tool and die, and
5  day-to-day personnel Team Member issues or Team
6  Relations problems.
7    Q   Do you have a work schedule?
8    A   The start time and stop time?
9    Q   Right.
10    A   I start at 5:45 in the morning and
11  usually finish up about 5:30 in the evening.
12    Q   And do you have a lawyer here today?
13    A   Yes, I do.
14    Q   Who is your lawyer?
15    A   Matt and our company lawyer, Chris.
16    Q   And what are your lawyers' last names?
17    A   Chris' last name is Smith.  Matt, I'm
18  rusty on that.
19    Q   What's your other lawyer's last name?
20    A   I'm not sure.
21    Q   So you've got one lawyer here you know
22  his real name and one lawyer here you only know
23  his first name?

8

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

### JAMES ALLEN BROOKSHIRE

1    A    That's correct.
2    **Q    And when did the lawyer that you've**
3    **identified as Matt become your lawyer?**
4    A    His official start date with the case,
5    that was back -- I'm trying to remember the
6    first encounter I had.  That was probably back
7    in April, April time frame.
8    **Q    And how about the lawyer that you've**
9    **identified as Chris Smith?  When did he become**
10   **your lawyer?**
11   A    He's been part of our legal counsel
12   since probably at least about a year I've known
13   him.
14   **Q    Well, I don't want to know just how**
15   **long he's been legal counsel.  I want to know**
16   **how long has Chris Smith been your lawyer.**
17       MR. JOHNSON:  Just for the Record,
18   object to the form.  I don't see the relevance
19   of asking when Chris Smith's start date with
20   HMMA was.
21       MR. KILBORN:  I don't want his start
22   date.  I want to know when Chris Smith became
23   Jim Brookshire's lawyer.

9

1    MR. JOHNSON:  And obviously that would
2    be attorney-client privilege.
3        MR. KILBORN:  Not today it would not
4    be.
5        MR. JOHNSON:  When Chris became
6    involved in representing Mr. Brookshire -- the
7    way you phrased the question -- would certainly
8    be.
9        MR. KILBORN:  Well, you can instruct
10   him not to answer.
11       MR. JOHNSON:  I instruct you not to
12   answer that.
13   **Q    Are you going to follow your lawyer's**
14   **instructions?**
15   A    Yes, sir.
16   **Q    And you're going to refuse to tell me**
17   **the date that Mr. Chris Smith became your**
18   **lawyer; is that right?**
19   A    Yes, sir.
20       MR. JOHNSON:  I mean, Mr. Kilborn, if
21   you'll explain to me why it's relevant and
22   necessary, I'm certainly willing to reconsider,
23   but based on the way you've asked the question

10

1    and your explanation for asking it, I'll
2    instruct him not to answer.  And he's stated he
3    will follow.  However, please understand that
4    I'm willing to reconsider if you're willing to
5    give me some reason to do so.
6        MR. KILBORN:  The reason I think it is
7    relevant and discoverable is because of the
8    Federal Rules of Civil Procedure.  But let's
9    move on from that.
10   **Q    What did you do to prepare for your**
11   **deposition today?**
12   A    I had just met with my legal counsel
13   yesterday and -- to discuss when the time was I
14   was supposed to appear here today and what it
15   was in regards to.
16   **Q    Okay.  Did you review any documents to**
17   **prepare for your deposition?**
18   A    Yes, sir.
19   **Q    What documents did you review?**
20   A    The documents that I had signed back, I
21   believe, in the April time frame that -- the
22   statements I had made in regards to Mr. Dees.
23   **Q    Let's see if we can't identify those.**

11

1    (Whereupon, Plaintiff's Exhibit
2    Number 13 was marked for identification
3    and copy of same is attached hereto.)
4
5    **Q    Mr. Brookshire, take a look at what**
6    **I've marked as Exhibit 13, which is made up of**
7    **two pages and they've got Bates numbers at the**
8    **bottom.  See these little numbers down here at**
9    **the bottom, Dees V HMMA 00037 and 38?**
10   A    Yes, sir.
11   **Q    So just to distinguish between the two**
12   **I'll call it Plaintiff's Exhibit 13.  The first**
13   **one will be 37 and the second one will be 38.**
14   **Are those the documents that you reviewed?**
15   A    Yes, sir.
16   **Q    And are these your statements?**
17   A    Yes, sir.
18   **Q    And you reviewed them to prepare for**
19   **your deposition?**
20   A    (Witness nods head.)
21   **Q    You have to say yes or no.**
22   A    Yes.

12

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

### JAMES ALLEN BROOKSHIRE

1    Q   Any other documents that you reviewed?
2    A   No.
3    Q   And take a look at Exhibit 13, the
4  first document, Bates number 37.  Whose
5  handwriting is that in?
6    A   The signature at the bottom or the
7  handwriting itself?
8    Q   Is that your signature?
9    A   Yes, that's my signature at the bottom.
10   Q   And it's dated February 15, '07?
11   A   Yes, sir.
12   Q   And the second document, Bates number
13  38, is that your signature?
14   A   Yes, sir.
15   Q   And the date is four days later?
16   A   Yeah.
17   Q   Who's handwriting is that?
18   A   Team Relations rep Will Ware.
19   Q   What's the name?
20   A   Team Relations rep William Ware.
21   Q   Did you write up one yourself?
22   A   No.
23   Q   And tell me how it came to pass that
                                              13

1  had told my supervisor about it the next day
2  because I was working night shift when it
3  happened.  My senior manager was sleeping, so
4  I'm not going to wake him up in the middle of
5  the night to tell him something like that.  I
6  just reported it to Mr. Dees' direct supervisor,
7  as well as my own, the next day.
8    Q   Your supervisor was Kevin Hughes?
9    A   No.  That's the team leader for
10  Maintenance.  My direct supervisor is Craig
11  Stapely.
12   Q   Craig Stapler?
13   A   Stapely.
14   Q   What is his job title?
15   A   He's senior manager of Stamping
16  Operations.
17   Q   And did you report anything to
18  Mr. Stapler (sic) or your Team Leader?
19   A   I just reported the incident to
20  Mr. Stapely the next day and reported it to
21  Leon's direct supervisor -- salaried supervisor,
22  Craig Prater.  The team leader that I spoke of
23  on night shift is the team leader over Leon
                                              15

1  you signed the first -- that you had this first
2  interview, Bates number 37.
3    A   The one -- the issue was brought about
4  during a time frame in which Leon's supervisor,
5  Mr. Prater, had asked me about a problem that I
6  had the night before.  I told the Team
7  Leader on the night shift -- because I was
8  currently on night shift at the time covering
9  because we had an assistant manager that had
10  resigned and went to work for another company,
11  and my senior manager had moved me to night
12  shift to cover for his position.  And I had a
13  problem there with Mr. Dees in which he was
14  caught in a position of sleeping, and I had made
15  note to the Team Leader and also informed his
16  assistant manager the next day on day shift.
17   Q   We'll get into that in detail.  Who did
18  you first report that to?
19   A   Reported it to the Team Leader.
20   Q   Who was that?
21   A   Kevin Hughes.
22   Q   Was the Team Leader your supervisor?
23   A   Team Leader is not my supervisor.  I
                                              14

1  Dees, Kevin Hughes.
2    Q   Kevin Hughes?
3    A   Yeah.
4    Q   And so the first person you reported
5  this incident to was Mr. Hughes?
6    A   Yes, sir.
7    Q   And did you report it verbally or in
8  writing?
9    A   Verbally.
10   Q   And what did you tell him?
11   A   I told him I'd caught one of his
12  Maintenance Team Members up there by the control
13  panel upstairs on the third floor in the SOP
14  area sleeping.
15   Q   What's SOP stand for?
16   A   Side outer panel area.  SOP, side outer
17  panel.
18   Q   And why did you report the sleeping
19  incident?
20   A   Because that's an unbecoming nature of
21  conduct or action of a Team Member to be in a
22  concealed area sleeping during working time.
23   Q   What's wrong with sleeping during
                                              16

4 (Pages 13 to 16)

## JAMES ALLEN BROOKSHIRE

1 working time?
2    A  It's not permissible.
3    Q  Why not?
4    A  It's against policy.
5    Q  What's that policy designed to prevent?
6    A  That's unbecoming performance of a Team
7 Member.  They're not doing their job.
8    Q  Not doing their job?
9    A  (Witness nods head.)
10    Q  You have to answer yes or no.  Is that
11 a yes?
12    A  He wasn't doing his job.
13    Q  You nodded and she can't get nods.
14 You have to say yes or no.
15    A  Yes.  He wasn't doing his job.
16    Q  Wasn't doing his job.  Was that a
17 safety issue?
18    A  Could be.
19    Q  How could it be?
20    A  Well, if he'd fall off the -- fall off
21 the chair onto the mezzanine or the catwalk
22 floor, he could injure himself.  Possibly he
23 could fall in the position -- because upstairs
                                                    17

1 '05.  During our two-week orientation, we had
2 Safety members of management come in there and
3 train us on basic fundamentals in operations of
4 the automation in the plant.
5    Q  When myself and Jeff Sport were there
6 yesterday with the two Hyundai attorneys, I
7 noticed we had to wear ear plugs, safety
8 goggles, Kevlar sleeves, and hard hats.  I got
9 the feeling it was sort of a dangerous place to
10 be.  Is that a good description of that plant?
11    MR. JOHNSON:  Object to the form.
12    A  Depending on which area you're in in
13 the plant deems which appropriate PPE is
14 necessary to wear in that department.  Our
15 department, you're exposed to a lot of outer
16 surface metal, sheet metal, which we're in a
17 higher chance of getting lacerations or getting
18 cuts.  And it's always been a standard to wear
19 hard hats in the area.  Each area is designated
20 to wear certain parts of PPE.  Just like in GA
21 all you have to wear out there is safety shoes,
22 safety shoes and safety glasses.
23    Q  Is the part of the plant where you were
                                                    19

1 we have trolleys carrying panels around.  And if
2 he wasn't watching what he was doing or fell in
3 a particular manner, maybe had a bad dream or
4 something like that, if he got up, he could get
5 seriously cut or injured by moving trolleys.
6    Q  And is safety one of the things you're
7 in charge of?
8    A  Yes, sir.
9    Q  Have you had safety training?
10    A  Depends on what training you're talking
11 about.
12    Q  Well, safety in regard to being in the
13 plant.
14    A  I've had lock-out/tag-out training.
15    Q  What's that?
16    A  That's where if you enter any area
17 where operational energy or any potential
18 hazards are in your working area that you can
19 disable that energy source.
20    Q  Any other safety training?
21    A  Not there at that facility.  Just a
22 basic -- excuse me.  We had basic introduction
23 to safety when I first started there in August
                                                    18

1 the night we're talking about -- is that called
2 the Stamping area?
3    A  Yes.
4    Q  And the two large stamping presses
5 stamp out metal sheets --
6    A  Yes, sir.
7    Q  -- into car parts?
8    A  Yes, sir.
9    Q  And they use it with what -- I mean,
10 they accomplish it by hydraulic force?
11    A  They're actually pneumatics and
12 mechanically driven presses.
13    Q  So it's a -- it's not a cutting with,
14 say, a laser torch.  It's a stamping with brute
15 force?
16    A  Yeah.  5400 ton IHI stamping presses.
17    Q  Did you say tons?
18    A  Yeah, 5400 ton presses.
19    Q  Not pounds?
20    A  Right.  Correct.
21    Q  And when that 5400 tons stamps out a
22 part, I imagine that's noisy, isn't it?
23    A  Yeah.
                                                    20

5 (Pages 17 to 20)

**JAMES ALLEN BROOKSHIRE**

1  Q   Do you in that area -- we call it the
2  Stamping Plant; is that correct?
3  A   Yes.
4  Q   The Stamping Plant, what safety gear do
5  you wear?
6  A   I wear sleeves, gloves, eye protection,
7  bump cap. Safety has just designated in the
8  last six months that we need to wear hearing
9  protection and steel-toe shoes.
10 Q   So at the time of the Dees incident,
11 you wore helmets, Kevlar sleeves, gloves?
12 A   Gloves if you're handling material, the
13 steel material.
14 Q   All right. Eye protection?
15 A   Yes, sir.
16 Q   But not necessarily ear plugs?
17 A   Not at that time.
18 Q   How about steel-toe shoes?
19 A   Yes, sir.
20 Q   And you've got on steel-toe shoes now,
21 don't you?
22 A   Yes, I do.
23 Q   And that safety equipment is basically
                                                     21

1  for the protection of the individual who is in
2  the plant?
3  A   Correct.
4  Q   And I also noticed in looking at the
5  plant yesterday that it's a very large building,
6  isn't it?
7  A   Correct.
8  Q   And the levels in the building are
9  floored with what I would call catwalks. Is
10 that a good name for that?
11 A   Yeah, that's appropriate.
12 Q   And a catwalk would be a metal grate?
13 A   Mesh floor.
14 Q   Mesh floor. And the mesh is a steel
15 mesh, isn't it?
16 A   Correct.
17 Q   Almost like a wire, except very heavy
18 gauge metal?
19 A   Yes, sir.
20 Q   And the mesh is put down on -- what do
21 you call them?
22 A   Angle.
23 Q   Angle iron?
                                                     22

1  A   Yes.
2  Q   And welded down on there?
3  A   Yes.
4  Q   And I noticed that in walking across
5  the mesh it was recommended that you walk on the
6  angle iron, not on the mesh itself. Is that a
7  good practice?
8  A   We walk across it. We've been
9  instructed that it's okay to walk across it.
10 Q   Okay. And then the way to get to the
11 different levels is up metal stairs?
12 A   Yes, sir.
13 Q   And the area where you describe where
14 Mr. Dees was sleeping, the trolleys, are those
15 the devices that sort of hang from the ceiling
16 and parts are carried around on some kind of
17 conveyor system?
18 A   Yes.
19 Q   You call those trolleys?
20 A   Yes.
21 Q   And the panel, the SOP panel, why is
22 that -- what does that do?
23 A   The SOP panel is the panel that's hung
                                                     23

1  on the trolley.
2  Q   That's hung on the trolley?
3  A   By the robots in the automation on the
4  back of the press line.
5  Q   The panels that I'm talking about would
6  be the metal panel where Mr. Dees was located.
7  A   Oh, the control panel, electrical
8  control panel.
9  Q   That's different than the SOP?
10 A   Yeah. You've got three levels. You've
11 got the base floor, you've got the second level,
12 which they do the rework for the SOP panels
13 where they have the repair booth and do
14 inspection of those panels, and then the third
15 floor is actually the storage system for the SOP
16 panels.
17 Q   So the SOP panels are part of the
18 automobile eventually?
19 A   Yeah. That's side outer, the big sides
20 of the car.
21 Q   Okay. So what I want to talk about is
22 the control panel where Mr. Dees was.
23 A   Electrical control panel.
                                                     24

6 (Pages 21 to 24)

## JAMES ALLEN BROOKSHIRE

1  Q   What does that control?
2  A   That's the -- I guess you'd -- in base
3  form, you'd say that's the brain behind the
4  operation of the SOP system. It's where they go
5  to check faults and reset faults.
6  Q   What's a fault?
7  A   If they have any kind of fault in the
8  system.
9  Q   Such as?
10  A   Maybe a trolley quit, maybe there's a
11  low voltage fault on one of the trolley boxes
12  and they've got to search for it. Then the
13  fault -- the system itself will capture the
14  fault and then the system will send out to a
15  touch screen and prompt a fault to let
16  Maintenance know that they need to fix the
17  problem.
18  Q   And that touch screen is inside the
19  control panel?
20  A   There's one down on the floor between
21  the presses.
22  Q   Well, how does it show up on the
23  control panel if there's a fault?
                                                    25

1  Q   So was Mr. Dees in Maintenance?
2  A   Yes, he was.
3  Q   Would he have to know how to use that
4  control panel?
5  A   He should.
6  Q   Part of his job?
7  A   He should, yeah.
8  Q   Going back to Exhibit 13, the first
9  page, Bates number 37, is this statement that
10  you signed true and correct?
11  A   Yeah, the best of my knowledge.
12  Q   Okay. You don't want to make any
13  changes in it, do you?
14  A   No.
15  Q   And the second page of that exhibit,
16  Bates number 38, is that also true and correct?
17  A   Yes.
18  Q   Do you want to make any changes in
19  that?
20  A   No.
21  Q   Outside of these two documents, there's
22  no other documents you reviewed?
23  A   No.
                                                    27

1  A   Because you can look in the control
2  panel and you've got PLC processors in there and
3  you'll have input and output analogue blocks.
4  And they'll have certain bits that will be
5  toggled that you can look it up. Maintenance
6  typically has books up there, and they can look
7  at which bit light is toggled on on the input or
8  output card, and that will indicate to them what
9  the fault is.
10  Q   This may be a simplification, but I
11  know on cars nowadays, even when I was growing
12  up, you can go into your car dealership and they
13  can plug in a computer and they can tell what's
14  wrong with the car with the computer. Is that a
15  simplified way of what this control panel can
16  tell you?
17  A   Yeah.
18  Q   You can locate where the fault is by --
19  A   Yeah, they can figure out -- it will
20  give them basic error coding, give them an
21  understanding of what's wrong. It doesn't tell
22  them exactly where the problem is at, but it
23  gives them an idea of what's wrong.
                                                    26

1  Q   What was the reason that the second
2  statement was taken four days later on Bates
3  number 38?
4  A   There was two situations where -- with
5  Team Relations there's an interview with Kevin,
6  then there was another interview later. And
7  they just wanted to reassure that the
8  understanding was the same both times.
9  Q   Who is they?
10  A   Team relations.
11  Q   I mean who? What human being?
12  A   William Ware is the one that took the
13  statements, but whoever he reports to, Audie
14  Swegman and Rob Clevenger and those guys.
15  Q   So what were you told when you --
16  before you did the second interview on February
17  19, '07?
18  A   That -- I wasn't really told anything.
19  They just told me that we needed to make sure
20  that there was a clear understanding of what
21  happened on this night of this incident.
22  Q   Well, is this the first page, Bates
23  number 37 -- that's not a clear understanding?
                                                    28

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## JAMES ALLEN BROOKSHIRE

1    A   I thought it was.
2    Q   So you didn't know why the second one
3    was necessary?
4    A   I didn't understand why they needed
5    another one, but whatever they needed, I told
6    them, you know, I would sign off on it.
7    Whatever information they deemed to make things
8    gel up and what was needed, I was willing to do
9    what they needed to do.
10   Q   And why do you think they needed to
11   make things gel up?
12   A   Make sure my story is consistent to be
13   fair to the Team Member, because that's Team
14   Relations' job to make sure things are fair.
15   Q   Fair to Mr. Dees?
16   A   Yes.
17   Q   Well, you were fair to Mr. Dees on the
18   first statement, number 37, weren't you?
19   A   That's what I seen.
20   Q   Was there anything -- you thought that
21   was complete and accurate, number 37, didn't
22   you?
23       MR. JOHNSON:  Object to the form.

29

1    Q   You're not on drugs?  You're not on
2    alcohol?  You don't have any mental problems
3    now?
4    A   No.  My wife tells me I'm nuts
5    sometimes, but...
6    Q   Well, sometimes they're right and
7    sometimes they're wrong.  But outside of that?
8    A   No.
9    Q   On the night in question -- and I think
10   that is the date of February 14th, according to
11   Exhibit 13, number 37 -- how many people were
12   you in charge of supervising?
13   A   On night shift at that time would have
14   been approximately 30.
15   Q   And were the 30 people scattered around
16   the Stamping Plant?
17   A   Yeah.
18   Q   And at that time, you were in charge of
19   quality, safety, production, those type issues?
20   A   Yeah.  In that position in that place
21   when I was working night shift, I was actually
22   filling in for the responsibility of the
23   assistant manager.  When I'm actually in my full

31

1    A   To the best of my knowledge.
2    Q   Okay.  Did Mr. Ware or anybody else
3    tell you why it was necessary to make things gel
4    up?
5    A   Me using the term gel up was my
6    terminology.
7    Q   I understand.  What did you mean by
8    that term?
9    A   Make sure the story is consistent for
10   fairness to the team member.
11   Q   So fairness to the Team Member would be
12   a paramount?  Fairness to Mr. Dees would be a
13   paramount concern?
14   A   To team relations and for HMMA Team
15   Members in general.  People need to be treated
16   fair and equal.
17   Q   Right.  And you're not on any
18   medication or anything now, are you?
19   A   No.  I've got asthma.  Sometimes I take
20   albuterol.
21   Q   All right.  Well, there's no reason why
22   you cannot testify truthfully today?
23   A   Correct.

30

1    responsibility is when I'm on day shift as the
2    manager where I'm responsible for both shifts.
3    At that time, I was filling in that position for
4    assistant manager on night shift.
5    Q   Who was that?
6    A   Mr. Rick Harvey, which he resigned and
7    moved to a job out in Arizona.
8    Q   And do you know a Mr. Prater?
9    A   Yeah, I know Mr. Prater.
10   Q   What was his job that evening?
11   A   He was not there that time of night.
12   He works day shift as assistant manager over
13   Stamping Maintenance.
14   Q   All right.  Was he Mr. Dees' usual
15   superior or supervisor?
16   A   That was his usual supervisor, yes.
17   Other than the fact of his Team Leader, Kevin
18   Hughes, which he reports to on his shift.
19   Q   Were you given an orientation when you
20   went to work for HMMA?
21   A   Yeah.  Two-week orientation.
22   Q   What did that cover?
23   A   It covers benefits as far as your

32

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

### JAMES ALLEN BROOKSHIRE

1 dental, eye, health, and your different
2 coverages, deductible. You had an introduction
3 to Team Relations. You had an introduction to
4 all the heads of departments and what their
5 functions and responsibilities were for each
6 department. And then Safety and Payroll and
7 Team Relations.
8    **Q  This was a two-week orientation?**
9    A  Yeah.
10    **Q  And I'm going to -- your counsel has**
11 **given us your personnel file. I'm going to mark**
12 **that as Exhibit 14. Do you have access to your**
13 **personnel file?**
14    A  I guess I would. I mean, I've never
15 went up and asked them for anything.
16
17    (Whereupon, Plaintiff's Exhibit
18 Number 14 was marked for identification
19 and copy of same is attached hereto.)
20
21    **Q  I'm going to mark the entire thing as**
22 **Exhibit 14. They've got some numbers at the**
23 **bottom of the page. We'll just refer to those**
33

1 for easy reference. And your employment
2 application in there begins at number 257.
3 Would you turn to that?
4    A  257. Okay.
5    **Q  And I believe it goes from 257 to 260.**
6 **Would you check those four pages and tell me if**
7 **that's your employment application?**
8    (Witness reviews document.) Yeah.
9    **Q  That's it?**
10    A  Yeah.
11    **Q  And it looks like on Certification on**
12 **last page it says right above your signature --**
13 **I'll just paraphrase. It just says everything**
14 **on here is true and correct. Would that be a**
15 **true statement?**
16    A  Yes, sir.
17    **Q  And then it also said any material**
18 **omissions and misstatements are grounds for**
19 **termination?**
20    A  Yeah.
21    **Q  You understood that?**
22    A  Yeah.
23    **Q  And then if you flip to the first page,**
34

1 **257, it has a notice to applicant down at the**
2 **bottom of the page. Did you read that?**
3    A  The Applicant Notice?
4    **Q  Right.**
5    A  Yes, sir.
6    **Q  Do you know what that means?**
7    A  Yeah.
8    **Q  What does it mean?**
9    A  HMMA endorses the EEO requirements,
10 equal employment opportunities for people, and
11 doesn't place any discrimination on whatever
12 your status is in regards to your background.
13    **Q  All right. And then on the second**
14 **page, Bates number 257, about a third of the way**
15 **down, it says do you know of any reason why you**
16 **would not be able to perform the various**
17 **functions of the job you're seeking. See that?**
18    A  Yeah.
19    **Q  And you checked off no?**
20    A  Right.
21    **Q  Did you know what jobs you were seeking**
22 **at the time?**
23    A  At the time, I had had a recruiter that
35

1 contacted me. I had graduated with my Master's
2 Degree and I was interested in pursuing other
3 opportunities, because at the time, General
4 Motors was actually doing salary freezes,
5 overtime freezes and there really wasn't much
6 opportunity to pursue a better career, better
7 profession. So this recruiter contacted me and
8 disclosed a position opening to me at Hyundai.
9 And at that time, it was assistant manager
10 position open in the Stamping Weld Shop. And
11 after I went for the first interview, everything
12 went extremely well. I came in for the second
13 interview, and it went extremely well, also.
14 And they actually offered me the Stamping
15 Manager's position because of my background of
16 experience and the satisfaction of the
17 interviews.
18    **Q  And you were hired into that position?**
19    A  Yes, sir.
20    **Q  So you've held the same position from**
21 **start to now?**
22    A  Correct.
23    **Q  So you were actually hired into a**
36

9 (Pages 33 to 36)

## JAMES ALLEN BROOKSHIRE

1  management position and still maintain that now?
2     A   Correct.
3     Q   And look at number 270. That's
4  Acknowledgment of Sexual Harassment Prevention
5  Training. It's got a checklist of things that
6  you've received.
7     A   270?
8     Q   270. You signed that?
9     A   Correct.
10    Q   And it looks like, for instance, you
11 viewed a videotape called Sexual Harassment.
12 That's number 3.
13    A   Yeah.
14    Q   And you reviewed -- for instance,
15 number 8, it says I have received and reviewed a
16 copy of HMMA's Serious Misconduct Policy.
17    A   Yes.
18    Q   Do you know what the Serious Misconduct
19 Policy is?
20    A   It depends on the circumstances of what
21 the employee had done as far as the Serious
22 Misconduct Policy applying to them. I don't
23 have it memorized verbatim in my head.

                                                     37

1     A   Yeah.
2     Q   All right. Is there anything unclear
3  about your testimony so far?
4     A   No.
5     Q   Now, Exhibit 15, is that a copy of a
6  manual that you would have received, knowing
7  that this may not be the exact piece of paper
8  that you got?
9     A   Yeah, this is a Team Member Handbook
10 that's been handed out to myself and all the
11 Team Members in the plant.
12    Q   Do you still have your copy?
13    A   I handed it out to one of my assistant
14 managers. He borrowed it right before I went on
15 Thanksgiving holiday, and I'm not sure if he
16 returned it because I haven't looked for it back
17 on my desk.
18    Q   But you do have a copy when it's not
19 loaned out to somebody else?
20    A   Yes.
21    Q   And you understand this is the rules
22 and regulations of Hyundai with regard to the
23 employees?

                                                     39

1
2     (Whereupon, Plaintiff's Exhibit
3  Number 15 was marked for identification
4  and copy of same is attached hereto.)
5
6     Q   I'm going to mark Exhibit Number 15, a
7  copy of a manual called Team Member Handbook,
8  and have you take a look at that and see if that
9  is something that you received and reviewed.
10    A   Yes, I have a copy of this.
11    Q   What did you write down there?
12    A   Exhibit number.
13    Q   Exhibit number?
14    A   Right.
15    Q   Can I see those notes you're writing
16 down?
17    A   (Witness complied.)
18    Q   What's the purpose of you keeping your
19 own notes in the deposition?
20    A   Clarity for my own self-purpose.
21    Q   What self-purpose would that be?
22    A   Clarity.
23    Q   For you?

                                                     38

1     A   Yes.
2     Q   And there's a section in here on
3  serious misconduct, I believe, isn't it?
4     A   Yes, there is. It's under Disciplinary
5  section.
6     Q   And take a look at page 36.
7     MR. JOHNSON: Do y'all have an extra
8  one?
9     MR. KILBORN: I don't but I think it's
10 produced.
11    Q   Serious misconduct starts at the bottom
12 of 33 and you go over to page 34, and toward the
13 middle and lower part of the document it's got
14 listed below are some examples of activities
15 that statute serious misconduct at HMMA. You
16 see that?
17    A   Yes, sir.
18    Q   Are you familiar with those?
19    A   Like I say, I don't have all of them
20 exactly memorized, but if I have something in
21 question, that's why we have the handbook for a
22 reference tool.
23    Q   Well, you had to read it and

                                                     40

**JAMES ALLEN BROOKSHIRE**

1  acknowledge what it said in the beginning,
2  didn't you?
3      A   Correct.
4      Q   Did you have any questions about these
5  rules?
6      A   No, sir.
7      Q   And serious misconduct can result in
8  termination, can it not?
9      A   It can.
10     Q   Okay. All right. And, for instance,
11  the first bullet point under the list it says
12  serious and/or excessive violations of HMMA's
13  attendance program. You see that?
14     A   Yes, sir.
15     Q   The second bullet point says serious
16  and/or excessive violations of HMMA's
17  performance standards. You see that?
18     A   Yes, sir.
19     Q   It goes on. It's got quite a few
20  bullet points. Which of these bullet points did
21  Mr. Dees violate?
22         MR. JOHNSON: Object to the form of the
23  question. Are you asking for -- if he knows for
                                                    41

1      Q   Okay.
2      A   The second or third one from the
3  bottom.
4      Q   Okay. Which other one?
5      A   Deliberately using unsafe work
6  practices that might seriously jeopardize the
7  health and safety of the Team Member.
8      Q   How did Mr. Dees deliberately use
9  unsafe work practice that might seriously
10  jeopardize the health and safety of the Team
11  Member or a fellow Team Member?
12     A   Jeopardizing his own health and safety
13  by sleeping in an area that's considered
14  dangerous.
15     Q   How is it considered dangerous?
16     A   Because of the moving panels. You have
17  moving sheet steel that moves around the area.
18  And being in a state of not being aware of your
19  surroundings, he could easily put himself in a
20  state of jeopardy to cut himself or get himself
21  hurt.
22     Q   So your opinion is Mr. Dees
23  deliberately put himself in a dangerous
                                                    43

1  sure, or are you asking what his opinions are?
2          MR. KILBORN: My question will just
3  stand like it is.
4          MR. JOHNSON: Okay. Object to the
5  form.
6      A   (Witness reviews document.) Basically
7  in the condition in which he was in the bullet
8  insubordination, including with failing to
9  perform assigned work and deliberately
10  performing unsafe work practices.
11     Q   Why don't you just take this black felt
12  pen or take your own pen there and just circle
13  the ones that you saw Mr. Dees violate?
14     A   (Witness complied.)
15     Q   Would you put your initials and today's
16  date by that?
17     A   (Witness complied.)
18     Q   All right. So we all know since we
19  don't have copies. Would you read for us
20  both of those so we can markup our copies?
21     A   Insubordination, including refusing to
22  perform assigned work or refusing to follow
23  direction of HMMA. Deliberately --
                                                    42

1  situation where he himself might get hurt?
2      A   Yes.
3      Q   Go back up to the one you marked first,
4  insubordination. Tell me how Mr. Dees was
5  guilty of insubordination as outlined in that
6  bullet point.
7      A   He wasn't performing work. He was off
8  his -- lunch period time off in a concealed area
9  asleep.
10     Q   Okay. Concealed area?
11     A   That's not -- in a hidden area. That's
12  not a trafficked area. There was no problems at
13  the time with the SOP system.
14     Q   How did you know that?
15     A   Because I was up there.
16     Q   And that's why you were up there?
17     A   I was up there checking quality
18  problems.
19     Q   Quality problems?
20     A   Yeah. Quality problems on the CM side
21  outer panel.
22     Q   What were the quality problems you were
23  checking?
                                                    44

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

**JAMES ALLEN BROOKSHIRE**

1    A    For wrinkles and splits on the panel.
2    Q    Did you have some suspicion that there
3    were quality problems?
4    A    Yeah.
5    Q    What made that occur to you?
6    A    We got a call from the Quality
7    Department, the Weld Shop, and they had told us
8    they'd seen some problems with it. The other
9    piece was we had the die back in the shop being
10   worked on. We had to bring it back up. We ran
11   very close to running the Body Shop out of
12   parts. So we had to put the job back in the
13   press quickly to get parts to the Weld Shop, and
14   we had to check the quality on them quickly also
15   to make sure we weren't going to jeopardize the
16   customer in shutting down production at the Weld
17   Shop.
18   Q    And do you agree with the fact that
19   Mr. Dees should have been terminated for
20   violating these two bullet points, Serious
21   Misconduct Policies?
22         MR. JOHNSON:  Object to the form.
23   A    For any employee taking their own time
                                                    45

1    Now, the part of it that I was not was
2    not under the influence on HMMA property.
3    Q    Well, did you violate that policy you
4    just read or not?
5    A    I don't actually know the policy of
6    that, but I know I failed a urine exam when I
7    went up to Medical after I had been cut. I had
8    been cut through my glove when I was helping
9    some Team Members pull some scrap out of the
10   scrap shoot. I went to Medical to be treated
11   for the laceration I received on my hand, and
12   it's protocol for safety incidents to be drug
13   tested.
14   Q    So you got caught with drugs?
15         MR. JOHNSON:  Object to the form.
16   A    I had shown up positive in the urine
17   sample.
18   Q    But you didn't expect to be caught, did
19   you?
20   A    I didn't think about it because of the
21   time of when the incident happened I had been at
22   a party and drinking alcohol.
23   Q    You got caught?
                                                    47

1    and not being -- performing the regular job task
2    and sleeping on the job, I do have a problem
3    with that. I do believe that's a problem
4    conflicting with company policy.
5    Q    So you believe he should have been
6    terminated?
7    A    Yes.
8    Q    So you agree with that?
9    A    Yes.
10   Q    And how many of these serious
11   misconduct policies on page 34 and 35 have you
12   yourself violated?
13   A    One of them.
14   Q    Which one is that?
15   A    The use of -- use of illegal drugs.
16   Q    Would you read for us that willful
17   misconduct that you yourself violated?
18   A    Use or possession, sale, transfer or
19   being under the influence of illegal drugs,
20   alcohol, or other intoxicating substances at any
21   time on HMMA property. Gifts of alcohol or
22   coolers containing alcohol are prohibited at
23   HMMA.
                                                    46

1    A    Showed up positive in the urine sample,
2    yes.
3    Q    What about the alcohol? Did they catch
4    you with that, too?
5    A    No.
6    Q    Did you tell them you'd also been
7    drinking alcohol?
8    A    On the weekend I had, that Saturday,
9    but I wasn't at work.
10   Q    Did you tell them that?
11   A    Yeah, I disclosed that to the HR
12   people, and then also I had to attend a
13   substance abuse program -- alcohol and substance
14   abuse program for condition of employment.
15   Q    What was the date you got caught?
16   A    March the 24th or 5th or 6th somewhere
17   in there. Towards the last week of March.
18   Q    2007?
19   A    Yes, sir.
20   Q    So what happened? You were the
21   Stamping Plant manager at that time?
22   A    Yeah.
23   Q    In charge of 30 people?
                                                    48

12  (Pages 45 to 48)

JAMES ALLEN BROOKSHIRE

1    A   Yeah.  As the manager, I'd be in charge
2  of the whole department then, but at that time,
3  I was just in charge of night shift.  That would
4  be correct.
5    Q   How many people on the night shift
6  would you be in charge of?
7    A   Night shift is 30 people.  But the
8  department as a whole is around 80 people.
9    Q   And you were in charge of the night
10  shift then?
11    A   Right.
12    Q   But you're also in charge of the whole
13  department?
14    A   Normally.
15    Q   Normally.  So that would be 80 people?
16    A   Correct.
17    Q   And you would be in charge of the
18  safety of those 80 people?
19    A   Correct.
20    Q   So you showed up on the job with
21  cocaine in your system and alcohol in your
22  system and in charge of the safety of 30 people
23  in Stamping Plant?

49

1    Q   Knew what it would do to the human
2  brain?
3    A   Yes, sir.
4    Q   Knew what it would do to your brain?
5    MR. JOHNSON:  Object to the form.
6    Q   Is that correct?
7    A   I knew the feeling.
8    Q   Right.  Well, you knew it was -- it's a
9  brain-altering substance, didn't you?
10    MR. JOHNSON:  Object to the form.
11    A   I know what the feeling is.
12    Q   Well, you know it's a mind-altering
13  substance, don't you, Mr. Brookshire?
14    MR. JOHNSON:  Object to the form.
15    Q   You can answer me.
16    A   I already have.
17    Q   Well, you say you knew what it felt
18  like.  I want to know did you know what it does
19  to the brain.
20    A   I had done classes on it.  I've had
21  classes on it back in high school, Health and
22  Science classes.
23    Q   So you knew it was an illegal drug;

51

1    MR. JOHNSON:  Object to the form.
2    A   I tested positive for -- on a drug
3  test, not alcohol.
4    Q   Well, but you had been using alcohol?
5    A   On the weekend when I wasn't at the
6  plant.  Correct.
7    Q   Well, you said it.  I just want to find
8  out about it.  You had been using alcohol and
9  you'd been -- what did you do?  Snort cocaine?
10    MR. JOHNSON:  Object to the form.
11    A   I had had a person at the party hand me
12  some out of their pocket.
13    Q   Did you snort it?
14    A   Yeah.
15    Q   How did you know how to ingest it?
16    A   During my younger, stupid days I had
17  messed around with it in my mid 20s.
18    Q   So you used cocaine before?
19    A   Yeah, my younger days I had.
20    Q   You knew how to snort it?
21    A   Yes, sir.
22    Q   Knew what it was?
23    A   Yes, sir.

50

1  correct?
2    MR. JOHNSON:  Object to the form.
3    A   Correct.
4    Q   And you knew it was a crime; correct?
5    MR. JOHNSON:  Object to the form.
6    A   Correct.
7    Q   And you knew that it has serious long-
8  and short-term effects; correct?
9    MR. JOHNSON:  Object to the form.
10    A   I'm not an expert on that subject
11  matter.  I couldn't tell you what the exact
12  long-term and short-term effects are on it.
13    Q   I thought you said you took some course
14  or class on it?
15    A   High school.
16    Q   In high school.  All right.  Well, are
17  you on drug rehab now?
18    A   No.
19    Q   Were you ever on drug rehab?
20    A   There was a three-week program,
21  substance abuse program.
22    Q   When were you on that program?
23    A   April, first part of May.  Three

52

13 (Pages 49 to 52)

## JAMES ALLEN BROOKSHIRE

| | |
|---|---|
| 1  weeks.  It's a three-week program. | 1 |
| 2  **Q  2007?** | 2  **Q  Turn back if you would to the Team** |
| 3  A  Correct. | 3  **Member Handbook.  That's Exhibit 15.  We were** |
| 4  **Q  Put on by who?** | 4  **looking at that earlier.  Page 34.  That's that** |
| 5  A  By the HR group.  It's -- it was a | 5  **little list of serious misconduct.  How about** |
| 6  condition of employment. | 6  **circling that one that you say you violated and** |
| 7  **Q  You mean --** | 7  **put your name and your initials?** |
| 8  A  A successful completion. | 8  A  (Witness complied.) |
| 9  **Q  So it's Hyundai?** | 9  **Q  Have you done that?** |
| 10  A  Correct. | 10  A  Yeah. |
| 11  **Q  So you spent how many weeks in a** | 11  **Q  Okay.  So you said you had abused** |
| 12  **Hyundai substance abuse program?** | 12  cocaine early on in life? |
| 13  A  Three weeks. | 13  A  Yeah. |
| 14  **Q  Three weeks.  Did you get paid for** | 14  **Q  Over what period of time?** |
| 15  **going?** | 15  A  Mid 20s.  Between 24 and 26, 27. |
| 16  A  Yes. | 16  Somewhere around there. |
| 17  **Q  Did you go on company time?** | 17  **Q  And then you're 35 now?** |
| 18  A  I went on -- you get put on disability. | 18  A  Excuse me? |
| 19  **Q  So you were put on disability?** | 19  **Q  How old are you now?** |
| 20  A  Correct. | 20  A  35. |
| 21  **Q  So you got paid as a disabled person?** | 21  **Q  35.  And where was this party you were** |
| 22  A  However the program works.  They call | 22  **at?** |
| 23  it -- however it works out.  I don't know all | 23  A  Place over in Prattville. |
| 53 | 55 |

| | |
|---|---|
| 1  the stipulations. | 1  **Q  Prattville.  Whose house?** |
| 2  **Q  What were you told?** | 2  A  Hector. |
| 3  A  That I had to complete a successful -- | 3  **Q  What's the name?** |
| 4  how do I put it -- I had to complete the program | 4  A  Hector. |
| 5  successfully to maintain my job, and then I | 5  **Q  Hector.  What's the full name?** |
| 6  would be monitored for two years after at random | 6  A  Hector.  I can't remember his last |
| 7  drug and alcohol screens.  And at any point in | 7  name.  My wife -- my stepdaughter is good |
| 8  time if I tested positive on either one of | 8  friends their daughter, and that's why we were |
| 9  those, I would meet immediate termination of my | 9  over there.  I believe his name is Hector Gomez, |
| 10  employment. | 10  I think. |
| 11  **Q  So were you -- you were still employed** | 11  **Q  You didn't know Hector Gomez?** |
| 12  **while you were on this Hyundai substance abuse** | 12  A  I knew him, yes. |
| 13  **program?** | 13  **Q  You knew him.  It must have been a** |
| 14  A  Correct. | 14  **pretty fun party, huh?** |
| 15  **Q  But you didn't receive your regular** | 15  MR. JOHNSON:  Object to the form. |
| 16  **salary, you received disability?** | 16  A  It was just a party. |
| 17  A  Correct.  That was my -- I didn't look | 17  **Q  All right.  So it was just a party.  So** |
| 18  into all that, so I don't know how all that | 18  **you were drinking alcohol and snorting cocaine** |
| 19  works out but I was paid while I was gone. | 19  **at this party; is that correct?** |
| 20  **Q  All right.** | 20  A  Yeah. |
| 21 | 21  **Q  Did you cut it yourself?** |
| 22  (Whereupon, a discussion was held off the | 22  A  No. |
| 23  Record.) | 23  **Q  Who cut it?** |
| 54 | 56 |

14  (Pages 53 to 56)

## JAMES ALLEN BROOKSHIRE

1    A  A guy that I didn't know.
2    **Q  Did you pay for it?**
3    A  I didn't know the guy.  No.
4    **Q  It was given to you?**
5    A  Yeah.  He had one of those little --
6  little things that's already cut up in there and
7  they carry it around in a vial.  He just...
8    **Q  You had seen that before?**
9    A  Yeah.
10    **Q  Have you used that before?**
11    A  Yeah, I have.
12    **Q  I've looked up how cocaine works.  One**
13  **of the descriptions that I found, I'm going to**
14  **read it to you.  See if you agree with it.  It**
15  **causes initially euphoria and a sense of buoyant**
16  **well-being marked by a feeling of complete**
17  **self-confidence, as well as pleasant**
18  **hallucinations, visual and auditory.  The peak**
19  **lift lasts only briefly, however, only 15 to 30**
20  **minutes.  Although, lesser effects last up to**
21  **two to four hours.  Do you know that that's what**
22  **it does?**
23    A  Euphoria.  I've experienced that with
                                                    57

1    A  it, but not hallucinations.
2    **Q  So you would be immune to that type of**
3  **effect?**
4       MR. JOHNSON:  Object to the form.
5    **Q  Is that correct?**
6    A  I don't know if anybody is immune to
7  anything.  But I can just tell you what I've
8  experienced with it.
9    **Q  How many other people were there**
10  **snorting cocaine?**
11    A  I just know about myself and the other
12  guy that had given me some.  I don't know who
13  else.
14    **Q  And you were drinking alcohol at the**
15  **same time?**
16    A  Yes, sir.
17    **Q  What's the effect of alcohol combined**
18  **with cocaine?**
19       MR. JOHNSON:  Object to the form.
20    A  I'm not an expert on that.  I mean, I
21  can tell you how I felt.
22    **Q  Yeah.  How did you feel?**
23    A  The alcohol is a depressant.  Cocaine
                                                    58

1  is a stimulant.  I mean, you're almost leveled
2  out.
3    **Q  So you felt leveled out?**
4    A  (Witness nods head.)
5    **Q  Is that correct?**
6    A  Yeah.
7    **Q  All right.  And did you know -- how did**
8  **you know that the alcohol and cocaine had that**
9  **effect?**
10    A  I told you.  I had had experience with
11  both of them in the past.
12    **Q  So you'd actually done both of them in**
13  **the past together?**
14    A  I have before, yes.
15    **Q  So sometimes you'd snort cocaine and**
16  **use the alcohol to level it out; sometimes you'd**
17  **use the alcohol and use the cocaine to level it**
18  **out?**
19       MR. JOHNSON:  Object to the form.
20    **Q  Isn't that right?**
21    A  I guess.
22    **Q  Well, don't guess.  Tell me.  What's**
23  **the truth?**
                                                    59

1    A  That's what I had done at the time.
2    **Q  And what time was this party over?**
3    A  Probably around 11 or 12.
4    **Q  Midnight?**
5    A  Probably around there.
6    **Q  And what time did you go to work?**
7    A  I didn't go to work until that Monday.
8  That was Saturday night.
9    **Q  Saturday night.  So you didn't know**
10  **whether or not the cocaine was still in your**
11  **system, did you?**
12    A  No.  Obviously if I knew that I had
13  done it and done a lot of it, I wouldn't have
14  even went to the hospital to get -- because I
15  know it's a known protocol to get drug tested.
16    **Q  What was that?**
17    A  I said obviously if I knew that I had
18  done a lot of it and intentionally done it, I
19  wouldn't have even went up to the hospital to
20  get treatment for my cut.
21    **Q  So when you cut yourself, you knew**
22  **that you were going to get drug tested, didn't**
23  **you?**
                                                    60

                                    15 (Pages 57 to 60)

### JAMES ALLEN BROOKSHIRE

1   A   Yeah.
2   Q   Why didn't you just fess up before they
3   found it?
4   A   Because I didn't acknowledge it because
5   of the state I was in in intoxication and
6   drinking alcohol.
7   Q   You were still intoxicated?
8   A   No. Not at that time, no. But at the
9   time I had done the cocaine I had been.
10  Q   All right. And there's various
11  nicknames for this stuff. Which one do you use?
12  A   I just call it coke.
13  Q   Coke. Have you ever heard it referred
14  to as flake or free base or lady or nose candy
15  or rock snow or anything like that?
16  A   I've heard it called snow before, but
17  that's about it.
18  Q   How about big C?
19  A   Huh-uh.
20  Q   How about blow?
21  A   I have heard of that because I've seen
22  a movie called Blow.
23  Q   Okay. Before you went on this Hyundai
                                                        61

1   A   Like I said, I knowingly didn't think
2   it was in me.
3   Q   You wouldn't have volunteered it, would
4   you?
5   A   No.
6   Q   How about a hair sample? Did they take
7   a hair sample?
8   A   They didn't take one.
9   Q   Did somebody else take one?
10  A   Did somebody...
11  Q   You can take hair samples and find out
12  about cocaine use, too, can't you?
13  A   I don't know. I know you can find it
14  in urine, and I understand that you can find it
15  in blood but I don't know about hair.
16  Q   Well, I was giving you what I thought
17  was your whole personnel file. Why isn't this
18  drug test in your personnel file?
19  A   Why what?
20  Q   I don't see the drug test, the urine
21  test in personnel file. Why isn't it in there?
22  A   I couldn't answer. I'm guessing they
23  probably keep that in Medical Department or
                                                        63

1   drug treatment program, had you ever been on any
2   other drug treatment programs?
3   A   No.
4   Q   And with cocaine in your system and
5   managing 30 people that day you don't feel like
6   you had created an unsafe work practice?
7       MR. JOHNSON: Object to the form.
8   A   It wasn't in my system at work. I
9   wasn't at work.
10  Q   Well, it was in your system because
11  they found it on the job, didn't they?
12  A   I tested positive in urine, but I
13  wasn't knowingly taking it at work or going to
14  work taking it.
15  Q   So it was in your urine; correct?
16  A   Correct.
17  Q   Well, why did they take a urine sample
18  if all you came in there for was a cut?
19  A   It's protocol for every safety incident
20  to be drug tested.
21  Q   And if they hadn't found it in your
22  urine sample, you wouldn't have volunteered it,
23  would you?
                                                        62

1   Teams Relations keeps it. I'm not sure.
2   Q   Did the 30 people under your
3   supervision while you had cocaine in your
4   system -- did they know that you had cocaine in
5   your system?
6       MR. JOHNSON: Object to the form.
7   A   No.
8   Q   You think they would have entrusted you
9   with their safety if they had known you had
10  cocaine in your system?
11      MR. JOHNSON: Object to the form.
12  A   I'm not sure. I can't answer that for
13  them.
14  Q   Well, would you trust somebody
15  supervising you in a dangerous plant like that
16  with cocaine in their system?
17      MR. JOHNSON: Object to the form.
18  A   I can't -- I mean, I know how I had
19  felt when I was on it. I can't -- I can't...
20  Q   So are you -- you made a medical
21  determination that you weren't affected by this
22  cocaine and that's why you went to work?
23      MR. JOHNSON: Object to the form.
                                                        64

### JAMES ALLEN BROOKSHIRE

1    A   No.
2    Q   Well, why did you go to work with this
3  stuff in your system?
4        MR. JOHNSON:  Object to the form.
5    A   Because I knowingly wasn't -- obviously
6  the urine sample tested positive.  But you
7  yourself just read that the effects last how
8  long?
9    Q   Well, I just read the short-term
10  effects.  Do you want me to read you the
11  long-term effects?
12    A   That's with how much usage?
13    Q   Well, what are the long-term effects?
14  You've been through the program.  Did you learn
15  what they are?
16        MR. JOHNSON:  Object to the form.
17    Q   Tell me what you learned.
18    A   With serious usage and consumption, you
19  will have problems down the road with lower
20  dopamine samples in your brain internally.
21    Q   Okay.  Well, other than lower dopamine,
22  what other long-term effects are there?
23    A   Depression.
                                              65

1    Q   So you took the risk with your safety
2  and the safety of your fellow workers that some
3  of those effects might take place, didn't you?
4        MR. JOHNSON:  Object to the form.
5    A   At the time when I was under it, that
6  was the short-term side effects.
7    Q   How do you know you haven't suffered
8  long-term side effects?
9    A   I'm not a medical expert.  I can't
10  justify that.  But I know in the past -- from
11  what I understand of that class after you
12  discontinue use of it, your dopamine levels will
13  come back and level out and your mindset is
14  normal.
15    Q   But you didn't know that at the time
16  you got caught, did you?
17    A   No.
18    Q   And you think showing up at work with
19  cocaine in your system is not near as bad as
20  sleeping on the job, is it?
21        MR. JOHNSON:  Object to the form.
22    A   I can't -- I can't answer that one.
23    Q   Well, you're a manager.  What do you
                                              67

1    Q   So you've never suffered anything like
2  rapid heartbeat?
3    A   Instantaneously you do.
4    Q   How about rapid breathing?
5    A   Instantaneously you do.
6    Q   How about soaring blood pressure?
7    A   Instantaneously.
8    Q   How about palpitations?
9    A   I don't know about that one.
10    Q   Sweating?
11    A   Yeah.
12    Q   Severe headache?
13    A   No.
14    Q   Pallor?
15    A   What's that?
16    Q   Pale.  You haven't ever suffered that?
17    A   Huh-uh.
18    Q   And you do know that use of cocaine can
19  sometimes result in heart failure and death,
20  don't you?
21        MR. JOHNSON:  Object to the form.
22    A   My understanding taking of that class
23  in mass quantities it can.
                                              66

1  think?
2    A   To me, it would depend on if the person
3  just done it or if they'd been off of it for a
4  couple of days.  To me, there's a big
5  difference.  There's the quick effects and the
6  long-term effects.  The quick effects, I
7  wouldn't trust somebody at work.  Just like with
8  alcohol or somebody experiences problems and
9  uncontrolled states and drinking excessive
10  amounts of coffee and caffeine.
11    Q   So you equate cocaine usage to drinking
12  coffee?
13    A   If I drink two or three cups of coffee
14  and did a snort of that, yeah, I would.
15    Q   Have you ever heard of a Hyundai coffee
16  abuse program?
17    A   No, they don't do that because coffee
18  is legal.
19    Q   Have you ever served any time in prison
20  for this cocaine habit?
21    A   No, sir.
22        MR. JOHNSON:  Object to the form.
23    Q   Did Hyundai report you to law
                                              68

17  (Pages 65 to 68)

## JAMES ALLEN BROOKSHIRE

1  enforcement?
2      A   I have no idea.
3      Q   Have you ever bought the cocaine?
4      A   In the past when I was younger, I --
5          MR. JOHNSON:  Just a second.
6  Obviously, object to the form of the question.
7  I'm not sure it's relevant here.  But
8  additionally to the extent that I don't want him
9  to make any statements that might get him into
10  criminal jeopardy.
11         MR. KILBORN:  Well, he can take the
12  Fifth Amendment.  But I want to know the answer
13  to that question.  This is the eye witness to
14  this case who has been caught red handed using
15  cocaine, showed up at the Hyundai plant with it
16  in his system in a managerial position, given a
17  pass, was terminated, around the time that
18  these incidents occurred.  I want to go into
19  that.  I think it's a credibility issue.
20         MR. JOHNSON:  And I understand your
21  point.  However -- and we've allowed him to
22  testify fully about his cocaine usage and you've
23  asked him plenty of questions about what

                                                        69

1  happened at work.  But beyond that, I see no
2  relevance, and I can't imagine anything -- I'm
3  not a criminal lawyer, and my recommendation to
4  him is to seek criminal counsel if he's going to
5  testify beyond what he's already testified to.
6          MR. SPORT:  Well, he indicated he was
7  represented by counsel today, so direct him not
8  to answer.
9          MR. JOHNSON:  Well, then, I direct him
10  not to answer that question.
11         MR. KILBORN:  Well, I'm going to pursue
12  this.  You can direct him not to answer.
13     Q   Are you refusing to answer whether or
14  not you have ever purchased cocaine?
15         MR. JOHNSON:  Under my advice, he is.
16     Q   All right.  Have you ever sold cocaine?
17         MR. JOHNSON:  Again, we would also --
18  my advice is that he not answer that and he will
19  not answer that.
20         MR. KILBORN:  Is he taking the Fifth
21  Amendment?
22         MR. JOHNSON:  Yes.
23     Q   Have you ever had possession of

                                                        70

1  cocaine?
2          MR. JOHNSON:  Again, same response
3  there.  My advice is that he not answer.  He
4  pleads the Fifth Amendment and is not answering.
5      Q   Have you ever had possession of drug
6  paraphernalia?
7          MR. JOHNSON:  Again, same response to
8  that issue.
9      Q   Are you taking the Fifth Amendment on
10  that, too?
11     A   Yes.
12     Q   Well, you committed a felony, right,
13  prior to showing up at work, didn't you?
14         MR. JOHNSON:  Object to the form.  And
15  same response to that question.
16     Q   You take the Fifth Amendment on that?
17     A   Yes.
18     Q   Well, don't you think commission of a
19  felony would be willful misconduct under
20  anybody's definition?
21         MR. JOHNSON:  Object to the form.
22     A   I think that condition lies within the
23  company's policies.  That's not something that I

                                                        71

1  solely determine myself.
2      Q   Well, you -- on your application we
3  reviewed a minute ago in Bates number 258, you
4  said on your application do you know of any
5  reason why you would not be able to perform
6  various functions of the job you're seeking
7  now.  Wouldn't you agree that snorting cocaine
8  could impair you in performing your job?
9          MR. JOHNSON:  Object to the form.
10     A   If I had deliberately done it right
11  before I went to work or during work, I would
12  agree with that.
13     Q   Suppose you had not deliberately done
14  it.
15     A   I think I would know if I had
16  deliberately done it or not right before I went
17  to work or not.
18     Q   Well, why didn't you reveal in this
19  application that you were basically a cocaine
20  abuser?
21         MR. JOHNSON:  Object to the form.
22     A   At the time in which this application
23  was filled out, I wasn't.  And to get a job at

                                                        72

                                        18  (Pages 69 to 72)

## JAMES ALLEN BROOKSHIRE

1  Hyundai, I had to take a drug test; hair test,
2  blood test, and urine.
3      Q   So you do know what a hair test is?
4      A   At that time they took it.  But what
5  you asked me was if I knew if it showed up on it
6  or what it takes to show up on it.  I don't
7  know.
8      Q   So you took a hair test, a blood test,
9  and a urine test?
10     A   Yeah.
11     Q   But you knew you were going to have to
12  take that; right?
13     A   I what?
14     Q   You knew to get a job you were going to
15  have to take that drug screen, didn't you?
16     A   Not necessarily.  I know you've got to
17  take urine tests to get jobs.
18     Q   Well, you knew -- you'd consented to
19  taking a drug test on your application, didn't
20  you?
21     A   Right.
22     Q   So you knew they were going to test you
23  for cocaine and any other drug, didn't you?
                                                73

1      Q   All right.  So you made the judgment as
2  a manager that since you felt physically free of
3  the effects of cocaine you could go in there and
4  supervise 30 workers?
5      MR. JOHNSON:  Object to the form.
6      Q   Is that correct?
7      A   I felt confident in my physical
8  condition in which I appeared to work on Monday.
9      Q   Well, apparently, Hyundai didn't feel
10  confident in that, did they?
11     MR. JOHNSON:  Object to the form.
12     A   They were following protocol for a
13  positive test on a urine sample.
14     Q   Well, do you know why Hyundai has got a
15  policy against drug usage?
16     A   I wouldn't be able to tell you all the
17  reasons why.  I mean, I didn't make that policy
18  and I wouldn't be able to tell you what -- all
19  the reasons why.
20     Q   Well, tell me one reason why.
21     MR. JOHNSON:  Object to the form.
22     A   Probably with deliberate or current
23  usage it probably would debilitate the judgment,
                                                75

1      A   Yeah, I knew they was going to take a
2  urine test.  Most jobs, places conditions of
3  employment do call for urine samples.
4      Q   So you knew full well not to use
5  cocaine before you did that?
6      A   I never knew what the actual period was
7  it stayed in your system until I took the class.
8      Q   Well, how do you know it didn't stay in
9  your system for a year if you didn't know before
10  you took the class?
11     A   I guess I wouldn't.
12     Q   How do you know it didn't stay in your
13  system for a week?
14     A   I guess I wouldn't.
15     Q   Well, how do you know it wouldn't stay
16  in your system for at least 48 hours?
17     A   (No response.)
18     Q   How do you know it wouldn't have stayed
19  in your system from the midnight you left the
20  party until the five a.m. when you showed up
21  Monday morning?
22     A   You just know the condition which you
23  feel physically at the time.
                                                74

1  activities, and reasoning of the individual.
2      Q   Well, this policy doesn't require
3  that.  It just says if you're using drugs that's
4  a willful misconduct, doesn't it?
5      MR. JOHNSON:  Object to the form.
6      Q   Excuse me?
7      A   If that's the way it's worded, that's
8  the way it's worded.
9      Q   Now, let's turn to Bates number 282 of
10  your personnel file, Exhibit 14.  That's a memo
11  from Wendy Warner to James Brookshire.  That's
12  you.  Have you ever seen that before?
13     A   Yeah, I signed that.
14     Q   It says management TM.  Whose signature
15  is that?
16     A   Management TM.  Oh, you mean Team
17  Relations rep?
18     Q   Well, MGMT TM.  Whose signature is
19  that?
20     A   Are you talking about where it says
21  management TM REL?
22     Q   No.  Right above that.
23     A   Management TM, Wendy Warner.
                                                76

19 (Pages 73 to 76)

JAMES ALLEN BROOKSHIRE

1    Q   And then where it says management TM
2  REL, whose signature is that?
3    A   Rob Clevenger.
4    Q   He would be your superior?
5    A   Team Relations Representative.
6    Q   Okay.
7    A   Same person that would represent
8  Mr. Dees. Well, him or William Ware.
9    Q   So Mr. Clevenger has full knowledge of
10  your drug use?
11   A   He knows -- he has knowledge of this
12  incident and violation of this policy.
13       MR. JOHNSON: Object to the form.
14   Q   And so does Ms. Warner?
15       MR. JOHNSON: Object to the form.
16   A   I presume.
17   Q   What happened to you after this urine
18  test showed the presence of cocaine? What
19  happened to you after that?
20   A   I was admitted to a program,
21  three-week -- well, they gave me the option of a
22  three-week program or a six-week program.
23   Q   Were you told -- were you threatened
                                                77

1  with termination?
2    A   If I did not complete the program --
3  did not submit myself to the program or complete
4  the program with success, then, yes, I would be
5  terminated.
6    Q   And who told you that?
7    A   That was told to me by Wendy.
8    Q   And where was this meeting with
9  Ms. Warner?
10   A   Up in HR.
11   Q   In her office?
12   A   Well, they've got conference rooms
13  along the wall there.
14   Q   Was it a private conference room?
15   A   Yeah.
16   Q   Nobody else listening?
17   A   Rob was there.
18   Q   Rob Clevenger was there?
19   A   Yeah.
20   Q   Well, tell me what happened.
21   A   They informed me that Medical had
22  contacted them and informed them of the status
23  or condition of my urine sample and they wanted
                                                78

1  to let me know that it was policy; that they
2  needed to follow protocol; that I either needed
3  to self-admit or they would admit me to a
4  program. And failure to complete or admit
5  myself to the program would end in termination
6  of employment.
7    Q   Is this program on the premises of
8  Hyundai?
9    A   No.
10   Q   Where is it?
11   A   It's -- I think they have a couple
12  different places, but the one I went to is
13  Alabama Psych.
14   Q   Give me the name of that.
15   A   I think they call it APS.
16   Q   APS. And you attended that daily?
17   A   Yeah, every day for three weeks.
18   Q   All day?
19   A   Yeah.
20   Q   Where is it located?
21   A   Carmichael Parkway.
22   Q   In Prattville?
23   A   Montgomery.
                                                79

1    Q   And it's called APS?
2    A   Yeah.
3    Q   How many other people were in that
4  program?
5    A   At the time I had started, there was
6  four other people, but they weren't from
7  Hyundai. They were other people in the program.
8    Q   Right. And did you get drug screens
9  during that program?
10   A   Oh, yeah.
11   Q   Every day?
12   A   It varied. They wouldn't tell you.
13  They wouldn't tell you. It would be in the
14  morning, in the afternoon, lunchtime.
15   Q   Did you tell them about your alcohol
16  abuse?
17   A   Yeah.
18       MR. JOHNSON: Object to the form.
19   A   Yes, I did.
20   Q   Is that a 12 Step program?
21   A   Yeah.
22   Q   And what step are you in right now?
23   A   I had -- part of that program was I had
                                                80

20 (Pages 77 to 80)

## JAMES ALLEN BROOKSHIRE

1  to attend AA meetings as well and get signatures
2  from representatives of AA meetings.
3      Q   So you were simultaneously going to the
4  drug rehab program with APS as well as AA?
5      A   Yeah.
6      Q   And how did you end up in AA?
7      A   Because the position that was given by
8  my therapist and the psychiatric doctors that
9  were there, they had clinically diagnosed that
10 it wasn't a substance abuse problem that I
11 have.  They had seen with the disposition of my
12 family in the past with my mother being an
13 alcoholic and my grandfather being an alcoholic
14 and -- and I had admitted to them that I would
15 drink on weekends but I did not drink during the
16 week while I was working.  But I admitted it to
17 them.  And they had ran me through, like I said,
18 with the psychiatrist and the therapist that's
19 what they deemed the most important thing was
20 for me to attend AA meetings.
21     Q   What was the name of the psychiatrist?
22     A   Dr. Shaw, I believe.
23     Q   Is he a medical doctor?

81

1      A   That's part of their meetings.  That's
2  part of their protocol.  There's people there
3  that hadn't drank in ten years and they've still
4  got to stand up and say that.
5      Q   Well, you had to stand up and say that,
6  didn't you?
7      A   That would be correct.
8      Q   And you had to stand up and say that in
9  the drug abuse program, too, regarding drugs,
10 didn't you?
11         MR. JOHNSON:  Object to the form.
12     A   What do you mean?  Stand up in the drug
13 program?
14     Q   Well, you had to admit that you were
15 addicted to drugs, that's why you were there.
16     A   That wasn't the clinical analysis that
17 was done by the doctor or the therapist.
18         MR. JOHNSON:  Object to the form.
19     Q   Did you stand up and admit that?
20     A   Admit what?
21     Q   That you were addicted to drugs?
22     A   No.  I admitted I made a stupid
23 decision one night.

83

1      A   I don't know what -- all of his
2  classifications.  I believe he was a
3  psychiatrist.  I know that much.
4      Q   And what's the name of the therapist?
5      A   Jena Empy.
6      Q   E-M-B-Y?
7      A   E-M-P-Y.
8      Q   And what is she?
9      A   She's a licensed therapist.  And I
10 don't know what all of her credentials were, but
11 she was a licensed therapist.
12     Q   And the first step in either the 12
13 point drug abuse program or the 12 point alcohol
14 abuse program is admission that you are addicted
15 to alcohol and/or drugs, isn't it?
16         MR. JOHNSON:  Object to the form.
17     A   The AA meeting it was admitting that
18 alcohol could have control over your life.
19 Meaning that it can be a problem in your life.
20     Q   Well, you have to get up there and say
21 my name is Jim Brookshire and I'm an alcoholic.
22 You have to make that admission, don't you?
23         MR. JOHNSON:  Object to the form.

82

1      Q   One night; right?
2      A   That would be correct.
3      Q   Okay.  And let's go back to this Bates
4  number 282, Plaintiff's Exhibit 14.  At the time
5  of this -- well, it says on March 27, 2001, HMMA
6  received confirmation as a result of your random
7  drug screen.  When was the actual date that you
8  were caught?
9      A   It was somewhere around March the 25th,
10 26th.  Somewhere right around there.  I can't
11 remember.  It was on a Tuesday or Wednesday.
12     Q   And it says in here that it's got four
13 conditions; is that correct?
14     A   Yeah.
15     Q   One, you had to attend a substance
16 abuse assessment session scheduled through
17 HMMA's Medical Clinic.  Was that done?
18     A   Yes.
19     Q   Said you were required to comply with
20 all aspects of the prescribed rehab program.
21 Was that done?
22     A   Yeah.
23     Q   Said you must agree to allow HMMA

84

21 (Pages 81 to 84)

**JAMES ALLEN BROOKSHIRE**

1 Medical Clinic to monitor your progress and
2 communicate with the assessment and
3 rehabilitation provider.
4    A   Yeah.
5    Q   That was accomplished?
6    A   Yeah.
7    Q   And then it said any future use or
8 possession of illegal and/or nonprescription
9 drugs or being under the influence of alcohol or
10 nonprescription drugs and/or illegal drugs while
11 on HMMA premises will subject you to corrective
12 action up to and including termination. You
13 understood that?
14    A   Yeah.  They told me that without a
15 doubt I'd be -- anything happened again I'd be
16 terminated.  And I've been -- part of their
17 process also is I'm subjected to random
18 drug/alcohol tests every month.  I get two to
19 three tests every month.  It's been going on
20 since then.
21    Q   Outside of Ms. Warner and Mr. Clevenger
22 who else at the Hyundai plant knows that?
23    A   I couldn't tell you.  I don't know.
85

1    Q   Did anybody ask you why did you
2 disappear?
3    A   I had Team Members ask me that.
4    Q   Who asked you that?
5    A   Just Team Members on the floor.  They
6 said is everything okay.  Because they knew my
7 wife and I had had some marital problems, too.
8    Q   Well, had your cocaine use caused
9 marital problems?
10    A   No.
11    Q   You hesitated.  Are you sure?
12    A   No.
13    Q   How about your alcohol abuse?
14       MR. JOHNSON:  Object to the form.
15    A   Alcohol did interfere with it in the
16 sense that my wife and I would have serious
17 arguments and I would walk out of the house and
18 go to the garage and drink a few beers, drink a
19 six-pack or so just to not listen to her because
20 she was unhappy about the move down here.
21    Q   Y'all didn't go through the unfortunate
22 experience of getting in a divorce, did you?
23    A   No.
86

1    Q   So at the time that you saw Mr. Dees
2 sleeping on the job, you were an alcoholic and
3 you did abuse alcohol; is that correct?
4       MR. JOHNSON:  I'm sorry.  I
5 misunderstood that.  What was that?
6    Q   At the time you saw Mr. Dees sleeping
7 and reported him, you were an alcoholic and you
8 were abusing alcohol; is that correct?
9       MR. JOHNSON:  Object to the form.
10    A   I had no deliberate use of alcohol at
11 the time, but on the weekend I had a drink.
12    Q   Well, how do you not deliberately use
13 alcohol?
14    A   Like if I knew I was going into work
15 that afternoon drinking a few beers before I
16 went in to work.
17    Q   And I don't mean to embarrass you and
18 there are a lot of people who are recovering
19 alcoholics.  But were you an alcoholic on the
20 day you saw Dees sleeping?
21    A   What's your definition of an
22 alcoholic?
23    Q   Whatever your definition is.  You're
87

1 the expert.
2    A   I'm not an expert.
3       MR. JOHNSON:  Object to the form.
4    Q   Well, you've been through the program.
5    A   From my understanding the clinical
6 definition is I was a conditional alcoholic.
7    Q   And you were that on the day you saw
8 Dees sleeping?
9    A   A conditional alcoholic on the weekends
10 when my wife and I would have altercations.
11    Q   And that alcoholism had led to serious
12 problems with your wife?
13       MR. JOHNSON:  Object to the form.
14    A   No.  It was due to the stress of the
15 move and going through a custody battle with my
16 wife's ex-husband.
17    Q   And if you had been terminated for
18 being positive drug tested for cocaine, what do
19 you think that would have done to your
20 employment career?
21    A   Probably dismantled it.
22    Q   And that would have been a severe
23 emotional as well as financial blow to you,
88

22 (Pages 85 to 88)

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

JAMES ALLEN BROOKSHIRE

1  wouldn't it?
2       MR. JOHNSON:  Object to the form.
3    A    Yeah, it would have been a trial
4  sometime.
5    Q    You would have had trouble getting a
6  job, wouldn't you?
7       MR. JOHNSON:  Object to the form.
8    A    I can't -- I can't say that.  I don't
9  know.
10   Q    So you've never been in a position of
11 having been terminated and tried to get a job?
12   A    No.
13   Q    Well, Mr. Dees is now in that position,
14 isn't he?
15      MR. JOHNSON:  Object to the form.
16   A    I don't know what he's doing right
17 now.  I can't speak for that.
18   Q    Well, you wouldn't want termination to
19 be a black mark on your employment record, would
20 you?
21      MR. JOHNSON:  Object to the form.
22   A    I mean, if it's -- if something like
23 that happens, it happens.  I mean, I can't...
                                                    89

1    Q    Well, do you agree with me that
2  termination is a black mark on your employment
3  record?
4    A    I'm sure it would be a problem.
5    Q    Would you agree with me that
6  termination for drug abuse like cocaine would be
7  a black mark on your employment record?
8    A    Probably would be.
9    Q    And at the time you were caught red
10 handed with cocaine in your system, you were the
11 only eye witness to Mr. Dees sleeping, were you
12 not?
13      MR. JOHNSON:  Object to the form.
14   A    I was the person that seen him
15 sleeping.  That would be correct.
16   Q    And you had signed two statements to
17 that effect, hadn't you?
18   A    Correct.
19   Q    And in this document we're looking at,
20 Bates number 228, signed by you, Wendy Warner,
21 and Mr. Clevenger, it says -- in the last
22 sentence it says this Letter of Conditional
23 Employment will remain in your file for a period
                                                    90

1  of 24 months.  You see that?
2    A    Yes.
3    Q    So you are a conditional employee,
4  aren't you?
5    A    (Witness nods head.)
6    Q    Is that correct?
7    A    That would be correct.
8    Q    All right.  So basically you're on
9  probation today, aren't you?
10   A    Correct.
11   Q    With Hyundai; is that correct?
12   A    Correct.
13   Q    And you know that the slightest
14 misbehavior on your part is going to result in
15 immediate termination, don't you?
16      MR. JOHNSON:  Object to the form.
17   A    That's my understanding.
18   Q    And Mr. Clevenger and Wendy Warner, as
19 well as the other Hyundai officials, they've
20 basically got life and death authority over your
21 job right now, don't they?
22      MR. JOHNSON:  Object to the form.
23   A    I don't know about they have sole
                                                    91

1  control or life or death.  That falls in my
2  lap.  That's my responsibility to control my
3  destiny through this issue.
4    Q    So you're going to be on conditional
5  employment for two years?
6    A    Correct.
7    Q    So your conditional employment is going
8  to end when?
9    A    Probably as of the date that I signed
10 on here, two years after that, '09.
11   Q    April '09?
12   A    April '09.
13   Q    When is the last time you had used
14 cocaine before you got caught at the Hyundai
15 plant?
16   A    I don't know.  I was probably around 25
17 or 26.  Somewhere right around there.  I can't
18 recall exactly.  That was ten years ago, eight
19 years ago.
20   Q    Were you addicted to it?
21   A    No.  I was more or less experimenting.
22 Experimenting.  Kind of a recreational --
23 recreational-type thing.  You're around some
                                                    92

23 (Pages 89 to 92)

### JAMES ALLEN BROOKSHIRE

1 people that were doing some of that stuff
2 sometimes, so it's kind of a stupid thing of
3 peer pressure, just fitting in, not making a
4 sound judgment on it at that time.
5    Q   Are you in charge of enforcing the drug
6 and alcohol abuse policy at the Hyundai plant in
7 your job as Stamping manager?
8    A   As far as enforcing the policy, if I
9 have an employee that I suspect that is doing
10 something like that or acting out in some way,
11 shape, or form, they are sent to Medical and
12 then dealt with through a process.  As far as me
13 following through and dictating all that, that's
14 not my scope.
15    Q   When's the last time you've been
16 randomly drug tested?
17    A   I think the Wednesday or Thursday right
18 before Thanksgiving week.
19    Q   Two weeks ago?
20    A   Yeah.
21    Q   What did it show?
22    A   Negative.
23    Q   Who gets the results of that?
                                            93

1 information.  And I note that a document related
2 to it was in his file that was produced, which
3 is Bates number 282.  And I'd like for y'all to
4 produce that today so I can ask him questions
5 about it.
6        And I would also point out that cocaine
7 usage is a serious problem.  Cocaine usage can
8 affect one's ability to recollect, one's
9 observation capabilities.  There are long-term
10 effects, which I think could bear on his
11 credibility.
12        MR. JOHNSON:  If we can just take a
13 quick break.  Let me and Chris go discuss that
14 issue, and then we'll get back with you.
15
16     (Whereupon, a brief recess was had in
17 the proceeding.)
18
19        MR. KILBORN:  I have requested prior to
20 the break the files on the Hyundai substance
21 abuse program treatment that the witness has
22 testified about as being relevant to credibility
23 issues clearly since he's the only eye witness
                                            95

1    A   My understanding -- from what I
2 understand, Medical people give the results to,
3 I believe, HR, I believe.
4    Q   I want to take a break.
5        MR. KILBORN:  Matt, I'd like to get his
6 entire file regarding this cocaine incident.
7        MR. SMITH:  Make a request.
8        MR. KILBORN:  Well, I think it's
9 covered by our current discovery.  It should
10 have been in his personnel file.
11        MR. SMITH:  It's at ICM.  It's
12 maintained in separate files.
13        MR. JOHNSON:  The current request
14 that's outstanding that we responded to has to
15 do with the personnel file.  This is a
16 completely separate medical file that contains
17 medical information, private health information
18 that employers, as I understand it, must keep
19 separately from general everyday personnel
20 info.
21        MR. KILBORN:  I know.  Well, we do have
22 a protective order.  I do think it's covered by
23 our request.  I do think it's relevant
                                            94

1 in the case and the presence of cocaine in his
2 system was a short time after this incident took
3 place.  As I understand, counsel has refused to
4 produce that on the grounds that, one, it hasn't
5 been requested and, two, that it's in the
6 possession of some other company called ICM.
7 And my position on the latter would be that it's
8 within Hyundai's possession, custody, or
9 control.  Control being the operative word.  And
10 I'm requesting it now so that I will not have to
11 come back and redepose the witness on the
12 subject matter of that since he's such a
13 critical witness in the case.
14        MR. JOHNSON:  Is that -- are you --
15 have you stated your case?
16        MR. KILBORN:  Yes.
17        MR. JOHNSON:  And just for the Record,
18 again, as Mr. Kilborn has stated, medical
19 records or anything related to the personal
20 health information of Mr. Brookshire or any
21 other witness in the case has not been requested
22 and as such has not been identified or produced
23 in discovery in this case.  To the extent a
                                            96

24 (Pages 93 to 96)

### JAMES ALLEN BROOKSHIRE

1  request is made, it will be addressed
2  appropriately and in a timely fashion. We do
3  not have that information here today in part
4  because it wasn't requested and as such we are
5  not in a position to produce it today.
6        Secondly, and perhaps of equal
7  practical importance, it is our understanding
8  that the Medical Department information is kept
9  on an outsource basis by a third-party and those
10 documents would not be available on site at HMMA
11 today. It may be possible to get them if they
12 had been timely and appropriately requested, but
13 it's our understanding that is likely not the
14 case.
15       MR. KILBORN: Will you state on the
16 Record whether or not Hyundai does have control
17 of those documents such that if they requested
18 them they could get them?
19       MR. JOHNSON: Had they been timely
20 requested, we could have gotten them and
21 responded appropriately.
22       MR. KILBORN: Well, I'm going to
23 continue.
                                          97

1        (Whereupon, Plaintiff's Exhibit
2   Number 16 was marked for identification
3   and copy of same is attached hereto.)
4
5
6   BY MR. KILBORN:
7   Q   Mr. Brookshire, let me give you a copy
8   of a document marked Plaintiff's Exhibit 16 and
9   ask you if you would look at the front and back
10  of that and tell me if you recognize either the
11  front or the back.
12  A   (Witness reviews document.) I've never
13  seen this document.
14  Q   Do you know who drew the sketch on the
15  back?
16  A   No.
17  Q   Do you know what that's a sketch of?
18  A   It's the control cabinet upstairs.
19  Q   Is it accurate?
20  A   Is this sketch saying that the doors
21  were open or the doors were closed?
22  Q   All I know is that I was given that
23  sketch, so I can't answer your question. My
                                          98

1   question is if that appears to be a sketch of
2   this control panel is an accurate sketch?
3   A   I can't remember if it's got three or
4   four doors, but I believe it's got three and
5   then it's got the sheet metal platform below it.
6   Q   So your testimony is it's accurate?
7   A   (Witness nods head.) Yeah.
8   Q   Is that a yes?
9   A   Yes.
10  Q   Do you see a chair in the sketch?
11  A   Yes, I do.
12  Q   Was that chair there on the night of
13  the incident in question?
14  A   Yeah, the chair was about where it was
15  up against the middle of the cabinet.
16  Q   The middle door?
17  A   The middle door.
18  Q   Mr. Dees was sitting in that chair?
19  A   Yes.
20  Q   And what is this -- appears to be some
21  type of object here and it's facing -- the
22  control panel would be on the left of the
23  sketch, bottom left?
                                          99

1   A   I don't recall that object being
2   there. I remember the chair being back up
3   against the cabinet, the middle door, facing
4   forward.
5   Q   Was the back of the chair touching the
6   middle door?
7   A   I couldn't tell you exactly if it was
8   touching the door or not. I know it was close
9   to back up towards the middle of the door -- or
10  middle door.
11  Q   How far in your judgment?
12  A   It was pretty close to the door.
13  Q   Inches?
14  A   Probably four inches or less.
15  Q   And was the chair in the position
16  indicated on the drawing that Mr. Dees was
17  sitting in?
18  A   The position I can recall was the chair
19  was facing parallel going off the platform which
20  it's sitting on, not angled, parallel in the
21  direction of the platform up towards the middle
22  door.
23  Q   So the chair was sitting square on --
                                          100

25 (Pages 97 to 100)

## JAMES ALLEN BROOKSHIRE

1  up against or close to the middle door facing
2  directly toward you?
3      A  Correct.
4      Q  All right.  And that's as opposed to
5  being at the angle it appears in the sketch?
6      A  Correct.
7      Q  And you did not see some object that
8  appears at the lower left of that sketch?
9      A  I don't recall any object being there.
10  There could have been a wire spool or something
11  off maybe close to the cabinet or off to the
12  side but I didn't see that.
13      Q  You did not see a wire spool?
14      A  If that's what that drawing is supposed
15  to be, I didn't see that.
16      Q  How about taking your pen there and
17  drawing a circle around what appears to be a
18  wire spool?
19      A  (Witness complied.)
20      Q  And draw a little line around there and
21  just put a line to your initials and today's
22  date so we'll know that's you today instead of
23  at the time it was drawn.

                                        101

1      A  (Witness complied.)
2      Q  And that object you do not recall
3  seeing was there?
4      A  No, sir.
5      Q  All right.  Would your testimony be
6  that it was not there?
7      A  It was not there.
8      Q  Okay.  Do you know who drew the sketch
9  that shows it there?
10      A  No idea.
11      Q  What would a wire spool be doing there?
12      A  Maybe if they had made some engineering
13  changes or some wiring changes inside this
14  cabinet and they had a wire spool there to run
15  input bits or something.  I don't know.
16      Q  There would be no other purpose for a
17  wire spool to be there?
18      A  (Witness shakes head.)
19      Q  You have to say yes or no.
20      A  No.
21      Q  What was the chair doing there?
22      A  That's a good question.
23      Q  Where did the chair come from?

                                        102

1      A  What I can tell what the chair looked
2  like it's an office chair.  It came from the
3  office.
4      Q  Was that the first time you'd ever seen
5  that chair?
6      A  I don't recall seeing -- I've seen
7  ladders.  I've seen ladders there, but I don't
8  recall seeing that specific chair sitting there
9  right there in front of the door.
10      Q  So that would have been an unauthorized
11  chair?
12      A  Yeah, because the office chairs are not
13  supposed to leave the office.
14      Q  All right.
15      A  Unless they have assigned chairs in
16  break areas or conference rooms or something
17  like that.
18      Q  Had that chair ever been there before?
19      A  Not that I can recall.  Like I said,
20  all I've ever seen there has been a ladder.
21      Q  And immediately after the incident
22  where you saw Mr. Dees in the chair asleep was
23  the chair removed?

                                        103

1      A  After the fact?  After time passed?
2      Q  Right.
3      A  Yeah.
4      Q  Who removed it?
5      A  I'm not sure.  I don't know who removed
6  it.
7      Q  That would have taken place February
8  14, 2007.  How long after that approximately
9  would it have been removed?
10      A  I can't recall that, sir.  I mean, I
11  didn't remove the chair.  I didn't tell my
12  people to remove the chair.  So I can't account
13  for who removed the chair and when it actually
14  was removed.  I don't know.
15      Q  So the chair was an unauthorized piece
16  of equipment?
17      A  Yeah.
18      Q  And is your job -- part of your job to
19  remove unauthorized equipment from the plant?
20      A  I've never -- I've never been in charge
21  of removing -- we make notes of stuff like that,
22  or I've had chairs in -- office chairs come out
23  in other break areas where we -- out of break

                                        104

                    26 (Pages 101 to 104)

## JAMES ALLEN BROOKSHIRE

1  areas and in places where they shouldn't be.
2  And presuming that we have heard some other
3  people had been sleeping, we removed those
4  chairs immediately. I know there have been some
5  chairs located in other areas and we've removed
6  and disposed of the chairs.
7      Q   So are you telling me that it was
8  fairly common to find employees sitting in
9  chairs sleeping?
10      MR. JOHNSON:  Object to the form.
11      A   No, that wasn't common, but we had
12  found some chairs that we had presumed that
13  people were using for that purpose and we
14  disposed of the chair.
15      Q   To sleep in a chair?
16      A   I'm guessing or having a break in the
17  chair off somewhere where it wasn't supposed to
18  be outside of a standard break area.
19      Q   Were there two chairs on that level?
20      A   I can't recall. This whole platform up
21  here is a mesh platform. And if you had set the
22  chair anywhere outside of here, your legs would
23  go through the platform.
                                              105

1      Q   So you have no information about
2  another chair on that level?
3      A   No. I know there was plywood --
4  there's a piece of plywood up on that mezzanine
5  and I remember there was a ladder but that was
6  on the opposite side.
7      Q   Was there a chair on the plywood?
8      A   I can't recall, because at the time,
9  our senior director of Engineering Maintenance
10  done a great job. He actually got that stuff
11  cleaned up up there. But I can't recall. I
12  remember there was a ladder there because
13  sometime when they've got to work on those
14  trolleys they've got to pull a ladder out and
15  they can't put a ladder on that wire mesh
16  because it will wobble. So they've got to move
17  that piece of plywood around if they've got to
18  work on a trolley. But another chair...
19      Q   Looking at Plaintiff's Exhibit 16, the
20  reverse side, the sketch, and looking directly
21  at the control panel, you see three doors, do
22  you not?
23      A   Correct.
                                              106

1      Q   And those are the same three doors you
2  saw; correct?
3      A   Yeah.
4      Q   And the door on the left of the
5  drawing, which side of that door looking at the
6  drawing, left or right, is it hinged in the
7  drawing?
8      A   Looking at the drawing?
9      Q   Right.
10      A   Going by this drawing, I would say it's
11  hinged on the right side looking at the left
12  door.
13      Q   All right. Draw an arrow down there
14  and put the word hinged and today's date and
15  your initials.
16      A   (Witness complied.)
17      Q   Now, and looking at the drawing on
18  the -- regarding the door on the right side of
19  the drawing looking directly at it, which side
20  of that door on the right is that door hinged in
21  the drawing?
22      A   Looking at the right door, it's hinged
23  on the left-hand side.
                                              107

1      Q   Go ahead and write hinged.
2      A   (Witness complied.)
3      Q   And the door in the middle is hinged on
4  its left or right side looking at the drawing?
5      A   Looking at the drawing the handle is on
6  the left-hand side of the door, so it would have
7  to be hinged on the right.
8      Q   Okay. Now, I've heard that somehow or
9  another Mr. Dees had used the doors to provide a
10  hiding place. Is that your recollection?
11      A   My recollection is at the time of this
12  incident the doors may have been cracked open
13  because sometimes Maintenance doesn't completely
14  shut the doors so they can easily access the
15  panel. But my recollection was the doors were
16  mostly shut. I can't account if they were
17  exactly locked shut but they were mostly shut.
18  As far as him using that routinely and opening
19  the doors to hide, I don't know.
20      Q   You didn't see door panels -- excuse
21  me -- you didn't see doors open to the extent
22  that you thought they were being used by
23  Mr. Dees as a blind to hide behind?
                                              108

                              27 (Pages 105 to 108)

### JAMES ALLEN BROOKSHIRE

1     MR. JOHNSON: Object to the form.
2   A   What I can tell you is the day of the
3 incident that I seen him I can't tell you
4 whether the doors were completely locked or not,
5 but they weren't wide open.
6   **Q  Well, in your opinion, since you were**
7 **the only one there besides Mr. Dees, were the**
8 **doors positioned so they made a blind to assist**
9 **in hiding?**
10     MR. JOHNSON: Object to the form.
11   A   I can't really see how opening these
12 doors hides him from anything.
13   **Q  I can't either, but that's not my**
14 **question.**
15   A   This is the third floor, and when
16 you're down here, this door is going to hide you
17 from a crane coming at you and that door hides
18 you from an elevator. So there's really...
19   **Q  So if you wanted to hide, you wouldn't**
20 **open the door panels looking at this drawing on**
21 **the left or right because the visibility would**
22 **be --**
23   A   Down below.
                                                    109

1   **Q  -- down below --**
2   A   Correct.
3   **Q  -- looking up and there's no door panel**
4 **to hide you there?**
5     MR. JOHNSON: Object to the form.
6   A   You're hidden by this floor plate. You
7 can't see through it because it's not mesh.
8   **Q  Does it appear to you in that sketch on**
9 **the reverse of Exhibit 16 that one has drawn the**
10 **left and right doors to make it appear they were**
11 **open to the extent that maybe they would provide**
12 **some cover or a blind of some type?**
13     MR. JOHNSON: Object to the form.
14   A   To me, it just looks like somebody has
15 drawn an electrical cabinet with the doors open
16 with a chair in it, and that to me doesn't -- to
17 me, I mean, they could have been looking at a
18 problem in either cabinet and left the door open
19 for all I know. I mean, I -- as far as somebody
20 setting something up like that, I don't know.
21   **Q  So is it your testimony that -- is it**
22 **your testimony that two of the doors on the**
23 **control panel were opened and used as a blind to**
                                                    110

1 **hide Mr. Dees while he was sleeping?**
2   A   It's not my testimony. I mean, what I
3 can tell you I can account for is how I
4 recollect the chair being positioned and how I
5 remember the doors being.
6   **Q  And you were the only one there besides**
7 **Mr. Dees?**
8   A   Correct.
9   **Q  Do you know where Hyundai got**
10 **information that two doors on the control panel**
11 **were used as a blind to hide Mr. Dees?**
12   A   No.
13   **Q  And, in fact, as you told me, if you**
14 **had opened the control panel doors to use them**
15 **as a blind on the left and right doors looking**
16 **at the drawing, it wouldn't be hiding you from**
17 **visibility anyway because the visibility is from**
18 **the front not the side?**
19   A   Visibility is from the bottom.
20   **Q  As a matter of fact, if you're standing**
21 **over here on the right of the drawing, you're**
22 **going to fall off into an abyss because there's**
23 **nothing there, is there?**
                                                   111

1   A   There's a little bit of an entranceway
2 and then right here is an elevator that brings
3 the trolleys up.
4   **Q  That elevator is just an open area,**
5 **isn't it?**
6   A   Right.
7   **Q  Maybe, what, 15 by 15?**
8   A   Probably.
9   **Q  So if somebody was standing there**
10 **they'd be talking to St. Peter?**
11   A   Yeah, they'd fly off.
12   **Q  So if Mr. Dees was trying to make a**
13 **blind out of the control panel doors, he would**
14 **have had to somehow or another taken the door**
15 **off and stuck it in front of him, wouldn't he?**
16     MR. JOHNSON: Object to the form.
17   A   To me, it's the approach of it. I
18 mean, you access it -- like if you -- this
19 walkway, there's a walkway or trolley
20 entranceway that comes down here. If you were
21 over here, like if you accessed and came up to
22 this elevator and came up over here and you were
23 right here and that door was open, that would
                                                   112

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969**

## JAMES ALLEN BROOKSHIRE

1 conceal him from there. But if you came around
2 the front, then you would see him. Back over
3 here, there's nothing here, and then you access
4 from the front or the bottom. But the bottom is
5 hidden by the floor plate.
6     Q    You came up directly -- you would have
7 been facing Dees, correct, and facing the
8 control panel?
9     A    Correct. I was off -- maybe like if it
10 was here, I was a little off coming in at this
11 angle.
12     Q    So when you came up, you could clearly
13 see him?
14     A    Yeah.
15     Q    He wasn't behind a blind or anything?
16     A    No.
17     Q    And I know there are quite a bit of
18 scuff marks on that plate in front of the
19 control panel. What causes that?
20     A    Scuff marks on the plate?
21     Q    Scuff marks, yeah.
22     A    I don't know. I mean, depends on what
23 the Maintenance guys do over there. Like I

113

1 said, I've seen ladders over there. I have no
2 idea. Multiple things cause scuff marks. I
3 mean, down on our other floor, we've got scuff
4 marks on our platforms from laying scrap panels
5 down. Every time you lay those panels down it
6 chips the paint and flakes the paint.
7     Q    And describe for me your actions in
8 coming up to the third floor where Mr. Dees was,
9 or the third level -- you call it a level or a
10 floor?
11     A    Third floor, third level.
12     Q    Describe what happened as you came up
13 there.
14     A    I was coming up the third floor, like I
15 said earlier, to check on some CM side outer
16 right-hand panels for splits and waves. I come
17 in through the entranceway there at the stairway
18 and came over between the panels to the row 6
19 and row 7 because that's their storage lane for
20 those panels. And I wanted to check the panels
21 that we had in there to see if we had good
22 panels to get to our customer. And I was coming
23 between the lanes to look at the backsides of

114

1 the panels because that's the easiest way to
2 look for splits and wrinkles is from the
3 backside of the panel. I had an LED flashlight
4 with me shining through there checking the
5 panels. I had a flashlight in one hand and a
6 stone in the other. And then I put the stone
7 away because I was going over there to check --
8 check -- because we were running them on the
9 press at the time, so they were coming in on the
10 entry lane over here.
11     Q    That would be on the left side of the
12 drawing look at it?
13     A    Yes. And I came and I -- and that's
14 the first lane. And that would be the first
15 lane.
16     Q    So you're writing the words first lane
17 on there?
18     A    Yeah.
19     Q    Make sure you put a date by anything
20 you write on there.
21     A    Okay. And you've got two lanes.
22 You've got an entry lane that comes in here and
23 then a -- where the trolleys are coming down

115

1 this lane, and then you've got a return lane
2 where empty trolleys are going down to this
3 elevator that goes to the presses. And that
4 circles back around actually above this area
5 here. And I was coming in here at the sixth
6 lane if you're looking at it from this way --
7 the sixth lane and the seventh lane.
8     Q    And you're putting the letters sixth
9 and seventh there?
10     A    Yeah.
11     Q    Go ahead and put your initials and date
12 there.
13     A    And I was coming down in between these
14 lanes with the flashlight checking these
15 panels. I come to the end, and it's kind of
16 hard. You've got to flip this around. But
17 there's two -- two lanes. You've got your lane
18 going around from the reworks station coming up
19 from the elevator. It comes up and comes across
20 right in front of here. And then you have the
21 other lane that comes off 6 and 7 to go to the
22 drop down station for the elevator in the
23 opposite direction. So I was wanting to check

116

29 (Pages 113 to 116)

### JAMES ALLEN BROOKSHIRE

1  panels and make sure we had good panels going to
2  the customer.  And then that's when I had to
3  come to a stop because we had panels making lane
4  changes and that's when I looked over there and
5  seen Leon over there.  And I was probably 30
6  feet right there at the end, because it's
7  probably from -- towards the end of the lane
8  right here to there it's about 30 feet, 25 to 30
9  feet.  Somewhere around in there.  And then this
10 went by and I had to wait for the other lane to
11 go by.  And then I crossed through and went
12 here, and that's probably 15 to 20 feet.  Right
13 in there in the middle I squelched my radio.  I
14 turned my radio up to squelch it.  Because I had
15 called the guys down on the floor to let them
16 know what I had seen as far as quality issues.
17 Then I was crossing across to go here.  And then
18 I seen Leon and I squelched my radio.  Kind of
19 like, hey, here's the alarm clock, wake up, wake
20 up.  So I was hurrying.  Once the panels came
21 through, I went over here to check the first
22 trolleys that were coming through.  We'd just
23 run them off the press and they'd just came up.
                                                117

1  told his Team Leader what I saw.
2     Q   Well, when you saw him last up there on
3  the third level, he was looking sleepy and
4  groggy?
5     A   He had the look of somebody just seen
6  him doing something he wasn't supposed to be
7  doing.  To me, he appeared to be fishing for
8  something to do, the reason why he was up
9  there.  Because normally we don't go up to the
10 third level unless there's a problem.
11    Q   So he was --
12    A   Normally nobody is up there unless we
13 had a problem.  We didn't have a trolly problem
14 because we were running fine.  We were just
15 waiting on the panels to make it to the Weld
16 Shop.  We was running them off the press.
17    Q   So Mr. Dees was basically creating a
18 ruse acting like he was doing something when he
19 really wasn't?
20       MR. JOHNSON:  Object to the form.
21    A   What it appeared to be to me was he had
22 came out of a stance off that chair having a
23 surprised look on his face that I was up there.
                                                119

1  I was circling around going through here waiting
2  for those to come by and I was going to this
3  first -- I think there was probably five -- five
4  right in here.  And then I was checking the
5  quality on them, going around the backside of
6  the panel and checking the quality.
7     After that that's when I noticed he had
8  gotten up out of his chair and grabbed what they
9  call -- we call them fishing poles, but they're
10 actually brake release poles.  They use them on
11 the trolleys.  We've got a mechanical brake on
12 there that actually releases the trolleys so
13 Maintenance can move the trolley out of
14 position.  And I had seen him grab that brake
15 pole.  He like jumped up out of the chair and he
16 grabbed the brake pole, and I'm wondering why he
17 grabbed the brake pole because we weren't having
18 any problems.  All the trolleys were moving at
19 the time.  And then after point after I made
20 that, I went back by and he was over here just
21 walking around looking at trolleys when I walked
22 back by and went back down the stairs.  And then
23 within that next half an hour, that's when I
                                                118

1     Q   And you say surprised look on his face?
2     A   Kind of like where did I come from kind
3  of a look.
4     Q   And the first time you saw Mr. Dees
5  sitting in the chair how many feet away were
6  you?
7     A   25.  20, 30.  Somewhere right around in
8  there.
9     Q   How close did you get to him?
10    A   Probably around 15 to 20.  Because
11 you've got the two lanes that run through here,
12 the return lane from rework and then the feed
13 lane.  And I went in between those lanes.
14    Q   And you say when you -- what did you
15 say you did with your radio?
16    A   Squelched it.
17    Q   Squelched your radio.  What did he do?
18    A   He didn't do anything.
19    Q   Nothing?
20    A   (Witness shakes head.)
21    Q   And what's the next thing you saw him
22 do?
23    A   That's when -- like I said, I went
                                                120

                                    30  (Pages 117 to 120)

### JAMES ALLEN BROOKSHIRE

1  through there and squelched my radio.  And I was
2  on my mission to get these panels to the Weld
3  Shop, because our priority is to make sure the
4  Weld Shop doesn't run out of parts, don't shut
5  the Weld Shop down.  So we're going through
6  here, cutting through here -- well, not we're --
7  I'm cutting through here, and I just squelched
8  my radio.  And I'm over here getting ready to
9  check these panels and make sure they're okay.
10  I go over here and flashlight them from the
11  front side and then go to the backside.  And
12  when I go to the backside obviously the door
13  openings are there, and that's when I realized
14  he -- he was like up out of the chair grabbing
15  one of the fishing poles.
16    Q   Well, did he like jump out of the
17  chair?
18    A   He was already up out of the chair just
19  moving around.  He had one of the poles in his
20  hand.
21    Q   Where had he gotten the pole from?
22    A   Normally the Maintenance guys will
23  leave them like laying with the -- there's like
                                                    121

1  a fence over here.  They'll leave them laying on
2  the floor up against the fence or leave them on
3  this side laying up against the fence like on
4  the mesh floor leaning up against the guardrail.
5    Q   So was he looking real guilty, wasn't
6  he?
7      MR. JOHNSON:  Object to the form.
8    A   I can't say a person is guilty.  I can
9  just say that the person -- that Mr. Dees
10  appeared to me that he had this surprised look
11  on his face, where did I come from.
12    Q   And you knew Mr. Dees, didn't you?
13    A   Yeah, I knew Mr. Dees.
14    Q   So you would know what a surprised look
15  on his face was; right?
16      MR. JOHNSON:  Object to the form.
17    A   How personal are you saying I knew
18  him?  Because I talked to him as a person.  But
19  as an expert knowing all of his integral aspects
20  of his life, I don't know that.  But I can tell
21  when somebody kind of gives a look like where
22  did you come from or what are you doing here
23  kind of look.
                                                    122

1    Q   That's the kind of look you saw?
2    A   Yeah.  Kind of (indicating).
3    Q   And when you first saw him, he was dead
4  asleep, wasn't he?
5      MR. JOHNSON:  Object to the form.
6    A   The position I seen him in, he appeared
7  to be asleep just like I made in my statement
8  with his hat on and the way his legs were
9  extended and the posture that he exhibited in
10  the chair.
11    Q   Did you see his eyes?
12    A   No, I didn't see his eyes.
13    Q   Were his eyes opened or closed?
14    A   I can't honestly tell you that because
15  he had a hat on, because we've got to wear a
16  bump cap.  And he had the hat on.  He was
17  positioned like this (indicating).
18    Q   And he was sitting in the chair?
19    A   Yes.
20    Q   And when you made your radio make that
21  chirping sound, he didn't move?
22    A   I didn't see him move.
23    Q   Okay.  Well, he didn't move as far as
                                                    123

1  you know?
2    A   Right.
3    Q   So that didn't wake him up, the
4  chirping sound?
5    A   (No response.)
6    Q   Excuse me?
7    A   At that point I guess it didn't because
8  he didn't move when I squelched my radio.  Like
9  I said, I walked by and I squelched the radio.
10  And if anybody's ever been up there, you can
11  feel vibrations in that platform when you're
12  walking.  I don't know if the vibrations
13  actually got him or what happened, but I know I
14  squelched my radio, no movement, and I was on my
15  way to go check the panels.  I did not stay
16  there and stare at him to see if he got up after
17  I squelched the radio.
18    Q   Why didn't you go over there and say,
19  hey, Leon, wake up?
20    A   Because at the time I thought the
21  squelching of the radio and me walking across
22  the platform would get him up.  And I was, like
23  I said, on my way to check the panels and make
                                                    124

31 (Pages 121 to 124)

### JAMES ALLEN BROOKSHIRE

1   sure that they were on the way to the Body Shop
2   and make sure we were making good quality panels
3   to go to the Body Shop.
4       Q   Well, you knew that chirping the radio
5   hadn't woken him up, didn't you?
6           MR. JOHNSON:  Object to the form.
7       A   I'm not for sure.
8       Q   Well, you didn't see any activity?
9       A   I knew it chirped and I didn't stand
10  there and stare at him.
11      Q   You did not see him wake up, did you?
12      A   No.
13      Q   All right, sir.  As far as you knew
14  when you walked back off, he was still asleep,
15  wasn't he?
16          MR. JOHNSON:  Object to the form.
17      A   From my recollection you can say that.
18      Q   And he only was awake as far as you
19  knew is when you came back and he was up
20  pretending like he was doing something with the
21  pole?
22      A   He had the pole in his hand.  Correct.
23      Q   Is it noisy up there with the trolleys
                                                    125

1   danger, wouldn't it?
2           MR. JOHNSON:  Object to the form.
3       A   It could put him in danger.
4       Q   You left where you saw him sleeping
5   without making sure he was awake or attempting
6   to wake him?
7       A   I did attempt to wake him, and I didn't
8   leave the area.  And you could rest assured if
9   he was still in that chair after I looked at
10  those two racks or two trolleys of panels, I
11  would have went over there and talked to him.
12      Q   But you didn't?
13      A   He was already up.
14      Q   Well, when you found him already up why
15  didn't you go over and say something to him
16  about what you had seen?
17      A   Because I'm not his direct supervisor.
18  That's not for me to address.
19      Q   Well, you were his supervisor on this
20  shift, weren't you?
21      A   No, no.
22      Q   I thought you were substituting for
23  the --
                                                    127

1   and everything?
2       A   The trolleys are pretty quiet.  Down
3   towards the presses is where the noise is at.
4       Q   Did you wear earplugs?
5       A   Up on the third floor you don't have to
6   wear them, or the SOP booth.  But down around
7   the press areas, you're supposed to wear
8   earplugs.
9       Q   Did you have earplugs?
10      A   No.  Because at that time hearing
11  protection wasn't mandatory yet.  I believe it
12  was around late spring to early summer is when
13  they -- Safety mandated hearing protection.
14      Q   Did he have earplugs?
15      A   I couldn't vouch for that at that
16  time.  It depends on what type of hearing
17  protection he might have had, it would be hard
18  to tell.  If he had the ones without the cords
19  in it, they could be up in his ears and I
20  wouldn't see them unless I was really close to
21  him.
22      Q   Well, you would agree that sleeping on
23  the job would certainly put Mr. Dees himself in
                                                    126

1       A   Assistant manager.  That would be
2   correct.  But Maintenance is not a direct report
3   to me.  Greg Prater is his direct report.
4       Q   But you did not report to Mr. Prater,
5   did you?
6       A   Oh, yeah, I did the next day, along
7   with my senior manager, Craig Stapely.
8       Q   But not then?
9       A   No.  That was one in the morning.  I
10  wasn't going to call Craig -- or Greg and wake
11  him up in the middle of the night.  Now, if
12  Kevin called him maybe he did, but I don't know
13  if Kevin did or not.  But I reported it to Kevin
14  within a half hour.
15      Q   And how long did you observe him
16  sitting in this sleeping position?
17      A   To be honest with you about the time I
18  come out of these two lanes and come through
19  there and squelched my radio, from the time I
20  went through here and cut between those trolleys
21  and made it over there, it couldn't have been
22  probably more than a minute.  A minute to two
23  minutes at the most.
                                                    128

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

## JAMES ALLEN BROOKSHIRE

1 **Q   You observed him sleeping for two**
2 **minutes?**
3   A   Probably around that time frame.
4 **Q   Did he have a cell phone in his hand?**
5   A   Not that I could see.
6 **Q   What time of night was it?**
7   A   Probably right around one o'clock.  It
8 was after lunch on second shift.
9 **Q   One a.m.?**
10   A   Yeah.
11 **Q   And you say he had his head down?**
12   A   Yeah.
13 **Q   Had he made a pillow of some type?**
14   A   I didn't see any type of pillow.
15 **Q   Was he wearing a jacket?**
16   A   I can't recall whether he was or
17 wasn't.
18 **Q   Did he have on his sleeves?**
19   A   I can't recall whether he did or
20 didn't.  You're supposed to.  I can tell you
21 that.  If he had his jacket on, I would not have
22 been able to tell if he had sleeves on.
23 **Q   Had he somehow or another fashioned his**
                                                           129

1 eating with the guys that went on the second
2 lunch at 12:15.  I usually only take about a 15-
3 to 20-minute lunch.
4 **Q   What time did you finish lunch?**
5   A   Probably around 12:30, 12:40.  And then
6 I went out to check the press and see if they
7 were getting it started making those parts out,
8 calling the AM down at the Body Shop and let him
9 know we had the job in the press and we were
10 trying to make some side outers.
11 **Q   So you have a clear recollection it was**
12 **after you had finished your lunch around**
13 **12:30 a.m.?**
14   A   Yeah.
15 **Q   When I was there yesterday I saw these**
16 **huge big lights.  Were the lights on?**
17   A   They're spotty.  They're energy-saving
18 lights.  So spontaneously some of them will shut
19 off for energy consumption savings.
20 **Q   Were the lights on that night?**
21   A   Some were.
22 **Q   How about the lights around the control**
23 **panel?**
                                                           131

1 jacket into some type of pillow?
2   A   Not that I could recall.  I never seen
3 his jacket in any way, shape, or form rolled up
4 around him or anything.
5 **Q   What makes you think that the time was**
6 **around one a.m.?**
7   A   It was after lunch.  It was after lunch
8 on night shift.
9 **Q   And lunch on night shift is when?**
10   A   The way it's broke up is typically
11 between 11:15 and midnight and the other one is
12 from midnight to 12:45.
13 **Q   So there are two 45-minute lunch breaks**
14 **in the middle of the night?**
15   A   That's the way we have it for
16 Production.  Maintenance is typically right
17 around 11:30 to 12:15.
18 **Q   And your testimony is it was after the**
19 **lunch break?**
20   A   Yeah, it was after everybody had ate.
21 **Q   Anything that makes you particularly**
22 **recollect that?**
23   A   I had personally myself just got done
                                                           130

1   A   To honestly tell you if those were on
2 at that point right above that panel, I can't
3 tell you that for sure.  I remember what I seen
4 Leon doing.
5 **Q   I believe I asked you who drew this**
6 **sketch on the reverse of Exhibit 16.**
7   A   Yeah, you did.
8 **Q   And did you tell me?**
9   A   I didn't know who drew it.  I don't
10 know.
11 **Q   And did you -- I forgot.  I apologize.**
12 **Is that an accurate sketch of what you saw?**
13   A   Yeah, it's pretty accurate other than
14 the fact, you know, to say these doors were
15 parallel to the way the floor is facing, I
16 couldn't tell you that.  But I said I couldn't
17 tell you whether it was actually locked or
18 unlocked.  They might have been cracked open.
19 It's not unusual for those Maintenance guys to
20 leave these doors cracked open or laying open a
21 little bit.
22 **Q   Well, the way the sketch is drawn it**
23 **looks like the doors were positioned to make a**
                                                           132

33 (Pages 129 to 132)

**JAMES ALLEN BROOKSHIRE**

1    blind, and you said that wasn't the case?
2         MR. JOHNSON: Object to the form.
3    A    What I can recall, I can't tell you
4    whether they were open. I'm positive they
5    weren't open parallel to the floor plate, but
6    they could have been open some.
7    Q    But not to make a blind?
8         MR. JOHNSON: Object to the form.
9    A    As far as somebody intentionally using
10   it for a blind, I don't know.
11   Q    What's your opinion?
12        MR. JOHNSON: Object to the form.
13   A    My opinion is that to me it really
14   doesn't make a difference what you're doing with
15   the doors. I mean, if you're in there working
16   on the equipment, you're in there working on
17   it. But as far as making a blind out of it, it
18   really doesn't make a difference, like I said,
19   unless you're coming back here from this
20   elevator lift station.
21   Q    Did you ever speak to Mr. Dees at all?
22   A    When?
23   Q    During this incident.

                                                    133

1    A    No.
2    Q    It's the second to last paragraph.
3    A    This one right here; right?
4    Q    On 37 it says, last sentence, not long
5    after this, Jim witnessed Leon walking down the
6    stairs. Is that true?
7    A    I'm trying to remember. I was hurrying
8    back downstairs. Probably in the time frame
9    which I talked to Kevin when I was talking to
10   Kevin, he came down, because down there in
11   the -- on the second floor, we have the rework
12   station, and I was down there with those guys
13   checking through panels and trying to sort out
14   the bad ones from the good ones to supply the
15   Body Shop because the entryway to the Body Shop
16   is right there on the second floor. And from
17   what I can recall, we were out there sorting
18   panels. And to say he was walking down
19   immediately after I seen him, I can't say that,
20   but I can recall that he came down at a later
21   time frame. But to say that he done it right
22   after I seen him, I can't recall that.
23   Q    Well, let me just read what it says.

                                                    135

1    A    Later on that evening. I didn't see
2    him much the rest of the evening after I ran
3    into him upstairs and went downstairs because --
4    trying to get that side outer to run. I believe
5    also that night we had some palletizing problems
6    on the other press as well. As far as being
7    there and being focused around Leon and talking
8    to him in particular, no, I didn't. Like I
9    said, he's not a direct report to me, so...
10   Q    And did you see him walking down the
11   stairs after you saw him sleeping?
12   A    I didn't -- I didn't pay attention. I
13   seen he was up and he was moving around. I was
14   heading back downstairs to make sure the press
15   was running.
16   Q    Well, I notice in your written
17   statement there, Exhibit 13, Bates number 37
18   says not long after this, Jim witnessed Leon
19   walking down the stairs. Is that true?
20   A    Which one was it?
21   Q    Second to last paragraph, number 37.
22   A    (Witness reviews document.)
23   Q    See where I'm talking about?

                                                    134

1    It just says not long after this, Jim witnessed
2    Leon walking down the stairs. My question is,
3    is that a true statement?
4    A    Yeah, that's a true statement. But,
5    like I said, if you are saying immediately, I
6    can't say he came down immediately, but he came
7    down before I talked to Kevin.
8    Q    Did you say anything to him?
9    A    To Leon or Kevin?
10   Q    Leon.
11   A    I didn't say anything to Leon. I just
12   said he's not a direct report to me, so it's
13   not...
14   Q    Did Kevin say anything to him to your
15   knowledge?
16   A    To my knowledge, no. I don't know.
17   Q    And was that the last you had to do
18   with this sleeping incident other than the
19   signing of the two statements that we've seen?
20   A    Yeah.
21   Q    Did you attend any disciplinary
22   hearings?
23   A    No.

                                                    136

### JAMES ALLEN BROOKSHIRE

1    Q   Did you give any further statements or
2  interviews?
3    A   No.
4    Q   Did anyone, other than after this
5  lawsuit was filed, ever interview you or talk to
6  you about what you saw?
7    A   I had one of the Korean -- Korean
8  Maintenance manager he asked me, you know, what
9  I had seen, and I told him what I seen. As far
10  as him being involved in the disciplinary
11  process, I don't know if he was or not. But
12  Mr. Mun came and spoke with me about it.
13    Q   And was that shortly after Mr. Dees got
14  terminated or before?
15    A   I believe it was before.
16    Q   I think Mr. Dees was terminated on or
17  about the 26th of February. You think it was
18  before that?
19    A   Yeah, I believe so.
20    Q   Let's maybe relate to that a date you
21  might remember. What was the date of your
22  youngest's birth, the one that's seven months
23  old now you said?
                                                              137

1    A   That was in May.
2    Q   In May. So we can't date that.
3        What was the occasion when Mr. Mun
4  talked to you and asked you about this?
5    A   If the 26th is when he was terminated,
6  it had to be that week of right before when all
7  this -- all the stuff was going on. Like I
8  said, I couldn't honestly tell you when the
9  exact day was that he was terminated because I
10  don't know. And I don't know when all the Team
11  Relations meetings went on with him and stuff
12  with Greg and John and all that. All I can tell
13  you is the stuff I was asked and witnessed.
14    Q   Well, the date of your last statement
15  is February 19, 2007.
16    A   Correct.
17    Q   That's Plaintiff's Exhibit 13. You
18  talked to Mr. Mun after that?
19    A   Yeah.
20    Q   And how did you happen to be talking to
21  him?
22    A   He came up and asked me.
23    Q   All right.
                                                              138

1    A   He said he wanted to talk to me in the
2  office, and we went in the conference room and
3  closed the door and he just asked me about it.
4    Q   There in the Stamping Plant?
5    A   Yeah.
6    Q   So there's some type of office there in
7  the plant?
8    A   Yeah. We've got -- in our Stamping
9  Shop we have two conference rooms. And then in
10  the Maintenance office there's one conference
11  room.
12    Q   Was anybody else there when you and
13  Mr. Mun were talking?
14    A   Just me and Mr. Mun.
15    Q   Did you know why he was asking you
16  about it?
17    A   He was just trying to understand what I
18  seen and what I visualized.
19    Q   And what did you tell Mr. Mun?
20    A   I described the same thing to him what
21  I told you, I went up there to check on side
22  outer panels. Then I showed him -- I was in
23  there with him and I showed in the chair the
                                                              139

1  position I see him in.
2    Q   So you actually took him up to the
3  site?
4    A   No. I just showed him from a chair
5  there in the conference room.
6    Q   Okay. What did Mr. Mun say?
7    A   He just kind of looked at me. His
8  English isn't very well spoken. So he just kind
9  of looked at me and nodded his head, oh, okay.
10    Q   That was it?
11    A   Yeah.
12    Q   All right. Where is Mr. Greg Prater
13  now?
14    A   He had taken a job at some other
15  company up in Tennessee or Kentucky.
16    Q   Do you know why he left?
17    A   From what I understand, he wasn't happy
18  with what he was doing here. He was wanting to
19  pursue another career, something promotional, or
20  get better options. And the other piece was he
21  was wanting to get closer to home. I think he
22  as one or two kids up in Tennessee. That's what
23  it was, Tennessee.
                                                              140

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

1    **Q  Had you ever heard any discussions**
2 **between Mr. Prater and Mr. Dees?**
3    A  I only heard one discussion, and that
4 was the day after we had an incident with Leon
5 where that trolley elevator system I was showing
6 you right here -- the lift station -- him and
7 another employee were working on that around
8 lunchtime, either the day before or two days
9 before. And they had just walked off the job
10 and went to lunch without telling anybody. And
11 we were very close to shutting the Body Shop
12 down. Kevin had to hurry up and go find some
13 other Maintenance Team Members to get that
14 system running before we shut the Maintenance
15 shop down. And the next day Kevin had told
16 Greg, and Greg had asked me to come in the
17 office and was asking me about this incident.
18 And he had called me and my senior manager in
19 there, Craig. And he was talking to me about
20 it. Then it wasn't too long after that he
21 called Leon in there and started asking Leon
22 about it. Leon was like I didn't walk off the
23 F'ing job. He goes, I always do my F'ing job.
141

1 And then Greg is like did you tell anybody.
2 Leon was like there wasn't an F'ing problem. I
3 mean, it was -- my boss, he's a preacher, and he
4 got up and walked out.
5    **Q  What was it, the last thing Mr. Dees**
6 **said?**
7    A  He said something about he don't walk
8 off the F'ing job. He tried calling -- let's
9 see. He said he tried calling Kevin on the
10 radio. I forget what he said. He said he tried
11 calling -- I forgot how he said it. I tried --
12 it had a couple of flavorful words in there, but
13 basically he said he tried getting ahold of
14 Kevin. But without confirmation of getting
15 ahold of Kevin, he still had left with the
16 system down.
17    **Q  So this was some incident Mr. Dees had**
18 **left his work area without permission?**
19    A  I would say so. I mean, he said it was
20 his lunchtime and he's entitled to his lunchtime
21 and he's going to take his F'ing lunch. And he
22 said he tried contacting Kevin and that's --
23 that's -- but Greg had asked for me and Craig to
142

1 be present as he asked Leon those questions
2 because I had been there on night shift. I
3 didn't actually know when Leon had left, but I
4 do know that Kevin had to call other people for
5 backup to get the elevator running or we were
6 going to shut the Body Shop down.
7    **Q  How long before you reported Mr. Dees**
8 **sleeping did this occur?**
9    A  This incident here?
10    **Q  I'm talking about where he used all the**
11 **profanity.**
12    A  I think in the conference room office
13 it was the day before. The day before this
14 incident happened. Then the issue with the
15 trolley happened that night -- that night
16 before. All within two days.
17    **Q  Within two days?**
18    A  Yeah, a couple of days.
19    **Q  Was Mr. Prater and Mr. Dees on speaking**
20 **terms?**
21    A  I don't know their personal
22 relationship. I mean, he -- obviously Greg
23 was -- Greg was his boss and what I can see I'm
143

1 sure there are assignments and stuff that Leon
2 didn't always agree with that I think Greg asked
3 him to do. But it wasn't nothing out of the
4 ordinary.
5    **Q  Greg Prater was called a Team Leader.**
6    A  He was assistant manager.
7    **Q  Assistant manager. Okay. Was there**
8 **any kind of disciplinary action about that?**
9    A  I couldn't tell you. I don't know.
10 Like I said, Greg dealt with that on his own
11 because Craig and I was always if you got one
12 issue, you need to take it behind closed doors
13 and deal with it. It don't need to involve all
14 of us. That's between Greg and John Applegate
15 and Leon. Like I said, Leon is not a direct
16 report to me or Craig.
17    **Q  Did you ever hear any discussion at**
18 **that plant about Mr. Dees' National Guard duty?**
19    A  No. I knew he was in it because him
20 and I had talked personally and I knew he was
21 still in the Reserves, still had duty.
22    **Q  Since he was not basically -- you were**
23 **not his direct report how did y'all get in that**
144

36 (Pages 141 to 144)

### JAMES ALLEN BROOKSHIRE

1  conversation?
2      A   Just being around him on the floor.  I
3  mean, he's out there with the rest of the guys
4  on the floor.  I mean, I always try to make sure
5  I have a working relationship with people, and,
6  you know, even though I didn't have direct
7  reports of Maintenance, I'd still try to help
8  them get parts and help them get stuff.  Because
9  the bottom line, their performance affects our
10  productivity.
11      Q   What did Mr. Dees tell you about his
12  National Guard?
13      A   He just told me he was in -- my
14  understanding he was in the Reserves and we
15  talked a little bit about his military
16  background, some time he spent in Korea.  And he
17  said he still actively does some stuff for the
18  military and he has some weekend duties
19  sometimes.  I didn't know when he went, but I
20  knew he was still involved with it.
21      Q   All right.  Any other discussion
22  between you and Mr. Dees?
23      A   I mean, just personable stuff, talking
                                                    145

1  about military or talking about press problems
2  or stuff like that.
3      Q   Tell me, other than the two lawyers
4  here today and Mr. Hughes who you've told me
5  about, that you've discussed this sleeping
6  incident with.
7      A   Mr. Hughes.  And I'm sorry.  I
8  discussed it with my senior manager, Craig
9  Stapely.
10      Q   Craig Stapely?
11      A   And discussed it with Mr. Mun and
12  discussed it with Greg Prater and John
13  Applegate.
14      Q   When is the last time you talked to
15  Greg Prater?
16      A   It's been when he left.  Whenever he
17  left.  The last day that he was leaving.
18      Q   So you talked to him the last day he
19  was leaving?
20      A   The last day he left.  You know, the
21  day before and the last day, just kind of
22  shaking his hand and wishing him good look on
23  his new assignment.
                                                    146

1      Q   No discussion about Mr. Dees?
2      A   No.
3      Q   No discussion about you?
4      A   (Witness shakes head.)
5      Q   No?
6      A   No.
7      Q   Did he know you were in the substance
8  abuse program at Hyundai?
9      A   Greg Prater?
10      Q   Right.
11      A   No.
12      Q   I want to show you a collection of
13  documents we've previously marked as Plaintiff's
14  Exhibit 9.  And there's a Bates number 39.  I
15  want you to refer to this if you would.  That's
16  an e-mail transmission dated -- from Greg Prater
17  dated February 8, 2007, and it refers to an
18  original message from William Ware to
19  Mr. Clevenger, copies to Greg Prater.  It says,
20  Rob, Greg P. and I met with all the TMs in
21  question about Leon leaving to go to lunch while
22  the lift was down.  We came to the consensus
23  that a Discussion Planner is needed for the TMs
                                                    147

1  who left to go to lunch while the lift was down;
2  Shane, Drake, and Leon.  The TMs performing the
3  repair should have waited until help arrived to
4  take over the repair.  The TL and Leon are not
5  on speaking terms and it appears that he blew
6  the incident out of proportion and he only
7  singled Leon out but for no apparent reason.
8  Proper communication and task transfer will be
9  the topic of the Discussion Planner.  If
10  necessary, I can type up all the notes in the
11  report, but I didn't think it was necessary if
12  Greg and I both agree on the resolution.  Let me
13  know if I need to.  Is that the incident you're
14  talking about?
15      A   Yeah.
16      Q   Now, I don't see any --
17      A   I remember Shane being with Leon, too,
18  but I don't remember Drake.  But I remember Leon
19  and Shane.
20      Q   You testified earlier that Mr. Dees had
21  used quite a bit of profanity.  You kept using
22  the words F'ing.  Meaning F-U-C-K-I-N-G; right?
23      A   Yeah.
                                                    148

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

JAMES ALLEN BROOKSHIRE

1    Q   You said that was throughout that
2 conversation.
3    A   There was damn and hell.
4    Q   Damn and hell.  What other profanity?
5    A   And shit.
6    Q   Shit.
7    A   That's it.
8    Q   What other profanity?
9    A   That's the four I can remember.
10    Q   And, of course, neither you nor
11 Mr. Prater and anybody else in that discussion
12 used any profanity; would that be true?
13       MR. JOHNSON:  Object to the form.
14    A   No, I didn't.  Greg didn't use it, and
15 Craig definitely didn't use it, and I didn't use
16 it either.
17    Q   Right.  So Mr. Dees was out of line in
18 your opinion?
19    A   It was pretty verbally -- I mean,
20 normally if a Production Team Member talks like
21 that to another Team Member or member of
22 management, I'll take corrective action on it.
23 What Greg done with it, I don't know.  But if a
                                              149

1 Team Member does that that works for me or any
2 member of management that works for me and talks
3 to another person like that I get them -- I
4 mean, depending on what phase they are in the
5 disciplinary process, I'll at least give them a
6 Discussion Planner for it.  We call them
7 Discussion Planners.  My boss that's a preacher,
8 he's definitely against -- he's a big one
9 against --
10    Q   Your boss would be who?
11    A   Craig Stapely.
12    Q   Stapely.  And this says the TL and Leon
13 are not on speaking terms.  Who would that be?
14    A   That's Kevin Hughes.
15    Q   And that's the man you reported the
16 sleeping incident to first?
17    A   Correct.
18    Q   And why weren't Mr. Hughes and Mr. Dees
19 on speaking terms?
20    A   I couldn't -- I mean, I don't know
21 their past history or what.  I do know that
22 Kevin has came to me a couple of times and, you
23 know, said that Leon is very standoff-ish to
                                              150

1 him, kind of like a -- kind of like a team --
2 like he tried to lead the guys in kind of a
3 negative -- negative way.
4    Q   Mr. Dees did?
5    A   Yeah.
6    Q   So Kevin Hughes is the first person you
7 reported the sleeping to; right?
8    A   Right.
9    Q   Kevin Hughes is your --
10    A   He's Maintenance's Team Leader.
11    Q   Your leader?
12    A   Greg Prater.
13    Q   Greg Prater is your leader?
14    A   No.  John Applegate is senior manager
15 of Maintenance.  Greg Prater reported to John
16 Applegate.  Kevin Hughes reports to Greg Prater
17 and Leon reports to Kevin.
18    Q   And Kevin is the one that you first
19 reported the sleeping to?
20    A   Correct.  Because that's the only
21 leadership figure that Maintenance has on night
22 shift is Kevin.
23    Q   And Kevin Hughes is the same person
                                              151

1 mentioned in this e-mail I just showed you?
2    A   Yeah.  That's correct.
3    Q   And he would be the TL who wasn't on
4 speaking terms with Mr. Dees?
5    A   (Witness nods head.)
6    Q   Correct?
7    A   As far as what their speaking terms
8 are, I don't know, but...
9    Q   Well, that's what this says?
10    A   Right.  He is Leon's Team Leader.
11    Q   This looks like Mr. William Ware sent
12 this.  He's the same person that took this
13 statement from you?
14    A   Correct.
15    Q   So Mr. Ware would have known when he
16 took that statement from you that Mr. Kevin
17 Hughes and Mr. Dees were not on speaking terms
18 according to this?
19    A   He would be the guy, yeah.
20    Q   And it says Mr. Dees was singled out
21 for no apparent reason.  Do you know where that
22 came from?
23    A   (Witness shakes head.)
                                              152

38 (Pages 149 to 152)

## JAMES ALLEN BROOKSHIRE

1    Q   You don't?
2    A   I mean, I don't know why -- I don't
3  know why he would be considered being the one
4  singled out. I can tell you I remember Leon had
5  been working on it and Shane. I don't recall
6  Mr. Drake working on it, but I remember Shane
7  and Leon working on that drop.
8    Q   Well, Shane and Mr. Drake -- what's
9  Mr. Drake's first name?
10   A   That is his first name. It's Drake
11 Barefoot.
12   Q   Shane and Drake Barefoot were not in
13 this discussion about this incident that you
14 participated in?
15   A   With Craig? Me and Craig and Greg?
16   Q   Right.
17   A   He just called -- I don't know if he
18 had already talked to Shane or Drake or who he
19 talked to in what order. I know that I was
20 there when he had talked to Leon.
21   Q   Well, this apparently says that Leon
22 was singled out as opposed to Shane or Drake,
23 doesn't it?
                                              153

1  already answered.
2    A   It was talking about that incident that
3  happened with the trolley lift station and
4  addressing him walking off the job and not
5  telling anybody.
6    Q   So he was cussing in the meeting and
7  then cussing leaving the meeting?
8    A   He said I'm not going to deal with this
9  shit and he opened the door and left.
10   Q   Well, do you know why you were in the
11 meeting at all?
12   A   Because I witnessed downtime. I didn't
13 witness him walk off the job, but I witnessed
14 downtime and that he was the one that was
15 working on it. But I don't know when he left,
16 but I did witness him and Shane working on it
17 and I did know that we almost shut the Body Shop
18 down because the elevator was down. There was
19 no communication made that he had gone to lunch
20 from my understanding.
21   Q   Did you ever hear anybody at Hyundai,
22 other than the discussion you and Leon had, talk
23 about Mr. Dees' Guard obligation?
                                              155

1    A   Going by what was put in this right
2  here, that's what it appears to be. But as far
3  as me knowing anything about him being singled
4  out, I don't know. I just know that I was in
5  there for when Greg had called Leon into the
6  office.
7    Q   Did Greg call Drake or Shane into the
8  office?
9    A   Not while we were there. After Leon
10 had came in there and had spewed out a few cuss
11 words, my boss got up and left. He just looked
12 at Greg and was like I'm not going to tolerate
13 this. He goes I'm leaving.
14   Q   So you were there just as a witness?
15   A   Craig had witnessed this talking and
16 Leon had walked out. Leon didn't -- he didn't
17 stay there. Had he finished uttering out a few
18 words and phrases and then he walked out.
19   Q   What words and phrases?
20   A   Well, that I was telling you, the hell,
21 the damn, and shit and...
22   Q   Tell me what you remember he said.
23      MR. JOHNSON: Object to the form. He's
                                              154

1    A   And that probably -- I mean, we talked
2  about him being in the Guard a couple of times,
3  but I don't know specifically when his weekends
4  were or when his periods were that he had to go
5  serve. But I knew he was actively involved in
6  it and there was times he had to do weekend duty
7  or whatever it was.
8    Q   Do you know what Hyundai's policy is
9  regarding weekend duty?
10   A   No, I don't. Because back when we had
11 talked about that, there was a memorandum, I
12 think, that was sent out by Team Relations
13 talking about that particular issue and there
14 was nobody in our area at the time that was
15 actively involved in duty. So I didn't really
16 get involved in the policy or the action or the
17 course that's taken for that.
18   Q   You said there was a memorandum put out
19 by HR talking about Guard duty?
20   A   Yeah, there was because there was like
21 some other people across the plant. I don't
22 know if it was Team Relations or HR or who it
23 was, but there was a notice or something put out
                                              156

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

### JAMES ALLEN BROOKSHIRE

1  that kind of said, hey, here's what we're going
2  to do. I can't recall exactly what it said.
3  But there were some people across the plant that
4  was also involved in the Forces.
5    Q   Involved in what?
6    A   Forces. Armed Forces.
7    Q   And did this come out after the
8  sleeping incident that you say you saw?
9    A   I can't recall. It was sometime this
10  year. I would guess it probably was. I don't
11  know.
12    Q   And who was it from?
13    A   It was either Team Relations or HR.
14    Q   And you got a copy?
15    A   No, I don't have one.
16    Q   What did -- did you get a copy and just
17  throw it away?
18    A   Well, we had gotten e-mails sent to
19  us -- I'm pretty sure it was in e-mail format
20  Team Relations, I think. What they had done is
21  we had to go around and check and see who's all
22  actively involved or participating in the Forces
23  or was part of the Forces. And then we didn't
                                                157

1    Q   And since you didn't have any Armed
2  Forces under your immediate supervision --
3    A   I didn't get in touch with the policy
4  or get deeply involved. If we had somebody and
5  they came up to me and said they're serving in
6  the Guard or something like that, then I would
7  go to HR and Team Relations and find out what
8  it --
9    Q   Did it specifically mention Guard duty?
10    A   It said -- I believe it said something
11  about serving, serving the Armed Forces or
12  serving duty or something like that. I can't
13  recall if it said National Guard or whatever.
14    Q   And what did it say about -- what was
15  the company policy that was in this e-mail?
16    A   I can't recall that.
17    Q   Was it setting forth the protocol to
18  follow if somebody on Guard duty --
19    A   Yeah, it was basically like -- just
20  like -- like I said, it was either guidelines or
21  policy or something. Just laying it out there
22  so there's no misunderstanding that this is what
23  needs to happen or...
                                                159

1  have nobody in our area participating in it, so
2  I didn't really find a need for myself to really
3  investigate what we needed to do because we
4  didn't have anybody involved in duty.
5    Q   You have a company e-mail address?
6    A   Yeah.
7    Q   What is it?
8    A   Jamesbrookshire@hmmausa.com.
9    Q   You would have gotten this through that
10  e-mail?
11    A   Yeah.
12    Q   And your best judgment is it was after
13  this sleeping incident?
14    A   I think. I think.
15    Q   And it said what? Some kind of notice?
16      MR. JOHNSON: Object to the form.
17    Q   A notice about what?
18    A   Just how the company policies apply or
19  the protocol that we follow for people serving
20  duty or serving in the Armed Forces.
21    Q   And it was sent to you because you're
22  in a supervisory capacity?
23    A   Right.
                                                158

1    Q   Did it refer to the fact that there was
2  a misunderstanding?
3    A   No. I think there was questions --
4  questions brought about. Because, like I said,
5  they have people in General Assembly, people in
6  Paint Shop, I think, also that had Guard duty or
7  served in the Forces. Actually our last Team
8  Member letter that's published, we've got
9  somebody in Iraq right now, and they were
10  talking about how they missed working at the
11  plant and ready to come back and put their
12  uniform on and work back at the plant again.
13    Q   Who at HR would have sent out this
14  e-mail?
15    A   I don't know. Like I said, it was
16  probably either -- usually notices or
17  information like that is either HR or Team
18  Relations, one of those two.
19    Q   Who would be the people? Would it be
20  Wendy Warner maybe?
21    A   Wendy or Rob.
22    Q   Rob Clevenger?
23    A   Rob Clevenger or Wendy Warner.
                                                160

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

JAMES ALLEN BROOKSHIRE

1    Q   So you think it was one of those two?
2    A   Yeah.  It would have to be one of those
3  two or their assistants, or sent out on their
4  behalf.
5    Q   And was it a mass e-mail to everybody?
6    A   Typically for information purposes,
7  they usually send it to -- they've usually got
8  -- the acronym they use is HMMA all and it goes
9  out to everybody on the e-mail system.
10   Q   Did it ever refer to whether or not
11 military orders would be required for Reserve
12 duty?
13   A   I can't recall that.
14     MR. KILBORN:  I want to take a break.
15
16   (Whereupon, a brief recess was had in
17 the proceeding.)
18
19 BY MR. KILBORN:
20   Q   Okay.  Was your wife at this party
21 where you were snorting that cocaine?
22   A   She wasn't.  She was only there for a
23 couple of hours.

161

1  their computers, but I don't know if it's like
2  for interconference calls or whatever at their
3  desk.
4    Q   So HMC headquarters in Seoul; right?
5    A   Yeah.
6    Q   They were monitoring the --
7    A   Press repair.
8    Q   -- press repair from Seoul?
9    A   I think so.  They've got some
10 organization they've got called Global Command
11 Center or something like that where they monitor
12 all the KPIs, key performance indexes, for all
13 the plants and any major catastrophic problems
14 or anything.  Our press was down for about a
15 month, and that's big downtime, big concern.
16   Q   Did you get any orientation when you
17 began work at Hyundai or had some since then
18 about the company organization relationship
19 between Hyundai Motor Corporation, AMC, HMMA, or
20 HMA?
21   A   Any meetings?
22   Q   Yeah.  Any orientation where the
23 relationship was discussed.

163

1    Q   But she was there?
2    A   Yeah, she was there in the earlier part
3  of the...
4    Q   When did she learn that you snorted
5  cocaine and ended up being found out at the
6  Hyundai plant?
7    A   I told her when -- that day when I
8  tested positive and when I went through all
9  that.
10   Q   She didn't know before then?
11   A   No.  She knew I had -- in my younger
12 years I had done it a couple of times.
13   Q   Are there any cameras in that Stamping
14 Plant?
15   A   There's some, I believe, externally on
16 the outsides of the building to kind of view
17 what's going on outside in some of the parking
18 lots.  They had had some set up inside the plant
19 just recently when we broke the press, and HMC
20 was monitoring the press repair from
21 headquarters.  But that was -- as far as any
22 other ones internally, I don't know of any.  I
23 know some of the Koreans have the web cams on

162

1    A   They had put us through what they --
2  well, not all of us.  But what they've been
3  trying to do is put everybody through what they
4  call cultural training, HMC culture training.
5  And they'll take, Team Members, management
6  members, and all that.  They had sent me last
7  year right before my wife -- about two weeks
8  before she was due to have the baby -- sent me
9  to Korea for a week.  But they picked Team
10 Members, management members and sent them
11 together as a group over to Korea.  And they've
12 been doing that off and on for a couple of
13 years, just to kind of learn their culture and
14 learn their ways and stuff.
15   Q   They took you out of your drug abuse
16 program?
17   A   No, no.  This was last year.
18   Q   2006?
19   A   2006, yes, sir.
20   Q   Did they tell you that this is just one
21 big company really --
22     MR. JOHNSON:  Object to the form.
23   Q   -- run by Seoul HMC?

164

41 (Pages 161 to 164)

## JAMES ALLEN BROOKSHIRE

1    A   Their philosophy is it's a company
2  working together in harmony to build the
3  quality -- highest quality automobiles for
4  people in the world.
5    Q   Right.  Well, what I'm hearing is that
6  HMC controls everything; is that true?
7         MR. JOHNSON:  Object to the form.
8    A   No, they don't control everything, but
9  I mean, it's -- my opinion, if I was starting --
10 just like Toyota or Honda when they first
11 started their first plant in a new country,
12 they're going to have active involvement on how
13 the company is structured, how it's ran to make
14 sure the business is going to prosper, because
15 they had a company they tried running in Canada
16 and had some problems there and it ended up not
17 making it.  So I think they know that they need
18 to take an active foothold in making sure the
19 company is going to be prosperous and move in
20 the right direction or otherwise they're going
21 to lose a lot of money.
22   Q   And who is they?
23   A   HMC and HMA.  It's in their best
                                              165

1  they're working through.  I wouldn't say HMC is
2  controlling everybody and telling them what to
3  do.
4    Q   How about HMA?
5    A   They don't have much of an influence on
6  us.  I mean, that's our sales group.  That's our
7  sales group, and they kind of -- really the only
8  involvement they have with us as far as giving
9  us an understanding of our production schedule
10 and our orders and how much overtime we need to
11 work to fulfill those orders.
12   Q   HMA does that?
13   A   Yeah, they give you a sales forecast.
14   Q   So you run production to meet the sales
15 forecast HMA puts out?
16   A   Yeah.
17   Q   Is that in written form?
18   A   I'm not involved with that.  That's
19 something that's done with Production Control.
20 Production Control figures out what all the
21 other departments need to do and the suppliers
22 and they kind of disseminate the information and
23 give it to us.
                                              167

1  interest to make sure the company is moving in
2  the right direction.  They've already -- just
3  our plant alone they've already reduced the
4  Korean head count activity in our Stamping
5  Department because we used to have like 15
6  Koreans in our department.  Now we only have
7  probably six.
8    Q   You started in 2005?
9    A   Yes, sir, August.
10   Q   So the HMC and HMA desired and actually
11 had active control to make sure that the
12 operations got up and running correctly?
13   A   (Witness nods head.)  And still it's
14 still a young plant.  We're still working bugs
15 out now, but it's progressed a lot from what it
16 was a couple of years ago.
17   Q   Was that a yes to my last question?
18 You nodded your head.
19   A   Yes.  Sorry.
20   Q   And is that active control by HMC and
21 HMA still present?
22        MR. JOHNSON:  Object to the form.
23   A   There's a joint partnership that
                                              166

1    Q   Is HMA -- do they have people on the
2  scene at the Hyundai plant?
3    A   We used to have a guy, Mr. Duckworth,
4  but he went back to HMA out in California.  He
5  was our major presence for HMA.  My
6  understanding is we have people that come in off
7  and on into our plant, but as far as having
8  direct people from HMA at our plant, I don't
9  know of any and where they're at.
10   Q   Outside of the sleeping incident, do
11 you know of any employment problems that's
12 Mr. Dees had at Hyundai?
13   A   The only other issue I know about
14 besides the issue with the elevator system that
15 was in the e-mail, the sleeping problem, Greg
16 had mentioned to me a couple of times he had
17 some issues with Leon kind of being defiant on
18 doing some work.  And that's about it.
19   Q   Tell me what you remember there.
20   A   Just him thinking that he doesn't need
21 to go clean up messes or clean up after
22 himself.  We've got areas that we agreed to --
23 between Production and Maintenance we agreed to
                                              168

42  (Pages 165 to 168)

## JAMES ALLEN BROOKSHIRE

1  clean up in the plant. And we -- Production is
2  responsible for the baler area. We clean up the
3  baler area and Maintenance is responsible for
4  cleaning up the press pits. And a lot of those
5  Maintenance guys -- I know Greg had mentioned
6  Leon, he didn't like to go down there and do his
7  share of cleaning up the press pit. He had
8  problems with that before.
9      Q   And the press pit is on the basement
10  level underneath the two giant presses?
11      A   Yes, sir.
12      Q   And that's where the shards and pieces
13  left over from the Stamping process come down
14  the shoot, hit the conveyor belt, and go off to
15  the baling area?
16      A   They have what they call the scrap
17  metal slugs -- they call them slugs, punch
18  pieces. Oil drips out of the press from leaks
19  and stuff like that.
20      Q   And have you been down in the pit when
21  it's operating?
22      A   Yeah, I've been down there.
23      Q   Describe that for me.
                                              169

1  just besides the little round slugs, aren't
2  there?
3      A   Basically what makes it out to the
4  floor is slugs. That's basically what --
5  because they're small and they fall out from the
6  sides of conveyor. Most of the scrap metal
7  comes down the shoots which are enclosed shoots
8  and hit the conveyor.
9      Q   And Mr. Dees didn't like to be in the
10  pit?
11      MR. JOHNSON: Object to the form.
12      A   Me asking him personally or knowing him
13  personally, I can't vouch for that, but I know
14  Greg had told me he had some issues with Leon
15  going down there and doing his job in the pit.
16  They had like a rotation set up where guys took
17  turns going down to the pit and cleaning the
18  pit. I know from what I understand he had some
19  problems with Leon going down there and doing
20  his.
21      Q   Mr. Dees didn't like the pit, did he?
22      MR. JOHNSON: Object to the form.
23      A   I don't know.
                                              171

1      A   Just, you mean, like the environment or
2  the sound or everything there?
3      Q   Everything.
4      A   The press pit you definitely have to
5  wear hearing protection. There's oil spots in
6  certain places like where it's dripping down
7  from either the blank washer, the press
8  hydraulic units, or what have you. And then the
9  scrap comes down the shoots and it's pretty
10  noisy coming down the shoots and hits the
11  conveyor and rolls out on the conveyor.
12  Sometimes those little slugs bounce out of the
13  sides of the conveyor. But you can't -- if you
14  get anywhere near the conveyor, they've got what
15  they call an E stop switch that you pull if
16  anything emergency happens and it shuts
17  everything off, shuts the press off, conveyor
18  off and everything there.
19      Q   There's a lot more than slugs that
20  comes out of there, isn't there? Isn't there
21  giant metal shards?
22      MR. JOHNSON: Object to the form.
23      Q   And all kinds of sharp pieces of metal
                                              170

1      Q   Did anybody like the pit?
2      A   I don't what they -- I've been down
3  there cleaning scrap up and oil up myself just
4  to show people I'll get in there and work with
5  them just to say, hey, it's not that bad of a
6  job.
7      Q   How many decibels is the noise in the
8  pit when the two presses are running?
9      A   I couldn't vouch for that, but I know
10  at the back of the presses it's 90, 95. 90 to
11  95 decibels.
12      Q   What is the level at which permanent
13  hearing loss is a danger?
14      MR. JOHNSON: Object to the form.
15      A   Over 85 decibels over an extended
16  eight-hour period you experience hearing loss.
17      Q   And this is about 90?
18      A   If you stand right there at the back of
19  the press consistently. That's right back there
20  where the opening is at the back of the press.
21  Currently right now we're purchasing sound
22  deadening material because we're trying to make
23  an effort -- consorted effort with Safety to
                                              172

43 (Pages 169 to 172)

## JAMES ALLEN BROOKSHIRE

1  reduce the decibels so people don't have to wear
2  hearing protection in the area anymore.
3      Q    And are Kevlar sleeves mandatory in the
4  pit?
5      A    Yes.
6      Q    Is hard hat mandatory in the pit?
7      A    Yes.
8      Q    Safety goggles mandatory in the pit?
9      A    Yes.
10     Q    Steel-toe shoes mandatory in the pit?
11     A    Yes.
12     Q    Any other safety gear mandatory?
13     A    If you're going to be picking up like
14 the metal scrap you were talking about, you've
15 got to wear gloves.
16     Q    Kevlar gloves?
17     A    Yes.
18     Q    Was one of Leon's jobs in the pit
19 picking up the metal shards?
20     A    Yeah.
21     Q    Anybody ever get cut doing that?
22     A    Usually if you're wearing your PPE most
23 of the time you won't get cut unless you're

173

1      Q    What you were doing it was dangerous
2  because it went right through your Kevlar glove;
3  isn't that true?
4          MR. JOHNSON: Object to the form.
5      A    There's ways you can handle the metal
6  that will reduce the danger of the job. And
7  that's -- that was just -- me personally I was
8  in a hurry trying to get the press running. I
9  was yanking it out. You can take the shards or
10 scrap pieces and you can bend them into pieces
11 and get poles and yank them out with poles and
12 stuff.
13     Q    Well, see if you can answer this
14 question. Isn't it true that the pit is a
15 dangerous, noisy, oily place to work?
16         MR. JOHNSON: Object to the form.
17     A    It's -- I mean, it's got noise because
18 of the presses running. It's going to be noisy
19 anywhere there are presses. 5400 tons, that
20 kind of pressure is going to generate noise. As
21 far as the oil, just like a car that ages, with
22 time you're going to have some oil leaks. It's
23 Maintenance's responsibility to fix those leaks

175

1  really tugging on a sharp piece of metal and
2  they'll kind of cut through the glove. But as
3  far as I know, I haven't heard anybody that's
4  been wearing their PPE get hurt like that.
5      Q    And you got cut because of why?
6      A    I was doing exactly what I just told
7  you. I was -- we had a piece of scrap stuck
8  down in the scrap shoot from above. When the
9  die cuts off the trim edge, it goes into the
10 scrap shoot which goes to the pit. Sometimes
11 those will get backed up or a panel will fall
12 off inside the scrap shoot and then the scrap
13 will back up. Then we have to pull all that
14 scrap out by hand. And there was a piece stuck
15 in there and I yanked on it and it just -- it
16 will go right through the glove.
17     Q    And it went right through your glove?
18     A    Yeah.
19     Q    That's a Kevlar glove?
20     A    Yeah.
21     Q    So it's dangerous, isn't it?
22         MR. JOHNSON: Object to the form.
23     A    Depends on what you're doing.

174

1  as they come about.
2      Q    So it's not oily?
3      A    I wouldn't call it excessive oily.
4      Q    But it's oily?
5      A    Yeah, there's oil down there.
6      Q    Oil is slippery, isn't it?
7      A    Yes.
8      Q    Even in steel-toe shoes it's slippery?
9          MR. JOHNSON: Object to the form.
10     A    It can be if you've got puddles of it
11 everywhere, yeah. Of course it can be
12 slippery. I mean, that's also part of us buying
13 our industrial boots.
14     Q    Did you ever see anybody taking
15 photographs of the control panel area where you
16 claim Mr. Dees was sleeping?
17     A    Have I seen anybody taking pictures?
18     Q    Right.
19     A    Huh-uh.
20     Q    Have you ever seen any photographs of
21 that area?
22     A    No.
23     Q    Is that area the same today as it was

176

44 (Pages 173 to 176)

### JAMES ALLEN BROOKSHIRE

1 when you say you saw Mr. Dees sleeping?
2     A   I'm trying to think.  The only
3 different thing that's up there right now from
4 that picture, there's an orange ladder that's
5 laying up there, been laying up there.  I mean,
6 there's no chair up there.  And somebody drew
7 that wire spool.  I don't remember that wire
8 spool.  There's nothing out in front of that
9 cabinet right now.
10     MR. KILBORN:  Thank you,
11 Mr. Brookshire.  That's all I have.
12         EXAMINATION
13 BY MR. JOHNSON:
14     Q   Mr. Brookshire, I've got a couple of
15 follow-up questions.  Some I just want to make
16 sure I'm clear on a couple of things.
17         The incident where you injured your
18 hand was that actually done in the pit or was
19 that up on the Production level at the
20 Stamping --
21     A   It was on the Production level.
22     Q   So that wasn't actually in the pit?
23     A   No, sir.
                                        177

1 serious misconduct?
2     A   Yes, sir.
3     Q   Okay.  And Mr. Kilborn asked you to
4 circle some bullet points, and one of the ones
5 that you circled was -- I guess it's the fifth
6 bullet point -- use, possession, sale, transfer
7 of, or being under the influence of illegal
8 drugs, alcohol, or any other intoxicating
9 substance at any time on HMMA property; correct?
10     A   Yeah.
11     Q   Now, just to go back and clarify.  Did
12 you ever use illegal drugs, alcohol, or any
13 other intoxicating substance on HMMA property?
14     A   No, sir.
15     Q   Did you ever possess any illegal drugs,
16 alcohol, or intoxicating substances on HMMA
17 property?
18     A   No, sir.
19     Q   Did you ever sell any illegal drugs,
20 alcohol, or other intoxicating substances on
21 HMMA property?
22     A   No, sir.
23     Q   Okay.  Did you ever transfer or give or
                                        179

1     Q   Mr. Brookshire, you reviewed
2 Plaintiff's Exhibit Number 15 with Mr. Kilborn;
3 correct?
4     A   Yes, sir.
5     Q   And just to make sure, when Mr. Kilborn
6 asked you to review the list, I think you looked
7 at some of the bullet points there; correct?
8     A   Yes, sir.
9     Q   And did you also review or read into
10 the Record what follows those bullet points?
11     A   The bullet points that I circled, I
12 read most of the bullet point.  I mean, I didn't
13 finish that one or that one towards the end.
14     Q   Did you read the final sentence there
15 that says the aforementioned list is not all
16 inclusive?
17     A   No, I didn't.  I didn't see that.
18     Q   You did not see that?
19     A   No.
20     Q   You understand what that means?
21     A   Right.  There could be other issues
22 that aren't included on this list.
23     Q   Other things that may constitute
                                        178

1 receive any illegal drugs, alcohol, or other
2 intoxicating substances at any time on HMMA
3 property?
4     A   No, sir.
5     Q   Were you ever under the influence of
6 illegal drugs, alcohol, or other intoxicating
7 substances at any time on HMMA property?
8     A   I wasn't under the influence, but I
9 know that I tested positive.
10     Q   And what do you mean by you know you
11 weren't under the influence?
12     A   As in the immediate debilitating
13 effects of drugs or alcohol.
14     Q   You often hear the term impairment.
15 Were you impaired at any time because of illegal
16 drugs, alcohol, or other intoxicating substances
17 on HMMA property?
18     A   No.
19     MR. KILBORN:  I'm going to object to
20 that as to him being an expert on what's
21 impaired.
22     Q   Okay.  Have you ever used any illegal
23 drugs, alcohol, or any other intoxicating
                                        180

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## JAMES ALLEN BROOKSHIRE

1  substances immediately prior to coming to work?
2      A   No, sir.
3      Q   Had you ever felt drunk at work?
4      A   No.  Tired, not drunk.
5      Q   Mr. Kilborn had asked you about a wire
6  spool that was on a drawing that somebody had
7  made.  Is it your testimony that you recall that
8  there was no wire spool there at the time you
9  saw Mr. Dees sleeping, or is it that you don't
10  remember whether it was there or not?
11      MR. KILBORN:  I object to counsel
12  leading his own witness.
13      A   I don't remember it being there.
14      Q   Okay.  You had mentioned to Mr. Kilborn
15  this Mr. Mun had come and spoken to you at some
16  point.  Do you recall whether he received a
17  telephone call from Mr. Dees' wife?
18      A   Yes, he did.
19      Q   Do you remember what he said about the
20  call from Dees' wife?
21      A   I think something to the effect that
22  his wife didn't feel that it was right for what
23  happened and he should not be getting any kind

181

1  didn't you?
2      A   I didn't have anything -- I didn't
3  possess anything.
4      Q   You knew about that, didn't you?
5      MR. JOHNSON:  Object to the form.
6      A   (No response.)
7      Q   You didn't know that was possible?
8      A   I don't have this whole book memorized.
9      Q   Let's see if you've got the rest of it
10  memorized.  HMMA also considers off-the-job
11  illegal drug use as proper cause for
12  disciplinary action up to and including
13  termination of employment.  You read that?
14      A   Yeah.
15      Q   And you are guilty of off-the-job
16  illegal drug use, aren't you?
17      MR. JOHNSON:  Object to the form.
18      A   I showed up positive in a urine screen.
19      Q   That's not my question.  You are guilty
20  of off-the-job illegal drug use, aren't you?
21      A   Going by a urine specimen, yes, I am.
22      Q   Well, going by what you know you did,
23  which is snort cocaine --

183

1  of discipline for doing that on the job, that he
2  didn't do anything wrong.
3      MR. JOHNSON:  I think I'm about done if
4  we could take a quick break so I could talk to
5  Chris.
6
7      (Whereupon, a brief recess was had in
8  the proceeding.)
9
10      MR. JOHNSON:  I'm done.
11      FURTHER EXAMINATION
12  BY MR. KILBORN:
13      Q   Mr. Brookshire, would you look at
14  Plaintiff's Exhibit 15, the handbook?  And if
15  you'll look on page 38 and 39, it's got specific
16  handbook rules on drug and alcohol, doesn't it?
17      A   Yeah.  I haven't -- like I said, I
18  haven't reviewed everything, but...
19      Q   Well, let me help you.  Look at the top
20  of page 39.  The third line down says any
21  illegal substance will be turned over to the
22  appropriate law enforcement agency and criminal
23  prosecution may result.  You knew about that,

182

1      MR. JOHNSON:  Object to the form.
2      Q   -- you violated this policy, didn't
3  you?
4      A   Yeah.
5      Q   And isn't it true that you have shown
6  up at work at Hyundai with alcohol on your
7  breath?
8      MR. JOHNSON:  Object to the form.
9      A   No, I haven't.
10      Q   You have not.  All right.  And you say
11  in response to your lawyer's questions that you
12  had, I think, gotten over the debilitating
13  effects of alcohol and cocaine by the time you
14  had showed up at work; is that true?
15      A   What's that?
16      Q   You told your lawyer you had gotten
17  over the debilitating effects of alcohol and
18  cocaine by the time you went to work?
19      A   That would be correct.
20      Q   When did you get over the debilitating
21  effects of both the alcohol and the cocaine?
22      MR. JOHNSON:  Object to the form.
23      A   I don't know the mathematical

184

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

## JAMES ALLEN BROOKSHIRE

1  calculations off the top of my head.
2      Q   What's your best judgment?
3      A   Alcohol is out of your body within 24
4  hours.
5      Q   Well, I'm not talking about anybody's
6  body.  When did you, Jim Brookshire, get over
7  the effects of cocaine and alcohol that you had
8  consumed at that party at this gentleman's
9  house?
10     A   The incident had happened on Saturday,
11  and I was over the debilitating effects by
12  Sunday.
13     Q   What time Sunday?
14     A   I don't know.  I was fine, out mowing
15  the yard by lunchtime Sunday.
16     Q   So you didn't even have a hangover;
17  right?
18     A   (Witness shakes head.)
19     Q   No?
20     A   No.  Tired.  Tired and thirsty.
21     Q   Did the cocaine make you thirsty or the
22  alcohol?
23     A   Alcohol.
                                              185

1      MR. KILBORN:  That's all my questions.
2  Thank you.
3          FURTHER EXAMINATION
4  BY MR. JOHNSON:
5      Q   Just to follow up with you,
6  Mr. Brookshire.  Mr. Kilborn referenced on page
7  39 of the Team Member Handbook, which was been
8  marked as Plaintiff's Exhibit 15, the last
9  sentence in the first partial paragraph on page
10  39 it says HMA also considers off-the-job
11  illegal drug use as proper cause for
12  disciplinary action up to and including
13  termination from employment.  Was the
14  conditional offer of employment to your
15  knowledge some form of disciplinary action?
16     MR. KILBORN:  Object.  Leading.
17  A   Most definitely.
18     MR. JOHNSON:  That's all I have.
19
20
21
22
23      FURTHER DEPONENT SAITH NOT
                                              186

1          C E R T I F I C A T E
2
3  STATE OF ALABAMA     )
4
5  COUNTY OF AUTAUGA    )
6
7
8      I hereby certify that the above and
9  foregoing deposition was taken down by me in
10  stenotype, and the questions and answers thereto
11  were transcribed by means of computer-aided
12  transcription, and that the foregoing represents
13  a true and accurate transcript of the testimony
14  given by said witness upon said hearing.
15      I further certify that I am neither of
16  counsel, nor kin to the parties to the action,
17  nor am I in anywise interested in the result of
18  said cause.
19
20
21      -------------------------------
21      STACEY L. JOHNSON, Commissioner
22      Certified Court Reporter,
22      ACCR#: 386 - Expires 09-30-08
23      Commission Expires 06-22-2011
                                              187

**HENDERSON & ASSOCIATES COURT REPORTERS, INC.**
**P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969**

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
| v. | ) | 2:07-cv-00306-MHT-CSC |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, and HYUNDAI MOTOR | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ROB CLEVENGER

1.    My name is Robert A. Clevenger.  I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.    I am employed by Hyundai Motor Manufacturing Alabama, LLC as Assistant Manager, Team Member Relations in the Team Relations Department.

3.    My responsibilities as Assistant Manager, Team Member Relations include overseeing the investigation of potential disciplinary issues involving Team Members, overseeing the maintenance of documents, information, and files concerning such investigations, and making a presentation to a termination committee on behalf of Team Relations concerning its investigation and related information in situations where an employee is being considered for termination.

4    In particular, I was directly involved in the investigation of Plaintiff Jerry Leon Dees, Jr., with respect to allegations that Jim Brookshire, HMMA's Stamping Production Manager, reported seeing Plaintiff asleep during his shift on February 14, 2007.

5.    Under my supervision and instruction, Team Relations Specialist William Ware interviewed Brookshire on February 15, 2007, and prepared a handwritten statement for Brookshire to sign confirming their discussion. A true and accurate copy of the handwritten statement is attached as **Attachment A.**

6.    Upon reviewing this initial statement, it was determined that additional confirming information would be helpful in the investigative process and, accordingly, under my supervision and instruction, William Ware interviewed Brookshire again on February 19, 2007, and prepared a handwritten statement for Brookshire to sign confirming their discussion. A true and accurate copy of the handwritten statement is attached as **Attachment B.**

7.    Additionally, Team Relations received information from Plaintiff following an interview of Plaintiff conducted by Plaintiff's supervisor, Greg Prater, and attended by William Ware. A Team Relations Memo is customarily prepared following such a meeting and William Ware did in fact prepared such a memo, dated February 21, 2007, which was made part of Team Relations' file materials. A true and accurate copy of this Team Relations Memo is attached as **Attachment C.**

8.    On February 23, 2007, I prepared a Team Relations Memo summarizing Team Relations' findings, Plant Engineering Department's recommendation, and information on relevant past practice. In sum, Plant Engineering Department's recommendation was termination given the circumstances, including Brookshire's statements, the fact that the area where Plaintiff was observed is an isolated area suggestive of intent, and, further, given that

Plaintiff's response contained inconsistencies with other evidence and because his response suggested a lack of concern about his job. The past practice considered in this situation involved another employee who, similar to Plaintiff, was discovered sleeping during working hours and was terminated as a result. A true and accurate copy of this Team Relations Memo is attached as **Attachment D.**

9. On February 26, 2007, I attended the termination committee meeting and presented Team Relations' findings, recommendations, and the above-referenced documents to the committee for consideration. Others that attended the termination committee included Wendy Warner, John Kalson, John Applegate, Rick Neal, and Scott Gordy. A true and accurate copy of the electronic appointment that I sent to these individuals scheduling the termination committee meeting held on February 26, 2007, and listing all of the attendees of termination committee, is attached as **Attachment E**.

10. My role in the termination committee process is simply to provide information for the termination committee to consider. Although Team Relations does ordinarily make a recommendation based on its findings, I do not technically have a "vote" on the termination committee and the termination committee is free to disregard Team Relations' findings or request further information before taking action.

11. The information and statements received by Team Relations, including information received from Plaintiff, and the memoranda prepared by Team Relations, contained no information suggesting that Plaintiff was a member of the uniformed services or that he felt he was being harassed by any HMMA Team Member, or that he was otherwise protected by the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301, et seq. ("USERRA") in any relevant aspect. At the time the termination committee met, the

information and documents presented and upon which Plaintiff's termination was based contained no suggestion that Plaintiff was a member of the uniformed service. Likewise, whether or not Plaintiff was a member of the uniformed service was not raised or discussed during the termination committee process and was not a basis or motivating factor related to the discussion, analysis, or decision surrounding his termination.

12.    After Plaintiff's employment was terminated, Wendy Warner, the Manager of HMMA's Employment & Benefits Section, instructed me to write a letter to Plaintiff for her signature regarding HMMA's Team Member Review Board process. A true and accurate copy of the letter I wrote to Plaintiff is attached as **Attachment F.**

13.    The Team Member Review Board process allows Team Members who feel they have been wrongfully terminated to request a review of that termination by a random selection of trained and qualified Team Members.

14.    I left Plaintiff separate telephone messages to contact me regarding the Team Member Review Board process on March 2, 2007, March 5, 2007, and March 7, 2007. In the March 7th letter described in paragraph 12 above, I informed Plaintiff that to continue the Team Member Review Process he would have had to attend a meeting with me on March 12, 2007 at 10:00 a.m. to review the process and select a Team Member panel.

15.    Plaintiff telephoned and left a message on March 10, 2007 stating that he received the May 7th letter described in paragraph 12 above and that he could not attend the meeting on March 12, 2007.

16.    I received no further contact from Plaintiff and am not aware of any additional contact from Plaintiff about his desire to participate in the Team Member Review Process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this the __14__ day of December, 2007.

_____
Robert A. Clevenger

Page 5 of 5

EXHIBIT

A

tabbies

Interview with Jim Brookshire

On Feb 14 at approx. 1:00 AM, Jim went upstairs to check on some quality issues in the S.O.P. (Side outer)

Jim went up to the 3rd floor where he noticed Leon Dees sitting at operating station. Leon was positioned with his head down and his back was towards the cabinet.

Jim observed Leon sitting in this position for approx. 2 minutes.

At this time Jim turned up his radio and let it chirp about 4 times before Leon responded.

Whenever Leon woke up he grabbed a pole and began to act like he was pulling trolleys.

Jim went around to check some panels and when he approached the area again he noticed Leon sitting in the same chair; however, this time he was alert. Not long after this Jim witnessed Leon walking down the stairs.

About 30 minutes passed by before Jim talked to TL Kevin Hughes. During this time Kevin did not know where Leon was.

J.A.B. 2-15-07

DEES V HMMA 00037  DOCS PRODUCED

EXHIBIT

tabbies'

B

Jim was approximately 25 feet away from Leon when he noticed that he was asleep.

Jim walked towards Leon and begin chirping his radio at a distance approx 15 feet.

Due to Leon's hat being on his head Jim did not see his eyes closed; however he (Jim) stated that his head was facing towards the floor, was with his chin tucked to his chest)

J.A.B
2-19-07

EXHIBIT

tabbies®

_____

| ![HYUNDAI logo] **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **TEAM RELATIONS MEMO** | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  05/26/06 | Owner: Team Relations | Revision Level:  02 |

**TO:**          Rob Clevenger

**FROM:**      William Ware

**DATE:**       February 21, 2007

**SUBJECT:**   Leon Dees

**Inteeview with Leon Dees, William Ware, and Greg Prater**

Greg began our talk with Leon by informing him that a member of management noticed

him on the third floor asleep on the morning of February 8th  Leon responded, "I was not

asleep, I know exactly who you are talking about, call Jim Brookshire in here and I will

confront him right now." Greg calmed Leon down and explained that the reason why we

had assembled into the room was so that we could get his side of the story. Leon stated

that he was sitting in a chair text messaging his daughter due to the bad weather outside.

His location was at the RO 1 station.  Leon stated that this event took place around 10:30-

11:30 pm  Leon also contends that Jim never approached him.  In fact when asked what

was the closest Jim came to him he replied about "55 feet."  Leon made the following

comment several times; he sat and watched Jim walk around on the third floor; however,

he is to the point where he does not care about what people say.  He went on to say that

we complain over and over again but nothing happens, so I just don't care anymore  "If

something breaks then I will fix it but I will not run the shop like I used to."



EXHIBIT

| ⬡ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

**TO:**      Greg Kimble

**FROM:**   Rob Clevenger

**DATE:**   February 23, 2007

**SUBJECT:**   Leon Dees/ Term

**Summary:** On February 14, 2007 at approximately 1am, Jim Brookshire (mgr, stamping) was in the stamping third level looking at a quality issue. The third level overhead is approximately 75ft off the ground  It is an isolated area  This is where the side outer panels are warehoused in overflow

Jim noticed Leon sitting in front of a panel in a chair. Jim states Leon was asleep with his head down and his chin tucked to his chest  Jim states he was 25ft away when he first noticed Leon. Two doors of the panel were open which served as a blind and hide Leon from most views.  He moved to within 15ft of Leon and observed him for approximately Two (2) minutes  At that time Jim keyed the mike on his radio and it made a chirping sound several times  At this sound Leon lifted his head then got up and picked up a tool used to clear carrier when they become inoperable

Leon did not speak to Jim or explain his presence in the overhead. Jim also noted there were no carriers that were in need of service. There is no reason for a maintenance person to be in the overhead unless there is an immediate need for carrier repair.

In Leon's statement he says the time was 10:30pm to 11:30pm  He also states he was sitting in the overhead text messaging his daughters regarding the weather and was not asleep  Leon state Jim never got closer than 50ft from him  Leon became agitated and stated he didn't give a damn and was tired of this shit

**Conclusion:** Leon's statement does not match the timeline or the proximity described by the stamping manager. I believe we must give weight to the manager's account and assume that the event took place at 1am on Wednesday morning  The storms had passed our area by 7:15pm on Tuesday evening. I have a signed statement by the stamping manager that he was 15ft from Leon and observed him for 2 minutes. There was a chair placed in between the two open doors  The area is several feet off the floor and is an area that a maintenance man would enter fix a carrier and then leave. There is not a need or a practice where a person would need a chair and be waiting in that area for a breakdown to occur. The department is asking for termination

| ⟨ HYUNDAI ⟩ Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

Past Practice:

| 102705 | King | Ontario | Engine | 3-Jan-06 | Inappropriate conduct | Sleeping during work hours |
|---|---|---|---|---|---|---|

# REDACTED - PRIVILEGED

DEES V HMMA 00034 DOCS PRODUCED

EXHIBIT

*E*

Dees v. HMMA     0351
Docs Produced



**HYUNDAI**

Motor Manufacturing Alabama, LLC
700 Hyundai Blvd.
Montgomery, Al 36105

```
┌─────────────────────┐
│      EXHIBIT         │
│  ___F___             │
│ tabbies              │
└─────────────────────┘
```

March 7, 2007

Jerry Leon Dees Jr.

14808 US Hwy 82

Maplesville, Al 36750

Dear Leon:

You were left a phone message on March 2, 2007, stating you had met the contact requirement for Team Member Review. On March 5, 2007 and again on March 7, 2007 you were contacted but a phone-answering machine was reached.

To continue the Team Member Review process you must meet with Rob Clevenger on Monday March 12, 2007 at 10:00am to review the process and select your panel. At that time you will be given the date and time of your review panel meeting. Please come to the security building at gate 3 at the specified time above.

Sincerely,

*Wendy J. Warner*

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

*TM DID NOT*
*ATTEND THIS*
*MEETING. HE LEFT*
*A PHONE MSG ON*
*SATURDAY 3/10/07*
*STATING HE RECEIVED THE*
*LETTER BUT COULD NOT*
*ATTEND. NO FURTHER*
*CONTACT FROM MR. DEES*

Dees v. HMMA    0321
Docs Produced

*11/15/07*

*Additional Doc Produced*      *JTS*

# Exhibit 3

# FREEDOM COURT REPORTING

Page 5

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5    CASE NUMBER: 2:07-cv-00306-MHT-CSC
6    JERRY LEON DEES, JR.,
7            Plaintiff,
8        vs.
9    HYUNDAI MOTOR MANUFACTURING
10   ALABAMA, LLC, and HYUNDAI
11   MOTOR AMERICA, INC.,
12           Defendants.
13   BEFORE:
14       ANGELA SMITH MCGALLIARD, Commissioner.
15   APPEARANCES:
16       VINCENT KILBORN, ESQUIRE, of
17   KILBORN, ROEBUCK & MCDONALD, 1810 Old
18   Government Street, Mobile, Alabama 36606,
19   appearing on behalf of the Plaintiff.
20       JEFFREY R. SPORT, ESQUIRE, of
21   KILBORN, ROEBUCK & MCDONALD, 1810 Old
22   Government Street, Mobile, Alabama 36606,
23   appearing on behalf of the Plaintiff.

Page 6

1    APPEARANCES (continued):
2        MATTHEW K. JOHNSON, ESQUIRE, of
3    OGLETREE, DEAKINS, NASH, SMOAK & STEWART,
4    The Ogletree Building, 300 North Main
5    Street, Greenville, South Carolina 29602,
6    appearing on behalf of the Defendants.
7        CHRISTOPHER N. SMITH, ESQUIRE, of
8    HYUNDAI MOTOR MANUFACTURING ALABAMA, 700
9    Hyundai Boulevard, Montgomery, Alabama
10   36105, appearing on behalf of the
11   Defendants.
12       ALSO PRESENT: Katherine Dees
13               Bobby Hall
14       * * * * * *
15
16
17
18
19
20
21
22
23

Page 7

1        I, ANGELA SMITH MCGALLIARD, RPR,
2    CRR, a Court Reporter of Pike Road, Alabama,
3    acting as Commissioner, certify that on this
4    date, as provided by the Federal Rules of
5    Civil Procedure and the foregoing
6    stipulation of counsel, there came before me
7    at the offices of Freedom Court Reporting,
8    416 S. Perry Street, Montgomery, Alabama
9    36104, beginning at 9:10 a.m., Jerry Leon
10   Dees, Jr., witness in the above cause, for
11   oral examination, whereupon the following
12   proceedings were had:
13       JERRY LEON DEES, JR.,
14   being first duly sworn, was examined and
15   testified as follows:
16       MR. KILBORN:  Court reporter,
17   can you keep the time for us?
18       COURT REPORTER:  Certainly.
19   Usual stipulations?
20       MR. JOHNSON:  I assume that
21   means the usual stipulations that we've got
22   in the guidelines --
23       MR. KILBORN:  Witness waives

Page 8

1    the reading and signing and all objections
2    except as to the form are reserved until
3    trial.
4        MR. JOHNSON:  Sounds fine with
5    me.
6            EXAMINATION
7    BY MR. JOHNSON:
8        Q.   Okay, Mr. Dees, my name is
9    Matt Johnson.  I practice law at Ogletree,
10   Deakins.  And I'm here basically to ask you
11   some questions about yourself and about this
12   case, and what you know about this case, and
13   other people that might know about the case.
14       This may seem like a fairly
15   formal proceeding, but I'm sort of here to
16   have a conversation with you and just ask
17   you questions.
18       Let me tell you up front,
19   occasionally I'm thinking two or three
20   questions down the line; and for better or
21   for worse, sometimes I ask questions that
22   don't make sense, and I apologize.  If I do
23   that, I want you to stop me, and let me know

2 (Pages 5 to 8)

# FREEDOM COURT REPORTING

Page 9

1  that. Don't be embarrassed. I'm fairly
2  thick skinned; and if I don't make sense or
3  my questions don't make sense, that's okay
4  with me. You just let me know because I
5  just want to make sure you're comfortable
6  and that you're answering questions that you
7  understand. Okay?
8  A.  I'll do it.
9  Q.  And the other thing, our court
10 reporter here is typing up everything that
11 we say. And she's probably got one of the
12 harder jobs of any of us today, so we want
13 to make her job as easy as we can. The best
14 way to do that is to make sure we speak up
15 loud and clear. Okay?
16 A.  Roger.
17 Q.  And if you can, Roger may
18 work, assuming that means yes. But I'd
19 prefer, and I'm sure our court reporter
20 would prefer it if you could say yes or no.
21 Is that okay?
22 A.  Yes.
23 Q.  Again, nods, shrugs of the

Page 10

1  shoulders, things of that nature are
2  difficult for her to write up, so make sure
3  everything you want to get across to me or
4  to her is in loud, clear, spoken English.
5  Okay?
6  A.  No problem.
7  Q.  I appreciate it.
8       And this is not an endurance
9  contest. It's probably going to take longer
10 than you or I want it to, but that's just
11 the way it goes, and I apologize in advance.
12 What I want to make sure you understand is
13 that you can take a break whenever you want
14 to; you can try to get something to drink if
15 we can find something; you can use the
16 restroom; you can stand up and walk around
17 as you'd like. Okay?
18 A.  Yes, sir.
19 Q.  Okay. Finally, I just want to
20 make sure before we get started into the
21 heart of things that you understand this is
22 sworn testimony?
23 A.  Yes.

Page 11

1  Q.  And you swear to tell the
2  truth?
3  A.  Whole truth, nothing but the
4  truth, so help me God.
5  Q.  Okay. And are you on any
6  medication that would prohibit you from
7  understanding me or my questions?
8  A.  No, sir.
9  Q.  Are you on any medication that
10 would prohibit you from being able to answer
11 truthfully and accurately?
12 A.  I'm not on any type of
13 medication.
14 Q.  Thank you.
15      If you would give me your full
16 name, including your middle name.
17 A.  Jerry Leon Dees, Junior.
18 Q.  Have you ever gone by any
19 other names?
20 A.  No, sir. Yeah. Staff
21 sergeant.
22 Q.  What's your date of birth?
23 A.  ████ '65.

Page 12

1  Q.  Where were you born?
2  A.  ████, Alabama.
3  Q.  ████?
4  A.  Yes, sir.
5  Q.  Where is that?
6  A.  ████ County.
7  Q.  What's that near?
8       MR. SPORT:  It's an hour north
9  of here.
10 A.  It's out in the middle of the
11 woods.
12      (Off-the-Record discussion
13       was held.)
14 Q.  What's your current address?
15 A.  ████████,
16 ████, Alabama █
17 Q.  And do you own a house -- Is
18 that a house?
19 A.  Yes, sir.
20 Q.  Do you own it or rent it?
21 A.  Well, the bank owns it right
22 now. Give me about thirteen more years, and
23 I might own it.

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1    Q.    Do you have any secondary
2 residences?
3    A.    Yeah.  The armory one weekend
4 a month.
5    Q.    And where do you work
6 currently?
7    A.    International Paper,
8 Prattville Mill.
9    Q.    What do you do at the
10 Prattville mill?
11    A.    Millwright, maintenance.
12    Q.    How long have you been there?
13    A.    Few months.
14    Q.    Okay.  Do you remember which
15 month you started?
16    A.    Approximately four months ago.
17    Q.    Okay.  And when you started
18 there four months ago, were you doing
19 millwright/maintenance?
20    A.    Yes, sir.
21    Q.    And prior to that, where did
22 you work?
23    A.    BE&K Construction Company at

Page 14

1 that mill.
2    Q.    At the Prattville mill?
3    A.    Yes, sir.
4    Q.    What were you doing for BE&K?
5    A.    Millwright, millwright and
6 welder.
7    Q.    Was that different than what
8 you're doing now?
9    A.    Not really, no.
10    Q.    Prior to BE&K where was the
11 last place you worked?
12    A.    Hyundai.
13    Q.    Do you remember what month you
14 started work at BE&K?
15    A.    27 February '07.
16    Q.    Okay.  And who is your
17 supervisor at the Prattville mill?
18    A.    Neil Causey.
19    Q.    Can you spell Causey?
20    A.    Causey, C-A-U-S-E-Y, I
21 believe.  I'm not sure.
22    Q.    Okay.  What is his position at
23 the mill?

Page 15

1    A.    Maintenance supervisor.
2    Q.    Who is Neil Causey's boss?
3    A.    I have no idea.
4    Q.    Okay.
5    A.    I haven't been there in a
6 month.  I've been at an Army school for the
7 last month, so I don't know.
8    Q.    Okay.  What kind of Army
9 school have you been at?
10    A.    BNCOC Phase II and III, Staff
11 NCO Advanced Leadership School.
12    Q.    Now, one thing I want to ask
13 you to do, both for my sake and for our
14 court reporter's sake.  I know throughout
15 this deposition we're going to refer to a
16 lot of Army terms, and say them slow or
17 spell them or do whatever you can to make
18 sure it gets on the Record clearly.
19    A.    It's B-N-C-O-C, Basic
20 Noncommissioned Officers Course.
21    Q.    Okay.  If you can, I know you
22 guys use a lot of abbreviations and stuff,
23 for purposes of this, if you could make sure

Page 16

1 and give us the full, plain spoken English.
2    A.    No acronyms?
3    Q.    Just define them before you
4 start using them.  Okay?
5    A.    All right.
6    Q.    Tell me, what is your Social
7 Security number?
8    A.    ███████.  Why?
9    Q.    You say why -- Why did I ask?
10    A.    Yes, sir.
11    Q.    Well, because I'm taking your
12 deposition.
13          And your driver's license
14 number?
15    A.    ███████
16    Q.    Is that an Alabama license?
17    A.    Yes, sir.
18    Q.    Is it restricted in any way?
19    A.    Negative.
20    Q.    Okay.  You don't wear glasses?
21    A.    No, sir.
22    Q.    And I'm assuming -- We have
23 some other people here today, and I'm

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1 assuming one of them is your wife?
2    A.    Yes, sir.
3    Q.    Okay.  And what is her name?
4    A.    ████████
5    Q.    ████████ with a K?
6    A.    ████████, Yun, Y-U-N,
7 Dees.
8    Q.    How long have y'all been
9 married?
10    A.    Twenty-two years.
11    Q.    And where is she from?
12    A.    ████████.
13    Q.    And prior to Mrs. Dees that's
14 here with us today, have you ever been
15 married before?
16    A.    No, sir.
17    Q.    Do you and Mrs. Dees have any
18 children?
19    A.    Two.
20    Q.    What are their names?
21    A.    ████████, ████████,
22 common spelling, Dees; ████████,
23 ████████, common spelling, Dees.

Page 18

1    Q.    How old are ████████ and
2 ████████?
3    A.    Twenty-one and sixteen --
4 seventeen.  She just had a birthday.
5    Q.    I assume those are the only
6 two children you have?
7    A.    Roger.  Yes, sir.
8    Q.    Okay.  Do you have other
9 relatives by blood or marriage that live in
10 Alabama?
11    A.    A lot of them.
12    Q.    You do?
13    A.    Yes, sir.
14    Q.    Tell me the names or towns
15 where they might live.
16    A.    Oh, God.
17    Q.    Let me explain why I'm asking.
18 At some point we may have to pick a jury in
19 this case, I don't want your cousin, aunt,
20 or uncle sitting on the jury.
21    A.    You're probably out then.
22 I've got relatives all over the state, all
23 the way up to South Carolina, Fort Bragg,

Page 19

1 all the way out to California.
2    Q.    I'm only interested in the
3 ones in Alabama.
4    A.    Well, I don't know.
5    Q.    You can give me their last
6 names, can't you?
7    A.    Yeah.  Dees, Mobley,
8 Patterson, Bates, Peek.  Heck I could go on
9 all day.  I don't know.
10    Q.    How do you spell Peek?
11    A.    P-E-E-K.
12    Q.    I'm assuming this jury will be
13 drawn from people that live somewhere in
14 proximity to Montgomery.  Do most of your
15 relatives live in and around Montgomery?
16    A.    I have some in Montgomery but
17 not most of them, no.  Like I said, they're
18 scattered throughout the state.
19    Q.    The ones that live in
20 Montgomery, can you give me the names of
21 some of the ones that live in or around
22 Montgomery.  By the way, I need you to
23 answer.

Page 20

1    A.    I'm trying -- She knows more
2 of my family than I do.  I grew up in
3 Alabama, but all I do is work.
4        MR. KILBORN:  You can't talk
5 to Katherine.  He just wants to know what
6 you know.
7    A.    Distant cousins, no, I don't
8 know them.
9    Q.    I'm assuming you're a U.S.
10 citizen?
11    A.    Yes, sir.
12    Q.    Did you graduate from high
13 school?
14    A.    Clay County High School,
15 Ashland, Alabama.
16    Q.    And when did you graduate?
17    A.    May '83.
18    Q.    And did you go to college?
19    A.    Some college.
20    Q.    Where?
21    A.    Didn't graduate.  Through the
22 military, University of Maryland, Wallace
23 Community College in Selma, and J.P. Tech.

5  (Pages 17 to 20)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1   Q.   J.P. Tech?
2   A.   Yeah. It's Faulkner now, I
3 believe.
4   Q.   Say that again.
5   A.   They changed the name to
6 Faulkner.
7   Q.   Faulkner Tech?
8   A.   I'm not sure what it is. It
9 was John Patterson Technical College when I
10 went there.
11   Q.   Okay. You mentioned one in
12 between the military University of Maryland
13 and J.P. Tech, what was that?
14   A.   Wallace Community College,
15 Selma.
16   Q.   And you did not get a degree
17 from any of those three institutions?
18   A.   No, sir.
19   Q.   And what did you study at the
20 military University of Maryland?
21   A.   It wasn't military. It was
22 the University of Maryland, when I was in
23 the military.

Page 22

1   Q.   Got it.
2   A.   Just core, basics, science,
3 English, math.
4   Q.   And at J.P. Tech or Faulkner?
5   A.   Maintenance program.
6   Q.   How much time did you spend at
7 the University of Maryland?
8   A.   I don't know. Depends on how
9 often I was deployed. I don't know, maybe a
10 year. I don't know. I mean, it was off and
11 on. It wasn't on a campus. Military brings
12 instructors in to the bases and the posts,
13 and you'll meet at a building there. And I
14 had a certified college instructor, and
15 that's where you had the classes. I was
16 never on the campus, except for J.P. Tech
17 and Wallace.
18   Q.   What kind of maintenance did
19 you study at J.P. Tech?
20   A.   Hydraulics, pneumatics,
21 electrical, blueprint reading, basic
22 maintenance technician studies.
23   Q.   Okay. What about --

Page 23

1   A.   Wallace was welding.
2   Q.   In welding, can you get some
3 sort of certification for that?
4   A.   Yes, sir, if you stay there
5 the whole two years.
6   Q.   All right.
7   A.   I had a family to feed, I
8 couldn't afford to stay there the whole two
9 years.
10   Q.   So you did not become
11 certified?
12   A.   No, sir.
13   Q.   And you're doing some welding
14 now at the Prattville mill?
15   A.   When it -- When it arises,
16 yes, sir.
17   Q.   Okay. Is that something that
18 you would need to be certified for?
19   A.   I got certified through one of
20 the companies I worked for. But as far as
21 actual certification, unless you're welding
22 on a boiler, or any type of military
23 equipment, stuff like that, no, you don't --

Page 24

1 If it's a pressurized vessel, you need a
2 certification; if it's not pressurized or
3 done to code -- some code you can get by
4 welding without a certification, like on
5 water tanks and stuff, you just have be able
6 to pass X-rays.
7   Q.   Okay. But now you're
8 certified?
9   A.   Well, I don't know if it is
10 still current or not to be honest. It was
11 before I went to work for Hyundai.
12   Q.   Who were you working with?
13   A.   Sim-Cala.
14   Q.   Sim-Cala. Other than the
15 schooling you got at University of Maryland,
16 J.P. Tech, Wallace Community College in
17 Selma, have you attended any other classes
18 or seminars since you got out of high
19 school?
20   A.   Just the classes that
21 International Paper sent all their
22 maintenance people to.
23   Q.   Okay. What was that?

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1    A.    Well, I mean, same thing. We
2  got precision skilled craftsman classes,
3  it's a forty- or eighty-hour class, I can't
4  remember. Same thing, hydraulic classes,
5  welding classes.
6    Q.    And did IP pay for that?
7    A.    Yes.
8    Q.    And did they pay you for your
9  time away from work or how did that work?
10    A.    Instead of going to work, we
11  went to the schools.
12    Q.    You got paid for the time?
13    A.    Yes, sir.
14    Q.    And how many hours was that?
15    A.    Altogether at different
16  schools, I have no idea. I mean, skilled
17  craftsman class was just one school. We
18  went to the same thing just like J.P. Tech,
19  blueprint reading classes, hydraulics. It
20  could go anywhere from a day to two or three
21  weeks, depending on what class it was. That
22  was several years back.
23    Q.    That was at -- I think you

Page 26

1  worked at International Paper before you
2  came to Hyundai?
3    A.    Yes, sir.
4    Q.    Okay. Let's go back and talk
5  about your employment history before
6  Hyundai. Do you remember when you started
7  with Hyundai?
8    A.    It was either 19 or 21
9  November '05.
10    Q.    All right. Let's walk
11  backwards. Where were you working until
12  November of '05?
13    A.    International Paper, Thorsby.
14    Q.    I'm sorry?
15    A.    I was at a different mill than
16  I am now. I was at the Thorsby mill.
17    Q.    How do you spell Thorsby?
18    A.    T-H-O-R-S-B-Y.
19    Q.    How long were you at the
20  Thorsby mill?
21    A.    Six years.
22    Q.    Do you remember -- So you
23  would have started in '99?

Page 27

1    A.    I believe so.
2    Q.    And during the time period
3  that you were at the Thorsby mill, what did
4  you do?
5    A.    I started out as just a
6  regular maintenance man. And when I left, I
7  was a maintenance leadman.
8    Q.    And what does a maintenance
9  leadman do?
10    A.    Schedules the work for all the
11  other shifts, for the -- all four
12  maintenance shifts we had; I was in charge
13  of the major projects; I basically handled
14  everything while the supervisor just took
15  care of all the paperwork.
16    Q.    Okay.
17    A.    All the major calls, I'd
18  respond to the major breakdowns, decide what
19  action we was going to take, let the
20  supervisor know what was going on, and go
21  from there.
22    Q.    Was that similar to what you
23  were doing at Hyundai?

Page 28

1    A.    No, sir.
2    Q.    Okay. How was it different?
3    A.    At Hyundai I was just a
4  regular maintenance technician.
5    Q.    You said you had done regular
6  maintenance at the Thorsby mill also?
7    A.    Yes, sir.
8    Q.    Was what you were doing at the
9  Thorsby mill consistent with what you were
10  doing at Hyundai?
11    A.    Yes, sir.
12    Q.    Tell me what you were doing at
13  the Thorsby mill as a regular maintenance
14  person?
15    A.    Same thing, answer calls; work
16  orders that came down, I'd handle them;
17  breakdowns; break-ins; welding; hydraulics;
18  pneumatics; electrical; just regular
19  maintenance work.
20    Q.    But what you were doing at the
21  Thorsby mill was essentially the same as
22  what you were later doing at Hyundai?
23    A.    Yes, sir. Basically.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1  Q.  How much were you getting paid
2  at Thorsby mill for maintenance?
3     A.  Fifteen -- No. I topped out
4  -- I went to the pay for skills program, it
5  was eighteen something.
6     Q.  Per hour?
7     A.  Yes, sir. I started out at
8  fifteen, and topped out at eighteen
9  something.
10    Q.  And what about as a
11 maintenance leadman?
12    A.  Twenty dollars, little over
13 twenty dollars.
14    Q.  How long did you work as a
15 maintenance leadman?
16    A.  Approximately three years, I
17 believe. I think. I'm not sure.
18    Q.  Okay. Who -- As a -- When you
19 were a regular maintenance tech, who was
20 your supervisor?
21    A.  John Allen.
22    Q.  Allen?
23    A.  A-L-L-E-N.

Page 30

1     Q.  And when you were a
2  maintenance leadman, who was your
3  supervisor?
4     A.  John Allen.
5     Q.  What was his role?
6     A.  He was a maintenance
7  supervisor on the old part of the mill.
8  There was two parts to the mill, we had an
9  old part and a new part, and he had
10 everything on the old side.
11    Q.  Okay. And how much -- When
12 you started at Hyundai, what were you making
13 per hour?
14    A.  Nineteen fifty-six.
15    Q.  What were you making when you
16 left?
17    A.  Twenty-three thirty-five.
18    Q.  And what were the
19 circumstances of you leaving the Thorsby
20 mill? Why did you leave?
21    A.  Go to work for Hyundai.
22    Q.  Okay.
23    A.  That was a -- That was the job

Page 31

1  to have, better benefits. Had better
2  benefits there than any place I've ever had,
3  even in the military.
4     Q.  Okay.
5     A.  Better pay. Like I say, that
6  was the job to have.
7     Q.  When you say job to have, you
8  mean generally in the community, or just for
9  you personally?
10    A.  No. Everywhere around where I
11 lived, it was either Mercedes or Hyundai,
12 everybody was wanting to go to one of the
13 two.
14    Q.  Okay.
15    A.  They both had outstanding
16 benefits, the work conditions weren't near
17 as rigorous as what we had. It was in a
18 controlled environment, air conditioned in
19 the summer, heated in the winter. And pay,
20 pay was a lot better than any wood yard you
21 were going to work on.
22    Q.  Okay. Did you know anybody
23 that was working for Hyundai before you went

Page 32

1  to work there?
2     A.  Yes, sir. A couple of
3  production people from the mill I worked at
4  had gotten jobs down there in production.
5     Q.  Who was that?
6     A.  Lamar Powell; I can't remember
7  Mike's last name. Mike somebody, I can't
8  remember his last name. And another guy we
9  called him Scooby, I don't know his real
10 name.
11    Q.  Okay. Scooby?
12    A.  Yes, sir.
13    Q.  Okay. Did you talk to Lamar
14 Powell or Mike or Scooby about coming to
15 work for Hyundai before you came?
16    A.  No, sir. When we left the
17 plant -- They probably left the plant six
18 months before I got hired on there. The
19 hours they were working, nobody talked to
20 them.
21    Q.  Okay. They were working --
22    A.  Long hours.
23    Q.  Okay. What -- Once you came

8 (Pages 29 to 32)

# FREEDOM COURT REPORTING

1  to work for Hyundai, did you talk to Lamar
2  Powell or Mike or Scooby?
3      A.    Scooby, no.  Lamar and Mike, a
4  couple of times.
5      Q.    Okay.  Did you talk to them
6  about your military career or uniformed
7  service or anything like that as --
8      A.    They asked was I going back to
9  Iraq any time soon, and I told them I didn't
10  know.
11      Q.    Okay.  Anything else y'all
12  talked about in terms of your military
13  career?
14      A.    Asked me was I still in, yeah.
15      Q.    I assume they were not members
16  of the Guard?
17      A.    No, sir.
18      Q.    Did you talk to them about
19  Greg Prater at all?
20      A.    No, sir.
21      Q.    Did they send you at
22  Kevin Hughes at all?
23      A.    No, sir.

1      Q.    Did you talk to them about
2  John Applegate at all?
3      A.    I don't think so.
4      Q.    Okay.
5      A.    I'd see them -- They worked
6  production, they was on the line.  You may
7  get to talk to them a minute at the most,
8  because they don't stop the line.  Because
9  if the line stops, it ain't good.
10      Q.    Okay.  And going back to your
11  employment history, let's talk about your
12  work prior to going to IP at the Thorsby
13  mill.  Where did you work before that?
14      A.    Sim-Cala.
15      Q.    And what did you do at
16  Sim-Cala?
17      A.    Maintenance.
18      Q.    And when you say maintenance,
19  were you doing basically the same thing you
20  were doing as a regular maintenance person
21  at the IP Thorsby mill?
22      A.    Yes and no.  It was a foundry.
23      Q.    And what were you doing there?

1      A.    At the foundry?
2      Q.    Uh-huh.
3      A.    Maintenance.  It was more
4  welding than anything.
5      Q.    Okay.  And give me your dates
6  of employment at Sim-Cala.
7      A.    I don't know.  I mean, I don't
8  know.  That was years ago.
9      Q.    Okay.
10      A.    I don't know.
11      Q.    Okay.  Do you remember who
12  your supervisor was?
13      A.    Huh-uh.  I can't remember his
14  name.  He was a short fellow.  I can't
15  remember his name.
16      Q.    Okay.  Did you have any sort
17  of on-the-job training with Sim-Cala?
18      A.    Yeah.  They're the ones that
19  sent me to J.P. Tech.  You had to go to J.P.
20  Tech.  And, no, I wasn't paid.
21      Q.    Did they send you at night?
22      A.    Yes, sir.  I had to complete
23  my ten-hour work shift, then go to school.

1      Q.    Okay.  And what was the reason
2  for the termination of the position at
3  Sim-Cala?
4      A.    Wasn't termination.  I quit --
5  left there to go to International Paper.
6      Q.    Why?
7      A.    Better pay.  I mean, make a
8  better living for my family.
9      Q.    Anything other than better
10  pay?
11      A.    Yeah.  We didn't have good
12  insurance.  I mean, that was -- Sim-Cala was
13  a rough job.  I mean, it was a rough job.
14  Even in the winter time, it was a
15  hundred-some-odd degrees in the plant.
16  Don't nobody want to work there.
17      Q.    Okay.  Is it still in
18  business?
19      A.    I have no idea.
20      Q.    Where was Sim-Cala?
21      A.    Off the Mt. Meigs exit here in
22  Montgomery.
23      Q.    Mt. Meigs?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 37

1     A.     Uh-huh.
2     Q.     **And prior to Sim-Cala, where**
3  **did you work?**
4     A.     Miller Mechanical.  It is a
5  company out of New York.
6     Q.     **What did you do for them?**
7     A.     Worked shutdowns in paper
8  mills.
9     Q.     **So you traveled for that?**
10    A.     Yes, sir.
11    Q.     **Were you married then?**
12    A.     Yes, sir.
13    Q.     **Imagine that was rough?**
14    A.     Yes, sir.
15    Q.     **How long were you with them?**
16    A.     Several years.
17    Q.     **Do you remember what years?**
18    A.     No, sir.  To be honest, no.
19    Q.     **And what -- you say you did --**
20 **you traveled and did shutdowns for Miller**
21 **Mechanical?**
22    A.     Yeah.
23    Q.     **Tell me what that involved.**

Page 38

1     A.     We worked in the pulp
2  divisions.  We did everything from changing
3  out motors, pumps, welding in the digesters,
4  changing screens out.  Anything to do in the
5  pulp division, we did it.
6     Q.     **Okay.  And prior to Miller**
7  **Mechanical, do you remember where you**
8  **worked?**
9     A.     I think it was just military
10 there.
11    Q.     **Just in the military?**
12    A.     Yes, sir.
13    Q.     **Okay.  Mr. Dees, let me give**
14 **you what we have been provided by your**
15 **attorneys.  I'm assuming this is your**
16 **resume?**
17    A.     Yes, sir.
18    Q.     **If you see down at the bottom**
19 **it says Dees V. HMMA 00013.**
20        MR. KILBORN:  Do you want to
21 go ahead and mark it.
22        MR. JOHNSON:  Yeah, let's go
23 ahead and mark it.

Page 39

1         (Whereupon, Defendant's
2          Exhibit No. 1 was marked
3          for identification.)
4         (Off-the-Record discussion
5          was held.)
6     Q.     **Mr. Dees, what we've marked as**
7  **Exhibit 1 to your deposition, you agree**
8  **that's your resume?**
9     A.     Starting at the top?
10    Q.     **Sure.**
11    A.     All right.  Projective,
12 employment with Hyundai Corporations --
13    Q.     **No.  No.  No.  You don't have**
14 **to read it.  Just look at it and tell me if**
15 **that is what it looks like.**
16    A.     Yes, sir.
17    Q.     **That was your resume?**
18    A.     Yes, sir.
19    Q.     **And to your knowledge, was**
20 **that the one that you submitted to Hyundai**
21 **when you applied?**
22    A.     Yes, sir.
23    Q.     **Okay.  That's all I've got to**

Page 40

1  ask on that one.
2         **All right.  Mr. Dees, let's**
3  **talk a little bit about your background in**
4  **the military.  I think you said your**
5  **employment prior to Miller Mechanical was**
6  **basically in the military.  So let's take**
7  **it, I guess, from the bottom.  You got out**
8  **of high school and went in the military?**
9     A.     No, sir.  I went to basic
10 training before I ever graduated.  Army
11 Basic Training, Fort McClellan, Alabama.
12    Q.     **Okay.  And when did you do**
13 **basic?**
14    A.     Summer of '82.  Between my
15 junior and senior year of high school.
16    Q.     **Okay.  And is Fort McClellan,**
17 **is that an Army base?**
18    A.     Yes, sir.
19    Q.     **And so then you did basic**
20 **training in the summer and then went back**
21 **and finished high school?**
22    A.     Yes, sir.
23    Q.     **Okay.  Then when you got out**

10  (Pages 37 to 40)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1  of high school, did you go back into the
2  Army?
3      A.   No, sir.  I went to basic
4  training for the Army National Guard.
5      Q.   That's what you did in the
6  summer of '82?
7      A.   Yes, sir.
8      Q.   Okay.  Well, talk me through
9  your military career, starting the summer of
10 '82.
11     A.   Summer of '82, basic training,
12 Fort McClellan, Alabama.
13     Q.   Okay.
14     A.   Summer of '83, Lackland Air
15 Force Base.  Left the guard, went to the Air
16 Force.  Army wouldn't let me be an MP and
17 that's what I wanted to do, that or
18 infantry, and they wouldn't let me go either
19 one so I went to the Air Force.  Went to the
20 Air Force as an MP school.
21     Q.   Okay.  When did you do that?
22     A.   '83.
23     Q.   All right.  Did you have to do

Page 42

1  basic training for the Air Force too?
2      A.   No, sir.  I'd have probably
3  got kicked out, probably.
4      Q.   Why is that?
5      A.   I can't fold clothes in
6  sixteen squares.
7      Q.   Okay.  So you did the MP
8  school in '83?
9      A.   Yes, sir.
10     Q.   Okay.  How long did that take?
11     A.   Eight weeks, I believe.
12     Q.   What did you do after that
13 eight weeks?
14     A.   Ground combat skills training.
15     Q.   Where?
16     A.   Camp Bullis, Texas.
17     Q.   How do you spell that?
18     A.   C-A-M-P B-U-L-L-I-S.
19     Q.   How long did ground combat
20 skills training take?
21     A.   I don't know.  Around eight
22 weeks, I think.  Six, eight weeks, I don't
23 know.

Page 43

1      Q.   Okay.
2      A.   M-60 machine gun nonspecialist
3  school, then M-60 machine gun specialist,
4  that was another four weeks.
5      Q.   The machine gun nonspecialist
6  school?
7      A.   Was two weeks.  And the
8  specialist school was two weeks.  Four weeks
9  to be a machine gunner.
10     Q.   Where was this school?
11     A.   Camp Bullis.
12     Q.   And the specialist school was
13 also at Bullis?
14     A.   Camp Bullis.
15     Q.   And that took four weeks?
16     A.   Four weeks for the total of
17 both of them, two weeks apiece.
18     Q.   Then after you completed the
19 machine gun specialist school, what did you
20 do?
21     A.   Went to Lackland Air Force
22 Base, Florida.
23     Q.   What did you do there?

Page 44

1      A.   Went to school a lot, stayed
2  in the woods a lot; got certified on a
3  radar, Intoxilizer, Breathalizer; a lot of
4  exercises, deployment exercises in the
5  woods; and I worked a lot of gates.
6      Q.   All right.  When you say you
7  were in school, I assume that was learning
8  stuff like how to operate radar, how to
9  operate Breathalizer?
10     A.   Competitions.  I shot
11 competitions for the Air Force.  Combat
12 competitions, peace keeper challenge.
13     Q.   Okay.  And when you say you
14 were in the woods a lot, I assume that was
15 all training?
16     A.   Yes, sir.
17     Q.   Okay.  What kind of training
18 were you doing?
19     A.   Ground combat skills.
20     Q.   Okay.
21     A.   I had some -- I had prior Army
22 training, and the Air Force don't really
23 have a lot of combat training so they

11  (Pages 41 to 44)

# FREEDOM COURT REPORTING

|  | Page 45 |
|---|---|

1  utilize on the other branches, Army and
2  Marine Corps combat courses. So that's why
3  I got stuck back in the woods.
4  　　Q.　When you say you worked a lot
5  of gates, does that mean doing security at
6  gates?
7  　　A.　Yes, sir.
8  　　Q.　I assume that's because you
9  were an MP?
10  　　A.　Yes, sir.
11  　　Q.　And technically were -- At
12  what point did you become an MP, when you
13  finished MP school in '83?
14  　　A.　Yes, sir.
15  　　Q.　All this other stuff, the
16  ground combat skills training, machine gun
17  training, that was all to sort of further
18  your education as an MP?
19  　　A.　Not really.
20  　　Q.　Okay.
21  　　A.　Air Force is responsible for
22  their own perimeter security, in the States
23  and overseas. And being as I had prior Army

|  | Page 46 |
|---|---|

1  service, that's where I got stuck.
2  　　Q.　Why is that?
3  　　A.　Because they thought I was a
4  grunt, so I went back to being a grunt.
5  　　Q.　Okay. And how long were you
6  at Lackland?
7  　　A.　Approximately a year I
8  believe.
9  　　Q.　What year was that? Was that
10  in '83 or '84 or both?
11  　　A.　'84 to '85, I believe.
12  February of '84 to maybe February of '85,
13  January of '85. I don't know.
14  　　Q.　After Lackland, where did you
15  go?
16  　　A.　Korea.
17  　　Q.　How long were you in Korea?
18  　　A.　Twelve months.
19  　　Q.　1985 through '86?
20  　　A.　February of '85 to February of
21  '86.
22  　　Q.　What did you do in Korea?
23  　　A.　I was on the SWAT team there.

|  | Page 47 |
|---|---|

1  I did a lot of SWAT recalls, worked town
2  patrol some, team spirit, got stuck in the
3  woods a lot, again. And that was it.
4  　　Q.　What are SWAT recalls?
5  　　A.　SWAT team. I was on the
6  military SWAT team. They call it a special
7  reaction team, SRT. That's their version of
8  the SWAT team.
9  　　Q.　And what did you do?
10  　　A.　I was an entry man, first one
11  in the door.
12  　　Q.　That would be like if there
13  was a hostage or crisis --
14  　　A.　Hostage situation, bank
15  robbery, anything you call a civilian SWAT
16  team for, that's what we was for.
17  　　Q.　Okay. And town patrol, is
18  that what it sounds like?
19  　　A.　Yes, sir.
20  　　Q.　I assume you just made sure
21  that other members of the military weren't
22  causing trouble, things like that?
23  　　A.　You worked strictly at night

|  | Page 48 |
|---|---|

1  patrolling local towns, walking through the
2  bars, off-limits areas, make sure the GIs
3  wasn't in the off-limits areas, things of
4  that nature.
5  　　Q.　And you say you got stuck in
6  the woods some more, what were you doing,
7  training?
8  　　A.　Team spirit exercises and
9  training exercises.
10  　　Q.　What are team spirit
11  exercises?
12  　　A.　There was a big military
13  buildup in Korea around every February or
14  March to show military strength without
15  all-out war.
16  　　Q.　Okay. And that was the team
17  spirit exercise?
18  　　A.　Yes, sir.
19  　　Q.　Okay. What else did you do
20  while you were in Korea?
21  　　A.　Got married.
22  　　Q.　I guess that's a big deal?
23  　　A.　Yes, sir.

# FREEDOM COURT REPORTING

Page 49

1    Q.   When did you get married?
2    A.   28 June '85.
3    Q.   My wife would be happy if I
4  could reel off those dates as quick as you
5  do.
6         Did y'all get married actually
7  in Korea?
8    A.   Yes, sir.
9    Q.   Anything else that you did
10 while you were in Korea?
11   A.   No. I don't know. That was
12 years ago. Maybe, maybe not. I don't know.
13 I don't remember.
14   Q.   All right. You came back to
15 the states in '86?
16   A.   Yes, sir. Fort Lewis,
17 Washington.
18   Q.   Fort Lewis?
19   A.   Yes. Tacoma, Washington.
20   Q.   That's an Air Force base?
21   A.   That's an Army post.
22   Q.   How did you get put on an Army
23 post?

Page 50

1    A.   Being an MP.
2    Q.   Okay. Did you serve as an MP
3  at Fort Lewis?
4    A.   Yes, sir.
5    Q.   How long?
6    A.   Was on a SWAT team three
7  years. Was on their SWAT team, completed
8  Washington State SWAT School, their state
9  certified school.
10   Q.   Those three years were 1986
11 through when?
12   A.   '89.
13   Q.   '89?
14   A.   March of '86 through May or
15 June of '89.
16   Q.   Okay.
17   A.   Germany.
18   Q.   You went to Germany after Fort
19 Lewis?
20   A.   Yes, sir.
21   Q.   Where in Germany?
22   A.   Bitburg Air Base,
23 B-I-T-B-U-R-G.

Page 51

1    Q.   How long were you at Bitburg?
2    A.   Three, three and a half years.
3  I don't know.
4    Q.   I assume your wife was
5  traveling with you at Fort Lewis and
6  Bitburg?
7    A.   Yes, sir.
8    Q.   And had y'all had any kids by
9  the time --
10   A.   My oldest daughter was born on
11 Fort Lewis, Madigan Army Medical Center.
12   Q.   How do you spell Madigan?
13   A.   M-A-D-I-G-A-N. And my
14 youngest daughter was born in Germany.
15   Q.   Okay. And when did you leave
16 Bitburg?
17   A.   August '92. August, September
18 '92, I'm not sure.
19   Q.   Now, around that time was
20 during, I guess, the first Gulf War?
21   A.   Yes, sir.
22   Q.   Were you deployed over in the
23 Middle East during that period?

Page 52

1    A.   Yes, sir. Desert Storm.
2  Desert Shield and Desert Storm. I was there
3  for both phases.
4    Q.   What were you doing during
5  Desert Storm?
6    A.   Combat patrols.
7    Q.   What did that involve?
8    A.   Security patrols, recons,
9  raids, ambushes, just basic combat patrol.
10   Q.   Where were you?
11   A.   Turkey, northern Iraqi border.
12 We traveled from -- what's the name of that
13 Air Force base? We traveled from some Air
14 Force base over the Turkish border, did
15 patrols and back. I don't remember the name
16 of the base.
17   Q.   Okay. What about -- Were you
18 anywhere else during Desert Storm?
19   A.   No, sir.
20   Q.   Okay. What about during
21 Desert Shield, what were you doing?
22   A.   Same thing. It all rolled one
23 into the other.

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1    Q.    Same place?
2    A.    Only thing that changed for us
3    was the name.
4    Q.    Okay.  How long were you over
5    in the Middle East?
6    A.    Little over three months.
7    Three months, I don't know.  It wasn't long.
8    Air Force deploys three months.  They're not
9    like the Army.
10   Q.    Okay.  And then I assume you
11   came back to Bitburg?
12   A.    Yes, sir.
13   Q.    Okay.  And then after Bitburg,
14   where did you go?
15   A.    Got out.
16   Q.    Got out of the Air Force?
17   A.    Yes, sir.
18   Q.    All right.
19   A.    Stayed out for a while and
20   joined the National Guard.
21   Q.    Do you remember when you --
22   when you got out of the Air Force?
23   A.    30 November '92.  Nine years,

Page 54

1    seven months, six days.
2    Q.    Okay.  Now, did you get any
3    sort of retirement from the military?
4    A.    No, sir.  I didn't -- I only
5    did -- I didn't do twenty years.
6    Q.    Okay.
7    A.    That's why I joined the
8    National Guard, finish it up and get my
9    retirement.
10   Q.    Okay.  When did you join the
11   National Guard?
12   A.    I don't know.  '93 or '94, I
13   don't know.
14   Q.    When you -- When you left
15   Bitburg and got out of the Air Force, did
16   you come back to Alabama?
17   A.    Yes, sir.
18   Q.    And is that when you started
19   working with Miller Mechanical?
20   A.    Yes, sir.  After -- Well, I
21   signed up, took some welding classes first,
22   and then went to work for Miller Mechanical.
23   Q.    Where did you take your

Page 55

1    welding classes?
2    A.    Wallace.
3    Q.    Wallace.  And you say it was a
4    couple of months before you joined the
5    National Guard?
6    A.    I don't know.  May have been a
7    year.  I don't know.
8    Q.    Okay.
9    A.    I don't know.
10   Q.    And you joined the Alabama
11   Army National Guard?
12   A.    Yes, sir.  2nd of the 117th
13   Field Artillery Battery.
14   Q.    And are you in a different
15   unit now?
16   A.    Yes, sir.
17   Q.    Okay.
18   A.    March 14th of '03 I was
19   involuntary transferred and extended to the
20   1165th MP Company.  Deployed March 15th,
21   sent to Iraq for seems like forever; kept
22   getting extended, kept getting extended, I
23   had three extensions; then came back.  I

Page 56

1    stayed with that company.
2    Q.    Okay.  How long were you in
3    Iraq during that time?
4    A.    Seventeen, eighteen months.  I
5    don't know.
6    Q.    When did you return?  I assume
7    it was in 2004?
8    A.    Oh, it was in 2004.  Late
9    2004.  I think it was around August.
10   Q.    Okay.  And what did the -- You
11   said you were in the 117th Field Artillery
12   Battery, what was their -- what were they
13   there for?  What did they do?
14   A.    It was field artillery unit.
15   I was 13 Echo.  It's called fire directional
16   specialist.
17   Q.    Which means what?
18   A.    Which means I -- The forward
19   observer sends me coordinates of where he
20   wants the rounds to go from the guns.
21   Q.    Okay.
22   A.    I take the wind velocity, the
23   -- The forward observer is looking at it,

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1  the view, from where the guns would be
2  looking at it; I plot everything on a map,
3  and I send the message to the guns, fire
4  mission, get ready to fire, I tell them what
5  to fire, how to fire it, when to fire it, at
6  what elevation, and what angle.
7      Q.    What kind of guns are you
8  talking about?
9      A.    105 Howitzers.
10      Q.    Okay.  And was that -- Were
11  you pretty narrowly focused with the 117th?
12      A.    Yes, sir.
13      Q.    Okay.
14      A.    What do you mean was I --
15      Q.    I mean, was that what you did?
16  Did you do anything else?
17      A.    No, sir.  Well, they changed
18  to a chemical company and I didn't -- I
19  don't like chemicals.
20      Q.    When did they change to a
21  chemical company, after you had gone to
22  Iraq?
23      A.    No, sir.  A few months before

Page 58

1  I left.  I don't remember.
2      Q.    Okay.  And when you say you
3  were involuntary transferred in March of
4  2003, how did that happen?
5      A.    They called me up, told me to
6  pack my bags, I was leaving the next day and
7  go, and I did.
8          I'm a soldier, I go where I'm
9  told to go, and fight where I'm told to
10  fight.
11          DET 1, 1165th, Detachment 1.
12      Q.    Okay.  What is the 1165th?
13      A.    Combat MP company.
14      Q.    Now, was that more consistent
15  with what you had done over in Korea and
16  with your prior training?
17      A.    Yes, sir.  That's the reason I
18  got pulled.  The state went through the
19  records, they didn't have enough people to
20  deploy, so I got pulled and sent with them.
21      Q.    Okay.  Tell me what you did
22  when you got to Iraq.
23      A.    Besides trying to stay alive?

Page 59

1      Q.    I'm assuming you did that.
2      A.    We conducted patrols to our
3  assigned sector of town, Baghdad at first.
4  My responsibility was the southeast side of
5  Baghdad.  Pretty good sector.  I had a
6  police station called Billot Police Station.
7  We was training Iraqi police, and helped
8  them set up their force protection, teach
9  them how to patrol, teach them how to
10  policeman.  At the same time we had to
11  conduct dismounted and mounted patrols of
12  the area, IED sweeps, raids, ambushes.
13  Basically you've got an MP on one side of
14  the fence, infantry on other side of the
15  fence, you combine them and you throw them
16  in.
17          We got in all-out ambushes so
18  bad that I had drivers thrown out of the
19  vehicles, men dying.  Went from there to a
20  town we called Little Fallujah, the name of
21  it was Latifiyah, thirty-five miles south of
22  Baghdad; we took it over from the Marine
23  Corps.  And it got its name Little Fallujah

Page 60

1  for a reason.  If you was going down there,
2  you were going to make contact.
3          And we stayed down there every
4  day.  We didn't have -- An army in a combat
5  zone, there is no such thing as a day off.
6  You work, you patrol.  We patrolled every
7  day.  Got -- Ran across I don't even know
8  how many IEDs, ambushes, going in kicking in
9  doors, taking the Iraqis out, taking them to
10  jail.
11          Train the Iraqi police so you
12  could fight them that night; train the Iraqi
13  army so you could fight them that night.
14          Left Latifiyah, went to First
15  Armored Division.  I was on Colonel Baker's
16  personal security detail.
17      Q.    Who is Colonel Baker?
18      A.    Second Combat Brigade Team,
19  First Armored Division, commander.
20      Q.    You were on his personal
21  security team?
22      A.    Yes, sir.
23      Q.    What did that involve?

15  (Pages 57 to 60)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 61

1    A.    Everywhere he wanted to go, I
2  had to make sure he made it there safely. I
3  mean every day he -- He was a jam-up
4  commander: He took care of his solders and
5  he knew his solders.
6          He traveled all over Iraq. He
7  had soldiers -- First Armored Division is a
8  big division, and he had a whole brigade
9  combat team, that's approximately
10 twenty-plus thousand soldiers. We'd go
11 anywhere up to a hundred miles from Baghdad.
12    Q.    Okay.
13    A.    His safety and welfare was my
14 responsibility. I'd make sure he stayed --
15 he was kept safe no matter where he went or
16 what he did.
17    Q.    And was that the last thing
18 you did when you were in Iraq?
19    A.    Yes, sir.
20    Q.    Okay. Since you -- Well, when
21 did you get back home from Iraq that second
22 time?
23    A.    Like I say, I think it was

Page 62

1  around August of '04. I'm not sure.
2    Q.    Okay. And beginning in --
3  Well, after August of '05, were you still a
4  member of the National Guard?
5    A.    Yes, sir. I still am.
6    Q.    Same company and everything?
7    A.    Yes, sir.
8    Q.    Okay. What is your current
9  rank?
10   A.    Staff sergeant, E-6. Until a
11 few months from now, and I'll be promoted to
12 an E-7.
13   Q.    What's the difference between
14 E-6 and E-7?
15   A.    Pay.
16   Q.    Pay?
17   A.    Title, job title. I'll be
18 taking over -- Right now I'm a fill-in
19 platoon sergeant. Any time we deploy, I'm
20 in charge of a platoon. But when I get that
21 promotion, it will be officially on paper,
22 I'll take official command of that platoon.
23   Q.    Okay. Which platoon?

Page 63

1    A.    Third platoon.
2    Q.    What's the difference in pay
3  between E-6 and E-7?
4    A.    I don't know yet.
5    Q.    Okay. And when you -- When
6  you began back in 1983 at Lackland -- or at
7  Fort McClellan, what was your rank then?
8    A.    E-1.
9    Q.    E-1?
10   A.    Bottom of the totem pole.
11   Q.    And did you move from E-1 to
12 E-2?
13   A.    Yeah.
14   Q.    When was that?
15   A.    I don't know.
16   Q.    Do you remember when your
17 ranks changed, thinking back?
18   A.    No. Back then it didn't
19 matter. Until you hit E-5 in the military,
20 it don't matter.
21   Q.    All right. When did you hit
22 E-5?
23   A.    Right before we went to Desert

Page 64

1  Shield.
2    Q.    And to progress from E-5 to
3  E-6, does it take training, recommendations
4  from superiors?
5    A.    Takes training, takes certain
6  schools you have to have, takes
7  recommendations. There's a lot of
8  requirements you have to have. Your packet
9  goes up before the State board. I picked my
10 E-6 up in Iraq.
11   Q.    When was that, the second time
12 or first time?
13   A.    Second time. In Air Force you
14 don't get E-6 prior to ten years. It just
15 don't happen. Like I say, you got all these
16 E-9s on the State board looking at your
17 packet, your records, your recommendations,
18 whether you have the requirements. They
19 pick your record apart with a fine-toothed
20 comb.
21   Q.    What have you done to go from
22 E-6 to E-7?
23   A.    Same thing. This last school,

16 (Pages 61 to 64)

# FREEDOM COURT REPORTING

Page 65

1  month-long school I've been in, was the last
2  requirement I needed to make E-7. And
3  really it's up to the State and my unit. My
4  unit, if they don't think you're ready,
5  you're not going to get it.
6      Q.    What was the last school you
7  attended?
8      A.    That BNCOC, Basic
9  Noncommissioned Officers Course.
10     Q.    Okay. Let's talk about that.
11     A.    All right.
12     Q.    Tell me more about that. What
13 is it?
14     A.    Well, you've got to know the
15 military legal system, as far as Uniform
16 Code of Military Justice; you've got to have
17 managerial skills; you've got to have -- I
18 mean, you spend two weeks in the field, so
19 your combat skills is tested big time.
20     Q.    During the school?
21     A.    Yes, sir.
22     Q.    And is it a month-long school?
23     A.    Well, I did two phases.

Page 66

1  There's three phases for my MOS, and each
2  one is two weeks long. And I did the second
3  and third phrases back to back.
4      Q.    All right. What was the first
5  phase?
6      A.    First phase is all basic
7  military knowledge, as far as your admin
8  side.
9      Q.    When did you do that?
10     A.    Last year. Last September, I
11 believe.
12     Q.    All right. When did you do
13 Phase II?
14     A.    I don't know. A month ago.
15     Q.    Okay. And you still have to
16 do Phase III?
17     A.    No, sir. I did Phase II and
18 III back to back.
19     Q.    Okay.
20        THE WITNESS: I need to take a
21 break if you don't mind.
22        MR. JOHNSON: That's fine.
23        (Recess taken.)

Page 67

1      Q.    Mr. Dees, going back on the
2  Record here. Just a couple other questions
3  about your military background.
4          You had mentioned that you
5  finished Phases II and III of BNCOC school.
6  How long did that take to finish II and III?
7      A.    Four weeks. That's mostly
8  field training.
9      Q.    Okay.
10     A.    All my -- I spent -- Like I
11 said, when I was seventeen, I went through
12 basic training. I come from a military
13 family, I've been a -- military is all I've
14 ever known. I don't have one blemish. I've
15 got letters of certificates, letters of
16 appreciation from full bird colonels; I've
17 got achievement medals, accommodation
18 medals; put in for a bronze star in Iraq.
19 You can ask any of my soldiers, Sergeant
20 Barnes, my soldiers that work for me, my
21 seniors, any of them, they'll attest to my
22 military background and my career.
23     Q.    Who -- And you mentioned

Page 68

1  Sergeant Barnes, is he one of your soldiers?
2      A.    He's my operation NCO, he
3  works for me. Sergeant Richberg, Sergeant
4  Martin.
5      Q.    Give me those names. You had
6  Sergeant Barnes?
7      A.    Sergeant Franklin D. Barnes.
8      Q.    He's your NCO?
9      A.    He's my operations NCO. He
10 works for me. He's the one that sent the
11 letter to Hyundai.
12     Q.    Did you tell him to send it?
13     A.    I went to the unit and
14 complained because I was being ordered to
15 give military orders for a drill weekend.
16 And Greg Prater knows -- He was in the
17 Guard, he knows you do not get military
18 orders for a drill weekend. I gave them a
19 schedule. Every time I hire on with an
20 employer, I tell them up front, I'm in the
21 National Guard, is this going to cause a
22 problem.
23     Q.    Did you tell Hyundai that up

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  front?
2      A.    I told Hyundai that up front.
3  I told International Paper, I told BE&K, I
4  told IP at Thorsby. I've always been up
5  front. You can ask my soldiers, you can ask
6  the people I -- Well, y'all's lawyer
7  interviewed my coworkers, they told him the
8  same thing. Leon Dees is honest. If he
9  screws up he will tell you. I may not be
10  perfect. I make mistakes just like the next
11  guy. But if I make one, I'll tell you. You
12  can go back to my employer at Thorsby, my
13  maintenance manager Danny Wyatt, I crashed
14  an eighty-five thousand dollar chipper. I
15  didn't know it. I went home that day, I
16  come back in, it was strowed all over
17  everywhere. They didn't have a clue what
18  happened to it. I knew what had happened.
19  I went up and I told them. I thought I was
20  fixing to get fired. But I told them
21  exactly what happened.
22          If I mess up, you can ask my
23  soldiers or anybody, if I mess up, I'm the

Page 70

1  first one to admit it.
2      Q.    You mentioned something that
3  was interesting to me. You said when you
4  got hired on by Hyundai, as with other
5  employers, you told them you were a member
6  of the National Guard.
7      A.    I gave Greg Prater my yearly
8  schedule, year in advance we get our
9  schedules, every October.
10     Q.    Let me make sure you
11  understand my question. I assume what
12  you're talking about with Greg Prater, he
13  wasn't the one that hired you, was he?
14     A.    Danny Blue interviewed me.
15  And I told Danny Blue I was in the Guard. I
16  told him I was in the National Guard, was an
17  active member in the Guard and have a
18  commitment to the Guard.
19     Q.    And was Danny Blue -- Who was
20  he? Was he somebody that interviewed you
21  during the hiring process?
22     A.    Yes, sir.
23     Q.    And do you know what his role

Page 71

1  is at Hyundai?
2      A.    He's a maintenance assistant
3  -- maintenance manager or assistant
4  maintenance of the -- I'm not sure which
5  department. He's on the electrical side.
6  I'm not sure.
7      Q.    Do you know if he was in the
8  military?
9      A.    Danny Blue?
10     Q.    Uh-huh.
11     A.    I don't think so. I'm not
12  sure, but I don't think so.
13     Q.    That's fine. I don't know him
14  at all.
15          But you told him specifically
16  you were in the Guard?
17     A.    Yes, sir, I did.
18     Q.    And did he indicate that would
19  be a problem?
20     A.    No, sir.
21     Q.    Did he indicate that anybody
22  at Hyundai would have a problem with that?
23     A.    No, sir.

Page 72

1      Q.    Did he say anything about
2  whether Hyundai has policies that support
3  members of the Guard?
4      A.    Their handbook states that.
5  You've got a copy of their handbook, and it
6  states their military policy.
7      Q.    And you've got a copy of their
8  handbook?
9      A.    Yes, sir.
10     Q.    When you got a copy of the
11  handbook, did they get you to sign an
12  acknowledgement saying you received it?
13     A.    I don't remember. I don't
14  know. I may have, I may not. I don't know.
15          (Whereupon, Defendant's
16              Exhibit No. 2 was marked
17              for identification.)
18     Q.    Mr. Dees, this is an exhibit
19  we've marked as Exhibit Number 2. Do you
20  recognize that document?
21     A.    Let me read it and make sure.
22          This is it.
23     Q.    And I know that -- It appears

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 73

1  the date on that is January 10th of '06;
2  correct?
3      A.   Yes, sir.  10 January '06.
4      Q.   And is that your signature
5  down there at the bottom?
6      A.   Yes, sir.
7      Q.   And my assumption is, since
8  it's from January 10th, of '06, this wasn't
9  signed at the time you initially hired on;
10  correct?  You hired on before '06; right?
11      A.   Yes, sir.
12      Q.   Do you know -- Do you recall
13  if you received a handbook at the time you
14  were hired and then they issued another
15  handbook later?
16      A.   No, sir.  That was it.  But
17  why was the '06 -- What was the original
18  number?  Looks like 10 January '07 and then
19  the '06 is highlighted.
20      Q.   Okay.  Do you know if that's
21  your handwriting or do you remember doing
22  that?
23      A.   I know -- I know they had a

Page 74

1  big push for everybody to sign that there,
2  because nobody had actually signed the --
3  They had a form in the handbook to sign, but
4  nobody had actually signed it.
5      Q.   Do you remember when they sent
6  this -- sent the acknowledgement around to
7  get people to sign it?
8      A.   To be honest, the exact date
9  or time, no.
10      Q.   Okay.
11      A.   But, mine says 10 January '07,
12  then the 7 is crossed out and the 6 is
13  highlighted.
14      Q.   Okay.  And you don't recall
15  whether you did that or not?
16      A.   No, sir.  Well, normally when
17  I do something like that, from my military
18  background, I initial it.
19      Q.   Okay.  But I assume that's
20  your signature?
21      A.   That's my signature.
22      Q.   Okay.
23      A.   And that's my clock number.

Page 75

1      Q.   Your clock number?
2      A.   Old clock number.
3      Q.   Okay.  And would it be fair to
4  state that possibly prior to that, you had
5  received a copy of the handbook?
6      A.   I received a copy of the
7  handbook when I hired on.
8      Q.   Okay.
9      A.   But like I said, this here, if
10  you look in the back of that handbook, or
11  the front, one, it's got this -- a statement
12  similar to this, or something in it --
13      Q.   Okay.
14      A.   -- and you're supposed to sign
15  it.  And none of us signed it.
16      Q.   Okay.
17      A.   That's why they came out with
18  these.
19      Q.   Do you remember reading the
20  handbook when you first got hired on?
21      A.   All the way through?
22      Q.   Sure.
23      A.   No.  Not all the way through.

Page 76

1  I mean I read bits and pieces and parts here
2  and there, yes, sir.
3      Q.   All right.  Do you remember
4  reading the part about military leaves or
5  anything related to military training?
6      A.   Yes, sir, it is.
7      Q.   Do you remember what it says?
8      A.   It says that -- that you don't
9  have to use your vacation time in lieu of
10  your military training.  Because that was a
11  big issue.
12      Q.   Okay.  Was his name Danny
13  Blue?
14      A.   Yes, sir.
15      Q.   Okay.  Did he say anything
16  else about Hyundai supporting members of the
17  military services or Guard with leaves?
18      A.   He said my being in the Guard
19  wouldn't have anything to do with me getting
20  hired.
21      Q.   Okay.  And you did get hired?
22      A.   Yes, sir.
23      Q.   Okay.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1    A.    But like I said, my military
2  career, they can -- they can look at
3  anything that they want to or talk to
4  anybody in my unit if they want to, I'd be
5  glad to let them.
6    Q.    My assumption is, your
7  attorneys have given us a number of
8  commendations and awards and things that
9  relate to your military service.
10    A.    Yes, sir. I've got
11  achievement metals out the ying-yang,
12  accommodation metals.
13    Q.    I'm assuming that you've
14  provided to your attorneys all of those that
15  are in your possession?
16    A.    Yes, sir.
17    Q.    Okay. Based on what you've
18  said and based on my review of your
19  accommodations and awards, my assumption is
20  you were never disciplined for anything
21  while you were in the military?
22    A.    No, sir. I had an outstanding
23  military -- I even took honor grad from a

Page 78

1  Marine Corps school.
2    Q.    Were you ever disciplined for
3  anything while you were with the National
4  Guard?
5    A.    No, sir. I know my job and
6  I'm very, very proud of the job I do, and
7  proud of the uniform I wear.
8    Q.    Okay.
9    A.    I've served my country two
10  different tours, combat tours, and I'm going
11  back again next year, and I'm going back
12  willingly.
13    Q.    Going back where?
14    A.    Iraq.
15    Q.    Do you know what you're going
16  to do when you go?
17    A.    Yes, sir, I do.
18    Q.    What are you going to do?
19    A.    Convoy security. Most
20  dangerous job you can have over there right
21  now.
22    Q.    Okay. When are you leaving?
23    A.    We won't know that until they

Page 79

1  feel we have the need to know. There's
2  three companies from my battalion going,
3  217th, 214th, 1165th.
4    Q.    And in addition to not being
5  disciplined while you were in the military,
6  I assume you were never court martialed for
7  anything?
8    A.    No, sir. No Article 15, no
9  letters of counseling, no letters of
10  reprimand. I come -- I know what my duty
11  is, and, like I said, I fulfill that duty.
12  I take care of my soldiers and my soldiers
13  take care of me. That's all I've ever
14  known, that's what I like, and I'm good at
15  it.
16    Q.    Now, earlier you used a term I
17  want to clear up, you said MOS, that stands
18  for Military Occupational Skill; correct?
19    A.    Yes, sir. I don't remember
20  using it, but that's what it stands for.
21    Q.    I think you used it.
22       Your military occupational
23  skill, would that be military police?

Page 80

1    A.    Yes, sir. That's one of them.
2    Q.    I don't know the answer to
3  this: Can people have more than one MOS?
4    A.    Yes, sir.
5    Q.    And do you have more than one?
6    A.    Yes, sir.
7    Q.    Okay. Tell me what yours are?
8    A.    13 Echo, field artillery, fire
9  direction control, FDC, fire direction
10  specialist. And 74 Delta. I ain't got a
11  clue what that is. It's in my records, it's
12  either chemical or signal one, I don't know.
13    Q.    13 Echo is that military
14  police?
15    A.    No, sir. That's artillery.
16    Q.    Okay. And is that all the
17  MOS's that you're aware of?
18    A.    Yes, sir.
19    Q.    Okay. Have you ever been
20  arrested for anything?
21    A.    No, sir.
22    Q.    Have you ever filed a worker's
23  compensation claim?

20  (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1    A.    No, sir.
2    Q.    Have you ever filed a Social
3    Security claim?
4    A.    No, sir.
5    Q.    Are you receiving any sort of
6    payments now for any sort of disability,
7    illness, short-term disability, long-term
8    disability, anything like that?
9    A.    When I came back from Iraq, I
10   had to have my shoulder operated where I
11   messed it up in Iraq.  I got, I think it
12   was, short-term disability through the IP, I
13   believe.  I'm not sure how it worked.  They
14   took care of everything.
15   Q.    All right.  What kind of
16   shoulder surgery did you have?  Did you have
17   a rotator cuff injury?
18   A.    Rotator cuff, lost the lining
19   in my shoulders, muscles.  Something to do
20   with the bone, I don't know.
21   Q.    What did you have done, do you
22   know?
23   A.    The muscles was completely

Page 82

1    torn off from the front or the back, one,
2    half way on the other side.  Like I say, I
3    lost the lining in my shoulder.  Something
4    else, I don't remember what the doc said.
5    He said it was screwed up.
6    Q.    Where did you have the surgery
7    done?
8    A.    Birmingham.
9    Q.    Birmingham?
10   A.    Yes, sir.  I ain't letting the
11   Army cut on me no more.  They've done it two
12   or three times, and every time it ain't gone
13   good.
14   Q.    Okay.  What were the other two
15   or three times for?
16   A.    When I was in Baghdad, they
17   cut me open in a make-shift hospital in the
18   middle of Baghdad to take my appendix out.
19   And I woke up with industrial staples in my
20   gut that I had to take out.  They cut my
21   wisdom teeth out up at Fort Lewis, and I
22   still don't have the feeling in my jaw.  So
23   I wasn't going for a third.

Page 83

1    Q.    Okay.  Is your shoulder back
2    where you can work fully at this point?
3    A.    Yes, sir.
4    Q.    Are you having any ongoing
5    problems that prevent you from working in
6    any way, shape, or form?
7    A.    No, sir.
8    Q.    Now, prior to today, to get
9    ready for this deposition, did you review
10   any documents?
11   A.    Just what Hyundai sent me, I
12   went over my military records.
13   Q.    Okay.  Anything -- When you
14   say just what Hyundai sent you, what was
15   that?
16   A.    I don't remember.  Benefits
17   packages, hire-on package, junk like that.
18   Q.    Okay.  Are you talking about
19   stuff we sent to your lawyer?
20   A.    Yeah.  Some statements from
21   Will Ware, I think.
22   Q.    Okay.
23   A.    Mostly it was all benefits,

Page 84

1    and hire-on package, and stuff from my
2    previous employers.
3    Q.    Okay.  Have you reviewed
4    anything else?
5    A.    No, sir.
6    Q.    Did you -- And, again, I'm not
7    -- I'm not going to ask you anything that
8    you talked to your lawyers about or asked
9    your lawyers or anything like that.
10        But other than your lawyers,
11   did you speak to anybody getting ready for
12   the depo?
13   A.    No, sir.
14   Q.    Did you review the complaint
15   that was filed?
16   A.    That my -- What do you mean?
17   Which -- That my lawyers filed?
18   Q.    Yes, sir.  To start the
19   lawsuit, your lawyers filed a summons and
20   complaint at the courthouse.
21   A.    Yes, sir.
22   Q.    Did you look at it getting
23   ready for today?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1    A.    I looked at it awhile back. I
2  don't remember. I've looked at it, yes,
3  sir.
4    Q.    But did you look at it to get
5  ready for today?
6    A.    I don't remember, to be
7  honest.
8    Q.    Okay.
9    A.    I talked to Bob yesterday
10 about some stuff, but I don't remember. To
11 be honest, I don't remember.
12   Q.    Okay. And when you say you
13 talked to Bob, are you referring to
14 Mr. Hall, who is here?
15   A.    Hall, yes, sir.
16   Q.    Okay. And what did y'all talk
17 about?
18   A.    The paperwork that he had
19 drawn up, gone over, my records.
20   Q.    Did you review his expert
21 report with him?
22   A.    Yes, sir.
23   Q.    Okay. Was there anything in

Page 86

1  his expert report that you disagreed with?
2    A.    No, sir. I mean, I ain't no
3  accountant or no lawyer.
4    Q.    Okay.
5    A.    So did I understand
6  everything? No, sir.
7    Q.    All right. Was there anything
8  in his expert report that you asked him to
9  change in any way, shape, or form?
10   A.    I don't believe so.
11   Q.    Okay. Other than reviewing
12 the report that he drafted, what else did
13 you do?
14   A.    That was about it.
15   Q.    When was that?
16   A.    I looked at Mr. Hall's report
17 yesterday.
18   Q.    Okay. Did you speak with
19 anybody else that worked for Hyundai getting
20 ready -- prior to today getting ready?
21   A.    No, sir. I mean, my
22 coworkers, they called me. I mean, we're
23 friends. We was tight, we was real close.

Page 87

1  Basically, I lived there more than I did at
2  home.
3    Q.    Okay. Which -- I mean, when
4  was the last time you spoke to one of your
5  coworkers?
6    A.    Bornberg called me yesterday
7  evening I believe. Yesterday sometime.
8    Q.    Who was that?
9    A.    Mark Bornberg.
10   Q.    What did he talk about?
11   A.    Just letting me know he was
12 going to Maplesville to cut a tree down for
13 one of my friends.
14   Q.    Did y'all talk about the
15 deposition or the lawsuit at all?
16   A.    No, sir. He asked how it was
17 going, I said I don't know yet.
18   Q.    Have you talked to any of your
19 former coworkers about the lawsuit or this
20 deposition?
21   A.    They -- Some lawyers from
22 South Carolina interviewed -- had them all
23 at work, was going to interview them all one

Page 88

1  night. And he interviewed three of them and
2  said he didn't want to talk to none of the
3  rest of them is the only thing they told me.
4    Q.    Who said that?
5    A.    Drake Barefoot.
6    Q.    And he said what now?
7    A.    Said that a lawyer told him
8  that they didn't have to talk to him, but
9  he'd like to ask them some questions. And
10 he started interviewing them, and says he
11 interviewed the third one and come out and
12 told the rest of them to leave, that he
13 wasn't getting what he wanted.
14   Q.    Okay. Who are the three that
15 you think were interviewed?
16   A.    I don't remember. Drake told
17 me the names, but I don't remember who it
18 was.
19   Q.    Okay. And that's Drake
20 Barefoot?
21   A.    Yes, sir.
22   Q.    Okay. Did Drake tell you
23 anything else about the interview?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 89

1    A.    No, sir.  I didn't ask him
2  nothing else.
3       **Q.    Okay.**
4    A.    I didn't ask him that, but --
5       **Q.    Did you talk to anybody else**
6  **about an interview?**
7    A.    No, sir.
8       **Q.    Other than Drake, do you know**
9  **anybody that gave an interview?**
10   A.    Like I said, Drake came and
11  told me who all he talked to, but I don't
12  remember who it was.  That's been a while --
13  few months ago, I guess.
14      **Q.    Okay.**
15   A.    Like I said, we was good
16  friends.  Most of the time we just call each
17  other to pick on each other.
18      **Q.    Okay.  And other than that**
19  **discussion, after those interviews, have you**
20  **had any other talks with Drake about the**
21  **lawsuit or this deposition or anything like**
22  **that?**
23   A.    No.  Like I said, they'll call

Page 90

1  and ask, and I -- Like I said, I ain't no
2  lawyer and I don't know, so I just -- that's
3  the same thing I tell them, I don't know.
4       **Q.    Okay.  Have you talked to**
5  **anybody else at Hyundai, other than your**
6  **coworkers about this lawsuit?**
7    A.    No, sir.
8       **Q.    Or about this deposition?**
9    A.    No, sir.
10      **Q.    I assume you talked to your**
11  **wife before coming here today?**
12   A.    I live with her, yes, sir.
13      **Q.    Well, did you talk to her --**
14  **Again, remember I told you earlier some of**
15  **my questions don't make sense.**
16      **That made sense, but it wasn't**
17  **the right question.  Did you talk to her**
18  **about this lawsuit or about your deposition**
19  **in preparation for today?**
20   A.    I reckon, yes, sir.
21      **Q.    Okay.  Do you remember what**
22  **y'all talked about?**
23   A.    No.  I mean, she just said

Page 91

1  this -- her Korean culture, she just -- she
2  was nervous.
3       **Q.    Okay.**
4    A.    That was it.
5       **Q.    Okay.**
6    A.    She's scared of the Koreans.
7       **Q.    Okay.  Why is that?**
8    A.    I mean, in Korea you don't
9  buck the system at all.  Korean civilian
10  life is like military life, you don't -- you
11  don't go up against the system at all.  If
12  they tell you to jump off a bridge, you jump
13  off a bridge and thank them half way down.
14      **Q.    Okay.  Other than your wife,**
15  **did you speak to any other family members**
16  **getting ready for the deposition?**
17   A.    No, sir.  I ain't had time.
18  I've been up at Fort McClellan for a month,
19  I came home Saturday.  And she's always got
20  something for me to do around the house, so,
21  no.
22      **Q.    I understand that.**
23      **Either in getting ready for**

Page 92

1  **the deposition or at any time during the**
2  **lawsuit, have you kept a journal or put**
3  **anything down in writing that might have**
4  **information relevant to the lawsuit?**
5    A.    Have I kept a journal?  No,
6  sir.  I kept notes when I was at Hyundai,
7  and they were taken.
8       **Q.    When you say you kept notes,**
9  **what were your notes like?**
10   A.    I spent several years in the
11  military, I kept meticulous notes:  dates,
12  times, places, specific comments.
13      **Q.    What did you keep them on?**
14   A.    Just blank copy paper.
15      **Q.    Blank copy paper?**
16   A.    Yes, sir.
17      **Q.    What color copy paper, plain**
18  **white?**
19   A.    Plain white paper.
20      **Q.    Where did the blank copy paper**
21  **come from?**
22   A.    Probably out of the copy
23  machine there.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 93

1    Q.    At work?
2    A.    Yes, sir.  I mean, I don't
3  know.  They gave us tablets to keep notes
4  on, to write daily logs on.  So I don't know
5  where I got it from.
6    Q.    Did you ever keep anything on
7  a journal or a daily log?
8    A.    We had to fill out daily
9  reports there at the plant, yes.
10    Q.    Okay.  And what did you do
11  with those reports?
12    A.    I turned mine in every day,
13  except for one day when I forgot to turn one
14  in and got in trouble for it.
15    Q.    Who did you turn it in to?
16    A.    We'd turn them in.  There was
17  a box in the office we had to turn them in
18  to.
19    Q.    When you say the office, is
20  that like a maintenance office?
21    A.    Yes, sir.  Every section has
22  their own maintenance office.
23    Q.    Okay.  Did any of your

Page 94

1  coworkers ever see you writing on copy paper
2  or writing in a journal about what was going
3  on at work?
4    A.    Yes, sir.
5    Q.    Okay.
6    A.    I mean, they knew I had notes.
7    Q.    Who were they?  Which ones?
8    A.    All of them.  Everybody on my
9  shift and the other shift.
10    Q.    All right.  Did they ever look
11  at them?
12    A.    No, I don't reckon so.
13    Q.    You don't remember ever
14  showing your notes to anybody?
15    A.    I don't reckon.  No.  No.
16    Q.    When you say they all knew
17  that you had them, what makes you say that?
18    A.    I mean, I told them.
19    Q.    Okay.  Other than you telling
20  them --
21    A.    They seen that -- I kept them
22  in my jacket pocket.  Wherever I went, they
23  went.

Page 95

1    Q.    But other than you telling
2  them that you had notes, did they ever --
3    A.    Yeah.  I'd pull them out of my
4  pocket, and they asked me, you got your
5  notes?  Yeah.
6    Q.    And were these notes related
7  to issues you were having with Greg Prater
8  or somebody else at the plant?
9    A.    Issues I was having period
10  regarding my military service.
11    Q.    Okay.  Did you ever take your
12  notes home?
13    A.    Yes, sir.  I'd take them home
14  and bring them back -- they'd stay with me
15  or either I'd lock them up in my locker.
16    Q.    And you kept them in your
17  pocket?
18    A.    Yes, sir.
19    Q.    Did you take any notes home
20  that are still at your home?
21    A.    No, sir.  When I left, my
22  jacket was locked up in my locker, and I
23  wasn't allowed to even go to my locker.  I

Page 96

1  was took out of there like a prisoner, like
2  a criminal.  Prater went and got my jacket
3  and brought it back to me, and there was no
4  notes in the pocket.
5         MR. SPORT:  For the Record,
6  Matt, we've asked y'all for those notes and
7  haven't gotten them.
8    A.    That's like this box here, I
9  don't know -- My locker stayed open,
10  unlocked, for two months after I was fired.
11  Then all of a sudden two months later they
12  come in and throw a lock on it for another
13  couple of months.  Then they -- all of a
14  sudden they take the lock off again.
15    Q.    You say that it was unlocked
16  for two months?
17    A.    Yeah.
18    Q.    I assume you didn't go back
19  there to see it personally?
20    A.    No.
21    Q.    What makes you think it was
22  unlocked for two months?
23    A.    Bornberg told me.  I asked him

24  (Pages 93 to 96)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 97

1  to look for my notes, and he said there's
2  nothing -- he said Kevin Hughes and Prater
3  had gone all through my locker.
4      Q.   Do you know -- Did Bornberg go
5  there the day you were terminated or the day
6  after?
7      A.   It was the day after.  That
8  night I got terminated, I'd been at work an
9  hour -- I drove fifty-something miles to
10 work -- to work for an hour, didn't have a
11 clue I was being fired; got security guards
12 coming in with me, around my friends,
13 telling you, let's go.  Like I said, I was
14 drug out like a criminal, and then that
15 lady, Wendy Warner, she was cold, short,
16 treated me like a piece of trash.
17     Q.   Okay.
18     A.   I've never been fired from a
19 job in my life.
20     Q.   And we're going to talk more
21 about Wendy Warner before the day is out.
22 The notes that you're talking about, how
23 much information was it?  How many pages?

Page 98

1  One page, more pages?
2      A.   No.  No.  There was several
3  pages.
4      Q.   Several being what, two,
5  three?
6      A.   Probably three or four.
7      Q.   So.
8      A.   My military career, when it
9  started, I figured it would drop after my
10 unit sent the letter, but, no.
11     Q.   Okay.
12     A.   But it wasn't just Prater, it
13 was Applegate, it was HR.  It wasn't one
14 individual, it was company.
15     Q.   What was Applegate doing?
16     A.   He basically told me -- I
17 asked him one time, I said:  What about the
18 letter my unit sent?  He said:  Well, I
19 ain't worried about that letter; He said,
20 whatever Prater says, I'm going to back him
21 up.  I've never heard Prater say anything
22 out of the way, which he was never around
23 Prater when Prater was in our shop; he sat

Page 99

1  up there in his office.  He said however
2  Prater wants to run his shop, that's what
3  he's going to do and I'm going to back him
4  up.
5      Q.   Is that all that Applegate had
6  to say?
7      A.   Basically, yeah.  Chewed me
8  out.
9      Q.   Chewed you out how?
10     A.   Told me that I needed to get
11 my act together.  I mean, I got Guard duty,
12 I have a military obligation.  I have to go
13 to that obligation.  I'm going to go to that
14 obligation.  Federal law protects me under
15 that obligation, but yet I'm still being
16 told that if I don't go to Guard duty and
17 don't show up to work, I'm going to be wrote
18 up for missing work.
19     Q.   When Applegate said "get your
20 act together," what was he referring to?
21     A.   I have no idea.  I didn't ask
22 him.
23     Q.   Did John Applegate ever ask to

Page 100

1  see any military orders of yours?
2      A.   No.  He just told me that he
3  backed Prater up on whatever he said.
4      Q.   Okay.
5      A.   HR did, yeah.
6          Well, I take that back.  There
7  was a little girl from HR, her name was
8  Keisha, I don't know what her last name is.
9  This was after my unit had sent the letter.
10 Said that -- She come out quoting something
11 from the ESGR regulation and then saying
12 that I had to provide orders so many days
13 prior to, or something, I don't remember.
14 And I said no, the regulation states that I
15 can be deployed up to three months on a
16 verbal order.
17         And I said:  Y'all have my
18 schedule a year advance.  You've had it.
19 They got my updated version, which he turned
20 in.  It got so bad that when I -- like, the
21 -- I went to BNCOC Phase I, I believe in
22 September, and I was deployed in support of
23 Katrina, I had to carry my orders to human

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 101

1  resources section myself, which y'all got
2  the papers somewhere in there where the HR
3  person had to sign off on me bringing my
4  orders up there, said manager not available,
5  because Prater wouldn't turn my orders in.
6  And you got Applegate and HR backing him up
7  on it, I'm against the wall. That's why I
8  kept notes.
9     Q.    I want to carve out Greg
10  Prater for just a moment.
11        In terms of Mr. Applegate, how
12  many discussions did you have with him that
13  had anything to do with your military
14  service?
15     A.    Two or three.
16     Q.    Two or three?
17     A.    I mean, every time I -- It was
18  several times, even after my unit sent the
19  letter. And he admitted to the letter being
20  there.
21     Q.    All right. Do you think it
22  was more than two or three or just two or
23  three?

Page 102

1     A.    I don't know. Like I said, it
2  was ongoing several, several months.
3     Q.    All right. So over a period
4  of several months, you had several
5  discussions with him?
6     A.    Uh-huh. And HR.
7     Q.    But I'm asking about Applegate
8  for now.
9     A.    Okay.
10     Q.    During the discussions that
11  you had with Applegate, did he ever demand
12  to see any orders of yours?
13     A.    I don't -- I don't think so.
14  I don't know. I don't remember.
15     Q.    Okay. You --
16     A.    He said I needed to get my
17  mind together and focus on the plant,
18  instead of -- How did he phrase it?
19        He came up with some elaborate
20  word and said I needed to basically just
21  don't worry about my Guard duty and stay at
22  work. I don't remember how he phrased it.
23     Q.    Do you remember when he said

Page 103

1  it?
2     A.    No.
3     Q.    How long before you were
4  actually terminated did your discussions
5  with Applegate take place? Was it back in
6  the fall?
7     A.    It started around the fall.
8  And it went on up through December and
9  January.
10     Q.    December and January?
11     A.    Uh-huh.
12     Q.    Did you have any problems
13  after January?
14     A.    With -- Yeah, I mean --
15     Q.    With Applegate, I'm sorry.
16     A.    With Applegate, yeah.
17     Q.    Okay. So it went past
18  December and January, is what you're telling
19  me?
20     A.    I believe it was in January, I
21  don't know. I don't remember the dates to
22  be exact. Like I say, they've got my notes,
23  that's got everything on it. They've got

Page 104

1  them somewhere. I didn't bring them out of
2  the plant.
3        Prater is the one that brought
4  my jacket to me, they was in the pocket. He
5  had keys to my locker. I had security
6  guards on me, I couldn't go back and get my
7  personal stuff. I had to give Prater my
8  keys to my locker and it stayed unlocked.
9  He unlocked it and it stayed unlocked. And
10  I was pushed out with security guards in
11  front of everybody, like I said, like a
12  common criminal.
13     Q.    During the time that you were
14  there, what kind of lock was on your locker?
15     A.    I don't remember. I think it
16  was just a little red Master lock.
17     Q.    Was it a keyed lock or
18  combination?
19     A.    It was a keyed lock. I had to
20  give Prater my keys to get in it.
21     Q.    Okay.
22     A.    He's the one who brought my
23  stuff to me. And all he brought was my

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 105

1  jacket and a little MP3 player that they had
2  given us for Christmas.
3      Q.   Was he with anybody else?
4      A.   No. I mean, I had to -- Like
5  I said, I had to stay there with the
6  security guards.
7      Q.   Okay.
8      A.   And Applegate may have walked
9  around with him. I don't know, I was so
10 upset. I didn't --
11     Q.   When you came to work that
12 morning --
13     A.   That night.
14     Q.   I mean that night. -- had you
15 gone to your locker?
16     A.   Yes, sir. I mean that's where
17 my tools was at. I had to go to my locker,
18 get my tools out. And that's the first
19 thing we did was go get our tools, go out on
20 the floor and get back briefed and all for
21 the shift, any problems we had. And I
22 went -- I'd go to my area of responsibility,
23 which was SOPS.

Page 106

1      Q.   So at what point during that
2  evening were you pulled off the job?
3      A.   I'd been there probably thirty
4  minutes or an hour.
5      Q.   Tell me what you had done that
6  day so far.
7      A.   Nothing. Like I said, I come
8  in, went to my locker, got my tools.
9      Q.   Did you put your coat in your
10 locker?
11     A.   Yes, sir. Because it was warm
12 that night. And I went out on the floor.
13 Might have been Paul Powell and them I was
14 talking to, I don't know, somebody on the
15 other shift, to see if we had problems that
16 day. And then I went back up to my area.
17 And about -- They was having a problem or
18 something on the press, and I seen Mr. Moon
19 down there, and I come down and was talking
20 to him, and my fellow coworkers. Prater
21 come up and said we need to talk. I turn
22 around and walk off to the office and --
23 Applegate's office; he said no, no, around

Page 107

1  here. I walk around there, and there's the
2  security guards and John Applegate. I knew
3  what was going on, because I heard the
4  rumors, the war stories when they fire
5  someone. They bring security guards in and
6  try to bag and tag you and take you out. I
7  said, I can't believe this is happening. He
8  said no, no, we're just going to talk, you
9  ain't fired. I said, what's the security
10 guards doing here? No. No. We need to
11 talk. I said no, I know what's going on.
12 So I grabbed my radio, took it off, gave it
13 to Applegate, I think. I said, I'm going
14 back to go get my junk; I said I know y'all
15 are taking me to the gates, I'm going to get
16 my junk. No, you can't go back in there.
17 And the security guards come up. I said,
18 I've got personal stuff in there, I'm going
19 to get. No, you can't go get it. I said,
20 well, I'm not leaving without my gear.
21 Prater said, well, I'll go get it, he said
22 give me your keys. So I handed him my keys.
23 Like I said, I was so upset, I don't

Page 108

1  remember if Applegate went with him or not.
2      Q.   Okay.
3      A.   Then they whisked me out with
4  security guards, took me around to the gate,
5  five miles from the parking lot I had parked
6  in, took me in the office, I walked in and
7  all the security guards are sitting there
8  bowed up, staring at me, walked me in a
9  little room. That lady sits me down,
10 introduces everybody, says her name, the
11 next fellow's name, Applegate's, and
12 somebody was sitting on my side of the
13 table, I don't remember. Held a letter up
14 like this (indicating), read it, slammed it
15 down on the table. I said, you're firing
16 me; I said, you've got a team leader in
17 there who's threatening several people
18 jumped up in their faces and you're firing
19 me and letting him stay. She said yes.
20     Q.   Who are you referring to?
21     A.   Wendy Warner, I guess. I
22 didn't know the lady.
23     Q.   No. Who is the team leader

# FREEDOM COURT REPORTING

Page 109

1  you're referring to?
2       A.    Kevin Hughes. I mean he had
3  had several altercations.
4       Anyhow, she slammed the paper
5  face down on the table, got up and walked
6  out. She was just cold. The little short
7  fellow, I don't remember his name, she told
8  me his name. I mean, he was cordial, but --
9       Q.    What did he look like?
10      A.    I don't know. Just a little
11 short fellow, a little overweight. He
12 wasn't fat. I don't know.
13      Q.    Okay. You don't remember his
14 name?
15      A.    Huh-uh.
16      Q.    Did he wear glasses?
17      A.    I don't remember. I was --
18 like I said, I was upset. I've never been
19 fired, never had a blemish in my civilian or
20 military record. And here all of a sudden
21 I'm getting fired for something I didn't do.
22      Q.    Had Greg Prater brought you
23 your jacket yet?

Page 110

1       A.    Yeah. He brought it to me
2  before the security guards took me out.
3  Like I said -- and I asked them then, I said
4  all that's in here is the MP3 player. I
5  said, when am I going to get the rest of my
6  junk, in the vehicle on the way around
7  there. We'll mail it to you.
8       Q.    Did you -- When you were in
9  the room with Wendy Warner and the other
10 fellow that you were talking, and anybody
11 else that was in the room, did you tell
12 them, I've got more personal stuff in my
13 locker and I'd like to go get it?
14      A.    She -- Yes, sir.
15      Q.    You said that to Wendy Warner
16 and the other people?
17      A.    I asked was I going to be able
18 to get my tool bag and my other stuff. And
19 Applegate is the one that told me no, said,
20 you're not going back in the plant.
21      She slammed the paper down and
22 got up and left. And Applegate, he took my
23 keys to my personal safety lock, my lock,

Page 111

1  and he said here, here's your jacket.
2       Q.    Did you look in your jacket at
3  that point?
4       A.    I looked in my jacket when
5  Prater brought it to me.
6       Q.    Did you know that there were
7  notes missing?
8       A.    Yes, I did.
9       Q.    Did you say anything to
10 Applegate?
11      A.    That's when I said, can I go
12 back and get my stuff. No. Security guard,
13 they put me in the vehicle, we left. I
14 mean . . .
15      Q.    When you were in the room with
16 Wendy Warner and the other gentlemen,
17 including Mr. Applegate, did you tell them
18 that I have some notes that are missing?
19      A.    I asked them could I go back
20 and get my personal stuff, that's what I
21 asked Applegate, said my tool bag and my
22 personal stuff, like I said before.
23      Q.    But you never told them

Page 112

1  anything specific that you were missing
2  other than your tool bag?
3       A.    I said my personal stuff.
4       Q.    And you never mentioned any
5  notes?
6       A.    No. I didn't mention
7  specifically. I said my personal stuff,
8  like I said.
9       Q.    Is it your testimony that you
10 were aware at that point in time that your
11 notes were not in your jacket?
12      A.    Yes, sir. Like I said, Prater
13 went and got my jacket, so . . .
14      Q.    Did you ask Prater where your
15 notes were?
16      A.    I don't remember. Like I say,
17 I was mad. I was upset. I never had -- I
18 never had anything -- Like I say, I've
19 served my country and I've served it
20 proudly, and I've served it for a long time.
21      Q.    Okay.
22      A.    And I'll do it again, gladly.
23 And I've never, never been treated like I

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 113

1  was a piece of trash like I was that night.
2  It was embarrassing. Then I have to go to
3  church on Sunday and look at my friends and
4  everybody knows, he got fired because he's
5  supposedly sleeping on the job. Everybody
6  is looking at you. No, that ain't right.
7      Q.    Where were you when you
8  realized that the notes weren't in your
9  jacket?
10     A.    There at the shop when they
11 brought me my jacket, like I said before.
12     Q.    How far is the shop from your
13 locker?
14     A.    My locker was in the shop. We
15 was on the outside of the shop. I wasn't in
16 the shop. He walked me from my area, around
17 the office, said go on around here. And we
18 went around the side of the shop.
19     Q.    Could you see your locker from
20 where you were outside the shop?
21     A.    No, sir. Block wall. And I
22 had the security guards there telling me I
23 couldn't go nowhere.

Page 114

1      Q.    Okay. And we're going to get
2  back to some of these issues, but I want to
3  cover some more basic stuff before we get
4  into it more deeply.
5             Have you ever filed any other
6  lawsuits?
7      A.    No, sir.
8      Q.    Have you ever filed any
9  administrative complaints like with the EEOC
10 or some sort of governmental entity?
11     A.    No, sir.
12     Q.    Have you ever been sued?
13     A.    No, sir.
14     Q.    And you may have shaken your
15 head, but I don't know if I heard you say
16 no --
17     A.    No.
18     Q.    You've not filed any EEOC --
19     A.    I filed -- When me and my wife
20 first came home from Germany, probably two
21 years after being home, I filed bankruptcy
22 because I didn't manage my finances right, I
23 was used to being in the Army and everything

Page 115

1  taken care of. The first two years kicked
2  my butt. After that, I haven't had a
3  problem since.
4      Q.    Okay. When was this you filed
5  bankruptcy?
6      A.    I don't know. You'll have to
7  -- I don't know. I'll have to get back with
8  you on that.
9      Q.    Right when you got back from
10 Germany, though?
11     A.    No, sir. It wasn't right --
12 It was like a year or two later. I don't
13 remember.
14     Q.    Where were you working then?
15     A.    I don't remember.
16     Q.    During the time that you were
17 with Hyundai, did you file any sort of
18 complaints with the HR department?
19     A.    Yes, sir. That's where I
20 started out. It, apparently, didn't do no
21 good.
22     Q.    All right. Let's talk about
23 the complaints. Did you file any written

Page 116

1  complaints?
2      A.    No, sir. There wasn't no form
3  -- a format for filing written complaints.
4  And when we tried, they didn't want to hear
5  it.
6      Q.    Okay. Did you ever talk to a
7  team relations representative about problems
8  you were having?
9      A.    Several times. Lucas Cooner
10 and Will Ware.
11     Q.    Will Ware?
12     A.    Yes, sir. And Lucas Cooner.
13     Q.    Anybody else with Hyundai?
14     A.    Greg Kimball.
15     Q.    Greg Kimball?
16     A.    And Keisha. I don't know what
17 -- I don't remember what her last name is.
18 She is no longer there. She went to Kia.
19 They moved her to Kia, in the HR department.
20     Q.    Can you think of anybody else
21 that you complained to?
22     A.    Other than the managers and
23 assistant managers, the production manager

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 117

1  who said he was over Prater, Craig Stapley
2  and Jim Brookshire both.
3      Q.    And the production manager was
4  who?
5      A.    Craig Stapley --
6      Q.    Stapler?
7      A.    Stapley, S-T-A-P-L-E-Y.
8      Q.    All right. And what other
9  members of management did you complain to?
10      A.    That was about it, I reckon.
11      Q.    Just to make sure I'm clear,
12  you never submitted anything in writing to
13  human resources?
14      A.    There was no way to submit
15  anything in writing. When I complained they
16  didn't want to hear anything about it. I
17  submitted an e-mail to Greg Kimball about
18  Prater harassing me about my Guard duty, and
19  I never received a reply to the e-mail in
20  person or anything.
21      Q.    When you say the last time
22  Greg Prater harassed you about your Guard
23  duty --

Page 118

1      A.    Before I got fired.
2      Q.    Where did you send the e-mail
3  from?
4      A.    The maintenance shop.
5      Q.    All right. Was Greg Kimball
6  working at that time?
7      A.    I don't remember. I think it
8  was on -- I don't remember if it was on day
9  shift or night shift. I think it was on
10  night shift. But the e-mail, I mean, that
11  was probably a month before I'd gotten
12  fired, and he had plenty of time to respond.
13      MR. SPORT: Matt, we'd like to
14  request that e-mail, because I don't think
15  we have that.
16      (Recess taken.)
17      Q.    Mr. Dees, we're back on the
18  Record.
19          You had talked a minute ago
20  about an e-mail you sent to Greg Kimball.
21  Did you have a log-in ID and a password at
22  Hyundai?
23      A.    Yes, sir.

Page 119

1      Q.    What was your log-in?
2      A.    I don't know. That was a year
3  ago, almost. I don't know.
4      Q.    Okay.
5      A.    I have no idea. I think it
6  was my clock number, I think. I'm not sure.
7      Q.    Okay. Do you know when you
8  were assigned the log-in ID?
9      A.    It wasn't long after I was
10  hired. I'm not sure.
11      Q.    Was it after you were hired?
12      A.    Yeah.
13      Q.    Okay. So when you say you
14  sent an e-mail to Greg Kimball, would that
15  have been on an internal Hyundai system,
16  e-mail system?
17      A.    Yes, sir.
18      Q.    You didn't send it from
19  Yahoo --
20      A.    No, sir.
21      Q.    -- or Google e-mail or
22  anything like that?
23      A.    No, sir. It was on the

Page 120

1  Hyundai system.
2      Q.    And it was while you were at
3  work?
4      A.    Yes, sir.
5      Q.    And do you remember where you
6  sent it from?
7      A.    The maintenance shop. Stamp
8  and maintenance shop.
9      Q.    Anybody else see you send it?
10      A.    Drake Barefoot and someone
11  else was there. I don't remember who the
12  other one was.
13      Q.    Do you remember what was in
14  it?
15      A.    It was a -- I don't remember
16  the exact wording, no. I was complaining to
17  Mr. Kimball that Prater was still giving me
18  a hard time about my Guard duty, and I felt
19  that my job was in jeopardy for that reason.
20  Because even -- Like I said, even after my
21  unit sent the letter, I complained to HR at
22  least two more times and both times met with
23  negative results, and I was still getting

30 (Pages 117 to 120)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 121

1   harassed about getting orders for my weekend
2   duty, when I wasn't showing up to work to go
3   to drill.
4        Q.    Was the e-mail after you went
5   to HR?
6        A.    Yes, sir.
7        Q.    And the e-mail was after
8   somebody apparently sent a letter to
9   Hyundai?
10       A.    Yes, sir. After my unit sent
11  the letter.
12       Q.    Okay. Did you talk to anybody
13  else in management or in HR after you sent
14  that e-mail?
15       A.    No, sir. I don't believe so.
16       Q.    Okay.
17       A.    I mean, I don't know. Like I
18  said, that was almost a year ago.
19       Q.    Okay. But you don't recall
20  it?
21       A.    No, sir.
22       Q.    Do you recall having any more
23  discussions with Greg Prater about your

Page 122

1   service or weekend duty or anything after
2   that e-mail got sent?
3        A.    He was always -- If he wasn't
4   telling me to bring in orders about my Guard
5   duty, he was making fun of what we did. Oh,
6   y'all just go down there and drink. Like I
7   said, it didn't matter who I complained to,
8   I complained to Greg Kimball, or Keisha,
9   John Applegate, they all: Well, I've never
10  heard Greg say anything like, I've never
11  heard Greg talk in a derogatory manner.
12       Q.    That's what they said?
13       A.    Yeah. And we back Greg up in
14  any decision he makes.
15       Q.    When you talked to William
16  Ware, who's with team relations, what did he
17  say about it?
18       A.    Prater would always use the
19  excuse that Rob Clevenger just said I can
20  do -- just like in the instance he was
21  trying to make me use my vacation for my
22  military service when I went to school.
23       Q.    Who was?

Page 123

1        A.    Prater. And supposedly
2   Applegate was backing him up, because
3   Applegate backed him on everything else, and
4   HR backed him too. And he told me I had to
5   use my vacation time -- He was thinking
6   about making me use my vacation time in lieu
7   of my military leave. And I said, well,
8   you're just going to go against the HMMA
9   handbook and throw it out the window. Rob
10  Clevenger told me I can do whatever I want
11  to, run my shop however I need to for the
12  benefit of the company.
13       Q.    And this is Greg Prater said
14  that?
15       A.    Yes, sir. Then he said that
16  Rob Clevenger had told him that.
17       Q.    Did John Applegate ever tell
18  him he could do that, to your knowledge?
19       A.    John Applegate told me to my
20  face that whatever decision Greg Prater
21  makes, he would back him on it.
22       Q.    Did anybody else from human
23  resources ever say anything like that, to

Page 124

1   your knowledge?
2        A.    Keisha -- Greg Kimball -- The
3   only reason HR got on to Prater the first
4   time was because he told us we couldn't talk
5   to HR. As far as my military obligation,
6   anything else, nothing ever came out of
7   that. It was just like I hadn't said
8   anything to them at all.
9             (Off-the-Record discussion
10              was held.)
11       Q.    The notes that you said you
12  kept?
13       A.    Yes, sir.
14       Q.    When did you start keeping
15  them?
16       A.    The first time I went to HR.
17  I mean, when Prater -- he was -- He said he
18  was a tank commander in the National Guard
19  as an E-4, that's not allowed. It goes
20  against Army regulation.
21       Q.    Say that again. I'm sorry.
22       A.    He said that he was a tank
23  commander in the National Guard as an E-4.

31 (Pages 121 to 124)

## FREEDOM COURT REPORTING

Page 125

1  He showed me his ID card one time, he was a
2  corporal, and his ID card was expired.  And
3  you're not allowed to be a tank commander in
4  the National Guard or the Army, period, as
5  an E-4.  You have to be an E-7 or higher.
6  But anyhow -- What did you ask me?  What did
7  I start out on?
8      Q.    No.  Let's -- I mean --
9      A.    Like I said, Clevenger and all
10 of them -- His excuse on everything was Rob
11 Clevenger told me I can run my shop how I
12 want to for the benefit of the company.
13     Q.    Okay.  Now, to your knowledge,
14 did Rob Clevenger ever say anything to you
15 about your military service?
16     A.    I never met the man.
17     Q.    So you don't have any
18 firsthand information --
19     A.    But Will Ware sat there and
20 told Prater, well, he can do whatever he
21 wants to, in front of me and everybody.
22     Q.    Said who can do whatever he
23 wants to?

Page 126

1      A.    That Prater could.  And that
2  Applegate and HR could.  He said we can run
3  the company however we want to.
4      Q.    William Ware said that?
5      A.    Yes, sir.  Because Prater put
6  him on the spot, and he had to come up with
7  an answer.
8      Q.    How did Prater put him on the
9  spot?
10     A.    Prater -- Because I was told
11 to stay over that morning.  Their handbook,
12 once again, states that you don't have to
13 stay over -- you can't be forced over ten
14 hours.  I'd worked ten hours, Prater come up
15 and asked questions.  I said as long as it
16 don't take over fifteen minutes, I'm tired.
17 He said, I can force you to stay here
18 twenty-four hours a day if I want to.  I
19 said, no, once again, that goes against your
20 own handbook.
21     Q.    What -- Is this a different
22 conversation here?
23     A.    Yeah.  Like I said he just --

Page 127

1  Everything was Rob Clevenger and human
2  resources and Applegate said I can do this.
3  And every time we talked to human relations
4  or human resources or Applegate, they backed
5  him up on every conversation.
6      Q.    Okay.  Tell me when did -- You
7  first started taking notes when?
8      A.    Like I said, the very first
9  time he got on to me about my Guard duty.  I
10 don't remember the exact date.  I have no
11 idea.
12     Q.    Do you remember the
13 approximate date?
14     A.    No.  I mean, August,
15 September, I don't know.  July, August,
16 September, I don't know.
17     Q.    At that point in time, did he
18 have your calendar for that year?
19     A.    He had my calendar when I
20 hired on.
21     Q.    Okay.
22     A.    We get our yearly training
23 calendar every October.

Page 128

1      Q.    Uh-huh.
2      A.    And he had it in his office on
3  his desk.
4      Q.    Greg Prater did?
5      A.    Yes, sir.
6      Q.    Okay.  So there would be no
7  question that if you were scheduled for
8  duty, he had it in advance?
9      A.    Yes, sir.
10     Q.    Okay.
11     A.    But yet he still wanted
12 military orders.  And I backed him up on it.
13     Q.    Did he want military orders
14 for every single weekend duty, every
15 training --
16     A.    Not the first six or eight
17 months, no, sir.
18     Q.    Okay.  When did he ask for
19 orders?
20     A.    Like I said, I don't remember
21 the exact date.  I don't know.  You're
22 wanting a date, and I can't give it to you.
23     Q.    Can you give me an approximate

32 (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

```
 1   date?
 2       A.    I already did.
 3           MR. SPORT:  Matt, we've
 4   produced those documents, those drill
 5   schedules, but they've not been produced to
 6   us from Hyundai's records, so we'd also like
 7   those.
 8       Q.    And, again, just to make sure
 9   I'm clear, the year that you say that he
10   started demanding orders, that was in 2006?
11       A.    Yes, sir.
12       Q.    Okay.  Do you have any idea
13   approximately how many times Greg Prater
14   asked you for copies of your orders?
15       A.    I don't know.  Seems like it
16   was every month.  But to be honest, the
17   exact times, no.  I have no idea.
18       Q.    Do you remember when the last
19   time he asked you for a copy of your orders
20   was?
21       A.    No, sir.  Like I said, I don't
22   -- the exact dates and times, no, sir.  I
23   don't know.
```

Page 130

```
 1       Q.    Okay.  Was there a period in
 2   time from the date that you were terminated
 3   in which you and Greg Prater did not have
 4   any discussions about your Guard duties?
 5       A.    I don't know.  I filed a
 6   complaint to the ESGR.
 7       Q.    When was that?
 8       A.    I don't know.  I don't know if
 9   it was right before I got fired or after I
10   got fired.  And they basically told me that
11   if Hyundai tells them it's not a military
12   matter, they don't have anything to do with
13   it.  And that's what happened, so that was a
14   deadend street.
15       Q.    Wait.  Who said that?
16       A.    The ESGR representative.  I
17   can't remember his name.  Dan or -- I don't
18   remember.  I e-mailed him and he e-mailed me
19   and he said -- then he called me one time
20   and said, well, I've called them, they told
21   me this has nothing to do with the Guard, so
22   therefore I cannot get involved.  And he
23   went off, all they got to do was a
```

Page 131

```
 1   statement, no, this ain't Guard related, and
 2   he was out of it.
 3       Q.    All right.  You don't remember
 4   who told you that?
 5       A.    The ESGR rep.  I don't
 6   remember his name, no.
 7       Q.    Did he provide you any sort of
 8   paperwork or anything?
 9       A.    No, sir.
10       Q.    Do you know if Hyundai
11   provided him with any paperwork or evidence?
12       A.    No, sir.  He said that -- Per
13   the conversation, he said I called them, and
14   this is what was said, so I'm out of it.
15       Q.    Okay.
16       A.    So I don't know if they
17   provided him with paperwork or not.  I mean,
18   I have no idea.
19       Q.    Again, I just want to make
20   sure I understand what it is he said he was
21   told.  This didn't have to do with guard
22   duty?
23       A.    That's what they told him.
```

Page 132

```
 1   That's what they're going to say.  That's
 2   common sense.  I mean . . .
 3       Q.    And to your knowledge, he
 4   didn't know anything else?
 5       A.    No, sir.
 6       Q.    And you don't remember his
 7   name?
 8       A.    I think it was Dan something.
 9   I don't know.  They've got -- They had
10   copies of the e-mails.  I don't know.
11       Q.    Who is they?
12       A.    Hyundai, I think.  I don't
13   remember.  I seen a copy of it somewhere.  I
14   don't know.
15           (Whereupon, Defendant's
16           Exhibit No. 3 was marked
17           for identification.)
18       Q.    Okay.  Let's go -- I want to
19   go through what we've marked as Defendant's
20   Exhibit 3, which is a copy of the complaint
21   that you and your lawyers filed.
22           If you go over a couple of
23   pages you'll see a page that's marked
```

33 (Pages 129 to 132)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 133

1  complaint.
2      A.    All right.
3      Q.    Did you have an opportunity to
4  review it before it got filed?
5      A.    Yes, sir. I believe so.
6      Q.    Okay.
7      A.    I believe. I don't know.
8  Like I say, that's been a year ago.
9      Q.    Okay. Let's turn to page two,
10 paragraph seven. In there it says you began
11 working on or about November 21, 2005. Do
12 you agree with that?
13     A.    Yes, sir.
14     Q.    Okay. And it says you were
15 working as a maintenance technician in the
16 stamping maintenance department; is that
17 accurate?
18     A.    Yes, sir.
19     Q.    And were you working under the
20 direct supervision of Kevin Hughes, who is
21 identified as a team leader?
22     A.    Yes, sir, he was a team
23 leader.

Page 134

1      Q.    Okay. And were you also
2  working under Greg Prater?
3      A.    Yes, sir. He was the
4  assistant manager.
5      Q.    Okay. And it's indicated in
6  here that Greg Prater reported to John
7  Applegate, is that your understanding?
8      A.    Yes, sir.
9      Q.    And who -- Do you know who
10 John Applegate is?
11     A.    As far as I know, he was the
12 only American in charge of the American side
13 of the maintenance.
14     Q.    What makes you think that
15 Prater was reporting to Applegate?
16     A.    Only thing we had -- That was
17 the way Applegate and Prater put it.
18     Q.    To who?
19     A.    All of us in the section.
20     Q.    Okay. I mean, did you have
21 regular conversations with John Applegate?
22     A.    No, sir. He had an office
23 over in the energy building, and we worked

Page 135

1  over in the stamping shop.
2      Q.    Okay. So when did John
3  Applegate tell you anything about his
4  relationship with Greg Prater?
5      A.    As in?
6      Q.    His working relationship, who
7  reported to who?
8      A.    Well, the very first time I --
9  I believe it was the first time I went to
10 HR. Then after HR, Applegate wanted to know
11 why we had gone to HR, I believe.
12     Q.    When you say "we went to HR,"
13 who are you talking about?
14     A.    I, myself, Barefoot, and
15 Weihe.
16     Q.    All right. And what was that
17 about?
18     A.    It all started with me because
19 of Prater and my Guard duty. Then it went
20 from that to he told -- I told him, I said,
21 well, I'm going to talk to HR about this
22 after this meeting. He said HR is not in
23 your chain of command, you don't have the

Page 136

1  authority to talk to them.
2      Q.    Who said that?
3      A.    Prater. I said -- Well, I
4  said, the handbook we're supposed to be
5  going by says HR has an open-door policy,
6  and I can talk to them any time. And I
7  said, you're telling me my Guard duty is a
8  problem, I said, I'm going to talk to HR.
9  And Chris Weihe and Barefoot said, well,
10 we're going to talk to them too. They had
11 their own issues.
12     Q.    Let me ask you this. So you
13 sat down with Greg Prater and Chris Weihe?
14     A.    No. He called the whole shift
15 in. It started out about a schedule. He
16 called the whole shift in, some goof up
17 about a schedule, the weekend. They got a
18 force list, an overtime force list. And he
19 would just take his force list and disregard
20 it, his own list, and that Applegate had
21 signed off on and HR had signed off on, and
22 threw it out the window and come out with
23 his own list. I had Guard duty that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 137

1  weekend, I said, I'm not going to be here.
2  He said, you're going to be here or you're
3  going to produce orders. I said, I'm going
4  to talk to HR.
5      Q.   Okay. And Chris Weihe and
6  Drake Barefoot were in on that discussion?
7      A.   The whole shift was.
8      Q.   Okay. And tell me more. What
9  else did Greg Prater say -- Was that the
10  first time you had a problem with him about
11  your Guard duty?
12      A.   That's where it all started,
13  yes.
14      Q.   Okay.
15      A.   Wasn't the first time. I'd
16  been blowing it off up to this point.
17      Q.   Okay. Who did you go see --
18  Well, did you go see --
19      A.   That was the first time I went
20  to HR and complained about it.
21      Q.   Is that when you talked to
22  Keisha?
23      A.   No, sir. That's when I talked

Page 138

1  to Greg Kimball. He was the very first one
2  I talked to. I was told that he was the man
3  in charge of human resources, and that's who
4  I talked to.
5      Q.   And you spoke to him face to
6  face?
7      A.   Yes, sir. In his office.
8      Q.   Okay. I mean, did you submit
9  anything in writing to him?
10      A.   No, sir.
11      Q.   Any e-mails at that time?
12      A.   No, sir.
13      Q.   I mean, did you just show up
14  in his office, did you schedule a meeting
15  with him?
16      A.   I took my lunch break. I did
17  not leave my work floor --
18      Q.   What time was your lunch
19  break?
20      A.   I don't remember.
21      Q.   You were working the night
22  shift?
23      A.   No. I was on the day shift

Page 139

1  the very first time it happened.
2      Q.   Okay. Let me go back to your
3  complaint. In paragraph eight there on page
4  three, it says that harassment of Dees by
5  Hyundai through Prater and Hughes began
6  almost immediately when Prater learned that
7  Dees was a member of the Alabama Army
8  National Guard and had served two tours in
9  Iraq.
10          Did Greg Prater -- How did
11  Greg Prater harass you because you were a
12  member of the Guard or because you served to
13  tours in Iraq?
14      A.   He said that -- He made the
15  comment that he had been in Baghdad, he had
16  killed people, he had been a Navy SEAL, he
17  had been a tank commander. And when I asked
18  him where he was at in Baghdad, he says --
19  when I asked him where he was in Iraq, I was
20  on the southside of Baghdad. I said, what
21  compound? I don't remember, there was so
22  many. I said, what was the name of the
23  compound? I don't remember. You know how

Page 140

1  it was there was compounds all over the
2  southside of Baghdad. I said, no, there
3  wasn't, there was one, the one I lived in.
4          And I had put him on the spot
5  because I listened to him six or eight
6  months, him and Applegate come around and
7  Prater start running up and talking about
8  how he been in combat and killed so many
9  people. And Applegate was like, yeah, this
10  is my boy. And I got friends that died in
11  Iraq, I've killed people in Iraq, and my
12  friends served proudly in Iraq. And
13  Applegate and HR and everybody was making a
14  disgrace of what we had done.
15      Q.   Well, what --
16      A.   When I went to them with my
17  complaints about my Guard duty, being forced
18  to produce military orders, they were like,
19  well, we'll look into the regulations.
20      Q.   Did Applegate ever demean you
21  or try to diminish your service in Iraq in
22  any way?
23      A.   He basically sat there the

35 (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1  last -- said, well, I know Prater is a hero.
2  And he's -- like I said, basically he's my
3  man, he's my boy.
4      Q.    When did he say that?
5      A.    I don't remember the exact
6  date. I don't know.
7      Q.    Okay.
8      A.    Ask him.
9      Q.    Other than saying good things
10  about Prater, did he say anything bad about
11  you or your service?
12      A.    Directly, no.
13      Q.    Indirectly what did he say?
14      A.    Well, I -- I don't know. Like
15  I say, that's been a long time ago.
16      Q.    All right. I need --
17      A.    And just -- You're asking a
18  question I can't answer.
19      Q.    That's fine. If you can't
20  answer, that's all I need to know.
21      A.    He'd make comments like: What
22  do you need to go down there for, all y'all
23  do is party.

Page 142

1      Q.    Who said that?
2      A.    Prater --
3      Q.    I know. Let's talk about
4  Applegate. Let's try to do this in some
5  orderly fashion.
6      A.    It's my depo, so I've got to
7  go at my own rate.
8      Q.    All right. Let me ask you
9  this: Am I hearing you correctly that you
10  don't have anything to tell me about ways
11  that Applegate either directly or indirectly
12  said bad things about you or your service?
13      A.    No. Just, like I said, that I
14  need to focus more on my job and not worry
15  about my Guard duty, and most of the time
16  all they do is party down there anyhow.
17      Q.    Is that the worst thing that
18  Applegate said?
19      A.    Yeah. Other than like I said,
20  just backing Prater up saying whatever
21  Prater decides is what I'm going with.
22      Q.    And are you telling me that
23  John Applegate told you that all y'all do

Page 143

1  when you do this duty is party?
2      A.    To my face, yes.
3      Q.    Okay. So did he and Prater
4  say that?
5      A.    Prater said that in front of
6  everybody.
7      Q.    Okay. Who did John Applegate
8  say it in front of?
9      A.    Me. Like I said, I had to
10  have meetings -- If I complained to HR, I
11  had to go see Applegate.
12      Q.    There are no witnesses to
13  Applegate saying all y'all do is party;
14  right?
15      A.    Nope.
16          Did your lawyers interview him
17  too?
18      Q.    Let me ask you about Keisha.
19  Did Keisha ever say anything to you about
20  you or your service in the Guard or Iraq?
21      A.    No. She just said I had to
22  have orders before I could be deployed or
23  sent out.

Page 144

1      Q.    Did Greg Kimball ever say
2  anything about you or your service in the
3  Guard or Iraq or Korea or anywhere else?
4      A.    No. The only thing he was
5  worried about was that Prater told us we
6  couldn't talk to human resources. He didn't
7  care about -- basically didn't care about
8  the complaint I was making about Prater
9  harassing me about my Guard. The only thing
10  he worried about was Prater telling we
11  couldn't talk to human resources.
12      Q.    Because he disagreed with it?
13      A.    Yeah. Because it's basically
14  telling him that he's not over Prater, that
15  Prater can do whatever he wants. That's the
16  only reason he got -- He could care less
17  whether Prater was harassing me about my
18  Guard service.
19      Q.    What makes you think he could
20  care less?
21      A.    Because nothing was done about
22  it, ever.
23      Q.    Let me ask you this: Did

36 (Pages 141 to 144)

# FREEDOM COURT REPORTING

Page 145

1  Kimball ever say anything to suggest that
2  either you or your service in Iraq or the
3  Guard was insignificant?
4      A.  No.  Like I say, the only
5  thing he cared about was Prater saying we
6  couldn't talk to him.
7      Q.  Okay.
8      A.  But that still doesn't excuse
9  the fact that he let Prater get away with
10  telling me I had to have military orders or
11  I was going to get wrote up for missing
12  work.
13      Q.  Did William Ware ever say
14  anything to you about your military service,
15  your Guard duty service in Iraq?
16      A.  No.  Will's only job there was
17  to keep the union out, keep peace, and tell
18  us that Prater could do whatever he wanted
19  to.
20      Q.  Okay.  Did anybody other than
21  Applegate and/or Prater say anything about
22  your service in Iraq, your service in the
23  National Guard, or your uniformed service?

Page 146

1      A.  No.  But like I said, that
2  doesn't change the factor or dismiss the
3  fact that they let him tell me I had to have
4  military orders or I was getting wrote up.
5      Q.  All right.  And understand,
6  I'm trying to figure out what the evidence
7  is, I'm trying to figure out what people
8  said and what you know.
9      A.  Uh-huh.
10      Q.  So, I want to figure out who
11  said what.
12      A.  All right.
13      Q.  Can you think of anybody else,
14  other than Applegate or Prater, that ever
15  said anything or did anything to you that
16  was harassing or demeaning in any way with
17  respect to your uniformed service?
18      A.  No.  I never had a problem
19  with anyone else about it.
20      Q.  Okay.  And with respect to
21  Applegate, I just want to make sure I
22  understand exactly what it is he said and
23  did.  Am I correct that he made a comment

Page 147

1  that during your reserve or Guard duty
2  people partied?
3      A.  Yes.
4      Q.  And did he ever say anything
5  else that was demeaning or insulting or
6  harassing in any way with respect to your
7  service?
8      A.  Other than backing Prater up
9  about having to have military orders, no.
10      Q.  Okay.  So backing Prater up
11  about orders?
12      A.  Yeah.
13      Q.  Okay.  You've indicated in
14  paragraph nine of your complaint in
15  subparagraph B, that Prater told you you
16  couldn't miss work to attend Guard training?
17      A.  Yes, sir.
18      Q.  Was that on one occasion or
19  multiple occasions?
20      A.  That was on multiple
21  occasions.
22      Q.  Okay.  And do you remember
23  specifically any of those particular

Page 148

1  occasions?
2      A.  Well, I mean, sometimes he'd
3  just walk up and say, hey, you've got to
4  have orders this weekend or it's a write-up,
5  and sometimes he'd say it in front of
6  everybody.
7      Q.  Did he ever write you up for
8  not having orders?
9      A.  No, sir.
10      Q.  Did anybody ever write you up
11  for anything related to your military
12  service?
13      A.  Not that I know of.  I don't
14  know.  I never signed anything.
15      Q.  Okay.  And you were never told
16  that you were being written up after the
17  fact?
18      A.  After the fact, no, sir.  He
19  just still kept coming up harassing me
20  saying where's your orders, where's your
21  orders.
22      Q.  Did you ever not attend any
23  Guard duty because of --

37  (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1    A.    Because of work?
2    **Q.    Because of Greg Prater or**
3    **work?**
4    A.    I don't know. I'd have to go
5    back and look at my LES's and see.
6    **Q.    Let me ask you this:  Do you**
7    **remember ever skipping any Guard duty on a**
8    **weekend, or a week-long duty, or any sort of**
9    **training because of your job at Hyundai?**
10    A.    I don't know.  I may have.
11    **Q.    But you don't remember it?**
12    A.    I may have.  I don't know.
13    **Q.    Do you remember it?**
14    A.    I said I don't know.
15    **Q.    Okay.  And I assume you**
16    **haven't provided your attorneys with any**
17    **information to suggest you ever missed any**
18    **Guard duty because of your work at Hyundai?**
19    A.    Like I said, I can go back and
20    look at my LES's and see.
21    **Q.    All right.  Let me ask you**
22    **this:  In paragraph 9-E of your complaint it**
23    **says:  Prater attempted to force Dees'**

Page 150

1    **coworkers to say that Dees had violated**
2    **Hyundai's policies and procedures when**
3    **Prater knew it was not true.**
4    **Do you have any idea from a**
5    **factual perspective what that means?**
6    A.    Yes, sir.
7    **Q.    Tell me about that.**
8    A.    About a month before I was
9    fired he tried to get one of my coworkers to
10    say that I was creating a hostile work
11    environment.
12    **Q.    Who did he say that to?**
13    A.    Shane Archer.
14    **Q.    What did he say to Shane?**
15    A.    He wanted Shane to say -- He
16    called Shane in the office with team
17    relations and wanted Shane to specifically
18    say that Leon was creating a hostile work
19    environment.
20    **Q.    You think he called Shane into**
21    **a meeting with team relations?**
22    A.    We all saw Shane go in the
23    office with him and team relations.  And

Page 151

1    Shane said out of his own mouth that that's
2    what Prater had said and he made the
3    statement -- he wrote a statement saying
4    that.
5    **Q.    Okay.  Who from team relations**
6    **were they with?**
7    A.    Will Ware.
8    **Q.    Were there any other instances**
9    **that fall within what you've described in**
10    **paragraph 9-E?**
11    A.    Yeah.  One other time that I
12    had a breakdown, Prater tried to get Shane
13    to say that I said, heck with the breakdown,
14    let's just go to lunch.  And I never stated
15    that.  That was Shane, myself, and Drake
16    Barefoot there.  And Drake was the one that
17    made the comment, but Prater wouldn't talk
18    to Drake.  And I asked him what happened, he
19    called Shane in once again trying to get
20    Shane to say I had caused the breakdown and
21    just walked off and left it, when Drake had
22    to run him down that I'm the one that stated
23    it --

Page 152

1    **Q.    That you stated what?**
2    A.    That I didn't, that Drake
3    stated it.
4    **Q.    Did you walk off the**
5    **breakdown?**
6    A.    No.
7    **Q.    You did not?**
8    A.    No.  We took our lunch shifts
9    -- Half the shift come in an hour early and
10    other shift came in an hour late.  We split
11    our lunch breaks up.  We had a breakdown in
12    my section.  The SOP asked -- that I was
13    told to stay in is where they supposedly
14    caught me sleeping.  It's out in open view
15    of everybody.  And I was working on it, we
16    had worked fifteen minutes over into our
17    lunch break, and myself and Drake was
18    working on it.  I handed my radio to Shane,
19    said call Kevin and get him to get the other
20    ones out here, they're fifteen minutes into
21    our lunch break, they're over theirs, tell
22    them to come finish up.  Shane went up and
23    took the radio, went downstairs, he found

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1  Kevin told him what was going on, me and
2  Drake was still working on the breakdown.
3  Kevin came up, everything was explained to
4  him, told him what he had to do to fix it.
5  Drake said, heck with this, he used a
6  four-letter word, said, we're going to
7  lunch. Kevin said, well, I don't know how
8  to fix this. Drake says, you need to step
9  up and do your job. We told you how to fix
10 it, we're going to lunch. And the other
11 shift came out, took the breakdown.
12        When I came in the next night,
13 the same thing, Jim Brookshire and Prater
14 and them was in there telling me that I had
15 walked off of a breakdown and left the line
16 down.
17    Q.    You said Brookshire was there?
18    A.    Yes, sir. Trying to chew me
19 out for having a breakdown. Drake seen what
20 was going on, come in and to talk to them.
21 They said, no, we got this. He called Shane
22 in and tried to get Shane to say Leon said
23 such and such. Drake come and said this is

Page 154

1  what happened, I'm the one that said what
2  you're trying to blame on him, this is how
3  it happened. They didn't want to talk to
4  Drake, he had to force them to listen.
5    Q.    Were you written up or
6  anything for that?
7    A.    No. I would have been if it
8  hadn't been for Drake.
9    Q.    Was there another incident
10 where you walked off your job to your
11 recollection?
12    A.    I don't believe so. After
13 reading all the stuff from Hyundai,
14 apparently they had a lot to say about me.
15    Q.    But to your knowledge, this
16 incident that you're talking about, was it
17 investigated by team relations?
18    A.    No. It was investigated by
19 Prater, the same one who investigated me for
20 supposedly sleeping, and firing me. He did
21 the sole investigation.
22    Q.    You think Prater did?
23    A.    That's what their statements

Page 155

1  are saying.
2    Q.    Whose statements?
3    A.    Will Ware's and Prater's.
4    Q.    Okay.
5    A.    That's what he admitted to the
6  coworkers after I was fired. This Wendy
7  Warner totally bypassed all their own
8  policies in their handbook for termination,
9  their termination procedure, and fired me
10 right off the bat, off someone else's word.
11 That's what I'm saying, everybody knew about
12 the problem, and everybody supported him on
13 every decision he made; they supported
14 Applegate, human resources.
15    Q.    Can you think of any other
16 instances that fit within paragraph 9-E of
17 your complaint?
18    A.    I don't know. You keep
19 asking, there may be something. I don't
20 know.
21    Q.    That's why I keep asking.
22    A.    I don't know. Maybe. I don't
23 remember anything else right now at this

Page 156

1  moment.
2    Q.    Okay. Paragraph 9-F of the
3  complaint talks about having to clean out
4  the pit.
5    A.    Yes, sir.
6    Q.    All right. Let's talk a
7  little bit about the pit. Is there just one
8  pit at the plant?
9    A.    Yes, sir. It's all one big
10 system.
11    Q.    I mean, is there one pit or
12 two pits or three?
13    A.    There was one -- After I
14 answer this, we've got to go to lunch. My
15 stomach is growling.
16        There's a pit under each
17 press.
18    Q.    All right. So there's more
19 than one pit?
20    A.    There's two presses and one
21 pit under the -- what's that other -- I
22 can't remember what that other press is
23 called, where it all -- scrap comes from two

39 (Pages 153 to 156)

# FREEDOM COURT REPORTING

Page 157

1  pits on a metal conveyor and goes down to
2  that where it's all crushed into one bale
3  and sent out and sold for scrap.
4      Q.    Okay.
5      A.    But I was always sent under
6  press one or two pit to clean up.
7      Q.    Okay.
8      A.    It's a dangerous process.
9  Because when you get down there, you have no
10  communication with nobody.  If anything
11  happens to you, you're there until somebody
12  decides to come looking for you.
13      Q.    Let me ask you this:  What
14  evidence do you have to suggest that anybody
15  at Hyundai assigned you to clean the pit to
16  try to get you to quit your job?
17      A.    Because after all this stuff
18  come up and my unit sent the letter, it
19  wasn't but a few weeks after that, I was
20  getting sent down to the pit to clean it, at
21  least once, two or three times a week,
22  sometimes three or four times a week.
23  Wasn't even our responsibility, production

Page 158

1  was supposed to clean the pit.
2      Q.    Production was supposed to
3  clean the pit?
4      A.    Yes, sir.  Like I said, we had
5  radios, but when you get to the pit, you
6  have no communication.
7      Q.    Why -- I mean, if somebody
8  from production is supposed to clean the
9  pit, did anybody from maintenance ever clean
10  the pit before you?
11      A.    Yes, sir.
12      Q.    All right.
13      A.    When they would make Prater
14  mad.
15      Q.    Okay.
16      A.    Or if they made Kevin mad or
17  if they made Jim Brookshire mad or if they
18  made Craig Stapley mad.
19      Q.    Those are production guys,
20  Brookshire and Stapley?
21      A.    Doesn't mean nothing though.
22  If they told you to go clean the pit, you
23  had to go clean the pit.

Page 159

1      Q.    So am I right, that the pit,
2  it wasn't like something that was cleaned on
3  schedule?
4      A.    No, sir.  Well, it was
5  supposed to be but, no, sir.
6      Q.    Okay.  Wasn't like there was a
7  schedule posted on the wall for who was
8  supposed to clean it when and that kind of
9  stuff?
10      A.    No, sir.  That was a
11  production thing.  But it didn't turn out to
12  be a production thing.
13      Q.    How many times do you think
14  you had to clean the pit?
15      A.    God, I don't know.  Like I
16  said, several weeks, at least two, three,
17  four times a week.
18      Q.    How often --
19      A.    Huh?
20      Q.    How often would your coworkers
21  in maintenance clean it?
22      A.    Nowhere near -- Mark Hanks
23  cleaned it once I think.

Page 160

1      Q.    Okay.
2      A.    Other than that, I don't
3  remember anybody being singled out to go
4  clean it.
5      Q.    Did anybody clean it as often
6  as you did?
7      A.    No, sir.
8      Q.    Did anybody clean it more than
9  you did?
10      A.    No, sir.
11      Q.    And other than Mark Hanks
12  cleaning it once, can you think of anybody
13  else who had to clean it one or more times?
14      A.    Not individually.  Sometimes
15  he'd send a whole shift down there once
16  every three or four months to clean it.
17      Q.    And is it your testimony the
18  pit got cleaned based purely on somebody
19  like Hughes or Prater or Brookshire or
20  Stapley telling you or your coworkers to go
21  do it?
22      A.    Yes, sir.
23      Q.    All right.  Let's say if you

40 (Pages 157 to 160)

# FREEDOM COURT REPORTING

Page 161

1 were working on -- is the -- Are the presses
2 numbered one and two?
3     Q.    Yes, sir.
4     Q.    Would your maintenance duties
5 be assigned to either press one or press two
6 on a given shift?
7     A.    There was maintenance
8 personnel on my shift assigned to those
9 presses. That wasn't even my area of
10 responsibility.
11     Q.    Okay. What was your area of
12 responsibility?
13     A.    SOPS.
14     Q.    Okay.
15     A.    When we came in, we was told
16 to get our tool bags, get the brief from the
17 off-going shift, and go to our areas of
18 responsibility. Mark Hanks had to stay on
19 press one, Darrel Gray press two, Drake
20 Barefoot on that other stamping press, I
21 can't remember what it was called, Chris
22 Weihe had to handle ASRS, and I had the
23 SOPS, and Shane was a floater.

Page 162

1     Q.    Okay.
2     A.    And I ended up running the
3 SOPS for the production people; I went above
4 and beyond my spectrum of duty. I was
5 supposed to be there for breakdowns. If it
6 broke down, I was supposed to fix it. They
7 was only allowed to run so many parts, like
8 so many Sonata right side outers, they get
9 to running good and they'd run way over
10 their quota. I'd have to go up there and
11 operate the system for them so they could do
12 that. I became instead of -- basically a
13 production worker. And if I hadn't have
14 done it, they wouldn't have ran. So it
15 ain't like I was a slouch. I could have
16 said, no, that's not my scope of duty. I
17 helped out. You can ask production, I even
18 went back there sometimes and I'd help them
19 catch panels if they was getting in a bind.
20     Q.    In your complaint it says you
21 cleaned the pit almost daily some weeks; is
22 that true?
23     A.    Yes, sir.

Page 163

1     Q.    And that's five days a week?
2     A.    Sometimes it's seven days a
3 week.
4     Q.    Sometimes seven days a week.
5     A.    We'd work a weekend off,
6 weekend on. Sometimes we might get a Sunday
7 off. I mean, I never cleaned it seven days
8 in a row, no.
9     Q.    Okay.
10     A.    Even after I complained about
11 it.
12     Q.    Did you clean it five days in
13 a row?
14     A.    Fricken Applegate told me
15 don't worry about it, it all pays the same.
16     Q.    Did you ever clean it five
17 days in a row?
18     A.    I may have. I don't know. I
19 mean, I cleaned it so many times so much, I
20 don't know.
21     Q.    Is it your testimony that you
22 cleaned it significantly more than any of
23 your coworkers?

Page 164

1     A.    Yes, sir. And they'll tell
2 you that.
3     Q.    Okay.
4     A.    As they told -- I believe -- I
5 don't know, you'd have to ask the lawyer who
6 interviewed the three.
7     Q.    I've talked to him.
8         Anyway, let me ask you this,
9 in paragraph ten it says: Applegate wrote
10 up about each and every action by Prater and
11 Hughes. He stood behind each and every
12 decision they made in running the stamping
13 department and refusing to act on or even
14 investigate complaints to Applegate about
15 Prater and Hughes.
16         We've talked a lot about what
17 Applegate said in terms of it's Prater's
18 department and he runs it. Is there more to
19 that story than you and I have talked about
20 so far?
21     A.    No. Like I said, even if I
22 complained about cleaning the pit all the
23 time, and Applegate asked me, said, what's

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1  it to you, it all pays the same?  I said,
2  well, it seems funny after this letter came,
3  all of a sudden I'm cleaning the pit all the
4  time.  He said, well, that letter don't have
5  nothing to do with this, it's just a
6  maintenance thing.  I said, well, we don't
7  normally clean it.  Well, it all pays the
8  same, don't worry about it.
9      Q.    Did you talk to him about the
10  fact that it's typically production that
11  cleans the pit but they're making
12  maintenance people clean it?
13      A.    Yes, sir.
14      Q.    And he said he's okay with
15  that --
16      A.    Don't worry about it, it all
17  pays the same.
18      Q.    In paragraph eleven of your
19  complaint you say that the harassment --
20      A.    Are you ready for chow?
21      Q.    Not yet.
22          I mean, if you're ready to go,
23  we'll go.

Page 166

1      A.    I'm hungry.
2          MR. JOHNSON:  Y'all ready to
3  take a break?
4          (Recess taken.)
5          MR. KILBORN:  I want to mark
6  this as --
7          MR. JOHNSON:  It's marked as
8  Exhibit 4.
9          (Whereupon, Defendant's
10          Exhibit No. 4 was marked
11          for identification.)
12          MR. KILBORN:  Defendant's
13  Exhibit 4 was just produced about ten
14  minutes after one, during Leon Dees's
15  deposition; it should have been produced
16  before.  It's obviously on the subject of
17  Guard duty; it's obviously on the subject of
18  human resources; and on the subject of Leon
19  Dees.  And I've asked -- I've told counsel I
20  want to redepose Wendy Warren on the subject
21  matter of this e-mail.
22          MR. JOHNSON:  Just for the
23  Record, with respect to Exhibit 4, this was

Page 167

1  the exhibit that came up, was identified
2  initially by Mr. Dees, which had not been
3  previously identified in Mr. Dees' discovery
4  responses by Mr. Dees or his counsel.  Once
5  it was identified by Mr. Dees during his
6  deposition, we were able to contact the
7  Hyundai plant and have it faxed to the court
8  reporter's office.  We've now marked it as
9  Defendant's Exhibit 4 and provided a copy to
10  Mr. Dees' lawyers, who had not identified it
11  previously.
12          MR. KILBORN:  I also note for
13  the Record that the letter that Sergeant
14  Barnes wrote has not been produced, which is
15  a key letter in this case.  And we've asked
16  that it be produced, that a search be made
17  for it.  That's a letter identified in
18  Franklin D. Barnes Dees 00002 dated March
19  26, 2007.
20          MR. JOHNSON:  Is that all?
21          MR. KILBORN:  That's it.  Go
22  ahead.
23      Q.    Mr. Dees, we're going back on

Page 168

1  the Record.  I've got a couple of questions
2  to ask you.
3          We've now marked an exhibit
4  that you mentioned previously in your
5  deposition, that we've gone back and gotten,
6  we've marked as Exhibit Number 4.  I know
7  that you and your lawyers have had an
8  opportunity to review that exhibit; is that
9  accurate?
10      A.    Yes, sir.
11      Q.    Okay.  And is that, in fact,
12  the e-mail that you testified to prior to
13  our lunch break?
14      A.    This is it.
15      Q.    Okay.
16      A.    6 February '07.  I asked
17  Mr. Kimball for a meeting, because, like I
18  said, both times I even had to file the
19  complaint through my unit.  And after
20  positive results, meeting the first time, we
21  went there, Prater told us we couldn't talk
22  to HR.  My unit stayed abreast of the
23  meeting, and it would die back down for a

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 169

1  week, and then everything else would kick
2  back up. Nothing changed over all. I'm
3  currently working night shift, and we would
4  greatly appreciate a meeting at your
5  convenience. And a week or two later I was
6  fired.
7      Q.    Now, if I could just look at
8  that. Again, this e-mail was sent on
9  February 6th of '07, does that sound right
10 to you?
11     A.    Yes, sir.
12     Q.    At that time, do you know
13 whether Greg Kimball was actively employed
14 or on leave from the plant?
15     A.    No one had told us he wasn't
16 there. Like I said, I worked night shift.
17     Q.    Did you know him personally?
18     A.    Did I know him personally?
19 You mean away from the plant?
20     Q.    No. I mean, did you know him?
21 You'd know him if he walked into the room
22 and talked to him?
23     A.    Yes, sir.

Page 170

1      Q.    Had you talked to him before?
2      A.    Yes, sir.
3      Q.    Had you talked to him
4  previously about any issues you may have had
5  with Greg Prater?
6      A.    It wasn't Prater specifically.
7  Like I said before, he was the very first
8  person I talked to when I went to HR.
9      Q.    Okay. But you didn't talk to
10 him about Prater specifically?
11     A.    Well, about Prater and
12 Applegate and having a problem with my Guard
13 duty, yes, sir, I did.
14     Q.    Okay. And what -- And I'm
15 just trying to think back to what we talked
16 about earlier this morning. I want to make
17 sure I'm right. That was what you had
18 testified to earlier, the year before you
19 got fired in the -- I think you testified in
20 the fall?
21     A.    Do what now?
22     Q.    The meeting -- That first
23 meeting you had with Greg Kimball.

Page 171

1      A.    Yes, sir.
2      Q.    Was that a meeting -- Was that
3  the year before you got terminated in that
4  fall period that you testified to?
5      A.    Yes, sir.
6      Q.    Okay. And where did that
7  meeting take place?
8      A.    In Greg Kimball's office.
9      Q.    Okay. And am I right that
10 neither you nor Greg Kimball produced
11 anything in writing after that meeting?
12     A.    No, sir.
13     Q.    And one of the things that it
14 says here on Defendant's Exhibit Number 4,
15 you'd indicate issues that have arisen on my
16 shift between Greg Prater, Kevin Hughes, and
17 yourself. What was the issue with Kevin
18 Hughes?
19     A.    Like I stated earlier, Kevin
20 had a history of jumping on employees.
21 And --
22     Q.    And when you say jumping on
23 employees, was that having to do with

Page 172

1  military duty or just his style of
2  management?
3      A.    His style of management. I
4  mean, he had -- he had jumped on two or
5  three other employees, one of them twice.
6  He'd get up in their face and holler at them
7  and bow up on them and intimidate them. And
8  he did the same thing to me, and I asked
9  him, I said: Are you bowing up on me? And
10 he made some comment, and I turned around
11 and I left.
12     Q.    Now, did that have anything to
13 do with your military service or your
14 reserve duties or anything like that?
15     A.    That particular incident? I
16 -- I don't know. After the letter came in,
17 and I started having all these problems is
18 when Kevin started -- I mean, that's when he
19 started birddogging me.
20     Q.    When who started birddogging
21 you?
22     A.    Kevin Hughes.
23     Q.    When did that start?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 173

1     A.     After -- Like I said, after my
2  letter from the unit came in.
3     Q.     Okay.  That's the letter from
4  Sergeant Barnes?
5     A.     Yes, sir.
6     Q.     Do you remember when that
7  letter came in?
8     A.     As I stated earlier, no, sir.
9     Q.     Do you recall who it was sent
10 to specifically?
11    A.     Yes, sir.  Like I stated
12 before, Greg Kimball.
13    Q.     Okay.  Did you ever talk to
14 Greg Kimball about whether or not he'd
15 actually gotten that letter?
16    A.     No, sir, I did not.
17    Q.     Do you have any evidence that
18 Greg Kimball or anybody else in Hyundai
19 management received the letter?
20    A.     I said just John Applegate
21 saying: Don't worry about that letter,
22 we've seen it, something to that effect.  I
23 don't remember exactly what his words were,

Page 174

1  but, yeah, he admitted the letter was there.
2     Q.     Do you remember when he said
3  that?
4     A.     I think it was the second
5  meeting I had with him.  I don't remember.
6     Q.     Second meeting with Applegate?
7     A.     Yeah.  I mean, I don't know to
8  be honest.  I can't say either way.
9     Q.     How many meetings did you have
10 with Applegate?
11    A.     I don't know.  Two, three.
12 Whatever I said this morning.
13    Q.     Okay.  In your letter to Greg
14 Kimball that we've marked as Exhibit 4 you
15 say:  I have talked to human resources on
16 two separate occasions regarding Greg Prater
17 and also filed a complaint on him through my
18 National Guard unit.
19    A.     Yes, sir.
20    Q.     Were the two separate
21 occasions the one time that you talked to
22 Greg Kimball and then when you talked to
23 Keisha?

Page 175

1     A.     No, sir.  The two separate
2  occasions was what it says, it was two
3  separate occasions.
4     Q.     But I'm trying to figure out
5  when those two separate occasions were and
6  who were they with?
7     A.     What do you mean?
8     Q.     On February 6th you basically
9  say you had two separate occasions that you
10 had discussions with human resources; right?
11    A.     Yes, sir.
12    Q.     Okay.  I want -- I'm just
13 trying to figure out if we can pin down when
14 those were and who you talked to.
15    A.     It's like I stated earlier
16 this morning, I don't know the exact dates.
17 That was over a year ago.  No, I don't.  I
18 don't know specific dates, times, no, sir.
19    Q.     Do you recall who they were
20 with?
21    A.     Like I stated this morning,
22 the first meeting was with Greg Kimball --
23    Q.     Okay.  That's one.

Page 176

1     A.     -- in HR, and the last two I
2  believe was with Keisha.
3     Q.     Okay.  So other than Greg
4  Kimball and Keisha, you don't recall having
5  discussions with anybody in HR?
6     A.     No, sir.
7     Q.     No, sir, I'm wrong or no, sir,
8  you didn't have meetings with anyone else?
9     A.     No, sir, I don't recall having
10 meetings with anyone else in HR.
11    Q.     And did Keisha ever say
12 anything to you that in any way demeaned or
13 insulted your prior uniformed service?
14    A.     No, sir.
15    Q.     Do you have any reason to
16 think that Keisha in any way influenced the
17 decision to terminate your employment?
18    A.     I have no idea who had any --
19 I don't know.  You're standing at work,
20 somebody comes up and tells you you're
21 fired, I mean --
22    Q.     Let me ask you this:  Do you
23 have any information to suggest who was

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1  involved in the decision to terminate your
2  employment?
3      A.    Rephrase.
4      Q.    Do you have any knowledge as
5  to who was involved in the decision to
6  terminate your employment?
7      A.    Nope.  I mean -- No.
8      Q.    Do you know whether Greg
9  Prater was involved?
10     A.    Well, I read statements that
11  he wrote.
12     Q.    Other than the statements that
13  he wrote --
14     A.    And he told the coworkers that
15  he did the investigation and it was his
16  decision.
17     Q.    Okay.  Who did he say that to?
18     A.    My shift.  But, they also said
19  that -- I believe it was that -- I don't
20  know, how was it phrased?
21          He didn't make the actual --
22  He can only make a recommendation.  The
23  actual decision had to come from HR.

Page 178

1      Q.    Okay.  And do you know who in
2  HR was involved in that decision-making
3  process?
4      A.    No, sir, I do not.
5      Q.    Also on Exhibit 4 it indicates
6  here that -- or you say:  There have been
7  positive results from both meetings and once
8  again I am seeking your help.
9          What were the positive results
10  that came from --
11     A.    Well, the first time Prater
12  said:  Y'all can't go to HR, that's not in
13  your chain of command.
14     Q.    Okay.
15     A.    And I -- Everything with me
16  was military term acronyms, because that's
17  all I've ever known, that's how I live my
18  life.  And HR jumped all over him.  Like I
19  said, that was only for their benefit.
20  Said, yeah, you can talk to us any time you
21  want.  And everything calmed down for a few
22  days or a week, but then same old routine
23  kicked in.

Page 179

1      Q.    What routine?
2      A.    Of getting harassed, are you
3  going to duty this weekend?  Where is your
4  orders?  Are you coming back Monday?  Do you
5  have my orders?  You're going to get wrote
6  up if you miss work.
7      Q.    Did Greg Prater ever do
8  anything other than demand to see orders or
9  suggest that he was going to write you up if
10  you missed work?
11     A.    As in?
12     Q.    You tell me.  I just want to
13  know what he did.
14     A.    I mean, other than hounding me
15  about my orders, harassing me about my duty,
16  HR and Applegate and basically team
17  relations and everyone backing him up, that
18  was pretty much enough.
19     Q.    Okay.  So would it be fair to
20  state that that's all that Greg Prater did
21  or that Applegate or HR did with respect to
22  your service?
23     A.    Well, yeah, I reckon.

Page 180

1      Q.    Okay.  Now, let's look at
2  paragraph twelve of your complaint.  And I'm
3  going to mark --
4          MR. SPORT:  Matt, do you have
5  another copy of that?
6          MR. JOHNSON:  Yeah.  I'm
7  getting it.  Hang on.
8      Q.    I'm going to mark as Exhibit 5
9  a fax cover letter and a letter --
10         (Off-the-Record discussion
11          was held.)
12         (Whereupon, Defendant's
13          Exhibit No. 5 was marked
14          for identification.)
15     Q.    All right.  Mr. Dees, in
16  paragraph twelve of your complaint it
17  references an October 23, 2006, letter from
18  Sergeant Franklin Barnes --
19     A.    I said on or about October 23.
20     Q.    On or about October 23, 2006,
21  Franklin Barnes, of Dees' Guard unit wrote a
22  letter of instruction to the human resources
23  department at Hyundai.  And if you look at

45 (Pages 177 to 180)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 181

1  what we've marked as Exhibit 5, that is
2  apparently a letter from Sergeant Barnes --
3  it says it's a memorandum for Record.
4      Are you aware of anything else
5  that Sergeant Barnes produced that was
6  produced to Hyundai?
7      A.   No, sir.
8      Q.   And let me -- I won't --
9      A.   This is not the actual letter
10  because he didn't keep a copy of the actual
11  letter.  This is in reference to what he had
12  stated -- basically stated.
13      Q.   Okay.  And let me make sure
14  and --
15      A.   On or about 23 October, that's
16  a military term, if you're not sure of the
17  date, exact date, that's what we use.
18      MR. JOHNSON:  Okay.  And let
19  me make sure, Mr. Kilborn or Mr. Sport,
20  we've definitely got one and two here, and I
21  don't want to -- if I'm overlooking or
22  misunderstanding, the 10/23 letter --
23      MR. SPORT:  We have not

Page 182

1  produced it because we don't have a copy of
2  it.
3      MR. JOHNSON:  Okay.
4      MR. SPORT:  It's our
5  understanding that Mr. Barnes cannot locate
6  a copy of it.  Based on his notes, and it
7  would roughly correspond, I believe, to
8  Mr. Dees' drill date of that month, that
9  that's when he wrote the letter.  And based
10  on that, we're requesting that letter from
11  human resources.
12      MR. JOHNSON:  All right.
13  So --
14      MR. SPORT:  Is that what you
15  were asking?
16      MR. JOHNSON:  I think so.
17  Thank you.
18      MR. SPORT:  Okay.
19      Q.   So, Mr. Dees, it's at least my
20  understanding that what we've got here as
21  Exhibit 5, that's different from the letter
22  we were talking about earlier that was sent
23  by Mr. Barnes to the human resources

Page 183

1  department?
2      A.   Yes, sir.  It's not the exact
3  same letter, no.  Sergeant Barnes didn't
4  keep a copy of the letter that was sent.
5      Q.   Did he send a copy to you?
6      A.   No, sir.  I didn't ask him to.
7      Q.   Well, regardless of what you
8  asked him to do, did he send one?
9      A.   No, sir.
10      Q.   Okay.  Do you know if he sent
11  one to anybody else?
12      A.   No, sir.
13      Q.   And you -- Do you know if -- I
14  want to make sure I understand.  Did he keep
15  a copy and lost it or did he not keep a copy
16  to your knowledge?
17      A.   To my knowledge, he did not
18  keep a copy.
19      Q.   Okay.
20      A.   And it not being an official
21  government document, he wasn't required to
22  keep a copy.
23      Q.   Okay.  Then is it your

Page 184

1  testimony it wasn't an official government
2  document?
3      A.   It was a letter -- When you
4  have a problem, you go to your unit.
5      Q.   Okay.  And he was actually
6  your subordinate in the unit; correct?
7      A.   Yes, sir.  But he's the full
8  time AGR person, so it's his job to take
9  care of stuff like that.
10      Q.   Okay.  Did you ask anyone who
11  you were subordinate to to write you a
12  letter like that?
13      A.   No, sir, I did not.  I went to
14  the unit, I talked to Sergeant Barnes.
15  Sergeant Barnes called Sergeant Richberg my
16  superior.  Sergeant Richberg was the senior
17  man, he's retired now, that was off Sergeant
18  Richberg's recommendations.
19      Q.   Okay.  Tell me Sergeant
20  Richberg's full name?
21      A.   Wendell Richberg.
22      Q.   And do you know where he
23  lives?

46 (Pages 181 to 184)

# FREEDOM COURT REPORTING

Page 185

```
1     A.    Anniston.
2     Q.    Anniston. Have you spoken to
3  him since this lawsuit was filed?
4     A.    Friday night.
5     Q.    Okay. Did y'all talk about
6  this lawsuit?
7     A.    No, sir.
8     Q.    Did you talk about your
9  deposition at all?
10    A.    No, sir.
11    Q.    Okay. What about Sergeant
12 Barnes, do you still talk to him?
13    A.    Every month at Guard. He
14 works for me.
15    Q.    At Guard duty. Okay. And,
16 again, going back to Exhibit 5 that we've
17 marked today, is the second page of that a
18 memo that you're familiar with?
19    A.    The actual letter?
20    Q.    Yes.
21    A.    Yes, sir.
22    Q.    You're familiar with that?
23    A.    I read it once.
```

Page 187

```
1     Q.    He retyped this memo?
2     A.    I'm just assuming. Like I
3  said, you'll have to ask Sergeant Barnes
4  this information.
5     Q.    Okay.
6     A.    I'm not going to sit here and
7  answer for him because I don't know.
8     Q.    I want to know what you know.
9  Do you know whether or not this is a retyped
10 memorandum or something he'd done --
11    A.    No, sir, I do not know. Like
12 I stated, I do not know. You'll have to ask
13 Sergeant Barnes, and he'll be glad to talk
14 to you.
15    Q.    Do you know where this copy
16 came from?
17    A.    Sergeant Barnes. It's got his
18 signature on it.
19    Q.    So I'm assuming Sergeant
20 Barnes kept a copy of this one?
21    A.    Apparently so. I don't know
22 that for sure either. I'm not going to say
23 either way.
```

Page 186

```
1     Q.    Did you read it before
2  Sergeant Barnes sent it?
3     A.    No, sir, I do not.
4     Q.    Do you know if Sergeant Barnes
5  sent it to anybody?
6     A.    Sergeant Barnes told me that
7  he sent it to Greg Kimball.
8     Q.    He said he sent it to Greg
9  Kimball?
10    A.    Yes, sir.
11    Q.    Did he indicate he had sent it
12 to anybody other than Greg Kimball?
13    A.    No, sir.
14    Q.    Did he send a copy to you?
15    A.    No, sir.
16    Q.    I assume he saved a copy of
17 this?
18    A.    No, sir.
19    Q.    Do you know where this -- this
20 copy came from?
21    A.    Sergeant Barnes retyped it.
22 You'll have to ask Sergeant Barnes this
23 info. This, I do not know.
```

Page 188

```
1     Q.    And not a copy of the other
2  one?
3     A.    Well, the other one shouldn't
4  have been a problem. He has to do it for
5  civilian law enforcement officers. I mean,
6  he didn't think nothing about it.
7     Q.    Did you ask him to prepare
8  this Exhibit Number 5?
9     A.    I asked him if he had a copy
10 of the letter he sent. He said he would
11 check and see. And he said he did not have
12 a copy. I said, look, what did you write?
13 I said I need a letter about what you said,
14 and that's what he produced. Anything other
15 than that, you'll have to ask Sergeant
16 Barnes.
17    Q.    Okay. So from what you're
18 telling me, either he told you he couldn't
19 find one, and then he found it --
20    A.    No, sir. He did not find it.
21 I never said he found it. I said he did not
22 find it.
23    Q.    Okay. That's fine.
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 189

1    To your knowledge, was this
2  done on March 26th originally?
3    A.    I have no idea.
4    Q.    Okay.  Do you have any idea
5  when he initially prepared it?
6    A.    No, sir.
7    Q.    All right.  And was -- The
8  first page of Exhibit 5 is to Mrs. Dees, I
9  assume that's your wife?
10   A.    Yes, sir.
11   Q.    Was this faxed to some fax
12 numbers of hers or at her office somewhere?
13   A.    Yes, sir.
14   Q.    Did you ask Sergeant Barnes to
15 send it to your wife?
16   A.    Yes, sir.
17   Q.    And was it at her office?
18   A.    Yes, sir.
19   Q.    Where does she work?
20   A.    Peachtree Bank in Maplesville,
21 Alabama.
22   Q.    So to your knowledge, Sergeant
23 Barnes sent this to her bank?

Page 190

1    A.    Yes, sir.
2    Q.    And did she bring it home to
3  you?
4    A.    Yes, sir.
5    Q.    And it looks like it was faxed
6  on March 26th; is that accurate?
7    A.    Yes, sir.
8    Q.    And do you recall whether that
9  was when you got it or not?
10   A.    Yeah.  She got it that day,
11 she brought it home that evening, yes, sir.
12   Q.    All right.  Had you talked to
13 Sergeant Barnes that day?
14   A.    I don't know.  I don't know.
15   Q.    Okay.  Do you remember talking
16 to Sergeant Barnes asking him to send you
17 some sort of memorandum for the Record or
18 something telling what he had done in the
19 past?
20   A.    Yes, sir.
21   Q.    Did he fax this to you on the
22 same day or did this take place at a later
23 time?

Page 191

1    A.    I don't know.
2    Q.    Okay.  Do you know if Sergeant
3  Barnes ever called Hyundai's HR department
4  for any reason?
5    A.    Not to my knowledge.
6    Q.    Okay.  Had you provided him
7  with Greg Kimball's name?
8    A.    Yes, sir.
9    Q.    Did you provide him with Greg
10 Kimball's address or fax number or anything
11 like that?
12   A.    Address to the plant.
13   Q.    Just the plant address?
14   A.    Yes, sir.  Attention Greg
15 Kimball.
16   Q.    Okay.  In paragraph thirteen
17 of your complaint you say:  After the letter
18 from Sergeant Barnes was sent to Hyundai,
19 the incidences of harassment outlined above
20 escalated.
21   Let me ask you that:  Is that
22 accurate?
23   A.    Yes, sir.

Page 192

1    Q.    How did they escalate?
2    A.    I mean, it went from every
3  other day I was being called on the carpet.
4  I mean --
5    Q.    Called on the carpet for what?
6    A.    Anything he could make up,
7  they could make up, everything.
8    Q.    What would they make up?
9    A.    The daily reports, and I
10 believe that was in there somewhere, where I
11 didn't turn in my daily report where I
12 actually filled it out but I worked over,
13 and it was still in the book, I just didn't
14 drop it off in the box.  And I was being
15 threatened with a write-up when there were
16 several other team members on both shifts
17 who hadn't turned in a daily report in over
18 a month.  That was just one example.
19   Q.    Well, during that period, were
20 -- were you ever suspended for any reason?
21   A.    No, sir.  They ignored their
22 whole firing process.  I was never written
23 up, to my knowledge.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 193

1    Q.    Okay.
2    A.    They went against their own
3  program, their own handbook, their own
4  system.
5    Q.    Okay. Just so I understand,
6  how did they do that?
7    A.    Well, supposedly there's a
8  system, a process, you have to go through to
9  get fired. Several steps in between. I
10  went from zero to fired.
11    Q.    So when you say they
12  disregarded the steps, you're talking about
13  your termination?
14    A.    Their own firing process.
15  It's not my termination. That's their
16  process that they came up with, that they
17  said they would abide by that they threw out
18  the window.
19    Q.    Okay. Also in paragraph
20  thirteen you say that on or about February
21  26, 2007, Prater got the stamping manager,
22  Jim Brookshire to falsely accuse Dees of
23  sleeping on the job.

Page 194

1    A.    February 26th was the day I
2  was terminated. I believe, like you said,
3  it was the 19th. I'm not sure, it was the
4  week before that.
5    Q.    Okay. So you put -- Do you
6  know why it says the 26th? Is it for any
7  reason other than that's the day you were
8  terminated?
9    A.    Yes, sir.
10    Q.    Do you have any personal
11  knowledge that Greg Prater tried to get Jim
12  Brookshire to say that you were sleeping?
13    A.    I don't know. Prater wasn't
14  even there that night. It was Jim
15  Brookshire.
16    Q.    So you agree Prater wasn't
17  even there that night?
18    A.    No, he wasn't. It was on a
19  night shift.
20    Q.    Okay. So if Greg Prater
21  wasn't at the plant the night that Jim
22  Brookshire made the allegations, how is it
23  that you say that Prater tried to convince

Page 195

1  Brookshire to make those allegations?
2    A.    Well, I mean -- I'm not sure
3  how he -- what went on. I know I was
4  standing up there in my area that I was
5  supposed to be in, with one of my coworkers,
6  who had left me standing out there in plain
7  site on a wire mesh floor where everybody
8  can see, not five minutes before I was
9  accused of sleeping. And I read Will Ware's
10  statements where Jim Brookshire said he
11  never saw my eyes closed. And the next
12  thing I know, I'm getting fired for sleeping
13  on duty. If I sleep on duty, he's saying
14  this ain't a military thing, he was always
15  referring to military things, every time
16  someone talked to me, they put it in a
17  military perspective. If I didn't live my
18  life in a military manner, why would they do
19  that? If I sleep on duty on post, I die.
20  That's not the most important thing. If I
21  sleep on duty on post, my men die, that's
22  the most important thing. I live my
23  civilian life just like I do my military

Page 196

1  life. Just because for the same reason --
2  Just like is fixing to happen next year, I
3  am going back to Iraq. If I slough off in
4  my civilian life, I slough off in my
5  military life. I don't do that.
6    Q.    Okay. Let me ask you this:
7  Do you know the night that Jim Brookshire
8  allegedly made the allegations he saw you
9  sleeping?
10    A.    Yes. I don't remember the
11  exact date. I think it was around the 19th.
12  But the exact incident, yes, sir, I remember
13  it.
14    Q.    So you know the incident?
15    A.    Yes, sir.
16    Q.    And you agree Greg Prater
17  wasn't on duty that night?
18    A.    No, sir, he was not.
19    Q.    Wasn't at the plant?
20    A.    No, sir.
21    Q.    Do you even know whether he
22  worked the next day?
23    A.    I don't know.

49 (Pages 193 to 196)

# FREEDOM COURT REPORTING

Page 197

1    Q.    Okay.  Do you know whether --
2  Do you have any evidence to suggest that he
3  and Jim Brookshire had talked before that
4  night about accusing you of something?
5    A.    If I had it, you would have
6  it.
7    Q.    Okay.  So, but, again, I just
8  want to make sure.  Okay?
9    A.    Like I say, you're the one
10 that's talked to them.  You'll have to go
11 ask them.
12   Q.    Let me ask you this:  You're
13 not aware of any evidence to suggest Greg
14 Prater told Jim Brookshire to make up some
15 allegations before that night, and Greg
16 Prater wasn't there that night, and you
17 don't know whether Greg Prater even worked
18 the next day, what evidence do you have to
19 suggest that Greg Prater told Jim Brookshire
20 what to do, or when to do it, or how to do
21 it?
22   A.    I don't have any evidence of
23 Prater and Jim corroborating or whatever you

Page 198

1  want to call it.
2    Q.    Okay.  Well, you would agree
3  that that's not consistent with what's
4  contained in your complaint?
5    A.    Did Prater and Brookshire
6  stick together on everything?  Yes.
7    Q.    In other words, they're
8  consistent?
9    A.    Yeah.  I mean, if Prater said
10 something, Brookshire backed him up;
11 Brookshire said something, Prater backed him
12 up.
13   Q.    Okay.  But where you've
14 indicated in your complaint that Prater got
15 the production staffing manager, Jim
16 Brookshire, to falsely accuse Dees of
17 sleeping on the job, what evidence do you
18 have that Prater did that?
19   A.    Like I said before, I don't
20 have none.  If I did, you'd have it.
21   Q.    Okay.  Thank you.
22       And am I correct that on the
23 evening of -- Well, you indicated you know

Page 199

1  the evening in question?
2    A.    Yes, sir.
3    Q.    All right.  How is it you know
4  when Jim Brookshire made those allegations?
5    A.    I saw him and Kevin Hughes
6  standing down on the floor pointing up at me
7  and Shane.
8    Q.    Pointing up at you where?
9    A.    Up in my area of
10 responsibility.  They said that I was
11 supposedly sleeping up in the SOPS.  It's
12 about -- It's what they call the third
13 floor.  And there's an open wire mesh floor
14 right there.  You can't hide.  And Shane
15 walked downstairs, and I let my guard down.
16 I had a brain cramp.  And it wasn't five
17 minutes, here come Jim walking up the
18 stairs, walking around the back, looked over
19 at me about fifty foot away, walked down,
20 looked out over the presses, came back,
21 looked at me again.  I watched him, I
22 watched him walk all the way back down the
23 stairs.  When he did, I got up and walked

Page 200

1  downstairs.
2    Q.    Okay.  Were you sitting down?
3    A.    Yes, sir, I was.  I was trying
4  to text message my daughter.
5    Q.    You were text messaging your
6  daughter?
7    A.    I was trying to, yes, sir, I
8  was.
9    Q.    So you had your phone in your
10 hand?
11   A.    Yes, sir, I did.
12   Q.    Were you looking down into
13 your lap at the phone?  Or how did you have
14 your phone?
15   A.    I had my phone right here
16 (indicating).  Like I said, I watched him
17 walk up the stairs, and I watched him.  We
18 made eye contact, he kept walking.  So I
19 went back to text messaging.  Then come back,
20 I looked up at him again, and I watched him
21 walk all the way down.  I closed my phone, I
22 got up, and I went down.
23   Q.    Did you actually send someone

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 201

1 a text message?
2    A.    I tried. No, I couldn't get
3 out.
4    Q.    **What do you mean you couldn't**
5 **get out?**
6    A.    Depending on the weather and
7 where you was at, sometimes you could get a
8 good signal in the plant and sometimes you
9 couldn't.
10    Q.    **Would there be any records to**
11 **support whether or not you actually made a**
12 **text message that evening?**
13    A.    I've got my phone bill, but,
14 no, I told you, I didn't get out.
15    Q.    **Okay. So is it your testimony**
16 **you had the phone in your hand, you were**
17 **pressing buttons, but nothing was happening?**
18    A.    Pretty much it.
19    Q.    **Were you wearing a hard hat?**
20    A.    No, sir. We wear ball caps
21 with a little plastic insert. And it was
22 sitting on the spool beside me, spool of
23 cable.

Page 202

1    Q.    **So you were not wearing a ball**
2 **cap?**
3    A.    No, sir.
4    Q.    **Were you wearing any sort of**
5 **eye protection or anything like that?**
6    A.    They were in my hard hat.
7    Q.    **Hard hat or ball cap?**
8    A.    Ball cap.
9    Q.    **Did you have a hard hat with**
10 **you?**
11    A.    No. They don't wear hard
12 hats.
13    Q.    **They don't wear them anywhere?**
14    A.    Not to my knowledge, no.
15    Q.    **In the whole plant?**
16    A.    Some people may, but I was
17 stuck in my section, I don't know.
18    Q.    **And your section was**
19 **somewhere?**
20    A.    Stamping maintenance.
21    Q.    **So to your knowledge, in**
22 **stamping maintenance they don't wear hard**
23 **hats?**

Page 203

1    A.    No, sir. They wear a ball
2 cap, what they call a bump cap, little
3 plastic insert.
4    Q.    **Okay. And during the period**
5 **in which you saw Jim Brookshire up on that**
6 **third floor, I mean, you saw Jim Brookshire**
7 **on the third floor?**
8    A.    Yes, sir. I watched him walk
9 up, around, and back down.
10    Q.    **Was this after Shane Archer**
11 **had left?**
12    A.    About five minutes after Shane
13 left.
14    Q.    **Five minutes. Do you recall**
15 **it being five minutes? That was a long time**
16 **ago.**
17    A.    It wasn't long. Like I said,
18 me and Shane had just been standing there
19 wondering why they were standing down on the
20 floor pointing up at us talking.
21    Q.    **Okay. Do you remember what**
22 **time it was you saw them down on the floor**
23 **pointing up at you?**

Page 204

1    A.    It was before chow.
2 Everything happened before chow that night.
3    Q.    **What time is chow?**
4    A.    I believe it was -- I think it
5 was eleven thirty that night, eleven thirty
6 or eleven forty-five.
7    Q.    **What time did you get to work?**
8    A.    I don't know. You would have
9 to -- Y'all got that.
10    Q.    **What time did you usually**
11 **start?**
12    A.    It depended whether I was
13 coming in early that night or late that
14 week.
15    Q.    **What's the latest you would**
16 **have gotten there?**
17    A.    I believe it was six or seven.
18    Q.    **P.m.?**
19    A.    I think.
20    Q.    **Okay. And starting at six or**
21 **seven, whenever you got there --**
22    A.    Six to four forty-five and
23 seven to five forty-five.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 205

1    Q.    All right.
2    A.    But we always had to be there
3    early.
4    Q.    So you would have been there
5    sometime slightly before six or seven?
6    A.    Yes, sir.
7    Q.    All right. So you get there a
8    little bit before six or seven. Do you go
9    to the -- is there an office for stamping
10   maintenance?
11   A.    That's where our lockers are
12   at.
13   Q.    All right. So would you
14   usually go to your locker first?
15   A.    Yes, sir.
16   Q.    All right. Do you remember
17   doing that on the night in question?
18   A.    I did it every night. That's
19   where my tools was locked up.
20   Q.    So you would go get your tools
21   to start the day?
22   A.    Yes, sir.
23   Q.    And on the evening in

Page 206

1    question, did you go immediately from
2    getting your tools to a meeting with Greg
3    Prater or Kevin Hughes or anybody like that?
4    What did you do?
5    A.    We didn't have meetings.
6    Q.    Okay.
7    A.    We'd get our tools and --
8    Q.    How did you know what to do?
9    A.    I mean, it's just standard.
10   Everybody -- We'd come in, we'd get our
11   tools, we'd go to work. I mean --
12   Q.    But how did you --
13   A.    -- that was the norm.
14   Q.    How did you know what to work
15   on?
16   A.    We didn't work on nothing. If
17   nothing wasn't broke down, we would go to
18   our area of responsibility.
19   Q.    So you would just go to an
20   area that you were responsible for?
21   A.    An area I was assigned.
22   Q.    And that was the SOP section
23   up on third floor?

Page 207

1    A.    Second and third floor.
2    Q.    Second and third floor.
3    A.    And if they was running them,
4    it could be on the first floor too.
5    Q.    All right. Did you go to the
6    second floor that night?
7    A.    Right off the bat?
8    Q.    Yeah.
9    A.    Probably not. I probably went
10   and got the brief from the off-going shift.
11   Q.    What is that? Is that
12   something telling you what to do?
13   A.    Like I said earlier this
14   morning, we go get our tools, go talk to
15   people on the off-going shift, find out if
16   there's any breakdowns, anything, any major
17   events we needed to know about or look out
18   for.
19   Q.    How long does that usually
20   take?
21   A.    If nothing happened, two
22   seconds. Give me your radio. Bye, y'all
23   take it easy.

Page 208

1    Q.    Would you share a radio with
2    the off-going shift?
3    A.    Yes, sir.
4    Q.    Do you know who your
5    counterpart is on the off-going shift or who
6    was on the evening in question?
7    A.    They didn't really have
8    assigned areas like we did, I don't think.
9    I mean, it would be different people.
10   Sometimes it would be Duane Tatum, or
11   sometimes it would be Lance Honeycutt, or --
12   I can't remember the other guy's name.
13   Q.    All right. Well, that's okay.
14         Once y'all sort of made the
15   shift change and talked with the off-going
16   guys, you would go to your work area;
17   correct?
18   A.    Yes, sir.
19   Q.    And on the evening in
20   question, you think that would have been
21   immediately up to the third level?
22   A.    Maybe not. Not if they was
23   running. If they was running, we would be

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 209

1  over at the press and see how they were
2  running and make sure the trolleys were
3  switching out right.
4     Q.    Do you remember what you did?
5     A.    No.
6     Q.    You can't remember?
7     A.    I remember the weather was bad
8  that night. There had been a couple of
9  nights that week the weather was bad, so I
10  don't -- several nights we had to go to the
11  storm shelters, like the pit and bathrooms,
12  because of the weather. So, no.
13     Q.    Do you remember having to go
14  to the storm shelter on the evening we're
15  talking about?
16     A.    I don't know if it was that
17  evening or a couple of evenings before.
18     Q.    Okay. Do you remember when
19  you first went up to the third level on the
20  evening we're talking about?
21     A.    Me and Shane went up there --
22  at the time the incident occurred, me and
23  Shane had gone up there because we had to

Page 210

1  pull trolleys.
2     Q.    Pull trolleys?
3     A.    Yes, sir. Because we had a
4  problem.
5     Q.    Just so -- I think I know what
6  you're talking about, but when you say pull
7  trolleys, is that when part of that conveyor
8  system gets off line or something, and you'd
9  have to go straighten it out?
10     A.    If you know what I'm talking
11  about, yeah, the things that ride the rails,
12  that's the trolleys.
13     Q.    Okay. Does that just mean one
14  of those got offline and you had to correct
15  it?
16     A.    Yes, sir.
17     Q.    Okay. And when you went up
18  there with Shane Archer, was that when you
19  looked down and saw Kevin Hughes and Jim
20  Brookshire looking up at you or was that
21  later in the evening?
22     A.    No. It was at that instant.
23  We had just finished pulling a trolley, just

Page 211

1  got the system back online.
2     Q.    How long did that take?
3     A.    Not long. I don't know to be
4  honest.
5     Q.    Okay. And so when you got the
6  trolleys back online, is that when Shane
7  Archer went downstairs?
8     A.    After we talked about Jim and
9  Kevin pointing up at us talking.
10     Q.    Okay. So you and Shane Archer
11  had a conversation where y'all talked about
12  Jim Brookshire and Kevin Hughes looking up
13  at you?
14     A.    Yes, sir.
15     Q.    And pointing?
16     A.    Yes, sir. It was basically
17  what are they doing? Why are they pointing
18  up here? I don't know.
19     Q.    And was that before midnight?
20     A.    Yes, sir.
21     Q.    And how much -- How long after
22  that was it that Jim Brookshire came
23  upstairs?

Page 212

1     A.    Like I said earlier, no more
2  than five minutes.
3     Q.    All right. And was it unusual
4  to see him walking around up there?
5     A.    Yes, sir. It was very unusual
6  to see him walking around up there unless
7  something was bad broke down.
8     Q.    Okay. Do you recall seeing
9  him up there more than that one time on that
10  evening?
11     A.    No, sir.
12     Q.    No?
13     A.    No, sir.
14     Q.    Do you recall when Jim
15  Brookshire walked up there, was there
16  anybody else on the third level?
17     A.    No, sir.
18     Q.    Just you and him?
19     A.    Yes, sir.
20     Q.    Have you talked to anybody
21  else who talked to Jim Brookshire about what
22  he had gone up there for?
23     A.    No, I don't guess I have.

53 (Pages 209 to 212)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 213

1    Q.    Okay.  And did you talk to Jim
2  Brookshire?
3    A.    That night, no.  And then
4  later on, huh-uh.
5    Q.    When he walked up there and
6  you saw him, did you say anything to him?
7    A.    No, sir.  Like I said he
8  was -- I was there at an MCC panel, and he
9  was up, I don't know, forty-five, fifty foot
10  away over there on the handrail.
11    Q.    Okay.  Did you wave at him or
12  motion to him at all?
13    A.    No, sir.  I just looked at
14  him.
15    Q.    You looked at him?
16    A.    Yes, sir.  He looked at me and
17  walked down to the presses, looked out over
18  the presses, then walked back, looked at me
19  again, and walked back down.
20    Q.    What was the closest he got to
21  you?
22    A.    Like I say, forty-five, maybe
23  fifty feet.

Page 214

1    Q.    Now, what was the thing you
2  said you were near?
3    A.    Motor control panel, MCC
4  panel.
5    Q.    MCC panel.  Now, is that --
6  What is that?
7    A.    It houses the PLC, computer
8  that runs the SOPS system.
9    Q.    Okay.  That's helpful.  Thank
10  you.  What is the PLC?
11    A.    Programmable logic computer.
12    Q.    Just for the sake of the
13  record, what does SOP mean?
14    A.    SOP is the trolley system,
15  side outer panel system.
16    Q.    Okay.  Again, what was the
17  thing that you were standing near?
18    A.    MCC.
19    Q.    Is the MCC, is it like a
20  computer, it has got computer readouts on
21  it, buttons and stuff?
22    A.    It's not a computer like
23  you're thinking of.  It's got cards and it

Page 215

1  -- Yes, it is a computer, but it doesn't
2  have a screen and the keys -- keyboards are
3  like what you're thinking.  You have to get
4  online with it.
5    Q.    How big is it?
6    A.    It's probably about ten-foot
7  long, two-foot deep, six-foot high.
8    Q.    Okay.  Does it have doors that
9  enclose it or some sort of cover or
10  anything?
11    A.    Yes, sir.
12    Q.    What's it got?
13    A.    It's got doors.
14    Q.    Okay.  How big are the doors?
15    A.    About like that door there
16  (indicating).
17    Q.    Okay.  Just for the sake of
18  the Record, that's not going to translate
19  well on paper.  Are there two doors to the
20  whole thing?
21    A.    No.  There was four -- four
22  doors.
23    Q.    So they would have each been

Page 216

1  about a fourth of that ten-foot length?
2    A.    Yes, sir.
3    Q.    Okay.
4    A.    Plus you had your stabs in
5  between.
6    Q.    What is a stab?
7    A.    Just your door frame.
8    Q.    Okay.  Now, at the time Jim
9  Brookshire came up there, did you have your
10  back to the MCC?
11    A.    Yes, sir, I did.
12    Q.    Okay.  Any reason you had your
13  back to the MCC?
14    A.    So I could watch the trolleys.
15    Q.    Okay.  Were you not up there
16  to watch the MCC?
17    A.    No, sir.
18    Q.    Okay.  Why would you be there
19  near the MCC as opposed to some other area
20  to watch the trolleys?
21    A.    Because if you try to sit out
22  on open mesh, you're going through the
23  floor.

54  (Pages 213 to 216)

# FREEDOM COURT REPORTING

Page 217

1    Q.    Was it not open mesh there
2  near the MCC?
3        A.    About a two-foot section, no,
4  sir.
5        Q.    A two-foot section was not
6  open mesh?
7        A.    No, sir.  But you can clearly
8  see up there everywhere.  And that's where
9  me and Shane was standing when Jim and Kevin
10  was standing up there pointing at us talking
11  about us.
12        Q.    Okay.  So from where you were
13  sitting at the time Jim Brookshire came up,
14  is it your testimony that you could see from
15  where you were sitting all the way down
16  through the second floor, and then down to
17  the first floor?
18        A.    Yes, sir.
19        Q.    And the first floor was the
20  main production level?
21        A.    Yes, sir.
22        Q.    Okay.  Had you ever sat up
23  there before?

Page 218

1        A.    Everybody had.
2        Q.    Okay.  And everybody being,
3  everybody in stamping maintenance or
4  everybody period?
5        A.    Everybody in stamping
6  maintenance.  Because if it goes down, you
7  may be up there five minutes, you may be up
8  there five hours.
9        Q.    Okay.  Let me ask you this:
10  When Shane Archer -- You and Shane Archer
11  were up there working together that night?
12        A.    Yes, sir.  Shane came up to
13  help me out.
14        Q.    When you and Shane had got
15  done and he walked downstairs, why did you
16  stay upstairs as opposed to going with
17  Shane?
18        A.    Wait to see if that trolley
19  stopped again or kept going.  They had track
20  switches, you've seen them.  Track switches
21  switch, they had a track that had gone out
22  on a track switch, which if you've seen the
23  system, which I'm sure you have, it may stop

Page 219

1  on this one, go to the next one, but then it
2  may stop again on the next one.  Just
3  because you get it going for two seconds,
4  don't mean it's going to be going -- it's
5  going to take off and run.
6        Q.    Okay.  So you were going to
7  stay up there and make sure it kept running?
8        A.    Yes, sir.
9        Q.    Okay.  What were you planning
10  to do?  I mean, how long would you stay
11  there?
12        A.    As long as nothing happened --
13  Well, that was my area of responsibility.  I
14  could have stayed there all night, and I
15  would have been right in doing so.  I was
16  told to stay in my area of responsibility
17  just like everyone else.  Like I said, Mark
18  Hanks, he had to stay on press one, Darrel
19  Gray, he had to stay on press two, and Weihe
20  and Barefoot.  That was my AO that I was
21  responsible for.
22        Q.    AO meaning what?
23        A.    Area of operation, area of

Page 220

1  responsibility.
2        Q.    Okay.  Did you ever sleep up
3  on the third level?
4        A.    I don't sleep.
5        Q.    Ever?
6        A.    Ever.
7        Q.    On the job?
8        A.    I don't sleep on the job, no.
9        Q.    Okay.
10        A.    I told you if I sleep -- I'm a
11  career soldier.  I've been doing this since
12  I was seventeen.
13        Q.    Doing what?  Stamping
14  maintenance?
15        A.    No.  I've been a soldier since
16  I was seventeen, and I don't sleep.  You've
17  got a young Joe out there, yeah, they may
18  fall asleep every now and then.  First big
19  exercise they have and they wake up with a
20  black ink mark cross their throat and they
21  know that they've been visited, and don't
22  know when or where, you don't sleep no more.
23  That's real life.  When you go to the combat

# FREEDOM COURT REPORTING

Page 221

1  zone, you know what happens. You don't
2  sleep. You sleep, people die.
3      Q.   Well, in terms of your work at
4  Hyundai, I'm assuming your testimony is
5  you've never slept?
6      A.   No, sir.
7      Q.   Before that night, on that
8  night, or since that night?
9      A.   No, sir. You don't sleep at
10 work.
11     Q.   Okay. What was it --
12     A.   If you sleep at work --
13     Q.   Was it unusual for people
14 working up on that third level to sleep?
15     A.   I never saw nobody up there
16 other than maintenance production go up
17 there and count the panels.
18     Q.   Okay. Did you ever see
19 anybody from maintenance sleep up there?
20     A.   No, sir.
21     Q.   Did you ever see any
22 indication that somebody from maintenance
23 had slept up there?

Page 222

1      A.   Talking about a chair in the
2  back corner? Yes, sir, there was a chair in
3  the back corner.
4      Q.   Was there a chair in the
5  corner?
6      A.   In that back corner over
7  there, yes, sir, there was.
8      Q.   What kind of chair was it?
9      A.   Same kind of chair I was
10 sitting in, a metal chair.
11     Q.   Was that all that was there?
12     A.   I believe so.
13     Q.   Nothing else in that back
14 corner?
15     A.   No.
16     Q.   Do you think somebody was back
17 there sleeping in that chair?
18     A.   I don't know. Wasn't nobody
19 on my shift was.
20     Q.   All right. Did you hear
21 anybody talking about people from other
22 shifts sleeping in that corner?
23     A.   No, sir.

Page 223

1      Q.   And is it your testimony that
2  nobody from your shift ever indicated that
3  they or anybody else on your shift slept in
4  that corner?
5      A.   I never talked to nobody on my
6  shift about sleeping in that corner, no,
7  sir.
8      Q.   Okay. Did you ever talk to
9  anybody on your shift about sleeping
10 anywhere up on the third level?
11     A.   No, sir. Drake Barefoot would
12 take his lunch break and go in the office
13 and sleep. Other than that, no, sir.
14     Q.   In the office?
15     A.   Yes, sir. During his lunch
16 break.
17     Q.   And is it your testimony that
18 while you were there, that there was nothing
19 other than a chair in the back corner?
20     A.   I don't remember seeing
21 nothing other than a chair there.
22     Q.   Okay. Do you -- Do you have
23 any personal knowledge, based on your

Page 224

1  conversations with Wendy Warner at the time
2  you were terminated or anybody at that time
3  or before then or after then, to know what
4  went on at the time the decision to
5  terminate was made?
6      A.   Say again.
7      Q.   Let me see if I can come up
8  with an easier way of asking it.
9          Would it be fair to state you
10 don't know who was involved in the decision
11 to terminate you?
12     A.   I have no idea who was
13 involved.
14     Q.   Okay. And do you know
15 anything else about the decision to
16 terminate you?
17     A.   No. Just that statement I
18 read where Prater said his recommendation
19 was termination. And that he told Hanks
20 that he did the investigation.
21     Q.   All right. And would it be
22 fair to state that you don't know whether
23 Greg Prater sat in on the discussions or

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 225

1  decision to terminate you?
2      A.    I didn't know they had had a
3  meeting on it.
4      Q.    Okay.  Do you have any reason
5  to think that Greg Prater had any other
6  involvement on it?
7      A.    Like I said, I didn't even
8  know they had a meeting.
9      Q.    Okay.  Do you have any
10  evidence to suggest that your past military
11  involvement, either in Korea, Iraq, National
12  Guard, was a motivating factor in the
13  decision to terminate you?
14      A.    That's the way it seemed.
15      Q.    And it seemed that way why?
16      A.    Because every bit of that
17  stemmed from my prior duty commitment.
18  Everything stemmed around my drill weekends.
19      Q.    What stemmed?
20      A.    All the problems, all the
21  harassments.
22      Q.    I'm talking about the actual
23  decision to terminate you.

Page 226

1      A.    Oh, I have no idea.  I don't
2  know.  Like I said, I didn't even know they
3  had a meeting on it.
4      Q.    Okay.  So it would be fair to
5  state that you're not aware, based on your
6  own personal knowledge, of any evidence to
7  suggest that your military service was a
8  motivating factor in the decision to
9  terminate you?
10      A.    Rephrase.
11      Q.    Would it be fair to say that
12  you don't have any personal knowledge that
13  your military history was a motivating
14  factor or part of the reason why they made
15  the decision to terminate you?
16      A.    I -- As far as my personal
17  knowledge, like I said, seems like my
18  military career was the whole reason for my
19  being fired.
20      Q.    Being fired or for being
21  harassed?
22      A.    Both.  It started with the
23  harassment and ended in the termination.

Page 227

1      Q.    How was it that was part of
2  your termination?
3      A.    Like I said before, that's
4  where all my problems stem from.  That's
5  where they all started with the drill
6  weekend.
7      Q.    Okay.  So are you suggesting
8  that the fact that you had problems with
9  your drill weekends leads you to think that
10  that's why you were terminated?
11      A.    Yes, sir.
12      Q.    And do you have any firsthand
13  knowledge that that is in fact the case?
14      A.    Just all the incidents leading
15  up to it.
16      Q.    Okay.  And do you know if
17  those incidents were discussed or considered
18  in the termination process?
19      A.    No, sir, I do not know that.
20          THE WITNESS:  It's break time.
21          MR. JOHNSON:  Okay.  If you
22  need a break, take one.
23          (Recess taken.)

Page 228

1      Q.    Okay, Mr. Dees, we're back on
2  the Record again.  I want to ask you a
3  couple more questions about some of the --
4  this alleged sleeping incident.
5          Jim Brookshire is somebody we
6  talked about.  Did you know Jim Brookshire
7  well?
8      A.    He was -- Yeah.  Working with
9  him every day near about.
10      Q.    Okay.  Did you ever have any
11  problems with him?
12      A.    No.  Not like with everyone
13  else, no.
14      Q.    Okay.  Did he ever demand
15  orders from you, or anything like that?
16      A.    No.  Because he wasn't in my
17  immediate chain of command.
18      Q.    Okay.  Did he ever say
19  anything to you about your military career
20  or your Guard duty or anything like that?
21      A.    No.  The only thing he cared
22  about was whether them presses was running.
23      Q.    Was what?

57 (Pages 225 to 228)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 229

1    A.    Whether the presses was
2  running.
3    Q.    Okay.  Do you have any reason
4  to think that Jim Brookshire has any bad
5  feelings or bad will towards you or anybody
6  else in the military for any reason?
7    A.    Towards me?  Yeah.  You got,
8  like I say, him and Prater, they were --
9  they rubbed each other's back.  You got
10 Prater come back down here a week ago,
11 talked to Bill Seivers telling him that
12 Applegate had told him to get rid of me.
13 You got --
14   Q.    Now, wait a minute.  Let's --
15   A.    After I got fired, I called
16 Mr. Moon, he said he would look into it.  He
17 says Prater was wrong in doing what he's
18 doing, but I can't do anything about it.
19       Were they rubbing each other's
20 back?  Yeah.  I mean, everything --
21 Everything started when Prater said I had to
22 have orders.
23   Q.    Okay.

Page 230

1    A.    And that come because -- I
2  don't know why it come about.
3    Q.    Well, I -- I got a pretty good
4  understanding of your relationship with Greg
5  Prater.  But I'm interested now in Jim
6  Brookshire.  I want to make sure I know all
7  about that.
8         Is what you're telling me that
9  the only issue you've got with Brookshire
10 was his closeness with Greg Prater?
11   A.    Well, every time I -- Not
12 every time.  Several times I got called into
13 the office, Jim was there, yes.
14   Q.    When you got called into the
15 office for what?
16   A.    Anything.  Like the daily
17 reports, the pit, the lift.  Anything.
18   Q.    All right.  Would that all be
19 stuff in Brookshire's area?
20   A.    Yeah.  He was over that whole
21 area.
22   Q.    Would there be any reason he
23 shouldn't be there?

Page 231

1    A.    Yeah.  It wasn't a production
2  issue.
3    Q.    All right.  In other words, it
4  was a maintenance issue and Brookshire
5  shouldn't have been there?
6    A.    Yeah.
7    Q.    All right.  During any of
8  those meetings did he ever suggest to you
9  that he came because he didn't like you,
10 didn't like the work you did, didn't like
11 the fact that you were in the service, or
12 anything like that?
13   A.    He's a politician, he's not
14 going to come out and say -- He's going to
15 try to make himself look good.
16   Q.    When you say he's a
17 politician, do you mean that literally or
18 figuratively?
19   A.    Figuratively.
20   Q.    Okay.  I'm assuming he's never
21 run for -- Had he run for office or anything
22 like that?
23   A.    Not that I know of.  You

Page 232

1  probably know him better than I do.  I don't
2  know.
3    Q.    Are you just commenting on his
4  personality?
5    A.    Commenting on his personality.
6    Q.    Okay.  Can you think of
7  anything else -- Other than showing up when
8  you got called into the office, can you
9  think of anything else Jim Brookshire did or
10 said that you think suggests any sort of
11 feelings against you?
12   A.    I mean, there had to be, why
13 else would he accuse me of sleeping?
14   Q.    What are they?  Are you
15 guessing or you know of some?
16   A.    I don't know.  You'll have to
17 ask him.
18   Q.    All right.
19       MR. SPORT:  And we're trying
20 to right now.
21   Q.    Okay.  But from your personal
22 standpoint, do you know of anything?
23   A.    Like I said, everything

58  (Pages 229 to 232)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 233

1  started with my military problem -- my
2  military commitment. And that's where it
3  stayed throughout my tenure there.
4      Q.    Okay.
5      A.    So you have to ask him.
6      Q.    To your knowledge, has Hyundai
7  ever been nominated for any awards related
8  to their employment of military personnel?
9      A.    According to -- According to
10 them they have. And --
11     Q.    Do you think it's not true?
12     A.    -- ESGR.
13         Well, it may be, I don't know.
14     Q.    Okay. Are you saying it's not
15 true?
16     A.    The ESGR rep said they had
17 been put in for one. And they said after I
18 got fired, about two weeks after I got
19 fired, I think, somebody said they put in
20 for one. I'm not sure. The ESGR rep, I
21 don't know, you'll have to call him.
22     Q.    Who are you talking about?
23     A.    That Dan, the one that I told

Page 234

1  you I had e-mailed, that ESGR
2  representative. You'll have to ask him.
3      Q.    Okay. All right. We'll have
4  to come back to that question because I lost
5  that e-mail.
6          Is there anybody else that you
7  and I haven't talked about that either knows
8  -- that works at Hyundai, that either knows
9  anything about problems you had with Prater
10 or HR or anybody related to your service,
11 anybody else?
12     A.    I called Mr. Moon the night I
13 got fired.
14     Q.    Yeah. Let's talk about
15 Mr. Moon. Did you talk to Mr. Moon or did
16 your wife talk to Mr. Moon?
17     A.    I talked to Mr. Moon first and
18 then my wife talked to him.
19     Q.    All right. What did you tell
20 Mr. Moon?
21     A.    I told him that I had been
22 fired, and that I was supposedly fired for
23 sleeping in the SOPS, up on the third floor,

Page 235

1  a week prior.
2      Q.    What did he say?
3      A.    He said that he didn't even
4  know that I was being considered for
5  termination; that he didn't know nothing
6  about it; and that he would look into it.
7      Q.    Okay. Did he say anything
8  else on the night of that call?
9      A.    He apologized for my being
10 fired and he hated that happened because I
11 was a good worker.
12     Q.    Okay. Did you say anything
13 else to him that night?
14     A.    I don't remember. By the time
15 I got home, I was pretty perturbed.
16     Q.    I mean, did you call him from
17 home?
18     A.    Yes, sir.
19     Q.    Did your wife talk to him that
20 night?
21     A.    Yes. She explained everything
22 to him in Korean.
23     Q.    Do you speak Korean?

Page 236

1      A.    Some. Between my Korean and
2  his English, we was able to communicate
3  pretty good.
4      Q.    Did you speak to him some in
5  Korean?
6      A.    I may have. Like I said, I
7  was pretty hot.
8      Q.    But, again, am I right that
9  you told me everything that you told him or
10 that he said to you on that telephone call?
11     A.    He said he would look into it
12 and get back with me.
13     Q.    All right. Based on either
14 what you overheard in Korean -- Was the
15 conversation your wife had with him in
16 Korean?
17     A.    Yes, sir.
18     Q.    Okay. From what you could
19 hear and understand in Korean, or from what
20 she told you later, what is your
21 understanding as to what she said?
22     A.    I wasn't paying attention to
23 the conversation she had with him. But

59 (Pages 233 to 236)

# FREEDOM COURT REPORTING

Page 237

1  basically the same thing, that he told her
2  he hated to see me fired because I was a
3  good employee and that he would look into it
4  and that he would get back with me.
5      Q.   Did he say anything else to
6  your wife that evening?
7      A.   I don't know.
8      Q.   Okay.  Do you know if your
9  wife had any later conversations with him?
10      A.   The next night he called back.
11      Q.   Okay.  And did he speak to you
12  that night?
13      A.   A little bit.  He mostly
14  talked to my wife.
15      Q.   Okay.  Were you able to
16  overhear the conversation?
17      A.   Yes, sir.  I talked to her
18  afterward.
19      Q.   All right.  What did they talk
20  about that night?
21      A.   He stated that Prater was
22  lying, that Prater had been wrong.
23      Q.   That Prater was lying?

Page 238

1      A.   Yes, sir.
2      Q.   Lying about what?
3      A.   My supposedly sleeping at
4  work.
5      Q.   Why did he say Prater was
6  wrong?
7      A.   And that he was --
8          MR. KILBORN:  Don't interrupt
9  him.
10      A.   I don't know.  You'll have to
11  ask him.  That Prater was wrong in firing me
12  and that there was nothing he could do about
13  it now, he was told to stay away from it.
14      Q.   Did he say who said to stay
15  away?
16      A.   No.  You'll have to -- I think
17  he made the comment to Mark Hanks.  I'm not
18  sure.
19      Q.   Do you know what Mr. Moon's --
20  what his position is at the plant?
21      A.   He was the Korean counterpart
22  to Prater; he was from HMC, he was our
23  Korean boss.

Page 239

1      Q.   Okay.  Did he indicate who he
2  had talked to since the last time y'all had
3  a telephone call?
4      A.   I think he talked to -- I
5  think he said it was J.H. Kim or president
6  Ahn.  It was J.H. Kim or Ahn, one, I can't
7  remember.
8      Q.   All right.  Do you know why
9  Mr. Moon said that Greg Prater had lied?
10      A.   You'll have to ask Mr. Moon
11  that.
12      Q.   Okay.  Do you --
13      A.   Mr. Moon said that Prater was
14  a bad man.
15      Q.   Okay.  Did he say specifically
16  what he understood Greg Prater to have lied
17  about?
18      A.   Yeah.  Said that Greg Prater
19  lied about my sleeping at work.
20      Q.   Okay.  Did you get the
21  impression that Mr. Moon thought that Greg
22  Prater had been there that night?
23      A.   No, sir, I did not.

Page 240

1      Q.   Okay.  Did Mr. Moon say that
2  Jim Brookshire had lied?
3      A.   I didn't ask him about Jim
4  Brookshire.
5      Q.   You never talked about Jim
6  Brookshire?
7      A.   No, sir.
8      Q.   Did you know that Jim
9  Brookshire was the one that indicated he had
10  seen you sleeping?
11      A.   Yes, I did.  I knew from the
12  very first meeting.
13      Q.   Okay.  You never told Mr. Moon
14  about that?
15      A.   No, I did not.
16      Q.   You never told Mr. Moon to
17  talk to Mr. Brookshire?
18      A.   No.  I'm sure he probably did,
19  though.  You've interviewed my friends,
20  you'd have to ask them what -- they talked
21  to them.
22      Q.   When you say you're sure
23  you're sure he did, do you know that or are

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 241

1  you just wanting that to be the case?
2      A.    Say again.
3      Q.    When you say you're sure that
4  Mr. Moon talked to Jim Brookshire, why? Why
5  do you say that?
6      A.    Because of Mr. Moon's attitude
7  toward Prater and production --
8  stamping/production in general.
9      Q.    Okay.
10     A.    Stamping management.
11     Q.    Okay. Did he ever say
12  anything about Jim Brookshire?
13     A.    On the phone? No.
14     Q.    Did he say anything about Jim
15  Brookshire in person?
16     A.    No.  We never talked about
17  Jim.
18     Q.    Okay.
19     A.    Usually all we talked about
20  was production -- I mean work-related
21  problems. But me and Mr. Moon was good
22  friends. We talked. We talked a lot.
23     Q.    Did you and Mr. Moon talk

Page 242

1  about who had made the decision to terminate
2  you?
3      A.    No, I did not.
4      Q.    Okay. Y'all didn't talk about
5  anybody but Greg Prater?
6      A.    I didn't talk about Greg
7  Prater. I asked -- He told me he would
8  check into seeing why I got fired. I don't
9  know who he talked to specifically, no. He
10  said, like I say, it was either J.H. Kim or
11  Ahn, one, and I told you the statements he
12  made.
13     Q.    Okay. And he didn't say
14  anything else?
15     A.    I don't know. He talked to my
16  wife, you'll have to -- I don't know.
17     Q.    Okay. And is your wife's
18  English perfect English?
19     A.    Pretty much.
20     Q.    If we were to take her
21  deposition, would there be any reason we
22  would need an interpreter?
23     A.    Not unless you don't speak

Page 243

1  English.
2      Q.    That's debatable. I'm
3  assuming y'all talk in English at the house?
4      A.    Yes, sir.
5      Q.    And she works in an
6  English-speaking environment?
7      A.    Yes, sir. My daughters don't
8  speak Korean, so she speaks English pretty
9  well.
10     Q.    Okay. Did Mr. Moon indicate
11  -- or did you and Mr. Moon discuss John
12  Applegate at all?
13     A.    No, sir. At that point I was
14  still upset. I mean, I was -- I was fired
15  up. I had been treated like crap, treated
16  like trash, accused of something I didn't
17  do; gone through the wringer for several,
18  several months. No, I was just upset. I
19  was bad upset. I had never had nothing like
20  that happen to me in my life.
21     Q.    Okay.
22     A.    I've got my evaluations from
23  BE&K and everywhere. When I left BE&K and

Page 244

1  went to International Paper, I got a
2  fifty-three out of fifty-four rating. I had
3  outstanding marks on my record. I've had
4  outstanding marks everywhere I worked. I've
5  never been accused of sleeping or had a
6  blemish on my record.
7      Q.    Okay. Let's talk a little bit
8  about in your complaint you've included as
9  count number two an outrage claim. That
10  starts on, I guess, page seven on your
11  complaint.
12          What's indicated here in count
13  two suggests that Hyundai intentionally
14  created a harassing environment and
15  subjected Dees to a pattern of intentional
16  harassment regarding Dees' membership in the
17  Guard and Dees' Guard service obligations.
18         MR. KILBORN: Are you
19  referring to a specific paragraph?
20         MR. JOHNSON: Paragraph
21  twenty-four.
22         MR. KILBORN: Take a look at
23  twenty-four.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 245

1     Q.    If you want to look at that
2  paragraph, you can, Mr. Dees.
3          Have you read it?
4     A.    Yes, sir.
5     Q.    Okay.  Other than the things
6  that we have already talked about, which is
7  obviously quite a bit, are there any other
8  facts that you're aware of to suggest that
9  Hyundai intentionally created a harassing
10  environment?
11     A.    Yes, sir.  Like I said, right
12  from the time it started, my Guard service
13  was a -- the center of everything, until my
14  termination.
15     Q.    Okay.  And you've indicated
16  that.  Is there anything else that you're
17  relying on to support your outrage claim
18  factually?
19     A.    Like I said, you've got a team
20  leader still working out there that said
21  Prater came down a week ago and told him
22  that Applegate told him to get rid of me,
23  that he needed to get rid of me.

Page 246

1     Q.    Who said this and when did
2  they say it?
3     A.    Bill Seivers, he's a team
4  leader on one of the shifts out there now.
5     Q.    When did you talk to him?
6     A.    I didn't.  You'll get a chance
7  to talk to him when you go back to the
8  plant, I reckon.  Prater came by his house a
9  week ago and made the comment that he had
10  recordings of Applegate making the comment
11  he needed to get rid of me.
12     Q.    And you didn't talk to Bill
13  Seivers?
14     A.    No, sir.
15     Q.    Do you know who talked to Bill
16  Seivers and told him he needed to get rid of
17  you?
18     A.    Yes, sir.  Mark Bornberg.
19     Q.    So Mark Bornberg talked to
20  Bill Seivers?
21     A.    Yes, sir.  They work together
22  everyday.
23     Q.    And called you and told you

Page 247

1  what you're telling me now?
2     A.    Yes, sir.
3     Q.    And this was -- when Prater
4  came was when?
5     A.    About a week ago, I think.
6     Q.    And Bill Seivers told Mark
7  Bornberg that Prater had recordings?
8     A.    Of Applegate stating --
9  telling him he needed to get rid of me.
10     Q.    All right.  When were they
11  made?
12     A.    I have no idea.  You'll have
13  to ask Applegate and Prater.
14     Q.    Do you have any idea, based on
15  your discussions with Mark Bornberg, why,
16  apparently, Greg Prater came to Bill
17  Seivers' house to talk to him?
18     A.    I have no idea.
19     Q.    Do you have any idea why they
20  would have talked about this situation?
21     A.    You'll have to ask Bill
22  Seivers that, or Prater.
23     Q.    And, again, I just want to

Page 248

1  know what you know.  If you don't know
2  anything, that's fine.
3          Did you work with Bill
4  Seivers?
5     A.    Yes, sir.  He was a team
6  leader on the other shift.
7     Q.    Okay.  Was Bill Seivers
8  somebody you were close to?
9     A.    I mean, yeah, we worked --
10  Like I said, everybody in our section, we
11  lived there, twelve hours a day, sometimes
12  seven days a week.
13     Q.    Okay.  Were he and Prater
14  particularly close?
15     A.    I don't know.  You'll have to
16  ask them about that.
17     Q.    Okay.  Another thing that
18  you've indicated in your outrage claim on
19  page seven of your complaint is that this
20  situation caused you severe emotional
21  distress.
22          What -- I mean, what kind of
23  severe emotional distress have you suffered?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 249

1    A.    I have never, never had a
2 blemish on any record, as I've stated
3 before, military or civilian.  When you're
4 standing there among your friends, you've
5 got security guards coming in telling you
6 you've got to go, treating you like a
7 criminal, they won't even let you go get
8 your personal property, that HMMA says
9 belongs to them once it gets through that
10 gate, says it's no longer yours, it's
11 theirs, you can't go get it; walking you
12 out, surrounding you like you're a crook.
13    Here I have -- Like I said, I
14 ain't no war hero, but I served my country
15 proudly so they can act like that and that
16 ain't -- I was walked out like a criminal.
17 When I got to that building, that security
18 building, I walked in, everybody is just
19 standing there bowed up and everything.  I'm
20 the focus of attention and it ain't good.
21 I'm walked in a room, I'm sat down, this
22 lady introduces herself, the next gentleman,
23 the next gentleman, and then she reads me a

Page 250

1 letter, slams it down on the table, face
2 down.  When I asked her questions, she's
3 short, very rude, gets up and walks out.
4    And then, the only thing
5 they're worried about is getting your little
6 security lock, your safety lock, and the
7 keys.  And you ask why come I'm being fired?
8 What happened to your firing process?  They
9 act like you're not even there; they don't
10 even want to acknowledge you.  You get
11 walked out, you're dropped off down here
12 (indicating), your truck is three gates up.
13 Security guard volunteered to take me to my
14 truck.  When I get to my truck, I had to
15 call them aside to get them to bring me my
16 tool bag, and then they got on to Shane
17 Archer for bringing me my tool bag that I
18 had purchased with my money, that they said
19 now belonged to them because I brought it in
20 that gate.  I go home, my wife, I call her,
21 she's crying.
22    All of a sudden I've gone from
23 a very, very good job that I wanted to keep,

Page 251

1 that was very hard to get, with better
2 benefits than I had on active duty in the
3 military, to unemployed.  Then I've got to
4 go home and try to comfort her.  All my
5 friends at work, everybody -- there's a lot
6 of people that work there, then they're
7 looking at you like why did you get fired?
8 Yeah, it hurt.  That ain't right.
9    Q.    It sounds to me like you got a
10 significant amount of problems with the way
11 in which the termination was conducted?
12    A.    It ain't just the way.  Why
13 was I terminated?
14    Q.    Okay.
15    A.    Like I said, they ignored
16 their own process.  They got a seven -- six-
17 or seven-step process.  I went from zero to
18 fired.  After several complaints, even a
19 complaint -- a letter sent by my unit, and
20 it's the same complaint the whole time, all
21 of a sudden I'm fired for an accusation that
22 occurred in a matter of five minutes.  No.
23    Q.    Any other facts you can point

Page 252

1 to that have resulted in severe emotional
2 distress?
3    A.    Made it look like my military
4 career wasn't worth a flip.  Made it look
5 like I was just some piece of trash come up
6 looking for a job.
7    Q.    Is that all the facts that
8 you're relying on to support your severe
9 emotional distress claim?
10    A.    Is that all the facts?  No.
11 My wife is still -- Everybody is still like:
12 I can't believe Leon got fired.
13    Q.    Tell me how -- I mean, tell me
14 how else it has impacted you.
15    A.    It impacted me financially big
16 time.  I go from a job where I'm bringing
17 home real good money, insurance, like I
18 said, better than I had in the military, to
19 a job where -- I'm just jobless.  And the
20 only reason I got a job the next day, is
21 because of a fellow I grew up with that I'd
22 known all my life.  Because when I went in
23 to fill out the job application the next

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 253

1  morning, the fellow told me, he asked me,
2  why did you leave Hyundai. I told him, I
3  said, I got fired. He said, I'm going to
4  tell you straight up, if it hadn't been for
5  your friend there recommending you, I would
6  not have hired you.
7      Q.    Who was your friend that
8  recommended you?
9      A.    James Daniel Smitherman.
10     Q.    Smitherman?
11     A.    Yes, sir. They told me
12  straight up they wouldn't have hired me
13  simply because I had been fired. I didn't
14  lie to them, I told them why I was fired,
15  said they accused me of sleeping on the job.
16  And when I got on with International Paper,
17  same thing, if I hadn't been working there
18  for five months and they hadn't seen my work
19  performance, they told me they would not
20  have hired me. Because I told them, same
21  thing, they asked me why I left Hyundai, I
22  told them the circumstances, everything, I
23  didn't holdback. I told them everything.

Page 254

1  And they said, you better be glad we saw
2  your work performance and James recommended
3  you or you would not be getting this job.
4      Q.    Okay. In terms of the severe
5  emotional distress you're claiming in this
6  lawsuit, did you ever talk to your pastor
7  about it, seek any counseling, go to the
8  doctor about it?
9      A.    I'm a soldier, I don't have
10  time to talk to nobody and I had a family to
11  feed, a kid in college, a kid in high
12  school. I had to work because I wasn't
13  making nowhere near what I was bringing home
14  out there.
15     Q.    Did it have any physical
16  impact on you at home? I mean did you cry a
17  lot?
18     A.    I don't cry. Unless my friend
19  is dead, I don't cry.
20     Q.    Did you lose sleep over it?
21     A.    Yeah. When you get fired, I
22  stayed wake all night several nights.
23     Q.    How many nights?

Page 255

1      A.    I don't know.
2      Q.    All night?
3      A.    All night the first few
4  nights, yeah. I've never -- I told you I've
5  never, never had a blemish on my record.
6      Q.    Since those first few nights,
7  have you lost any sleep over it?
8      A.    I don't know. I mean, there's
9  times me and her talk about it, yeah. I've
10  never been treated like that, never.
11     Q.    All right. Are there any
12  other sort of psychological problems that
13  you've had as a result of the emotional
14  distress of this incident?
15     A.    Yeah. Every time I go to fill
16  out an application anywhere it says have you
17  ever been terminated? Yes, I have. And
18  why?
19     Q.    Are you filling out job
20  applications currently?
21     A.    No. But even if you go to a
22  bank and fill out a loan application,
23  they'll ask if you've ever been terminated

Page 256

1  from a job. I'm an honest person, like I
2  said, I'll tell you when I mess up. And
3  I've got to put yes, and they're going to
4  ask my why and I've got to tell them.
5      Q.    Have you received any medical
6  treatment as a result of emotional distress
7  as a result of this incident?
8      A.    I told you, I've got a family
9  with a kid in college, I ain't got time to
10  seek nothing, I've got to make money.
11          I've got a girl that's in a
12  third year in college and junior in high
13  school, I don't have time to go talk to
14  nobody. I got bills to pay, like everybody
15  else.
16     Q.    You mentioned that Shane
17  Archer had gotten your tool bag?
18     A.    Yes, sir. And they got onto
19  him for that. They threatened to fire him.
20     Q.    I want to make sure I
21  understand what was going on there. I
22  assume your tool bag -- Where was your tool
23  bag when he went to get it?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1    A.   It was in the plant back there
2  in the stamping section. I don't even
3  remember where I left it.
4    Q.   So when they had come to get
5  you before they went and cleaned out your
6  locker and gave you your jacket, had you had
7  your tool bag with you somewhere out in the
8  plant, you just left it there?
9    A.   Yes, sir.
10    Q.   When they came up to you?
11    A.   Yes, sir.
12    Q.   Where did Shane Archer bring
13  it to you?
14    A.   He brought it to the gate up
15  there in front of body weld, up there where
16  I parked.
17    Q.   Okay. And that was after you
18  sat down with Wendy Warner and the others to
19  talk about the termination?
20    A.   They kicked me out of the
21  plant, I couldn't get back in. As a matter
22  of fact, the guard that gave me a ride to my
23  truck, come back around there to the gate

Page 258

1  and wanted to know why I was still there.
2  And Don Gillingham, something like that, the
3  body weld maintenance manager, he was
4  standing outside, about thirty feet down
5  from me. Apparently everybody but me knew I
6  was getting fired because he called security
7  and asked what I was still doing there, when
8  all I'm doing is waiting on my tool bag. I
9  was treated like a thug, and I don't like
10  it. I might as well have been a prisoner of
11  war somewhere.
12    THE WITNESS: Let me take a
13  break and go check on my wife.
14    MR. JOHNSON: Okay. That's
15  fine.
16    (Recess taken.)
17    (Whereupon, Defendant's
18    Exhibit No. 6 was marked
19    for identification.)
20    Q.   Mr. Dees, this is something
21  we've marked as Exhibit 6 to your
22  deposition. Can you take a look at that and
23  tell me whether that -- you've seen this

Page 259

1  document before?
2    MR. SPORT: Matt, while he's
3  looking at that, would you mind -- if the
4  document is Bates numbered, putting the
5  Bates number in the Record?
6    MR. JOHNSON: The only reason
7  I wouldn't, is because some of these are our
8  documents and some are your documents, so
9  the Bates numbers -- if I say it's Bates
10  number 35 --
11    MR. SPORT: Just read the
12  Bates number into the Record.
13    MR. JOHNSON: I know. But if
14  I say Bates number 35, it could be my Bates
15  number 35 or your Bates number 35.
16    MR. SPORT: Well, no, your
17  Bates sequence is Dees V. HMMA and ours is
18  just Dees. So they are different.
19    MR. JOHNSON: Why don't we
20  just use the exhibit numbers. It's a
21  deposition, why don't we just use exhibit
22  numbers.
23    MR. SPORT: Okay. Well, I

Page 260

1  don't know why you would be opposed to
2  putting the Bates number in the Record.
3    MR. KILBORN: Well, I'll put
4  it in there. It's Dees versus HMMA 00035.
5    Q.   Have you read it?
6    A.   Yes, sir.
7    Q.   Several lines down there in
8  bold print it suggests that -- or Greg
9  Prater suggests that during his discussion
10  with you at one point you responded by
11  saying, quote, I just don't give a damn.
12  You guys just do whatever you want. I'm fed
13  up with this -- and I'll spell -- S-H-I-T,
14  period, end quote.
15    Do you recall ever making a
16  statement similar to that?
17    A.   A statement I made to him.
18  Then he referred to -- You've got to look at
19  it if you were a forward observer on lookout
20  guard duty. The statement I made to him is,
21  if I were the lookout on guard duty, I
22  wouldn't be sleeping.
23    Q.   So are you saying you did not

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 261

1  make the comment he has in bold print there?
2      A.    No, sir, I did not.
3      Q.    Okay.  Not at that time, and
4  never at any time?
5      A.    (Witness shakes head in the
6  negative.)
7      Q.    When you say you remember --
8  Are you saying you don't remember making it
9  or you know you didn't make it?
10     A.    No, sir, I didn't -- I didn't
11 cuss him like that.
12     Q.    Okay.
13     A.    And I didn't make --
14     Q.    When you say you didn't cuss
15 him like that, is that because you don't use
16 curse words?
17     A.    Try not to.
18     Q.    Okay.  When you say try not
19 to, do you succeed or do you use them?
20     A.    Most of the time I do.
21     Q.    Okay.  Is it your testimony
22 that you did not use curse words at Greg
23 Prater?

Page 262

1      A.    No, sir, I did not.
2      Q.    Did you use any at anybody at
3  the plant?
4      A.    No, sir.
5      Q.    Okay.  Did you use curse words
6  around your coworkers?
7      A.    No, sir.  Most of the time --
8  If I mash my finger or something.
9           No, sir, I try not to, and
10 most of the time I don't.  I'm not going to
11 sit here and tell you no, I never do it.
12     Q.    In your conversations with
13 Greg Prater, at any point in time did you
14 ever ask him, what can I do about this
15 situation?  How can I keep my job?  What can
16 I do to keep my job?
17     A.    I didn't think my job was in
18 jeopardy at that point.  Like I said, they
19 have a six- or seven-step firing process.  I
20 haven't even entered phase one at this step,
21 at this phase.  I have not entered the
22 firing process whatsoever.  Any time you --
23 Lucas Cooner told us, any time you enter a

Page 263

1  firing process, they have to tell you.
2      Q.    All right.  Now, so in terms
3  of this process, did you ever raise that
4  issue?  Did you ever say, hey, somebody,
5  it's not right to terminate me, I haven't
6  gone through the process?
7      A.    That lady.
8      Q.    Wendy Warner?
9      A.    That's her.
10     Q.    Okay.
11     A.    And like I said, it's like I
12 wasn't even talking.
13     Q.    Did she respond to you or say
14 anything about that process?
15     A.    No, sir.
16     Q.    Okay.  Now, I mean, in terms
17 of processes and procedures, did you engage
18 in any subsequent processes or procedures
19 after your termination to try to get your
20 job back or try to get the situation
21 changed?
22     A.    I called them about the --
23 what's it called?

Page 264

1      Q.    Team member review?
2      A.    That's it.
3      Q.    Okay.  Tell me about that.
4  Who did you call?
5      A.    I never could get ahold of
6  nobody.  I had Rob Clevenger's number, I
7  think, and I never saw him.  I'd leave him
8  messages and he'd leave me messages.
9      Q.    So y'all traded messages?
10     A.    Yes, sir.
11     Q.    Did Wendy Warner ever call
12 you?
13     A.    No, sir.
14     Q.    Did anybody but Rob Clevenger
15 ever call you about the review process?
16     A.    I don't think so.  I don't
17 know.
18     Q.    Okay.  Do you remember getting
19 a letter from Wendy Warner indicating when
20 the team member review would be scheduled
21 for?
22     A.    Yeah.  I got it on a Saturday
23 evening and that review was supposed to have

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 265

1  been a Monday morning.
2         (Whereupon, Defendant's
3         Exhibit No. 7 was marked
4         for identification.)
5     Q.    Okay.  And let me mark as
6  Exhibit 7, a copy of the letter.
7     MR. JOHNSON:  For Mr. Sport
8  and Mr. Kilborn's benefit, that's Dees V
9  HMMA document 1.
10    MR. KILBORN:  Thank you.
11    Q.    Mr. Dees, what we've marked
12 there as Exhibit 7, do you recall receiving
13 that letter at your home?
14    A.    Yes, sir.
15    Q.    And you say you received that
16 on a Saturday?
17    A.    Yes, sir.
18    Q.    Okay.  And then the review was
19 scheduled for the following Monday?
20    A.    Yes, sir.
21    Q.    Okay.  And it was scheduled
22 for ten o'clock in the morning?
23    A.    Yes, sir.

Page 266

1     Q.    And did you attend?
2     A.    No, sir.
3     Q.    Did you call Wendy Warner to
4  talk about it?
5     A.    No, sir.
6     Q.    Did you call Rob Clevenger to
7  talk about it?
8     A.    No, sir.
9     Q.    Did you call anybody to say I
10 can't be there at ten?
11    A.    No, sir.  I believe I talked
12 to my lawyers about it.
13    Q.    Okay.  And after talking to
14 your lawyers, you didn't show up?
15    A.    No, sir.  The reason I didn't
16 show up, because I had a job that was paying
17 a little bit, even though it wasn't paying
18 what I was making at Hyundai.  And if I had
19 taken off from a job, not only being there a
20 week or two to go to meet to try to get my
21 old job, I wouldn't have had a job when I
22 got back the next day.
23    Q.    Did you tell anybody at

Page 267

1  Hyundai that you got another job and it
2  conflicts with that ten o'clock meeting?
3     A.    I got this letter Saturday
4  evening.  Monday morning you're not going to
5  get ahold of anybody there.
6     Q.    Had you ever left a voicemail
7  with Rob Clevenger saying that you had
8  another job and telling him when it ought to
9  be scheduled?
10    A.    No, sir.  This letter and
11 those two little messages, the only thing I
12 got was that I met the requirements, and
13 that was it.  I didn't know what was going
14 on, I never could get ahold of nobody there.
15    Q.    Did you write them a letter?
16    A.    No, sir, I did not.
17    Q.    Were you keeping notes about
18 what was going on at this point in time?
19    A.    No, sir.  I had to make money.
20    Q.    Okay.
21    A.    Because I had to work a lot of
22 hours because I wasn't making nowhere near
23 what I was making.

Page 268

1     Q.    You said you were keeping
2  notes when you were at Hyundai, you were
3  making money then, weren't you?
4     A.    Yes, I was.
5     Q.    And you were working?
6     A.    Yes, sir.
7     Q.    And you were keeping notes
8  then?
9     A.    I didn't have the problems I
10 was having then.
11    Q.    And this was still going on
12 later?
13    A.    There was no one to talk to,
14 what notes was there to keep?  I had two
15 messages on my answering machine.  What else
16 is there to keep?  I kept the messages.
17    Q.    Do you think they were both
18 from Rob Clevenger?
19    A.    I don't remember.  I know one
20 of them was.  I don't remember if both of
21 them were or not.  I don't know.
22    Q.    So you remember one of them
23 was from Rob Clevenger?

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 269

1    A.    Yes, sir.
2    Q.    And the other may have been
3    from him, may have been from somebody else?
4    A.    May have been.
5    Q.    Do you know when those
6    telephone messages came in?
7    A.    According to this, it says
8    March the 2nd and March the 7th.  May or may
9    not have been, I don't know.  Like I said,
10   my world had been turned upside down.
11   Q.    Do you recall receiving the
12   initial phone message on March the 2nd?
13   A.    I don't believe so.
14   Q.    And do you know whether that
15   was from Rob Clevenger or who?
16   A.    I don't remember.
17   Q.    Do you remember returning that
18   call immediately?
19   A.    No, sir.  Because it was late
20   in the evening, I had gotten home from work
21   late.
22   Q.    All right.  Did you return
23   that call the next day?

Page 270

1    A.    I may have.  I don't know.
2    Q.    All right.  Do you remember
3    returning that call before March the 5th?
4    A.    I don't know.  I don't recall.
5    Q.    All right.  Do you remember
6    returning that call before March the 7th?
7    A.    I don't know.
8    Q.    Okay.  And, again, was it your
9    understanding when you received this letter
10   marked Exhibit 7, that the -- you were
11   supposed to meet with Rob Clevenger on that
12   Monday morning to talk about the review
13   process?
14   A.    Yes, sir.  That wasn't a
15   guarantee that I was going to get a job
16   back.  That was just a selected panel to see
17   about getting the job back, to go back into
18   the firing.
19   Q.    Did you know how the panel
20   selection process worked?
21   A.    No, sir.
22   Q.    Do you know whether it would
23   have been a panel of your peers that you

Page 271

1    would have selected from or how it would
2    have been done?
3    A.    I didn't know anything about
4    the process at all.
5    Q.    And you didn't show up to find
6    out?
7    A.    No, sir.  Like I said, I had
8    to work.  I couldn't take a chance on losing
9    a job that I had gotten through a friend to
10   try and look, maybe possibly one in a
11   million shot getting a job back that I had
12   been fired from.
13   Q.    You never called Rob Clevenger
14   that morning before you went to work to tell
15   him you couldn't make it?
16   A.    No, sir.
17   Q.    And you never called him
18   since, did you?
19   A.    No, sir.
20   Q.    Are you aware of any other
21   process at Hyundai that might possibly allow
22   you to get your job back, other than this
23   team member review process?

Page 272

1    A.    I don't know.  I don't know
2    what they have.
3    Q.    Okay.  But the one you did
4    know of, you didn't use, did you?
5    A.    At that point, no, sir.  Like
6    I said, I had a family to feed.  I can't
7    afford to lose one job for a job I had been
8    fired from already.  If I'd have left that
9    job to try and get that review back, I might
10   not have got another job.
11        (Whereupon, Defendant's
12        Exhibit No. 8 was marked
13        for identification.)
14   Q.    Let's mark this as Exhibit 8.
15   And this is Dees 3.
16        Mr. Dees, have you had a
17   chance to look at Exhibit 8?
18   A.    Yes, sir.
19   Q.    Okay.  Are you familiar with
20   that exhibit?
21   A.    Yes, sir.
22   Q.    Okay.  Tell me what it is.
23   A.    It's a yearly training

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 273

1  calendar schedule for my unit.
2      Q.    For a period beginning October
3  2006?
4      A.    Yes, sir.
5      Q.    Is this -- We talked earlier
6  about y'all get a training schedule on an
7  annual basis.  Was this what you were
8  talking about there?
9      A.    Yes, sir.
10     Q.    Okay.  Would this -- Am I
11 correct that this would show all training
12 dates beginning October 21 of '06 through
13 that training year?
14     A.    When this schedule was made,
15 yes, sir.  They were subject to change and
16 subject to be added to and taken from.
17     Q.    Okay.  Do you know if from
18 October 21st going forward, it was in fact
19 changed, added to, or subtracted from?
20     A.    You'd have to call my unit and
21 ask them.
22     Q.    Again, I'm asking you if you
23 know.

Page 274

1      A.    I don't remember.  It may
2  have, may not have been.  I don't know.
3      Q.    Okay.  Do you know -- You'd
4  indicated there was sort of an initial point
5  at which Greg Prater demanded orders.  Do
6  you know if any of the -- if any of these
7  are the dates that he demanded orders for?
8      A.    Probably several of them.
9      Q.    You think more than one
10 possibly?
11     A.    It had to have been October.
12 Like I said, it was several, several months.
13         (Whereupon, Defendant's
14          Exhibit No. 9 was marked
15          for identification.)
16     Q.    Okay.  And let's go ahead,
17 just so you can have both documents, also
18 mark as Exhibit 9, your '05 schedule.
19     A.    This is an '06 schedule.  It
20 says '06 on top.
21         MR. SPORT:  I was wondering
22 where you got the '05, because I don't have
23 it.

Page 275

1          MR. JOHNSON:  It's Dees 4.
2      A.    You got 1 October 05 in the
3  upper right-hand corner, but your month and
4  dates say '06.  This is the company training
5  schedule, this is my detachment training
6  schedule.
7      Q.    Okay.  Let me make sure.
8          MR. SPORT:  So somewhere on
9  this document is an error, we just don't
10 know what it is.  It's either in the dates
11 or it's on the date of the document.  We
12 don't know what it is.
13     A.    This one has company
14 commander's signature (indicating), this one
15 has my detachment commander's signature
16 (indicating).
17     Q.    All right.  Well, let me get
18 these marked and we'll talk through them and
19 figure out what they show.
20         All right.  So if we look at
21 -- What we've marked Exhibit 9, that shows a
22 date of October 1, of '05, but it has drill
23 dates in '06; correct?

Page 276

1      A.    Yes, sir.
2      Q.    Does that -- Does that make
3  sense to you?
4      A.    No.  I mean, I don't know.
5  You'll have to call my unit and ask them.
6      Q.    Okay.
7      A.    That would be Sergeant Barnes.
8      Q.    Look at the fax numbers there
9  at the top.  Do you recognize any of those
10 fax numbers?
11     A.    Yes, sir.
12     Q.    What is the -- Do you
13 recognize the 334-366-5278?
14     A.    Yes, sir.  That's to my wife.
15     Q.    That's to your wife?
16     A.    Yes, sir.
17     Q.    And the date of that fax
18 letter is March 26 of '07; correct?
19     A.    Yes, sir.
20         MR. SPORT:  Matt, if I can
21 interrupt you.
22         MR. JOHNSON:  Sure.
23         MR. SPORT:  It appears those

69 (Pages 273 to 276)

# FREEDOM COURT REPORTING

Page 277

1  two pages, page three and four, are pages
2  three and four of a fax that starts with
3  Dees 1 and 2, which you've already marked
4  earlier as Exhibit whatever.
5      MR. JOHNSON:  Okay.
6      MR. SPORT:  So it appears on
7  March 26th, Sergeant Barnes faxed all four
8  of those pages.  And Dees 5 is simply the
9  original of the fax version of Dees 3.  I
10  don't know if that clears anything up, but
11  that's the way it appears.
12      Q.    Okay.  Well, let's go back on
13  the Record.
14          Just so I can make sure, if we
15  look at Exhibit 6 and Exhibit -- I'm sorry,
16  Exhibit 8 and Exhibit 9, the 334-366-5278
17  fax number is to your wife; correct?
18      A.    Yes, sir.
19      Q.    And the date is March the
20  26th?
21      A.    Same day as the letter.
22      Q.    Same day as the letter, which
23  we previously marked as Exhibit 5.  So if

Page 278

1  you'd look -- hold Exhibit 5 up there for
2  just a second.
3      A.    (Witness complies.)
4      Q.    All right.  So, Mr. Dees, does
5  it make sense to you that Exhibit 5 goes
6  along with Exhibit 8 and 9, as a single fax?
7      A.    Yes, sir.
8      Q.    Okay.  And it was sent from
9  the National Guard unit?
10      A.    Yes, sir.
11      Q.    Were you there on March the
12  26th of '07?
13      A.    No, sir.  I don't believe.  I
14  believe that was a weekday.
15      Q.    Okay.
16      A.    And if it was, I was at work.
17      Q.    And who is Kevin Smith?
18      A.    Company commander.
19      Q.    And who is Shawn C. Dall?
20      A.    Detachment commander.
21      Q.    Okay.  What's the difference
22  between company commander and the detachment
23  commander?

Page 279

1      A.    Company commander is over the
2  detachment commander, we fall under the
3  company.
4      Q.    So would Shawn Dall have been
5  higher up the chain of command than Kevin
6  Smith?
7      A.    No, sir.
8      Q.    I got it backwards?
9      A.    Yes, sir.  Company is down in
10  Fairhope, we're up in Brewton.
11      Q.    Why would orders come from two
12  different places?  Would they not always
13  come from the same place?
14      A.    That's not orders.  That's
15  just the schedule.
16      Q.    Why would the schedule come
17  from two different places?
18      A.    Because we're not in the same
19  building as the company.  Our company is
20  down in Fairhope, we're up in Brewton.
21  We're in two separate locations.
22      Q.    Okay.  Now, what is the -- and
23  the company is the 1165th Detachment 1?

Page 280

1      A.    We're Detachment 1, 3rd
2  Platoon, 1165th Military Police Company.
3      Q.    Okay.  So does the training
4  schedule ordinarily come from the detachment
5  or from the company?
6      A.    That depends on the CO, what
7  he wants, what he tells that lieutenant to
8  do.
9      Q.    Okay.  And the CO being who?
10      A.    CO being Lieutenant Smith,
11  which is no longer the CO.
12      Q.    Who is now?
13      A.    Captain Payne.
14      Q.    What's his first name?
15      A.    Captain.
16      Q.    Or her first name?
17      A.    I don't know.
18      Q.    And Captain Payne is in
19  Fairhope?
20      A.    Yes, sir.
21      Q.    Did you keep records of your
22  training schedule?
23      A.    I have one posted on my

70  (Pages 277 to 280)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 281

1   refrigerator at the house.
2        Q.    All right.  Did you keep it
3   for '06?
4        A.    Do I have it now is what
5   you're saying?
6        Q.    Yes.
7        A.    Whatever this current year's
8   training schedule is on my refrigerator,
9   yes.
10       Q.    All right.  But --
11       A.    Did I keep them from the
12  previous?
13       Q.    Right.
14       A.    No.
15       Q.    Okay.  Do you have -- Do you
16  have a training schedule for the period
17  beginning the first part of '07?  Will that
18  -- I assume that's Exhibit 8 here?
19       A.    Yes, sir.  My company went to
20  Fort McClellan for AT this summer, and I
21  went this year and I went to Belize for AT.
22       Q.    AT being annual training?
23       A.    Annual training.

Page 282

1        Q.    And where did that take place
2   -- I mean when did that take place?
3        A.    12 May through 26 May.
4        Q.    And the training that you were
5   just on?
6        A.    Yes, sir.
7        Q.    Tell me what that was called
8   again.
9        A.    Basic Noncommissioned Officers
10  Course Phase II and III.
11       Q.    And was your current employer
12  aware you were going on that?
13       A.    Yes, sir.
14       Q.    And is your current employer
15  aware that you are back?
16       A.    Yes, sir.
17       Q.    Okay.  Is your current
18  employer aware that you are here today?
19       A.    Yes, sir.
20       Q.    We've gotten a copy of some
21  cell phone records from your attorneys that
22  were faxed to us here today.
23       A.    Yes.

Page 283

1        Q.    I want to mark those as
2   Exhibit 10.
3              (Whereupon, Defendant's
4              Exhibit No. 10 was marked
5              for identification.)
6        MR. SPORT:  Matt, do I
7   understand you'd like me to get you a little
8   more legible copy than that?
9        MR. JOHNSON:  Yes.
10       MR. SPORT:  I'll scan it and
11  e-mail it to you.
12       MR. JOHNSON:  That would be
13  great.  I would appreciate that.
14       Q.    Mr. Dees, let me let you look
15  at Exhibit 10.  Unfortunately we're going to
16  have to share a little bit on Exhibit 10,
17  because it's the only copy we've got -- or
18  it's the only copy I've got.
19       MR. JOHNSON:  Do we have
20  another copy?  Doesn't matter.  Just so I
21  understand, has any portion of this been
22  redacted, Jeff?
23       MR. SPORT:  Yes.

Page 284

1        MR. JOHNSON:  Do you know
2   which portion has been redacted?
3        MR. SPORT:  Account number and
4   carrier.
5        MR. JOHNSON:  I can see where
6   account number is redacted, invoice number
7   is redacted --
8        MR. SPORT:  And the carrier's
9   name appears on the page and we redacted
10  that.  All the phone call information --
11       MR. JOHNSON:  You mean who
12  provided the cell phone service?
13       MR. SPORT:  Yes.
14       MR. JOHNSON:  You mean you're
15  not going to tell us who he got his cell
16  phone from?
17       MR. SPORT:  I don't think
18  you're entitled to it.
19       MR. JOHNSON:  Well, I'm going
20  to ask him about it, and we can argue about
21  that later.
22              It also suggests here under
23  detail for Leon, it says 334, did you redact

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 285

1  his cell phone number?
2        MR. SPORT:  Yes.
3        MR. JOHNSON:  Are you not
4  wanting to know what cell phone number he
5  used?  I mean was it redacted on purpose?
6        MR. SPORT:  Yes.
7        MR. JOHNSON:  What was the
8  purpose?
9        MR. SPORT:  We originally
10  objected to it because of privacy reasons.
11  It does have something -- The calls made
12  around the date in question do have
13  something to do with the case, so we
14  produced that page, we just don't feel
15  you're entitled to the rest of the
16  information.
17        Q.    Okay.  I'm going to ask you
18  questions now about Exhibit Number 10.
19  Mr. Dees, am I correct that it's your
20  testimony today and previously that on the
21  night in question, when Jim Brookshire saw
22  you up on the third level, you were using
23  your phone to send a text message to your

Page 286

1  daughter?
2        A.    Yes, sir.
3        Q.    And what was the text message
4  about?
5        A.    To let her know that I was
6  okay.
7        Q.    Would there be any reason you
8  would not be okay?
9        A.    Well, she was worried.
10        Q.    Well, when you say she was
11  worried, how do you know she was worried?
12        A.    Because she called me before I
13  got to work on my way to work, I believe.
14        Q.    Okay.  You think she called
15  you on your cell phone?
16        A.    Yes, sir.  I believe it's on
17  there.
18        Q.    All right.  If you can, show
19  me where that is.
20        A.    I can't for my life make out
21  -- I don't know.  I see the 14:45, incoming.
22        Q.    All right.  What is the date
23  you're looking at?

Page 287

1        A.    13th, February 13th and 14th.
2        Q.    Okay.  And you see a telephone
3  call coming in on the 13th?
4        A.    I don't remember what day --
5  What day are you talking about?  What day
6  are you wanting?
7        Q.    Well, what I understand to be
8  the case, and subject to your agreement or
9  disagreement, was that, at least according
10  to the witness statements, Jim Brookshire
11  saw you in the third level at approximately
12  one a.m. on February 14th.  So you would
13  have been coming to work on the 13th, I
14  assume.
15        MR. KILBORN:  Say that again.
16        MR. JOHNSON:  He was seen on
17  February 14th and would have been -- started
18  work on the afternoon or dinnertime on the
19  13th.
20        A.    That's going to be it there,
21  the Birmingham, Alabama.  671, whatever it
22  is, six-something p.m.
23        Q.    Say that again.

Page 288

1        A.    Right here (indicating),
2  whatever this is here.  There's two or
3  three.  It looks like my wife called or
4  either the youngest daughter called from the
5  house.
6        Q.    Are you looking on the 13th
7  there?
8        A.    These right here (indicating).
9        Q.    The 5:23 p.m., I'm assuming
10  that's what that says.
11        A.    Yeah.
12        Q.    And then six --
13        A.    Let's see.  I start -- I think
14  it's these two (indicating), from what I can
15  see.  I don't -- Six something, I don't know
16  what that is.
17        Q.    All right.  Well, let's just
18  -- we'll break this thing out -- it says --
19  the dotted lines going across, there's seven
20  -- this is in the seventh area between the
21  dotted lines.
22        A.    That's the Birmingham call
23  there.

# FREEDOM COURT REPORTING

Page 289

1    Q.    All right.  The Birmingham
2  call from, and is that 205-389-5974?
3    A.    Yes, sir, I believe that's it.
4    Q.    All right.  Whose number is
5  that?
6    A.    That's one of her friends.
7    Q.    That's one of your daughter's
8  friends?
9    A.    Yes.
10    Q.    So you think that was your
11  daughter calling from Birmingham?
12    A.    They was down in the basement.
13  She had left her phone in the room.
14    Q.    Okay.
15    A.    They put them down in the
16  basement because of the weather.
17    Q.    Okay.  And the call right
18  before that, from a 334 number in
19  Maplesville, is that your home number or
20  your wife's number?
21    A.    That's my home number.
22    Q.    Okay.  And then the next
23  number from Maplesville, I'm assuming that's

Page 290

1  also your home number?
2    A.    Yes, sir.
3    Q.    Okay.  Can you read what time
4  that came in to you?
5    A.    I have no idea.
6    Q.    Okay.
7    A.    Something P, twenty-eight P.
8    Q.    All right.  Now, do you carry
9  your personal cell phone with you when you
10  were in the plant?
11    A.    Yes, sir.
12    Q.    All the time?
13    A.    Reason being, those radios --
14  like I said, those radios, sometimes they
15  work, sometimes they didn't.  A lot of times
16  we would -- Prater told us if we had a
17  breakdown over five or ten minutes, to call
18  him at home, no matter what time of the
19  night it was.  And we got called by him on
20  our personal phones that we paid for the
21  calls a lot of times on breakdowns.  I even
22  had to call Mr. Moon several times on
23  breakdowns.

Page 291

1    Q.    Okay.  Let me ask you here.
2  Looks like on February 14th, there's a
3  couple of incoming calls from -- I'm
4  guessing that's 334-419-1445?
5    A.    That's my number.  It says
6  incoming.  I don't know who it was.
7    Q.    That's your home phone number?
8    A.    No, sir.  That's my cell
9  number.  I don't know who was calling.  I
10  don't know.  It just lists it as an incoming
11  call.
12    Q.    Well, on your cell phone
13  records does it list as an incoming call --
14    A.    It's listed there as an
15  incoming call.
16    Q.    I'm just trying to figure out,
17  it looks to me -- I'm just trying to read
18  your records, does it not make more sense
19  that the calls to Maplesville and Birmingham
20  were calls that were made by you to somebody
21  else?
22    A.    No, sir.  Like this here
23  (indicating), it lists my number, that means

Page 292

1  they don't know who the number was that
2  called me.
3    Q.    Oh, okay.  So is it -- is this
4  all incoming calls or does it -- On your
5  phone records, does it separately list calls
6  that you made outgoing?
7    A.    I ain't never been asked
8  before, so . . .
9    Q.    All right.  Does it separately
10  list calls -- text messages that goes out?
11    A.    It just charges you for each
12  text message.
13    Q.    Okay.  Does it indicate when
14  you made those text messages?
15    A.    No, sir.  You just get a
16  charge.
17    Q.    All right.  Do you still have
18  the same telephone number?
19    A.    Yes, sir.
20    Q.    And have you reviewed your
21  telephone to see if you still have the text
22  messages on it from this period of time?
23    A.    A year ago?  No, sir.  I never

73 (Pages 289 to 292)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 293

1  did get through that night.  The weather was
2  bad.  Sometimes it could be sunny outside
3  and for some reason you may not get through,
4  you may get through.
5      Q.    And just to be safe, I want to
6  make sure we're clear.  When you said a year
7  ago, I'm talking about back in February of
8  this year?
9      A.    All right.  This is November.
10     Q.    Okay.  I just want to make
11 sure you were also talking about February of
12 this year.
13     A.    Yes, sir.
14     Q.    Okay.  Do you -- Do you have
15 any idea whether your cell phone records
16 show anything about text messages incoming
17 or outgoing as per a specific time?
18     A.    You get a charge, ten cents
19 per message, period.
20     Q.    And what is your complete
21 telephone number, cell phone number?  And I
22 promise I won't use it to call you.
23     A.    If you're writing it down, I

Page 294

1  ain't saying it.
2      Q.    I need you to say it.
3      A.    334-419-1445.  I thought you
4  weren't going to write it down.
5      Q.    I never said that.
6      Again, I'll make a promise to
7  you, I'm not going to give it to anybody
8  who's going to give it out.
9      MR. KILBORN:  That's covered
10 by the protective order we agreed on; right?
11     MR. JOHNSON:  That's fine.  I
12 agree.
13     Q.    Do you know if you made any
14 outgoing telephone calls on the night in
15 question?
16     A.    You've got the record.
17     Q.    Okay.  Again, it's hard for me
18 to, one, read it; and, two, it's hard to
19 tell which is incoming and which is
20 outgoing.  I mean, are -- because I think
21 what you told me earlier was that the ones
22 that say, for instance, Birmingham, Alabama,
23 isn't necessarily an outgoing call, it might

Page 295

1  be an incoming call.
2      A.    If I get an incoming call and
3  it comes up unknown number, they can't get
4  the number, they put my number down.
5      Q.    Okay.  And what about if it's
6  an incoming call from your daughter, what
7  does it show?
8      A.    That's it right there,
9  Birmingham.
10     Q.    And what if you make a call to
11 your daughter in Birmingham?
12     A.    Well, hold on, let me see if I
13 can find one.
14     Q.    And, again, this is for your
15 attorney's benefit --
16     A.    That may have been a call to
17 her friend's phone, I don't know.
18     MR. JOHNSON:  Without the
19 complete records, Mr. Sport, I'm having a
20 difficult time making heads or tails of this
21 thing.
22     MR. SPORT:  What else is
23 there?

Page 296

1      MR. KILBORN:  Hold on.  We
2  gave you what you asked for.  Now, we can
3  stop there.
4      We asked to inspect the plant.
5  Somebody on the legal team took the position
6  that we were a couple days late, therefore,
7  we couldn't inspect the plant.  Now, I'll
8  give you plenty more discovery which I don't
9  have to give you, as an accommodation, but I
10 expect the same.
11     MR. JOHNSON:  I think you have
12 to give us his cell phone records.  I was
13 trying to be gracious to you and your client
14 by not demanding them all.  And I haven't
15 demanded them all.  All I'm doing is saying
16 now that we're at the deposition and I can't
17 make heads nor tails of it in order to
18 examine the witness, then it's appropriate
19 for me to get.
20     MR. KILBORN:  This was covered
21 by your request for production, that's why
22 we gave it to you.
23     MR. JOHNSON:  I think

74 (Pages 293 to 296)

# FREEDOM COURT REPORTING

Page 297

1  technically, it's all covered by the request
2  for production and the protective order.
3          MR. KILBORN: What period of
4  time?
5          MR. JOHNSON: For the night in
6  question, and that would include --
7          MR. KILBORN: That is in
8  response to the request for production.
9          MR. JOHNSON: I think it's
10 fair for me to get the whole record. You're
11 giving me one page out of --
12         MR. SPORT: What are you
13 asking me for?
14         MR. JOHNSON: What I'm asking
15 you for is all seven pages of that invoice
16 so I can make the interpretation fairly
17 whether or not there is other information
18 that helps me to interpret the single page
19 that you've provided in a redacted version.
20 I'm not fussing at you for
21 redacting it, that's perfectly fine with me.
22 What I'd like to see is the entire invoice.
23 And I also want --

Page 298

1          MR. KILBORN: What did you ask
2  for?
3          MR. JOHNSON: I asked for the
4  whole thing and he said he would provide me
5  records --
6          MR. KILBORN: You did?
7          MR. JOHNSON: -- from the
8  evening in question.
9          MR. KILBORN: Will you show me
10 that request?
11         MR. JOHNSON: Okay.
12 All I can say is that by fax
13 dated August the 9th, your partner,
14 Mr. Sport, said: Your statement that we
15 agreed to, quote, produce copies of your
16 client's mobile phone records inclusive of
17 the entire shift he worked on the night in
18 question is incorrect. Rather he says: We
19 agreed to produce our client's cell phone
20 records for the time period in question
21 only.
22 All right. The time period in
23 question only would be the night of this

Page 299

1  incident. It does not necessarily mean that
2  you're not going to give me the entire
3  invoice.
4          MR. KILBORN: I think it does.
5  I'm just telling you that I don't mind
6  discussing a fair exchange of documents, but
7  I want the same consideration and not some
8  technicality that we were two days late.
9          Let me just say this. Let me
10 look at the entire bill. I don't
11 necessarily -- I don't necessarily think
12 there's a problem, but I don't think it's
13 going to help you and here's why. I used to
14 be with a carrier that provided a bill like
15 this. My current carrier actually shows to
16 and from, so you know if it's outgoing or
17 incoming. These don't do that. But my
18 former carrier that gave me a bill identical
19 to this, this is what it means, and you can
20 make this out, kind of sort of. And when I
21 give you the cleaner copy, you'll be able to
22 see. This says number called, that's that
23 column title, this column is entitled

Page 300

1  destination called.
2          When you see destination
3  called and a city, I believe that indicates
4  an outgoing call; and when there's an
5  incoming call, instead of a destination
6  city, it says incoming call. That's what I
7  believe this means. Other than contacting
8  the carrier and confirming that, I don't
9  know how the rest of the bill will help you.
10         MR. JOHNSON: Again, you
11 hadn't provided that to us, so I don't know.
12 It may not, I agree with you. But I can't
13 feel like I'm doing my job --
14         MR. SPORT: Is that your
15 question, you want to know what's outgoing
16 and what's incoming?
17         MR. KILBORN: Let's go off the
18 Record and you and I will talk. Take a
19 break.
20         (Recess taken.)
21         (Whereupon, Defendant's
22          Exhibit No. 11 was marked
23          for identification.)

75 (Pages 297 to 300)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 301

1    Q.    All right.  Mr. Dees, we're
2  going back on the Record now, just so you
3  know.
4        Let me show you what I have
5  marked as Defendant's Exhibit 11.  And I
6  know that you and your attorneys had an
7  opportunity to look at that just before we
8  got started; is that correct?
9        A.    Yes, sir.  We had just seen
10  the box before we got started?
11    Q.    Right.
12    A.    Yes, sir.
13    Q.    And just for the Record, I
14  gave you a box of items; correct?
15    A.    Yes, sir.
16    Q.    And you reviewed the contents
17  of the box?
18    A.    Yes, sir.
19    Q.    And were the contents of the
20  box consistent with what's indicated on
21  Exhibit 11?
22    A.    Yes, sir.  But you got to take
23  into account, like I said, my locker was

Page 302

1  left unlocked for several months, then a
2  lock was placed on it, then a lock was taken
3  off, and then whoever -- one of y'all was
4  videoed taking the contents out of the
5  box --
6    Q.    Okay.
7    A.    I mean, out of the locker.
8    Q.    Okay.
9    A.    I mean, there's no chain of
10  custody there.
11    Q.    Okay.  But I just want to make
12  sure that we're clear on the box of items
13  that was given to you today was consistent
14  with what's listed on that sheet?
15    A.    You can have them back.
16  That's not my stuff on that box.  The tools
17  belong to Hyundai.
18    Q.    Now, let me ask you this.
19  With respect to the list of items there on
20  Exhibit Number 11, do you have any reason to
21  think at the time of your termination there
22  were other items in that locker, other than
23  the jacket that you got back and some notes

Page 303

1  that you mentioned earlier?
2    A.    Yeah.  I mean, I had Army pay
3  stubs in there, with my account number,
4  where my money is being sent, my social, all
5  my information pertaining to my Army -- my
6  account that my Army check goes into, and my
7  military service --
8    Q.    Did they get sent to you --
9    A.    -- notes.  No, they didn't get
10  sent to me.  The only thing I received since
11  I left was when you brought that box today.
12  I haven't received, I haven't heard from
13  them, nothing.
14    Q.    Your Army pay stubs, were
15  those sent to you at Hyundai?  Did you
16  receive your paycheck at Hyundai?
17    A.    No, sir.  I had it in my
18  pocket, and carried it in there, and forgot
19  it, took it out and put it in my locker.
20    Q.    Is it one pay stub?
21    A.    No.  It's several.  But like I
22  said, it had my savings account number, my
23  Social Security number, it had everything on

Page 304

1  there.
2    Q.    Your pay stubs have your
3  Social Security number on it and your
4  account number for your bank?
5    A.    An Army pay stub, yes, sir, it
6  does.
7    Q.    Do you have subsequent Army
8  pay stubs?
9    A.    Yes, sir, somewhere.
10    Q.    All right.  The ones that you
11  do have, are they in the same format and
12  look just like the ones that were in your
13  locker on date of termination?
14    A.    Yes, sir.  It's got my rank,
15  my years of service, unit.
16    Q.    And this is just a pay stub,
17  that's all we're talking about?
18    A.    Yeah.  There was a couple of
19  them.  I mean I don't know.
20    Q.    All right.
21    A.    At the time, yeah, I left a
22  lot of stuff in there.  That was back in
23  February.  And y'all show up with stuff that

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 305

1  don't even belong to me. That stuff there
2  belonged to Hyundai. You can carry it back
3  to them. My personal stuff, they left.
4      Prater went in, left my tool
5  bag, everything out there, everything in my
6  locker, and brought me that jacket with that
7  little MP3 player and my notes was missing
8  and everything is -- and this here, I can't
9  even read hardly.
10     Q.    I'm trying to figure out what
11  else you had in your locker, other than
12  what's on that list, the MP3 player, the
13  notes, the pay stubs, and the jacket. Can
14  you think of anything?
15     A.    No, sir.
16     Q.    Was there anything else of
17  value in that locker?
18     A.    I don't know.
19     Q.    Okay.
20     A.    I don't know.
21     Q.    Now, how many Army pay stubs
22  would there have been?
23     A.    There was two or three.

Page 306

1      Q.    Two or three?
2      A.    Yes, sir.
3      Q.    Okay. And do you know what
4  months they were for?
5      A.    No, sir.
6      Q.    Do you remember when you put
7  them in your locker?
8      A.    No, sir.
9      Q.    Do you remember how long they
10  were in your locker?
11     A.    No, sir.
12     Q.    Do you remember showing them
13  to anybody or talking to anybody about it?
14     A.    No, sir.
15     Q.    And when you say pay stubs,
16  are they literally pay stubs where you tear
17  the check off the bottom half?
18     A.    No, sir. It's a computer
19  printout.
20     Q.    Okay. It just shows what was
21  direct deposited into your account?
22     A.    Yes, sir.
23     Q.    Okay. So it doesn't actually

Page 307

1  come with an actual check?
2      A.    No, sir.
3      Q.    And is it on a
4  eight-and-a-half-by-eleven, normal sheet of
5  paper size thing?
6      A.    Yes, sir.
7      Q.    And I assume, like regular pay
8  stubs, it shows, you know, what your gross
9  is, what they took out, what they withheld
10  for taxes, and that kind of stuff?
11     A.    Yes, sir.
12     Q.    Okay. Anything else you can
13  think of that was in your locker?
14     A.    I don't know. I hadn't
15  thought about it today.
16     Q.    All right. Well, have you
17  thought about it before today?
18     A.    A while back, after I'd gotten
19  fired, yes, sir, I did.
20     Q.    All right. Did you write down
21  what you thought was in your locker at that
22  point in time, take notes on it?
23     A.    No, sir, I did not. I was

Page 308

1  flustered, I was mad.
2      Q.    Does being mad make you not
3  take notes?
4      A.    No, sir. That didn't have
5  nothing to do with me not taking notes.
6      Q.    Okay.
7      A.    That had everything to do with
8  me being flustered and mad because I had
9  gotten fired for somebody recommending that
10  I be fired, off of a recommendation that he
11  had made. It's right there in your letter
12  that you had, that he recommended it.
13     Q.    What are you talking about?
14     A.    Prater. He recommended it.
15     Q.    I know what you're talking
16  about. But you're referring to Prater?
17     A.    Yeah. It said he recommended
18  it: Based on this conversation, I feel that
19  even if he were not sleeping, that he
20  doesn't care enough about his job to defend
21  anyone from thinking he was sleeping. John,
22  my recommendation is termination.
23     Q.    What exhibit are you referring

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 309

1  to?
2      A.    Number 6.
3          (Whereupon, Defendant's
4          Exhibit No. 12 was marked
5          for identification.)
6      Q.    Okay.  Let me show you what
7  we've marked as Exhibit 12, and that's Dees
8  versus HMMA number 6, deposition Exhibit 12.
9      A.    Where is 9?  Or have I got
10 them.  I got them backwards.  Hold on.
11     Q.    Do you recognize that
12 document, Mr. Dees?
13     A.    I've never seen this document.
14     Q.    You've never seen that
15 document?
16          Is it your testimony you've
17 never seen that?
18     A.    Not until -- I believe I saw
19 it yesterday, but prior to that, no, I'd
20 never seen this document.
21     Q.    You indicated that when you
22 met with Wendy Warner and some others at the
23 time of your termination, Wendy Warner had a

Page 310

1  piece of paper that as you testified,
2  slammed it on the table?
3      A.    Yes, sir.
4      Q.    Did you read that document?
5      A.    No, sir, I didn't read it.
6  She read a document that she had in her hand
7  that she was holding up at an angle that she
8  could see.  I was sitting across the table
9  from her.  She read the document, and she
10 finished it, placed it face down on the
11 table like that (indicating).
12     Q.    Do you remember anything about
13 what she read out loud to you?
14     A.    Just that I had been accused
15 of sleeping and I was being terminated
16 immediately.
17     Q.    All right.  Was that on
18 February 26th?
19     A.    That was it.
20     Q.    Do you remember if the letter
21 said anything like this:  Dear Leon, it has
22 been brought to my attention on February
23 14th, 2007, you were found by a member of

Page 311

1  HMMA management in the third floor overhead
2  sleeping.  HMMA policy states, quote,
3  serious and excessive violations of HMMA's
4  performance standards, end quote, is a
5  serious misconduct violation.
6          I won't read the whole thing,
7  but since you're looking at Exhibit 12, what
8  you're reading there, is that consistent
9  with what she read to you?
10     A.    I don't know.  Like I said, I
11 had been floored.  The only thing I heard
12 was sleeping and terminated immediately, and
13 I couldn't believe it.
14     Q.    Okay.
15     A.    I mean, that was --
16     Q.    Do you -- Just so I can make
17 sure that the Record is clear, what does
18 cleaning the pit involve?
19     A.    Cleaning the pit involves
20 picking all the scrap up around the
21 conveyors that's fallen while the presses
22 are running.  And you have a -- It's very
23 dangerous because you're doing it, you're

Page 312

1  down there, you have no communication, if
2  anything happens to you, you're there until
3  someone decides to come looking for you.
4      Q.    Would you go there without
5  telling somebody you're in it?
6      A.    I wouldn't go there unless
7  told to go there.
8      Q.    Would the -- Are the -- You
9  say the presses are running when you're down
10 there?
11     A.    Yes, sir.
12     Q.    And I want to make sure I
13 understand.  I mean, the presses aren't some
14 giant thing that comes down and stamps where
15 you're actually standing when you're
16 cleaning out the pit, is it?
17     A.    No, sir.  But the scraps are
18 falling down where you're actually standing.
19 I mean, it's falling onto a metal conveyor,
20 but the reason you're having to go clean the
21 pit is because it bounces out of that
22 conveyor onto the floor.  And you do -- you
23 get stuck.  You've got little protective

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 313

1  gloves, but it only covers your forearms and
2  your hands, everything else is fair game.
3      Q.    But what we're talking about
4  is picking up or removing, essentially,
5  debris from the stamping equipment that
6  comes off a conveyor belt?
7      A.    No, sir. We're talking about
8  putting yourself in a hazardous situation
9  with scrap falling thirty foot into a chute,
10 bouncing off a metal conveyor, coming down
11 right beside your head, your back, your
12 neck, everything else that's exposed. And
13 the gloves you're wearing is only cut
14 resistant, not cut proof.
15     Q.    Do you have any reason to
16 think that working in the pit is
17 unreasonably dangerous or inappropriate?
18     A.    It's very dangerous. Like I
19 said, you got sharp steel coming down
20 through these chutes, sheet metal, some of
21 it is perfectly square corners, and that's the
22 comes out to a razor point. And that's the
23 reason you're cleaning it, because it

Page 314

1  doesn't stay in the conveyor, it bounces out
2  all over the place. And if you get hit by
3  it, you get cut no matter what you're
4  wearing.
5      Q.    To your knowledge, has anybody
6  been injured because of the pit?
7      A.    Several people has been --
8  Well, I believe somebody has. I don't
9  remember who it was.
10     Q.    You don't recall?
11     A.    No.
12     Q.    Okay.
13     A.    The metal is very sharp.
14 They've got numerous instances of people
15 getting cut by that metal.
16     Q.    Is there -- Did you ever get
17 cut by the metal?
18     A.    I got -- Yes, sir. Not bad
19 cuts where I had to have stitches, no.
20     Q.    Did you file any sort of
21 worker's comp claim or report an injury or
22 anything like that?
23     A.    No, sir.

Page 315

1      Q.    Did you ever see -- Do y'all
2  have a nurse or doctor on site at the plant?
3      A.    Yes, sir. But you was
4  discouraged from going there.
5      Q.    Did you ever get hurt and go
6  there?
7      A.    No, sir, I never went there.
8      Q.    Okay.
9      A.    If I got a cut, I covered it
10 up and I drove home.
11     Q.    Did you ever file any
12 complaints to anybody in management about
13 the pit?
14     A.    Yes, sir, I did. Several
15 times.
16     Q.    Who was that?
17     A.    I went to HR and Applegate.
18     Q.    Did you file any written
19 complaints?
20     A.    No, sir. Like I said, they
21 didn't have a format or process for filing
22 written complaints.
23     Q.    Okay. When you talked to

Page 316

1  Applegate, what did he say about the pit?
2      A.    Like I said this morning, he
3  said it all pays the same, what's your
4  problem.
5      Q.    Who did you talk to in HR
6  about the pit?
7      A.    I believe it was Keisha.
8      Q.    Keisha. And what did she say
9  about the pit?
10     A.    She said she would get with
11 Applegate and Prater. The next thing I know
12 I'm going to talk to Applegate.
13     Q.    Okay. Do you have any reason
14 to think you've been discriminated against
15 or harassed for any other protected
16 characteristic like sex, age, race?
17     A.    Everything stems around my
18 military career, everything. Like I say, it
19 all started with harassment about my orders.
20 Everything had to do with my weekend drill,
21 all the way from Prater to HR. Every time
22 I'd go to them, the letter from my unit, the
23 e-mail, everything all the way to the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 317

1  recommendation for Prater saying I recommend
2  him for termination, everything stemmed
3  around my Guard duty.
4  **Q.   Okay.  And so I'm assuming**
5  **that since you're saying everything stems**
6  **from your Guard duty, I'm assuming it would**
7  **be safe to rule out any other issues, like**
8  **age, race, sex, religion, anything like**
9  **that?**
10  A.   I reckon.
11  **Q.   You would agree?**
12  A.   I mean, I don't know what --
13  **Q.   Let me ask you this --**
14  A.   Like I said, everything come
15  from my Guard duty.  As far as to my
16  knowledge, everything from the beginning
17  from when it started, to the end, to my
18  knowledge, seemed like it come from my Guard
19  duty and my commitment to the Guard.
20  **Q.   Let me ask you some pretty**
21  **simple questions.  Were you terminated**
22  **because of your age?**
23  A.   Well, they say I was

Page 318

1  terminated because I was sleeping.  But,
2  like I say, that all started because of my
3  Guard duty.
4  **Q.   Are you saying you were**
5  **terminated because of your age?**
6  A.   I'm not saying anything.  I'm
7  saying I was terminated because of my Guard
8  duty is what I'm saying.
9  **Q.   Were you discriminated against**
10  **because of your age?**
11  A.   Like I said before, I believe
12  I was terminated against because of my Guard
13  duty service.
14  **Q.   Were you discriminated against**
15  **because of your age?**
16  A.   I have no idea.
17  **Q.   Is that a yes or no, were you**
18  **or weren't you?**
19  MR. KILBORN:  Don't raise your
20  voice.  We're not suing over any type of
21  discrimination other than the circumstances
22  that we sued over.
23  MR. JOHNSON:  I agree.  And I

Page 319

1  just want to rule out that there's no other
2  lawsuits coming in the future related to
3  this.
4  MR. KILBORN:  You're not.
5  That's guaranteed.
6  MR. JOHNSON:  Okay.
7  **Q.   And when did you first start**
8  **taking notes about the harassment issues?**
9  A.   The very first time it
10  happened.
11  **Q.   The very first time?**
12  A.   Yes, sir.
13  **Q.   Okay.  And did you ever show**
14  **your notes to any of your coworkers?**
15  A.   We went through this this
16  morning.
17  **Q.   That's right.  Did you ever**
18  **show them to anybody in HR?**
19  A.   No, sir.
20  **Q.   And would it be fair to state**
21  **that --**
22  A.   I never showed them to no one
23  in HR, but I made the complaints from my

Page 320

1  notes to HR.  When I went to HR, I discussed
2  what was on my notes.
3  **Q.   Okay.**
4  A.   Did I pull them out and show
5  them to them?  No.
6  **Q.   Other than with respect to**
7  **your military service, how was your**
8  **relationship with Greg Prater?**
9  A.   He was my boss, I was the
10  employee.
11  **Q.   I mean, was he a good boss?**
12  A.   No.
13  **Q.   Why not?**
14  A.   I mean, well, you talked to my
15  coworkers.
16  **Q.   I'm talking to you now.**
17  A.   He has no supervisory skills.
18  **Q.   Okay.  What makes you say**
19  **that?**
20  A.   His mismanagement of funds,
21  his mismanagement of time.
22  **Q.   Mismanagement of funds, how?**
23  A.   Not ordering parts, then when

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 321

1  he ordered parts, he ordered too many of the
2  wrong thing and not having money to order
3  the right parts.
4      Q.    Mismanagement of time, how is
5  that?
6      A.    Scheduling people to come in
7  on the weekend to work and not having the
8  parts there to do the job.
9      Q.    Did you have any problems with
10  Greg Prater because of that?  Did you tell
11  him he was a bad manager?
12      A.    No, sir.  It wasn't my job.
13      Q.    Did you ever suggest to him
14  that he wasn't a good manager?
15      A.    No, sir.  I was being paid to
16  do a job, and I did the job I was paid to
17  do.
18      Q.    Did you ever indicate to him
19  that he didn't do his job well?
20      A.    No, sir.
21      Q.    Okay.
22      A.    Several others did, but not
23  me.

Page 322

1      Q.    Not you?  You never did?
2      A.    No, sir.
3      Q.    Okay.  Now, before the letter
4  was sent from Sergeant Barnes, back in
5  October —
6      A.    Yes, sir.
7      Q.    — did you have any problems
8  with Greg Prater?
9      A.    That's the reason the letter
10  was sent.
11      Q.    Okay.  And prior to that time
12  in October, can you think — do you have any
13  idea how many times you had issues with Greg
14  Prater?
15      A.    I don't know.
16      Q.    Was it one instance and then
17  Sergeant Barnes — you had Sergeant Barnes
18  send that letter?
19      A.    No, sir.  If it had been one
20  incident, I wouldn't have sent it.  I don't
21  hit the panic button for no reason.
22      Q.    Had you gone to human
23  resources before the letter from Sergeant

Page 323

1  Barnes got sent?
2      A.    Yes, sir.  That's why I had
3  Sergeant Barnes send the letter.  That's why
4  I made a complaint to my unit, and Sergeant
5  Richberg made the recommendation.
6      Q.    Okay.
7      A.    Like I said earlier, the only
8  thing HR was concerned about was he told us
9  we couldn't talk to them.  They could care
10  less whether his harassment about my Guard
11  service or not.
12      Q.    All right.  How was Greg
13  Prater viewed by your coworkers?
14      A.    You'll have to ask them that.
15      Q.    Well, did they ever say
16  anything to you about what they thought of
17  him?
18      A.    Yeah.
19      Q.    What did they say?
20      A.    I don't remember specific
21  quotes.  He wasn't very popular.
22      Q.    Okay.  Did he have specific
23  problems with anybody?

Page 324

1      A.    You'll have to ask them that.
2  I can't testify as to their problems they
3  had with or without him.  I don't know.
4      Q.    Do you remember anything any
5  of your coworkers ever said about problems
6  they were having with Prater?
7      A.    No, sir.
8      Q.    Do you recall any of your
9  coworkers ever arguing with Prater in your
10  presence?
11      A.    Well, that very first day we
12  went to HR, everybody was arguing with him.
13      Q.    About what?
14      A.    When he told us we couldn't go
15  to HR.  And Chris Weihe jumped on him about
16  making fun of my military career and about
17  harassing me about my military career.
18      Q.    What did Chris say?
19      A.    I don't remember exact words.
20  I don't know.
21      Q.    Were you there when he said
22  them?
23      A.    Oh, yeah, we was there.  The

81  (Pages 321 to 324)

# FREEDOM COURT REPORTING

Page 325

1 whole shift was there.
2  Q. Do you remember approximately
3 what Chris said?
4  A. No. That was over a year ago.
5  Q. Okay. Can you think of
6 anybody other than Chris Weihe that might
7 have said something to Prater about your
8 military service?
9  A. Some of the fellows on the
10 other shift said they did, I don't know.
11  Q. Do you know if Chris Weihe is
12 still working at the plant?
13  A. Yes, he is.
14  Q. He hasn't been terminated for
15 taking up for you or anything like that?
16  A. No. Well, I take that back,
17 Drake and -- Who is it? I think it was
18 Drake and Hanks both said something to him.
19  Q. To who?
20  A. Prater.
21  Q. Do you know what they said?
22  A. No.
23  Q. Were you there when they said

Page 326

1 it?
2  A. Yeah. But that was -- that
3 was -- that was a pretty good -- pretty big
4 meeting. And I -- He had jumped on me
5 pretty hard about my Guard duty that day.
6  Q. How did he jump on you?
7  A. Telling me that all we did was
8 go down there and party, we didn't train.
9  Q. Was it --
10  A. All we was was a bunch of
11 losers wanting to play army.
12  Q. Was that the worst incident?
13  A. Was that the worst incident?
14 Probably not. That was probably the worst
15 group incident.
16  Q. Okay. What was the worst
17 incident that the two of you had?
18  A. I mean, we never -- I never
19 got in a shouting match.
20  Q. What is the worst thing he
21 ever said to you?
22  A. Like I said, basically telling
23 me I wasn't -- that my military career was

Page 327

1 basically a ruse, a joke.
2  Q. How did he say that?
3  A. Y'all ain't nothing but a
4 bunch of weekend wienie wannabe's, something
5 of that nature. And all the time -- Like I
6 said, you got a fellow sitting here saying
7 he's been to Baghdad, talking about how many
8 people he's killed and everything, and then
9 all of a sudden you've been over there a
10 couple times, you've done it, and sitting
11 there and telling you you're a joke. I
12 mean, as far as actual knock-down dragouts,
13 no, I don't -- I can control myself better
14 than that.
15  Q. What about him? Did he ever
16 yell at you?
17  A. He yelled at everybody.
18  Q. When you say yelled, did he
19 literally raise his voice?
20  A. Oh, yeah. When I say he
21 yelled, yes, he yelled.
22  Q. Did he ever yell at you about
23 your military service?

Page 328

1  A. Yeah.
2  Q. What did -- How did he yell at
3 you? What did he yell at you?
4  A. You're going to bring me some
5 military orders. And come in Monday:
6 Where's my orders? If you don't bring them,
7 you're going to get wrote up. You're going
8 to get fired for your military service. You
9 were supposed to be here this weekend.
10 If you haven't talked to him,
11 I'm sure you will, which I'm sure you have.
12  Q. Anything else that he said?
13  A. I don't remember. I mean, it
14 was -- it was an ongoing event for several,
15 several months.
16  Q. But I need to make sure I know
17 what he did.
18  A. Okay. We've covered it.
19  Q. All right.
20  A. I'm telling you what he did.
21 Like I said, you talk to my friends, you
22 pretty much know.
23  Q. Is there anything else that

82 (Pages 325 to 328)

# FREEDOM COURT REPORTING

Page 329

1  Greg Prater did or said that you felt was
2  harassing in any way?
3        A.    Yeah.  Like I said -- Like I
4  started out this morning, my military
5  service became an issue, and it never went
6  away.  It stayed an issue, it caused
7  problems.  And I believe, to my utmost
8  ability, that that was the reason I'm fired
9  -- I was fired.  I mean, everything points
10  -- everything falls back on my military
11  commitment, everything, from get-go to
12  finish.
13        I don't care what her letter
14  (indicating) says, even -- Like I said,
15  Prater's recommendation, even if he wasn't
16  sleeping, I recommend he be terminated.
17  Everything falls back to me not providing
18  something that I cannot provide for a drill,
19  for a weekend.
20        MR. KILBORN:  For the Record,
21  you pointed to a Defendant's Exhibit 12.
22        THE WITNESS:  Yes, sir.
23        MR. KILBORN:  All right.  I

Page 330

1  just wanted the Record to be clear what you
2  pointed to.
3        Q.    Mr. Dees, was using the cell
4  phone for text messaging or other personal
5  purposes, a violation of Hyundai policy or
6  other policy?
7        A.    Well, you've got their policy
8  there somewhere, I know.
9        Q.    I'm asking you?
10        A.    Their policy states your cell
11  phone is to be kept in your locker and only
12  used on breaks and lunch breaks.  And as I
13  stated earlier, Prater, Mr. Moon, Applegate
14  even called some of our team members on our
15  personal cell phones during breakdowns
16  wanting to know what was going on.
17        Q.    Okay.
18        A.    Their policy said one thing,
19  they enforced something else.
20        Q.    Okay.
21        A.    And that come from management,
22  all the way down.  And if you didn't have
23  your cell phone, why didn't you call me on

Page 331

1  your cell phone was the question asked.
2        Q.    Okay.
3        A.    So they ignored -- They threw
4  their own policy out the window, as they did
5  with everything else, as they did with their
6  policy on the military leave.  Prater
7  telling me he's going to make me use my
8  vacation time in lieu of my military leave.
9        Q.    They never did that, though?
10        A.    No, sir, he didn't.
11        Q.    Okay.
12        A.    But I didn't know that.
13        Q.    You called -- Why is it you
14  made the decision to call Mr. Moon after you
15  were terminated?  Why Mr. Moon?
16        A.    He was the only person I knew
17  to call.
18        Q.    Why didn't you call Mr. Moon
19  and complain about Greg Prater when he was
20  allegedly harassing you?
21        A.    The Koreans -- Well, everybody
22  complained to Mr. Moon about Prater.
23  Mr. Moon knew how Prater was, that's what he

Page 332

1  said.
2        Q.    Did you?
3        A.    Yeah, I complained to
4  Mr. Moon.
5        Q.    What did you tell Mr. Moon
6  about Prater before you were terminated?
7        A.    The exact comments, I have no
8  idea.
9        Q.    Did you tell him he's
10  harassing me because I go on Guard duty?
11        A.    Yes, I did.  I told Mr. Moon
12  that I was being picked on by Greg Prater,
13  by Applegate and HR.  And he said, look, I
14  know Prater is a bad man.  Give me time.
15        Q.    This was before you were
16  terminated?
17        A.    Yes.  I wasn't the only one
18  that complained to him.
19        Q.    Okay.
20        A.    But as far as, like I said,
21  about my Guard duty, yes, I did.  I didn't
22  know nobody else to call.  Mr. Moon was the
23  only one I knew.  He was the other

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 333

1  counterpart, the Korean counterpart, my
2  Korean boss in that shop, and I called him.
3      Q.   What I'm trying to make sure I
4  understand, is in the sense that you called
5  him after you were terminated, did you call
6  him or have your wife call him during the
7  period in which you were allegedly harassed
8  to try to get him to stop Greg Prater?
9      A.   No. I talked to him a few
10  times at work. But I didn't know I was
11  being terminated. How am I supposed to call
12  somebody if I don't know I'm being
13  terminated?
14      Q.   Did you know you were being
15  harassed?
16      A.   Yes. Why do you think I went
17  to HR.
18      Q.   So you knew that but you
19  didn't go to Mr. Moon with that?
20      A.   I told you earlier that I
21  complained to Mr. Moon about one time and he
22  said give me time. And Prater was -- He
23  knew Applegate. But apparently it didn't do

Page 334

1  no good, they told him to leave it alone.
2      Q.   Is that the only discussion
3  you had with Mr. Moon about the harassment?
4      A.   Probably. Because the Koreans
5  don't like to discuss problems like that.
6  They think if they wait, they will just go
7  away; that's their custom.
8      Q.   Do you have any reason to
9  think that Mr. Moon talked to President Ahn
10  about the situation?
11      A.   Say again.
12      Q.   Do you have any reason to
13  think that Mr. Moon spoke to President Ahn
14  about your situation?
15      A.   Before I was fired?
16      Q.   Before or after.
17      A.   Well, he talked to either J.H.
18  Kim or Mr. Ahn, one, after I was fired. I
19  have no idea who he talked to before I was
20  fired.
21      Q.   Do you have any reason to
22  think that President Ahn had anything to do
23  with your termination or even knew about

Page 335

1  your termination?
2      A.   I don't know. Like I said,
3  everything went back to that military
4  record.
5      Q.   But again what did you know.
6  Do you have any reason to think that Mr. Ahn
7  knew about your situation?
8      A.   Like I said, it all went back
9  to my military record. Apparently it had to
10  have come up somewhere along the line.
11      Q.   Do you have any personal
12  knowledge as to what Mr. Ahn knew about it?
13  That's an easy question to answer.
14      A.   I wasn't in the meeting. I
15  don't know what they discussed. All I
16  know --
17      Q.   So the answer is no?
18          MR. KILBORN: Hold on. Don't
19  interrupt him.
20      A.   All I know is that it went
21  back -- it started with my military career,
22  my military commitment, and it stayed there.
23      Q.   Would it be fair --

Page 336

1      A.   I wasn't in the meeting, I
2  don't know what they discussed. I just know
3  everything come from my military obligation.
4      Q.   Would it be fair to state that
5  you, today, don't have knowledge of whether
6  President Ahn were involved or not involved?
7  Would that be a fair statement?
8      A.   I'm going with my last
9  comment.
10      Q.   Well, is that not a fair
11  statement or is it a fair statement?
12      A.   Like I said, I wasn't in the
13  meeting. I have no idea what they said.
14  All I know is everything stemmed from my
15  military career and commitment.
16      Q.   So you don't know what
17  involvement, if any, Mr. Ahn had; is that
18  true?
19      A.   Like I said --
20          MR. KILBORN: Object. You
21  asked him that four or five times.
22          MR. JOHNSON: He doesn't want
23  to answer the question though.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 337

1    MR. KILBORN: Hold on. I'm
2 going to get my objection in or we're going
3 to be here until the cows come home. You
4 asked him that four or five times, he's told
5 you what he knows about Mr. Ahn, he's told
6 you that Mr. Moon said that he was going to
7 Mr. Ahn or Mr. Kim. Now get on with your
8 next question.
9    MR. JOHNSON: What he hasn't
10 said is what he knows about whether or not
11 Mr. Ahn was involved.
12    MR. KILBORN: I think he's
13 told you what he knows. If you know
14 anything else, tell him about Mr. Ahn.
15    Q.   Do you know anything else
16 about Mr. Ahn's involvement?
17    A.   I've answered the question the
18 only way I know how to answer it, and that's
19 the answer I'm sticking with.
20    Q.   Okay. So there's nothing else
21 you can tell me about Mr. Ahn's involvement
22 with your situation?
23    A.   Like I said, I've answered to

Page 338

1 the best of my ability, and that's the
2 answer I'm sticking with.
3    Q.   I'm sure that will be
4 satisfactory.
5    Who is the other gentleman,
6 Mr. Kim?
7    A.   J.H. Kim.
8    Q.   What do you know about
9 Mr. Kim's involvement? Tell me what you
10 know.
11    A.   Same thing.
12    Q.   So you don't have anything to
13 tell me?
14    A.   No, sir.
15    Q.   Do you have anything to tell
16 me about Jason Lee's involvement?
17    A.   I have no knowledge of who
18 Jason Lee is.
19    Q.   Okay.
20    A.   All I know is that he called
21 my wife and interviewed her for a job.
22    Q.   Okay. When did that happen?
23    A.   I don't know. I was working

Page 339

1 there.
2    Q.   Okay. You mentioned your
3 military pay stubs earlier. Did you get pay
4 stubs from Hyundai?
5    A.   Yes, sir.
6    Q.   And you do you remember what
7 company name was on the pay stub?
8    A.   No, I do not.
9    Q.   Okay. Do you remember if it
10 was Hyundai Motor Manufacturing Alabama?
11    A.   I don't know. I don't
12 remember. I don't remember what was on the
13 pay stub.
14    I know -- I tell you what I do
15 know, I know that HMC owns everything,
16 because our Korean bosses worked for HMC,
17 and that's what their badges said, and
18 that's what they said, so HMC owned all of
19 us, and they told us that.
20    Q.   Okay. Did you ever deal with
21 anybody from HMA?
22    A.   I don't remember. I may have,
23 I may not have.

Page 340

1    Q.   But you don't recall if you
2 did or didn't?
3    A.   No, sir. I mean, I know it
4 went HMC, HMA, and like I say, HMMA, and we
5 all fell under HMC; HMC owns all of it.
6 That's what we was told by the Koreans.
7    Q.   Do you have any information to
8 suggest that anybody from HMA was involved
9 in your termination?
10    A.   They own our company.
11    Q.   Do you have any other
12 knowledge?
13    A.   They own our company. HMC
14 owns all of us, we're all one big -- they
15 were all one big company.
16    Q.   Do you have any information to
17 suggest that HMA was involved, other than in
18 the ownership, as you state?
19    A.   Like I said, it was all one
20 company.
21    Q.   Is there anything else you can
22 tell me about that?
23    A.   It was all one company.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 341

1    Q.    Okay.  I'm going to take that
2  as a no.
3    A.    It was all one company.  It's
4  not a no, it was all one company.  You talk
5  to the Koreans out there, and they will tell
6  you this is all one company.
7    Q.    Who?  Who says that?  What
8  Koreans?
9    A.    Any Korean.  You go out there
10  and ask any one of them, and they will tell
11  you that HMC is sole owner and HMC controls
12  everything.
13    Q.    They say HMC controls
14  everything?
15    A.    HMC, HMC, HMA, it goes down
16  the chain.  They run their companies like a
17  military organization in a chain of command.
18  And you've got HMC, HMA; HMC would be the
19  commandant, HMA would be your generals, and
20  HMMA would be your peons and your officers.
21    Q.    Did any of them -- Well, do
22  you know any HMA employees?
23    A.    I may have met some of them.

Page 342

1  We had people coming in from HMA all the
2  time, but I don't remember.  I don't know.
3  We had people coming in from all.  We had
4  people coming in from Kia that HMC owns.  We
5  had people from everywhere.  As far as
6  personally knowing them, I don't remember.
7  I may have met them, I may not have met
8  them.
9    Q.    Okay.
10         MR. JOHNSON:  Can we mark this
11  one?
12         MR. SPORT:  Sure.
13         (Whereupon, Defendant's
14         Exhibit No. 13 was marked
15         for identification.)
16    Q.    Mr. Dees, I'm going to mark as
17  Exhibit 13, which is a seven-page document
18  which appears to be your cell phone record.
19  Can you just take a look at it and confirm
20  that that's what it is?
21         (Recess taken.)
22    Q.    Okay.  Mr. Dees, we've got
23  marked as Exhibit 13 the seven-page phone

Page 343

1  bill.  And we've had some discussions with
2  your attorneys after the Record.
3         MR. JOHNSON:  As I understand
4  it, Mr. Sport, correct me if I'm wrong.
5  Mr. Sport is going to provide to our court
6  reporter an additional copy of pages one
7  through seven of Exhibit 13 and we'll mark
8  that -- Can we have that marked as 14?
9         COURT REPORTER:  Sure.
10         MR. JOHNSON:  And just for the
11  Record, 14 will basically be this exactly
12  presumably less the fax transmittal
13  information.
14         MR. SPORT:  Hopefully more
15  legible.
16         MR. JOHNSON:  More legible
17         MR. SPORT:  That's the goal.
18         (Whereupon, Defendant's
19         Exhibit No. 14 was marked
20         for identification.)
21    Q.    Okay.  Now, to the extent that
22  I can, Mr. Dees, I want to look through
23  Exhibit 13, since I haven't had a chance to

Page 344

1  look at it yet, and then possibly ask some
2  questions.
3         I assume Nikki is one of your
4  daughters?
5    A.    Yeah.
6    Q.    And are there only two phones
7  on this plan?
8    A.    Is that the only two plans on
9  that for phone?
10         MR. KILBORN:  You have to
11  answer the question.  This is your
12  deposition.
13    A.    I can't -- I don't pay the
14  bills, I just work.
15    Q.    Okay.  And, Mr. Dees, this
16  question is as much for your attorneys as it
17  is for you.  I'm looking at page five of
18  this bill, and it looks like some of the
19  incoming calls don't have a number
20  associated with it.
21         MR. SPORT:  They have not been
22  redacted, if that's your question.
23    A.    I didn't say I had a good

86  (Pages 341 to 344)

# FREEDOM COURT REPORTING

Page 345

1  provider, I just said I had a provider.
2         MR. JOHNSON: And who -- You
3  know, I know that it's been redacted from
4  this, but I don't see any issues asking who
5  his provider is, is that something y'all are
6  opposed to him answering, subject to the
7  protective order?
8         MR. KILBORN: I'll let him
9  answer who his provider is. But outside of
10  what you've got there, you hadn't asked for
11  it and we're going to object to any further
12  request. But as I further stated, I'll
13  discuss with you sharing documents as we
14  talked about earlier.
15         MR. JOHNSON: Okay. I'm not
16  sure I understand. But I understand you'll
17  let him tell me who his cell phone provider
18  is.
19         MR. KILBORN: Well, no, let me
20  make that clear. We've asked a simple
21  request to look at the plant and photograph
22  it, that's what I'm talking about. In other
23  words, what I'm talking about is, I like

Page 346

1  free discovery, and I'll do that with you,
2  even though you haven't asked about it.
3         MR. JOHNSON: I think we did
4  ask for --
5         MR. KILBORN: But you guys
6  pulling these technicalities, so don't be
7  asking us for accommodations unless you're
8  willing to also give us accommodations.
9         MR. JOHNSON: Well, let me say
10  this, Mr. Kilborn, I believe and if
11  necessary I can go back and dig through the
12  file and find it, I think we asked for all
13  of his cellular telephone records. And we
14  were told we couldn't have them, I didn't
15  complain about that. I thought Mr. Sport
16  and I had reached some agreement on that,
17  which was fine with me. But my
18  understanding was that I would at least know
19  who the provider was. And I don't see why
20  that's a problem.
21         If I need to go back and
22  search for what we did in fact, ask for
23  months and months ago, I can do it.

Page 347

1         MR. KILBORN: I just told you,
2  I'd let him testify who his provider was.
3  But I'm just asking for accommodation, and I
4  want it on the Record, you said you didn't
5  know what I was talking about and I wanted
6  to make clear what I was talking about.
7    Q.    Mr. Dees, who is your cell
8  phone provider?
9    A.    Unicel.
10    Q.    And was Unicel your provider
11  back in 2007?
12    A.    Yes, sir.
13    Q.    And how do you spell Unicel?
14    A.    U-N-I-C-E-L.
15    Q.    Just one L?
16    A.    Yes.
17    Q.    And, Mr. Dees, are you
18  familiar with anywhere in this invoice where
19  it talks about you having text messaging
20  capacity or how much you were charged for
21  text messages?
22    A.    Like I said, I just work. I
23  don't pay the bills.

Page 348

1    Q.    Okay.
2    A.    I don't --
3    Q.    So, you never look at the cell
4  phone bills?
5    A.    No.
6    Q.    Okay. Have you ever looked at
7  this one before today?
8    A.    I may have. I don't know.
9    Q.    You don't recall?
10    A.    No.
11    Q.    Mr. Dees, did you have a
12  chance to look at the report that Mr. Hall,
13  who is here with us today, prepared?
14    A.    Yes, sir.
15    Q.    Okay. And when did you review
16  it?
17    A.    I reviewed it yesterday with
18  Mr. Hall, like I said this morning.
19    Q.    Okay. And in reviewing it
20  with Mr. Hall, did y'all do a page-by-page
21  analysis of it, or what did you do?
22    A.    Somewhat. Not really. I'm
23  not an accountant or a lawyer, I don't know.

# FREEDOM COURT REPORTING

Page 349

1    Q.    Okay. And was there anything
2  in Mr. Hall's report that you didn't agree
3  with?
4        MR. KILBORN: Asked and
5  answered.
6        MR. JOHNSON: Did I cover
7  that?
8    Q.    I know you indicated that you
9  filed a complaint with the ESGR. Did you
10 file a complaint with any other governmental
11 agencies?
12    A.    No, sir.
13    Q.    Did you ever go to the EEOC to
14 try to file a claim there?
15    A.    No.
16    Q.    Did you talk to any other
17 governmental entities about possibly filing
18 a claim?
19    A.    Not after I talked to ESGR, I
20 felt it was a waste of time.
21    Q.    Did you ever call the
22 Department of Labor?
23    A.    No. I told you, I had to go

Page 350

1  back to work. I didn't have time for --
2    Q.    Okay.
3        MR. JOHNSON: We'll take a
4  short break, talk with Mr. Smith, and we may
5  be done.
6    A.    All right. A while ago, when
7  you asked me did I call that Monday morning,
8  I'd forgotten but yes, I called. I kept
9  getting an answering machine, I got
10 frustrated, call my wife, asked her to call.
11 She wouldn't call because she didn't know
12 what to say. And I don't know whether I
13 ever left a message that I was trying to
14 call and reschedule.
15    Q.    All right. What Monday
16 morning are you talking about?
17    A.    That Monday morning, that peer
18 review process.
19    Q.    All right. Let me ask you
20 this. Did you talk to somebody on a break
21 about your prior answer?
22    A.    No, I --
23        MR. KILBORN: Hold on. You

Page 351

1  can't ask who he talked to on a break.
2        MR. JOHNSON: Why not? He's
3  not supposed to talk to people on a break
4  about the substance of his testimony.
5        MR. KILBORN: He can talk to
6  his lawyers all he wants.
7        MR. JOHNSON: About the
8  substance of his testimony?
9        MR. KILBORN: He can talk to
10 his lawyer about anything he wants to.
11        MR. JOHNSON: In Alabama state
12 court maybe. Do you think that will fly in
13 Federal Court?
14        MR. KILBORN: I certainly do.
15    A.    Look, I'm the type person,
16 when I read something over and over again,
17 the more I think about it, the more it jars
18 my memory.
19    Q.    Are you telling me you didn't
20 talk to anybody else about the substance of
21 your testimony on that point?
22    A.    You asked a question earlier,
23 I gave you an answer.

Page 352

1    Q.    I know. Now you've got a
2  different answer.
3    A.    Yes. And I told you that I
4  did call them that morning. And I kept
5  getting the answering machine, I told you
6  what happened, I got frustrated. Called my
7  wife, I asked her to try and call. And she
8  wouldn't call because she didn't know what
9  to say. So I tried to call back. I don't
10 remember whether I left a message or not,
11 but I know I was trying to call and
12 reschedule.
13    Q.    Let me ask you this, did you
14 talk to your wife about that on the break?
15    A.    You asked -- I told you what
16 I'd done. I mean, you asked a question
17 earlier, I answered it, and I had answered
18 the question wrong.
19    Q.    Okay.
20    A.    What the question was, did I
21 attempt to call anyone that day to
22 reschedule, did I attempt to go, did I
23 attempt to talk to anyone, did I attempt to

88  (Pages 349 to 352)

# FREEDOM COURT REPORTING

Page 353

1  write anyone, and I had said no.  And I
2  forgot, I did try to call that morning.  And
3  I had -- I kept getting an answering
4  machine.
5      Q.    All right.  And you agree
6  that's not what you testified to earlier
7  today?
8      A.    That's not what I testified to
9  earlier today, no.
10     Q.    All right.  Did any particular
11 thing spur you to change your testimony in
12 that regard?
13     A.    Well --
14     Q.    Did you talk to your wife
15 about what you said earlier?
16     A.    I told you, I forgot and I
17 answered the question wrong.
18     Q.    Okay.  Did you talk to your
19 wife about your testimony?
20     A.    I told you, that was my
21 answer.  I gave you my answer.
22     Q.    I'm asking you a specific
23 question.

Page 354

1      A.    And I answered your question.
2  I said I forgot what I had done.
3      Q.    And are you also --
4      A.    And I answered the question.
5  I stated that I had called.  I have
6  forgotten that I had called.
7      Q.    I heard you.
8      A.    I also stated that I got an
9  answering machine several times.  I also
10 stated that I got frustrated; that I called
11 my wife; that I had asked my wife to call;
12 my wife would not call.  Therefore, I don't
13 know if I left a message or not.  I was
14 upset, and I was working to make money.
15 That's my answer.
16     Q.    And I understand that's your
17 answer now --
18     A.    Yes, sir.
19     Q.    -- but that wasn't your answer
20 earlier --
21     A.    No, sir, that was not my
22 answer earlier.
23     Q.    -- I'm trying to figure out

Page 355

1  what spurred you --
2      A.    But I gave you the answer,
3  like I said.
4      Q.    Did you talk to your wife
5  about your testimony here today?
6      A.    No, sir.  I'm telling you that
7  that was my answer, period, plain and
8  simple.
9      Q.    And you did not talk to your
10 wife about it?  That's your sworn testimony?
11     A.    She's got wrote down what I
12 said.
13     Q.    I'm asking a simple question,
14 yes or no.
15     A.    I gave you an answer to your
16 question.
17     Q.    Did you talk to your wife?
18     A.    I gave you an answer to your
19 question, sir.
20     Q.    That didn't sound like an
21 answer to me and I --
22     A.    You asked me earlier today had
23 I tried to get in contact with anybody, and

Page 356

1  I answered no.
2      Q.    You did answer no.
3      A.    You acknowledge I answered no.
4  That was my answer.
5      Q.    Your testimony earlier today
6  is different than your testimony right now;
7  correct?
8      A.    You don't make mistakes?
9      Q.    I make mistakes.
10     A.    So do I, I'm human.  I don't
11 know nobody that don't make mistakes.
12     Q.    Let me ask some questions
13 here.  And I'd like some answers from you.
14 I mean, we've got several hours we can be
15 here or we can go home.
16     A.    I can stay awake.
17     Q.    That's what you say.
18     A.    That's what I know.
19     Q.    Now let me ask the question:
20 Your testimony was different this morning
21 than it is now.  And if it just suddenly
22 struck you for no apparent reason, that's
23 fine.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 357

1    A.    You've never had that happen?
2    Q.    I have had it happen. Is that
3  what happened to you?
4    A.    What's so strange about it?
5    Q.    Is that what happened to you?
6    A.    What's so strange about it?
7    Q.    Is that what happened to you?
8    A.    I told you.
9    Q.    No.
10    A.    I answered the question wrong
11  earlier today, and that's my answer.
12    Q.    I know you said you changed
13  your testimony, that's obvious from what
14  you're saying.
15    A.    Yes, I did.
16    Q.    That's obvious from what
17  you're saying.
18    A.    Yes.
19    Q.    What I'm asking you is, what
20  made it change? Were you just suddenly
21  struck by a different thought or did you
22  talk to somebody that made you change your
23  testimony?

Page 358

1    A.    I answered the question.
2    Q.    You did not answer that
3  question.
4    A.    That's my testimony I'm
5  sticking with, period.
6    Q.    I'm going to get an answer.
7    A.    We've got a couple more hours.
8    Q.    And we can go now or we can go
9  then. But I want an answer to the question.
10    A.    Okay. Ask your question.
11    Q.    Did you talk to your wife or
12  anybody else and that made you change your
13  testimony?
14    A.    I told you -- Well, she's got
15  what I told you, that's what I'm sticking
16  with.
17    Q.    Did you talk to your wife
18  about substance of your testimony during
19  this deposition?
20    A.    She's through typing now.
21        MR. KILBORN: Let's take a
22  break.
23        (Recess taken.)

Page 359

1        MR. JOHNSON: Back on the
2  Record.
3    Q.    Mr. Dees, before we took a
4  break, I had started asking you some
5  questions --
6    A.    Yes, sir.
7    Q.    -- because you testified to
8  one thing earlier today, and moments ago,
9  just before the break, you testified
10  something different.
11    A.    Yes, I did.
12    Q.    And, again, that's okay with
13  me. I just want to know why. And if your
14  testimony is that you just remembered, then
15  I'd like to know that. But if the truth is
16  that you talked to your wife, and she jogged
17  your memory, and you now know more, I want
18  to know that.
19    A.    She told me that I -- She told
20  me that I had called them. I forgot about
21  it. Because she told me I called her saying
22  I was frustrated. When she said that, I
23  remembered, yeah, I called them several

Page 360

1  times.
2    Q.    Okay. So now you remember
3  calling them?
4    A.    Yes, sir, I did. And I got
5  mad because I kept getting that stinking
6  answering machine.
7    Q.    Okay. See, that wasn't too
8  hard, was it?
9    A.    Well, this is all new to me.
10  I'm a soldier. I go fight where I'm told to
11  fight and jump on who I'm told to.
12    Q.    This is where we fight.
13    A.    That's what y'all get paid
14  for. This ain't my environment.
15    Q.    All right. There wasn't any
16  magic to that, I just wanted to know the
17  answer to the question. Okay?
18    A.    Well . . .
19    Q.    Have you ever appeared in
20  court before?
21    A.    Just when I filed bankruptcy.
22    Q.    Okay. Did you give a
23  deposition?

90 (Pages 357 to 360)

# FREEDOM COURT REPORTING

Page 361

1    A.    No, sir.
2    Q.    Have you ever given a
3  deposition like this today?
4    A.    Nope.
5        MR. SPORT:  You have now.
6        THE WITNESS:  Yeah.  I don't
7  like these at all.
8    Q.    When you filed bankruptcy, did
9  you actually have to go to bankruptcy court?
10   A.    Yes, I did.  It was quite
11 embarrassing.
12   Q.    Now, Mr. Dees, before we get
13 -- I basically get one shot at asking you
14 questions.
15   A.    All right.
16   Q.    And I don't want to leave here
17 thinking I didn't ask you something or I
18 didn't get a fair answer from you.
19       Are there any other questions
20 that I've asked you today that you've
21 already answered that you feel like you need
22 to change or add to or take from?
23   A.    I'm still uncertain as to what

Page 362

1  you was wanting when you were asking about
2  my knowledge of a meeting and whatever.  You
3  kept asking the question, and I still don't
4  -- I'm still unsure of what you was hinting
5  at.
6    Q.    Okay.  What --
7    A.    Like I said, all I know is
8  everything stemmed from my military
9  service --
10   Q.    And that's all you know?
11   A.    -- and my military commitment.
12 I don't care what was said in the meeting, I
13 wasn't in the meeting.  All I know is
14 everything when my military commitment
15 became a problem, it escalated to a point
16 and it got me terminated because of my
17 military commitment.
18       I didn't even know they had
19 had a meeting.  But I know -- do know that
20 my military career was the reason for my
21 being terminated.
22   Q.    All right.  And you know that
23 just because that's the only problems you

Page 363

1  had with Mr. Prater or how do you know that?
2    A.    That stemmed -- That caused
3  all of my problems from when we started to
4  finish.
5        MR. JOHNSON:  As I said
6  earlier, I'm going to take a quick break and
7  talk with Mr. Smith.  And assuming he hasn't
8  thought of anything else, we'll probably be
9  done.  So give me just a few minutes, and
10 we'll be right back.
11       (Recess taken.)
12   Q.    Mr. Dees, I know that your
13 attorneys had early on in the case provided
14 something called Plaintiff's Initial
15 Disclosures.  It included a list of
16 witnesses and people that know something
17 about the case.
18       And I want to ask -- I want to
19 read off some of the names and ask you to
20 let me know if there is anybody else that
21 you're familiar with that might have
22 information that's not included here.
23       MR. SPORT:  Matt, before he

Page 364

1  starts on that, do you also have the
2  supplement?
3        MR. JOHNSON:  Yeah.  I think
4  so.
5        MR. SPORT:  We added some
6  names.
7        MR. JOHNSON:  Okay.  Well, let
8  me make sure.  Did you add names on the
9  supplement?  I know you provided those tax
10 documents.
11       MR. SPORT:  Yeah.  I think we
12 added a couple of names, four, five, six,
13 seven, something like that.
14       MR. JOHNSON:  You don't happen
15 to have them, do you?
16       MR. SPORT:  I don't.  But go
17 ahead and ask him, and the documents will
18 say what they say.
19       MR. JOHNSON:  Yeah.  Sure.
20   Q.    All right.  Well, anyways,
21 Mr. Dees, I realize that there might be
22 additional names on a supplemental
23 disclosure, and if they're there, I'll look

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 365

1    at it and see what they are.
2           But for purposes of the
3    deposition, let me just refer to the Initial
4    Disclosures that were provided. And they've
5    indicated a number of names that have come
6    up plenty of times: Your name, your wife's
7    name, Greg Prater's name, Kevin Hughes, John
8    Applegate. They list here Keisha Morris, is
9    that the Keisha you're referring to?
10       A.    Yes, sir.
11       Q.    Okay. Mr. Moon is included,
12   Wendy Warner is included. It's identified
13   Drake Barefoot, he was a coworker of yours;
14   is that right?
15       A.    That's right.
16       Q.    Okay. And we've talked about
17   him some. Mark Bornberg, was he also your
18   coworker?
19       A.    Yes.
20       Q.    And we've talked about him
21   some?
22       A.    Yes.
23       Q.    Okay. And Chris -- W-E-I-H-E?

Page 366

1    A.    Weihe.
2    Q.    And we talked about him some.
3    I think we also talked about Shane Archer
4    who worked with you as well?
5    A.    Uh-huh.
6    Q.    Is that a yes?
7    A.    Yes.
8    Q.    And I think you mentioned Mark
9    Hanks' name, but I didn't get a good feel
10   for what you understood Mark Hanks to know.
11   Tell me what -- I know we talked about the
12   big meeting where you and a number of your
13   coworkers were there, you talked with
14   Prater, and that was sort of a big deal
15   meeting that we talked about. Was Mark
16   Hanks there?
17       A.    Yes.
18       Q.    And was Shane Archer there?
19       A.    Yes. Well, wait a minute.
20   The first meeting? I don't know if Shane
21   was there or not.
22       Q.    Did he start later than some
23   of the other guys?

Page 367

1    A.    Yeah.
2    Q.    Okay.
3    A.    No. He came to work -- I
4    don't know when he started with the company.
5    Plus he started out on that weekend shift
6    and then he moved to our shift.
7    Q.    Okay. What about Chris Weihe,
8    was he --
9    A.    Chris was one of the very
10   first ones hired on.
11   Q.    Was he at that meeting?
12   A.    Yes.
13   Q.    And was Mark Bornberg at that
14   meeting?
15   A.    I don't know if Bornberg was
16   or not.
17   Q.    Okay. And was Drake Barefoot
18   at the meeting?
19   A.    Yes.
20   Q.    Okay. And also included here
21   is a guy we haven't talked about, John
22   Wingo?
23   A.    Yes. Wingo was there too.

Page 368

1    Q.    Who is John Wingo?
2    A.    He worked at International
3    Paper with me, came down to Hyundai with me.
4    And I'd known him several years, and he left
5    and went to Honda.
6    Q.    Okay. When did he do that?
7    A.    I don't know.
8    Q.    I mean, did he leave before
9    your termination, or since then?
10   A.    Before I was fired, yes.
11   Q.    Okay. And what did John Wingo
12   know?
13   A.    He was there for most of the
14   harassment, most of the time I was being
15   pushed and harassed.
16   Q.    All right. Did you ever have
17   any conversations with John Wingo about it?
18   A.    Yes, sir. Me and John were
19   tight. He was a former Marine. Me and him
20   had a good military bond.
21   Q.    You use the word pushed and
22   harassed, were you actually physically
23   pushed or were you just talking mentally

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 369

1  pushed?
2      A.   I was actually physically
3  grabbed, yes.
4      Q.   When?
5      A.   By Prater.
6      Q.   When?
7      A.   Before a shift one time. He
8  come in and somebody stated, I got a
9  headache, and he said: Yeah, so do I, and
10  pointed at me. And, I don't know, several
11  minutes later came up and tried to bear hug
12  me from behind. And I don't even remember
13  what the comment was that he made.
14      Q.   You don't remember?
15      A.   No, sir.
16      Q.   I mean, was he just goofing
17  around, or what was the point of the bear
18  hug?
19      A.   He -- It was -- Dadgumit. No,
20  I mean, it wasn't goofing. I didn't --
21  There was nothing goofing around. I didn't
22  goof around with him, with management. I
23  don't -- I don't remember.

Page 370

1      Q.   I mean, did you think he was
2  trying to physically attack you?
3      A.   No. Because then that would
4  -- I mean, I don't know what he was trying
5  to do. He come up and grabbed me from
6  behind. And I don't remember what the
7  comment was that was made, but it was there
8  in the shift office. Bill Seivers' shift
9  saw it, my shift saw it. I busted loose,
10  grabbed my tools, and walked out.
11      Q.   Okay.
12      A.   I don't remember what it was
13  for. I don't remember what he said. I was
14  -- I don't know.
15      Q.   Did y'all have any other
16  discussion about it?
17      A.   No. I mean, some of the other
18  fellows voiced their opinions.
19      Q.   What did they say?
20      A.   Just like every other thing --
21  I don't know, I wasn't in there. I left.
22  They voiced their opinion, like I said, it
23  was like everything else, it was washed

Page 371

1  under the bridge because he was management.
2      Q.   Okay.
3      A.   He cussed two of our
4  specialists out, they went to team
5  relations, went to HR, same thing, washed
6  under the bridge because he was management.
7      Q.   All right. With respect to
8  these guys that are your coworkers, Drake
9  Barefoot, Mark Bornberg, Chris Weihe, Shane
10  Archer, Mark Hanks, or John Wingo, can you
11  think of any other discussions you had with
12  them about Prater or your problems because
13  of your military service that we haven't
14  talked about already?
15      A.   There probably is, but right
16  offhand, no, I don't remember. Plus there
17  was Sergeant First Class Richberg and
18  Sergeant Martin in my unit.
19      Q.   Wait. Say that again.
20      A.   You have Sergeant First Class
21  Richberg and Sergeant Martin you need to add
22  to your list.
23      Q.   Who is Richberg? I think you

Page 372

1  mentioned his name earlier.
2      A.   He was my superior. He
3  retired.
4          MR. SPORT: I'll represent to
5  you, I think those are two of the names we
6  added in our supplement.
7          MR. JOHNSON: I think you're
8  right. Now I remember it.
9      Q.   Martin is somebody we talked
10  about earlier?
11      A.   Martin, he took Sergeant First
12  Class Richberg's place in our unit. I've
13  known him for about ten years.
14      Q.   Barring anybody that may be in
15  a supplemental disclosure that your
16  attorneys have provided to us, and I'm sorry
17  I can't hand them to you to look at, can you
18  think of any other people that would have
19  knowledge about your case or the allegations
20  that you've made?
21      A.   You need to talk to some of
22  the production people there, if you haven't
23  already. I mean, they -- I don't know.

93 (Pages 369 to 372)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 373

1    Q.    Is there anybody that knows
2 anything about it that we should talk to?
3    A.    Right offhand --
4          MR. SPORT: I don't think we
5 had listed one of the names he had mentioned
6 today. The guy's name ends in a Y, works in
7 production.
8          MR. JOHNSON: Stapley.
9          MR. SPORT: Stapley. I don't
10 think we've listed him, but we probably need
11 to supplement him.
12    Q.    Mr. Dees, sort of my last
13 question here, I know -- your attorneys have
14 provided me a lot of documents, and I'm
15 assuming they all came from you. Are you
16 aware of any documents related to this case,
17 issues you had with Hyundai, issues you've
18 had with Greg Prater individually, or
19 anybody else that might relate to this case
20 that you haven't provided to your lawyers?
21          Is there any other
22 correspondence, any other e-mails, notes, or
23 anything?

Page 374

1    A.    I don't -- Not offhand. But
2 like the e-mail from -- that I sent to
3 Kimball, I'd forgotten about it until today.
4 I mean, if I remember it, they'll know about
5 it. But as of right now, no.
6    Q.    Okay. So as of right now, you
7 don't know of anything else that hasn't been
8 provided to your lawyers?
9    A.    No.
10          MR. JOHNSON: That's it. I
11 appreciate your time. I know it was a long
12 time.
13          MR. KILBORN: I've got a few
14 questions.
15          EXAMINATION
16 BY MR. KILBORN:
17    Q.    Mr. Dees, the security
18 building where you were taken, does that
19 building have recording devices?
20    A.    Yes, sir.
21    Q.    What type?
22    A.    I know it has video recording
23 devices, I don't know if it has audio or

Page 375

1 not.
2    Q.    Were there video recording
3 devices when you come into the security
4 building when you were fired?
5    A.    Yes, sir. They have a room in
6 there, when you walk in the door, there's a
7 door straight across from the entry door,
8 and that room is all their recording
9 devices, I believe. That's where I saw
10 them.
11    Q.    You saw them there?
12    A.    Yes, sir.
13    Q.    Okay. And what about the
14 plant, does it have any recording devices?
15    A.    Yes, sir.
16    Q.    Where are they?
17    A.    Specifics, I don't know. I
18 know we had a coax running up in our
19 building in the production building, because
20 Prater would brag that he would go back
21 there and disconnect the coax to their
22 cameras in our section and then they would
23 call him and ask him what was wrong with it.

Page 376

1 And he'd have to go hook it back up.
2          But as far as where they were
3 actually located, I don't know, I just know
4 they had them. Because like I said, he took
5 several of us back there and showed us the
6 coax bragging how he would turn it --
7 disconnect it, and then they would call and
8 make -- the cameras would go blank when you
9 disconnect your feed, the cameras go black,
10 then they would call him and make him
11 reconnect it. So they did have cameras in
12 our section.
13    Q.    And you mentioned another
14 recording, you said it was -- was it a Bill
15 Shivers?
16    A.    Seivers.
17    Q.    Seivers. Said he had
18 recordings by Applegate?
19    A.    Said Prater stated to him that
20 he had voice recordings of Applegate telling
21 him to terminate me, that he needed to get
22 rid of me.
23    Q.    Okay. Now, prior to the 26th

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 377

1  of February when you were taken into the
2  firing room in the security house or
3  building, had you had any warning at all or
4  had you been told that you were going to be
5  terminated or that you were being considered
6  for termination?
7      A.   No, sir.  I had no idea
8  whatsoever.  It floored me when I walked in
9  the room and they told me I was being fired.
10  There was nothing leading up to it, no
11  inclination, nothing.
12      Q.   For instance, Defendant's
13  Exhibit 6 is the e-mail counsel asked you
14  about February 21, 2007, at 5:30 a.m. from
15  Prater to Applegate.  It says:  Based on
16  this conversation, I feel that even if he
17  was not sleeping, that he doesn't care
18  enough about his job to prevent anyone from
19  thinking he was sleeping.  John, my
20  recommendation, as hard as it is for me to
21  say, termination.  Greg.
22          Had you been told anything
23  like that at that time?

Page 378

1      A.   No, sir.  And Prater when he
2  got anybody fired, he always bragged about
3  it later.  He had been responsible for two
4  people being fired prior to me, and all we
5  heard was him bragging about how he had got
6  them fired.
7      Q.   Were you told when you were
8  terminated that you -- You were told you
9  were being terminated for sleeping?
10      A.   That's what that -- the lady
11  said.
12      Q.   All right.  Were you told that
13  you were being terminated, because, quote,
14  you don't care about your job to prevent
15  anyone from thinking you were sleeping?
16      A.   No, sir.
17      Q.   And counsel also asked you
18  about embarrassment.  And you do attend a
19  church?
20      A.   Yes, sir.
21      Q.   And do the people in the
22  church know that you got terminated?
23      A.   Yes, sir.

Page 379

1      Q.   Do they know why Hyundai said
2  you were terminated?
3      A.   Yes, sir.
4      Q.   All right.  Does that create
5  any embarrassment for you?
6      A.   Yes, sir.  Because I didn't
7  talk to no one for a long time about it, and
8  everyone just assumed that I had actually
9  fell asleep on the job and all my military
10  friends and all my close friends, they
11  couldn't believe it.  They kept asking me
12  did -- what happened.  And I just -- I
13  didn't talk to nobody about it for a long
14  time, because like I said, that's -- I've
15  never.
16      Q.   And up until Hyundai decided,
17  in their infinite wisdom, that you were a
18  man who slept on the job, you had a
19  blemish-free record both in civilian and
20  military life?
21      A.   Yes, sir.
22      Q.   And now whenever you apply for
23  employment or apply for anything, bank

Page 380

1  credit, where there's a question about have
2  you ever been terminated or received any
3  type of job action, you've got to put that
4  down?
5      A.   Yes, sir.  When I went to work
6  for International Paper in Thorsby, I made
7  -- I made leadman in three years, and that
8  was unheard of.
9      Q.   And was that -- Does the fact
10  that that blemish is now on your reputation,
11  does that cause you any distress?
12      A.   Yes, sir.  It still causes
13  problems.  Even between me and my wife.  I
14  mean, that -- Like I said, I've -- I take
15  pride in my work, just like I do my uniform.
16  And if I go to do something, I put a hundred
17  and fifty percent into whatever I'm doing.
18  Even the production people there and
19  maintenance people, all, when they said --
20  found out that I had been accused of
21  sleeping, they said:  There's no way, he's
22  too hyper.  Because I'm an outgoing person,
23  even at night.  I've always been that way.

95 (Pages 377 to 380)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 381

1  They said there's no way he was sleeping, it
2  ain't no way.  And you can ask several of
3  the production people there in stamping,
4  production that I worked with, any of them,
5  they all know me.
6         MR. KILBORN:  That's all I
7  have.
8         MR. JOHNSON:  Just a couple
9  follow-up questions.
10        EXAMINATION CONTINUED
11 BY MR. JOHNSON:
12     Q.    You mentioned some sort of
13 video in the security building?
14     A.    Yes, sir.
15     Q.    Do you know if it's actually
16 recording or just a video camera that's
17 monitored?
18     A.    We was told it was a video
19 recording.
20     Q.    Who told you that?
21     A.    Prater and -- I have to think
22 about that one.  Because it was one of the
23 other maintenance supervisors from one of

Page 382

1  the other sections.  I don't remember.
2      Q.    When were you told that?
3      A.    About from get-go.  Well, they
4  briefed it in -- I believe they briefed it
5  in their hiring process.  And -- Well, I
6  know it was recording, because they busted
7  one of the temporary workers out back and on
8  the floor there by the presses one night for
9  -- she was doing a striptease apparently
10 there by the presses one night, they said
11 the next thing they knew, security come
12 running through the building; said they used
13 the recording when they fired her.
14     Q.    Okay.  Are you aware of any --
15 Well, you mentioned some coax cables?
16     A.    For the cameras.
17     Q.    Okay.  Other than something
18 that Greg Prater might have told you about
19 those coax cables, do you know what they
20 were, where they went to, or where they came
21 from?
22     A.    We tried to follow them out,
23 but it was seventy-five, seventy feet up in

Page 383

1  the ceiling, running conduit, waves through
2  conduit, through cable waves.  There was no
3  way to follow that, no, we didn't have a
4  clue.
5      Q.    Did you ever see them attached
6  to a camera?
7      A.    No.  I said there's no way.
8  But they had to -- How did they -- They said
9  they recorded the old girl doing the
10 striptease there in the plant by the press.
11     Q.    Did you ever see any cameras
12 up in that third level near the SOP?
13     A.    I never looked for them up
14 there.
15     Q.    So you never saw any?
16     A.    Like I said, I never looked
17 for any.  They may have been up there, may
18 not have.  I don't know, I never looked for
19 them.
20     Q.    Okay.  And what church do you
21 go to?
22     A.    Hillcrest Baptist Church in
23 Maplesville, Alabama.

Page 384

1      Q.    How big a church is that?
2      A.    I don't know.  Your average
3  sized church.  Probably got a hundred people
4  there at any service.
5      Q.    How many members total?
6      A.    Oh, God, I don't know.
7      Q.    You don't know?
8      A.    I don't know.
9      Q.    Do you know anybody else from
10 HMMA that works there -- or that goes to
11 church there?
12     A.    Yes, sir.
13     Q.    Who?
14     A.    Keith Smith.
15     Q.    Who is he?
16     A.    He works -- He's a production
17 team leader over in general assembly.
18     Q.    Okay.  Now, you said people at
19 church knew that you had been terminated?
20     A.    Yes, sir.
21     Q.    Did you tell anybody at the
22 church?
23     A.    Nope.

96 (Pages 381 to 384)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 385

1  Q.  Do you have any idea how they
2  knew?
3  A.  Yes, sir.
4  Q.  How?
5  A.  Keith's son worked in the
6  building I worked in.  Derick.
7  Q.  You think Derick told somebody
8  at the church?
9  A.  They said Derick told his
10  father, and it just went from there.  I live
11  in a small community, if you look wrong,
12  everybody knows it within five minutes.
13  Q.  Okay.  Did you ever talk to
14  Derick Smith or Keith Smith about it?
15  A.  No, sir.
16  Q.  You never talked to either of
17  them?
18  A.  No, sir.
19  Q.  Okay.  Do you know anybody who
20  has?
21  A.  No.
22  Q.  Do you know if your wife did?
23  A.  I don't know.

Page 386

1  Q.  Other than Derick and Keith
2  Smith, do you know anybody else at your
3  church who knows about it?
4  A.  I think Keith is the only one,
5  I think, from church that goes there.  But,
6  like I said, there's several people there in
7  the community that work down there.
8  Q.  Did anybody from your church
9  say anything to you about what the situation
10  at HMMA?
11  A.  There was a couple that asked,
12  but I don't remember.
13  Q.  Do you know who asked?
14  A.  They was asking that Sunday,
15  and I was trying to avoid the issue because
16  I was embarrassed.
17  Q.  Did you ever have any
18  conversations with anybody at church that
19  you can recall, that knew about you being
20  terminated at Hyundai?
21  A.  Just one person.  Mr. Bob
22  Eddy.  He's the one -- When I got fired, I
23  didn't know what to do.  I had never had

Page 387

1  anything like this happen, and I was just --
2  I went and talked to Mr. Bob and --
3  Q.  Who is Mr. Bob?
4  A.  -- explained to him everything
5  that happened.  And he's the one who put me
6  in contact with Mr. Kilborn.
7  Q.  Okay.  And is Bob Eddy just a
8  member of the church?
9  A.  He's a member of the church
10  and a friend.
11  Q.  Okay.  But he's not like your
12  pastor or something like that?
13  A.  No, sir.
14  Q.  Okay.  And what's the pastor's
15  name at the church?
16  A.  We don't have one.  He went
17  north with his family who is ill, and
18  he resigned a few weeks ago.  His father is
19  in bad health.
20  Q.  What was his name?
21  A.  Jason Vincent.
22  Q.  Did you ever talk to Jason
23  Vincent about this situation?

Page 388

1  A.  No, sir.
2  Q.  Did he ever call you to check
3  on you about it or do anything to suggest he
4  knew about it?
5  A.  Like I said, I was embarrassed
6  about it, I didn't let on -- I didn't want
7  to talk to -- I didn't want to talk to
8  nobody about it.  Like I say, ain't never
9  had anything like this happen.  And when you
10  got -- When I walked in that first Sunday
11  and Keith looked at me and just hung his
12  head, and other people, I started to turn
13  around and walk out.
14  MR. JOHNSON:  Okay.  That's
15  all I've got.  I appreciate it.
16  (The deposition was concluded at 5:33 p.m.,
17  November 20, 2007.)
18
19
20
21
22
23

97  (Pages 385 to 388)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 389

1      REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  MONTGOMERY COUNTY,
4      I, Angela Smith McGalliard,
5  Registered Professional Reporter and
6  Certified Realtime Reporter, Commissioner
7  for the State of Alabama at Large, do hereby
8  certify that the above and foregoing
9  proceeding was taken down by me by
10 stenographic means, and that the content
11 herein was produced in transcript form by
12 computer aid under my supervision, and that
13 the foregoing represents, to the best of my
14 ability, a true and correct transcript of
15 the proceedings occurring on said date and
16 at said time.
17     I further certify that I am neither
18 of kin nor of counsel to the parties to the
19 action; nor in any manner interested in the
20 result of said case.
21

22 _____
   Angela Smith
   McGalliard, RPR, CRR,
23 CCR Lic. No. 98.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660