**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | **CASE NO.** |
| | ) | **2:07-cv-00306-MHT-CSC** |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, and HYUNDAI | ) | |
| MOTOR AMERICA, INC., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.    **INTRODUCTION**

Plaintiff Jerry Leon Dees, Jr. ("Dees") is a working man and a career military soldier who

served his country and his civilian employer with honor and integrity. Dees is a decorated combat

veteran. He served in Operation Desert Storm with the U.S. Air Force and in Operation Iraqi

Freedom with the Army National Guard ("Guard"). Dees is revered and respected by his superiors,

peers, and subordinates alike. In fact, Sgt. Dees has been nominated to receive the Bronze Star for

his performance on the personal protection team of Colonel Baker, the Commanding Officer of the

2nd Brigade, 1st Armored Division.

Sergeant Dees enjoyed the same admiration and respect from his peers at Hyundai Motor

Manufacturing Alabama, LLC's ("HMMA"). Sergeant Dees had an exemplary employment history

with HMMA until his military service obligations conflicted with HMMA's production schedule.

In the summer of 2006, Dees informed HMMA that he could not comply with HMMA's order to

work during an unscheduled weekend because of his preexisting military obligations. Thereafter,

- 1 -

HMMA embarked on a campaign of harassment that was designed to force Dees to either quit his job or quit the Guard.  HMMA told Dees to ignore his Guard obligations and remain at work, threatened to deduct vacation days anytime Dees needed military leave, assigned Dees to the dirtiest, most dangerous jobs in the plant, and openly mocked Dees for his participation in the Guard.

When HMMA failed to force Dees to quit his job or the Guard, HMMA tried to get Dees' co-workers to lie about him so that HMMA would have an excuse to fire Dees without running afoul of USERRA.  Sergeant Dees' co-workers refused to go along with HMMA's scheme to concoct a pre-textual reason for firing Dees.  In fact, Dees is so respected and admired by his co-workers that several who are still employed by HMMA have courageously (despite legitimate fears that they too will become targeted for termination) signed statements confirming that HMMA harassed Dees and targeted him for termination in retaliation for his Guard obligations.

On February 6, 2007, Sgt. Dees filed a written request with HMMA's Human Resources Department requesting a third meeting to discuss, once again, HMMA's harassment of Dees in retaliation for Dees' military service.  One week later (and before any such meeting occurred), HMMA falsely accused Dees of falling asleep on the job.  Thereafter, HMMA conducted an "investigation" and convened a Termination Committee all of which was an elaborate effort to avoid being sued under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301, et seq. ("USERRA").  During its "investigation," HMMA refused to interview Dees' co-worker, Shane Archer ("Archer"), the only HMMA employee who worked side-by-side with Dees during the night in question and the only eyewitness other than the accuser.  Dees begged HMMA to interview Archer because Archer would confirm that Dees was not asleep on the job.

The Termination Committee refused to allow Dees to defend himself and did not interview

Archer.  The Termination Committee did not consider three key pieces of evidence: an October 23, 2006 letter from the National Guard that was sent in response to HMMA's harassment of Dees over his military obligations; a November 15, 2006 Hyundai memo commemorating Sgt. Dees' concerns that HMMA was retaliating against him because of his Guard obligations; and Sgt. Dees' written request, one week before the incident for which he was terminated, for a third meeting with HMMA's Human Resources Department because of HMMA's persistent harassment of him over his Guard obligations.  The Termination Committee was clearly convened to whitewash Sgt. Dees' termination.  HMMA went out of its way to eliminate any reference to Dees' military obligations and his ongoing dispute with HMMA over those obligations so that it could make the very arguments it is making to the Court today.

Archer has voluntarily submitted a statement confirming that Dees did not fall asleep on the job and that HMMA used this incident to terminate Dees in retaliation for his Guard obligations.  Incredibly, Archer even provided this information to HMMA's lawyer after this suit was filed.  Nevertheless, HMMA never once conveyed this information to Dees, and, despite filing its Initial Disclosures and three amendments thereto which identified numerous HMMA employees as potential witnesses, HMMA never once identified Archer as possessing evidence relevant to this case.  HMMA's reprehensible conduct clearly did not end with its termination of Dees.

Dees has sued Defendants for violating his civil rights as set forth by USERRA, for outrage because HMMA set out to destroy the career of a man who has served his country during a time of war with honor and distinction, and for conversion of personal belongings that HMMA refused to return to Dees.  Dees further asserts similar claims against Hyundai Motor America, Inc. ("HMA")

because HMA completely controls HMMA to such an extent that HMA should be deemed Dees'
employer under USERRA.

## II.    STATEMENT OF FACTS

### A.    Dees' Previous Employment and Military Record

Dees is a career military soldier and a decorated combat veteran who served his country with
honor and integrity.  Sergeant Dees served in Operation Desert Storm with the U.S. Air Force and
Operation Iraqi Freedom with the Guard. Dees will return to his honorable duties in Iraq sometime
in 2008. (Dees Depo. at 63:21 – 64:1; 67:1-23; 77:1 – 79:15; 249:1-3).

Dees is revered, respected, and trusted by his military superiors, peers, and subordinates
alike. (Harrison Decl. ¶¶ 3-5; Richburg Decl. ¶¶ 3-6).  Sergeant Dees' superiors singled him out
during combat patrols because of his skill, courage, and dependability.  In fact, Sgt. Dees has been
nominated to receive the Bronze Star for his service on the personal protection team of Colonel
Baker, the Commanding Officer of the 2nd Brigade, 1st Armored Division in Baghdad, Iraq.
(Richburg Decl. ¶ 5).

### B.    Dees' Employment with HMMA

In addition to his exemplary military record, Sgt. Dees has an unblemished civilian
employment record.  While employed by SIMCALA, Inc., Dees received employee evaluations that
included descriptions such as: "outstanding attitude for this job," "energetic; seldom tires," "always
regular and prompt, volunteers for overtime when needed," and "requires no supervision."  (HMMA
Subpoena Docs Bates No. 00024).

HMMA hired Dees on or about November 21, 2005 (Dees Depo. at 133:9-13).  Dees
maintained an exemplary work record until the summer of 2006 when HMMA ordered him to work

- 4 -

an unscheduled weekend that conflicted with his monthly Guard drill obligations. Dees informed his supervisor, Greg Prater, of his preexisting military obligations. (Dees Depo. at 135:2 – 137:20).

Dees had previously provided HMMA with a YTC or yearly training calendar which included all scheduled Guard drill weekends for the year 2006. (Dees Depo. at 68: 13-22). This YTC is the only notice or "order" that the Guard provides to guardsmen or their employers. (Barnes Memorandum of Record). Dees told HMMA this. Nevertheless, HMMA, knowing that it had the Guard's YTC and that these were the only "orders" that Dees could provide, repeatedly demanded that Dees produce "written orders" each time Dees stated that he had to fulfill his Guard drill obligations. (Dees Decl. ¶ 10).

When HMMA began pestering Dees because of his Guard obligations, Dees asked for assistance from his Guard unit. On or about October 23, 2006, Sergeant Franklin D. Barnes sent HMMA's Human Resources a Letter Of Instruction explaining that orders for drill weekends were not "cut" or issued on an individual weekend basis. Instead, drill weekends were scheduled a year in advance and published in the YTC or schedule. Sergeant Barnes offered to provide HMMA a Letter of Participation confirming that Sgt. Dees was present at each scheduled drill. Finally, Sgt. Barnes instructed HMMA that if it needed any further information concerning Sgt. Dees' military obligations to contact him. (Dees Depo. at 68: 8-15; Barnes Memorandum of Record).

After HMMA received Sgt. Barnes' Letter of Instruction ("LOI"), HMMA initiated a campaign of harassing Dees because of his Guard obligations. Before Sgt. Barnes wrote his LOI to HMMA, Dees had an unblemished work record. Within a week of HMMA's receipt of the LOI, HMMA began citing Dees for various alleged rules infractions. By the time HMMA terminated

Dees on February 26, 2007, HMMA issued four citations against Dees.  (Dees Decl. ¶ 4; Dees Depo. at 157: 13-22).

On November 15, 2006, Dees expressed his concern to John Applegate that HMMA, through Prater, was harassing him because of his military obligations.  Hyundai's own memo, labeled a Discussion Planner, commemorates this meeting:

> On 11/15/06, Leon from the Press Shop complained that Greg was not treating him fairly concerning his military duty.  **He accused Greg of requiring written orders when not required and assigning him hard work as a form of punishment.**  I discussed the situation with Greg and Leon.  This is another example of a communication problem in Press Maintenance. [Emphasis added]

(Discussion Planner dated November 15, 2006).

After Dees voiced his concern to Applegate (and after Applegate shrugged off Dees' concern as a "communication problem"), HMMA's harassment of Dees escalated.  HMMA tried to force Sgt. Dees to either quit his job or quit the Guard by:

- demanding orders for every Guard drill weekend that were impossible to produce (Dees Depo. at 68: 13-22; 120:20 – 121:3; 121:22 – 122:5; 128:13 – 129:17; 136:12 – 137:7; 144:23 – 145:12; 145:20 – 146:4; 147: 4-12; 147:22 – 148:21; 179 1-18; 229: 20-22; 316:13 – 317:3; 328: 2-11; Wingo Decl. ¶¶ 6-7; Borngerg Decl. ¶ 3);

- telling Sgt. Dees not to worry about his Guard duty and stay at work (Dees Depo. at 102: 10-22);

- threatening to deduct his military leave from his vacation time (Dees Depo. at 122:15 – 123:7: 331: 2-9); and

- threatening to charge Sgt. Dees with harassment because Dees asked a manager to put locks on the gangboxes[1] so that maintenance employees could keep their tools secure (Bornberg Decl. ¶ 6).

---

[1] Gangboxes are large toolboxes used by the maintenance staff to store tools or parts.

HMMA also punished Sgt. Dees for honoring his Guard drill obligations by assigning him to the dirtiest, most dangerous jobs in the plant.  For example, Greg Prater assigned Dees to clean the "pit" more than any other employee.  (Dees Depo. at 157-165; Wingo Decl. ¶ 8; Archer Decl. ¶ 14; Bornberg Decl. ¶ 8).  The "pit" is a concrete-enclosed area directly under the two stamping presses where razor-sharp scrap metal from the stamping presses are flung and where hydraulic fluid, lubricating oil, and other effluents from production flow.  Working in the pit is a noisy, filthy, highly dangerous job that everyone in the maintenance department dreads. (Dees Depo. at 156-158; Dees Decl. ¶ 6). Employees working in the pit must wear ballistic sleeves over their clothing, safety glasses to protect against flying metal shards, and ear protection to prevent hearing loss from the 90 decibel noise level. (Dees Decl. ¶¶ 6-7).

Sergeant Dees' co-workers confirm that Dees was assigned to the pit more than anyone else and that this was in retaliation for Dees' commitment to his military services with the Guard. (Wingo Decl. ¶¶ 8-9; Bornberg Decl. ¶¶ 5, 8).  HMMA claims that the Daily Reports which would confirm that fact do not exist.  (Applegate Depo. at 27:13 - 28:9; 12/11/07 Letter to Defendants). These Daily Reports do not "exist" because Prater destroyed them after this suit was filed.  (Dees Decl. ¶¶ 7-8).

HMMA, primarily through Prater, singled Dees out for ridicule because of his Guard obligations.  John Wingo, one of Sgt. Dees' co-workers, states:

> In my presence, and in the presence of other team members, Prater stated that all Guard members did on their training weekends was drink beer and play golf.  Prater made clear that he resented Leon for fulfilling his obligations to the Guard.

(Wingo Decl. ¶ 5).

When it became obvious that Sgt. Dees would not quit HMMA or the Guard, HMMA began

scheming on how to terminate Dees without running afoul of USERRA.  HMMA tried to get Dees'

co-workers to lie and say Dees was creating a hostile work environment.  Archer, a present HMMA

employee, states:

> 3.     Based on my personal observations, Prater wanted to get rid of Leon because of the ongoing dispute over Leon's Guard obligations. On at least two occasions, Prater attempted to coerce me to lie about Leon so that HMMA could have him fired.
>
> 4.     In November or December 2006, Prater tried to get me to say that Leon was threatening and making the workplace stressful because of his aggressive behavior. I refused to lie. On another occasion, Prater tried to get me to say that Leon threw down a part and walked away from Prater. I was there, and Leon did not throw anything down or walk away. I was very uncomfortable in these situations. However, I would not lie so HMMA could fire Leon.
>
> 5.     All the team members in Stamping Maintenance, including myself, knew that Prater was out to get Leon because of his Guard obligations.

(Archer Decl. ¶¶ 3-5; See also, Dees Depo. at 149:21 – 151:23; 153:17 – 154:8; Bornberg

Decl. ¶ 7).

Dees voiced his concern over HMMA's retaliation against him to no less than seven

members of HMMA management. (Dees Depo. at 116:6 – 117:10).  On February 6, 2007, Sgt. Dees

wrote an email to Greg Kimble in HMMA's Human Resources Department requesting a third

meeting with Human Resources to discuss HMMA's continued retaliation against him because of

his military obligations with the Guard:

> Mr. Kimble,
> I am writing to request a meeting with you regarding several issues that have arisen on my shift between Greg Prater, Kevin Hughes, and myself.  **I have talked to Human Resources on two separate occasions regarding Greg Prater and also filed a complaint on**

**him through my National Guard Unit.** There have been positive results from both meetings and once again I am seeking your help. I am currently working night shift but would greatly appreciate a meeting with you at your convenience. Thank you. [Emphasis added]

[Dees Email of 2/6/2007].

One week after Sgt. Dees' request for a third meeting with HMMA's Human Resources Department, HMMA alleges that it "caught" Dees asleep in a chair in an isolated part of the plant behind doors that Dees had positioned to serve as "blinds" to hide him from view. (Clevenger Memo dated Feb. 23, 2007). Sergeant Dees denies that he was in any way sleeping on the job. HMMA rejected Sgt. Dees' testimony solely because Dees' accuser was a member of management and Dees was just an employee. (Clevenger Memo dated Feb. 23, 2007; Clevenger Depo. at 151:4 – 152:17).

Dees told HMMA during its "investigation" that Archer had been with him the entire evening and could prove that he was not asleep. Dees begged HMMA to interview Archer. (Dees Decl. ¶ 3). However, HMMA refused to interview Archer before terminating Dees. (Archer Decl. ¶ 15). **Archer states that it was impossible for Dees to have been sleeping on the job**:

> 6.    On the night that Jim Brookshire claims he caught Leon sleeping, I was working with Leon in the Side Outer Panels area, commonly referred to as the SOPS. I had been with HMMA for approximately six months, and was training with Leon.
>
> 7.    Leon was assigned responsibility for SOPS, so he was stationed in that area. It was very common for Leon to be in this area, since it was his area of assigned responsibility. Leon was assisting the production department in running the system. We were on the third floor mezzanine. I saw Kevin Hughes, team leader, walking below us and looking up. The floor we were on is steel mesh that can be seen through. Jim Brookshire was with Kevin Hughes, and they were looking up at Leon and myself. We were clearly visible.

8.     Shortly thereafter, I left the third floor. Leon remained to monitor the trolley system that carries the stamped panels. I went to press No. 2 to check on things there. When I left the third floor, the doors on the PLC cabinet were closed. There was no "blind" created with the PLC doors to hide Leon's chair.

9.     **When I left Leon, he was, as usual, alert and tending to his responsibilities. I observed Leon and saw no indication that Leon was groggy or tired.**

10.     Approximately five minutes after I left Leon on the third floor, Leon came down and joined me at press No. 2. The five or so minutes we were apart was the only time we were apart all night. Although I do not remember the exact time, I do remember that it was before our lunch time at 11:30 p.m. We were working the 6:00 p.m. to 4:45 a.m. shift.

11.     When Leon joined me at press No. 2, he was alert. Again, I observed Leon, and he gave no indication of being tired or groggy.

12.     As I stated, Leon and I were separated only for about five minutes. Leon could not have set up the PLC as a "blind" or otherwise have arranged the room, fallen asleep, woke up, and returned to me at press No. 2 within that time frame.

13.     **Leon did not fall asleep at work. I believe this false claim was an excuse to fire Leon because of Leon's Guard activities.**

14.     **It was clear to me for quite some time that Leon was being harassed because of his Guard obligations.** Leon was always the first choice to work the pit, which is a job that no one likes to do. The Stamping Maintenance daily reports, completed by the team members based on their assigned tasked each day, would show that Leon worked the pit more than anyone on our shift. Team members turned these daily reports in to Greg Prater, who filed them in the shop office.

15.     I understand that HMMA conducted an investigation into the events regarding Brookshire allegedly catching Leon asleep. Even though I was the HMMA employee who worked side-by-side with Leon the entire night in question, **no one at HMMA asked me a single question about that night before Leon was fired. After this case was filed, one of HMMA's lawyers asked me what happened that night, and I told him Leon was not sleeping**.

16.     Neither Hughes nor Brookshire came up to the third floor mezzanine area that night while I was up there. [Emphasis added]

- 10 -

(Archer Decl. ¶¶ 3-16) (emphasis added).

Although HMMA refused to interview Archer before terminating Dees, HMMA's lawyer did interview Archer after this suit was filed. Archer told HMMA's lawyer that Dees was not sleeping on the job. (Archer Decl. ¶ 15). HMMA failed to disclose this information to Dees or to even identify Archer as a person possessing potentially relevant information even though HMMA filed its Initial Disclosures on June 7, 2007 and filed three supplements thereto, disclosing numerous HMMA employees.

Every "fact" upon which HMMA relied in terminating Dees was bogus. For example, Dees was not sitting in a chair in an isolated part of HMMA's plant. Instead, Dees was working in his normal area of assignment. (Dees Depo. at 161: 11-13; 206:14 – 207:1; Archer Decl. ¶ 7). Dees and Archer had just repaired a trolley, and Dees was sitting in a chair monitoring the system to ensure that it was back on line. (Dees Depo. at 209:21 – 211:9; 218:9 – 220:1; Archer Decl. ¶¶ 6-12).

The "facts" upon which HMMA relied in firing Dees are also inconsistent. For example, Jim Brookshire, the HMMA member of management who allegedly saw Dees sleeping, denies ever seeing the doors arranged as "blinds" the way that they were shown in a sketch and in later staged photographs that HMMA has relied upon as justification for firing Dees. Brookshire testified that the hinges on the doors were even sketched on the wrong side. (Brookshire Depo. at 108:8 – 109:5). In fact, Brookshire's two written statements, taken four days apart, contain no reference to cabinet doors creating a blind. (Brookshire Statements). And, another HMMA employee testified that he inspected the scene the morning after Dees was terminated and none of the photographs accurately represented the way the area was configured. (Mun Depo. at 60:20-61:19).

HMMA was determined to fire Dees even if it could not prove that Dees was actually sleeping on the job.  Prater circulated an e-mail urging the Termination Committee to fire Dees **whether he was sleeping or not.** (Prater E-Mail dated Feb. 21, 2007).

HMMA's Termination Committee convened ostensibly to determine whether Dees should be fired for sleeping on a job.  This hearing was a complete sham. The committee refused to hear anything Dees had to say (Dees Depo. at 249-251), never interviewed Archer (Archer Decl. ¶¶ 6-15), and even though HMMA's continued harassment of Dees because of his military obligations was the subject of Dees' written request for a meeting with HMMA's Human Resources Department one week before the incident in question, the Termination Committee's files contain no reference to Dees' military record or HMMA's perpetual harassment of Dees.  Consequently, the Termination Committee never considered the Guard's October 23, 2006 letter to HMMA that was written in response to HMMA's harassment of Dees, Hyundai's November 15, 2006 internal memo commemorating Dees' concern that HMMA was retaliating against him for his military obligations, or Dees' February 6, 2007 written request for a third meeting with the Human Resources Department.   The Termination Committee's records appear to have been whitewashed and deliberately cleansed of any reference to Dees' military background or HMMA's ongoing harassment of Dees because of his military service.

On February 26, 2007, HMMA fired Dees shortly after he arrived at work.  HMMA ordered security guards to remove Dees from the premises like a common criminal. (Dees Depo. at 95:19 – 96:4; 104: 9-13; 248:22 – 249:20). Dees was not allowed to retrieve his personal belongings from his locker.  Instead, the security guards told him: "we'll mail it to you." (Dees Depo. at 110: 3-7). Despite these assurances, HMMA never sent the remainder of Dees' personal belongings to him,

nor did HMMA ever notify Dees to come get them.

The night of his firing, Sgt. Dees telephoned Gwang Mun, the Korean Coordinator for Stamping Maintenance. (Dees Depo.  229:14-16). Dees told Mun that he had been falsely accused of sleeping on the job and had been fired.  Mun promised to look into the incident.  (Dees Depo. 229:14-16; Mun Depo. 55:1-5; Katherine Dees Depo. at 70:7-15). Later, Mun called Dees' wife, Katherine, and told her that Prater had lied, Prater was a "bad man," but that there was nothing he could do because his supervisor had told him to stay out of it. (K. Dees Depo. at 74:3-75:22).

Sergeant Dees, because he is a decorated combat veteran and a patriot who has been a part of the U.S. military since before his senior year in high school, feels the harassment and the distress of HMMA destroying his unblemished work record and his reputation to a greater degree than an average person would.  HMMA chose the one accusation that would hit at the heart of Sgt. Dees' being – falsely accusing him of intentionally abandoning his duties.  (Dees Depo. at 248:17 – 251:13).  Dees transformed from a normally "jolly" man, happy with anything and anybody, to a person who refused to communicate with his wife.  (Katherine Dees Depo. at 29:15 – 30:11).  Dees was embarrassed and humiliated by the way HMMA treated him like a "criminal."  (Dees Depo. at 248-251).  HMMA's conduct has caused problems between Dees and his wife. (Dees Depo. at 380: 9-13.) He lost sleep, and still has trouble sleeping. (Dees Depo. at 254:20 – 255:10). He suffered extreme shame and embarrassment because people he worshiped with at church knew why he had been terminated. (Dees Depo. at 378:17 – 379:15). And, Sgt. Dees relives the entire traumatic experience over again every time he fills out a job application or applies for a bank loan and has to disclose that he was terminated by HMMA. (Dees Depo. at 255: 11-18; 379:22 – 380:5).

C.      **HMMA and HMA Are an Integrated Enterprise**

HMMA and HMA are substantially interrelated, as are all the companies of Hyundai Motor Company ("HMC"). The 2006 Hyundai Motor Company Control Group Coverage Testing Projections states that a group of companies including HMA and HMMA form a controlled group of corporations. (2006 HMC Control Group Testing Projections).

HMMA is a wholly-owned subsidiary of HMA. HMMA is a limited liability company formed in Delaware. (Phillips Depo. at 14:20 – 16:2). HMA is its only member. (Phillips Depo. at 22: 3-9). HMMA is, therefore, a "disregarded entity" for income tax purposes. (Phillips Depo. at 121: 5-18). It does not file its own tax returns, but its results of operations are included in HMA's tax returns, because HMA is HMMA's sole member. (Phillips Depo. at 38:20 – 40:14).

Seventy-eight expatriate Korean nationals work at HMMA. (Warner Depo. at 27: 7-11). Many HMMA senior management positions are filled by these expatriate Koreans, including the vice president for human resources, the president, the CFO, the COO, and several directors, senior managers, coordinators, technical coordinators. ((Warner Depo. at 27: 12-21). All of these seventy-eight expatriate Korean nationals work for Hyundai Motor Company from Seoul, Korea. (Warner Depo. at 27:22 – 28:2). Also, all are paid by HMC. (Warner Depo. at 30: 4-17). HMC is the parent company of both HMMA and HMA. (Warner Depo. at 55: 9-14).

HMMA has four managers, who are Chairman Chung, who owns HMC, Vice Chairman Kim, and the president/CEO and Chief Financial Officer of HMMA. (Phillips Depo. at 28: 1-10). Therefore, two of HMMA's four managers are the Chairman and Vice Chairman of HMC. HMMA's LLC Agreement states that HMA appoints the four members of HMMA's board of directors.

- 14 -

(Phillips Depo. at 80:14 – 83:20; HMMA LLC Agreement). These directors have exclusive authority to manage HMMA. (Phillips Depo. at 83: 12-20; HMMA LLC Agreement).

HMC controls the annual production and capacity of the HMMA plant. (Phillips Depo. at 96: 12-16). Even though Phillips testified that HMA had no authority to tell HMMA what to manufacture (Phillips Depo. at 68:13 – 69:3), that is not entirely true when the big picture is considered. HMMA's budget is approved by HMC (Phillips Depo. at 94:17 – 95:4), and the entire budget is driven by HMA's sales forecast. (Kalson Depo. at 11: 7-17). Further, if the sales forecast is adjusted downward during the year, the reduced demand quantity of vehicles by model is communicated to HMMA management, and HMMA then produces the lower quantity of vehicles. (Kalson Depo. at 19:12 – 20:1). Production volume requirements come from HMC. (Kalson Depo. at 9: 10-14). Those requirements are adjustment throughout the year as market conditions change. (Kalson Depo. at 9:15 – 10:1). HMC gets its market information from HMA. (Kalson Depo. at 11: 7-17). Therefore, HMA does control the quantities of vehicles HMMA produces.

HMMA is a captive manufacturer. Approximately 90% of its vehicles are sold to HMA, its parent company. (Phillips Depo. at 149: 13-19). When the vehicles roll off the assembly line and go out the back gate, they are automatically sold to HMA. (Phillips Depo. at 65:19 – 66:5).

Finally, virtually all of HMMA's significant transactions are transactions with related parties, including sales, purchases, accounts receivable, accounts payable, loans, and warranty expense and payables. (Phillips Depo. at 58: 5-20). Further, all of HMMA's long-term debt, approximately $575 million, is guaranteed by HMC. (Phillips depo. at 99:17 – 100:12).

- 15 -

## III.    ARGUMENT

### A.    Defendants are not entitled to summary judgment on the USERRA claims

Defendants acknowledge that Dees, as a U.S. Army National Guardsman, is entitled to the protections provided by the Uniformed Services Employment and Reemployments Rights Act of 1994, 38 U.S.C. § 4301, et seq. ("USERRA").  USERRA protects veterans against discrimination in their employment on account of their prior military service.[2]

Under USERRA's 3-tiered burden of proof allocation, Dees first "must show by a preponderance of the evidence that [his military status] was a motivating factor in [defendants'] decision to discharge [him]." Harris v. City of Montgomery, 322 F. Supp. 2d 1319, 1324-25 (M.D. Ala. 2004) (Thompson, J.) (quoting *NLRB v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1424 (11th Cir. 1998)).  "Such a showing establishes . . . [a] violation unless [defendants] can show as an affirmative defense that [they] would have discharged [Dees] for a legitimate reason regardless of . . . [his military status]." Id.  If the defendants could satisfy that burden, Dees "may then offer evidence that [defendants'] proffered 'legitimate' explanation is pretextual–that the reason either did not exist or was not in fact relied upon–and thereby conclusively restore the inference of unlawful motivation." Id.

---

[2] Specifically, *38 U.S.C. § 4311(a)* (emphasis added) provides:

> A person who is a **member of**, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a **uniformed service shall not be denied** initial employment, reemployment, **retention in employment**, promotion, or **any benefit of employment** by an employer **on the basis of that membership**, application for membership, **performance of service**, application for service, **or obligation**.

- 16 -

1.      **The Evidence Establishes that Dees' Military Status was a Motivating Factor in the Defendants' Decision to Terminate Dees' Employment**

"'Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned  its decision on that consideration.'" <u>Fink v. City of New York</u>, 129 F. Supp. 2d 511, 520 (E.D.N.Y. 2001) (quoting *Robinson v. Morris-Moore Chevrolet-Buick, Inc.*, 974 F. Supp. 571, 576 (E.D. Tex. 1997)).  <u>Fink</u>, 129 F. Supp. 2d at 521 n. 2.  A motivating factor in an USERRA case "is not necessarily the sole cause of the action, but rather is one of the factors that 'a **truthful employer would list** if asked for the reasons for its decision."  <u>Fink v. City of New York</u>, 129 F. Supp. 2d at 520 (quoting *Sanguinetti v. United Parcel Serv., Inc.*, 114 F. Supp. 2d 1313, 1318 (S.D. Fla. 2000)) (emphasis added).

The court can infer discriminatory motivation under USERRA from a number of considerations, such as:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected [**21]  by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

<u>Coffman v. Chugach Support Servs., Inc.</u>, 411 F.3d 1231, 1238 (11th Cir. 2005) (quoting *Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001)*).

a.      **HMMA's Hostility Toward Dees based on his Military Activity**

The evidence in this case establishes HMMA's ongoing hostility toward Dees based on his military status.  Prior to his termination, Dees' supervisor, Greg Prater, repeatedly harassed Dees over many months about his Guard obligations.[3]  Sergeant Dees' supervisor, Prater, demonstrated

[3]Defendants argue that because Prater was formerly in the military he could harbor no discriminatory animus towards Dees' military service or that they should at least be entitled to a "strong presumption" that no

particular animus towards Dees and his service obligations.  John Wingo, one of Sgt. Dees' co-workers, states:

> In my presence, and in the presence of other team members, Prater stated that all Guard members did on their training weekends was drink beer and play golf.  Prater made clear that he resented Leon for fulfilling his obligations to the Guard.

(Wingo Decl. ¶ 5).

Shane Archer and Mark Bornberg, other HMMA employees, have confirmed that Prater harassed Dees about fulfilling his military obligations to the Guard.  (Bornberg Decl. ¶ 3; Archer Decl. ¶ 3).  HMMA management, and particularly John Applegate (who was the head of Dees' department and a member of the HMMA Termination Committee who made the ultimate decision to fire Dees), was aware of this harassment and did nothing about it.  (Bornberg Decl. ¶¶ 3-4).

Dees' work record for HMMA was exemplary until his Guard obligations interfered with HMMA's production schedule in the late summer of 2006.  After Dees informed HMMA that he had to honor his military obligations, HMMA began a pattern of harassing Dees.  (Dees Decl. ¶ 10).  After Sgt. Barnes wrote his Letter of Instruction, what was once scattershot derogatory comments developed into a pattern of repeated, ongoing harassment relating to Dees' military service obligations:  more and more disparaging remarks about the Guard and Dees' service in the Guard; threats to make Dees take vacation time instead of military leave to attend military training exercises; statements to Dees that he should stay at work and not worry about his Guard duty; a threat to file a harassment claim against Dees simply because he asked HMMA management to put

---

discrimination occurred.  Defendants have presented no evidence that Prater actually served in the military–other than a statement contained in his personnel file.  The Defendants do not present a declaration by Prater himself stating that he served in any capacity with the military.  Regardless, even accepting HMMA's naked assertion, it has been over 15 years since Prater served a stint in the U.S. Navy.

locks on all maintenance employees' large toolboxes in order that maintenance workers could keep their valuable tools secure; and, retaliatory punishment of Dees by assigning him to work in the dangerous "pit" far more frequently than any other stamping maintenance employee. All of these HMMA harassment tactics were intended to force Dees to resign his employment at HMMA.

When the recurring harassment of Dees by HMMA did not stop, Dees complained to at least seven members of HMMA management, including John Applegate who was head of Dees' department and on the HMMA Termination Committee.

The disparaging comments of Prater and Applegate "were not stray remarks in the workplace or statements by lower level employees. They are ... direct evidence that the allegedly discriminatory conduct was animated by [plaintiff's] involvement in the military... and the significance to be attributed to them is for the jury to determine." Maher v. City of Chicago, 406 F. Supp. 2d 1006, 1030 (N.D. Ill. 2006) (citing Volovsek v. Wisc. Dept. of Agriculture, Trade, and Consumer Protection, 344 F.3d 680, 690 (7th Cir. 2003) (supervisors' comments sufficient to preclude summary judgment in gender discrimination case)). Moreover, even "stray remarks by nondecisionmakers ... may ... be considered 'evidence of a company's general atmosphere of discrimination.'" Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc., 473 F.2d 11, 17 (1st Cir. 2007) (reversing trial court's grant of summary judgment to employer on USERRA claim) (citation omitted). "'[S]uch evidence ... tend[s] to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.'" Velazquez-Garcia, 473 F.2d at 17 (citation omitted). See also, Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3rd Cir.1997) ("Although stray remarks by non-decisionmakers alone are insufficient to

establish discriminatory intent, we have held that such remarks can still constitute evidence of the atmosphere in which the employment decision was carried out.").

In <u>Fink v. City of New York</u>, 129 F. Supp. 2d 511, 521 n. 2 (E.D.N.Y. 2001), for example, the plaintiff testified that when he spoke to his supervisor to convince him that federal law required plaintiff to get credit for his pension while he was on active duty in Bosnia, the supervisor said "[I] don't know nothing about the law.  This is the way the fire department does it" and that he "didn't want to hear it... this is the fire department.  This is the way we do it.  Period.  That's it.  You're not getting it."  The court found these to be "open expressions of hostility toward [plaintiff] and his requests" and that based on this evidence and other evidence of hostility, "a reasonable juror could certainly conclude that [plaintiff's] veteran status motivated or contributed to the [employment-related] decision."  <u>Id.</u>

Likewise, in <u>Maher</u>, 406 F. Supp. 2d 1006, 1023-24 & 1030 (N.D. Ill. 2006), the court denied summary judgment on a USERRA claim where supervisors made comments to plaintiff about him being "off gallivanting in Bosnia," told him he did not have a telephone because he was "on one of those damn military leaves" when the phones were installed, told him he was too old to be in the military, "refused to do anything about the files stacked in the plaintiff's office and hectored plaintiff continuously when he was doing a leadership course for the Naval Reserves."

As in these cases, HMMA's ongoing harassment of and outward hostility toward Sgt. Dees based on his military status is sufficient, in and of itself, to establish HMMA's discriminatory motivation.

Moreover, the evidence establishes that Applegate's and/or Prater's "evident dislike for" Dees' military status "**infected the process** of evaluating [plaintiff]" from the outset, and that the

Termination Committee was convened to whitewash Sgt. Dees' termination, and that HMMA's asserted justification for firing Sgt. Dees was simply a pretext HMMA that made up in an attempt to avoid liability under USERRA.  See  Herawi v. Ala. Dept. of Forensic Sciences, 311 F. Supp. 2d 1335, 1348 (M.D. Ala. 2004) (Thompson, J.) (emphasis added).

HMMA's Termination Committee was supposed to have met to determine whether Dees should be fired for intentionally sleeping on the job.  The meeting was a sham intended to disinfect the discrimination Sgt. Dees had suffered based on his service in the Guard.  The committee refused to hear anything Dees had to say, never interviewed Archer, and even though HMMA's continued harassment of Dees because of his military obligations was the subject of Dees' written request for a meeting with HMMA's Human Resources Department one week before the incident in question, the Termination Committee's files contains no reference to Dees' military record or HMMA's perpetual harassment of Dees.  Consequently, the Termination Committee never considered the Guard's October 23, 2006 letter to HMMA that was written in response to HMMA's harassment of Dees, Hyundai's November 15, 2006 internal memo commemorating Dees' concern that HMMA was retaliating against him for his military obligations, or Dees' February 6, 2007 written request for a third meeting with the Human Resources Department.  The Termination Committee's records appear to have deliberately been cleansed of any reference to Dees' military background or HMMA's ongoing harassment of Dees because of his military service.

> **i.     HMMA's destruction of records is further evidence of discriminatory motive in firing Sgt. Dees**

All stamping maintenance employees, including Dees, are required to complete "Daily Reports" which show the tasks that employee worked on that day.  As Dees and Applegate testified

and Dees' coworkers have confirmed, an analysis of these reports would clearly evidence that Dees was assigned pit duty far more often than any other employee. After this case was filed, however, HMMA destroyed these reports.

Moreover, Dees began keeping notes to document the specific nature, date and time of the repeated acts of harassment. (Dees Dep., 92:8-12). He carried these notes to and from work with him, leaving them in his locker while at work. (Id., at 95:11-15). Dees' wife's testimony confirmed the existence of these notes. (K. Dees Dep., 62:2-21). Dees had left these notes in his locker the morning he was fired. He repeatedly requested that HMMA return these notes. HMMA failed to return these notes and has not produced them in this litigation, leading to the inevitable certainty that HMMA destroyed these notes after firing Dees. Dees' personal notes would have had a significant value to his lawsuit by allowing him to be more precise about the dates, times and nature of each incident of HMMA's harassment.

The jury in this case "may (but need not) infer" from HMMA's destruction of these records, all of which would be relevant to the issue of HMMA's discriminatory animus and motivation in firing Dees, "that the contents of the document[s] were unfavorable to [HMMA]." Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 177 (1st Cir. 1998). "This permissive negative inference springs from the commonsense notion that a party who destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position." Id.

**b.     Proximity in Time**

Dees was fired within four months of the letter his Guard unit sent to remind HMMA of its federal law obligations respecting uniformed servicemembers; three months after Hyundai's internal

records reflect that Dees lodged a formal complaint for HMMA's harassment and retaliation against Dees for his military obligations; and **one week after Dees filed a written request to meet with HMMA's Human Resource Department for a third time to discuss HMMA's continued harassment over his military obligations**. It is obvious that HMMA terminated Dees before he could have this third meeting with the Human Resources Department. It is also obvious that HMMA went out of its way to keep any of this evidence from being reviewed by the Termination Committee so that HMMA could make the "sterilized" arguments that it made in its summary judgment motion.

### c.     Inconsistencies in HMMA's asserted reason for terminating Dees

Defendants argue they "had an honest good faith belief Dees was seen sleeping during working hours," yet, as set forth below, the facts underlying this reason were demonstrably false and the Termination Committee (through John Applegate, a member of that committee, and the head of Dees' department) knew these facts were not only false but fabricated.

### d.     Dees' Termination Was Not Consistent with HMMA's Past Practice

Warner admits that employees accidentally falling asleep or nodding off on the job are not terminated. It is only purposefully, deliberately, willfully, intentionally or egregiously sleeping on the job that is a terminable offense. [Warner Dep., 190:12-192:4]. The only documents produced by the defendants as being similar terminable offenses to Dees' incident were those relating to Ontario King and Sharon Baker. Sharon Baker was falling asleep for lengthy time periods during employee training. Ontario King actually made a bed in a secluded area of the plant and slept on it. It appears that the Termination Committee's records were whitewashed and that the stated "facts" of this incident were deliberately misconstrued so as to parallel the facts related to the termination

of another employee, Ontario King, who had been caught lying down asleep on a bed King had created for that express purpose. (King Investigation File at 1, 4).

### 2. The Defendants Have Failed to Meet their Burden that they would have terminated Dees regardless of Dees' Military Status and, in any event, their Proffered "Legitimate" Explanation for Dees' Termination is Pretextual

Since Dees has established a prima facie case of defendants' USERRA violation, the defendants may avoid liability only by establishing "as an uncontroverted fact that it would have terminated his employment even if he had not been a member of the Guard." Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2001). Yet, for the reasons set forth below and based on the record in this case, the Defendants cannot "sustain[ ] their burden of proving that their conduct would have been the same notwithstanding Plaintiff's reservist status." Steenken v. Campbell, 2007 U.S. Dist. LEXIS 18500, *14, 154 Lab. Cas. (CCH) P10,829 (E.D. Ky. Mar. 15, 2007).

Defendants claim they terminated Dees for "**intentionally sleeping on the job**" which the Termination Committee "deemed ... to be a violation of HMMA's Serious Misconduct Policy and warranted the penalty of termination." [Defs.' Br., 14 (emphasis added); see also Defs.' Br., 25 – "termination committee deliberated and concluded that Dees was **intentionally sleeping** during work hours" (emphasis added)]. Defendants say they made this conclusion based on a finding that "the area where Dees was observed (by Brookshire) is an area isolated and **suggestive of intent to sleep**." [Id., 13] (emphasis added). Defendants also claim that the Termination Committee, "to ensure consistency in its decision-making, ... considered information on past practice" in terminating another employee "who was discovered **intentionally sleeping on the job**." [Warner 2nd Decl. ¶ 14, p. 4; Defs.' Br., 13] (emphasis added).

- 24 -

Defendants attempt to immunize their Termination Committee's decision to fire Dees by claiming that even if he were not intentionally sleeping on the job they cannot be liable because the Termination Committee had an honest, good-faith belief that he was. Again, it is significant to note that HMMA does **not** consider incidents of accidentally falling asleep and "nodd[ing] off" to be terminable offenses "but an individual that purposefully was sleeping on the job," on the other hand, will be terminated. [Warner Dep., 190:16-191:2].

As to defendants' asserted honest, good-faith belief, this Court has held that to rebut this claim and establish pretext for defendants' discriminatory actions, the plaintiff may "show[ ] (or, at least, point[ ] to evidence that suggests) that the employer either did not rely on that report or that the employer did rely on the report but **knew it was false**. In either case, the plaintiff would have shown that the employer was **likely lying about the reasons** for its behavior and **that, by definition, is pretext**." Strickland v. Prime Care of Dothan, 108 F. Supp. 2d 1329, 1332 (M.D. Ala. 2000) (emphasis added).

Pretext "may be established by showing that the employer's proffered explanation is false or 'unworthy of credence.'... **Evidence demonstrating that the employer's explanation is false or unworthy of credence**, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination [or retaliation] **even without further evidence of the defendant's true motive**. No further evidence of discriminatory animus is required because 'once the employer's justification has been eliminated, discrimination [or retaliation] may well be the most likely alternative explanation." Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003) (emphasis added) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 & 147 (2000)).

As the Supreme Court explained in Reeves,

the trier of fact **can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose**. Such an inference is **consistent with the general principle** of evidence law **that the factfinder is entitled to consider** a **party's** *dishonesty about a material fact as affirmative evidence of guilt*.

530 U.S. at 147 (emphasis added). <u>Accord</u> <u>Cleveland v. Home Shopping Network, Inc.</u>, 369 F.3d 1189, 1194-95 (11th Cir. 2004) (quoting *Reeves*, 530 U.S. at 147).

The record evidence shows that Defendants' asserted reason for firing Dees – for intentionally sleeping on the job – is false or unworthy of credence. The Termination Committee knew or should have known that the facts underlying its decision to terminate Dees were wrong. Specifically, HMMA's Termination Committee determined Dees' **intent** to sleep from two alleged facts presented to it.

First, HMMA claims that the area where Dees was claimed to be sleeping, the SOPS (Side Outer Panel area), was an unusual place for Dees to be, out of the way and "not in the location where he should have been working." [Warner Dep., 191:3-7]. Second, Dees had fabricated a "blind" by opening two doors on the PLC ["Programmable Logic Computer"] cabinet on both sides of his chair so that no one could see him sleeping. [Warner Dep., 191:3-9].

Both "facts" are not only demonstrably false, but **the Termination Committee**, through **Applegate** (the senior member of HMMA stamping maintenance management) who was on the Termination Committee and attended the meeting deciding Dees' fate, **knew that both facts were false,** thus obliterating the defendants' asserted defense of good faith reliance.

Dees was normally assigned to the SOPS, and it was normal and very common for him to be on the 3rd floor mezzanine assisting the production department in operating the system, and diagnosing and repairing any problems. (Dees dep., 161:11-13; 206:14-207:1; Archer Decl., ¶ 7).

That night, Dees and his coworker Shane Archer had been up there making a repair to a trolley and Dees was monitoring the system to ensure it was back online.

**John Applegate** confirmed that it **would not be unusual** for Dees to be found in the SOPS. (Applegate Dep., 59:12-62:2).  Therefore, the first fact alleged in support of Dees' intent to sleep, that he was in an isolated area where he would not normally be, **is false and Applegate and the Termination Committee knew it**.

The second fact that the defendants say shows Dees' **intent to sleep** was similarly fabricated. Nowhere during Team Relations' investigation into the incident did information arise regarding Dees creating a "blind" to hide himself from view behind the PLC doors until it appeared in the email from Clevenger to Kimble dated February 23, 2007.  [Ex. 17].  Rob Clevenger, who was in charge of investigating the incident, testified that he got this information **from John Applegate**, and was forced to admit that the one eyewitness to this incident, Jim Brookshire, never mentioned the PLC doors being open or claimed that Dees had created a blind.  (Clevenger Dep., 89:3-90:10).  Mr. Brookshire testified, in fact, that **he did not see the PLC doors open creating a blind**.  (Brookshire Dep., 108:8-109:5).  Therefore, the only other fact supporting HMMA's contention that Dees was intentionally asleep is also demonstrably false - created out of thin air by **Applegate and the Termination Committee as a pretextual bolster for its termination of Dees because he was in the U.S. Army National Guard**.

Further evidence exists of the defendants' dishonesty about the second "fact" underlying the decision to terminate Dees.  Specifically, almost 3 weeks after the alleged incident of Dees' intentionally sleeping, HMMA sent Rob Clevenger from Team Relations to the area in question and staged a series of photographs purporting to show that Dees had in fact created a blind to hide

himself while he slept.  These photographs contradict each other because the area in question was staged 2 different ways by HMMA and Gwang Mun (HMMA's Korean Coordinator for stamping maintenance) testified that **neither photo represented the way the area was configured the day after Dees was supposedly observed sleeping**. [Mun Dep., 60:20-61:19].

Moreover, HMMA never interviewed Shane Archer who was working side-by-side with Dees that night, despite Dees begging HMMA to interview Archer.  Dees told HMMA that Archer had been with him only moments before Brookshire appeared in the SOPS area.  Archer flatly denies that Dees could have been intentionally asleep because he was only apart from Dees for 5 minutes or so all night (apparently the 5 minutes during which Brookshire claims to have caught Dees intentionally sleeping).  Archer and Dees testify that they were working in the SOPS area, saw Brookshire and team leader Kevin Hughes looking up at them and pointing.  Shortly thereafter, Archer left the SOPS and went to check on press number 2.  When Archer left, Dees was alert and tending to his duties.  Dees watched Brookshire come up to the SOPS area and walk around never getting within 50 feet of Dees.  (Dees Dep., 213:5-23).  About five minutes later, Dees joined Archer at press number 2.  This five or so minutes was the only time Archer and Dees were apart the entire night.  **Only after this lawsuit was filed** did HMMA (or actually its lawyers) see fit to interview Archer, who corroborated the entirety of Dees' version of events.

The above evidence "showing that [defendants] lied about the reasons for [their] acts – that [they] had a 'dishonest belief' in the reasons – can be strong evidence that [they] acted with discriminatory intent." Woodard v. Fanboy, LLC, 298 F.3d 1261, 1265 (11th Cir. 2002).  Moreover, the jury may infer from the "inconsistencies in or the unconvincing nature of the decisionmakers'

testimony" that the defendants' reason for firing Dees was pretextual. <u>Castleman v. Acme Boot Co.</u>, 959 F.2d 1417, 1422 (7th Cir. 1992).[4]

Additionally, the evidence of HMMA's pervasive harassment of Dees, HMMA's disparaging remarks about his military status and the timing of its termination of Dees all further show that HMMA's asserted reason for termination is a mere pretext. <u>See Stough v. Jameson Inns</u>, 2006 U.S. Dist. LEXIS 48537, *17 (M.D. Ala. July 17, 2006)("[c]omments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext. <u>Damon v. Fleming Supermarkets of Florida, Inc.</u>, 196 F.3d 1354, 1362 (11th Cir. 1999); <u>Ross v. Rhodes Furniture, Inc.</u>, 146 F.3d 1286, 1291 (11th Cir. 1998).") (quoting <u>Herawi v. State of Alabama Dept. of Forensic Sciences</u>, 311 F. Supp.2d 1335, 1348 (M.D. Ala. 2004)(Thompson, J.)).[5]

From the evidence presented, a jury can find that: HMMA wanted Sgt. Dees to quit because of his military obligations; and, that after it became obvious that he had no intentions of quitting despite suffering all the harassment HMMA could dish and after Sgt. Dees had yet again complained to HMMA Human Resources, HMMA falsely accused Dees of intentionally sleeping

---

[4]<u>See also</u>, <u>EEOC v. Ethan Allen, Inc.</u>, 44 F.3d 116, 120 (2d Cir. 1994) (holding that a reasonable juror could infer that the shifting and inconsistent explanations given by the employer at trial were pretextual, developed over time to counter the evidence suggesting discrimination); <u>Dominguez-Cruz v. Negron-Ramos</u>, 202 F.3d 424, 432 (1st Cir. 2000) ("when a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual."); <u>Staten v. New Palace Casino, LLC</u>, 187 Fed. Appx. 350, 359 (5th Cir. 2006) ("When an employer offers inconsistent explanations for its employment decision at different times, as here, the jury may infer that the employer's proffered reasons are pretextual. ... The timing of an employer's changing rationale is also probative of pretext.")

[5]<u>See also</u>, <u>Smith v. School Board of Polk County, Fla.</u>, 205 F. Supp. 2d 1308 (M.D.Fla. 2002)(comments by supervisor sufficient to show that employee's reserve status was a motivating factor in certain conduct); <u>Gillie-Harp v. Cardinal Health, Inc.</u>, 249 F.Supp.2d 1113 (W.D.Wis. 2003)(supervisor's hostile comments about plaintiff's requests for military leaves along with other evidence precluded summary judgment); <u>Leisek v. Brightwood Corp.</u>, 278 F.3d 895, 900 (9th Cir. 2002) (inference of discrimination from evidence that plaintiff was told to deduct military leave from his vacation time and that future leave orders would not be honored). <u>Cf.</u>, <u>Jones v. Bessemer Carraway Med. Ctr.</u>, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (holding that "language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out a prima facie case")

on the job (not simply nodding off or accidentally falling asleep which would not have justified a termination). The jury has more than enough evidence in the record to find that HMMA is lying about why it fired Sgt. Dees and that the Termination Committee proceeding (and investigation) was a sham intended to whitewash the lie based on, among other things (like the failure to interview Shane Archer), the 2 "facts" on which the Termination Committee claims it relied, both of which are demonstrably false and fabricated. Molina v. Rimco, Inc., 2006 U.S. Dist. LEXIS 65471, *21-22, No. 05-1181 (D.P.R. Sept. 12, 2006) (denying employer's summary judgment motion on USERRA termination claim) ("Given that USERRA and its predecessor statutes are to be liberally construed for the benefit of those who left private life to serve their country, we must leave the question of Defendant's intent in terminating Plaintiff for a jury to decide.") (citing *Alabama Power Co. v. Davis, 431 U.S. 581, 584 (1977))*.[6]

In short, Dees "has submitted evidence that defendants' stated reason is not the real reason they removed him." Harris, 322 F. Supp. 2d at 1326. Therefore, "a genuine issue of material fact remains unresolved regarding defendants' true motivations for their action. In other words, a reasonable juror could certainly conclude that, in light of all the evidence, defendants would not have made the decision to remove Harris but for his military obligations." Harris, 322 F. Supp. 2d at 1326.

Defendants' motion for summary judgment on Dees' USERRA claim should therefore be denied.

---

[6]See also, Hill v. Michelin North Am., Inc., 252 F.3d 307, 312-13 (4th Cir. 2001) ("Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries."). Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment and noting that "determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury" (internal quotation marks and citation omitted))

**B.    Defendants are not entitled to summary judgment on plaintiff's outrage claim**

Dees has submitted sufficient evidence to show that HMMA's conduct was (1) intentional, (2) extreme and outrageous, and (3) that, as a result, Dees suffered extreme emotional distress.

HMMA management intentionally fabricated a story that Dees was intentionally sleeping on the job so HMMA could fire him because of his military service obligations. This conduct was extreme and outrageous. To be extreme and outrageous under Alabama law, the termination must have been for reasons that "contravene public policy." *Lees v. Sea Breeze Health Care Center, Inc.*, 391 F. Supp. 2d 1103, 1107 (S.D. Ala. 2005). In *Lees*, an employee of the defendant joined the U.S. Air Force Reserves, after which she was subjected to verbal harassment regarding her membership in the reserves. *Id.* at 1104. After returning from basic training, she was once again subjected to verbal harassment about her membership in the military. *Id.* at 1105. In all, the term of verbal harassment lasted 10 months. *Id.* at 1104. Eventually, Lees was fired because of her membership in the military. *Id.* at 1105. The court further found that "a ten-month onslaught of harassment, a slew of adverse repercussions, and a firing, all because the plaintiff had enlisted in the U.S. Air Force Reserves, would offend public policy, as expressed in USERRA." *Id.* at 1108.

Here, as in *Lees*. Dees was subjected to a months-long period of verbal harassment and retaliation. This harassment and retaliation escalated until HMMA fired Dees because of his military obligations. Dees' harassment and ultimate firing by HMMA, therefore, satisfy the second element of an Alabama outrage claim.

Dees also suffered extreme emotional distress, which began when HMMA began its pattern of harassment and retaliatory actions against Dees, and increased as HMMA escalated its harassment after Dees complained to his Guard unit about HMMA harassing him about his military service

obligations, causing his Guard unit to write a letter of instruction to HMMA. Because of the extreme emotional distress during this time, Dees turned from a normally "jolly" man, happy with anything and anybody, to a person who someone who was not talking too much. (Katherine Dees Depo. at 29:15 – 30:11).

Also, Sgt. Dees, because he is a decorated combat veteran and a patriot who has been a part of the U.S. military since before his senior year in high school, feels the harassment and the distress of HMMA destroying his unblemished work record and his reputation to a greater degree than an average person would. As discussed above, knowing that they could not terminate Dees because of his military obligations, HMMA concocted a scheme to fire him for sleeping on the job, fabricated evidence against him, and suppressed the one witness who could clear him of the accusation. For a soldier, they chose the one accusation that would hit at the heart of his being – intentional abandonment of his duties. Then, after the lawsuit was filed, the Defendants learned the truth from Shane Archer: Dees was not asleep as Brookshire has alleged. Rather than disclose the truth, however, Defendants not only failed to disclose it, but continued to maintain their bogus claim – even to a federal judge.

Dees testified about the various aspects of emotional distress he experienced. It caused problems between he and his wife. (Dees Depo. at 380: 9-13.) He lost sleep, and still has trouble sleeping. (Dees Depo. at 254:20 – 255:10). He suffered extreme shame and embarrassment because people he worshiped with at church knew why he had been terminated. (Dees Depo. at 378:17 – 379:15). And, he relives the entire traumatic experience over again every time he fills out a job application or applies for a bank loan. (Dees Depo. at 255: 11-18; 379:22 – 380:5).

Dees admitted that he had never talked to a pastor about the emotional distress he suffered, nor did he seek the counsel of a psychiatrist, or cry about it, because he had mouths to feed. (Dees Depo. at 254: 4-19; 256:5-15). Dees did, however, experience severe emotional distress, and dealt with it internally through praying to his Lord about it. (Dees Decl. ¶ 9). Just because Dees was stoic and dealt with things internally, and prayed to his Lord for relief, doesn't mean Dees is entitled to less recovery under the law than someone who ran to a psychiatrist and gets their relief from a pill bottle.

Based on the foregoing, the Defendants are not entitled to summary judgment on Sgt. Dees' outrage claim.

### C.    Defendants are not entitled to summary judgment on Dees' conversion claim.

Dees had no opportunity to retrieve his personal belongings from his locker before he left the HMMA plant.  Dees testified that he was "taken out of there like a prisoner, like a criminal.".... Dees testified that when he saw the security guards he knew he was being fired, despite Applegate's assurance that he was not.  Once Dees realized what was happening, he attempted to retrieve his personal belongings from his locker, but the security officers refused to let him back in the plant. Dees told the security guards he was not leaving without his gear, so Greg Prater volunteered to retrieve his gear for him.  Prater did retrieve Dees' jacket and a small music player given to employees as a Christmas  present, but did not retrieve anything else of Dees' personal belongings. Dees told the security officers that all Prater had brought was his jacket and the music player, and asked when he would get the rest of his belongings.  The security staff said, "we'll mail it to you." Security staff transported Dees to the security building and escorted Dees into a conference room.

- 33 -

While there, Dees again asked if he was going to be able to retrieve the rest of his belongings. Applegate told Dees no and said, "you're not going back in the plant."

Dees testified that in his locker when he was fired and kept against his will from retrieving his personal belongings, were his jacket, his music player, several Army pay stubs that contained Dees' personal banking and social security info, and his several pages of notes about the harassing conduct that HMMA had perpetrated on him during the preceding several months. Dees testified that his tool bag, which stayed in his locker when he was not at work, had been taken out of his locker upon his arrival at the plant, and was with Dees in the plant when Prater came and got Dees so HMMA could fire him. Dees left the tool bag on the floor where he was meeting with his co-workers.

Fortunately for Dees, one of his co-workers brought his tool bag to him outside the gate before Dees left the parking lot on the night Dees was fired. Prater, however, who had volunteered to retrieve Dees' personal belongings from his locker, only returned Dees' jacket and the music player. Despite one attempt to retrieve his personal property himself and **at least 3 requests for HMMA to give him his personal belongings**, all he got was, "we'll mail it to you." Yet, **HMMA** never did - it **never sent the remainder of Dees' personal belongings to him, nor did it ever notify Dees to come get them**.

Dees has therefore presented evidence sufficient to the jury to determine that HMMA either destroyed his personal property or refused to surrender this property after he made 3 demands for its return. In either case, HMMA would be liable for conversion under Alabama law. See Kemp's Wrecker Serv. v. Grassland Sod Co., 404 So. 2d 348, 352 (Ala. Civ. App. 1981) (conversion liability upon destruction of personalty belonging to another); Birmingham Jefferson County Transit Auth.

v. Arvan, 669 So. 2d 825 (Ala. 1995) (authority's failure to return to employee after termination certain items of personal property was sufficient for conversion judgment).[7]  And, HMMA's return of certain of Dees' items **after this litigation was commenced** does not preclude Dees' action for HMMA's conversion of that property.  See Brown v. Campbell, 536 So. 2d 920 (Ala. 1988) (rejecting defendant's contention that returning property before trial precludes action for conversion; there was evidence that defendant refused to surrender property after plaintiff requested it).

While the items converted by Defendants – Dees' Army pay stubs and his personal notes on HMMA's pattern of harassment – have no distinguishable face value or readily ascertainable market value, they do have a value that must be determined by the jury.  Dees' pay stubs contained his personal banking and social security information that could be used to steal his identity.  More significantly, Dees' personal notes would have had a significant value to his lawsuit by allowing him to be more precise about the dates, times and nature of each incident of HMMA's harassment.

Based on the foregoing, Defendants' motion for summary judgment on Sgt. Dees' conversion claim is due to be denied.

### D.    HMA is not entitled to summary judgment because it and HMMA are an Integrated Enterprise

Like other federal employment statutes, USERRA is a remedial statute to be liberally construed and strictly enforced for the benefit of military servicemembers who have left private life to serve their country.  Alabama Power Co. v. Davis, 431 U.S. 581 (1977); H.R.Rep. No. 103-65

---

[7]The Defendants' argument – that they cannot be liable for conversion by its employees unless they specifically ratified their employees' action – is so far afield that it strains credulity.  The case they use to support their argument, Hendley v. Springhill Mem'l Hosp., 575 So. 2d 547 (Ala. 1990), involved a hospital **equipment vendor** who posed as a gynecologist to perform a vaginal exam of a hospital patient.  Had that case involved an **employee** acting within the line and scope of his duties during working hours (as any HMMA employee would have been in taking or destroying Dees' property), liability would have most certainly attached.

(1993); Duarte v. Agilent Techs., 366 F. Supp. 2d 1039, 1046 (D. Colo. 2005).  As with similar federal employment legislation, the "integrated enterprise" or "single employer" test should be applied to determine the liability of a parent company for misconduct by and through operation of its subsidiary.  Cf., Duarte, 366 F. Supp. 1039 (finding case law construing ADEA helpful in interpreting USERRA provision).

Where a parent company exercises such control over a subsidiary that the two companies are essentially the same entity, a parent will be considered the employer of its subsidiary's personnel. Bruce v. S & H Riggers & Erectors, Inc., 732 F. Supp. 1172, 1175 (N.D. Ga. 1990).  To determine whether a parent and subsidiary are so interrelated that they are to be considered one employer for USERRA purposes, the "integrated enterprise" test is applied.  Id. (citing *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930 (11th Cir. 1987)).  Under this test, the court considers proof of the following: "(1) an interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership or financial control."  Id. (citing *Radio & Television Broadcast Technicians, Local Union 1264, Int'l Brotherhood of Electrical Workers, AFL-CIO v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255 (1965)).

Here, and as fully set out in the facts above, HMMA's operations are interrelated with HMA's. HMMA's annual budget is controlled by HMC directly and indirectly by HMA through its sales forecasts. HMA's periodic revisions of its market demand projections have a direct effect on HMMA's operations.

Common management and common ownership and financial control are shown by HMMA being wholly-owned by HMA, and exclusive control of HMMA being vested in four managers appointed by HMA. Two of these managers are the Chairman and Vice Chairman of HMC – further

evidence of common control. HMMA's finances are also intertwined with HMA. Most of HMMA's transactions are with related parties. Approximately 90% of the vehicles produced by HMMA are purchased by HMA. Also, HMC has guaranteed all of HMMA's $574 million in long-term debt. Centralized labor relations is shown by HMMA and HMA being part of a controlled group of corporations. Also, an HMA executive was placed at HMMA as Deputy President of HMMA for a period of over one year, and all expenses were paid by HMA.

## CONCLUSION

Based on the argument and evidence presented by the Plaintiff, the Defendants' motion for summary judgment is due to be denied.


Respectfully submitted,


s/ Vincent F. Kilborn, III
Vincent F. Kilborn, III (KILBV4484)

s/ David A. McDonald
David A. McDonald (MCDOD5329)

s/ W. Perry Hall
W. Perry Hall (HALLW9043)

s/ Jeffrey R. Sport
Jeffrey R. Sport (SPORJ5390)
**Attorneys for Plaintiff**

OF COUNSEL:

KILBORN, ROEBUCK & McDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660

- 37 -

Telephone: (251) 479-9010
Fax: (251) 479-6747
E-mail: vfk@krmlaw.com
E-mail: dam@krmlaw.com
E-mail: wph@krmlaw.com
E-mail: jeff.sport@sportlaw.us

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have on the 1st day of February, 2008, electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

J. Trent Scofield, Esq.
T. Scott Kelly, Esq.
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118

Matthew K. Johnson, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602


<u>s/ Jeffrey R. Sport</u>
COUNSEL

- 38 -