# IN THE UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | Case No.  2:07-cv-00306-MHT-CSC |
| | * | |
| HYUNDAI MOTOR MANUFACTURING | * | |
| ALABAMA, LLC and HYUNDAI MOTOR | * | |
| AMERICA, INC., | * | |
| | * | |
| Defendants. | * | |

## PLAINTIFF'S EVIDENTIARY SUBMISSION IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, Jerry Leon Dees, Jr., and submits this Evidentiary Submission in Support of His Response in Opposition to Defendant's Motion for Summary Judgment, as follows:

## TABLE  OF  EXHIBITS

**Exh #**      **Description**

1        Deposition of Jerry Leon Dees

2        Deposition of Katherine Dees

3        Deposition of Wendy Warner (11/15/07)

4        Deposition of Robert Clevenger

5        Deposition of Gwang Mun

6        Deposition of John Applegate

7        Deposition of James Brookshire

1

8    Declaration of Jerry Leon Dees

9    Declaration of Shane Archer

10    Declaration of Mark Bornberg

11    Declaration of John Wingo

12    Declaration of Lt. Col. (Ret.) Todd Harrison

13    Declaration of Wendell Richburg

14    Composite - HMA & HMMA Initial Disclosures and Supplements thereto

15    12/11/07 Letter to Defense Counsel from Jeffrey R. Sport, Esq.

16    Frankin Barnes Memorandum of Record (DEES000002)

17    Team Relations Memo to Greg Kimble from Rob Clevenger dated 02/23/07

18    Interview with James Brookshire dated 02/15/07

19    Email to John Applegate from Greg Prater dated 02/21/07 (Dees v. HMMA 00035)

20    *FILED UNDER SEAL - Confidential*
      Ontario King Investigation File (Dees v. HMMA 00283-287)

21    *FILED UNDER SEAL - Confidential*
      Photographs (Dees v. Hyundai 0345-346)

22    Email to Greg Kimble from Jerry Dees dated 2/06/07

23    Team Relations Memo to Robert Clevenger from William Ware dated 2/21/07

24    *FILED UNDER SEAL - Confidential*
      Discussion Planner (John W. Applegate and Greg Prater) dated 11/15/06 (Dees v. HMMA 00173-174)

25    *FILED UNDER SEAL - Confidential*
      Limited Liability Company Agreement of Hyundai Motor Manufacturing Alabama, LLC dated 4/12/02 (HMMA 30b5000828-838)

26    *FILED UNDER SEAL - Confidential*
      Memo Regarding 2006 Hyundai Motor Company Controlled Group Coverage Testing Projections (HMMA30b5000811-827)

27    *FILED UNDER SEAL - Confidential*
      Hyundai Motor America Advance Pricing Agreement Renewal Request dated 9/11/06 (HMMA 30b5000898-946)

28    *FILED UNDER SEAL - Confidential*
Hyundai Motor Manufacturing Alabama, LLC Financial Statements
December 31, 2006 and 2005 (HMMA 30b5001524-1541)

29    *FILED UNDER SEAL - Confidential*
North American Affiliate Expense Allocation Agreement dated 9/1/06
(HMMA 30b5000122-124)

30    *FILED UNDER SEAL - Confidential*
Letter to Keith Duckworth from Greg Kimble dated 2/15/05 (HMMA
30b5000121)

31    *FILED UNDER SEAL - Confidential*
Hyundai Motor Company General Corporate Profile (HMMA 30b5000846-897)

32    Simcala Employee Evaluation (Dees V HMMA 00024 SUBPOENA DOCS)

33    *FILED UNDER SEAL – Confidential*
Deposition of Mickey Phillips

34    *FILED UNDER SEAL – Confidential*
Deposition of John Kalson

Respectfully submitted on this the 1st day of February, 2008.

/s/ Jeffrey R. Sport

Jeffrey R. Sport, Esquire (SPORJ5390)
Vincent F. Kilborn, III, Esquire (KILBV4484)
W. Perry Hall, Esquire (HALLW9043)
KILBORN, ROEBUCK & MCDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747

OF COUNSEL:

David A. McDonald, Esquire (MCDOD5329)
KILBORN, ROEBUCK & MCDONALD
P.O. Box 832
Mobile, AL 36601
(251) 434-0045 Telephone

3

(251) 434-0047 Fax
Email: dam@krmlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that I have, on the 1st day of February, 2008, electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Jeffrey R. Sport                
OF COUNSEL

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3          NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-cv-00306-MHT-CSC
6    JERRY LEON DEES, JR.,
7          Plaintiff,
8          vs.
9    HYUNDAI MOTOR MANUFACTURING
10   ALABAMA, LLC, and HYUNDAI
11   MOTOR AMERICA, INC.,
12         Defendants.
13        S T I P U L A T I O N
14        IT IS STIPULATED AND AGREED by and
15   between the parties through their respective
16   counsel, that the deposition of Jerry Leon
17   Dees, Jr., may be taken before Angela Smith
18   McGalliard, RPR, CRR, at the offices of
19   Freedom Court Reporting, at 416 S. Perry
20   Street, Montgomery, Alabama 36104, on the
21   20th day of November, 2007.
22
23        DEPOSITION OF JERRY LEON DEES, JR.

Page 2

1        IT IS FURTHER STIPULATED AND
2    AGREED that the signature to and the reading
3    of the deposition by the witness is waived,
4    the deposition to have the same force and
5    effect as if full compliance had been had
6    with all laws and rules of Court relating to
7    the taking of depositions.
8        IT IS FURTHER STIPULATED AND
9    AGREED that it shall not be necessary for
10   any objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties
13   may make objections and assign grounds at
14   the time of the trial, or at the time said
15   deposition is offered in evidence, or prior
16   thereto.
17       IT IS FURTHER STIPULATED AND
18   AGREED that the notice of filing of the
19   deposition by the Commissioner is waived.
20
21        * * * * * * * * * * * * *
22
23

Page 3

1        * * * * * * * * * * * *
2          I N D E X
3         EXAMINATION
4              PAGE
5    By Mr. Johnson ...................... 8
6    By Mr. Kilborn .................... 374
7        EXAMINATION CONTINUED
8              PAGE
9    By Mr. Johnson .................... 381
10       DEFENDANT'S EXHIBITS
11             PAGE
12   Exhibit 1 - Dees' resume ........... 39
13   Exhibit 2 - Handbook
14        acknowledgement .......... 72
15   Exhibit 3 - Complaint ............. 132
16   Exhibit 4 - E-mail re: Dees'
17        Guard duty ............. 166
18   Exhibit 5 - October 2006 letter
19        from Sgt. Barnes ........ 180
20   Exhibit 6 - Bates Dees v. HMMA
21        00035 .................. 258
22   Exhibit 7 - Team member review
23        meeting letter, Dees v.

Page 4

1        HMMA 1  ................. 265
2    Exhibit 8 - Yearly training
3        calendar, Bates Dees 3 .. 272
4    Exhibit 9 - Bates Dees 4,
5        training schedule ....... 274
6    Exhibit 10 - Cell phone records ... 283
7    Exhibit 11 - List of contents of
8        box .................... 301
9    Exhibit 12 - Dees v. HMMA 6 ...... 309
10   Exhibit 13 - Seven-page cell
11        phone record ........... 342
12   Exhibit 14 - More legible copy of
13        Exhibit 13 ............. 343
14   (Ex. 14, to be e-mailed by Plaintiff's
15   counsel, not recieved at the time of
16   production.)
17        * * * * * * * * * * * * *
18
19
20
21
22
23

PLAINTIFF'S
EXHIBIT
1

Page 5

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5    CASE NUMBER:  2:07-cv-00306-MHT-CSC
6    JERRY LEON DEES, JR.,
7          Plaintiff,
8          vs.
9    HYUNDAI MOTOR MANUFACTURING
10   ALABAMA, LLC, and HYUNDAI
11   MOTOR AMERICA, INC.,
12         Defendants.
13   BEFORE:
14      ANGELA SMITH MCGALLIARD, Commissioner.
15   APPEARANCES:
16      VINCENT KILBORN, ESQUIRE, of
17   KILBORN, ROEBUCK & MCDONALD, 1810 Old
18   Government Street, Mobile, Alabama 36606,
19   appearing on behalf of the Plaintiff.
20      JEFFREY R. SPORT, ESQUIRE, of
21   KILBORN, ROEBUCK & MCDONALD, 1810 Old
22   Government Street, Mobile, Alabama 36606,
23   appearing on behalf of the Plaintiff.

Page 6

1    APPEARANCES (continued):
2       MATTHEW K. JOHNSON, ESQUIRE, of
3    OGLETREE, DEAKINS, NASH, SMOAK & STEWART,
4    The Ogletree Building, 300 North Main
5    Street, Greenville, South Carolina 29602,
6    appearing on behalf of the Defendants.
7       CHRISTOPHER N. SMITH, ESQUIRE, of
8    HYUNDAI MOTOR MANUFACTURING ALABAMA, 700
9    Hyundai Boulevard, Montgomery, Alabama
10   36105, appearing on behalf of the
11   Defendants.
12       ALSO PRESENT:  Katherine Dees
13             Bobby Hall
14             * * * * * *
15
16
17
18
19
20
21
22
23

Page 7

1       I, ANGELA SMITH MCGALLIARD, RPR,
2    CRR, a Court Reporter of Pike Road, Alabama,
3    acting as Commissioner, certify that on this
4    date, as provided by the Federal Rules of
5    Civil Procedure and the foregoing
6    stipulation of counsel, there came before me
7    at the offices of Freedom Court Reporting,
8    416 S. Perry Street, Montgomery, Alabama
9    36104, beginning at 9:10 a.m., Jerry Leon
10   Dees, Jr., a witness in the above cause, for
11   oral examination, whereupon the following
12   proceedings were had:
13       JERRY LEON DEES, JR.,
14   being first duly sworn, was examined and
15   testified as follows:
16       MR. KILBORN:  Court reporter,
17   can you keep the time for us?
18       COURT REPORTER:  Certainly.
19   Usual stipulations?
20       MR. JOHNSON:  I assume that
21   means the usual stipulations that we've got
22   in the guidelines --
23       MR. KILBORN:  Witness waives

Page 8

1    the reading and signing and all objections
2    except as to the form are reserved until
3    trial.
4       MR. JOHNSON:  Sounds fine with
5    me.
6             EXAMINATION
7    BY MR. JOHNSON:
8       Q.    Okay, Mr. Dees, my name is
9    Matt Johnson.  I practice law at Ogletree,
10   Deakins.  And I'm here basically to ask you
11   some questions about yourself and about this
12   case, and what you know about this case, and
13   other people that might know about the case.
14       This may seem like a fairly
15   formal proceeding, but I'm sort of here to
16   have a conversation with you and just ask
17   you questions.
18       Let me tell you up front,
19   occasionally I'm thinking two or three
20   questions down the line; and for better or
21   for worse, sometimes I ask questions that
22   don't make sense, and I apologize.  If I do
23   that, I want you to stop me, and let me know

2 (Pages 5 to 8)

Page 9

1  that. Don't be embarrassed. I'm fairly
2  thick skinned; and if I don't make sense or
3  my questions don't make sense, that's okay
4  with me. You just let me know because I
5  just want to make sure you're comfortable
6  and that you're answering questions that you
7  understand. Okay?
8      A.    I'll do it.
9      Q.    And the other thing, our court
10 reporter here is typing up everything that
11 we say. And she's probably got one of the
12 harder jobs of any of us today, so we want
13 to make her job as easy as we can. The best
14 way to do that is to make sure we speak up
15 loud and clear. Okay?
16     A.    Roger.
17     Q.    And if you can, Roger may
18 work, assuming that means yes. But I'd
19 prefer, and I'm sure our court reporter
20 would prefer it if you could say yes or no.
21 Is that okay?
22     A.    Yes.
23     Q.    Again, nods, shrugs of the

Page 10

1  shoulders, things of that nature are
2  difficult for her to write up, so make sure
3  everything you want to get across to me or
4  to her is in loud, clear, spoken English.
5  Okay?
6      A.    No problem.
7      Q.    I appreciate it.
8           And this is not an endurance
9  contest. It's probably going to take longer
10 than you or I want it to, but that's just
11 the way it goes, and I apologize in advance.
12 What I want to make sure you understand is
13 that you can take a break whenever you want
14 to; you can try to get something to drink if
15 we can find something; you can use the
16 restroom; you can stand up and walk around
17 as you'd like. Okay?
18     A.    Yes, sir.
19     Q.    Okay. Finally, I just want to
20 make sure before we get started into the
21 heart of things that you understand this is
22 sworn testimony?
23     A.    Yes.

Page 11

1      Q.    And you swear to tell the
2  truth?
3      A.    Whole truth, nothing but the
4  truth, so help me God.
5      Q.    Okay. And are you on any
6  medication that would prohibit you from
7  understanding me or my questions?
8      A.    No, sir.
9      Q.    Are you on any medication that
10 would prohibit you from being able to answer
11 truthfully and accurately?
12     A.    I'm not on any type of
13 medication.
14     Q.    Thank you.
15          If you would give me your full
16 name, including your middle name.
17     A.    Jerry Leon Dees, Junior.
18     Q.    Have you ever gone by any
19 other names?
20     A.    No, sir. Yeah. Staff
21 sergeant.
22     Q.    What's your date of birth?
23     A.    19 January '65.

Page 12

1      Q.    Where were you born?
2      A.    Clanton, Alabama.
3      Q.    C-L-A-N-T-O-N?
4      A.    Yes, sir.
5      Q.    Where is that?
6      A.    Chilton County.
7      Q.    What's that near?
8           MR. SPORT: It's an hour north
9  of here.
10     A.    It's out in the middle of the
11 woods.
12          (Off-the-Record discussion
13          was held.)
14     Q.    What's your current address?
15     A.    14805 U.S. Highway 82,
16 Maplesville, Alabama 36750.
17     Q.    And do you own a house -- Is
18 that a house?
19     A.    Yes, sir.
20     Q.    Do you own it or rent it?
21     A.    Well, the bank owns it right
22 now. Give me about thirteen more years, and
23 I might own it.

3 (Pages 9 to 12)

FREEDOM COURT REPORTING

Page 13

1      Q.    Do you have any secondary
2  residences?
3      A.    Yeah.  The armory one weekend
4  a month.
5      Q.    And where do you work
6  currently?
7      A.    International Paper,
8  Prattville Mill.
9      Q.    What do you do at the
10  Prattville mill?
11      A.    Millwright, maintenance.
12      Q.    How long have you been there?
13      A.    Few months.
14      Q.    Okay.  Do you remember which
15  month you started?
16      A.    Approximately four months ago.
17      Q.    Okay.  And when you started
18  there four months ago, were you doing
19  millwright/maintenance?
20      A.    Yes, sir.
21      Q.    And prior to that, where did
22  you work?
23      A.    BE&K Construction Company at

Page 14

1  that mill.
2      Q.    At the Prattville mill?
3      A.    Yes, sir.
4      Q.    What were you doing for BE&K?
5      A.    Millwright, millwright and
6  welder.
7      Q.    Was that different than what
8  you're doing now?
9      A.    Not really, no.
10      Q.    Prior to BE&K where was the
11  last place you worked?
12      A.    Hyundai.
13      Q.    Do you remember what month you
14  started work at BE&K?
15      A.    27 February '07.
16      Q.    Okay.  And who is your
17  supervisor at the Prattville mill?
18      A.    Neil Causey.
19      Q.    Can you spell Causey?
20      A.    Causey, C-A-U-S-E-Y, I
21  believe.  I'm not sure.
22      Q.    Okay.  What is his position at
23  the mill?

Page 15

1      A.    Maintenance supervisor.
2      Q.    Who is Neil Causey's boss?
3      A.    I have no idea.
4      Q.    Okay.
5      A.    I haven't been there in a
6  month.  I've been at an Army school for the
7  last month, so I don't know.
8      Q.    Okay.  What kind of Army
9  school have you been at?
10      A.    BNCOC Phase II and III, Staff
11  NCO Advanced Leadership School.
12      Q.    Now, one thing I want to ask
13  you to do, both for my sake and for our
14  court reporter's sake.  I know throughout
15  this deposition we're going to refer to a
16  lot of Army terms, and say them slow or
17  spell them or do whatever you can to make
18  sure it gets on the Record clearly.
19      A.    It's B-N-C-O-C, Basic
20  Noncommissioned Officers Course.
21      Q.    Okay.  If you can, I know you
22  guys use a lot of abbreviations and stuff,
23  for purposes of this, if you could make sure

Page 16

1  and give us the full, plain spoken English.
2      A.    No acronyms?
3      Q.    Just define them before you
4  start using them.  Okay?
5      A.    All right.
6      Q.    Tell me, what is your Social
7  Security number?
8      A.    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.  Why?
9      Q.    You say why -- Why did I ask?
10      A.    Yes, sir.
11      Q.    Well, because I'm taking your
12  deposition.
13            And your driver's license
14  number?
15      A.    5068722.
16      Q.    Is that an Alabama license?
17      A.    Yes, sir.
18      Q.    Is it restricted in any way?
19      A.    Negative.
20      Q.    Okay.  You don't wear glasses?
21      A.    No, sir.
22      Q.    And I'm assuming -- We have
23  some other people here today, and I'm

4 (Pages 13 to 16)

Page 17

1 assuming one of them is your wife?
2    A.   Yes, sir.
3    Q.   Okay. And what is her name?
4    A.   Katherine.
5    Q.   Katherine with a K?
6    A.   K-A-T-H-E-R-I-N-E, Yun, Y-U-N,
7 Dees.
8    Q.   How long have y'all been
9 married?
10    A.   Twenty-two years.
11    Q.   And where is she from?
12    A.   Seoul, Korea.
13    Q.   And prior to Mrs. Dees that's
14 here with us today, have you ever been
15 married before?
16    A.   No, sir.
17    Q.   Do you and Mrs. Dees have any
18 children?
19    A.   Two.
20    Q.   What are their names?
21    A.   Nakita Ann, N-A-K-I-T-A, Ann,
22 common spelling, Dees; Meagan, M-E-A-G-A-N,
23 Ruth, common spelling, Dees.

Page 18

1    Q.   How old are Nakita Ann and
2 Meagan Ruth?
3    A.   Twenty-one and sixteen --
4 seventeen. She just had a birthday.
5    Q.   I assume those are the only
6 two children you have?
7    A.   Roger. Yes, sir.
8    Q.   Okay. Do you have other
9 relatives by blood or marriage that live in
10 Alabama?
11    A.   A lot of them.
12    Q.   You do?
13    A.   Yes, sir.
14    Q.   Tell me the names or towns
15 where they might live.
16    A.   Oh, God.
17    Q.   Let me explain why I'm asking.
18 At some point we may have to pick a jury in
19 this case, I don't want your cousin, aunt,
20 or uncle sitting on the jury.
21    A.   You're probably out then.
22 I've got relatives all over the state, all
23 the way up to South Carolina, Fort Bragg,

Page 19

1 all the way out to California.
2    Q.   I'm only interested in the
3 ones in Alabama.
4    A.   Well, I don't know.
5    Q.   You can give me their last
6 names, can't you?
7    A.   Yeah. Dees, Mobley,
8 Patterson, Bates, Peek. Heck I could go on
9 all day. I don't know.
10    Q.   How do you spell Peek?
11    A.   P-E-E-K.
12    Q.   I'm assuming this jury will be
13 drawn from people that live somewhere in
14 proximity to Montgomery. Do most of your
15 relatives live in and around Montgomery?
16    A.   I have some in Montgomery but
17 not most of them, no. Like I said, they're
18 scattered throughout the state.
19    Q.   The ones that live in
20 Montgomery, can you give me the names of
21 some of the ones that live in or around
22 Montgomery. By the way, I need you to
23 answer.

Page 20

1    A.   I'm trying -- She knows more
2 of my family than I do. I grew up in
3 Alabama, but all I do is work.
4    MR. KILBORN: You can't talk
5 to Katherine. He just wants to know what
6 you know.
7    A.   Distant cousins, no, I don't
8 know them.
9    Q.   I'm assuming you're a U.S.
10 citizen?
11    A.   Yes, sir.
12    Q.   Did you graduate from high
13 school?
14    A.   Clay County High School,
15 Ashland, Alabama.
16    Q.   And when did you graduate?
17    A.   May '83.
18    Q.   And did you go to college?
19    A.   Some college.
20    Q.   Where?
21    A.   Didn't graduate. Through the
22 military, University of Maryland, Wallace
23 Community College in Selma, and J.P. Tech.

5 (Pages 17 to 20)

FREEDOM COURT REPORTING

Page 21

1    Q.    J.P. Tech?
2    A.    Yeah. It's Faulkner now, I
3    believe.
4    Q.    Say that again.
5    A.    They changed the name to
6    Faulkner.
7    Q.    Faulkner Tech?
8    A.    I'm not sure what it is. It
9    was John Patterson Technical College when I
10    went there.
11    Q.    Okay. You mentioned one in
12    between the military University of Maryland
13    and J.P. Tech, what was that?
14    A.    Wallace Community College,
15    Selma.
16    Q.    And you did not get a degree
17    from any of those three institutions?
18    A.    No, sir.
19    Q.    And what did you study at the
20    military University of Maryland?
21    A.    It wasn't military. It was
22    the University of Maryland, when I was in
23    the military.

Page 22

1    Q.    Got it.
2    A.    Just core, basics, science,
3    English, math.
4    Q.    And at J.P. Tech or Faulkner?
5    A.    Maintenance program.
6    Q.    How much time did you spend at
7    the University of Maryland?
8    A.    I don't know. Depends on how
9    often I was deployed. I don't know, maybe a
10    year. I don't know. I mean, it was off and
11    on. It wasn't on a campus. Military brings
12    instructors in to the bases and the posts,
13    and you'll meet at a building there. And I
14    had a certified college instructor, and
15    that's where you had the classes. I was
16    never on the campus, except for J.P. Tech
17    and Wallace.
18    Q.    What kind of maintenance did
19    you study at J.P. Tech?
20    A.    Hydraulics, pneumatics,
21    electrical, blueprint reading, basic
22    maintenance technician studies.
23    Q.    Okay. What about --

Page 23

1    A.    Wallace was welding.
2    Q.    In welding, can you get some
3    sort of certification for that?
4    A.    Yes, sir, if you stay there
5    the whole two years.
6    Q.    All right.
7    A.    I had a family to feed, I
8    couldn't afford to stay there the whole two
9    years.
10    Q.    So you did not become
11    certified?
12    A.    No, sir.
13    Q.    And you're doing some welding
14    now at the Prattville mill?
15    A.    When it -- When it arises,
16    yes, sir.
17    Q.    Okay. Is that something that
18    you would need to be certified for?
19    A.    I got certified through one of
20    the companies I worked for. But as far as
21    actual certification, unless you're welding
22    on a boiler, or any type of military
23    equipment, stuff like that, no, you don't --

Page 24

1    If it's a pressurized vessel, you need a
2    certification; if it's not pressurized or
3    done to code -- some code you can get by
4    welding without a certification, like on
5    water tanks and stuff, you just have be able
6    to pass X-rays.
7    Q.    Okay. But now you're
8    certified?
9    A.    Well, I don't know if it is
10    still current or not to be honest. It was
11    before I went to work for Hyundai.
12    Q.    Who were you working with?
13    A.    Sim-Cala.
14    Q.    Sim-Cala. Other than the
15    schooling you got at University of Maryland,
16    J.P. Tech, Wallace Community College in
17    Selma, have you attended any other classes
18    or seminars since you got out of high
19    school?
20    A.    Just the classes that
21    International Paper sent all their
22    maintenance people to.
23    Q.    Okay. What was that?

6 (Pages 21 to 24)

Page 25

1    A.    Well, I mean, same thing. We
2  got precision skilled craftsman classes,
3  it's a forty- or eighty-hour class, I can't
4  remember. Same thing, hydraulic classes,
5  welding classes.
6    Q.    And did IP pay for that?
7    A.    Yes.
8    Q.    And did they pay you for your
9  time away from work or how did that work?
10    A.    Instead of going to work, we
11  went to the schools.
12    Q.    You got paid for the time?
13    A.    Yes, sir.
14    Q.    And how many hours was that?
15    A.    Altogether at different
16  schools, I have no idea. I mean, skilled
17  craftsman class was just one school. We
18  went to the same thing just like J.P. Tech,
19  blueprint reading classes, hydraulics. It
20  could go anywhere from a day to two or three
21  weeks, depending on what class it was. That
22  was several years back.
23    Q.    That was at -- I think you

Page 26

1  worked at International Paper before you
2  came to Hyundai?
3    A.    Yes, sir.
4    Q.    Okay. Let's go back and talk
5  about your employment history before
6  Hyundai. Do you remember when you started
7  with Hyundai?
8    A.    It was either 19 or 21
9  November '05.
10    Q.    All right. Let's walk
11  backwards. Where were you working until
12  November of '05?
13    A.    International Paper, Thorsby.
14    Q.    I'm sorry?
15    A.    I was at a different mill than
16  I am now. I was at the Thorsby mill.
17    Q.    How do you spell Thorsby?
18    A.    T-H-O-R-S-B-Y.
19    Q.    How long were you at the
20  Thorsby mill?
21    A.    Six years.
22    Q.    Do you remember -- So you
23  would have started in '99?

Page 27

1    A.    I believe so.
2    Q.    And during the time period
3  that you were at the Thorsby mill, what did
4  you do?
5    A.    I started out as just a
6  regular maintenance man. And when I left, I
7  was a maintenance leadman.
8    Q.    And what does a maintenance
9  leadman do?
10    A.    Schedules the work for all the
11  other shifts, for the -- all four
12  maintenance shifts we had; I was in charge
13  of the major projects; I basically handled
14  everything while the supervisor just took
15  care of all the paperwork.
16    Q.    Okay.
17    A.    All the major calls, I'd
18  respond to the major breakdowns, decide what
19  action we was going to take, let the
20  supervisor know what was going on, and go
21  from there.
22    Q.    Was that similar to what you
23  were doing at Hyundai?

Page 28

1    A.    No, sir.
2    Q.    Okay. How was it different?
3    A.    At Hyundai I was just a
4  regular maintenance technician.
5    Q.    You said you had done regular
6  maintenance at the Thorsby mill also?
7    A.    Yes, sir.
8    Q.    Was what you were doing at the
9  Thorsby mill consistent with what you were
10  doing at Hyundai?
11    A.    Yes, sir.
12    Q.    Tell me what you were doing at
13  the Thorsby mill as a regular maintenance
14  person?
15    A.    Same thing, answer calls; work
16  orders that came down, I'd handle them;
17  breakdowns; break-ins; welding; hydraulics;
18  pneumatics; electrical; just regular
19  maintenance work.
20    Q.    But what you were doing at the
21  Thorsby mill was essentially the same as
22  what you were later doing at Hyundai?
23    A.    Yes, sir. Basically.

7 (Pages 25 to 28)

Page 29

1    Q.   How much were you getting paid
2  at Thorsby mill for maintenance?
3    A.   Fifteen -- No.  I topped out
4  -- I went to the pay for skills program, it
5  was eighteen something.
6    Q.   Per hour?
7    A.   Yes, sir.  I started out at
8  fifteen, and topped out at eighteen
9  something.
10    Q.   And what about as a
11  maintenance leadman?
12    A.   Twenty dollars, little over
13  twenty dollars.
14    Q.   How long did you work as a
15  maintenance leadman?
16    A.   Approximately three years, I
17  believe.  I think.  I'm not sure.
18    Q.   Okay.  Who -- As a -- When you
19  were a regular maintenance tech, who was
20  your supervisor?
21    A.   John Allen.
22    Q.   Allen?
23    A.   A-L-L-E-N.

Page 30

1    Q.   And when you were a
2  maintenance leadman, who was your
3  supervisor?
4    A.   John Allen.
5    Q.   What was his role?
6    A.   He was a maintenance
7  supervisor on the old part of the mill.
8  There was two parts to the mill, we had an
9  old part and a new part, and he had
10  everything on the old side.
11    Q.   Okay.  And how much -- When
12  you started at Hyundai, what were you making
13  per hour?
14    A.   Nineteen fifty-six.
15    Q.   What were you making when you
16  left?
17    A.   Twenty-three thirty-five.
18    Q.   And what were the
19  circumstances of you leaving the Thorsby
20  mill?  Why did you leave?
21    A.   Go to work for Hyundai.
22    Q.   Okay.
23    A.   That was a -- That was the job

Page 31

1  to have, better benefits.  Had better
2  benefits there than any place I've ever had,
3  even in the military.
4    Q.   Okay.
5    A.   Better pay.  Like I say, that
6  was the job to have.
7    Q.   When you say job to have, you
8  mean generally in the community, or just for
9  you personally?
10    A.   No.  Everywhere around where I
11  lived, it was either Mercedes or Hyundai,
12  everybody was wanting to go to one of the
13  two.
14    Q.   Okay.
15    A.   They both had outstanding
16  benefits, the work conditions weren't near
17  as rigorous as what we had.  It was in a
18  controlled environment, air conditioned in
19  the summer, heated in the winter.  And pay,
20  pay was a lot better than any wood yard you
21  were going to work on.
22    Q.   Okay.  Did you know anybody
23  that was working for Hyundai before you went

Page 32

1  to work there?
2    A.   Yes, sir.  A couple of
3  production people from the mill I worked at
4  had gotten jobs down there in production.
5    Q.   Who was that?
6    A.   Lamar Powell; I can't remember
7  Mike's last name.  Mike somebody, I can't
8  remember his last name.  And another guy we
9  called him Scooby, I don't know his real
10  name.
11    Q.   Okay.  Scooby?
12    A.   Yes, sir.
13    Q.   Okay.  Did you talk to Lamar
14  Powell or Mike or Scooby about coming to
15  work for Hyundai before you came?
16    A.   No, sir.  When we left the
17  plant -- They probably left the plant six
18  months before I got hired on there.  The
19  hours they were working, nobody talked to
20  them.
21    Q.   Okay.  They were working --
22    A.   Long hours.
23    Q.   Okay.  What -- Once you came

8 (Pages 29 to 32)

FREEDOM COURT REPORTING

Page 33

1  to work for Hyundai, did you talk to Lamar
2  Powell or Mike or Scooby?
3       A.    Scooby, no.  Lamar and Mike, a
4  couple of times.
5       Q.    Okay.  Did you talk to them
6  about your military career or uniformed
7  service or anything like that as --
8       A.    They asked was I going back to
9  Iraq any time soon, and I told them I didn't
10  know.
11      Q.    Okay.  Anything else y'all
12  talked about in terms of your military
13  career?
14      A.    Asked me was I still in, yeah.
15      Q.    I assume they were not members
16  of the Guard?
17      A.    No, sir.
18      Q.    Did you talk to them about
19  Greg Prater at all?
20      A.    No, sir.
21      Q.    Did you talk to them about
22  Kevin Hughes at all?
23      A.    No, sir.

Page 34

1       Q.    Did you talk to them about
2  John Applegate at all?
3       A.    I don't think so.
4       Q.    Okay.
5       A.    I'd see them -- They worked
6  production, they was on the line.  You may
7  get to talk to them a minute at the most,
8  because they don't stop the line.  Because
9  if the line stops, it ain't good.
10      Q.    Okay.  And going back to your
11  employment history, let's talk about your
12  work prior to going to IP at the Thorsby
13  mill.  Where did you work before that?
14      A.    Sim-Cala.
15      Q.    And what did you do at
16  Sim-Cala?
17      A.    Maintenance.
18      Q.    And when you say maintenance,
19  were you doing basically the same thing you
20  were doing as a regular maintenance person
21  at the IP Thorsby mill?
22      A.    Yes and no.  It was a foundry.
23      Q.    And what were you doing there?

Page 35

1       A.    At the foundry?
2       Q.    Uh-huh.
3       A.    Maintenance.  It was more
4  welding than anything.
5       Q.    Okay.  And give me your dates
6  of employment at Sim-Cala.
7       A.    I don't know.  I mean, I don't
8  know.  That was years ago.
9       Q.    Okay.
10      A.    I don't know.
11      Q.    Okay.  Do you remember who
12  your supervisor was?
13      A.    Huh-uh.  I can't remember his
14  name.  He was a short fellow.  I can't
15  remember his name.
16      Q.    Okay.  Did you have any sort
17  of on-the-job training with Sim-Cala?
18      A.    Yeah.  They're the ones that
19  sent me to J.P. Tech.  You had to go to J.P.
20  Tech.  And, no, I wasn't paid.
21      Q.    Did they send you at night?
22      A.    Yes, sir.  I had to complete
23  my ten-hour work shift, then go to school.

Page 36

1       Q.    Okay.  And what was the reason
2  for the termination of the position at
3  Sim-Cala?
4       A.    Wasn't termination.  I quit --
5  left there to go to International Paper.
6       Q.    Why?
7       A.    Better pay.  I mean, make a
8  better living for my family.
9       Q.    Anything other than better
10  pay?
11      A.    Yeah.  We didn't have good
12  insurance.  I mean, that was -- Sim-Cala was
13  a rough job.  I mean, it was a rough job.
14  Even in the winter time, it was a
15  hundred-some-odd degrees in the plant.
16  Don't nobody want to work there.
17      Q.    Okay.  Is it still in
18  business?
19      A.    I have no idea.
20      Q.    Where was Sim-Cala?
21      A.    Off the Mt. Meigs exit here in
22  Montgomery.
23      Q.    Mt. Meigs?

9 (Pages 33 to 36)

FREEDOM COURT REPORTING

Page 37

1    A.    Uh-huh.
2    Q.    And prior to Sim-Cala, where
3  did you work?
4    A.    Miller Mechanical.  It is a
5  company out of New York.
6    Q.    What did you do for them?
7    A.    Worked shutdowns in paper
8  mills.
9    Q.    So you traveled for that?
10    A.    Yes, sir.
11    Q.    Were you married then?
12    A.    Yes, sir.
13    Q.    Imagine that was rough?
14    A.    Yes, sir.
15    Q.    How long were you with them?
16    A.    Several years.
17    Q.    Do you remember what years?
18    A.    No, sir.  To be honest, no.
19    Q.    And what -- you say you did --
20  you traveled and did shutdowns for Miller
21  Mechanical?
22    A.    Yeah.
23    Q.    Tell me what that involved.

Page 38

1    A.    We worked in the pulp
2  divisions.  We did everything from changing
3  out motors, pumps, welding in the digesters,
4  changing screens out.  Anything to do in the
5  pulp division, we did it.
6    Q.    Okay.  And prior to Miller
7  Mechanical, do you remember where you
8  worked?
9    A.    I think it was just military
10  there.
11    Q.    Just in the military?
12    A.    Yes, sir.
13    Q.    Okay.  Mr. Dees, let me give
14  you what we have been provided by your
15  attorneys.  I'm assuming this is your
16  resume?
17    A.    Yes, sir.
18    Q.    If you see down at the bottom
19  it says Dees V. HMMA 00013.
20        MR. KILBORN:  Do you want to
21  go ahead and mark it.
22        MR. JOHNSON:  Yeah, let's go
23  ahead and mark it.

Page 39

1            (Whereupon, Defendant's
2            Exhibit No. 1 was marked
3            for identification.)
4            (Off-the-Record discussion
5            was held.)
6    Q.    Mr. Dees, what we've marked as
7  Exhibit 1 to your deposition, you agree
8  that's your resume?
9    A.    Starting at the top?
10    Q.    Sure.
11    A.    All right.  Projective,
12  employment with Hyundai Corporations --
13    Q.    No.  No.  No.  You don't have
14  to read it.  Just look at it and tell me if
15  that is what it looks like.
16    A.    Yes, sir.
17    Q.    That was your resume?
18    A.    Yes, sir.
19    Q.    And to your knowledge, was
20  that the one that you submitted to Hyundai
21  when you applied?
22    A.    Yes, sir.
23    Q.    Okay.  That's all I've got to

Page 40

1  ask on that one.
2        All right.  Mr. Dees, let's
3  talk a little bit about your background in
4  the military.  I think you said your
5  employment prior to Miller Mechanical was
6  basically in the military.  So let's take
7  it, I guess, from the bottom.  You got out
8  of high school and went in the military?
9    A.    No, sir.  I went to basic
10  training before I ever graduated.  Army
11  Basic Training, Fort McClellan, Alabama.
12    Q.    Okay.  And when did you do
13  basic?
14    A.    Summer of '82.  Between my
15  junior and senior year of high school.
16    Q.    Okay.  And is Fort McClellan,
17  is that an Army base?
18    A.    Yes, sir.
19    Q.    And so then you did basic
20  training in the summer and then went back
21  and finished high school?
22    A.    Yes, sir.
23    Q.    Okay.  Then when you got out

10 (Pages 37 to 40)

FREEDOM COURT REPORTING

Page 41

1   of high school, did you go back into the
2   Army?
3       A.    No, sir. I went to basic
4   training for the Army National Guard.
5       Q.    That's what you did in the
6   summer of '82?
7       A.    Yes, sir.
8       Q.    Okay. Well, talk me through
9   your military career, starting the summer of
10  '82.
11      A.    Summer of '82, basic training,
12  Fort McClellan, Alabama.
13      Q.    Okay.
14      A.    Summer of '83, Lackland Air
15  Force Base. Left the guard, went to the Air
16  Force. Army wouldn't let me be an MP and
17  that's what I wanted to do, that or
18  infantry, and they wouldn't let me go either
19  one so I went to the Air Force. Went to the
20  Air Force as an MP school.
21      Q.    Okay. When did you do that?
22      A.    '83.
23      Q.    All right. Did you have to do

Page 42

1   basic training for the Air Force too?
2       A.    No, sir. I'd have probably
3   got kicked out, probably.
4       Q.    Why is that?
5       A.    I can't fold clothes in
6   sixteen squares.
7       Q.    Okay. So you did the MP
8   school in '83?
9       A.    Yes, sir.
10      Q.    Okay. How long did that take?
11      A.    Eight weeks, I believe.
12      Q.    What did you do after that
13  eight weeks?
14      A.    Ground combat skills training.
15      Q.    Where?
16      A.    Camp Bullis, Texas.
17      Q.    How do you spell that?
18      A.    C-A-M-P B-U-L-L-I-S.
19      Q.    How long did ground combat
20  skills training take?
21      A.    I don't know. Around eight
22  weeks, I think. Six, eight weeks, I don't
23  know.

Page 43

1       Q.    Okay.
2       A.    M-60 machine gun nonspecialist
3   school, then M-60 machine gun specialist,
4   that was another four weeks.
5       Q.    The machine gun nonspecialist
6   school?
7       A.    Was two weeks. And the
8   specialist school was two weeks. Four weeks
9   to be a machine gunner.
10      Q.    Where was this school?
11      A.    Camp Bullis.
12      Q.    And the specialist school was
13  also at Bullis?
14      A.    Camp Bullis.
15      Q.    And that took four weeks?
16      A.    Four weeks for the total of
17  both of them, two weeks apiece.
18      Q.    Then after you completed the
19  machine gun specialist school, what did you
20  do?
21      A.    Went to Lackland Air Force
22  Base, Florida.
23      Q.    What did you do there?

Page 44

1       A.    Went to school a lot, stayed
2   in the woods a lot; got certified on a
3   radar, Intoxilizer, Breathalizer; a lot of
4   exercises, deployment exercises in the
5   woods; and I worked a lot of gates.
6       Q.    All right. When you say you
7   were in school, I assume that was learning
8   stuff like how to operate radar, how to
9   operate Breathalizer?
10      A.    Competitions. I shot
11  competitions for the Air Force. Combat
12  competitions, peace keeper challenge.
13      Q.    Okay. And when you say you
14  were in the woods a lot, I assume that was
15  all training?
16      A.    Yes, sir.
17      Q.    Okay. What kind of training
18  were you doing?
19      A.    Ground combat skills.
20      Q.    Okay.
21      A.    I had some -- I had prior Army
22  training, and the Air Force don't really
23  have a lot of combat training so they

FREEDOM COURT REPORTING

Page 45

1  utilize on the other branches, Army and
2  Marine Corps combat courses. So that's why
3  I got stuck back in the woods.
4       Q.    When you say you worked a lot
5  of gates, does that mean doing security at
6  gates?
7       A.    Yes, sir.
8       Q.    I assume that's because you
9  were an MP?
10      A.    Yes, sir.
11      Q.    And technically were -- At
12  what point did you become an MP, when you
13  finished MP school in '83?
14      A.    Yes, sir.
15      Q.    All this other stuff, the
16  ground combat skills training, machine gun
17  training, that was all to sort of further
18  your education as an MP?
19      A.    Not really.
20      Q.    Okay.
21      A.    Air Force is responsible for
22  their own perimeter security, in the States
23  and overseas. And being as I had prior Army

Page 46

1  service, that's where I got stuck.
2       Q.    Why is that?
3       A.    Because they thought I was a
4  grunt, so I went back to being a grunt.
5       Q.    Okay. And how long were you
6  at Lackland?
7       A.    Approximately a year I
8  believe.
9       Q.    What year was that? Was that
10  in '83 or '84 or both?
11      A.    '84 to '85, I believe.
12  February of '84 to maybe February of '85,
13  January of '85. I don't know.
14      Q.    After Lackland, where did you
15  go?
16      A.    Korea.
17      Q.    How long were you in Korea?
18      A.    Twelve months.
19      Q.    1985 through '86?
20      A.    February of '85 to February of
21  '86.
22      Q.    What did you do in Korea?
23      A.    I was on the SWAT team there.

Page 47

1  I did a lot of SWAT recalls, worked town
2  patrol some, team spirit, got stuck in the
3  woods a lot, again. And that was it.
4       Q.    What are SWAT recalls?
5       A.    SWAT team. I was on the
6  military SWAT team. They call it a special
7  reaction team, SRT. That's their version of
8  the SWAT team.
9       Q.    And what did you do?
10      A.    I was an entry man, first one
11  in the door.
12      Q.    That would be like if there
13  was a hostage or crisis --
14      A.    Hostage situation, bank
15  robbery, anything you call a civilian SWAT
16  team for, that's what we was for.
17      Q.    Okay. And town patrol, is
18  that what it sounds like?
19      A.    Yes, sir.
20      Q.    I assume you just made sure
21  that other members of the military weren't
22  causing trouble, things like that?
23      A.    You worked strictly at night

Page 48

1  patrolling local towns, walking through the
2  bars, off-limits areas, make sure the GIs
3  wasn't in the off-limits areas, things of
4  that nature.
5       Q.    And you say you got stuck in
6  the woods some more, what were you doing,
7  training?
8       A.    Team spirit exercises and
9  training exercises.
10      Q.    What are team spirit
11  exercises?
12      A.    There was a big military
13  buildup in Korea around every February or
14  March to show military strength without
15  all-out war.
16      Q.    Okay. And that was the team
17  spirit exercise?
18      A.    Yes, sir.
19      Q.    Okay. What else did you do
20  while you were in Korea?
21      A.    Got married.
22      Q.    I guess that's a big deal?
23      A.    Yes, sir.

12 (Pages 45 to 48)

FREEDOM COURT REPORTING

Page 49

1    Q.    When did you get married?
2    A.    28 June '85.
3    Q.    My wife would be happy if I
4  could reel off those dates as quick as you
5  do.
6          Did y'all get married actually
7  in Korea?
8    A.    Yes, sir.
9    Q.    Anything else that you did
10  while you were in Korea?
11    A.    No. I don't know. That was
12  years ago. Maybe, maybe not. I don't know.
13  I don't remember.
14    Q.    All right. You came back to
15  the states in '86?
16    A.    Yes, sir. Fort Lewis,
17  Washington.
18    Q.    Fort Lewis?
19    A.    Yes. Tacoma, Washington.
20    Q.    That's an Air Force base?
21    A.    That's an Army post.
22    Q.    How did you get put on an Army
23  post?

Page 50

1    A.    Being an MP.
2    Q.    Okay. Did you serve as an MP
3  at Fort Lewis?
4    A.    Yes, sir.
5    Q.    How long?
6    A.    Was on a SWAT team three
7  years. Was on their SWAT team, completed
8  Washington State SWAT School, their state
9  certified school.
10    Q.    Those three years were 1986
11  through when?
12    A.    '89.
13    Q.    '89?
14    A.    March of '86 through May or
15  June of '89.
16    Q.    Okay.
17    A.    Germany.
18    Q.    You went to Germany after Fort
19  Lewis?
20    A.    Yes, sir.
21    Q.    Where in Germany?
22    A.    Bitburg Air Base,
23  B-I-T-B-U-R-G.

Page 51

1    Q.    How long were you at Bitburg?
2    A.    Three, three and a half years.
3  I don't know.
4    Q.    I assume your wife was
5  traveling with you at Fort Lewis and
6  Bitburg?
7    A.    Yes, sir.
8    Q.    And had y'all had any kids by
9  the time --
10    A.    My oldest daughter was born on
11  Fort Lewis, Madigan Army Medical Center.
12    Q.    How do you spell Madigan?
13    A.    M-A-D-I-G-A-N. And my
14  youngest daughter was born in Germany.
15    Q.    Okay. And when did you leave
16  Bitburg?
17    A.    August '92. August, September
18  '92, I'm not sure.
19    Q.    Now, around that time was
20  during, I guess, the first Gulf War?
21    A.    Yes, sir.
22    Q.    Were you deployed over in the
23  Middle East during that period?

Page 52

1    A.    Yes, sir. Desert Storm.
2  Desert Shield and Desert Storm. I was there
3  for both phases.
4    Q.    What were you doing during
5  Desert Storm?
6    A.    Combat patrols.
7    Q.    What did that involve?
8    A.    Security patrols, recons,
9  raids, ambushes, just basic combat patrol.
10    Q.    Where were you?
11    A.    Turkey, northern Iraqi border.
12  We traveled from -- what's the name of that
13  Air Force base? We traveled from some Air
14  Force base over the Turkish border, did
15  patrols and back. I don't remember the name
16  of the base.
17    Q.    Okay. What about -- Were you
18  anywhere else during Desert Storm?
19    A.    No, sir.
20    Q.    Okay. What about during
21  Desert Shield, what were you doing?
22    A.    Same thing. It all rolled one
23  into the other.

13 (Pages 49 to 52)

FREEDOM COURT REPORTING

Page 53

1  Q.  Same place?
2  A.  Only thing that changed for us
3  was the name.
4  Q.  Okay. How long were you over
5  in the Middle East?
6  A.  Little over three months.
7  Three months, I don't know. It wasn't long.
8  Air Force deploys three months. They're not
9  like the Army.
10  Q.  Okay. And then I assume you
11  came back to Bitburg?
12  A.  Yes, sir.
13  Q.  Okay. And then after Bitburg,
14  where did you go?
15  A.  Got out.
16  Q.  Got out of the Air Force?
17  A.  Yes, sir.
18  Q.  All right.
19  A.  Stayed out for a while and
20  joined the National Guard.
21  Q.  Do you remember when you --
22  when you got out of the Air Force?
23  A.  30 November '92. Nine years,

Page 54

1  seven months, six days.
2  Q.  Okay. Now, did you get any
3  sort of retirement from the military?
4  A.  No, sir. I didn't -- I only
5  did -- I didn't do twenty years.
6  Q.  Okay.
7  A.  That's why I joined the
8  National Guard, finish it up and get my
9  retirement.
10  Q.  Okay. When did you join the
11  National Guard?
12  A.  I don't know. '93 or '94, I
13  don't know.
14  Q.  When you -- When you left
15  Bitburg and got out of the Air Force, did
16  you come back to Alabama?
17  A.  Yes, sir.
18  Q.  And is that when you started
19  working with Miller Mechanical?
20  A.  Yes, sir. After -- Well, I
21  signed up, took some welding classes first,
22  and then went to work for Miller Mechanical.
23  Q.  Where did you take your

Page 55

1  welding classes?
2  A.  Wallace.
3  Q.  Wallace. And you say it was a
4  couple of months before you joined the
5  National Guard?
6  A.  I don't know. May have been a
7  year. I don't know.
8  Q.  Okay.
9  A.  I don't know.
10  Q.  And you joined the Alabama
11  Army National Guard?
12  A.  Yes, sir. 2nd of the 117th
13  Field Artillery Battery.
14  Q.  And are you in a different
15  unit now?
16  A.  Yes, sir.
17  Q.  Okay.
18  A.  March 14th of '03 I was
19  involuntary transferred and extended to the
20  1165th MP Company. Deployed March 15th,
21  sent to Iraq for seems like forever; kept
22  getting extended, kept getting extended, I
23  had three extensions; then came back. I

Page 56

1  stayed with that company.
2  Q.  Okay. How long were you in
3  Iraq during that time?
4  A.  Seventeen, eighteen months. I
5  don't know.
6  Q.  When did you return? I assume
7  it was in 2004?
8  A.  Oh, it was in 2004. Late
9  2004. I think it was around August.
10  Q.  Okay. And what did the -- You
11  said you were in the 117th Field Artillery
12  Battery, what was their -- what were they
13  there for? What did they do?
14  A.  It was field artillery unit.
15  I was 13 Echo. It's called fire directional
16  specialist.
17  Q.  Which means what?
18  A.  Which means I -- The forward
19  observer sends me coordinates of where he
20  wants the rounds to go from the guns.
21  Q.  Okay.
22  A.  I take the wind velocity, the
23  -- The forward observer is looking at it,

14 (Pages 53 to 56)

Page 57

1  the view, from where the guns would be
2  looking at it; I plot everything on a map,
3  and I send the message to the guns, fire
4  mission, get ready to fire, I tell them what
5  to fire, how to fire it, when to fire it, at
6  what elevation, and what angle.
7      Q.    What kind of guns are you
8  talking about?
9      A.    105 Howitzers.
10     Q.    Okay.  And was that -- Were
11 you pretty narrowly focused with the 117th?
12     A.    Yes, sir.
13     Q.    Okay.
14     A.    What do you mean was I --
15     Q.    I mean, was that what you did?
16 Did you do anything else?
17     A.    No, sir.  Well, they changed
18 to a chemical company and I didn't -- I
19 don't like chemicals.
20     Q.    When did they change to a
21 chemical company, after you had gone to
22 Iraq?
23     A.    No, sir.  A few months before

Page 58

1  I left.  I don't remember.
2      Q.    Okay.  And when you say you
3  were involuntary transferred in March of
4  2003, how did that happen?
5      A.    They called me up, told me to
6  pack my bags, I was leaving the next day and
7  go, and I did.
8          I'm a soldier, I go where I'm
9  told to go, and fight where I'm told to
10 fight.
11         DET 1, 1165th, Detachment 1.
12     Q.    Okay.  What is the 1165th?
13     A.    Combat MP company.
14     Q.    Now, was that more consistent
15 with what you had done over in Korea and
16 with your prior training?
17     A.    Yes, sir.  That's the reason I
18 got pulled.  The state went through the
19 records, they didn't have enough people to
20 deploy, so I got pulled and sent with them.
21     Q.    Okay.  Tell me what you did
22 when you got to Iraq.
23     A.    Besides trying to stay alive?

Page 59

1      Q.    I'm assuming you did that.
2      A.    We conducted patrols to our
3  assigned sector of town, Baghdad at first.
4  My responsibility was the southeast side of
5  Baghdad.  Pretty good sector.  I had a
6  police station called Billot Police Station.
7  We was training Iraqi police, and helped
8  them set up their force protection, teach
9  them how to patrol, teach them how to
10 policeman.  At the same time we had to
11 conduct dismounted and mounted patrols of
12 the area, IED sweeps, raids, ambushes.
13 Basically you've got an MP on one side of
14 the fence, infantry on other side of the
15 fence, you combine them and you throw them
16 in.
17         We got in all-out ambushes so
18 bad that I had drivers thrown out of the
19 vehicles, men dying.  Went from there to a
20 town we called Little Fallujah, the name of
21 it was Latifiyah, thirty-five miles south of
22 Baghdad; we took it over from the Marine
23 Corps.  And it got its name Little Fallujah

Page 60

1  for a reason.  If you was going down there,
2  you were going to make contact.
3          And we stayed down there every
4  day.  We didn't have -- An army in a combat
5  zone, there is no such thing as a day off.
6  You work, you patrol.  We patrolled every
7  day.  Got -- Ran across I don't even know
8  how many IEDs, ambushes, going in kicking in
9  doors, taking the Iraqis out, taking them to
10 jail.
11         Train the Iraqi police so you
12 could fight them that night; train the Iraqi
13 army so you could fight them that night.
14         Left Latifiyah, went to First
15 Armored Division.  I was on Colonel Baker's
16 personal security detail.
17     Q.    Who is Colonel Baker?
18     A.    Second Combat Brigade Team,
19 First Armored Division, commander.
20     Q.    You were on his personal
21 security team?
22     A.    Yes, sir.
23     Q.    What did that involve?

FREEDOM COURT REPORTING

Page 61

1    A.    Everywhere he wanted to go, I
2  had to make sure he made it there safely. I
3  mean every day he -- He was a jam-up
4  commander: He took care of his solders and
5  he knew his solders.
6          He traveled all over Iraq. He
7  had soldiers -- First Armored Division is a
8  big division, and he had a whole brigade
9  combat team, that's approximately
10 twenty-plus thousand soldiers. We'd go
11 anywhere up to a hundred miles from Baghdad.
12   Q.    Okay.
13   A.    His safety and welfare was my
14 responsibility. I'd make sure he stayed --
15 he was kept safe no matter where he went or
16 what he did.
17   Q.    And was that the last thing
18 you did when you were in Iraq?
19   A.    Yes, sir.
20   Q.    Okay. Since you -- Well, when
21 did you get back home from Iraq that second
22 time?
23   A.    Like I say, I think it was

Page 62

1  around August of '04. I'm not sure.
2    Q.    Okay. And beginning in --
3  Well, after August of '05, were you still a
4  member of the National Guard?
5    A.    Yes, sir. I still am.
6    Q.    Same company and everything?
7    A.    Yes, sir.
8    Q.    Okay. What is your current
9  rank?
10   A.    Staff sergeant, E-6. Until a
11 few months from now, and I'll be promoted to
12 an E-7.
13   Q.    What's the difference between
14 E-6 and E-7?
15   A.    Pay.
16   Q.    Pay?
17   A.    Title, job title. I'll be
18 taking over -- Right now I'm a fill-in
19 platoon sergeant. Any time we deploy, I'm
20 in charge of a platoon. But when I get that
21 promotion, it will be officially on paper,
22 I'll take official command of that platoon.
23   Q.    Okay. Which platoon?

Page 63

1    A.    Third platoon.
2    Q.    What's the difference in pay
3  between E-6 and E-7?
4    A.    I don't know yet.
5    Q.    Okay. And when you -- When
6  you began back in 1983 at Lackland -- or at
7  Fort McClellan, what was your rank then?
8    A.    E-1.
9    Q.    E-1?
10   A.    Bottom of the totem pole.
11   Q.    And did you move from E-1 to
12 E-2?
13   A.    Yeah.
14   Q.    When was that?
15   A.    I don't know.
16   Q.    Do you remember when your
17 ranks changed, thinking back?
18   A.    No. Back then it didn't
19 matter. Until you hit E-5 in the military,
20 it don't matter.
21   Q.    All right. When did you hit
22 E-5?
23   A.    Right before we went to Desert

Page 64

1  Shield.
2    Q.    And to progress from E-5 to
3  E-6, does it take training, recommendations
4  from superiors?
5    A.    Takes training, takes certain
6  schools you have to have, takes
7  recommendations. There's a lot of
8  requirements you have to have. Your packet
9  goes up before the State board. I picked my
10 E-6 up in Iraq.
11   Q.    When was that, the second time
12 or first time?
13   A.    Second time. In Air Force you
14 don't get E-6 prior to ten years. It just
15 don't happen. Like I say, you got all these
16 E-9s on the State board looking at your
17 packet, your records, your recommendations,
18 whether you have the requirements. They
19 pick your record apart with a fine-toothed
20 comb.
21   Q.    What have you done to go from
22 E-6 to E-7?
23   A.    Same thing. This last school,

16 (Pages 61 to 64)

FREEDOM COURT REPORTING

Page 65

1  month-long school I've been in, was the last
2  requirement I needed to make E-7. And
3  really it's up to the State and my unit. My
4  unit, if they don't think you're ready,
5  you're not going to get it.
6      Q.    What was the last school you
7  attended?
8      A.    That BNCOC, Basic
9  Noncommissioned Officers Course.
10     Q.    Okay. Let's talk about that.
11     A.    All right.
12     Q.    Tell me more about that. What
13  is it?
14     A.    Well, you've got to know the
15  military legal system, as far as Uniform
16  Code of Military Justice; you've got to have
17  managerial skills; you've got to have -- I
18  mean, you spend two weeks in the field, so
19  your combat skills is tested big time.
20     Q.    During the school?
21     A.    Yes, sir.
22     Q.    And is it a month-long school?
23     A.    Well, I did two phases.

Page 66

1  There's three phases for my MOS, and each
2  one is two weeks long. And I did the second
3  and third phrases back to back.
4      Q.    All right. What was the first
5  phase?
6      A.    First phase is all basic
7  military knowledge, as far as your admin
8  side.
9      Q.    When did you do that?
10     A.    Last year. Last September, I
11  believe.
12     Q.    All right. When did you do
13  Phase II?
14     A.    I don't know. A month ago.
15     Q.    Okay. And you still have to
16  do Phase III?
17     A.    No, sir. I did Phase II and
18  III back to back.
19     Q.    Okay.
20         THE WITNESS: I need to take a
21  break if you don't mind.
22         MR. JOHNSON: That's fine.
23         (Recess taken.)

Page 67

1      Q.    Mr. Dees, going back on the
2  Record here. Just a couple other questions
3  about your military background.
4          You had mentioned that you
5  finished Phases II and III of BNCOC school.
6  How long did that take to finish II and III?
7      A.    Four weeks. That's mostly
8  field training.
9      Q.    Okay.
10     A.    All my -- I spent -- Like I
11  said, when I was seventeen, I went through
12  basic training. I come from a military
13  family, I've been a -- military is all I've
14  ever known. I don't have one blemish. I've
15  got letters of certificates, letters of
16  appreciation from full bird colonels; I've
17  got achievement medals, accommodation
18  medals; put in for a bronze star in Iraq.
19  You can ask any of my soldiers, Sergeant
20  Barnes, my soldiers that work for me, my
21  seniors, any of them, they'll attest to my
22  military background and my career.
23     Q.    Who -- And you mentioned

Page 68

1  Sergeant Barnes, is he one of your soldiers?
2      A.    He's my operation NCO, he
3  works for me. Sergeant Richberg, Sergeant
4  Martin.
5      Q.    Give me those names. You had
6  Sergeant Barnes?
7      A.    Sergeant Franklin D. Barnes.
8      Q.    He's your NCO?
9      A.    He's my operations NCO. He
10  works for me. He's the one that sent the
11  letter to Hyundai.
12     Q.    Did you tell him to send it?
13     A.    I went to the unit and
14  complained because I was being ordered to
15  give military orders for a drill weekend.
16  And Greg Prater knows -- He was in the
17  Guard, he knows you do not get military
18  orders for a drill weekend. I gave them a
19  schedule. Every time I hire on with an
20  employer, I tell them up front, I'm in the
21  National Guard, is this going to cause a
22  problem.
23     Q.    Did you tell Hyundai that up

17 (Pages 65 to 68)

Page 69

1  front?
2      A.    I told Hyundai that up front.
3  I told International Paper, I told BE&K, I
4  told IP at Thorsby. I've always been up
5  front. You can ask my soldiers, you can ask
6  the people I -- Well, y'all's lawyer
7  interviewed my coworkers, they told him the
8  same thing. Leon Dees is honest. If he
9  screws up he will tell you. I may not be
10  perfect. I make mistakes just like the next
11  guy. But if I make one, I'll tell you. You
12  can go back to my employer at Thorsby, my
13  maintenance manager Danny Wyatt, I crashed
14  an eighty-five thousand dollar chipper. I
15  didn't know it. I went home that day, I
16  come back in, it was strowed all over
17  everywhere. They didn't have a clue what
18  happened to it. I knew what had happened.
19  I went up and I told them. I thought I was
20  fixing to get fired. But I told them
21  exactly what happened.
22          If I mess up, you can ask my
23  soldiers or anybody, if I mess up, I'm the

Page 70

1  first one to admit it.
2      Q.    You mentioned something that
3  was interesting to me. You said when you
4  got hired on by Hyundai, as with other
5  employers, you told them you were a member
6  of the National Guard.
7      A.    I gave Greg Prater my yearly
8  schedule, year in advance we get our
9  schedules, every October.
10      Q.    Let me make sure you
11  understand my question. I assume what
12  you're talking about with Greg Prater, he
13  wasn't the one that hired you, was he?
14      A.    Danny Blue interviewed me.
15  And I told Danny Blue I was in the Guard. I
16  told him I was in the National Guard, was an
17  active member in the Guard and have a
18  commitment to the Guard.
19      Q.    And was Danny Blue -- Who was
20  he? Was he somebody that interviewed you
21  during the hiring process?
22      A.    Yes, sir.
23      Q.    And do you know what his role

Page 71

1  is at Hyundai?
2      A.    He's a maintenance assistant
3  -- maintenance manager or assistant
4  maintenance of the -- I'm not sure which
5  department. He's on the electrical side.
6  I'm not sure.
7      Q.    Do you know if he was in the
8  military?
9      A.    Danny Blue?
10      Q.    Uh-huh.
11      A.    I don't think so. I'm not
12  sure, but I don't think so.
13      Q.    That's fine. I don't know him
14  at all.
15          But you told him specifically
16  you were in the Guard.
17      A.    Yes, sir, I did.
18      Q.    And did he indicate that would
19  be a problem?
20      A.    No, sir.
21      Q.    Did he indicate that anybody
22  at Hyundai would have a problem with that?
23      A.    No, sir.

Page 72

1      Q.    Did he say anything about
2  whether Hyundai has policies that support
3  members of the Guard?
4      A.    Their handbook states that.
5  You've got a copy of their handbook, and it
6  states their military policy.
7      Q.    And you've got a copy of their
8  handbook?
9      A.    Yes, sir.
10      Q.    When you got a copy of the
11  handbook, did they get you to sign an
12  acknowledgement saying you received it?
13      A.    I don't remember. I don't
14  know. I may have, I may not. I don't know.
15          (Whereupon, Defendant's
16          Exhibit No. 2 was marked
17          for identification.)
18      Q.    Mr. Dees, this is an exhibit
19  we've marked as Exhibit Number 2. Do you
20  recognize that document?
21      A.    Let me read it and make sure.
22          This is it.
23      Q.    And I know that -- It appears

FREEDOM COURT REPORTING

Page 73

1  the date on that is January 10th of '06;
2  correct?
3      A.   Yes, sir. 10 January '06.
4      Q.   And is that your signature
5  down there at the bottom?
6      A.   Yes, sir.
7      Q.   And my assumption is, since
8  it's from January 10th, of '06, this wasn't
9  signed at the time you initially hired on;
10  correct? You hired on before '06; right?
11     A.   Yes, sir.
12     Q.   Do you know -- Do you recall
13  if you received a handbook at the time you
14  were hired and then they issued another
15  handbook later?
16     A.   No, sir. That was it. But
17  why was the '06 -- What was the original
18  number? Looks like 10 January '07 and then
19  the '06 is highlighted.
20     Q.   Okay. Do you know if that's
21  your handwriting or do you remember doing
22  that?
23     A.   I know -- I know they had a

Page 74

1  big push for everybody to sign that there,
2  because nobody had actually signed the --
3  They had a form in the handbook to sign, but
4  nobody had actually signed it.
5      Q.   Do you remember when they sent
6  this -- sent the acknowledgement around to
7  get people to sign it?
8      A.   To be honest, the exact date
9  or time, no.
10     Q.   Okay.
11     A.   But, mine says 10 January '07,
12  then the 7 is crossed out and the 6 is
13  highlighted.
14     Q.   Okay. And you don't recall
15  whether you did that or not?
16     A.   No, sir. Well, normally when
17  I do something like that, from my military
18  background, I initial it.
19     Q.   Okay. But I assume that's
20  your signature?
21     A.   That's my signature.
22     Q.   Okay.
23     A.   And that's my clock number.

Page 75

1      Q.   Your clock number?
2      A.   Old clock number.
3      Q.   Okay. And would it be fair to
4  state that possibly prior to that, you had
5  received a copy of the handbook?
6      A.   I received a copy of the
7  handbook when I hired on.
8      Q.   Okay.
9      A.   But like I said, this here, if
10  you look in the back of that handbook, or
11  the front, one, it's got this -- a statement
12  similar to this, or something in it --
13     Q.   Okay.
14     A.   -- and you're supposed to sign
15  it. And none of us signed it.
16     Q.   Okay.
17     A.   That's why they came out with
18  these.
19     Q.   Do you remember reading the
20  handbook when you first got hired on?
21     A.   All the way through?
22     Q.   Sure.
23     A.   No. Not all the way through.

Page 76

1  I mean I read bits and pieces and parts here
2  and there, yes, sir.
3      Q.   All right. Do you remember
4  reading the part about military leaves or
5  anything related to military training?
6      A.   Yes, sir, it is.
7      Q.   Do you remember what it says?
8      A.   It says that -- that you don't
9  have to use your vacation time in lieu of
10  your military training. Because that was a
11  big issue.
12     Q.   Okay. Was his name Danny
13  Blue?
14     A.   Yes, sir.
15     Q.   Okay. Did he say anything
16  else about Hyundai supporting members of the
17  military services or Guard with leaves?
18     A.   He said my being in the Guard
19  wouldn't have anything to do with me getting
20  hired.
21     Q.   Okay. And you did get hired?
22     A.   Yes, sir.
23     Q.   Okay.

19 (Pages 73 to 76)

Page 77

1     A.    But like I said, my military
2  career, they can -- they can look at
3  anything that they want to or talk to
4  anybody in my unit if they want to, I'd be
5  glad to let them.
6     Q.    My assumption is, your
7  attorneys have given us a number of
8  commendations and awards and things that
9  relate to your military service.
10    A.    Yes, sir. I've got
11 achievement metals out the ying-yang,
12 accommodation metals.
13    Q.    I'm assuming that you've
14 provided to your attorneys all of those that
15 are in your possession?
16    A.    Yes, sir.
17    Q.    Okay. Based on what you've
18 said and based on my review of your
19 accommodations and awards, my assumption is
20 you were never disciplined for anything
21 while you were in the military?
22    A.    No, sir. I had an outstanding
23 military -- I even took honor grad from a

Page 78

1  Marine Corps school.
2     Q.    Were you ever disciplined for
3  anything while you were with the National
4  Guard?
5     A.    No, sir. I know my job and
6  I'm very, very proud of the job I do, and
7  proud of the uniform I wear.
8     Q.    Okay.
9     A.    I've served my country two
10 different tours, combat tours, and I'm going
11 back again next year, and I'm going back
12 willingly.
13    Q.    Going back where?
14    A.    Iraq.
15    Q.    Do you know what you're going
16 to do when you go?
17    A.    Yes, sir, I do.
18    Q.    What are you going to do?
19    A.    Convoy security. Most
20 dangerous job you can have over there right
21 now.
22    Q.    Okay. When are you leaving?
23    A.    We won't know that until they

Page 79

1  feel we have the need to know. There's
2  three companies from my battalion going,
3  217th, 214th, 1165th.
4     Q.    And in addition to not being
5  disciplined while you were in the military,
6  I assume you were never court martialed for
7  anything?
8     A.    No, sir. No Article 15, no
9  letters of counseling, no letters of
10 reprimand. I come -- I know what my duty
11 is, and, like I said, I fulfill that duty.
12 I take care of my soldiers and my soldiers
13 take care of me. That's all I've ever
14 known, that's what I like, and I'm good at
15 it.
16    Q.    Now, earlier you used a term I
17 want to clear up, you said MOS, that stands
18 for Military Occupational Skill; correct?
19    A.    Yes, sir. I don't remember
20 using it, but that's what it stands for.
21    Q.    I think you used it.
22          Your military occupational
23 skill, would that be military police?

Page 80

1     A.    Yes, sir. That's one of them.
2     Q.    I don't know the answer to
3  this: Can people have more than one MOS?
4     A.    Yes, sir.
5     Q.    And do you have more than one?
6     A.    Yes, sir.
7     Q.    Okay. Tell me what yours are?
8     A.    13 Echo, field artillery, fire
9  direction control, FDC, fire direction
10 specialist. And 74 Delta. I ain't got a
11 clue what that is. It's in my records, it's
12 either chemical or signal one, I don't know.
13    Q.    13 Echo is that military
14 police?
15    A.    No, sir. That's artillery.
16    Q.    Okay. And is that all the
17 MOS's that you're aware of?
18    A.    Yes, sir.
19    Q.    Okay. Have you ever been
20 arrested for anything?
21    A.    No, sir.
22    Q.    Have you ever filed a worker's
23 compensation claim?

20 (Pages 77 to 80)

FREEDOM COURT REPORTING

Page 81

1      A.    No, sir.
2      Q.    Have you ever filed a Social
3   Security claim?
4      A.    No, sir.
5      Q.    Are you receiving any sort of
6   payments now for any sort of disability,
7   illness, short-term disability, long-term
8   disability, anything like that?
9      A.    When I came back from Iraq, I
10  had to have my shoulder operated where I
11  messed it up in Iraq.  I got, I think it
12  was, short-term disability through the IP, I
13  believe.  I'm not sure how it worked.  They
14  took care of everything.
15     Q.    All right.  What kind of
16  shoulder surgery did you have?  Did you have
17  a rotator cuff injury?
18     A.    Rotator cuff, lost the lining
19  in my shoulders, muscles.  Something to do
20  with the bone, I don't know.
21     Q.    What did you have done, do you
22  know?
23     A.    The muscles was completely

Page 82

1   torn off from the front or the back, one,
2   half way on the other side.  Like I say, I
3   lost the lining in my shoulder.  Something
4   else, I don't remember what the doc said.
5   He said it was screwed up.
6      Q.    Where did you have the surgery
7   done?
8      A.    Birmingham.
9      Q.    Birmingham?
10     A.    Yes, sir.  I ain't letting the
11  Army cut on me no more.  They've done it two
12  or three times, and every time it ain't gone
13  good.
14     Q.    Okay.  What were the other two
15  or three times for?
16     A.    When I was in Baghdad, they
17  cut me open in a make-shift hospital in the
18  middle of Baghdad to take my appendix out.
19  And I woke up with industrial staples in my
20  gut that I had to take out.  They cut my
21  wisdom teeth out up at Fort Lewis, and I
22  still don't have the feeling in my jaw.  So
23  I wasn't going for a third.

Page 83

1      Q.    Okay.  Is your shoulder back
2   where you can work fully at this point?
3      A.    Yes, sir.
4      Q.    Are you having any ongoing
5   problems that prevent you from working in
6   any way, shape, or form?
7      A.    No, sir.
8      Q.    Now, prior to today, to get
9   ready for this deposition, did you review
10  any documents?
11     A.    Just what Hyundai sent me, I
12  went over my military records.
13     Q.    Okay.  Anything -- When you
14  say just what Hyundai sent you, what was
15  that?
16     A.    I don't remember.  Benefits
17  packages, hire-on package, junk like that.
18     Q.    Okay.  Are you talking about
19  stuff we sent to your lawyer?
20     A.    Yeah.  Some statements from
21  Will Ware, I think.
22     Q.    Okay.
23     A.    Mostly it was all benefits,

Page 84

1   and hire-on package, and stuff from my
2   previous employers.
3      Q.    Okay.  Have you reviewed
4   anything else?
5      A.    No, sir.
6      Q.    Did you -- And, again, I'm not
7   -- I'm not going to ask you anything that
8   you talked to your lawyers about or asked
9   your lawyers or anything like that.
10          But other than your lawyers,
11  did you speak to anybody getting ready for
12  the depo?
13     A.    No, sir.
14     Q.    Did you review the complaint
15  that was filed?
16     A.    That my -- What do you mean?
17  Which -- That my lawyers filed?
18     Q.    Yes, sir.  To start the
19  lawsuit, your lawyers filed a summons and
20  complaint at the courthouse.
21     A.    Yes, sir.
22     Q.    Did you look at it getting
23  ready for today?

21 (Pages 81 to 84)

FREEDOM COURT REPORTING

Page 85

1    A.    I looked at it awhile back.  I
2  don't remember.  I've looked at it, yes,
3  sir.
4    Q.    But did you look at it to get
5  ready for today?
6    A.    I don't remember, to be
7  honest.
8    Q.    Okay.
9    A.    I talked to Bob yesterday
10  about some stuff, but I don't remember.  To
11  be honest, I don't remember.
12    Q.    Okay.  And when you say you
13  talked to Bob, are you referring to
14  Mr. Hall, who is here?
15    A.    Hall, yes, sir.
16    Q.    Okay.  And what did y'all talk
17  about?
18    A.    The paperwork that he had
19  drawn up, gone over, my records.
20    Q.    Did you review his expert
21  report with him?
22    A.    Yes, sir.
23    Q.    Okay.  Was there anything in

Page 86

1  his expert report that you disagreed with?
2    A.    No, sir.  I mean, I ain't no
3  accountant or no lawyer.
4    Q.    Okay.
5    A.    So did I understand
6  everything?  No, sir.
7    Q.    All right.  Was there anything
8  in his expert report that you asked him to
9  change in any way, shape, or form?
10    A.    I don't believe so.
11    Q.    Okay.  Other than reviewing
12  the report that he drafted, what else did
13  you do?
14    A.    That was about it.
15    Q.    When was that?
16    A.    I looked at Mr. Hall's report
17  yesterday.
18    Q.    Okay.  Did you speak with
19  anybody else that worked for Hyundai getting
20  ready -- prior to today getting ready?
21    A.    No, sir.  I mean, my
22  coworkers, they called me.  I mean, we're
23  friends.  We was tight, we was real close.

Page 87

1  Basically, I lived there more than I did at
2  home.
3    Q.    Okay.  Which -- I mean, when
4  was the last time you spoke to one of your
5  coworkers?
6    A.    Bornberg called me yesterday
7  evening I believe.  Yesterday sometime.
8    Q.    Who was that?
9    A.    Mark Bornberg.
10    Q.    What did he talk about?
11    A.    Just letting me know he was
12  going to Maplesville to cut a tree down for
13  one of my friends.
14    Q.    Did y'all talk about the
15  deposition or the lawsuit at all?
16    A.    No, sir.  He asked how it was
17  going, I said I don't know yet.
18    Q.    Have you talked to any of your
19  former coworkers about the lawsuit or this
20  deposition?
21    A.    They -- Some lawyers from
22  South Carolina interviewed -- had them all
23  at work, was going to interview them all one

Page 88

1  night.  And he interviewed three of them and
2  said he didn't want to talk to none of the
3  rest of them is the only thing they told me.
4    Q.    Who said that?
5    A.    Drake Barefoot.
6    Q.    And he said what now?
7    A.    Said that a lawyer told him
8  that they didn't have to talk to him, but
9  he'd like to ask them some questions.  And
10  he started interviewing them, and says he
11  interviewed the third one and come out and
12  told the rest of them to leave, that he
13  wasn't getting what he wanted.
14    Q.    Okay.  Who are the three that
15  you think were interviewed?
16    A.    I don't remember.  Drake told
17  me the names, but I don't remember who it
18  was.
19    Q.    Okay.  And that's Drake
20  Barefoot?
21    A.    Yes, sir.
22    Q.    Okay.  Did Drake tell you
23  anything else about the interview?

22 (Pages 85 to 88)

FREEDOM COURT REPORTING

Page 89

1    A.    No, sir. I didn't ask him
2  nothing else.
3    Q.    Okay.
4    A.    I didn't ask him that, but --
5    Q.    Did you talk to anybody else
6  about an interview?
7    A.    No, sir.
8    Q.    Other than Drake, do you know
9  anybody that gave an interview?
10    A.    Like I said, Drake came and
11  told me who all he talked to, but I don't
12  remember who it was. That's been a while --
13  few months ago, I guess.
14    Q.    Okay.
15    A.    Like I said, we was good
16  friends. Most of the time we just call each
17  other to pick on each other.
18    Q.    Okay. And other than that
19  discussion, after those interviews, have you
20  had any other talks with Drake about the
21  lawsuit or this deposition or anything like
22  that?
23    A.    No. Like I said, they'll call

Page 90

1  and ask, and I -- Like I said, I ain't no
2  lawyer and I don't know, so I just -- that's
3  the same thing I tell them, I don't know.
4    Q.    Okay. Have you talked to
5  anybody else at Hyundai, other than your
6  coworkers about this lawsuit?
7    A.    No, sir.
8    Q.    Or about this deposition?
9    A.    No, sir.
10    Q.    I assume you talked to your
11  wife before coming here today?
12    A.    I live with her, yes, sir.
13    Q.    Well, did you talk to her --
14  Again, remember I told you earlier some of
15  my questions don't make sense.
16          That made sense, but it wasn't
17  the right question. Did you talk to her
18  about this lawsuit or about your deposition
19  in preparation for today?
20    A.    I reckon, yes, sir.
21    Q.    Okay. Do you remember what
22  y'all talked about?
23    A.    No. I mean, she just said

Page 91

1  this -- her Korean culture, she just -- she
2  was nervous.
3    Q.    Okay.
4    A.    That was it.
5    Q.    Okay.
6    A.    She's scared of the Koreans.
7    Q.    Okay. Why is that?
8    A.    I mean, in Korea you don't
9  buck the system at all. Korean civilian
10  life is like military life, you don't -- you
11  don't go up against the system at all. If
12  they tell you to jump off a bridge, you jump
13  off a bridge and thank them half way down.
14    Q.    Okay. Other than your wife,
15  did you speak to any other family members
16  getting ready for the deposition?
17    A.    No, sir. I ain't had time.
18  I've been up at Fort McClellan for a month,
19  I came home Saturday. And she's always got
20  something for me to do around the house, so,
21  no.
22    Q.    I understand that.
23          Either in getting ready for

Page 92

1  the deposition or at any time during the
2  lawsuit, have you kept a journal or put
3  anything down in writing that might have
4  information relevant to the lawsuit?
5    A.    Have I kept a journal? No,
6  sir. I kept notes when I was at Hyundai,
7  and they were taken.
8    Q.    When you say you kept notes,
9  what were your notes like?
10    A.    I spent several years in the
11  military, I kept meticulous notes: dates,
12  times, places, specific comments.
13    Q.    What did you keep them on?
14    A.    Just blank copy paper.
15    Q.    Blank copy paper?
16    A.    Yes, sir.
17    Q.    What color copy paper, plain
18  white?
19    A.    Plain white paper.
20    Q.    Where did the blank copy paper
21  come from?
22    A.    Probably out of the copy
23  machine there.

23 (Pages 89 to 92)

Page 93

1    Q.    At work?
2    A.    Yes, sir. I mean, I don't
3 know. They gave us tablets to keep notes
4 on, to write daily logs on. So I don't know
5 where I got it from.
6    Q.    Did you ever keep anything on
7 a journal or a daily log?
8    A.    We had to fill out daily
9 reports there at the plant, yes.
10    Q.    Okay. And what did you do
11 with those reports?
12    A.    I turned mine in every day,
13 except for one day when I forgot to turn one
14 in and got in trouble for it.
15    Q.    Who did you turn it in to?
16    A.    We'd turn them in. There was
17 a box in the office we had to turn them in
18 to.
19    Q.    When you say the office, is
20 that like a maintenance office?
21    A.    Yes, sir. Every section has
22 their own maintenance office.
23    Q.    Okay. Did any of your

Page 94

1 coworkers ever see you writing on copy paper
2 or writing in a journal about what was going
3 on at work?
4    A.    Yes, sir.
5    Q.    Okay.
6    A.    I mean, they knew I had notes.
7    Q.    Who were they? Which ones?
8    A.    All of them. Everybody on my
9 shift and the other shift.
10    Q.    All right. Did they ever look
11 at them?
12    A.    No, I don't reckon so.
13    Q.    You don't remember ever
14 showing your notes to anybody?
15    A.    I don't reckon. No. No.
16    Q.    When you say they all knew
17 that you had them, what makes you say that?
18    A.    I mean, I told them.
19    Q.    Okay. Other than you telling
20 them --
21    A.    They seen that -- I kept them
22 in my jacket pocket. Wherever I went, they
23 went.

Page 95

1    Q.    But other than you telling
2 them that you had notes, did they ever --
3    A.    Yeah. I'd pull them out of my
4 pocket, and they asked me, you got your
5 notes? Yeah.
6    Q.    And were these notes related
7 to issues you were having with Greg Prater
8 or somebody else at the plant?
9    A.    Issues I was having period
10 regarding my military service.
11    Q.    Okay. Did you ever take your
12 notes home?
13    A.    Yes, sir. I'd take them home
14 and bring them back -- they'd stay with me
15 or either I'd lock them up in my locker.
16    Q.    And you kept them in your
17 pocket?
18    A.    Yes, sir.
19    Q.    Did you take any notes home
20 that are still at your home?
21    A.    No, sir. When I left, my
22 jacket was locked up in my locker, and I
23 wasn't allowed to even go to my locker. I

Page 96

1 was took out of there like a prisoner, like
2 a criminal. Prater went and got my jacket
3 and brought it back to me, and there was no
4 notes in the pocket.
5    MR. SPORT: For the Record,
6 Matt, we've asked y'all for those notes and
7 haven't gotten them.
8    A.    That's like this box here, I
9 don't know -- My locker stayed open,
10 unlocked, for two months after I was fired.
11 Then all of a sudden two months later they
12 come in and throw a lock on it for another
13 couple of months. Then they -- all of a
14 sudden they take the lock off again.
15    Q.    You say that it was unlocked
16 for two months?
17    A.    Yeah.
18    Q.    I assume you didn't go back
19 there to see it personally?
20    A.    No.
21    Q.    What makes you think it was
22 unlocked for two months?
23    A.    Bornberg told me. I asked him

Page 97

1  to look for my notes, and he said there's
2  nothing -- he said Kevin Hughes and Prater
3  had gone all through my locker.
4      Q.    Do you know -- Did Bornberg go
5  there the day you were terminated or the day
6  after?
7      A.    It was the day after. That
8  night I got terminated, I'd been at work an
9  hour -- I drove fifty-something miles to
10  work -- to work for an hour, didn't have a
11  clue I was being fired; got security guards
12  coming in with me, around my friends,
13  telling you, let's go. Like I said, I was
14  drug out like a criminal, and then that
15  lady, Wendy Warner, she was cold, short,
16  treated me like a piece of trash.
17      Q.    Okay.
18      A.    I've never been fired from a
19  job in my life.
20      Q.    And we're going to talk more
21  about Wendy Warner before the day is out.
22  The notes that you're talking about, how
23  much information was it? How many pages?

Page 98

1  One page, more pages?
2      A.    No. No. There was several
3  pages.
4      Q.    Several being what, two,
5  three?
6      A.    Probably three or four.
7      Q.    So.
8      A.    My military career, when it
9  started, I figured it would drop after my
10  unit sent the letter, but, no.
11      Q.    Okay.
12      A.    But it wasn't just Prater, it
13  was Applegate, it was HR. It wasn't one
14  individual, it was company.
15      Q.    What was Applegate doing?
16      A.    He basically told me -- I
17  asked him one time, I said: What about the
18  letter my unit sent? He said: Well, I
19  ain't worried about that letter; He said,
20  whatever Prater says, I'm going to back him
21  up. I've never heard Prater say anything
22  out of the way, which he was never around
23  Prater when Prater was in our shop; he sat

Page 99

1  up there in his office. He said however
2  Prater wants to run his shop, that's what
3  he's going to do and I'm going to back him
4  up.
5      Q.    Is that all that Applegate had
6  to say?
7      A.    Basically, yeah. Chewed me
8  out.
9      Q.    Chewed you out how?
10      A.    Told me that I needed to get
11  my act together. I mean, I got Guard duty,
12  I have a military obligation. I have to go
13  to that obligation. I'm going to go to that
14  obligation. Federal law protects me under
15  that obligation, but yet I'm still being
16  told that if I don't go to Guard duty and
17  don't show up to work, I'm going to be wrote
18  up for missing work.
19      Q.    When Applegate said "get your
20  act together," what was he referring to?
21      A.    I have no idea. I didn't ask
22  him.
23      Q.    Did John Applegate ever ask to

Page 100

1  see any military orders of yours?
2      A.    No. He just told me that he
3  backed Prater up on whatever he said.
4      Q.    Okay.
5      A.    HR did, yeah.
6          Well, I take that back. There
7  was a little girl from HR, her name was
8  Keisha, I don't know what her last name is.
9  This was after my unit had sent the letter.
10  Said that -- She come out quoting something
11  from the ESGR regulation and then saying
12  that I had to provide orders so many days
13  prior to, or something, I don't remember.
14  And I said no, the regulation states that I
15  can be deployed up to three months on a
16  verbal order.
17          And I said: Y'all have my
18  schedule a year advance. You've had it.
19  They got my updated version, which he turned
20  in. It got so bad that when I -- like, the
21  -- I went to BNCOC Phase I, I believe in
22  September, and I was deployed in support of
23  Katrina, I had to carry my orders to human

FREEDOM COURT REPORTING

Page 101

1  resources section myself, which y'all got
2  the papers somewhere in there where the HR
3  person had to sign off on me bringing my
4  orders up there, said manager not available,
5  because Prater wouldn't turn my orders in.
6  And you got Applegate and HR backing him up
7  on it, I'm against the wall. That's why I
8  kept notes.
9      Q.    I want to carve out Greg
10 Prater for just a moment.
11         In terms of Mr. Applegate, how
12 many discussions did you have with him that
13 had anything to do with your military
14 service?
15     A.    Two or three.
16     Q.    Two or three?
17     A.    I mean, every time I -- It was
18 several times, even after my unit sent the
19 letter. And he admitted to the letter being
20 there.
21     Q.    All right. Do you think it
22 was more than two or three or just two or
23 three?

Page 102

1      A.    I don't know. Like I said, it
2  was ongoing several, several months.
3      Q.    All right. So over a period
4  of several months, you had several
5  discussions with him?
6      A.    Uh-huh. And HR.
7      Q.    But I'm asking about Applegate
8  for now.
9      A.    Okay.
10     Q.    During the discussions that
11 you had with Applegate, did he ever demand
12 to see any orders of yours?
13     A.    I don't -- I don't think so.
14 I don't know. I don't remember.
15     Q.    Okay. You --
16     A.    He said I needed to get my
17 mind together and focus on the plant,
18 instead of -- How did he phrase it?
19         He came up with some elaborate
20 word and said I needed to basically just
21 don't worry about my Guard duty and stay at
22 work. I don't remember how he phrased it.
23     Q.    Do you remember when he said

Page 103

1  it?
2      A.    No.
3      Q.    How long before you were
4  actually terminated did your discussions
5  with Applegate take place? Was it back in
6  the fall?
7      A.    It started around the fall.
8  And it went on up through December and
9  January.
10     Q.    December and January?
11     A.    Uh-huh.
12     Q.    Did you have any problems
13 after January?
14     A.    With -- Yeah, I mean --
15     Q.    With Applegate, I'm sorry.
16     A.    With Applegate, yeah.
17     Q.    Okay. So it went past
18 December and January, is what you're telling
19 me?
20     A.    I believe it was in January, I
21 don't know. I don't remember the dates to
22 be exact. Like I say, they've got my notes,
23 that's got everything on it. They've got

Page 104

1  them somewhere. I didn't bring them out of
2  the plant.
3         Prater is the one that brought
4  my jacket to me, they was in the pocket. He
5  had keys to my locker. I had security
6  guards on me, I couldn't go back and get my
7  personal stuff. I had to give Prater my
8  keys to my locker and it stayed unlocked.
9  He unlocked it and it stayed unlocked. And
10 I was pushed out with security guards in
11 front of everybody, like I said, like a
12 common criminal.
13     Q.    During the time that you were
14 there, what kind of lock was on your locker?
15     A.    I don't remember. I think it
16 was just a little red Master lock.
17     Q.    Was it a keyed lock or
18 combination?
19     A.    It was a keyed lock. I had to
20 give Prater my keys to get in it.
21     Q.    Okay.
22     A.    He's the one who brought my
23 stuff to me. And all he brought was my

26 (Pages 101 to 104)

Page 105

1  jacket and a little MP3 player that they had
2  given us for Christmas.
3      Q.    Was he with anybody else?
4      A.    No. I mean, I had to -- Like
5  I said, I had to stay there with the
6  security guards.
7      Q.    Okay.
8      A.    And Applegate may have walked
9  around with him. I don't know, I was so
10 upset. I didn't --
11     Q.    When you came to work that
12 morning --
13     A.    That night.
14     Q.    I mean that night. -- had you
15 gone to your locker?
16     A.    Yes, sir. I mean that's where
17 my tools was at. I had to go to my locker,
18 get my tools out. And that's the first
19 thing we did was go get our tools, go out on
20 the floor and get back briefed and all for
21 the shift, any problems we had. And I
22 went -- I'd go to my area of responsibility,
23 which was SOPS.

Page 106

1      Q.    So at what point during that
2  evening were you pulled off the job?
3      A.    I'd been there probably thirty
4  minutes or an hour.
5      Q.    Tell me what you had done that
6  day so far.
7      A.    Nothing. Like I said, I come
8  in, went to my locker, got my tools.
9      Q.    Did you put your coat in your
10 locker?
11     A.    Yes, sir. Because it was warm
12 that night. And I went out on the floor.
13 Might have been Paul Powell and them I was
14 talking to, I don't know, somebody on the
15 other shift, to see if we had problems that
16 day. And then I went back up to my area.
17 And about -- They was having a problem or
18 something on the press, and I seen Mr. Moon
19 down there, and I come down and was talking
20 to him, and my fellow coworkers. Prater
21 come up and said we need to talk. I turn
22 around and walk off to the office and --
23 Applegate's office; he said no, no, around

Page 107

1  here. I walk around there, and there's the
2  security guards and John Applegate. I knew
3  what was going on, because I heard the
4  rumors, the war stories when they fire
5  someone. They bring security guards in and
6  try to bag and tag you and take you out. I
7  said, I can't believe this is happening. He
8  said no, no, we're just going to talk, you
9  ain't fired. I said, what's the security
10 guards doing here? No. No. We need to
11 talk. I said no, I know what's going on.
12 So I grabbed my radio, took it off, gave it
13 to Applegate, I think. I said, I'm going
14 back to go get my junk; I said I know y'all
15 are taking me to the gates, I'm going to get
16 my junk. No, you can't go back in there.
17 And the security guards come up. I said,
18 I've got personal stuff in there, I'm going
19 to get. No, you can't go get it. I said,
20 well, I'm not leaving without my gear. And
21 Prater said, well, I'll go get it, he said
22 give me your keys. So I handed him my keys.
23 Like I said, I was so upset, I don't

Page 108

1  remember if Applegate went with him or not.
2      Q.    Okay.
3      A.    Then they whisked me out with
4  security guards, took me around to the gate,
5  five miles from the parking lot I had parked
6  in, took me in the office, I walked in and
7  all the security guards are sitting there
8  bowed up, staring at me, walked me in a
9  little room. That lady sits me down,
10 introduces everybody, says her name, the
11 next fellow's name, Applegate's, and
12 somebody was sitting on my side of the
13 table, I don't remember. Held a letter up
14 like this (indicating), read it, slammed it
15 down on the table. I said, you're firing
16 me; I said, you've got a team leader in
17 there who's threatening several people
18 jumped up in their faces and you're firing
19 me and letting him stay. She said yes.
20     Q.    Who are you referring to?
21     A.    Wendy Warner, I guess. I
22 didn't know the lady.
23     Q.    No. Who is the team leader

27 (Pages 105 to 108)

FREEDOM COURT REPORTING

Page 109

1  you're referring to?
2      A.   Kevin Hughes. I mean he had
3  had several altercations.
4          Anyhow, she slammed the paper
5  face down on the table, got up and walked
6  out. She was just cold. The little short
7  fellow, I don't remember his name, she told
8  me his name. I mean, he was cordial, but --
9      Q.   What did he look like?
10     A.   I don't know. Just a little
11 short fellow, a little overweight. He
12 wasn't fat. I don't know.
13     Q.   Okay. You don't remember his
14 name?
15     A.   Huh-uh.
16     Q.   Did he wear glasses?
17     A.   I don't remember. I was --
18 like I said, I was upset. I've never been
19 fired, never had a blemish in my civilian or
20 military record. And here all of a sudden
21 I'm getting fired for something I didn't do.
22     Q.   Had Greg Prater brought you
23 your jacket yet?

Page 110

1      A.   Yeah. He brought it to me
2  before the security guards took me out.
3  Like I said -- and I asked them then, I said
4  all that's in here is the MP3 player. I
5  said, when am I going to get the rest of my
6  junk, in the vehicle on the way around
7  there. We'll mail it to you.
8      Q.   Did you -- When you were in
9  the room with Wendy Warner and the other
10 fellow that you were talking, and anybody
11 else that was in the room, did you tell
12 them, I've got more personal stuff in my
13 locker and I'd like to go get it?
14     A.   She -- Yes, sir.
15     Q.   You said that to Wendy Warner
16 and the other people?
17     A.   I asked was I going to be able
18 to get my tool bag and my other stuff. And
19 Applegate is the one that told me no, said,
20 you're not going back in the plant.
21         She slammed the paper down and
22 got up and left. And Applegate, he took my
23 keys to my personal safety lock, my lock,

Page 111

1  and he said here, here's your jacket.
2      Q.   Did you look in your jacket at
3  that point?
4      A.   I looked in my jacket when
5  Prater brought it to me.
6      Q.   Did you know that there were
7  notes missing?
8      A.   Yes, I did.
9      Q.   Did you say anything to
10 Applegate?
11     A.   That's when I said, can I go
12 back and get my stuff. No. Security guard,
13 they put me in the vehicle, we left. I
14 mean . . .
15     Q.   When you were in the room with
16 Wendy Warner and the other gentlemen,
17 including Mr. Applegate, did you tell them
18 that I have some notes that are missing?
19     A.   I asked them could I go back
20 and get my personal stuff, that's what I
21 asked Applegate, said my tool bag and my
22 personal stuff, like I said before.
23     Q.   But you never told them

Page 112

1  anything specific that you were missing
2  other than your tool bag?
3      A.   I said my personal stuff.
4      Q.   And you never mentioned any
5  notes?
6      A.   No. I didn't mention
7  specifically. I said my personal stuff,
8  like I said.
9      Q.   Is it your testimony that you
10 were aware at that point in time that your
11 notes were not in your jacket?
12     A.   Yes, sir. Like I said, Prater
13 went and got my jacket, so . . .
14     Q.   Did you ask Prater where your
15 notes were?
16     A.   I don't remember. Like I say,
17 I was mad. I was upset. I never had -- I
18 never had anything -- Like I say, I've
19 served my country and I've served it
20 proudly, and I've served it for a long time.
21     Q.   Okay.
22     A.   And I'll do it again, gladly.
23 And I've never, never been treated like I

Page 113

1    was a piece of trash like I was that night.
2    It was embarrassing. Then I have to go to
3    church on Sunday and look at my friends and
4    everybody knows, he got fired because he's
5    supposedly sleeping on the job. Everybody
6    is looking at you. No, that ain't right.
7        Q.    Where were you when you
8    realized that the notes weren't in your
9    jacket?
10       A.    There at the shop when they
11   brought me my jacket, like I said before.
12       Q.    How far is the shop from your
13   locker?
14       A.    My locker was in the shop. We
15   was on the outside of the shop. I wasn't in
16   the shop. He walked me from my area, around
17   the office, said go on around here. And we
18   went around the side of the shop.
19       Q.    Could you see your locker from
20   where you were outside the shop?
21       A.    No, sir. Block wall. And I
22   had the security guards there telling me I
23   couldn't go nowhere.

Page 114

1        Q.    Okay. And we're going to get
2    back to some of these issues, but I want to
3    cover some more basic stuff before we get
4    into it more deeply.
5             Have you ever filed any other
6    lawsuits?
7        A.    No, sir.
8        Q.    Have you ever filed any
9    administrative complaints like with the EEOC
10   or some sort of governmental entity?
11       A.    No, sir.
12       Q.    Have you ever been sued?
13       A.    No, sir.
14       Q.    And you may have shaken your
15   head, but I don't know if I heard you say
16   no --
17       A.    No.
18       Q.    You've not filed any EEOC --
19       A.    I filed -- When me and my wife
20   first came home from Germany, probably two
21   years after being home, I filed bankruptcy
22   because I didn't manage my finances right, I
23   was used to being in the Army and everything

Page 115

1    taken care of. The first two years kicked
2    my butt. After that, I haven't had a
3    problem since.
4        Q.    Okay. When was this you filed
5    bankruptcy?
6        A.    I don't know. You'll have to
7    -- I don't know. I'll have to get back with
8    you on that.
9        Q.    Right when you got back from
10   Germany, though?
11       A.    No, sir. It wasn't right --
12   It was like a year or two later. I don't
13   remember.
14       Q.    Where were you working then?
15       A.    I don't remember.
16       Q.    During the time that you were
17   with Hyundai, did you file any sort of
18   complaints with the HR department?
19       A.    Yes, sir. That's where I
20   started out. It, apparently, didn't do no
21   good.
22       Q.    All right. Let's talk about
23   the complaints. Did you file any written

Page 116

1    complaints?
2        A.    No, sir. There wasn't no form
3    -- a format for filing written complaints.
4    And when we tried, they didn't want to hear
5    it.
6        Q.    Okay. Did you ever talk to a
7    team relations representative about problems
8    you were having?
9        A.    Several times. Lucas Cooner
10   and Will Ware.
11       Q.    Will Ware?
12       A.    Yes, sir. And Lucas Cooner.
13       Q.    Anybody else with Hyundai?
14       A.    Greg Kimball.
15       Q.    Greg Kimball?
16       A.    And Keisha. I don't know what
17   -- I don't remember what her last name is.
18   She is no longer there. She went to Kia.
19   They moved her to Kia, in the HR department.
20       Q.    Can you think of anybody else
21   that you complained to?
22       A.    Other than the managers and
23   assistant managers, the production manager

29 (Pages 113 to 116)

Page 117

1 who said he was over Prater, Craig Stapley
2 and Jim Brookshire both.
3    Q.    And the production manager was
4 who?
5    A.    Craig Stapley --
6    Q.    Stapler?
7    A.    Stapley, S-T-A-P-L-E-Y.
8    Q.    All right. And what other
9 members of management did you complain to?
10    A.    That was about it, I reckon.
11    Q.    Just to make sure I'm clear,
12 you never submitted anything in writing to
13 human resources?
14    A.    There was no way to submit
15 anything in writing. When I complained they
16 didn't want to hear anything about it. I
17 submitted an e-mail to Greg Kimball about
18 Prater harassing me about my Guard duty, and
19 I never received a reply to the e-mail in
20 person or anything.
21    Q.    When you say the last time
22 Greg Prater harassed you about your Guard
23 duty --

Page 118

1    A.    Before I got fired.
2    Q.    Where did you send the e-mail
3 from?
4    A.    The maintenance shop.
5    Q.    All right. Was Greg Kimball
6 working at that time?
7    A.    I don't remember. I think it
8 was on -- I don't remember if it was on day
9 shift or night shift. I think it was on
10 night shift. But the e-mail, I mean, that
11 was probably a month before I'd gotten
12 fired, and he had plenty of time to respond.
13    MR. SPORT: Matt, we'd like to
14 request that e-mail, because I don't think
15 we have that.
16    (Recess taken.)
17    Q.    Mr. Dees, we're back on the
18 Record.
19    You had talked a minute ago
20 about an e-mail you sent to Greg Kimball.
21 Did you have a log-in ID and a password at
22 Hyundai?
23    A.    Yes, sir.

Page 119

1    Q.    What was your log-in?
2    A.    I don't know. That was a year
3 ago, almost. I don't know.
4    Q.    Okay.
5    A.    I have no idea. I think it
6 was my clock number, I think. I'm not sure.
7    Q.    Okay. Do you know when you
8 were assigned the log-in ID?
9    A.    It wasn't long after I was
10 hired. I'm not sure.
11    Q.    Was it after you were hired?
12    A.    Yeah.
13    Q.    Okay. So when you say you
14 sent an e-mail to Greg Kimball, would that
15 have been on an internal Hyundai system,
16 e-mail system?
17    A.    Yes, sir.
18    Q.    You didn't send it from
19 Yahoo --
20    A.    No, sir.
21    Q.    -- or Google e-mail or
22 anything like that?
23    A.    No, sir. It was on the

Page 120

1 Hyundai system.
2    Q.    And it was while you were at
3 work?
4    A.    Yes, sir.
5    Q.    And do you remember where you
6 sent it from?
7    A.    The maintenance shop. Stamp
8 and maintenance shop.
9    Q.    Anybody else see you send it?
10    A.    Drake Barefoot and someone
11 else was there. I don't remember who the
12 other one was.
13    Q.    Do you remember what was in
14 it?
15    A.    It was a -- I don't remember
16 the exact wording, no. I was complaining to
17 Mr. Kimball that Prater was still giving me
18 a hard time about my Guard duty, and I felt
19 that my job was in jeopardy for that reason.
20 Because even -- Like I said, even after my
21 unit sent the letter, I complained to HR at
22 least two more times and both times met with
23 negative results, and I was still getting

30 (Pages 117 to 120)

FREEDOM COURT REPORTING

Page 121

1   harassed about getting orders for my weekend
2   duty, when I wasn't showing up to work to go
3   to drill.
4       Q.    Was the e-mail after you went
5   to HR?
6       A.    Yes, sir.
7       Q.    And the e-mail was after
8   somebody apparently sent a letter to
9   Hyundai?
10      A.    Yes, sir. After my unit sent
11  the letter.
12      Q.    Okay. Did you talk to anybody
13  else in management or in HR after you sent
14  that e-mail?
15      A.    No, sir. I don't believe so.
16      Q.    Okay.
17      A.    I mean, I don't know. Like I
18  said, that was almost a year ago.
19      Q.    Okay. But you don't recall
20  it?
21      A.    No, sir.
22      Q.    Do you recall having any more
23  discussions with Greg Prater about your

Page 122

1   service or weekend duty or anything after
2   that e-mail got sent?
3       A.    He was always -- If he wasn't
4   telling me to bring in orders about my Guard
5   duty, he was making fun of what we did. Oh,
6   y'all just go down there and drink. Like I
7   said, it didn't matter who I complained to,
8   I complained to Greg Kimball, or Keisha,
9   John Applegate, they all: Well, I've never
10  heard Greg say anything like, I've never
11  heard Greg talk in a derogatory manner.
12      Q.    That's what they said?
13      A.    Yeah. And we back Greg up in
14  any decision he makes.
15      Q.    When you talked to William
16  Ware, who's with team relations, what did he
17  say about it?
18      A.    Prater would always use the
19  excuse that Rob Clevenger just said I can
20  do -- just like in the instance he was
21  trying to make me use my vacation for my
22  military service when I went to school.
23      Q.    Who was?

Page 123

1       A.    Prater. And supposedly
2   Applegate was backing him up, because
3   Applegate backed him on everything else, and
4   HR backed him too. And he told me I had to
5   use my vacation time -- He was thinking
6   about making me use my vacation time in lieu
7   of my military leave. And I said, well,
8   you're just going to go against the HMMA
9   handbook and throw it out the window. Rob
10  Clevenger told me I can do whatever I want
11  to, run my shop however I need to for the
12  benefit of the company.
13      Q.    And this is Greg Prater said
14  that?
15      A.    Yes, sir. Then he said that
16  Rob Clevenger had told him that.
17      Q.    Did John Applegate ever tell
18  him he could do that, to your knowledge?
19      A.    John Applegate told me to my
20  face that whatever decision Greg Prater
21  makes, he would back him on it.
22      Q.    Did anybody else from human
23  resources ever say anything like that, to

Page 124

1   your knowledge?
2       A.    Keisha -- Greg Kimball -- The
3   only reason HR got on to Prater the first
4   time was because he told us we couldn't talk
5   to HR. As far as my military obligation,
6   anything else, nothing ever came out of
7   that. It was just like I hadn't said
8   anything to them at all.
9           (Off-the-Record discussion
10          was held.)
11      Q.    The notes that you said you
12  kept?
13      A.    Yes, sir.
14      Q.    When did you start keeping
15  them?
16      A.    The first time I went to HR.
17  I mean, when Prater -- he was -- He said he
18  was a tank commander in the National Guard
19  as an E-4, that's not allowed. It goes
20  against Army regulation.
21      Q.    Say that again. I'm sorry.
22      A.    He said that he was a tank
23  commander in the National Guard as an E-4.

31 (Pages 121 to 124)

Page 125

1    He showed me his ID card one time, he was a
2    corporal, and his ID card was expired.  And
3    you're not allowed to be a tank commander in
4    the National Guard or the Army, period, as
5    an E-4.  You have to be an E-7 or higher.
6    But anyhow -- What did you ask me?  What did
7    I start out on?
8        Q.    No.  Let's -- I mean --
9        A.    Like I said, Clevenger and all
10   of them -- His excuse on everything was Rob
11   Clevenger told me I can run my shop how I
12   want to for the benefit of the company.
13       Q.    Okay.  Now, to your knowledge,
14   did Rob Clevenger ever say anything to you
15   about your military service?
16       A.    I never met the man.
17       Q.    So you don't have any
18   firsthand information --
19       A.    But Will Ware sat there and
20   told Prater, well, he can do whatever he
21   wants to, in front of me and everybody.
22       Q.    Said who can do whatever he
23   wants to?

Page 126

1        A.    That Prater could.  And that
2    Applegate and HR could.  He said we can run
3    the company however we want to.
4        Q.    William Ware said that?
5        A.    Yes, sir.  Because Prater put
6    him on the spot, and he had to come up with
7    an answer.
8        Q.    How did Prater put him on the
9    spot?
10       A.    Prater -- Because I was told
11   to stay over that morning.  Their handbook,
12   once again, states that you don't have to
13   stay over -- you can't be forced over ten
14   hours.  I'd worked ten hours, Prater come up
15   and asked questions.  I said as long as it
16   don't take over fifteen minutes, I'm tired.
17   He said, I can force you to stay here
18   twenty-four hours a day if I want to.  I
19   said, no, once again, that goes against your
20   own handbook.
21       Q.    What -- Is this a different
22   conversation here?
23       A.    Yeah.  Like I said he just --

Page 127

1    Everything was Rob Clevenger and human
2    resources and Applegate said I can do this.
3    And every time we talked to human relations
4    or human resources or Applegate, they backed
5    him up on every conversation.
6        Q.    Okay.  Tell me when did -- You
7    first started taking notes when?
8        A.    Like I said, the very first
9    time he got on to me about my Guard duty.  I
10   don't remember the exact date.  I have no
11   idea.
12       Q.    Do you remember the
13   approximate date?
14       A.    No.  I mean, August,
15   September, I don't know.  July, August,
16   September, I don't know.
17       Q.    At that point in time, did he
18   have your calendar for that year?
19       A.    He had my calendar when I
20   hired on.
21       Q.    Okay.
22       A.    We get our yearly training
23   calendar every October.

Page 128

1        Q.    Uh-huh.
2        A.    And he had it in his office on
3    his desk.
4        Q.    Greg Prater did?
5        A.    Yes, sir.
6        Q.    Okay.  So there would be no
7    question that if you were scheduled for
8    duty, he had it in advance?
9        A.    Yes, sir.
10       Q.    Okay.
11       A.    But yet he still wanted
12   military orders.  And I backed him up on it.
13       Q.    Did he want military orders
14   for every single weekend duty, every
15   training --
16       A.    Not the first six or eight
17   months, no, sir.
18       Q.    Okay.  When did he ask for
19   orders?
20       A.    Like I said, I don't remember
21   the exact date.  I don't know.  You're
22   wanting a date, and I can't give it to you.
23       Q.    Can you give me an approximate

32 (Pages 125 to 128)

Page 129

1  date?
2      A.    I already did.
3      MR. SPORT:  Matt, we've
4  produced those documents, those drill
5  schedules, but they've not been produced to
6  us from Hyundai's records, so we'd also like
7  those.
8      Q.    And, again, just to make sure
9  I'm clear, the year that you say that he
10  started demanding orders, that was in 2006?
11      A.    Yes, sir.
12      Q.    Okay.  Do you have any idea
13  approximately how many times Greg Prater
14  asked you for copies of your orders?
15      A.    I don't know.  Seems like it
16  was every month.  But to be honest, the
17  exact times, no.  I have no idea.
18      Q.    Do you remember when the last
19  time he asked you for a copy of your orders
20  was?
21      A.    No, sir.  Like I said, I don't
22  -- the exact dates and times, no, sir.  I
23  don't know.

Page 130

1      Q.    Okay.  Was there a period in
2  time from the date that you were terminated
3  in which you and Greg Prater did not have
4  any discussions about your Guard duties?
5      A.    I don't know.  I filed a
6  complaint to the ESGR.
7      Q.    When was that?
8      A.    I don't know.  I don't know if
9  it was right before I got fired or after I
10  got fired.  And they basically told me that
11  if Hyundai tells them it's not a military
12  matter, they don't have anything to do with
13  it.  And that's what happened, so that was a
14  deadend street.
15      Q.    Wait.  Who said that?
16      A.    The ESGR representative.  I
17  can't remember his name.  Dan or -- I don't
18  remember.  I e-mailed him and he e-mailed me
19  and he said -- then he called me one time
20  and said, well, I've called them, they told
21  me this has nothing to do with the Guard, so
22  therefore I cannot get involved.  And he
23  went off, all they got to do was a

Page 131

1  statement, no, this ain't Guard related, and
2  he was out of it.
3      Q.    All right.  You don't remember
4  who told you that?
5      A.    The ESGR rep.  I don't
6  remember his name, no.
7      Q.    Did he provide you any sort of
8  paperwork or anything?
9      A.    No, sir.
10      Q.    Do you know if Hyundai
11  provided him with any paperwork or evidence?
12      A.    No, sir.  He said that -- Per
13  the conversation, he said I called them, and
14  this is what was said, so I'm out of it.
15      Q.    Okay.
16      A.    So I don't know if they
17  provided him with paperwork or not.  I mean,
18  I have no idea.
19      Q.    Again, I just want to make
20  sure I understand what it is he said he was
21  told.  This didn't have to do with guard
22  duty?
23      A.    That's what they told him.

Page 132

1  That's what they're going to say.  That's
2  common sense.  I mean . . .
3      Q.    And to your knowledge, he
4  didn't know anything else?
5      A.    No, sir.
6      Q.    And you don't remember his
7  name?
8      A.    I think it was Dan something.
9  I don't know.  They've got -- They had
10  copies of the e-mails.  I don't know.
11      Q.    Who is they?
12      A.    Hyundai, I think.  I don't
13  remember.  I seen a copy of it somewhere.  I
14  don't know.
15          (Whereupon, Defendant's
16          Exhibit No. 3 was marked
17          for identification.)
18      Q.    Okay.  Let's go -- I want to
19  go through what we've marked as Defendant's
20  Exhibit 3, which is a copy of the complaint
21  that you and your lawyers filed.
22          If you go over a couple of
23  pages you'll see a page that's marked

33 (Pages 129 to 132)

FREEDOM COURT REPORTING

Page 133

1    complaint.
2        A.    All right.
3        Q.    Did you have an opportunity to
4    review it before it got filed?
5        A.    Yes, sir.  I believe so.
6        Q.    Okay.
7        A.    I believe.  I don't know.
8    Like I say, that's been a year ago.
9        Q.    Okay.  Let's turn to page two,
10   paragraph seven.  In there it says you began
11   working on or about November 21, 2005.  Do
12   you agree with that?
13       A.    Yes, sir.
14       Q.    Okay.  And it says you were
15   working as a maintenance technician in the
16   stamping maintenance department; is that
17   accurate?
18       A.    Yes, sir.
19       Q.    And were you working under the
20   direct supervision of Kevin Hughes, who is
21   identified as a team leader?
22       A.    Yes, sir, he was a team
23   leader.

Page 134

1        Q.    Okay.  And were you also
2    working under Greg Prater?
3        A.    Yes, sir.  He was the
4    assistant manager.
5        Q.    Okay.  And it's indicated in
6    here that Greg Prater reported to John
7    Applegate, is that your understanding?
8        A.    Yes, sir.
9        Q.    And who -- Do you know who
10   John Applegate is?
11       A.    As far as I know, he was the
12   only American in charge of the American side
13   of the maintenance.
14       Q.    What makes you think that
15   Prater was reporting to Applegate?
16       A.    Only thing we had -- That was
17   the way Applegate and Prater put it.
18       Q.    To who?
19       A.    All of us in the section.
20       Q.    Okay.  I mean, did you have
21   regular conversations with John Applegate?
22       A.    No, sir.  He had an office
23   over in the energy building, and we worked

Page 135

1    over in the stamping shop.
2        Q.    Okay.  So when did John
3    Applegate tell you anything about his
4    relationship with Greg Prater?
5        A.    As in?
6        Q.    His working relationship, who
7    reported to who?
8        A.    Well, the very first time I --
9    I believe it was the first time I went to
10   HR.  Then after HR, Applegate wanted to know
11   why we had gone to HR, I believe.
12       Q.    When you say "we went to HR,"
13   who are you talking about?
14       A.    I, myself, Barefoot, and
15   Weihe.
16       Q.    All right.  And what was that
17   about?
18       A.    It all started with me because
19   of Prater and my Guard duty.  Then it went
20   from that to he told -- I told him, I said,
21   well, I'm going to talk to HR about this
22   after this meeting.  He said HR is not in
23   your chain of command, you don't have the

Page 136

1    authority to talk to them.
2        Q.    Who said that?
3        A.    Prater.  I said -- Well, I
4    said, the handbook we're supposed to be
5    going by says HR has an open-door policy,
6    and I can talk to them any time.  And I
7    said, you're telling me my Guard duty is a
8    problem, I said, I'm going to talk to HR.
9    And Chris Weihe and Barefoot said, well,
10   we're going to talk to them too.  They had
11   their own issues.
12       Q.    Let me ask you this.  So you
13   sat down with Greg Prater and Chris Weihe?
14       A.    No.  He called the whole shift
15   in.  It started out about a schedule.  He
16   called the whole shift in, some goof up
17   about a schedule, the weekend.  They got a
18   force list, an overtime force list.  And he
19   would just take his force list and disregard
20   it, his own list, and that Applegate had
21   signed off on and HR had signed off on, and
22   threw it out the window and come out with
23   his own list.  I had Guard duty that

FREEDOM COURT REPORTING

Page 137

1  weekend, I said, I'm not going to be here.
2  He said, you're going to be here or you're
3  going to produce orders. I said, I'm going
4  to talk to HR.
5      Q.    Okay. And Chris Weihe and
6  Drake Barefoot were in on that discussion?
7      A.    The whole shift was.
8      Q.    Okay. And tell me more. What
9  else did Greg Prater say -- Was that the
10  first time you had a problem with him about
11  your Guard duty?
12      A.    That's where it all started,
13  yes.
14      Q.    Okay.
15      A.    Wasn't the first time. I'd
16  been blowing it off up to this point.
17      Q.    Okay. Who did you go see --
18  Well, did you go see --
19      A.    That was the first time I went
20  to HR and complained about it.
21      Q.    Is that when you talked to
22  Keisha?
23      A.    No, sir. That's when I talked

Page 138

1  to Greg Kimball. He was the very first one
2  I talked to. I was told that he was the man
3  in charge of human resources, and that's who
4  I talked to.
5      Q.    And you spoke to him face to
6  face?
7      A.    Yes, sir. In his office.
8      Q.    Okay. I mean, did you submit
9  anything in writing to him?
10      A.    No, sir.
11      Q.    Any e-mails at that time?
12      A.    No, sir.
13      Q.    I mean, did you just show up
14  in his office, did you schedule a meeting
15  with him?
16      A.    I took my lunch break. I did
17  not leave my work floor --
18      Q.    What time was your lunch
19  break?
20      A.    I don't remember.
21      Q.    You were working the night
22  shift?
23      A.    No. I was on the day shift

Page 139

1  the very first time it happened.
2      Q.    Okay. Let me go back to your
3  complaint. In paragraph eight there on page
4  three, it says that harassment of Dees by
5  Hyundai through Prater and Hughes began
6  almost immediately when Prater learned that
7  Dees was a member of the Alabama Army
8  National Guard and had served two tours in
9  Iraq.
10          Did Greg Prater -- How did
11  Greg Prater harass you because you were a
12  member of the Guard or because you served to
13  tours in Iraq?
14      A.    He said that -- He made the
15  comment that he had been in Baghdad, he had
16  killed people, he had been a Navy SEAL, he
17  had been a tank commander. And when I asked
18  him where he was at in Baghdad, he says --
19  when I asked him where he was in Iraq, I was
20  on the southside of Baghdad. I said, what
21  compound? I don't remember, there was so
22  many. I said, what was the name of the
23  compound? I don't remember. You know how

Page 140

1  it was there was compounds all over the
2  southside of Baghdad. I said, no, there
3  wasn't, there was one, the one I lived in.
4          And I had put him on the spot
5  because I listened to him six or eight
6  months, him and Applegate come around and
7  Prater start running up and talking about
8  how he been in combat and killed so many
9  people. And Applegate was like, yeah, this
10  is my boy. And I got friends that died in
11  Iraq, I've killed people in Iraq, and my
12  friends served proudly in Iraq. And
13  Applegate and HR and everybody was making a
14  disgrace of what we had done.
15      Q.    Well, what --
16      A.    When I went to them with my
17  complaints about my Guard duty, being forced
18  to produce military orders, they were like,
19  well, we'll look into the regulations.
20      Q.    Did Applegate ever demean you
21  or try to diminish your service in Iraq in
22  any way?
23      A.    He basically sat there the

35 (Pages 137 to 140)

Page 141

1　last -- said, well, I know Prater is a hero.
2　And he's -- like I said, basically he's my
3　man, he's my boy.
4　　Q.　When did he say that?
5　　A.　I don't remember the exact
6　date. I don't know.
7　　Q.　Okay.
8　　A.　Ask him.
9　　Q.　Other than saying good things
10　about Prater, did he say anything bad about
11　you or your service?
12　　A.　Directly, no.
13　　Q.　Indirectly what did he say?
14　　A.　Well, I -- I don't know. Like
15　I say, that's been a long time ago.
16　　Q.　All right. I need --
17　　A.　And just -- You're asking a
18　question I can't answer.
19　　Q.　That's fine. If you can't
20　answer, that's all I need to know.
21　　A.　He'd make comments like: What
22　do you need to go down there for, all y'all
23　do is party.

Page 142

1　　Q.　Who said that?
2　　A.　Prater --
3　　Q.　I know. Let's talk about
4　Applegate. Let's try to do this in some
5　orderly fashion.
6　　A.　It's my depo, so I've got to
7　go at my own rate.
8　　Q.　All right. Let me ask you
9　this: Am I hearing you correctly that you
10　don't have anything to tell me about ways
11　that Applegate either directly or indirectly
12　said bad things about you or your service?
13　　A.　No. Just, like I said, that I
14　need to focus more on my job and not worry
15　about my Guard duty, and most of the time
16　all they do is party down there anyhow.
17　　Q.　Is that the worst thing that
18　Applegate said?
19　　A.　Yeah. Other than like I said,
20　just backing Prater up saying whatever
21　Prater decides is what I'm going with.
22　　Q.　And are you telling me that
23　John Applegate told you that all y'all do

Page 143

1　when you do this duty is party?
2　　A.　To my face, yes.
3　　Q.　Okay. So did he and Prater
4　say that?
5　　A.　Prater said that in front of
6　everybody.
7　　Q.　Okay. Who did John Applegate
8　say it in front of?
9　　A.　Me. Like I said, I had to
10　have meetings -- If I complained to HR, I
11　had to go see Applegate.
12　　Q.　There are no witnesses to
13　Applegate saying all y'all do is party;
14　right?
15　　A.　Nope.
16　　　Did your lawyers interview him
17　too?
18　　Q.　Let me ask you about Keisha.
19　Did Keisha ever say anything to you about
20　you or your service in the Guard or Iraq?
21　　A.　No. She just said I had to
22　have orders before I could be deployed or
23　sent out.

Page 144

1　　Q.　Did Greg Kimball ever say
2　anything about you or your service in the
3　Guard or Iraq or Korea or anywhere else?
4　　A.　No. The only thing he was
5　worried about was that Prater told us we
6　couldn't talk to human resources. He didn't
7　care about -- basically didn't care about
8　the complaint I was making about Prater
9　harassing me about my Guard. The only thing
10　he worried about was Prater telling we
11　couldn't talk to human resources.
12　　Q.　Because he disagreed with it?
13　　A.　Yeah. Because it's basically
14　telling him that he's not over Prater, that
15　Prater can do whatever he wants. That's the
16　only reason he got -- He could care less
17　whether Prater was harassing me about my
18　Guard service.
19　　Q.　What makes you think he could
20　care less?
21　　A.　Because nothing was done about
22　it, ever.
23　　Q.　Let me ask you this: Did

36 (Pages 141 to 144)

FREEDOM COURT REPORTING

Page 145

1 Kimball ever say anything to suggest that
2 either you or your service in Iraq or the
3 Guard was insignificant?
4     A.    No.  Like I say, the only
5 thing he cared about was Prater saying we
6 couldn't talk to him.
7     Q.    Okay.
8     A.    But that still doesn't excuse
9 the fact that he let Prater get away with
10 telling me I had to have military orders or
11 I was going to get wrote up for missing
12 work.
13     Q.    Did William Ware ever say
14 anything to you about your military service,
15 your Guard duty service in Iraq?
16     A.    No.  Will's only job there was
17 to keep the union out, keep peace, and tell
18 us that Prater could do whatever he wanted
19 to.
20     Q.    Okay.  Did anybody other than
21 Applegate and/or Prater say anything about
22 your service in Iraq, your service in the
23 National Guard, or your uniformed service?

Page 146

1     A.    No.  But like I said, that
2 doesn't change the factor or dismiss the
3 fact that they let him tell me I had to have
4 military orders or I was getting wrote up.
5     Q.    All right.  And understand,
6 I'm trying to figure out what the evidence
7 is, I'm trying to figure out what people
8 said and what you know.
9     A.    Uh-huh.
10     Q.    So, I want to figure out who
11 said what.
12     A.    All right.
13     Q.    Can you think of anybody else,
14 other than Applegate or Prater, that ever
15 said anything or did anything to you that
16 was harassing or demeaning in any way with
17 respect to your uniformed service?
18     A.    No.  I never had a problem
19 with anyone else about it.
20     Q.    Okay.  And with respect to
21 Applegate, I just want to make sure I
22 understand exactly what it is he said and
23 did.  Am I correct that he made a comment

Page 147

1 that during your reserve or Guard duty
2 people partied?
3     A.    Yes.
4     Q.    And did he ever say anything
5 else that was demeaning or insulting or
6 harassing in any way with respect to your
7 service?
8     A.    Other than backing Prater up
9 about having to have military orders, no.
10     Q.    Okay.  So backing Prater up
11 about orders?
12     A.    Yeah.
13     Q.    Okay.  You've indicated in
14 paragraph nine of your complaint in
15 subparagraph B, that Prater told you you
16 couldn't miss work to attend Guard training?
17     A.    Yes, sir.
18     Q.    Was that on one occasion or
19 multiple occasions?
20     A.    That was on multiple
21 occasions.
22     Q.    Okay.  And do you remember
23 specifically any of those particular

Page 148

1 occasions?
2     A.    Well, I mean, sometimes he'd
3 just walk up and say, hey, you've got to
4 have orders this weekend or it's a write-up,
5 and sometimes he'd say it in front of
6 everybody.
7     Q.    Did he ever write you up for
8 not having orders?
9     A.    No, sir.
10     Q.    Did anybody ever write you up
11 for anything related to your military
12 service?
13     A.    Not that I know of.  I don't
14 know.  I never signed anything.
15     Q.    Okay.  And you were never told
16 that you were being written up after the
17 fact?
18     A.    After the fact, no, sir.  He
19 just still kept coming up harassing me
20 saying where's your orders, where's your
21 orders.
22     Q.    Did you ever not attend any
23 Guard duty because of --

37 (Pages 145 to 148)

FREEDOM COURT REPORTING

Page 149

1    A.   Because of work?
2    Q.   Because of Greg Prater or
3 work?
4    A.   I don't know.  I'd have to go
5 back and look at my LES's and see.
6    Q.   Let me ask you this:  Do you
7 remember ever skipping any Guard duty on a
8 weekend, or a week-long duty, or any sort of
9 training because of your job at Hyundai?
10    A.   I don't know.  I may have.
11    Q.   But you don't remember it?
12    A.   I may have.  I don't know.
13    Q.   Do you remember it?
14    A.   I said I don't know.
15    Q.   Okay.  And I assume you
16 haven't provided your attorneys with any
17 information to suggest you ever missed any
18 Guard duty because of your work at Hyundai?
19    A.   Like I said, I can go back and
20 look at my LES's and see.
21    Q.   All right.  Let me ask you
22 this:  In paragraph 9-E of your complaint it
23 says:  Prater attempted to force Dees'

Page 150

1 coworkers to say that Dees had violated
2 Hyundai's policies and procedures when
3 Prater knew it was not true.
4      Do you have any idea from a
5 factual perspective what that means?
6    A.   Yes, sir.
7    Q.   Tell me about that.
8    A.   About a month before I was
9 fired he tried to get one of my coworkers to
10 say that I was creating a hostile work
11 environment.
12    Q.   Who did he say that to?
13    A.   Shane Archer.
14    Q.   What did he say to Shane?
15    A.   He wanted Shane to say -- He
16 called Shane in the office with team
17 relations and wanted Shane to specifically
18 say that Leon was creating a hostile work
19 environment.
20    Q.   You think he called Shane into
21 a meeting with team relations?
22    A.   We all saw Shane go in the
23 office with him and team relations.  And

Page 151

1 Shane said out of his own mouth that that's
2 what Prater had said and he made the
3 statement -- he wrote a statement saying
4 that.
5    Q.   Okay.  Who from team relations
6 were they with?
7    A.   Will Ware.
8    Q.   Were there any other instances
9 that fall within what you've described in
10 paragraph 9-E?
11    A.   Yeah.  One other time that I
12 had a breakdown, Prater tried to get Shane
13 to say that I said, heck with the breakdown,
14 let's just go to lunch.  And I never stated
15 that.  That was Shane, myself, and Drake
16 Barefoot there.  And Drake was the one that
17 made the comment, but Prater wouldn't talk
18 to Drake.  And I asked him what happened, he
19 called Shane in once again trying to get
20 Shane to say I had caused the breakdown and
21 just walked off and left it, when Drake had
22 to run him down that I'm the one that stated
23 it --

Page 152

1    Q.   That you stated what?
2    A.   That I didn't, that Drake
3 stated it.
4    Q.   Did you walk off the
5 breakdown?
6    A.   No.
7    Q.   You did not?
8    A.   No.  We took our lunch shifts
9 -- Half the shift come in an hour early and
10 other shift came in an hour late.  We split
11 our lunch breaks up.  We had a breakdown in
12 my section.  The SOP asked -- that I was
13 told to stay in is where they supposedly
14 caught me sleeping.  It's out in open view
15 of everybody.  And I was working on it, we
16 had worked fifteen minutes over into our
17 lunch break, and myself and Drake was
18 working on it.  I handed my radio to Shane,
19 said call Kevin and get him to get the other
20 ones out here, they're fifteen minutes into
21 our lunch break, they're over theirs, tell
22 them to come finish up.  Shane went up and
23 took the radio, went downstairs, he found

FREEDOM COURT REPORTING

Page 153

1  Kevin told him what was going on, me and
2  Drake was still working on the breakdown.
3  Kevin came up, everything was explained to
4  him, told him what he had to do to fix it.
5  Drake said, heck with this, he used a
6  four-letter word, said, we're going to
7  lunch. Kevin said, well, I don't know how
8  to fix this. Drake says, you need to step
9  up and do your job. We told you how to fix
10  it, we're going to lunch. And the other
11  shift came out, took the breakdown.
12       When I came in the next night,
13  the same thing, Jim Brookshire and Prater
14  and them was in there telling me that I had
15  walked off of a breakdown and left the line
16  down.
17       Q.  You said Brookshire was there?
18       A.  Yes, sir. Trying to chew me
19  out for having a breakdown. Drake seen what
20  was going on, come in and to talk to them.
21  They said, no, we got this. He called Shane
22  in and tried to get Shane to say Leon said
23  such and such. Drake come and said this is

Page 154

1  what happened, I'm the one that said what
2  you're trying to blame on him, this is how
3  it happened. They didn't want to talk to
4  Drake, he had to force them to listen.
5       Q.  Were you written up or
6  anything for that?
7       A.  No. I would have been if it
8  hadn't been for Drake.
9       Q.  Was there another incident
10  where you walked off your job to your
11  recollection?
12       A.  I don't believe so. After
13  reading all the stuff from Hyundai,
14  apparently they had a lot to say about me.
15       Q.  But to your knowledge, this
16  incident that you're talking about, was it
17  investigated by team relations?
18       A.  No. It was investigated by
19  Prater, the same one who investigated me for
20  supposedly sleeping, and firing me. He did
21  the sole investigation.
22       Q.  You think Prater did?
23       A.  That's what their statements

Page 155

1  are saying.
2       Q.  Whose statements?
3       A.  Will Ware's and Prater's.
4       Q.  Okay.
5       A.  That's what he admitted to the
6  coworkers after I was fired. This Wendy
7  Warner totally bypassed all their own
8  policies in their handbook for termination,
9  their termination procedure, and fired me
10  right off the bat, off someone else's word.
11  That's what I'm saying, everybody knew about
12  the problem, and everybody supported him on
13  every decision he made; they supported
14  Applegate, human resources.
15       Q.  Can you think of any other
16  instances that fit within paragraph 9-E of
17  your complaint?
18       A.  I don't know. You keep
19  asking, there may be something. I don't
20  know.
21       Q.  That's why I keep asking.
22       A.  I don't know. Maybe. I don't
23  remember anything else right now at this

Page 156

1  moment.
2       Q.  Okay. Paragraph 9-F of the
3  complaint talks about having to clean out
4  the pit.
5       A.  Yes, sir.
6       Q.  All right. Let's talk a
7  little bit about the pit. Is there just one
8  pit at the plant?
9       A.  Yes, sir. It's all one big
10  system.
11       Q.  I mean, is there one pit or
12  two pits or three?
13       A.  There was one -- After I
14  answer this, we've got to go to lunch. My
15  stomach is growling.
16       There's a pit under each
17  press.
18       Q.  All right. So there's more
19  than one pit?
20       A.  There's two presses and one
21  pit under the -- what's that other -- I
22  can't remember what that other press is
23  called, where it all -- scrap comes from two

39 (Pages 153 to 156)

FREEDOM COURT REPORTING

Page 157

1  pits on a metal conveyor and goes down to
2  that where it's all crushed into one bale
3  and sent out and sold for scrap.
4      Q.    Okay.
5      A.    But I was always sent under
6  press one or two pit to clean up.
7      Q.    Okay.
8      A.    It's a dangerous process.
9  Because when you get down there, you have no
10  communication with nobody. If anything
11  happens to you, you're there until somebody
12  decides to come looking for you.
13      Q.    Let me ask you this: What
14  evidence do you have to suggest that anybody
15  at Hyundai assigned you to clean the pit to
16  try to get you to quit your job?
17      A.    Because after all this stuff
18  come up and my unit sent the letter, it
19  wasn't but a few weeks after that, I was
20  getting sent down to the pit to clean it, at
21  least once, two or three times a week,
22  sometimes three or four times a week.
23  Wasn't even our responsibility, production

Page 158

1  was supposed to clean the pit.
2      Q.    Production was supposed to
3  clean the pit?
4      A.    Yes, sir. Like I said, we had
5  radios, but when you get to the pit, you
6  have no communication.
7      Q.    Why -- I mean, if somebody
8  from production is supposed to clean the
9  pit, did anybody from maintenance ever clean
10  the pit before you?
11      A.    Yes, sir.
12      Q.    All right.
13      A.    When they would make Prater
14  mad.
15      Q.    Okay.
16      A.    Or if they made Kevin mad'or
17  if they made Jim Brookshire mad or if they
18  made Craig Stapley mad.
19      Q.    Those are production guys,
20  Brookshire and Stapley?
21      A.    Doesn't mean nothing though.
22  If they told you to go clean the pit, you
23  had to go clean the pit.

Page 159

1      Q.    So am I right, that the pit,
2  it wasn't like something that was cleaned on
3  schedule?
4      A.    No, sir. Well, it was
5  supposed to be but, no, sir.
6      Q.    Okay. Wasn't like there was a
7  schedule posted on the wall for who was
8  supposed to clean it when and that kind of
9  stuff?
10      A.    No, sir. That was a
11  production thing. But it didn't turn out to
12  be a production thing.
13      Q.    How many times do you think
14  you had to clean the pit?
15      A.    God, I don't know. Like I
16  said, several weeks, at least two, three,
17  four times a week.
18      Q.    How often --
19      A.    Huh?
20      Q.    How often would your coworkers
21  in maintenance clean it?
22      A.    Nowhere near -- Mark Hanks
23  cleaned it once I think.

Page 160

1      Q.    Okay.
2      A.    Other than that, I don't
3  remember anybody being singled out to go
4  clean it.
5      Q.    Did anybody clean it as often
6  as you did?
7      A.    No, sir.
8      Q.    Did anybody clean it more than
9  you did?
10      A.    No, sir.
11      Q.    And other than Mark Hanks
12  cleaning it once, can you think of anybody
13  else who had to clean it one or more times?
14      A.    Not individually. Sometimes
15  he'd send a whole shift down there once
16  every three or four months to clean it.
17      Q.    And is it your testimony the
18  pit got cleaned based purely on somebody
19  like Hughes or Prater or Brookshire or
20  Stapley telling you or your coworkers to go
21  do it?
22      A.    Yes, sir.
23      Q.    All right. Let's say if you

40 (Pages 157 to 160)

FREEDOM COURT REPORTING

Page 161

1 were working on -- is the -- Are the presses
2 numbered one and two?
3    A.    Yes, sir.
4    Q.    Would your maintenance duties
5 be assigned to either press one or press two
6 on a given shift?
7    A.    There was maintenance
8 personnel on my shift assigned to those
9 presses. That wasn't even my area of
10 responsibility.
11    Q.    Okay. What was your area of
12 responsibility?
13    A.    SOPS.
14    Q.    Okay.
15    A.    When we came in, we was told
16 to get our tool bags, get the brief from the
17 off-going shift, and go to our areas of
18 responsibility. Mark Hanks had to stay on
19 press one, Darrel Gray press two, Drake
20 Barefoot on that other stamping press, I
21 can't remember what it was called, Chris
22 Weihe had to handle ASRS, and I had the
23 SOPS, and Shane was a floater.

Page 162

1    Q.    Okay.
2    A.    And I ended up running the
3 SOPS for the production people; I went above
4 and beyond my spectrum of duty. I was
5 supposed to be there for breakdowns. If it
6 broke down, I was supposed to fix it. They
7 was only allowed to run so many parts, like
8 so many Sonata right side outers, they get
9 to running good and they'd run way over
10 their quota. I'd have to go up there and
11 operate the system for them so they could do
12 that. I became instead of -- basically a
13 production worker. And if I hadn't have
14 done it, they wouldn't have ran. So it
15 ain't like I was a slouch. I could have
16 said, no, that's not my scope of duty. I
17 helped out. You can ask production, I even
18 went back there sometimes and I'd help them
19 catch panels if they was getting in a bind.
20    Q.    In your complaint it says you
21 cleaned the pit almost daily some weeks; is
22 that true?
23    A.    Yes, sir.

Page 163

1    Q.    And that's five days a week?
2    A.    Sometimes it's seven days a
3 week.
4    Q.    Sometimes seven days a week.
5    A.    We'd work a weekend off,
6 weekend on. Sometimes we might get a Sunday
7 off. I mean, I never cleaned it seven days
8 in a row, no.
9    Q.    Okay.
10    A.    Even after I complained about
11 it.
12    Q.    Did you clean it five days in
13 a row?
14    A.    Fricken Applegate told me
15 don't worry about it, it all pays the same.
16    Q.    Did you ever clean it five
17 days in a row?
18    A.    I may have. I don't know. I
19 mean, I cleaned it so many times so much, I
20 don't know.
21    Q.    Is it your testimony that you
22 cleaned it significantly more than any of
23 your coworkers?

Page 164

1    A.    Yes, sir. And they'll tell
2 you that.
3    Q.    Okay.
4    A.    As they told -- I believe -- I
5 don't know, you'd have to ask the lawyer who
6 interviewed the three.
7    Q.    I've talked to him.
8          Anyway, let me ask you this,
9 in paragraph ten it says: Applegate wrote
10 up about each and every action by Prater and
11 Hughes. He stood behind each and every
12 decision they made in running the stamping
13 department and refusing to act on or even
14 investigate complaints to Applegate about
15 Prater and Hughes.
16          We've talked a lot about what
17 Applegate said in terms of it's Prater's
18 department and he runs it. Is there more to
19 that story than you and I have talked about
20 so far?
21    A.    No. Like I said, even if I
22 complained about cleaning the pit all the
23 time, and Applegate asked me, said, what's

41 (Pages 161 to 164)

Page 165

1    it to you, it all pays the same? I said,
2    well, it seems funny after this letter came,
3    all of a sudden I'm cleaning the pit all the
4    time. He said, well, that letter don't have
5    nothing to do with this, it's just a
6    maintenance thing. I said, well, we don't
7    normally clean it. Well, it all pays the
8    same, don't worry about it.
9        Q.    Did you talk to him about the
10   fact that it's typically production that
11   cleans the pit but they're making
12   maintenance people clean it?
13       A.    Yes, sir.
14       Q.    And he said he's okay with
15   that --
16       A.    Don't worry about it, it all
17   pays the same.
18       Q.    In paragraph eleven of your
19   complaint you say that the harassment --
20       A.    Are you ready for chow?
21       Q.    Not yet.
22           I mean, if you're ready to go,
23   we'll go.

Page 166

1        A.    I'm hungry.
2            MR. JOHNSON: Y'all ready to
3    take a break?
4            (Recess taken.)
5            MR. KILBORN: I want to mark
6    this as --
7            MR. JOHNSON: It's marked as
8    Exhibit 4.
9            (Whereupon, Defendant's
10           Exhibit No. 4 was marked
11           for identification.)
12           MR. KILBORN: Defendant's
13   Exhibit 4 was just produced about ten
14   minutes after one, during Leon Dees's
15   deposition; it should have been produced
16   before. It's obviously on the subject of
17   Guard duty; it's obviously on the subject of
18   human resources; and on the subject of Leon
19   Dees. And I've asked -- I've told counsel I
20   want to redepose Wendy Warren on the subject
21   matter of this e-mail.
22           MR. JOHNSON: Just for the
23   Record, with respect to Exhibit 4, this was

Page 167

1    the exhibit that came up, was identified
2    initially by Mr. Dees, which had not been
3    previously identified in Mr. Dees' discovery
4    responses by Mr. Dees or his counsel. Once
5    it was identified by Mr. Dees during his
6    deposition, we were able to contact the
7    Hyundai plant and have it faxed to the court
8    reporter's office. We've now marked it as
9    Defendant's Exhibit 4 and provided a copy to
10   Mr. Dees' lawyers, who had not identified it
11   previously.
12           MR. KILBORN: I also note for
13   the Record that the letter that Sergeant
14   Barnes wrote has not been produced, which is
15   a key letter in this case. And we've asked
16   that it be produced, that a search be made
17   for it. That's a letter identified in
18   Franklin D. Barnes Dees 00002 dated March
19   26, 2007.
20           MR. JOHNSON: Is that all?
21           MR. KILBORN: That's it. Go
22   ahead.
23       Q.    Mr. Dees, we're going back on

Page 168

1    the Record. I've got a couple of questions
2    to ask you.
3            We've now marked an exhibit
4    that you mentioned previously in your
5    deposition, that we've gone back and gotten,
6    we've marked as Exhibit Number 4. I know
7    that you and your lawyers have had an
8    opportunity to review that exhibit; is that
9    accurate?
10       A.    Yes, sir.
11       Q.    Okay. And is that, in fact,
12   the e-mail that you testified to prior to
13   our lunch break?
14       A.    This is it.
15       Q.    Okay.
16       A.    6 February '07. I asked
17   Mr. Kimball for a meeting, because, like I
18   said, both times I even had to file the
19   complaint through my unit. And after
20   positive results, meeting the first time, we
21   went there, Prater told us we couldn't talk
22   to HR. My unit stayed abreast of the
23   meeting, and it would die back down for a

42 (Pages 165 to 168)

FREEDOM COURT REPORTING

Page 169

1  week, and then everything else would kick
2  back up. Nothing changed over all. I'm
3  currently working night shift, and we would
4  greatly appreciate a meeting at your
5  convenience. And a week or two later I was
6  fired.
7      Q.    Now, if I could just look at
8  that. Again, this e-mail was sent on
9  February 6th of '07, does that sound right
10 to you?
11     A.    Yes, sir.
12     Q.    At that time, do you know
13 whether Greg Kimball was actively employed
14 or on leave from the plant?
15     A.    No one had told us he wasn't
16 there. Like I said, I worked night shift.
17     Q.    Did you know him personally?
18     A.    Did I know him personally?
19 You mean away from the plant?
20     Q.    No. I mean, did you know him?
21 You'd know him if he walked into the room
22 and talked to him?
23     A.    Yes, sir.

Page 170

1      Q.    Had you talked to him before?
2      A.    Yes, sir.
3      Q.    Had you talked to him
4  previously about any issues you may have had
5  with Greg Prater?
6      A.    It wasn't Prater specifically.
7  Like I said before, he was the very first
8  person I talked to when I went to HR.
9      Q.    Okay. But you didn't talk to
10 him about Prater specifically?
11     A.    Well, about Prater and
12 Applegate and having a problem with my Guard
13 duty, yes, sir, I did.
14     Q.    Okay. And what -- And I'm
15 just trying to think back to what we talked
16 about earlier this morning. I want to make
17 sure I'm right. That was what you had
18 testified to earlier, the year before you
19 got fired in the -- I think you testified in
20 the fall?
21     A.    Do what now?
22     Q.    The meeting -- That first
23 meeting you had with Greg Kimball.

Page 171

1      A.    Yes, sir.
2      Q.    Was that a meeting -- Was that
3  the year before you got terminated in that
4  fall period that you testified to?
5      A.    Yes, sir.
6      Q.    Okay. And where did that
7  meeting take place?
8      A.    In Greg Kimball's office.
9      Q.    Okay. And am I right that
10 neither you nor Greg Kimball produced
11 anything in writing after that meeting?
12     A.    No, sir.
13     Q.    And one of the things that it
14 says here on Defendant's Exhibit Number 4,
15 you'd indicate issues that have arisen on my
16 shift between Greg Prater, Kevin Hughes, and
17 yourself. What was the issue with Kevin
18 Hughes?
19     A.    Like I stated earlier, Kevin
20 had a history of jumping on employees.
21 And --
22     Q.    And when you say jumping on
23 employees, was that having to do with

Page 172

1  military duty or just his style of
2  management?
3      A.    His style of management. I
4  mean, he had -- he had jumped on two or
5  three other employees, one of them twice.
6  He'd get up in their face and holler at them
7  and bow up on them and intimidate them. And
8  he did the same thing to me, and I asked
9  him, I said: Are you bowing up on me? And
10 he made some comment, and I turned around
11 and I left.
12     Q.    Now, did that have anything to
13 do with your military service or your
14 reserve duties or anything like that?
15     A.    That particular incident? I
16 -- I don't know. After the letter came in,
17 and I started having all these problems is
18 when Kevin started -- I mean, that's when he
19 started birddogging me.
20     Q.    When who started birddogging
21 you?
22     A.    Kevin Hughes.
23     Q.    When did that start?

43 (Pages 169 to 172)

FREEDOM COURT REPORTING

Page 173

1    A.    After -- Like I said, after my
2  letter from the unit came in.
3    Q.    Okay. That's the letter from
4  Sergeant Barnes?
5    A.    Yes, sir.
6    Q.    Do you remember when that
7  letter came in?
8    A.    As I stated earlier, no, sir.
9    Q.    Do you recall who it was sent
10  to specifically?
11    A.    Yes, sir. Like I stated
12  before, Greg Kimball.
13    Q.    Okay. Did you ever talk to
14  Greg Kimball about whether or not he'd
15  actually gotten that letter?
16    A.    No, sir, I did not.
17    Q.    Do you have any evidence that
18  Greg Kimball or anybody else in Hyundai
19  management received the letter?
20    A.    I said just John Applegate
21  saying: Don't worry about that letter,
22  we've seen it, something to that effect. I
23  don't remember exactly what his words were,

Page 174

1  but, yeah, he admitted the letter was there.
2    Q.    Do you remember when he said
3  that?
4    A.    I think it was the second
5  meeting I had with him. I don't remember.
6    Q.    Second meeting with Applegate?
7    A.    Yeah. I mean, I don't know to
8  be honest. I can't say either way.
9    Q.    How many meetings did you have
10  with Applegate?
11    A.    I don't know. Two, three.
12  Whatever I said this morning.
13    Q.    Okay. In your letter to Greg
14  Kimball that we've marked as Exhibit 4 you
15  say: I have talked to human resources on
16  two separate occasions regarding Greg Prater
17  and also filed a complaint on him through my
18  National Guard unit.
19    A.    Yes, sir.
20    Q.    Were the two separate
21  occasions the one time that you talked to
22  Greg Kimball and then when you talked to
23  Keisha?

Page 175

1    A.    No, sir. The two separate
2  occasions was what it says, it was two
3  separate occasions.
4    Q.    But I'm trying to figure out
5  when those two separate occasions were and
6  who were they with?
7    A.    What do you mean?
8    Q.    On February 6th you basically
9  say you had two separate occasions that you
10  had discussions with human resources; right?
11    A.    Yes, sir.
12    Q.    Okay. I want -- I'm just
13  trying to figure out if we can pin down when
14  those were and who you talked to.
15    A.    It's like I stated earlier
16  this morning, I don't know the exact dates.
17  That was over a year ago. No, I don't. I
18  don't know specific dates, times, no, sir.
19    Q.    Do you recall who they were
20  with?
21    A.    Like I stated this morning,
22  the first meeting was with Greg Kimball --
23    Q.    Okay. That's one.

Page 176

1    A.    -- in HR, and the last two I
2  believe was with Keisha.
3    Q.    Okay. So other than Greg
4  Kimball and Keisha, you don't recall having
5  discussions with anybody in HR?
6    A.    No, sir.
7    Q.    No, sir, I'm wrong or no, sir,
8  you didn't have meetings with anyone else?
9    A.    No, sir, I don't recall having
10  meetings with anyone else in HR.
11    Q.    And did Keisha ever say
12  anything to you that in any way demeaned or
13  insulted your prior uniformed service?
14    A.    No, sir.
15    Q.    Do you have any reason to
16  think that Keisha in any way influenced the
17  decision to terminate your employment?
18    A.    I have no idea who had any --
19  I don't know. You're standing at work,
20  somebody comes up and tells you you're
21  fired, I mean --
22    Q.    Let me ask you this: Do you
23  have any information to suggest who was

FREEDOM COURT REPORTING

Page 177

1  involved in the decision to terminate your
2  employment?
3      A.    Rephrase.
4      Q.    Do you have any knowledge as
5  to who was involved in the decision to
6  terminate your employment?
7      A.    Nope. I mean -- No.
8      Q.    Do you know whether Greg
9  Prater was involved?
10     A.    Well, I read statements that
11 he wrote.
12     Q.    Other than the statements that
13 he wrote --
14     A.    And he told the coworkers that
15 he did the investigation and it was his
16 decision.
17     Q.    Okay. Who did he say that to?
18     A.    My shift. But, they also said
19 that -- I believe it was that -- I don't
20 know, how was it phrased?
21            He didn't make the actual --
22 He can only make a recommendation. The
23 actual decision had to come from HR.

Page 178

1      Q.    Okay. And do you know who in
2  HR was involved in that decision-making
3  process?
4      A.    No, sir, I do not.
5      Q.    Also on Exhibit 4 it indicates
6  here that -- or you say: There have been
7  positive results from both meetings and once
8  again I am seeking your help.
9            What were the positive results
10 that came from --
11     A.    Well, the first time Prater
12 said: Y'all can't go to HR, that's not in
13 your chain of command.
14     Q.    Okay.
15     A.    And I -- Everything with me
16 was military term acronyms, because that's
17 all I've ever known, that's how I live my
18 life. And HR jumped all over him. Like I
19 said, that was only for their benefit.
20 Said, yeah, you can talk to us any time you
21 want. And everything calmed down for a few
22 days or a week, but then same old routine
23 kicked in.

Page 179

1      Q.    What routine?
2      A.    Of getting harassed, are you
3  going to duty this weekend? Where is your
4  orders? Are you coming back Monday? Do you
5  have my orders? You're going to get wrote
6  up if you miss work.
7      Q.    Did Greg Prater ever do
8  anything other than demand to see orders or
9  suggest that he was going to write you up if
10 you missed work?
11     A.    As in?
12     Q.    You tell me. I just want to
13 know what he did.
14     A.    I mean, other than hounding me
15 about my orders, harassing me about my duty,
16 HR and Applegate and basically team
17 relations and everyone backing him up, that
18 was pretty much enough.
19     Q.    Okay. So would it be fair to
20 state that that's all that Greg Prater did
21 or that Applegate or HR did with respect to
22 your service?
23     A.    Well, yeah, I reckon.

Page 180

1      Q.    Okay. Now, let's look at
2  paragraph twelve of your complaint. And I'm
3  going to mark --
4            MR. SPORT: Matt, do you have
5  another copy of that?
6            MR. JOHNSON: Yeah. I'm
7  getting it. Hang on.
8      Q.    I'm going to mark as Exhibit 5
9  a fax cover letter and a letter --
10           (Off-the-Record discussion
11           was held.)
12           (Whereupon, Defendant's
13           Exhibit No. 5 was marked
14           for identification.)
15     Q.    All right. Mr. Dees, in
16 paragraph twelve of your complaint it
17 references an October 23, 2006, letter from
18 Sergeant Franklin Barnes --
19     A.    I said on or about October 23.
20     Q.    On or about October 23, 2006,
21 Franklin Barnes, of Dees' Guard unit wrote a
22 letter of instruction to the human resources
23 department at Hyundai. And if you look at

45 (Pages 177 to 180)

FREEDOM COURT REPORTING

Page 181

1  what we've marked as Exhibit 5, that is
2  apparently a letter from Sergeant Barnes --
3  it says it's a memorandum for Record.
4        Are you aware of anything else
5  that Sergeant Barnes produced that was
6  produced to Hyundai?
7     A.  No, sir.
8     Q.  And let me -- I won't --
9     A.  This is not the actual letter
10 because he didn't keep a copy of the actual
11 letter.  This is in reference to what he had
12 stated -- basically stated.
13    Q.  Okay.  And let me make sure
14 and --
15    A.  On or about 23 October, that's
16 a military term, if you're not sure of the
17 date, exact date, that's what we use.
18        MR. JOHNSON: Okay.  And let
19 me make sure, Mr. Kilborn or Mr. Sport,
20 we've definitely got one and two here, and I
21 don't want to -- if I'm overlooking or
22 misunderstanding, the 10/23 letter --
23        MR. SPORT: We have not

Page 182

1  produced it because we don't have a copy of
2  it.
3        MR. JOHNSON: Okay.
4        MR. SPORT: It's our
5  understanding that Mr. Barnes cannot locate
6  a copy of it.  Based on his notes, and it
7  would roughly correspond, I believe, to
8  Mr. Dees' drill date of that month, that
9  that's when he wrote the letter.  And based
10 on that, we're requesting that letter from
11 human resources.
12        MR. JOHNSON: All right.
13 So --
14        MR. SPORT: Is that what you
15 were asking?
16        MR. JOHNSON: I think so.
17 Thank you.
18        MR. SPORT: Okay.
19    Q.  So, Mr. Dees, it's at least my
20 understanding that what we've got here as
21 Exhibit 5, that's different from the letter
22 we were talking about earlier that was sent
23 by Mr. Barnes to the human resources

Page 183

1  department?
2     A.  Yes, sir.  It's not the exact
3  same letter, no.  Sergeant Barnes didn't
4  keep a copy of the letter that was sent.
5     Q.  Did he send a copy to you?
6     A.  No, sir.  I didn't ask him to.
7     Q.  Well, regardless of what you
8  asked him to do, did he send one?
9     A.  No, sir.
10    Q.  Okay.  Do you know if he sent
11 one to anybody else?
12    A.  No, sir.
13    Q.  And you -- Do you know if -- I
14 want to make sure I understand.  Did he keep
15 a copy and lost it or did he not keep a copy
16 to your knowledge?
17    A.  To my knowledge, he did not
18 keep a copy.
19    Q.  Okay.
20    A.  And it not being an official
21 government document, he wasn't required to
22 keep a copy.
23    Q.  Okay.  Then is it your

Page 184

1  testimony it wasn't an official government
2  document?
3     A.  It was a letter -- When you
4  have a problem, you go to your unit.
5     Q.  Okay.  And he was actually
6  your subordinate in the unit; correct?
7     A.  Yes, sir.  But he's the full
8  time AGR person, so it's his job to take
9  care of stuff like that.
10    Q.  Okay.  Did you ask anyone who
11 you were subordinate to to write you a
12 letter like that?
13    A.  No, sir, I did not.  I went to
14 the unit, I talked to Sergeant Barnes.
15 Sergeant Barnes called Sergeant Richberg my
16 superior.  Sergeant Richberg was the senior
17 man, he's retired now, that was off Sergeant
18 Richberg's recommendations.
19    Q.  Okay.  Tell me Sergeant
20 Richberg's full name?
21    A.  Wendell Richberg.
22    Q.  And do you know where he
23 lives?

46 (Pages 181 to 184)

Page 185

1     A.     Anniston.
2     Q.     Anniston. Have you spoken to
3 him since this lawsuit was filed?
4     A.     Friday night.
5     Q.     Okay. Did y'all talk about
6 this lawsuit?
7     A.     No, sir.
8     Q.     Did you talk about your
9 deposition at all?
10     A.     No, sir.
11     Q.     Okay. What about Sergeant
12 Barnes, do you still talk to him?
13     A.     Every month at Guard. He
14 works for me.
15     Q.     At Guard duty. Okay. And,
16 again, going back to Exhibit 5 that we've
17 marked today, is the second page of that a
18 memo that you're familiar with?
19     A.     The actual letter?
20     Q.     Yes.
21     A.     Yes, sir.
22     Q.     You're familiar with that?
23     A.     I read it once.

Page 186

1     Q.     Did you read it before
2 Sergeant Barnes sent it?
3     A.     No, sir, I do not.
4     Q.     Do you know if Sergeant Barnes
5 sent it to anybody?
6     A.     Sergeant Barnes told me that
7 he sent it to Greg Kimball.
8     Q.     He said he sent it to Greg
9 Kimball?
10     A.     Yes, sir.
11     Q.     Did he indicate he had sent it
12 to anybody other than Greg Kimball?
13     A.     No, sir.
14     Q.     Did he send a copy to you?
15     A.     No, sir.
16     Q.     I assume he saved a copy of
17 this?
18     A.     No, sir.
19     Q.     Do you know where this -- this
20 copy came from?
21     A.     Sergeant Barnes retyped it.
22 You'll have to ask Sergeant Barnes this
23 info. This, I do not know.

Page 187

1     Q.     He retyped this memo?
2     A.     I'm just assuming. Like I
3 said, you'll have to ask Sergeant Barnes
4 this information.
5     Q.     Okay.
6     A.     I'm not going to sit here and
7 answer for him because I don't know.
8     Q.     I want to know what you know.
9 Do you know whether or not this is a retyped
10 memorandum or something he'd done --
11     A.     No, sir, I do not know. Like
12 I stated, I do not know. You'll have to ask
13 Sergeant Barnes, and he'll be glad to talk
14 to you.
15     Q.     Do you know where this copy
16 came from?
17     A.     Sergeant Barnes. It's got his
18 signature on it.
19     Q.     So I'm assuming Sergeant
20 Barnes kept a copy of this one?
21     A.     Apparently so. I don't know
22 that for sure either. I'm not going to say
23 either way.

Page 188

1     Q.     And not a copy of the other
2 one?
3     A.     Well, the other one shouldn't
4 have been a problem. He has to do it for
5 civilian law enforcement officers. I mean,
6 he didn't think nothing about it.
7     Q.     Did you ask him to prepare
8 this Exhibit Number 5?
9     A.     I asked him if he had a copy
10 of the letter he sent. He said he would
11 check and see. And he said he did not have
12 a copy. I said, look, what did you write?
13 I said I need a letter about what you said,
14 and that's what he produced. Anything other
15 than that, you'll have to ask Sergeant
16 Barnes.
17     Q.     Okay. So from what you're
18 telling me, either he told you he couldn't
19 find one, and then he found it --
20     A.     No, sir. He did not find it.
21 I never said he found it. I said he did not
22 find it.
23     Q.     Okay. That's fine.

47 (Pages 185 to 188)

FREEDOM COURT REPORTING

Page 189

1      To your knowledge, was this
2  done on March 26th originally?
3      A.   I have no idea.
4      Q.   Okay.  Do you have any idea
5  when he initially prepared it?
6      A.   No, sir.
7      Q.   All right.  And was -- The
8  first page of Exhibit 5 is to Mrs. Dees, I
9  assume that's your wife?
10     A.   Yes, sir.
11     Q.   Was this faxed to some fax
12  numbers of hers or at her office somewhere?
13     A.   Yes, sir.
14     Q.   Did you ask Sergeant Barnes to
15  send it to your wife?
16     A.   Yes, sir.
17     Q.   And was it at her office?
18     A.   Yes, sir.
19     Q.   Where does she work?
20     A.   Peachtree Bank in Maplesville,
21  Alabama.
22     Q.   So to your knowledge, Sergeant
23  Barnes sent this to her bank?

Page 190

1      A.   Yes, sir.
2      Q.   And did she bring it home to
3  you?
4      A.   Yes, sir.
5      Q.   And it looks like it was faxed
6  on March 26th; is that accurate?
7      A.   Yes, sir.
8      Q.   And do you recall whether that
9  was when you got it or not?
10     A.   Yeah.  She got it that day,
11  she brought it home that evening, yes, sir.
12     Q.   All right.  Had you talked to
13  Sergeant Barnes that day?
14     A.   I don't know.  I don't know.
15     Q.   Okay.  Do you remember talking
16  to Sergeant Barnes asking him to send you
17  some sort of memorandum for the Record or
18  something telling what he had done in the
19  past?
20     A.   Yes, sir.
21     Q.   Did he fax this to you on the
22  same day or did this take place at a later
23  time?

Page 191

1      A.   I don't know.
2      Q.   Okay.  Do you know if Sergeant
3  Barnes ever called Hyundai's HR department
4  for any reason?
5      A.   Not to my knowledge.
6      Q.   Okay.  Had you provided him
7  with Greg Kimball's name?
8      A.   Yes, sir.
9      Q.   Did you provide him with Greg
10  Kimball's address or fax number or anything
11  like that?
12     A.   Address to the plant.
13     Q.   Just the plant address?
14     A.   Yes, sir.  Attention Greg
15  Kimball.
16     Q.   Okay.  In paragraph thirteen
17  of your complaint you say: After the letter
18  from Sergeant Barnes was sent to Hyundai,
19  the incidences of harassment outlined above
20  escalated.
21      Let me ask you that:  Is that
22  accurate?
23     A.   Yes, sir.

Page 192

1      Q.   How did they escalate?
2      A.   I mean, it went from every
3  other day I was being called on the carpet.
4  I mean --
5      Q.   Called on the carpet for what?
6      A.   Anything he could make up,
7  they could make up, everything.
8      Q.   What would they make up?
9      A.   The daily reports, and I
10  believe that was in there somewhere, where I
11  didn't turn in my daily report where I
12  actually filled it out but I worked over,
13  and it was still in the book, I just didn't
14  drop it off in the box.  And I was being
15  threatened on a write-up when there were
16  several other team members on both shifts
17  who hadn't turned in a daily report in over
18  a month.  That was just one example.
19     Q.   Well, during that period, were
20  -- were you ever suspended for any reason?
21     A.   No, sir.  They ignored their
22  whole firing process.  I was never written
23  up, to my knowledge.

48 (Pages 189 to 192)

FREEDOM COURT REPORTING

Page 193

1    Q.    Okay.
2    A.    They went against their own
3  program, their own handbook, their own
4  system.
5    Q.    Okay. Just so I understand,
6  how did they do that?
7    A.    Well, supposedly there's a
8  system, a process, you have to go through to
9  get fired. Several steps in between. I
10  went from zero to fired.
11    Q.    So when you say they
12  disregarded the steps, you're talking about
13  your termination?
14    A.    Their own firing process.
15  It's not my termination. That's their
16  process that they came up with, that they
17  said they would abide by that they threw out
18  the window.
19    Q.    Okay. Also in paragraph
20  thirteen you say that on or about February
21  26, 2007, Prater got the stamping manager,
22  Jim Brookshire to falsely accuse Dees of
23  sleeping on the job.

Page 194

1    A.    February 26th was the day I
2  was terminated. I believe, like you said,
3  it was the 19th. I'm not sure, it was the
4  week before that.
5    Q.    Okay. So you put -- Do you
6  know why it says the 26th? Is it for any
7  reason other than that's the day you were
8  terminated?
9    A.    Yes, sir.
10    Q.    Do you have any personal
11  knowledge that Greg Prater tried to get Jim
12  Brookshire to say that you were sleeping?
13    A.    I don't know. Prater wasn't
14  even there that night. It was Jim
15  Brookshire.
16    Q.    So you agree Prater wasn't
17  even there that night?
18    A.    No, he wasn't. It was on a
19  night shift.
20    Q.    Okay. So if Greg Prater
21  wasn't at the plant the night that Jim
22  Brookshire made the allegations, how is it
23  that you say that Prater tried to convince

Page 195

1  Brookshire to make those allegations?
2    A.    Well, I mean -- I'm not sure
3  how he -- what went on. I know I was
4  standing up there in my area that I was
5  supposed to be in, with one of my coworkers,
6  who had left me standing out there in plain
7  site on a wire mesh floor where everybody
8  can see, not five minutes before I was
9  accused of sleeping. And I read Will Ware's
10  statements where Jim Brookshire said he
11  never saw my eyes closed. And the next
12  thing I know, I'm getting fired for sleeping
13  on duty. If I sleep on duty, he's saying
14  this ain't a military thing, he was always
15  referring to military things, every time
16  someone talked to me, they put it in a
17  military perspective. If I didn't live my
18  life in a military manner, why would they do
19  that? If I sleep on duty on post, I die.
20  That's not the most important thing. If I
21  sleep on duty on post, my men die, that's
22  the most important thing. I live my
23  civilian life just like I do my military

Page 196

1  life. Just because for the same reason --
2  Just like is fixing to happen next year, I
3  am going back to Iraq. If I slough off in
4  my civilian life, I slough off in my
5  military life. I don't do that.
6    Q.    Okay. Let me ask you this:
7  Do you know the night that Jim Brookshire
8  allegedly made the allegations he saw you
9  sleeping?
10    A.    Yes. I don't remember the
11  exact date. I think it was around the 19th.
12  But the exact incident, yes, sir, I remember
13  it.
14    Q.    So you know the incident?
15    A.    Yes, sir.
16    Q.    And you agree Greg Prater
17  wasn't on duty that night?
18    A.    No, sir, he was not.
19    Q.    Wasn't at the plant?
20    A.    No, sir.
21    Q.    Do you even know whether he
22  worked the next day?
23    A.    I don't know.

49 (Pages 193 to 196)

FREEDOM COURT REPORTING

Page 197

1    Q.    Okay.  Do you know whether --
2    Do you have any evidence to suggest that he
3    and Jim Brookshire had talked before that
4    night about accusing you of something?
5    A.    If I had it, you would have
6    it.
7    Q.    Okay.  So, but, again, I just
8    want to make sure.  Okay?
9    A.    Like I say, you're the one
10   that's talked to them.  You'll have to go
11   ask them.
12   Q.    Let me ask you this:  You're
13   not aware of any evidence to suggest Greg
14   Prater told Jim Brookshire to make up some
15   allegations before that night, and Greg
16   Prater wasn't there that night, and you
17   don't know whether Greg Prater even worked
18   the next day, what evidence do you have to
19   suggest that Greg Prater told Jim Brookshire
20   what to do, or when to do it, or how to do
21   it?
22   A.    I don't have any evidence of
23   Prater and Jim corroborating or whatever you

Page 198

1    want to call it.
2    Q.    Okay.  Well, you would agree
3    that that's not consistent with what's
4    contained in your complaint?
5    A.    Did Prater and Brookshire
6    stick together on everything?  Yes.
7    Q.    In other words, they're
8    consistent?
9    A.    Yeah.  I mean, if Prater said
10   something, Brookshire backed him up;
11   Brookshire said something, Prater backed him
12   up.
13   Q.    Okay.  But where you've
14   indicated in your complaint that Prater got
15   the production staffing manager, Jim
16   Brookshire, to falsely accuse Dees of
17   sleeping on the job, what evidence do you
18   have that Prater did that?
19   A.    Like I said before, I don't
20   have none.  If I did, you'd have it.
21   Q.    Okay.  Thank you.
22   And am I correct that on the
23   evening of -- Well, you indicated you know

Page 199

1    the evening in question?
2    A.    Yes, sir.
3    Q.    All right.  How is it you know
4    when Jim Brookshire made those allegations?
5    A.    I saw him and Kevin Hughes
6    standing down on the floor pointing up at me
7    and Shane.
8    Q.    Pointing up at you where?
9    A.    Up in my area of
10   responsibility.  They said that I was
11   supposedly sleeping up in the SOPS.  It's
12   about -- It's what they call the third
13   floor.  And there's an open wire mesh floor
14   right there.  You can't hide.  And Shane
15   walked downstairs, and I let my guard down.
16   I had a brain cramp.  And it wasn't five
17   minutes, here come Jim walking up the
18   stairs, walking around the back, looked over
19   at me about fifty foot away, walked down,
20   looked out over the presses, came back,
21   looked at me again.  I watched him, I
22   watched him walk all the way back down the
23   stairs.  When he did, I got up and walked

Page 200

1    downstairs.
2    Q.    Okay.  Were you sitting down?
3    A.    Yes, sir, I was.  I was trying
4    to text message my daughter.
5    Q.    You were text messaging your
6    daughter?
7    A.    I was trying to, yes, sir, I
8    was.
9    Q.    So you had your phone in your
10   hand?
11   A.    Yes, sir, I did.
12   Q.    Were you looking down into
13   your lap at the phone?  Or how did you have
14   your phone?
15   A.    I had my phone right here
16   (indicating).  Like I said, I watched him
17   walk up the stairs, and I watched him.  We
18   made eye contact, he kept walking.  So I
19   went back to text messaging.  He come back,
20   I looked up at him again, and I watched him
21   walk all the way down.  I closed my phone, I
22   got up, and I went down.
23   Q.    Did you actually send someone

50 (Pages 197 to 200)

FREEDOM COURT REPORTING

Page 201

1   a text message?
2        A.    I tried.  No, I couldn't get
3   out.
4        Q.    What do you mean you couldn't
5   get out?
6        A.    Depending on the weather and
7   where you was at, sometimes you could get a
8   good signal in the plant and sometimes you
9   couldn't.
10       Q.    Would there be any records to
11  support whether or not you actually made a
12  text message that evening?
13       A.    I've got my phone bill, but,
14  no, I told you, I didn't get out.
15       Q.    Okay.  So is it your testimony
16  you had the phone in your hand, you were
17  pressing buttons, but nothing was happening?
18       A.    Pretty much it.
19       Q.    Were you wearing a hard hat?
20       A.    No, sir.  We wear ball caps
21  with a little plastic insert.  And it was
22  sitting on the spool beside me, spool of
23  cable.

Page 202

1        Q.    So you were not wearing a ball
2   cap?
3        A.    No, sir.
4        Q.    Were you wearing any sort of
5   eye protection or anything like that?
6        A.    They were in my hard hat.
7        Q.    Hard hat or ball cap?
8        A.    Ball cap.
9        Q.    Did you have a hard hat with
10  you?
11       A.    No.  They don't wear hard
12  hats.
13       Q.    They don't wear them anywhere?
14       A.    Not to my knowledge, no.
15       Q.    In the whole plant?
16       A.    Some people may, but I was
17  stuck in my section, I don't know.
18       Q.    And your section was
19  somewhere?
20       A.    Stamping maintenance.
21       Q.    So to your knowledge, in
22  stamping maintenance they don't wear hard
23  hats?

Page 203

1        A.    No, sir.  They wear a ball
2   cap, what they call a bump cap, little
3   plastic insert.
4        Q.    Okay.  And during the period
5   in which you saw Jim Brookshire up on that
6   third floor, I mean, you saw Jim Brookshire
7   on the third floor?
8        A.    Yes, sir.  I watched him walk
9   up, around, and back down.
10       Q.    Was this after Shane Archer
11  had left?
12       A.    About five minutes after Shane
13  left.
14       Q.    Five minutes.  Do you recall
15  it being five minutes?  That was a long time
16  ago.
17       A.    It wasn't long.  Like I said,
18  me and Shane had just been standing there
19  wondering why they were standing down on the
20  floor pointing up at us talking.
21       Q.    Okay.  Do you remember what
22  time it was you saw them down on the floor
23  pointing up at you?

Page 204

1        A.    It was before chow.
2   Everything happened before chow that night.
3        Q.    What time is chow?
4        A.    I believe it was -- I think it
5   was eleven thirty that night, eleven thirty
6   or eleven forty-five.
7        Q.    What time did you get to work?
8        A.    I don't know.  You would have
9   to -- Y'all got that.
10       Q.    What time did you usually
11  start?
12       A.    It depended whether I was
13  coming in early that night or late that
14  week.
15       Q.    What's the latest you would
16  have gotten there?
17       A.    I believe it was six or seven.
18       Q.    P.m.?
19       A.    I think.
20       Q.    Okay.  And starting at six or
21  seven, whenever you got there --
22       A.    Six to four forty-five and
23  seven to five forty-five.

51 (Pages 201 to 204)

FREEDOM COURT REPORTING

Page 205

1    Q.    All right.
2    A.    But we always had to be there
3    early.
4    Q.    So you would have been there
5    sometime slightly before six or seven?
6    A.    Yes, sir.
7    Q.    All right.  So you get there a
8    little bit before six or seven.  Do you go
9    to the -- is there an office for stamping
10   maintenance?
11   A.    That's where our lockers are
12   at.
13   Q.    All right.  So would you
14   usually go to your locker first?
15   A.    Yes, sir.
16   Q.    All right.  Do you remember
17   doing that on the night in question?
18   A.    I did it every night.  That's
19   where my tools was locked up.
20   Q.    So you would go get your tools
21   to start the day?
22   A.    Yes, sir.
23   Q.    And on the evening in

Page 206

1    question, did you go immediately from
2    getting your tools to a meeting with Greg
3    Prater or Kevin Hughes or anybody like that?
4    What did you do?
5    A.    We didn't have meetings.
6    Q.    Okay.
7    A.    We'd get our tools and --
8    Q.    How did you know what to do?
9    A.    I mean, it's just standard.
10   Everybody -- We'd come in, we'd get our
11   tools, we'd go to work.  I mean --
12   Q.    But how did you --
13   A.    -- that was the norm.
14   Q.    How did you know what to work
15   on?
16   A.    We didn't work on nothing.  If
17   nothing wasn't broke down, we would go to
18   our area of responsibility.
19   Q.    So you would just go to an
20   area that you were responsible for?
21   A.    An area I was assigned.
22   Q.    And that was the SOP section
23   up on third floor?

Page 207

1    A.    Second and third floor.
2    Q.    Second and third floor.
3    A.    And if they was running them,
4    it could be on the first floor too.
5    Q.    All right.  Did you go to the
6    second floor that night?
7    A.    Right off the bat?
8    Q.    Yeah.
9    A.    Probably not.  I probably went
10   and got the brief from the off-going shift.
11   Q.    What is that?  Is that
12   something telling you what to do?
13   A.    Like I said earlier this
14   morning, we go get our tools, go talk to
15   people on the off-going shift, find out if
16   there's any breakdowns, anything, any major
17   events we needed to know about or look out
18   for.
19   Q.    How long does that usually
20   take?
21   A.    If nothing happened, two
22   seconds.  Give me your radio.  Bye, y'all
23   take it easy.

Page 208

1    Q.    Would you share a radio with
2    the off-going shift?
3    A.    Yes, sir.
4    Q.    Do you know who your
5    counterpart is on the off-going shift or who
6    was on the evening in question?
7    A.    They didn't really have
8    assigned areas like we did, I don't think.
9    I mean, it would be different people.
10   Sometimes it would be Duane Tatum, or
11   sometimes it would be Lance Honeycutt, or --
12   I can't remember the other guy's name.
13   Q.    All right.  Well, that's okay.
14       Once y'all sort of made the
15   shift change and talked with the off-going
16   guys, you would go to your work area;
17   correct?
18   A.    Yes, sir.
19   Q.    And on the evening in
20   question, you think that would have been
21   immediately up to the third level?
22   A.    Maybe not.  Not if they was
23   running.  If they was running, we would be

52 (Pages 205 to 208)

FREEDOM COURT REPORTING

Page 209

1  over at the press and see how they were
2  running and make sure the trolleys were
3  switching out right.
4      Q.   Do you remember what you did?
5      A.   No.
6      Q.   You can't remember?
7      A.   I remember the weather was bad
8  that night. There had been a couple of
9  nights that week the weather was bad, so I
10  don't -- several nights we had to go to the
11  storm shelters, like the pit and bathrooms,
12  because of the weather. So, no.
13      Q.   Do you remember having to go
14  to the storm shelter on the evening we're
15  talking about?
16      A.   I don't know if it was that
17  evening or a couple of evenings before.
18      Q.   Okay. Do you remember when
19  you first went up to the third level on the
20  evening we're talking about?
21      A.   Me and Shane went up there --
22  at the time the incident occurred, me and
23  Shane had gone up there because we had to

Page 210

1  pull trolleys.
2      Q.   Pull trolleys?
3      A.   Yes, sir. Because we had a
4  problem.
5      Q.   Just so -- I think I know what
6  you're talking about, but when you say pull
7  trolleys, is that when part of that conveyor
8  system gets off line or something, and you'd
9  have to go straighten it out?
10      A.   If you know what I'm talking
11  about, yeah, the things that ride the rails,
12  that's the trolleys.
13      Q.   Okay. Does that just mean one
14  of those got offline and you had to correct
15  it?
16      A.   Yes, sir.
17      Q.   Okay. And when you went up
18  there with Shane Archer, was that when you
19  looked down and saw Kevin Hughes and Jim
20  Brookshire looking up at you or was that
21  later in the evening?
22      A.   No. It was at that instant.
23  We had just finished pulling a trolley, just

Page 211

1  got the system back online.
2      Q.   How long did that take?
3      A.   Not long. I don't know to be
4  honest.
5      Q.   Okay. And so when you got the
6  trolleys back online, is that when Shane
7  Archer went downstairs?
8      A.   After we talked about Jim and
9  Kevin pointing up at us talking.
10      Q.   Okay. So you and Shane Archer
11  had a conversation where y'all talked about
12  Jim Brookshire and Kevin Hughes looking up
13  at you?
14      A.   Yes, sir.
15      Q.   And pointing?
16      A.   Yes, sir. It was basically
17  what are they doing? Why are they pointing
18  up here? I don't know.
19      Q.   And was that before midnight?
20      A.   Yes, sir.
21      Q.   And how much -- How long after
22  that was it that Jim Brookshire came
23  upstairs?

Page 212

1      A.   Like I said earlier, no more
2  than five minutes.
3      Q.   All right. And was it unusual
4  to see him walking around up there?
5      A.   Yes, sir. It was very unusual
6  to see him walking around up there unless
7  something was bad broke down.
8      Q.   Okay. Do you recall seeing
9  him up there more than that one time on that
10  evening?
11      A.   No, sir.
12      Q.   No?
13      A.   No, sir.
14      Q.   Do you recall when Jim
15  Brookshire walked up there, was there
16  anybody else on the third level?
17      A.   No, sir.
18      Q.   Just you and him?
19      A.   Yes, sir.
20      Q.   Have you talked to anybody
21  else who talked to Jim Brookshire about what
22  he had gone up there for?
23      A.   No, I don't guess I have.

53 (Pages 209 to 212)

Page 213

1    Q.    Okay.  And did you talk to Jim
2  Brookshire?
3    A.    That night, no.  And then
4  later on, huh-uh.
5    Q.    When he walked up there and
6  you saw him, did you say anything to him?
7    A.    No, sir.  Like I said he
8  was -- I was there at an MCC panel, and he
9  was up, I don't know, forty-five, fifty foot
10  away over there on the handrail.
11    Q.    Okay.  Did you wave at him or
12  motion to him at all?
13    A.    No, sir.  I just looked at
14  him.
15    Q.    You looked at him?
16    A.    Yes, sir.  He looked at me and
17  walked down to the presses, looked out over
18  the presses, then walked back, looked at me
19  again, and walked back down.
20    Q.    What was the closest he got to
21  you?
22    A.    Like I say, forty-five, maybe
23  fifty feet.

Page 214

1    Q.    Now, what was the thing you
2  said you were near?
3    A.    Motor control panel, MCC
4  panel.
5    Q.    MCC panel.  Now, is that --
6  What is that?
7    A.    It houses the PLC, computer
8  that runs the SOPS system.
9    Q.    Okay.  That's helpful.  Thank
10  you.  What is the PLC?
11    A.    Programmable logic computer.
12    Q.    Just for the sake of the
13  record, what does SOP mean?
14    A.    SOP is the trolley system,
15  side outer panel system.
16    Q.    Okay.  Again, what was the
17  thing that you were standing near?
18    A.    MCC.
19    Q.    Is the MCC, is it like a
20  computer, it has got computer readouts on
21  it, buttons and stuff?
22    A.    It's not a computer like
23  you're thinking of.  It's got cards and it

Page 215

1  -- Yes, it is a computer, but it doesn't
2  have a screen and the keys -- keyboards are
3  like what you're thinking.  You have to get
4  online with it.
5    Q.    How big is it?
6    A.    It's probably about ten-foot
7  long, two-foot deep, six-foot high.
8    Q.    Okay.  Does it have doors that
9  enclose it or some sort of cover or
10  anything?
11    A.    Yes, sir.
12    Q.    What's it got?
13    A.    It's got doors.
14    Q.    Okay.  How big are the doors?
15    A.    About like that door there
16  (indicating).
17    Q.    Okay.  Just for the sake of
18  the Record, that's not going to translate
19  well on paper.  Are there two doors to the
20  whole thing?
21    A.    No.  There was four -- four
22  doors.
23    Q.    So they would have each been

Page 216

1  about a fourth of that ten-foot length?
2    A.    Yes, sir.
3    Q.    Okay.
4    A.    Plus you had your stabs in
5  between.
6    Q.    What is a stab?
7    A.    Just your door frame.
8    Q.    Okay.  Now, at the time Jim
9  Brookshire came up there, did you have your
10  back to the MCC?
11    A.    Yes, sir, I did.
12    Q.    Okay.  Any reason you had your
13  back to the MCC?
14    A.    So I could watch the trolleys.
15    Q.    Okay.  Were you not up there
16  to watch the MCC?
17    A.    No, sir.
18    Q.    Okay.  Why would you be there
19  near the MCC as opposed to some other area
20  to watch the trolleys?
21    A.    Because if you try to sit out
22  on open mesh, you're going through the
23  floor.

54 (Pages 213 to 216)

FREEDOM COURT REPORTING

Page 217

1        Q.    Was it not open mesh there
2   near the MCC?
3        A.    About a two-foot section, no,
4   sir.
5        Q.    A two-foot section was not
6   open mesh?
7        A.    No, sir.  But you can clearly
8   see up there everywhere.  And that's where
9   me and Shane was standing when Jim and Kevin
10  was standing up there pointing at us talking
11  about us.
12       Q.    Okay.  So from where you were
13  sitting at the time Jim Brookshire came up,
14  is it your testimony that you could see from
15  where you were sitting all the way down
16  through the second floor, and then down to
17  the first floor?
18       A.    Yes, sir.
19       Q.    And the first floor was the
20  main production level?
21       A.    Yes, sir.
22       Q.    Okay.  Had you ever sat up
23  there before?

Page 218

1        A.    Everybody had.
2        Q.    Okay.  And everybody being,
3   everybody in stamping maintenance or
4   everybody period?
5        A.    Everybody in stamping
6   maintenance.  Because if it goes down, you
7   may be up there five minutes, you may be up
8   there five hours.
9        Q.    Okay.  Let me ask you this:
10  When Shane Archer -- You and Shane Archer
11  were up there working together that night?
12       A.    Yes, sir.  Shane came up to
13  help me out.
14       Q.    When you and Shane had got
15  done and he walked downstairs, why did you
16  stay upstairs as opposed to going with
17  Shane?
18       A.    Wait to see if that trolley
19  stopped again or kept going.  They had track
20  switches, you've seen them.  Track switches
21  switch, they had a track that had gone out
22  on a track switch, which if you've seen the
23  system, which I'm sure you have, it may stop

Page 219

1   on this one, go to the next one, but then it
2   may stop again on the next one.  Just
3   because you get it going for two seconds,
4   don't mean it's going to be going -- it's
5   going to take off and run.
6        Q.    Okay.  So you were going to
7   stay up there and make sure it kept running?
8        A.    Yes, sir.
9        Q.    Okay.  What were you planning
10  to do?  I mean, how long would you stay
11  there?
12       A.    As long as nothing happened --
13  Well, that was my area of responsibility.  I
14  could have stayed there all night, and I
15  would have been right in doing so.  I was
16  told to stay in my area of responsibility
17  just like everyone else.  Like I said, Mark
18  Hanks, he had to stay on press one, Darrel
19  Gray, he had to stay on press two, and Weihe
20  and Barefoot.  That was my AO that I was
21  responsible for.
22       Q.    AO meaning what?
23       A.    Area of operation, area of

Page 220

1   responsibility.
2        Q.    Okay.  Did you ever sleep up
3   on the third level?
4        A.    I don't sleep.
5        Q.    Ever?
6        A.    Ever.
7        Q.    On the job?
8        A.    I don't sleep on the job, no.
9        Q.    Okay.
10       A.    I told you if I sleep -- I'm a
11  career soldier.  I've been doing this since
12  I was seventeen.
13       Q.    Doing what?  Stamping
14  maintenance?
15       A.    No.  I've been a soldier since
16  I was seventeen, and I don't sleep.  You've
17  got a young Joe out there, yeah, they may
18  fall asleep every now and then.  First big
19  exercise they have and they wake up with a
20  black ink mark cross their throat and they
21  know that they've been visited, and don't
22  know when or where, you don't sleep no more.
23  That's real life.  When you go to the combat

55 (Pages 217 to 220)

FREEDOM COURT REPORTING

Page 221

1  zone, you know what happens. You don't
2  sleep. You sleep, people die.
3       Q.    Well, in terms of your work at
4  Hyundai, I'm assuming your testimony is
5  you've never slept?
6       A.    No, sir.
7       Q.    Before that night, on that
8  night, or since that night?
9       A.    No, sir. You don't sleep at
10 work.
11      Q.    Okay. What was it --
12      A.    If you sleep at work --
13      Q.    Was it unusual for people
14 working up on that third level to sleep?
15      A.    I never saw nobody up there
16 other than maintenance production go up
17 there and count the panels.
18      Q.    Okay. Did you ever see
19 anybody from maintenance sleep up there?
20      A.    No, sir.
21      Q.    Did you ever see any
22 indication that somebody from maintenance
23 had slept up there?

Page 222

1       A.    Talking about a chair in the
2  back corner? Yes, sir, there was a chair in
3  the back corner.
4       Q.    Was there a chair in the
5  corner?
6       A.    In that back corner over
7  there, yes, sir, there was.
8       Q.    What kind of chair was it?
9       A.    Same kind of chair I was
10 sitting in, a metal chair.
11      Q.    Was that all that was there?
12      A.    I believe so.
13      Q.    Nothing else in that back
14 corner?
15      A.    No.
16      Q.    Do you think somebody was back
17 there sleeping in that chair?
18      A.    I don't know. Wasn't nobody
19 on my shift was.
20      Q.    All right. Did you hear
21 anybody talking about people from other
22 shifts sleeping in that corner?
23      A.    No, sir.

Page 223

1       Q.    And is it your testimony that
2  nobody from your shift ever indicated that
3  they or anybody else on your shift slept in
4  that corner?
5       A.    I never talked to nobody on my
6  shift about sleeping in that corner, no,
7  sir.
8       Q.    Okay. Did you ever talk to
9  anybody on your shift about sleeping
10 anywhere up on the third level?
11      A.    No, sir. Drake Barefoot would
12 take his lunch break and go in the office
13 and sleep. Other than that, no, sir.
14      Q.    In the office?
15      A.    Yes, sir. During his lunch
16 break.
17      Q.    And is it your testimony that
18 while you were there, that there was nothing
19 other than a chair in the back corner?
20      A.    I don't remember seeing
21 nothing other than a chair there.
22      Q.    Okay. Do you -- Do you have
23 any personal knowledge, based on your

Page 224

1  conversations with Wendy Warner at the time
2  you were terminated or anybody at that time
3  or before then or after then, to know what
4  went on at the time the decision to
5  terminate was made?
6       A.    Say again.
7       Q.    Let me see if I can come up
8  with an easier way of asking it.
9             Would it be fair to state you
10 don't know who was involved in the decision
11 to terminate you?
12      A.    I have no idea who was
13 involved.
14      Q.    Okay. And do you know
15 anything else about the decision to
16 terminate you?
17      A.    No. Just that statement I
18 read where Prater said his recommendation
19 was termination. And that he told Hanks
20 that he did the investigation.
21      Q.    All right. And would it be
22 fair to state that you don't know whether
23 Greg Prater sat in on the discussions or

56 (Pages 221 to 224)

Page 225

1   decision to terminate you?
2       A.    I didn't know they had had a
3   meeting on it.
4       Q.    Okay.  Do you have any reason
5   to think that Greg Prater had any other
6   involvement on it?
7       A.    Like I said, I didn't even
8   know they had a meeting.
9       Q.    Okay.  Do you have any
10  evidence to suggest that your past military
11  involvement, either in Korea, Iraq, National
12  Guard, was a motivating factor in the
13  decision to terminate you?
14      A.    That's the way it seemed.
15      Q.    And it seemed that way why?
16      A.    Because every bit of that
17  stemmed from my prior duty commitment.
18  Everything stemmed around my drill weekends.
19      Q.    What stemmed?
20      A.    All the problems, all the
21  harassments.
22      Q.    I'm talking about the actual
23  decision to terminate you.

Page 226

1       A.    Oh, I have no idea.  I don't
2   know.  Like I said, I didn't even know they
3   had a meeting on it.
4       Q.    Okay.  So it would be fair to
5   state that you're not aware, based on your
6   own personal knowledge, of any evidence to
7   suggest that your military service was a
8   motivating factor in the decision to
9   terminate you?
10      A.    Rephrase.
11      Q.    Would it be fair to say that
12  you don't have any personal knowledge that
13  your military history was a motivating
14  factor or part of the reason why they made
15  the decision to terminate you?
16      A.    I -- As far as my personal
17  knowledge, like I said, seems like my
18  military career was the whole reason for my
19  being fired.
20      Q.    Being fired or for being
21  harassed?
22      A.    Both.  It started with the
23  harassment and ended in the termination.

Page 227

1       Q.    How was it that was part of
2   your termination?
3       A.    Like I said before, that's
4   where all my problems stem from.  That's
5   where they all started with the drill
6   weekend.
7       Q.    Okay.  So are you suggesting
8   that the fact that you had problems with
9   your drill weekends leads you to think that
10  that's why you were terminated?
11      A.    Yes, sir.
12      Q.    And do you have any firsthand
13  knowledge that that is in fact the case?
14      A.    Just all the incidents leading
15  up to it.
16      Q.    Okay.  And do you know if
17  those incidents were discussed or considered
18  in the termination process?
19      A.    No, sir, I do not know that.
20      THE WITNESS:  It's break time.
21      MR. JOHNSON:  Okay.  If you
22  need a break, take one.
23      (Recess taken.)

Page 228

1       Q.    Okay, Mr. Dees, we're back on
2   the Record again.  I want to ask you a
3   couple more questions about some of the --
4   this alleged sleeping incident.
5       Jim Brookshire is somebody we
6   talked about.  Did you know Jim Brookshire
7   well?
8       A.    He was -- Yeah.  Working with
9   him every day near about.
10      Q.    Okay.  Did you ever have any
11  problems with him?
12      A.    No.  Not like with everyone
13  else, no.
14      Q.    Okay.  Did he ever demand
15  orders from you, or anything like that?
16      A.    No.  Because he wasn't in my
17  immediate chain of command.
18      Q.    Okay.  Did he ever say
19  anything to you about your military career
20  or your Guard duty or anything like that?
21      A.    No.  The only thing he cared
22  about was whether them presses was running.
23      Q.    Was what?

57 (Pages 225 to 228)

Page 229

1    A.    Whether the presses was
2  running.
3    Q.    Okay.  Do you have any reason
4  to think that Jim Brookshire has any bad
5  feelings or bad will towards you or anybody
6  else in the military for any reason?
7    A.    Towards me?  Yeah.  You got,
8  like I say, him and Prater, they were --
9  they rubbed each other's back.  You got
10  Prater come back down here a week ago,
11  talked to Bill Seivers telling him that
12  Applegate had told him to get rid of me.
13  You got --
14    Q.    Now, wait a minute.  Let's --
15    A.    After I got fired, I called
16  Mr. Moon, he said he would look into it.  He
17  says Prater was wrong in doing what he's
18  doing, but I can't do anything about it.
19          Were they rubbing each other's
20  back?  Yeah.  I mean, everything --
21  Everything started when Prater said I had to
22  have orders.
23    Q.    Okay.

Page 230

1    A.    And that come because -- I
2  don't know why it come about.
3    Q.    Well, I -- I got a pretty good
4  understanding of your relationship with Greg
5  Prater.  But I'm interested now in Jim
6  Brookshire.  I want to make sure I know all
7  about that.
8          Is what you're telling me that
9  the only issue you've got with Brookshire
10  was his closeness with Greg Prater?
11    A.    Well, every time I -- Not
12  every time.  Several times I got called into
13  the office, Jim was there, yes.
14    Q.    When you got called into the
15  office for what?
16    A.    Anything.  Like the daily
17  reports, the pit, the lift.  Anything.
18    Q.    All right.  Would that all be
19  stuff in Brookshire's area?
20    A.    Yeah.  He was over that whole
21  area.
22    Q.    Would there be any reason he
23  shouldn't be there?

Page 231

1    A.    Yeah.  It wasn't a production
2  issue.
3    Q.    All right.  In other words, it
4  was a maintenance issue and Brookshire
5  shouldn't have been there?
6    A.    Yeah.
7    Q.    All right.  During any of
8  those meetings did he ever suggest to you
9  that he came because he didn't like you,
10  didn't like the work you did, didn't like
11  the fact that you were in the service, or
12  anything like that?
13    A.    He's a politician, he's not
14  going to come out and say -- He's going to
15  try to make himself good.
16    Q.    When you say he's a
17  politician, do you mean that literally or
18  figuratively?
19    A.    Figuratively.
20    Q.    Okay.  I'm assuming he's never
21  run for -- Had he run for office or anything
22  like that?
23    A.    Not that I know of.  You

Page 232

1  probably know him better than I do.  I don't
2  know.
3    Q.    Are you just commenting on his
4  personality?
5    A.    Commenting on his personality.
6    Q.    Okay.  Can you think of
7  anything else -- Other than showing up when
8  you got called into the office, can you
9  think of anything else Jim Brookshire did or
10  said that you think suggests any sort of
11  feelings against you?
12    A.    I mean, there had to be, why
13  else would he accuse me of sleeping?
14    Q.    What are they?  Are you
15  guessing or you know of some?
16    A.    I don't know.  You'll have to
17  ask him.
18    Q.    All right.
19          MR. SPORT:  And we're trying
20  to right now.
21    Q.    Okay.  But from your personal
22  standpoint, do you know of anything?
23    A.    Like I said, everything

58 (Pages 229 to 232)

Page 233

1  started with my military problem -- my
2  military commitment. And that's where it
3  stayed throughout my tenure there.
4      Q.    Okay.
5      A.    So you have to ask him.
6      Q.    To your knowledge, has Hyundai
7  ever been nominated for any awards related
8  to their employment of military personnel?
9      A.    According to -- According to
10  them they hate. And --
11     Q.    Do you think it's not true?
12     A.    -- ESGR.
13          Well, it may be, I don't know.
14     Q.    Okay. Are you saying it's not
15  true?
16     A.    The ESGR rep said they had
17  been put in for one. And they said after I
18  got fired, about two weeks after I got
19  fired, I think, somebody said they put in
20  for one. I'm not sure. The ESGR rep, I
21  don't know, you'll have to call him.
22     Q.    Who are you talking about?
23     A.    That Dan, the one that I told

Page 234

1  you I had e-mailed, that ESGR
2  representative. You'll have to ask him.
3      Q.    Okay. All right. We'll have
4  to come back to that question because I lost
5  that e-mail.
6          Is there anybody else that you
7  and I haven't talked about that either knows
8  -- that works at Hyundai, that either knows
9  anything about problems you had with Prater
10  or HR or anybody related to your service,
11  anybody else?
12     A.    I called Mr. Moon the night I
13  got fired.
14     Q.    Yeah. Let's talk about
15  Mr. Moon. Did you talk to Mr. Moon or did
16  your wife talk to Mr. Moon?
17     A.    I talked to Mr. Moon first and
18  then my wife talked to him.
19     Q.    All right. What did you tell
20  Mr. Moon?
21     A.    I told him that I had been
22  fired, and that I was supposedly fired for
23  sleeping in the SOPS, up on the third floor,

Page 235

1  a week prior.
2      Q.    What did he say?
3      A.    He said that he didn't even
4  know that I was even being considered for
5  termination; that he didn't know nothing
6  about it; and that he would look into it.
7      Q.    Okay. Did he say anything
8  else on the night of that call?
9      A.    He apologized for my being
10  fired and hated that happened because I
11  was a good worker.
12     Q.    Okay. Did you say anything
13  else to him that night?
14     A.    I don't remember. By the time
15  I got home, I was pretty perturbed.
16     Q.    I mean, did you call him from
17  home?
18     A.    Yes, sir.
19     Q.    Did your wife talk to him that
20  night?
21     A.    Yes. She explained everything
22  to him in Korean.
23     Q.    Do you speak Korean?

Page 236

1      A.    Some. Between my Korean and
2  his English, we was able to communicate
3  pretty good.
4      Q.    Did you speak to him some in
5  Korean?
6      A.    I may have. Like I said, I
7  was pretty hot.
8      Q.    But, again, am I right that
9  you told me everything that you told him or
10  that he said to you on that telephone call?
11     A.    He said he would look into it
12  and get back with me.
13     Q.    All right. Based on either
14  what you overheard in Korean -- Was the
15  conversation your wife had with him in
16  Korean?
17     A.    Yes, sir.
18     Q.    Okay. From what you could
19  hear and understand in Korean, or from what
20  she told you later, what is your
21  understanding as to what she said?
22     A.    I wasn't paying attention to
23  the conversation she had with him. But

Page 237

1　basically the same thing, that he told her
2　he hated to see me fired because I was a
3　good employee and that he would look into it
4　and that he would get back with me.
5　　　Q.　Did he say anything else to
6　your wife that evening?
7　　　A.　I don't know.
8　　　Q.　Okay.  Do you know if your
9　wife had any later conversations with him?
10　　　A.　The next night he called back.
11　　　Q.　Okay.  And did he speak to you
12　that night?
13　　　A.　A little bit.  He mostly
14　talked to my wife.
15　　　Q.　Okay.  Were you able to
16　overhear the conversation?
17　　　A.　Yes, sir.  I talked to her
18　afterward.
19　　　Q.　All right.  What did they talk
20　about that night?
21　　　A.　He stated that Prater was
22　lying, that Prater had been wrong.
23　　　Q.　That Prater was lying?

Page 238

1　　　A.　Yes, sir.
2　　　Q.　Lying about what?
3　　　A.　My supposedly sleeping at
4　work.
5　　　Q.　Why did he say Prater was
6　wrong?
7　　　A.　And that he was --
8　　　MR. KILBORN:  Don't interrupt
9　him.
10　　　A.　I don't know.  You'll have to
11　ask him.  That Prater was wrong in firing me
12　and that there was nothing he could do about
13　it now, he was told to stay away from it.
14　　　Q.　Did he say who said to stay
15　away?
16　　　A.　No.  You'll have to -- I think
17　he made the comment to Mark Hanks.  I'm not
18　sure.
19　　　Q.　Do you know what Mr. Moon's --
20　what his position is at the plant?
21　　　A.　He was the Korean counterpart
22　to Prater; he was from HMC, he was our
23　Korean boss.

Page 239

1　　　Q.　Okay.  Did he indicate who he
2　had talked to since the last time y'all had
3　a telephone call?
4　　　A.　I think he talked to -- I
5　think he said it was J.H. Kim or president
6　Ahn.  It was J.H. Kim or Ahn, one, I can't
7　remember.
8　　　Q.　All right.  Do you know why
9　Mr. Moon said that Greg Prater had lied?
10　　　A.　You'll have to ask Mr. Moon
11　that.
12　　　Q.　Okay.  Do you --
13　　　A.　Mr. Moon said that Prater was
14　a bad man.
15　　　Q.　Okay.  Did he say specifically
16　what he understood Greg Prater to have lied
17　about?
18　　　A.　Yeah.  Said that Greg Prater
19　lied about my sleeping at work.
20　　　Q.　Okay.  Did you get the
21　impression that Mr. Moon thought that Greg
22　Prater had been there that night?
23　　　A.　No, sir, I did not.

Page 240

1　　　Q.　Okay.  Did Mr. Moon say that
2　Jim Brookshire had lied?
3　　　A.　I didn't ask him about Jim
4　Brookshire.
5　　　Q.　You never talked about Jim
6　Brookshire?
7　　　A.　No, sir.
8　　　Q.　Did you know that Jim
9　Brookshire was the one that indicated he had
10　seen you sleeping?
11　　　A.　Yes, I did.  I knew from the
12　very first meeting.
13　　　Q.　Okay.  You never told Mr. Moon
14　about that?
15　　　A.　No, I did not.
16　　　Q.　You never told Mr. Moon to
17　talk to Mr. Brookshire?
18　　　A.　No.  I'm sure he probably did,
19　though.  You've interviewed my friends,
20　you'd have to ask them what -- they talked
21　to them.
22　　　Q.　When you say you're sure
23　you're sure he did, do you know that or are

60 (Pages 237 to 240)

Page 241

1  you just wanting that to be the case?
2      A.    Say again.
3      Q.    When you say you're sure that
4  Mr. Moon talked to Jim Brookshire, why?  Why
5  do you say that?
6      A.    Because of Mr. Moon's attitude
7  toward Prater and production --
8  stamping/production in general.
9      Q.    Okay.
10     A.    Stamping management.
11     Q.    Okay.  Did he ever say
12 anything about Jim Brookshire?
13     A.    On the phone?  No.
14     Q.    Did he say anything about Jim
15 Brookshire in person?
16     A.    No.  We never talked about
17 Jim.
18     Q.    Okay.
19     A.    Usually all we talked about
20 was production -- I mean work-related
21 problems.  But me and Mr. Moon was good
22 friends.  We talked.  We talked a lot.
23     Q.    Did you and Mr. Moon talk

Page 242

1  about who had made the decision to terminate
2  you?
3      A.    No, I did not.
4      Q.    Okay.  Y'all didn't talk about
5  anybody but Greg Prater?
6      A.    I didn't talk about Greg
7  Prater.  I asked -- He told me he would
8  check into seeing why I got fired.  I don't
9  know who he talked to specifically, no.  He
10 said, like I say, it was either J.H. Kim or
11 Ahn, one, and I told you the statements he
12 made.
13     Q.    Okay.  And he didn't say
14 anything else?
15     A.    I don't know.  He talked to my
16 wife, you'll have to -- I don't know.
17     Q.    Okay.  And is your wife's
18 English perfect English?
19     A.    Pretty much.
20     Q.    If we were to take her
21 deposition, would there be any reason we
22 would need an interpreter?
23     A.    Not unless you don't speak

Page 243

1  English.
2      Q.    That's debatable.  I'm
3  assuming y'all talk in English at the house?
4      A.    Yes, sir.
5      Q.    And she works in an
6  English-speaking environment?
7      A.    Yes, sir.  My daughters don't
8  speak Korean, so she speaks English pretty
9  well.
10     Q.    Okay.  Did Mr. Moon indicate
11 -- or did you and Mr. Moon discuss John
12 Applegate at all?
13     A.    No, sir.  At that point I was
14 still upset.  I mean, I was -- I was fired
15 up.  I had been treated like crap, treated
16 like trash, accused of something I didn't
17 do; gone through the wringer for several,
18 several months.  No, I was just upset.  I
19 was bad upset.  I had never had nothing like
20 that happen to me in my life.
21     Q.    Okay.
22     A.    I've got my evaluations from
23 BE&K and everywhere.  When I left BE&K and

Page 244

1  went to International Paper, I got a
2  fifty-three out of fifty-four rating.  I had
3  outstanding marks on my record.  I've had
4  outstanding marks everywhere I worked.  I've
5  never been accused of sleeping or had a
6  blemish on my record.
7      Q.    Okay.  Let's talk a little bit
8  about in your complaint you've included as
9  count number two an outrage claim.  That
10 starts on, I guess, page seven on your
11 complaint.
12         What's indicated here in count
13 two suggests that Hyundai intentionally
14 created a harassing environment and
15 subjected Dees to a pattern of intentional
16 harassment regarding Dees' membership in the
17 Guard and Dees' Guard service obligations.
18         MR. KILBORN:  Are you
19 referring to a specific paragraph?
20         MR. JOHNSON:  Paragraph
21 twenty-four.
22         MR. KILBORN:  Take a look at
23 twenty-four.

61 (Pages 241 to 244)

FREEDOM COURT REPORTING

Page 245

1     Q.   If you want to look at that
2  paragraph, you can, Mr. Dees.
3          Have you read it?
4     A.   Yes, sir.
5     Q.   Okay.  Other than the things
6  that we have already talked about, which is
7  obviously quite a bit, are there any other
8  facts that you're aware of to suggest that
9  Hyundai intentionally created a harassing
10 environment?
11    A.   Yes, sir.  Like I said, right
12 from the time it started, my Guard service
13 was a -- the center of everything, until my
14 termination.
15    Q.   Okay.  And you've indicated
16 that.  Is there anything else that you're
17 relying on to support your outrage claim
18 factually?
19    A.   Like I said, you've got a team
20 leader still working out there that said
21 Prater came down a week ago and told him
22 that Applegate told him to get rid of me,
23 that he needed to get rid of me.

Page 246

1     Q.   Who said this and when did
2  they say it?
3     A.   Bill Seivers, he's a team
4  leader on one of the shifts out there now.
5     Q.   When did you talk to him?
6     A.   I didn't.  You'll get a chance
7  to talk to him when you go back to the
8  plant, I reckon.  Prater came by his house a
9  week ago and made the comment that he had
10 recordings of Applegate making the comment
11 he needed to get rid of me.
12    Q.   And you didn't talk to Bill
13 Seivers?
14    A.   No, sir.
15    Q.   Do you know who talked to Bill
16 Seivers and told him he needed to get rid of
17 you?
18    A.   Yes, sir.  Mark Bornberg.
19    Q.   So Mark Bornberg talked to
20 Bill Seivers?
21    A.   Yes, sir.  They work together
22 everyday.
23    Q.   And called you and told you

Page 247

1  what you're telling me now?
2     A.   Yes, sir.
3     Q.   And this was -- when Prater
4  came was when?
5     A.   About a week ago, I think.
6     Q.   And Bill Seivers told Mark
7  Bornberg that Prater had recordings?
8     A.   Of Applegate stating --
9  telling him he needed to get rid of me.
10    Q.   All right.  When were they
11 made?
12    A.   I have no idea.  You'll have
13 to ask Applegate and Prater.
14    Q.   Do you have any idea, based on
15 your discussions with Mark Bornberg, why,
16 apparently, Greg Prater came to Bill
17 Seivers' house to talk to him?
18    A.   I have no idea.
19    Q.   Do you have any idea why they
20 would have talked about this situation?
21    A.   You'll have to ask Bill
22 Seivers that, or Prater.
23    Q.   And, again, I just want to

Page 248

1  know what you know.  If you don't know
2  anything, that's fine.
3          Did you work with Bill
4  Seivers?
5     A.   Yes, sir.  He was a team
6  leader on the other shift.
7     Q.   Okay.  Was Bill Seivers
8  somebody you were close to?
9     A.   I mean, yeah, we worked --
10 Like I said, everybody in our section, we
11 lived there, twelve hours a day, sometimes
12 seven days a week.
13    Q.   Okay.  Were he and Prater
14 particularly close?
15    A.   I don't know.  You'll have to
16 ask them about that.
17    Q.   Okay.  Another thing that
18 you've indicated in your outrage claim on
19 page seven of your complaint is that this
20 situation caused you severe emotional
21 distress.
22          What -- I mean, what kind of
23 severe emotional distress have you suffered?

62 (Pages 245 to 248)

Page 249

1      A.    I have never, never had a
2  blemish on any record, as I've stated
3  before, military or civilian.  When you're
4  standing there among your friends, you've
5  got security guards coming in telling you
6  you've got to go, treating you like a
7  criminal, they won't even let you go get
8  your personal property, that HMMA says
9  belongs to them once it gets through that
10  gate, says it's no longer yours, it's
11  theirs, you can't go get it; walking you
12  out, surrounding you like you're a crook.
13      Here I have -- Like I said, I
14  ain't no war hero, but I served my country
15  proudly so they can act like that and that
16  ain't -- I was walked out like a criminal.
17  When I got to that building, that security
18  building, I walked in, everybody is just
19  standing there bowed up and everything.  I'm
20  the focus of attention and it ain't good.
21  I'm walked in a room, I'm sat down, this
22  lady introduces herself, the next gentleman,
23  the next gentleman, and then she reads me a

Page 250

1  letter, slams it down on the table, face
2  down.  When I asked her questions, she's
3  short, very rude, gets up and walks out.
4      And then, the only thing
5  they're worried about is getting your little
6  security lock, your safety lock, and the
7  keys.  And you ask why come I'm being fired?
8  What happened to your firing process?  They
9  act like you're not even there; they don't
10  even want to acknowledge you.  You get
11  walked out, you're dropped off down here
12  (indicating), your truck is three gates up.
13  Security guard volunteered to take me to my
14  truck.  When I get to my truck, I had to
15  call them aside to get them to bring me my
16  tool bag, and then they got on to Shane
17  Archer for bringing me my tool bag that I
18  had purchased with my money, that they said
19  now belonged to them because I brought it in
20  that gate.  I go home, my wife, I call her,
21  she's crying.
22      All of a sudden I've gone from
23  a very, very good job that I wanted to keep,

Page 251

1  that was very hard to get, with better
2  benefits than I had on active duty in the
3  military, to unemployed.  Then I've got to
4  go home and try to comfort her.  All my
5  friends at work, everybody -- there's a lot
6  of people that work there, then they're
7  looking at you like why did you get fired?
8  Yeah, it hurt.  That ain't right.
9      Q.    It sounds to me like you got a
10  significant amount of problems with the way
11  in which the termination was conducted?
12      A.    It ain't just the way.  Why
13  was I terminated?
14      Q.    Okay.
15      A.    Like I said, they ignored
16  their own process.  They got a seven -- six-
17  or seven-step process.  I went from zero to
18  fired.  After several complaints, even a
19  complaint -- a letter sent by my unit, and
20  it's the same complaint the whole time, all
21  of a sudden I'm fired for an accusation that
22  occurred in a matter of five minutes.  No.
23      Q.    Any other facts you can point

Page 252

1  to that have resulted in severe emotional
2  distress?
3      A.    Made it look like my military
4  career wasn't worth a flip.  Made it look
5  like I was just some piece of trash come up
6  looking for a job.
7      Q.    Is that all the facts that
8  you're relying on to support your severe
9  emotional distress claim?
10      A.    Is that all the facts?  No.
11  My wife is still -- Everybody is still like:
12  I can't believe Leon got fired.
13      Q.    Tell me how -- I mean, tell me
14  how else it has impacted you.
15      A.    It impacted me financially big
16  time.  I go from a job where I'm bringing
17  home real good money, insurance, like I
18  said, better than I had in the military, to
19  a job where -- I'm just jobless.  And the
20  only reason I got a job the next day, is
21  because of a fellow I grew up with that I'd
22  known all my life.  Because when I went in
23  to fill out the job application the next

63 (Pages 249 to 252)

FREEDOM COURT REPORTING

Page 253

1   morning, the fellow told me, he asked me,
2   why did you leave Hyundai. I told him, I
3   said, I got fired. He said, I'm going to
4   tell you straight up, if it hadn't been for
5   your friend there recommending you, I would
6   not have hired you.
7        Q.    Who was your friend that
8   recommended you?
9        A.    James Daniel Smitherman.
10       Q.    Smitherman?
11       A.    Yes, sir. They told me
12  straight up they wouldn't have hired me
13  simply because I had been fired. I didn't
14  lie to them, I told them why I was fired,
15  said they accused me of sleeping on the job.
16  And when I got on with International Paper,
17  same thing, if I hadn't been working there
18  for five months and they hadn't seen my work
19  performance, they told me they would not
20  have hired me. Because I told them, same
21  thing, they asked me why I left Hyundai, I
22  told them the circumstances, everything, I
23  didn't holdback. I told them everything.

Page 254

1   And they said, you better be glad we saw
2   your work performance and James recommended
3   you or you would not be getting this job.
4        Q.    Okay. In terms of the severe
5   emotional distress you're claiming in this
6   lawsuit, did you ever talk to your pastor
7   about it, seek any counseling, go to the
8   doctor about it?
9        A.    I'm a soldier, I don't have
10  time to talk to nobody and I had a family to
11  feed, a kid in college, a kid in high
12  school. I had to work because I wasn't
13  making nowhere near what I was bringing home
14  out there.
15       Q.    Did it have any physical
16  impact on you at home? I mean did you cry a
17  lot?
18       A.    I don't cry. Unless my friend
19  is dead, I don't cry.
20       Q.    Did you lose sleep over it?
21       A.    Yeah. When you get fired, I
22  stayed wake all night several nights.
23       Q.    How many nights?

Page 255

1        A.    I don't know.
2        Q.    All night?
3        A.    All night the first few
4   nights, yeah. I've never -- I told you I've
5   never, never had a blemish on my record.
6        Q.    Since those first few nights,
7   have you lost any sleep over it?
8        A.    I don't know. I mean, there's
9   times me and her talk about it, yeah. I've
10  never been treated like that, never.
11       Q.    All right. Are there any
12  other sort of psychological problems that
13  you've had as a result of the emotional
14  distress of this incident?
15       A.    Yeah. Every time I go to fill
16  out an application anywhere it says have you
17  ever been terminated? Yes, I have. And
18  why?
19       Q.    Are you filling out job
20  applications currently?
21       A.    No. But even if you go to a
22  bank and fill out a loan application,
23  they'll ask if you've ever been terminated

Page 256

1   from a job. I'm an honest person, like I
2   said, I'll tell you when I mess up. And
3   I've got to put yes, and they're going to
4   ask my why and I've got to tell them.
5        Q.    Have you received any medical
6   treatment as a result of emotional distress
7   as a result of this incident?
8        A.    I told you, I've got a family
9   with a kid in college, I ain't got time to
10  seek nothing, I've got to make money.
11            I've got a girl that's in a
12  third year in college and junior in high
13  school, I don't have time to go talk to
14  nobody. I got bills to pay, like everybody
15  else.
16       Q.    You mentioned that Shane
17  Archer had gotten your tool bag?
18       A.    Yes, sir. And they got onto
19  him for that. They threatened to fire him.
20       Q.    I want to make sure I
21  understand what was going on there. I
22  assume your tool bag -- Where was your tool
23  bag when he went to get it?

64 (Pages 253 to 256)

FREEDOM COURT REPORTING

Page 257

1    A.   It was in the plant back there
2  in the stamping section. I don't even
3  remember where I left it.
4    Q.   So when they had come to get
5  you before they went and cleaned out your
6  locker and gave you your jacket, had you had
7  your tool bag with you somewhere out in the
8  plant, you just left it there?
9    A.   Yes, sir.
10   Q.   When they came up to you?
11   A.   Yes, sir.
12   Q.   Where did Shane Archer bring
13 it to you?
14   A.   He brought it to the gate up
15 there in front of body weld, up there where
16 I parked.
17   Q.   Okay. And that was after you
18 sat down with Wendy Warner and the others to
19 talk about the termination?
20   A.   They kicked me out of the
21 plant, I couldn't get back in. As a matter
22 of fact, the guard that gave me a ride to my
23 truck, come back around there to the gate

Page 258

1  and wanted to know why I was still there.
2  And Don Gillingham, something like that, the
3  body weld maintenance manager, he was
4  standing outside, about thirty feet down
5  from me. Apparently everybody but me knew I
6  was getting fired because he called security
7  and asked what I was still doing there, when
8  all I'm doing is waiting on my tool bag. I
9  was treated like a thug, and I don't like
10 it. I might as well have been a prisoner of
11 war somewhere.
12   THE WITNESS: Let me take a
13 break and go check on my wife.
14   MR. JOHNSON: Okay. That's
15 fine.
16   (Recess taken.)
17   (Whereupon, Defendant's
18     Exhibit No. 6 was marked
19     for identification.)
20   Q.   Mr. Dees, this is something
21 we've marked as Exhibit 6 to your
22 deposition. Can you take a look at that and
23 tell me whether that -- you've seen this

Page 259

1  document before?
2    MR. SPORT: Matt, while he's
3  looking at that, would you mind -- if the
4  document is Bates numbered, putting the
5  Bates number in the Record?
6    MR. JOHNSON: The only reason
7  I wouldn't, is because some of these are our
8  documents and some are your documents, so
9  the Bates numbers -- if I say it's Bates
10 number 35 --
11   MR. SPORT: Just read the
12 Bates number into the Record.
13   MR. JOHNSON: I know. But if
14 I say Bates number 35, it could be my Bates
15 number 35 or your Bates number 35.
16   MR. SPORT: Well, no, your
17 Bates sequence is Dees V. HMMA and ours is
18 just Dees. So they are different.
19   MR. JOHNSON: Why don't we
20 just use the exhibit numbers. It's a
21 deposition, why don't we just use exhibit
22 numbers.
23   MR. SPORT: Okay. Well, I

Page 260

1  don't know why you would be opposed to
2  putting the Bates number in the Record.
3    MR. KILBORN: Well, I'll put
4  it in there. It's Dees versus HMMA 00035.
5    Q.   Have you read it?
6    A.   Yes, sir.
7    Q.   Several lines down there in
8  bold print it suggests that -- or Greg
9  Prater suggests that during his discussion
10 with you at one point you responded by
11 saying, quote, I just don't give a damn.
12 You guys just do whatever you want. I'm fed
13 up with this -- and I'll spell -- S-H-I-T,
14 period, end quote.
15   Do you recall ever making a
16 statement similar to that?
17   A.   A statement I made to him.
18 Then he referred to -- You've got to look at
19 it if you were a forward observer on lookout
20 guard duty. The statement I made to him is,
21 if I were the lookout on guard duty, I
22 wouldn't be sleeping.
23   Q.   So are you saying you did not

Page 261

1   make the comment he has in bold print there?
2       A.   No, sir, I did not.
3       Q.   Okay. Not at that time, and
4   never at any time?
5       A.   (Witness shakes head in the
6   negative.)
7       Q.   When you say you remember --
8   Are you saying you don't remember making it
9   or you know you didn't make it?
10      A.   No, sir, I didn't -- I didn't
11  cuss him like that.
12      Q.   Okay.
13      A.   And I didn't make --
14      Q.   When you say you didn't cuss
15  him like that, is that because you don't use
16  curse words?
17      A.   Try not to.
18      Q.   Okay. When you say try not
19  to, do you succeed or do you use them?
20      A.   Most of the time I do.
21      Q.   Okay. Is it your testimony
22  that you did not use curse words at Greg
23  Prater?

Page 262

1       A.   No, sir, I did not.
2       Q.   Did you use any at anybody at
3   the plant?
4       A.   No, sir.
5       Q.   Okay. Did you use curse words
6   around your coworkers?
7       A.   No, sir. Most of the time --
8   If I mash my finger or something.
9            No, sir, I try not to, and
10  most of the time I don't. I'm not going to
11  sit here and tell you no, I never do it.
12      Q.   In your conversations with
13  Greg Prater, at any point in time did you
14  ever ask him, what can I do about this
15  situation? How can I keep my job? What can
16  I do to keep my job?
17      A.   I didn't think my job was in
18  jeopardy at that point. Like I said, they
19  have a six- or seven-step firing process. I
20  haven't even entered phase one at this step,
21  at this phase. I have not entered the
22  firing process whatsoever. Any time you --
23  Lucas Cooner told us, any time you enter a

Page 263

1   firing process, they have to tell you.
2       Q.   All right. Now, so in terms
3   of this process, did you ever raise that
4   issue? Did you ever say, hey, somebody,
5   it's not right to terminate me, I haven't
6   gone through the process?
7       A.   That lady.
8       Q.   Wendy Warner?
9       A.   That's her.
10      Q.   Okay.
11      A.   And like I said, it's like I
12  wasn't even talking.
13      Q.   Did she respond to you or say
14  anything about that process?
15      A.   No, sir.
16      Q.   Okay. Now, I mean, in terms
17  of processes and procedures, did you engage
18  in any subsequent processes or procedures
19  after your termination to try to get your
20  job back or try to get the situation
21  changed?
22      A.   I called them about the --
23  what's it called?

Page 264

1       Q.   Team member review?
2       A.   That's it.
3       Q.   Okay. Tell me about that.
4   Who did you call?
5       A.   I never could get ahold of
6   nobody. I had Rob Clevenger's number, I
7   think, and I never saw him. I'd leave him
8   messages and he'd leave me messages.
9       Q.   So y'all traded messages?
10      A.   Yes, sir.
11      Q.   Did Wendy Warner ever call
12  you?
13      A.   No, sir.
14      Q.   Did anybody but Rob Clevenger
15  ever call you about the review process?
16      A.   I don't think so. I don't
17  know.
18      Q.   Okay. Do you remember getting
19  a letter from Wendy Warner indicating when
20  the team member review would be scheduled
21  for?
22      A.   Yeah. I got it on a Saturday
23  evening and that review was supposed to have

66 (Pages 261 to 264)

FREEDOM COURT REPORTING

Page 265

1 been a Monday morning.
2        (Whereupon, Defendant's
3        Exhibit No. 7 was marked
4        for identification.)
5    Q.    Okay.  And let me mark as
6 Exhibit 7, a copy of the letter.
7        MR. JOHNSON:  For Mr. Sport
8 and Mr. Kilborn's benefit, that's Dees V
9 HMMA document 1.
10        MR. KILBORN:  Thank you.
11    Q.    Mr. Dees, what we've marked
12 there as Exhibit 7, do you recall receiving
13 that letter at your home?
14    A.    Yes, sir.
15    Q.    And you say you received that
16 on a Saturday?
17    A.    Yes, sir.
18    Q.    Okay.  And then the review was
19 scheduled for the following Monday?
20    A.    Yes, sir.
21    Q.    Okay.  And it was scheduled
22 for ten o'clock in the morning?
23    A.    Yes, sir.

Page 266

1    Q.    And did you attend?
2    A.    No, sir.
3    Q.    Did you call Wendy Warner to
4 talk about it?
5    A.    No, sir.
6    Q.    Did you call Rob Clevenger to
7 talk about it?
8    A.    No, sir.
9    Q.    Did you call anybody to say I
10 can't be there at ten?
11    A.    No, sir.  I believe I talked
12 to my lawyers about it.
13    Q.    Okay.  And after talking to
14 your lawyers, you didn't show up?
15    A.    No, sir.  The reason I didn't
16 show up, because I had a job that was paying
17 a little bit, even though it wasn't paying
18 what I was making at Hyundai.  And if I had
19 taken off from a job, not only being there a
20 week or two to go to meet to try to get my
21 old job, I wouldn't have had a job when I
22 got back the next day.
23    Q.    Did you tell anybody at

Page 267

1 Hyundai that you got another job and it
2 conflicts with that ten o'clock meeting?
3    A.    I got this letter Saturday
4 evening.  Monday morning you're not going to
5 get ahold of anybody there.
6    Q.    Had you ever left a voicemail
7 with Rob Clevenger saying that you had
8 another job and telling him when it ought to
9 be scheduled?
10    A.    No, sir.  This letter and
11 those two little messages, the only thing I
12 got was that I met the requirements, and
13 that was it.  I didn't know what was going
14 on, I never could get ahold of nobody there.
15    Q.    Did you write them a letter?
16    A.    No, sir, I did not.
17    Q.    Were you keeping notes about
18 what was going on at this point in time?
19    A.    No, sir.  I had to make money.
20    Q.    Okay.
21    A.    Because I had to work a lot of
22 hours because I wasn't making nowhere near
23 what I was making.

Page 268

1    Q.    You said you were keeping
2 notes when you were at Hyundai, you were
3 making money then, weren't you?
4    A.    Yes, I was.
5    Q.    And you were working?
6    A.    Yes, sir.
7    Q.    And you were keeping notes
8 then?
9    A.    I didn't have the problems I
10 was having then.
11    Q.    And this was still going on
12 later?
13    A.    There was no one to talk to,
14 what notes was there to keep?  I had two
15 messages on my answering machine.  What else
16 is there to keep?  I kept the messages.
17    Q.    Do you think they were both
18 from Rob Clevenger?
19    A.    I don't remember.  I know one
20 of them was.  I don't remember if both of
21 them were or not.  I don't know.
22    Q.    So you remember one of them
23 was from Rob Clevenger?

67 (Pages 265 to 268)

FREEDOM COURT REPORTING

Page 269

1    A.    Yes, sir.
2    Q.    And the other may have been
3  from him, may have been from somebody else?
4    A.    May have been.
5    Q.    Do you know when those
6  telephone messages came in?
7    A.    According to this, it says
8  March the 2nd and March the 7th. May or may
9  not have been, I don't know. Like I said,
10  my world may have been turned upside down.
11    Q.    Do you recall receiving the
12  initial phone message on March the 2nd?
13    A.    I don't believe so.
14    Q.    And do you know whether that
15  was from Rob Clevenger or who?
16    A.    I don't remember.
17    Q.    Do you remember returning that
18  call immediately?
19    A.    No, sir. Because it was late
20  in the evening, I had gotten home from work
21  late.
22    Q.    All right. Did you return
23  that call the next day?

Page 270

1    A.    I may have. I don't know.
2    Q.    All right. Do you remember
3  returning that call before March the 5th?
4    A.    I don't know. I don't recall.
5    Q.    All right. Do you remember
6  returning that call before March the 7th?
7    A.    I don't know.
8    Q.    Okay. And, again, was it your
9  understanding when you received this letter
10  marked Exhibit 7, that the -- you were
11  supposed to meet with Rob Clevenger on that
12  Monday morning to talk about the review
13  process?
14    A.    Yes, sir. That wasn't a
15  guarantee that I was going to get a job
16  back. That was just a selected panel to see
17  about getting the job back, to go back into
18  the firing.
19    Q.    Did you know how the panel
20  selection process worked?
21    A.    No, sir.
22    Q.    Do you know whether it would
23  have been a panel of your peers that you

Page 271

1  would have selected from or how it would
2  have been done?
3    A.    I didn't know anything about
4  the process at all.
5    Q.    And you didn't show up to find
6  out?
7    A.    No, sir. Like I said, I had
8  to work. I couldn't take a chance on losing
9  a job that I had gotten through a friend to
10  try and look, maybe possibly one in a
11  million shot getting a job back that I had
12  been fired from.
13    Q.    You never called Rob Clevenger
14  that morning before you went to work to tell
15  him you couldn't make it?
16    A.    No, sir.
17    Q.    And you never called him
18  since, did you?
19    A.    No, sir.
20    Q.    Are you aware of any other
21  process at Hyundai that might possibly allow
22  you to get your job back, other than this
23  team member review process?

Page 272

1    A.    I don't know. I don't know
2  what they have.
3    Q.    Okay. But the one you did
4  know of, you didn't use, did you?
5    A.    At that point, no, sir. Like
6  I said, I had a family to feed. I can't
7  afford to lose one job for a job I had been
8  fired from already. If I'd have left that
9  job to try and get that review back, I might
10  not have got another job.
11        (Whereupon, Defendant's
12        Exhibit No. 8 was marked
13        for identification.)
14    Q.    Let's mark this as Exhibit 8.
15  And this is Dees 3.
16        Mr. Dees, have you had a
17  chance to look at Exhibit 8?
18    A.    Yes, sir.
19    Q.    Okay. Are you familiar with
20  that exhibit?
21    A.    Yes, sir.
22    Q.    Okay. Tell me what it is.
23    A.    It's a yearly training

68 (Pages 269 to 272)

FREEDOM COURT REPORTING

Page 273

1  calendar schedule for my unit.
2      Q.    For a period beginning October
3  2006?
4      A.    Yes, sir.
5      Q.    Is this -- We talked earlier
6  about y'all get a training schedule on an
7  annual basis.  Was this what you were
8  talking about there?
9      A.    Yes, sir.
10     Q.    Okay.  Would this -- Am I
11  correct that this would show all training
12  dates beginning October 21 of '06 through
13  that training year?
14     A.    When this schedule was made,
15  yes, sir.  They were subject to change and
16  subject to be added to and taken from.
17     Q.    Okay.  Do you know if from
18  October 21st going forward, it was in fact
19  changed, added to, or subtracted from?
20     A.    You'd have to call my unit and
21  ask them.
22     Q.    Again, I'm asking you if you
23  know.

Page 274

1      A.    I don't remember.  It may
2  have, may not have been.  I don't know.
3      Q.    Okay.  Do you know -- You'd
4  indicated there was sort of an initial point
5  at which Greg Prater demanded orders.  Do
6  you know if any of the -- if any of these
7  are the dates that he demanded orders for?
8      A.    Probably several of them.
9      Q.    You think more than one
10  possibly?
11     A.    It had to have been October.
12  Like I said, it was several, several months.
13            (Whereupon, Defendant's
14            Exhibit No. 9 was marked
15            for identification.)
16     Q.    Okay.  And let's go ahead,
17  just so you can have both documents, also
18  mark as Exhibit 9, your '05 schedule.
19     A.    This is an '06 schedule.  It
20  says '06 on top.
21            MR. SPORT:  I was wondering
22  where you got the '05, because I don't have
23  it.

Page 275

1            MR. JOHNSON:  It's Dees 4.
2      A.    You got 1 October 05 in the
3  upper right-hand corner, but your month and
4  dates say '06.  This is the company training
5  schedule, this is my detachment training
6  schedule.
7      Q.    Okay.  Let me make sure.
8            MR. SPORT:  So somewhere on
9  this document is an error, we just don't
10  know what it is.  It's either in the dates
11  or it's on the date of the document.  We
12  don't know what it is.
13     A.    This one has company
14  commander's signature (indicating), this one
15  has my detachment commander's signature
16  (indicating).
17     Q.    All right.  Well, let me get
18  these marked and we'll talk through them and
19  figure out what they show.
20            All right.  So if we look at
21  -- What we've marked Exhibit 9, that shows a
22  date of October 1, of '05, but it has drill
23  dates in '06; correct?

Page 276

1      A.    Yes, sir.
2      Q.    Does that -- Does that make
3  sense to you?
4      A.    No.  I mean, I don't know.
5  You'll have to call my unit and ask them.
6      Q.    Okay.
7      A.    That would be Sergeant Barnes.
8      Q.    Look at the fax numbers there
9  at the top.  Do you recognize any of those
10  fax numbers?
11     A.    Yes, sir.
12     Q.    What is the -- Do you
13  recognize the 334-366-5278?
14     A.    Yes, sir.  That's to my wife.
15     Q.    That's to your wife?
16     A.    Yes, sir.
17     Q.    And the date of that fax
18  letter is March 26 of '07; correct?
19     A.    Yes, sir.
20            MR. SPORT:  Matt, if I can
21  interrupt you.
22            MR. JOHNSON:  Sure.
23            MR. SPORT:  It appears those

69 (Pages 273 to 276)

FREEDOM COURT REPORTING

Page 277

1   two pages, page three and four, are pages
2   three and four of a fax that starts with
3   Dees 1 and 2, which you've already marked
4   earlier as Exhibit whatever.
5          MR. JOHNSON: Okay.
6          MR. SPORT: So it appears on
7   March 26th, Sergeant Barnes faxed all four
8   of those pages. And Dees 5 is simply the
9   original of the fax version of Dees 3. I
10  don't know if that clears anything up, but
11  that's the way it appears.
12      Q.   Okay. Well, let's go back on
13  the Record.
14          Just so I can make sure, if we
15  look at Exhibit 6 and Exhibit -- I'm sorry,
16  Exhibit 8 and Exhibit 9, the 334-366-5278
17  fax number is to your wife; correct?
18      A.   Yes, sir.
19      Q.   And the date is March the
20  26th?
21      A.   Same day as the letter.
22      Q.   Same day as the letter, which
23  we previously marked as Exhibit 5. So if

Page 278

1   you'd look -- hold Exhibit 5 up there for
2   just a second.
3       A.   (Witness complies.)
4       Q.   All right. So, Mr. Dees, does
5   it make sense to you that Exhibit 5 goes
6   along with Exhibit 8 and 9, as a single fax?
7       A.   Yes, sir.
8       Q.   Okay. And it was sent from
9   the National Guard unit?
10      A.   Yes, sir.
11      Q.   Were you there on March the
12  26th of '07?
13      A.   No, sir. I don't believe. I
14  believe that was a weekday.
15      Q.   Okay.
16      A.   And if it was, I was at work.
17      Q.   And who is Kevin Smith?
18      A.   Company commander.
19      Q.   And who is Shawn C. Dall?
20      A.   Detachment commander.
21      Q.   Okay. What's the difference
22  between company commander and the detachment
23  commander?

Page 279

1       A.   Company commander is over the
2   detachment commander, we fall under the
3   company.
4       Q.   So would Shawn Dall have been
5   higher up the chain of command than Kevin
6   Smith?
7       A.   No, sir.
8       Q.   I got it backwards?
9       A.   Yes, sir. Company is down in
10  Fairhope, we're up in Brewton.
11      Q.   Why would orders come from two
12  different places? Would they not always
13  come from the same place?
14      A.   That's not orders. That's
15  just the schedule.
16      Q.   Why would the schedule come
17  from two different places?
18      A.   Because we're not in the same
19  building as the company. Our company is
20  down in Fairhope, we're up in Brewton.
21  We're in two separate locations.
22      Q.   Okay. Now, what is the -- and
23  the company is the 1165th Detachment 1?

Page 280

1       A.   We're Detachment 1, 3rd
2   Platoon, 1165th Military Police Company.
3       Q.   Okay. So does the training
4   schedule ordinarily come from the detachment
5   or from the company?
6       A.   That depends on the CO, what
7   he wants, what he tells that lieutenant to
8   do.
9       Q.   Okay. And the CO being who?
10      A.   CO being Lieutenant Smith,
11  which is no longer the CO.
12      Q.   Who is now?
13      A.   Captain Payne.
14      Q.   What's his first name?
15      A.   Captain.
16      Q.   Or her first name?
17      A.   I don't know.
18      Q.   And Captain Payne is in
19  Fairhope?
20      A.   Yes, sir.
21      Q.   Did you keep records of your
22  training schedule?
23      A.   I have one posted on my

70 (Pages 277 to 280)

| Page 281 | Page 283 |
|---|---|
| 1  refrigerator at the house.<br>2      Q.    All right.  Did you keep it<br>3  for '06?<br>4      A.    Do I have it now is what<br>5  you're saying?<br>6      Q.    Yes.<br>7      A.    Whatever this current year's<br>8  training schedule is on my refrigerator,<br>9  yes.<br>10     Q.    All right.  But --<br>11     A.    Did I keep them from the<br>12 previous?<br>13     Q.    Right.<br>14     A.    No.<br>15     Q.    Okay.  Do you have -- Do you<br>16 have a training schedule for the period<br>17 beginning the first part of '07?  Will that<br>18 -- I assume that's Exhibit 8 here?<br>19     A.    Yes, sir.  My company went to<br>20 Fort McClellan for AT this summer, and I<br>21 went this year and I went to Belize for AT.<br>22     Q.    AT being annual training?<br>23     A.    Annual training. | 1      Q.    I want to mark those as<br>2  Exhibit 10.<br>3          (Whereupon, Defendant's<br>4          Exhibit No. 10 was marked<br>5          for identification.)<br>6          MR. SPORT:  Matt, do I<br>7  understand you'd like me to get you a little<br>8  more legible copy than that?<br>9          MR. JOHNSON:  Yes.<br>10         MR. SPORT:  I'll scan it and<br>11 e-mail it to you.<br>12         MR. JOHNSON:  That would be<br>13 great.  I would appreciate that.<br>14     Q.    Mr. Dees, let me let you look<br>15 at Exhibit 10.  Unfortunately we're going to<br>16 have to share a little bit on Exhibit 10,<br>17 because it's the only copy we've got -- or<br>18 it's the only copy I've got.<br>19         MR. JOHNSON:  Do we have<br>20 another copy?  Doesn't matter.  Just so I<br>21 understand, has any portion of this been<br>22 redacted, Jeff?<br>23         MR. SPORT:  Yes. |

| Page 282 | Page 284 |
|---|---|
| 1      Q.    And where did that take place<br>2  -- I mean when did that take place?<br>3      A.    12 May through 26 May.<br>4      Q.    And the training that you were<br>5  just on?<br>6      A.    Yes, sir.<br>7      Q.    Tell me what that was called<br>8  again.<br>9      A.    Basic Noncommissioned Officers<br>10 Course Phase II and III.<br>11     Q.    And was your current employer<br>12 aware you were going on that?<br>13     A.    Yes, sir.<br>14     Q.    And is your current employer<br>15 aware that you are back?<br>16     A.    Yes, sir.<br>17     Q.    Okay.  Is your current<br>18 employer aware that you are here today?<br>19     A.    Yes, sir.<br>20     Q.    We've gotten a copy of some<br>21 cell phone records from your attorneys that<br>22 were faxed to us here today.<br>23     A.    Yes. | 1          MR. JOHNSON:  Do you know<br>2  which portion has been redacted?<br>3          MR. SPORT:  Account number and<br>4  carrier.<br>5          MR. JOHNSON:  I can see where<br>6  account number is redacted, invoice number<br>7  is redacted --<br>8          MR. SPORT:  And the carrier's<br>9  name appears on the page and we redacted<br>10 that.  All the phone call information --<br>11         MR. JOHNSON:  You mean who<br>12 provided the cell phone service?<br>13         MR. SPORT:  Yes.<br>14         MR. JOHNSON:  You mean you're<br>15 not going to tell us who he got his cell<br>16 phone from?<br>17         MR. SPORT:  I don't think<br>18 you're entitled to it.<br>19         MR. JOHNSON:  Well, I'm going<br>20 to ask him about it, and we can argue about<br>21 that later.<br>22         It also suggests here under<br>23 detail for Leon, it says 334, did you redact |

FREEDOM COURT REPORTING

Page 285

1   his cell phone number?
2        MR. SPORT: Yes.
3        MR. JOHNSON: Are you not
4   wanting us to know what cell phone number he
5   used? I mean was it redacted on purpose?
6        MR. SPORT: Yes.
7        MR. JOHNSON: What was the
8   purpose?
9        MR. SPORT: We originally
10  objected to it because of privacy reasons.
11  It does have something -- The calls made
12  around the date in question do have
13  something to do with the case, so we
14  produced that page, we just don't feel
15  you're entitled to the rest of the
16  information.
17       Q.   Okay. I'm going to ask you
18  questions now about Exhibit Number 10.
19  Mr. Dees, am I correct that it's your
20  testimony today and previously that on the
21  night in question, when Jim Brookshire saw
22  you up on the third level, you were using
23  your phone to send a text message to your

Page 287

1        A.   13th, February 13th and 14th.
2        Q.   Okay. And you see a telephone
3   call coming in on the 13th?
4        A.   I don't remember what day --
5   What day are you talking about? What day
6   are you wanting?
7        Q.   Well, what I understand to be
8   the case, and subject to your agreement or
9   disagreement, was that, at least according
10  to the witness statements, Jim Brookshire
11  saw you in the third level at approximately
12  one a.m. on February 14th. So you would
13  have been coming to work on the 13th, I
14  assume.
15       MR. KILBORN: Say that again.
16       MR. JOHNSON: He was seen on
17  February 14th and would have been -- started
18  work on the afternoon or dinnertime on the
19  13th.
20       A.   That's going to be it there,
21  the Birmingham, Alabama. 671, whatever it
22  is, six-something p.m.
23       Q.   Say that again.

Page 286

1   daughter?
2        A.   Yes, sir.
3        Q.   And what was the text message
4   about?
5        A.   To let her know that I was
6   okay.
7        Q.   Would there be any reason you
8   would not be okay?
9        A.   Well, she was worried.
10       Q.   Well, when you say she was
11  worried, how do you know she was worried?
12       A.   Because she called me before I
13  got to work on my way to work, I believe.
14       Q.   Okay. You think she called
15  you on your cell phone?
16       A.   Yes, sir. I believe it's on
17  there.
18       Q.   All right. If you can, show
19  me where that is.
20       A.   I can't for my life make out
21  -- I don't know. I see the 14:45, incoming.
22       Q.   All right. What is the date
23  you're looking at?

Page 288

1        A.   Right here (indicating),
2   whatever this is here. There's two or
3   three. It looks like my wife called or
4   either the youngest daughter called from the
5   house.
6        Q.   Are you looking on the 13th
7   there?
8        A.   These right here (indicating).
9        Q.   The 5:23 p.m., I'm assuming
10  that's what that says.
11       A.   Yeah.
12       Q.   And then six --
13       A.   Let's see. I start -- I think
14  it's these two (indicating), from what I can
15  see. I don't -- Six something, I don't know
16  what that is.
17       Q.   All right. Well, let's just
18  -- we'll break this thing out -- it says --
19  the dotted lines going across, there's seven
20  -- this is in the seventh area between the
21  dotted lines.
22       A.   That's the Birmingham call
23  there.

Page 289

1    Q.    All right.  The Birmingham
2  call from, and is that 205-389-5974?
3    A.    Yes, sir, I believe that's it.
4    Q.    All right.  Whose number is
5  that?
6    A.    That's one of her friends.
7    Q.    That's one of your daughter's
8  friends?
9    A.    Yes.
10    Q.    So you think that was your
11  daughter calling from Birmingham?
12    A.    They was down in the basement.
13  She had left her phone in the room.
14    Q.    Okay.
15    A.    They put them down in the
16  basement because of the weather.
17    Q.    Okay.  And the call right
18  before that, from a 334 number in
19  Maplesville, is that your home number or
20  your wife's number?
21    A.    That's my home number.
22    Q.    Okay.  And then the next
23  number from Maplesville, I'm assuming that's

Page 290

1  also your home number?
2    A.    Yes, sir.
3    Q.    Okay.  Can you read what time
4  that came in to you?
5    A.    I have no idea.
6    Q.    Okay.
7    A.    Something P, twenty-eight P.
8    Q.    All right.  Now, do you carry
9  your personal cell phone with you when you
10  were in the plant?
11    A.    Yes, sir.
12    Q.    All the time?
13    A.    Reason being, those radios --
14  like I said, those radios, sometimes they
15  work, sometimes they didn't.  A lot of times
16  we would -- Prater told us if we had a
17  breakdown over five or ten minutes, to call
18  him at home, no matter what time of the
19  night it was.  And we got called by him on
20  our personal phones that we paid for the
21  calls a lot of times on breakdowns.  I even
22  had to call Mr. Moon several times on
23  breakdowns.

Page 291

1    Q.    Okay.  Let me ask you here.
2  Looks like on February 14th, there's a
3  couple of incoming calls from -- I'm
4  guessing that's 334-419-1445?
5    A.    That's my number.  It says
6  incoming.  I don't know who it was.
7    Q.    That's your home phone number?
8    A.    No, sir.  That's my cell
9  number.  I don't know who was calling.  I
10  don't know.  It just lists it as an incoming
11  call.
12    Q.    Well, on your cell phone
13  records does it list as an incoming call --
14    A.    It's listed there as an
15  incoming call.
16    Q.    I'm just trying to figure out,
17  it looks to me -- I'm just trying to read
18  your records, does it not make more sense
19  that the calls to Maplesville and Birmingham
20  were calls that were made by you to somebody
21  else?
22    A.    No, sir.  Like this here
23  (indicating), it lists my number, that means

Page 292

1  they don't know who the number was that
2  called me.
3    Q.    Oh, okay.  So is it -- is this
4  all incoming calls or does it -- On your
5  phone records, does it separately list calls
6  that you made outgoing?
7    A.    I ain't never been asked
8  before, so . . .
9    Q.    All right.  Does it separately
10  list calls -- text messages that goes out?
11    A.    It just charges you for each
12  text message.
13    Q.    Okay.  Does it indicate when
14  you made those text messages?
15    A.    No, sir.  You just get a
16  charge.
17    Q.    All right.  Do you still have
18  the same telephone number?
19    A.    Yes, sir.
20    Q.    And have you reviewed your
21  telephone to see if you still have the text
22  messages on it from this period of time?
23    A.    A year ago?  No, sir.  I never

73 (Pages 289 to 292)

Page 293

1  did get through that night. The weather was
2  bad. Sometimes it could be sunny outside
3  and for some reason you may not get through,
4  you may get through.
5      Q.    And just to be safe, I want to
6  make sure we're clear. When you said a year
7  ago, I'm talking about back in February of
8  this year?
9      A.    All right. This is November.
10     Q.    Okay. I just want to make
11  sure you were also talking about February of
12  this year.
13     A.    Yes, sir.
14     Q.    Okay. Do you -- Do you have
15  any idea whether your cell phone records
16  show anything about text messages incoming
17  or outgoing as per a specific time?
18     A.    You get a charge, ten cents
19  per message, period.
20     Q.    And what is your complete
21  telephone number, cell phone number? And I
22  promise I won't use it to call you.
23     A.    If you're writing it down, I

Page 294

1  ain't saying it.
2      Q.    I need you to say it.
3      A.    334-419-1445. I thought you
4  weren't going to write it down.
5      Q.    I never said that.
6          Again, I'll make a promise to
7  you, I'm not going to give it to anybody
8  who's going to give it out.
9      MR. KILBORN: That's covered
10  by the protective order we agreed on; right?
11     MR. JOHNSON: That's fine. I
12  agree.
13     Q.    Do you know if you made any
14  outgoing telephone calls on the night in
15  question?
16     A.    You've got the record.
17     Q.    Okay. Again, it's hard for me
18  to, one, read it; and, two, it's hard to
19  tell which is incoming and which is
20  outgoing. I mean, are -- because I think
21  what you told me earlier was that the ones
22  that say, for instance, Birmingham, Alabama,
23  isn't necessarily an outgoing call, it might

Page 295

1  be an incoming call.
2      A.    If I get an incoming call and
3  it comes up unknown number, they can't get
4  the number, they put my number down.
5      Q.    Okay. And what about if it's
6  an incoming call from your daughter, what
7  does it show?
8      A.    That's it right there,
9  Birmingham.
10     Q.    And what if you make a call to
11  your daughter in Birmingham?
12     A.    Well, hold on, let me see if I
13  can find one.
14     Q.    And, again, this is for your
15  attorney's benefit --
16     A.    That may have been a call to
17  her friend's phone, I don't know.
18     MR. JOHNSON: Without the
19  complete records, Mr. Sport, I'm having a
20  difficult time making heads or tails of this
21  thing.
22     MR. SPORT: What else is
23  there?

Page 296

1      MR. KILBORN: Hold on. We
2  gave you what you asked for. Now, we can
3  stop there.
4          We asked to inspect the plant.
5  Somebody on the legal team took the position
6  that we were a couple days late, therefore,
7  we couldn't inspect the plant. Now, I'll
8  give you plenty more discovery which I don't
9  have to give you, as an accommodation, but I
10  expect the same.
11     MR. JOHNSON: I think you have
12  to give us his cell phone records. I was
13  trying to be gracious to you and your client
14  by not demanding them all. And I haven't
15  demanded them all. All I'm doing is saying
16  now that we're at the deposition and I can't
17  make heads nor tails of it in order to
18  examine the witness, then it's appropriate
19  for me to get.
20     MR. KILBORN: This was covered
21  by your request for production, that's why
22  we gave it to you.
23     MR. JOHNSON: I think

74 (Pages 293 to 296)

Page 297

1  technically, it's all covered by the request
2  for production and the protective order.
3          MR. KILBORN:  What period of
4  time?
5          MR. JOHNSON:  For the night in
6  question, and that would include --
7          MR. KILBORN:  That is in
8  response to the request for production.
9          MR. JOHNSON:  I think it's
10  fair for me to get the whole record.  You're
11  giving me one page out of --
12          MR. SPORT:  What are you
13  asking me for?
14          MR. JOHNSON:  What I'm asking
15  you for is all seven pages of that invoice
16  so I can make the interpretation fairly
17  whether or not there is other information
18  that helps me to interpret the single page
19  that you've provided in a redacted version.
20          I'm not fussing at you for
21  redacting it, that's perfectly fine with me.
22  What I'd like to see is the entire invoice.
23  And I also want --

Page 298

1          MR. KILBORN:  What did you ask
2  for?
3          MR. JOHNSON:  I asked for the
4  whole thing and he said he would provide me
5  records --
6          MR. KILBORN:  You did?
7          MR. JOHNSON:  -- from the
8  evening in question.
9          MR. KILBORN:  Will you show me
10  that request?
11          MR. JOHNSON:  Okay.
12          All I can say is that by fax
13  dated August the 9th, your partner,
14  Mr. Sport, said:  Your statement that we
15  agreed to, quote, produce copies of your
16  client's mobile phone records inclusive of
17  the entire shift he worked on the night in
18  question is incorrect.  Rather he says:  We
19  agreed to produce our client's cell phone
20  records for the time period in question
21  only.
22          All right.  The time period in
23  question only would be the night of this

Page 299

1  incident.  It does not necessarily mean that
2  you're not going to give me the entire
3  invoice.
4          MR. KILBORN:  I think it does.
5  I'm just telling you that I don't mind
6  discussing a fair exchange of documents, but
7  I want the same consideration and not some
8  technicality that we were two days late.
9          Let me just say this.  Let me
10  look at the entire bill.  I don't
11  necessarily -- I don't necessarily think
12  there's a problem, but I don't think it's
13  going to help you and here's why.  I used to
14  be with a carrier that provided a bill like
15  this.  My current carrier actually shows to
16  and from, so you know if it's outgoing or
17  incoming.  These don't do that.  But my
18  former carrier that gave me a bill identical
19  to this, this is what it means, and you can
20  make this out, kind of sort of.  And when I
21  give you the cleaner copy, you'll be able to
22  see.  This says number called, that's that
23  column title, this column is entitled

Page 300

1  destination called.
2          When you see destination
3  called and a city, I believe that indicates
4  an outgoing call; and when there's an
5  incoming call, instead of a destination
6  city, it says incoming call.  That's what I
7  believe this means.  Other than contacting
8  the carrier and confirming that, I don't
9  know how the rest of the bill will help you.
10          MR. JOHNSON:  Again, you
11  hadn't provided that to us, so I don't know.
12  It may not, I agree with you.  But I can't
13  feel like I'm doing my job --
14          MR. SPORT:  Is that your
15  question, you want to know what's outgoing
16  and what's incoming?
17          MR. KILBORN:  Let's go off the
18  Record and you and I will talk.  Take a
19  break.
20          (Recess taken.)
21          (Whereupon, Defendant's
22          Exhibit No. 11 was marked
23          for identification.)

75 (Pages 297 to 300)

FREEDOM COURT REPORTING

Page 301

1    Q.    All right.  Mr. Dees, we're
2  going back on the Record now, just so you
3  know.
4        Let me show you what I have
5  marked as Defendant's Exhibit 11.  And I
6  know that you and your attorneys had an
7  opportunity to look at that just before we
8  got started; is that correct?
9    A.    Yes, sir.  We had just seen
10  the box before we got started?
11    Q.    Right.
12    A.    Yes, sir.
13    Q.    And just for the Record, I
14  gave you a box of items; correct?
15    A.    Yes, sir.
16    Q.    And you reviewed the contents
17  of the box?
18    A.    Yes, sir.
19    Q.    And were the contents of the
20  box consistent with what's indicated on
21  Exhibit 11?
22    A.    Yes, sir.  But you got to take
23  into account, like I said, my locker was

Page 302

1  left unlocked for several months, then a
2  lock was placed on it, then a lock was taken
3  off, and then whoever -- one of y'all was
4  videoed taking the contents out of the
5  box --
6    Q.    Okay.
7    A.    I mean, out of the locker.
8    Q.    Okay.
9    A.    I mean, there's no chain of
10  custody there.
11    Q.    Okay.  But I just want to make
12  sure that we're clear on the box of items
13  that was given to you today was consistent
14  with what's listed on that sheet?
15    A.    You can have them back.
16  That's not my stuff on that box.  The tools
17  belong to Hyundai.
18    Q.    Now, let me ask you this.
19  With respect to the list of items there on
20  Exhibit Number 11, do you have any reason to
21  think at the time of your termination there
22  were other items in that locker, other than
23  the jacket that you got back and some notes

Page 303

1  that you mentioned earlier?
2    A.    Yeah.  I mean, I had Army pay
3  stubs in there, with my account number,
4  where my money is being sent, my social, all
5  my information pertaining to my Army -- my
6  account that my Army check goes into, and my
7  military service --
8    Q.    Did they get sent to you --
9    A.    -- notes.  No, they didn't get
10  sent to me.  The only thing I received since
11  I left was when you brought that box today.
12  I haven't received, I haven't heard from
13  them, nothing.
14    Q.    Your Army pay stubs, were
15  those sent to you at Hyundai?  Did you
16  receive your paycheck at Hyundai?
17    A.    No, sir.  I had it in my
18  pocket, and carried it in there, and forgot
19  it, took it out and put it in my locker.
20    Q.    Is it one pay stub?
21    A.    No.  It's several.  But like I
22  said, it had my savings account number, my
23  Social Security number, it had everything on

Page 304

1  there.
2    Q.    Your pay stubs have your
3  Social Security number on it and your
4  account number for your bank?
5    A.    An Army pay stub, yes, sir, it
6  does.
7    Q.    Do you have subsequent Army
8  pay stubs?
9    A.    Yes, sir, somewhere.
10    Q.    All right.  The ones that you
11  do have, are they in the same format and
12  look just like the ones that were in your
13  locker on date of termination?
14    A.    Yes, sir.  It's got my rank,
15  my years of service, unit.
16    Q.    And this is just a pay stub,
17  that's all we're talking about?
18    A.    Yeah.  There was a couple of
19  them.  I mean I don't know.
20    Q.    All right.
21    A.    At the time, yeah, I left a
22  lot of stuff in there.  That was back in
23  February.  And y'all show up with stuff that

76 (Pages 301 to 304)

FREEDOM COURT REPORTING

Page 305

1 don't even belong to me. That stuff there
2 belonged to Hyundai. You can carry it back
3 to them. My personal stuff, they left.
4 　　　Prater went in, left my tool
5 bag, everything out there, everything in my
6 locker, and brought me that jacket with that
7 little MP3 player and my notes was missing
8 and everything is -- and this here, I can't
9 even read hardly.
10 　　Q.　I'm trying to figure out what
11 else you had in your locker, other than
12 what's on that list, the MP3 player, the
13 notes, the pay stubs, and the jacket. Can
14 you think of anything?
15 　　A.　No, sir.
16 　　Q.　Was there anything else of
17 value in that locker?
18 　　A.　I don't know.
19 　　Q.　Okay.
20 　　A.　I don't know.
21 　　Q.　Now, how many Army pay stubs
22 would there have been?
23 　　A.　There was two or three.

Page 306

1 　　Q.　Two or three?
2 　　A.　Yes, sir.
3 　　Q.　Okay. And do you know what
4 months they were for?
5 　　A.　No, sir.
6 　　Q.　Do you remember when you put
7 them in your locker?
8 　　A.　No, sir.
9 　　Q.　Do you remember how long they
10 were in your locker?
11 　　A.　No, sir.
12 　　Q.　Do you remember showing them
13 to anybody or talking to anybody about it?
14 　　A.　No, sir.
15 　　Q.　And when you say pay stubs,
16 are they literally pay stubs where you tear
17 the check off the bottom half?
18 　　A.　No, sir. It's a computer
19 printout.
20 　　Q.　Okay. It just shows what was
21 direct deposited into your account?
22 　　A.　Yes, sir.
23 　　Q.　Okay. So it doesn't actually

Page 307

1 come with an actual check?
2 　　A.　No, sir.
3 　　Q.　And is it on a
4 eight-and-a-half-by-eleven, normal sheet of
5 paper size thing?
6 　　A.　Yes, sir.
7 　　Q.　And I assume, like regular pay
8 stubs, it shows, you know, what your gross
9 is, what they took out, what they withheld
10 for taxes, and that kind of stuff?
11 　　A.　Yes, sir.
12 　　Q.　Okay. Anything else you can
13 think of that was in your locker?
14 　　A.　I don't know. I hadn't
15 thought about it today.
16 　　Q.　All right. Well, have you
17 thought about it before today?
18 　　A.　A while back, after I'd gotten
19 fired, yes, sir, I did.
20 　　Q.　All right. Did you write down
21 what you thought was in your locker at that
22 point in time, take notes on it?
23 　　A.　No, sir, I did not. I was

Page 308

1 flustered, I was mad.
2 　　Q.　Does being mad make you not
3 take notes?
4 　　A.　No, sir. That didn't have
5 nothing to do with me not taking notes.
6 　　Q.　Okay.
7 　　A.　That had everything to do with
8 me being flustered and mad because I had
9 gotten fired for somebody recommending that
10 I be fired, off of a recommendation that he
11 had made. It's right there in your letter
12 that you had, that he recommended it.
13 　　Q.　What are you talking about?
14 　　A.　Prater. He recommended it.
15 　　Q.　I know what you're talking
16 about. But you're referring to Prater?
17 　　A.　Yeah. It said he recommended
18 it: Based on this conversation, I feel that
19 even if he were not sleeping, that he
20 doesn't care enough about his job to defend
21 anyone from thinking he was sleeping. John,
22 my recommendation is termination.
23 　　Q.　What exhibit are you referring

77 (Pages 305 to 308)

Page 309

1  to?
2      A.    Number 6.
3          (Whereupon, Defendant's
4          Exhibit No. 12 was marked
5          for identification.)
6      Q.    Okay. Let me show you what
7  we've marked as Exhibit 12, and that's Dees
8  versus HMMA number 6, deposition Exhibit 12.
9      A.    Where is 9? Or have I got
10 them. I got them backwards. Hold on.
11     Q.    Do you recognize that
12 document, Mr. Dees?
13     A.    I've never seen this document.
14     Q.    You've never seen that
15 document?
16         Is it your testimony you've
17 never seen that?
18     A.    Not until -- I believe I saw
19 it yesterday, but prior to that, no, I'd
20 never seen this document.
21     Q.    You indicated that when you
22 met with Wendy Warner and some others at the
23 time of your termination, Wendy Warner had a

Page 310

1  piece of paper that as you testified,
2  slammed it on the table?
3      A.    Yes, sir.
4      Q.    Did you read that document?
5      A.    No, sir, I didn't read it.
6  She read a document that she had in her hand
7  that she was holding up at an angle that she
8  could see. I was sitting across the table
9  from her. She read the document, she
10 finished it, placed it face down on the
11 table like that (indicating).
12     Q.    Do you remember anything about
13 what she read out loud to you?
14     A.    Just that I had been accused
15 of sleeping and I was being terminated
16 immediately.
17     Q.    All right. Was that on
18 February 26th?
19     A.    That was it.
20     Q.    Do you remember if the letter
21 said anything like this: Dear Leon, it has
22 been brought to my attention on February
23 14th, 2007, you were found by a member of

Page 311

1  HMMA management in the third floor overhead
2  sleeping. HMMA policy states, quote,
3  serious and excessive violations of HMMA's
4  performance standards, end quote, is a
5  serious misconduct violation.
6          I won't read the whole thing,
7  but since you're looking at Exhibit 12, what
8  you're reading there, is that consistent
9  with what she read to you?
10     A.    I don't know. Like I said, I
11 had been floored. The only thing I heard
12 was sleeping and terminated immediately, and
13 I couldn't believe it.
14     Q.    Okay.
15     A.    I mean, that was --
16     Q.    Do you -- Just so I can make
17 sure that the Record is clear, what does
18 cleaning the pit involve?
19     A.    Cleaning the pit involves
20 picking all the scrap up around the
21 conveyors that's fallen while the presses
22 are running. And you have a -- It's very
23 dangerous because you're doing it, you're

Page 312

1  down there, you have no communication, if
2  anything happens to you, you're there until
3  someone decides to come looking for you.
4      Q.    Would you go there without
5  telling somebody you're in it?
6      A.    I wouldn't go there unless
7  told to go there.
8      Q.    Would the -- Are the -- You
9  say the presses are running when you're down
10 there?
11     A.    Yes, sir.
12     Q.    And I want to make sure I
13 understand. I mean, the presses aren't some
14 giant thing that comes down and stamps where
15 you're actually standing when you're
16 cleaning out the pit, is it?
17     A.    No, sir. But the scraps are
18 falling down where you're actually standing.
19 I mean, it's falling onto a metal conveyor,
20 and the reason you're having to go clean the
21 pit is because it bounces out of that
22 conveyor onto the floor. And you do -- you
23 get stuck. You've got little protective

78 (Pages 309 to 312)

Page 313

1  gloves, but it only covers your forearms and
2  your hands, everything else is fair game.
3      Q.    But what we're talking about
4  is picking up or removing, essentially,
5  debris from the stamping equipment that
6  comes off a conveyor belt?
7      A.    No, sir. We're talking about
8  putting yourself in a hazardous situation
9  with scrap falling thirty foot into a chute,
10  bouncing off a metal conveyor, coming down
11  right beside your head, your back, your
12  neck, everything else that's exposed. And
13  the gloves you're wearing is only cut
14  resistant, not cut proof.
15      Q.    Do you have any reason to
16  think that working in the pit is
17  unreasonably dangerous or inappropriate?
18      A.    It's very dangerous. Like I
19  said, you got sharp steel coming down
20  through these chutes, sheet metal, some of
21  it is perfectly square corners, some of it
22  comes out to a razor point. And that's the
23  reason you're cleaning it, because it

Page 314

1  doesn't stay in the conveyor, it bounces out
2  all over the place. And if you get hit by
3  it, you get cut no matter what you're
4  wearing.
5      Q.    To your knowledge, has anybody
6  been injured because of the pit?
7      A.    Several people has been --
8  Well, I believe somebody has. I don't
9  remember who it was.
10      Q.    You don't recall?
11      A.    No.
12      Q.    Okay.
13      A.    The metal is very sharp.
14  They've got numerous instances of people
15  getting cut by that metal.
16      Q.    Is there -- Did you ever get
17  cut by the metal?
18      A.    I got -- Yes, sir. Not bad
19  cuts where I had to have stitches, no.
20      Q.    Did you file any sort of
21  worker's comp claim or report an injury or
22  anything like that?
23      A.    No, sir.

Page 315

1      Q.    Did you ever see -- Do y'all
2  have a nurse or doctor on site at the plant?
3      A.    Yes, sir. But you was
4  discouraged from going there.
5      Q.    Did you ever get hurt and go
6  there?
7      A.    No, sir, I never went there.
8      Q.    Okay.
9      A.    If I got a cut, I covered it
10  up and I drove home.
11      Q.    Did you ever file any
12  complaints to anybody in management about
13  the pit?
14      A.    Yes, sir, I did. Several
15  times.
16      Q.    Who was that?
17      A.    I went to HR and Applegate.
18      Q.    Did you file any written
19  complaints?
20      A.    No, sir. Like I said, they
21  didn't have a format or process for filing
22  written complaints.
23      Q.    Okay. When you talked to

Page 316

1  Applegate, what did he say about the pit?
2      A.    Like I said this morning, he
3  said it all pays the same, what's your
4  problem.
5      Q.    Who did you talk to in HR
6  about the pit?
7      A.    I believe it was Keisha.
8      Q.    Keisha. And what did she say
9  about the pit?
10      A.    She said she would get with
11  Applegate and Prater. The next thing I know
12  I'm going to talk to Applegate.
13      Q.    Okay. Do you have any reason
14  to think you've been discriminated against
15  or harassed for any other protected
16  characteristic like sex, age, race?
17      A.    Everything stems around my
18  military career, everything. Like I say, it
19  all started with harassment about my orders.
20  Everything had to do with my weekend drill,
21  all the way from Prater to HR. Every time
22  I'd go to them, the letter from my unit, the
23  e-mail, everything all the way to the

FREEDOM COURT REPORTING

Page 317

1  recommendation for Prater saying I recommend
2  him for termination, everything stemmed
3  around my Guard duty.
4      Q.   Okay.  And so I'm assuming
5  that since you're saying everything stems
6  from your Guard duty, I'm assuming it would
7  be safe to rule out any other issues, like
8  age, race, sex, religion, anything like
9  that?
10     A.   I reckon.
11     Q.   You would agree?
12     A.   I mean, I don't know what --
13     Q.   Let me ask you this --
14     A.   Like I said, everything come
15 from my Guard duty.  As far as to my
16 knowledge, everything from the beginning
17 from when it started, to the end, to my
18 knowledge, seemed like it come from my Guard
19 duty and my commitment to the Guard.
20     Q.   Let me ask you some pretty
21 simple questions.  Were you terminated
22 because of your age?
23     A.   Well, they say I was

Page 318

1  terminated because I was sleeping.  But,
2  like I say, that all started because of my
3  Guard duty.
4      Q.   Are you saying you were
5  terminated because of your age?
6      A.   I'm not saying anything.  I'm
7  saying I was terminated because of my Guard
8  duty is what I'm saying.
9      Q.   Were you discriminated against
10 because of your age?
11     A.   Like I said before, I believe
12 I was terminated against because of my Guard
13 duty service.
14     Q.   Were you discriminated against
15 because of your age?
16     A.   I have no idea.
17     Q.   Is that a yes or no, were you
18 or weren't you?
19         MR. KILBORN:  Don't raise your
20 voice.  We're not suing over any type of
21 discrimination other than the circumstances
22 that we sued over.
23         MR. JOHNSON:  I agree.  And I

Page 319

1  just want to rule out that there's no other
2  lawsuits coming in the future related to
3  this.
4          MR. KILBORN:  You're not.
5  That's guaranteed.
6          MR. JOHNSON:  Okay.
7      Q.   And when did you first start
8  taking notes about the harassment issues?
9      A.   The very first time it
10 happened.
11     Q.   The very first time?
12     A.   Yes, sir.
13     Q.   Okay.  And did you ever show
14 your notes to any of your coworkers?
15     A.   We went through this this
16 morning.
17     Q.   That's right.  Did you ever
18 show them to anybody in HR?
19     A.   No, sir.
20     Q.   And would it be fair to state
21 that --
22     A.   I never showed them to no one
23 in HR, but I made the complaints from my

Page 320

1  notes to HR.  When I went to HR, I discussed
2  what was on my notes.
3      Q.   Okay.
4      A.   Did I pull them out and show
5  them to them?  No.
6      Q.   Other than with respect to
7  your military service, how was your
8  relationship with Greg Prater?
9      A.   He was my boss, I was the
10 employee.
11     Q.   I mean, was he a good boss?
12     A.   No.
13     Q.   Why not?
14     A.   I mean, well, you talked to my
15 coworkers.
16     Q.   I'm talking to you now.
17     A.   He has no supervisory skills.
18     Q.   Okay.  What makes you say
19 that?
20     A.   His mismanagement of funds,
21 his mismanagement of time.
22     Q.   Mismanagement of funds, how?
23     A.   Not ordering parts, then when

Page 321

1  he ordered parts, he ordered too many of the
2  wrong thing and not having money to order
3  the right parts.
4     Q.    Mismanagement of time, how is
5  that?
6     A.    Scheduling people to come in
7  on the weekend to work and not having the
8  parts there to do the job.
9     Q.    Did you have any problems with
10  Greg Prater because of that? Did you tell
11  him he was a bad manager?
12     A.    No, sir. It wasn't my job.
13     Q.    Did you ever suggest to him
14  that he wasn't a good manager?
15     A.    No, sir. I was being paid to
16  do a job, and I did the job I was paid to
17  do.
18     Q.    Did you ever indicate to him
19  that he didn't do his job well?
20     A.    No, sir.
21     Q.    Okay.
22     A.    Several others did, but not
23  me.

Page 322

1     Q.    Not you? You never did?
2     A.    No, sir.
3     Q.    Okay. Now, before the letter
4  was sent from Sergeant Barnes, back in
5  October --
6     A.    Yes, sir.
7     Q.    -- did you have any problems
8  with Greg Prater?
9     A.    That's the reason the letter
10  was sent.
11     Q.    Okay. And prior to that time
12  in October, can you think -- do you have any
13  idea how many times you had issues with Greg
14  Prater?
15     A.    I don't know.
16     Q.    Was it one instance and then
17  Sergeant Barnes -- you had Sergeant Barnes
18  send that letter?
19     A.    No, sir. If it had been one
20  incident, I wouldn't have sent it. I don't
21  hit the panic button for no reason.
22     Q.    Had you gone to human
23  resources before the letter from Sergeant

Page 323

1  Barnes got sent?
2     A.    Yes, sir. That's why I had
3  Sergeant Barnes send the letter. That's why
4  I made a complaint to my unit, and Sergeant
5  Richberg made the recommendation.
6     Q.    Okay.
7     A.    Like I said earlier, the only
8  thing HR was concerned about was he told us
9  we couldn't talk to them. They could care
10  less whether his harassment about my Guard
11  service or not.
12     Q.    All right. How was Greg
13  Prater viewed by your coworkers?
14     A.    You'll have to ask them that.
15     Q.    Well, did they ever say
16  anything to you about what they thought of
17  him?
18     A.    Yeah.
19     Q.    What did they say?
20     A.    I don't remember specific
21  quotes. He wasn't very popular.
22     Q.    Okay. Did he have specific
23  problems with anybody?

Page 324

1     A.    You'll have to ask them that.
2  I can't testify as to their problems they
3  had with or without him. I don't know.
4     Q.    Do you remember anything any
5  of your coworkers ever said about problems
6  they were having with Prater?
7     A.    No, sir.
8     Q.    Do you recall any of your
9  coworkers ever arguing with Prater in your
10  presence?
11     A.    Well, that very first day we
12  went to HR, everybody was arguing with him.
13     Q.    About what?
14     A.    When he told us we couldn't go
15  to HR. And Chris Weihe jumped on him about
16  making fun of my military career and about
17  harassing me about my military career.
18     Q.    What did Chris say?
19     A.    I don't remember exact words.
20  I don't know.
21     Q.    Were you there when he said
22  them?
23     A.    Oh, yeah, we was there. The

81 (Pages 321 to 324)

FREEDOM COURT REPORTING

Page 325

1  whole shift was there.
2      Q.   Do you remember approximately
3  what Chris said?
4      A.   No.  That was over a year ago.
5      Q.   Okay.  Can you think of
6  anybody other than Chris Weihe that might
7  have said something to Prater about your
8  military service?
9      A.   Some of the fellows on the
10  other shift said they did, I just know.
11      Q.   Do you know if Chris Weihe is
12  still working at the plant?
13      A.   Yes, he is.
14      Q.   He hasn't been terminated for
15  taking up for you or anything like that?
16      A.   No.  Well, I take that back,
17  Drake and -- Who is it?  I think it was
18  Drake and Hanks both said something to him.
19      Q.   To who?
20      A.   Prater.
21      Q.   Do you know what they said?
22      A.   No.
23      Q.   Were you there when they said

Page 326

1  it?
2      A.   Yeah.  But that was -- that
3  was -- that was a pretty good -- pretty big
4  meeting.  And I -- He had jumped on me
5  pretty hard about my Guard duty that day.
6      Q.   How did he jump on you?
7      A.   Telling me that all we did was
8  go down there and party, we didn't train.
9      Q.   Was it --
10      A.   All we was was a bunch of
11  losers wanting to play army.
12      Q.   Was that the worst incident?
13      A.   Was that the worst incident?
14  Probably not.  That was probably the worst
15  group incident.
16      Q.   Okay.  What was the worst
17  incident that the two of you had?
18      A.   I mean, we never -- I never
19  got in a shouting match.
20      Q.   What is the worst thing he
21  ever said to you?
22      A.   Like I said, basically telling
23  me I wasn't -- that my military career was

Page 327

1  basically a ruse, a joke.
2      Q.   How did he say that?
3      A.   Y'all ain't nothing but a
4  bunch of weekend wienie wannabe's, something
5  of that nature.  And all the time -- Like I
6  said, you got a fellow sitting here saying
7  he's been to Baghdad, talking about how many
8  people he's killed and everything, and then
9  all of a sudden you've been over there a
10  couple times, you've done it, and sitting
11  there and telling you you're a joke.  I
12  mean, as far as actual knock-down dragouts,
13  no, I don't -- I can control myself better
14  than that.
15      Q.   What about him?  Did he ever
16  yell at you?
17      A.   He yelled at everybody.
18      Q.   When you say yelled, did he
19  literally raise his voice?
20      A.   Oh, yeah.  When I say he
21  yelled, yes, he yelled.
22      Q.   Did he ever yell at you about
23  your military service?

Page 328

1      A.   Yeah.
2      Q.   What did -- How did he yell at
3  you?  What did he yell at you?
4      A.   You're going to bring me some
5  military orders.  And come in Monday:
6  Where's my orders?  If you don't bring them,
7  you're going to get wrote up.  You're going
8  to get fired for your military service.  You
9  were supposed to be here this weekend.
10          If you haven't talked to him,
11  I'm sure you will, which I'm sure you have.
12      Q.   Anything else that he said?
13      A.   I don't remember.  I mean, it
14  was -- it was an ongoing event for several,
15  several months.
16      Q.   But I need to make sure I know
17  what he did.
18      A.   Okay.  We've covered it.
19      Q.   All right.
20      A.   I'm telling you what he did.
21  Like I said, you talk to my friends, you
22  pretty much know.
23      Q.   Is there anything else that

82 (Pages 325 to 328)

FREEDOM COURT REPORTING

Page 329

1  Greg Prater did or said that you felt was
2  harassing in any way?
3      A.   Yeah.  Like I said -- Like I
4  started out this morning, my military
5  service became an issue, and it never went
6  away.  It stayed an issue, it caused
7  problems.  And I believe, to my utmost
8  ability, that that was the reason I'm fired
9  -- I was fired.  I mean, everything points
10  -- everything falls back on my military
11  commitment, everything, from get-go to
12  finish.
13          I don't care what her letter
14  (indicating) says, even -- Like I said,
15  Prater's recommendation, even if he wasn't
16  sleeping, I recommend he be terminated.
17  Everything falls back to me not providing
18  something that I cannot provide for a drill,
19  for a weekend.
20          MR. KILBORN:  For the Record,
21  you pointed to a Defendant's Exhibit 12.
22          THE WITNESS:  Yes, sir.
23          MR. KILBORN:  All right.  I

Page 330

1  just wanted the Record to be clear what you
2  pointed to.
3      Q.   Mr. Dees, was using the cell
4  phone for text messaging or other personal
5  purposes, a violation of Hyundai policy or
6  other policy?
7      A.   Well, you've got their policy
8  there somewhere, I know.
9      Q.   I'm asking you?
10      A.   Their policy states your cell
11  phone is to be kept in your locker and only
12  used on breaks and lunch breaks.  And as I
13  stated earlier, Prater, Mr. Moon, Applegate
14  even called some of our team members on our
15  personal cell phones during breakdowns
16  wanting to know what was going on.
17      Q.   Okay.
18      A.   Their policy said one thing,
19  they enforced something else.
20      Q.   Okay.
21      A.   And that come from management,
22  all the way down.  And if you didn't have
23  your cell phone, why didn't you call me on

Page 331

1  your cell phone was the question asked.
2      Q.   Okay.
3      A.   So they ignored -- They threw
4  their own policy out the window, as they did
5  with everything else, as they did with their
6  policy on the military leave.  Prater
7  telling me he's going to make me use my
8  vacation time in lieu of my military leave.
9      Q.   They never did that, though?
10      A.   No, sir, he didn't.
11      Q.   Okay.
12      A.   But I didn't know that.
13      Q.   You called -- Why is it you
14  made the decision to call Mr. Moon after you
15  were terminated?  Why Mr. Moon?
16      A.   He was the only person I knew
17  to call.
18      Q.   Why didn't you call Mr. Moon
19  and complain about Greg Prater when he was
20  allegedly harassing you?
21      A.   The Koreans -- Well, everybody
22  complained to Mr. Moon about Prater.
23  Mr. Moon knew how Prater was, that's what he

Page 332

1  said.
2      Q.   Did you?
3      A.   Yeah, I complained to
4  Mr. Moon.
5      Q.   What did you tell Mr. Moon
6  about Prater before you were terminated?
7      A.   The exact comments, I have no
8  idea.
9      Q.   Did you tell him he's
10  harassing me because I go on Guard duty?
11      A.   Yes, I did.  I told Mr. Moon
12  that I was being picked on by Greg Prater,
13  by Applegate, and HR.  And he said, look, I
14  know Prater is a bad man.  Give me time.
15      Q.   This was before you were
16  terminated?
17      A.   Yes.  I wasn't the only one
18  that complained to him.
19      Q.   Okay.
20      A.   But as far as, like I said,
21  about my Guard duty, yes, I did.  I didn't
22  know nobody else to call.  Mr. Moon was the
23  only one I knew.  He was the other

Page 333

1  counterpart, the Korean counterpart, my
2  Korean boss in that shop, and I called him.
3      Q.    What I'm trying to make sure I
4  understand, is in the sense that you called
5  him after you were terminated, did you call
6  him or have your wife call him during the
7  period in which you were allegedly harassed
8  to try to get him to stop Greg Prater?
9      A.    No.  I talked to him a few
10  times at work.  But I didn't know I was
11  being terminated.  How am I supposed to call
12  somebody if I don't know I'm being
13  terminated?
14      Q.    Did you know you were being
15  harassed?
16      A.    Yes.  Why do you think I went
17  to HR.
18      Q.    So you knew that but you
19  didn't go to Mr. Moon with that?
20      A.    I told you earlier that I
21  complained to Mr. Moon about one time and he
22  said give me time.  And Prater was -- He
23  knew Applegate.  But apparently it didn't do

Page 334

1  no good, they told him to leave it alone.
2      Q.    Is that the only discussion
3  you had with Mr. Moon about the harassment?
4      A.    Probably.  Because the Koreans
5  don't like to discuss problems like that.
6  They think if they wait, they will just go
7  away; that's their custom.
8      Q.    Do you have any reason to
9  think that Mr. Moon talked to President Ahn
10  about the situation?
11      A.    Say again.
12      Q.    Do you have any reason to
13  think that Mr. Moon spoke to President Ahn
14  about your situation?
15      A.    Before I was fired?
16      Q.    Before or after.
17      A.    Well, he talked to either J.H.
18  Kim or Mr. Ahn, one, after I was fired.  I
19  have no idea who he talked to before I was
20  fired.
21      Q.    Do you have any reason to
22  think that President Ahn had anything to do
23  with your termination or even knew about

Page 335

1  your termination?
2      A.    I don't know.  Like I said,
3  everything went back to that military
4  record.
5      Q.    But again what did you know.
6  Do you have any reason to think that Mr. Ahn
7  knew about your situation?
8      A.    Like I said, it all went back
9  to my military record.  Apparently it had to
10  have come up somewhere along the line.
11      Q.    Do you have any personal
12  knowledge as to what Mr. Ahn knew about it?
13  That's an easy question to answer.
14      A.    I wasn't in the meeting.  I
15  don't know what they discussed.  All I
16  know --
17      Q.    So the answer is no?
18          MR. KILBORN: Hold on.  Don't
19  interrupt him.
20      A.    All I know is that it went
21  back -- it started with my military career,
22  my military commitment, and it stayed there.
23      Q.    Would it be fair --

Page 336

1      A.    I wasn't in the meeting, I
2  don't know what they discussed.  I just know
3  everything come from my military obligation.
4      Q.    Would it be fair to state that
5  you, today, don't have knowledge of whether
6  President Ahn were involved or not involved?
7  Would that be a fair statement?
8      A.    I'm going with my last
9  comment.
10      Q.    Well, is that not a fair
11  statement or is it a fair statement?
12      A.    Like I said, I wasn't in the
13  meeting.  I have no idea what they said.
14  All I know is everything stemmed from my
15  military career and commitment.
16      Q.    So you don't know what
17  involvement, if any, Mr. Ahn had; is that
18  true?
19      A.    Like I said --
20          MR. KILBORN: Object.  You
21  asked him that four or five times.
22          MR. JOHNSON: He doesn't want
23  to answer the question though.

84 (Pages 333 to 336)

Page 337

1          MR. KILBORN: Hold on. I'm
2  going to get my objection in or we're going
3  to be here until the cows come home. You
4  asked him that four or five times, he's told
5  you what he knows about Mr. Ahn, he's told
6  you that Mr. Moon said that he was going to
7  Mr. Ahn or Mr. Kim. Now get on with your
8  next question.
9          MR. JOHNSON: What he hasn't
10  said is what he knows about whether or not
11  Mr. Ahn was involved.
12          MR. KILBORN: I think he's
13  told you what he knows. If you know
14  anything else, tell him about Mr. Ahn.
15      Q.    Do you know anything else
16  about Mr. Ahn's involvement?
17      A.    I've answered the question the
18  only way I know how to answer it, and that's
19  the answer I'm sticking with.
20      Q.    Okay. So there's nothing else
21  you can tell me about Mr. Ahn's involvement
22  with your situation?
23      A.    Like I said, I've answered to

Page 338

1  the best of my ability, and that's the
2  answer I'm sticking with.
3      Q.    I'm sure that will be
4  satisfactory.
5          Who is the other gentleman,
6  Mr. Kim?
7      A.    J.H. Kim.
8      Q.    What do you know about
9  Mr. Kim's involvement? Tell me what you
10  know.
11      A.    Same thing.
12      Q.    So you don't have anything to
13  tell me?
14      A.    No, sir.
15      Q.    Do you have anything to tell
16  me about Jason Lee's involvement?
17      A.    I have no knowledge of who
18  Jason Lee is.
19      Q.    Okay.
20      A.    All I know is that he called
21  my wife and interviewed her for a job.
22      Q.    Okay. When did that happen?
23      A.    I don't know. I was working

Page 339

1  there.
2      Q.    Okay. You mentioned your
3  military pay stubs earlier. Did you get pay
4  stubs from Hyundai?
5      A.    Yes, sir.
6      Q.    And you do you remember what
7  company name was on the pay stub?
8      A.    No, I do not.
9      Q.    Okay. Do you remember if it
10  was Hyundai Motor Manufacturing Alabama?
11      A.    I don't know. I don't
12  remember. I don't remember what was on the
13  pay stub.
14          I know -- I tell you what I do
15  know, I know that HMC owns everything,
16  because our Korean bosses worked for HMC,
17  and that's what their badges said, and
18  that's what they said, so HMC owned all of
19  us, and they told us that.
20      Q.    Okay. Did you ever deal with
21  anybody from HMA?
22      A.    I don't remember. I may have,
23  I may not have.

Page 340

1      Q.    But you don't recall if you
2  did or didn't?
3      A.    No, sir. I mean, I know it
4  went HMC, HMA, and like I say, HMMA, and we
5  all fell under HMC; HMC owns all of it.
6  That's what we was told by the Koreans.
7      Q.    Do you have any information to
8  suggest that anybody from HMA was involved
9  in your termination?
10      A.    They own our company.
11      Q.    Do you have any other
12  knowledge?
13      A.    They own our company. HMC
14  owns all of us, we're all one big -- they
15  were all one big company.
16      Q.    Do you have any information to
17  suggest that HMA was involved, other than in
18  the ownership, as you state?
19      A.    Like I said, it was all one
20  company.
21      Q.    Is there anything else you can
22  tell me about that?
23      A.    It was all one company.

85 (Pages 337 to 340)

FREEDOM COURT REPORTING

Page 341

1    Q.    Okay. I'm going to take that
2  as a no.
3    A.    It was all one company. It's
4  not a no, it was all one company. You talk
5  to the Koreans out there, and they will tell
6  you this is all one company.
7    Q.    Who? Who says that? What
8  Koreans?
9    A.    Any Korean. You go out there
10 and ask any one of them, and they will tell
11 you that HMC is sole owner and HMC controls
12 everything.
13   Q.    They say HMC controls
14 everything?
15   A.    HMC, HMC, HMA, it goes down
16 the chain. They run their companies like a
17 military organization in a chain of command.
18 And you've got HMC, HMA; HMC would be the
19 commandant, HMA would be your generals, and
20 HMMA would be your peons and your officers.
21   Q.    Did any of them -- Well, do
22 you know any HMA employees?
23   A.    I may have met some of them.

Page 342

1  We had people coming in from HMA all the
2  time, but I don't remember. I don't know.
3  We had people coming in from all. We had
4  people coming in from Kia that HMC owns. We
5  had people from everywhere. As far as
6  personally knowing them, I don't remember.
7  I may have met them, I may not have met
8  them.
9    Q.    Okay.
10        MR. JOHNSON: Can we mark this
11 one?
12        MR. SPORT: Sure.
13        (Whereupon, Defendant's
14        Exhibit No. 13 was marked
15        for identification.)
16   Q.    Mr. Dees, I'm going to mark as
17 Exhibit 13, which is a seven-page document
18 which appears to be your cell phone record.
19 Can you just take a look at it and confirm
20 that that's what it is?
21        (Recess taken.)
22   Q.    Okay. Mr. Dees, we've got
23 marked as Exhibit 13 the seven-page phone

Page 343

1  bill. And we've had some discussions with
2  your attorneys after the Record.
3        MR. JOHNSON: As I understand
4  it, Mr. Sport, correct me if I'm wrong.
5  Mr. Sport is going to provide to our court
6  reporter an additional copy of pages one
7  through seven of Exhibit 13 and we'll mark
8  that -- Can we have that marked as 14?
9        COURT REPORTER: Sure.
10        MR. JOHNSON: And just for the
11 Record, 14 will basically be this exactly
12 presumably less the fax transmittal
13 information.
14        MR. SPORT: Hopefully more
15 legible.
16        MR. JOHNSON: More legible
17        MR. SPORT: That's the goal.
18        (Whereupon, Defendant's
19        Exhibit No. 14 was marked
20        for identification.)
21   Q.    Okay. Now, to the extent that
22 I can, Mr. Dees, I want to look through
23 Exhibit 13, since I haven't had a chance to

Page 344

1  look at it yet, and then possibly ask some
2  questions.
3        I assume Nikki is one of your
4  daughters?
5    A.    Yeah.
6    Q.    And are there only two phones
7  on this plan?
8    A.    Is that the only two plans on
9  that for phone?
10        MR. KILBORN: You have to
11 answer the question. This is your
12 deposition.
13   A.    I can't -- I don't pay the
14 bills, I just work.
15   Q.    Okay. And, Mr. Dees, this
16 question is as much for your attorneys as it
17 is for you. I'm looking at page five of
18 this bill, and it looks like some of the
19 incoming calls don't have a number
20 associated with it.
21        MR. SPORT: They have not been
22 redacted, if that's your question.
23   A.    I didn't say I had a good

86 (Pages 341 to 344)

Page 345

1  provider, I just said I had a provider.
2      MR. JOHNSON: And who -- You
3  know, I know that it's been redacted from
4  this, but I don't see any issues asking who
5  his provider is, is that something y'all are
6  opposed to him answering, subject to the
7  protective order?
8      MR. KILBORN: I'll let him
9  answer who his provider is. But outside of
10 what you've got there, you hadn't asked for
11 it and we're going to object to any further
12 request. But as I further stated, I'll
13 discuss with you sharing documents as we
14 talked about earlier.
15     MR. JOHNSON: Okay. I'm not
16 sure I understand. But I understand you'll
17 let him tell me who his cell phone provider
18 is.
19     MR. KILBORN: Well, no, let me
20 make that clear. We've asked a simple
21 request to look at the plant and photograph
22 it, that's what I'm talking about. In other
23 words, what I'm talking about is, I like

Page 346

1  free discovery, and I'll do that with you,
2  even though you haven't asked about it.
3      MR. JOHNSON: I think we did
4  ask for --
5      MR. KILBORN: But you guys
6  pulling these technicalities, so don't be
7  asking us for accommodations unless you're
8  willing to also give us accommodations.
9      MR. JOHNSON: Well, let me say
10 this, Mr. Kilborn, I believe and if
11 necessary I can go back and dig through the
12 file and find it, I think we asked for all
13 of his cellular telephone records. And we
14 were told we couldn't have them, I didn't
15 complain about that. I thought Mr. Sport
16 and I had reached some agreement on that,
17 which was fine with me. But my
18 understanding was that I would at least know
19 who the provider was. And I don't see why
20 that's a problem.
21     If I need to go back and
22 search for what we did in fact, ask for
23 months and months ago, I can do it.

Page 347

1      MR. KILBORN: I just told you,
2  I'd let him testify who his provider was.
3  But I'm just asking for accommodation, and I
4  want it on the Record, you said you didn't
5  know what I was talking about and I wanted
6  to make clear what I was talking about.
7      Q.   Mr. Dees, who is your cell
8  phone provider?
9      A.   Unicel.
10     Q.   And was Unicel your provider
11 back in 2007?
12     A.   Yes, sir.
13     Q.   And how do you spell Unicel?
14     A.   U-N-I-C-E-L.
15     Q.   Just one L?
16     A.   Yes.
17     Q.   And, Mr. Dees, are you
18 familiar with anywhere in this invoice where
19 it talks about you having text messaging
20 capacity or how much you were charged for
21 text messages?
22     A.   Like I said, I just work. I
23 don't pay the bills.

Page 348

1      Q.   Okay.
2      A.   I don't --
3      Q.   So, you never look at the cell
4  phone bills?
5      A.   No.
6      Q.   Okay. Have you ever looked at
7  this one before today?
8      A.   I may have. I don't know.
9      Q.   You don't recall?
10     A.   No.
11     Q.   Mr. Dees, did you have a
12 chance to look at the report that Mr. Hall,
13 who is here with us today, prepared?
14     A.   Yes, sir.
15     Q.   Okay. And when did you review
16 it?
17     A.   I reviewed it yesterday with
18 Mr. Hall, like I said this morning.
19     Q.   Okay. And in reviewing it
20 with Mr. Hall, did y'all do a page-by-page
21 analysis of it, or what did you do?
22     A.   Somewhat. Not really. I'm
23 not an accountant or a lawyer, I don't know.

87 (Pages 345 to 348)

FREEDOM COURT REPORTING

Page 349

1    Q.   Okay. And was there anything
2  in Mr. Hall's report that you didn't agree
3  with?
4           MR. KILBORN: Asked and
5  answered.
6           MR. JOHNSON: Did I cover
7  that?
8    Q.   I know you indicated that you
9  filed a complaint with the ESGR. Did you
10  file a complaint with any other governmental
11  agencies?
12    A.   No, sir.
13    Q.   Did you ever go to the EEOC to
14  try to file a claim there?
15    A.   No.
16    Q.   Did you talk to any other
17  governmental entities about possibly filing
18  a claim?
19    A.   Not after I talked to ESGR, I
20  felt it was a waste of time.
21    Q.   Did you ever call the
22  Department of Labor?
23    A.   No. I told you, I had to go

Page 350

1  back to work. I didn't have time for --
2    Q.   Okay.
3           MR. JOHNSON: We'll take a
4  short break, talk with Mr. Smith, and we may
5  be done.
6    A.   All right. A while ago, when
7  you asked me did I call that Monday morning,
8  I'd forgotten but yes, I called. I kept
9  getting an answering machine, I got
10  frustrated, call my wife, asked her to call.
11  She wouldn't call because she didn't know
12  what to say. And I don't know whether I
13  ever left a message that I was trying to
14  call and reschedule.
15    Q.   All right. What Monday
16  morning are you talking about?
17    A.   That Monday morning, that peer
18  review process.
19    Q.   All right. Let me ask you
20  this. Did you talk to somebody on a break
21  about your prior answer?
22    A.   No, I --
23           MR. KILBORN: Hold on. You

Page 351

1  can't ask who he talked to on a break.
2           MR. JOHNSON: Why not? He's
3  not supposed to talk to people on a break
4  about the substance of his testimony.
5           MR. KILBORN: He can talk to
6  his lawyers all he wants.
7           MR. JOHNSON: About the
8  substance of his testimony?
9           MR. KILBORN: He can talk to
10  his lawyer about anything he wants.
11           MR. JOHNSON: In Alabama state
12  court maybe. Do you think that will fly in
13  Federal Court?
14           MR. KILBORN: I certainly do.
15    A.   Look, I'm the type person,
16  when I read something over and over again,
17  the more I think about it, the more it jars
18  my memory.
19    Q.   Are you telling me you didn't
20  talk to anybody else about the substance of
21  your testimony on that point?
22    A.   You asked a question earlier,
23  I gave you an answer.

Page 352

1    Q.   I know. Now you've got a
2  different answer.
3    A.   Yes. And I told you that I
4  did call them that morning. And I kept
5  getting the answering machine, I told you
6  what happened, I got frustrated. Called my
7  wife, I asked her to try and call. And she
8  wouldn't call because she didn't know what
9  to say. So I tried to call back. I don't
10  remember whether I left a message or not,
11  but I know I was trying to call and
12  reschedule.
13    Q.   Let me ask you this, did you
14  talk to your wife about that on the break?
15    A.   You asked -- I told you what
16  I'd done. I mean, you asked a question
17  earlier, I answered it, and I had answered
18  the question wrong.
19    Q.   Okay.
20    A.   What the question was, did I
21  attempt to call anyone that day to
22  reschedule, did I attempt to go, did I
23  attempt to talk to anyone, did I attempt to

88 (Pages 349 to 352)

FREEDOM COURT REPORTING

Page 353

1  write anyone, and I had said no. And I
2  forgot, I did try to call that morning. And
3  I had -- I kept getting an answering
4  machine.
5      Q.    All right. And you agree
6  that's not what you testified to earlier
7  today?
8      A.    That's not what I testified to
9  earlier today, no.
10     Q.    All right. Did any particular
11 thing spur you to change your testimony in
12 that regard?
13     A.    Well --
14     Q.    Did you talk to your wife
15 about what you said earlier?
16     A.    I told you, I forgot and I
17 answered the question wrong.
18     Q.    Okay. Did you talk to your
19 wife about your testimony?
20     A.    That told you, that was my
21 answer. I gave you my answer.
22     Q.    I'm asking you a specific
23 question.

Page 355

1  what spurred you --
2      A.    But I gave you the answer,
3  like I said.
4      Q.    Did you talk to your wife
5  about your testimony here today?
6      A.    No, sir. I'm telling you that
7  that was my answer, period, plain and
8  simple.
9      Q.    And you did not talk to your
10 wife about it? That's your sworn testimony?
11     A.    She's got wrote down what I
12 said.
13     Q.    I'm asking a simple question,
14 yes or no.
15     A.    I gave you an answer to your
16 question.
17     Q.    Did you talk to your wife?
18     A.    I gave you an answer to your
19 question, sir.
20     Q.    That didn't sound like an
21 answer to me and I --
22     A.    You asked me earlier today had
23 I tried to get in contact with anybody, and

Page 354

1      A.    And I answered your question.
2  I said I forgot what I had done.
3      Q.    And are you also --
4      A.    And I answered the question.
5  I stated that I had called. I have
6  forgotten that I had called.
7      Q.    I heard you.
8      A.    I also stated that I got an
9  answering machine several times. I also
10 stated that I got frustrated; that I called
11 my wife; that I had asked my wife to call;
12 my wife would not call. Therefore, I don't
13 know if I left a message or not. I was
14 upset, and I was working to make money.
15 That's my answer.
16     Q.    And I understand that's your
17 answer now --
18     A.    Yes, sir.
19     Q.    -- but that wasn't your answer
20 earlier --
21     A.    No, sir, that was not my
22 answer earlier.
23     Q.    -- I'm trying to figure out

Page 356

1  I answered no.
2      Q.    You did answer no.
3      A.    You acknowledge I answered no.
4  That was my answer.
5      Q.    Your testimony earlier today
6  is different than your testimony right now;
7  correct?
8      A.    You don't make mistakes?
9      Q.    I make mistakes.
10     A.    So do I, I'm human. I don't
11 know nobody that don't make mistakes.
12     Q.    Let me ask some questions
13 here. And I'd like some answers from you.
14 I mean, we've got several hours we can be
15 here or we can go home.
16     A.    I can stay awake.
17     Q.    That's what you say.
18     A.    That's what I know.
19     Q.    Now let me ask the question:
20 Your testimony was different this morning
21 than it is now. And if it just suddenly
22 struck you for no apparent reason, that's
23 fine.

89 (Pages 353 to 356)

FREEDOM COURT REPORTING

Page 357

1    A.    You've never had that happen?
2    Q.    I have had it happen. Is that
3 what happened to you?
4    A.    What's so strange about it?
5    Q.    Is that what happened to you?
6    A.    What's so strange about it?
7    Q.    Is that what happened to you?
8    A.    I told you.
9    Q.    No.
10    A.    I answered the question wrong
11 earlier today, and that's my answer.
12    Q.    I know you said you changed
13 your testimony, that's obvious from what
14 you're saying.
15    A.    Yes, I did.
16    Q.    That's obvious from what
17 you're saying.
18    A.    Yes.
19    Q.    What I'm asking you is, what
20 made it change? Were you just suddenly
21 struck by a different thought or did you
22 talk to somebody that made you change your
23 testimony?

Page 358

1    A.    I answered the question.
2    Q.    You did not answer that
3 question.
4    A.    That's my testimony I'm
5 sticking with, period.
6    Q.    I'm going to get an answer.
7    A.    We've got a couple more hours.
8    Q.    And we can go now or we can go
9 then. But I want an answer to the question.
10    A.    Okay. Ask your question.
11    Q.    Did you talk to your wife or
12 anybody else and that made you change your
13 testimony?
14    A.    I told you -- Well, she's got
15 what I told you, that's what I'm sticking
16 with.
17    Q.    Did you talk to your wife
18 about substance of your testimony during
19 this deposition?
20    A.    She's through typing now.
21        MR. KILBORN: Let's take a
22 break.
23        (Recess taken.)

Page 359

1        MR. JOHNSON: Back on the
2 Record.
3    Q.    Mr. Dees, before we took a
4 break, I had started asking you some
5 questions --
6    A.    Yes, sir.
7    Q.    -- because you testified to
8 one thing earlier today, and moments ago,
9 just before the break, you testified
10 something different.
11    A.    Yes, I did.
12    Q.    And, again, that's okay with
13 me. I just want to know why. And if your
14 testimony is that you just remembered, then
15 I'd like to know that. But if the truth is
16 that you talked to your wife, and she jogged
17 your memory, and you now know more, I want
18 to know that.
19    A.    She told me that I -- She told
20 me that I had called them. I forgot about
21 it. Because she told me I called her saying
22 I was frustrated. When she said that, I
23 remembered, yeah, I called them several

Page 360

1 times.
2    Q.    Okay. So now you remember
3 calling them?
4    A.    Yes, sir, I did. And I got
5 mad because I kept getting that stinking
6 answering machine.
7    Q.    Okay. See, that wasn't too
8 hard, was it?
9    A.    Well, this is all new to me.
10 I'm a soldier. I go fight where I'm told to
11 fight and jump on who I'm told to.
12    Q.    This is where we fight.
13    A.    That's what y'all get paid
14 for. This ain't my environment.
15    Q.    All right. There wasn't any
16 magic to that, I just wanted to know the
17 answer to the question. Okay?
18    A.    Well . . .
19    Q.    Have you ever appeared in
20 court before?
21    A.    Just when I filed bankruptcy.
22    Q.    Okay. Did you give a
23 deposition?

90 (Pages 357 to 360)

FREEDOM COURT REPORTING

Page 361

1    A.    No, sir.
2    Q.    Have you ever given a
3  deposition like this today?
4    A.    Nope.
5        MR. SPORT: You have now.
6        THE WITNESS: Yeah. I don't
7  like these at all.
8    Q.    When you filed bankruptcy, did
9  you actually have to go to bankruptcy court?
10    A.    Yes, I did. It was quite
11  embarrassing.
12    Q.    Now, Mr. Dees, before we get
13  -- I basically get one shot at asking you
14  questions.
15    A.    All right.
16    Q.    And I don't want to leave here
17  thinking I didn't ask you something or I
18  didn't get a fair answer from you.
19        Are there any other questions
20  that I've asked you today that you've
21  already answered that you feel like you need
22  to change or add to or take from?
23    A.    I'm still uncertain as to what

Page 362

1  you was wanting when you were asking about
2  my knowledge of a meeting and whatever. You
3  kept asking the question, and I still don't
4  -- I'm still unsure of what you was hinting
5  at.
6    Q.    Okay. What --
7    A.    Like I said, all I know is
8  everything stemmed from my military
9  service --
10    Q.    And that's all you know?
11    A.    -- and my military commitment.
12  I don't care what was said in the meeting, I
13  wasn't in the meeting. All I know is
14  everything when my military commitment
15  became a problem, it escalated to a point
16  and it got me terminated because of my
17  military commitment.
18        I didn't even know they had
19  had a meeting. But I know -- do know that
20  my military career was the reason for my
21  being terminated.
22    Q.    All right. And you know that
23  just because that's the only problems you

Page 363

1  had with Mr. Prater or how do you know that?
2    A.    That stemmed -- That caused
3  all of my problems from when we started to
4  finish.
5        MR. JOHNSON: As I said
6  earlier, I'm going to take a quick break and
7  talk with Mr. Smith. And assuming he hasn't
8  thought of anything else, we'll probably be
9  done. So give me just a few minutes, and
10  we'll be right back.
11        (Recess taken.)
12    Q.    Mr. Dees, I know that your
13  attorneys had early on in the case provided
14  something called Plaintiff's Initial
15  Disclosures. It included a list of
16  witnesses and people that know something
17  about the case.
18        And I want to ask -- I want to
19  read off some of the names and ask you to
20  let me know if there is anybody else that
21  you're familiar with that might have
22  information that's not included here.
23        MR. SPORT: Matt, before he

Page 364

1  starts on that, do you also have the
2  supplement?
3        MR. JOHNSON: Yeah. I think
4  so.
5        MR. SPORT: We added some
6  names.
7        MR. JOHNSON: Okay. Well, let
8  me make sure. Did you add names on the
9  supplement? I know you provided those tax
10  documents.
11        MR. SPORT: Yeah. I think we
12  added a couple of names, four, five, six,
13  seven, something like that.
14        MR. JOHNSON: You don't happen
15  to have them, do you?
16        MR. SPORT: I don't. But go
17  ahead and ask him, and the documents will
18  say what they say.
19        MR. JOHNSON: Yeah. Sure.
20    Q.    All right. Well, anyways,
21  Mr. Dees, I realize that there might be
22  additional names on a supplemental
23  disclosure, and if they're there, I'll look

91 (Pages 361 to 364)

FREEDOM COURT REPORTING

Page 365

1  at it and see what they are.
2       But for purposes of the
3  deposition, let me just refer to the Initial
4  Disclosures that were provided. And they've
5  indicated a number of names that have come
6  up plenty of times: Your name, your wife's
7  name, Greg Prater's name, Kevin Hughes, John
8  Applegate. They list here Keisha Morris, is
9  that the Keisha you're referring to?
10      A.    Yes, sir.
11      Q.    Okay. Mr. Moon is included,
12  Wendy Warner is included. It's identified
13  Drake Barefoot, he was a coworker of yours;
14  is that right?
15      A.    That's right.
16      Q.    Okay. And we've talked about
17  him some. Mark Bornberg, was he also your
18  coworker?
19      A.    Yes.
20      Q.    And we've talked about him
21  some?
22      A.    Yes.
23      Q.    Okay. And Chris -- W-E-I-H-E?

Page 366

1       A.    Weihe.
2       Q.    And we talked about him some.
3  I think we also talked about Shane Archer
4  who worked with you as well?
5       A.    Uh-huh.
6       Q.    Is that a yes?
7       A.    Yes.
8       Q.    And I think you mentioned Mark
9  Hanks' name, but I didn't get a good feel
10  for what you understood Mark Hanks to know.
11  Tell me what -- I know we talked about the
12  big meeting where you and a number of your
13  coworkers were there, you talked with
14  Prater, and that was sort of a big deal
15  meeting that we talked about. Was Mark
16  Hanks there?
17      A.    Yes.
18      Q.    And was Shane Archer there?
19      A.    Yes. Well, wait a minute.
20  The first meeting? I don't know if Shane
21  was there or not.
22      Q.    Did he start later than some
23  of the other guys?

Page 367

1       A.    Yeah.
2       Q.    Okay.
3       A.    No. He came to work -- I
4  don't know when he started with the company.
5  Plus he started out on that weekend shift
6  and then he moved to our shift.
7       Q.    Okay. What about Chris Weihe,
8  was he --
9       A.    Chris was one of the very
10  first ones hired on.
11      Q.    Was he at that meeting?
12      A.    Yes.
13      Q.    And was Mark Bornberg at that
14  meeting?
15      A.    I don't know if Bornberg was
16  or not.
17      Q.    Okay. And was Drake Barefoot
18  at the meeting?
19      A.    Yes.
20      Q.    Okay. And also included here
21  is a guy we haven't talked about, John
22  Wingo?
23      A.    Yes. Wingo was there too.

Page 368

1       Q.    Who is John Wingo?
2       A.    He worked at International
3  Paper with me, came down to Hyundai with me.
4  And I'd known him several years, and he left
5  and went to Honda.
6       Q.    Okay. When did he do that?
7       A.    I don't know.
8       Q.    I mean, did he leave before
9  your termination, or since then?
10      A.    Before I was fired, yes.
11      Q.    Okay. And what did John Wingo
12  know?
13      A.    He was there for most of the
14  harassment, most of the time I was being
15  pushed and harassed.
16      Q.    All right. Did you ever have
17  any conversations with John Wingo about it?
18      A.    Yes, sir. Me and John were
19  tight. He was a former Marine. Me and him
20  had a good military bond.
21      Q.    You use the word pushed and
22  harassed, were you actually physically
23  pushed or were you just talking mentally

92 (Pages 365 to 368)

FREEDOM COURT REPORTING

Page 369

1  pushed?
2      A.    I was actually physically
3  grabbed, yes.
4      Q.    When?
5      A.    By Prater.
6      Q.    When?
7      A.    Before a shift one time.  He
8  come in and somebody stated, I got a
9  headache, and he said:  Yeah, so do I, and
10  pointed at me.  And, I don't know, several
11  minutes later came up and tried to bear hug
12  me from behind.  And I don't even remember
13  what the comment was that he made.
14      Q.    You don't remember?
15      A.    No, sir.
16      Q.    I mean, was he just goofing
17  around, or what was the point of the bear
18  hug?
19      A.    He -- It was -- Dadgumit.  No,
20  I mean, it wasn't goofing.  I didn't --
21  There was nothing goofing around.  I didn't
22  goof around with him, with management.  I
23  don't -- I don't remember.

Page 370

1      Q.    I mean, did you think he was
2  trying to physically attack you?
3      A.    No.  Because then that would
4  -- I mean, I don't know what he was trying
5  to do.  He come up and grabbed me from
6  behind.  And I don't remember what the
7  comment was that was made, but it was there
8  in the shift office.  Bill Seivers' shift
9  saw it, my shift saw it.  I busted loose,
10  grabbed my tools, and walked out.
11      Q.    Okay.
12      A.    I don't remember what it was
13  for.  I don't remember what he said.  I was
14  -- I don't know.
15      Q.    Did y'all have any other
16  discussion about it?
17      A.    No.  I mean, some of the other
18  fellows voiced their opinions.
19      Q.    What did they say?
20      A.    Just like every other thing --
21  I don't know, I wasn't in there.  I left.
22  They voiced their opinion, like I said, it
23  was like everything else, it was washed

Page 371

1  under the bridge because he was management.
2      Q.    Okay.
3      A.    He cussed two of our
4  specialists out, they went to labor
5  relations, went to HR, same thing, washed
6  under the bridge because he was management.
7      Q.    All right.  With respect to
8  these guys that are your coworkers, Drake
9  Barefoot, Mark Bornberg, Chris Weihe, Shane
10  Archer, Mark Hanks, or John Wingo, can you
11  think of any other discussions you had with
12  them about Prater or your problems because
13  of your military service that we haven't
14  talked about already?
15      A.    There probably is, but right
16  offhand, no, I don't remember.  Plus there
17  was Sergeant First Class Richberg and
18  Sergeant Martin in my unit.
19      Q.    Wait.  Say that again.
20      A.    You have Sergeant First Class
21  Richberg and Sergeant Martin you need to add
22  to your list.
23      Q.    Who is Richberg?  I think you

Page 372

1  mentioned his name earlier.
2      A.    He was my superior.  He
3  retired.
4          MR. SPORT:  I'll represent to
5  you, I think those are two of the names we
6  added in our supplement.
7          MR. JOHNSON:  I think you're
8  right.  Now I remember it.
9      Q.    Martin is somebody we talked
10  about earlier?
11      A.    Martin, he took Sergeant First
12  Class Richberg's place in our unit.  I've
13  known him for about ten years.
14      Q.    Barring anybody that may be in
15  a supplemental disclosure that your
16  attorneys have provided to us, and I'm sorry
17  I can't hand them to you to look at, can you
18  think of any other people that would have
19  knowledge about your case or the allegations
20  that you've made?
21      A.    You need to talk to some of
22  the production people there, if you haven't
23  already.  I mean, they -- I don't know.

93 (Pages 369 to 372)

FREEDOM COURT REPORTING

Page 373

1    Q.    Is there anybody that knows
2  anything about it that we should talk to?
3    A.    Right offhand --
4        MR. SPORT: I don't think we
5  had listed one of the names he had mentioned
6  today. The guy's name ends in a Y, works in
7  production.
8        MR. JOHNSON: Stapley.
9        MR. SPORT: Stapley. I don't
10  think we've listed him, but we probably need
11  to supplement him.
12    Q.    Mr. Dees, sort of my last
13  question here, I know -- your attorneys have
14  provided me a lot of documents, and I'm
15  assuming they all came from you. Are you
16  aware of any documents related to this case,
17  issues you had with Hyundai, issues you've
18  had with Greg Prater individually, or
19  anybody else that might relate to this case
20  that you haven't provided to your lawyers?
21        Is there any other
22  correspondence, any other e-mails, notes, or
23  anything?

Page 374

1    A.    I don't -- Not offhand. But
2  like the e-mail from -- that I sent to
3  Kimball, I'd forgotten about it until today.
4  I mean, if I remember it, they'll know about
5  it. But as of right now, no.
6    Q.    Okay. So as of right now, you
7  don't know of anything else that hasn't been
8  provided to your lawyers?
9    A.    No.
10        MR. JOHNSON: That's it. I
11  appreciate your time. I know it was a long
12  time.
13        MR. KILBORN: I've got a few
14  questions.
15        EXAMINATION
16  BY MR. KILBORN:
17    Q.    Mr. Dees, the security
18  building where you were taken, does that
19  building have recording devices?
20    A.    Yes, sir.
21    Q.    What type?
22    A.    I know it has video recording
23  devices, I don't know if it has audio or

Page 375

1  not.
2    Q.    Were there video recording
3  devices when you come into the security
4  building when you were fired?
5    A.    Yes, sir. They have a room in
6  there, when you walk in the door, there's a
7  door straight across from the entry door,
8  and that room is all their recording
9  devices, I believe. That's where I saw
10  them.
11    Q.    You saw them there?
12    A.    Yes, sir.
13    Q.    Okay. And what about the
14  plant, does it have any recording devices?
15    A.    Yes, sir.
16    Q.    Where are they?
17    A.    Specifics, I don't know. I
18  know we had a coax running up in our
19  building in the production building, because
20  Prater would brag that he would go back
21  there and disconnect the coax to their
22  cameras in our section and then they would
23  call him and ask him what was wrong with it.

Page 376

1  And he'd have to go hook it back up.
2        But as far as where they were
3  actually located, I don't know, I just know
4  they had them. Because like I said, he took
5  several of us back there and showed us the
6  coax bragging how he would turn it --
7  disconnect it, and then they would call and
8  make -- the cameras would go blank when you
9  disconnect your feed, the cameras go black,
10  then they would call him and make him
11  reconnect it. So they did have cameras in
12  our section.
13    Q.    And you mentioned another
14  recording, you said it was -- was it a Bill
15  Shivers?
16    A.    Seivers.
17    Q.    Seivers. Said he had
18  recordings by Applegate?
19    A.    Said Prater stated to him that
20  he had voice recordings of Applegate telling
21  him to terminate me, that he needed to get
22  rid of me.
23    Q.    Okay. Now, prior to the 26th

94 (Pages 373 to 376)

FREEDOM COURT REPORTING

Page 377

1   of February when you were taken into the
2   firing room in the security house or
3   building, had you had any warning at all or
4   had you been told that you were going to be
5   terminated or that you were being considered
6   for termination?
7       A.   No, sir. I had no idea
8   whatsoever. It floored me when I walked in
9   the room and they told me I was being fired.
10  There was nothing leading up to it, no
11  inclination, nothing.
12      Q.   For instance, Defendant's
13  Exhibit 6 is the e-mail counsel asked you
14  about February 21, 2007, at 5:30 a.m. from
15  Prater to Applegate. It says: Based on
16  this conversation, I feel that even if he
17  was not sleeping, that he doesn't care
18  enough about his job to prevent anyone from
19  thinking he was sleeping. John, my
20  recommendation, as hard as it is for me to
21  say, termination. Greg.
22          Had you been told anything
23  like that at that time?

Page 378

1       A.   No, sir. And Prater when he
2   got anybody fired, he always bragged about
3   it later. He had been responsible for two
4   people being fired prior to me, and all we
5   heard was him bragging about how he had got
6   them fired.
7       Q.   Were you told when you were
8   terminated that you -- You were told you
9   were being terminated for sleeping?
10      A.   That's what that -- the lady
11  said.
12      Q.   All right. Were you told that
13  you were being terminated, because, quote,
14  you don't care about your job to prevent
15  anyone from thinking you were sleeping?
16      A.   No, sir.
17      Q.   And counsel also asked you
18  about embarrassment. And you do attend a
19  church?
20      A.   Yes, sir.
21      Q.   And do the people in the
22  church know that you got terminated?
23      A.   Yes, sir.

Page 379

1       Q.   Do they know why Hyundai said
2   you were terminated?
3       A.   Yes, sir.
4       Q.   All right. Does that create
5   any embarrassment for you?
6       A.   Yes, sir. Because I didn't
7   talk to no one for a long time about it, and
8   everyone just assumed that I had actually
9   fell asleep on the job and all my military
10  friends and all my close friends, they
11  couldn't believe it. They kept asking me
12  did -- what happened. And I just -- I
13  didn't talk to nobody about it for a long
14  time, because like I said, that's -- I've
15  never.
16      Q.   And up until Hyundai decided,
17  in their infinite wisdom, that you were a
18  man who slept on the job, you had a
19  blemish-free record both in civilian and
20  military life?
21      A.   Yes, sir.
22      Q.   And now whenever you apply for
23  employment or apply for anything, bank

Page 380

1   credit, where there's a question about have
2   you ever been terminated or received any
3   type of job action, you've got to put that
4   down?
5       A.   Yes, sir. When I went to work
6   for International Paper in Thorsby, I made
7   -- I made leadman in three years, and that
8   was unheard of.
9       Q.   And was that -- Does the fact
10  that that blemish is now on your reputation,
11  does that cause you any distress?
12      A.   Yes, sir. It still causes
13  problems. Even between me and my wife. I
14  mean, that -- Like I said, I've -- I take
15  pride in my work, just like I do my uniform.
16  And if I go to do something, I put a hundred
17  and fifty percent into whatever I'm doing.
18  Even the production people there and
19  maintenance people, all, when they said --
20  found out that I had been accused of
21  sleeping, they said: There's no way, he's
22  too hyper. Because I'm an outgoing person,
23  even at night. I've always been that way.

95 (Pages 377 to 380)

Page 381

1 They said there's no way he was sleeping, it
2 ain't no way. And you can ask several of
3 the production people there in stamping,
4 production that I worked with, any of them,
5 they all know me.
6       MR. KILBORN: That's all I
7 have.
8       MR. JOHNSON: Just a couple
9 follow-up questions.
10      EXAMINATION CONTINUED
11 BY MR. JOHNSON:
12      Q.    You mentioned some sort of
13 video in the security building?
14      A.    Yes, sir.
15      Q.    Do you know if it's actually
16 recording or just a video camera that's
17 monitored?
18      A.    We was told it was a video
19 recording.
20      Q.    Who told you that?
21      A.    Prater and -- I have to think
22 about that one. Because it was one of the
23 other maintenance supervisors from one of

Page 382

1 the other sections. I don't remember.
2      Q.    When were you told that?
3      A.    About from get-go. Well, they
4 briefed it in -- I believe they briefed it
5 in their hiring process. And -- Well, I
6 know it was recording, because they busted
7 one of the temporary workers out back and on
8 the floor there by the presses one night for
9 -- she was doing a striptease apparently
10 there by the presses one night, they said
11 the next thing they knew, security come
12 running through the building; said they used
13 the recording when they fired her.
14      Q.    Okay. Are you aware of any --
15 Well, you mentioned some coax cables?
16      A.    For the cameras.
17      Q.    Okay. Other than something
18 that Greg Prater might have told you about
19 those coax cables, do you know what they
20 were, where they went to, or where they came
21 from?
22      A.    We tried to follow them out,
23 but it was seventy-five, seventy feet up in

Page 383

1 the ceiling, running conduit, waves through
2 conduit, through cable waves. There was no
3 way to follow that, no, we didn't have a
4 clue.
5      Q.    Did you ever see them attached
6 to a camera?
7      A.    No. I said there's no way.
8 But they had to -- How did they -- They said
9 they recorded the old girl doing the
10 striptease there in the plant by the press.
11      Q.    Did you ever see any cameras
12 up in that third level near the SOP?
13      A.    I never looked for them up
14 there.
15      Q.    So you never saw any?
16      A.    Like I said, I never looked
17 for any. They may have been up there, may
18 not have. I don't know, I never looked for
19 them.
20      Q.    Okay. And what church do you
21 go to?
22      A.    Hillcrest Baptist Church in
23 Maplesville, Alabama.

Page 384

1      Q.    How big a church is that?
2      A.    I don't know. Your average
3 sized church. Probably got a hundred people
4 there at any service.
5      Q.    How many members total?
6      A.    Oh, God, I don't know.
7      Q.    You don't know?
8      A.    I don't know.
9      Q.    Do you know anybody else from
10 HMMA that works there -- or that goes to
11 church there?
12      A.    Yes, sir.
13      Q.    Who?
14      A.    Keith Smith.
15      Q.    Who is he?
16      A.    He works -- He's a production
17 team leader over in general assembly.
18      Q.    Okay. Now, you said people at
19 church knew that you had been terminated?
20      A.    Yes, sir.
21      Q.    Did you tell anybody at the
22 church?
23      A.    Nope.

96 (Pages 381 to 384)

FREEDOM COURT REPORTING

Page 385

```
1      Q.   Do you have any idea how they
2   knew?
3      A.   Yes, sir.
4      Q.   How?
5      A.   Keith's son worked in the
6   building I worked in.  Derick.
7      Q.   You think Derick told somebody
8   at the church?
9      A.   They said Derick told his
10  father, and it just went from there.  I live
11  in a small community, if you look wrong,
12  everybody knows it within five minutes.
13     Q.   Okay.  Did you ever talk to
14  Derick Smith or Keith Smith about it?
15     A.   No, sir.
16     Q.   You never talked to either of
17  them?
18     A.   No, sir.
19     Q.   Okay.  Do you know anybody who
20  has?
21     A.   No.
22     Q.   Do you know if your wife did?
23     A.   I don't know.
```

Page 386

```
1      Q.   Other than Derick and Keith
2   Smith, do you know anybody else at your
3   church who knows about it?
4      A.   I think Keith is the only one,
5   I think, from church that goes there.  But,
6   like I said, there's several people there in
7   the community that work down there.
8      Q.   Did anybody from your church
9   say anything to you about what the situation
10  at HMMA?
11     A.   There was a couple that asked,
12  but I don't remember.
13     Q.   Do you know who asked?
14     A.   They was asking that Sunday,
15  and I was trying to avoid the issue because
16  I was embarrassed.
17     Q.   Did you ever have any
18  conversations with anybody at church that
19  you can recall, that knew about you being
20  terminated at Hyundai?
21     A.   Just one person.  Mr. Bob
22  Eddy.  He's the one -- When I got fired, I
23  didn't know what to do.  I had never had
```

Page 387

```
1   anything like this happen, and I was just --
2   I went and talked to Mr. Bob and --
3      Q.   Who is Mr. Bob?
4      A.   -- explained to him everything
5   that happened.  And he's the one who put me
6   in contact with Mr. Kilborn.
7      Q.   Okay.  And is Bob Eddy just a
8   member of the church?
9      A.   He's a member of the church
10  and a friend.
11     Q.   Okay.  But he's not like your
12  pastor or something like that?
13     A.   No, sir.
14     Q.   Okay.  And what's the pastor's
15  name at the church?
16     A.   We don't have one.  He went
17  north to be with his family who is ill, and
18  he resigned a few weeks ago.  His father is
19  in bad health.
20     Q.   What was his name?
21     A.   Jason Vincent.
22     Q.   Did you ever talk to Jason
23  Vincent about this situation?
```

Page 388

```
1      A.   No, sir.
2      Q.   Did he ever call you to check
3   on you about it or do anything to suggest he
4   knew about it?
5      A.   Like I said, I was embarrassed
6   about it, I didn't let on -- I didn't want
7   to talk to -- I didn't want to talk to
8   nobody about it.  Like I say, ain't never
9   had anything like this happen.  And when you
10  got -- When I walked in that first Sunday
11  and Keith looked at me and just hung his
12  head, and other people, I started to turn
13  around and walk out.
14          MR. JOHNSON:  Okay.  That's
15  all I've got.  I appreciate it.
16  (The deposition was concluded at 5:33 p.m.,
17   November 20, 2007.)
18
19
20
21
22
23
```

97 (Pages 385 to 388)

FREEDOM COURT REPORTING

Page 389

```
 1        REPORTER'S CERTIFICATE
 2   STATE OF ALABAMA,
 3   MONTGOMERY COUNTY,
 4        I, Angela Smith McGalliard,
 5   Registered Professional Reporter and
 6   Certified Realtime Reporter, Commissioner
 7   for the State of Alabama at Large, do hereby
 8   certify that the above and foregoing
 9   proceeding was taken down by me by
10   stenographic means, and that the content
11   herein was produced in transcript form by
12   computer aid under my supervision, and that
13   the foregoing represents, to the best of my
14   ability, a true and correct transcript of
15   the proceedings occurring on said date and
16   at said time.
17        I further certify that I am neither
18   of kin nor of counsel to the parties to the
19   action; nor in any manner interested in the
20   result of said case.
21
22        _____
          Angela Smith
          McGalliard, RPR, CRR,
23        CCR Lic. No. 98.
```

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CASE NO.: 2:07-cv-00306-MHT-CSC


JERRY LEON DEES, JR.,

        Plaintiff,

            V.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and

HYUNDAI MOTOR AMERICA, INC.,

        Defendants.




        S T I P U L A T I O N S


    IT IS STIPULATED AND AGREED by and

between the parties, through their respective

counsel, that the deposition of KATHERINE DEES

may be taken before STACEY L. JOHNSON,

Commissioner, at the Hampton Inn, 60 Wasden

Road, Hope Hull, Alabama, on the 8th day of

January, 2008.



KATHERINE DEES

Page 59

1    Said he come got me, and I didn't know -- I have

2    no idea what was that about until he went around

3    corner or something and he saw somebody -- I

4    don't remember the name -- and he said, and I

5    knew then something was up.

6        Q    Okay.  What else?

7        A    And then that was it.

8        Q    Did you and your husband talk more

9    about any past history he may have had with Jim

10   Brookshire?

11       A    No, I did not.

12       Q    Did he ever say he had had problems

13   with Brookshire, or what did you learn about

14   Brookshire?

15       A    No, we didn't discuss anything about

16   who Brookshire was or whatever.  And he did say,

17   I was just talking to Mr. Mun and I bet he don't

18   even know what's going on.  He said, I'm going

19   to call him and let him know.

20       Q    And did y'all call Mr. Mun at that

21   time?

22       A    He did.

23       Q    Okay.  You were listening to his

KATHERINE DEES

Page 60

1    conversation with Mr. Mun?

2        A    He was talking very slowly and what

3    happened.

4        Q    Was he speaking in English or Korean?

5        A    Well, it's a little bit of both.  He

6    was speaking both.  And he finally -- he gives

7    me the phone to tell Mr. Mun, you know, what

8    happened, so I got the phone.  And, you know, I

9    never talked to him before.  That was the first

10   time I was talking to him.  And I told him the

11   whole thing, what he told me.

12       Q    What did you overhear your husband say

13   to Mr. Mun?

14       A    What did I what?

15       Q    When your husband was on the phone with

16   Mr. Mun, what did your husband say?

17       A    He said that they fire me because I was

18   sleeping in the job.  And I don't remember exact

19   words he said.  Like I said, he was speaking

20   Korean and English.  And, you know, about the

21   time I was so upset.

22       Q    Do you recall if your husband said, you

23   know, that can't be true because somebody was

KATHERINE DEES

Page 70

1    he told me he was going down to pit a lot and

2    have to ask him to bring the orders a lot and...

3        Q    Did you tell Mr. Mun about any other

4    forms of harassment?

5        A    No, sir, because that's only thing that

6    he told me at that point.

7        Q    Okay.  Did you say anything else to

8    Mr. Mun during your conversation?

9        A    I asked him if he was familiar about

10   why he got fired or even if he knows he got

11   fired.  He said he had no idea and he was going

12   to check into it next day.  He said, I cannot do

13   anything right now, but next day I'm going to

14   check into it and I'll give you a call back and

15   see what's going on.

16       Q    And did you hear from him the next day?

17       A    It was -- I believe it was the second

18   day.

19       Q    Okay.

20       A    I don't believe it was very next day

21   because I thought he was going to call me very

22   next day and I'm thinking, well, I guess he

23   didn't have a chance to look or whatever.  I

KATHERINE DEES

Page 71

1    don't know.  And then he called.  He surprised

2    me.  He called day after next --

3         Q     Was your husband home then?

4         A     -- and told me.  Yes, he was that

5    night.

6         Q     So Mr. Mun called at night?

7         A     Next night.  Uh-huh.

8         Q     When you say next night, was it 24

9    hours after your first conversation or 48 hours?

10        A     He got fired 26th, 27th.  He called me

11   28th.

12        Q     At night on the 28th?

13        A     Right.

14        Q     And am I correct that your husband was

15   terminated on the night of the 26th?

16        A     Right.

17        Q     Okay.  On the 27th and 28th, did you

18   talk with your husband any more about the

19   situation?

20        A     Not that I recall.  I mean, it was

21   done.  And I did ask him why didn't they -- I

22   thought handbook said it was going through the

23   procedures, whatever the firing procedures.  I

KATHERINE DEES

Page 72

1    wonder why they didn't do that.  And he called

2    company back about -- what's the word --

3    purview.

4        Q    Whatever you remember.

5        A    That, you know, they get chance to

6    defend themselves.

7        Q    He called the next day?

8        A    Yeah, I believe so.

9        Q    The day after he was terminated?

10       A    I believe so.

11       Q    Who did he call?

12       A    I don't remember who he called, but he

13   called the number and he said he getting

14   answering machine.

15       Q    Do you know was there -- was it some

16   person's answering machine?

17       A    I don't know.  He just told me he get

18   answering machine.

19       Q    And those calls were made before the

20   second call with Mr. Mun?

21       A    I believe it was the next day, 27th --

22       Q    Okay.

23       A    -- I believe.  Because I don't recall

KATHERINE DEES

Page 73

1    exact date because I asked him to call back and

2    get things straight.

3        Q    Did anything else happen before you

4    received the second call from Mr. Mun?

5        A    How do you mean anything happen?

6        Q    Well, did you talk with your husband

7    more about it?  Did you call anybody?  Did your

8    husband call anybody?

9        A    Not that I recall.

10       Q    Okay.

11       A    He was too busy trying to find a job.

12       Q    Was he able to find a job at that

13   point?

14       A    Yeah.  He went for work -- he went to

15   work the next day.

16       Q    Which day?  The 27th or the 28th?

17       A    Right.  The 27th.

18       Q    Now, the second telephone call with

19   Mr. Mun, tell me about that.

20       A    What you want me to tell you?

21       Q    What was said.  What do you recall?

22       A    He called me, and I answered the

23   phone.  Well, actually, he answered the phone.

KATHERINE DEES

Page 74

1    And then --

2        Q    Your husband answered the phone?

3        A    I think so.  And I talked to him, and

4    he said that -- and I was very disappointed he

5    couldn't remember no more than what he

6    remembered today.  I was very disappointed

7    because me and him talked for a while.  He said

8    he went to look where they said that he was

9    sleeping, and he went up there.  And he told me

10   that he couldn't sleep up there.

11       Q    Mr. Mun said that?

12       A    Yes, he did.  Said he could not fall

13   asleep up there.  And told me that Prater is

14   lying.  I don't know if that's his thoughts,

15   whatever.  I'm just telling you what he told me.

16       Q    Did he say what Prater was lying about?

17       A    No.  That's all he said.

18       Q    What was your understanding with

19   respect to what Prater had to do with the

20   sleeping incident?

21       A    I don't know.  What do you mean?

22   Between me and him?

23       Q    What did he bring Prater's name up for,

KATHERINE DEES

Page 75

1    or did you bring Prater's name up?

2        A    I did not; he did.

3        Q    Do you know why he brought Prater's

4    name up?

5        A    No, sir.  You've got to understand.

6    Again, it's Korean culture.  You know, when --

7    usually a man ask you a question or something,

8    you know, it's just -- it's different.  It's not

9    like me and you talking.  We watch what we say.

10   I generally try to listen.

11            But anyway, that's what he told me.

12   And he said he asked somebody, and he told me

13   that boojang -- whoever the supervisor was -- he

14   said boojang told me to stay out of it.

15       Q    And what's the guy's name?

16       A    I don't know.  He just said boojang.

17   Boojang means supervisor.

18       Q    Can you spell that?

19       A    Boojang.  That's just name of the

20   position, call him supervisor kind of.  Head

21   honcho maybe.  That's what he told me.  Said

22   boojang told me to stay out of it.

23       Q    Did he say anything else about that?

KATHERINE DEES

Page 77

 1    or not he thought that your husband was sleeping

 2    or not sleeping when he was accused of doing so?

 3        A    No, he did not.

 4        Q    And am I right that other than simply

 5    saying that Prater was lying, he didn't tell you

 6    specifically what he was lying about?

 7        A    No.  He did tell me -- he did tell me

 8    that Prater is bad man.

 9        Q    Did he use the words bad man in Korean?

10        A    Korean, yes, he did.

11        Q    Okay.

12        A    As a matter of fact, he said he is a

13    napan namja.  Two words.  That means he's a bad

14    man.

15        Q    Spell that if you can, or something

16    similar to it anyway.

17        A    Can we just say the bad man is the same

18    thing?

19        Q    Well, you said a word.

20        A    Right.

21             THE REPORTER:  Can you write it?

22    Because I won't know how to...

23             THE WITNESS:  (Witness complied.)

WENDY SUSAN WARNER

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CIVIL ACTION NO.:  2:07-00306-MHT-CSC


JERRY LEON DEES, JR.,

    Plaintiff,

        vs

HYUNDAI MOTOR MANUFACTURING

ALABAMA, L.L.C. and HYUNDAI MOTOR

AMERICA, INC.,

    Defendants.


S T I P U L A T I O N S


    IT IS STIPULATED AND AGREED by and between
the parties, through their respective counsel, that the
deposition of WENDY SUSAN WARNER may be taken before
DONNA E. HENDERSON, CSR, Commissioner, at the law
offices of Copeland, Franco, Screws & Gill, P.A., 444
South Perry Street, Montgomery, Alabama, on the 15th
day of November, 2007.

PLAINTIFF'S
EXHIBIT
3

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652   (251)694-0950   (888)557-2969

WENDY SUSAN WARNER

Page 27

1        A     An expatriate is someone that's been

2    dispatched from the corporate headquarters to serve a

3    period of time here to help us set up the facility.

4        Q     How did he get the name expatriate?

5              BY MR. SCOFIELD:  Object to the form.

6              THE WITNESS:  It's a financial term.

7        Q     (BY MR. KILBORN:)  Are there any other

8    expatriates?

9        A     There are.

10       Q     Who are they?

11       A     We have seventy-eight of them.

12       Q     All right.  And what -- Could you give me

13   their names?  And I don't want to go through all

14   seventy-eight, just the --

15       A     Well, you could start with a lot of Lees.

16   Lees, Parks, Jangs and Ahns and Ryus and you'd probably

17   have them all because their names are -- there's very

18   few names, so -- but we have vice president for human

19   resources, a president, a CFO, a COO, a -- several

20   directors, senior managers, coordinators, technical

21   coordinators.

22       Q     And they all work for Hyundai Motor Company?

23       A     That's correct.

WENDY SUSAN WARNER

Page 30

1      A    That's true.

2      Q    And they're all called expats?

3      A    Yes.  Expatriates, yes.

4      Q    And they're all officers in one way or the

5  other of HMMA?

6           BY MR. SCOFIELD:  Object to the form.

7           THE WITNESS:  Yes.

8      Q    (BY MR. KILBORN:)  But they all work for --

9      A    HMC.

10     Q    -- Hyundai Motor Company?

11     A    That's correct.

12     Q    Who pays them?

13     A    HMC.

14     Q    Hyundai Motor Company?

15     A    Yes.

16     Q    In Seoul, South Korea?

17     A    Yes, sir.

18     Q    So you've got seventy-eight officers of HMMA

19  who are paid by Hyundai Motor Company headquartered in

20  Seoul, South Korea?

21          BY MR. SCOFIELD:  Object to the form.

22          THE WITNESS:  Right.

23     Q    (BY MR. KILBORN:)  Are they employees other

WENDY SUSAN WARNER

Page 55

```
 1              THE WITNESS:  No.

 2         Q    (BY MR. KILBORN:)   Do you know anything about

 3    the financial relationships between HMC, HMMA and HMA?

 4              BY MR. SCOFIELD:  Object to the form.

 5              THE WITNESS:  No.

 6         Q    (BY MR. KILBORN:)   Do you know anything about

 7    the business purposes of those three?

 8         A    Yes.

 9         Q    And the business purposes of HMC would be

10    what?

11         A    They are the headquarters and they are the

12    parent company.

13         Q    The parent company of who?

14         A    HMMA and HMA.

15         Q    How about Glovis?

16         A    I do know that there is some sort of

17    relationship with them, that there's a certain

18    percentage that they own, but I don't know the actual

19    percentage.

20         Q    Well, the -- You refer to HMC as -- I think

21    you used the word parent?

22         A    Uh-huh.

23         Q    What do you mean by parent?
```

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CASE NO.:  2:07-cv-00306-MHT-CSC


JERRY LEON DEES, JR.,

          Plaintiff,

              V.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and

HYUNDAI MOTOR AMERICA, INC.,

          Defendants.



S T I P U L A T I O N S



          IT IS STIPULATED AND AGREED by and

between the parties, through their respective

counsel, that the deposition of ROBERT ALLEN

CLEVENGER may be taken before STACEY L. JOHNSON,

Commissioner, at the Hampton Inn, Tampa Room, 60

Wasden Road, Hope Hull, Alabama, on the 13th day

of December, 2007.



PLAINTIFF'S
EXHIBIT
4

ROBERT ALLEN CLEVENGER

Page 30

```
 1      A     No, sir.

 2      Q     Did Mr. Dees attend?

 3      A     No, sir.

 4      Q     Did Mr. Brookshire attend?

 5      A     No, sir.

 6      Q     Did Mr. Hughes attend?

 7      A     Mr. Hughes?

 8      Q     Yeah.  Do you know Mr. Hughes?

 9      A     May I have a full name?

10      Q     Kevin Hughes.

11      A     No, sir.

12      Q     Did you attend?

13      A     Yes, sir.

14      Q     And are all the corrective action

15   meetings held in the Law Library?

16            MR. SCOFIELD:  Object to the form.

17      A     No, sir.

18      Q     What other locations?

19      A     It depends on the situation.

20      Q     You mean just availability or some

21   other reason?

22      A     Mostly availability.

23      Q     Did the meeting have someone who ran
```

ROBERT ALLEN CLEVENGER

Page 31

1    the meeting, like chaired the meeting?

2        A    No, sir.

3        Q    So no one led the meeting?

4        A    I handed out the summaries, but I don't

5    lead the meeting.

6        Q    Okay.  And when you say summaries, I

7    want to try to identify the summaries.  I want

8    to find out what summaries there are that were

9    handed out.  Are the summaries called Team

10   Relations Memo?

11       A    Yes, that could be.

12       Q    I'll show it to you.  Is there a set

13   type of document that is passed out at the

14   meeting?

15       A    Generally, it's on a Team Relations

16   Memo document, yes, sir.

17       Q    And you were responsible for creating

18   that?

19       A    Yes, sir.

20       Q    You were responsible for its content?

21       A    Yes, sir.

22       Q    Did anyone review the Team Relations

23   Memo prior to you passing it out?

ROBERT ALLEN CLEVENGER

Page 32

```
 1      A    No, sir.

 2      Q    Here's a copy of Plaintiff's Exhibit

 3   16.  It's entitled Team Relations Memo, February

 4   21, 2007.  Is that what you passed out at the

 5   meeting?

 6      A    That was contained within the packet,

 7   yes.

 8      Q    So in the packet that was passed out?

 9      A    Yes.

10      Q    All right.  What else was in the

11   packet?

12      A    There was a Summary Memo from myself.

13      Q    From yourself?

14      A    Yes.

15      Q    To who?

16      A    I believe it was addressed to Greg

17   Kimble, Director of HR.

18      Q    Greg Kendall?

19      A    Kimble.

20      Q    Take a look at Exhibit 1 there and see

21   if that is the packet that you handed out.

22           MR. SCOFIELD:  Take your time and look

23   at the whole document.  And that's, what, from
```

ROBERT ALLEN CLEVENGER

Page 33

1    Wendy Warner's deposition?

2            MR. SPORT:  It's one of those files

3    that you brought.

4            MR. SCOFIELD:  Counsel, if I can help

5    the process.  I think what Mr. Clevenger is

6    looking at is the original Team Relations file

7    that we produced upon request at Wendy Warner's

8    deposition.  That's what I believe that document

9    is.

10           MR. SPORT:  Well, it was separate.  You

11   produced several files.  It was separate.  And

12   from his description of the packet, it sounded

13   like that might be it.

14           MR. SCOFIELD:  Well, that's what -- I

15   don't want to guess here.  But Mr. Clevenger

16   will tell us if he distributed all of that.

17       Q    Okay.

18       A    It didn't contain everything.

19       Q    Could you look at Exhibit 1 and give me

20   the date and Bates number?

21           MR. SCOFIELD:  Vince, those are going

22   to be originals that aren't numbered.

23           MR. KILBORN:  Uh-huh.

ROBERT ALLEN CLEVENGER

Page 34

1     Q    Let's see if we can do this as painless

2     as possible.  Look at Exhibit 1.  The first memo

3     in there is dated February 23, 2007 from, what,

4     yourself to Mr. Kimble?

5     A    Yes, sir.

6     Q    That was in the packet?

7     A    Yes, sir.

8     Q    All right.  And the next document looks

9     like a handwritten note.  Was that in the

10    packet?

11    A    No, sir.

12         MR. SCOFIELD:  And if I can just

13    interject here, Vince.  That represents the

14    original Bates number that you guys have, which

15    is number 34, which is the second page of that

16    memo that had attorney-client information that I

17    redacted.  I withheld the original, but you guys

18    have the redacted version.

19    Q    The next document in that Exhibit 1 is

20    an e-mail dated February 21, 2007 from Mr. John

21    Applegate to yourself.  It's also Defense

22    Exhibit 6.  Was that in the packet?

23    A    No, sir.

ROBERT ALLEN CLEVENGER

Page 35

1        Q    And the next document is entitled Team

2    Relations Memo, dated February 21, 2007, from

3    yourself to William Ware.  It's also Plaintiff's

4    Exhibit 16.  Was that in the packet?

5        A    May I clarify?

6        Q    Sure.

7        A    You said from myself to William Ware.

8    It's from William Ware to myself.

9        Q    Excuse me.  I'm sorry.

10        A    That's okay.

11        Q    That was in the packet?

12        A    Yes, sir.

13        Q    And that's also Plaintiff's Exhibit 16

14    that sits here?

15        A    Yes, sir.

16        Q    And there's a handwritten statement --

17    purportedly by Mr. Brookshire -- initialed at

18    the bottom and a second statement initialed by

19    Mr. Brookshire at the bottom.  The first one

20    being dated February 15, '07 and the second one

21    being dated, I think, February 19, '07.  Was

22    that in the packet?

23        A    Yes, sir.

ROBERT ALLEN CLEVENGER

Page 36

1        Q    And I think we've already covered this

2    one.  The next document is a February 9, 2007

3    memorandum from -- an e-mail it looks like.  I

4    can't tell whether it's a document from John

5    Applegate to Mr. Greg Prater.  Subject, Leon

6    Dees.  It looks like it's answering an e-mail

7    from William Ware to yourself dated February 7,

8    2007.  Was that document which looks like it's

9    got two e-mails in it -- was that in the packet?

10       A    No, sir.

11       Q    And the next document is called

12   Discussion of Planner.  Was that in the packet?

13            MR. SCOFIELD:  Object to the form.

14       A    No, sir.

15       Q    Was there anything else in the packet

16   other than the three documents we've identified

17   within Exhibit 1?  And we'll run through those

18   one more time to be sure.

19       A    Sure.

20       Q    That's the Owner Team Relations

21   Memorandum, February 23, Greg Kimble to --

22   excuse me -- from yourself to Greg Kimble; the

23   Team Relations Memo, February 21; and the two

ROBERT ALLEN CLEVENGER

Page 37

1   written statements by Mr. Brookshire.  Was

2   anything else in the packet?

3       A    No, sir.

4           MR. SCOFIELD:  Vince, if I might

5   clarify.  Jeff and I were having a side

6   conversation.  There's a second page of the Team

7   Relations Memo that has Ontario King in it.

8   That's what I have -- my handwriting is in there

9   that says number 34.  Just in fairness because

10  that's an original redacted document that is

11  contained in this exhibit, I think it would be

12  appropriate to ask him with regard to this page

13  2.

14          MR. KILBORN:  Ontario King's file was

15  in there, too?

16          MR. SCOFIELD:  No, sir, that's not what

17  I'm saying.  I'm saying that there's another

18  page that goes with this memorandum.

19      Q    Was there anything about Ontario King

20  in the packet?

21      A    Yes, sir.

22      Q    What was it?

23      A    A small entry on another page

ROBERT ALLEN CLEVENGER

Page 38

1      regarding, I believe it was, his name, possibly

2      Team Member number.

3          Q    That's for Ontario King?

4          A    Yes, sir.

5              MR. SCOFIELD:  And it's sitting right

6      here.  I'm just trying to move things along.

7

8          (Whereupon, Plaintiff's Exhibit

9      Number 22 was marked for identification

10     and copy of same is attached hereto.)

11

12         Q    Within Plaintiff's Exhibit 2, there's a

13     document entitled Team Relations Memo.  I'm

14     going to put Exhibit 22 on that.  It's within

15     Exhibit 2.  And it's dated -- it doesn't have a

16     date.  It says revision date 9 September '04.

17     Is that Exhibit 22 -- is that the forth document

18     that was in the packet?

19         A    That is page 2 of this other document.

20         Q    Page 2 of your memorandum?

21         A    Yes, sir.

22         Q    So Exhibit 22 was attached to your

23     February 23, 2007 memorandum to Mr. Greg Kimble?

ROBERT ALLEN CLEVENGER

Page 39

1      A     Yes, sir.

2      Q     All right.  So it was, what, stapled to

3  it?

4      A     Yes, sir.

5      Q     Your February 23, 2007 memorandum to

6  Mr. Greg Kimble has a conclusion and it's got a

7  recommendation of termination.  Did you write

8  that entire document, including the conclusion

9  and the recommendation for termination?

10     A     There's two questions there, sir.

11     Q     Okay.  Break them down.  Answer both of

12  them.

13     A     Yes, sir, I wrote the document.

14     Q     Okay.

15     A     The last sentence, the Department is

16  asking for termination.

17     Q     All right.  Did you write that?

18     A     I wrote those words, yes.

19     Q     Was that your recommendation?

20     A     That was the recommendation of the

21  department that he works for.

22     Q     Did you have a recommendation?

23     A     No, sir.

ROBERT ALLEN CLEVENGER

Page 151

1    summation of what you've said?

2         MR. SCOFIELD:  Object to the form.

3    A    Yes, sir.

4    Q    You say in your February 23, 2007 Team

5    Relations Memo to Greg Kimble that was given to

6    the termination meeting in your conclusion, I

7    believe we must give weight to the manager's

8    account and assume that the event took place at

9    one a.m. on Wednesday morning.  Did you see

10   that?

11        MR. SCOFIELD:  No, Vince.  We're trying

12   to get to that document.

13        MR. KILBORN:  It's in your Exhibit 1.

14        MR. SCOFIELD:  There are only about 500

15   pages in here.  So we're working our way there.

16        MR. SPORT:  No.  That one was out.

17        MR. KILBORN:  There you go.

18   Q    Have you got that memo that you wrote?

19   A    Yes, sir.

20   Q    You see your conclusion?

21   A    I see the sentence that you read, yes,

22   sir.

23   Q    You say, I believe we must give weight

ROBERT ALLEN CLEVENGER

Page 152

1    to the manager's account.  Is the I you?

2              MR. SCOFIELD:  Object to the form.

3       A     Yes.

4       Q     And the we is who?

5       A     HMMA.

6       Q     That's not just the team -- the people

7    who were going to be in the team meeting.

8    That's the entire company?

9       A     Well, I mean the collective we.

10      Q     And you say weight.  What do you mean

11   weight to the manager's account?  Do you mean

12   that he would be more believable than Dees?

13      A     I believe that we must give -- that we

14   needed to give that statement more weight.

15      Q     And do you base that on anything other

16   than the fact that Brookshire was a manager?

17      A     No, sir.

18      Q     You also state underneath there, I have

19   a signed statement by the Stamping Manager that

20   he was 15 feet from Leon and observed him for

21   two minutes.  There was a chair placed in

22   between the two open doors.  The area is several

23   feet off the floor and isn't an area that a

ROBERT ALLEN CLEVENGER

Page 125

```
 1        A     It appears that the doors are open,

 2    yes, sir.

 3        Q     Does it appear to you --

 4        A     And would conceal the chair in the

 5    middle.

 6        Q     It would hide it, wouldn't it?

 7        A     Yes, sir.

 8

 9        (Whereupon, Plaintiff's Exhibit

10    Number 23 was marked for identification

11    and copy of same is attached hereto.)

12

13        Q     I'm going to show you, Mr. Clevenger, a

14    series of photographs Bates numbered 344 through

15    350.  And the Bates numbers are at the bottom

16    lower right, so we may refer to those numbers.

17    Do you know what these pictures are?

18        A     Yes, sir.

19        MR. SCOFIELD:  Go ahead and flip

20    through all of them.

21        Q     Have you flipped through it?

22        A     Yes, sir.

23        Q     What are they?
```

ROBERT ALLEN CLEVENGER

Page 126

1        A      This is the area that Mr. Applegate

2     said that the incident took place.

3        Q      And Hyundai has told us that these were

4     taken on March 5, 2007.  Does that jibe with

5     your recollection?

6        A      Yes, sir.

7        Q      Did you take the pictures?

8        A      Yes.

9        Q      And what was the purpose?

10        A      Mr. Dees had requested that his

11     termination be reviewed by a Team Member Review

12     Board.  So in preparation for him starting that

13     process, I took these photos.

14        Q      And how did you know where to go take

15     the photos?

16        A      Mr. Applegate had shown me where the

17     incident had taken place.

18        Q      Previously?

19        A      During this situation.

20        Q      So he was there when you took the

21     pictures?

22        A      As I recall.

23        Q      Anybody else?

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CASE NO.:  2:07-cv-00306-MHT-CSC


JERRY LEON DEES, JR.,

　　　　Plaintiff,

　　　　　　V.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and

HYUNDAI MOTOR AMERICA, INC.,

　　　　Defendants.


S T I P U L A T I O N S


IT IS STIPULATED AND AGREED by and

between the parties, through their respective

counsel, that the deposition of GWANG MUN may be

taken before STACEY L. JOHNSON, Commissioner, at

the Hampton Inn, 60 Wasden Road, Hope Hull,

Alabama, on the 8th day of January, 2008.

PLAINTIFF'S
EXHIBIT
tabbies
5

GWANG MUN

1     Q   You worked with Mr. Dees for seven

2   months prior to him being terminated, did you

3   not?

4     A   Until January of 2007, I used to work

5   in the Welding Department, and at that time --

6   that is, January of 2007 -- I moved over to

7   Stamping Department and I have worked with

8   Mr. Dees for about a month.  I used to spend

9   about roughly 80 percent of my time for the

10   Welding side.

11     Q   Prior to January of 2007?

12     A   That is true.

13     Q   Did Mr. Dees ever give you any reason

14   to believe that he was not honest?

15     MR. JOHNSON:  Object to the form.

16     A   No.

17     Q   Did Mr. Dees ever give you any reason

18   to believe that he was not an honorable man?

19     MR. JOHNSON:  Object to the form.

20     THE INTERPRETER:  I have a little

21   difficulty in interpreting the word honorable,

22   so let me explain to him because I can't find

23   the exact match -- matching word in Korean.  May

GWANG MUN

Page 23

1    I ask him a little help?

2              MR. JOHNSON:  It's Mr. Sport's

3    deposition.

4              MR. SPORT:  I don't have a problem with

5    that as long as -- as long as the meaning of my

6    question is ultimately conveyed to Mr. Mun.

7              THE INTERPRETER:  Okay.  I'm assuming

8    that there is a word for it, but I just can't

9    think of it.  And that's what I would like to

10   tell him.

11             MR. SPORT:  A Korean word for --

12             MR. CHU:  I'm actually still trying to

13   find the direct appropriate translation.

14             THE INTERPRETER:  These are cultural

15   differences that sometimes -- the expression is

16   not used in Korea that way, so it's difficult

17   to -- honorable man.

18             MRS. DEES:  It means -- I would take it

19   as wouldn't do anything out of line.

20             MR. SPORT:  Well, let me explain --

21             THE INTERPRETER:  It's -- it's --

22             MR. SPORT:  -- what I mean in English

23   and then maybe you can find an appropriate way

GWANG MUN

Page 24

```
 1      to phrase it in Korean.  What I mean when I say

 2      an honorable man is he has integrity, he is

 3      honest, he -- he tells the truth, he behaves

 4      appropriately.

 5              MR. JOHNSON:  Object to the form.

 6      A    I would say that he is an honorable

 7      man.

 8      Q    Okay.

 9      A    It is a rather difficult question for

10      me to answer because as I explained.

11      Q    I understand.  Do you know Katherine

12      Dees?

13      A    This is the first chance that I have to

14      see her in person.

15      Q    Have you ever spoken with Mrs. Dees on

16      the telephone?

17      A    I have talked with her twice on the

18      phone.

19      Q    Do you know Greg Prater?

20      A    I do.

21      Q    How long did you know Mr. Prater?

22      A    About 14 months.  Approximately 14

23      months.
```

GWANG MUN

Page 57

```
 1        Q     Did you think it was unusual for

 2    Mr. and Mrs. Dees to call you and tell you what

 3    had happened?

 4              MR. JOHNSON:  Object to the form.

 5        A     A little.

 6        Q     Why did you agree to check into the

 7    matter?

 8        A     I thought I should help clear up the

 9    situation if someone is accused of doing

10    something they claim they didn't, whether it was

11    Mr. Dees or someone else.

12        Q     Isn't it true, Mr. Mun, that Mr. Dees

13    was a very good worker and that this accusation

14    that led to his firing was totally out of

15    character for Mr. Dees?

16              MR. JOHNSON:  Object to the form.

17        A     My feeling was not that strong.

18        Q     Was it a feeling along those lines but

19    may be not quite as strong as I expressed it?

20              MR. JOHNSON:  Object to the form.

21        A     I do not understand the point of your

22    question.

23        Q     Well, I'm just trying to -- to
```

GWANG MUN

Page 58

1    ascertain why it was that you agreed to help

2    these people if you had absolutely no

3    relationship with them beyond knowing who

4    Mr. Dees was at work.

5        A    I feel I should try to help anybody who

6    is falsely accused of wrongdoing.

7        Q    Did you think he was falsely accused at

8    that point?

9            MR. JOHNSON:  Object to the form.

10       A    Aside from the fact I was just told by

11   Mr. and Mrs. Dees that he was accused of

12   sleeping.

13       Q    Falsely?

14       A    Falsely.

15       Q    Did you actually check into why

16   Mr. Dees had been fired?

17       A    Yes.

18       Q    Who did you make inquiries to?

19       A    I was told that a man by the name of

20   Jim filled out the report, and I did talk to

21   Jim.

22       Q    So you talked to Mr. Brookshire?

23           MR. JOHNSON:  Object to the form.

1      A      Probably.

2      Q      And what did Mr. -- well, scratch

3    that.

4             Who told you that Mr. Brookshire had

5    filled out the report?

6      A      Greg Prater.

7      Q      So the first person you talked to was

8    Mr. Prater, and he told you that Mr. Brookshire

9    had filled out the report?

10            MR. JOHNSON:  Object to the form.

11     A      I did ask Mr. Prater what happened, and

12   Jim Brookshire -- and he said Jim Brookshire

13   filled out the report.

14     Q      And when you talked to Mr. Brookshire,

15   what did he tell you?

16     A      He explained what it looked like from

17   the third floor, and I read his report.

18     Q      Do you recall anything about what he

19   told you it looked like?

20     A      Yes, I do remember what he told me.

21     Q      And what was that?

22     A      I went to the place with him.

23     Q      The place where he allegedly saw

GWANG MUN

Page 60

1    Mr. Dees asleep?

2        A    Yes.

3        Q    And what happened when you went to the

4    place?

5        A    He was sitting in his chair and was

6    sleeping.

7        Q    That's what Mr. Brookshire told you?

8        A    Yes.

9        Q    So when you went up to the third floor

10   mezzanine near the PLC controller, what did you

11   see?

12       A    There was a chair on the side.

13       Q    On the side of what?

14       A    Beside the control panel.

15

16       (Whereupon, Plaintiff's Exhibit

17   Number 28 was marked for identification

18   and copy of same is attached hereto.)

19

20       Q    I'm going to show you what I've marked

21   as Plaintiff's Exhibit Number 28.  Is that what

22   you saw?

23       A    I'm not sure, but when I was there,

GWANG MUN

Page 61

1       this chair was sitting on the left side.

2

3           (Whereupon, Plaintiff's Exhibit

4       Number 29 was marked for identification

5       and copy of same is attached hereto.)

6

7       Q    Okay.  Let me show you what I've marked

8       as Exhibit 29.  Is that closer to what you saw

9       but the chair is on the wrong side?

10      A    I remember the chair was on the left

11      side.

12      Q    So -- and the positioning of the doors,

13      were the doors closed?

14      A    I believe it was closed.

15      Q    And this visit that you made with

16      Mr. Brookshire up to the third floor mezzanine

17      would have been the day after Mr. Dees was

18      fired?

19      A    It was the next day.

20      Q    Did you call Mrs. Dees back?

21      A    Yes, I did.

22      Q    And when was that?

23      A    I don't remember exactly what day.  I

GWANG MUN

Page 62

1    remember calling her from my house.

2        Q    Would that have been the next night

3    from the original phone call?

4        A    It was right after I met Jim

5    Brookshire, so it's likely that there was --

6    there was a day.

7        Q    What did you -- well, before I get to

8    that, did Mr. Brookshire say anything else about

9    him finding Mr. Dees asleep?

10       A    He didn't talk about anything else.

11       Q    Did he -- did he describe to you what

12   he saw in any more specific terms than just

13   seeing Mr. Dees asleep?

14       A    I don't recall exactly what took place

15   between Mr. Brookshire and myself, but I recall

16   that Mr. Brookshire mentioned that until I got

17   quite close to Mr. Dees he did not -- he was not

18   aware of my approaching.

19       Q    That's what Mr. Brookshire said?

20       A    Yes.

21       Q    Is that all that you remember about

22   your conversation with Mr. Brookshire?

23       A    That's it.  That's about all.

GWANG MUN

Page 67

1    investigation into the process that was gone

2    through to ensure that HMMA was following its

3    own policies and, as you stated, the normal

4    practice of making sure that someone got an

5    evaluation prior to being terminated.

6              MR. JOHNSON:  Object to the form.

7      Q    Did you follow up on that?

8              THE INTERPRETER:  It's too long.

9              MR. SPORT:  Too long.

10             THE INTERPRETER:  I can't -- yeah.

11    Could you cut it short a few pieces?

12             MR. SPORT:  Sure.

13     Q    You said to me a moment ago that

14    someone had told you that Mr. Dees did not show

15    up for his hearing.

16     A    Whether he didn't come or whether he

17    left the meeting, yeah, I don't remember.

18     Q    Okay.  But that would have occurred

19    after your return phone call to Mrs. Dees?

20             MR. JOHNSON:  Object to the form.

21     A    That must have taken place before he

22    was fired.

23     Q    Well, the documents will show whatever

GWANG MUN

Page 68

1    they show.  But my question is this.  Mrs. Dees

2    told you two things.  One was that Mr. Dees was

3    not asleep but he had been accused of being

4    asleep and that's why he was fired.  And you've

5    told me what you did to check into that.  The

6    second thing that you told me was that he was

7    fired without a due evaluation of the event.

8    And I'm asking what did you do to check into

9    whether or not that was true.

10              MR. JOHNSON:  Object to the form.

11       A    I simply asked someone about that.

12       Q    And who did you ask?

13       A    Greg Prater.

14       Q    And what did Mr. Prater say?

15       A    As I told you a few minutes ago, either

16   Mr. Dees did not come to the meeting or he left

17   the meeting.  And I heard that there was a

18   hearing about that.

19       Q    And that's what Mr. Prater told you?

20       A    Yes.  That's correct.

21       Q    So when you called Mrs. Dees, did you

22   tell her anything about the fact that there had

23   been an investigation and it had been determined

GWANG MUN

Page 69

1    that Mr. Dees, in fact, was asleep?

2              MR. JOHNSON:  Object to the form.

3         A    I remember I said something like that.

4         Q    So when you called Mrs. Dees back as

5    you said you would, you were doing what you

6    promised to do; is that correct?

7              MR. JOHNSON:  Object to the form.

8         A    I told her the day before that I would

9    look into the matter, and I was trying to give

10   her what I found out.

11        Q    And you did that?

12        A    Yes.

13        Q    So you were an honorable man; you were

14   a good man?

15             MR. JOHNSON:  Object to the form.

16        A    Thank you for regarding me as a good

17   man.

18        Q    Mr. Mun, is it not true that when you

19   called Mrs. Dees you told her that Mr. Prater

20   was lying but there was nothing you could do

21   about it, that you had been told to stay out of

22   it?

23             MR. JOHNSON:  Object to the form.

JOHN WAYNE APPLEGATE

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CASE NO.:  2:0cv00306-MHT-CSC


JERRY LEON DEES, JR.,

      Plaintiff,

        V.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and

HYUNDAI MOTOR AMERICA, INC.,

      Defendants.




S T I P U L A T I O N S




IT IS STIPULATED AND AGREED by and

between the parties, through their respective

counsel, that the deposition of JOHN WAYNE

APPLEGATE may be taken before STACEY L. JOHNSON,

Commissioner, at the Marriott Prattville at

Capitol Hill, 2500 Legends Circle, Prattville,

Alabama, on the 29th day of November, 2007.

PLAINTIFF'S
EXHIBIT
6

JOHN WAYNE APPLEGATE

Page 27

1      Q    So what would you estimate the

2   percentage of time that would be split between

3   working under the Stamping press in that

4   location versus working near the conveyor

5   picking up scrap that had come off of it?

6      A    For the Maintenance person, he would be

7   spending the majority of his or her time

8   underneath the press on the press side and not

9   so much time over by the scrap shoot.  The scrap

10  shoots -- I mean, there's no equipment over

11  there, you know, so they spend their time where

12  the equipment is.

13     Q    The Team Members, as I understand it,

14  complete daily reports -- are required to

15  complete daily reports and turn those in?

16     A    Yes.

17     Q    And put them in a book?

18     A    Yes.

19     Q    I guess that book is maintained by

20  whoever the supervisor is?

21     A    Yes.

22     Q    Okay.  And I assume that those daily

23  reports would log whatever it is that Team

JOHN WAYNE APPLEGATE

Page 28

1    Member was assigned to do that day?

2        A    It should, yes.

3        Q    It should.  So if I were to look at

4    those daily reports, it should tell me what,

5    say, on any particular day Mr. Dees was doing

6    versus what Mr. Archer, Mr. Barefoot, or any

7    other Team Member was doing?

8        A    Yes.  If they -- again, if they

9    completed them, you know, accurately it should.

10           MR. SPORT:  Matt, I think those are

11   responsive and we'd like those.  I haven't seen

12   any of those.

13           MR. JOHNSON:  I don't -- I'm not sure

14   what they would be responsive to.  I'm not

15   saying they're not responsive.  They certainly

16   haven't come up.  And I don't know anything

17   about the retention policy on those or how long

18   they keep them or who keeps them.  So I don't

19   know.  We can -- I can certainly go back and try

20   to figure out, one, whether they're responsive

21   to any and, two, if we still have them or would

22   have them.

23           MR. SPORT:  Well, let's ask

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CASE NO.:  2:0cv00306-MHT-CSC


JERRY LEON DEES, JR.,

         Plaintiff,

              V.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and

HYUNDAI MOTOR AMERICA, INC.,

         Defendants.


        S T I P U L A T I O N S



        IT IS STIPULATED AND AGREED by and

between the parties, through their respective

counsel, that the deposition of JAMES ALLEN

BROOKSHIRE may be taken before STACEY L.

JOHNSON, Commissioner, at the Marriott

Prattville at Capitol Hill, 2500 Legends Circle,

Prattville, Alabama, on the 29th day of

November, 2007.

PLAINTIFF'S
EXHIBIT
7

JAMES ALLEN BROOKSHIRE

Page 108

1    Q    Go ahead and write hinged.

2    A    (Witness complied.)

3    Q    And the door in the middle is hinged on

4    its left or right side looking at the drawing?

5    A    Looking at the drawing the handle is on

6    the left-hand side of the door, so it would have

7    to be hinged on the right.

8    Q    Okay.  Now, I've heard that somehow or

9    another Mr. Dees had used the doors to provide a

10   hiding place.  Is that your recollection?

11   A    My recollection is at the time of this

12   incident the doors may have been cracked open

13   because sometimes Maintenance doesn't completely

14   shut the doors so they can easily access the

15   panel.  But my recollection was the doors were

16   mostly shut.  I can't account if they were

17   exactly locked shut but they were mostly shut.

18   As far as him using that routinely and opening

19   the doors to hide, I don't know.

20   Q    You didn't see door panels -- excuse

21   me -- you didn't see doors open to the extent

22   that you thought they were being used by

23   Mr. Dees as a blind to hide behind?

JAMES ALLEN BROOKSHIRE

Page 109

1           MR. JOHNSON:  Object to the form.

2      A    What I can tell you is the day of the

3  incident that I seen him I can't tell you

4  whether the doors were completely locked or not,

5  but they weren't wide open.

6      Q    Well, in your opinion, since you were

7  the only one there besides Mr. Dees, were the

8  doors positioned so they made a blind to assist

9  in hiding?

10          MR. JOHNSON:  Object to the form.

11     A    I can't really see how opening these

12  doors hides him from anything.

13     Q    I can't either, but that's not my

14  question.

15     A    This is the third floor, and when

16  you're down here, this door is going to hide you

17  from a crane coming at you and that door hides

18  you from an elevator.  So there's really...

19     Q    So if you wanted to hide, you wouldn't

20  open the door panels looking at this drawing on

21  the left or right because the visibility would

22  be --

23     A    Down below.

**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY LEON DEES, JR.,                    *
                                         *
      Plaintiff,                        *
                                         *
Vs.                                      *          **CASE NO.**
                                         *     **2:07-cv-00306-MHT-CSC**
HYUNDAI MOTOR MANUFACTURING              *
ALABAMA, LLC, and HYUNDAI                *
MOTOR AMERICA, INC.,                     *
                                         *
      Defendants.                       *

## <u>DECLARATION OF LEON DEES</u>

1.      My name is Leon Dees. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.      I was employed with Hyundai Motor Manufacturing Alabama, LLC ("HMMA"), from November 2005 until February 26, 2007, in the stamping maintenance department as a maintenance technician.

3.      During my interview with Greg Prater and William Ware conducted as part of the investigation by Team Relations of the allegation that Jim Brookshire observed me sleeping, I told Prater and Ware that I had not been sleeping, that I did not sleep at work, and that Shane Archer and I had been in the SOPS on the third floor to repair and pull trolleys. I also told them that Shane had been with me the entire shift except for the five or so minutes he went down to press No. 2 before me, as I had stayed behind to make sure that the trolleys were not going to malfunction again. I further told them that if



PLAINTIFF'S
EXHIBIT
8

they questioned Shane about the incident, he should be able to verify everything I had told them.

4.    My work record at HMMA prior to the harassment about my military service obligations was exemplary. I had no  blemishes on my work record at HMMA prior to the Guard writing the Letter of Instruction ("LOI") to HMMA in October 2006. Within a week of the LOI, and until I wrote an e-mail to Greg Kimble on February 6, 2007, citing continued harassment about my military service obligations despite two previous complaints to, I was written up four times for various alleged rules infractions.

5.    Exactly one week after I wrote the email to Kimble, complaining for the third time about harassment because of my military service obligations, I was accused of sleeping on the job.

6.    The pit is a concrete-enclosed area under the two stamping presses. Working in the pit is a highly dangerous and filthy activity. HMMA requires employees working in the pit to wear ballistic sleeves over their clothing and safety eyewear to prevent injury from flying metal, and hearing protection to prevent hearing loss from the 90 decibel noise level. The stamping presses punch out automobile body panels from sheet metal using thousands of pounds of hydraulic force. Scrap metal pieces from the stamping process, many of them razor sharp, fall down through a chute into the pit below. Along with the razor-sharp scrap metal comes hydraulic fluid and oil from lubricating the presses and the material being pressed during the stamping process. Although in theory the scrap metal is supposed to fall onto a conveyor that transports it out from under the press where it can be accumulated to send to a scrap vendor, much of the razor-sharp scrap metal flies through the air and lands on the floor. While all of

- 2 -

this is happening and the presses are running immediately overhead, the employee assigned to the pit must clean up the mess constantly being made by the razor-sharp metal and fluids hitting the floor.

7.    As part of my job function at HMMA, I completed Daily Reports every day that detailed the work activities I performed each day. These Daily Reports were filed in the maintenance shop office and maintained by Greg Prater. When I was assigned to the pit, which was often, after I complained to my unit about being harassed because of my military service obligations, I would always designate on the Daily Report that I was in the pit. An analysis of those Daily Reports would reveal that I worked in the pit more than any other stamping maintenance employee.

8.    I have recently learned that Spencer Lewis, who had replaced Greg Prater as Assistant Manager and has since left HMMA, saw Greg Prater destroy the daily reports that related to me sometime after this lawsuit was filed and before Prater left HMMA.

9.    Although I never talked to a pastor about the emotional distress I suffered or sought medical treatment for it or cry about it, I did experience severe emotional distress, and dealt with it internally through praying to his Lord about it. I relive the trauma of being falsely accused of abandoning my post every time I fill out a job application or a bank loan application. My wife and I cannot discuss what happened for any length of time without her breaking down and crying, which causes me great pain.

10.    The weekend drill schedule published by the Guard every October is the only notice of Guard drill weekend dates. I repeatedly told this to HMMA management when orders for weekend drill were repeatedly demanded.

- 3 -

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this _31_ day of January, 2008.

_Jerry Leon Dees, Jr._
Jerry Leon Dees, Jr.

- 4 -

**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY LEON DEES, JR.,                          *
                                               *
     Plaintiff,                          *
                                               *
Vs.                                            *          **CASE NO.**
                                               *      **2:07-cv-00306-MHT-CSC**
HYUNDAI MOTOR MANUFACTURING                    *
ALABAMA, LLC, and HYUNDAI                       *
MOTOR AMERICA, INC.,                           *
                                               *
     Defendants.                         *

## <u>DECLARATION OF SHANE ARCHER</u>

    1.    My name is Shane Archer. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

    2.    I am a team member in the Stamping Maintenance department at Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). Leon Dees and I were team members in Stamping Maintenance, reporting to Greg Prater, our immediate supervisor.

    3.    Based on my personal observations, Prater wanted to get rid of Leon because of the ongoing dispute over Leon's Guard obligations. On at least two occasions, Prater attempted to coerce me to lie about Leon so that HMMA could have him fired.

    4.    In November or December 2006, Prater tried to get me to say that Leon was threatening and making the workplace stressful because of his aggressive behavior. I refused to lie. On another occasion, Prater tried to get me to say that Leon threw down a part and walked away from Prater. I was there, and Leon did not throw

- 1 -



anything down or walk away. I was very uncomfortable in these situations. However, I would not lie so HMMA could fire Leon.

5.    All the team members in Stamping Maintenance, including myself, knew that Prater was out to get Leon because of his Guard obligations.

6.    On the night that Jim Brookshire claims he caught Leon sleeping, I was working with Leon in the Side Outer Panels area, commonly referred to as the SOPS. I had been with HMMA for approximately six months, and was training with Leon.

7.    Leon was assigned responsibility for SOPS, so he was stationed in that area. It was very common for Leon to be in this area, since it was his area of assigned responsibility. Leon was assisting the production department in running the system. We were on the third floor mezzanine. I saw Kevin Hughes, team leader, walking below us and looking up. The floor we were on is steel mesh that can be seen through. Jim Brookshire was with Kevin Hughes, and they were looking up at Leon and myself. We were clearly visible.

8.    Shortly thereafter, I left the third floor.  Leon remained to monitor the trolley system that carries the stamped panels. I went to press No. 2 to check on things there. When I left the third floor, the doors on the PLC cabinet were closed. There was no "blind" created with the PLC doors to hide Leon's chair.

9.    When I left Leon, he was, as usual, alert and tending to his responsibilities. I observed Leon and saw no indication that Leon was groggy or tired.

10.    Approximately five minutes after I left Leon on the third floor, Leon came down and joined me at press No. 2. The five or so minutes we were apart was the only time we were apart all night. Although I do not remember the exact time, I do remember

- 2 -

that it was before our lunch time at 11:30 p.m. We were working the 6:00 p.m. to 4:45 a.m. shift.

11.    When Leon joined me at press No. 2, he was alert.  Again, I observed Leon, and he gave no indication of being tired or groggy.

12.    As I stated, Leon and I were separated only for about five minutes.  Leon could not have set up the PLC as a "blind" or otherwise have arranged the room, fallen asleep, woke up, and returned to me at press No. 2 within that time frame.

13.    Leon did not fall asleep at work.  I believe this false claim was an excuse to fire Leon because of Leon's Guard activities.

14.    It was clear to me for quite some time that Leon was being harassed because of his Guard obligations.  Leon was always the first choice to work the pit, which is a job that no one likes to do. The Stamping Maintenance daily reports, completed by the team members based on their assigned tasked each day, would show that Leon worked the pit more than anyone on our shift. Team members turned these daily reports in to Greg Prater, who filed them in the shop office.

15.    I understand that HMMA conducted an investigation into the events regarding Brookshire allegedly catching Leon asleep. Even though I was the HMMA employee who worked side-by-side with Leon the entire night in question, no one at HMMA asked me a single question about that night before Leon was fired. After this case was filed, one of HMMA's lawyers asked me what happened that night, and I told him Leon was not sleeping.

16.    Neither Hughes nor Brookshire came up to the third floor mezzanine area that night while I was up there.

- 3 -

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this ___24___ day of January, 2008.

_____
Shane Archer

**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA

JERRY LEON DEES, JR.,                          *
                                               *
          Plaintiff,                           *
                                               *
Vs.                                            *          **CASE NO.**
                                               *     **2:07-cv-00306-MHT-CSC**
HYUNDAI MOTOR MANUFACTURING                    *
ALABAMA, LLC, and HYUNDAI                      *
MOTOR AMERICA, INC.,                           *
                                               *
          Defendants.                          *

<u>**DECLARATION OF MARK BORNBERG**</u>

    1.    My name is Mark Bornberg. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

    2.    I am a team member in the Stamping Maintenance department at Hyundai Motor Manufacturing Alabama ("HMMA"). I worked with Leon Dees and with Greg Prater, our immediate supervisor.

    3.    HMMA harassed Leon about his Guard duty, particularly about not having written orders for his drill weekends. Leon went to John Applegate, head of Maintenance, to complain about HMMA's harassment, but Applegate did not take any action.

    4.    Leon then went to Human Resources and complained about the harassment. When that did no good, he had his Guard unit write a letter to HMMA Human Resources about the federal law pertaining to Guard personnel.

- 1 -



**PLAINTIFF'S EXHIBIT**
10

5.    After the letter from the Guard, Prater's harassment of Dees got worse. It looked like Leon had a target on his back because of his Guard obligations. The other team members thought so too.

6.    On one occasion, Kevin Hughes, team leader, took a small disagreement and accused Leon of threatening him. On another occasion, when Leon asked Prater to buy locks for the gang boxes, Prater accused Leon of creating a hostile work environment.

7.    Shane Archer told me that HMMA tried to get Archer to lie and say that Leon was creating a hostile work environment so that HMMA could fire him. Archer refused, even though he had been an employee only a few months.

8.    HMMA always assigned Leon to clean the pit more than anyone else. During a one-week period, Leon cleaned the pit several days.

9.    Paul Powell, a Stamping Maintenance team member from the other shift, and I demanded proof that Leon was sleeping. All that existed was the word of Jim Brookshire. Brookshire's word is questionable. Brookshire has come to work with alcohol on his breath. This has been witnessed by several other people.

10.    Brookshire often sided with Prater in HMMA's harassment of Dees. On one occasion, Prater, Brookshire and Craig Stapely got onto Leon about not completing his daily report, although other team members had not completed their daily reports and no other team member was questioned.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this _22nd_ day of January, 2008.


Mark Bornberg

**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| Vs. | * | **CASE NO.** |
| | * | **2:07-cv-00306-MHT-CSC** |
| HYUNDAI MOTOR MANUFACTURING | * | |
| ALABAMA, LLC, and HYUNDAI | * | |
| MOTOR AMERICA, INC., | * | |
| | * | |
| Defendants. | * | |

## DECLARATION OF JOHN WINGO

1.      My name is John Wingo. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.      I was employed with Hyundai Motor Manufacturing Alabama, LLC ("HMMA"), from January 2006 until September 2006, in the stamping maintenance department as a team member of Leon Dees.

3.      I have known Leon Dees for several years, and I worked with him at International Paper before coming to HMMA.

4.      While I was employed by HMMA, HMMA, through supervisors such as Greg Prater, harassed Leon Dees about his orders from the National Guard and made derogatory comments about the National Guard in general.

5.      In my presence, and in the presence of other team members, Prater stated that all Guard members did on their training weekends was drink beer and play golf. Prater made clear that he resented Leon for fulfilling his obligations to the Guard.

- 1 -



6.    On several occasions, HMMA and Prater demanded that Leon provide orders for his training weekends. Leon would explain that his training schedule was published annually and provided to HMMA Human Resources, and that he had turned it in as he was supposed to. Demanding non-existent orders from Leon was clearly harassment based on Leon's Guard obligations.

7.    On one occasion, Leon had two weeks special training for the Guard. HMMA and Prater demanded orders showing he had to attend the training. Leon explained that he had already filled out and provided appropriate forms. Prater, however, would not let it drop. The closer it got to Leon's departure date for the training, HMMA and Prater kept bringing it up, demanding a copy of his orders, and Leon would again explain that he had properly turned forms in.

8.    HMMA would send Leon to clean the pit more than anyone else. HMMA also assigned Leon the worst jobs, such as the dirty job of wiping down the press.

9.    It was clear to me and common knowledge among the Stamping Maintenance team members that HMMA wanted to get rid of Dees because of his Guard obligations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this _24th_ day of January, 2008.

John Wingo

- 2 -

**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA

JERRY LEON DEES, JR.,          *

      Plaintiff,             *

                       *

Vs.                       *         **CASE NO.**

                       *   **2:07-cv-00306-MHT-CSC**

HYUNDAI MOTOR MANUFACTURING   *

ALABAMA, LLC, and HYUNDAI      *

MOTOR AMERICA, INC.,       *

                       *

      Defendants.           *

<u>**DECLARATION OF LT. COL. (Ret.) TODD HARRISON**</u>

     1.     My name is Todd Harrison. I am over eighteen (18) years of age, and have personal knowledge regarding the information contained in this Declaration.

     2.     During 2003 and 2004, I was Commander of the 1168th Military Police Battalion in Baghdad, Iraq. Sgt. Jerry Leon Dees was a member of the 1165th Military Police, which was assigned to my Battalion.

     3.     I came to know Sgt. Dees when he was assigned to my second security detail. Sgt. Dees served in this capacity for three to six months. During his time on my security detail, Sgt. Dees was always extremely professional, alert, and dependable.

     4.     Sgt. Dees was in charge of my second security detail, which was a back-up to my personal body guard, a staff sergeant who ran my entire security detail. My personal body guard came to rely heavily on Sgt. Dees because of Sgt. Dees' reliability and professionalism.

- 1 -



**PLAINTIFF'S EXHIBIT**

12

5.    I literally trusted Sgt. Dees with my life, and I cannot believe any claim that Sgt. Dees fell asleep while on duty, even in a civilian job.   This would be completely contrary to his character.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this ___24th___ day of January, 2008.

Lt. Col. (Ret.) Todd Harrison

- 2 -

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA

JERRY LEON DEES, JR.,     *
            *
  Plaintiff,      *
            *
Vs.           *   **CASE NO.**
            *  **2:07-cv-00306-MHT-CSC**
HYUNDAI MOTOR MANUFACTURING *
ALABAMA, LLC, and HYUNDAI   *
MOTOR AMERICA, INC.,    *
            *
  Defendants.     *

### DECLARATION OF WENDELL RICHBURG

1.  My name is Wendell Richburg. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.  Until my retirement in October 2007, I was the Operations NCO for the 1165th Military Police, an Army National Guard unit headquartered at Riel Armory in Fairhope, Alabama. I served in the National Guard for twenty-two years.

3.  I first met Sergeant Jerry Leon Dees in March 2003. Although Sgt. Dees had been in a chemical unit in Clanton, Alabama , Dees volunteered for active duty with the 1165th in Iraq, serving with honor in Iraq from May 2003 through July 2004. Most of that time Sgt. Dees spent in the Baghdad area training Iraqi police and conduction combat patrols.

4.  I frequently accompanied Sgt. Dees on combat patrols as part of a three-man team. When I had the opportunity, I specifically elected to patrol with Sgt. Dees because of his skill, courage, and dependability.

- 1 -



5.     While in Iraq, Sgt. Dees was also assigned to the personal protection team of Colonel Baker, the Commanding Officer of the 2nd Brigade, 1st Armored Division. Sgt. Dees has been recommended for a Bronze Star for his performance in this job.

6.     Sgt. Dees was a good man in combat, and always received excellent ratings on his efficiency reports. I cannot believe any allegation that Sgt. Dees fell asleep while on duty, even in a civilian job. This would be completely contrary to his character.

7.     Sgt. Dees should have been eligible for a promotion earlier this year, except that he was not able to attend a mandatory school because of his problems at Hyundai.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct. Executed this _____ day of January, 2008.

Sgt. First Class (ret.) Wendell Richburg

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY LEON DEES, JR.,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
vs.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
HYUNDAI MOTOR MANUFACTURING　)
ALABAMA, LLC, and HYUNDAI MOTOR )
AMERICA, INC.,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)

CASE NO.
2:07-cv-00306-MHT-CSC

**HYUNDAI MOTOR MANUFACTURING ALABAMA LLC'S AND
HYUNDAI MOTOR AMERICA, INC.'S INITIAL DISCLOSURES**

Defendants Hyundai Motor Manufacturing Alabama LLC ("HMMA") and Hyundai Motor America, Inc. ("HMA") (collectively "Defendants"), provide the following identification of witnesses, documents, damages and insurance coverage as provided for in Federal Rule of Civil Procedure 26(a)(1):

**A.　Persons Likely To Have Discoverable Information**

Defendants state that Plaintiff's counsel is ethically prohibited by Rule 4.2 of the Alabama Rules of Professional Conduct from contacting HMMA and HMA employees who possess management authority or whose admissions could bind Defendant(s).　As such, Plaintiff is prohibited from contacting witnesses designated below as 2-8.　Without waiving and in accordance with this statement, Defendants are aware of the following individuals responsive to this disclosure requirement:

　　1.　　Jerry Leon Dees, Jr.
　　　　　c/o Plaintiff's counsel



PLAINTIFF'S
EXHIBIT
14

Jerry Leon Dees, Jr. is believed to have knowledge of the allegations set forth in his Complaint.

2.      Wendy Warner
        Manager of the Employment Section, HMMA
        c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        One Federal Place, Suite 1000
        1819 5th Avenue North
        Birmingham, AL   35203-2118

Ms. Warner has information regarding the relationship between HMA and HMMA, information relating to HMMA's employment of Plaintiff, and the events alleged in this lawsuit.

3.      Jim Brookshire
        Stamping Manager, HMMA
        c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        One Federal Place, Suite 1000
        1819 5th Avenue North
        Birmingham, AL   35203-2118
        (205) 328-1900

Mr. Brookshire is familiar with the incident and investigation that led to the termination of Plaintiff's employment with HMMA and the events alleged in this lawsuit.

4.      William Ware
        Team Relations Specialist, HMMA
        c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        One Federal Place, Suite 1000
        1819 5th Avenue North
        Birmingham, AL   35203-2118
        (205) 328-1900

Mr. Ware is familiar with the investigation of the incident that led to the termination of Plaintiff's employment with HMMA and the events alleged in this lawsuit.

5.      Greg Prater
        Manager, Plant Engineering, HMMA
        c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        One Federal Place, Suite 1000
        1819 5th Avenue North
        Birmingham, AL   35203-2118
        (205) 328-1900

Mr. Prater has information relating to Plaintiff's employment at HMMA and the events alleged in this lawsuit.

6.    Kevin Hughes
       Team Leader, Plant Engineering, HMMA
       c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
       One Federal Place, Suite 1000
       1819 5th Avenue North
       Birmingham, AL  35203-2118
       (205) 328-1900

Mr. Hughes is generally familiar with the employment of Plaintiff at HMMA and the events alleged in this lawsuit.

7.    Rob Clevenger
       Team Relations, HMMA
       c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
       One Federal Place, Suite 1000
       1819 5th Avenue North
       Birmingham, AL  35203-2118
       (205) 328-1900

Mr. Clevenger assisted in the investigation of an incident that led to the termination of Plaintiff's employment and has information of the events alleged in this lawsuit.

8.    John Applegate
       Sr. Manager, Plant Engineering, HMMA
       c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
       One Federal Place, Suite 1000
       1819 5th Avenue North
       Birmingham, AL  35203-2118
       (205) 328-1900

Mr. Applegate is familiar with the job duties of HMMA maintenance members, familiar with events surrounding the termination of Plaintiff's employment and with the events alleged in this lawsuit.

Defendants reserve the right to timely supplement these Initial Disclosures.

3

**B.    Relevant Documents**

Defendants state that some documents listed below may be protected by the attorney-client privilege, or the attorney work product doctrine, or as trial preparation materials under Rule 26(b)(3). By listing such documents, Defendants do not waive the privilege(s) attached thereto. In addition, Defendants do not waive any other objection it may have to discovery requests with respect to such documents (such as a requirement that certain document requests be limited in scope and/or be subject to a mutually agreeable protective order).

Without waiving and in accordance with the above statements, Defendants are currently aware of the following documents responsive to the disclosure requirement:

1.    Employment file for Jerry Leon Dees, Jr.
2.    Team Relations file for Jerry Leon Dees, Jr.
3.    Benefits file for Jerry Leon Dees, Jr.
4.    Payroll file for Jerry Leon Dees, Jr.
5.    Team Member Handbook
6.    Military Leave policy
7.    Any documents disclosed by any party during the discovery of this case.

Defendants reserve the right to timely supplement these Initial Disclosures.

**C.    Computation of Claimed Damages**

HMMA and HMA do not claim damages at this time, however, discovery is ongoing. HMMA and HMA reserve the right to supplement this response as discovery proceeds, and claim attorneys fees and expenses if it prevails and if the Court determines that such fees and expenses are recoverable under applicable rule or statute. HMMA and HMA further reserve the right to claim damages, attorney's fees and expenses for any counter-claim or third-party claim that it makes in this action.

4

**D.**      **Insurance Agreement**

There is an insurance agreement that may be applicable to any judgment entered in this

proceeding.

Defendants reserve the right to supplement these disclosures as discovery proceeds.

Served this the 7th day of June, 2007.

J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com


Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**


Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2007, I served a copy of the foregoing via U.S. Mail, postage prepaid, and addressed as follows:

Vincent F. Kilborn, Esq.
David Allen McDonald, Esq.
W. Perry Hall, Esq.
Kilborn, Roebuck & McDonald
1810 Old Government Street
P.O. Box 68710
Mobile, AL 36660

Jeffrey R. Sport, Esq.
Jeffrey R. Sport, P.C.
8475 Sterling Drive
Mobile, AL 36695

_____
Of Counsel

6

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. |
| vs. | ) | 2:07-cv-00306-MHT-CSC |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, and HYUNDAI MOTOR | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## HYUNDAI MOTOR MANUFACTURING ALABAMA LLC'S AND HYUNDAI MOTOR AMERICA, INC.'S FIRST SUPPLEMENTAL DISCLOSURES

Defendants Hyundai Motor Manufacturing Alabama LLC ("HMMA") and Hyundai Motor America, Inc. ("HMA") (collectively "Defendants"), supplement the identification of persons likely to have discoverable information as provided for in Federal Rule of Civil Procedure 26(a)(1) as follows:

A.    <u>Persons Likely To Have Discoverable Information</u>

Defendants state that Plaintiff's counsel is ethically prohibited by Rule 4.2 of the Alabama Rules of Professional Conduct from contacting HMMA and HMA employees who possess management authority or whose admissions could bind Defendant(s). As such, Plaintiff is prohibited from contacting witnesses designated below as 1-4. Without waiving and in accordance with this statement, Defendants are aware of the following individuals responsive to this disclosure requirement:

1.      John Kalson
        Vice President Production, HMMA
        c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        One Federal Place, Suite 1000
        1819 5th Avenue North
        Birmingham, AL  35203-2118

Mr. Kalson is familiar with the decision-making process that resulted in Dees' termination.

2.      Scott Gordy
        Manager of Payroll, HMMA
        c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        One Federal Place, Suite 1000
        1819 5th Avenue North
        Birmingham, AL  35203-2118

Mr. Gordy is familiar with the decision-making process that resulted in Dees' termination.

3.      Richard E. Neal
        General Counsel, HMMA
        c/o Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
        One Federal Place, Suite 1000
        1819 5th Avenue North
        Birmingham, AL  35203-2118

Mr. Neal is familiar with the decision-making process that resulted in Dees' termination because he was consulted as General Counsel to ensure that the termination process was legally defensible and, therefore, Mr. Neal's involvement is attorney-client privileged.

4.      In addition, the following individuals are familiar with the decision-making process that resulted in Dees' termination: (a) John Applegate; (b) Rob Clevenger; and (c) Wendy Warner.

Defendants reserve the right to supplement these disclosures as discovery proceeds.

Served this the 11th day of September, 2007.

_____
J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)

2

OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on September 11th, 2007, I served a copy of the foregoing via Federal Express and addressed as follows:

Vincent F. Kilborn, Esq.
David Allen McDonald, Esq.
W. Perry Hall, Esq.
Jeffrey R. Sport, Esq.
Kilborn, Roebuck & McDonald
1810 Old Government Street
P.O. Box 68710
Mobile, AL 36660

_____
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. |
| | ) | 2:07-cv-00306-MHT-CSC |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, and HYUNDAI MOTOR | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' SUPPLEMENTED INITIAL DISCLOSURES/DOCUMENT PRODUCTION

Pursuant to Federal Rule of Civil Procedure 26(c), Defendants, Hyundai Motor Manufacturing Alabama LLC ("HMMA") and Hyundai Motor America, Inc. ("HMA") (collectively "Defendants"), make the following supplementations to their Initial Disclosures and production of documents which have been made during the course of discovery to date. In making this supplementation, Defendants hereby adopt and incorporate their complete objections, responses, and identification of documents which have been previously produced during the course of discovery.

## A.    Persons Likely To Have Discoverable Information

Defendants recognize that the 30(b)(6) deposition scope issue regarding the relationship between HMMA and HMA is currently pending before the Court. Both Defendants HMMA and HMA shall designate corporate representative(s) to provide information responsive to the appropriate scope, as that scope is determined by the Court or otherwise agreed to by the parties.

Out of an abundance of caution, Defendants include these corporate representatives as persons likely to have discoverable information, for purposes of supplementation of their Initial Disclosures. Defendants reserve the right to further supplement as justice requires.

**B.**    **Relevant Documents**

Defendants supplement their document disclosures/document production as follows:

1.    Documents from Plaintiff's original employment file (Bates # 309 – 325, previously provided).

2.    Contents removed from Plaintiff's locker and provided to Plaintiff on November 20, 2007.

3.    DVD memorializing removal of Plaintiff's locker contents, previously provided to Plaintiff's counsel.

4.    List of contents removed from Plaintiff's locker (Bates #332).

5.    Copies of "original" files marked at the deposition of Wendy Warner, deposition exhibits nos. 1 – 4, available from Court Reporter.

6.    Documents responsive to the duces tecum requests served in connection with Wendy Warner's deposition (Warner Depo Doc. # 0001 - 54, previously provided).

7.    E-mail from Plaintiff to Greg Kimble, dated February 6, 2007 (Bates #333), attached hereto.

8.    Updated Employment department file of Greg Prater, to reflect documents added to his file as of September 7, 2007 (Bates # 0326 – 331).

9.    Defendant HMMA states that, with the exception of the documents identified in number 8 above, it has no additional documents to supplement regarding the Employment department and Team Relations department files of Kevin Hughes, Greg Prater, John Applegate, Jim Brookshire, and Wendy Warner.

10.    Additional electronic mail documents retrieved related to Plaintiff's termination meeting and de-activation of Plaintiff's HMMA I.T. account (Bates # 0334 - 338, attached hereto).

11.    Additional electronic mail documents retrieved by John Applegate from his work

2

computer related to Plaintiff's employment. (Bates # 0339 – 0343).

12.     Photographs taken by Rob Clevenger on March 5, 2007 (Bates # 0344 – 0350).

13.     Compact disc containing 219 photographs taken during November 28, 2007 On-Site Inspection noticed by Plaintiff's Counsel.

14.     Out of an abundance of caution, Defendants also identify all documents obtained from third parties via subpoena, which have been previously provided. Defendants shall also make available any documents provided pursuant to subpoena served on Plaintiff's cellular phone provider.

Defendants reserve the right to supplement as justice requires.

**C.     Computation of Claimed Damages**

HMMA and HMA do not claim damages at this time, however, discovery is ongoing. HMMA and HMA reserve the right to supplement this response as discovery proceeds, and claim attorneys fees and expenses if it prevails and if the Court determines that such fees and expenses are recoverable under applicable rule or statute. HMMA and HMA further reserve the right to claim damages, attorney's fees and expenses for any counter-claim or third-party claim that it makes in this action.

**D.     Insurance Agreement**

There is an insurance agreement that may be applicable to any judgment entered in this proceeding.

Defendants reserve the right to supplement these disclosures as justice requires.

Signed as to objections,

J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,

3

SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com
Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2007, I served a copy of the foregoing via Hand

Delivery, and addressed as follows:

Jeffrey R. Sport, Esq.
Vincent F. Kilborn, Esq.
David Allen McDonald, Esq.
W. Perry Hall, Esq.
Kilborn, Roebuck & McDonald
1810 Old Government Street
Mobile, AL 36660

Of Counsel

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **JERRY LEON DEES, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CASE NO.** |
| **vs.** | ) | **2:07-cv-00306-MHT-CSC** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING** | ) | |
| **ALABAMA, LLC, and HYUNDAI MOTOR** | ) | |
| **AMERICA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' SECOND SUPPLEMENTED INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(c), Defendants, Hyundai Motor Manufacturing Alabama LLC ("HMMA") and Hyundai Motor America, Inc. ("HMA") (collectively "Defendants"), make the following supplementations to their Initial Disclosures which have been made during the course of discovery to date. In making this supplementation, Defendants hereby adopt and incorporate their complete objections, responses, and identification of documents which have been previously produced during the course of discovery.

**A.    Persons Likely To Have Discoverable Information**

Defendants supplement their Initial Disclosures to include Kathy Parker, Vice President, Human Resources and Community Relations of Hyundai Motor America, Inc. Ms. Parker is believed to have discoverable information regarding the fact that HMA has no control or influence over HMMA's Human Resources/Employment Department, and that HMA never employed Plaintiff or had any control over his employment opportunities.

Defendants reserve the right to further supplement as justice requires.

J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**


Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on December __10<u>th</u>__, 2007, I served a copy of the foregoing via

Facsimile and First Class U. S. Mail, postage prepaid, addressed as follows:

Jeffrey R. Sport, Esq.
Vincent F. Kilborn, Esq.
David Allen McDonald, Esq.
W. Perry Hall, Esq.
Kilborn, Roebuck & McDonald
P.O. Box 66710
Mobile, AL  36660

Of Counsel

3

# KILBORN
# ROEBUCK &
# McDONALD
### ATTORNEYS AT LAW

| VINCENT F. KILBORN, III | M. LLOYD ROEBUCK | DAVID A. MCDONALD | W. PERRY HALL | JEFFREY R. SPORT |
|---|---|---|---|---|

December 11, 2007

<u>Via Fax and U.S. Mail</u>

J. Trent Scofield, Esquire
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118

Matthew K. Johnson, Esquire
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602

Re:   *Dees v. Hyundai Motor Manufacturing Alabama, LLC, et al.*

Gentlemen:

During Mr. Applegate's deposition it became apparent that there may be additional documents responsive to our existing document requests that have not yet been produced. First, Mr. Applegate testified that the daily reports should contain evidence of the activities performed by the maintenance employees on any given day. Since we have previously requested documents relating or referring to the "pit" in request No. 9, I believe that these daily reports are responsive to that request.

Second, Mr. Dees testified that Mr. Prater maintained the guard weekend schedules that Mr. Dees turned in. These documents are responsive to request No. 3.

Third, as Matt and I discussed, Plaintiff has previously requested all policies and procedures in effect during Mr. Dees' employment tenure. Matt indicated that what was produced was what was relevant to this suit. Defendants, however, are not the only arbiter of what is relevant. I have offered to review an index of the policies and procedures to ascertain whether any others may be relevant, in our opinion. Please provide either all of the requested policies and procedures, or an index containing a description of the policies and procedures, for my review.

Please provide these documents as soon as possible, or please notify me of your objections immediately so that I may file the appropriate motion to compel.

PLAINTIFF'S
EXHIBIT
15

Trent Scofield, Esq.
December 11, 2007
Page 2 of 2

With best regards, I remain

Very truly, yours,

JEFFREY R. SPORT
For the Firm

JRS/jrs

MAR-26-2007 13:52  FROM:ARNG-RECRUITING

DETACHMENT 1, 1165TH MILITARY POLICE (CBT)(SPT)
ALABAMA ARMY NATIONAL GUARD
95 AIRPORT DRIVE
BREWTON, ALABAMA 36426

TM4A-1-RNCO                                          26 MAR 2007

MEMORANDUM FOR RECORD

SUBJECT: IDT INSTRUCTIONAL LETTER FOR HUMAN RESOURCE OFFICER

1.  This is in reference to a letter that was sent on behalf of SSG Jerry L. Dees, on or around 23 OCT 2006. SSG Dees notified this office that his supervisor was requiring a copy of orders for SSG Dees' IDT Training Periods, (drill weekends). At this time I mailed a LOI, letter of instruction to the Human Resource Office of Hyundai in Montgomery, which is SSG Dees' place of employment.

2. Basically the letter stated that orders for drill weekends were not cut. The only orders cut was a unit order for the 2 week annual training period. Drill weekends are scheduled out on a YTC, yearly training schedule and this provides the employer with all the drill dates and annual training dates for that physical year. Also if the employer required it, the unit would gladly provide a Letter of Participation stating that SSG Dees was present at the scheduled drill. I also provided a copy of the yearly drill calendar to the HRO and to SSG Dees to give to his supervisor. I also informed the HRO if there was anything that the unit could do to make this process easier for the employer, let me know.

3.  If you need any further information, please contact me, SGT BARNES at 251-867-5473.

FOR THE COMMANDER:

FRANKLIN D. BARNES
SGT, MP, AL ARNG
TRAINING NCO

PLAINTIFF'S
EXHIBIT
16

| ⬡ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Team Relations Memo** | HR-AL-HR-TR-<br>F-00002 |
|---|---|---|
| Revision Date:  9-<br>Sept-04 | Owner: Team Relations | Revision Level:<br>00 |

**TO:**  Greg Kimble

**FROM:**  Rob Clevenger

**DATE:**  February 23, 2007

**SUBJECT:**  Leon Dees/ Term

**Summary:** On February 14, 2007 at approximately 1am, Jim Brookshire (mgr, stamping) was in the stamping third level looking at a quality issue. The third level overhead is approximately 75ft off the ground. It is an isolated area. This is where the side outer panels are warehoused in overflow.

Jim noticed Leon sitting in front of a panel in a chair. Jim states Leon was asleep with his head down and his chin tucked to his chest. Jim states he was 25ft away when he first noticed Leon. Two doors of the panel were open which served as a blind and hide Leon from most views.  He moved to within 15ft of Leon and observed him for approximately Two (2) minutes. At that time Jim keyed the mike on his radio and it made a chirping sound several times. At this sound Leon lifted his head then got up and picked up a tool used to clear carrier when they become inoperable.

Leon did not speak to Jim or explain his presence in the overhead. Jim also noted there were no carriers that were in need of service. There is no reason for a maintenance person to be in the overhead unless there is an immediate need for carrier repair.

In Leon's statement he says the time was 10:30pm to 11:30pm. He also states he was sitting in the overhead text messaging his daughters regarding the weather and was not asleep. Leon state Jim never got closer than 50ft from him. Leon became agitated and stated he didn't give a damn and was tired of this shit.

**Conclusion:** Leon's statement does not match the timeline or the proximity described by the stamping manager. I believe we must give weight to the manager's account and assume that the event took place at 1am on Wednesday morning. The storms had passed our area by 7:15pm on Tuesday evening. I have a signed statement by the stamping manager that he was 15ft from Leon and observed him for 2 minutes. There was a chair placed in between the two open doors. The area is several feet off the floor and is an area that a maintenance man would enter fix a carrier and then leave. There is not a need or a practice where a person would need a chair and be waiting in that area for a breakdown to occur. The department is asking for termination.



**PLAINTIFF'S EXHIBIT**<br>17

| ![HYUNDAI logo] **HYUNDAI** Hyundai Motor Manufacturing Alabama | **Team Relations Memo** | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

Past Practice:

| 102705 | King | Ontario | Engine | 3-Jan-06 | Inappropriate conduct | Sleeping during work hours |
|---|---|---|---|---|---|---|

PLAINTIFF'S
EXHIBIT
18

Interview with Jim Brookshire

On Feb 14 at approx. 1:00 AM, Jim went upstairs to check on some quality issues in the SOP. (side outer)

Jim went up to the 3rd floor where he noticed Leon Deer sitting at operating station. Leon was positioned with his head down and his back was towards the cabinet.

Jim observed Leon sitting in this position for approx. 2 minutes.

At this time Jim turned up his radio and let it chirp about 4 times before Leon responded.

Whenever Leon woke up he grabbed a pole and began to act like he was pulling trolleys.

Jim went around to check some panels and when he approached the area again he noticed Leon sitting in the same chair; however, this time he was alert. Not long after this Jim witnessed Leon walking down the stairs.

About 30 minutes passed by before Jim talked to the Kevin Hughes. During this time Kevin did not know where Leon was.

T-A B— 2-15-07

Jim was approximately 25 feet away from Leon when he noticed that he was asleep.

Jim walked towards Leon and began chirping his radio at a distance approx 15 feet.

Due to Leon's hat being on his head Jim did not see his eyes closed; however he (Jim) stated that his head was facing towards the floor, with his chin tucked to his chest).

J-A-B
2-19-07

**Clevenger, Robert A HMMA/HR**

| | |
|---|---|
| **From:** | Applegate, John HMMA/Plant Engineering |
| **Sent:** | Wednesday, February 21, 2007 5:58 AM |
| **To:** | Clevenger, Robert A HMMA/HR |
| **Subject:** | FW: Leon Deez |

**From:** Prater, Greg L HMMA/Plant Engineering
**Sent:** Wednesday, February 21, 2007 5:20 AM
**To:** Applegate, John HMMA/Plant Engineering
**Subject:** Leon Deez

John per Leon and I and Wills conversation: I started that it was reported by management that he was sleeping in the SOPS – he said I know who it is it was Jim, I didn't confirm or deny, I just said I was just following up.
Leon said that he was not sleeping there in the SOPS, He watched Jim walk all around the Mezzanine area and he was Text Messaging his daughter due to the bad weather, I asked what time he said around 10:30 or 11 pm he wasn't for sure , He also stated that he knew what Jim was doing and what he thought he was doing, he just watched him and continued text messaging, I asked why would you leave a question in his mind, why didn't he nod at him or wave or something just to prove that he wasn't sleeping, his response is I just don't give a DAMN, You guys just do what ever you want IM fed up with this SHIT, I explained that what you do if you were a Forward Observer on look out and on Guard Duty and you had some one (Officer ) come by would you have done the same, HIS Reply was that's totally different, you cant compare that with this , and he goes on about his war stories, . .... then back to the point, I asked him at any time did Jim approach you while you were Text Messaging him he said the closest he came to me was 50 ft and that was it .. I asked him again are you sure that he couldn't have approached you when you were looking down or anything , his reply NO the closest he got was 50ft. and I asked him if he had anything else to say.... he grumbled around about he wanted to talk with Jim and confront this and I told him NO, that this was not to be brought up to Jim he didn't need to confront Jim, that he needed to leave things alone with him, he said again bring him in here, I said again, No that all I was doing was following up, and trying to gather facts that's all. He didn't need to confront Jim that this could make things worst especially if it were a hostile confrontation. I asked him for anything else, he said no. Based on this conversation I feel that even if he were not sleeping, that he doesn't care enough about his job to prevent anyone from thinking his was sleeping. John my recommendation, as hard as it is for me to say: Termination. Greg



**PLAINTIFF'S EXHIBIT**

19

DEES V HMMA 00035 DOCS PRODUCED

## Powers, Nancy HMMA/HR

**From:** Dees, Jerry L. Jr HMMA/Plant Engineering
**Sent:** Tuesday, February 06, 2007 10:57 PM
**To:** Kimble, Greg HMMA/HR

Mr. Kimble,
      I am writing to request a meeting with you regarding several issues that have arisen on my shift between Greg Prater, Kevin Hughes, and myself. I have talked to Human Resources on two separate occasions regarding Greg Prater and also filed a complaint on him through my National Guard Unit. There have been positive results from both meetings and once again I am seeking your help. I am currently working night shift but would greatly appreciate a meeting with you at your convenience. Thank you.

Leon Dees
Stamping Maintenance



PLAINTIFF'S
EXHIBIT
tabbies
22

11/20/2007

| HYUNDAI<br>Hyundai Motor Manufacturing Alabama | TEAM RELATIONS MEMO | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 05/26/06 | Owner: Team Relations | Revision Level: 02 |

**TO:**      Rob Clevenger

**FROM:**    William Ware

**DATE:**    February 21, 2007

**SUBJECT:**  Leon Dees

### Inteverview with Leon Dees, William Ware, and Greg Prater

Greg began our talk with Leon by informing him that a member of management noticed

him on the third floor asleep on the morning of February 8th.  Leon responded, "I was not

asleep, I know exactly who you are talking about, call Jim Brookshire in here and I will

confront him right now."  Greg calmed Leon down and explained that the reason why we

had assembled into the room was so that we could get his side of the story. Leon stated

that he was sitting in a chair text messaging his daughter due to the bad weather outside.

His location was at the RO 1 station.  Leon stated that this event took place around 10:30-

11:30 pm.  Leon also contends that Jim never approached him.  In fact when asked what

was the closest Jim came to him he replied about "55 feet."  Leon made the following

comment several times; he sat and watched Jim walk around on the third floor; however,

he is to the point where he does not care about what people say.  He went on to say that

we complain over and over again but nothing happens, so I just don't care anymore.  "If

something breaks then I will fix it but I will not run the shop like I used to."



PLAINTIFF'S
EXHIBIT
23



PLAINTIFF'S
EXHIBIT
32

# EMPLOYEE EVALUATION

Employee: *L. DEES*          Clock No. *5762*

Job: *A. MAINTENANCE*     Time in Present Job: More /(Less than 1 Year)

## INSTRUCTIONS:

Listed below are a number of traits, abilities and characteristics that are important for success in business. Circle the number next to the descriptive phrase which most nearly describes the employee being rated in his present job classification.
**Carefully evaluate each of the qualities separately.**

### A. ACCURACY

| | |
|---|---|
| 1 | Careless, makes recurrent errors |
| 2 | Usually accurate, makes only average number of mistakes |
| ③ | Requires little supervision; is exact and precise most of the time |

### B. ABILITY TO FOLLOW INSTRUCTIONS

| | |
|---|---|
| 1 | Requires more than average instructions and explanations |
| 2 | Grasps instructions with average ability |
| ③ | Usually quick to understand and learn |

### C. SAFETY AWARENESS

| | |
|---|---|
| 1 | Sometimes safety conscientious and wears safety equipment |
| ② | Most of the time safety conscientious and wears safety equipment |
| 3 | Always safety conscientious and always wears safety equipment |

### D. HOUSEKEEPING

| | |
|---|---|
| 1 | Some tendency to be careless and untidy |
| ② | Ordinarily keeps work area fairly neat |
| 3 | Always neat, clean and orderly |

### E. ATTITUDE

| | |
|---|---|
| 1 | Attitude questionable for this job |
| 2 | Attitude satisfactory for this job |
| ③ | Outstanding attitude for this job |

### F. PHYSICAL FITNESS

| | |
|---|---|
| 1 | Frequently tires and is slow |
| 2 | Meets physical and energy job requirements |
| ③ | Energetic; seldom tires |

### G. ATTENDANCE

| | |
|---|---|
| 1 | Lax in attendance and/or reporting for work on time/leaving job early |
| 2 | Usually present and on time |
| 3 | Very prompt, regular in attendance |
| ④ | Always regular and prompt, volunteers for overtime when needed |

### H. DEPENDABILITY

| | |
|---|---|
| 1 | Requires close supervision, is unreliable |
| 2 | Sometimes requires prompting to complete job assignments or follow S.O.P.'s |
| 3 | Requires little supervison, completes job assignment and follows S.O.P.'s without prompting |
| ④ | Requires no supervision, completes job assignment and follows S.O.P.'s without prompting, assists others with their job assignments |

# Plaintiff's Exhibits 33-34 Filed Under Seal Confidential