**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY LEON DEES, JR.,

Plaintiff,

Vs.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, and HYUNDAI MOTOR AMERICA, INC.,

Defendants.

**CASE NO. 2:07-cv-00306-MHT-CSC**

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PORTIONS OF PLAINTIFF'S EVIDENTIARY SUBMISSION IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Jerry Leon Dees, Jr. ("Dees"), hereby opposes the Defendants' motion to strike portions of Plaintiff's evidentiary submission in opposition to Defendants' motion for summary judgment. Defendants essentially seek to strike the entirety of all six declarations Dees submitted in support of his opposition to Defendants' motion for summary judgment because they don't like the contents. Dees addresses the designations provided in Defendants' motion as follows:

**Declaration of Leon Dees**

1. ¶ 3. It is disingenuous to suggest that Dees' statements should be struck because they are self-serving. **"Self-serving" is not a valid objection.** An affidavit or declaration will not be rejected merely because it is a self-serving recitation by the party himself (indeed, it would make little sense for a party to submit one that was not self-serving). *See SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (citing *U.S. v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999)). "That an affidavit is

selfserving (sic) bears on its **credibility**, not on its cognizability for purposes of establishing a genuine issue of material fact." *Id.* What's more, Dees' statements reiterate what he testified about in his deposition, which has been also corroborated by Shane Archer. (*see* Archer Declaration). Dees has personal knowledge of whether Shane was with him on the night in question, why he stayed behind when Archer went down to Press No. 2, and what Shane would say if questioned about that evening during HMMA's "investigation" of the incident.

    2.    ¶ 4. Defendants' fail to mention that this paragraph is also factual. There has been extensive document discovery in this case regarding Sgt. Dees' work and military history. No evidence, including testimony or documents, produced in this case contradicts Dees' statement, nor have the Defendants made any such contention.

    3.    ¶ 5. Dees' statement is factual, and is proven by documents in evidence. It is undisputed that Dees sent the e-mail to Kimble, HMMA's vice president of human resources, on **HMMA's own computer system**, and that HMMA received it. Further, HMMA produced it at Dees' deposition. The facts belie HMMA's claim that it was never received. The jury will decide the facts based on admissible evidence presented at trial, including this e-mail to Kimble (someone Dees had consulted with **twice** before about HMMA's harassment of Dees because of his military service) requesting a meeting about the continued harassment, and asked to draw their own conclusions about what happened.

    4.    ¶ 6. Defendants' objections overlook that Dees worked in the pit more than any other team member, and had intimate and almost daily personal knowledge of the conditions in the pit. Dees wore the safety equipment of which he testifies, and, as a maintenance technician with twenty years' experience, would be familiar with the purposes for such equipment. Fluids from the presses

above drip continuously on the floor of the pit, and metal parts are strewn on the floor after coming out of the chute and missing the conveyor, or coming off the conveyor itself. The presses are immediately overhead, stamping body panels out of sheet metal with thousands of pounds of pressure, which activity is far from being a silent one. Further, Dees testified about the dangerous nature of working in the pit in his deposition. (Dees Depo. at 157: 4-12; 311:16 – 314:4).

     5.     ¶ 7. It defies common sense to assert that a person working in the pit cannot testify about his personal experience of working in the pit less than, more than, or the same amount as, his co-workers. What's more, the declarations of Dees' co-workers confirm that Dees did, in fact, work in the pit far more than his co-workers. (Bornberg Decl. ¶ 8; Archer Decl. ¶ 14; Wingo Decl. ¶ 8). Dees also testified at length in his deposition about the frequency of his assignment to the pit versus his co-workers. (Dees Depo. at 159:13 – 160:22; 162:20 – 164:7). With respect to Defendants' objection on the grounds that Plaintiff did not identify these reports in his initial disclosures, Plaintiff issued two requests for production to which the daily reports would have been responsive. Early on this case, on June 7, 2007, Dees served requests for production on Defendants clearly covering documents relating to working in the pit, including Requests 3 and 9 below which requested the following:

> Plaintiff's Request No. 3: All documents regarding **Jerry Leon Dees, Jr. and his employment at HMMA** and his discharge, including his personal property left in his locker.
>
> Plaintiff's Request No. 9: **All documents** regarding HMMA employees who were assigned to clean the scrap area known as **the "pit"** during the tenure of Plaintiff's employment.

Plaintiff's Requests for Production of Documents to Defendants (emphasis added).

Defendants did not produce these daily reports in discovery. After Dees testified about the daily reports in his deposition, and that the reports would prove that he cleaned the pit more than any of his co-workers, Plaintiff's counsel demanded these daily reports. Although Defendants promised to look for the daily reports and make them available in December 2007 (see Exhibit A hereto), the remaining reports were not produced until February 18, 2008. (Exhibit A). Interestingly, out of almost 700 daily reports produced, only one was written by Dees. To argue now that the Defendants had no notice that the daily reports were an issue is simply false.

6. ¶ 8. Defendants, in their exhaustive survey of the law regarding Rule 56(e) declarations, overlooked the most basic rule regarding hearsay in summary judgment affidavits: although "[t]he general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment … a court may consider hearsay if it is evident that the statements could be 'reduced to admissible form' at trial." *Davis v. Houston Co. Bd. Of Ed.*, 2008 WL 410619 *3 (M.D.Ala., Feb. 13, 2008) (citing *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999), and *Bozeman v. Orum*, 199 F.Supp.2d 1216, 1222 (M.D.Ala. 2002). Further, "[e]ven though a document, deponent, or affiant references hearsay information, that information may be considered on summary judgment if it would be admissible at trial under an exception to the hearsay rule or as non-hearsay." *Bozeman*, 199 F.Supp.2d at 1222 (citing *Macuba*, 193 F.3d at 1323-24). At trial, Spencer Lewis and Bill Sievers, the HMMA employees having knowledge of existence the daily reports and their destruction, will testify at trial about the following:

    a. After Dees was fired, Prater and two file cabinets were moved upstairs to the spare parts area;

    b. While downstairs, these two file cabinets contained the daily reports of the stamping maintenance team members, including those of Leon Dees; and

c. Prater was seen throwing away documents from these two file cabinets after Dees was terminated.

Also, Dees has personal knowledge of what he was told, and that statement can be introduced to prove what he was told and, therefore, is not hearsay.

**Declaration of Shane Archer**

7. ¶ 3. The statements Defendants object to in paragraph 3 of Archer's declaration are clearly based on Archer's personal knowledge and observations. Archer worked with Dees for several months and had opportunity to observe HMMA's treatment of Dees as compared to the other team members. Archer's opinion based on his personal experience and observation, therefore, is relevant and admissible. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (personal knowledge may include reasonable inferences grounded in observation or other first-hand experience). Nor are the statements hearsay. Archer's statement regarding Prater attempting to get Archer to lie is firsthand testimony of what transpired between Archer and Prater. It is admissible because it is firsthand and can be admitted to prove what Archer was told. Further, it is admissible as a party-opponent admission as an employee of Defendant under Rule 801(d)(2)(A) of the *Federal Rules of Civil Procedure* as the statements were made in the scope of Prater's employment with HMMA. Further, this statement by Archer corroborates Dees' own testimony in his deposition. (Dees Depo. at 150:7 – 152:3).

8.     ¶ 5. As previously noted, the statement need only present evidence that can be made admissible at trial; it need not be admissible in its current form. Plaintiff can (and will) make this evidence admissible by having Dees' co-workers testify on this point at trial.

9.     ¶¶ 9, 11, 12 and 13. Archer's statements corroborate Dees' testimony with firsthand personal knowledge of what happened on the night in question, and provide proof of HMMA's pretextual firing. This pretext was participated in by John Applegate and Robert Clevenger, two members of HMMA management that attended and participated in the Termination Committee meeting. They had direct knowledge of an **ongoing dispute** with HMMA management regarding Dees' complaints about mistreatment because of his weekend military obligations. Dees was to be terminated because the pit assignment and other harassment had failed to run Dees off. A pretext had to be created, and Archer's statements support Plaintiff's position that Applegate and Clevenger knew about and participated in the pretextual firing up to and including participation in the Termination Committee's decision making process.

Applegate and Clevenger had knowledge that Archer's testimony would disprove the sleeping allegation and destroy the pretext. The investigation was carried out by their direct reports, Greg Prater and William Ware. The evidence shows that Applegate and Clevenger fabricated the story about the "blind" created by the cabinet doors, which was necessary for HMMA's termination action to appear consistent with past practice (*i.e.*, intentional sleeping was a firing offense). Applegate and Clevenger kept Archer's testimony from the Termination Committee, and also made sure that the Termination Committee records did not contain four critical documents that prove Dees was set up: (1) the October 23, 2006 letter from Dees' Guard unit to HMMA human resources; (2) the November 15, 2006 Discussion Planner wherein Applegate acknowledged Dees' complaints of

harassment because of his Guard obligation, and wrote them off to Prater's lack of communication; (3) the January 6, 2007 e-mail from Dees to Greg Kimble, Vice President of HMMA human resources wherein Dees complains to Kimble for the THIRD TIME about the harassment regarding his Guard duty, and sent by Dees just ONE WEEK before Dees was allegedly caught sleeping; and (4) the e-mail from Prater to Applegate dated February 21, 2008, forwarded from Applegate to Clevenger, wherein Prater recommended termination whether Dees was sleeping or not.

Thus, Archer's Declaration statements help prove the Termination Committee's decision a pretext. Two of the Termination Committee's participants, Applegate and Clevenger, knew of the ongoing Guard obligation dispute plus the **exculpatory information**, including Archer's testimony as discussed above, and thus fully participated in the pretextual firing.

10.  ¶ 13. Defendants compare Archer's statement about his opinion regarding the false claim of Dees being asleep an excuse to fire Dees because of his Guard activities, to an "information and belief" statement. (Def. Mot. to Strike at 12). This statement, however, is nothing like an "information and belief" statement. Archer's statement is based solely on his experience and firsthand observations of working with Dees and seeing how HMMA treated Dees relative to Dees' co-workers. As previously noted, personal knowledge may include reasonable inferences grounded in observation or other first-hand experience. *Payne*, 337 F.3d at 772.

11.  ¶ 14. Defendants ignore that Archer worked with Dees for several months and personally observed HMMA's treatment of Dees. Archer is competent to draw inferences from his firsthand observations and experiences. *Payne*, 337 F.3d at 772.

12. ¶ 14. Archer worked with Leon for several months and would have a firsthand knowledge of how often Leon worked the pit relative to the other team members. Also, Archer would have firsthand knowledge of whether his co-workers' liked working in the pit.

13. ¶ 14. Archer has firsthand knowledge of the reports and the information the reports contained because he was required to complete them daily during the time Dees was employed at HMMA. Also, as stated above, Archer would also have firsthand knowledge of how often Dees worked the pit relative to his co-workers.

14. ¶ 15. Archer is more than competent to testify about what happened that night, as he was working with Dees the entire night. Also, Archer points out Defendants interviewed him after this lawsuit was filed, and Archer told them this information. As previously noted, at no time during discovery in this case did Defendants identify Archer as a person who might have knowledge relevant to this case, as requested by Dees in his Interrogatory No. 7 propounded June 7, 2007.

**<u>Declaration of Mark Bornberg</u>**

15. ¶ 3. Bornberg witnessed HMMA's treatment of Dees firsthand, and therefore, would have personal knowledge of the nature of the particular acts of harassment. Also, whether Bornberg witnessed Dees' meeting with Applegate or Dees told him about it makes no difference – it is admissible either way. If he witnessed the meeting, it is admissible for the truth of the matter asserted. If Dees told him of the meeting, it is admissible to prove what he was told. Also, Bornberg worked with Dees daily, and he has personal knowledge of Leon's actions, and would certainly have personal knowledge of whether HMMA's behavior towards Dees changed after Dees complained to Applegate. Further, Bornberg's statement corroborates Dees own testimony. (Dees Depo at 98:11 – 99:4; 101:11 – 102:6; 103:3 – 104:2; 122: 3-14; 123: 17-21).

16. ¶ 4. As with Defendants' previous objection, Bornberg worked with Dees daily and would have contemporaneous personal knowledge of all of these events. Also, Bornberg's statement corroborates Dees' deposition testimony. (Dees Depo. at 68: 5-22; 172:12 – 173:5). Further, the sending of the letter is confirmed by a summary of the correspondence prepared by Sgt. Franklin Barnes and produced in this case. (Pl. Brief in Support of his Resp. in Opp. To Def. Mot. for Sum.Jud. (Doc. 107), Exhibit 16, Bates No. DEES 000002).

17. ¶ 5. As with Defendants' previous objections, Bornberg worked with Dees daily and would have contemporaneous personal knowledge about HMMA's treatment of Dees, and would be qualified to testify as to whether HMMA's harassment of Dees because of his military obligations escalated after Dees' got his Guard unit to send HMMA the letter of October 23, 2006.

18. ¶ 7. This statement is non-hearsay, as it is not offered to prove the truth of the matter asserted, but offered to prove what Archer told him. This statement has been corroborated by Archer in his declaration (Archer Decl. ¶¶ 3-4) and by Dees in his deposition. (Dees Depo. at 150:7 – 152:3).

19. ¶ 8. This statement is based on Bornberg's personal knowledge. Bornberg worked with Dees daily, and would have knowledge of the frequency Dees was assigned to the pit verses the rest of Dees' shift.

20. ¶ 9. This statement is also based on Bornberg's personal knowledge, as Bornberg has sworn in his declaration.

**Declaration of John Wingo**

21. ¶ 4. John Wingo ("Wingo") worked with Dees at HMMA. (Wingo Decl. ¶ 2). Wingo, therefore, would have personal knowledge of HMMA's harassment of Dees, and is competent to make inferences about his firsthand observations of HMMA's treatment of Dees.

22. ¶ 5. This statement was based on Wingo's personal knowledge of working with Dees at HMMA. Wingo gives an example of the evidence he has regarding the statement Defendants' object to in the remainder of ¶ 5, unquoted by Defendants.

23. ¶ 6. As Wingo witnessed these events firsthand, he would be qualified and competent to state whether, in his mind, Prater repeatedly demanding orders that Prater knew did not exist was harassing conduct. *Payne*, 337 F.3d at 772.

24. ¶ 8. As with Defendants' repeated objections to this same testimony by all of the other witnesses above, Defendants ignore that Wingo worked with Dees on a regular basis, and would have personal knowledge of how often Dees was assigned to clean the pit versus the other team members on Dees' shift.

25. ¶ 9. Wingo's testimony is based on his firsthand knowledge of working on Dees' shift for months.

**Declaration of Lt. Col. (Ret.) Todd Harrison**

26. ¶ 5. As Colonel Harrison trusted Dees with his life, he would have personal knowledge of and is certainly qualified to testify about Dees' character. Further, Defendants' objection to "form affidavit language" apparently relates to one or two sentences in the entirety of Col. Harrison's affidavit. To the extent that any of the cases cited by Defendants actually deal with the subject of "form affidavit language" (Def. Mot. to Strike at 5), these cases deal with conclusory allegations not based on personal knowledge of the affiant. *See Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 950-951 (5th Cir. 1988).

**Declaration of Wendell Richburg**

27. ¶ 6. This statement is certainly not speculative. As Mr. Richburg testified, he accompanied Sgt. Dees on many combat patrols, and specifically elected to patrol with Dees "because of his skill, courage and dependability." (Richburg Decl. ¶ 4). Mr. Richburg, also, would have personal knowledge of Dees' character. Also, as noted above, Defendants object to one or two sentences as being "form affidavit language." To the extent that any of the cases cited by Defendants actually deal with the subject of "form affidavit language" (Def. Mot. to Strike at 5), these cases deal with conclusory allegations not based on personal knowledge of the affiant. *See Matter of Lewisville Properties, Inc.*, 849 F.2d 946, 950-951 (5th Cir. 1988).

28. ¶ 7. As the Operations NCO for Dees unit, Richburg would have personal knowledge of these facts.

For the foregoing reasons, the Defendants' motion to strike or exclude portions of Dees' evidentiary submission in opposition to Defendants' motion for summary judgment is due to be denied.

Dated this 22nd day of February, 2008.

Respectfully submitted,

/s/ Jeffrey R. Sport
Vincent F. Kilborn, Esq. (KILBV4484)
Jeffrey R. Sport, Esq. (SPORJ5390)
KILBORN, ROEBUCK & MCDONALD
1810 Old Government Street
P.O. Box 66710
Mobile, Alabama 36660
Phone: (251) 479-9010
Fax: (251) 479-6747

E-mail: vfk@krmlaw.com
E-mail: jeff.sport@sportlaw.us

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on the 22nd day of February, 2008, electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

Timothy A. Palmer, Esq.
J. Trent Scofield, Esq.
T. Scott Kelly, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118

Matthew K. Johnson, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602

s/ Jeffrey R. Sport
COUNSEL

Ogletree Deakins

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

One Federal Place
1819 Fifth Avenue North, Suite 1000
Birmingham, Alabama 35203-2118
Telephone: 205.328.1900
Facsimile: 205.328.6000
www.ogletreedeakins.com

J. TRENT SCOFIELD
Direct Dial: (205) 714-4422
E-mail: trent.scofield@odnss.com

December 18, 2007

**VIA FACSIMILE AND U. S MAIL**

Jeffrey R. Sport, Esq.
Kilborn, Roebuck & McDonald
P.O. Box 66710
Mobile, AL 36660

Re: **Dees v. Hyundai Motor Manufacturing Alabama, LLC, et al.**

Dear Jeff:

This letter will address the issues raised in your three letters dated December 11, 2007. I am available to further discuss any of these issues by telephone.

1. **"New" Military Duty Policy or Notice**

At our request, HMMA's Team Relations management has searched all written communications distributed by that department in order to determine if there has been any modification and/or clarification to the military leave policy. Team Relations cannot locate any such document and has no record of its existence. We will continue to search for the document and, if it exists, we will produce it as soon as it is discovered. However, for purposes of response, HMMA has nothing to supplement at this time.

2. **Brookshire Medical Records**

We have reviewed Plaintiff's original document requests, and Plaintiff has not requested Brookshire's medical records. Assuming arguendo that such a request is pending, HMMA states that it does not maintain medical records for Brookshire and, therefore, it has no documents to produce. Team Member medical records are maintained by Industrial Care Management ("ICM"), an independent third-party medical provider.

Notwithstanding these facts, HMMA objects to the production of Brookshire's medical records because such evidence is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence regarding Plaintiff's claims asserted in this matter. There is no testimony in this case which would suggest that Brookshire failed a drug screen at any time before he observed Plaintiff sleeping on the job. Any non-party medical record would contain



personal, sensitive and confidential information, as well as information properly subject to privilege. Therefore, HMMA would further object to any attempt to compel production of these documents.

**3. Daily Reports**

To the extent such "Daily Report" documents have been maintained, HMMA will produce them as they have been kept in the ordinary course of business. I have asked HMMA to provide the Daily Reports that have been maintained for the entire department. We can provide photocopies at your expense or we can make the original available for inspection and copying. Please let me know which manner of production you prefer.

**4. Guard Schedules**

After search, HMMA has concluded that it does not have any copies of Plaintiff's weekend guard schedules. Therefore, it has no such documents to produce. If these documents are discovered, HMMA will produce them.

**5. Policies and Procedures**

HMMA renews its objections to Plaintiff's "all policies and procedures" request. HMMA has produced copies of all policies related to Plaintiff's disciplinary infraction and termination. HMMA has also produced its Team Member Handbook. To my knowledge, there has been no deposition testimony regarding any particular policy which has not been produced.

HMMA does not maintain a "policy index," therefore no such index can be produced. If you have reason to believe that there are specific policies which have not been produced and which are relevant to Plaintiff's claims asserted, please share your thoughts with me and I will be glad to address your concerns on a policy-by-policy basis. Otherwise, I do not believe the discovery rules authorize production of every policy maintained by HMMA in this case.

Jeffrey R. Sport, Esq.
***Re: Dees v. Hyundai Motor Manufacturing Alabama, LLC, et al.***
December 18, 2007
Page 3

I trust that this letter has sufficiently addressed each written discovery issue you have previously raised. As always, I am available by telephone to further discuss all of the responses contained herein.

Very truly yours,

J. Trent Scofield

JTS/skp

Ogletree Deakins

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

One Federal Place
1819 Fifth Avenue North, Suite 1000
Birmingham, Alabama 35203-2118
Telephone: 205.328.1900
Facsimile: 205.328.6000
www.ogletreedeakins.com

**J. TRENT SCOFIELD**
**Direct Dial: (205) 714-4422**
**E-mail: trent.scofield@odnss.com**

February 15, 2008

**VIA FEDERAL EXPRESS**

Jeffrey R. Sport, Esq.
Kilborn, Roebuck & McDonald
1810 Old Government Street
Mobile, AL 36606

**Re: Dees v. Hyundai Motor Manufacturing Alabama, LLC, et al.**

Dear Jeff:

I write to address what appears to be an open discovery issue in this case. By letter dated December 11, 2007, you requested copies of any Daily Reports related to Mr. Dees. In response, by letter dated December 18, 2007, I informed you that I had requested Daily Reports for the entire HMMA maintenance department, and those original reports would be made available for inspection or copies would be made at your expense. You never responded to inform me regarding the manner in which you wished to review these documents.

Both Plaintiff's summary judgment opposition and Plaintiff's pretrial contentions make an unfounded allegation that HMMA has intentionally destroyed evidence in this case. This is an allegation which our client vigorously denies. I am enclosing herein, along with an invoice, copies of all maintenance department Daily Reports, that have been maintained by HMMA in the ordinary course of its business. These documents have been labeled as Dees v. HMMA 0365 - 1049 and have been marked as Confidential under the terms of the Protective Order.

My review indicates that there is only one Daily Report relating to Mr. Dees which was located by HMMA in response to your request. That particular Daily Report appears at the top of the enclosed stack of documents. Please recall that, on February 1, 2007, Mr. Dees was issued a Discussion Planner for failing to complete his Daily Reports. (See Dees Docs Nos. 43-44). I am producing the remainder of the Daily Reports, for the entire department, which have been maintained by HMMA.

If you have any questions, or wish to further discuss this issue, please do not hesitate to contact me.

Ogletree Deakins
ATTORNEYS AT LAW

Jeffrey R. Sport, Esq.
***Re: Dees v. Hyundai Motor Manufacturing Alabama, LLC, et al.***
February 15, 2008
Page 2

Very truly yours,

J. Trent Scofield

JTS/skp

Enclosure