IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JERRY LEON DEES, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO.: |
| v. ) | 2:07-cv-00306-MHT-CSC |
| ) | |
| HYUNDAI MOTOR MANUFACTURING ) | |
| ALABAMA, LLC, and HYUNDAI MOTOR ) | |
| AMERICA, INC., ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' DISCLOSURE RELATED TO FAMILIAL RELATIONSHIP
BETWEEN POTENTIAL WITNESS AND THE TRIAL JUDGE**

Defendants Hyundai Motor Manufacturing Alabama, LLC ("HMMA") and Hyundai Motor America, Inc. ("HMA") (collectively "Defendants"), through undersigned counsel, files this pleading to serve as a disclosure to both Plaintiff Jerry Leon Dees (hereinafter "Plaintiff") and to the Court regarding the familial relationship (as they understand it) between Greg Kimble, a potential witness in this action, and the Honorable Myron H. Thompson, the trial judge assigned to this case. Defendants further state:

**A.     Relevant Facts / Procedural History**

1.      Plaintiff is a former HMMA employee. Before beginning a medical leave of absence, Greg Kimble was actively employed as the Human Resources Director of HMMA. It is undisputed that there is an overlap of common dates of employment between Plaintiff and Mr. Kimble.

2. Mr. Kimble began a medical leave of absence on or about January 12, 2007, and Mr. Kimble currently remains on "Leave of Absence" status. See Doc. 68, Exh. 7, Second Decl. of Wendy Warner at para. 7.

3. The decision to terminate Plaintiff's employment was made on or about February 26, 2007, approximately six weeks after Mr. Kimble began his leave of absence. It is undisputed that Mr. Kimble played no role in the decision to terminate Plaintiff's employment.

4. However, in deposition, Plaintiff testified that had the following alleged interactions with Mr. Kimble which, depending on the Court's rulings on Defendants' pending dispositive motion, may be relevant to anticipated presentation of evidence at the trial of this case:

- Plaintiff alleges he made complaints to Mr. Kimble regarding problems he was having at HMMA;[1]

- Plaintiff alleges he sent Mr. Kimble an e-mail regarding Greg Prater harassing him about Guard Duty;[2]

- Plaintiff alleges he met personally with Mr. Kimble to discuss his complaints relating to Prater at Guard Duty;[3] and

- Plaintiff alleges his Sergeant sent Mr. Kimble a letter regarding Guard Duty.[4]

5. Should the Court decide that some part or all of the Plaintiff's USERRA claims survive summary judgment, then Plaintiff's alleged interactions with Mr. Kimble may be relevant to both Plaintiff's claims and Defendants' defenses at trial.

6. Out of an abundance of caution, Defendants have listed Mr. Kimble as a "may call" witness, whose testimony is anticipated to rebut the versions of events described by Plaintiff and/or negate any potential adverse inference if Mr. Kimble is not called as a witness.

---

[1] See Exh. 1: Plaintiff's Depo. Excerpts, pp. 116-117.
[2] Id., also Plaintiff's Depo. Exh. 4.
[3] Id. at 138, 143-44, 170-71.
[4] Id. at pp. 173-74, 191.

2

7.      During the course of preparation for trial, Defendants' counsel has learned from Mr. Kimble that he and the trial judge are second cousins. Specifically, Mr. Kimble has informed Defendants' counsel that he and the trial judge share a common great, great grandmother.

**B.     Applicable Authorities**

8.      Defendants and their counsel highly regard this tribunal and recognize their obligation to act at all times with candor to the Court. See, e.g., Alabama Rule of Professional Conduct 3.3.

9.      28 U.S.C. § 455(a) governs recusal and provides that, "Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

10.     This is an objective test, and a judge's decision regarding recusal is reviewed under the abuse of discretion standard. See McWhorter v. City of Birmingham, 906 F. 2d 674, 678 (11th Cir. 1990).

11.     Judicial Canon 3, regarding impartiality, envisions recusal "in a proceeding in which the judge's impartiality might reasonably be questioned," including situations where:

> (d)  the judge or the judge's spouse, or a person related to or either within the third degree of relationship, or the spouse of such a person:
>
> (iv)  is to the judge's knowledge likely to be a material witness in the proceeding.

12.     The Canon further states, "the degree of relationship is calculated according to the civil law system; the following relatives are within the third degree of relationship: parent, child, grandparent, grandchild, great grand parent, great grandchild, sister, brother, aunt, uncle, niece and nephew; the listed relatives include whole and half blood relatives and most step relatives." Judicial Canon 3(C)(3)(a).

13.     Defendants make this disclosure out of an abundance of caution.  Defendants do not suggest, based on the information presently available to them, that: (a) Mr. Kimble will be considered a "material witness" in this proceeding, and/or (b) that Mr. Kimble and the trial judge sit within a degree of relationship as defined by the applicable Judicial Canon.

Respectfully submitted this 31st day of March, 2008.

/s/  J. Trent Scofield
Timothy A. Palmer (PAL-009)
J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: timothy.palmer@odnss.com
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC and
Hyundai Motor America, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of March, 2008, I electronically filed the foregoing *Defendants' Disclosure Related to Familial Relationship Between Potential Witness and the Trial Judge* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: W. Perry Hall, Vincent F. Kilborn, III, David Allen McDonald, Jeffrey Rayborn Sport, Timothy A. Palmer, T. Scott Kelly, and Matthew K. Johnson.

/s/ J. Trent Scofield
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
E-mail: trent.scofield@odnss.com

# Jerry Dees v. HMMA and HMA
## 2:07-cv-00306-MHT-CSC

# EXHIBIT 1

## Defendants' Disclosure Related to Familial Relationship Between Potential Witness And The Trial Judge

FREEDOM COURT REPORTING

Page 113

1  was a piece of trash like I was that night.
2  It was embarrassing. Then I have to go to
3  church on Sunday and look at my friends and
4  everybody knows, he got fired because he's
5  supposedly sleeping on the job. Everybody
6  is looking at you. No, that ain't right.
7      Q.  Where were you when you
8  realized that the notes weren't in your
9  jacket?
10     A.  There at the shop when they
11 brought me my jacket, like I said before.
12     Q.  How far is the shop from your
13 locker?
14     A.  My locker was in the shop. We
15 was on the outside of the shop. I wasn't in
16 the shop. He walked me from my area, around
17 the office, said go on around here. And we
18 went around the side of the shop.
19     Q.  Could you see your locker from
20 where you were outside the shop?
21     A.  No, sir. Block wall. And I
22 had the security guards there telling me I
23 couldn't go nowhere.

Page 114

1      Q.  Okay. And we're going to get
2  back to some of these issues, but I want to
3  cover some more basic stuff before we get
4  into it more deeply.
5          Have you ever filed any other
6  lawsuits?
7      A.  No, sir.
8      Q.  Have you ever filed any
9  administrative complaints like with the EEOC
10 or some sort of governmental entity?
11     A.  No, sir.
12     Q.  Have you ever been sued?
13     A.  No, sir.
14     Q.  And you may have shaken your
15 head, but I don't know if I heard you say
16 no --
17     A.  No.
18     Q.  You've not filed any EEOC --
19     A.  I filed -- When me and my wife
20 first came home from Germany, probably two
21 years after being home, I filed bankruptcy
22 because I didn't manage my finances right, I
23 was used to being in the Army and everything

Page 115

1  taken care of. The first two years kicked
2  my butt. After that, I haven't had a
3  problem since.
4      Q.  Okay. When was this you filed
5  bankruptcy?
6      A.  I don't know. You'll have to
7  -- I don't know. I'll have to get back with
8  you on that.
9      Q.  Right when you got back from
10 Germany, though?
11     A.  No, sir. It wasn't right --
12 It was like a year or two later. I don't
13 remember.
14     Q.  Where were you working then?
15     A.  I don't remember.
16     Q.  During the time that you were
17 with Hyundai, did you file any sort of
18 complaints with the HR department?
19     A.  Yes, sir. That's where I
20 started out. It, apparently, didn't do no
21 good.
22     Q.  All right. Let's talk about
23 the complaints. Did you file any written

Page 116

1  complaints?
2      A.  No, sir. There wasn't no form
3  -- a format for filing written complaints.
4  And when we tried, they didn't want to hear
5  it.
6      Q.  Okay. Did you ever talk to a
7  team relations representative about problems
8  you were having?
9      A.  Several times. Lucas Cooner
10 and Will Ware.
11     Q.  Will Ware?
12     A.  Yes, sir. And Lucas Cooner.
13     Q.  Anybody else with Hyundai?
14     A.  Greg Kimball.
15     Q.  Greg Kimball?
16     A.  And Keisha. I don't know what
17 -- I don't remember what her last name is.
18 She is no longer there. She went to Kia.
19 They moved her to Kia, in the HR department.
20     Q.  Can you think of anybody else
21 that you complained to?
22     A.  Other than the managers and
23 assistant managers, the production manager

29 (Pages 113 to 116)

**Page 117**

1 who said he was over Prater, Craig Stapley
2 and Jim Brookshire both.
3    Q.   And the production manager was
4 who?
5    A.   Craig Stapley --
6    Q.   Stapler?
7    A.   Stapley, S-T-A-P-L-E-Y.
8    Q.   All right.  And what other
9 members of management did you complain to?
10    A.   That was about it, I reckon.
11    Q.   Just to make sure I'm clear,
12 you never submitted anything in writing to
13 human resources?
14    A.   There was no way to submit
15 anything in writing.  When I complained they
16 didn't want to hear anything about it.  I
17 submitted an e-mail to Greg Kimball about
18 Prater harassing me about my Guard duty, and
19 I never received a reply to the e-mail in
20 person or anything.
21    Q.   When you say the last time
22 Greg Prater harassed you about your Guard
23 duty --

**Page 118**

1    A.   Before I got fired.
2    Q.   Where did you send the e-mail
3 from?
4    A.   The maintenance shop.
5    Q.   All right.  Was Greg Kimball
6 working at that time?
7    A.   I don't remember.  I think it
8 was on -- I don't remember if it was on day
9 shift or night shift.  I think it was on
10 night shift.  But the e-mail, I mean, that
11 was probably a month before I'd gotten
12 fired, and he had plenty of time to respond.
13    MR. SPORT:  Matt, we'd like to
14 request that e-mail, because I don't think
15 we have that.
16    (Recess taken.)
17    Q.   Mr. Dees, we're back on the
18 Record.
19    You had talked a minute ago
20 about an e-mail you sent to Greg Kimball.
21 Did you have a log-in ID and a password at
22 Hyundai?
23    A.   Yes, sir.

**Page 119**

1    Q.   What was your log-in?
2    A.   I don't know.  That was a year
3 ago, almost.  I don't know.
4    Q.   Okay.
5    A.   I have no idea.  I think it
6 was my clock number, I think.  I'm not sure.
7    Q.   Okay.  Do you know when you
8 were assigned the log-in ID?
9    A.   It wasn't long after I was
10 hired.  I'm not sure.
11    Q.   Was it after you were hired?
12    A.   Yeah.
13    Q.   Okay.  So when you say you
14 sent an e-mail to Greg Kimball, would that
15 have been on an internal Hyundai system,
16 e-mail system?
17    A.   Yes, sir.
18    Q.   You didn't send it from
19 Yahoo --
20    A.   No, sir.
21    Q.   -- or Google e-mail or
22 anything like that?
23    A.   No, sir.  It was on the

**Page 120**

1 Hyundai system.
2    Q.   And it was while you were at
3 work?
4    A.   Yes, sir.
5    Q.   And do you remember where you
6 sent it from?
7    A.   The maintenance shop.  Stamp
8 and maintenance shop.
9    Q.   Anybody else see you send it?
10    A.   Drake Barefoot and someone
11 else was there.  I don't remember who the
12 other one was.
13    Q.   Do you remember what was in
14 it?
15    A.   It was a -- I don't remember
16 the exact wording, no.  I was complaining to
17 Mr. Kimball that Prater was still giving me
18 a hard time about my Guard duty, and I felt
19 that my job was in jeopardy for that reason.
20 Because even -- Like I said, even after my
21 unit sent the letter, I complained to HR at
22 least two more times and both times met with
23 negative results, and I was still getting

**Powers, Nancy HMMA/HR**

From: Dees, Jerry L. Jr HMMA/Plant Engineering
Sent: Tuesday, February 06, 2007 10:57 PM
To: Kimble, Greg HMMA/HR

Mr. Kimble,
    I am writing to request a meeting with you regarding several issues that have arisen on my shift between Greg Prater, Kevin Hughes, and myself. I have talked to Human Resources on two separate occasions regarding Greg Prater and also filed a complaint on him through my National Guard Unit. There have been positive results from both meetings and once again I am seeking your help. I am currently working night shift but would greatly appreciate a meeting with you at your convenience. Thank you.

Leon Dees
Stamping Maintenance


DEFENDANT'S EXHIBIT 4

Page 137

1  weekend, I said, I'm not going to be here.
2  He said, you're going to be here or you're
3  going to produce orders. I said, I'm going
4  to talk to HR.
5      Q.   Okay. And Chris Weihe and
6  Drake Barefoot were in on that discussion?
7      A.   The whole shift was.
8      Q.   Okay. And tell me more. What
9  else did Greg Prater say -- Was that the
10 first time you had a problem with him about
11 your Guard duty?
12     A.   That's where it all started,
13 yes.
14     Q.   Okay.
15     A.   Wasn't the first time. I'd
16 been blowing it off up to this point.
17     Q.   Okay. Who did you go see --
18 Well, did you go see --
19     A.   That was the first time I went
20 to HR and complained about it.
21     Q.   Is that when you talked to
22 Keisha?
23     A.   No, sir. That's when I talked

Page 138

1  to Greg Kimball. He was the very first one
2  I talked to. I was told that he was the man
3  in charge of human resources, and that's who
4  I talked to.
5      Q.   And you spoke to him face to
6  face?
7      A.   Yes, sir. In his office.
8      Q.   Okay. I mean, did you submit
9  anything in writing to him?
10     A.   No, sir.
11     Q.   Any e-mails at that time?
12     A.   No, sir.
13     Q.   I mean, did you just show up
14 in his office, did you schedule a meeting
15 with him?
16     A.   I took my lunch break. I did
17 not leave my work floor --
18     Q.   What time was your lunch
19 break?
20     A.   I don't remember.
21     Q.   You were working the night
22 shift?
23     A.   No. I was on the day shift

Page 139

1  the very first time it happened.
2      Q.   Okay. Let me go back to your
3  complaint. In paragraph eight there on page
4  three, it says that harassment of Dees by
5  Hyundai through Prater and Hughes began
6  almost immediately when Prater learned that
7  Dees was a member of the Alabama Army
8  National Guard and had served two tours in
9  Iraq.
10         Did Greg Prater -- How did
11 Greg Prater harass you because you were a
12 member of the Guard or because you served to
13 tours in Iraq?
14     A.   He said that -- He made the
15 comment that he had been in Baghdad, he had
16 killed people, he had been a Navy SEAL, he
17 had been a tank commander. And when I asked
18 him where he was at in Baghdad, he says --
19 when I asked him where he was in Iraq, I was
20 on the southside of Baghdad. I said, what
21 compound? I don't remember, there was so
22 many. I said, what was the name of the
23 compound? I don't remember. You know how

Page 140

1  it was there was compounds all over the
2  southside of Baghdad. I said, no, there
3  wasn't, there was one, the one I lived in.
4          And I had put him on the spot
5  because I listened to him six or eight
6  months, him and Applegate come around and
7  Prater start running up and talking about
8  how he been in combat and killed so many
9  people. And Applegate was like, yeah, this
10 is my boy. And I got friends that died in
11 Iraq, I've killed people in Iraq, and my
12 friends served proudly in Iraq. And
13 Applegate and HR and everybody was making a
14 disgrace of what we had done.
15     Q.   Well, what --
16     A.   When I went to them with my
17 complaints about my Guard duty, being forced
18 to produce military orders, they were like,
19 well, we'll look into the regulations.
20     Q.   Did Applegate ever demean you
21 or try to diminish your service in Iraq in
22 any way?
23     A.   He basically sat there the

35 (Pages 137 to 140)

Page 141

1  last -- said, well, I know Prater is a hero.
2  And he's -- like I said, basically he's my
3  man, he's my boy.
4      Q.  When did he say that?
5      A.  I don't remember the exact
6  date. I don't know.
7      Q.  Okay.
8      A.  Ask him.
9      Q.  Other than saying good things
10 about Prater, did he say anything bad about
11 you or your service?
12     A.  Directly, no.
13     Q.  Indirectly what did he say?
14     A.  Well, I -- I don't know. Like
15 I say, that's been a long time ago.
16     Q.  All right. I need --
17     A.  And just -- You're asking a
18 question I can't answer.
19     Q.  That's fine. If you can't
20 answer, that's all I need to know.
21     A.  He'd make comments like: What
22 do you need to go down there for, all y'all
23 do is party.

Page 142

1      Q.  Who said that?
2      A.  Prater --
3      Q.  I know. Let's talk about
4  Applegate. Let's try to do this in some
5  orderly fashion.
6      A.  It's my depo, so I've got to
7  go at my own rate.
8      Q.  All right. Let me ask you
9  this: Am I hearing you correctly that you
10 don't have anything to tell me about ways
11 that Applegate either directly or indirectly
12 said bad things about you or your service?
13     A.  No. Just, like I said, that I
14 need to focus more on my job and not worry
15 about my Guard duty, and most of the time
16 all they do is party down there anyhow.
17     Q.  Is that the worst thing that
18 Applegate said?
19     A.  Yeah. Other than like I said,
20 just backing Prater up saying whatever
21 Prater decides is what I'm going with.
22     Q.  And are you telling me that
23 John Applegate told you that all y'all do

Page 143

1  when you do this duty is party?
2      A.  To my face, yes.
3      Q.  Okay. So did he and Prater
4  say that?
5      A.  Prater said that in front of
6  everybody.
7      Q.  Okay. Who did John Applegate
8  say it in front of?
9      A.  Me. Like I said, I had to
10 have meetings -- If I complained to HR, I
11 had to go see Applegate.
12     Q.  There are no witnesses to
13 Applegate saying all y'all do is party;
14 right?
15     A.  Nope.
16         Did your lawyers interview him
17 too?
18     Q.  Let me ask you about Keisha.
19 Did Keisha ever say anything to you about
20 you or your service in the Guard or Iraq?
21     A.  No. She just said I had to
22 have orders before I could be deployed or
23 sent out.

Page 144

1      Q.  Did Greg Kimball ever say
2  anything about you or your service in the
3  Guard or Iraq or Korea or anywhere else?
4      A.  No. The only thing he was
5  worried about was that Prater told us we
6  couldn't talk to human resources. He didn't
7  care about -- basically didn't care about
8  the complaint I was making about Prater
9  harassing me about my Guard. The only thing
10 he worried about was Prater telling we
11 couldn't talk to human resources.
12     Q.  Because he disagreed with it?
13     A.  Yeah. Because it's basically
14 telling him that he's not over Prater, that
15 Prater can do whatever he wants. That's the
16 only reason he got -- He could care less
17 whether Prater was harassing me about my
18 Guard service.
19     Q.  What makes you think he could
20 care less?
21     A.  Because nothing was done about
22 it, ever.
23     Q.  Let me ask you this: Did

Page 169

1  week, and then everything else would kick
2  back up. Nothing changed over all. I'm
3  currently working night shift, and we would
4  greatly appreciate a meeting at your
5  convenience. And a week or two later I was
6  fired.
7      Q.  Now, if I could just look at
8  that. Again, this e-mail was sent on
9  February 6th of '07, does that sound right
10 to you?
11     A.  Yes, sir.
12     Q.  At that time, do you know
13 whether Greg Kimball was actively employed
14 or on leave from the plant?
15     A.  No one had told us he wasn't
16 there. Like I said, I worked night shift.
17     Q.  Did you know him personally?
18     A.  Did I know him personally?
19 You mean away from the plant?
20     Q.  No. I mean, did you know him?
21 You'd know him if he walked into the room
22 and talked to him?
23     A.  Yes, sir.

Page 170

1      Q.  Had you talked to him before?
2      A.  Yes, sir.
3      Q.  Had you talked to him
4  previously about any issues you may have had
5  with Greg Prater?
6      A.  It wasn't Prater specifically.
7  Like I said before, he was the very first
8  person I talked to when I went to HR.
9      Q.  Okay. But you didn't talk to
10 him about Prater specifically?
11     A.  Well, about Prater and
12 Applegate and having a problem with my Guard
13 duty, yes, sir, I did.
14     Q.  Okay. And what -- And I'm
15 just trying to think back to what we talked
16 about earlier this morning. I want to make
17 sure I'm right. That was what you had
18 testified to earlier, the year before you
19 got fired in the -- I think you testified in
20 the fall?
21     A.  Do what now?
22     Q.  The meeting -- That first
23 meeting you had with Greg Kimball.

Page 171

1      A.  Yes, sir.
2      Q.  Was that a meeting -- Was that
3  the year before you got terminated in that
4  fall period that you testified to?
5      A.  Yes, sir.
6      Q.  Okay. And where did that
7  meeting take place?
8      A.  In Greg Kimball's office.
9      Q.  Okay. And am I right that
10 neither you nor Greg Kimball produced
11 anything in writing after that meeting?
12     A.  No, sir.
13     Q.  And one of the things that it
14 says here on Defendant's Exhibit Number 4,
15 you'd indicate issues that have arisen on my
16 shift between Greg Prater, Kevin Hughes, and
17 yourself. What was the issue with Kevin
18 Hughes?
19     A.  Like I stated earlier, Kevin
20 had a history of jumping on employees.
21 And --
22     Q.  And when you say jumping on
23 employees, was that having to do with

Page 172

1  military duty or just his style of
2  management?
3      A.  His style of management. I
4  mean, he had -- he had jumped on two or
5  three other employees, one of them twice.
6  He'd get up in their face and holler at them
7  and bow up on them and intimidate them. And
8  he did the same thing to me, and I asked
9  him, I said: Are you bowing up on me? And
10 he made some comment, and I turned around
11 and I left.
12     Q.  Now, did that have anything to
13 do with your military service or your
14 reserve duties or anything like that?
15     A.  That particular incident? I
16 -- I don't know. After the letter came in,
17 and I started having all these problems is
18 when Kevin started -- I mean, that's when he
19 started birddogging me.
20     Q.  When who started birddogging
21 you?
22     A.  Kevin Hughes.
23     Q.  When did that start?

**FREEDOM COURT REPORTING**

Page 173

1   A.   After -- Like I said, after my
2   letter from the unit came in.
3   Q.   Okay. That's the letter from
4   Sergeant Barnes?
5   A.   Yes, sir.
6   Q.   Do you remember when that
7   letter came in?
8   A.   As I stated earlier, no, sir.
9   Q.   Do you recall who it was sent
10  to specifically?
11  A.   Yes, sir. Like I stated
12  before, Greg Kimball.
13  Q.   Okay. Did you ever talk to
14  Greg Kimball about whether or not he'd
15  actually gotten that letter?
16  A.   No, sir, I did not.
17  Q.   Do you have any evidence that
18  Greg Kimball or anybody else in Hyundai
19  management received the letter?
20  A.   I said just John Applegate
21  saying: Don't worry about that letter,
22  we've seen it, something to that effect. I
23  don't remember exactly what his words were,

Page 174

1   but, yeah, he admitted the letter was there.
2   Q.   Do you remember when he said
3   that?
4   A.   I think it was the second
5   meeting I had with him. I don't remember.
6   Q.   Second meeting with Applegate?
7   A.   Yeah. I mean, I don't know to
8   be honest. I can't say either way.
9   Q.   How many meetings did you have
10  with Applegate?
11  A.   I don't know. Two, three.
12  Whatever I said this morning.
13  Q.   Okay. In your letter to Greg
14  Kimball that we've marked as Exhibit 4 you
15  say: I have talked to human resources on
16  two separate occasions regarding Greg Prater
17  and also filed a complaint on him through my
18  National Guard unit.
19  A.   Yes, sir.
20  Q.   Were the two separate
21  occasions the one time that you talked to
22  Greg Kimball and then when you talked to
23  Keisha?

Page 175

1   A.   No, sir. The two separate
2   occasions was what it says, it was two
3   separate occasions.
4   Q.   But I'm trying to figure out
5   when those two separate occasions were and
6   who were they with?
7   A.   What do you mean?
8   Q.   On February 6th you basically
9   say you had two separate occasions that you
10  had discussions with human resources; right?
11  A.   Yes, sir.
12  Q.   Okay. I want -- I'm just
13  trying to figure out if we can pin down when
14  those were and who you talked to.
15  A.   It's like I stated earlier
16  this morning, I don't know the exact dates.
17  That was over a year ago. No, I don't. I
18  don't know specific dates, times, no, sir.
19  Q.   Do you recall who they were
20  with?
21  A.   Like I stated this morning,
22  the first meeting was with Greg Kimball --
23  Q.   Okay. That's one.

Page 176

1   A.   -- in HR, and the last two I
2   believe was with Keisha.
3   Q.   Okay. So other than Greg
4   Kimball and Keisha, you don't recall having
5   discussions with anybody in HR?
6   A.   No, sir.
7   Q.   No, sir, I'm wrong or no, sir,
8   you didn't have meetings with anyone else?
9   A.   No, sir, I don't recall having
10  meetings with anyone else in HR.
11  Q.   And did Keisha ever say
12  anything to you that in any way demeaned or
13  insulted your prior uniformed service?
14  A.   No, sir.
15  Q.   Do you have any reason to
16  think that Keisha in any way influenced the
17  decision to terminate your employment?
18  A.   I have no idea who had any --
19  I don't know. You're standing at work,
20  somebody comes up and tells you you're
21  fired, I mean --
22  Q.   Let me ask you this: Do you
23  have any information to suggest who was

44 (Pages 173 to 176)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Page 189

1  To your knowledge, was this
2  done on March 26th originally?
3      A.  I have no idea.
4      Q.  Okay. Do you have any idea
5  when he initially prepared it?
6      A.  No, sir.
7      Q.  All right. And was -- The
8  first page of Exhibit 5 is to Mrs. Dees, I
9  assume that's your wife?
10     A.  Yes, sir.
11     Q.  Was this faxed to some fax
12 numbers of hers or at her office somewhere?
13     A.  Yes, sir.
14     Q.  Did you ask Sergeant Barnes to
15 send it to your wife?
16     A.  Yes, sir.
17     Q.  And was it at her office?
18     A.  Yes, sir.
19     Q.  Where does she work?
20     A.  Peachtree Bank in Maplesville,
21 Alabama.
22     Q.  So to your knowledge, Sergeant
23 Barnes sent this to her bank?

Page 190

1      A.  Yes, sir.
2      Q.  And did she bring it home to
3  you?
4      A.  Yes, sir.
5      Q.  And it looks like it was faxed
6  on March 26th; is that accurate?
7      A.  Yes, sir.
8      Q.  And do you recall whether that
9  was when you got it or not?
10     A.  Yeah. She got it that day,
11 she brought it home that evening, yes, sir.
12     Q.  All right. Had you talked to
13 Sergeant Barnes that day?
14     A.  I don't know. I don't know.
15     Q.  Okay. Do you remember talking
16 to Sergeant Barnes asking him to send you
17 some sort of memorandum for the Record or
18 something telling what he had done in the
19 past?
20     A.  Yes, sir.
21     Q.  Did he fax this to you on the
22 same day or did this take place at a later
23 time?

Page 191

1      A.  I don't know.
2      Q.  Okay. Do you know if Sergeant
3  Barnes ever called Hyundai's HR department
4  for any reason?
5      A.  Not to my knowledge.
6      Q.  Okay. Had you provided him
7  with Greg Kimball's name?
8      A.  Yes, sir.
9      Q.  Did you provide him with Greg
10 Kimball's address or fax number or anything
11 like that?
12     A.  Address to the plant.
13     Q.  Just the plant address?
14     A.  Yes, sir. Attention Greg
15 Kimball.
16     Q.  Okay. In paragraph thirteen
17 of your complaint you say: After the letter
18 from Sergeant Barnes was sent to Hyundai,
19 the incidences of harassment outlined above
20 escalated.
21         Let me ask you that: Is that
22 accurate?
23     A.  Yes, sir.

Page 192

1      Q.  How did they escalate?
2      A.  I mean, it went from every
3  other day I was being called on the carpet.
4  I mean --
5      Q.  Called on the carpet for what?
6      A.  Anything he could make up,
7  they could make up, everything.
8      Q.  What would they make up?
9      A.  The daily reports, and I
10 believe that was in there somewhere, where I
11 didn't turn in my daily report where I
12 actually filled it out but I worked over,
13 and it was still in the book, I just didn't
14 drop it off in the box. And I was being
15 threatened on a write-up when there were
16 several other team members on both shifts
17 who hadn't turned in a daily report in over
18 a month. That was just one example.
19     Q.  Well, during that period, were
20 -- were you ever suspended for any reason?
21     A.  No, sir. They ignored their
22 whole firing process. I was never written
23 up, to my knowledge.

48 (Pages 189 to 192)