IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JERRY LEON DEES, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | CIVIL ACTION NO.: |
| v. ) | 2:07-cv-00306-MHT-CSC |
| ) | |
| HYUNDAI MOTOR MANUFACTURING ) | |
| ALABAMA, LLC, and HYUNDAI MOTOR ) | |
| AMERICA, INC., ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MOTION IN LIMINE AND SUPPORTING AUTHORITIES
TO EXCLUDE TESTIMONY CONCERNING GENERAL ALLEGATIONS
OF BAD CORPORATE CONDUCT**

Defendants Hyundai Motor Manufacturing Alabama, LLC ("HMMA") and Hyundai Motor America, Inc. ("HMA") (collectively "Defendants"), through undersigned counsel, respectfully move this Court *in limine* for an Order directing Plaintiff, his witnesses, and his attorneys not to mention or bring before the jury, either directly or indirectly, upon voir dire, reading of the pleadings, statement of the case, interrogation of witnesses, argument, or objections before the jury of any of the following without first having called such matters to the Court's attention, out of the presence of the jury, and obtained a favorable ruling as to the admissibility of any such matters.

This motion in limine is specifically directed to any testimony, comments, or argument that: (1) HMMA and HMA were not meeting their corporate obligations; (2) that HMMA and HMA were engaged in any alleged fraud or other criminal conduct (e.g., "Enron"-type conduct);

(3) any reference that HMMA and HMA or any related entities are part of a "chaebol;"[1] (4) any reference to Hyundai Motor Company's ("HMC") Chairman Chung Mong Koo's conviction for embezzlement and breach of trust (as well as other charges), his resulting sentence, and the subsequent suspension of that sentence; (5) any general allegation of bad conduct by these corporate entities not directly relevant to any claims in this suit; and (6) any bad conduct or wrongdoing by other corporations not parties to this case.  In support of this motion, Defendants state:[2]

  1. The impetus of this motion comes from several clearly improper lines of questioning utilized by Plaintiff's counsel during the deposition of Wendy Warner, conducted November 15, 2007.  Ms. Warner is employed as the Manager for HMMA's Employment and Benefits departments.

  2. For example, Plaintiff's counsel asked Ms. Warner numerous questions about Chung Mong Koo, the Chairman of Hyundai Motor Company ("HMC"), his family, and his recent sentence and subsequent release.  See Warner Depo., pp. 64-67, attached hereto as Exhibit 1.  It is undisputed that HMC is not a party to this proceeding.  Plaintiff's counsel further questioned Ms. Warner:

> • Why is it that that's the standard and Mr. Chung - - Chairman Chung gets convicted of wrongfully diverting money from financially healthy members of Hyundai Motor Group, he's sentenced to, I think, six years in prison and he's welcomed back with open arms in the company and yet here you've got a war hero named Leon Dees who sleeps on the job and he is terminated?[3]

---

[1] Plaintiff's counsel defined this term as a "family-controlled dynasty," see infra at paragraph 3.
[2] In order to streamline the pleadings in this action, Defendants have included the applicable authorities in support of their motion in limine concerning general allegations of bad corporate conduct.  Defendants respectfully request that this pleading be considered both as a motion and supporting brief.
[3] Exh. 2, Warner Depo. Transcript, pp. 192-193.

3.      Also during this deposition, Plaintiff's counsel asked Ms. Warner regarding whether Hyundai was a "chaebol," or a family-controlled dynasty. Exh. 1 at pp. 64-65. Plaintiff's counsel's improper line of questioning continued with examples such as:

- Well, he'd [Chairman Chung] probably be outraged that Mr. Dees got fired, wouldn't he?

- Well, let's just assume that Mr. Chung did work at HMMA and say, embezzled a hundred million dollars, what would you do as an HMMA HR person?[4]

4.      Such allegations that have no bearing on the subject matter of the claims in this case are not relevant to Plaintiff's allegations, and would be intended solely to unfairly prejudice Defendants. Fed.R.Evid. 401, 402, 403, 608.

5.      Any evidence of character traits, morality, or reputation of HMMA and HMA, or existing or former employees or representatives of HMMA and HMA, or any other corporate entity, including but not limited to Chairman Chung Mong Koo and HMC, or any reference to the reputation of such individuals for having such character traits, including evidence of other alleged wrongs or acts not relevant to the claims in this case, should be excluded from evidence. Fed.R.Evid. 404, 608(b).

6.      Moreover, global references to the corporate character, morality, or reputation of HMMA and HMA as a whole should be excluded. Id.

WHEREFORE, premises considered, HMMA and HMA respectfully request that this Court enter an Order precluding Plaintiff, Plaintiff's witnesses, and Plaintiff's attorneys from introducing into evidence, making comments or giving any testimony concerning, or making any argument relating to, general allegations of bad corporate conduct by HMMA and HMA or other

---

[4] Id. at Exh 2, Warner Depo., pp. 193-94.

corporate entities (including, but not limited to, HMC) in the presence of the jury. Likewise, HMMA and HMA request the Court to give limiting instructions at the appropriate times to avoid the concerns addressed by Fed.R.Evid. 403.

Respectfully submitted this 31st day of March, 2008.

/s/ J. Trent Scofield

Timothy A. Palmer (PAL-009)
J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor Manufacturing Alabama, LLC and Hyundai Motor America, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of March, 2008, I electronically filed the foregoing *Defendants' Motion in Limine and Supporting Authorities to Exclude Testimony Concerning General Allegations of Bad Corporate Conduct* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: W. Perry Hall, Vincent F. Kilborn, III, David Allen McDonald, Jeffrey Rayborn Sport, Timothy A. Palmer, T. Scott Kelly, and Matthew K. Johnson.

                                            /s/ J. Trent Scofield
                                            J. Trent Scofield (SCO-024)

# Jerry Dees v. HMMA and HMA
## 2:07-cv-00306-MHT-CSC

# EXHIBIT 1

**Defendants' Motion in Limine and Supporting Authorities to Exclude Testimony Concerning General Allegations Of Bad Corporate Conduct**

**Page 61**

1    BY MR. SCOFIELD: Object to the form.
2        THE WITNESS: No. We do have supplier
3  meetings with all of the tier one suppliers and Glovis
4  does attend, but they're human resources folks so we,
5  again, exchange information, support from a human
6  resources situation, but it's called a supplier meeting
7  that human resources and purchasing tries to support
8  the suppliers with information. And, again, same as we
9  did at Toyota, same as other transplants do to support
10 their suppliers in their base here.
11    Q  (BY MR. KILBORN:) You used a term and I
12 didn't write it down. Is there a term for these
13 meetings?
14    A  It's called a supplier meeting.
15    Q  Supplier meeting?
16    A  Uh-huh. They supply various components and
17 parts to build the vehicle and so you have to have a
18 real close relationship as well as a just-in-time type
19 of operation.
20    Q  And how often are these meetings held?
21        BY MR. SCOFIELD: Object to the form.
22        THE WITNESS: Quarterly.
23    Q  (BY MR. KILBORN:) Quarterly?

**Page 62**

1    A  Uh-huh.
2    Q  And the last one was when?
3    A  I didn't go, but team relations went and
4  purchasing, so let's see, this is November, I would say
5  probably the June timeframe.
6    Q  And who attends these meetings?
7    A  The human resources groups and sometimes
8  purchasing.
9    Q  Of the Hyundai companies?
10   A  Tier ones.
11   Q  Of the tier ones.
12   A  Uh-huh.
13   Q  Tell me what you mean by tier ones.
14   A  Tier one is a direct supplier. Tier two
15 could be providing support to the tier one, so it's
16 only tier one suppliers which is a direct supplier to
17 HMMA.
18   Q  And are all of the tier one companies Hyundai
19 companies?
20   A  No.
21   Q  How about tier two?
22   A  No. Conglomerations; some are, some aren't.
23   Q  Okay. Have you ever heard the name Hyundai

**Page 63**

1  Automotive Group?
2    A  I've heard of it, yes.
3    Q  Do you know what it is?
4    A  No.
5    Q  Do you know anything about its structure?
6    A  Not really.
7    Q  Financial, legal, corporate, otherwise?
8    A  No.
9        BY MR. SCOFIELD: Object to the form.
10   Q  (BY MR. KILBORN:) Does HMMA, L.L.C. have
11 members?
12   A  Has members, does L.L.C. have members?
13       BY MR. SCOFIELD: Object to the form.
14   Q  (BY MR. KILBORN:) I was asking you that
15 question.
16   A  I don't understand. Obviously, I don't know,
17 so I don't understand the question.
18   Q  Does HMMA, L.L.C. have stock?
19       BY MR. SCOFIELD: Object to the form.
20       THE WITNESS: Not that I know of.
21   Q  (BY MR. KILBORN:) Explain to me then the
22 legal or business control of HMMA, L.L.C. How is it
23 controlled if it's not owned by stockholders and

**Page 64**

1  doesn't have a Board of Directors, it doesn't have
2  officers?
3        BY MR. SCOFIELD: Object to the form.
4        THE WITNESS: I honestly don't know.
5        BY MR. SCOFIELD: The witness can answer to
6  the extent that she knows.
7    Q  (BY MR. KILBORN:) Is it your understanding
8  that it's family-owned?
9    A  Uh-huh.
10   Q  You have to say yes or no.
11   A  Yes.
12   Q  Is that Chairman Chung?
13   A  Yes.
14   Q  Would that include his son?
15   A  I would think so, yes.
16   Q  Any other family members?
17   A  Not that I know of.
18   Q  Am I correct that having worked for Toyota
19 and then now having worked for Hyundai, both of which
20 are Asian companies, that you know something about the
21 Asian corporate mentality?
22   A  Somewhat?
23   Q  There's a Korean word that means family

**Page 65**

1 controlled, a dynasty. Do you know what that word is?
2     BY MR. SCOFIELD: Object to the form.
3     THE WITNESS: In reading newspapers, I
4 believe it's called chaebol.
5     Q   (BY MR. KILBORN:) Right. Do you know how
6 that's spelled?
7     A   I'd be guessing.
8     Q   Okay. What is your understanding from your
9 reading what a chaebol is?
10     BY MR. SCOFIELD: Object to the form.
11     THE WITNESS: Just that it's a family-owned
12 company.
13     Q   (BY MR. KILBORN:) Is that what Hyundai is?
14     BY MR. SCOFIELD: Object to the form.
15     THE WITNESS: I'd be guessing. I don't know.
16     Q   (BY MR. KILBORN:) From what you know, what
17 you've seen at Hyundai and what you've read about a
18 chaebol is, do you think that Hyundai is a chaebol?
19     BY MR. SCOFIELD: Object to the form.
20     THE WITNESS: Again, I'd be guessing.
21     Q   (BY MR. KILBORN:) I've heard it referred to
22 as a chaebol. Have you heard that?
23     A   Just in newspapers that I've read.

**Page 66**

1     Q   And what type of newspapers have you read?
2     A   I read some of the Korean newspapers to stay
3 current with Hyundai.
4     Q   Okay. Are they translated into English?
5     A   Yeah.
6     Q   Are they made available by the expats or HMA
7 or HMMA?
8     A   No, just my own research.
9     BY MR. SCOFIELD: Object to the form.
10     THE WITNESS: My own information.
11     Q   (BY MR. KILBORN:) Okay. And have you read
12 that Hyundai is an authoritarian management structure?
13     BY MR. SCOFIELD: Object to the form.
14     THE WITNESS: I have not read that.
15     Q   (BY MR. KILBORN:) Have you read anything
16 about the corporate structure of the various Hyundai
17 corporations?
18     A   No.
19     Q   Did you read about Chairman Chung's
20 indictment and conviction for embezzlement and other
21 crimes?
22     A   Yes.
23     BY MR. SCOFIELD: Object to the form.

**Page 67**

1     Q   (BY MR. KILBORN:) And did you read where, I
2 think, he got six years in prison but then he was let
3 out because he was so important to the company?
4     A   Yes.
5     BY MR. SCOFIELD: Object to the form.
6     Q   (BY MR. KILBORN:) Or the country?
7     A   I did read that.
8     Q   Okay. And did you read where he apologized
9 to the country for his criminal acts?
10     BY MR. SCOFIELD: Object to the form.
11     THE WITNESS: Yes.
12     Q   (BY MR. KILBORN:) And did you read that he
13 and his son own sixty percent of Glovis?
14     A   I didn't remember that part.
15     Q   Did you -- Did you remember that his son and
16 he as part of this apology had given the sixty percent
17 of Glovis that they own to some charity?
18     BY MR. SCOFIELD: Object to the form.
19     THE WITNESS: No.
20     Q   (BY MR. KILBORN:) Would it be correct to say
21 then that you, Wendy Warner, have no knowledge about
22 the legal, financial structure of HMMA, HMA or HMC?
23     BY MR. SCOFIELD: Object to the form.

**Page 68**

1     THE WITNESS: Yes.
2     Q   (BY MR. KILBORN:) And that you have no
3 knowledge about the business structure of those
4 companies except what you know about the human
5 resources --
6     A   Yes.
7     Q   -- department?
8     BY MR. SCOFIELD: Object to the form.
9     Q   (BY MR. KILBORN:) So you, Wendy Warner, are
10 strictly a human resources person within HMMA?
11     A   Yes.
12     Q   You don't have access to legal matters,
13 financial matters, accounting matters, supply
14 matters --
15     A   No.
16     BY MR. SCOFIELD: Object to the form.
17     Q   (BY MR. KILBORN) -- manufacturing matters,
18 any other operational matters at all?
19     BY MR. SCOFIELD: Object to the form.
20     THE WITNESS: Yes, that's correct.
21     Q   (BY MR. KILBORN:) And this isn't an
22 endurance test, so any time you want to get up and take
23 a break, let me know.

<u>**Jerry Dees v. HMMA and HMA**</u>
**2:07-cv-00306-MHT-CSC**

# EXHIBIT 2

**Defendants' Motion in Limine and Supporting Authorities to Exclude Testimony Concerning General Allegations Of Bad Corporate Conduct**

**Page 189**

1  can go through or we can take a break.
2      THE WITNESS: How much longer do you
3  anticipate?
4      BY MR. KILBORN: Several hours I'd say.
5      THE WITNESS: We probably need to break then
6
7  (Whereupon, there was a recess held in the
8  deposition.)
9
10      BY MR. KILBORN: Trent, I'm just going to
11  mark that Hyundai file that you gave me. I think it's
12  1 through 93.
13      BY MR. SCOFIELD: The one in connection with
14  our original document production?
15      BY MR. KILBORN: This is just the format that
16  you gave it to me.
17      BY MR. SCOFIELD: Okay.
18      BY MR. KILBORN: I just thought it was easier
19  to just refer to Bates Number.
20      BY MR. SCOFIELD: That's fine.
21      BY MR. KILBORN: And once we copy the
22  personnel file, then I'll be able to identify what part
23  of this is personnel. I think it's 1 through 75.

**Page 190**

1      BY MR. SCOFIELD: Whatever works with you
2  guys.
3      BY MR. KILBORN: I'm just trying to be
4  efficient.
5
6  (Whereupon, Plaintiff's Exhibit 9 was marked
7  for identification and copy of same is
8  attached hereto.)
9
10  Q  (BY MR. KILBORN:) Ms. Warner, are you ready?
11  A  Yes, sir.
12  Q  Ms. Warner, I understand that Mr. Dees was
13  terminated because he slept on the job; is that
14  correct?
15  A  Yes, sir.
16  Q  Is sleeping on the job always a firing
17  offense at HMMA?
18      BY MR. SCOFIELD: Object to the form.
19      You can answer.
20      THE WITNESS: To the degree that he was found
21  sleeping on the job, yes. We have had situations that
22  individuals had sleep apnea or they fell asleep, just
23  nodded off, that would not constitute termination, but

**Page 191**

1  an individual that purposefully was sleeping on the
2  job, yes.
3  Q  (BY MR. KILBORN:) And what is it about
4  sleeping on the job with Mr. Dees that lifted it to a
5  firing offense?
6  A  He was not in the location where he should
7  have been working. He was sitting in a chair with two
8  of the doors opened to allow him privacy to sleep and
9  it was observed by a member of our management.
10  Q  So he was in the wrong location and what
11  else?
12  A  Sitting in a chair sleeping with a pillow and
13  two of the doors that were open to an area that is only
14  used very rarely. He was on the third floor of the
15  building, not on the first floor where the stamping
16  presses are in the department where he works.
17  Q  And you said that he had pillows?
18  A  My understanding was that he did have a
19  pillow that was propped up.
20  Q  Like what kind of pillow?
21  A  Something to -- for his head. I don't know
22  if it was pillow, but it was something propped up to
23  hold his head up to sleep.

**Page 192**

1  Q  So basically HMMA determined that you had a
2  deliberate, willful, egregious sleeping on the job?
3      BY MR. SCOFIELD: Object to the form.
4      THE WITNESS: Yes, sir.
5  Q  (BY MR. KILBORN:) Okay. Why is it that
6  that's the standard and Mr. Chung -- Chairman Chung
7  gets convicted of wrongfully diverting money from
8  financially healthy members of Hyundai Motor Group,
9  he's sentenced to, I think, six years in prison and
10  he's welcomed back with open arms in the company and
11  yet here you've got a war hero named Leon Dees who
12  sleeps on the job and he's terminated? How do those
13  two standards fit?
14      BY MR. SCOFIELD: Object to the form.
15      THE WITNESS: Again, there's no correlation
16  because Mr. Chung doesn't work for HMMA. Leon Dees
17  does work for HMMA and we have policies and procedures
18  pertaining to this particular plant that he did not
19  follow.
20  Q  (BY MR. KILBORN:) But Mr. Chung basically
21  started the company, started the plant, started HMMA
22  and controls it, doesn't it?
23      BY MR. SCOFIELD: Object to the form.

48 (Pages 189 to 192)

**Page 193**

1    THE WITNESS: He doesn't fall under the
2 jurisdiction of our policies and procedure, Leon Dees
3 does.
4    Q   (BY MR. KILBORN:) Why doesn't he?
5    BY MR. SCOFIELD: Object to the form.
6    THE WITNESS: Because Mr. Chung doesn't work
7 for HMMA.
8    Q   (BY MR. KILBORN:) So Mr. Chung has a
9 different standard?
10    BY MR. SCOFIELD: Object to the form.
11    THE WITNESS: I would assume so. Again, he
12 is not one of my employees, Mr. Dees is.
13    Q   (BY MR. KILBORN:) You think Mr. Chung if
14 called to testify in this case would say I sure do
15 think he should have been fired?
16    BY MR. SCOFIELD: Object to the form.
17    THE WITNESS: It would be speculation on my
18 part. I don't know what he would say.
19    Q   (BY MR. KILBORN:) Well, he'd probably be
20 outraged that Mr. Dees got fired, wouldn't he?
21    BY MR. SCOFIELD: Object to the form.
22    THE WITNESS: I wouldn't know. I'd be
23 speculating on what someone would think or feel or say.

**Page 194**

1    Q   (BY MR. KILBORN:) But you did meet him,
2 right?
3    A   Mr. Chung?
4    Q   Right.
5    A   Yes, at a dinner.
6    Q   And you did speak to him?
7    A   He thanked me for my service and I thanked
8 him as well.
9    Q   Well, let's just assume that Mr. Chung did
10 work at HMMA and, say, embezzled a hundred million
11 dollars, what would you do to him as an HMMA HR person?
12    A   I would have to --
13    BY MR. SCOFIELD: Object to the form.
14    THE WITNESS: -- investigate it before I
15 would make any kind of conclusion or supposition about
16 it.
17    Q   (BY MR. KILBORN:) Well, let's say you
18 investigate it and you found that he diverted -- you
19 know, he criminally diverted over a hundred million
20 dollars?
21    A   Supposition on my part again.
22    BY MR. SCOFIELD: Object to the form.
23    THE WITNESS: It's not something that's

**Page 195**

1 reality.
2    Q   (BY MR. KILBORN:) Or just assume that he
3 did, would that be a firing offense?
4    A   Of course.
5    BY MR. SCOFIELD: Same objection.
6    Q   (BY MR. KILBORN:) To your knowledge, have
7 any expats been terminated for sleeping on the job?
8    A   Not that I'm aware of, no. And, again, that
9 would have been under the HR coordinator's rule of
10 engagement.
11    Q   Have any of the expats been terminated,
12 period, to your knowledge?
13    A   Not that I'm aware of, no.
14    Q   And you've been there, what, a little over
15 four years?
16    A   Uh-huh.
17    Q   Have you ever seen any of them sleeping on
18 the job?
19    A   No, sir.
20    Q   Take a look at Exhibit 9. This is a
21 collection of documents produced by Hyundai, Bates
22 Numbered 1 through 93. I'll just refer to them by
23 Bates Number.

**Page 196**

1    A   Okay.
2    Q   The first document, document number 1, is a
3 letter that you wrote to Mr. Dees dated March 7, 2007.
4 Did you write that letter yourself?
5    A   It's a standard letter that's drafted by our
6 team relations group, but I did review it and did know
7 that it was being sent out.
8    Q   But my question is: Did you draft it?
9    A   No.
10    Q   Do you have personal knowledge of the
11 information in there?
12    A   Yes.
13    Q   And how do you know that he was, quote, left
14 a phone message on March 2nd, 2007?
15    A   My assistant manager in team relations,
16 Rob Clevenger, informed me of that.
17    Q   So it's what somebody told you?
18    A   That's correct.
19    Q   Well, is there anything in there that you
20 know of of your own personal knowledge as opposed to
21 hearsay?
22    BY MR. SCOFIELD: Object to the form.
23    THE WITNESS: This information was given to