**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY LEON DEES, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:07-cv-00306-MHT-CSC** |
| | ) | |
| **HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, and HYUNDAI MOTOR AMERICA, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION AND SUPPORTING AUTHORITIES TO DISQUALIFY PLAINTIFF'S EXPERT ROBERT HALL, II, CPA**

In accordance with Rules 403, 702, 703 and 704 of the Federal Rules of Evidence, Defendants Hyundai Motor Manufacturing Alabama, LLC ("HMMA") and Hyundai Motor America, Inc. ("HMA") (collectively "Defendants"), file this Motion to Disqualify Plaintiff's Expert, Robert Hall, II, CPA. Alternatively, Defendants move this Court, *in limine*, to place appropriate limitations on Mr. Hall's testimony, in keeping with the federal law controlling this action (USERRA), and the Federal Rules of Evidence.

In support of this motion, Defendants respectfully show the Court as follows:[1]

**A. Relevant Facts**

1. Plaintiff has designated Robert Hall, II, CPA, as an expert witness in this case. See Plaintiff's Notice of Filing the Disclosure of Expert Testimony, dated October 1, 2007, attached hereto as Exhibit 1.

---

[1] In order to streamline the pleadings in this action, Defendants have included the supporting authorities in connection with this motion. Defendants respectfully request that this pleading be considered as both a motion and supporting brief.

2. Mr. Hall has provided an Expert Report and a Supplemental Report. See Expert Reports, attached hereto as Exhibit 1 (original) and Exhibit 2 (supplemented). Mr. Hall also provided deposition testimony in connection with this case. See Deposition Transcript, attached as Exhibit 3.

- **Mr. Hall's Statements Regarding Alleged Harassment and Unlawful Termination of Plaintiff**

3. Mr. Hall is a Certified Public Accountant who has no legal training. Regarding USERRA, the federal statute at the center of this litigation, Mr. Hall testified, "I would say I have a layman's understanding of it." (Exh. 3, p. 69: 6-7).

4. However, Mr. Hall's supplemented Expert Report contains the following statements which he wishes the Court to consider:

- **Alleged Harassment and Unlawful Termination of Plaintiff**

> Harassment of Mr. Dees by Hyundai through Prater and Hughes began almost immediately when Prater learned that Mr. Dees was a member of the Guard.
>
> Hyundai harassed Mr. Dees by:
>
> a. Prater repeatedly demanded that Mr. Dees provide military orders to excuse missing work because of monthly weekend Guard training, even though the Guard issues only an annual training schedule;
>
> b. Prater telling Mr. Dees he could not miss work to attend his Guard training;
>
> c. Prater frequently made derogatory remarks about the Guard in the presence of Mr. Dees and other employees;
>
> d. Prater told Mr. Dees that he could not go to Hyundai's Human Resources department to complain about how he was being treated, despite the company's "open door" policy regarding employee complaints;
>
> e. Prater attempted to force Mr. Dees' coworkers to say that Dees had violated Hyundai policy and procedures when Prater knew it was not true;

> f. In an effort to coerce Mr. Dees into quitting his job so that Hyundai would not have to deal with Mr. Dees' Guard service obligations, Mr. Dees was forced to clean the "pit" more frequently than the other personnel. The pit is a highly dangerous area where sharp scrap metal pieces from the stamping process drop off the conveyor and collect. The pit was used by Hyundai, through Prater and Hughes, to punish Mr. Dees. The scrap process was running many times while Mr. Dees was made to clean the pit making this job far more dangerous. Mr. Dees cleaned the pit almost daily some weeks. Overall, his work assignment to the pit was several times that of his coworkers.
>
> Applegate backed Prater's and Hughes' harassment by standing behind the decisions they made in running the stamping maintenance department and by refusing to act or investigate complaints to Applegate regarding Prater and Hughes.
>
> Harassment of Mr. Dees continued and escalated after the Guard wrote a letter to Hyundai regarding their request for individual orders for each monthly training period.
>
> On or about February 14, 2007, Prater's fellow Hyundai employee Jim Brookshire falsely accused Mr. Dees of sleeping on the job.
>
> On February 26, 2007, Hyundai fired Mr. Dees for allegedly sleeping on the job, despite Hyundai's documented six-step policy of Corrective Action.
>
> As a result of Hyundai's termination of Mr. Dees in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, Mr. Dees was forced to obtain other employment.[2]

- **Mr. Hall's Alleged Damages Data**

5. Mr. Hall's supplemented Expert Report continues by providing data by making summary and conclusions regarding: (a) lost wages/fringe benefits through trial of $24,333 and (b) lost wages/fringe benefits through worklife expectancy of $351,298. See Exh. 2 at paras. 12-13. Mr. Hall combines these figures to state that, "Total economic loss of Wages and Fringe Benefits equals $375,961." Id. at para. 14.

[2] See Exhibit 2, supplemented Expert Report at paras. 4-10.

6. It is undisputed that Plaintiff's date of termination was February 26, 2007. Mr. Hall's supplemented report states, "Mr. Dees was scheduled to receive a pay increase to $24.58 in May 2007 and to $27.05 per hour in November 2007." Id. at para. 17.

7. Regarding the alleged November 2007 pay increase, Mr. Hall credits the source of that information as a conversation that Plaintiff allegedly had "with a former co-worker." (Exh. 3 at pp. 40: 22-23 – 41: 1-3). Mr. Hall does not know the identity of this co-worker and has not received any information from this individual. (Id. at pp. 41-42, passim).

**B. Argument and Authorities**

8. The Court should disqualify Mr. Hall for multiple reasons: (1) his opinions are legal conclusions and are not appropriate for expert testimony; (2) he is not qualified to render expert testimony regarding the application of USERRA and its remedial structure; and (3) his methodology appears unreliable and unverifiable.

9. The Court should exclude Mr. Hall as an expert in this case because his testimony consists of legal conclusions that will not assist the jury during trial of this case. Although an expert witness may testify in the form of an opinion or inference as to an ultimate fact issue, an expert may not provide legal conclusions. Fed. R. Evid. 704(a); Woods v. Lecureux, 110 F. 3d 1215, 1220 (6th Cir. 1997) ("It is, therefore, apparent that testimony offering nothing more than a legal conclusion - i.e., testimony that does little more than tell the jury what result to reach - is properly excluded under the Rules").

10. It is well-settled that an expert's testimony "must offer more analysis than just the 'bottom line.'" Minasian v. Standard Chartered Bank, PLC, 109 F.3d 1212, 1216 (7th Cir. 1997) (The court rejected the plaintiff's expert's affidavit that was "full of vigorous assertion [much of it legal analysis in the guise of banking expertise], carefully tailored to support plaintiff's

position but devoid of analysis."). "An expert should offer more than opinions or legal conclusions on issues that will determine the outcome of the case." Marting v. Crawford & Co., 9 Wage & Hour Cas. (BNA) 2d 554, *4 (N.D. Ill. 2004).

11. Based on the positions taken in his reports, it appears Mr. Hall's opinions are offered to prove the ultimate legal question to be decided in this case. Because expert testimony as to such "bottom line" legal matters is inappropriate, his testimony should be precluded at trial.

- **Standard For Admissibility of Expert Testimony Under The Federal Rules of Evidence**

12. Even if Mr. Hall's testimony properly were the subject of expert evidence, it nonetheless should be excluded. Mr. Hall is not qualified to render opinions regarding the issue of USERRA liability, and his opinions are without the requisite foundation, reliability and verifiability.

13. The Supreme Court outlined the analytical framework for determining the admissibility of expert testimony under the Federal Rules of Evidence in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); Fed. R. Evid. 702. In Daubert, the Court instructed district courts to function as "gatekeepers" and permit only reliable and relevant expert testimony to be presented to the jury. Id. at 590-93. This "gatekeeping" responsibility applies not only to scientific testimony, but to *all* expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (emphasis added).

14. As part of its gatekeeping responsibility, the Court must first be assured that the proffered witness is qualified to testify by virtue of the witnesses' "knowledge, skill, experience, training, and education." Fed. R. Evid. 702. "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given

subject." Wilson v. Woods, 163 F. 3d 935, 937 (5th Cir. 1999) (internal citations omitted). Next, a trial court must be assured that the expert's opinions are reliable. Daubert, 509 U.S. at 589-90.

15. Finally, a trial court must be assured that the expert's opinions are relevant to the facts and issues presented. Id. The burden of proof on all Daubert issues rests on the proponent of the testimony. Moore v. Ashland Chem., Inc., 151 F. 3d 269, 276 (5th Cir. 1998) (en banc).

- **Mr. Hall Is Not Qualified To Render Expert Opinions On USERRA**

16. To determine whether Mr. Hall is qualified to render the proffered opinion, "the court is to examine not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." Smelser v. Norfolk S. Ry. Co., 105 F. 3d 299, 303 (6th Cir. 1997). Mr. Hall does not possess any specialized knowledge, training, education, or experience sufficient to qualify him as an expert on the interpretation of USERRA.

17. The Advisory Committee's Notes to Rule 702 make clear that, "if the witness is relying primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Mr. Hall is unable to provide such an explanation, as his experience as a CPA has never touched on the USERRA issue before the Court.

18. Mr. Hall is unable to articulate how his experience leads him to many of the opinions stated here. Mr. Hall is certainly not qualified to offer an opinion regarding Plaintiff's working conditions or any alleged adverse employment action under USERRA. Expert opinions that are speculative or based on mere conjecture will be excluded because they cannot assist the jury. Kumho, 526 U. S. at 151. The mere fact that Mr. Hall has a subjective opinion and is willing to testify "it is so" is insufficient to support his "expert" testimony. Viterbo v. Dow Chemical Co.,

826 F. 2d 420, 421 (5th Cir. 1987); Alevromagiros v. Hechinger Co., 933 F. 2d 417, 421 (4th Cir. 1993). Unsupported opinions offer no assistance to the trier of fact, as required by Rule 702, and are more prejudicial than probative. Therefore, any such testimony should be excluded under Rule 403.

- **Mr. Hall's Damages Model Is Contrary To USERRA**

19. The remedies under USERRA are discrete and well-defined. 38 U. S. C. 4323(d). These remedies include: reinstatement and any loss of wages/benefits. If an employer's actions are determined to be willful, the Court may allow liquidated damages. Id.

20. It is well-settled that, in employment discrimination cases, back pay is calculated from the date of the adverse employment action through the date of judgment. See, e.g. Nord v. United States Steel Corp., 758 F. 2d 1462, 1472-73 (11th Cir. 1985) (Title VII). Here, Mr. Hall's attempt to tender a projected damages figure exceeding **$350,000**, based on nearly **two decades** of anticipated **future** earnings, is completely unfounded under federal law and highly prejudicial.

21. To the extent any future earnings may be considered, that is a decision for this Court - - not the jury in this case. See, e.g. EEOC v. W & O, Inc., 213 F. 3d 600, 618 (11th Cir. 2000) (Title VII; "the award of front pay is a form of equitable relief" - - properly within the discretion of the trial court). Determining front pay requires the district court to predict future events and consider "many complicated and interlocking factors." Mason v. Oklahoma Turnpike Auth., 115 F. 3d 1442, 1458 (10th Cir. 1997). Such a calculation must necessarily be based on more than "mere guesswork." Carter v. Sedgwick County, Kan., 929 F. 2d 1501, 1505 (10th Cir. 1991).

22. Because Mr. Hall's damages projection is contrary to the applicable federal statute governing this case, his opinion as an "expert" should be disallowed.

• **Mr. Hall's Assumptions Are Unreliable And Unverifiable**

23. Mr. Hall credits an unnamed co-worker and assumes a pay increase of more than $2.50/hour for Plaintiff. See Relevant Facts, paras. 6-7. As this Court has previously noted, Rule 702 requires expert testimony to be based on both a reliable methodology and a sufficient factual basis. Rudd v. General Motors Corp., 127 F. Supp. 2d 1330, 1337 (M.D. Ala. 2001).

24. The hearsay and assumption-based nature of such testimony makes it inherently unreliable and improper for an expert to base his opinion.

## III. Conclusion

Based on the evidence and the application of authorities presented herein, this Court should disqualify Mr. Hall as an expert witness in this case. Should the Court decide otherwise and recognize Mr. Hall as an expert, any testimony offered by him should be limited to those areas where he has been qualified to offer such opinions in keeping with the Federal Rules of Evidence.

Respectfully submitted this 31st day of March, 2008.

/s/ J. Trent Scofield
Timothy A. Palmer (PAL-009)
J. Trent Scofield (SCO-024)
T. Scott Kelly (KEL-053)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: timothy.palmer@odnss.com
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

Attorneys for Defendants Hyundai Motor Manufacturing Alabama, LLC and Hyundai Motor America, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of March, 2008, I electronically filed the foregoing *Defendants' Motion and Supporting Authorities to Disqualify Plaintiff's Expert Robert Hall, II, CPA* with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: W. Perry Hall, Vincent F. Kilborn, III, David Allen McDonald, Jeffrey Rayborn Sport, Timothy A. Palmer, T. Scott Kelly, and Matthew K. Johnson.

/s/ J. Trent Scofield
OF COUNSEL

# Jerry Dees v. HMMA and HMA
# 2:07-cv-00306-MHT-CSC

# EXHIBIT 1

## Defendants' Motion and Supporting Authorities to Disqualify Plaintiff's Expert Robert Hall, II, CPA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **JERRY LEON DEES, JR.,** | * | |
| **Plaintiff,** | * | |
| **vs.** | * | **Case No. 2:07-cv-00306-MHT-CSC** |
| **HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and HYUNDAI MOTOR AMERICA, INC.,** | * | |
| | * | |
| **Defendants.** | * | |

**PLAINTIFF'S NOTICE OF FILING**
**THE DISCLOSURE OF EXPERT TESTIMONY**

COMES NOW Plaintiff, Jerry Leon Dees, Jr., ("Dees"), and hereby files notice to this Court that it has disclosed, October 1, 2007, the identity of Plaintiff's expert and the substance of the anticipated testimony by his expert in compliance with Rule 26(a)(2) of the Federal Rules of Civil Procedure and pursuant to the Court's Uniform Scheduling Order (Doc 19). Such disclosure has been made by facsimile and by depositing a copy of the same into the United States Mail with postage prepaid to all counsel of record.

Dated this 1st day of October, 2007.

/s/ W. Perry Hall
W. Perry Hall (HALLW9043)
Vincent F. Kilborn, III
KILBORN & ROEBUCK
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747



OF COUNSEL
David A. McDonald, Esquire
KILBORN, ROEBUCK & MCDONALD
203 South Warren Street (36602)
P.O. Box 832
Mobile, AL 36601
(251) 434-0045 Telephone
(251) 434-0047 Fax
Email: dam@krmlaw.us

**CERTIFICATE OF SERVICE**

I do hereby certify that I have served on this 1st day of October, 2007, the foregoing pleading on all counsel of record by facsimile and by depositing a copy of same in the United States Mail with postage prepaid to:

J. Trent Scofield
T. Scott Kelly, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Federal Place, Ste. 1000
1819 Fifth Avenue North
Birmingham, AL 35203

Matthew K. Johnson, Esq.
Ogletree, Deakins, Nash,
Smoak & Stewart, P.C.
Post Office Box 2757
Greenville, SC 29602

/s/ W. Perry Hall
COUNSEL

**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JERRY LEON DEES, JR., *
*
Plaintiff, *
*
v. * CASE NO.
* 2:07-cv-00306-MHT-CSC
HYUNDAI MOTOR MANUFACTURING *
ALABAMA, LLC and HYUNDAI *
MOTOR AMERICA, INC., *
*
Defendant. *

**RULE 26(a)(2)(B) FEDERAL RULES OF CIVIL PROCEDURE DISCLOSURE OF EXPERT TESTIMONY**

Jerry Leon Dees, Jr., (hereinafter referred to as "Mr. Dees") by and through its counsel of record and in compliance with Rule 26(a)(2)(B), Federal Rules of Civil Procedure, discloses the substance of its expert's anticipated testimony as follows:

**QUALIFICATIONS, EXPERIENCE AND COMPENSATION**

My name is Robert P. Hall, II and I am a Certified Public Accountant and sole shareholder of Robert Hall & Associates, P.C. a Certified Public Accounting and consulting firm in Mobile, Alabama. By education and experience, I have expertise in accounting, auditing, taxation, and consulting, and in business planning and analysis.

I have a Bachelor of Science degree in Business with an emphasis in Accounting from the University of South Alabama, and have 22 years of experience in business analyses and consulting. I have experience in preparing cost analyses and projections. Attached hereto and labeled as EXHIBIT 1 is information regarding my experience.

I have been retained as an expert witness by the plaintiff's attorneys to calculate economic loss to Mr. Dees as a result of his wrongful termination of employment on February 26, 2007.

My firm is compensated at the rate of $120 per hour for all services rendered in this case. The firm is also compensated for expenses incurred. Compensation is for time incurred, and in no way relates to the outcome of this case or the specific nature of my findings or opinions.

**FOUNDATION**

In preparing this report, I interviewed Mr. Dees and others, and reviewed various pleadings and other documents. A complete listing of evidence I reviewed is presented at EXHIBIT 2.

My evaluation and calculation of damages is premised on my understanding of the case as discussed below. My understanding of the case includes certain factual assumptions relating to the establishment of liability necessary to the calculation and presentation of economic loss as a result of the injury to Mr. Dees. **As of the date of this report, no depositions have been taken in this case. I fully intend to supplement this report when deposition testimony, as well as other additional discovery, becomes available.**

**BACKGROUND UNDERSTANDING**

1. Mr. Dees was born on January 19, 1965. He graduated from Clay County High School in 1983. Prior to graduating from high school he enlisted in the Army National Guard (hereinafter referred to as "the Guard") and completed his basic training. In 1983, Mr. Dees was released from the Guard in order to enlist for active

duty in the U.S. Air Force where he served until 1992. In 1994 he re-enlisted in the Guard where he continues to serve. Mr. Dees is currently a Staff Sergeant and is assigned to the 1165th Military Police. Mr. Dees served active duty during both the Iraqi conflicts.

2. Mr. Dees attended some junior college and technical college but did not receive a degree.
3. Mr. Dees began working at Hyundai Motor Manufacturing Alabama, LLC (hereinafter referred to as "Hyundai") in November 2005. He was employed as a maintenance team member in the Stamping Maintenance department under the direct supervision of "team leader" Kevin Hughes (hereinafter referred to as "Hughes") and Stamping Maintenance assistant manager Greg Prater (hereinafter referred to as "Prater"). Prater reported to John Applegate, American maintenance senior manager (hereinafter referred to as "Applegate")
4. Harassment of Mr. Dees by Hyundai through Prater and Hughes began almost immediately when Prater learned that Mr. Dees was a member of the Guard.
5. Hyundai harassed Mr. Dees by:
   a. Prater repeatedly demanded that Mr. Dees provide military orders to excuse missing work because of monthly weekend Guard training, even though the Guard issues only an annual training schedule;
   b. Prater telling Mr. Dees he could not miss work to attend his Guard training;
   c. Prater frequently made derogatory remarks about the Guard in the presence of Mr. Dees and other employees;

    d.  Prater told Mr. Dees that he could not go to Hyundai's Human Resources department to complain about how he was being treated, despite the company's "open door" policy regarding employee complaints;

    e.  Prater attempted to force Mr. Dees' coworkers to say that Dees had violated Hyundai policy and procedures when Prater knew it was not true;

    f.  In an effort to coerce Mr. Dees into quitting his job so that Hyundai would not have to deal with Mr. Dees' Guard service obligations, Mr. Dees was forced to clean the "pit" more frequently than the other personnel. The pit is a highly dangerous area where sharp scrap metal pieces from the stamping process drop off the conveyor and collect. The pit was used by Hyundai, through Prater and Hughes, to punish Mr. Dees. The scrap process was running many times while Mr. Dees was made to clean the pit making this job far more dangerous. Mr. Dees cleaned the pit almost daily some weeks. Overall, his work assignment to the pit was several times that of his coworkers.

6.  Applegate backed Prater's and Hughes' harassment by standing behind the decisions they made in running the stamping maintenance department and by refusing to act or investigate complaints to Applegate regarding Prater and Hughes.

7.  Harassment of Mr. Dees continued and escalated after the Guard wrote a letter to Hyundai regarding their request for individual orders for each monthly training period.

8.  On or about February 14, 2007, Prater's fellow Hyundai employee Jim Brookshire falsely accused Mr. Dees of sleeping on the job.

9. On February 26, 2007, Hyundai fired Mr. Dees for allegedly sleeping on the job, despite Hyundai's documented six-step policy of Corrective Action.

10. As a result of Hyundai's termination of Mr. Dees in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, Mr. Dees was forced to obtain other employment.

11. From February 27, 2007 until July 06, 2007, Mr. Dees was employed by BE&K, Inc as a millwright. He was employed by International Paper on July 12, 2007 as a maintenance lead man. As of the date of this report he remains in this position. Mr. Dees' total compensation on his two subsequent jobs is less than that he enjoyed at Hyundai.

**SUMMARY AND CONCLUSIONS**

12. Loss of Wages and Fringe Benefits to trial is $26,953. See EXHIBIT 3.

13. Loss of Wages and Fringe Benefits from trial through worklife expectancy equals $255,196. See EXHIBIT 3.

14. Total economic loss of Wages and Fringe Benefits equals $282,149. See EXHIBIT 3.

**ANALYSIS**

15. The economic loss as a result of the injury of Mr. Dees is calculated on past losses (back pay) and future losses (front pay). The past loss represents the amount of income Mr. Dees would have earned from the date of wrongful employment termination to the date of trial, but for his wrongful employment termination. The future loss is the present net cash value of lost earnings and fringe benefits from the date of the trial through the worklife expectancy of Mr. Dees.

16. I have made the following financial assumptions in my calculations:

a) Mr. Dees had a worklife expectancy of 19 years at the time of wrongful employment termination. See EXHIBIT 8.

b) Mr. Dees' real earnings as a maintenance team member, without regard to inflation would have increased at a rate of .53 percent per year. See EXHIBIT 4, Part 1.

c) Mr. Dees' real earnings as a maintenance lead man, without regard to inflation will increase at a rate of .51 percent per year. See EXHIBIT 4, Part 1.

d) The date of the trial is March 31, 2008.

17. Before wrongful employment termination, Mr. Dees received $23.35 per hour for the first 40 hours worked per week, $35.03 per hour for overtime and $46.70 for hours worked on Sundays and holidays. He also received a shift differential equal to $1 per hour for the first 40 hours worked, $1.5 for overtime hours worked and $2 per hour for Sundays and holidays worked. Mr. Dees was scheduled to receive a pay increase to $24.58 per hour in May 2007 and to $25.94 per hour in November 2007. Overtime pay would also increase to $36.87 per hour and Sunday/holiday pay to $49.16 per hour in May 2007. In November 2007, overtime pay would also increase to $38.91 per hour and Sunday/holiday pay would increase to $51.88 per hour. His 2007 earnings have been estimated by annualizing the actual hours worked at regular, overtime, and Sunday/holiday through his paycheck dated March 06, 2007[1] multiplied by the various per hourly rates. The estimate was adjusted to account for vacation and personal time paid at the time of his wrongful employment termination.

[1] For the purpose of this analysis, payroll earnings were calculated based on check disbursement date instead of payroll period end dates.

Annualized income for 2007, the year of wrongful employment termination, totaled $87,447 and has been used as a base to project actual earnings had the wrongful employment termination not occurred. See EXHIBIT 5.

18. Mr. Dees' compensation for 2007 from BE&K, Inc. was $15,883. See EXHIBIT 6. His International Paper compensation through check date 09/13/2007 was $10,211. See EXHIBIT 6. The remainder of his 2007 compensation has been projected based on an average of full work weeks (the first paycheck was not used in the projection because it was a partial week). Overtime was based on an average of full weeks worked to date plus additional hours that Mr. Dees expects to work during plant shutdowns in 2007. Mr. Dees' hourly wage is $25.37 per hour for the first 40 hours worked. His overtime wage is $38.06 per hour. Annualized income from International Paper for the remainder of 2007 totaled $20,204. See EXHIBIT 6. Total projected income for 2007 was $30,415. See EXHIBIT 6.

19. For 2008, Mr. Dees expects to receive a pay increase to $27.99 per hour in January and an additional pay increase to $30.23 in July. Compensation for 2008 has been projected based on working 2,080 regular hours (40 hrs. per week x 52 weeks per year) and overtime based on the 2007 annualized amounts plus additional overtime that Mr. Dees expects to work during plant shutdowns. His projected compensation for 2008 totaled $75,939. See EXHIBIT 6.

20. I refer to worklife tables in "Worklife Estimates: Effects of Race and Education," Bureau of Labor Statistics, Bulletin 2254, February 1986 and determined that Mr. Dees' remaining worklife as of the date of wrongful employment termination to be 19 years. See EXHIBIT 8.

21. The discount rate is based upon the rate of return available for 20-year inflation indexed United States Treasury Bonds noted in the Federal Reserve Statistical Release, release date: September 20, 2007. The effects of inflation have been removed from these bonds so that they provide a real rate of return. This rate is 2.25% (see EXHIBIT 9), before income tax and 2.01%[2] after income tax. U.S. Treasury securities are exempt from state income tax; therefore only federal income tax is considered in calculating the after-tax rate. Mr. Dees' federal income tax rate for 2006 was calculated at 10.53% of his adjusted gross earnings.

22. The growth rates on earnings are based upon data compiled by the Bureau of Labor Statistics in their Employment Cost Index Constant-dollar 1975-2005 (December 2005=100). These tables adjust for the effects of inflation and provide the real rates of growth. See EXHIBIT 4, Part 2. A real rate of .53 percent provides the expected rate of growth in compensation had Mr. Dees continued working as a maintenance team member. See EXHIBIT 4, Part 1. A real rate of .51 percent provides the expected rate of growth in compensation of a maintenance lead man. See EXHIBIT 4, Part 1. Mr. Dees' International Paper compensation is governed by a union contract which holds his wage per hour constant at $30.23 through 2012. The real growth rate will be applied to his compensation from 2013 forward.

23. Mr. Dees was provided health insurance coverage by Hyundai until his wrongful employment termination on 02/26/2007. He contributed $378.04 annually toward this coverage. He continued this coverage under COBRA for three months at a cost of $2,001. See EXHIBIT 7. During his employment at BE&K, Inc., Mr. Dees contributed $86.83 per bi-weekly pay check toward health insurance premiums ($434

[2] Calculated as follows: discount rate x (1-income tax rate)=after tax discount rate

during his employment). See EXHIBIT 7. Currently, Mr. Dees pays $108 per bi-weekly pay period from International Paper wages toward his health coverage. I estimate that he will pay $861 in health insurance through his employment at International Paper. See EXHIBIT 7. Mr. Dees' total loss of benefit from the date of his wrongful employment termination to the end of 2007 was $2,991. See EXHIBIT 7.

24. For determining the lost health insurance fringe benefit for 2008 and future years, I calculated the annual amount of premium contributions required for coverage through his employment at International Paper ($107.65 per bi-weekly pay period x 26 pay periods or $2,799) less the amount that he would have been required to pay if employment had not been terminated at Hyundai ($14.54 per bi-weekly pay period x 26 pay periods or $378). The annual loss resulting from the loss of health insurance fringe benefits is $2,421 for 2008 and each year that follows. See EXHIBIT 7.

25. Mr. Dees was also provided Long Term Disability Insurance as a benefit at no cost by Hyundai. International Paper provides similar coverage to its employees at a cost of $10.98 per week or $571 per year. See EXHIBIT 7. This amount was used to value the lost benefit.

26. Mr. Dees was provided a 401(k) retirement savings plan through Hyundai. Hyundai matched Mr. Dees' contributions at a rate of 60% of the first 4% of his contributions. International Paper provides Mr. Dees with 401(k) Savings and Investment Plan. International Paper matches 50 cents on the dollar on the first 1% to 4% of employee contributions. In addition, International Paper provides retirement income based on

age and years of service. I have assumed that these benefits are similar and that the value of this lost benefit is $0.

27. Mr. Dees' total compensation is expected to lag behind what he would have earned at Hyundai, as Hyundai is one of the most favored employers in the Montgomery, Alabama area.

28. Damages have been calculated using the "but for" method of calculating lost earnings and fringes. The "but for" method is an accepted method of calculating lost earnings and fringes damages, and is the preferred method when a more precise estimation of lost earnings and fringes is desired.

**ADDITIONAL OPINIONS**

I may also do other analyses and reach additional conclusions as additional discovery documents, deposition testimony, and defendants' experts' reports and depositions become available.

Dated this 1st day of October, 2007.

ROBERT P. HALL II, CPA

**DEES v. HMMA and HMA**
**EXHIBIT 1**
**QUALIFICATIONS**

**Robert P. Hall II, CPA**
**3955 McGregor Avenue South**
**Mobile, Alabama 36608**

**Professional Experience**

| | |
|---|---|
| **1997-present** | Robert Hall & Associates, PC/GibbonsHall, LLC, Mobile, Alabama, Owner. |
| **1990-1997** | Crow and Shields, PC, Mobile, Alabama. Manager, responsible for various accounting, auditing and tax clients. Also responsible for managing firm's information systems. |
| **1987-1990** | George Hieronymus, CPA, Mobile Alabama, Staff accountant, responsible for various small business client's accounting, auditing and tax services. |
| **1986-1987** | McKenzie Industries, Inc. Mobile, Alabama. President – in charge of sales and marketing. |
| **1984-1986** | Hall Affiliates, Inc. Mobile, Alabama. Assistant controller, in charge of financial reporting, internal audit and tax compliance for 10 wholesale florist operations. Duties also included managing one of the wholesale operations for several months while a permanent manager was hired. |

## Professional Standing and Associations

**License and Certificates**

Certified Public Accountant, licensed in the State of Alabama

**Professional Associations**

Member, American Institute of Certified Public Accountants
Member, Alabama Society of Certified Public Accountants
Member, Mobile Chapter of the Alabama Society of Certified Public Accountants

## Education

B.S Business Administration, University of South Alabama, 1984

## Civic Activities

Child Day Care Association, Inc., Immediate Past Board President
Mobile United, Finance Committee Member
Leadership Mobile, Graduate Class of 2002

## Testimony Rendered

None in the last four years.

**DEES v. HMMA and HMA**
**EXHIBIT 2**
**LISTING OF EVIDENCE REVIEWED**

1. Review of complaint and pleadings.

2. Discussions with Leon Dees and Katherine Dees.

3. Review of plaintiff's production.

4. Review of defendants' production.

5. *Guide to Litigation Support Services*, (11th Ed., Practitioners Publishing Company, July 2006).

6. *Measuring Damages Involving Individuals,*(American Institute of Certified Public Accountants, Inc., 2004)

7. http://www.hmmausa.com, HMMA Employment

8. http://www.hyundaiusa.com, Summary of benefits & programs

9. http://www.workingfilms.org, On the Job in North Carolina, "State Lures Good Jobs, But Companies Worry About Workers," David Firestone, New York Times, January 28, 2002.

**DEES v. HMMA and HMA**
**Exhibit 3**
**Economic Loss Calculation**

| | | |
|---|---|---|
| Name of employee | Jerry L. Dees | |
| Calculation date | 3/31/2008 | Expected Trial Date |
| Fraction of year-calc date | 24.66% | 1/1/2008 |
| Fraction of year-final year | 15.34% | |
| Race/sex | White male | |
| Profession | Maintenance team member | |
| Education | High school/some college | |
| Date of birth | 1/19/1965 | |
| Date of termination | 2/26/2007 | |
| Age at termination | 42.1 | |
| Worklife expectancy | 19 years | |
| Age at end of worklife | 61.1 | |
| Age at end of life expectancy | 77.4 | |

| | |
|---|---|
| Earnings growth, Hyundai | 0.53% |
| Earnings growth, Mitigating Wage | 0.51% |
| Before tax discount | 2.25% |
| After tax discount | 2.01% |
| Annual income lost | 87,447 |
| Replacement earnings | 75,939 |
| Date of replacement hire | 2/27/2007 |

| Year | Years from Termination | To/From Report | Age | Earning but for .53% | Actual Capacity/ earnings .51% (after 2012) | Net loss of earnings | Fringe benefits lost | Total Loss | Lost Value 2.01% | Cumulative | Report Date 10/01/2007 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/26/2007 | | | 42.10 | | | | | | | | | |
| 12/31/2007 | 0.84 | 0.25 | 43.05 | 67,715 | 46,298 | 21,417 | 3,467 | 24,884 | | | | |
| 3/31/2008 | 1.09 | 0.00 | 43.29 | 21,679 | 20,358 | 1,321 | 748 | 2,069 | | | **$ 26,953** | **Past loss** |
| 12/31/2008 | 1.84 | -0.75 | 44.05 | 66,231 | 55,581 | 10,650 | 2,244 | 12,894 | (12,702) | (12,702) | | |
| 12/31/2009 | 2.84 | -1.75 | 45.05 | 88,376 | 75,939 | 12,437 | 2,992 | 15,429 | (14,899) | (27,601) | | |
| 12/31/2010 | 3.84 | -2.75 | 46.05 | 88,844 | 75,939 | 12,905 | 2,992 | 15,897 | (15,048) | (42,649) | | |
| 12/31/2011 | 4.84 | -3.75 | 47.05 | 89,314 | 75,939 | 13,375 | 2,992 | 16,367 | (15,187) | (57,836) | | |
| 12/31/2012 | 5.84 | -4.75 | 48.05 | 89,787 | 75,939 | 13,848 | 2,992 | 16,840 | (15,318) | (73,154) | | |
| 12/31/2013 | 6.84 | -5.75 | 49.05 | 90,262 | 76,325 | 13,937 | 2,992 | 16,929 | (15,095) | (88,249) | | |
| 12/31/2014 | 7.84 | -6.75 | 50.05 | 90,740 | 76,713 | 14,027 | 2,992 | 17,019 | (14,876) | (103,125) | | |
| 12/31/2015 | 8.84 | -7.75 | 51.05 | 91,221 | 77,103 | 14,118 | 2,992 | 17,110 | (14,660) | (117,785) | | |
| 12/31/2016 | 9.84 | -8.75 | 52.05 | 91,704 | 77,494 | 14,210 | 2,992 | 17,202 | (14,448) | (132,233) | | |
| 12/31/2017 | 10.84 | -9.75 | 53.05 | 92,190 | 77,887 | 14,303 | 2,992 | 17,295 | (14,240) | (146,473) | | |
| 12/31/2018 | 11.84 | -10.75 | 54.05 | 92,678 | 78,282 | 14,396 | 2,992 | 17,388 | (14,034) | (160,507) | | |
| 12/31/2019 | 12.84 | -11.75 | 55.05 | 93,169 | 78,679 | 14,490 | 2,992 | 17,482 | (13,831) | (174,338) | | |
| 12/31/2020 | 13.84 | -12.75 | 56.05 | 93,662 | 79,078 | 14,584 | 2,992 | 17,576 | (13,631) | (187,969) | | |
| 12/31/2021 | 14.84 | -13.75 | 57.05 | 94,158 | 79,480 | 14,678 | 2,992 | 17,670 | (13,433) | (201,402) | | |
| 12/31/2022 | 15.84 | -14.75 | 58.05 | 94,657 | 79,884 | 14,773 | 2,992 | 17,765 | (13,239) | (214,641) | | |
| 12/31/2023 | 16.84 | -15.75 | 59.05 | 95,158 | 80,290 | 14,868 | 2,992 | 17,860 | (13,047) | (227,688) | | |
| 12/31/2024 | 17.84 | -16.75 | 60.05 | 95,662 | 80,698 | 14,964 | 2,992 | 17,956 | (12,859) | (240,547) | | |
| 12/31/2025 | 18.84 | -17.75 | 61.05 | 96,169 | 81,108 | 15,061 | 2,992 | 18,053 | (12,673) | (253,220) | | |
| 2/25/2026 | 19.00 | -17.91 | 61.10 | 14,830 | 12,505 | 2,325 | 499 | 2,824 | (1,976) | (255,196) | | |
| | | | | | | | | | (255,196) | | **$ 255,196** | **Future loss** |
| | | | | | | | | | | | **$ 282,149** | **Total economic loss** |

DEES v. HMMA and HMA
**Exhibit 4 - Part 1 of 2**
**Earnings Growth**

Average Growth Last 10 years

Table 6. Employment Cost Index (Wages and Salary Only), Private Industry Workers

Manufacturing, Blue Collar Occupations

| | Employment Cost Index | Change | Percentage Change | |
|---|---|---|---|---|
| 1995 | 94.9 | | | |
| 1996 | 94.9 | 0 | 0.00% | |
| 1997 | 96.2 | 1.3 | 1.37% | |
| 1998 | 97.6 | 1.4 | 1.46% | |
| 1999 | 98.2 | 0.6 | 0.61% | |
| 2000 | 98.3 | 0.1 | 0.10% | |
| 2001 | 100.7 | 2.4 | 2.44% | |
| 2002 | 101.1 | 0.4 | 0.40% | |
| 2003 | 101.7 | 0.6 | 0.59% | |
| 2004 | 101 | -0.7 | -0.69% | |
| 2005 | 100 | -1 | -0.99% | |
| | 1084.6 | | 0.53% | Average Growth Rate |

Table 7. Employment Cost Index (Wages and Salaries Only), Private Industry Workers By Bargaining Status, Region, and Area Size

Union Workers, Manufacturing, blue-collar occupations

| Employment Cost Index | Change | Percentage Change | |
|---|---|---|---|
| 95.1 | | | |
| 94.6 | -0.5 | -0.53% | |
| 95.6 | 1 | 1.06% | |
| 96.9 | 1.3 | 1.36% | |
| 97.6 | 0.7 | 0.72% | |
| 97.8 | 0.2 | 0.20% | |
| 99.8 | 2 | 2.04% | |
| 100.7 | 0.9 | 0.90% | |
| 101.5 | 0.8 | 0.79% | |
| 100.4 | -1.1 | -1.08% | |
| 100 | -0.4 | -0.40% | |
| 1080 | | 0.51% | Average Growth Rate |



DEES v. HMMA and HMA
EXHIBIT 4
PART 2 of 2

# Employment Cost Index
# Historical Listing
# Constant-dollar
# 1975-2005

## (December 2005=100)

**Table #** **Page**

*Not seasonally adjusted*

Compensation

**2a** Civilian; by occupation and industry ........ 3
**2b** State and local government; by occupation and industry ........ 12
**3** Private industry; by occupation and industry ........ 20
**4** Private industry; by bargaining status, region, and area size ........ 51

Wages and salaries

**5a** Civilian; by occupation and industry ........ 62
**5b** State and local government; by occupation and industry ........ 71
**6** Private industry; by occupation and industry ........ 79
**7** Private industry; by bargaining status, region, and area size ........ 114

Benefits

**8a** Civilian, State and local government ........ 127
**8b** Private industry, by occupation and industry ........ 128

*Note: Tables in this listing are numbered to be consistent with the numbering scheme used in the ECI Current-dollar estimates historical listing and the ECI News Release. Since it is not appropriate to calculate a constant dollar value for seasonally adjusted data, those estimates, which appear in Tables 1a, 1b, and 1c of the ECI Current-dollar estimates historical listing and Table 1 of the ECI News Release are not included in this listing.

Bureau of Labor Statistics
Office of Compensation Levels and Trends
2 Massachusetts Avenue, NE – Suite 4175
Washington, DC 20212-0001

202.691.6199
NCSinfo@bls.gov
http://www.bls.gov/ncs/ect
May 10, 2006

# NOTES

Beginning with estimates for March 2006, several changes were introduced to the Employment Cost Index (ECI). Among these changes was the rebasing of the ECI, which was changed to December 2005=100. Prior to this, the base was June 1989=100, which was used from March 1990 through December 2005. Before March 1990 the base was June 1981=100. December 2005=100 indexes were calculated by dividing the June 1989=100 index values for each series by the December 2005 index value for that series and then multiplying by 100. 3- and 12-month percent changes were then calculated from the rebased indexes. These percent changes may differ from those calculated from the June 1989=100 indexes only because of rounding. The change to the June 1989=100 base is explained in the technical note, "Employment Cost Index Rebased to June 1989," in the April 1990 issue of the Monthly Labor Review (bls.gov/opub/mlr/1990/04/rpt1full.pdf).

When using the ECI for escalation contracts, users should review the fact sheet "How to Use the Employment Cost Index for Escalation" (bls.gov/ncs/ect/escalation.htm) as well as the ECI Current-dollar estimates historical listing, which does not deflate the index. *Constant-dollar estimates in this historical listing are not appropriate for use in escalation clauses.*

The deflator used for all constant-dollar ECI series was derived from the Consumer Price Index for All Urban Consumers (CPI-U). In order to calculate the constant dollar indexes, the CPI-U was converted to the same base as the ECI, December 2005=100. The ECI for each quarter was then divided by the converted CPI-U for the same reference period. The CPI-U U.S. City Average All Items was used for all series except for the regional estimates, which used corresponding CPI-U regional series.

This listing includes not seasonally adjusted ECI series for which current-dollar estimates are published. The constant-dollar compensation and benefit series must be interpreted with caution. Changes in employer costs for employee benefits do not necessarily measure changes in the welfare of workers.

More detailed information on the ECI is available from several sources. These include: "National Compensation Measures," in the BLS Handbook of Methods (bls.gov/opub/hom/pdf/homch8.pdf), and several articles published in the Monthly Labor Review (bls.gov/opub/mlr/mlrhome.htm) and Compensation and Working Conditions (bls.gov/opub/cwc/home.htm). These articles, and other descriptive pieces are also available by calling (202) 691-6199 or sending e-mail to NCSinfo@bls.gov. Additional changes to the ECI take effect with the March 2006 estimates. For more information, see "Change is Coming to the ECI" at bls.gov/ncs/ect/sp/ecsm0001.htm. Also, the April 2006 issue of the Monthly Labor Review is devoted to a series of articles detailing these changes (bls.gov/opub/mlr/2006/04/contents.htm).

This historical listing—which provides constant-dollar estimates from 1975-2005—uses the Standard Industrial Classification System (SIC), Occupational Classification System (OCS), and 1990 employment weights. It also uses indexes based on December 2005=100 to be consistent with the changes to the ECI introduced with the March 2006 estimates.

Three additional historical listings have estimates for the Employment Cost Index. One listing provides estimates for this same time period (1975-2005) but reflect current-dollar changes. It also uses the SIC, OCS, and 1990 weights. The other two listings provide data for 2001 to the present and are based on the new 2002 North American Industrial Classification System (NAICS), 2000 Standard Occupational Classification Manual (SOC), and incorporate the 2002 employment weights. One listing provides current-dollar estimates while the second provides constant-dollar estimates. All four historical listings are available at: bls.gov/ncs/ect/home.htm#tables.

**TABLE 6. EMPLOYMENT COST INDEX (WAGES AND SALARIES ONLY), PRIVATE INDUSTRY WORKERS[1]**

**(Constant dollars, not seasonally adjusted) — Continued**

| Series and year | Indexes (December 2005=100) | | | | Percent Changes for | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 3 months ended-- | | | | 12 months ended-- | | | |
| | Mar. | Jun. | Sep. | Dec. | Mar. | Jun. | Sep. | Dec. | Mar. | Jun. | Sep. | Dec. |
| Manufacturing, blue-collar occupations: | | | | | | | | | | | | |
| 1989 | 95.7 | 95.3 | 95.5 | 95.7 | -0.6 | -0.4 | 0.2 | 0.2 | -1.9 | -1.8 | -0.5 | -0.6 |
| 1990 | 94.8 | 95.0 | 93.7 | 93.8 | -.9 | .2 | -1.4 | .1 | -1.0 | -.3 | -1.9 | -2.0 |
| 1991 | 94.0 | 94.1 | 94.0 | 94.4 | .2 | .1 | -.1 | .4 | -.8 | -1.0 | .3 | .6 |
| 1992 | 94.4 | 94.3 | 94.1 | 94.3 | .0 | -.1 | -.2 | .2 | .4 | .2 | .1 | -.1 |
| 1993 | 93.8 | 93.8 | 93.9 | 94.3 | -.5 | .0 | .1 | .4 | -.6 | -.5 | -.2 | .0 |
| 1994 | 94.0 | 94.2 | 94.0 | 94.5 | -.3 | .2 | -.2 | .5 | .2 | .4 | .1 | .2 |
| 1995 | 94.1 | 94.4 | 94.4 | 94.9 | -.4 | .3 | .0 | .5 | .1 | .2 | .4 | .4 |
| 1996 | 94.4 | 94.7 | 94.7 | 94.9 | -.5 | .3 | .0 | .2 | .3 | .3 | .3 | .1 |
| 1997 | 94.7 | 95.3 | 95.5 | 96.2 | -.2 | .6 | .2 | .7 | .3 | .7 | .9 | 1.3 |
| 1998 | 96.5 | 96.6 | 97.1 | 97.6 | .3 | .1 | .5 | .5 | 1.9 | 1.3 | 1.7 | 1.5 |
| 1999 | 97.7 | 97.6 | 97.5 | 98.2 | .1 | -.1 | -.1 | .7 | 1.3 | 1.1 | .4 | .6 |
| 2000 | 97.3 | 97.4 | 97.7 | 98.3 | -.9 | .1 | .3 | .6 | -.4 | -.2 | .2 | .1 |
| 2001 | 98.3 | 98.2 | 99.0 | 100.7 | .0 | -.1 | .8 | 1.7 | 1.0 | .8 | 1.3 | 2.4 |
| 2002 | 100.4 | 100.5 | 100.3 | 101.1 | -.3 | .1 | -.2 | .8 | 2.1 | 2.3 | 1.3 | .5 |
| 2003 | 100.4 | 101.0 | 100.9 | 101.7 | -.7 | .6 | -.1 | .8 | .0 | .6 | .6 | .6 |
| 2004 | 100.9 | 100.2 | 101.0 | 101.0 | -.8 | -.7 | .8 | .0 | .5 | -.8 | .1 | -.7 |
| 2005 | 100.1 | 100.2 | 98.5 | 100.0 | -.9 | .1 | -1.7 | 1.5 | -.8 | .0 | -2.5 | -.9 |
| Manufacturing, durable goods: | | | | | | | | | | | | |
| 1976 | – | – | 98.2 | 99.6 | – | – | – | 1.4 | – | – | – | – |
| 1977 | 99.4 | 98.8 | 99.9 | 100.8 | -.2 | -.6 | 1.1 | .9 | – | – | 1.7 | 1.2 |
| 1978 | 100.5 | 99.2 | 99.2 | 100.3 | -.3 | -1.3 | .0 | 1.1 | 1.0 | .5 | -.7 | -.6 |
| 1979 | 98.9 | 96.9 | 96.0 | 96.2 | -1.4 | -2.0 | -.9 | .2 | -1.6 | -2.4 | -3.3 | -4.0 |
| 1980 | 94.5 | 93.4 | 94.4 | 94.0 | -1.8 | -1.2 | 1.1 | -.4 | -4.5 | -3.6 | -1.7 | -2.3 |
| 1981 | 93.8 | 93.5 | 93.0 | 94.3 | -.2 | -.3 | -.5 | 1.4 | -.7 | .1 | -1.5 | .3 |
| 1982 | 95.3 | 93.8 | 94.4 | 95.8 | 1.1 | -1.6 | .6 | 1.5 | 1.6 | .3 | 1.5 | 1.6 |
| 1983 | 96.2 | 95.2 | 95.0 | 95.7 | .4 | -1.0 | -.2 | .7 | 1.0 | 1.5 | .7 | -.1 |
| 1984 | 95.7 | 95.3 | 95.0 | 95.9 | .0 | -.4 | -.3 | .9 | -.6 | .1 | .0 | .2 |
| 1985 | 96.1 | 96.2 | 96.1 | 95.8 | .2 | .1 | -.1 | -.3 | .4 | .9 | 1.1 | -.1 |
| 1986 | 97.3 | 97.4 | 97.3 | 97.6 | 1.6 | .1 | -.1 | .3 | 1.3 | 1.3 | 1.3 | 1.9 |
| 1987 | 96.6 | 96.2 | 95.7 | 96.3 | -1.0 | -.4 | -.5 | .6 | -.7 | -1.3 | -1.6 | -1.2 |
| 1988 | 96.2 | 95.6 | 94.7 | 94.7 | -.1 | -.6 | -.9 | .0 | -.5 | -.6 | -1.1 | -1.8 |
| 1989 | 94.3 | 93.8 | 93.8 | 94.1 | -.4 | -.5 | .0 | .3 | -2.0 | -1.9 | -.9 | -.6 |
| 1990 | 93.3 | 93.4 | 92.4 | 92.3 | -.9 | .1 | -1.1 | -.1 | -1.0 | -.4 | -1.5 | -1.9 |
| 1991 | 92.5 | 92.7 | 92.7 | 93.1 | .2 | .2 | .0 | .4 | -.9 | -.8 | .3 | .8 |
| 1992 | 93.0 | 92.9 | 92.9 | 93.1 | -.1 | -.1 | .0 | .2 | .5 | .2 | .2 | .0 |
| 1993 | 92.8 | 92.8 | 93.0 | 93.6 | -.3 | .0 | .2 | .6 | -.2 | -.1 | .1 | .6 |
| 1994 | 93.2 | 93.3 | 93.3 | 93.9 | -.4 | .1 | .0 | .6 | .4 | .6 | .4 | .3 |
| 1995 | 93.7 | 93.8 | 93.9 | 94.3 | -.2 | .1 | .1 | .4 | .6 | .5 | .6 | .4 |
| 1996 | 93.5 | 94.0 | 94.2 | 94.3 | -.8 | .5 | .2 | .1 | -.2 | .2 | .3 | .0 |
| 1997 | 93.9 | 94.5 | 94.7 | 95.2 | -.4 | .6 | .2 | .5 | .4 | .5 | .6 | 1.0 |
| 1998 | 95.8 | 96.1 | 96.7 | 97.3 | .6 | .3 | .6 | .6 | 2.0 | 1.7 | 2.1 | 2.2 |
| 1999 | 97.3 | 97.5 | 97.4 | 98.1 | .0 | .2 | -.1 | .7 | 1.6 | 1.5 | .7 | .9 |
| 2000 | 97.3 | 97.7 | 97.9 | 98.6 | -.8 | .4 | .2 | .7 | .0 | .3 | .6 | .5 |
| 2001 | 98.4 | 98.4 | 98.9 | 100.6 | -.2 | .0 | .5 | 1.7 | 1.2 | .7 | 1.0 | 2.0 |
| 2002 | 100.2 | 100.5 | 100.4 | 101.2 | -.4 | .3 | -.1 | .8 | 1.8 | 2.1 | 1.5 | .7 |
| 2003 | 100.4 | 101.2 | 100.9 | 101.6 | -.8 | .8 | -.3 | .7 | .2 | .7 | .6 | .4 |
| 2004 | 100.6 | 100.0 | 100.8 | 100.8 | -1.0 | -.6 | .8 | .0 | .2 | -1.2 | -.1 | -.8 |
| 2005 | 99.9 | 100.0 | 98.4 | 100.0 | -.9 | .1 | -1.6 | 1.6 | -.7 | .0 | -2.4 | -.7 |

See footnotes at end of table.

NOTE: Excerpt from Bureau of Labor Statistics, Employment Cost Index

**TABLE 7. EMPLOYMENT COST INDEX (WAGES AND SALARIES ONLY), PRIVATE INDUSTRY WORKERS[1] BY BARGAINING STATUS, REGION[2] AND AREA SIZE**

**(Constant dollars, not seasonally adjusted) — Continued**

| Series and year | Indexes (December 2005=100) | | | | Percent Changes for | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 3 months ended– | | | | 12 months ended– | | | |
| | Mar. | Jun. | Sep. | Dec. | Mar. | Jun. | Sep. | Dec. | Mar. | Jun. | Sep. | Dec. |
| Union workers, manufacturing: | | | | | | | | | | | | |
| 1998 | 95.1 | 95.2 | 96.2 | 96.5 | 0.3 | 0.1 | 1.1 | 0.3 | 1.8 | 1.4 | 1.9 | 1.8 |
| 1999 | 96.4 | 96.5 | 96.3 | 97.2 | -.1 | .1 | -.2 | .9 | 1.3 | 1.3 | .1 | .7 |
| 2000 | 96.5 | 96.5 | 96.8 | 97.5 | -.7 | .0 | .3 | .7 | .1 | .0 | .6 | .3 |
| 2001 | 97.2 | 97.2 | 97.9 | 99.6 | -.3 | .0 | .7 | 1.7 | .8 | .8 | 1.1 | 2.2 |
| 2002 | 99.1 | 99.3 | 99.6 | 100.7 | -.5 | .2 | .3 | 1.1 | 2.0 | 2.2 | 1.8 | 1.1 |
| 2003 | 99.9 | 101.0 | 100.7 | 101.4 | -.8 | 1.1 | -.3 | .7 | .8 | 1.6 | 1.1 | .8 |
| 2004 | 100.4 | 99.8 | 100.6 | 100.5 | -1.0 | -.6 | .8 | -.1 | .5 | -1.1 | -.1 | -.9 |
| 2005 | 99.4 | 99.6 | 98.1 | 100.0 | -1.1 | .2 | -1.5 | 1.9 | -1.0 | -.2 | -2.5 | -.5 |
| Union workers, manufacturing, blue-collar occupations: | | | | | | | | | | | | |
| 1987 | – | 99.2 | 98.5 | 100.1 | – | – | -.7 | 1.6 | – | – | – | – |
| 1988 | 99.3 | 98.6 | 97.7 | 97.9 | -.8 | -.7 | -.9 | .2 | – | -.6 | -.9 | -2.2 |
| 1989 | 97.2 | 96.7 | 96.6 | 96.9 | -.7 | -.5 | -.1 | .3 | -2.1 | -2.0 | -1.1 | -1.0 |
| 1990 | 95.6 | 95.9 | 94.2 | 94.6 | -1.3 | .3 | -1.8 | .4 | -1.6 | -.8 | -2.5 | -2.4 |
| 1991 | 94.8 | 94.9 | 94.7 | 95.2 | .2 | .1 | -.2 | .5 | -.9 | -1.1 | .5 | .6 |
| 1992 | 95.1 | 94.9 | 94.8 | 95.1 | -.1 | -.2 | -.1 | .3 | .3 | .0 | .1 | -.1 |
| 1993 | 94.5 | 94.6 | 94.6 | 95.3 | -.6 | .1 | .0 | .7 | -.6 | -.3 | -.2 | .2 |
| 1994 | 94.9 | 95.4 | 95.1 | 95.4 | -.4 | .5 | -.3 | .3 | .4 | .8 | .5 | .1 |
| 1995 | 94.8 | 94.6 | 94.8 | 95.1 | -.6 | -.2 | .2 | .3 | -.1 | -.8 | -.3 | -.3 |
| 1996 | 94.4 | 94.6 | 94.5 | 94.6 | -.7 | .2 | -.1 | .1 | -.4 | .0 | -.3 | -.5 |
| 1997 | 94.1 | 94.5 | 95.0 | 95.6 | -.5 | .4 | .5 | .6 | -.3 | -.1 | .5 | 1.0 |
| 1998 | 95.5 | 95.7 | 96.4 | 96.9 | -.1 | .2 | .7 | .5 | 1.4 | 1.3 | 1.5 | 1.4 |
| 1999 | 96.7 | 96.8 | 96.6 | 97.6 | -.2 | .1 | -.2 | 1.0 | 1.3 | 1.1 | .2 | .7 |
| 2000 | 96.6 | 96.5 | 97.0 | 97.8 | -1.0 | -.1 | .5 | .8 | -.1 | -.3 | .4 | .2 |
| 2001 | 97.4 | 97.3 | 98.2 | 99.8 | -.4 | -.1 | .9 | 1.6 | .8 | .8 | 1.2 | 2.1 |
| 2002 | 99.2 | 99.4 | 99.7 | 100.7 | -.6 | .2 | .3 | 1.0 | 1.9 | 2.2 | 1.6 | .9 |
| 2003 | 99.9 | 100.9 | 100.6 | 101.5 | -.8 | 1.0 | -.3 | .9 | .7 | 1.5 | .9 | .8 |
| 2004 | 100.4 | 99.8 | 100.6 | 100.4 | -1.1 | -.6 | .8 | -.2 | .5 | -1.1 | .0 | -1.0 |
| 2005 | 99.3 | 99.5 | 98.0 | 100.0 | -1.1 | .2 | -1.5 | 2.0 | -1.1 | -.3 | -2.6 | -.4 |
| Union workers, nonmanufacturing: | | | | | | | | | | | | |
| 1976 | – | – | 104.6 | 104.9 | – | – | – | .3 | – | – | – | – |
| 1977 | 104.1 | 104.2 | 104.7 | 105.3 | -.8 | .1 | .5 | .6 | – | – | .2 | .4 |
| 1978 | 104.6 | 104.2 | 104.0 | 103.6 | -.7 | -.4 | -.2 | -.4 | .5 | .0 | -.7 | -1.7 |
| 1979 | 102.3 | 101.0 | 100.4 | 99.2 | -1.3 | -1.3 | -.6 | -1.2 | -2.1 | -3.1 | -3.4 | -4.2 |
| 1980 | 97.0 | 96.5 | 98.0 | 97.7 | -2.2 | -.5 | 1.6 | -.3 | -5.2 | -4.4 | -2.4 | -1.6 |
| 1981 | 96.9 | 97.4 | 97.4 | 98.7 | -.8 | .5 | .0 | 1.3 | -.1 | .9 | -.6 | 1.1 |
| 1982 | 100.0 | 99.0 | 100.2 | 101.9 | 1.3 | -1.0 | 1.2 | 1.7 | 3.2 | 1.7 | 2.9 | 3.2 |
| 1983 | 103.1 | 103.0 | 103.8 | 103.6 | 1.2 | -.1 | .8 | -.2 | 3.1 | 4.0 | 3.6 | 1.6 |
| 1984 | 103.4 | 102.7 | 102.0 | 102.3 | -.2 | -.7 | -.7 | .3 | .3 | -.3 | -1.7 | -1.2 |
| 1985 | 101.9 | 101.8 | 102.1 | 101.6 | -.4 | -.1 | .3 | -.5 | -1.4 | -.8 | .1 | -.7 |
| 1986 | 103.0 | 102.7 | 102.9 | 102.8 | 1.4 | -.3 | .2 | -.1 | 1.0 | .9 | .8 | 1.1 |
| 1987 | 102.0 | 101.2 | 100.4 | 100.6 | -.8 | -.8 | -.8 | .2 | -.9 | -1.5 | -2.4 | -2.2 |
| 1988 | 100.1 | 99.8 | 99.1 | 98.6 | -.5 | -.3 | -.7 | -.5 | -1.9 | -1.3 | -1.3 | -1.9 |
| 1989 | 97.8 | 96.9 | 96.9 | 96.8 | -.8 | -.9 | .0 | -.1 | -2.3 | -2.9 | -2.2 | -1.9 |
| 1990 | 95.7 | 95.3 | 94.4 | 94.2 | -1.1 | -.4 | -.9 | -.2 | -2.1 | -1.6 | -2.6 | -2.7 |
| 1991 | 94.3 | 94.4 | 94.6 | 94.7 | .1 | .1 | .2 | .1 | -1.5 | -1.0 | .2 | .5 |
| 1992 | 94.5 | 95.0 | 95.1 | 95.1 | -.2 | .5 | .1 | .0 | .2 | .6 | .5 | .4 |

See footnotes at end of table.

NOTE: Excerpt from Bureau of Labor Statistics, Employment Cost Index

**DEES v. HMMA and HMA**
**Exhibit 5**
**Earnings But For**

| heck Dates | Regular | Personal | Vacation | Jury | HOURS Holiday | Unpaid Mil | OT 1.5 | OT 2.0 | TOTAL | Rate | SP 2-R | HOURS SP 2-O(1.5x) | SP 2-O (2x) | Other Pay | Re-calc Amount | Cummulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/9/2007 | | | | | | | | | - | 23.35 | | | | 1,000.00 | 1,000.00 | 1,000.00 |
| 1/9/2007 | 32.00 | | | | 48.00 | | 18.25 | 30.25 | 128.50 | 23.35 | | | | 2.22 | 3,922.10 | 4,922.10 |
| 1/23/2007 | 72.00 | | | | 8.00 | | 26.90 | 8.00 | 114.90 | 23.35 | 72.00 | 26.90 | 8.00 | 102.22 | 3,414.34 | 8,336.44 |
| 2/6/2007 | 64.00 | | 8.00 | | 8.00 | | 28.90 | 16.50 | 125.40 | 23.35 | 80.00 | 28.90 | 16.50 | 2.22 | 3,809.34 | 12,145.79 |
| 2/20/2007 | 60.00 | | 12.00 | | | 8.00 | 16.10 | | 96.10 | 23.35 | 72.00 | 16.10 | | 102.22 | 2,443.47 | 14,589.26 |
| 3/6/2007 | 56.00 | 16.00 | 84.00 | | | | 27.50 | 8.50 | 192.00 | 23.35 | 80.00 | 27.50 | 8.50 | 1.90 | 5,142.89 | 19,732.14 |
| otals Actual | 284.00 | 16.00 | 104.00 | - | 64.00 | 8.00 | 117.65 | 63.25 | 656.90 | | 304.00 | 99.40 | 33.00 | 1,210.78 | 19,732.14 | |
| rojected 3/20/2007 to 12/25/2007 | 1,680.00 | - | (76.00) | - | - | - | 486.84 | 190.21 | 2,281.05 | 23.35 | 762.46 | 194.86 | 66.23 | | 64,574.94 | |
| Differential for $ .23raise to 24.58/hr ssumed 17 pay checks) | | | | | | | | | | | | | | | 2,778.72 | |
| Differential for $ 1.36 ise to 25.94/hr (Assumed st 2 pay checks) | | | | | | | | | | | | | | | 361.46 | 67,715.12 |
| rojected for 2007 | 1,964.00 | 16.00 | 28.00 | - | 64.00 | 8.00 | 604.49 | 253.46 | 2,937.95 | | 1,066.46 | 294.26 | 99.23 | 1,210.78 | 87,447.26 | |

| | Per Pay Period | | Projected to EOY | |
|---|---|---|---|---|
| nalysis of Overtime | OT 1.5 | OT 2.0 | OT 1.5 | OT 2.0 |
| rior year average hours per pay period | 23.18 | 9.06 | 486.84 | 190.21 |

| | Per Pay Period | | | Projected to EOY | | |
|---|---|---|---|---|---|---|
| nalysis of Shift Differential | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) |
| rior year average hours per pay period | 36.31 | 9.28 | 3.15 | 762.46 | 194.86 | 66.23 |

**DEES v. HMMA and HMA**
**Exhibit 6**
**Actual Capacity/Earnings**

| Check Dates | Regular | Personal | Vacation | Jury | Holiday | Unpaid Mil | OT 1.5 | OT 2.0 | TOTAL | Rate | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) | Other Pay | Re-calc Amount | Cummulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | HOURS | | | | | | | | | | HOURS | | | | | |
| BE&K | | | | | | | | | | | | | | | | |
| 3/8/2007 | 27.25 | | | | | | | | 27.25 | 20 | | | | | 545.00 | 545.00 |
| 3/15/2007 | 40 | | | | | | 9.5 | | 49.50 | 20 | | | | | 1,085.00 | 1,630.00 |
| 3/22/2007 | 40 | | | | | | | | 40.00 | 20 | | | | | 800.00 | 2,430.00 |
| 3/29/2007 | 40 | | | | | | 15 | | 55.00 | 20 | | | | | 1,250.00 | 3,680.00 |
| 4/5/2007 | 40 | | | | | | 10.5 | | 50.50 | 20 | | | | | 1,115.00 | 4,795.00 |
| 4/12/2007 | 40 | | | | | | 32.75 | | 72.75 | 20 | | | | 0.1 | 1,782.60 | 6,577.60 |
| 4/19/2007 | 40 | | | | | | 29 | | 69.00 | 20 | | | | 0.2 | 1,670.20 | 8,247.80 |
| 4/26/2007 | 40 | | | | | | | | 40.00 | 20 | | | | | 800.00 | 9,047.80 |
| 5/3/2007 | 40 | | | | | | 11.5 | | 51.50 | 20 | | | | | 1,145.00 | 10,192.80 |
| 5/10/2007 | 30 | | | | | | | | 30.00 | 20 | | | | | 600.00 | 10,792.80 |
| 5/17/2007 | 40 | | | | | | | | 40.00 | 20 | | | | | 800.00 | 11,592.80 |
| 5/24/2007 | 0 | | | | | | | | - | 20 | | | | | - | 11,592.80 |
| 5/31/2007 | 0 | | | | | | | | - | 20 | | | | | - | 11,592.80 |
| 6/7/2007 | 30 | | | | | | | | 30.00 | 20 | | | | | 600.00 | 12,192.80 |
| 6/14/2007 | 40 | | | | | | | | 40.00 | 20 | | | | | 800.00 | 12,992.80 |
| 6/21/2007 | 40 | | | | | | 1.75 | | 41.75 | 20 | | | | 0.1 | 852.60 | 13,845.40 |
| 6/28/2007 | 40 | | | | | | 1.25 | | 41.25 | 20 | | | | 0.1 | 837.60 | 14,683.00 |
| 7/5/2007 | 34.25 | | | | | | | | 34.25 | 20 | | | | | 685.00 | 15,368.00 |
| 7/12/2007 | 25.75 | | | | | | | | 25.75 | 20 | | | | | 515.00 | 15,883.00 |
| › | | | | | | | | | | | | | | | | |
| 7/19/2007 | 16 | | | | | | 0 | | 16.00 | 25.37 | | | | | 405.92 | 405.92 |
| 7/26/2007 | 0 | | | | | | 0 | | - | | | | | | - | 405.92 |
| 8/2/2007 | 80 | | | | | | 7.666667 | | 87.67 | 25.37 | | | | -0.01 | 2,321.35 | 2,727.27 |
| 8/16/2007 | 80 | | | | | | 15.33333 | | 95.33 | 25.37 | | | | 0.03 | 2,613.14 | 5,340.41 |
| 8/30/2007 | 80 | | | | | | 16.83333 | | 96.83 | 25.37 | | | | 0.02 | 2,670.21 | 8,010.62 |
| 9/13/2007 | 80 | | | | | | 4.5 | | 84.50 | 25.37 | | | | | 2,200.85 | 10,211.47 |
| | | | | | | | | | | | | | | | 10,211.47 | |
| 9/27/2007 | 80 | | | | | | 51.08333 | | 131.08 | 25.37 | | | | | 3,973.58 | 14,185.04 |
| 10/11/2007 | 80 | | | | | | 51.08333 | | 131.08 | 25.37 | | | | | 3,973.58 | 18,158.62 |
| 10/25/2007 | 80 | | | | | | 11.08333 | | 91.08 | 25.37 | | | | | 2,451.38 | 20,609.99 |
| 11/8/2007 | 80 | | | | | | 11.08333 | | 91.08 | 25.37 | | | | | 2,451.38 | 23,061.37 |
| 11/22/2007 | 80 | | | | | | 11.08333 | | 91.08 | 25.37 | | | | | 2,451.38 | 25,512.75 |
| 12/6/2007 | 80 | | | | | | 11.08333 | | 91.08 | 25.37 | | | | | 2,451.38 | 27,964.12 |
| 12/20/2007 | 80 | | | | | | 11.08333 | | 91.08 | 25.37 | | | | | 2,451.38 | 30,415.50 |
| | | | | | | | | | | | | | | | 20,204.03 | |

**DEES v. HMMA and HMA**
**Exhibit 6**
**Actual Capacity/Earnings**

| | | | | HOURS | | | | | | | | HOURS | | | Re-calc | Cummulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Check Dates | Regular | Personal | Vacation | Jury | Holiday | Unpaid Mil | OT 1.5 | OT 2.0 | TOTAL | Rate | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) | Other Pay | Amount | |
| 1/3/2008 | 80 | | | | | | 11.08333 | | 91.08 | 25.37 | | | | | 2,451.38 | 2,451.38 |
| 1/17/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 5,155.91 |
| 1/31/2008 | 80 | | | | | | 51.08333 | | 131.08 | 27.99 | | | | | 4,383.93 | 9,539.84 |
| 2/14/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 12,244.37 |
| 2/28/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 14,948.90 |
| 3/13/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 17,653.43 |
| 3/27/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 20,357.96 |
| 4/10/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 23,062.49 |
| 4/24/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 25,767.02 |
| 5/8/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 28,471.55 |
| 5/22/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 31,176.08 |
| 6/5/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 33,880.61 |
| 6/19/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 36,585.14 |
| 7/3/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 39,289.67 |
| 7/17/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 41,994.20 |
| 7/31/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 44,915.17 |
| 8/14/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 47,836.14 |
| 8/28/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 50,757.11 |
| 9/11/2008 | 80 | | | | | | 51.08333 | | 131.08 | 30.23 | | | | | 4,734.77 | 55,491.88 |
| 9/25/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 58,412.85 |
| 10/9/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 61,333.82 |
| 10/23/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 64,254.79 |
| 11/6/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 67,175.76 |
| 11/20/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 70,096.73 |
| 12/4/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 73,017.70 |
| 12/18/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 75,938.67 |

| | Periods | Total Hours | Avg. Regular time per period | Total Overtime | Avg. Overtime per period |
|---|---|---|---|---|---|
| verage Hours per pay period 8/02/2007 to 09/13/2007 | 4 | 320 | 80 | 44.333333 | 11.08333 |

Ir. Dees expects to receive 20 hours of additional overtime for the next 4 weeks for this years shutdown. This shutdown is the ırgest in the plants 40+ year history. Subsequent shutdowns(2x per year) should last 2 weeks and yelld 40 hours of overtime.

**DEES v. HMMA and HMA**
**Exhibit 7**
**Fringe Benefits -**
**Disability Insurance**

|  | HMMA | | IP | |
|---|---|---|---|---|
| LTD Benefit | 60% of first 16,667 monthly pay | $ 2,693 | 60% of your monthly base pay up to $3000 per month during periods of disability | $ 2,638 |
| Waiting Period | 180days | | 180 days following expiration of Weekly Sickness and Accident Benefits | |
| Max Benefit Period | 65, SSNRA or 3 years 6 mos. (Whichever longest) | | Age 67 Generally | |
| Cost to employee | | | | |
| Weekly | | $ - | | $ 10.98 |
| Annual | | $ - | | $ 570.96 |
| Monthly | | $ - | | $ 47.58 |

**Table A-2. Life and worklife expectancies of men by race, 1979-80**

(Average years remaining)

| Age | White men | | | | Black and other men | | | |
|---|---|---|---|---|---|---|---|---|
| | Life expectancy [1] | Expectation of active life by labor force status | | | Life expectancy [1] | Expectation of active life by labor force status | | |
| | | Total | Currently active | Currently inactive | | Total | Currently active | Currently inactive |
| $x$ | $^{\bullet}e^{\bullet}_x$ | $^{\bullet}e^a_x$ | $^ae^a_x$ | $^ie^a_x$ | $^{\bullet}e^{\bullet}_x$ | $^{\bullet}e^a_x$ | $^ae^a_x$ | $^ie^a_x$ |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| 16 | 56.1 | 39.9 | 40.6 | 39.1 | 51.4 | 33.6 | 34.3 | 33.2 |
| 17 | 55.2 | 39.4 | 40.0 | 38.4 | 50.4 | 33.2 | 33.9 | 32.7 |
| 18 | 54.3 | 38.8 | 39.4 | 37.8 | 49.5 | 32.8 | 33.5 | 32.2 |
| 19 | 53.3 | 38.2 | 38.8 | 37.1 | 48.6 | 32.4 | 33.0 | 31.7 |
| 20 | 52.4 | 37.5 | 38.1 | 36.4 | 47.6 | 31.9 | 32.4 | 31.1 |
| 21 | 51.5 | 36.9 | 37.4 | 35.6 | 46.8 | 31.3 | 31.8 | 30.4 |
| 22 | 50.6 | 36.1 | 36.6 | 34.9 | 45.9 | 30.7 | 31.1 | 29.7 |
| 23 | 49.7 | 35.4 | 35.8 | 34.1 | 45.0 | 30.0 | 30.4 | 29.0 |
| 24 | 48.8 | 34.6 | 35.0 | 33.2 | 44.1 | 29.3 | 29.7 | 28.3 |
| 25 | 47.9 | 33.8 | 34.2 | 32.4 | 43.3 | 28.6 | 28.9 | 27.5 |
| 26 | 47.0 | 32.9 | 33.3 | 31.5 | 42.4 | 27.9 | 28.2 | 26.6 |
| 27 | 46.1 | 32.1 | 32.4 | 30.6 | 41.5 | 27.1 | 27.4 | 25.8 |
| 28 | 45.2 | 31.2 | 31.6 | 29.7 | 40.7 | 26.4 | 26.6 | 25.0 |
| 29 | 44.2 | 30.3 | 30.7 | 28.7 | 39.8 | 25.6 | 25.8 | 24.1 |
| 30 | 43.3 | 29.5 | 29.8 | 27.7 | 39.0 | 24.8 | 25.0 | 23.2 |
| 31 | 42.4 | 28.6 | 28.9 | 26.7 | 38.1 | 24.0 | 24.2 | 22.3 |
| 32 | 41.4 | 27.7 | 28.0 | 25.7 | 37.2 | 23.2 | 23.4 | 21.3 |
| 33 | 40.5 | 26.8 | 27.1 | 24.7 | 36.4 | 22.3 | 22.7 | 20.3 |
| 34 | 39.6 | 25.9 | 26.2 | 23.7 | 35.5 | 21.5 | 21.9 | 19.3 |
| 35 | 38.6 | 25.0 | 25.3 | 22.7 | 34.7 | 20.7 | 21.1 | 18.2 |
| 36 | 37.7 | 24.1 | 24.4 | 21.7 | 33.8 | 19.9 | 20.4 | 17.1 |
| 37 | 36.8 | 23.2 | 23.5 | 20.7 | 33.0 | 19.1 | 19.6 | 16.0 |
| 38 | 35.9 | 22.3 | 22.6 | 19.6 | 32.2 | 18.4 | 18.9 | 15.0 |
| 39 | 34.9 | 21.4 | 21.7 | 18.6 | 31.3 | 17.6 | 18.1 | 14.2 |
| 40 | 34.0 | 20.5 | 20.9 | 17.5 | 30.5 | 16.8 | 17.4 | 13.4 |
| 41 | 33.1 | 19.6 | 20.0 | 16.4 | 29.7 | 16.0 | 16.7 | 12.6 |
| 42 | 32.2 | 18.7 | 19.1 | 15.4 | 28.9 | 15.3 | 16.0 | 11.9 |
| 43 | 31.3 | 17.8 | 18.3 | 14.3 | 28.1 | 14.5 | 15.2 | 11.1 |
| 44 | 30.4 | 16.9 | 17.4 | 13.2 | 27.3 | 13.8 | 14.5 | 10.4 |
| 45 | 29.5 | 16.1 | 16.6 | 12.1 | 26.5 | 13.1 | 13.8 | 9.7 |
| 46 | 28.6 | 15.2 | 15.8 | 11.2 | 25.8 | 12.4 | 13.1 | 8.9 |
| 47 | 27.8 | 14.4 | 14.9 | 10.3 | 25.0 | 11.6 | 12.4 | 8.1 |
| 48 | 26.9 | 13.5 | 14.1 | 9.4 | 24.3 | 10.9 | 11.7 | 7.3 |
| 49 | 26.1 | 12.7 | 13.4 | 8.6 | 23.5 | 10.2 | 11.0 | 6.5 |
| 50 | 25.2 | 11.9 | 12.6 | 7.8 | 22.8 | 9.5 | 10.4 | 5.7 |
| 51 | 24.4 | 11.1 | 11.8 | 7.1 | 22.1 | 8.8 | 9.7 | 4.9 |
| 52 | 23.6 | 10.3 | 11.1 | 6.3 | 21.5 | 8.1 | 9.1 | 4.3 |
| 53 | 22.8 | 9.5 | 10.3 | 5.6 | 20.8 | 7.4 | 8.4 | 3.7 |
| 54 | 22.0 | 8.7 | 9.6 | 5.0 | 20.2 | 6.8 | 7.8 | 3.2 |
| 55 | 21.3 | 8.0 | 8.9 | 4.4 | 19.5 | 6.1 | 7.2 | 2.8 |
| 56 | 20.5 | 7.2 | 8.2 | 3.8 | 18.9 | 5.5 | 6.6 | 2.6 |
| 57 | 19.7 | 6.5 | 7.5 | 3.3 | 18.3 | 4.9 | 6.0 | 2.2 |
| 58 | 19.0 | 5.8 | 6.9 | 2.9 | 17.7 | 4.3 | 5.6 | 1.9 |
| 59 | 18.3 | 5.2 | 6.3 | 2.5 | 17.1 | 3.7 | 5.1 | 1.8 |
| 60 | 17.6 | 4.5 | 5.8 | 2.2 | 16.5 | 3.3 | 4.7 | 1.6 |
| 61 | 16.9 | 4.0 | 5.4 | 2.0 | 15.9 | 2.9 | 4.4 | 1.5 |
| 62 | 16.2 | 3.5 | 5.0 | 1.8 | 15.4 | 2.5 | 4.1 | 1.4 |
| 63 | 15.6 | 3.1 | 4.7 | 1.5 | 14.9 | 2.2 | 3.8 | 1.3 |
| 64 | 14.9 | 2.7 | 4.4 | 1.3 | 14.3 | 2.0 | 3.6 | 1.2 |
| 65 | 14.3 | 2.3 | 4.2 | 1.2 | 13.8 | 1.8 | 3.5 | 1.1 |
| 66 | 13.7 | 2.1 | 4.0 | 1.0 | 13.3 | 1.6 | 3.4 | 1.0 |
| 67 | 13.1 | 1.8 | 3.8 | .8 | 12.8 | 1.4 | 3.3 | .9 |
| 68 | 12.5 | 1.6 | 3.6 | .7 | 12.3 | 1.3 | 3.2 | .7 |
| 69 | 11.9 | 1.4 | 3.5 | .5 | 11.8 | 1.2 | 3.0 | .6 |
| 70 | 11.4 | 1.2 | 3.3 | .4 | 11.4 | 1.0 | 2.9 | .4 |
| 71 | 10.9 | 1.1 | 3.1 | .3 | 10.9 | .9 | 2.7 | .3 |
| 72 | 10.4 | .9 | 2.9 | .2 | 10.5 | .7 | 2.6 | .2 |
| 73 | 9.9 | .8 | 2.6 | .1 | 10.0 | .6 | 2.3 | .1 |
| 74 | 9.4 | .7 | 2.3 | .1 | 9.6 | .5 | 1.8 | .0 |
| 75 | 8.9 | .6 | 1.8 | .0 | 9.2 | .3 | 1.3 | .0 |

[1] Mortality rates used reflect racial differentials in survival.

NOTE: Excerpt from Bureau of Labor Statistics, Bulletin 2254, February 1986, "Worklife Estimates: Effects of Race and Education"

Case 2:07-cv-00306-MHT-CSC Document 144-2 Filed 03/31/2008 Page 28 of 30

Federal Reserve Statistical Release

DEES v. HMMA and HMA
EXHIBIT 9

H.15
## Selected Interest Rates (Daily)

Skip to Content

*Release Date: September 20, 2007*

Weekly release dates | Historical data | Data Download Program (DDP) | About | Announcements
Daily update *Other formats:* Screen reader | ASCII

The weekly release is posted on Monday. Daily updates of the weekly release are posted Tuesday through Friday on this site. If Monday is a holiday, the weekly release will be posted on Tuesday after the holiday and the daily update will not be posted on that Tuesday.

FEDERAL RESERVE STATISTICAL RELEASE

H.15 DAILY UPDATE: WEB RELEASE ONLY
SELECTED INTEREST RATES
For use at 4:15 p.m. Eastern Time

Yields in percent per annum — September 20, 2007

| Instruments | 2007 Sep 17 | 2007 Sep 18 | 2007 Sep 19 |
|---|---|---|---|
| Federal funds (effective) 1 2 3 | 5.33 | 4.92 | 4.74 |
| Commercial Paper 3 4 5 | | | |
| Nonfinancial | | | |
| 1-month | 4.97 | 4.97 | 4.76 |
| 2-month | 4.99 | 4.98 | 4.73 |
| 3-month | 4.95 | 4.95 | 4.81 |
| Financial | | | |
| 1-month | 5.23 | 5.02 | 4.72 |
| 2-month | 5.25 | 5.04 | 4.78 |
| 3-month | 5.25 | 5.05 | 4.94 |
| CDs (secondary market) 3 6 | | | |
| 1-month | 5.42 | 5.42 | 5.12 |
| 3-month | 5.52 | 5.50 | 5.17 |
| 6-month | 5.36 | 5.37 | 5.10 |
| Eurodollar deposits (London) 3 7 | | | |
| 1-month | 5.55 | 5.20 | 5.15 |
| 3-month | 5.60 | 5.20 | 5.22 |
| 6-month | 5.45 | 5.10 | 5.15 |
| Bank prime loan 2 3 8 | 8.25 | 7.75 | 7.75 |
| Discount window primary credit 2 9 | 5.75 | 5.25 | 5.25 |
| U.S. government securities | | | |
| Treasury bills (secondary market) 3 4 | | | |
| 4-week | 3.71 | 3.80 | 3.54 |
| 3-month | 4.05 | 3.91 | 3.83 |
| 6-month | 4.15 | 3.97 | 3.94 |
| Treasury constant maturities | | | |
| Nominal 10 | | | |
| 1-month | 3.82 | 3.87 | 3.62 |
| 3-month | 4.15 | 4.01 | 3.93 |
| 6-month | 4.31 | 4.12 | 4.09 |
| 1-year | 4.23 | 4.08 | 4.06 |
| 2-year | 4.08 | 4.00 | 4.00 |
| 3-year | 4.11 | 4.04 | 4.06 |
| 5-year | 4.21 | 4.19 | 4.20 |
| 7-year | 4.32 | 4.32 | 4.33 |
| 10-year | 4.48 | 4.50 | 4.53 |
| 20-year | 4.76 | 4.81 | 4.86 |
| 30-year | 4.72 | 4.77 | 4.83 |
| Inflation indexed 11 | | | |
| 5-year | 2.13 | 2.09 | 2.08 |
| 7-year | 2.19 | 2.17 | 2.18 |
| 10-year | 2.21 | 2.19 | 2.21 |
| 20-year | 2.22 | 2.20 | 2.25 ← |
| Inflation-indexed long-term average 12 | 2.20 | 2.19 | 2.24 |
| Interest rate swaps 13 | | | |
| 1-year | 5.00 | 5.02 | 4.75 |

DEES v. HMMA and HM
EXHIBIT 9

| | | | |
|---|---|---|---|
| 2-year | 4.78 | 4.80 | 4.61 |
| 3-year | 4.78 | 4.81 | 4.65 |
| 4-year | 4.84 | 4.86 | 4.73 |
| 5-year | 4.90 | 4.92 | 4.82 |
| 7-year | 5.02 | 5.03 | 4.96 |
| 10-year | 5.17 | 5.17 | 5.14 |
| 30-year | 5.39 | 5.39 | 5.41 |
| Corporate bonds | | | |
| Moody's seasoned | | | |
| Aaa 14 | 5.68 | 5.73 | 5.77 |
| Baa | 6.58 | 6.61 | 6.64 |
| State & local bonds 15 | | | |
| Conventional mortgages 16 | | | |

---

Footnotes

1. The daily effective federal funds rate is a weighted average of rates on brokered trades.

2. Weekly figures are averages of 7 calendar days ending on Wednesday of the current week; monthly figures include each calendar day in the month.

3. Annualized using a 360-day year or bank interest.

4. On a discount basis.

5. Interest rates interpolated from data on certain commercial paper trades settled by The Depository Trust Company. The trades represent sales of commercial paper by dealers or direct issuers to investors (that is, the offer side). The 1-, 2-, and 3-month rates are equivalent to the 30-, 60-, and 90-day dates reported on the Board's Commercial Paper Web page (www.federalreserve.gov/releases/cp/).

6. An average of dealer bid rates on nationally traded certificates of deposit.

7. Bid rates for Eurodollar deposits collected around 9:30 a.m. Eastern time.

8. Rate posted by a majority of top 25 (by assets in domestic offices) insured U.S.-chartered commercial banks. Prime is one of several base rates used by banks to price short-term business loans.

9. The rate charged for discounts made and advances extended under the Federal Reserve's primary credit discount window program, which became effective January 9, 2003. This rate replaces that for adjustment credit, which was discontinued after January 8, 2003. For further information, see www.federalreserve.gov/boarddocs/press/bcreg/2002/200210312/default.htm. The rate reported is that for the Federal Reserve Bank of New York. Historical series for the rate on adjustment credit as well as the rate on primary credit are available at www.federalreserve.gov/releases/h15/data.htm.

10. Yields on actively traded non-inflation-indexed issues adjusted to constant maturities. The 30-year Treasury constant maturity series was discontinued on February 18, 2002, and reintroduced on February 9, 2006. From February 18, 2002, to February 9, 2006, the U.S. Treasury published a factor for adjusting the daily nominal 20-year constant maturity in order to estimate a 30-year nominal rate. The historical adjustment factor can be found at www.treas.gov/offices/domestic-finance/debt-management/interest-rate/ltcompositeindex_historical.shtml. Source: U.S. Treasury.

11. Yields on Treasury inflation protected securities (TIPS) adjusted to constant maturities. Source: U.S. Treasury. Additional information on both nominal and inflation-indexed yields may be found at www.treas.gov/offices/domestic-finance/debt-management/interest-rate/index.html.

12. Based on the unweighted average bid yields for all TIPS with remaining terms to maturity of more than 10 years.

13. International Swaps and Derivatives Association (ISDA(R)) mid-market par swap rates. Rates are for a Fixed Rate Payer in return for receiving three month LIBOR, and are based on rates collected at 11:00 a.m. Eastern time by Garban Intercapital plc and published on Reuters Page ISDAFIX(R)1. ISDAFIX is a registered service mark of ISDA. Source: Reuters Limited.

14. Moody's Aaa rates through December 6, 2001, are averages of Aaa utility and Aaa industrial bond rates. As of December 7, 2001, these rates are averages of Aaa industrial bonds only.

15. Bond Buyer Index, general obligation, 20 years to maturity, mixed quality; Thursday quotations.

16. Contract interest rates on commitments for fixed-rate first mortgages. Source: FHLMC.

Note: Weekly and monthly figures on this release, as well as annual figures available on the Board's historical H.15 web site (see below), are averages of business days unless otherwise noted.

Current and historical H.15 data are available on the Federal Reserve Board's web site (www.federalreserve.gov/). For information about individual copies or subscriptions, contact Publications Services at the Federal Reserve Board (phone 202-452-3244, fax 202-728-5886). For paid electronic access to current and historical data, call STAT-USA at 1-800-782-8872 or 202-482-1986.

Description of the Treasury Nominal and Inflation-Indexed Constant Maturity Series

Yields on Treasury nominal securities at "constant maturity" are interpolated by the U.S. Treasury from the daily yield curve for non-inflation-indexed Treasury securities. This curve, which relates the yield on a security to its time to maturity, is based on the closing market bid yields on actively traded Treasury securities in the over-the-counter market. These market yields are calculated from composites of quotations obtained by the Federal Reserve Bank of New York. The constant maturity yield values are read from the yield curve at fixed maturities, currently 1, 3, and 6 months and 1, 2, 3, 5, 7, 10, 20, and 30 years. This method provides a yield for a 10-year maturity, for example, even if no outstanding security has exactly 10 years remaining to maturity. Similarly, yields on inflation-indexed securities at "constant maturity" are interpolated from the daily yield curve for Treasury inflation protected securities in the over-the-counter market. The inflation-indexed constant maturity yields are read from this yield curve at fixed maturities, currently 5, 7, 10, and 20 years.

Weekly release dates | Historical data | Data Download Program (DDP) | About | Announcements
Daily update *Other formats:* Screen reader | ASCII

Statistical releases

Home | Economic research and data
Accessibility | Contact Us
**Last update: September 20, 2007**

# Jerry Dees v. HMMA and HMA
# 2:07-cv-00306-MHT-CSC

# EXHIBIT 2

## Defendants' Motion and Supporting Authorities to Disqualify Plaintiff's Expert Robert Hall, II, CPA

**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NO. |
| | * | 2:07-cv-00306-MHT-CSC |
| HYUNDAI MOTOR MANUFACTURING | * | |
| ALABAMA, LLC and HYUNDAI | * | |
| MOTOR AMERICA, INC., | * | |
| | * | |
| Defendant. | * | |

**RULE 26(a)(2)(B) FEDERAL RULES OF CIVIL PROCEDURE SUPPLEMENTAL DISCLOSURE OF EXPERT TESTIMONY**

Jerry Leon Dees, Jr., (hereinafter referred to as "Mr. Dees") by and through its counsel of record and in compliance with Rule 26(a)(2)(B), Federal Rules of Civil Procedure, discloses the substance of its expert's anticipated testimony as follows:

**QUALIFICATIONS, EXPERIENCE AND COMPENSATION**

My name is Robert P. Hall, II and I am a Certified Public Accountant and sole shareholder of Robert Hall & Associates, P.C. a Certified Public Accounting and consulting firm in Mobile, Alabama. By education and experience, I have expertise in accounting, auditing, taxation, and consulting, and in business planning and analysis.

I have a Bachelor of Science degree in Business with an emphasis in Accounting from the University of South Alabama, and have 22 years of experience in business analyses and consulting. I have experience in preparing cost analyses and projections. Attached hereto and labeled as EXHIBIT 1 is information regarding my experience.

Hall Depo.

DEFENDANT'S
EXHIBIT

2

I have been retained as an expert witness by the plaintiff's attorneys to calculate economic loss to Mr. Dees as a result of his wrongful termination of employment on February 26, 2007.

My firm is compensated at the rate of $120 per hour for all services rendered in this case. The firm is also compensated for expenses incurred. Compensation is for time incurred, and in no way relates to the outcome of this case or the specific nature of my findings or opinions.

## FOUNDATION

In preparing this report, I interviewed Mr. Dees and others, and reviewed various pleadings and other documents. A complete listing of evidence I reviewed is presented at EXHIBIT 2.

My evaluation and calculation of damages is premised on my understanding of the case as discussed below. My understanding of the case includes certain factual assumptions relating to the establishment of liability necessary to the calculation and presentation of economic loss as a result of the injury to Mr. Dees. **I fully intend to supplement this report when additional deposition testimony, as well as other additional discovery, becomes available.**

## BACKGROUND UNDERSTANDING

1. Mr. Dees was born on January 19, 1965. He graduated from Clay County High School in 1983. Prior to graduating from high school he enlisted in the Army National Guard (hereinafter referred to as "the Guard") and completed his basic training. In 1983, Mr. Dees was released from the Guard in order to enlist for active duty in the U.S. Air Force where he served until 1992. In 1994 he re-enlisted in the

Guard where he continues to serve. Mr. Dees is currently a Staff Sergeant and is assigned to the 1165th Military Police. Mr. Dees served active duty during both the Iraqi conflicts.

2. Mr. Dees attended some junior college and technical college but did not receive a degree.

3. Mr. Dees began working at Hyundai Motor Manufacturing Alabama, LLC (hereinafter referred to as "Hyundai") in November 2005. He was employed as a maintenance team member in the Stamping Maintenance department under the direct supervision of "team leader" Kevin Hughes (hereinafter referred to as "Hughes") and Stamping Maintenance assistant manager Greg Prater (hereinafter referred to as "Prater"). Prater reported to John Applegate, American maintenance senior manager (hereinafter referred to as "Applegate").

4. Harassment of Mr. Dees by Hyundai through Prater and Hughes began almost immediately when Prater learned that Mr. Dees was a member of the Guard.

5. Hyundai harassed Mr. Dees by:

   a. Prater repeatedly demanded that Mr. Dees provide military orders to excuse missing work because of monthly weekend Guard training, even though the Guard issues only an annual training schedule;

   b. Prater telling Mr. Dees he could not miss work to attend his Guard training;

   c. Prater frequently made derogatory remarks about the Guard in the presence of Mr. Dees and other employees;

d. Prater told Mr. Dees that he could not go to Hyundai's Human Resources department to complain about how he was being treated, despite the company's "open door" policy regarding employee complaints;

e. Prater attempted to force Mr. Dees' coworkers to say that Dees had violated Hyundai policy and procedures when Prater knew it was not true;

f. In an effort to coerce Mr. Dees into quitting his job so that Hyundai would not have to deal with Mr. Dees' Guard service obligations, Mr. Dees was forced to clean the "pit" more frequently than the other personnel. The pit is a highly dangerous area where sharp scrap metal pieces from the stamping process drop off the conveyor and collect. The pit was used by Hyundai, through Prater and Hughes, to punish Mr. Dees. The scrap process was running many times while Mr. Dees was made to clean the pit making this job far more dangerous. Mr. Dees cleaned the pit almost daily some weeks. Overall, his work assignment to the pit was several times that of his coworkers.

6. Applegate backed Prater's and Hughes' harassment by standing behind the decisions they made in running the stamping maintenance department and by refusing to act or investigate complaints to Applegate regarding Prater and Hughes.

7. Harassment of Mr. Dees continued and escalated after the Guard wrote a letter to Hyundai regarding their request for individual orders for each monthly training period.

8. On or about February 14, 2007, Prater's fellow Hyundai employee Jim Brookshire falsely accused Mr. Dees of sleeping on the job.

9. On February 26, 2007, Hyundai fired Mr. Dees for allegedly sleeping on the job, despite Hyundai's documented six-step policy of Corrective Action.

10. As a result of Hyundai's termination of Mr. Dees in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, Mr. Dees was forced to obtain other employment.

11. From February 27, 2007 until July 06, 2007, Mr. Dees was employed by BE&K, Inc. as a millwright. He was employed by International Paper on July 12, 2007 as a maintenance lead man. As of the date of this report he remains in this position. Mr. Dees' total compensation on his two subsequent jobs is less than that he enjoyed at Hyundai.

## SUMMARY AND CONCLUSIONS

12. Loss of Wages and Fringe Benefits to trial is $24,033. See EXHIBIT 3.

13. Loss of Wages and Fringe Benefits from trial through worklife expectancy equals $351,928. See EXHIBIT 3.

14. Total economic loss of Wages and Fringe Benefits equals $375,961. See EXHIBIT 3.

## ANALYSIS

15. The economic loss as a result of the injury of Mr. Dees is calculated on past losses (back pay) and future losses (front pay). The past loss represents the amount of income Mr. Dees would have earned from the date of wrongful employment termination to the date of trial, but for his wrongful employment termination. The future loss is the present net cash value of lost earnings and fringe benefits from the date of the trial through the worklife expectancy of Mr. Dees.

16. I have made the following financial assumptions in my calculations:

a) Mr. Dees had a worklife expectancy of 19 years at the time of wrongful employment termination. See EXHIBIT 8.

b) Mr. Dees' real earnings as a maintenance team member, without regard to inflation would have increased at a rate of .53 percent per year. See EXHIBIT 4, Part 1.

c) Mr. Dees' real earnings as a maintenance lead man, without regard to inflation will increase at a rate of .51 percent per year. See EXHIBIT 4, Part 1.

d) The date of the trial is March 31, 2008.

17. Before wrongful employment termination, Mr. Dees received $23.35 per hour for the first 40 hours worked per week, $35.03 per hour for overtime and $46.70 for hours worked on Sundays and holidays. He also received a shift differential equal to $1 per hour for the first 40 hours worked, $1.50 for overtime hours worked and $2 per hour for Sundays and holidays worked. Mr. Dees was scheduled to receive a pay increase to $24.58 per hour in May 2007 and to $27.05 per hour in November 2007. Overtime pay would increase to $36.87 per hour and Sunday/holiday pay to $49.16 per hour in May 2007. In November 2007, overtime pay would increase to $40.58 per hour and Sunday/holiday pay would increase to $54.10 per hour. His 2007 earnings have been estimated by adding earnings through his paycheck dated March 06, 2007[1] to estimated earnings through the remainder of the year. Actual hours paid through December 6, 2007 by his subsequent employers along with estimated hours paid on his final paycheck of 2007 were used to project his income from Hyundai for the rest

[1] For the purpose of this analysis, payroll earnings were calculated based on check disbursement date instead of payroll period end dates.

of 2007. Regular hours were adjusted for plant shutdowns which occurred on October 5th, 12th and 19th and for 7 days during November and December (the exact dates during these months are unknown). I have assumed that Hyundai's maintenance employees did not work during these shutdown days. In calculating this adjustment, I did not use the 8 hour work day on October 19th since Mr. Dees was on Active Duty Training with the National Guard and this day was not counted in total hours worked. Mr. Dees was on duty from the 19th of October until the 20th of November 2007. Additionally overtime and shift differentials for the period after wrongful termination have been adjusted down to the percentage of hours paid in 2007 (1748) to hours paid in the 2006 base year (1872). Annualized income for 2007, the year of wrongful employment termination, totaled $78,461. Projected earnings for 2008 are based on 2080 regular hours less 80 hours of annual National Guard training and 120 hours of Active Duty Training that Mr. Dees is scheduled to attend from March 1, 2008 until March 22, 2008 or 1880 total regular hours. Overtime hours, Sunday/Holiday hours, shift differential and "other pay" is projected to be equal to that earned in 2006. Projected income for 2008 totals $90,372 and has been used as a base to project actual earnings had the wrongful termination not occurred. See EXHIBIT 5.

18. Mr. Dees' compensation for 2007 from BE&K, Inc. was $15,883. See EXHIBIT 6. His International Paper compensation through check date December 6, 2007 was $24,057. See EXHIBIT 6. The remainder of his 2007 compensation has been projected based on Mr. Dees receiving one more paycheck for 80 regular hours and 11.08333 overtime hours. Overtime was based on an average of full weeks worked from August 02, 2007 to September 13, 2007. Mr. Dees' hourly wage was $25.37 per

hour for the first 40 hours worked. His overtime wage is $38.06 per hour. Mr. Dees received an increase in pay to $25.88 per hour in December of 2007. Total projected income from International Paper for 2007 totaled $26,558. See EXHIBIT 6.

19. For 2008, Mr. Dees expects to receive a pay increase to $27.99 per hour in January and an additional pay increase to $30.23 in July. Compensation for 2008 has been projected based on working 2,080 regular hours (40 hrs. per week x 52 weeks per year) less time that he expects to be away from work for annual and other required National Guard training. As noted above in item 17, Mr. Dees anticipates spending 200 hours away from work at International Paper on National Guard duty during 2008. Overtime is based on the 2007 annualized amounts plus additional overtime that Mr. Dees expects to work during plant shutdowns less overtime that would have been earned during the weeks that he is away on National Guard duty. His projected compensation for 2008 totaled $69,227. Projected earnings for 2009 are based on the same estimated number of regular hours (1880) and overtime hours (340.4583) used in 2008 at his expected hourly rate of $30.23 per hour. His projected compensation for 2009 totaled $72,270. See EXHIBIT 6.

20. I refer to worklife tables in "Worklife Estimates: Effects of Race and Education," Bureau of Labor Statistics, Bulletin 2254, February 1986 and determined that Mr. Dees' remaining worklife as of the date of wrongful employment termination to be 19 years. See EXHIBIT 8.

21. The discount rate is based upon the rate of return available for 20-year inflation indexed United States Treasury Bonds noted in the Federal Reserve Statistical Release, release date: September 20, 2007. The effects of inflation have been

removed from these bonds so that they provide a real rate of return. This rate is 2.25% (see EXHIBIT 9), before income tax and 2.01%[2] after income tax. U.S. Treasury securities are exempt from state income tax; therefore only federal income tax is considered in calculating the after-tax rate. Mr. Dees' federal income tax rate for 2006 was calculated at 10.53% of his adjusted gross earnings.

22. The growth rates on earnings are based upon data compiled by the Bureau of Labor Statistics in their Employment Cost Index Constant-dollar 1975-2005 (December 2005=100). These tables adjust for the effects of inflation and provide the real rates of growth. See EXHIBIT 4, Part 2. A real rate of .53 percent provides the expected rate of growth in compensation had Mr. Dees continued working as a maintenance team member. See EXHIBIT 4, Part 1. A real rate of .51 percent provides the expected rate of growth in compensation of a maintenance lead man. See EXHIBIT 4, Part 1. Mr. Dees' International Paper compensation is governed by a union contract which holds his wage per hour constant at $30.23 through 2012. The real growth rate will be applied to his compensation from 2013 forward.

23. Mr. Dees was provided health insurance coverage by Hyundai until his wrongful employment termination on February 26, 2007. He contributed $378.04 annually toward this coverage. He continued this coverage under COBRA for three months at a cost of $2,001. See EXHIBIT 7. During his employment at BE&K, Inc., Mr. Dees contributed $86.83 per bi-weekly pay check toward health insurance premiums ($434 during his employment). See EXHIBIT 7. Currently, Mr. Dees pays $108 per bi-weekly pay period from International Paper wages toward his health coverage. I estimate that he will pay $861 in health insurance through his employment at

[2] Calculated as follows: discount rate x (1-income tax rate)=after tax discount rate

International Paper. See EXHIBIT 7. Mr. Dees' total loss of benefit from the date of his wrongful employment termination to the end of 2007 was $2,991. See EXHIBIT 7.

24. For determining the lost health insurance fringe benefit for 2008 and future years, I calculated the annual amount of premium contributions required for coverage through his employment at International Paper ($107.65 per bi-weekly pay period x 26 pay periods or $2,799) less the amount that he would have been required to pay if employment had not been terminated at Hyundai ($14.54 per bi-weekly pay period x 26 pay periods or $378). The annual loss resulting from the loss of health insurance fringe benefits is $2,421 for 2008 and each year that follows. See EXHIBIT 7.

25. Mr. Dees was also provided Long Term Disability Insurance as a benefit at no cost by Hyundai. International Paper provides similar coverage to its employees at a cost of $10.98 per week or $571 per year. See EXHIBIT 7. This amount was used to value the lost benefit.

26. Mr. Dees was provided a 401(k) retirement savings plan through Hyundai. Hyundai matched Mr. Dees' contributions at a rate of 60% of the first 4% of his contributions. International Paper provides Mr. Dees with 401(k) Savings and Investment Plan. International Paper matches 50 cents on the dollar on the first 1% to 4% of employee contributions. In addition, International Paper provides retirement income based on age and years of service. I have assumed that these benefits are similar and that the value of this lost benefit is $0.

27. Mr. Dees' total compensation is expected to lag behind what he would have earned at Hyundai, as Hyundai is one of the most favored employers in the Montgomery, Alabama area.

28. Damages have been calculated using the "but for" method of calculating lost earnings and fringes. The "but for" method is an accepted method of calculating lost earnings and fringes damages, and is the preferred method when a more precise estimation of lost earnings and fringes is desired.

**ADDITIONAL OPINIONS**

I may also do other analyses and reach additional conclusions as additional discovery documents, deposition testimony, and defendants' experts' reports and depositions become available.

Dated this 23rd day of January, 2008.

ROBERT P. HALL II, CPA

**DEES v. HMMA and HMA**
**EXHIBIT 1**
**QUALIFICATIONS**

**Robert P. Hall II, CPA**
**3955 McGregor Avenue South**
**Mobile, Alabama 36608**

**Professional Experience**

**1997-present** Robert Hall & Associates, PC/GibbonsHall, LLC, Mobile, Alabama, Owner.

**1990-1997** Crow and Shields, PC, Mobile, Alabama. Manager, responsible for various accounting, auditing and tax clients. Also responsible for managing firm's information systems.

**1987-1990** George Hieronymus, CPA, Mobile Alabama, Staff accountant, responsible for various small business client's accounting, auditing and tax services.

**1986-1987** McKenzie Industries, Inc. Mobile, Alabama. President – in charge of sales and marketing.

**1984-1986** Hall Affiliates, Inc. Mobile, Alabama. Assistant controller, in charge of financial reporting, internal audit and tax compliance for 10 wholesale florist operations. Duties also included managing one of the wholesale operations for several months while a permanent manager was hired.

## Professional Standing and Associations

**License and Certificates** — Certified Public Accountant, licensed in the State of Alabama

**Professional Associations** — Member, American Institute of Certified Public Accountants
Member, Alabama Society of Certified Public Accountants
Member, Mobile Chapter of the Alabama Society of Certified Public Accountants

## Education

B.S Business Administration, University of South Alabama, 1984

## Civic Activities

Child Day Care Association, Inc., Immediate Past Board President
Mobile United, Finance Committee Member
Leadership Mobile, Graduate Class of 2002

## Testimony Rendered

None in the last four years.

**DEES v. HMMA and HMA**
**EXHIBIT 2**
**LISTING OF EVIDENCE REVIEWED**

1. Review of complaint and pleadings.
2. Discussions with Leon Dees and Katherine Dees.
3. Review of plaintiff's production.
4. Review of defendants' production.
5. Deposition of Jerry Leon Dees
6. Deposition of Robert Allen Clevenger
7. Deposition of James Allen Brookshire
8. Deposition of John Wayne Applegate
9. Deposition of Wendy Susan Warner
10. *Guide to Litigation Support Services*, (11th Ed., Practitioners Publishing Company, July 2006).
11. *Measuring Damages Involving Individuals,*(American Institute of Certified Public Accountants, Inc., 2004)
12. http://www.hmmausa.com, HMMA Employment
13. http://www.hyundaiusa.com, Summary of benefits & programs
14. http://www.workingfilms.org, On the Job in North Carolina, "State Lures Good Jobs, But Companies Worry About Workers," David Firestone, New York Times, January 28, 2002.
15. http://new.windingroad.com/earningsfinancials/hyundai-halts-production-as-sonata-sales-dip, Hyundai Halts Production as Sonata Sales Dip, Seyth Miersma, Winding Road for Drivers, October 5th, 2007
16. South Korea: Hyundai denies US plant cut plans, Byline:just-auto.com editorial team, December 11, 2007.
17. http://www.michigan.com/apps/pbcs.dll/article?AID=2008801080351, Hyundai's Genesis targets luxury market, Joe Guy Collier, Detroit Free Press, January 8, 2008.

**DEES v. HMMA and HMA**
**F it 3**
**Economic . s Calculation**

| | | |
|---|---|---|
| Name of employee | Jerry L. Dees | |
| Calculation date | 3/31/2008 | Expected Trial Date |
| Fraction of year-calc date | 24.66% | 1/1/2008 |
| Fraction of year-final year | 15.34% | |
| Race/sex | White male | |
| Profession | Maintenance team member | |
| Education | High school/some college | |
| Date of birth | 1/19/1965 | |
| Date of termination | 2/26/2007 | |
| Age at termination | 42.1 | |
| Worklife expectancy | 19 years | |
| Age at end of worklife | 61.1 | |
| Age at end of life expectancy | 77.4 | |

| | |
|---|---|
| Earnings growth, Hyundai | 0.53% |
| Earnings growth, Mitigating Wage | 0.51% |
| Before tax discount | 2.25% |
| After tax discount | 2.01% |
| Annual income lost | 90,372 |
| Replacement earnings | 69,227 |
| Date of replacement hire | 2/27/2007 |

| Year | Years from Termination | To/From Report | Age | Earning but for .53% | Actual Capacity/ earnings .51% (after 2012) | Net loss of earnings | Fringe benefits lost | Total Loss | Lost Value 2.01% | Cumulative | Report Date 10/01/2007 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/26/2007 | | | 42.10 | | | | | | | | | |
| 12/31/2007 | 0.84 | 0.25 | 43.05 | 58,729 | 42,441 | 16,288 | 3,467 | 19,755 | | | | |
| 3/31/2008 | 1.09 | 0.00 | 43.29 | 19,880 | 16,350 | 3,530 | 748 | 4,278 | | | $ 24,033 | **Past loss** |
| 12/31/2008 | 1.84 | -0.75 | 44.05 | 70,492 | 52,877 | 17,615 | 2,244 | 19,859 | (19,563) | (19,563) | | |
| 12/31/2009 | 2.84 | -1.75 | 45.05 | 90,851 | 72,270 | 18,581 | 2,992 | 21,573 | (20,832) | (40,395) | | |
| 12/31/2010 | 3.84 | -2.75 | 46.05 | 91,332 | 72,270 | 19,062 | 2,992 | 22,054 | (20,876) | (61,271) | | |
| 12/31/2011 | 4.84 | -3.75 | 47.05 | 91,816 | 72,270 | 19,546 | 2,992 | 22,538 | (20,913) | (82,184) | | |
| 12/31/2012 | 5.84 | -4.75 | 48.05 | 92,302 | 72,270 | 20,032 | 2,992 | 23,024 | (20,943) | (103,127) | | |
| 12/31/2013 | 6.84 | -5.75 | 49.05 | 92,791 | 72,637 | 20,154 | 2,992 | 23,146 | (20,638) | (123,765) | | |
| 12/31/2014 | 7.84 | -6.75 | 50.05 | 93,282 | 73,006 | 20,276 | 2,992 | 23,268 | (20,338) | (144,103) | | |
| 12/31/2015 | 8.84 | -7.75 | 51.05 | 93,776 | 73,377 | 20,399 | 2,992 | 23,391 | (20,042) | (164,145) | | |
| 12/31/2016 | 9.84 | -8.75 | 52.05 | 94,273 | 73,750 | 20,523 | 2,992 | 23,515 | (19,750) | (183,895) | | |
| 12/31/2017 | 10.84 | -9.75 | 53.05 | 94,772 | 74,124 | 20,648 | 2,992 | 23,640 | (19,464) | (203,359) | | |
| 12/31/2018 | 11.84 | -10.75 | 54.05 | 95,274 | 74,500 | 20,774 | 2,992 | 23,766 | (19,181) | (222,540) | | |
| 12/31/2019 | 12.84 | -11.75 | 55.05 | 95,779 | 74,878 | 20,901 | 2,992 | 23,893 | (18,903) | (241,443) | | |
| 12/31/2020 | 13.84 | -12.75 | 56.05 | 96,286 | 75,258 | 21,028 | 2,992 | 24,020 | (18,629) | (260,072) | | |
| 12/31/2021 | 14.84 | -13.75 | 57.05 | 96,796 | 75,640 | 21,156 | 2,992 | 24,148 | (18,358) | (278,430) | | |
| 12/31/2022 | 15.84 | -14.75 | 58.05 | 97,309 | 76,024 | 21,285 | 2,992 | 24,277 | (18,092) | (296,522) | | |
| 12/31/2023 | 16.84 | -15.75 | 59.05 | 97,824 | 76,410 | 21,414 | 2,992 | 24,406 | (17,829) | (314,351) | | |
| 12/31/2024 | 17.84 | -16.75 | 60.05 | 98,342 | 76,798 | 21,544 | 2,992 | 24,536 | (17,571) | (331,922) | | |
| 12/31/2025 | 18.84 | -17.75 | 61.05 | 98,863 | 77,188 | 21,675 | 2,992 | 24,667 | (17,316) | (349,238) | | |
| 2/25/2026 | 19.00 | -17.91 | 61.10 | 15,246 | 11,901 | 3,345 | 499 | 3,844 | (2,690) | (351,928) | | |
| | | | | | | | | | (351,928) | | $ 351,928 | **Future loss** |
| | | | | | | | | | | | $ 375,961 | **Total economic loss** |

DEES v. HMMA and HMA
Exhibit 4 - Part 1 of 2
**Earnings Growth**

Average Growth Last 10 years

Ta[illegible] 6. Employment Cost Index (Wages and S[illegible] Only), Private Industry Workers

Manufacturing, Blue Collar Occupations

| | Employment Cost Index | Change | Percentage Change |
|---|---|---|---|
| 1995 | 94.9 | | |
| 1996 | 94.9 | 0 | 0.00% |
| 1997 | 96.2 | 1.3 | 1.37% |
| 1998 | 97.6 | 1.4 | 1.46% |
| 1999 | 98.2 | 0.6 | 0.61% |
| 2000 | 98.3 | 0.1 | 0.10% |
| 2001 | 100.7 | 2.4 | 2.44% |
| 2002 | 101.1 | 0.4 | 0.40% |
| 2003 | 101.7 | 0.6 | 0.59% |
| 2004 | 101 | -0.7 | -0.69% |
| 2005 | 100 | -1 | -0.99% |
| | 1084.6 | | 0.53% Average Growth Rate |

Table 7. Employment Cost Index (Wages and Salaries Only), Private Industry Workers By Bargaining Status, Region, and Area Size

Union Workers, Manufacturing, blue-collar occupations

| Employment Cost Index | Change | Percentage Change |
|---|---|---|
| 95.1 | | |
| 94.6 | -0.5 | -0.53% |
| 95.6 | 1 | 1.06% |
| 96.9 | 1.3 | 1.36% |
| 97.6 | 0.7 | 0.72% |
| 97.8 | 0.2 | 0.20% |
| 99.8 | 2 | 2.04% |
| 100.7 | 0.9 | 0.90% |
| 101.5 | 0.8 | 0.79% |
| 100.4 | -1.1 | -1.08% |
| 100 | -0.4 | -0.40% |
| 1080 | | 0.51% Average Growth Rate |



DEES v. HMMA and HMA
EXHIBIT 4
PART 2 of 2

# Employment Cost Index Historical Listing Constant-dollar 1975-2005

## (December 2005=100)

**Table #** **Page**

*Not seasonally adjusted*

Compensation

**2a** Civilian; by occupation and industry ..... 3
**2b** State and local government; by occupation and industry ..... 12
**3** Private industry; by occupation and industry ..... 20
**4** Private industry; by bargaining status, region, and area size ..... 51

Wages and salaries

**5a** Civilian; by occupation and industry ..... 62
**5b** State and local government; by occupation and industry ..... 71
**6** Private industry; by occupation and industry ..... 79
**7** Private industry; by bargaining status, region, and area size ..... 114

Benefits

**8a** Civilian, State and local government ..... 127
**8b** Private industry, by occupation and industry ..... 128

*Note: Tables in this listing are numbered to be consistent with the numbering scheme used in the ECI Current-dollar estimates historical listing and the ECI News Release. Since it is not appropriate to calculate a constant dollar value for seasonally adjusted data, those estimates, which appear in Tables 1a, 1b, and 1c of the ECI Current-dollar estimates historical listing and Table 1 of the ECI News Release are not included in this listing.

Bureau of Labor Statistics
Office of Compensation Levels and Trends
2 Massachusetts Avenue, NE – Suite 4175
Washington, DC 20212-0001

202.691.6199
NCSinfo@bls.gov
http://www.bls.gov/ncs/ect
May 10, 2006

EXHIBIT 4
PART 2 of 2

NOTES

Beginning with estimates for March 2006, several changes were introduced to the Employment Cost Index (ECI). Among these changes was the rebasing of the ECI, which was changed to December 2005=100. Prior to this, the base was June 1989=100, which was used from March 1990 through December 2005. Before March 1990 the base was June 1981=100. December 2005=100 indexes were calculated by dividing the June 1989=100 index values for each series by the December 2005 index value for that series and then multiplying by 100. 3- and 12-month percent changes were then calculated from the rebased indexes. These percent changes may differ from those calculated from the June 1989=100 indexes only because of rounding. The change to the June 1989=100 base is explained in the technical note, "Employment Cost Index Rebased to June 1989," in the April 1990 issue of the Monthly Labor Review (bls.gov/opub/mlr/1990/04/rpt1full.pdf).

When using the ECI for escalation contracts, users should review the fact sheet "How to Use the Employment Cost Index for Escalation" (bls.gov/ncs/ect/escalation.htm) as well as the ECI Current-dollar estimates historical listing, which does not deflate the index. *Constant-dollar estimates in this historical listing are not appropriate for use in escalation clauses.*

The deflator used for all constant-dollar ECI series was derived from the Consumer Price Index for All Urban Consumers (CPI-U). In order to calculate the constant dollar indexes, the CPI-U was converted to the same base as the ECI, December 2005=100. The ECI for each quarter was then divided by the converted CPI-U for the same reference period. The CPI-U U.S. City Average All Items was used for all series except for the regional estimates, which used corresponding CPI-U regional series.

This listing includes not seasonally adjusted ECI series for which current-dollar estimates are published. The constant-dollar compensation and benefit series must be interpreted with caution. Changes in employer costs for employee benefits do not necessarily measure changes in the welfare of workers.

More detailed information on the ECI is available from several sources. These include: "National Compensation Measures," in the BLS Handbook of Methods (bls.gov/opub/hom/pdf/homch8.pdf), and several articles published in the Monthly Labor Review (bls.gov/opub/mlr/mlrhome.htm) and Compensation and Working Conditions (bls.gov/opub/cwc/home.htm). These articles, and other descriptive pieces are also available by calling (202) 691-6199 or sending e-mail to NCSinfo@bls.gov. Additional changes to the ECI take effect with the March 2006 estimates. For more information, see "Change is Coming to the ECI" at bls.gov/ncs/ect/sp/ecsm0001.htm. Also, the April 2006 issue of the Monthly Labor Review is devoted to a series of articles detailing these changes (bls.gov/opub/mlr/2006/04/contents.htm).

This historical listing—which provides constant-dollar estimates from 1975-2005—uses the Standard Industrial Classification System (SIC), Occupational Classification System (OCS), and 1990 employment weights. It also uses indexes based on December 2005=100 to be consistent with the changes to the ECI introduced with the March 2006 estimates.

Three additional historical listings have estimates for the Employment Cost Index. One listing provides estimates for this same time period (1975-2005) but reflect current-dollar changes. It also uses the SIC, OCS, and 1990 weights. The other two listings provide data for 2001 to the present and are based on the new 2002 North American Industrial Classification System (NAICS), 2000 Standard Occupational Classification Manual (SOC), and incorporate the 2002 employment weights. One listing provides current-dollar estimates while the second provides constant-dollar estimates. All four historical listings are available at: bls.gov/ncs/ect/home.htm#tables.

Ex... 5
Earnl t For

| Check Dates | | Regular | Personal | Vacation | Jury | HOURS Holiday | Unpaid Mil | OT 1.5 | OT 2.0 | TOTAL | Rate | SP 2-R | HOURS SP 2-O(1.5x) | SP 2-O (2x) | Other Pay | Re-calc Amount | Cumulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/9/2007 | | | | | | | | | | - | 23.35 | | | | 1,000.00 | 1,000.00 | 1,000.00 |
| 1/9/2007 | | 32.00 | | | | 48.00 | | 18.25 | 30.25 | 128.50 | 23.35 | | | | 2.22 | 3,922.10 | 4,922.10 |
| 1/23/2007 | | 72.00 | | | | 8.00 | | 26.90 | 8.00 | 114.90 | 23.35 | 72.00 | 26.90 | 8.00 | 102.22 | 3,414.34 | 8,336.44 |
| 2/6/2007 | | 64.00 | | 8.00 | | 8.00 | | 28.90 | 16.50 | 125.40 | 23.35 | 80.00 | 28.90 | 16.50 | 2.22 | 3,809.34 | 12,145.78 |
| 2/20/2007 | | 60.00 | | 12.00 | | | 8.00 | 16.10 | | 96.10 | 23.35 | 72.00 | 16.10 | | 102.22 | 2,443.47 | 14,589.25 |
| 3/6/2007 | | 56.00 | 16.00 | 84.00 | | | | 27.50 | 8.50 | 192.00 | 23.35 | 80.00 | 27.50 | 8.50 | 1.90 | 5,142.89 | 19,732.14 |
| Totals Actual | | 284.00 | 16.00 | 104.00 | - | 64.00 | 8.00 | 117.65 | 63.25 | 656.90 | | 304.00 | 99.40 | 33.00 | 1,210.78 | 19,732.14 | |
| Projected 3/20/2007 to | 12/25/2007 | 1,428.00 | - | (76.00) | - | - | 252.00 | 486.84 | 190.21 | 2,281.05 | 23.35 | 762.46 | 194.86 | 66.23 | | 58,690.74 | |
| Differential for $ 1.23raise to 24.58/hr (Assumed 17 pay checks) | | | | | | | | | | | | | | | | 2,778.72 | |
| Differential for $ 3.7 raise to 27.05/hr (Assumed last 2 pay checks) Per Mr. Dees based on conversation with former co-worker. | | | | | | | | | | | | | | | | 983.38 | |
| October Shutdown days ( 3 days, 5th, 12th & 19th) (Dees at ADT on the 19th hours not included in projection) | | (16.00) | | | | | | | | (16.00) | 24.58 | | | | | (393.28) | |
| November Shutdown days (4) | | (32.00) | | | | | | | | (32.00) | 24.58 | | | | | (786.56) | |
| December Shutdown days (3) | | (24.00) | | | | | | | | (24.00) | 27.05 | | | | | (649.20) | |
| Reduction in estimated overtime based on a percentage of 2007 regular hours to 2006 regular hours (1748hrs/1872hrs) | | | | | | | | (32.23) | (12.59) | (44.82) | 24.6981 | (50.47) | (12.90) | (4.38) | | (1,894.57) | 58,729.24 |
| Projected for 2007 | | 1,640.00 | 16.00 | 28.00 | - | 64.00 | 260.00 | 572.26 | 240.87 | 2,821.13 | | 1,015.99 | 281.36 | 94.85 | 1,210.78 | 78,461.37 | |

Ex[illegible] 5
Earn[illegible] For

| | HOURS | | | | | | | | | | HOURS | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Check Dates | Regular | Personal | Vacation | Jury | Holiday | Unpaid Mil | OT 1.5 | OT 2.0 | TOTAL | Rate | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) | Other Pay | .e-calc Amount | Cumulative |
| Projected for 2008 | 1,696.00 | 16 | 104 | | 64 | 200 | 602.75 | 235.5 | 2,918.25 | 27.05 | 944.00 | 241.25 | 82.00 | 851.00 | 90,372.01 | |
| Earned through 3/31/08 | 440.00 | | | | | 120 | 85.00 | 73.00 | 718.00 | 27.05 | 236.00 | 60.31 | 20.50 | 212.75 | 19,880.39 | |
| Earned remainder of 2008 | 1,256.00 | 16.00 | 104.00 | - | 64.00 | 80 | 517.75 | 162.50 | 2,200.25 | 27.05 | 708.00 | 180.94 | 61.50 | 638.25 | 70,491.61 | |

Mr. Dees anticipates having to participate in one 3 week National Guard training in addition to his usual 2 week of annual drill. Assumed that 200 hours should be deducted from his 2080 hours of regular work time for a total of 1880 regular hours.

| | Per Pay Period | | Projected to EOY | |
|---|---|---|---|---|
| Analysis of Overtime | OT 1.5 | OT 2.0 | OT 1.5 | OT 2.0 |
| 2006 average hours per pay period | 23.18 | 9.06 | 486.84 | 190.21 |

| | Per Pay Period | | | Projected to EOY | | |
|---|---|---|---|---|---|---|
| Analysis of Shift Differential | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) |
| 2006 average per pay period | 36.31 | 9.28 | 3.15 | 762.46 | 194.86 | 66.23 |

**DEES v. HMMA and HMA**
**E' 6**
**Actual Ca, /Earnings**

| Check Dates | Regular | Personal | Vacation | Jury | Holiday | Unpaid Mil | OT 1.5 | OT 2.0 | TOTAL | Rate | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) | Other Pay | Re-calc Amount | Cummulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | HOURS | | | | | | | | | | HOURS | | | | | |
| **BE&K** | | | | | | | | | | | | | | | | |
| 3/8/2007 | 27.25 | | | | | | | | 27.25 | 20 | | | | | 545.00 | 545.00 |
| 3/15/2007 | 40 | | | | | | 9.5 | | 49.50 | 20 | | | | | 1,085.00 | 1,630.00 |
| 3/22/2007 | 40 | | | | | | | | 40.00 | 20 | | | | | 800.00 | 2,430.00 |
| 3/29/2007 | 40 | | | | | | 15 | | 55.00 | 20 | | | | | 1,250.00 | 3,680.00 |
| 4/5/2007 | 40 | | | | | | 10.5 | | 50.50 | 20 | | | | | 1,115.00 | 4,795.00 |
| 4/12/2007 | 40 | | | | | | 32.75 | | 72.75 | 20 | | | | 0.1 | 1,782.60 | 6,577.60 |
| 4/19/2007 | 40 | | | | | | 29 | | 69.00 | 20 | | | | 0.2 | 1,670.20 | 8,247.80 |
| 4/26/2007 | 40 | | | | | | | | 40.00 | 20 | | | | | 800.00 | 9,047.80 |
| 5/3/2007 | 40 | | | | | | 11.5 | | 51.50 | 20 | | | | | 1,145.00 | 10,192.80 |
| 5/10/2007 | 30 | | | | | | | | 30.00 | 20 | | | | | 600.00 | 10,792.80 |
| 5/17/2007 | 40 | | | | | | | | 40.00 | 20 | | | | | 800.00 | 11,592.80 |
| 5/24/2007 | 0 | | | | | | | | - | 20 | | | | | - | 11,592.80 |
| 5/31/2007 | 0 | | | | | | | | - | 20 | | | | | - | 11,592.80 |
| 6/7/2007 | 30 | | | | | | | | 30.00 | 20 | | | | | 600.00 | 12,192.80 |
| 6/14/2007 | 40 | | | | | | | | 40.00 | 20 | | | | | 800.00 | 12,992.80 |
| 6/21/2007 | 40 | | | | | | 1.75 | | 41.75 | 20 | | | | 0.1 | 852.60 | 13,845.40 |
| 6/28/2007 | 40 | | | | | | 1.25 | | 41.25 | 20 | | | | 0.1 | 837.60 | 14,683.00 |
| 7/5/2007 | 34.25 | | | | | | | | 34.25 | 20 | | | | | 685.00 | 15,368.00 |
| 7/12/2007 | 25.75 | | | | | | | | 25.75 | 20 | | | | | 515.00 | 15,883.00 |
| **IP** | | | | | | | | | | | | | | | | |
| 7/19/2007 | 16 | | | | | | 0 | | 16.00 | 25.37 | | | | | 405.92 | 405.92 |
| 7/26/2007 | 0 | | | | | | 0 | | - | | | | | | - | 405.92 |
| 8/2/2007 | 80 | | | | | | 7.666667 | | 87.67 | 25.37 | | | | -0.01 | 2,321.35 | 2,727.27 |
| 8/16/2007 | 80 | | | | | | 15.33333 | | 95.33 | 25.37 | | | | 0.03 | 2,613.14 | 5,340.41 |
| 8/30/2007 | 80 | | | | | | 16.83333 | | 96.83 | 25.37 | | | | 0.02 | 2,670.21 | 8,010.62 |
| 9/13/2007 | 80 | | | | | | 4.5 | | 84.50 | 25.37 | | | | | 2,200.85 | 10,211.47 |
| 9/27/2007 | 80 | | | | | | 41.16667 | | 121.17 | 25.37 | | | | | 3,596.20 | 13,807.66 |
| 10/11/2007 | 80 | | | | | | 68.5 | | 148.50 | 25.37 | | | | 18.16 | 4,654.53 | 18,462.19 |
| 10/25/2007 | 80 | | | | | | 8.333333 | | 88.33 | 25.37 | | | | 1110.46 | 3,457.19 | 21,919.38 |
| 11/8/2007 | 0 | | | | | | 0 | | - | 25.37 | | | | | - | 21,919.38 |
| 11/22/2007 | 0 | | | | | | 0 | | - | 25.37 | | | | 345.91 | 345.91 | 22,265.29 |
| 12/6/2007 | 69.25 | | | | | | 0 | | 69.25 | 25.88 | | | | | 1,792.19 | 24,057.48 |
| 12/20/2007 | 80 | | | | | | 11.08333 | | 91.08 | 25.88 | | | | | 2,500.66 | 26,558.13 |

Ex' 6
Actual Ca| Earnings

| Check Dates | Regular | Personal | Vacation | Jury | Holiday | Unpaid Mil | OT 1.5 | OT 2.0 | TOTAL | Rate | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) | Other Pay | Re-calc Amount | Cummulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | HOURS | | | | | | | | | | HOURS | | | | | |
| **2008** | | | | | | | | | | | | | | | | |
| 1/3/2008 | 80 | | | | | | 11.08333 | | 91.08 | 25.88 | | | | | 2,500.66 | 2,500.66 |
| 1/17/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 5,205.19 |
| 1/31/2008 | 80 | | | | | | 51.08333 | | 131.08 | 27.99 | | | | | 4,383.93 | 9,589.12 |
| 2/14/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 12,293.65 |
| 2/28/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 14,998.18 |
| 3/13/2008 * | 40 | | | | | | 5.541667 | | 45.54 | 27.99 | | | | | 1,352.27 | 16,350.45 |
| 3/27/2008 * | 0 | | | | | | 0 | | - | 27.99 | | | | | - | 16,350.45 |
| 4/10/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 19,054.98 |
| 4/24/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 21,759.51 |
| 5/8/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 24,464.04 |
| 5/22/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 27,168.57 |
| 6/5/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 29,873.10 |
| 6/19/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 32,577.63 |
| 7/3/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 35,282.16 |
| 7/17/2008 | 80 | | | | | | 11.08333 | | 91.08 | 27.99 | | | | | 2,704.53 | 37,986.69 |
| 7/31/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 40,907.66 |
| 8/14/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 43,828.63 |
| 8/28/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 46,749.60 |
| 9/11/2008 | 80 | | | | | | 51.08333 | | 131.08 | 30.23 | | | | | 4,734.77 | 51,484.37 |
| 9/25/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 54,405.34 |
| 10/9/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 57,326.31 |
| 10/23/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 60,247.28 |
| 11/6/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 63,168.25 |
| 11/20/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 66,089.22 |
| 12/4/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 69,010.19 |
| 12/18/2008 | 80 | | | | | | 11.08333 | | 91.08 | 30.23 | | | | | 2,920.97 | 71,931.16 |
| Adjustments | | | | | | | | | | | | | | | | |
| NG Summer Training - Assumed prior to rate increase | -80 | | | | | | -11.08333 | | (91.08) | 27.99 | | | | | (2,704.53) | 69,226.63 |

* Mr. Dees is scheduled for ADT 3/1/08 to 3/22/08 and will miss 120 hours of regular time.

| | Regular | OT 1.5 | TOTAL | Rate | Re-calc Amount |
|---|---|---|---|---|---|
| **2009 Total** | 2080 | 368.1666 | 2,448.17 | 30.23 | 79,572.91 |
| Less Nat. G. Servic | -200 | -27.70833 | | | |
| | 1880 | 340.4583 | 2,220.46 | 30.23 | 72,270.48 |

**DEES v. HMMA and HMA**
**E: 6**
**Actual Ca; /Earnings**

| Check Dates | Regular | Personal | Vacation | Jury | Holiday | Unpaid Mil | OT 1.5 | OT 2.0 | TOTAL | Rate | SP 2-R | SP 2-O(1.5x) | SP 2-O (2x) | Other Pay | Re-calc Amount | Cummulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

(HOURS spans Regular through OT 2.0; HOURS spans SP 2-R through SP 2-O (2x).)

| Average Hours per pay period | Periods | Total Hours | Avg. Regular time per period | Total Overtime | Avg. Overtime per period |
|---|---|---|---|---|---|
| 08/02/2007 to 9/13/2007 | 4 | 320 | 80 | 44.333333 | 11.08333 |

Per Mr. Dees shutdowns(2x per year) should last 2 weeks and yeild 40 hours of additional overtime.

**DEES v. HMMA and HMA**
**Exhibit 7**
**Fringe Benefits -**
**Health Insurance**

| | | | |
|---|---|---|---|
| Cobra Premium | 3/30/2007 | 667.00 | Per Ms. Dees cobra payments were made as follows. |
| | Apr-07 | 667.00 | |
| | May-07 | 667.00 | |
| Total | | 2,001.00 | |
| BEK Empoyee portion | 6/14/2007 | 86.83 | See Pay stubs |
| | 6/21/2007 | 86.83 | |
| | 6/28/2007 | 86.83 | |
| | 7/5/2007 | 86.83 | |
| | 7/12/2007 | 86.83 | |
| Total | | 434.15 | |
| IP employee portion | 9/13/2007 | 107.65 | See Pay Stubs |
| | 9/27/2007 | 107.65 | |
| | 10/11/2007 | 107.65 | |
| | 10/25/2007 | 107.65 | |
| | 11/8/2007 | 107.65 | |
| | 11/22/2007 | 107.65 | |
| | 12/6/2007 | 107.65 | |
| | 12/20/2007 | 107.65 | |
| Total | | 861.20 | |
| 2007 Total insurance prem | | 3,296.35 | |
| 2008 and forward Total annual insurance costs | | 2,798.90 | |

| Health Insurance Recap | Actual Payment Post termination | Remaining Payment - Pre-termination (Mar. thru Dec.) | Net Loss |
|---|---|---|---|
| 2007 Benefit loss | 3,296.35 | 305.34 | 2,991.01 |
| | | Premium that would be paid if still employeed | |
| 2008 Benefit loss | 2,798.90 | 378.04 | 2,420.86 |

**DEES v. HMMA and HMA**
**Exhibit 7**
**Fringe Benefits -**
**Disability Insurance**

| | HMMA | | IP | |
|---|---|---|---|---|
| LTD Benefit | 60% of first 16,667 monthly pay | $ 2,693 | 60% of your monthly base pay up to $3000 per month during periods of disability | $ 2,638 |
| Waiting Period | 180days | | 180 days following expiration of Weekly Sickness and Accident Benefits | |
| Max Benefit Period | 65, SSNRA or 3 years 6 mos. (Whichever longest) | | Age 67 Generally | |
| Cost to employee | | | | |
| Weekly | | $ - | | $ 10.98 |
| Annual | | $ - | | $ 570.96 |
| Monthly | | $ - | | $ 47.58 |

DEES v. HMMA and HMA
EXHIBIT 8

**Table A-2. Life and worklife expectancies for men by race, 1979-80**

(Average years remaining)

| Age | White men | | | | Black and other men | | | |
|---|---|---|---|---|---|---|---|---|
| | Life expectancy [1] | Expectation of active life by labor force status | | | Life expectancy [1] | Expectation of active life by labor force status | | |
| | | Total | Currently active | Currently inactive | | Total | Currently active | Currently inactive |
| $x$ | $^{\circ}e^{\circ}_x$ | $^{\circ}e^{a}_x$ | $^{a}e^{a}_x$ | $^{i}e^{a}_x$ | $^{\circ}e^{\circ}_x$ | $^{\circ}e^{a}_x$ | $^{a}e^{a}_x$ | $^{i}e^{a}_x$ |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| 16 | 56.1 | 39.9 | 40.6 | 39.1 | 51.4 | 33.6 | 34.3 | 33.2 |
| 17 | 55.2 | 39.4 | 40.0 | 38.4 | 50.4 | 33.2 | 33.9 | 32.7 |
| 18 | 54.3 | 38.8 | 39.4 | 37.8 | 49.5 | 32.8 | 33.5 | 32.2 |
| 19 | 53.3 | 38.2 | 38.8 | 37.1 | 48.6 | 32.4 | 33.0 | 31.7 |
| 20 | 52.4 | 37.5 | 38.1 | 36.4 | 47.6 | 31.9 | 32.4 | 31.1 |
| 21 | 51.5 | 36.9 | 37.4 | 35.6 | 46.8 | 31.3 | 31.8 | 30.4 |
| 22 | 50.6 | 36.1 | 36.6 | 34.9 | 45.9 | 30.7 | 31.1 | 29.7 |
| 23 | 49.7 | 35.4 | 35.8 | 34.1 | 45.0 | 30.0 | 30.4 | 29.0 |
| 24 | 48.8 | 34.6 | 35.0 | 33.2 | 44.1 | 29.3 | 29.7 | 28.3 |
| 25 | 47.9 | 33.8 | 34.2 | 32.4 | 43.3 | 28.6 | 28.9 | 27.5 |
| 26 | 47.0 | 32.9 | 33.3 | 31.5 | 42.4 | 27.9 | 28.2 | 26.6 |
| 27 | 46.1 | 32.1 | 32.4 | 30.6 | 41.5 | 27.1 | 27.4 | 25.8 |
| 28 | 45.2 | 31.2 | 31.6 | 29.7 | 40.7 | 26.4 | 26.6 | 25.0 |
| 29 | 44.2 | 30.3 | 30.7 | 28.7 | 39.8 | 25.6 | 25.8 | 24.1 |
| 30 | 43.3 | 29.5 | 29.8 | 27.7 | 39.0 | 24.8 | 25.0 | 23.2 |
| 31 | 42.4 | 28.6 | 28.9 | 26.7 | 38.1 | 24.0 | 24.2 | 22.3 |
| 32 | 41.4 | 27.7 | 28.0 | 25.7 | 37.2 | 23.2 | 23.4 | 21.3 |
| 33 | 40.5 | 26.8 | 27.1 | 24.7 | 36.4 | 22.3 | 22.7 | 20.3 |
| 34 | 39.6 | 25.9 | 26.2 | 23.7 | 35.5 | 21.5 | 21.9 | 19.3 |
| 35 | 38.6 | 25.0 | 25.3 | 22.7 | 34.7 | 20.7 | 21.1 | 18.2 |
| 36 | 37.7 | 24.1 | 24.4 | 21.7 | 33.8 | 19.9 | 20.4 | 17.1 |
| 37 | 36.8 | 23.2 | 23.5 | 20.7 | 33.0 | 19.1 | 19.6 | 16.0 |
| 38 | 35.9 | 22.3 | 22.6 | 19.8 | 32.2 | 18.4 | 18.9 | 15.0 |
| 39 | 34.9 | 21.4 | 21.7 | 18.8 | 31.3 | 17.6 | 18.1 | 14.2 |
| 40 | 34.0 | 20.5 | 20.9 | 17.5 | 30.5 | 16.8 | 17.4 | 13.4 |
| 41 | 33.1 | 19.6 | 20.0 | 16.4 | 29.7 | 16.0 | 16.7 | 12.6 |
| 42 | 32.2 | 18.7 | 19.1 | 15.4 | 28.9 | 15.3 | 16.0 | 11.9 |
| 43 | 31.3 | 17.8 | 18.3 | 14.3 | 28.1 | 14.6 | 15.2 | 11.1 |
| 44 | 30.4 | 16.9 | 17.4 | 13.2 | 27.3 | 13.8 | 14.5 | 10.4 |
| 45 | 29.5 | 16.1 | 16.6 | 12.1 | 26.5 | 13.1 | 13.8 | 9.7 |
| 46 | 28.6 | 15.2 | 15.8 | 11.2 | 25.8 | 12.4 | 13.1 | 8.9 |
| 47 | 27.8 | 14.4 | 14.9 | 10.3 | 25.0 | 11.6 | 12.4 | 8.1 |
| 48 | 26.9 | 13.5 | 14.1 | 9.4 | 24.3 | 10.9 | 11.7 | 7.3 |
| 49 | 26.1 | 12.7 | 13.4 | 8.6 | 23.5 | 10.2 | 11.0 | 6.5 |
| 50 | 25.2 | 11.9 | 12.6 | 7.8 | 22.8 | 9.5 | 10.4 | 5.7 |
| 51 | 24.4 | 11.1 | 11.8 | 7.1 | 22.1 | 8.8 | 9.7 | 4.9 |
| 52 | 23.6 | 10.3 | 11.1 | 6.3 | 21.5 | 8.1 | 9.1 | 4.3 |
| 53 | 22.8 | 9.5 | 10.3 | 5.6 | 20.8 | 7.4 | 8.4 | 3.7 |
| 54 | 22.0 | 8.7 | 9.6 | 5.0 | 20.2 | 6.8 | 7.8 | 3.2 |
| 55 | 21.3 | 8.0 | 8.9 | 4.4 | 19.5 | 6.1 | 7.2 | 2.8 |
| 56 | 20.5 | 7.2 | 8.2 | 3.8 | 18.9 | 5.5 | 6.6 | 2.6 |
| 57 | 19.7 | 6.5 | 7.5 | 3.3 | 18.3 | 4.9 | 6.0 | 2.2 |
| 58 | 19.0 | 5.8 | 6.9 | 2.9 | 17.7 | 4.3 | 5.6 | 1.9 |
| 59 | 18.3 | 5.2 | 6.3 | 2.5 | 17.1 | 3.7 | 5.1 | 1.8 |
| 60 | 17.6 | 4.5 | 5.8 | 2.2 | 16.5 | 3.3 | 4.7 | 1.6 |
| 61 | 16.9 | 4.0 | 5.4 | 2.0 | 15.9 | 2.9 | 4.4 | 1.5 |
| 62 | 16.2 | 3.5 | 5.0 | 1.8 | 15.4 | 2.5 | 4.1 | 1.4 |
| 63 | 15.6 | 3.1 | 4.7 | 1.5 | 14.9 | 2.2 | 3.8 | 1.3 |
| 64 | 14.9 | 2.7 | 4.4 | 1.3 | 14.3 | 2.0 | 3.6 | 1.2 |
| 65 | 14.3 | 2.3 | 4.2 | 1.2 | 13.8 | 1.8 | 3.5 | 1.1 |
| 66 | 13.7 | 2.1 | 4.0 | 1.0 | 13.3 | 1.6 | 3.4 | 1.0 |
| 67 | 13.1 | 1.8 | 3.8 | .8 | 12.8 | 1.4 | 3.3 | .9 |
| 68 | 12.5 | 1.6 | 3.6 | .7 | 12.3 | 1.3 | 3.2 | .7 |
| 69 | 11.9 | 1.4 | 3.5 | .5 | 11.8 | 1.2 | 3.0 | .6 |
| 70 | 11.4 | 1.2 | 3.3 | .4 | 11.4 | 1.0 | 2.9 | .4 |
| 71 | 10.9 | 1.1 | 3.1 | .3 | 10.9 | .9 | 2.7 | .3 |
| 72 | 10.4 | .9 | 2.9 | .2 | 10.5 | .7 | 2.6 | .2 |
| 73 | 9.9 | .8 | 2.6 | .1 | 10.0 | .6 | 2.3 | .1 |
| 74 | 9.4 | .7 | 2.3 | .1 | 9.6 | .5 | 1.8 | .0 |
| 75 | 8.9 | .6 | 1.8 | .0 | 9.2 | .3 | 1.3 | .0 |

[1] Mortality rates used reflect racial differentials in survival.

NOTE: Excerpt from Bureau of Labor Statistics, Bulletin 2254, February 1986, "Worklife Estimates: Effects of Race and Education"



DEES v. HMMA and HM
EXHIBIT 9

Federal Reserve Statistical Release

H.15

## elected Interest Rates (Daily)

Skip to Content

*Release Date: September 20, 2007*

Weekly release dates | Historical data | Data Download Program (DDP) | About | Announcements

Daily update *Other formats:* Screen reader | ASCII

The weekly release is posted on Monday. Daily updates of the weekly release are posted Tuesday through Friday on this site. If Monday is a holiday, the weekly release will be posted on Tuesday after the holiday and the daily update will not be posted on that Tuesday.

FEDERAL RESERVE STATISTICAL RELEASE

H.15 DAILY UPDATE: WEB RELEASE ONLY
SELECTED INTEREST RATES
For use at 4:15 p.m. Eastern Time

Yields in percent per annum — September 20, 2007

| Instruments | 2007 Sep 17 | 2007 Sep 18 | 2007 Sep 19 |
|---|---|---|---|
| Federal funds (effective) 1 2 3 | 5.33 | 4.92 | 4.74 |
| Commercial Paper 3 4 5 | | | |
| Nonfinancial | | | |
| 1-month | 4.97 | 4.97 | 4.76 |
| 2-month | 4.99 | 4.98 | 4.73 |
| 3-month | 4.95 | 4.95 | 4.81 |
| Financial | | | |
| 1-month | 5.23 | 5.02 | 4.72 |
| 2-month | 5.25 | 5.04 | 4.78 |
| 3-month | 5.25 | 5.05 | 4.94 |
| CDs (secondary market) 3 6 | | | |
| 1-month | 5.42 | 5.42 | 5.12 |
| 3-month | 5.52 | 5.50 | 5.17 |
| 6-month | 5.36 | 5.37 | 5.10 |
| Eurodollar deposits (London) 3 7 | | | |
| 1-month | 5.55 | 5.20 | 5.15 |
| 3-month | 5.60 | 5.20 | 5.22 |
| 6-month | 5.45 | 5.10 | 5.15 |
| Bank prime loan 2 3 8 | 8.25 | 7.75 | 7.75 |
| Discount window primary credit 2 9 | 5.75 | 5.25 | 5.25 |
| U.S. government securities | | | |
| Treasury bills (secondary market) 3 4 | | | |
| 4-week | 3.71 | 3.80 | 3.54 |
| 3-month | 4.05 | 3.91 | 3.83 |
| 6-month | 4.15 | 3.97 | 3.94 |
| Treasury constant maturities | | | |
| Nominal 10 | | | |
| 1-month | 3.82 | 3.87 | 3.62 |
| 3-month | 4.15 | 4.01 | 3.93 |
| 6-month | 4.31 | 4.12 | 4.09 |
| 1-year | 4.23 | 4.08 | 4.06 |
| 2-year | 4.08 | 4.00 | 4.00 |
| 3-year | 4.11 | 4.04 | 4.06 |
| 5-year | 4.21 | 4.19 | 4.20 |
| 7-year | 4.32 | 4.32 | 4.33 |
| 10-year | 4.48 | 4.50 | 4.53 |
| 20-year | 4.76 | 4.81 | 4.86 |
| 30-year | 4.72 | 4.77 | 4.83 |
| Inflation indexed 11 | | | |
| 5-year | 2.13 | 2.09 | 2.08 |
| 7-year | 2.19 | 2.17 | 2.18 |
| 10-year | 2.21 | 2.19 | 2.21 |
| 20-year | 2.22 | 2.20 | 2.25 ← |
| Inflation-indexed long-term average 12 | 2.20 | 2.19 | 2.24 |
| Interest rate swaps 13 | | | |
| 1-year | 5.00 | 5.02 | 4.75 |

DEES v. HMMA and HM
EXHIBIT 9

| | | | |
|---|---|---|---|
| 2-year | 4.78 | 4.80 | 4.61 |
| 3-year | 4.78 | 4.81 | 4.65 |
| 4-year | 4.84 | 4.86 | 4.73 |
| 5-year | 4.90 | 4.92 | 4.82 |
| 7-year | 5.02 | 5.03 | 4.96 |
| 10-year | 5.17 | 5.17 | 5.14 |
| 30-year | 5.39 | 5.39 | 5.41 |
| Corporate bonds | | | |
| Moody's seasoned | | | |
| Aaa 14 | 5.68 | 5.73 | 5.77 |
| Baa | 6.58 | 6.61 | 6.64 |
| State & local bonds 15 | | | |
| Conventional mortgages 16 | | | |

---

Footnotes

1. The daily effective federal funds rate is a weighted average of rates on brokered trades.

2. Weekly figures are averages of 7 calendar days ending on Wednesday of the current week; monthly figures include each calendar day in the month.

3. Annualized using a 360-day year or bank interest.

4. On a discount basis.

5. Interest rates interpolated from data on certain commercial paper trades settled by The Depository Trust Company. The trades represent sales of commercial paper by dealers or direct issuers to investors (that is, the offer side). The 1-, 2-, and 3-month rates are equivalent to the 30-, 60-, and 90-day dates reported on the Board's Commercial Paper Web page (www.federalreserve.gov/releases/cp/).

6. An average of dealer bid rates on nationally traded certificates of deposit.

7. Bid rates for Eurodollar deposits collected around 9:30 a.m. Eastern time.

8. Rate posted by a majority of top 25 (by assets in domestic offices) insured U.S.-chartered commercial banks. Prime is one of several base rates used by banks to price short-term business loans.

9. The rate charged for discounts made and advances extended under the Federal Reserve's primary credit discount window program, which became effective January 9, 2003. This rate replaces that for adjustment credit, which was discontinued after January 8, 2003. For further information, see www.federalreserve.gov/boarddocs/press/bcreg/2002/200210312/default.htm. The rate reported is that for the Federal Reserve Bank of New York. Historical series for the rate on adjustment credit as well as the rate on primary credit are available at www.federalreserve.gov/releases/h15/data.htm.

10. Yields on actively traded non-inflation-indexed issues adjusted to constant maturities. The 30-year Treasury constant maturity series was discontinued on February 18, 2002, and reintroduced on February 9, 2006. From February 18, 2002, to February 9, 2006, the U.S. Treasury published a factor for adjusting the daily nominal 20-year constant maturity in order to estimate a 30-year nominal rate. The historical adjustment factor can be found at www.treas.gov/offices/domestic-finance/debt-management/interest-rate/ltcompositeindex_historical.shtml. Source: U.S. Treasury.

11. Yields on Treasury inflation protected securities (TIPS) adjusted to constant maturities. Source: U.S. Treasury. Additional information on both nominal and inflation-indexed yields may be found at www.treas.gov/offices/domestic-finance/debt-management/interest-rate/index.html.

12. Based on the unweighted average bid yields for all TIPS with remaining terms to maturity of more than 10 years.

13. International Swaps and Derivatives Association (ISDA(R)) mid-market par swap rates. Rates are for a Fixed Rate Payer in return for receiving three month LIBOR, and are based on rates collected at 11:00 a.m. Eastern time by Garban Intercapital plc and published on Reuters Page ISDAFIX(R)1. ISDAFIX is a registered service mark of ISDA. Source: Reuters Limited.

14. Moody's Aaa rates through December 6, 2001, are averages of Aaa utility and Aaa industrial bond rates. As of December 7, 2001, these rates are averages of Aaa industrial bonds only.

15. Bond Buyer Index, general obligation, 20 years to maturity, mixed quality; Thursday quotations.

16. Contract interest rates on commitments for fixed-rate first mortgages. Source: FHLMC.

FRB: H.15 Selected Interest Rates, Web-Only Daily Update - September 20, 2007 Case 2:07-cv-00306-MHT-CSC Document 144-3 Filed 03/31/2008 Page 30 of 30 Page 3 of 3

DEES v. HMMA and EXHIBIT 9

---

Note: Weekly and monthly figures on this release, as well as annual figures available on the Board's historical H.15 web site (see below), are averages of business days unless otherwise noted.

---

Current and historical H.15 data are available on the Federal Reserve Board's web site (www.federalreserve.gov/). For information about individual copies or subscriptions, contact Publications Services at the Federal Reserve Board (phone 202-452-3244, fax 202-728-5886). For paid electronic access to current and historical data, call STAT-USA at 1-800-782-8872 or 202-482-1986.

---

Description of the Treasury Nominal and Inflation-Indexed Constant Maturity Series

Yields on Treasury nominal securities at "constant maturity" are interpolated by the U.S. Treasury from the daily yield curve for non-inflation-indexed Treasury securities. This curve, which relates the yield on a security to its time to maturity, is based on the closing market bid yields on actively traded Treasury securities in the over-the-counter market. These market yields are calculated from composites of quotations obtained by the Federal Reserve Bank of New York. The constant maturity yield values are read from the yield curve at fixed maturities, currently 1, 3, and 6 months and 1, 2, 3, 5, 7, 10, 20, and 30 years. This method provides a yield for a 10-year maturity, for example, even if no outstanding security has exactly 10 years remaining to maturity. Similarly, yields on inflation-indexed securities at "constant maturity" are interpolated from the daily yield curve for Treasury inflation protected securities in the over-the-counter market. The inflation-indexed constant maturity yields are read from this yield curve at fixed maturities, currently 5, 7, 10, and 20 years.

---

Weekly release dates | Historical data | Data Download Program (DDP) | About | Announcements
Daily update *Other formats:* Screen reader | ASCII

Statistical releases

.ne | Economic research and data
Accessibility | Contact Us
**Last update: September 20, 2007**

# Jerry Dees v. HMMA and HMA
# 2:07-cv-00306-MHT-CSC

# EXHIBIT 3

## Defendants' Motion and Supporting Authorities to Disqualify Plaintiff's Expert Robert Hall, II, CPA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO.: 2:07-CV-00306-MHT-CSC

JERRY LEON DEES, JR.,
Plaintiff,
vs.
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC., AND HYUNDAI MOTOR AMERICA, INC.,
Defendants.

DEPOSITION OF ROBERT HALL, III, CPA

STIPULATIONS

IT IS STIPULATED AND AGREED by and between the parties, through their respective counsel, that the deposition of ROBERT HALL, III, CPA, may be taken before Kathleen Cavazos, Commissioner, at the law offices of Kilborn, Roebuck & McDonald, 1810 Old Government Street, Mobile, Alabama, on the 28th day of January, 2008.

IT IS FURTHER STIPULATED AND AGREED that the signature to and the reading of the deposition by the

1

witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections to be made by counsel to any questions except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Commissioner is waived.

2

EXAMINATION INDEX

ROBERT HALL, II, CPA: PAGE

BY MR. JOHNSON ................. 5

EXHIBIT INDEX

DEFENDANT'S:

1 RULE 26(a)(2)(B) FEDERAL RULES OF CIVIL PROCEDURE DISCLOSURE OF EXPERT TESTIMONY - INITIAL REPORT 5

2 RULE 26(a)(2)(B) FEDERAL RULES OF CIVIL PROCEDURE DISCLOSURE OF EXPERT TESTIMONY - SUPPLEMENTAL REPORT 24

3 ARTICLE ENTITLED SOUTH KOREA: HYUNDAI DENIES US PLANT CUT PLANS 27

4 ARTICLE ENTITLED HYUNDAI HALTS PRODUCTION AS SONATA SALES DIP 27

5 ARTICLE ENTITLED HYUNDAI'S GENESIS TARGETS LUXURY MARKET 27

6 ARTICLE ENTITLED STATE LURES GOOD JOBS BUT COMPANIES WORRY ABOUT WORKERS 27

7 HYUNDAI MOTOR AMERICA, HYUNDAI MOTOR FINANCE COMPANY - SUMMARY OF BENEFITS AND PROGRAMS 27

8 WORK SCHEDULE 44

9 LABOR AGREEMENT 75

3

APPEARANCES

4 KILBORN, ROEBUCK & MCDONALD, by Vincent F. Kilborn, Esq., 1810 Old Government Street, Mobile, Alabama 36606, appearing on behalf of the Plaintiff.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, by Matthew K. Johnson, Esq., P.O. Box 2757, Greenville, South Carolina 29602, appearing on behalf of the Defendants.

4

I, Kathleen Cavazos, RPR, CCR, a Court Reporter of Mobile, Alabama, and Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure and the foregoing stipulation of counsel, there came before me at 1810 Old Government Street, Mobile Alabama 36606, beginning at 9:00 a.m., ROBERT HALL, II, CPA, witness in the above cause, for oral examination, whereupon the following proceedings were had:

(Defendant's Exhibit 1 marked for identification and attached hereto.)

ROBERT HALL, II, CPA,

the witness, having been first duly sworn by the Court Reporter, was examined and testified as follows:

THE COURT REPORTER: Do we have the usual stipulations?

MR. JOHNSON: Sure.

MR. KILBORN: That's fine.

EXAMINATION

BY MR. JOHNSON:

**Q. Just for the record, I'm Matt Johnson from Greenville, South Carolina representing Hyundai Motor Manufacturing Alabama, LLC, and Hyundai Motor America,**

**Inc.**

A. All right.

**Q. If you would, please state your name.**

A. I'm Robert Hall.

**Q. Mr. Hall, I know a little bit about you from having met you in the past, and I'm just here to ask you some questions. I know you've sat in on depositions before, so you know more or less how the process works. Hopefully, we won't be too long here today but, obviously, as I know you've heard me tell other people before, if you need to take a break or something, just let me know and we'll stop and we'll be happy to take a break. Hopefully, we won't go too long.**

**Again, just a reminder, I may remind you throughout the deposition that our court reporter is going to try to type everything that we say. So I'm sure she'd appreciate it if we don't talk too fast, and if we don't talk over each other and if we use yes or no answers or good, plain spoken English.**

A. All right.

**Q. And I've marked as Exhibit 1 what I understand to be a copy of your report. If you could, just review that and confirm that for me.**

A. I believe this is it.

**Q. Okay. And you can hold onto that because we may be referring to that at times throughout the day.**

**Another thing, when I initially spoke to Mr. Dees's lawyers, I had provided them with a copy of a Notice of Deposition and subpoena.**

A. Right.

**Q. Did you receive a copy?**

A. I did.

**Q. And exhibit A on the subpoena asked you to bring certain types of documents. Have you brought your file materials today?**

A. I have.

**Q. All right. Thank you. And so I may be asking you a little bit about what your file materials are.**

A. Right.

**Q. Additionally today, obviously, I want to talk to you about the report that you've created that we've marked as Exhibit 1. I also want to talk to you, sort of, more in detail about your opinions in the case and the facts you've relied upon. Okay?**

A. Uh-huh.

**Q. But first I want to get some background**

**information on you. If you can, give me your business address.**

A. 2866 Dauphin Street, D-A-U-P-H-I-N, Suite Y. That's 36606.

**Q. That's here in Mobile?**

A. That's right.

**Q. And what's the name of your business?**

A. It's Robert Hall & Associates, P.C.

**Q. Do you have any other business names or any other businesses other than that business?**

A. Probably not of interest, but the name of the firm before was Robert P. Hall, P.C., FKA.

**Q. And where did you go to school?**

A. I went -- Are we talking about college?

**Q. Actually, let me short-circuit that, if we can. My recollection is that exhibit 1 to what we've marked as the Deposition Exhibit Number 1 shows your qualifications.**

A. Okay.

**Q. And I do not recall if that -- That does not have your education on it, does it?**

A. Page 2 does.

**Q. Okay. There you go. And is that still**

accurate?
A. It is.
Q. Now, I know that this was prepared, if I recall, sometime in October -- in October of 2007 or prior to October 2007. Has anything about your resume, qualifications or education changed since that time?
A. No.
Q. Have you been asked to amend, supplement or add to the report that we've marked as Deposition Exhibit 1?
A. Yes, it's been supplemented. I finished it the last part of last week.
Q. And did you bring a copy of it today?
A. It's in the box.
MR. JOHNSON: Can we go ahead and get that, Vince?
MR. KILBORN: Sure. Where's the box?
A. It's in the kitchen.
MR. JOHNSON: You want to take a break and go get it?
MR. KILBORN: Sure.
(Whereupon, an off-the-record break was taken, after which the following occurred:)
BY MR. JOHNSON:

9

Q. Mr. Hall, we're back on the record. While they're copying the more recent report that you prepared, I'm just going to ask you some other background stuff. First off, we've covered your education. Secondly, in terms of publications or articles you've written, is that included in, I guess, your initial report?
A. Well, no. There's only one. I wrote an article for a law firm, I don't remember if it was seven or eight years ago, in a little news magazine. It had to do with divorce and, you know, the way it affects deductions and negotiating with exemptions and all that stuff.
Q. And which law firm was that?
A. They're no longer around. They busted up, but at the time it was Eiland, Murray & Sherman.
Q. What kind of law firm was that?
A. Well, you know, kind of diversified, I guess. Some of them did criminal defense work. One guy did divorce and one guy was kind of a plaintiff's attorney.
Q. And that's the only article that you've written?
A. Yeah. There may have been two. I don't remember. I noted that on my second one, but I guess when I got your subpoena it kind of jogged my memory.
Q. Okay. And I note in the initial report you

10

indicated that, in terms of professional standing in associations, you are a member of the American Institute of Certified Public Accountants, the Alabama Society of Certified Public Accountants, and the Mobile Chapter of the Alabama Society of Certified Public Accountants?
A. That's correct.
Q. Are there any other professional organizations you're a member of?
A. No.
Q. And those three professional associations, what does it take to be a member of those?
A. Well, I know the reason I'm a member is I'm a certified public accountant and I practice in the State of Alabama in Mobile. So I would imagine that, you know, a requirement of membership, although I'm not certain, is being a CPA and practicing in the state.
Q. Are any of those something where you have to be selected or elected or chosen to become a member?
A. No.
Q. And have you received any awards, honors or distinctions related to your work as a CPA?
A. No.
Q. Now, let me ask you some questions just

11

generally about your work in this particular lawsuit. I assume that you have met with Mr. Dees?
A. I did.
Q. Do you remember when you were initially contacted about this case?
A. No, not off the top of my head. I would imagine it was in -- well, I'm not going to guess.
Q. Okay. Do you -- The date of your initial report was October the 1st of 2007. Was it somewhere fairly close in time to October 1st?
A. It was in plenty of time to do the work necessary to get my report done. I don't remember exactly.
Q. And do you remember how you were contacted?
A. I imagine -- I believe it was Mr. Sport that gave me a call. I believe Mr. Sport gave me a telephone call.
Q. Had you worked with him previously?
A. No. As an expert?
Q. Right.
A. No.
Q. Did you know him professionally?
A. I did.

12

**Q. How did y'all know one another?**
A. He had -- at the time was an expert on a case that one of my clients was involved in.
**Q. What type of case was that?**
A. Let's see. I couldn't -- you know, I can't tell you exactly what it's called. There was something that had to do with a contract, I think. I don't know. I'm not -- I don't know.
**Q. Okay. And after your initial contact with Mr. Sport, did you exchange any correspondence to confirm the nature of your relationship?**
A. You mean like an engagement letter?
**Q. Yes.**
A. No.
**Q. What was your understanding as to what you were being asked to do by Mr. Sport at that point?**
A. He asked me to look at Mr. Dees's situation and come up with a damage model, see if there were any damages involved.
**Q. And in your conversation with Mr. Sport at that point in time, did you take any notes that you hand wrote or put into the computer?**
A. Un-uh.

13

**Q. Is that a no?**
A. Yes, that's a no.
**Q. And after your initial conversation with Mr. Sport, what was the next thing you did in the case?**
A. I believe he sent me a box of stuff, maybe the first discovery stuff, a couple of files, and I started going through the files.
**Q. And after that point did you receive additional documentation prior to completing your first --**
A. I did.
**Q. -- draft?**
A. Uh-huh.
**Q. And what else did you receive?**
A. Updated information, I guess, all the stuff that kept flowing in, you know, from either discovery or -- I don't think there were any depositions at that point in time but, basically, additional information that came -- you know, that was discovered.
**Q. Okay. And did you receive any e-mails or electronic documents?**
A. Yeah, I got an e-mail, you know, just general stuff about format of my report and some stuff. I guess there's one about depositions, scheduling depositions

14

or -- I guess there was some talk about rescheduling today. I think there was one about that.
**Q. Sure. In terms of the format of the report, what did that have to do with?**
A. Just the layout in accordance with this Rule 26(a).
**Q. Prior to this case, had you reviewed Rule 26(a)?**
A. No. Well, excuse me. I had, as a matter of fact. I wrote a report, I want to say, six years ago and it was in this format.
**Q. And what was the prior report for?**
A. There was some people that were being chased by the police, and there was an accident, and they were all killed. It had to do with lost earnings.
**Q. Were you working with their family's attorney, or who were you working with in that case?**
A. I was working with a lawyer by the name of Jim Patterson.
**Q. And who did Jim Patterson represent in that case?**
A. I'm not sure if he represented the City of Foley or somebody, you know, somebody on the defense side. I can't recall exactly who the defendant was.

15

**Q. And tell me -- Prior to completing your first report, other than you said you received some documents that were generated during discovery, can you think of anything else that you reviewed in preparation for your first report?**
A. I grabbed some information from Mrs. Dees about some insurance stuff and some other benefit type stuff related to the BE&K and IP employment.
**Q. Did you talk to Mr. Dees about it?**
A. Yeah.
**Q. And anything else that you reviewed prior to preparation of the first report?**
A. You mean in addition to what's disclosed on here? Do you want me to talk about everything?
**Q. Sure. I think we'll just look at Exhibit 1 -- or Exhibit 2 to your first report, which we've marked as Deposition Exhibit 1. I know you've got nine particular items listed there. Is that listing of nine things comprehensive?**
A. There may have been some stuff out there, you know, while I was looking on the Internet but nothing substantive.
**Q. And what is number nine there? It says -- it**

16

**has a website address of workingfilms.org.**
A. Well, it's an article that was on the web that talked about what the effect of having Hyundai in Alabama was going to be and kind of the practice of, you know, when a company like that comes into the state, what they're trying to do and looking for.
**Q. And do you have a copy of that?**
A. Yes. It's in here.
**Q. And what about -- Number seven suggests that you looked at HMMA employment information on the Internet as well.**
A. Right.
**Q. Did you print that information off?**
A. I did.
**Q. Do you have a copy of it here?**
A. I believe so. It should be in the box.
**Q. And you also reviewed -- Number eight says summary of benefits and programs, hyundaiusa.com?**
A. Uh-huh.
**Q. Did you print that information off as well?**
A. I did.
**Q. And do you also have it here today?**
A. I believe so.

**Q. And look at number five, Guide to Litigation Support Services. Is that like a treatise or what is that?**
A. It's a publication that's -- I don't know that treatise is the right -- It's a guide, practice guide, for doing litigation support services.
**Q. And is that something you maintain at your office?**
A. Well, we use it on the Internet.
**Q. It's on the Internet?**
A. Uh-huh.
**Q. Is that a yes?**
A. Yes.
**Q. Okay. I just want to make sure she understands. And did you print off any particular portions of that book to use in this case?**
A. Yeah, uh-huh.
**Q. And are they included as one of the other exhibits here?**
A. No.
**Q. And do you have a copy of the portions of the Guide to Litigation Support Services that you used?**
A. Un-uh.

**Q. No?**
A. No, I don't have them.
**Q. But you say there were specific sections that you referred to in preparing your initial report?**
A. There were -- I used it as a guide to prepare my damage calculation.
**Q. And look, also, at number six in your listing of evidence reviewed. It looks like it's something entitled Measuring Damages Involving Individuals. What is that?**
A. That's another guide for calculating damages of individuals.
**Q. And is that a book that you maintained at your office or something?**
A. It is.
**Q. Did you use any particular portion of the book?**
A. I used it as a guide to form my judgements and make calculations, yes.
**Q. Were there specific sections that you relied upon or did you use it generally?**
A. I'm not exactly sure what you're asking.
**Q. Well, was there anything specific about the book that helped formulate your opinions, or was it just the book generally?**

A. I would say generally.
**Q. And did you make copies of any particular sections of that book?**
A. Un-uh.
**Q. No?**
A. No.
**Q. Just in looking at your listing of evidence reviewed --**
A. Before we move forward, there may be a section of the PPC Guide that I did use to gather some information from, if that relates to what you were asking. I want to make sure I'm clear on that.
**Q. And by PPC, you're referring to what you identified as number five, the Guide to Litigation Support Services?**
A. I am.
**Q. And you're saying there might be specific sections you referred to?**
A. No. I said there are sections there that they provide to help gather information and I used that.
**Q. And who provided that information?**
A. Well, I guess --
**Q. The publisher, you're talking about?**

A. Oh, yeah, yeah.
**Q. And I'm trying to just get a handle on, sort of, the totality of things you relied upon. Other than one through nine, you indicated that you spoke to Mrs. Dees, and she provided you some information about benefits and insurance from BE&K and IP?**
A. Right.
**Q. Is there anything else specifically that Mr. and Mrs. Dees provided you other than that?**
A. Well, you know, I asked them various questions.
**Q. Did you have a questionnaire sheet or anything that you used as a guide to ask the questions of them?**
A. You know, to some extent but, then, you know others, you know, there are things to ask that I did ask, and I'm sure there are things that --
**Q. Did you take notes during your discussion with Mr. and/or Mrs. Dees?**
A. I did.
**Q. And do you have a copy of those notes here?**
A. Yeah. They should be compiled on some of that stuff or some of the other spreadsheets.
**Q. And are those handwritten notes or did you type them?**

21

A. They're typed and they're handwritten.
**Q. And can you think of any other documents that you may have received or reviewed or generated other than the two reports and what we've identified as a listing of evidence reviewed, one through nine, in your report?**
A. I don't recall any.
**Q. And other than Mr. and/or Mrs. Dees, did you talk to anybody else in preparation of your initial report?**
A. I mean, that's a pretty general question. Can you help me out?
**Q. Did you interview any coworkers?**
A. No.
**Q. Did you interview anybody -- and by "interview," I mean just talk to, whatever --**
A. I think I understand.
**Q. -- anybody that worked at Hyundai?**
A. No.
**Q. Did you get information from anybody other than Mr. or Mrs. Dees or their attorneys?**
A. Well --
**Q. And the books that we've talked about?**
A. Not that I recall.

22

**Q. Okay. And did you review any documents in preparation for today's deposition?**
A. Well, like I said, I just finished the supplemental report through the end of last week and, other than kind of going back through and, you know, reading the depositions that I got subsequent to finishing the reports --
**Q. Which depositions did you use?**
A. I've read all of them.
**Q. And when you say all of them, which ones did you read?**
A. Oh, I don't know. They're in the box. I guess -- I don't remember what the last one was that was given to me, but I've got them listed separately on the supplemental report.
**Q. Okay.**
A. I've got them in the box.
**Q. Okay.**
MR. KILBORN: Take a look at Exhibit 2, Matt, in his supplemental report.
A. Oh, I know who the last one was, Mr. -- Is it Moon?
MR. KILBORN: Yeah, Moon.

23

**Q. So it looks like what you have here in exhibit 2 is similar to the exhibit 2 on your initial report?**
A. Right.
**Q. And let's go ahead and mark your supplemental report as Exhibit 2.**
**(Defendant's Exhibit 2 marked for identification and attached hereto.)**
**Q. So now I'm looking at Deposition Exhibit Number 2, your exhibit number 2 to your supplemental report, and it looks like you now have identified 17 things that you reviewed in preparation of your report; is that accurate?**
A. Yes.
**Q. And different than your initial exhibit 2 would be the depositions of Mr. Dees, Robert Allen Clevenger, James Allen Brookshire, John Wayne Applegate and Wendy Susan Warner.**
A. Right.
**Q. And is it my understanding that you've also reviewed the deposition of Mr. Moon?**
A. After issuing the supplemental report.
**Q. Okay. Was there anything in Mr. Moon's deposition that you've reviewed that would in any way change your opinions or conclusions in the supplemental**

24

**report?**
A. Yeah. You'll note in the report that there was some talk, I guess, in something that was disclosed by you guys that said that the plant was going to be shut down for 10 days. So I adjusted the number of hours that he would have earned at Hyundai had they not been working, had maintenance not been working. But I think I understand from that deposition, correct me if I'm out of whack on this, that maintenance worked, according to Mr. Moon. So it would have to be adjusted for that. I don't think it's going to make a great difference, but I think it probably needs to be adjusted.
**Q. When you say you adjusted the hours down, did you do that just for 2007, or did you do that on an annual basis going forward?**
A. I did it for 2007.
**Q. Only?**
A. Yeah, only.
**Q. Okay. And anything else about Mr. Moon's deposition that would change your conclusions or opinions?**
A. Not that I'm aware of.
**Q. Okay.**

25

A. I would probably read it in its entirety again before doing my supplemental -- another supplement, if asked to do so.
**Q. Now, in reviewing Mr. Dees's deposition, can you recall anything in Mr. Dees's deposition that made you change your opinions or conclusions from the first report to the supplemental report?**
A. No.
**Q. And what about with Mr. Clevenger's depo?**
A. No.
**Q. Nothing in Mr. Clevenger's deposition made you change your report?**
A. Not that I'm aware of.
**Q. Did anything in James Allen Brookshire's deposition make you change any of your opinions or conclusions from the first report?**
A. Not with regard to the calculations, no.
**Q. And what about with Mr. Applegate's deposition?**
A. Un-uh.
**Q. Is that a no?**
A. No.
**Q. Okay. Similarly, with Ms. Warner's depo?**
A. No.

26

**Q. You've also included in your listing of evidence reviewed a number 15, which appears to be something from the Internet, and I'm assuming it's entitled Hyundai Halts Production as Sonata Sales Dip.**
A. Right.
**Q. What was that article?**
A. I get them all cluttered up. It would probably be helpful if we had copies of them.
**Q. Okay. One thing I would like to do before I get out of here is get copies of any of the articles we have.**
MR. JOHNSON: Can we go ahead and take a break, Vince, and just take care of that?
MR. KILBORN: Sure.
(Whereupon, an off-the-record break was taken, after which the following occurred:)
(Defendant's Exhibits 3 through 7 marked for identification and attached hereto.)
BY MR. JOHNSON:
**Q. Mr. Hall, we're back on the record now, if you're ready.**
**We've now marked as Exhibits 3, 4, 5, 6 and 7 several of the exhibits identified in your report as**

27

**evidence that you have reviewed.**
A. Right.
**Q. Now, would it be fair to say that we've identified all of the evidence that you've considered in preparing your report?**
A. As I said earlier, you know, there may have been some other things out there that I read over, but this is a substantive portion of it.
**Q. Okay. Let's review Exhibit 3 which appears to be an article from the Internet entitled Hyundai Denies US Plant Plans.**
A. Right.
**Q. Did anything you read in this particular article change your opinions or conclusions from the time you prepared your first report to the second?**
A. Would you ask the question again?
MR. KILBORN: What exhibit number is that, Matt?
**Q. Three. Anything about this article that changed your opinions or conclusions after you prepared the first report?**
A. No.
**Q. Now, let's look at what we've marked as Exhibit**

28

**4, which is -- appears to be an Internet article entitled Hyundai Halts Production as Sonata Sales Dip.**
A. Right.
**Q. Do you have that in front of you?**
A. I do.
**Q. And did anything in this article change your opinions or your conclusions after you prepared the initial report?**
A. Yes.
**Q. And what is it that changed your conclusions or opinions?**
A. Again, after seeing that article that accompanied one of y'all's filings, I set out to look and see -- I needed to identify the specific days that the plant was shut down or, indeed, to try to identify the specific days that the plant was shut down, and one of these days, the 19th, is a day that -- well, I guess it's twofold, to be honest with you. You have the 10 days that were out there as possible shutdown days, not knowing, you know, whether maintenance was working or not, and during that period of time Mr. Dees had active duty training, or in that frame of time he had some active duty training that I knew he was out for, I think,

close to a month. So I felt like it was important to, you know, cross reference the days back to days that he was on duty.
**Q. Okay. And do you know what days he was on active duty?**
A. I'd be going off of memory but if a guess is appropriate, I can guess.
**Q. Okay.**
A. I believe he was gone from the 19th of October through the 22nd of November.
**Q. And in coming up with your calculation of damages for 2007, did you back that time out of time you estimated he would have been working had he remained at Hyundai?**
A. Did I back the time that -- yeah, that was already backed out for 2007.
**Q. And how much time did you back out of 2007 for his Uniform Services during that period?**
A. I'm not sure that that's -- Basically, what I did was I took the average for 2007 that he worked and applied that to 2007 at Hyundai. I think that's probably a better answer.
**Q. Okay. So you looked at the hours during 2007**

**that he worked for BE&K and International Paper?**
A. And Hyundai.
**Q. And Hyundai. Did you assume that he worked the same number of hours at BE&K and subsequently at International Paper that he would have worked at Hyundai?**
A. Regular hours, yes.
**Q. Okay. And I want to make sure I'm asking the question the correct way. My understanding is that when Mr. Dees is on Uniform Service, he wouldn't ordinarily receive pay for time away from work; is that your understanding?**
A. Well, I think -- I believe that he could have if he had turned his time in taking the difference, but that was not his practice.
**Q. And tell me again when he was gone in October, the 19th through when?**
A. I think the 22nd but, again, I'm going on recollection.
**Q. And were there any other times that you were aware of in 2007 after he left Hyundai that he missed work due to Uniform Service?**
A. I can't go on recollection. I can go back here and assume but, you know, I don't really feel comfortable

doing that.
**Q. I guess my question is, in calculating his damages, were his damages reduced in any fashion or amount for time that he either did or would have missed for Uniform Services?**
A. Yes.
**Q. And I guess I'm just trying to figure out where that shows up in your report and how you calculated it.**
A. Well, again, for 2007, the measure was actual hours, actual regular hours worked at Hyundai less nine of the shutdown days, and at IP it was just his regular hours worked. Well, not just IP but BE&K, IP and Hyundai. I mean, you've got actual earnings there, basically, what we're talking about, actual earnings with those employers projected with Hyundai.
**Q. And going forward from, I guess, now that you've got the report, the supplemental report -- following the supplemental report and your projections into the future, did you reduce by any Uniform Service?**
A. I did.
**Q. And how did you make that calculation?**
A. Based on what Mr. Dees expects to be away for 2008.

**Q. And how much does he expect to be away for 2008?**
A. I believe 200 hours.
**Q. And did you actually reduce his income or the amount that he worked by 200 hours in calculating his projected earnings?**
A. I did.
**Q. And what about 2009?**
A. I used the same estimate, 200 hours.
**Q. And for -- did you use that -- how many years going forward?**
A. Well, I don't know what's left. I mean, the total work life is 19 years. So everything from, you know, 2008, 2009 and then forward.
**Q. Through his work-life expectancy?**
A. Exactly.
**Q. And did you talk to Mr. Dees about where that 200-hour figure came from?**
A. I did.
**Q. And where did it come from? What's the basis for 200 hours?**
A. Well, he's got 80 hours every year of just regular summer guard duty, I think they call it, and, again, he's expecting to be gone this year for three

weeks, I think, or -- What's that, 120 hours?
**Q. Okay. And where do the extra 80 hours come from?**
A. Well, it's 80 hours for two weeks summer duty and then 120 for his active-duty training.
**Q. Okay. In your discussions with Mr. Dees, did he indicate to you that he intended to go serve overseas in the future?**
A. At one point he did but it seems recently he's not so sure he's going this time.
**Q. And why is that?**
A. I don't know. I guess --
**Q. Have you spoken to him about it?**
A. That's where that information came from, Mr. Dees.
**Q. Okay. And what exactly did Mr. Dees say about the possibility of he might go overseas or he might not go overseas?**
A. I don't remember exactly, but I can tell you the gist of it was he's not as sure now that he's going over to Iraq again.
**Q. Did he suggest that was because of a choice that he had made or --**

A. I didn't get the feeling, but I didn't -- you know, it's not like I interrogated him about it.
**Q. And going back to what we've marked as Exhibit 4 to your deposition, is there anything else in this article that influenced or changed your opinions and conclusions from the first report to the second?**
A. We're back on Hyundai Halts Production as Sonatas Dip?
**Q. Yes.**
A. No.
**Q. Okay. Now, if you would, turn to what we've marked as your Deposition Exhibit Number 5, an article entitled Hyundai's Genesis Targets Luxury Market. Did anything in that article influence or change your opinions and conclusions from the time you prepared your first report to the supplemental?**
A. Well, what I was looking for was a trend that there would be more shutdown days, you know, to see if I needed to include some estimate of 10 shutdown days a year. So as far as changing my report, no.
**Q. Okay.**
MR. KILBORN: Wait. I think I've got your original because it's got blue marks there and I've

already marked on it.
A. That's fine.
**Q. Would it be fair to say that with respect to Exhibit 5, that it did not cause any change from your first report to your second?**
A. You know, I mean, it makes me uncomfortable to have a question couched like that because from report one to report two I'm trying to gather information to make a reasonable estimate of what his damage is, you know.
**Q. Sure. I guess what I'm saying, in trying to gather that information, is there any information in here that influenced your decision as to what his damages would be?**
A. Well, I guess if you ask it like that, yes.
**Q. What would that be?**
A. It influenced me not to make a projection of plant shutdown days going forward.
**Q. Anything else?**
A. I don't believe so.
**Q. Okay. Now, let's look at Exhibit Number 6 which also appears to be an Internet article entitled State Lures Good Jobs but Companies Worry About Workers.**
A. Right.

**Q. Do you have that?**

A. Uh-huh.

**Q. And, again, similar to the questions I asked about the other ones, is there any information in here that influenced your thinking or changed your thinking from the first to the second report?**

A. I guess it gave me information as to what employers like Hyundai look for when they move into a state.

**Q. And anything else?**

A. No. I think that's about it.

**Q. Did that have any impact on your calculation of Mr. Dees's damages?**

A. Other than as an educational tool for me in forming my opinion.

**Q. Okay. That's what I'm trying to figure out. How did it help form your opinion as to what his damages are?**

A. Helped educate me about Hyundai in Alabama and, I guess, how they hire, you know, what they're looking for.

**Q. Okay. And did it provide you any other information other than that?**

A. No.

**Q. Then, now, let's turn to Exhibit 7 which appears to be Hyundai Motor America, Hyundai Motor Finance Company Summary of Benefits and Programs.**

A. Uh-huh.

**Q. And was this something you had only after you had prepared your initial report?**

A. No. I had it before.

**Q. Okay. And would this be what's identified in, I guess, the supplemental report as listing of evidence reviewed number 13?**

A. Yes.

**Q. Okay. And it appears that this says it's for Hyundai Motor America and Hyundai Motor Finance Company; is that correct?**

A. That's right.

**Q. Did you believe at the time or presently that this was a summary of the benefits that Mr. Dees was receiving at Hyundai Motor Manufacturing Alabama?**

A. No, but I used it as a tool to compare the information that I had.

**Q. Okay. Anything particular about that comparison that influenced your conclusion as to the amount of his**

**damages?**

A. I guess I could give you the same response as before. I was just trying to learn about the company, learn about the benefits they offered, that kind of stuff.

**Q. Okay. Did you review a summary of benefits and programs similar to this that had to do with Hyundai Motor Manufacturing Alabama?**

A. I believe that was provided in the information that was discovered, discovery documents.

**Q. But I'm assuming you didn't see a similar summary like what we've marked as Exhibit 7 specifically related to Hyundai Motor Manufacturing Alabama?**

A. I don't recall.

**Q. Okay. What you had marked as number 12, HMMA employment in your listing of evidence reviewed, at least on Deposition Exhibit Number 2, was that included in what we've just been looking at anywhere?**

A. I don't see it. It may still be in the file.

**Q. Do you know if you have it?**

A. I should have it. It should be in there.

**Q. Can you check?**

MR. KILBORN: What number are we looking at?

A. 12, I think.

**Q. And, similarly, there was the workingfilms.org article.**

A. I think we already covered that one. That's the stuff about Carolina and -- Unless it's down in there, I don't see it, but we can print it off the Internet. I know exactly where it is. It basically talks about maintenance employers -- or employment.

**Q. And do you recall generally what it says about maintenance employees or maintenance?**

A. It talks about what the compensation is.

**Q. Okay. And was it consistent with the information you received from Mr. Dees or through discovery in this case?**

A. Well, it was but I understand in talking with Mr. Dees in the supplement or while getting the supplement ready that he understands that his wage now would we higher. He believes that it's 27.05, if my memory serves me correctly.

**Q. And Mr. Dees provided you that information?**

A. He did.

**Q. And what was that based on?**

A. I think he had a conversation with a former

co-worker.

**Q. Do you know who he had spoken to?**

A. I don't.

**Q. Now, I noticed in your supplemental report on Page 6 of what we've marked as Defendant's Exhibit Number 2, it looks to me like the first supplemental report was there on about the sixth line down in paragraph 17 where you indicate Mr. Dees was scheduled to receive a raise to $27.05 per hour in November 2007.**

A. Right.

**Q. Is that what you're referring to?**

A. It is.

**Q. And am I correct that that information is based on something that Mr. Dees told you that he learned from somebody that was working at the plant?**

A. That's correct.

**Q. And am I correct that you're not sure who that individual is?**

A. That's correct.

**Q. And am I correct -- I assume, obviously, then, you haven't talked to that person or reviewed any written statements from that person?**

A. I have not.

**Q. Do you have any other information about where that information came from or the veracity of that information?**

A. No.

**Q. Okay. It appeared to me that, based upon the summary and conclusions that you've included in your initial report and your supplemental report, that the loss of wages and benefits to trial and the loss of wages and benefits from trial through work-life expectancy, in paragraphs 12 and 13 on either of those, are different. The numbers are different.**

A. Yes.

**Q. Is that difference related to this increase in wages that you've estimated?**

A. The 27.05.

**Q. To be 27.05 in November 2007?**

A. To some extent.

**Q. Other than that increase in the expected wage rate in November 2007, what else accounts for the difference there?**

A. You know, again, that's a pretty general question. I guess, if I cover the big stuff -- or do we want to go through --

**Q. Let's cover the big stuff first.**

A. Okay. Well, the main stuff centers around his -- the amount of time that he is available for regular hours. So the stuff we were talking about earlier, we talked about the 2,000 hours, you know, 2,080 that would be 52 weeks times eight hours times five days a week. You know, at the time, in the first report, Mr. Dees was unsure exactly -- you know, when I questioned him about the number of hours that he had, he was not sure exactly what they, you know, what the difference was, you know. He said that he thought he had some information from where he kept records of when he was working and what he was doing that weren't available through the first report but came available through the second report.

**Q. Okay. And that information just showed how much he was actually working at International Paper, or what did it show?**

A. It gave an explanation of the number of hours he had at Hyundai in 2006.

**Q. And what was the information he provided you?**

A. A schedule.

**Q. And was there a -- I mean, did you receive a**

**copy of the schedule?**

A. I did.

**Q. And is it included as an exhibit in your supplemental report?**

A. It's not.

**Q. And do you have a copy of that schedule?**

A. I do.

**Q. Do you mind getting a copy of that so we can make it an exhibit?**

**(Whereupon, an off-the-record break was taken, after which the following occurred:)**

**(Defendant's Exhibit 8 marked for identification and attached hereto.)**

**BY MR. HALL:**

**Q. We're back on the record, Mr. Hall, and I'm looking at what we've marked as Deposition Exhibit Number 8.**

A. Right.

**Q. Before we took a break, we talked about a schedule that you had been provided, and is this in fact the schedule?**

A. It is.

**Q. I see down at the bottom, it says from Leon. Is**

**that your handwriting?**
A. It is.
**Q. And I'm assuming this was received from Leon Dees?**
A. That's correct.
**Q. And did Leon Dees provide you any additional back-up information to explain how he got these numbers?**
A. No. He didn't.
**Q. And just explain this to me. What am I looking at here?**
A. You'll see where he's marked his drills on the weekends, but then the regular time there was 11 days, I guess, the week that ends the 27th where he's got a Friday he's gone, and then he's gone from the 6th through the 13th to summer camp.
**Q. You're talking about February 27th?**
A. I am.
**Q. Okay.**
A. For 11 days, and then you can see down here on the line that's 29 May, he had weapons drill for three days, and then he had some other drill down here from 11 September through 18 September where he had another eight days. So I was able to -- from looking at this, I was

able to determine -- it kind of filled a gap that was left in the payroll records because it identified that he was on duty during these days.
**Q. Okay. Just so I -- you have your original here?**
A. I do.
**Q. Do you mind -- I just want to make sure I understand, sort of, since we're not looking at color copies, and I know some of this in the original would be red, some would be green or a turquoise color. Do you mind grabbing the original just so I can take some notes on my color copy?**
MR. KILBORN: We may have a color copier here. You want me to ask?
MR. JOHNSON: Yeah, just for the sake of the record. It would look better.
(Whereupon, an off-the-record break was taken, after which the following occurred:)
BY MR. JOHNSON:
**Q. Mr. Hall, we're back on the record. I'm looking at what we've marked as Exhibit 8 but also at the original that you have which is actually in color so we can kind of figure out what the colors are here. It looks like, if I'm reading the legend, you've indicated**

**that some were going to be in red. Red says "short" here. What is that?**
A. Actually, I think it's a legend but I don't know that any show up as red.
**Q. Okay. And you've got holiday overtime shows up in yellow, correct?**
A. I believe so.
**Q. So that would basically be January the 2nd, January the 16th, 11 hours during the week of the 10th, eight and a quarter hours the week of July the 3rd, and then during the week of December 25th of '06 you've got 12 -- basically, got 32 -- well, you got 40 and a quarter hours that week, correct?**
A. That's what it appears.
**Q. Okay. And then you've also indicated on your legend in sort of a rose or pink color, I assume that's personal time?**
A. I believe so.
**Q. And that looks like we've got eight hours on the week of February 27th, eight the week of April the 10th and eight the week of April the 17th.**
A. Right.
**Q. And then you've also indicated in your legend --**

A. It's not my legend.
**Q. I'm sorry. His legend, you're right. Vacation time shows up as turquois, and it appears the vacation time is the eight hours during the week of February 6th, eight hours during the week of April 24th, I guess the entire week of June the 5th, eight hours the week of June 19th, eight hours during the week of August the 7th, four hours during the week of September 25th, and then an additional 12 hours during the week of December the 4th. Is that accurate?**
A. That's what it appears from the schedule.
**Q. Okay. And then on the legend it also shows paid in -- I guess that's bright green. What does that indicate?**
A. I'm not sure. I really wasn't interested in anything but trying to identify the time here that, you know, constituted the difference between 2,080 and the amount of work hours, regular hours that he had.
**Q. And it shows drill in tan; is that correct?**
A. Uh-huh.
**Q. And that time shows up the week of January the 2nd, the week of January the 30th, and does it show from Friday the week of February 27th all the way through the**

end of the week of March 13th?
A. It appears to.
Q. And an additional drill on Saturday during the week of March 27th?
A. Yes.
Q. And then two days on Saturday, Sunday, the week of April 24th of 2006?
A. Yes.
Q. And then from Wednesday through Sunday the week of May the 29th?
A. Yes.
Q. And then Saturday and Sunday, the week of July the 3rd?
A. Yes.
Q. And then it looks like he's got drill beginning on Saturday during the week of September 4th that goes all the way through Wednesday, the week of the 18th?
A. Yes.
Q. And that would be all that shows up on this sheet?
A. That's correct.
MR. KILBORN: What color is that?
A. Tan.

49

MR. JOHNSON: Tan.
Q. And you said that what was significant about this in terms of your calculations was the comparison to 2,080 hours, correct?
A. Yes.
Q. Tell me -- and I see there's a total here at the bottom 2,516?
A. Yes.
Q. Was that the significant figure for you?
A. No.
Q. Tell me sort of how you applied this table to your comparison to 2,080 hours.
A. Well, you know, it was obvious that in 2006 he only had X number of regular hours, 18 hundred plus or minus, and, again, the way the schedule came about was I asked Mr. Dees, you know, how come you only had 18 hundred and some odd hours, and he said I don't know. I don't remember the exact conversation but, you know, he couldn't pinpoint exactly the reason, but he did offer the schedule. You know, what the schedule told me was the reason why he didn't have those hours.
Q. Why he didn't have more than the 18 hundred something?

50

A. Exactly.
Q. And based on this schedule, did you recalculate the number of actual hours that he would have worked had he not been on Uniform Services duty?
A. Would you ask that again?
Q. Well, I guess, when you saw this chart that we've marked as Exhibit 8, you then figured out when he's on drill and when he's actually working?
A. Right.
Q. And how much he actually did work, i.e., the 18 hundred something hours.
A. Right.
Q. What then did you do with that information?
A. I used it to project the number of regular hours.
Q. Okay. And where does that show up in your report?
A. Would you like to start on the Hyundai side?
Q. Sure.
A. Exhibit 5, Page 2 of 2.
Q. This is in your supplemental report we've marked as Defendant's Exhibit 2 for the depo?
A. Exactly.

51

Q. Is this, what you've marked as Exhibit 5, is this different from anything you had in your prior report?
A. Yes.
Q. And did you have a similar chart in your prior report?
A. I did.
Q. Which one was that?
A. Can I have this back? Are you done with it?
Q. Hang onto it for now. I'm looking at exhibit 5 in your initial report, and it appears to be entitled Earnings But For, which is the same as the title of exhibit number 5 in your supplemental report.
A. Right.
Q. So are these the two we need to be comparing? Are these essentially the same report, just different numbers?
A. Yeah. We had more history for -- you know, so it's not the same report. I mean, I guess we'll get to the differences.
Q. It looks to me, when I compare the original exhibit 5 with the supplemental exhibit 5, that the projected number of hours of regular work that he would

52

**have had for the period from March 20th of 2007 through the end of 2007 is actually projected to be less than in the initial report, or is that the actual hours?**
A. You say from the 9th of January through the 6th of February -- I mean, 6th of March?
**Q. March the 20th. You've got a line here on exhibit 5 that's underneath --**
A. That's the actual hours that he -- that's his Hyundai pay, the actual through the time he was terminated.
**Q. So if you look at the most recent exhibit 5, the actual hours he was paid is where?**
A. Totals actual.
**Q. And that's the 284 hours?**
A. That, plus the personal, the vacation and the holiday. It doesn't include the unpaid military. But then the rest of it is actual. I mean, the calculation doesn't include it. It was noted on one of the paychecks, though.
**Q. And just below totals actual it says projected?**
A. Right.
**Q. And then sort of the next column over, it says 3/20/2007 through 12/25/2007. Do those two go together?**

53

**Is that part of the projected?**
A. That's projected for the period post-termination. It's kind of a subtotal, bear in mind.
**Q. Would it be fair to state that, based on the additional information you received after you prepared your initial report, you estimated that his regular hours would actually be somewhat less?**
A. I did. What went in there were the actual hours, regular hours that he worked in his subsequent employment.
**Q. Okay. I guess I'm not understanding. The 1,428 regular hours, is that what he actually did work in 2007 from March 20th to the end of the year?**
A. Yes. If you net the two, that's what he actually worked.
**Q. So would it be fair to state that's not really a projected number, that's an actual number for 2007?**
A. That's the actual number he worked. Now, the overtime is projected.
**Q. And show me where that is.**
A. It's in OT 1.5, OT 2.0 on that same line.
**Q. And the OT 1.5 is 486.84 hours?**
A. That's correct.

54

**Q. And that would be just regular overtime at time and a half?**
A. That's correct.
**Q. And then OT 2.0 is 190.21 hours?**
A. That's correct.
**Q. Would that be holiday overtime?**
A. That's correct.
**Q. And tell me what -- In the supplemental report here under exhibit 5, you've got -- looks like it says recalculated amount column.**
A. Yeah.
**Q. And in the newer version, you've got the recalculated amount in the projected section as $58,690.74.**
A. Uh-huh.
**Q. What does that figure mean? What is that figure?**
A. That's the calculation of the number of hours at the various rates.
**Q. The number of hours or the number of dollars?**
A. Well, yeah, based on -- That's how it's arrived.
**Q. And so are you estimating that he would have earned from March 20th, 2007 to December 25th, 2007**

55

**$58.690.74?**
A. Again, it's a subtotal. There's other calculations that come in to there that get to what's projected for 2007. That's certainly one step.
**Q. But that is a step towards calculating what he would have earned for '07?**
A. That's correct.
**Q. And then the next, under the recalculated amount, you've got an amount of $2,778.72. What is that amount?**
A. Those are the regular -- that's a number that adjusts for the raise that he was due to receive.
**Q. And that would be the raise to take place --**
A. It's noted in the report. May, I believe.
MR. KILBORN: What's the paragraph number?
A. 17, Page 6.
**Q. Okay. Similarly, the number below that is $983.38. Is that based on the subsequent raise he would have received in November of 2007?**
A. That's correct.
**Q. And then below that you've got an additional section that says October shutdown days. Tell me how that factors into your analysis there.**

56

A. Well, at the time, I had seen this information about the plant being shutdown, but I couldn't verify whether maintenance was working. So I adjusted his pay for those days, shy of the one day that we've discussed.

**Q. Am I correct that you actually decreased his expected pay based on those shutdown days?**

A. I did.

**Q. And am I correct that, at least, based upon your understanding of Mr. Moon's testimony, you would go back in and add that back in?**

A. It seems reasonable.

**Q. And then sort of the next to last row there you've got numbers appearing in the OT 1.5, OT 2.0 column?**

A. Right.

**Q. Tell me what those numbers are.**

A. We were talking about .2, weren't we?

**Q. I'm sorry? Yeah. These two numbers right there. It's a negative 32.23 and a negative 12.59.**

A. What I did was, 2006, for overtime and double time, I considered that as the base year. And since he had 1,748 hours worked of regular time, I felt it was reasonable to lower that down in proportion to the

regular hours he had worked in the current year.

**Q. Okay. So is that -- how did you make -- How did you determine the amount to lower it? You just looked at previous year versus actual year?**

A. That's correct.

**Q. Mr. Hall, did you prepare the initial report and the supplemental report?**

A. Yes.

**Q. And did anybody assist you in the preparation? Did you have any other accountants or other CPAs that aided you?**

A. I used some to check the math and read the content.

**Q. Okay. Who? People that work with you or for you?**

A. That's correct.

**Q. Now, if you look there at the, sort of, I guess, the final line in Exhibit 5 to your supplemental report which we've marked as Deposition Exhibit 2, you've got sort of highlighted in the square there $78,461.37.**

A. That's correct.

**Q. Tell me, what does that figure represent?**

A. That is the estimated earnings at Hyundai for

2007.

**Q. Okay. I guess it appears that Exhibit 5 carries over into the next page?**

A. That's correct.

**Q. And tell me what that second page shows. It looks like it has projections for 2008.**

A. It does.

**Q. Up at the top?**

A. Uh-huh.

**Q. And what is that, what you expect he would have earned at Hyundai for 2008?**

A. That's correct.

**Q. And is it your projection that for 2008 he would have worked 2,918 and a quarter hours? I'm looking at the total.**

A. Yes. I'm not sure if it has unpaid military in that total. I'd have to get a calculator out and make sure.

**Q. Okay. And then on that second line, it says earned through 3/31/08. Is that just to show what he would earn, projected earnings --**

A. At the date of trial.

**Q. Okay, but only for 2008?**

A. That's correct, to the date of trial.

**Q. So from January 1, '08 to 3/31/08?**

A. Right.

**Q. And then the next line would show what he would have earned after 3/31/08 through the end of 2008?**

A. That's correct.

**Q. And do you have any sort of similar calculations that show 2009, 2010, 2011?**

A. Let's see. No. I believe 2009 becomes the base year from that point forward.

**Q. What do you mean base year?**

A. Well, at that point -- from that point, the hours are -- you know, that's used as the projection, the wage projection for the remainder of his work life.

**Q. And when you say -- From what point, from March 31, '08 or end of '08?**

A. I think that's his -- I'm not sure I understand your question.

**Q. Let's take a step back and tell me what you meant by base year.**

A. The 2008 was -- All right. We come up with the $90,000, and that's applied to the rest of his work life, the total of his 2008 wages.

**Q. Okay. So you're looking at, on Page 2 of exhibit 5 to your supplemental report, the recalculated amount of $90,372.01?**
A. That's correct.
**Q. Are you suggesting that, sort of, the base rate for 2009 and years going forward would be that amount?**
A. I have.
**Q. Okay. Let me ask you this: Have you made any assumptions or assumed any facts that are not identified in either your initial report or your supplemental report?**
A. Could you be a little bit more specific?
**Q. Yeah. For instance, I'll just give you an example of what I'm referring to as an assumption. You indicate in your initial and supplemental report that his work-life expectancy would be 19 years from the point of termination. You also indicate that his earnings would have increased at a rate of .53 percent per year as a maintenance team member. You also indicate that his real earnings as a maintenance lead man, without regard to inflation, will increase at a rate of .15 percent a year?**
A. Right.
**Q. Are there any other similar assumptions that**

61

**you've made in calculating the actual numbers for his economic losses?**
A. That aren't disclosed in the report?
**Q. Yes.**
A. Not that I'm aware of.
**Q. You've indicated a work-life expectancy of nine years?**
A. Right.
**Q. And you've identified exhibit 8 as supporting that assumption. What is exhibit 8?**
MR. KILBORN: You said nine. You meant 19.
**Q. Did I say nine? Okay.**
A. Exhibit 8. Let's see. Okay. These are some statistical -- labor statistics or statistical information from the Bureau of Labor Statistics, and it provides work-life expectancies, you know, based on your race and education.
**Q. Okay. For his, it looks like there's an arrow drawn out somewhere near 19.1 which is circled, correct?**
A. Yes.
**Q. Is that the number you're focusing on for Mr. Dees?**
A. It is.

62

**Q. I notice this report came out in February of 1986.**
A. It did.
**Q. And, according to the title at the top of the page, it says table A-2, Life and Work-life Expectancies for Men by Race, 1979 to 1980. Are you aware of any more recent studies that discuss work-life expectancy?**
A. There are some other studies out there.
**Q. Okay. And do you know if they're the same as or different?**
A. One in particular that I looked at was a little -- you know, it was comparable. It had like 19.2, I think.
**Q. Was it a more recent study?**
A. It was a little bit more recent but this one is the standard.
**Q. Why is this one the standard?**
A. It's just the one that's accepted and relied upon.
**Q. Okay. And one question, and sort of my very brief comparison of the initial report and the supplemental report, I want to ask you a couple of questions about the differences between the two. It**

63

**appears that, at least with respect to your qualifications, experience and compensation, which is sort of the first section in the report, there aren't any differences between the two.**
A. That's correct.
**Q. Would it be also correct to say that the foundation section is not changed?**
A. I wouldn't think it's changed substantially.
**Q. Has it changed at all, to your knowledge? I know Exhibit 2 may have changed.**
A. Well, I mean, you know, there may be a word here and there, you know, to address the nature of the supplemental report.
**Q. But are you aware of any differences between the foundation section in the initial and the supplemental reports?**
A. No.
**Q. And, similarly, in the background understanding, in my brief review, I didn't see any differences between paragraphs one through 11 in the supplemental report as with respect to the comparable paragraphs in the initial report.**
A. I think they're the same.

64

**Q. In terms of the information you've included in your background and understanding, you've indicated some information about his high school?**
A. Right.
**Q. His guard service and his prior employment with HMMA and information about events that occurred while at HMMA.**
A. Right.
**Q. How were those significant to or incorporated into your ultimate conclusions about his economic damage?**
A. I think it was important for me to understand the background of his case.
**Q. Did that in any way influence the actual numbers you reached in terms of the amount of his economic damages?**
A. Are you asking me if because of his case I tried to skew the numbers?
**Q. No. I mean -- if I need to, I'll be happy to, but I'm assuming that's not the case.**
A. I don't understand what you're asking, then.
**Q. You've included information in here about him going to junior college and technical college but did not receive a degree.**

A. Right.
**Q. How did that impact the numbers that you ultimately arrived at? How was that significant?**
A. The amount of education, you know, it led, played into the calculation of his estimated future wages.
**Q. How so?**
A. Well, not as much as it would otherwise. I mean, he was able to go out and find additional employment, but it was something that needed to be understood and documented.
**Q. Well, did the fact that he attended junior college and technical college suggest that you would make any different assumptions than you did, or would that in any way impact the numbers either up or down?**
A. Not as much since he had current employment. Obviously, he learned what he's doing, you know, at this trade school, learned a lot about what he's doing.
**Q. Well, let's assume -- Well, strike that.**
**You've also indicated in here some facts that suggest Mr. Dees was, and I'm going to quote your words, "harassed," as used in paragraphs four and five. Is that information that you received from Mr. Dees?**

A. I believe it was in his complaint.
**Q. Okay. And I'm assuming you don't have any firsthand, personal knowledge of that yourself?**
A. No.
**Q. And the facts as alleged in paragraph four and in paragraph five also up to and including six and seven, how are those facts relevant to, or how did they impact your ultimate conclusions and opinions?**
A. You know, again, it's critical to my understanding of, you know, the background.
**Q. And why?**
A. Well, the same reason I read all those other documents that were provided. It's just factual -- you know, it's the background information available on Mr. Dees's case.
**Q. Would your opinions or conclusions be any different if he were terminated for any other reason?**
A. Say that again.
**Q. Well, you've included a lot of factual assertions in your report.**
A. Uh-huh.
**Q. That talk about harassment.**
A. Right.

**Q. Let's assume that he was terminated for an entirely different reason.**
A. Right.
**Q. Would your report be any different?**
A. I think it would probably -- you know --
**Q. Would the numbers be any different?**
A. Given all the other numbers? No.
**Q. Okay. And would it be fair to state that what you've indicated here in paragraphs eight and nine about the allegations against Mr. Dees for sleeping on the job -- did you receive that information and put it in your initial report based on the complaint?**
A. I did.
**Q. And anything else?**
A. Well, you know, some of it may have come from some of the other, you know, pleadings or whatever documentation I looked at based on the case.
**Q. I'm assuming you didn't have any --**
A. Firsthand knowledge?
**Q. -- firsthand knowledge.**
A. No.
**Q. And prior to preparing your report, were you at all familiar with the Uniform Services Employment**

**Re-employment Rights Act?**

A. I would say that I understood it generally. There have been a fair amount of folks that have gone to active duty and you hear in the news they're supposed to be provided a place when they come back. I guess certain employers have to provide a place of employment. I would say I have a layman's understanding of it.

**Q. In paragraph 10, you indicate that Mr. Dees was terminated in violation of the Act.**

A. Right.

**Q. When you say that it was in violation of the Act, is that based on any firsthand knowledge of the facts?**

A. Un-uh.

**Q. Is that a no?**

A. Just based on the -- you know, on his complaint and other information.

**Q. And was it based on any deeper understanding of the Act?**

A. Are you asking from a legal standpoint? No. You know, that's their area.

**Q. Okay. That's not your area.**

A. No. Mine is to make sure I have a background

69

understanding of what's going on in the case.

**Q. Okay. And it appears that the supplemental report is dated January 23rd, 2008; is that correct?**

A. It is.

**Q. And am I right that you read Mr. Moon's deposition after that time?**

A. That's correct.

**Q. And you anticipate preparing an additional supplemental report?**

A. If asked to.

**Q. Have you been asked to do so?**

A. Not as of yet.

**Q. Were you asked to prepare this supplemental report?**

A. I was.

**Q. At the time you prepared your initial report, you had indicated in paragraph 17 that you expected Mr. Dees would receive a pay increase to $24.58 in May of 2007 and then an additional increase to $25.94 in November 2007?**

A. That's right.

**Q. What did you base that on?**

A. Initially, Mr. Dees gave me that information,

70

and I believe it was also in that website listing that I didn't provide to you.

**Q. Did you review a copy of any sort of union contract or union agreement with International Paper?**

A. I'm not sure if it's a union contract. I do have some paperwork that was provided that has some rates. I think it was in the disclosure. I'm not sure if they've got it or -- but it was something that was provided to me and I have a copy of it.

**Q. Do you mind -- can you pull that, please?**

A. Uh-huh.

(Whereupon, an off-the-record break was taken, after which the following occurred:)

BY MR. JOHNSON:

**Q. Back on the record. Mr. Hall, we're back on the record. I'm going to go back and ask you some more questions about some of the assumptions we talked about earlier. We had talked about the work-life expectancy. Another thing you indicated here was that his real earnings as a maintenance team member would have been, without regard to inflation, would have increased at a rate of .53 percent per year as indicated in exhibit 4, part one to your supplemental report.**

71

**If I'm looking at exhibit 4, part one, tell me what I'm looking at. Is this a chart that you prepared or where does this information come from?**

A. The indexes come from the Employment Cost Index Historical Listing.

**Q. Now, is that index copied straight out, or is this something you repaired or your office prepared?**

A. I prepared it based on this.

**Q. So table six and table seven came from the Employment Cost Index?**

A. Yes, Bureau of Labor Statistics.

**Q. Did the Employment Cost Index have, like, these actual tables in there?**

A. No. They had the indexes in there. I took the changes between, you know, between the years and then came up with an average growth rate based on 10 years.

**Q. Okay. When you say that his earnings as a maintenance team member without regard to increase would have increased at a rate of .53 percent a year, is that simply an average of the percentage change shown in table six?**

A. It is.

**Q. From 1995 to 2005?**

72

A. Well, it's '96 but the first change is --
**Q. I'm sorry. You're right. Am I correct that the actual -- the change was actually negative in 2004 and 2005?**
A. That's correct.
**Q. And, actually, it was more negative in 2005 than it was in 2006 -- I mean, than in 2004. Sorry.**
A. That's right.
**Q. And is there any reason to conclude that it would not continue to go in a negative direction for 2006 or 2007 or going forward?**
A. I couldn't speculate to that.
**Q. Do you have any actual numbers for 2006 or 2007?**
A. I do not.
**Q. Have you seen any other information that would allow you to project actual numbers for 2008 or going forward from 2008?**
A. No, just the average that I've calculated here.
**Q. And do you know if the Employment Cost Index has information from any time after 2005 or has it been supplemented?**
A. Not that I'm aware of.
**Q. And when you say Mr. Dees's real earnings as a**

**maintenance team member would increase at .53 percent per year, when you say maintenance team member as opposed to in other places you refer to maintenance lead man, are you assuming that his work at Hyundai was as a maintenance team member?**
A. Yes.
**Q. And is his work currently as a maintenance lead man?**
A. At IP?
**Q. Yes.**
A. Yes.
**Q. And so, then, table seven in exhibit 4 to your supplemental report, part one of two, table seven, are you suggesting, would relate to his work as a lead man at IP?**
A. Yes.
**Q. So, in other words, those two numbers, the .53 and the .51 --**
**(Off-the-record interruption.)**
**Q. I'm sorry. We took a quick break there. Going back to what I was saying, the two numbers there, the .53 percent increases for maintenance team member and the .51 percent for maintenance lead man, do those two numbers,**

**respectively, show that, essentially, to break it down, that if he had remained as a maintenance team member at Hyundai, he would have gotten approximately .53 percent increases per year; whereas, at International Paper as a lead man it's increasing at slightly less, at .51 percent per year?**
A. That's right. There's some limitations to the second part of that that are noted in my report.
**Q. Okay. Meaning what?**
A. Well, his contract is frozen for a period of time, I think, 2012.
**Q. At International Paper?**
A. Uh-huh.
**Q. Is that a yes?**
A. Yes.
**Q. Since we're talking about it, let's go ahead and mark a copy of that contract.**
**(Defendant's Exhibit 9 marked for identification and attached hereto.)**
**Q. Mr. Hall, we've marked a copy as Exhibit 9. It's a labor agreement by and between International Paper Prattville Mill and the Paper, Allied-Industrial, Chemical, and Energy Workers International Union.**

A. Right.
**Q. Was this provided to you by Mr. Dees or his lawyers?**
A. Yes.
**Q. And when did you receive this?**
A. You know, I don't know. After the first report.
**Q. After the first report?**
A. Uh-huh. Before the second report was issued.
**Q. I guess I'm a little confused because in your initial report in paragraph 22 it suggests that Mr. Dees's International Paper compensation is governed by a union contract.**
A. Right. What paragraph are you on?
**Q. Paragraph 22 in your initial report. My assumption was that you were aware of and had reviewed the contract at that point. Is that not true?**
A. No. It wasn't available to me. This was from Mr. Dees.
**Q. Okay. So was the information that Mr. Dees provided to you that the union contract held his wages at $30.23 through 2012 just something he told you as opposed to what you reviewed in a contract?**
A. That's correct.

**Q. And upon reviewing the contract, was that accurate?**
A. Yes. Well, the hours are, the per-hour amount is correct.
**Q. Okay. In other words, his wage is going to be held at $30.23 through 2012?**
A. I believe that's a supplemental contract and this is the old contract.
**Q. Do you have the supplemental contract?**
A. I do not.
**Q. Did Mr. Dees have the supplemental contract?**
A. Not that I'm aware of.
**Q. Then --**
A. I think he's trying to get it.
**Q. Have you seen any documentation that suggests that his wages would be held constant through 2012?**
A. Shy of what he's told me?
**Q. Right.**
A. No.
**Q. But would it be fair to state that in coming up with the economic damages that are indicated in your initial and supplemental report, are they based on an assumption that he would not receive any actual wage**

**increases through 2012?**
A. Would you run that question by me again?
**Q. Sure. You've obviously calculated what you think his economic loss is going to be after the trial date.**
A. Right.
**Q. And am I correct that based on the information that Mr. Dees provided you, the amounts that you came up with assume that he's going to remain constant at $30.23 through 2012?**
A. Yes.
**Q. So your numbers don't reflect any actual income growth after 2012?**
A. Uh-uh.
**Q. Is that accurate?**
A. Not until after 2012.
**Q. Okay.**
MR. KILBORN: If Leon gets that contract, we'll give that to you.
MR. JOHNSON: Okay. If y'all could, because I'm sure he could get it.
**Q. Mr. Hall, if we look at the contract that we do have here that we've marked as Exhibit 9, it indicates,**

**exhibit A, wage rates begins on page 43 of the contract.**
A. Okay.
**Q. And if you look at the different wage rates, it appears that they have the wage rates based on different locales and maybe different work locations. On Page 41 it says Local 1978 Paper. Page 42, Local 1978 Shipping.**
A. Right.
**Q. My assumption is that Page 49 is the page that shows Mr. Dees's --**
A. I believe that's correct.
**Q. And there seems to be an arrow drawn out on the right-hand side of the row that says 9th level?**
A. Uh-huh.
**Q. Is it your understanding that Mr. Dees was a 9th level mechanic?**
A. Say that again.
**Q. I'm just trying to figure out where Mr. Dees fits on there.**
A. Well, I believe his wage rate is 25.88 at some point and moves up according to the schedule. So, yeah, and he's in the maintenance department. As far as the level that he is, I think that, you know, seems logical.
**Q. And what did you say his current wage rate is?**

A. I believe it's 27.99.
**Q. I noted in paragraph 19 of your supplemental report, it says for 2008 Mr. Dees expects to receive a pay increase to 27.99 per hour.**
A. Right.
**Q. And are the numbers, the calculations you've made to show his actual economic losses from now until trial date and then trial date going forward, do they account for that 27.99 wage rate or --**
A. He's moved up to 30.23, you know, at the time that he expects to get that increase. It's been adjusted for that increase.
**Q. Okay. You're looking at paragraph 19?**
A. Well, no, not really. Uh-huh.
**Q. Okay. If you would, look at paragraph 21 of your supplemental report.**
A. Uh-huh.
**Q. Tell me what you mean by "discount rate."**
A. Well, discount rate is used to take, in this case, an amount that would be required right now to cover his damage through the rest of, you know, the damage period. So, in other words, it's like taking X amount of dollars needed now to invest to provide a cash flow.

**Q. Okay. Equivalent to what he would have earned over time?**
A. Correct.
**Q. And I know you've used the 20-year Inflation Index US Treasury Bonds?**
A. I did.
**Q. To calculate that discount rate?**
A. Uh-huh.
**Q. And you indicate that the rate is 2.25 percent before income tax and 2.01 after tax?**
A. Yes, sir.
**Q. And is that current data still?**
A. It's through September 20th, 2007.
**Q. And do you know if those numbers have changed since September 20th?**
A. No.
**Q. You don't know or they've not changed?**
A. No, I don't know.
**Q. And how is it that you chose the 20-year Inflation Index Treasury Bonds?**
A. Because it matched his work life -- parallels his work-life period, generally.
**Q. I'm not referring so much to the length, the**

**20-year time period, but how did you fix upon treasury bonds, specifically? I mean, was there any magic to picking treasury bonds?**
A. Well, first of all, they're virtually risk free.
**Q. Are they virtually risk free or actually risk free?**
A. I think they're considered risk free, as risk free as risk free gets.
**Q. And would it be fair to state that other CPAs or other economists may use something other than US treasury bonds to calculate the discount rate?**
A. There are other US-treasury backed instruments that are used in common practice.
**Q. Such as what?**
A. Treasury bills, treasury notes.
**Q. Are there any other instruments other than US treasury-backed that would be used for the same purpose?**
A. I don't think it would be good practice.
**Q. And why is that?**
A. Because anything else is assuming risk and it's based on a risk-free return.
**Q. Okay. And why use a risk-free return?**
A. Because the Plaintiff, if he recovers these

damages, he's entitled to invest it risk free to insure his cash flow from his damages is secure.
**Q. I mean, would you agree that that's somewhat different than the actual work life which would not be risk free?**
A. Ask that again.
**Q. Well, I mean, if somebody in the ordinary course of -- Let's assume that he continued working at Hyundai for the rest of his work life. That work life could be 19.1 years or could be less, right?**
A. Uh-huh.
**Q. And things can happen in the interim that decrease your ability to work, correct?**
A. I guess there's a possibility of that.
**Q. Okay. And would it be fair to state that the discount rate you have provided for doesn't account for any of those real-life risks?**
A. No, it wouldn't be common practice.
**Q. And go to paragraph 22. You've used the term "growth rates on earnings." What do you mean by "growth rates"?**
A. Growth rate is the average without inflation, the earnings in those categories. There's a whole list

of categories. The categories that parallel Mr. Dees's occupations would increase.
**Q. So there, you're just referring to the numbers we spoke earlier, that .53 percent and the .51 percent?**
A. That's correct.
**Q. Then in paragraph 23 you talked a little bit about health insurance?**
A. Uh-huh.
**Q. Did you do any comparison of the health insurance that he had at Hyundai and the comparison of health insurance that he has at International Paper in any way other than just the amount that it cost Mr. Dees?**
A. I read both the coverages.
**Q. Did you factor in to, sort of, the level of coverages, the amount of deductibles, the type of coverage provided, what was covered, what was not covered in your economic calculations?**
A. No.
**Q. So what is your recollection about the current International Paper policy and the former Hyundai policy in terms of how they compared?**
A. My recollection, and, again, Mr. Dees indicated when we talked about it that the coverage wasn't as good.

**Q. At International Paper?**
A. At International Paper.
**Q. Did he give you any more specifics other than that?**
A. No.
**Q. In paragraph 25 you refer to long-term disability coverage?**
A. Right.
**Q. And I understand he got that at no cost from Hyundai?**
A. That's correct.
**Q. And that he pays 10.98 per week at International Paper for it?**
A. I'm not sure if he's enrolled in it or not. That's what it would cost if he was to get a similar coverage at IP.
**Q. Have you compared the two LTD policies?**
A. Again, they're relatively similar but the Hyundai policy is a little bit better.
**Q. Is that based on your actually reviewing both policies?**
A. I've read over them.
**Q. And when you say you believe Hyundai's is a**

**little better, how do you define that?**
A. Well, the amount of the coverage, should he become disabled, is a little bit higher.
**Q. What was the coverage under the Hyundai LTD policy?**
A. I don't remember.
**Q. Do you remember under the International Paper policy?**
A. Not off the top of my head.
**Q. And am I reading paragraph 26 correctly with respect to the 401(k), that essentially -- I mean, would it be fair to state that while there are differences, ultimately, they are similar enough to where there's no economic loss going from the Hyundai 401(k) to the IP?**
A. Right.
**Q. If you would, look at Exhibit 3 to your supplemental report.**
A. I got it.
**Q. The second to last column on the right-hand side that has numbers in it is entitled Lost Value, 2.01 percent; is that correct?**
A. That's correct.
**Q. Tell me what the 2.01 percent represents.**

A. That is an after-tax discount rate.
**Q. Okay. That's the discount rate that was referred to in -- Which paragraph was that?**
A. I don't remember.
**Q. Paragraph 21. Okay. And why do you use the after-tax rate there as opposed to the 2.25 percent?**
A. It's adjusted for federal income tax.
**Q. Adjusted -- What do you mean by adjusted for federal income tax?**
A. The earnings he would earn would be subject to federal income tax, so it's common practice to adjust it and equalize it for that.
**Q. When you say "earnings," are you referring to earnings if he had actually worked at Hyundai?**
A. Well, the difference between the earnings that he would have earned had he not been terminated, less the earnings that he's got now. Do I not understand your question?
**Q. Well, maybe I'm not understanding. I'm just trying to figure out what that Lost Value, 2.01 percent column reflects. Are you reducing what you expect his economic losses are going to be in that column?**
A. I'm reducing the -- yeah. I'm reducing the

discount rate.
**Q. Okay. So let me just -- to make sure I understand, if we looked at the row that's 12/31/08, it appears the total loss column says -- I'm assuming you're meaning that if you add up the earnings that he didn't earn, the benefits that he did not receive the benefit of, the total economic value of that is $12,894 as of the last day --**
A. Which one are you on? Are you on the first one or second one?
**Q. I'm looking at the wrong one. Let me start over.**
MR. KILBORN: What exhibit are y'all on now?
**Q. Exhibit 3 from the supplemental. If you look at that, my assumption is that if you add up all of the lost benefits and lost wages that you've calculated for 2008, at the end of that year, for the year 2008 his total economic loss would have been $19,859?**
A. That's right.
**Q. And my assumption is that you're assuming that as of May 31st, whatever the trial date is, you're trying to calculate how much money would we have to put in his pocket to insure that on 12/31/08 he has actually gotten**

$19,859. And that amount is $19,563?

A. Yes.

Q. Okay. And, similarly, if you go down to 12/31/2025, to insure that he earns for 2025 what you would expect to be his actual losses for that year, you would have to put in his pocket on the date of trial, assuming it was May 31, $17,316?

A. Which one are you on again?

Q. 2025.

A. Yes.

Q. So my assumption is that, and correct me if I'm wrong, but where you've indicated that his lost wages and benefits from the date of trial through the end of his work life is $351,928, that is just a calculation by year of how much he would have actually been out for that year, less the discount rate each year, and then adding up each of those individual numbers to reach that $351,928 there at the bottom?

A. Right.

Q. And there at the bottom, I'm assuming that the $375,961 is just the total of that future economic loss after trial of 351,928, plus what you've estimated his actual past loss to be through trial.

89

A. Uh-huh. Yes.

Q. Do you have clients complete some sort of in-take form or any form when you do this kind of work for them?

A. They don't complete an in-take form, no.

Q. And have you prepared any other reports other than the two we've marked as Exhibits 1 and 2 to your deposition today?

A. No.

Q. Any other correspondence related to this case that you prepared?

A. No.

Q. And do you anticipate preparing any additional charts or reports or, I guess, tables that you would use to explain to a jury Mr. Dees's economic loss?

A. I haven't anticipated that to this point.

Q. And, as I understand it, indicated in your report, it shows your rate at 120 an hour?

A. Yes.

Q. And have you provided either an expert opinion or deposition testimony or trial testimony in a similar case before?

A. No.

90

Q. Have you ever worked for Mr. Sport before?

A. No.

Q. Have you ever worked for Mr. Kilborn before?

A. Well, not other than in the capacity of, you know, being the CPA for one of his clients.

Q. Mr. Kilborn or Mr. Sport?

A. Both.

Q. You never provided expert testimony for either of them?

A. No.

Q. And when you say you were the CPA for their clients, you just mean you did their accounting?

A. Uh-huh.

MR. KILBORN: He just had to be at the wrong place at the wrong time.

Q. Have you ever given a deposition before?

A. No. This is my first one.

Q. Have you ever prepared an affidavit related to a lawsuit, any sort of sworn written statement?

A. Not that I recall. Not recently, if at all.

Q. Would it be fair to state that you've never testified against Hyundai Manufacturing or Hyundai Motor Manufacturing Alabama before?

91

A. No.

Q. And, similarly, with Hyundai Motor America?

A. No.

Q. Well, I think that's it. Appreciate it.

A. I'm glad to do it.

FURTHER THE DEPONENT SAYETH NOT.

92

CERTIFICATE

STATE OF ALABAMA )

COUNTY OF MOBILE )

I hereby certify that the above and foregoing deposition was taken down by me in stenotype, and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

____________________________

KATHLEEN F. CAVAZOS, CCR, RPR
NOTARY PUBLIC
MY COMMISSION EXPIRES:
12/4/11
ALABAMA LICENSE NO.: ACCR302

93