# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | |
|---|---|
| **JERRY LEON DEES, JR.,** | |
| **Plaintiff,** | |
| | **CIVIL ACTION NO.:** |
| **v.** | **2:07-cv-00306-MHT-CSC** |
| **HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, and HYUNDAI MOTOR AMERICA, INC.,** | |
| **Defendants.** | |

## DEFENDANT'S TRIAL BRIEF

Timothy A. Palmer (PAL009)
J. Trent Scofield (SCO024)
T. Scott Kelly (KEL053)
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail:  tim.palmer@odnss.com
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC  29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Vice Granted 05/15/07**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................... 1

II.    DEFENDANTS' STATEMENT OF FACTS........................................................ 1

    A.  Hyundai Motor Manufacturing Alabama, LLC .......................................... 1

    B.  Dees' Employment with HMMA................................................................ 2

    C.  Dees' Evidence of Alleged Harassment .................................................... 2

    D.  HMMA Terminates Dees' Employment..................................................... 4

III.    ARGUMENT ..................................................................................................... 5

    A.  Dees' Harassment Claim Fails As A Matter Of Law ................................. 5

        1.  USERRA Does Not Provide For A Claim Of Harassment........................ 5

        2.  Evidence Insufficient to Establish Hostile Work Environment Under USERRA ...... 6

        3.  HMMA is Entitled to the *Faragher-Ellerth* Defense……………………………14

    B.  Even If Plaintiff Proves His Harassment Claim, He Is Not Entitled To Any Monetary Damages........................................................................................ 15

    C.  Defendants Are Entitled to Judgment As A Matter Of Law On Plaintiff's Conversion Claim........................................................................................ 17

IV.    Conclusion ......................................................................................................... 18

i

## I.   INTRODUCTION

This Trial Brief addresses those of Plaintiff's claims that survived Defendants' motion for summary judgment. Plaintiff Jerry Leon Dees claims that Defendant Hyundai Motor Manufacturing Alabama, LLC ("HMMA") authorized harassment due to his military service in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301, *et seq*. ("USERRA").  Dees also asserts a conversion claim against HMMA.

Dees' harassment claim fails as a matter of law because USERRA does not provide a cause of action for such a claim and, even if this Court finds otherwise, Dees does not present evidence that the alleged harassment was severe and pervasive, and that the harassment was based on his military service.   HMMA also escapes any liability for the alleged harassment because it meets the *Faragher-Ellerth* standard of proof.  Even if Dees prevails on the merits of his harassment claim, he is not entitled to recover any monetary damages.

Dees' conversion claim fails as a matter of law due to the fact that there is no evidence HMMA ratified any conduct to support such a claim and HMMA's Locker Policy seriously undermines any claim Dees had a right to title and an immediate right of possession to any items allegedly left in his locker.

## II.  DEFENDANTS' STATEMENT OF FACTS

### A.      Hyundai Motor Manufacturing Alabama, LLC

HMMA manufactures automobiles and its principal place of business is in Montgomery County, Alabama.   HMMA is an equal employment opportunity employer and does not tolerate harassment in the workplace.

### B.    Dees' Employment with HMMA

Danny Blue, one of HMMA's Managers of Plant Engineering, interviewed Dees for a maintenance position at HMMA.  During the interview, Dees informed Blue that Dees was a member of and had commitments to the National Guard.[1]  Blue explained to Dees that no one at HMMA would have a problem with his National Guard commitments.  Indeed, HMMA has a Military Leave Policy that states HMMA will pay the difference between military pay and regular wages/salary for up to one month, which is not required by law.  HMMA's Military Leave Policy also requests employees to "notify their supervisors as soon as they are aware of the military obligations."

HMMA hired Dees as a Maintenance Technician assigned to the Stamping Department on or about November 21, 2005.  During his employment at HMMA, Dees' direct supervisor was Greg Prater.  Prater was also a member of the uniformed service.  Dees' Team Leader, was Kevin Hughes.[2]

### C.    Dees' Evidence of Alleged Harassment

HMMA does not tolerate harassment in the workplace.  HMMA's Anti-Harassment Policy states, "it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, *veteran's status, or any other unlawful basis*." (emphasis added).

Dees alleges Prater and John Applegate, HMMA's Senior Manager of Plant Engineering, harassed him while employed by HMMA.   Dees views Prater's assignment of Dees to clean the

---

[1] It is undisputed that Dees served in the Alabama Army National Guard and in Iraq.
[2] A Team Leader is not a supervisor or a member of management, but is responsible for directing the activities and job assignments for the Team Members in a specific area.

"pit,"[3] Prater's alleged requests for copies of Dees' military orders, Prater's alleged comments of Dees "partying" while on guard duty, and Prater's alleged instruction to a co-worker to falsely accuse Dees for a breakdown in production as evidence of actionable harassment pursuant to USERRA.

Dees also claims that after Sergeant Franklin Barnes, one of his military superiors sent HMMA a letter about his military duty, the harassment worsened. To date, HMMA has never received the original letter from Sergeant Barnes. However, there is no evidence to suggest that HMMA, Prater, or Applegate actually ever received or much less had knowledge about the existence of the letter until after Dees was no longer employed by HMMA. Indeed, HMMA first received a different communication (not the original letter) from one of Dees' subordinates in the military a few weeks after HMMA terminated his employment. Therefore, Dees' claims about worsening harassment as a result of the phantom letter are unsupported.

Also casting doubt on the veracity of Dees' allegations is his inability to recall any specific dates that Prater requested the military orders. Dees never received any discipline for failing to provide military orders, for attending guard duty, or for the breakdown in production incident. Even though Dees alleges he worked in the pit more than any other worker and the pit was dangerous, he has produced no admissible evidence to support these allegations.

As for Applegate's alleged harassing conduct, Dees focus appears to be on Applegate's support of Prater and Applegate's sole comment to Dees about "partying" while on guard duty. It is undisputed that Applegate never demanded military orders from Dees. Indeed, after Dees complained about Prater's requests for military orders, Applegate spoke with HMMA's Team

---

[3] The pit is actually at least two areas under HMMA's stamping press where scrap metal is moved on a conveyor to an area where it is crushed. Cleaning the pit involved picking up the scrap metal that fell off the conveyor and mopping any leaking oil from the stamping presses.

3

Relations Department[4] about the issue.  After learning from Team Relations that verbal confirmation of military orders was sufficient, Applegate explained the process to Prater.

Dees alleges he reported the "harassment" to HMMA's Human Resources Department on at least two occasions, and it failed to respond.  However, Dees' own words in an email dated February 6, 2007, to Greg Kimble, HMMA's Director of Human Resources, stated he had spoken to Human Resources twice previously with "positive results from both meetings," and requested a meeting to discuss apparently more recent issues. Dees claims he received no response from Kimble.  However, Kimble was on medical leave during this time period.

Clearly, at least on two separate occasions, HMMA responded to and remedied the alleged harassment to Dees' satisfaction.

### D.    HMMA Terminates Dees' Employment

On February, 26, 2007, Wendy Warner, HMMA's Employment Department Manager, informed Dees that HMMA had terminated his employment.  During this session, Warner provided Dees with a termination letter explaining that a member of management had observed him sleeping on the job and that such conduct violated HMMA's Serious Misconduct Policy. Warner informed Dees of this decision in HMMA's security building where all Team Member termination sessions are held.

Dees contends that HMMA confiscated his personal items that he kept in a locker on HMMA's property.[5]  In particular, Dees claims, when he was fired, the locker contained a jacket,

---

[4] HMMA's Team Relations Department serves as a regular resource for all Team Members and assists in workplace investigations.

[5] HMMA's Locker Policy defines Team Members usage of HMMA lockers and warns that the lockers should not be used to store money or valuables.  The Locker Policy also specifically states that HMMA is not responsible for anything destroyed, lost or stolen from the locker and the locker remains the property of HMMA at all times.

an MP3 player, personal tools, two or three military pay stubs, and handwritten notes in his HMMA locker.[6]

Dees' jacket, personal tools and his MP3 player were retuned to him before he left HMMA's premises on the date his employment terminated. Warner's normal custom during the termination process is to ask whether employees have personal belongings that need to be returned. During this conversation, Dees did not inform Warner that any notes or pay stubs were missing.

Warner also advised Dees of his right to participate in HMMA's peer review process if he desired to contest the termination decision. However, Dees failed to participate in this process.

### III.    ARGUMENT

#### A.    Dees' Harassment Claim Fails As A Matter Of Law

##### 1.    *USERRA Does Not Provide For A Claim Of Harassment.*

No federal circuit courts, including the Eleventh Circuit, or any district courts in the Eleventh Circuit have recognized a harassment claim pursuant to USERRA.[7] The statute does not specifically prohibit an employer from subjecting an employee to harassment or a hostile work environment due to the employee's uniformed service. *See* 38 U.S.C. § 4311(a)

---

[6] Dees also reviewed a list of smaller items that were his locker at the time of his termination and that were provided to Dees at his deposition. However, Dees stated that these items did not belong to him.

[7] Without addressing whether USERRA provides a claim for harassment, the Seventh Circuit found that plaintiff firefighters' own conclusory statements of alleged harassment alone were insufficient to establish a claim of harassment. *See Miller City of Indianapolis*, 281 F.3d 648, 653 (7th Cir. 2002) (affirming employer's summary judgment pursuant to doctrine of laches and recognizing that any harassment claims must be supported by evidence that conduct was sufficiently severe and pervasive to alter the conditions of employment and create an abusive work environment).

A review of the legislative purpose does not support liability for harassment claims under USERRA.  Congress enacted USERRA "to encourage people to join" the armed services, not "to combat an ignorant or vicious stereotyping of [members of the armed services] as undependable employees".  *Velasquez v. Frapwell*, 160 F.3d 389, 392 (7th Cir. 1998), *vacated in part on other grounds*, 165 F.3d 593 (1999) (citing *Monroe v. Standard Oil Co*., 452 U.S. 549 (1981).  As this Court has recognized, "USERRA's primary focus is not on negative opinions of certain groups but on the reality that employers may not want to hire employees who, as members of the armed services, could frequently be absent for long periods of time."  *Dees v. Hyundai Motor Mfg. Alabama*, LLC, 524 F.Supp.2d 1348, 1351 (M.D.Ala. 2007) (*citing* 38 U.S.C. § 4301(a)).  USERRA's goals, which include "encourag[ing] noncareer service in the uniformed services by eliminating or minimizing the disadvantage to civilian careers and employment which can result from such service" and "minimize[ing] the disruption to the lives of persons performing service in the uniformed services as well as to their employers," also do not reveal any specific protections from harassing conduct.  *Id.*

Based on the fact that no court in this Circuit has found a hostile work environment claim cognizable under USERRA, and given the fact that USERRA does not specifically mention or allow for such relief, it is HMMA's respectful position that Dees' USERRA harassment claim fails.

### 2.    *Evidence Insufficient to Establish Hostile Work Environment Under USERRA*

Dees cannot meet his burden to prove the conduct of which he complains is severe and pervasive as to establish a valid harassment claim.  To assert a hostile work environment claim under another federal statute, such as Title VII of the Civil Rights Act of 1964 ("Title VII"), as

amended, 42 U.S.C. §§ 2000e to 2000e-17 (1994 & Supp. 2003), a plaintiff must show that he was subjected to severe and pervasive harassment that materially altered the conditions of his employment. *See Baldwin v. Blue Cross Blue Shield of Ala.*, 480 F.3d 1287, 1301 (11th Cir. 2007) (setting forth *prima facie* case for harassment pursuant to Title VII). Therefore, for Dees to prevail on his hostile work environment claim, he must show, "that he was harassed because of his [military status], that the harassment was 'sufficiently severe or pervasive to alter the terms and conditions of employment,' and that there is some basis for holding the employer liable." *Baldwin.*, 480 F.3d at 1301 (citing *Walton v. Johnson & Johnson Servs.*, 347 F.3d 1272, 1279-80 (11th Cir. 2003); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000).

The severe and pervasive element is the one that "tests the mettle … of harassment claims." *Gupta*, 212 F.3d at 583. Courts are to determine whether an environment is sufficiently and objectively hostile or abusive by looking at all the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997).

Dees' claims lack sufficient frequency to establish severe and pervasive conduct. Even applying the most lenient standard, Dees cannot demonstrate that the few requests for military orders, jokes about guard duty, and the assignment to the "pit" over the course of a few months rise to actionable USERRA harassment.[8] *Baskerville v. Culligan Intern. Co.*, 50 F.3d 428 (7th

---

[8] An analysis of Title VII case law where continuous sexually related comments were made reveals that even if Dees proves the comments about his military service were frequent, the frequency alone would not establish the severe and pervasive standard. *See Knox v. Neaton Auto Prod. Mfg., Inc.*, 375 F.3d 451, 459-60 (6th Cir. 2004) ("continuously made sex-related

7

Cir. 1995) (where the alleged conduct was eight verbal comments and one hand gesture simulating masturbation, over the course of seven months); *see also Sasser v. Ala. Dep't of Corr*., 373 F.Supp.2d 1276, 1290 (M.D. Ala. 2005) (finding that four incidents in a nine-month period were not sufficiently pervasive); *Portera v. State of Ala. Dep't of Fin*., 322 F.Supp.2d 1285, 1290 (M.D. Ala. 2004) (finding that four, non-severe incidents over a six-month period were insufficiently pervasive). The "sporadic use of abusive language, gender-related jokes, and occasional teasing" do not give rise to a hostile work environment under Title VII. *Faragher*, 524 U.S. at 788.

Even if Dees establishes the frequency of the conduct, the requests for military orders, jokes about guard duty, and assignment to work in the pit are not severe and pervasive enough to sustain a hostile work environment claim under USERRA or in the Eleventh Circuit. *See Figueroa Reyes v. Hospital San Pablo del Este,* 389 F.Supp.2d 205, 213 (D. Puerto Rico 2005) (evidence that an alleged harasser participated unannounced on a conference call, requested that plaintiff give better notice of his military leave, and request that plaintiff train other employees fall so short of being harassment as to not warrant individual consideration); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-48 (11th Cir. 1999) (harasser allegedly said to plaintiff "I'm getting fired up," rubbed his hip against plaintiff's hip while touching her shoulder and smiling, made sniffing sounds on two occasions while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and harasser's "constant" following and staring at Mendoza in a "very obvious fashion" not sufficiently severe or pervasive). Other Circuits courts

---

comments, "such as commenting on different 'women's good looking behinds,' and talk about 'sleeping with different women . . .'" and frequent use of the "F" word were not sufficient to prove severe and pervasive sexual harassment).

also have held that far more egregious conduct did not meet the "severe and pervasive" standard. *See e.g., Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003) (finding that a disabled employee who was told by her employer that "she better get better this time" and that he would "no longer tolerate her health problems" was not subjected to a hostile work environment under the ADA); *Shepherd v. Comptroller of Public Accounts of Tex.*, 168 F.3d 871, 872-75 (5th Cir. 1999) (comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress), *cert. denied*, 528 U.S. 963 (1999); *McConathy v. Dr. Pepper/Seven-Up Corp.*, 131 F.3d 558, 564 (5th Cir. 1998) (finding that an employer's boorish behavior toward an employee regarding the slow pace of the employee's recovery from a disease, his reassignment of work away from her, and his insensitivity toward her need from surgery and time to recuperate was not sufficient as a matter of law to state a claim of hostile environment harassment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357, 361 (7th Cir.1998) (co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks), *cert. denied*, 528 U.S. 988 (1999); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work).

Courts have even refused to find physical touching in the sexual context to rise to the severe and pervasive standard, so clearly Dees' harassment allegations which involved no physical contact are insufficient are insufficient to establish this standard. *See*, *e.g.*, *Hilt-Dyson*

*v. City of Chicago*, 282 F.3d 456, 463-64 (7th Cir. 2002), *cert. denied*, 537 U.S. 820 (2002)

(claims where harasser allegedly "rubbed the middle of her back with his left and, … then slid

his hand to (plaintiff's) right shoulder and squeezed it," again "rubbed the middle of (plaintiff's)

back and touched her shoulder," and stared at the plaintiff's chest and required her to raise her

arms were insufficient to establish harassment claim because each incident was brief, and

involved "no other threats, intimidation, or humiliation."); *see also Carter v. Greenspan*, 304 F.

Supp. 2d 13, 25 (D.D.C. 2004) (no hostile work environment where plaintiff alleged that co-

worker caressed his knee, placed her breast on his arm, and placed her fingers on his buttocks);

*Valentine-Johnson v. Roche*, 238 F. Supp. 2d 911, 917 (E.D. Mich. 2003) (claim that supervisor

put his arm around plaintiff and stood too close to her did not rise to the level of severe and

pervasive harassment);  *Murray v. City of Winston-Salem*, 203 F. Supp. 2d 493, 498-99

(M.D.N.C. 2002) (allegations that supervisor made a suggestive comment to plaintiff, put his

arm around her, touched her thigh twice, and inappropriately stared at her do not establish a

hostile work environment); *Gillum v. Fed. Home Loan Bank of Topeka*, 970 F. Supp. 843, 852

(D. Kan. 1997) (no hostile work environment where plaintiff's supervisor leaned against her,

brushed his body up against her while breathing heavily in a manner suggesting arousal, brushed

up against her as he passed by her, brushed his pelvis against her as he squeezed past, and

touched her arms or hands in a "slow and meaningful" manner); *Shepherd v. Progressive Metal

Finishers, Inc.*, No. 01-B-2382-S, p. 9-10 (N.D. Ala. filed March 24, 2004) (not sufficiently

severe and pervasive when harasser touched plaintiff's "buttocks, back and breast," later touched

and stared at her breasts while she was working, touched her buttocks again and asked "what's

the going price," and made repeated "comments about her panties being too tight")[9]; *Stokes v.*

---

[9] A copy of the Memorandum Opinion is attached as Exhibit A.

*South Central Steel, Inc.,* No. 2:05-02226-LSC (N.D. Ala. filed July 27, 2007) (no evidence that the alleged harasser staring at the plaintiff's "breasts and/or crotch," rubbing "his front 'private area' twice against her buttocks," rubbing the front of his body against her side, repeatedly running "the back of his hand along [her] thigh" while explaining how to "run weights" and rubbing  "foot on her calf" were not physically threatening or humiliating to establish the severe and pervasive standard)[10];  *Embry v. M.C. Products, Inc.*, No. 02-HS-3167-M (N.D. Ala. filed September 23, 2005) (conduct based on sex but <u>not</u> sufficiently severe and pervasive when alleged harasser was constantly "blowing kisses," "licking his lips and staring," told stories about "date raping his own aunt" and being nicknamed "'Uncle Nasty Tongue' for the way he performed oral sex," talked about "screwing around with men" and how "an asshole is just like a pussy," said on "several occasions" that he "wanted to screw [plaintiff] up [his] ass" and promised that "I will fuck you.  I will fuck you up the ass just like I fucked your wife.").[11]

Dees' statements of subjective belief that Prater assigned him to more frequently clean "the pit" likewise do not constitute actionable harassment.  Applegate testified that this assignment was required for all Dees' co-workers.   Additionally, Dees' allegations that harassment was initiated and directed by Prater are negated by the undisputed fact that Prater **also** was a member of the uniformed services.  *See Elrod v. Sears & Roebuck, Co*., 939 F.2d 1466, 1471 (11th Cir. 1991) (same-actor defense).

Dees' statements that Applegate told Dees to "focus on his job," that Applegate gave Prater more respect for Prater's role in the military, and that Prater was Applegate's "boy" also do not rise to actionable harassment under any statute.  Courts have held that similar conduct,

---

[10] A copy of the Memorandum Opinion is attached as Exhibit B.
[11] A copy of the Memorandum Opinion is attached as Exhibit C.

including shunning or ostracism by co-workers and supervisors is insufficient to sustain a harassment claim. *See Wu v. Thomas,* 996 F.2d 271, 273 n. 3 (11th Cir. 1993), *cert. denied,* 511 U.S. 1033, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994) ("we cannot find any case that clearly established that retaliatory harassment, as opposed to sexual or racial harassment, could violate Title VII where the employer caused the employee no tangible harm, such as loss of salary, benefits or position"); *see also Williams v. City of Kansas City,* 223 F.3d 749, 754 (8th Cir. 2000) (supervisor's "silent treatment is at most ostracism, which does not rise to the level of an actionable adverse employment action"); *Munday v. Waste Management of North America, Inc.,* 126 F.3d 239, 243 (4th Cir. 1997), *cert. denied,* 522 U.S. 1116, 118 S.Ct. 1053, 140 L.Ed.2d 116 (1998) (yelling at the employee and telling others to ignore and spy on her does not constitute an adverse employment action); *Metclaf v. Metropolitan Life, Inc.,* 961 F.Supp. 1536, 1544 (D. Utah 1997) ([b]eing treated "almost contemptuously" by fellow employees, the "isolation treatment," and publicly criticizing an employee's work performance without just cause does not constitute adverse employment action by an employer); *Scusa v. Nestle USA Co., Inc.,* 181 F.3d 958, 969-70 (8th Cir. 1999) ("general allegations of co-worker ostracism" are not actionable); *Reynolds v. Golden Corral Corp.,* 106 F.Supp.2d 1243, 1255 (M.D. Ala. 1999) (shunning and not speaking to the plaintiff did not support harassment claim); *Kortan v. California Youth Auth.,* 217 F.3d 1104, 1112 (9th Cir. 2000) (finding that a supervisor who reacted plaintiff's complaint about him by being less civil, staring at her in a hostile fashion, and being more critical of her performance did not constitute an adverse employment action within the meaning of Title VII); *Ray v. Henderson,* 217 F.3d 1234, 1241 (9th Cir. 2000) ("[M]ere ostracism by co-workers does not constitute an adverse employment action") (citation omitted); *Drake v. Minnesota Mining &*

*Mfg. Co.,* 134 F.3d 878, 886 (7th Cir. 1998) (terms and conditions of plaintiff's employment were not affected by co-workers' shunning).

Likewise, Prater and Applegate's alleged comments about Dees "partying" and "drinking" while on guard duty are not actionable. *Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 78 (1998) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

USERRA does not punish intent alone. *See Maher v. City of Chicago*, 406 F.Supp.2d 1006, 1024 (N.D. Ill. 2006). To be actionable under USERRA, there must be an employment action, and it must be "materially" adverse, meaning more than "a mere inconvenience or an alteration of job responsibilities." *Id.*, citing *Ribando v. United Airlines, Inc.,* 200 F.3d 507, 511 (7th Cir. 1999). As the Seventh Circuit has explained, "a materially adverse change might be indicated by a termination of employment, a demotion evidences by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices that might be unique to a particular situation." *Id.*

The fact that HMMA never denied Dees any leaves of absence for military duty and Dees never missed any pay because of his military duty also negates any inference that the alleged harassment was severe and pervasive. *See Miller v. City of Chicago*, 281 F.3d 648, 653 (7th Cir. 2002) (claims of harassment are insufficiently severe and pervasive where, among other things, the court found "it is telling here that the fire department has not denied any requests by any of the plaintiffs for leaves of absence for military service).

Dees' harassment claims, standing alone, do not support a finding of liability under USERRA. Accordingly, Dees has failed to demonstrate that the totality of the circumstances at

13

HMMA to be sufficiently severe and pervasive to alter his condition of employment, thus barring his hostile work environment claim. *Mendoza*, 195 F.3d at 1246.

### 3.    HMMA is Entitled to the *Faragher-Ellerth* Defense

HMMA meets the *Faragher-Ellerth* standard of proof by establishing that: "(1) it exercised reasonable care to prevent and correct promptly any harassing behavior"; and (2) Dees "unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided." *Baldwin*, 480 F.3d at 1303.

It is undisputed that HMMA had policies against harassment in its Team Member handbook.  Here, the evidence clearly shows that Dees knew of the available options for reporting employee concerns as it is undisputed that Dees complained about Prater during his employment.  The more relevant analysis, however, requires a look at the matters of which he complained.

The evidence is undisputed that Dees did not report his allegations of Prater's alleged instruction to a co-worker to falsely accuse Dees for a breakdown in production, and Prater's alleged comments about Dees' "partying" while on guard duty.  Instead, it appears Dees complained that Prater requested Dees to provide a copy of his military orders.

Dees did not fulfill his obligation to avoid harm by reporting the above alleged conduct to HMMA.  Thus, his failure to report the alleged misconduct and to take advantage of the preventive, corrective opportunities provided by HMMA, is fatal to his case. *See Coates v. Sundoor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999).[12]

---

[12] *See also, Madray v. Publix Super Markets, Inc.*,  208 F.3d 1290, 1290 (11th Cir. 2000) holding that vague complaints to individuals not included in the employer's harassment complaint mechanism were an insufficient effort to utilize that procedure.)

Moreover, once HMMA learned of Dees' complaints, HMMA took appropriate and effective action.   Indeed, after Dees complained about Prater requesting military orders, Applegate spoke with HMMA's Team Relations Department about the issue.  After learning that verbal confirmation of military orders was sufficient, Applegate communicated this information to Prater.  Prater was also disciplined for requesting the military orders from Dees. HMMA's actions assured that the alleged "harassment" ended and are legally sufficient.  *Steele v. Offshore Drilling, Inc.*, 867 F.2d 1311, 1317-18 (11th Cir. 1989); *see Fleming v. Boeing Co.*, 120 F.3d 242, 246-47 (11th Cir. 1997).  Thus, HMMA is entitled to the *Faragher-Ellerth* defense.

**B.    Even If Plaintiff Proves His Harassment Claim, He Is Not Entitled To Any Monetary Damages**

The available damages under USERRA are discrete and well-defined.   The only compensable damages under USERRA are lost wages and benefits and injunctive relief.  *See* 38 U.S.C. § 4323(d) (1) (A)-(B).  These remedies allow a court to ensure that employers comply with the provisions of USERRA, and to make an employee whole when those provisions are violated. *See Woodard v. New York Health and Hosp. Corp.,* 2008 WL 728887, at * 20 (E.D.N.Y. Mar. 17, 2008).   USERRA also provides an additional "liquidated damages" remedy that can double a plaintiff's lost wages and benefits to punish an employer's willful misconduct. 38 U.S.C. § 4323(d)(1)(C). *Id*; *see also Schmauch v. Honda of Am. Mfg*., 311 F.Supp.2d 631, 635 (S.D.Ohio 2003) (explaining USERRA's remedial scheme).

USERRA does not provide for recovery of compensatory damages for mental anguish/emotional distress or for recovery of punitive damages.  *See Vander Wal v. Sykes Enters.*, 377 F. Supp. 2d 738, 746 (D.N.D. 2005); *Sutherland v. Sosi Intern., Ltd*., 2007 WL 2332412, at *2 (E.D. Va. Aug. 10, 2007).

It is important to note that USERRA draws its remedial scheme from the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. § 201 *et seq.* Similar to USERRA, the FLSA does <u>not</u> provide for punitive damages or compensatory damages for items such as pain, suffering, humiliation, or mental or emotional distress. 29 U.S.C. § 216(b); *See Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 935 (11th Cir. 2000); *Tombrello v. USX Corp.,* 763 F. Supp. 541, 546 (N.D. Ala. 1991). The FLSA also does not provide a cause of action for harassment.

In his Complaint, Plaintiff sought "compensatory and punitive and/or liquidated damages, reasonable attorneys fees and court costs under USERRA, 38 U.S.C.A. § 4323 (West 2007)" in connection to his claims for harassment and termination in violation of USERRA. Because this Court has found that HMMA lawfully terminated Plaintiff's employment and such action did not violate USERRA, Plaintiff cannot recover **any** back pay, wages or lost benefits. USERRA does not provide for the recovery of monetary damages for a hostile work environment.[13]

Accordingly even if Plaintiff prevails on his USERRA harassment claim, he would only be entitled to injunctive relief.[14]

---

[13] This Court in its Opinion issued May 21, 2008, cited *E.E.O.C. v. Massey Yardley Chrysler Plymouth*, Inc., 117 F. 3d 1244 (11th Cir. 1997) for the proposition that the Eleventh Circuit has recognized a harassment claim under the ADEA. However, in footnote 7 of the *Massey Yardley* opinion, the Eleventh Circuit stated "[N]either party questions, hence we do not actually decide, whether the hostile work environment doctrine developed in Title VII actions applies in an ADEA action, a question so far decided specifically by only one circuit court of appeals, the Sixth." *Id.* at 1249, n. 7. *Yardley Massey* also discussed the award of backpay due to the plaintiff's constructive discharge claim, and not because of any actionable harassment under the ADEA. Here, we are not faced with an unlawful termination or constructive discharge claim. Thus, Plaintiff cannot recover any monetary damages under USERRA for his harassment claim.

[14] However, Plaintiff failed to specifically plead a request for injunctive relief in his complaint and is likewise not entitled to recover any injunctive relief. *See Calderon v. Kansas Dept. of Social and Rehabilitation Services*, 181 F. 3d 1180, 1183-84 (10th Cir. 1999) (Plaintiff not

**C.     Defendants Are Entitled to Judgment As A Matter Of Law On Plaintiff's Conversion Claim**

Dees confines his conversion claim to two items: military pay stubs and his personal notes on his allegations of harassment.   After admitting that these two items have "no distinguishable face value or readily ascertainable market value" (Doc. 107 at p. 35), Dees argues that a jury should decide if the information was used in connection with stealing Dees' identity.   Absent from the record is any evidence that Dees has been a victim of identity theft. Additionally, Dees claims the notes would have added value to his lawsuit because it would have allowed him to be more precise about the alleged USERRA violation.   Again, this argument lacks any evidentiary support.

Moreover, Dees infers that it was Prater who took his alleged notes. (Doc. 107 at p. 33). Such an allegation, even if taken as true, fails to survive summary judgment applying Alabama law.   Under the doctrine of <u>respondeat</u> <u>superior</u>, it is well-settled that an employer is not liable for the intentional acts of its employee unless the acts were committed within the scope of the employee's employment or were done to further the interests of the employer.   *Joyner v. AAA Cooper Transp.*, 477 So. 2d 364, 365 (Ala. 1985).   Dees offers no evidence, other than his conclusory allegations, that HMMA authorized and/or ratified such alleged misconduct.   Absent such evidence, HMMA cannot be liable for such an alleged tort of conversion.   *See East Alabama Behavioral Medicine v. Chancey*, 883 So. 2d 162 (Ala. 2003) ("Acquiescence or ratification requires full knowledge or means of knowledge of all material facts.").

In order for these issues to reach a jury, Dees must first establish a <u>prima facie</u> case of conversion under Alabama law.   Plaintiff has failed to do so.   Plaintiff completely fails to address

---

entitled to equitable relief when she failed to expressly request prospective injunctive relief in her complaint or later in her suit to trigger she was entitled to relief).

HMMA's Locker Policy, which provides that Plaintiff had no expectation of privacy in his locker (where he left the two items in controversy). Thus, Dees fails to establish he had an immediate right of possession of the materials in the locker belonging to HMMA. *See Rice v. Birmingham Coal & Coke Co.*, 608 So.2d 713 (Ala. 1992) ("general or specific title and actual possession or the entitlement to immediate possession of the property" required to establish conversion); *see also Thompson v. Ford Motor Credit Co.*, 550 F.2d 256 (5th Cir. 1977) (To sustain an allegation of conversion, a plaintiff must be able to show a legal title and immediate right of possession.).

Additionally, Dees presents no evidence that HMMA destroyed (or authorized/instructed its employees to do so) the two items from his HMMA locker. Assuming arguendo that HMMA did possess the two items (which it denies), its mere possession alone is not sufficient to establish a *prima facie* case. *See L.L. Cardy v. Capital City Asphalt Co.*, 477 So.2d 350, 354 (Ala. 1985) ("The bare possession of property without some wrongful act in the acquisition of possession, or its detention, and without illegal assumption of ownership or illegal user or misuser, is not conversion.")

Accordingly, Dees' conversion claim fails as a matter of law.

### IV.     CONCLUSION

For the foregoing reasons, HMMA is entitled to judgment in its favor on Dees' USERRA harassment and conversion claims. Defendant respectfully requests that this Court enter judgment in its favor, dismiss this case with prejudice and award Defendant costs in defending this lawsuit.

Respectfully submitted this the 26th day of May, 2008.

/s/ J. Trent Scofield
Timothy A. Palmer (PAL009)
J. Trent Scofield (SCO024)
T. Scott Kelly (KEL053)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
Fax: (205) 328-6000
E-mail: tim.palmer@odnss.com
E-mail: trent.scofield@odnss.com
E-mail: scott.kelly@odnss.com

Matthew K. Johnson
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602
Tel.: (864) 271-1300
Fax: (864) 235-8806
E-mail: matthew.johnson@odnss.com
**Pro Hac Granted 5/15/07**

Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 26th day of May, 2008, I electronically filed the foregoing *Defendants' Trial Brief* on behalf of Defendant Hyundai Motor Manufacturing Alabama, LLC with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: W. Perry Hall, Vincent F. Kilborn, III, David Allen McDonald, Jeffrey R. Sport, T. Scott Kelly, Matthew K. Johnson, and Timothy A. Palmer.

<u>/s/ J. Trent Scofield</u>
J. Trent Scofield (SCO024)
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Tel.: (205) 328-1900
E-mail: trent.scofield@odnss.com

6335151.1

20

# EXHIBIT  A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

04 MAR 24  PM 2: 32

U.S. OF ALABAMA
N.D. OF ALABAMA

VALORIE ELAINE SHEPHERD,  }
  }
  Plaintiff,  }
  }
v.  }  CASE NO. CV 01-B-2382-S
  }
PROGRESSIVE METAL  }
FINISHERS, INC.,  }
  }  **ENTERED**
  Defendant.  }
  MAR 24 2004

<u>**MEMORANDUM OPINION**</u>

Currently before the court is a Motion for Summary Judgment filed by the defendant

Progressive Metal Finishers, Inc.  In her Complaint, plaintiff Valorie Shepherd has sued her

former employer, defendant Progressive Metal Finishers, Inc., alleging sexual harassment in

violation of Title VII of the Civil Rights Act of 1964, and invasion of privacy in violation of

state law.[1]  Upon consideration of the record, the submissions of the parties, and the relevant

law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be

granted.

I.  <u>**Factual Summary**</u>

Progressive Metal Finishers ("PMF") is a closely-held company; its primary business is

anodizing and finishing aluminum parts. (Doc. 32, Ex. 2 ¶ 2.)  PMF employs about 35 people in

Bessemer, Alabama. (*Id.*)  PMF anodizes and finishes aluminum parts as its primary business.

(*Id.*)  PMF has an anti-sexual harassment policy, which prohibits sexual harassment and sets

---

[1]Plaintiff also made claims for alleged retaliation and pay discrimination.  Plaintiff has
abandoned these claims. (Pl. Br. in Opp.'n to Def.'s Mot. for Summ. J. at 15.)

*38*

forth the consequences of engaging in such conduct. (Doc. 32, Ex. 2 ¶ 4; Doc. 32, Ex. 1, exs. 6, 8-10.)

Plaintiff was fully aware of PMF's anti-sexual harassment policy, as she signed the employee handbook indicating her receipt and understanding of the policy. (Doc. 32, Ex. 1 at 114-17 and exs. 8-10.) Plaintiff received sexual harassment training in 1998, during which she signed another acknowledgment indicating her receipt and understanding of the policy. (Doc. 32, Ex. 1 at 55-56 and ex. 6.) As of June 1997, plaintiff was aware that she could complain to Human Resources at PMF about any harassment problems and she could directly complain to Jason Turman, PMF's Controller and on-site Human Resource representative. (Doc. 32, Ex. 1 at 54-55; Ex. 2 ¶ 1.) Plaintiff also acknowledged she could complain to Ken Deaver, the President and Owner of PMF. (Doc. 32, Ex. 1 at 55.) Plaintiff testified she had a full understanding of the procedures for reporting sexual harassment; she stated in her deposition: "Well, report the person that's responsible for the sexual harassment. If the person is the manager of the person, you would go over his head." (Doc. 32, Ex. 1 at 55.)

Plaintiff's employment with PMF began in February 1995 as a temporary employee through Manpower, and continued until June 1995 when PMF permanently hired her as a racker. (Doc. 32, Ex. 1 at 46-48.) Plaintiff was a full-time, hourly employee on the day shift. (Doc. 32, Ex. 1 at 48.) Plaintiff's salary began at $6.50 per hour, and periodically increased through pay raises to $9.10 per hour at the time she left PMF. (Doc. 32, Ex. 1 at 38, 48, 142.) Her pay was never reduced. (Doc. 32, Ex. 1 at 142.)

Lab technicians at PMF regularly monitor the chemicals used in the anodizing process. (Doc. 32, Ex. 2 ¶ 6.) Eddie Pryor supervised and worked in the lab and racking area on the day

-2-

shift. (Doc. 32, Ex. 2 ¶ 6.)  In May or June 2000, one of PMF's full-time lab technicians, Val

Gostian, resigned (doc. 32, Ex. 1 at 50), requiring PMF to find an employee to assist the other

lab technicians on the day shift (doc. 32, Ex. 2 ¶ 6).  In July 2000, Turman decided to place

Shepherd in a newly created, split position of racker/lab technician. (Doc. 32, Ex. 1 at 107; Ex. 2

¶ 6.)  Plaintiff's new position required her to work about six hours per day racking, and spend

one and one-half hours performing other tasks in the lab. (Doc. 32, Ex. 1 at 80-81.)  While

working in the lab, plaintiff was not qualified, nor required, to perform skilled tasks such as

testing the acid cleaner, adding acid to the brite dip, filling the tanks, adjusting the levels in

recovery as needed, setting the parameters, cleaning up spills, determining the amount of water

usage, and performing tank draining. (Doc. 32, Ex. 2 ¶ 7.)  Full-time lab technicians Bill Irvin

and John Andrews performed these jobs, and Pryor had performed them at times as well. (Doc.

32, Ex. 2 ¶ 7.)

There were several instances of plaintiff not calling in to work when she needed to take a

day off for sick leave or for another reason. (Doc. 32, Ex. 1 at 84, 118-25; Ex. 2 ¶ 5.)  PMF's

policy allowed an employee to be terminated for three or more "no call, no shows." (Doc. 32,

Ex. 1, exs. 8-10.)  During her deposition, plaintiff admitted having at least six or seven "no call,

no show" incidents, and she received numerous written disciplinary actions warning her of

possible termination if she continued to fail to call in before she was absent from work. (Doc. 32,

Ex. 1 at 118-25 and exs. 11-16.)  On February 12, 2001, plaintiff received a disciplinary notice

when she failed to call or show for work on December 22, 2000. (Doc. 32, Ex. 1 at 124 and ex.

16.)  The notice was a "final notice," which stated that if plaintiff was absent from work again

without reporting it prior to work time, she would be terminated. (Doc. 32, Ex. 1 at 124-25 and ex. 16.)

Sometimes plaintiff called in when she was going to be absent, but, on numerous other occasions in 2001, she did not, including March 20-21, 2001, April 19-20, 27, and 30, 2001, and May 1-2, 2001. (Doc. 32, Ex. 2 ¶ 5 and ex. A.) Plaintiff testified she had called in during April 2001 to notify PMF she could not make it to work. (Doc. 32, Ex. 1 at 147-48.) Her telephone records indicate she did in fact occasionally call PMF. (Doc. 32, Ex. 3, exs. A-C; Ex. 4, exs. A-B; Ex. 2 ¶ 5 and ex. A.) However, those records also show she did not call in on April 19-20, 27, and 30, 2001, and May 1-2, 2001. (Doc. 32, Ex. 3 ¶ 4 and exs. A-C; Ex. 4, exs. A-B; Ex. 2 ¶ 5 and ex. A.) PMF recorded these absences as "no call, no show," absences, pursuant to its policy. (Doc. 32, Ex. 1, ex. 8 at 9; Ex. 1, ex. 10 at 6; Ex. 3, ex. A; Ex. 2 ¶ 5 and ex. A.)

On April 25, 2001, plaintiff went to work to pick up her paycheck, and she announced that she would return to work the next day. However, plaintiff failed to show up for work, and PMF treated her as a voluntary quit under its "no call, no show" policy. (Doc. 32, Ex. 1 at 125; Ex. 2 ¶¶ 5, 9.) When PMF employees have many "no call, no shows," they are deemed to have voluntarily quit under PMF's attendance policy. (Doc. 32, Ex. 1, ex. 8 at 9; Ex. 1, ex. 10 at 6; Ex. 2 ¶¶ 5, 10 and ex. A.)

While plaintiff was absent from work in April, PMF lost one of its major accounts, resulting in a layoff of approximately twenty-five employees–almost 50% of PMF's workforce. (Doc. 32, Ex. 2 ¶ 8.) As a result, PMF eliminated its night shift. (Doc. 32, Ex. 2 ¶ 8.) John Andrews, a lab tech supervisor on the night shift who had more seniority than plaintiff, was retained to work the day shift in the lab. (Doc. 32, Ex. 2 ¶ 9.) PMF reassigned plaintiff to a full-

time racking position, with no loss of pay or benefits. (Doc. 32, Ex. 1 at 140; Ex. 2 ¶ 9.)

Plaintiff's direct supervisor, Eddie Pryor, called plaintiff on April 25, 2001, to explain PMF's

restructuring decision. (Doc. 32, Ex. 1 at 138-40.) Due to her absences in April 2001, plaintiff

was not aware of the layoffs resulting from the loss of the account. (Doc. 32, Ex. 1 at 146.)

Plaintiff refused to move back into a full-time racker position, stating her left hand would

not be able to handle the work. (Doc. 32, Ex. 1 at 140.) To accommodate plaintiff, Turman

authorized Pryor to allow plaintiff to perform light-duty work, which included sweeping and

performing general cleaning duties for the same pay. (Doc. 32, Ex. 1 at 140-41.) Plaintiff

refused, and she never returned to work at PMF. (Doc. 32, Ex. 1 at 139; Ex. 2 ¶ 9.) PMF did not

formally terminate plaintiff. (Doc. 32, Ex. 1 at 146; Ex. 2 ¶ 5.)

In this lawsuit, plaintiff alleges her supervisor, Eddie Pryor, sexually harassed her. (Doc.

32, Ex. 1 at 68-82, 94-99, 106.) However, she only reported one incident of alleged harassment

which allegedly occurred on March 1, 2001, to PMF management. (Doc. 32, Ex. 1 at 60.) On

March 1, 2001, plaintiff fell on steps coming from the lab. (Doc. 32, Ex. 1 at 61.) She suffered

minor bruising, but told Turman she wanted to continue racking parts, which she did. (Doc. 32,

Ex. 1 at 61-64.) After about an hour and a half, plaintiff's back began to hurt, and she decided to

go to the plant office to request a medical slip to see a doctor. (Doc. 32, Ex. 1 at 67-68.) During

this walk to the plant office Pryor allegedly touched plaintiff. (Doc. 32, Ex. 1 at 70-71.) As she

and Pryor were walking from the racking area to the plant office (Doc. 32, Ex. 1 at 72) plaintiff

alleges Pryor touched her "on my buttocks, my back, my breast," and he said to her, "do it hurt

here, do it hurt there, do it hurt there." (Doc. 32, Ex. 1 at 60.) Pryor allegedly touched plaintiff

"softly" for ten to twenty seconds. (Doc. 32, Ex. 1 at 71.)

Once plaintiff reached Turman's office, she requested a doctor's note for her back, and Turman typed a worker's compensation claim form. (Doc. 32, Ex. 1 at 74-75.) Plaintiff also requested that Turman tell Pryor to "keep his hands off [her]." (Doc. 32, Ex. 1 at 58.) Plaintiff did not explain to Turman what Pryor had done, and she never said anything about sexual harassment: "I just asked him to ask Eddie to keep his hands off of me." (Doc. 32, Ex. 1 at 69, 74-75.)

Plaintiff stated in her deposition that (1) Pryor touched and stared at her breasts on one occasion in March 2001 in the lab while she typed a report, but admitted that it was possible Pryor was looking at what she was typing and not at her breasts (Doc. 32, Ex. 1 at 96); (2) in March 2001, when plaintiff was mixing paint, Pryor allegedly touched her buttocks and asked her, "what is the going price" (*Id.* at 81); and (3) at different times during her employment, Pryor allegedly made comments about her panties being too tight (Doc. 32, Ex. 1 at 89-90). Although plaintiff knew of PMF's sexual harassment policy, she never reported any other alleged sexual harassment to PMF management.[2] (Doc. 32, Ex. 1 at 55-57, 90, 93-94, 99-101, 106 and ex. 6.)

In her deposition plaintiff acknowledged the workplace was generally "good," and employees often told jokes, including some with sexual content that she thought were funny. (Doc. 32, Ex. 1 at 88-89.) Plaintiff also testified she did not think sexual jokes told by Pryor and others were inappropriate. (Doc. 32, Ex. 1 at 88.)[3]

---

[2]Plaintiff testified that other employees witnessed the paint mixing incident and the panties comment. These witnesses deny having personal knowledge of any such conduct by Pryor. (*See, e.g.* Doc. 32, Ex. 9 ¶¶ 5-8; Ex. 5 ¶¶ 5-7; Ex. 7 ¶¶ 5-8; Ex. 6 ¶¶ 5-8; Ex. 8 ¶¶ 5-8.) However, for Summary Judgment purposes, the court assumes these incidents occurred.

[3]Defendant offered evidence that plaintiff grabbed the buttocks of co-worker Willie Battle and referred to the size of Battle's penis, as well as the penis size of another employee,

-6-

In her amended complaint, plaintiff asserts a claim for quid pro quo harassment, contending that she was demoted and terminated because she refused to have sex with Pryor. (Doc. 5 ¶ 5.) Plaintiff did not make this allegation in her EEOC charge (Charge No. 130A11894). (Doc. 32, Ex. 1 at 24; Ex. 1, exs. 3-4.) In her deposition, defendant asked plaintiff about every alleged instance of harassment by Pryor, but she did not testify that Pryor demoted and/or terminated her because she refused to have sex with him. (Doc. 32, Ex. 1 at 105-06.)

The record before the court indicates that Turman, not Pryor, made decisions regarding plaintiff's pay and job assignments (Doc. 32, Ex. 1 at 106-07, 159). These included the decision to treat her unexcused absences as a voluntary quit under PMF's "no call, no show" policy, as well as the decision to reorganize the work force after losing a large account in April 2001. (Doc. 32, Ex. 2 ¶ 10.)

## II.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if

---

J.W. Laister. (Doc. 32, Ex. 5 ¶ 8; Ex. 7 ¶ 9.) Plaintiff denies these allegations and for purposes of summary judgment the court will assume the incidents did not happen. In any event, the evidence is not relevant, because the court does not get to the issue of whether any improper conduct was unwelcome.

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

III.    **Discussion**

    A.    **Sexual Harassment Claim**

        1.    **Hostile Work Environment Sexual Harassment**

Plaintiff contends Pryor's harassment of her created a hostile work environment. To establish a sexually hostile work environment, plaintiff must show she was subjected to sexual harassment "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Plaintiff must prove not only that she perceived the environment to be hostile and abusive because of her sex, but also that a reasonable person would perceive the environment to be hostile. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068 (2000)); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1981). Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment" such that an abusive working

-8-

environment is created. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). The Supreme Court has suggested using "common sense" to distinguish between unlawful and lawful conduct for sexual harassment purposes. *Id.* at 82 (explaining that common sense and the particular social context in which the action occurs will aid the court in deciphering what amounts to harassment).

When determining whether harassment is severe or pervasive, courts examine whether the conduct was objectively and subjectively severe or pervasive to alter the employee's terms or conditions of employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). In *Mendoza*, the plaintiff presented four categories of harassing conduct, including verbal comments, physical contact, noises directed toward plaintiff, and following and staring at plaintiff in an "obvious fashion." The court found the conduct fell short of being severe or pervasive enough to alter the terms or conditions of employment. 195 F.3d at 1247.

Here, plaintiff reported only one alleged incident to PMF management. As noted above, on March 1, 2001, Pryor, plaintiff's supervisor, was walking to the plant office with plaintiff when he allegedly touched her buttocks, back and breast after plaintiff complained of pain from falling down and injuring herself earlier in the day. Pryor asked, "do it hurt here, do it hurt there" each time he "touch[ed] her softly." (Doc. 32, Ex. 1 at 60, 71.) Plaintiff admits the incident only lasted between ten and twenty seconds. (Doc. 32, Ex. 1 at 71.)

It is clear that the alleged conduct of Pryor on March 1, 2001, standing alone does not constitute actionable sexual harassment under Title VII. However, plaintiff testified in other depositions to other acts of alleged harassment: 1) Pryor touched and stared at her breasts on one occasion in a lab while she typed a report; 2) on one occasion Pryor touched her buttocks and

-9-

asked "what is the going price;" and 3) at different times during her employment, Pryor allegedly made comments about her panties being too tight.

In evaluating whether alleged harassing conduct is sufficiently severe or pervasive, courts must examine: (1) the frequency of the conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely offensive; and (4) whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23; *Gupta*, 212 F.3d at 584; *Mendoza*, 195 F.3d at 1246. Even assuming all plaintiff's allegations, the conduct does not rise to the level necessary to establish a hostile environment based on plaintiff's sex. A reasonable person would not find it severe, it was not physically threatening or humiliating, and it did not unreasonably interfere with plaintiff's work performance. Because the alleged harassment was not, as a matter of law, sufficiently severe or pervasive to create a hostile work environment, defendant is entitled to judgment as a matter of law.

### 2. Quid Pro Quo Harassment

Although plaintiff asserts a quid pro quo claim in her Amended Complaint (Doc. 5), she did not assert this claim in her EEOC charge and questionnaire, nor did she assert any quid pro quo harassment claims in her deposition or brief. (Doc. 32, Ex. 1, exs 3-4.) Even assuming plaintiff had filed an EEOC charge alleging quid pro quo harassment, plaintiff does not refer to any tangible adverse employment action specifically tied to any alleged harassment. (Doc. 32, Ex. 1, ex. 4.)

### B. Invasion of Privacy

Plaintiff also alleges a state law invasion of privacy claim. Her claim is based upon the previously mentioned incident that occurred between she and Pryor while walking to the plant

-10-

office after she fell on March 1, 2001. Under Alabama case law, employers are liable for torts committed by their employees if (1) an employee acts within the line and scope of his employment, or (2) the employer ratifies, confirms, or adopts the employee's unauthorized wrongful conduct. *Sparks v. Regional Medical Center Bd.*, 792 F. Supp. 735, 748 (N.D. Ala. 1992) (citing *Moman v. Gregerson's Foods, Inc.*, 570 So. 2d 1215, 1216 (Ala. 1990)). Under Alabama law, sexual conduct by an employee is generally considered to be personal and not within the line and scope of employment. *Brewer v. Petroleum Suppliers, Inc.*, 946 F. Supp. 926, 933 (N.D. Ala. 1996) (citing *Doe v. Swift*, 570 So. 2d 1209, 1211 (Ala. 1990)). Assuming for purposes of this claim alone that Pryor sexually harassed plaintiff, Pryor's act was not within the line and scope of his employment, and PMF is not responsible for that act unless it ratified, confirmed, or adopted Pryor's act. There is no evidence that is did so. Based on the evidence before the court, PMF is not liable for invasion of privacy under Alabama law.

## IV.    Defendant's Request for Attorneys' Fees, Costs and Expenses

In defendant's briefs in support of its Motion for Summary Judgment, defendant states that it is entitled to an award of its costs, expenses and attorneys' fees. Defendant does not state whether it seeks fees against plaintiff, plaintiff's counsel, or both, and whether it seeks sanctions and/or fees pursuant to Rule 11 of the Federal Rules of Civil Procedure and/or pursuant to 42 U.S.C. § 1988. If defendant wishes to pursue its request for fees, it should file a motion on or before **April 19, 2004**.

V.    **Conclusion**

For the reasons stated herein, the court is of the opinion that no genuine issues of material fact exist and defendant is entitled to judgment as a matter of law. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this the 24th day of March, 2004.

**SHARON LOVELACE BLACKBURN**
United States District Judge

-12-

# EXHIBIT   B

2007 Jul-27  PM 12:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| STACY M. STOKES, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | 2:05-CV-02226-LSC |
| | ] | |
| SOUTH CENTRAL STEEL, INC., et al., | ] | |
| | ] | |
| Defendants. | ] | |

MEMORANDUM OF OPINION

I.    Introduction.

The Court has for consideration a motion for summary judgment, which was filed on April 16, 2007, by defendants South Central Steel, Inc. ("SCS"), and Roger Ricks ("Mr. Ricks"). (Doc. 29.) Plaintiff Stacy M. Stokes ("Ms. Stokes") has sued SCS and Mr. Ricks for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, invasion of privacy, assault, and battery. (Doc. 1.) Defendants have moved for summary judgment on all of Plaintiffs' claims. (Doc. 29.) The issues raised in Defendants' motion for summary judgment have been briefed by both parties and are now ripe for decision. Upon full consideration of the legal

arguments and evidence presented, Defendants' motion will be granted in part and denied in part.

Ii.    Motions to Strike.

As a preliminary matter, the Court will address the evidentiary motions filed in this action. Defendants have filed two motions to strike portions of the affidavits/statements of Stacy Stokes, Haley Wright, Eric Heaton, and Michelle Smith. (Docs. 38, 39.) In their motions to strike, Defendants identify specific statements they want stricken and argue that the testimony is conjecture, hearsay, conclusory, subjective belief, not reasonably based on personal knowledge, irrelevant, and/or inconsistent with prior deposition testimony. For the reasons outlined below, the motions will be denied.

Defendants allege that three statements in Stacy Stokes' affidavit conflict with her prior deposition testimony. In this circuit, "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984). An examination of each of

the disputed statements, however, shows that the alleged conflicts do not meet the standard outlined in *Van T. Junkins & Assocs.*

First, Defendants argue that Ms. Stokes' statement: "Around the same time, Mr. Ricks had also made an inappropriate comment about my appearance," contradicts her previous deposition testimony that listed only Mr. Ricks' question, "what are you good at?" as an instance of verbal sexual harassment.  (Doc. 38 at 8.)  Because Ms. Stokes' new allegation does not say what Mr. Ricks actually said about her appearance, it is not helpful—and this Court cannot say with any certainty that it contradicts previous testimony and/or creates any genuine issue of fact in this matter.

Defendants also contend that Ms. Stokes' assertion that Mr. Ricks "kept asking me over and over and over 'What are you good at?' [And, b]ased on his tone and inflection, it was apparent that he was asking this question in a sexually suggestive manner," contradicts her earlier testimony in which she described him saying "what are you good at?" twice and said she took the comment the "wrong way."  (Doc. 38 at 9.)  The Court notes, however, that on page 330 of her deposition, Ms. Stokes testifies that she "took [Mr. Ricks' question, 'what are you good at?'] to be sexual";

Page 3 of 27

therefore, no contradiction has been shown in that respect. And, to the extent Defendants argue that it matters whether Mr. Ricks asked the question two times or "over and over and over," there has been absolutely no indication that the difference is material.

Finally, Defendants move to strike the statement: "Mr. Ricks told me that my co-workers would be fired if they helped me with certain aspects of my job." Defendants argue that the allegation, raised for the first time in the affidavit, conflicts with previous testimony in which Plaintiff said that she had testified to everything in her deposition that she contended was retaliatory conduct. (Doc. 38 at 9.) However, in support of their motion to strike, Defendants have not pointed this Court to the page on which Ms. Stokes allegedly gave her "clear answer" to an "unambiguous question" that "negate[d] the existence of any genuine issue of material fact." Instead, Defendants cite to a portion of Plaintiff's testimony regarding sexually harassing conduct—not retaliatory conduct. (*Id.* (citing Pl. Dep. at 314-25).) Therefore, Defendants have not met their burden to show that Plaintiff's new statement should be stricken as materially inconsistent with prior testimony.

Defendants have also moved to strike the statements of previous SCS female employees who claim that they were also sexually harassed by Mr. Ricks in the course of their employment with the company. Defendants cite *Goff v. Cont'l Oil Co.*, 678 F.2d 593, 596-97 (5th Cir. 1982), as support for the proposition that the statements of former employees of SCS are not relevant to Plaintiff's discrimination claims. *Goff* is, of course, non-binding on this Court, and Defendants have not cited any Eleventh Circuit law on the subject.

In *Goff*, the Fifth Circuit Court of Appeals upheld the district court's decision to exclude as irrelevant the testimony of former employees regarding alleged discrimination by the defendant corporation. The Fifth Circuit noted that the plaintiff's claim was one of individualized discrimination, none of the former employees worked with the plaintiff in his division, none of the witnesses observed the incidents claimed by the plaintiff, and none of the individuals' testimony would have concerned the same supervisors complained of by the plaintiff. *Id*.

*Goff* is clearly distinguishable from this case. Here, Haley Wright and Michelle Smith have discussed the alleged sexually harassing actions of Mr.

Ricks as their supervisor and as sole owner of SCS—the only alleged harasser in this matter. Mr. Ricks has testified that he does not stare at women's crotches when he speaks to them (Ricks Dep. at 108); he does not yell, scream, or curse at his employees (*id*. at 118-19); and he has not rubbed his "front area" against the buttocks of his female employees (*id*. at 152). Ms. Wright and Ms. Smith have made statements to the contrary. At the very least, their testimony may be relevant as impeachment evidence.

To the extent Defendants argue that a declarant's testimony is otherwise irrelevant, lacking personal knowledge, conclusory, or improper in any other manner, the Court has noted and considered these characterizations. The materiality, relevancy, and potential admissibility of evidence at trial was carefully weighed by the Court during the summary judgment process. Immaterial evidence, irrelevant evidence, and other evidence that could not be reduced to admissible form at trial, *see Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999), was rejected by this Court when making its final decision on Defendants' summary judgment motion.

III.     Facts.[1]

Plaintiff Stacy Stokes began her employment with SCS in February 2004 as a receptionist.  At the time of her hire, Ms. Stokes' job duties included answering the telephone, receiving and transmitting faxes, general secretarial responsibilities, and running drawings and cut lists.

SCS is a heavy industrial steel fabricator that furnishes steel for commercial buildings.  At all times relevant to this action, SCS had fewer than one hundred employees.   Roger Ricks is SCS's president and sole shareholder.

Ms. Stokes alleges that within the first week of her employment, Mr. Ricks slid behind her in the copyroom while she was standing at a table and rubbed his front "private area" against her buttocks, even though there was sufficient room for him to pass by with no physical contact.  Less than a minute later, Mr. Ricks again stepped sideways behind her and rubbed the

---

[1]The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

front of his body against her. This time, Mr. Ricks said "excuse me." Although Ms. Stokes believed that the first contact may have been an accident, she became convinced after the second pass that Mr. Ricks' conduct was intentional.

Ms. Stokes did not say anything to Mr. Ricks about the copyroom incident; instead, she complained to a coworker, Mike Miller. Mr. Miller told her to speak with one of her supervisors: office manager, Kim Revis. While SCS had a general policy prohibiting "harassment" generally, the company did not have a specific policy regarding sexual harassment. Moreover, there was no policy or procedure written or provided to employees on how to report possible sexual harassment. When Ms. Stokes complained to Ms. Revis, the office manager suggested that Ms. Stokes wear less revealing clothing to work, and explained that in the past, Mr. Ricks looked down the front of her own low-cut blouse. Ms. Revis did not report Ms. Stokes' complaint to Mr. Ricks.

Plaintiff claims that on or around February 23, 2004, Mr. Ricks repeatedly brushed his hand against the outside of her thigh while she stood next to him in his office and he explained how to "run weights." Mr. Ricks

then asked her to sit next to him, which she did. Ms. Stokes claims that she subsequently felt Mr. Ricks' foot rubbing her calf, so she kicked him. Ten minutes later, she asked to be excused for an appointment, and she left the office. Ms. Stokes later told Ms. Revis about this incident, but again, nothing was done. Ms. Revis testified that she believed her conversations with Ms. Stokes were merely talks between two women, and she admitted she had no training on how to handle complaints of workplace harassment.

Plaintiff alleges that on a number of occasions, Mr. Ricks stared at her breast and/or crotch area. Ms. Revis, who has since left SCS, has also testified that Mr. Ricks stared at her breasts and that she joked with other employees that Mr. Ricks was a "crotch starer."

Ms. Stokes maintains that Mr. Ricks was verbally abusive. She admits that he was an "equal opportunity abuser" with regard to yelling and cursing at the employees, but testified that he was kind to her until she rejected his alleged advances and kicked him. Plaintiff also claims that one day, when she sought help with a computer problem and told Mr. Ricks that she was not good with computers, he asked her, "well, tell me what you are good

at."  In light of the other incidents outlined above, Ms. Stokes interpreted this exchange as having a sexual connotation.

On March 11, 2004, Plaintiff's counsel sent a letter to SCS that demanded Mr. Ricks stop sexually harassing Ms. Stokes and threatened legal action for such conduct.   Eleven days later, on March 22, an office memorandum was issued requiring that all of Ms. Stokes' work be channeled through either Mr. Ricks or Ms. Revis.  Ms. Stokes was also ordered to direct any of her questions regarding accounting or computer issues to Mr. Ricks or Ms. Revis.  Plaintiff maintains that Mr. Ricks subsequently began criticizing her work and ignoring her requests for assistance or instruction.  Mr. Ricks, himself, testified that he began documenting Ms. Stokes' errors.  Plaintiff filed an EEOC charge alleging sexual harassment on April 13, 2004.

Over time, Ms. Stokes was asked to perform fewer and fewer tasks. SCS claims that Ms. Stokes made numerous errors in cut lists, but she composed cut lists (albeit, less of them) until the end of her employment with the company.  Ms. Revis testified that much of the work Ms. Stokes had performed, such as copying drawings and entering data, went to her while the plaintiff was left at her desk with little or nothing to do.  She also stated

that Mr. Ricks told her he wanted Ms. Stokes to quit.  After a time, Ms. Stokes' only real job duty was to answer the phone.

Plaintiff resigned from her position at SCS on September 7, 2004.  She filed an additional EEOC charge on December 28, 2004, which alleged unlawful retaliation and constructive discharge.

IV.    Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

V.    Analysis.

    A.    Title VII.

        1.    Sexual Harassment.

There are two kinds of Title VII sexual harassment claims: "(1) quid pro quo, which are 'based on threats which are carried out' or fulfilled, and

(2) hostile environment, which are based on 'bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000). In this case, Plaintiff alleges that she was subjected to a hostile work environment (Doc. 34 at 16), and Defendants have moved for summary judgment on that claim.

In order to establish a hostile environment claim based on sex discrimination, a plaintiff must show: (1) that she belongs to a protected group, (2) that she has been subject to unwelcome harassment, (3) that the harassment was based on her sex, (4) that the harassment was sufficiently severe and pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment, and (5) a basis for holding the employer liable. *Mendoza v. Borden Inc.*, 195 F.3d 1238, 1245 & 1248 n.5 (11th Cir. 1999); *see also Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497, 1502-03 (11th Cir. 1985). Defendants contend that they are entitled to summary judgment because: (1) any alleged harassment was not based on Ms. Stokes' sex, and (2) the alleged harassing conduct was not sufficiently severe and pervasive. (Doc. 30.)

The requirement "that the conduct complained of was 'sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment'[] is the element that tests the mettle of most sexual harassment claims." *Gupta*, 212 F.3d at 583 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere 'general civility code.'" *Id.* "Accordingly, a plaintiff must establish not only that she subjectively perceived the environment to be hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive." *Id.* (citing *Mendoza*, 195 F.3d at 1246; *Faragher*, 524 U.S. at 788). The Court believes that Ms. Stokes subjectively perceived her environment to be hostile and abusive; therefore, we examine whether that perception was objectively reasonable.

In this circuit, there are "four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246.  This Court "should examine the conduct in context, not as isolated acts, and determine whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment." *Id*.

The sexual harassment Plaintiff alleges in support of her hostile environment claim includes: (1) one occasion in which Mr. Ricks rubbed his front "private area" twice against Ms. Stokes' buttocks while passing behind her in the copy room; (2) one instance when Mr. Ricks repeatedly ran the back of his hand along Ms. Stokes' thigh and rubbed his foot on her calf; (3) one occasion in which Mr. Ricks asked Ms. Stokes, "what are you good at?"; and (4) regular interactions wherein Mr. Ricks would stare at Plaintiff's breasts and/or crotch.  (Doc. 34 at 17-18, 21.)  The Court finds that this conduct is similar to the harassment alleged by the plaintiff in *Mendoza v. Borden*, 195 F.3d 1238 (11th Cir. 1999)[2]—conduct that the Eleventh Circuit

---

[2]In *Mendoza*, the plaintiff presented evidence of: "(1) one instance in which [the supervisor] said to [the plaintiff] 'I'm getting fired up'; (2) one occasion in which [the supervisor] rubbed his hip against [the plaintiff's] hip while touching her shoulder and smiling; (3) two instances in which [the supervisor] made a sniffing sound while looking at [the plaintiff's] groin area and one instance of sniffing without looking at her groin;

Court of Appeals determined was not sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.

As in *Mendoza*, this Court questions whether all the conduct alleged in this case "includes the necessary sexual or other gender-related connotations to be actionable sex discrimination." 195 F.3d at 1247. The question "what are you good at?" could have a sexual inference in some instances, but in this case, Plaintiff has testified that the statement was made in response to her seeking computer assistance from Mr. Ricks and commenting that she was not good with computers. Like the plaintiff in *Mendoza*, Ms. Stokes approached Mr. Ricks, not the other way around, and another employee was present in his office when the question was asked. *See id.* at 1248. "Thus, the circumstances of this interaction do not objectively indicate that the statement . . . had a sexual or other gender-related connotation." *Id.*

---

and (4) [the supervisor's] 'constant' following and staring at [the plaintiff] in a 'very obvious fashion.'" 195 F.3d at 1247.

However, even if this Court assumes that the conduct alleged by the plaintiff in this case was sexual in nature, Plaintiff's hostile environment claim does not survive the application of the four factors outlined in *Mendoza*. Ms. Stokes has not presented evidence that any of Mr. Ricks' sexual misconduct was physically threatening or humiliating, or that the conduct as a whole unreasonably interfered with her job performance. *See Mendoza*, 195 F.3d at 1248-49. The alleged touchings and one verbal incident were not frequent; they all occurred within approximately the first month of Plaintiff's employment, and Ms. Stokes worked for SCS for around seven months total.

Most importantly, however, none of the alleged conduct is severe. *See id*. at 1249. The instances in which Mr. Ricks is alleged to have touched Ms. Stokes in a physical manner were isolated, brief, and unaccompanied by any smiles, propositions, or sexually suggestive comments. The most frequent and egregious conduct—Mr. Ricks' staring at Plaintiff's breasts and/or crotch—while offensive and boorish, simply is not, when considered in combination with the other misconduct alleged, severe or pervasive enough to meet the minimum levels of conduct required by this circuit and others.

*See, e.g., Mendoza*, 195 F.3d at 1246-47 (listing case law from other circuits and the types of misconduct that have been found to be insufficient to support a hostile environment claim). Therefore, summary judgment will be granted on Plaintiff's hostile environment claim.

        2.    Retaliation.

Plaintiff also contends that Defendants retaliated against her in violation of Title VII after she complained about Mr. Ricks' sexually harassing conduct. In order to establish a prima facie case of retaliation, a plaintiff must show: "(1) that [s]he engaged in statutorily protected expression; (2) that [s]he suffered an adverse employment action; and (3) that there is some causal relationship between the two events." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). Defendants argue that Plaintiff has failed to establish that she suffered adverse actions sufficient to present her retaliation claim to a jury. (Doc. 30 at 17-23.)

Recently, in *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S. Ct. 2405 (2006), the U.S. Supreme Court defined adverse employment actions in the context of a retaliation claim as an employer's actions that are "materially adverse to a reasonable employee or job applicant." *Id.* at

2409. In other words, the "actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*. "[N]ormally[,] petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id*. at 2415. The Supreme Court emphasized, however, that "context matters." *Id*. "[T]he significance of any given act of retaliation will often depend upon the particular circumstances." *Id*.

The evidence in this case, taken in the light most favorable to the plaintiff, indicates that after Ms. Stokes' attorney sent a letter to SCS on March 11, 2004, demanding that all sexually harassing behavior cease: (1) Mr. Ricks issued an office memorandum requiring that all of Ms. Stokes' work be channeled through him, or if the issue had to do with invoices or accounting, through Ms. Revis; (2) the same memorandum mandated that Ms. Stokes direct all of her questions to Mr. Ricks or Ms. Revis regarding accounting and computer issues; (3) Mr. Ricks began "keeping up" with Ms. Stokes' errors and created a file for that purpose (Ricks Dep. at 220-21); (4) when Ms. Stokes asked Mr. Ricks for assistance, he ignored her or refused to help; and (5) in time, all of Ms. Stokes' job duties except answering the

phone, and limited cut list work, were reassigned to other employees.[3]
Collectively, these facts do not amount to "minor annoyances," and they
are sufficient to create a jury question as to whether Defendants' actions
constitute actionable retaliation for her complaints of sexual harassment.[4]

     3.    Constructive Discharge.

Plaintiff claims that the sexual harassment and retaliatory actions she
suffered were so egregious that she was, in effect, constructively discharged
from her position at SCS. "A constructive discharge occurs when a
discriminatory employer imposes working conditions that are 'so intolerable
that a reasonable person in [the employee's] position would have been
compelled to resign.'" *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974,
977 (11th Cir. 2003) (quoting *Poole v. Country Club of Columbus, Inc.*, 129

---

[3]Kim Revis, the office manager, testified: "I had to do the majority of [Ms. Stokes'
past duties]. A lot of my time was split between running copies of the drawings and
different things of that sort . . . [and a]ll the data entry that she was doing for me was
now 100 percent back to me." (Revis Dep. at 70, 72.) Ms. Revis also said that as Ms.
Stokes' supervisor: "As far as I know, when she decided to leave South Central Steel, the
only duty that she had was to answer the phone." (*Id.* at 67.)

[4]Defendants argue that they have shown legitimate, nondiscriminatory reasons for
assigning fewer cut lists to Ms. Stokes—namely, that she made multiple errors while
creating cut lists. (Doc. 30 at 21; 37 at 8.) However, Defendants also maintain that
Plaintiff continued to work on cut lists until she left SCS, and Defendants do not proffer
additional legitimate, nondiscriminatory reasons for the removal of Ms. Stokes' other job
responsibilities.

F.3d 551, 553 (11th Cir. 1997)).    Moreover, the "standard for proving

constructive discharge is higher than the standard for proving a hostile work

environment." *Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272,

1282 (11th Cir. 2003) (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d

1208, 1231 (11th Cir. 2001)).    And, the facts of this case simply do not meet

that standard.

This Court has already concluded that Plaintiff has not adduced

sufficient evidence in support of her hostile environment claim.    Further,

while the alleged retaliatory actions Ms. Stokes suffered may well deter a

reasonable person from making or supporting a charge of discrimination,

those actions—even when considered in combination with the alleged

instances of sexual harassment she endured—do not constitute "intolerable"

working conditions.    Therefore, summary judgment will be entered on the

constructive discharge claim.

B.    Alabama State Law Claims.

Finally, Plaintiff has asserted state law claims of invasion of privacy,

assault, and battery against Mr. Ricks, and she contends that SCS is

vicariously liable for the tortious conduct.

1.    Invasion of Privacy.

Although Defendants' motion requests summary judgment on all of Plaintiff's claims, Defendants' memoranda do not present any legal argument or citation to evidence in support of summary judgment concerning the state-law invasion of privacy claim. (Docs. 30, 37.) In fact, the invasion of privacy claim is never mentioned. The parties moving for summary judgment bear the initial burden of presenting to the Court the basis for their motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Because Defendants have not met this burden, summary judgment must be denied with regard to Count IV of Plaintiff's Complaint.

2.    Assault.

Plaintiff argues that Defendants are liable for assault because Mr. Ricks told her that he had a gun in his office and, on a separate occasion, said in her presence while he walked a salesman out the door, "I have killed before and I could kill again." (Doc. 34 at 28-29.) Ms. Stokes claims that these actions put her in fear for her life.

"An assault consists of ' . . . an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances

as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'" *Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990) (quoting *Holcombe v. Whitaker,* 318 So. 2d 289, 294 (Ala. 1975)) (internal citations omitted).  "Words standing alone cannot constitute an assault.  However, they may give meaning to an act, and when both are taken together they may create a well-founded fear of a battery in the mind of the person at whom they are directed, thereby constituting an assault." *Id.* at 351-52.

In this case, there is no evidence that Mr. Ricks' words were accompanied by any threatening physical actions toward the plaintiff. Moreover, there are no objective indications that Mr. Ricks' statement that he "could kill again" was directed at Ms. Stokes—and not merely overheard by the plaintiff as she sat at her desk near the door.  In fact, Ms. Stokes testified that when he made the alleged offensive statement, Mr. Ricks was discussing his service in Vietnam as he walked a salesman out the door.  She admits she had her head down, the comment was not made to her, and Mr. Ricks never made any reference to her when he made the statement.  (Pl.

Dep. at 335-36.) No reasonable jury could conclude that Mr. Ricks' words in these instances were sufficient to create a well-founded fear of an imminent battery. Defendants, therefore, are entitled to summary judgment on Plaintiff's assault claim.

> 3. Battery.

In order to succeed on a claim alleging battery under Alabama law, a plaintiff must establish: "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998) (citing *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986); Restatement (Second) of Torts § 18 (1965)). Defendants argue that Plaintiff cannot meet the third element of her claim because, while she has alleged a number of touchings by Mr. Ricks, there is no evidence that Mr. Ricks touched Ms. Stokes "in rudeness, or in anger, or in a hostile manner." (Doc. 30 at 27; 37 at 10.)

However, "[a]n actual injury to the body is not a necessary element of a civil assault and battery," *Surrency*, 489 So. 2d at 1104, and the Alabama Supreme Court has found that evidence of unwanted sexual

touchings can constitute substantial evidence of battery, *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d at 1194. Ms. Stokes has testified that Mr. Ricks rubbed his front private area against her buttocks twice, and rubbed the back of his hand against her thigh and touched his foot to her calf on another occasion. Given the circumstances described in the record, a reasonable jury could conclude that the actions were unwelcome, intentional, and offensive. Therefore, Plaintiff will be allowed to proceed with her battery claim against Mr. Ricks.

      4.    Vicarious Liability.

    SCS maintains, however, that it cannot be held responsible for any battery committed by Mr. Ricks because the company did not ratify his actions. (Doc. 26 at 61.) An employer can be held liable for the intentional torts of an employee "if the employer ratifies the employee's conduct." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d at 1195. "An employer ratifies conduct if the employer: (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted

sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." *Potts v. BE & K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992).

SCS contends that it is not liable for Mr. Ricks' intentional acts because "[a]n employer <u>cannot be said</u> to have ratified an employee's conduct when the employer, upon learning of an employee's conduct, which was not in the scope of the employee's employment, gives instructions calculated to prevent a recurrence." (Doc. 30 at 29 (quoting *E. Ala. Behavioral Medicine, P.C. v. Chancey*, 883 So. 2d 162, 169-71 (Ala. 2003)) (emphasis made by the defendants).) SCS, however, does not identify the instructions that were given to prevent a recurrence of Mr. Ricks' actions. In fact, SCS subsequently admits that Ms. Revis did not respond properly to Ms. Stokes' initial complaint about Mr. Ricks touching her in the copy room. (Doc. 30 at 30.) Moreover, the evidence, taken in the light most favorable to the plaintiff, shows that after her first complaint to Ms. Revis, Mr. Ricks again touched Ms. Stokes inappropriately.

SCS has not met its burden to show that it is entitled to summary judgment on Plaintiff's claim that it is vicariously liable for battery; therefore, this claim will also go to a jury.

VI.    Conclusion.

For the reasons stated above, Defendants' motion for summary judgment is due to be granted in part and denied in part.  A separate order will be entered.

Done this <u>27th</u> day of <u>July 2007</u>.


_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153

# EXHIBIT   C

FILED

2005 Sep-23  AM 10:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

DOUGLAS EMBRY,          )
                                 )
      PLAINTIFF,       )
                                 )
VS.                      )      CV-02-HS-3167-M
                                 )
M.C. PRODUCTS, INC.,     )
                                 )
      DEFENDANT.    )

## MEMORANDUM OF DECISION

The court has before it the November 10, 2003 motion (doc. # 30) of

defendant M.C. Products, Inc. for summary judgment.  Oral argument was held

September 24, 2004.

### I. Procedural History

Plaintiff Douglas Embry commenced this action on December 27, 2002, by

filing a complaint in this court against M.C. Products, Inc.,[1] asserting a sexual

harassment claim and a constructive discharge claim under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq., and a state law claim for negligent

and/or wanton and malicious hiring, training, supervision and/or retention.  (See

---

[1] Plaintiff originally sued Millcast, Inc.  (Compl.)  Defendant changed its name and filed
a motion (doc. # 7) to substitute the new name, M.C. Products, Inc., for the old one.  That motion
was granted by order of this court (doc. # 8) on June 17, 2003.

Compl.)  Defendant's November 10, 2003, motion for summary judgment asserts

that there is no genuine issue of material fact and that defendant is entitled to

judgment as a matter of law.  (See generally Def.'s Mem. Supp. Summ. J.)

On November 10, 2003, defendant also filed evidence[2] (doc. #31) and a

memorandum of law (doc. # 48) in support of its motion.  Plaintiff filed a brief

(doc. # 35) and evidence[3] in opposition to the motion on November 28, 2003.

Defendant filed a reply brief (doc. # 39) to plaintiff's opposition on December 5,

2003.  The court has considered all of the briefs and the evidence.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

---

[2] Defendants submitted the following evidence: the deposition of Douglas Embry; the last page of plaintiff's application for employment with defendant, signed by plaintiff; defendant's employee handbook with a page on which plaintiff acknowledged, by his signature, receipt of the book; the EEOC Notice of Charge of Discrimination; the EEOC Charge of Discrimination; case action summaries for cases in which plaintiff was charged with various offenses by the Municipality of Lincoln; a handwritten formal complaint from plaintiff to plant manager Randy McCoy; the deposition of Sanford Knight; Sanford Knight's application for employment with defendant, signed by Knight; the deposition of Ken Shelton; Ken Shelton's application for employment with defendant, signed by Shelton; the deposition of Ronald "Randy" McCoy.

[3] Plaintiff submitted the following evidence:  Excerpts from the deposition of Ken Shelton.  In his brief, plaintiff also relies on evidence submitted by defendant.

2

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings that the moving party believes

demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477

U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the

nonmoving party to go beyond the pleadings and by his own affidavits, or by the

depositions, answers to interrogatories, and admissions of file, designate specific

facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are

irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Chapman,

229 F.3d at 1023. All reasonable doubts about the facts and all justifiable

inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023;

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If

the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted. Anderson, 477 U.S. at 249.    The method used by the

party moving for summary judgment to discharge its initial burden depends on

3

whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2

F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d

1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at

trial, then it can only meet its initial burden on summary judgment by coming

forward with positive evidence demonstrating the absence of a genuine issue of

material fact; i.e. facts that would entitle it to a directed verdict if not controverted

at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a

showing, the burden shifts to the non-moving party to produce significant,

probative evidence demonstrating a genuine issue for trial.

     If the moving party does not bear the burden of proof at trial, it can satisfy

its initial burden on summary judgment in either of two ways.  First, the moving

party may produce affirmative evidence negating a material fact, thus

demonstrating that the non-moving party will be unable to prove its case at trial.

Once the moving party satisfies its burden using this method, the non-moving

party must respond with positive evidence sufficient to resist a motion for directed

verdict at trial.  The second method by which the moving party who does not bear

the burden of proof at trial can satisfy its initial burden on summary judgment is to

affirmatively show the absence of evidence in the record to support a judgment for

the non-moving party on the issue in question.  This method requires more than a

simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Facts[4]

Douglas Embry worked for M.C. Products, Inc. ("M.C. Products") from approximately April 14, 2000, until he quit on March 11, 2002. (Embry Dep. at 28, 73.) M.C. Products manufactures functional and decorative architectural columns. Embry worked as a pourer in M.C. Products' cap and base department.

---

[4] If the facts are in dispute, they are stated in the manner most favorable to the non-moving party. See Fitzpatrick, 2 F.3d at 1115.

(Id. at 31-32.)  His responsibilities primarily consisted of pouring mixtures into column molds and removing the hardened columns.  (Id. at 35-36.)  The alleged harasser, Sanford Knight, also worked for M.C. Products in the cap and base department.  (Embry Dep. at 32; Knight Dep. at 9-10.)  Both men were given a copy of M.C. Products' employee handbook, which contained the company's sexual harassment policy, when they began working there.[5]  (Embry Dep. at 31; Knight Dep. at 10-11, 14-16.)

Knight and Embry knew each other because they had been neighbors when Embry was growing up.[6]  (Embry Dep. at 37; Knight Dep. at 40.)  While they were working together at M.C. Products, Knight and Embry occasionally went to lunch together and smoked marijuana on their lunch breaks.  (Embry Dep. at 40, 208-13; Knight Dep. at 37-38.)  However, after the alleged harassment began, they stopped going to lunch together by themselves and only went with a group of other men, never riding in the same car.  (Embry Dep. at 128-33, 270-71.)  Embry also gave Knight a ride to work for about a two-week period while they were both employed

_____

[5] Apparently, Knight either cannot read at all or cannot read very well.  (Knight Dep. at 13-18.)  Paula Leverton, M.C. Products' secretary at the time he was hired, read him the employee handbook, including the sexual harassment policy, and he testified he understood it.  (Id. at 11-16.)

[6] Knight was already twenty-five years old when the two lived next door to each other.  (See Embry Dep. at 9, 37; Knight Dep. at 40.)

6

at M.C. Products. (Embry Dep. at 38-40; Knight Dep. at 54.) The two worked together for about one year before the alleged harassment began occurring. (Embry Dep. at 124.)

While Embry and Knight worked together in the cap and base department, they were typically stationed about twenty feet away from each other, and they sometimes had conversations about sex in general and about certain women they wanted to have sex with in particular. (Embry Dep. at 34, 233-34.) Embry testified that the two "talk[ed] like . . . construction worker[s]" about women and sex. (Id. at 234.) In addition, when they were riding to work together, Knight told Embry stories about "date-raping his own aunt," being nicknamed "Uncle Nasty Tongue" because of the way he performed oral sex on his nieces and nephews, and "screwing around with men." (Id. at 54-55, 106-08.) During these conversations, Knight also opined that "an asshole is just like a pussy." (Id. at 55.)

In August or September 2001, Embry reported to his supervisor, Ken Shelton, that Knight was "licking his lips and staring" at him. (Id. at 50-51.) Embry requested that Shelton ask Knight to leave him alone, but Shelton ignored Embry. (Id. at 50-52.) Because Shelton took no action, Embry reported Knight's behavior to Randy McCoy, M.C. Products' plant manager. (Id. at 52.) Embry also submitted a handwritten note to McCoy, complaining about Knight's and Shelton's

behavior. (Id. at 178-85.) Embry did not allege sexual harassment in his initial verbal complaints or in the note he wrote McCoy because he was unsure whether Knight's behavior was sexual in nature and he was "halfway embarrassed that a man would do that to [him]." (Id. at 179-80.) In September 2001, in response to Embry's complaints, McCoy questioned Knight and the other employees who worked with Knight and Embry in the cap and base department, but Knight denied the behavior and no one else saw him do it. (McCoy Dep. at 44-50.) Although he did not report it to either of his supervisors, Embry also testified that Knight would walk up behind him and stand too close to him while he was bending down to remove columns from molds and that Knight stared at his crotch. (Embry Dep. at 46-47, 139-42.)

Because of reports that Knight and Embry were not getting along[7] and because of a decrease in production demand at the plant, McCoy moved Embry from the cap and base department to the column line in late August or early September 2001. (McCoy Dep. at 51-52; Embry Dep. at 58.) During the period he was working on the line, from August or September 2001 until February 2002, Embry was sent back to the cap and base department about one or two times per

---

[7] McCoy testified that he did not move Embry as a result of the sexual harassment claims. (McCoy Dep. at 51-52.)

week, and many of the times he went back, Knight continued to harass him.
(Embry Dep. at 62-63.)  Embry estimates that Knight harassed him on ten to
twenty occasions when he returned to the cap and base department during this
period.  (Id.)  Nevertheless, after being promised a 75-cent raise, Embry agreed to
move back to the cap and base department full time in February 2002.  (Id. at 66-
67.)  Once Embry was back in the cap and base department, Knight resumed his
previous behavior, licking his lips, blowing kisses and staring at Embry three to
four times a day for three to five minutes at a time.  (Id. at 121-23.)  Knight and
Embry were approximately three to five feet from each other while Knight was
engaging in this behavior.  (Id. at 72-73.)

     In March 2002, sometime during the week before plaintiff quit his job at
M.C. Products, Knight told Embry on several occasions that he "wanted to screw
[him] up [his] ass."  (Id. at 73-74, 79-80, 139.)  Embry testified that he really
thought Knight was going to do this or attempt to do this because of a
conversation he previously had with Knight's cousin, known to Embry only as
"Peanut," and because Embry feels that "39 years old is old enough to know when
somebody is trying to do something sexually towards you."  (Id. at 74-76, 176-77.)
"Peanut," who worked with Embry at M.C. Products at some point, told Embry
that Knight had "fucked his own son up his own ass" and that Knight's ex-wife had

9

shot him in the buttocks for raping their son. (Id. at 74-77.) In addition, Knight

did not make similar comments or gestures to his female co-workers. (McCoy

Dep. at 97-98; Knight Dep. at 62-63; Shelton Dep. at 48.) The day before he quit,

Embry reported to McCoy that Knight had made comments about sodomizing him.

McCoy laughed and told Embry to ignore Knight.[8] (Embry Dep. at 79, 143.)

McCoy also threatened to fire both Embry and Knight if they could not get along.

(Id. at 149.) Despite this, the day before Embry left, McCoy promised to move

him away from Knight but did not do so. (Id. at 79, 149-50.)

On the day that he quit, March 11, 2002, Embry told McCoy that he "just

couldn't work around no faggot. I just got to I can't stand it. I can't take it no

more." (Id. at 84.) The same day, McCoy called a meeting in the break room to

discuss the issue. (Id. at 155.) Embry, Knight, McCoy, and Shelton attended the

meeting. (Id.) At the meeting, McCoy informed Embry that he would not move

him and that he should ignore Knight. (Id.) McCoy told Knight to "go back to

work and don't [] worry about it." (Id.) Embry then told the group that he didn't

"want to work with no faggots." (Id.) Then, Embry testified, Knight told him in

---

[8] It is unclear whether Embry actually told McCoy exactly what Knight said. He testified that he "told" McCoy about the incident, but when he was specifically asked what he told McCoy, he stated that he told him he just "couldn't take" working around Knight anymore, which falls short of putting McCoy on notice of the situation. (Embry Dep. at 80, 143.) However, because the facts must be construed in the light most favorable to plaintiff, the court will assume that Embry specifically apprised McCoy of the situation.

front of Shelton and McCoy that, "I will fuck you. I will fuck you up your ass just like I fucked your wife." (Id. at 156.) At that point, Embry clocked out and quit. (Id.) Both Shelton and McCoy attempted to make Embry reconsider and stay on the job. (McCoy Dep. at 113.) After being provoked by Knight's comment about his wife, on his way out the door, Embry told Knight that "[h]e might have had sex with my wife, but he probably ain't had more sex than I've had with his wife."[9] (Embry Dep. at 272.)

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint alleges a sexual harassment claim and a constructive discharge claim under Title VII and a negligent hiring, training, supervision, and/or retention claim under state law. Defendant's motion for summary judgment, as amplified in its memorandum in support thereof, asserts that (1) plaintiff's sexual harassment claim fails because he cannot show the alleged harassment occurred because of his gender or that he was subjected to conditions that constitute a hostile work environment as a matter of law, (2) plaintiff's constructive discharge claim fails because his work conditions were not intolerable and he failed to act reasonably under the circumstances, and (3)

---

[9] Apparently, one of Knight's wives, LuAnn "Belle" Story, had a sexual relationship with Embry while the two were in high school together. (Embry Dep. at 157-58, 271-72.)

11

plaintiff's negligent and/or wanton and malicious hiring, training, supervision and/or retention claim fails because he cannot prove the underlying tort and because defendant had no notice or knowledge of Knight's alleged misconduct before it occurred. (See generally Def.'s Mem. Supp. Summ. J.) Each of plaintiff's claims is discussed separately below.

## A. Sexual Harassment Claim

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). While the language of Title VII does not explicitly mention sexual harassment, the Supreme Court and the Eleventh Circuit have long recognized that the congressional intent behind prohibiting discrimination in "terms, conditions, or privileges of employment" includes prohibiting "the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Mendoza v. Borden, Inc., 195 F.3d 1238, 1244-45 (11th Cir. 1999); Henson v. City of Dundee, 682 F.2d 897, 901 (11th Cir. 1982). Sexual harassment does not

need to involve members of the opposite sex; same-sex harassment is also

actionable under Title VII. <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S.

75, 79-80 (1998). Although courts have clearly held that Title VII prohibits sexual

harassment, they have also emphasized that "Title VII is not a federal 'civility

code'" that prohibits all kinds of teasing and rude behavior that occur in the

workplace. <u>Mendoza</u>, 195 F.3d at 1245 (quoting <u>Oncale</u>, 523 U.S. at 82).

To establish a prima facie case for a sexually hostile work environment

claim, plaintiff must show (1) that he belongs to a protected group, (2) that he has

been subject to unwelcome sexual harassment, such as sexual advances, requests

for sexual favors, and/or other conduct of a sexual nature, (3) that the harassment

was based on his gender, (4) that the harassment "was sufficiently severe or

pervasive to alter the terms and conditions of employment and create a

discriminatorily abusive working environment," and (5) that a basis for holding

the employer liable exists. <u>Hulsey v. Pride Restaurants, L.L.C.</u>, 367 F.3d 1238,

1244 (11th Cir. 2004); <u>Mendoza</u>, 195 F.3d at 1245.

Defendant does not dispute that plaintiff has established elements (1), (2),

and (5) of his prima facie case. Both genders are protected equally under Title

VII. Thus, as a man, plaintiff is a member of a protected group. With regard to

the second element of the prima facie case, if the facts are construed in the light

most favorable to plaintiff, it is clear that Embry was subjected to unwanted sexual harassment because of Knight's comments and behavior. Whether Knight's conduct was severe or pervasive enough to alter Embry's terms and conditions of employment is a separate inquiry, which is discussed below.

The fifth element of the prima facie case has also been established in this case. In Title VII cases where the alleged harassment was committed by a co-worker, a plaintiff must show that his employer had either actual or constructive notice of the harassment and "failed to take immediate and appropriate corrective action." Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003). Actual notice can be shown by proof that defendant's management knew about the harassment. Id. Actual notice is automatically established if the employer has a clear, published sexual harassment policy, and plaintiff follows the complaint procedure outlined in the policy. Id. In the instant case, M.C. Products had actual notice of the harassment. Plaintiff reported Knight's behavior to both his immediate supervisor, Ken Shelton, and the plant manager, Randy McCoy, in either August or September of 2001 and reported Knight's subsequent harassment to McCoy up until the time plaintiff quit his job on March 11, 2002. Plaintiff's reporting was in accordance with the clear, published sexual harassment policy

14

followed by M.C. Products,[10] which states that "[e]mployee complaints of sexual harassment may be made either through the company's regular complaint procedure[11] or directly to the plant manager." Plaintiff followed this procedure by reporting to Shelton, who reported to McCoy, and by reporting directly to McCoy. Because M.C. Products had actual notice of the harassment, plaintiff has clearly established the fifth element of his prima facie case.

Defendant disputes the existence of the third element of plaintiff's prima facie case: that the harassment was based on his gender. In order for a Title VII plaintiff to establish this element, he must show that "but for the fact of [his] sex, [he] would not have been the object of harassment." Henson, 682 F.2d at 904. In other words, in a typical case where a male supervisor harasses a female worker, if the worker shows that the male supervisor did not treat her male co-workers in a similar manner, she has established that the harassment was based on her sex. Id. However, in cases in which the alleged harasser treats workers of both sexes

---

[10] The sexual harassment policy is part of the MillCast, Inc. Employee Handbook, which was submitted to the court as defendant's exhibit 2.

[11] The term "regular complaint procedure" is not defined in the sexual harassment policy. Shelton was not aware of the term but knew that sexual harassment complaints were supposed to be reported to an employee's supervisor and then investigated. (Shelton Dep. at 70-71.) McCoy testified that the "regular complaint procedure" consisted of the employee reporting it to his immediate supervisor, who would in turn report it to the plant manager, who would continue reporting up the chain if he felt the claim warranted further investigation. (McCoy Dep. at 77-78.)

15

similarly or the conduct is equally offensive to both sexes, a plaintiff cannot show

that the harassment was based upon sex because men and women were afforded

equal treatment. Id.

In the instant case, plaintiff has established that the harassment was based

on his gender. Defendant relies heavily on a Seventh Circuit case which suggests

that if the alleged harasser did not actually wish to participate in some sort of

sexual act with the plaintiff but instead made comments that were "expressions of

animosity or juvenile provocation,"[12] then the harassment could not be based on

the plaintiff's sex. Johnson v. Hondo, Inc., 125 F.3d 408, 412 (7th Cir. 1997). The

Johnson case, however, predates the Supreme Court's decision in Oncale, in which

the Court clearly states that "harassing conduct need not be motivated by sexual

desire to support an inference of discrimination on the basis of sex." Oncale, 523

U.S. at 80. A sexual discrimination claim can lie even if the "harasser is motivated

by general hostility" or animosity toward the plaintiff and not by a desire to have

_____

[12] The Seventh Circuit held that
[E]xpressions such as "fuck me," "kiss my ass," and "suck my dick," are
commonplace in certain circles, and more often than not, when these expressions
are used (particularly when uttered by men speaking to other men), their use has
no connection whatsoever with the sexual acts to which they make reference -
even when they are accompanied, as they sometimes were here, with a crotch-
grabbing gesture. Ordinarily, they are simply expressions of animosity or juvenile
provocation, and there is no basis in this record to conclude that [the alleged
harasser]'s usage was any different.
Johnson, 125 F.3d at 412.

16

sex with him or her. Id. Thus, it is not necessary, as defendant appears to believe, to prove that the alleged harasser is a homosexual. In this case, Embry has shown that the harassment was based on his gender because Knight did not similarly harass his female co-workers by licking his lips at them, blowing them kisses, or making inappropriate sexual comments. (McCoy Dep. at 97-98; Knight Dep. at 62-63; Shelton Dep. at 48.) Thus, regardless of whether Knight actually desired to have sex with Embry, Knight's harassing comments and gestures were only aimed at Embry, a man. They were not aimed at his female coworkers or at all of his other coworkers generally. Because of this, Embry has established the third element of his prima facie case.

Defendant also disputes the existence of the fourth element of the prima facie case: that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. This element of the prima facie case contains both subjective and objective components. Mendoza, 195 F.3d at 1246. The plaintiff must subjectively view the harassment as severe or pervasive enough to alter the terms and conditions of employment, and the plaintiff's perception must be objectively reasonable under the circumstances. Id. The objective component of this test is fact-intensive, and there are four factors that courts should consider in determining

17

whether harassment objectively altered the terms or conditions of employment:
"(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the
conduct is physically threatening or humiliating, or a mere offensive utterance;
and (4) whether the conduct unreasonably interferes with the employee's job
performance." Id. These factors should be used to consider all instances of
harassment collectively with regard to the totality of the circumstances. Id.

In the instant case, considering the aforementioned factors under the totality
of the circumstances, Embry has not demonstrated that the harassment was
sufficiently severe or pervasive to alter the terms and conditions of employment
and create a discriminatorily abusive working environment. The court does not
doubt that Embry subjectively perceived the harassment to be severe and pervasive
enough to alter the terms and conditions of his employment. However, the
harassment is not objectively severe or pervasive enough. The factors used in
determining this are discussed below.

In determining whether the terms and conditions of his employment were
objectively altered, the court first looks at the frequency of Knight's conduct.
While Knight only told Embry he wanted to "fuck him up the ass" on a couple of
occasions, he frequently licked his lips at Embry, blew him kisses, and stared at
him. Embry estimated that it happened as many as twenty times during the six-

month period he was returning to the cap and base department from the line and

three or four times per day once he returned to caps and bases full time.

Second, the court examines the severity of Knight's conduct.  While

Knight's gestures - licking his lips, blowing kisses, and staring at Embry - could

certainly be construed as suggestive and his comment about "fucking [plaintiff] up

the ass" was definitely vulgar, they do not rise to the level of being severe enough

to alter the terms or conditions of plaintiff's employment when compared to the

facts of other Title VII cases.  See, e.g., Gupta v. Florida Bd. of Regents, 212 F.3d

571, 584-85 (supervisor telling employee that she was beautiful on one occasion,

frequently calling her at home, and commenting on the promiscuity of people from

Jamaica compared to the innocence of people from India was not sufficient to alter

the terms or conditions of employment); Mendoza, 195 F.3d at 1247-48

(supervisor rubbing his hip against employee's hip, making sniffing noises while

looking at her groin, and constantly following her and staring were insufficient to

alter terms and conditions of employment); cf. Griffin v. City of Opa-Locka, 261

F.3d 1295, 1312-13 (11th Cir. 2001) (supervisor requesting employee work for

him because she had "big tits;" repeatedly asking employee out on dates, to cook

for him, and to be his girlfriend; making sexual comments and insulting remarks

about her body, weight, and appearance; constantly requesting hugs so he could

19

feel her breasts and look down her shirt; rubbing his knee against her buttocks and whispering that he was still looking for a girlfriend; and finally raping her after she refused his advances sufficient to create jury question on whether terms and conditions of employment were altered); Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 509 (11th Cir. 2000) (alleged harasser giving coworker unwanted massages, standing so close to her that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his body parts severe enough to go to a jury). In his deposition testimony, the main behavior Embry reported·was that Knight was staring at him, but the Eleventh Circuit has recognized that, while staring at someone, combined with other behavior, can rise to the level of being severe and pervasive, in general, "the everyday observation of fellow employees in the workplace is also a natural and unavoidable occurrence when people work together in close quarters." Mendoza, 195 F.3d at 1248. While some of Knight's other behavior - licking his lips and blowing kisses - may not be unavoidable consequences of working in close quarters, the conduct plaintiff complains of in this case - staring and gesturing without touching or threatening - is much more analogous to the conduct in Gupta and Mendoza than it is to the conduct in Griffin and Johnson, and it simply does not rise to the level of being severe or pervasive enough to create a jury question.

Third, the court looks at whether Knight's conduct was physically threatening or humiliating or instead was a mere offensive utterance. In the instant case, Knight's behavior did not rise to the level of being physically threatening or humiliating. Knight did not actually touch Embry, and he never threatened Embry with any sort of physical force if Embry did not submit to what Embry characterizes as Knight's sexual advances. Despite Embry's contention that he felt threatened by Knight because Knight is "a big guy," Embry was apparently not afraid to tell Knight that "he was going to make me [Embry] hurt him." (Embry Dep. at 82, 54.) While Knight's behavior and comments were in poor taste and may have been offensive to Embry, they seem to amount to little more than the type of "male-on-male horseplay" Title VII is not designed to protect against, especially in light of Embry and Knight's previously friendly relationship. See Oncale, 523 U.S. at 81. Just a short time before the alleged harassment occurred, the two were going to lunch together and smoking marijuana. They had previously talked about vulgar topics, and Knight may not have known that Embry no longer wanted to participate in such discussions or in any type of friendly banter. The fact that Embry was offended is irrelevant because a reasonable person in Embry's situation would not construe Knight's behavior to be physically threatening or humiliating or severe enough to alter the terms and conditions of

21

Embry's employment. Knight's conduct is much more akin to an "offensive utterance." Even if, however, Embry could demonstrate that Knight's conduct was physically threatening or humiliating, he still cannot establish that it was severe or pervasive enough to alter the terms and conditions of his employment or that it unreasonably interfered with his job performance.

Lastly, the court examines whether Knight's conduct unreasonably interfered with Embry's job performance. Although Embry claimed Knight's behavior distracted him while he was working, there is no evidence to indicate that it unreasonably interfered with his job performance. Despite Knight's harassment, Embry continued to be an exemplary M.C. Products' employee. (Shelton Dep. at 23-25; McCoy Dep. at 51-52.) He was not moved from the cap and base department because of his job performance. In fact, McCoy had Embry return to caps and bases after he had been moved to the line because he was so skilled at performing the more detailed tasks in caps and bases. There is no evidence that the quality or quantity of Embry's work product was affected by Knight's harassment. Thus, the harassment did not unreasonably interfere with plaintiff's job performance.

Considering these four factors under the totality of the circumstances, plaintiff has failed to establish the fourth element of his prima facie case: that the

22

harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. The harassment alleged in this case was simply not severe or pervasive enough to support a claim under Title VII, and plaintiff's previous social interactions with Knight, including their conversations about sex, further lessen the severity of Knight's conduct. Because plaintiff has failed to establish a prima facie case on his hostile work environment claim, there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law regarding this claim.

**B. Constructive Discharge Claim**

"[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) (internal quotations omitted). To prove a constructive discharge, the plaintiff must go beyond just proving actionable harassment because "'[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment.'" Walton v. Johnson & Johnson Serv., Inc., 347 F.3d 1272, 1282 (11th Cir. 2003) (quoting Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001)). For purposes of Title VII, constructive discharge

23

occurs when an "employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) (quoting Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997)). In constructive discharge cases, "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987). In addition, the employee must generally give the employer time to remedy the situation before leaving the job. Kilgore v. Thompson & Brock Mgmt., 93 F.3d 752, 754 (11th Cir. 1996).

In the instant case, Embry cannot show that he was constructively discharged. Embry could not establish the fourth element of his prima facie case: that Knight's harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment. Constructive discharge requires an even higher showing of intolerable conditions than that required to establish a prima facie case for sexual harassment. Because Embry could not even meet the lower burden of establishing a prima facie case, he clearly cannot meet the higher burden of

showing constructive discharge.[13]  In addition, even if Embry had been able to

show sufficiently intolerable conditions, he did not act reasonably under the

circumstances because he did not give his supervisors time to remedy the

situation.  While Embry had previously reported to his supervisors that Knight was

licking his lips and blowing kisses at him, Knight did not begin making vulgar

comments about "fucking up the ass" until the day before Embry quit. (Embry

Dep. at 79.)  The same day, Embry reported it and was told that he would be

moved.  The next day, when Embry was not immediately reassigned, he decided to

quit despite the fact that McCoy had called a meeting in the break room so that he,

Shelton, Embry, and Knight could discuss the situation and despite McCoy's and

Shelton's pleas for Embry to stay on the job and their assurances that something

could be worked out.  A reasonable person would have given McCoy and/or

Shelton more than one day to remedy the situation by moving Embry away from

---

[13] The court disagrees with plaintiff's contention that the plaintiffs in Morgan and Poole, both cases in which the Eleventh Circuit found there was a material issue of fact on the constructive discharge claim, "faced far less egregious facts" than the plaintiff in the instant case. In both Morgan and Poole, the harassment the plaintiffs suffered significantly interfered with their ability to do their jobs.  Morgan, 6 F.3d at 752-53 (genuine issue of material fact on constructive discharge claim existed when, after employee turned down supervisor's request for a date, he told her that she "had not had a real man until she had him," remained in her work area for hours every day, gave her low evaluations and told others to criticize her work); Poole, 129 F.3d at 552 (plaintiff suing under Age Discrimination in Employment Act created genuine issue of material fact when plaintiff offered evidence that supervisor repeatedly made comments about her age, gradually reduced her responsibilities and had his wife sit at her desk, and eventually moved her to another department, giving her only a chair and not a desk and instructing other employees in department not to speak to her).

Knight or by taking some other action. Because a reasonable person in Embry's situation would not have felt compelled to resign, Embry's claim for constructive discharge under Title VII fails. No issue of material fact remains, and defendant is entitled to judgment as a matter of law on the constructive discharge claim.

**C. State Law Claim**

"Alabama does not recognize an independent cause of action for sexual harassment." Machen v. Childersburg Bancorporation, Inc., 761 So. 2d 981, 983 n.1 (Ala. 1999). Instead, sexual harassment claims must be brought under tort theories, such as invasion of privacy, assault and battery, and negligent training and supervision. Id. To establish a cause of action for negligent training and supervision and hold an employer liable for the intentional torts of an employee, a plaintiff must show one of the following: (1) that the employee's wrongful acts were committed in the line and scope of his employment; (2) that the acts were committed in furtherance of the business of the employer; or (3) that the employer participated in, authorized, or ratified the wrongful acts. Id. at 984 (citing Mardis v. Robbins Tire & Rubber Co., 669 So. 2d 885, 889 (Ala. 1995)). There is no question that Knight was not acting within the line and scope of his employment when he harassed Embry or that his actions were not committed in furtherance of M.C. Products' business. Thus, the only question before the court is whether M.C.

26

Products participated in, authorized, or ratified Knight's conduct. To prove this, a plaintiff must prove the underlying tortious conduct of the harasser and also (1) that the employer "'had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation.'" Machen, 761 So. 2d at 985 (quoting Potts v. BE & K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992)).

In the instant case, plaintiff cannot prove that defendant participated in, authorized, or ratified the harasser's conduct because he cannot prove the harasser's underlying tortious conduct. The Alabama Supreme Court has explicitly recognized that proving the underlying tortious conduct on the part of the employer's agent is a prerequisite to showing an employer participated in, authorized, or ratified the agent's conduct. Stevenson v. Precision Standard, Inc., 762 So. 2d 820, 824-25 (Ala. 1999) (holding that because the jury exonerated the supervisor, the employer "simply cannot be held liable for authorizing or ratifying conduct that, according to the jury, did not occur"). In the instant case, because plaintiff has failed to establish a prima facie case of sexual harassment, plaintiff

27

has failed to "prove" the underlying tortious conduct that would make M.C.

Products liable on a negligent training or supervision claim.

Even assuming, arguendo, that plaintiff could prove the underlying tortious

conduct on the part of the employee-harasser, he cannot prove all three of the

remaining elements necessary to hold M.C. Products liable for negligent training

or supervision. Embry could prove that M.C. Products was aware of Knight's

conduct and that it was directed at him because he reported Knight on several

occasions. However, Embry could not prove that, based upon Embry's reports of

Knight's behavior, McCoy and Shelton knew or should have known that Embry

was being sexually harassed. Both McCoy and Shelton were aware of Knight and

Embry's previously friendly relationship. That relationship, combined with

Embry's apparently vague reports of Knight's behavior, did not indicate to McCoy

and Shelton that they should take Embry's allegations of harassment seriously.[14]

---

[14] Shelton's deposition testimony supports the conclusion that he did not know Knight was sexually harassing Embry because of Embry's vague reports:

A. But overall . . . they got along. From getting to know them, I came to find out that they actually live next door to each other. I also know that they used to ride to work together. . . .

Q. Do you know of any problems that Doug reported he had with Mr. Knight?

A. I know that once Doug said to me that Mr. Knight was staring at him. I didn't quite understand what that meant.

. . .

Now, when he said that, I didn't know what to take of it. I didn't know what to take of it, you know. . . . we [McCoy and Shelton] all were just a little confused. . . . [McCoy] kept asking Doug, what do you mean, what do you mean staring at me? And, you know, Doug would just say that he keeps looking at me and

Despite the fact that it was not clear to them that Knight was sexually harassing

Embry, McCoy still took measures to remedy the situation.  He moved Embry

from the cap and base department once and held a meeting to discuss the issue.

McCoy was not given the opportunity to move Embry a second time or take any

other action because Embry quit when he was not moved the very next day.

In summary, the court finds that no material issues of fact remain and that

defendant M.C. Products, Inc. is entitled to judgment as a matter of law as to all

claims asserted by plaintiff.  A separate order will be entered.

DONE this 23rd day of September, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

wouldn't go - wouldn't elaborate on it, just kept saying he keeps looking at me. . . .