**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JERRY LEON DEES, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | **CASE NO.** |
| ) | **2:07-cv-00306-MHT-CSC** |
| HYUNDAI MOTOR MANUFACTURING ) | |
| ALABAMA, LLC, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S CONSOLIDATED TRIAL BRIEF AND RESPONSES IN OPPOSITION TO DEFENDANT'S MOTIONS I N LIMINE**

Comes now the Plaintiff, JERRY LEON DEES, JR. ("Dees") and submits his consolidated trial brief and responses in opposition to Defendant's motions for leave to file motions in limine to: exclude testimony regarding Plaintiff's dismissed claims (Doc. 195); exclude Plaintiff's expert based on Court's summary judgment ruling (Doc. 197); exclude testimony regarding the decision to terminate Plaintiff's employment (Doc. 198); and exclude testimony regarding harassment based on events related to Plaintiff's termination of employment (Doc. 201). This pleading is being filed as a consolidated pleading for the sake of brevity, judicial economy and the Court's convenience. This pleading is intended to address numerous overlapping issues, particularly as relates to the relevance of the evidence Hyundai seeks to exclude. Insofar as the motion to exclude Plaintiff's expert testimony, the Plaintiff relies on his previously submitted opposition concerning Hyundai's effort to exclude expert testimony (see doc. 172, responding to doc. 144), as well as the arguments below relating to the availability of damages for which the expert's testimony remains admissible for the reasons previously stated.

- 2 -

## I. INTRODUCTION

On May 21, 2008, the Court entered and opinion on Defendants' motion for summary judgment (Doc. 186). Based on that opinion, Plaintiff will be trying his USERRA harassment claim and his state law conversion claim. Plaintiff's USERRA termination claim and state law outrage claim were dismissed by the Court. The Court also dismissed Hyundai Motor America from the case.

## II. STATEMENT OF FACTS

Dees is a decorated career military soldier and combat veteran who served in Operation Desert Storm with the U.S. Air Force and Operation Iraqi Freedom with the Alabama National Guard ("Guard"). In addition to his exemplary military record, Sgt. Dees has an unblemished civilian employment record.

Dees also maintained an exemplary work record at HMMA from his hiring on November 21, 2005 until the summer of 2006 when HMMA ordered him to work an unscheduled weekend that conflicted with his monthly Guard drill obligations. Dees' supervisor, Greg Prater ("Prater"), demanded that Dees produce written orders for his drill weekend, despite Prater having been previously in the Guard and familiar with their procedures.

In fact, Prater frequently made derogatory comments about the Guard. For example, Prater told Dees, "What do you need to go down there for, all y'all do is party;" after a Guard drill weekend, Prater demanded orders and told Dees that he was going to get written up, and that he was going to get fired for his military service; Prater told Dees that he and his fellow Guardsmen weren't anything but a bunch of "weekend wienie wannabes;" Prater told Dees in a group setting that Dees and his fellow Guardsmen were a bunch of losers wanting to play army.

Although Prater knew that written orders were not required, Dees reminded Prater that the Guard provided its members a YTC, or yearly training calendar, which included all scheduled Guard drill weekends for the year 2006, and that Dees had already provided the YTC to HMMA. Nevertheless, HMMA, knowing that it had the Guard's YTC and that these were the only "orders" that Dees could provide, repeatedly demanded that Dees produce "written orders" each time Dees stated that he had to fulfill his Guard obligations.

When the repeated demands for written orders did not cease, despite several visits to HMMA human resources as well as to Prater's immediate superior, John Applegate ("Applegate"), Dees asked for assistance from his Guard unit. On or about October 23, 2006, Sergeant Franklin D. Barnes sent HMMA's Human Resources department a Letter Of Instruction ("LOI") explaining that orders for drill weekends were not "cut" or issued on an individual weekend basis. Sergeant Barnes also offered to provide HMMA a Letter of Participation confirming that Sgt. Dees was present at each scheduled drill.

After HMMA received the LOI, HMMA initiated a 4-month-long campaign of harassing Dees because of his Guard obligations. Before Sgt. Barnes wrote his LOI to HMMA, Dees had an unblemished work record during his then eleven-month tenure at HMMA. Within a week of HMMA's receipt of the LOI, HMMA began citing Dees for various alleged rules infractions. By the time HMMA terminated Dees on February 26, 2007, HMMA issued four citations against Dees.

On November 15, 2006, Dees expressed his concern to John Applegate that HMMA, through Prater, was harassing him because of his military obligations. Hyundai's own memo commemorated this meeting. In fact, rather than initiate an investigation into the alleged harassment of Dees required by HMMA's own Anti-Discrimination Policy, Applegate

participated in the harassment. Applegate told Dees to get his mind together and focus on the plant, and told Dees not to worry about his Guard duty and stay at work. Applegate also told Dees that all Guardsmen do at weekend drill is party.

After Dees voiced his concern to Applegate (and after Applegate shrugged off Dees' concern as a "communication problem"), HMMA's harassment of Dees escalated. HMMA tried to force Sgt. Dees to either quit his job or quit the Guard by:

- Demanding orders for every Guard drill weekend, which were impossible to produce;

- Telling Sgt. Dees not to worry about his Guard duty and stay at work;

- Threatening to deduct his military leave from his vacation time;

- Ridiculing Dees and the Guard (*e.g.*, After a Guard drill weekend, Prater demanded orders and told Dees that he was going to get written up, and that he was going to get fired for his military service; Prater told Dees that he and his fellow Guardsmen weren't anything but a bunch of "weekend wienie wannabes;" Prater told Dees in a group setting that Dees and his fellow Guardsmen were a bunch of losers wanting to play army);

- Telling Dees to focus on his job at HMMA and not worry about the Guard; and

- Threatening to charge Sgt. Dees with harassment because Dees asked a manager to put locks on the gangboxes so that maintenance employees could keep their tools secure.

HMMA also punished Sgt. Dees for honoring his Guard drill obligations by assigning him to the dirtiest, most dangerous jobs in the plant. For example, Greg Prater assigned Dees to clean the "pit" more than any other employee. (The "pit" is a concrete-enclosed area directly under the two stamping presses where razor-sharp scrap metal from the stamping presses are flung and where hydraulic fluid, lubricating oil, and other effluents from production flow. Working in the pit is a noisy, filthy, highly dangerous job that everyone in the maintenance department dreads. Employees working in the pit must wear ballistic sleeves over their clothing,

safety glasses to protect against flying metal shards, and ear protection to prevent hearing loss from the 90 decibel noise level).

What's more, Daily Reports, which HMMA required team members to complete each day chronicling what the team member observed and did that day, that would confirm that Sgt. Dees worked in the pit more than his co-workers, no longer exist. Prater destroyed these Daily Reports after this suit was filed.

As a result of this harassment, Dees felt anger and humiliation at having his lifelong commitment to God and country, as well as the commitments of his fellow Guardsmen, denigrated and belittled by those who obviously had no respect for the freedom he and they helped provide. Dees felt degraded by the harassment, and the harassment caused tension at home and undue stress in the workplace. Dees began to dread going to work because of the harassment.

When it became obvious that Sgt. Dees would not quit HMMA or the Guard, HMMA began scheming on how to terminate Dees without running afoul of USERRA. HMMA tried to get Dees' co-workers to lie and say Dees was creating a hostile work environment.

Dees voiced his concern over HMMA's retaliation against him to no less than seven members of HMMA management. On February 6, 2007, Sgt. Dees wrote an email to Greg Kimble in HMMA's Human Resources Department requesting a third meeting with Human Resources to discuss HMMA's continued retaliation against him because of his military obligations with the Guard.

On February 13, 2007, one week after Sgt. Dees' request for a third meeting with HMMA's Human Resources Department, HMMA allegedly "caught" Dees asleep in a chair in an isolated part of the plant in which Dees was not supposed to be, behind doors that Dees had

positioned to serve as "blinds" to hide him from view. These allegations were patently false, and designed to further harass Dees by getting him fired.

Dees told HMMA during an interview conducted by Prater and a member of Team Relations that his co-worker, Shane Archer had been with him the entire evening and could prove that he was not asleep. Dees begged Prater and HMMA to interview Archer. However, HMMA refused to interview Archer before terminating Dees.

On February 26, 2007, HMMA fired Dees shortly after he arrived at work. HMMA ordered security guards to remove Dees from the premises like a common criminal or prisoner. Despite repeated requests to Prater and Applegate, as well as the security personnel, Dees was not allowed to retrieve his personal belongings from his locker. Instead, the security guards told him: "we'll mail it to you." Despite these assurances, HMMA never sent the remainder of Dees' personal belongings to him, nor did HMMA ever notify Dees to come get them.

In a final act of harassment, when HMMA learned that Dees had inquired about a Peer Review, a process by which he might be able to get his job back, HMMA sent Clevenger to the SOP area where Dees was "caught" sleeping in order to **stage** photographs that would support HMMA's claim of sleeping, so as to prevent Dees from getting his job back. These photographs were clearly **staged** in order support the claim fabricated by Applegate that Dees` was trying hide while sleeping.

## VII. ARGUMENT

### A. Plaintiff's USERRA harassment claim

HMMA acknowledges that Dees, as a U.S. Army National Guardsman, is entitled to the protections provided by the Uniformed Services Employment and Reemployments Rights Act of

1994, 38 U.S.C. § 4301, et seq. ("USERRA"). USERRA protects veterans against discrimination in their employment on account of their prior military service.

As noted by the Court in its Opinion (Doc. 186, pp. 14-18), although not specifically provided for in the statute, a claim of discriminatory harassment is cognizable under USERRA, because Congress intended the phrase "benefit of employment" to be interpreted expansively in order to support veterans. *Petersen v. Dept. of Interior*, 71 M.S.P.R. 227, 236 (1996). The *Petersen* court further noted the Supreme Court has broadly construed USERRA's predecessor statutes [*Id.* (citations omitted)], and that courts have consistently held other anti-discrimination statutes to prohibit harassment despite the lack of anti-harassment language. *Id.* at 238-39.

Although the Eleventh Circuit has not addressed whether USERRA allows a harassment claim, it has acknowledged the prohibition against harassment in other discrimination statutes. *See, e.g., Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367 (11th Cir. 2000) (school district may be liable under Title IX for teacher's sexual harassment of a student); *E.E.O.C. v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244 (11th Cir. 1997) (awarding back pay for harassment under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et. seq.*).

HMMA subjected Dees to harassment based on his military service and obligations "sufficiently pervasive to alter conditions of employment and create an abusive working environment." *Maher v. City of Chicago*, 406 F. Supp. 2d 1006, 1023 (N.D. Ill. 2006).

The disparaging comments of Prater and Applegate "were not stray remarks in the workplace or statements by lower level employees. They are ... direct evidence that the allegedly discriminatory conduct was animated by [plaintiff's] involvement in the military... and the significance to be attributed to them is for the jury to determine." *Maher*, 406 F. Supp. 2d at 1030 (citing *Volovsek v. Wisc. Dept. of Agriculture, Trade, and Consumer Protection*, 344 F.3d

680, 690 (7th Cir. 2003) (supervisors' comments sufficient to preclude summary judgment in gender discrimination case)). Moreover, even "stray remarks by nondecisionmakers ... may ... be considered 'evidence of a company's general atmosphere of discrimination.'" *Velazquez-Garcia v. Horizon Lines of Puerto Rico, Inc.*, 473 F.2d 11, 17 (1st Cir. 2007) (reversing trial court's grant of summary judgment to employer on USERRA claim) (citation omitted). "'[S]uch evidence ... tend[s] to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff.'" *Velazquez- Garcia*, 473 F.2d at 17 (citation omitted). *See also, Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3rd Cir.1997) ("Although stray remarks by non-decisionmakers alone are insufficient to establish discriminatory intent, we have held that such remarks can still constitute evidence of the atmosphere in which the employment decision was carried out.").

In *Fink v. City of New York*, 129 F. Supp. 2d 511, 521 n. 2 (E.D.N.Y. 2001), for example, the plaintiff testified that when he spoke to his supervisor to convince him that federal law required plaintiff to get credit for his pension while he was on active duty in Bosnia, the supervisor said "[I] don't know nothing about the law. This is the way the fire department does it" and that he "didn't want to hear it... this is the fire department. This is the way we do it. Period. That's it. You're not getting it." The court found these to be "open expressions of hostility toward [plaintiff] and his requests" and that based on this evidence and other evidence of hostility, "a reasonable juror could certainly conclude that [plaintiff's] veteran status motivated or contributed to the [employment-related] decision." *Id*.

Likewise, in *Maher*, the court denied summary judgment on a USERRA claim where supervisors made comments to plaintiff about him being "off gallivanting in Bosnia," told him he did not have a telephone because he was "on one of those damn military leaves" when the

phones were installed, told him he was too old to be in the military, "refused to do anything about the files stacked in the plaintiff's office and hectored plaintiff continuously when he was doing a leadership course for the Naval Reserves." *Maher*, 406 F. Supp. 2d at 1023-24 & 1030.

Similarly, when Dees complained to Applegate about the harassment because of his military obligations, Applegate backed Prater's decisions and confirmed Prater could run his department has Prater saw fit. Both Prater and Applegate made derogatory remarks about the Guard and its members, as discussed *supra*. What's more, Team Relations confirmed that Prater could run his department has he saw fit.

HMMA ignoring Dees' complaints of harassment were in clear contravention of HMMA's Anti-Harassment Policy, which required "prompt and appropriate action." The policy was totally ignored. No action was ever taken.

As in these cases, HMMA's ongoing harassment of and outward hostility toward Sgt. Dees based on his military status is sufficient, in and of itself, to establish HMMA's discriminatory motivation.

1. **HMMA's destruction of records is evidence of discriminatory intent and willfulness in harassing Sgt. Dees**

All stamping maintenance employees, including Dees, were required to complete "Daily Reports" which show the tasks that employee worked on that day. As the evidence will show, an analysis of these reports would clearly prove that Dees was assigned pit duty more than his coworkers. After this case was filed, HMMA destroyed these reports.

The jury in this case "may (but need not) infer" from HMMA's destruction of these records, all of which would be relevant to the issue of HMMA's discriminatory animus and motivation in firing Dees, "that the contents of the document[s] were unfavorable to [HMMA]." *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998). "This permissive negative

inference springs from the commonsense notion that a party who destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position." *Id.*

**2. Dees' being accused of sleeping on the job was another act of harassment**

Although the Court has ruled that the Termination Committee's decision to fire Dees for intentionally sleeping was not made in bad faith based on the lack of knowledge of the other bad acts, Dees is still entitled to argue that the circumstances surrounding HMMA allegedly catching Dees asleep constitute a further act of harassment against Dees by HMMA. HMMA argued successfully that the "Chinese wall" created between the actions of the Termination Committee and the actions of Prater and Applegate protected the Termination Committee's decision from the appearance of "bad faith." HMMA cannot now argue that the Plaintiff should be prevented from arguing the illegal nature of the bad acts perpetrated by HMMA employees **outside the circle of decision-makers** within the Termination Committee. HMMA should not be able to have it both ways.

The incident involving HMMA catching Dees asleep is yet another act of harassment. First, HMMA claims that the area where Dees was claimed to be sleeping, the SOP (Side Outer Panel area), was an unusual place for Dees to be, out of the way and not in the location where he should have been working. Second, HMMA claims that Dees fabricated a "blind" by opening two doors on the PLC ["Programmable Logic Computer"] cabinet on both sides of his chair so that no one could see him sleeping.

Both "facts" are demonstrably false. First, Dees was normally assigned to the SOP, and it was normal and very common for him to be on the third floor mezzanine (where he was

allegedly sleeping) assisting the production department in operating the system, and diagnosing and repairing any problems.

Second, nowhere during Team Relations' investigation into the incident did information arise regarding Dees creating a "blind" to hide himself from view behind the PLC doors until it appeared in a memo from Rob Clevenger, Team Relations Manager, to Greg Kimble, Vice President – Human Resources, dated February 23, 2007. Clevenger got this information **from Applegate**, and the one eyewitness to this incident, Jim Brookshire, never mentioned the PLC doors being open or claimed that Dees had created a blind.

What's more, almost three weeks after the alleged sleeping incident, HMMA sent Clevenger to the SOP area to stage a series of photographs purporting to show that Dees had in fact created a blind to hide himself while he slept. This further harassment was carried out to prevent Dees from getting his job back through the Peer Review process.

Moreover, HMMA never interviewed Shane Archer, who was working side-by-side with Dees that night, despite Dees begging HMMA to interview Archer. Dees told HMMA that Archer had been with him only moments before Brookshire appeared in the SOP area. HMMA did not interview the one witness that could have corroborated Dees' version of events.

Finally, and importantly, HMMA did not simply terminate Dees without cause, as HMMA has strenuously argued it had the right to do under Alabama's at-will employment doctrine. Instead, HMMA chose to fabricate a false reason to terminate Dees in order to further harass Dees and stain his unblemished record and reputation permanently, and to provide justification for and cover up its previous harassment.

The above evidence "showing that [defendants] lied about the reasons for [their] acts – that [they] had a 'dishonest belief' in the reasons – can be strong evidence that [they] acted with

discriminatory intent." *Woodard v. Fanboy, LLC*, 298 F.3d 1261, 1265 (11th Cir. 2002). *See also, Smith v. School Board of Polk County, Fla.*, 205 F. Supp. 2d 1308 (M.D.Fla. 2002) (comments by supervisor sufficient to show that employee's reserve status was a motivating factor in certain conduct); *Gillie-Harp v. Cardinal Health, Inc.*, 249 F.Supp.2d 1113 (W.D.Wis. 2003) (supervisor's hostile comments about plaintiff's requests for military leaves along with other evidence precluded summary judgment); *Leisek v. Brightwood Corp.*, 278 F.3d 895, 900 (9th Cir. 2002) (inference of discrimination from evidence that plaintiff was told to deduct military leave from his vacation time and that future leave orders would not be honored).

HMMA wanted Sgt. Dees to quit because of his military obligations and, after it became obvious that he would not quit despite suffering all the harassment HMMA could dish out, and after Sgt. Dees had yet again complained to HMMA Human Resources, HMMA falsely accused Dees of intentionally sleeping on the job in order to harass Dees further, and to justify its previous harassment of Dees and cover it up. *See Hill v. Michelin North America, Inc.*, 252 F.3d 307, 312-13 (4th Cir. 2001) ("Because USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries."); *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment and noting that "determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury" (internal quotation marks and citation omitted)).

### a. Dees will prove compensatory damages in the nature of lost wages and benefits as well as non-economic damages

Relative to his USERRA harassment claim, Dees claims compensatory damages in the form of lost wages and benefits, liquidated damages, and non-economic damages in the form of mental anguish due to the harassment he suffered at the hands of HMMA.

Dees is entitled to prove and recover compensatory damages in the form of lost wages and benefits related to the adverse employment action suffered by Dees resulting from HMMA's harassing conduct whereby Dees was falsely accused of sleeping in order to get him fired. This harassment is outside of the scope of the decision of the Termination Committee to terminate Dees for sleeping. Plaintiff accepts the Court's ruling that the Termination Committee did not act in bad faith when it terminated Dees. Because of the "Chinese wall" HMMA has created between the Termination Committee and the HMMA personnel committing the harassing conduct, however, the Court's decision as to the Termination Committee should not be equally applicable to the bad actors. HMMA should not be able to have its cake and eat it, too.

HMMA is one of the highest-paying employers for his skill set in the central Alabama area, and he will likely never make as much money anywhere else as he did at HMMA. Dees claims both back pay and front pay compensatory damages totaling $375,000. What's more, it is within the Court's discretion based upon USERRA's broad equitable powers to award Dees front pay damages, even without considering Dees' possible future wages. *See Carpenter v. Tyler*, 226 Fed.Appx. 400, 401, 2007 WL 1112653 (5th Cir. April 12, 2007).

Dees also claims liquidated damages under USERRA. Under USERRA, liquidated damages of an amount equal to compensatory damages are available when the prohibited conduct is willful. Here, HMMA's harassing conduct was clearly willful.

Dees further claims **mental anguish damages** for the harassment perpetrated against him by HMMA because of Dees' military membership and obligations. Mental anguish damages are allowed for discrimination under USERRA. See Pl.'s Opp. to Mot. to Strike, etc., filed concurrently herewith. Nor is medical evidence required to support an award for mental anguish. *See Fink*, 129 F.Supp.2d at 531. Mental anguish damages are based on the degradation,

humiliation, and stress brought on by the illegal harassment that necessitated Dees always working with a co-worker to protect himself from attack, as well as resulted in the sense of dread Dees felt when it was time to go to work at HMMA.

## B.  Dees' state law conversion claim

The evidence will show that HMMA prevented Dees from retrieving his personal belongings from his locker before he left the HMMA plant. Once Dees realized that he was being terminated, despite Applegate's assurances he was not, he attempted to retrieve his personal belongings from his locker, but the security officers refused to let him back in the plant.

Dees told the security guards he was not leaving without his gear, so Prater and Applegate volunteered to retrieve his gear for him. Dees gave Prater and Applegate his locker keys, and Prater and Applegate did retrieve Dees' jacket and a small music player given to employees as a Christmas present, but did not retrieve anything else of Dees' personal belongings. Dees told the security officers that all Prater had brought was his jacket and the music player, and asked when he would get the rest of his belongings. The security staff said, "we'll mail it to you." Dees was repeatedly told he was not allowed to return to the plant to retrieve the rest of his belongings, including his tool bag, several Army pay stubs that contained Dees' personal banking and social security info, and his several pages of notes about all of the incidents of harassing conduct perpetrated by HMMA on him during the preceding several months. Further, the notes regarding the harassment were in Dees' jacket pocket and, therefore, must have been intentionally removed by Prater and Applegate. (Fortunately for Dees, one of his co-workers brought his tool bag to him outside the gate before Dees left the parking lot on the night Dees was fired.)

Prater and Applegate were acting within the scope of their employment when they converted Dees' personal property. Both were management employees, and retrieving Dees' belongings was an act committed as part of Dees' termination. *See Joyner v. AAA Cooper Transportation*, 477 So. 2d 364, 365 (Ala. 1985) (to hold employer liable for acts of employee, claimant must show employee acted within the line and scope of his employment, the acts were in furtherance of the employer's business, or that the employer ratified the employee's conduct). Dees' also repeatedly told security personnel that his belongings were still in the plant, but Dees' personal property was not returned to him that day, nor at any other time. HMMA is liable for conversion under Alabama law. *See Kemp's Wrecker Serv. v. Grassland Sod Co.*, 404 So. 2d 348, 352 (Ala.Civ.App. 1981) (conversion liability upon destruction of personalty belonging to another); *Birmingham Jefferson County Transit Auth. v. Arvan*, 669 So. 2d 825 (Ala. 1995) (authority's failure to return to employee after termination certain items of personal property was sufficient for conversion judgment). Moreover, HMMA's alleged return of the contents of Dees' locker **after this litigation was commenced** does not preclude Dees' action for HMMA's conversion of that property. *See Brown v. Campbell*, 536 So. 2d 920 (Ala. 1988) (rejecting defendant's contention that returning property before trial precludes action for conversion; there was evidence defendant refused to surrender property after plaintiff requested it).

While the items converted by Defendants – Dees' personal notes on HMMA's pattern of harassment and his Army pay stubs – have no distinguishable face value or readily ascertainable market value, they do have a value that must be determined by the jury. Dees asserts that the pages of notes detailing every aspect of HMMA's harassing conduct were his case, because the notes would have allowed him to be more precise about the dates, times and nature of each incident of HMMA's harassment. Dees, therefore, places a value to him on the notes equivalent

to the compensatory damages by his expert, or $375,000. This testimony is proper under Alabama law. *Lary v. Gardner*, 908 So. 2d 955, 959 (Ala.Civ.App. 2005) ("The Plaintiff, in the absence of evidence showing market value, may prove other factors of value such as the value of the property to him." (citations omitted)), *citing Sarkesian v. Cedric Chase Photographic Laboratories*, 324 Mass. 620, 622, 87 N.E.2d 745, 746 (1949) ("The ordinary measure of damages for the loss of property … which … has no market value, is the actual value of the property to its owner." (citations omitted)). Also, Dees' pay stubs contained his personal banking and social security information that could be used to steal his identity.

Dees further has suffered mental anguish relating to HMMA's conversion of his military pay stubs and his notes of HMMA's harassing conduct. Mental anguish damages are available under Alabama law for conversion of personal property. *See Williford v. Emerton*, 935 So. 2d 1150, 1155 (Ala. 2004) (mental anguish damages allowed for loss of converted personal property, including wedding gifts and wedding photos); *New Plan Realty Trust v. Morgan*, 792 So. 2d 351, 364 (Ala. 2000) (mental anguish damages allowed for loss of converted household belongings).

Because of the conversion of Dees' notes of HMMA's harassing conduct, Dees has suffered stress related to whether the absence of the notes has negatively impacted his case against HMMA. Also, because of the conversion of his military pay stubs, Dees has suffered stress related to the reasonable fear that his personal banking information and social security number might be used to steal his identity.

WHEREFORE, the PREMISES CONSIDERED, Defendant's motions in limine addressed above are due to be denied.

        Respectfully submitted,

        /s/ Jeffrey R. Sport_____
        Jeffrey R. Sport (SPORJ5390)

OF COUNSEL:

KILBORN, ROEBUCK & McDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747
E-mail: jeff.sport@sportlaw.us

        **Attorney for Plaintiff**

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on this 26th day of May, 2008, electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

Timothy A. Palmer, Esq.
J. Trent Scofield, Esq.
T. Scott Kelly, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118

Matthew K. Johnson, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602

        /s/ Jeffrey R. Sport_____
        COUNSEL