**IN THE UNITED STATES DISTRICT COURT**
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JERRY LEON DEES, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | **CASE NO.** |
| | ) | **2:07-cv-00306-MHT-CSC** |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO RECONSIDER THE
COURT'S DISMISSAL OF PLAINTIFF'S USERRA TERMINATION CLAIM**

Comes now the Plaintiff, JERRY LEON DEES, JR. ("Dees"), by and through his counsel of record, and files this memorandum in support of his motion to reconsider the Court's dismissal of his USERRA termination claim, stating as follows:

On May 21, 2008, the Court dismissed Plaintiff's USERRA termination claim on HMMA's motion for summary judgment. (Doc.'s 186 and 187).

In so doing, the Court cited three premises upon which it relied, as follows:

- Only Prater "harbored some animus" towards Dees because of Dees' Guard membership and, since Prater did not participate in the decision to fire Dees, Prater's animus cannot be imputed to HMMA to hold HMMA liable for Dees' termination;

- Because Brookshire found Dees sleeping, and no bias was attributed to Brookshire, then Brookshire had no discriminatory motive when he allegedly observed Dees sleeping; and

- The termination proceeding was based solely on the allegations that Dees was asleep on the job so, therefore, Dees cannot show that his military status was a "motivating factor" in his termination.

As discussed below, Plaintiff has presented significant evidence that these three premises are not supported by the weight of the evidence and, taken in the light most favorable to the Plaintiff, a reasonable jury could conclude that Dees' military membership was a motivating factor in his termination by HMMA.

**Only Prater Harbored Animus Towards Dees About Dees' Guard Duty**

The premise that only Prater harbored animus towards Dees and was the only actor at HMMA that harassed Dees because of his Guard membership and obligations is contradicted by the sheer weight of the evidence.

In addition to the significant and pervasive harassment visited upon Dees by Prater because of Dees' Guard membership and obligations, cited by the Court in its Opinion dated May 21. 2008, John Applegate, Sr. Manager of Maintenance and Prater's immediate supervisor, also subjected Dees to harassment because of Dees' Guard membership and obligations. Applegate harbored animus against Dees because of the Guard's letter of instruction ("LOI") sent to HMMA, and not only was Applegate aware of the harassment perpetrated on Dees because of his Guard membership and obligations, he participated in it.

What's more, Applegate participated in the Termination Committee meeting, and Applegate made the recommendation to terminate Dees. [Clevenger Depo. at 39:5-21; 162:16-163:3] Applegate was, therefore, the decision-maker regarding whether Dees would be terminated.

During the months-long harassment by Prater, Dees attempted to end the harassment by, among other things, meeting with Applegate, which Dees did two or three times. [Dees Depo., Pl. Evid. Sub. in Support of His Opposition to Def. Mot. Sum. Jud., Exhibit 1 (Doc. 108-2), at 101:11-15] During these meetings, Applegate told Dees not to worry about his Guard duty and stay at work. [Dees Depo. at 102:10-22] Applegate also told Dees he needed to focus more on his job and not worry about his Guard duty, and that most of the time all they (the Guardsmen) do is party down there anyhow. [Dees Depo. at 142:8-16] Further, Applegate told Dees not to worry about the letter Dees' Guard unit sent to HMMA. [Dees Depo. at 173:17-22]

What's more, even after the Guard sent the LOI, Applegate made it clear to Dees that Prater could run the department any way Prater saw fit, and Applegate ratified each and every decision Prater made. [Dees Depo. at 98:15-21; 123:17-21] Finally, when it was obvious that Dees was not going to quit because of the harassment, Applegate told Prater to get rid of Dees. [Dees Depo. at 229:3-13; 245:15-23] This evidence should be considered at the summary judgment stage because it can be made admissible at trial. *See Trevizo v. Adams*, 455 f.3d 1155, 1160 (10th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

After HMMA fired Dees, Applegate participated in the staging of photos of SOPS third-floor mezzanine [Clevenger Depo. at 126:3-22], where Brookshire allegedly observed Dees sleeping, so that Dees would not get his job back if Dees chose to pursue a peer review of his termination. The proof is conclusive that the photographs were staged because:

- The photographs were taken three weeks after the alleged incident [Clevenger Depo. at 125:13-126:6];

- The position of the doors was, depending on the photograph, either open to support the story fabricated by Applegate that Dees created of a "blind," or completely closed; but was not as Brookshire described:

  > 108
  > 8    Q   Okay.  Now, I've heard that somehow or
  > 9  another Mr. Dees had used the doors to provide a
  > 10  hiding place.  Is that your recollection?
  > 11    A   My recollection is at the time of this
  > 12  incident the doors may have been cracked open
  > 13  because sometimes Maintenance doesn't completely
  > 14  shut the doors so they can easily access the
  > 15  panel.  But my recollection was the doors were
  > 16  mostly shut.  I can't account if they were
  > 17  exactly locked shut but they were mostly shut.
  > 18  As far as him using that routinely and opening
  > 19  the doors to hide, I don't know.
  > 20    Q   You didn't see door panels -- excuse
  > 21  me -- you didn't see doors open to the extent
  > 22  that you thought they were being used by
  > 23  Mr. Dees as a blind to hide behind?
  >
  > 109
  > 1    MR. JOHNSON:  Object to the form.
  > 2    A   What I can tell you is the day of the
  > 3  incident that I seen him I can't tell you
  > 4  whether the doors were completely locked or not,
  > 5  but they weren't wide open.

  [Brookshire Depo. at 108:8-109:5];

- Nor was the position of the doors as Gwang Mun, Coordinator for Stamping Maintenance, testified when he examined the area the day after Dees was fired [Mun Depo. at 59:7-61:19]; and

- Clevenger had no reasonable explanation for the photographs and why they differed from eyewitness accounts, and could not say who had set the area up as it was when he and Applegate arrived on the scene on March 5, 2007, and had no idea who re-

staged the scene so different photos could be taken. [Clevenger Depo. at 132:4-133:9; 133:17-134:2; 134:14-135:11; 137:22-141:12].

Dees' team leader Kevin Hughes also harbored animus toward and harassed Dees. After Dee's Guard unit sent the LOI to HMMA, Hughes started "birddogging" Dees. [Dees Depo. at 172:15-173:5] Hughes was involved in the "lift" incident that resulted in Dees getting written up for the fourth time after the Guard issued the LOI. [Dees Depo. at 151:8-154:4] This incident occurred on February 6, 2007 – *the same day* Dees requested another meeting with Greg Kimble, Vice President of Human Resources, to again his harassment because of his Guard duty. [Pl. Evid. Sub. in Support of His Opposition to Def. Mot. Sum. Jud., Exhibit 22 (Doc. 108-23)]

Hughes also participated in assigning Dees to the pit as punishment for complaining about his treatment to his Guard unit. [Dees Depo. at 157:17-158:23] What's more, Hughes was with Jim Brookshire on the night Brookshire allegedly caught Dees asleep in the SOP third floor mezzanine, pointing up at Dees and Shane Archer, just before Archer left the area and Brookshire then came upstairs and allegedly observed Dees sleeping. [Dees Depo. at 199:3-200:1; Archer Declaration, Pl. Evid. Sub. in Support of His Opposition to Def. Mot. Sum. Jud., Exhibit 9, ¶ 7 (Doc. 108-10)]

**Brookshire Could Not Have Had a Discriminatory Motive**

The premise that Brookshire could not have had a discriminatory motive is also contradicted by the weight of the evidence presented. Brookshire was frequently with Hughes and Prater when they disciplined Dees, even though production issues were not involved. [Dees Depo. at 230:3-231:6] Brookshire also participated in sending Dees to clean the pit. [Dees Depo. at 157:17-158:23]

What's more, Brookshire, along with Hughes and Prater, falsely accused Dees of creating a production breakdown and then walking away from the repair on February 6, 2007 (the "lift" incident). [Dees Depo. at 149:21-154:4] As noted above, this false accusation resulted in Prater writing Dees up for the fourth time since the Guard sent the LOI to HMMA. [Ex. A, DEES V HMMA 41-42] This false accusation by Brookshire, Hughes and Prater occurred exactly one week before Brookshire allegedly observed Dees sleeping, and ***on the same day*** as Dees' e-mail to Greg Kimble requesting another meeting to discuss continued harassment because of his Guard duty.

**Termination Proceeding was Based Solely On Sleeping Allegations**

Finally, the premise that the decision of the termination committee was based solely on the allegations of sleeping and, therefore, the termination decision was not made in bad faith, is simply not in accord with the great weight of evidence.

As noted by the Court, Dees was fired for "intentional sleeping." The two facts upon which the termination committee relied to establish Dees intent to sleep (that Dees was in an area he was not supposed to be and that Dees had positioned the doors of the cabinet to form a "blind" so he could avoid detection) were false, and were obviously fabricated by Applegate. Clevenger testified that Applegate gave him both of those pieces of information. [Clevenger Depo. at 48:7-49:7; 89:3-90:10: 92:19-93:19] No mention of these alleged facts, ***fabricated to create the appearance of intent to sleep***, is anywhere else in the record. Brookshire's own statement makes no mention of these fabricated facts. [Ex. B, Clevenger Depo. at 89:13-90:10; Brookshire's Statements, Exhibit C] In fact, Brookshire admitted that the doors were mostly shut, and not open as described by Applegate. [Brookshire depo., Def. Ev. Sub. in Supp. Mot. Sum. Jud., Ex. B (Doc. 68-4), at 108:8-109:5]

Further, Applegate was present at the Termination Committee meeting, and Applegate made the recommendation to terminate Dees. [Clevenger Depo. at 39:5-21; 162:16-163:3] Applegate was, therefore, the decision-maker regarding whether Dees would be terminated. As discussed above, Applegate harbored animus against Dees because of the Guard's LOI sent to HMMA, and not only was Applegate aware of the harassment perpetrated on Dees because of his Guard membership and obligations, he participated in it. Further, Applegate told Prater to get rid of Dees. [Dees Depo. at 229:3-13; 245:15-23]

Therefore, in the light most favorable to Dees, Applegate, who was present at the Termination Committee meeting, fabricated the two critical facts upon which Dees termination for intentional sleeping was based, and made the recommendation to fire Dees, which the Termination Committee merely ratified based on his fabricated facts and his recommendation.

Also, HMMA did not follow its own procedures when Dees complained of harassment. [See HMMA's Anti-Harassment Policy, Ex. D hereto] This policy stated that "(a)ctions, words, jokes, or comments based on an individual's sex, race, ethnicity, age (40+), religion, or any other legally protected characteristic will not be tolerated." [Ex. D, DEES V HMMA 00083-86] The policy further defined discrimination and unlawful harassment as "forms of misconduct that demean another person and undermine the integrity of the employment relationship," and prohibited that conduct. [Ex. D, DEES V HMMA 00083] The policy required that when "HMMA becomes aware that harassment **might** exist, it will take prompt and appropriate action." [Ex. D, DEES V HMMA 00084, ¶ 1 (emphasis added)] The policy further stated that "All reports will be promptly investigated…" [*Id.*, ¶ 3.]

Despite Dees meeting with Applegate two or three times [Dees Depo., *supra*] and meeting with HMMA human resources, including its Vice President, Kimble, on at least two

occasions to report and discuss HMMA's harassment of Dees because of his Guard membership and obligations, no one at HMMA ever investigated Dees' claims as required by HMMA's Anti-Harassment Policy. In fact, Applegate ignored Dees' complaints, writing them off as mere communications problems. [See Ex. E, Discussion Planner dated Nov. 15, 2006] In that memorandum, Dees complained to Applegate, who ignored Dees' complaint, as follows:

> On 11/15/06, Leon from the Press Shop complained that **Greg was not treating him fairly concerning his military duty. He accused Greg of requiring written orders when not required and assigning him hard work as a form of punishment**. I discussed the situation with Greg and Leon. This is another example of a communication problem in Press Maintenance.

[Ex. E (emphasis added)]

When Dees was caught sleeping, however, Prater conducted the investigation. Although Dees had a corroborating witness, Archer, who could confirm Dees was not sleeping and the other details of Dees' version of events, neither Prater nor Team Relations interviewed Archer. Instead, Team Relations chose to blindly believe what Brookshire and Applegate said. Clevenger admitted that this was because a member of management is to be believed before an employee, and no other reason. [Clevenger Depo. at 151:4-152:17]

Because Prater conducted the investigation into Dees sleeping, even though Prater was one of the primary perpetrators of the illegal harassment of Dees, and Prater's deciding not to interview Archer was a decision so out of the realm of fairness in the investigation, the jury should be allowed to view it as circumstantial evidence that Prater was involved in setting Dees up to get fired.

As the Court stated in its Opinion, 38 U.S.C. § 4311 prohibits discrimination in employment if the employee's membership in the armed services 'is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the

absence of such membership.'" [Doc. 186 at 8.] To present his USERRA claim to the jury, therefore, Dees must present evidence from which a reasonable jury could conclude that his protected status was a motivating factor in his termination. "A motivating factor does not mean that it had to be the sole cause of the employment action. Instead, it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Coffman v. Chugach Support Services, Inc.*, 411 F.3d 1231, 1238 (11th Cir. 2005) (quotations and citations omitted). "Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Id.* (citations omitted).

"Circumstantial evidence plays a critical part in these cases, for discrimination is seldom open or notorious." *Id.* (quotations and citations omitted). Furthermore, "(t)he court can infer discriminatory motivation under USERRA from a variety of considerations, such as: proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the preferred reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with the knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Id.*

The evidence presented above, taken in the light most favorable to Dees, shows that Applegate, Prater, Hughes and Brookshire participated in harassing and retaliatory acts that subjected Dees to harassment because of his Guard membership and obligations. When Dees would not quit, Applegate directed Prater to get rid of Dees. Hughes and Brookshire participated in the acts that led to Brookshire accusing Dees of sleeping on the job. In order to show that Dees was intentionally asleep, Applegate fabricated the "facts" that Dees was in an isolated area he was not supposed to be, and that Dees had created a "blind" by placing his chair between two

open doors to hide himself from view. Despite the existence of Archer, a corroborating witness that would confirm Dees' version of events, Prater, who conducted the investigation, refused to interview Archer. Applegate then had the fabricated facts showing that Dees intended to sleep, along with Applegate's recommendation to fire Dees, placed in the summary memo given to the Termination Committee. Applegate participated in that meeting and reiterated these fabricated facts and his recommendation to terminate Dees. On Applegate's recommendation and the false evidence presented, the Termination Committee voted to fire Dees.

Since Applegate participated in the harassment along with his direct report, Prater, and Brookshire, the manager that allegedly caught Dees sleeping, and because Applegate fabricated the false evidence used to convince the Termination Committee that Dees was intentionally sleeping on the job, sufficient evidence exists from which a reasonable jury could conclude that Dees' Guard membership was a motivating factor in his termination.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully moves the Court to reconsider its dismissal of Plaintiff's USERRA termination claim, and to reinstate said claim.

Respectfully submitted,


s/ Jeffrey R. Sport_____
Jeffrey R. Sport (SPORJ5390)

OF COUNSEL:

KILBORN, ROEBUCK & McDONALD
1810 Old Government Street
Post Office Box 66710
Mobile, Alabama 36660
Telephone: (251) 479-9010
Fax: (251) 479-6747
E-mail: jeff.sport@sportlaw.us

**Attorney for Plaintiff**

**CERTIFICATE OF SERVICE**

I do hereby certify that I have on the 2nd day of June, 2008, electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send notification of such filing to:

J. Trent Scofield, Esq.
Timothy A. Palmer, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203-2118

Matthew K. Johnson, Esq.
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
P.O. Box 2757
Greenville, SC 29602

s/ Jeffrey R. Sport_____
COUNSEL

ENTERED

| HYUNDAI<br>Hyundai Motor Manufacturing Alabama | DISCUSSION PLANNER | HR-AL-HR-TR-F-00028 |
|---|---|---|
| Rev Date: 06/24/06 | Owner: Team Relations | Revision Level: 02 |

| DATE | 2.5.07 |
|---|---|
| **SUPERVISOR NAME**<br>(originator of this document) | Greg Prater |
| **DISCUSSION WITH:**<br>Include T/M# & Department | Leon Dees (103039)    Maint. |
| **SITUATION**<br>To be discussed | Walking away from a breakdown situation (job) |
| **DESCRIBE PERSON INVOLVED**<br>* Performance/Work Habits Record<br>* General Behavior<br>* Specifics for KP-1 | TM look to Leon for advise on SOPS |
| **OBJECTIVE'S)**<br>* What do you hope to accomplish<br>in this discussion | Discussing walking away from a job or Breakdown situation without communication |
| **CRITICAL STEPS TO BE USED**<br>* Which key principles will you use?<br>When? | examples |
| **BACKGROUND INFORMATION**<br>* Facts Known<br>* Information Needed<br>* Concerns<br>* Possible cause(s)/reason(s) for the<br>situation<br>* Consequences to T/M if the situation<br>continues<br>* Other | There was a breakdown situation on the VL and Shane and Leon were working on the VL, Leon left the breakdown and went to lunch with no face to face with the turn over which Kevin Hughes was leading that repair group. Leon is assigned the SOPS |
| **ALTERNATIVES**<br>* Possible actions/solutions<br>* Resources available<br>* Constraints | |

EXHIBIT

A

tabbies

Printed Document for Reference Only

Rev #: 02<br>Rev Date: 6/24/2006

DEES V HMMA 00041  DOCS PRODUCED

DISCUSSION SUMMARY

I spoke to Leon investigating the incident, during his interview, Greg Prater asked Leon what could have went better, and Leon refused to answer, then Greg Prater said that, Leon is a ssigned SOPS he (Leon) was responsible for this area, that he was heading the repair up, Leon should and alway be the one doing a hand over on a breakdown, if he were going to lunch, or take a later lunch, and complete the breakdown, Greg Prater also explained that Leon needed to work with Kevin, have a working relationship between he and Kevin, Greg expects Leon to follow instructions from Kevin, that if there was an issue to follow up with Greg Prater or any other member of management, if there was a safety concern, Greg told Leon that just walking away from a breakdown situation adn go to lunch and let someone else give a pass down, who is not as skilled in particular area. he told me he didnt have anything to say to Kevin.

| SPECIFIC ACTIONS: | PERSON RESPONSIBLE | BY WHEN |
|---|---|---|
| | | |

FOLLOW-UP
* Date, Time, Place
* Other

REVIEW

To what extent did you meet your objectives?

all

What Critical Steps/Key Principles did you handle most effectively?

examples

What Critical Steps/Key Principles could you have used more effectively?

What will you do differently in your next discussion?

none.

DEES V HMMA 00042  DOCS PRODUCED

ROBERT ALLEN CLEVENGER

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CASE NO.: 2:07-cv-00306-MHT-CSC


JERRY LEON DEES, JR.,

      Plaintiff,

        V.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and

HYUNDAI MOTOR AMERICA, INC.,

      Defendants.



S T I P U L A T I O N S



    IT IS STIPULATED AND AGREED by and

between the parties, through their respective

counsel, that the deposition of ROBERT ALLEN

CLEVENGER may be taken before STACEY L. JOHNSON,

Commissioner, at the Hampton Inn, Tampa Room, 60

Wasden Road, Hope Hull, Alabama, on the 13th day

of December, 2007.

Exhibit
B

ROBERT ALLEN CLEVENGER

Page 2

1      IT IS FURTHER STIPULATED AND AGREED
2  that the signature to and the reading of the
3  deposition by the witness is hereby not waived,
4  the deposition to have the same force and effect
5  as if full compliance had been had with all laws
6  and rules of Court relating to the taking of
7  depositions.
8      IT IS FURTHER STIPULATED AND AGREED
9  that it shall not be necessary for any
10  objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties may
13  make objections and assign grounds at the time
14  of trial, or at the time said deposition is
15  offered in evidence, or prior thereto.
16      IT IS FURTHER STIPULATED AND AGREED
17  that the notice of filing of the deposition by
18  the Commissioner is waived.
19
20
21
22
23

Page 4

1     A P P E A R A N C E S
2  FOR THE PLAINTIFF, JERRY LEON DEES, JR.:
3    KILBORN, ROEBUCK & McDONALD
3    Jeffrey R. Sport
4    (SPORJ5390)
4    jeff.sport@sportlaw.us
5
5    Vincent F. Kilborn, III
6    (KILBV4484)
6    1810 Old Government Street
7    Mobile, Alabama  36606
7    (251) 479-9010
8
8  FOR THE DEFENDANTS, HYUNDAI MOTOR MANUFACTURING
9
10  ALABAMA, LLC and HYUNDAI MOTOR AMERICA, INC.:
11    OGLETREE, DEAKINS, NASH, SMOAK
11      & STEWART, P.C.
12    J. Trent Scofield
12    One Federal Place
13    Suite 1000
13    1819 Fifth Avenue North
14    Birmingham, Alabama  35203
14
15
15  HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC
16    Christopher N. Smith
16    chrissmith@hmmausa.com
17    700 Hyundai Boulevard
17    Montgomery, Alabama  36105
18    (334) 387-8057
18
19
19
20
20
21
22
23

Page 3

1        INDEX
2  EXAMINATION BY:       PAGE NUMBER:
3  Mr. Kilborn...............5-212
4
5  EXHIBITS:
6  Plaintiff's Exhibit 21......................18
7    (Team Discussion Meeting)
8  Plaintiff's Exhibit 22......................38
9    (Team Relations Memo)
10  Plaintiff's Exhibit 23.....................125
11    (photographs)
12  Plaintiff's Exhibit 24.....................129
13    (2-2-07 Inter-Office Memo to R. Clevenger)
14  Plaintiff's Exhibit 25.....................130
15    (3-7-07 letter to Jerry Leon Dees, Jr.)
16  Plaintiff's Exhibit 26.....................169
17    (e-mails)
18
19
20
21
22
23

Page 5

1    I, STACEY L. JOHNSON, a CCR of Deatsville,
2  Alabama, and Notary Public for the State of
3  Alabama at Large, acting as Commissioner,
4  certify that on this date, as provided by the
5  Federal Rules of Civil Procedure and the
6  foregoing stipulation of counsel, there came
7  before me at 60 Wasden Road, Hope Hull, Alabama,
8  beginning at 1:22 p.m., ROBERT ALLEN CLEVENGER,
9  witness in the above cause, for oral
10  examination, whereupon the following proceedings
11  were had:
12      ROBERT ALLEN CLEVENGER,
13  the witness, after having been first duly sworn
14  to speak the truth, the whole truth, and nothing
15  but the truth, testified as follows:
16      EXAMINATION
17  BY MR. KILBORN:
18    Q  Afternoon, Mr. Clevenger.
19    A  Good afternoon.
20    Q  Could you tell me your full name?
21    A  Robert Allen Clevenger.
22    Q  And your address, please?
23    A  1074 East Poplar Street, Prattville,

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652   (251)694-0950   (888)557-2969

ROBERT ALLEN CLEVENGER

1    Alabama 36066.
2        Q    Are you married?
3        A    Yes, sir.
4        Q    What's your wife's name?
5        A    Stephanie Ann Clevenger.
6        Q    Do you have any children?
7        A    Yes, sir.
8        Q    How many?
9        A    Three.
10       Q    Where were you born?
11       A    I was born in Tipton, Indiana.
12       Q    Are you currently employed?
13       A    Yes, sir.
14       Q    By who?
15       A    Hyundai Motor Manufacturing Alabama.
16       Q    And when did you start?
17       A    November 11, 2003 -- excuse me --
18   November 10, 2003.
19       Q    And your current job?
20       A    Assistant Manager, Team Relations.
21       Q    What are your duties?
22       MR. SCOFIELD:  Object to the form.  You
23   can answer.

1        A    Policy interpretation, policy writing,
2    overseeing collecting information for corrective
3    actions or investigations.
4        Q    What is corrective action?
5        A    That's -- corrective action is what we
6    would call a progressive discipline system.
7        Q    Whose progressive system?
8        MR. SCOFIELD:  Object to the form.
9        A    It would -- it's a corrective system to
10   correct situations, performance, or behavior.
11       Q    Is that your progressive action system
12   or HMMA's or somebody else's?
13       A    HMMA's.
14       Q    Did you help create it?
15       A    No, sir.
16       Q    Who created it?
17       MR. SCOFIELD:  Object to the form.  You
18   can answer.
19       A    I don't know.
20       Q    How did you find out about its
21   existence?
22       A    When I was hired, it was already -- it
23   was already in place.

1        Q    So it was in a manual?
2        A    Yes.  It was in written form.
3        Q    Written form.  So you have a copy of
4    the progressive corrective action system in
5    written form in your office?
6        A    No, sir.
7        Q    Where is it kept?
8        A    It is currently kept on the server.
9        Q    All right.  So it's in computer form?
10       A    Yes, sir.
11       Q    You have access to it?
12       A    I do.
13       Q    Do you have an e-mail address?
14       A    Yes, sir.
15       Q    What is your e-mail address?
16       MR. SCOFIELD:  Object to the form.  You
17   can answer.
18       A    Rclevenger@hmmausa.com.
19       Q    Have you ever had any other e-mail
20   address?
21       MR. SCOFIELD:  Object to the form.  You
22   can answer.
23       A    Not at this company, sir.

1        Q    You have a personal e-mail address, I
2    assume?
3        A    Yes.
4        Q    Do you do any business on that e-mail?
5        A    No, sir.
6        Q    Do you have an office?
7        A    No, sir.
8        Q    Where do you stay?
9        A    It's cubical systems.
10       Q    You have a cubical?
11       A    Yes, sir.
12       Q    What size?
13       MR. SCOFIELD:  Object to the form.
14       A    I could only approximate it.
15       Q    That's fine.
16       A    Five by five.
17       Q    Feet or yards?
18       A    Feet.
19       Q    You've got a desk and a chair?
20       A    Yes.  The desk is built into the wall
21   system and then a chair.
22       Q    Okay.  And your attorneys were kind
23   enough to give me a tour through part of the

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652   (251)694-0950   (888)557-2969

ROBERT ALLEN CLEVENGER

Page 10

1    plant, so I know a little bit about it.  But
2    what building is your cubical in?
3        A    Administration.
4        Q    Is that the first building on the left
5    when you come down Hyundai Drive into the plant?
6        A    No, sir.
7        Q    Okay.  Second building?
8        A    No, sir.  That would be -- that would
9    be Weld Shop.
10       Q    All right.  Well, I know where the
11   Manufacturing Building is.
12       A    Yes.
13       Q    And I know where the Assembly Building
14   is.  Where would your be in relation to those?
15       A    The Administration Building is as
16   you're looking at the site directly left of
17   General Assembly.
18       Q    What's the name of the building?
19       A    Administration Building.
20       Q    Now, what's the first building on your
21   left when you come in down the road going toward
22   the Administration Building?
23       A    That would be the Training Center.

Page 11

1        Q    The Training Center.  Were you trained
2    there?
3        A    I attended orientation there.
4        Q    Was that in 2003?
5        A    Yes, sir.
6        Q    And so -- but you -- you've never been
7    back in that building after that?
8            MR. SCOFIELD:  Object to the form.
9        A    I've been there several times.
10       Q    And what would be the purpose of --
11       A    To attend other training classes.
12       Q    Do you have a Korean counterpart?
13           MR. SCOFIELD:  Object to the form.
14       A    No, sir.
15       Q    Who is your immediate supervisor?
16       A    Audie Swegman.
17       Q    Swegman?
18       A    Yes, sir.
19       Q    And what is his title?
20       A    Manager of Supplier Support and Team
21   Relations.
22       Q    And supplier support would be what?
23           MR. SCOFIELD:  Object to the form.

Page 12

1        A    Any resources that we may have in terms
2    of policy or procedure that a supplier might
3    want help with, he would supply that.
4        Q    And by supplier, do you mean any vendor
5    to HMMA?
6            MR. SCOFIELD:  Object to the form.
7        A    Generally any Tier One supplier to
8    HMMA.
9        Q    And what is Tier One?
10       A    A supplier that would supply us with
11   parts.
12       Q    Any other types of supplies?
13           MR. SCOFIELD:  Object to the form.
14       A    No, sir.
15       Q    What about professional services?
16       A    I don't think I understand.
17       Q    Well, you have lots of vendors of
18   things.  You have vendors of toilet paper,
19   vendors of tires, vendors of mechanic services,
20   vendors of vending machines.  I mean, you've got
21   lots of vendors.  So when you say supplier, what
22   kind of supplier are we talking about?
23       A    I understand.  Parts related to the

Page 13

1    vehicle.
2        Q    Parts.  And so this Mr. Swegman is the
3    Manager of, you said, Supplier Support?
4        A    Yes, sir.
5        Q    And what type of support does HMMA give
6    suppliers?
7            MR. SCOFIELD:  Object to the form.
8    Asked and answered.
9        A    Aid if they request it in writing or
10   producing policies/procedures.
11       Q    Even independent vendors?
12           MR. SCOFIELD:  Object to the form.
13       A    Again, only those vendors that supply
14   parts for the vehicle.
15       Q    Yeah.
16       A    Tier One.
17       Q    Well, would those be the Hyundai family
18   of companies or outside vendors?
19       A    Outside as well.
20           MR. SCOFIELD:  Object to the form.
21       Q    Outside.  So, for instance, somebody
22   might be a manufacturer of bearings.
23   Mr. Swegman would aid them in policies?

4 (Pages 10 to 13)

ROBERT ALLEN CLEVENGER

Page 14

1      MR. SCOFIELD:  Object to the form.
2    A   Generally, it's larger component parts.
3    Q   Okay.  Well, engine blocks?
4    A   Possibly.
5    Q   Okay.  Do you get involved in that?
6    A   No, sir.
7    Q   Do you know why it is that Hyundai aids
8  independent, third-party vendors in their
9  policies?
10    A   I can only offer you my thought.
11    Q   Okay.
12    A   If they request the help to help.
13    Q   Would that be like employment policies?
14      MR. SCOFIELD:  Object to the form.
15    A   Generally, no.
16    Q   What type of policies?  You've got me
17  lost.  I don't know whether y'all tell them what
18  their eating habits ought to be, what their
19  dress code ought to be, what their HR policies
20  ought to be or what.
21      MR. SCOFIELD:  Object to the form.
22    A   We don't -- he would not tell them to
23  do anything.  It would be if they request help,

Page 15

1  help them craft those policies for themselves,
2  such as Team Wear, which you just mentioned.
3    Q   Team Wear?
4    A   The clothing.
5    Q   Dress code?
6    A   Yes.  Team Wear is what we call the
7  uniform that we -- that we have.
8    Q   So you don't refer to that as you've
9  got on as a shirt, you call it Team Wear?
10    A   Yes, sir.
11    Q   So you've got on Team Wear shirt and
12  Team Wear pants and Team Wear shoes?
13    A   Generally, just pants and the shirt are
14  referred to as Team Wear.
15    Q   Okay.  Any other types of policies like
16  dress code would -- if they requested help would
17  Mr. Swegman help them with?
18    A   If he was able.
19    Q   Like what else?
20    A   I'm not involved in that piece, so it
21  would depend on what was requested.
22    Q   So, for instance, Vince Kilborn
23  couldn't walk in and request help with a policy,

Page 16

1  but if I was a vendor of parts maybe I could?
2      MR. SCOFIELD:  Object to the form.
3    A   Possibly.
4    Q   And how many cubicles are in the
5  building that you're in?
6    A   I don't know.
7      MR. SCOFIELD:  Object to the form.
8    Q   Well, is it as far as the eye could see
9  or just three or four?
10    A   Several.  I don't know an exact number,
11  sir.
12    Q   Are your offices in just one big room?
13    A   Yes, sir.
14    Q   How big is the room?
15    A   Approximately 50 feet by 50 feet.
16  Maybe more.
17    Q   And is that room dedicated to one
18  particular function?
19      MR. SCOFIELD:  Object to the form.
20    A   No, sir.
21    Q   Multiple functions?
22    A   Yes, sir.
23    Q   Outside of the Team Managers, there are

Page 17

1  other types of people doing other types of jobs
2  in there?
3    A   Yes, sir.
4    Q   And Mr. Swegman's cubical is there,
5  too?
6    A   Yes, sir.
7    Q   Is he right next to you?
8    A   No, sir.
9    Q   How far is he from you?
10    A   Approximately 15 or 20 feet.
11    Q   Okay.  And do you have a lawyer --
12  personal lawyer here today?
13      MR. SCOFIELD:  Object to the form.
14    A   I have Mr. Scofield and Mr. Smith.
15    Q   Are those your personal lawyers --
16      MR. SCOFIELD:  Object to the form.
17    A   No, sir.
18    Q   -- for this deposition?
19    A   No, sir.
20    Q   Do you have a personal lawyer for this
21  deposition?
22    A   No, sir.
23    Q   Do you have a personal lawyer for any

5 (Pages 14 to 17)

ROBERT ALLEN CLEVENGER

Page 18

1  reason?
2      A   No, sir.
3      Q   Have you ever given a deposition
4  before?
5      A   No, sir.
6      Q   Have you ever testified under oath
7  before?
8      A   No, sir.
9      Q   Have you ever signed any kind of sworn
10  document, like an affidavit or interrogatory
11  answer?
12      A   I don't recall specifically.
13      Q   Okay.  How old are you?
14      A   I'm 44.
15      MR. KILBORN:  Can we mark -- what was
16  the next exhibit?
17      MR. SPORT:  21.
18
19      (Whereupon, Plaintiff's Exhibit
20  Number 21 was marked for identification
21  and copy of same is attached hereto.)
22
23      Q   This is my only copy, so if you'll

Page 19

1  pardon me, I'll have to sort of pass it back and
2  forth between us.
3      Could you tell me what this document is
4  that we were given today?
5      A   That is a screen print from Microsoft
6  Office Outlook of a meeting that I had set.
7      Q   And how did you locate that?
8      A   I went into my calendar and was able to
9  pull up the old meeting notice.
10      Q   The old what?
11      A   I was able to go back in my calendar
12  and pull the old meeting notice from that time.
13      Q   What caused you to search for your
14  calendar?
15      MR. SCOFIELD:  Object to the form.
16      A   I was requested to try and locate
17  anything pertaining to this situation.
18      Q   Meaning Leon Dees?
19      A   Yes, sir.
20      Q   Had you ever before you were requested
21  recently been requested to pull up anything
22  relating to Jerry Leon Dees?
23      A   Yes, sir.

Page 20

1      Q   You had?
2      MR. SCOFIELD:  Object.  I guess I -- do
3  you understand his question?
4      Q   Was that the first time you were
5  requested to find electronically or in hard copy
6  documents regarding Jerry Leon Dees?
7      A   No, sir.
8      Q   When was the first time you were
9  requested to do that?
10      A   I don't recall the specific date.
11      Q   Give me a month.
12      A   I honestly don't know.
13      Q   Give me a year.
14      A   It was 2007.
15      Q   How about a season?
16      A   Late summer.
17      Q   Of 2007.  And tell me who requested
18  that you do that.
19      A   Rick Neal.
20      Q   Who is he?
21      A   General counsel.
22      MR. SCOFIELD:  At this point, I'm going
23  to instruct him not to answer to the extent he

Page 21

1  relates anything provided by Mr. Neal based on
2  attorney-client privilege.  We will stipulate
3  that we as counsel asked Mr. Clevenger in
4  connection with preparation for his deposition
5  if he had any documents related in any way,
6  shape, or form to Jerry Leon Dees.
7      Q   Well, why was it that you only
8  discovered this recently?
9      A   I hadn't thought of it before.
10      Q   How are your files kept?
11      MR. SCOFIELD:  Object to the form.
12      A   This was not part of a file.  This is
13  part of a program.  Files would be kept in a
14  filing cabinet.
15      Q   Do you keep those?
16      A   They're kept in the department.
17      Q   Do you have access to them?
18      A   Yes, sir.
19      Q   So you have access to Jerry Leon Dees'
20  file?
21      A   Yes, sir.
22      Q   How many files does he have?
23      A   One that I'm aware.

6 (Pages 18 to 21)

ROBERT ALLEN CLEVENGER

Page 22

1    Q    What's it called?
2    A    It just has his name.
3    Q    It's not called personnel file or
4    anything like that?
5    A    Not that I maintain, sir.
6    Q    Well, there's files that somebody else
7    maintains that you know about?
8    A    I would say there would also be an
9    employment file.
10   Q    Do you have access to that?
11   A    No, sir.
12   Q    Who has access to that?
13   A    Manager of employment.
14   Q    Who is that?
15   A    Wendy Warner.
16   Q    Now, this Exhibit 21, it looks like
17   it's a -- well, you tell me what it is since you
18   pulled it up.
19   A    When you open meeting note in Outlook,
20   this is the screen that you see.
21   Q    And what does that screen tell me?
22      MR. SCOFIELD:  Object to the form.
23   A    It tells who was requested to attend

Page 23

1    the meeting.
2    Q    Does it say who requested the meeting?
3    A    No, sir.
4    Q    Did you request the meeting?
5    A    Yes, sir.
6    Q    You did?
7    A    Yes, sir.
8    Q    So did you send this notice?
9    A    Yes, sir.
10   Q    And what is the date that you created
11   this document?
12   A    I don't believe the creation date is on
13   there.
14   Q    Well, whether it's on there or not,
15   what day did you send out this notice?
16   A    I don't recall.
17   Q    What month?
18   A    February.
19   Q    2007?
20   A    Yes, sir.
21   Q    What was the reason for sending the
22   notice?
23   A    To supply the information to the folks

Page 24

1    listed on the meeting notice.
2    Q    Who decided who to send the notice to?
3    A    Those are the -- those are the
4    individuals that are -- that review the
5    information.
6    Q    How did you know what individuals
7    review information?
8    A    I was told at hire who should be in the
9    meeting.
10   Q    And who told you?
11   A    Mr. Swegman.
12   Q    And what would be the purpose of this
13   meeting?
14   A    So that those parties could review the
15   information, collect it, and make a decision.
16   Q    What decisions were available?
17      MR. SCOFIELD:  Object to the form.
18   A    Termination or some other decision that
19   they might make.
20   Q    Would termination be the most severe
21   discipline?
22      MR. SCOFIELD:  Object to the form.
23   A    Yes.

Page 25

1    Q    And what would be the options for a
2    lesser discipline?
3    A    Anything -- anything listed within our
4    corrective action policy.
5    Q    Which would be what?  Probation?
6    Suspension?  Cut in pay?  Demotion?  Anything
7    like that?
8    A    Those are not listed.
9    Q    What is listed?
10   A    There are phases of corrective action.
11   Q    Well, what are the options?
12   A    Phase 1, phase 2, phase 3, phase 4.
13   Q    And tell me what phase 1 is.
14   A    Phase 1 is an informal discussion.
15   Q    Phase 2?
16   A    Formal discussion.
17   Q    Phase 3?
18   A    Commitment discussion.
19   Q    Commitment discussion?
20   A    Yes, sir.
21   Q    And phase 4?
22   A    Decision making leave.
23   Q    And did you create those categories?

ROBERT ALLEN CLEVENGER

Page 26

1    A   No, sir.
2    Q   Did you participate in their creation?
3    A   No, sir.
4    Q   Who created them?
5    A   It's my understanding Mr. Swegman.
6    Q   And tell me what a commitment decision
7  is.
8    A   Commitment discussion would be a
9  meeting with the Team Member, and they would be
10  required to draft an action plan on how they
11  plan to correct their behavior.
12   Q   And a discussion -- what's --
13  discussion -- I didn't get phase 4.
14       MR. SPORT:  Decision making.
15   Q   What's number 4?
16   A   Decision making leave.
17   Q   Tell me what that is.
18   A   It would also require a written action
19  plan but would also include a day off for a Team
20  Member to reflect and determine how they should
21  proceed.
22   Q   Any other types of disciplinary action
23  available under Hyundai's policies at that time?

Page 27

1    A   Also serious misconduct, which is what
2  the termination would have been contained
3  within.
4    Q   Well, if serious misconduct is the
5  offense, is termination the only action that's
6  available?
7    A   It has --
8        MR. SCOFIELD:  Object to the form.
9    A   It has two alternatives.
10   Q   And what are those alternatives?
11   A   Termination is one and a Letter of
12  Conditional Employment.
13   Q   What is a Letter of Conditional
14  Employment?
15   A   It remains active for 36 months and
16  advises the Team Member that if there are any
17  other breaches of policy it could end in
18  termination.
19   Q   Are you familiar with conditional
20  employment letters?
21   A   I'm sorry.  I don't understand.
22   Q   Are you familiar with conditional
23  employment letters?

Page 28

1        MR. SCOFIELD:  Object to the form.  At
2  Hyundai?
3    Q   At Hyundai.
4    A   Yes, sir.
5    Q   Have you participated in conditional
6  employment letters being written?
7    A   Yes, sir.
8    Q   About how many of those do you
9  participate in in a year?
10       MR. SCOFIELD:  Object to the form.
11   A   I could only estimate.
12   Q   What's your best judgment?
13   A   Maybe ten.
14   Q   Who determined where this meeting
15  that's on Exhibit 21 would be held?
16   A   I selected the conference room.
17   Q   And what was the name of the conference
18  room?
19   A   The Law Library.
20   Q   Why the Law Library?
21       MR. SCOFIELD:  Object to the form.
22   A   It's not subject to schedule for anyone
23  else, so it's availability.

Page 29

1    Q   And why is it called the Law Library?
2    A   It's located directly next to the Legal
3  area.
4    Q   Is the Legal area near your cubical?
5    A   Yes, sir.
6    Q   Yes?
7    A   Yes, sir.
8    Q   And it's got -- looks like time for the
9  meeting start time was four and end time was
10  4:30.  Am I reading that right?
11   A   Yes, sir.
12   Q   And did you schedule the 30 minutes?
13   A   Yes, sir.
14   Q   Did this meeting take place?
15   A   Yes, sir.
16   Q   How long did it last?
17   A   I don't recall.
18   Q   Use your best judgment.
19   A   Between a half hour and 45 minutes.
20   Q   And did anybody attend the meeting
21  other than those listed on Exhibit 21?
22   A   I only recall those attendees.
23   Q   Did Mr. Prater attend?

8 (Pages 26 to 29)

ROBERT ALLEN CLEVENGER

Page 30

1    A    No, sir.
2    Q    Did Mr. Dees attend?
3    A    No, sir.
4    Q    Did Mr. Brookshire attend?
5    A    No, sir.
6    Q    Did Mr. Hughes attend?
7    A    Mr. Hughes?
8    Q    Yeah.  Do you know Mr. Hughes?
9    A    May I have a full name?
10   Q    Kevin Hughes.
11   A    No, sir.
12   Q    Did you attend?
13   A    Yes, sir.
14   Q    And are all the corrective action
15   meetings held in the Law Library?
16       MR. SCOFIELD:  Object to the form.
17   A    No, sir.
18   Q    What other locations?
19   A    It depends on the situation.
20   Q    You mean just availability or some
21   other reason?
22   A    Mostly availability.
23   Q    Did the meeting have someone who ran

Page 31

1    the meeting, like chaired the meeting?
2    A    No, sir.
3    Q    So no one led the meeting?
4    A    I handed out the summaries, but I don't
5    lead the meeting.
6    Q    Okay.  And when you say summaries, I
7    want to try to identify the summaries.  I want
8    to find out what summaries there are that were
9    handed out.  Are the summaries called Team
10   Relations Memo?
11   A    Yes, that could be.
12   Q    I'll show it to you.  Is there a set
13   type of document that is passed out at the
14   meeting?
15   A    Generally, it's on a Team Relations
16   Memo document, yes, sir.
17   Q    And you were responsible for creating
18   that?
19   A    Yes, sir.
20   Q    You were responsible for its content?
21   A    Yes, sir.
22   Q    Did anyone review the Team Relations
23   Memo prior to you passing it out?

Page 32

1    A    No, sir.
2    Q    Here's a copy of Plaintiff's Exhibit
3    16.  It's entitled Team Relations Memo, February
4    21, 2007.  Is that what you passed out at the
5    meeting?
6    A    That was contained within the packet,
7    yes.
8    Q    So in the packet that was passed out?
9    A    Yes.
10   Q    All right.  What else was in the
11   packet?
12   A    There was a Summary Memo from myself.
13   Q    From yourself?
14   A    Yes.
15   Q    To who?
16   A    I believe it was addressed to Greg
17   Kimble, Director of HR.
18   Q    Greg Kendall?
19   A    Kimble.
20   Q    Take a look at Exhibit 1 there and see
21   if that is the packet that you handed out.
22       MR. SCOFIELD:  Take your time and look
23   at the whole document.  And that's, what, from

Page 33

1    Wendy Warner's deposition?
2        MR. SPORT:  It's one of those files
3    that you brought.
4        MR. SCOFIELD:  Counsel, if I can help
5    the process.  I think what Mr. Clevenger is
6    looking at is the original Team Relations file
7    that we produced upon request at Wendy Warner's
8    deposition.  That's what I believe that document
9    is.
10       MR. SPORT:  Well, it was separate.  You
11   produced several files.  It was separate.  And
12   from his description of the packet, it sounded
13   like that might be it.
14       MR. SCOFIELD:  Well, that's what -- I
15   don't want to guess here.  But Mr. Clevenger
16   will tell us if he distributed all of that.
17   Q    Okay.
18   A    It didn't contain everything.
19   Q    Could you look at Exhibit 1 and give me
20   the date and Bates number?
21       MR. SCOFIELD:  Vince, those are going
22   to be originals that aren't numbered.
23       MR. KILBORN:  Uh-huh.

9 (Pages 30 to 33)

ROBERT ALLEN CLEVENGER

Page 34

1    Q    Let's see if we can do this as painless
2    as possible.  Look at Exhibit 1.  The first memo
3    in there is dated February 23, 2007 from, what,
4    yourself to Mr. Kimble?
5    A    Yes, sir.
6    Q    That was in the packet?
7    A    Yes, sir.
8    Q    All right.  And the next document looks
9    like a handwritten note.  Was that in the
10   packet?
11   A    No, sir.
12       MR. SCOFIELD:  And if I can just
13   interject here, Vince.  That represents the
14   original Bates number that you guys have, which
15   is number 34, which is the second page of that
16   memo that had attorney-client information that I
17   redacted.  I withheld the original, but you guys
18   have the redacted version.
19   Q    The next document in that Exhibit 1 is
20   an e-mail dated February 21, 2007 from Mr. John
21   Applegate to yourself.  It's also Defense
22   Exhibit 6.  Was that in the packet?
23   A    No, sir.

Page 35

1    Q    And the next document is entitled Team
2    Relations Memo, dated February 21, 2007, from
3    yourself to William Ware.  It's also Plaintiff's
4    Exhibit 16.  Was that in the packet?
5    A    May I clarify?
6    Q    Sure.
7    A    You said from myself to William Ware.
8    It's from William Ware to myself.
9    Q    Excuse me.  I'm sorry.
10   A    That's okay.
11   Q    That was in the packet?
12   A    Yes, sir.
13   Q    And that's also Plaintiff's Exhibit 16
14   that sits here?
15   A    Yes, sir.
16   Q    And there's a handwritten statement --
17   purportedly by Mr. Brookshire -- initialed at
18   the bottom and a second statement initialed by
19   Mr. Brookshire at the bottom.  The first one
20   being dated February 15, '07 and the second one
21   being dated, I think, February 19, '07.  Was
22   that in the packet?
23   A    Yes, sir.

Page 36

1    Q    And I think we've already covered this
2    one.  The next document is a February 9, 2007
3    memorandum from -- an e-mail it looks like.  I
4    can't tell whether it's a document from John
5    Applegate to Mr. Greg Prater.  Subject, Leon
6    Dees.  It looks like it's answering an e-mail
7    from William Ware to yourself dated February 7,
8    2007.  Was that document which looks like it's
9    got two e-mails in it -- was that in the packet?
10   A    No, sir.
11   Q    And the next document is called
12   Discussion of Planner.  Was that in the packet?
13       MR. SCOFIELD:  Object to the form.
14   A    No, sir.
15   Q    Was there anything else in the packet
16   other than the three documents we've identified
17   within Exhibit 1?  And we'll run through those
18   one more time to be sure.
19   A    Sure.
20   Q    That's the Owner Team Relations
21   Memorandum, February 23, Greg Kimble to --
22   excuse me -- from yourself to Greg Kimble; the
23   Team Relations Memo, February 21; and the two

Page 37

1    written statements by Mr. Brookshire.  Was
2    anything else in the packet?
3    A    No, sir.
4        MR. SCOFIELD:  Vince, if I might
5    clarify.  Jeff and I were having a side
6    conversation.  There's a second page of the Team
7    Relations Memo that has Ontario King in it.
8    That's what I have -- my handwriting is in there
9    that says number 34.  Just in fairness because
10   that's an original redacted document that is
11   contained in this exhibit, I think it would be
12   appropriate to ask him with regard to this page
13   2.
14       MR. KILBORN:  Ontario King's file was
15   in there, too?
16       MR. SCOFIELD:  No, sir, that's not what
17   I'm saying.  I'm saying that there's another
18   page that goes with this memorandum.
19   Q    Was there anything about Ontario King
20   in the packet?
21   A    Yes, sir.
22   Q    What was it?
23   A    A small entry on another page

10 (Pages 34 to 37)

ROBERT ALLEN CLEVENGER

Page 38

1    regarding, I believe it was, his name, possibly
2    Team Member number.
3        Q    That's for Ontario King?
4        A    Yes, sir.
5            MR. SCOFIELD:  And it's sitting right
6    here.  I'm just trying to move things along.
7
8            (Whereupon, Plaintiff's Exhibit
9    Number 22 was marked for identification
10   and copy of same is attached hereto.)
11
12       Q    Within Plaintiff's Exhibit 2, there's a
13   document entitled Team Relations Memo.  I'm
14   going to put Exhibit 22 on that.  It's within
15   Exhibit 2.  And it's dated -- it doesn't have a
16   date.  It says revision date 9 September '04.
17   Is that Exhibit 22 -- is that the forth document
18   that was in the packet?
19       A    That is page 2 of this other document.
20       Q    Page 2 of your memorandum?
21       A    Yes, sir.
22       Q    So Exhibit 22 was attached to your
23   February 23, 2007 memorandum to Mr. Greg Kimble?

Page 39

1        A    Yes, sir.
2        Q    All right.  So it was, what, stapled to
3    it?
4        A    Yes, sir.
5        Q    Your February 23, 2007 memorandum to
6    Mr. Greg Kimble has a conclusion and it's got a
7    recommendation of termination.  Did you write
8    that entire document, including the conclusion
9    and the recommendation for termination?
10       A    There's two questions there, sir.
11       Q    Okay.  Break them down.  Answer both of
12   them.
13       A    Yes, sir, I wrote the document.
14       Q    Okay.
15       A    The last sentence, the Department is
16   asking for termination.
17       Q    All right.  Did you write that?
18       A    I wrote those words, yes.
19       Q    Was that your recommendation?
20       A    That was the recommendation of the
21   department that he works for.
22       Q    Did you have a recommendation?
23       A    No, sir.

Page 40

1        Q    So your job was not to recommend one
2    way or the other?
3            MR. SCOFIELD:  Object to the form.
4        A    No, sir.
5        Q    Your job was simply to gather
6    information and pass it out?
7        A    Yes, sir.
8        Q    And who were the decision makers?
9            MR. SCOFIELD:  Object to the form.
10       A    In Mr. Kimble's absence, Wendy Warner.
11       Q    And was she present?
12       A    Yes, sir.
13       Q    What was the function of the other
14   people at the meeting?  We'll just break it
15   down.  Mr. Neal, what was his function?
16       A    Advisory only.
17           MR. SCOFIELD:  Again, I reserve the
18   privilege.  I'm not going to let him testify to
19   anything Mr. Neal may have said.
20       Q    Did Mr. Neal give any advice in the
21   meeting?
22           MR. SCOFIELD:  I'm going to object and
23   instruct you not to answer.

Page 41

1        Q    Did Mr. Neal say anything?
2            MR. SCOFIELD:  Same instruction.
3        Q    Did he speak a word?
4            MR. SCOFIELD:  Same instruction.
5        Q    You're not going to answer that?
6            MR. SCOFIELD:  Under my instruction.
7        Q    You have to answer.  You're not going
8    to answer that question; is that correct?
9        A    Under -- under --
10           MR. SCOFIELD:  Advice of counsel.
11       Q    Under what?
12           MR. SCOFIELD:  He's not answering under
13   my instruction.
14           MR. KILBORN:  I hear your advice, but
15   he needs to answer.
16       Q    Are you going to follow your attorney's
17   instruction?
18       A    Under advice of counsel.
19       Q    You are going to follow it?
20           MR. SCOFIELD:  Again, Vince, we'll
21   stipulate that Mr. Neal was there, but we're not
22   going to let you ask him any questions.
23           MR. KILBORN:  I know, but he's the

11  (Pages 38 to 41)

ROBERT ALLEN CLEVENGER

Page 42

1  witness.  He's got to tell me if he's going to
2  not answer or not.
3        MR. SCOFIELD:  And I think he did.
4        MR. KILBORN:  No, he didn't.
5    Q   Are you going to answer that question?
6    A   Under advice of counsel, no.
7    Q   Who decided to bring Ontario King's
8  file into the meeting?
9        MR. SCOFIELD:  Object to the form.  He
10  never testified they brought Ontario King's file
11  into the meeting.
12    Q   What's the answer to the question?
13    A   I did not bring Ontario King's file
14  into the meeting.
15    Q   Okay.  Well, who brought up the name
16  Ontario King?
17    A   I put that on the document.
18    Q   And why did you put that in the packet?
19    A   It was a similar situation.
20    Q   How was it similar?
21    A   It involved sleeping while at work.
22    Q   Sleeping while what?
23    A   At work.

Page 43

1    Q   Okay.  Same corrective action?
2    A   Yes.
3    Q   All right.  Same circumstances?
4    A   Very similar.
5    Q   All right.  Did anybody discuss Ontario
6  King?
7    A   I don't recall.
8    Q   Did you?
9        MR. SCOFIELD:  Again, this is in the
10  context of the Termination Committee meeting?
11        MR. KILBORN:  In the meeting, yes.
12    A   I don't recall.
13    Q   Did anyone ask you who is Ontario King
14  or why is his name being given to us?
15    A   I don't recall.
16    Q   Was there anything dissimilar between
17  Leon Dees sleeping and Ontario King sleeping?
18        MR. SCOFIELD:  Object to the form.
19    A   I can only think of one thing.
20    Q   What is that?
21    A   Mr. King was lying down flat.
22    Q   That's the only difference you recall?
23    A   Yes, sir.

Page 44

1    Q   Was Mr. King's sleeping incident
2  discussed at all?
3    A   I don't recall.
4    Q   Was there a vote taken?
5    A   No, sir.
6    Q   Was there a decision made at the
7  meeting?
8    A   Yes, sir.
9    Q   Was it announced?
10    A   Ms. Warner announced.
11    Q   And what did she say?
12    A   Termination.
13    Q   Was there any discussion of any lesser
14  penalty, such as a conditional employment
15  letter?
16    A   I don't recall.
17    Q   Was Mr. Dees' previous employment
18  history with HMMA discussed?
19    A   I don't recall.
20    Q   Do you think it should have been
21  discussed?
22        MR. SCOFIELD:  Object to the form.
23    A   The meeting dealt with the individual

Page 45

1  situation.
2    Q   Would that --
3    A   The most current situation.
4    Q   Well, that individual was Mr. Dees;
5  correct?
6    A   And the incident of sleeping.  That's
7  what was discussed.
8    Q   And my question is specifically was
9  Mr. Dees' past employment history with HMMA
10  discussed at all in any way, shape, form, or
11  fashion?
12        MR. SCOFIELD:  Object to the form.
13    A   I don't recall.
14    Q   You didn't hear it?
15        MR. SCOFIELD:  Object to the form.
16    A   I don't recall if it was or wasn't.
17    Q   You did not include anything in his
18  employment file in your packet, did you?
19    A   No, sir.
20    Q   You did not include any Discussion
21  Planners that might have been had with him?
22    A   No, sir.
23    Q   You did not include any laudatory or

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

ROBERT ALLEN CLEVENGER

Page 46

1  favorable comment that HMMA had made about his
2  work performance or job performance, did you?
3        MR. SCOFIELD: Object to the form. You
4  can answer.
5    A  No, sir.
6    Q  You did not include, for instance, that
7  there was a Discussion Planner dated June 26,
8  2006 where Mr. Dees was being described as,
9  quote, helped greatly with SOPS? You did not
10 include that?
11   A  No, sir.
12   Q  You did not include any Discussion
13 Planner regarding Mr. Dees dated June 24, 2006
14 where it was stated Leon supports all PM on
15 SOPS; follows all safety policies of HMMA. You
16 didn't include that in your packet, did you?
17       MR. SCOFIELD: Object to the form.
18   A  No, sir.
19   Q  Was that discussed?
20   A  I don't recall.
21   Q  What was the issue at the committee
22 meeting that you attended?
23   A  Sleeping while working.

Page 47

1    Q  Well, was there an issue of whether or
2  not he was, in fact, sleeping?
3        MR. SCOFIELD: Object to the form.
4    A  There was a statement by a member of
5  management that said he was found sleeping.
6    Q  Jim Brookshire?
7    A  Yes, sir.
8    Q  There was also a statement by Mr. Dees
9  that he was not sleeping, wasn't there?
10   A  That was -- yes, sir.
11   Q  And there were only two eye witnesses,
12 Mr. Dees and Mr. Brookshire?
13   A  Yes, sir.
14   Q  What factors were used to determine
15 whether Mr. Dees was telling the truth or
16 Mr. Brookshire was telling the truth since
17 Brookshire said he was sleeping and Dees said he
18 wasn't?
19       MR. SCOFIELD: Object to the form.
20   A  A member of management making a
21 statement that Mr. Dees was sleeping.
22   Q  That carried the day because he was
23 management?

Page 48

1    A  Yes, sir.
2    Q  Well, what about Mr. Brookshire being
3  management made him more believable than
4  Mr. Dees?
5    A  I had to take the information I was
6  given, sir.
7    Q  But you were told by Mr. Dees he was
8  not sleeping, absolute denial. What made
9  Mr. Brookshire more credible than Mr. Dees?
10       MR. SCOFIELD: Object to the form.
11   A  That area is not an area where there is
12 a job that someone stays at.
13   Q  And who said that?
14   A  Mr. Applegate.
15   Q  Mr. Applegate?
16   A  (Witness nods head.)
17   Q  So Mr. -- I don't see -- did
18 Mr. Applegate -- was Mr. Applegate there?
19   A  During?
20   Q  During the meeting.
21   A  For a time, yes.
22   Q  You didn't mention that before.
23   A  I believe he's on the meeting notice,

Page 49

1  sir.
2    Q  So Mr. Applegate, he stated that there
3  was no reason for Mr. Dees to be in that
4  location --
5        MR. SCOFIELD: Object to the form.
6    Q  -- is that correct?
7    A  Yes.
8    Q  All right. Did Mr. Applegate -- strike
9  that.
10       Did any of the members of the meeting
11 go to the location?
12       MR. SCOFIELD: Object to the form.
13   A  No, sir.
14   Q  Did you ever talk to Mr. Brookshire
15 personally?
16       MR. SCOFIELD: Object to the form. In
17 connection with his investigation or at any
18 time?
19   Q  Yeah, in connection with -- well, you
20 were the investigator in this matter, weren't
21 you?
22   A  I collected the information.
23   Q  You used the word investigation was

13 (Pages 46 to 49)

ROBERT ALLEN CLEVENGER

Page 50

1  part of your job description.  Were you the
2  investigator?
3      A    Yes, sir.
4      Q    And were you the one who interviewed
5  Mr. Brookshire?
6      A    No, sir.
7      Q    Who did that?
8      A    William Ware.
9      Q    William Ware?
10     A    Yes, sir.
11     Q    And was he also in the meeting?
12     A    No, sir.
13     Q    Was Mr. -- was there anything discussed
14 at the meeting or was any evidence presented at
15 the meeting regarding anything about Mr. Dees'
16 past history other than the sleeping incident?
17         MR. SCOFIELD:  Object to the form.
18     A    No, sir.
19     Q    Was it discussed at the meeting that
20 Mr. Dees and Mr. Prater did not get along?
21     A    I don't recall.
22     Q    Was it discussed at the meeting that
23 Mr. Dees had e-mailed Mr. Greg Kimble on

Page 51

1  February 5, 2007 regarding a problem he was
2  experiencing regarding his National Guard duty?
3      A    I don't recall that.
4      Q    I want to show you what's been marked
5  previously as Defendant's -- that's HMMA's --
6  Exhibit 4.  I'll show you this e-mail.  Was that
7  e-mail discussed or the contents of it
8  discussed?
9      A    I don't recall that being discussed at
10 all.
11     Q    Did you know the existence of this
12 e-mail at the time of the meeting where
13 termination was recommended?
14     A    No, sir.
15     Q    You did have communication with
16 Mr. Kimble before the meeting, did you not?
17         MR. SCOFIELD:  Object to the form.
18     A    I don't recall when Mr. Kimble left on
19 medical leave.
20     Q    Well, you know that he had -- you had
21 sent him a memorandum dated February 23, 2007 on
22 the subject of Mr. Dees and the sleeping;
23 correct?

Page 52

1      A    All the memorandums were -- would be
2  addressed to Mr. Kimble because he was the
3  director of the department.
4      Q    And you included that memorandum in
5  your packet as we've seen, didn't you?
6      A    Yes, sir.
7      Q    All right.  And was Mr. Kimble at the
8  meeting?
9      A    No, sir.
10     Q    Did Mr. Kimble ever mention to you or
11 to anybody else, to your knowledge, in the
12 meeting or outside the meeting that he had
13 specifically complained to Mr. Kimble that
14 issues had arisen on his shift between
15 Mr. Prater, Kevin Hughes, and himself that he
16 had talked to Human Relations on two separate
17 occasions regarding Mr. Prater and also had
18 filed a complaint on him through his National
19 Guard unit?
20     A    I'm not aware of that, sir.
21     Q    Don't you think it would have been
22 relevant to a termination to cover the subject
23 of a complaint made by the employee being

Page 53

1  terminated regarding his National Guard duty
2  that had been submitted in writing?
3         MR. SCOFIELD:  Object to the form.
4      A    The subject of the meeting, sir, is
5  whether he was sleeping on the job.
6      Q    All right.  So you don't think that
7  e-mail should have been discussed at all, do
8  you?
9         MR. SCOFIELD:  Object to the form.
10     A    No, sir.
11     Q    Did Mr. Kimble ever tell you about this
12 problem Mr. Dees had made regarding his National
13 Guard duty?
14     A    No, sir.
15     Q    And you had no knowledge of it?
16     A    No, sir.
17     Q    Take a look if you would at the Exhibit
18 1 there which has the documents in the packet
19 that you submitted to the committee.  There are
20 two statements in there.  One dated 2-15-07 and
21 one dated 12-19-07.  They have Bates numbers at
22 the bottom of 37 and 38.  Those are handwritten
23 statements called Interview with Jim

14 (Pages 50 to 53)

ROBERT ALLEN CLEVENGER

Page 54

1   Brookshire.  Do you see that?  Plaintiff's
2   Exhibit 13.  You see those two statements?
3      A   Yes, sir.
4      Q   Now, you say who took these statements?
5      A   William Ware.
6      Q   And you were not present?
7      A   No, sir.
8      Q   Why did he take the statements -- you
9   being the investigator -- and not you?
10     A   William Ware is on second shift and I
11  was on first shift.
12     Q   So if you'd been on second shift, you
13  would have taken the statement from
14  Mr. Brookshire?
15     A   Possibly.
16     Q   Does he have the same job that you do,
17  different shift?
18     A   No, sir.
19     Q   Have you taken statements before
20  yourself like this?
21     A   Yes, sir.
22     Q   What experience do you have in taking
23  statements?

Page 55

1      A   I simply record what the individual
2   says.
3      Q   Well, what experience and training have
4   you had in doing that?
5      A   I have taken an investigations class.
6      Q   Have you ever been a member of law
7   enforcement?
8      A   No, sir.
9      Q   What is your college degree in?
10     A   I don't have one, sir.
11     Q   Have you ever been in the armed
12  services?
13     A   No, sir.
14     Q   Did you go to college?
15     A   Yes, sir.
16     Q   What college?
17     A   Indiana University.
18     Q   What series of courses did you take?
19     A   General studies.
20     Q   And how many years did you last in
21  Indiana University?
22         MR. SCOFIELD:  Object to the form.
23     A   Approximately one and a half.

Page 56

1      Q   So what happened?  Did you just drop
2   out or what?
3          MR. SCOFIELD:  Object to the form.
4      A   Yes, sir.
5      Q   Were you kicked out, or did you just
6   quit?
7          MR. SCOFIELD:  Object to the form.
8      A   I didn't have the grades to stay in,
9   sir.
10     Q   Flunked out?
11         MR. SCOFIELD:  Object to the form.
12     A   Yes, sir.
13     Q   When you applied to Hyundai for a job,
14  did you tell them that?
15         MR. SCOFIELD:  Object to the form.
16     A   They were aware that I had no college
17  degree, yes.
18     Q   That ain't what I asked you.  Did you
19  tell them you flunked out of college after a
20  year and a half?
21     A   It wasn't a question asked, sir.
22     Q   That's not what I asked you.  Did you
23  tell Hyundai that you flunked out of college

Page 57

1   after a year and a half?
2          MR. SCOFIELD:  Same objection.
3      A   No, sir.
4      Q   There's a question on the application
5   that says do you know of anything else that you
6   need to tell us relative to us giving you a
7   job.  Why didn't you put that down there?
8          MR. SCOFIELD:  Object to the form.
9      A   I didn't think it was relevant.
10     Q   You knew it was relevant, you just knew
11  it sounded bad; isn't that true?
12         MR. SCOFIELD:  Same objection.  It's
13  argumentative.
14     A   No, sir, I didn't think it was
15  relevant.
16     Q   But you also knew it sounded bad,
17  didn't you?
18         MR. SCOFIELD:  Object to the form.
19     A   I didn't think it was relevant.
20     Q   That's not my question.  You knew it
21  sounded bad, didn't you?
22         MR. SCOFIELD:  Object to the form.
23     A   No, sir.

15 (Pages 54 to 57)

ROBERT ALLEN CLEVENGER

Page 58

1    Q    Well, what happened after you flunked
2    out?
3        MR. SCOFIELD:  Same objection.
4    A    I attended a technical college.
5    Q    What kind of technical college?
6    A    IVY Tech.
7    Q    IVY Tech?
8    A    Yes, sir.
9    Q    As in intravenous?
10   A    I-V-Y.
11   Q    What's that mean?
12   A    Indiana Vocational -- and I honestly
13   don't know what the last stands for.
14   Q    And what course of study did you take
15   there?
16   A    Mechanical drawing.
17   Q    And how long did you last there?
18       MR. SCOFIELD:  Object to the form.
19   A    One year.
20   Q    Did you get a certificate, or did you
21   graduate?
22   A    No, sir.
23   Q    What happened there?

Page 59

1    A    I received a full-time job.
2    Q    So you never graduated?
3    A    No, sir.
4    Q    How much further did you have to go
5    before you graduated?
6        MR. SCOFIELD:  Object to the form.
7    A    I don't know.
8    Q    Well, say, another semester or another
9    year?  Give me some judgment.
10       MR. SCOFIELD:  Object to the form.
11   A    I don't recall.
12   Q    What did you learn how to do?
13       MR. SCOFIELD:  Object to the form.
14   A    It was drafting classes, mechanical
15   drawing.
16   Q    Buildings, piping systems, heating
17   systems, cooling systems, or what?
18   A    The drawings were mechanical items.
19   Q    HVAC or what?  Electric?
20   A    No, sir.  I remember plumbing
21   specifically, sir.
22   Q    So you learned how to do plumbing
23   drawings.  What other kind of mechanical

Page 60

1    drawings?
2    A    That was -- that's the only one that I
3    recall, sir.
4    Q    Were you learning how to be a plumber?
5    A    No, sir.
6    Q    You learned how to draw plumbing
7    systems?
8    A    No, sir.
9        MR. SCOFIELD:  Object to the form.
10   Q    What were you learning how to be?
11   A    It's the actual parts.
12   Q    Designing plumbing parts?
13   A    No, sir.
14   Q    Well, give me a hint.  This isn't a --
15   A    It was simply drawing --
16       MR. SCOFIELD:  Object to the form.
17   A    -- already existing parts.
18   Q    Like an artist copying existing parts?
19   A    No, sir.
20   Q    Well, just take me through that.  In
21   other words, you put a plumbing part on the
22   table and you would draw it?
23   A    Measure and draw it and apply -- apply

Page 61

1    measurements to the different pieces.
2    Q    What does that entitle you to do or
3    prepare you to do in life?
4        MR. SCOFIELD:  Object to the form.
5    A    It was teaching the skill of mechanical
6    drawing.
7    Q    All right.  So you were basically
8    learning how to sketch things?
9    A    No, sir.  They're mechanical drawings.
10   Q    So you could draw a faucet for
11   instance?
12   A    That would be one of the -- that could
13   be one of the outcomes, yes.
14   Q    All right.  Did you ever do anything
15   with this mechanical drawing course that you
16   took that you didn't finish?
17       MR. SCOFIELD:  Object to the form.
18   A    No, sir.
19   Q    So that was a waste of time?
20       MR. SCOFIELD:  Object to the form.
21   A    No, sir.
22   Q    So have you ever used it?
23   A    No, sir.

16 (Pages 58 to 61)

ROBERT ALLEN CLEVENGER

Page 62

1    Q    What courses -- you said general -- I
2  forget the word you used.  When you were at
3  Indiana University and flunked out, what course
4  of studies were you following?  Social studies
5  or chemistry or physics or math or what?
6        MR. SCOFIELD:  Object to the form.  I
7  think he testified general study.
8    Q    What's general?  History?  Philosophy?
9    A    Economics, algebra.
10    Q    You flunked algebra, huh?
11        MR. SCOFIELD:  Object to the form.
12    A    Yes.
13    Q    Did you flunk calculous?
14    A    I didn't take calculous.
15    Q    Did you flunk trigonometry?
16    A    I didn't take trigonometry.
17    Q    Was this a state university?
18    A    Yes.
19    Q    So nobody at Hyundai knows that you
20  flunked out of college?
21        MR. SCOFIELD:  Object to the form.
22    Q    You never told them?
23    A    No, sir.

Page 63

1    Q    Okay.  So you didn't follow this
2  plumbing drawing career.  You got -- you say you
3  got a job?
4    A    Yes, sir.
5    Q    How old were you when you got this job?
6    A    I believe 18.
7    Q    What job was it?
8    A    Working at Service Merchandise.
9    Q    Doing what?
10    A    Working in their electronics department
11  as a salesperson.
12    Q    So this was something new, selling
13  electronics?
14        MR. SCOFIELD:  Object to the form.
15    A    Yes.
16    Q    Well, you said you got this new job at
17  age 18?
18    A    Yes.
19    Q    Well, how old were you when you flunked
20  out of college?
21        MR. SCOFIELD:  Object to the form.
22    A    I believe Indiana University would --
23  approximately 19 and a half.

Page 64

1    Q    So you flunked out of Indiana
2  University after you had the job at Service
3  Merchandise?
4    A    Yes.
5    Q    Well, let me get the chronology
6  straight.  You did graduate from high school?
7    A    Yes.
8    Q    Did you get a GED or a diploma?
9    A    Diploma.
10    Q    After that, what did you do?  Go to
11  work for Service Merchandise?
12    A    While going to school.
13    Q    While going to Indiana University?
14    A    Yes, sir.
15    Q    Okay.  And then you flunked out, so you
16  kept the job at Service Merchandise?
17    A    Yes.
18    Q    How long did you last there?
19        MR. SCOFIELD:  Object to the form.
20    A    Until 1988.
21    Q    How many years was that?
22    A    Eight.
23    Q    What position did you hold when you

Page 65

1  left?
2    A    Manager of electronics department.
3    Q    And while you had that job, were you
4  ever subject to any type of disciplinary action
5  whatsoever?
6    A    No, sir.
7        MR. SCOFIELD:  Object to the form.
8    Q    All right.  And why did you leave
9  Service Merchandise?
10    A    To go to work for Subaru Isuzu Indiana.
11    Q    Subaru Isuzu?
12    A    Automotive.
13    Q    That's the same company?
14    A    Yes, sir.
15    Q    And where was that located?
16    A    Lafayette, Indiana.
17    Q    And what did you do there?
18    A    I was an associate, production
19  associate.
20    Q    What does that mean?
21    A    I built cars.
22    Q    Were you in the Maintenance Department?
23    A    No, sir.

17 (Pages 62 to 65)

ROBERT ALLEN CLEVENGER

Page 66

1    Q    What type of trade were you in?
2         MR. SCOFIELD:  Object to the form.
3    A    There was no trade.  I worked on the
4  line.
5    Q    So you weren't a welder?
6    A    No, sir.
7    Q    You were not a millwright?
8    A    No, sir.
9    Q    You weren't a plumber or electrician?
10   A    No, sir.
11   Q    You just worked?
12   A    Assembly.
13   Q    Assembly?
14   A    Uh-huh.
15   Q    So this was something new to you, I
16 take it?
17   A    Yes, sir.
18   Q    So working with your hands?
19   A    Yes, sir.
20   Q    All right.  How long did you have that
21 job?
22   A    Until 2003.
23   Q    That's when you went to work for

Page 67

1  Hyundai?
2    A    Yes, sir.
3    Q    And what were you doing at Subaru Isuzu
4  when you left?
5    A    Specialist in Team Relations.
6    Q    And what did that mean?
7    A    Team Relations Specialist works out on
8  the floor talking to Team Members, advising on
9  policy and procedure.
10   Q    What department were you in?
11   A    General Assembly.
12   Q    General Assembly?
13   A    Yes, sir.
14   Q    Were you doing for Subaru -- what's the
15 name of the company?  Give me a name for it.
16   A    The acronym is SIA.
17   Q    When you worked for SIA, were you doing
18 investigations?
19   A    I participated.
20   Q    Participated?
21   A    (Witness nods head.)
22   Q    Did they train you how to do
23 investigations?

Page 68

1    A    Yes.
2    Q    You have a class on that?
3    A    It was written material.
4    Q    All right.  Like a book to tell you how
5  to do investigations?
6         MR. SCOFIELD:  Object to the form.
7    Q    Or a manual?
8    A    A manual, I'd say.
9    Q    So you read the manual on how to do it?
10   A    Yes.
11   Q    And I guess you left that at SIA when
12 you left?
13   A    Yes.
14   Q    Because that was company property?
15   A    Yes, sir.
16   Q    All right.  Other than reading the
17 manual on how to do investigations, did you have
18 any other training, like videos or classes or
19 anything like that?
20        MR. SCOFIELD:  Object to the form.
21   A    Not at SIA.
22   Q    Okay.  Up to going to work for Hyundai,
23 have I covered all of your employment history?

Page 69

1    A    Yes.
2    Q    So up until today, have you ever
3  yourself personally been subject to any type of
4  job action or corrective action or disciplinary
5  action?
6         MR. SCOFIELD:  Object to the form.
7    A    No.
8    Q    And how was it that at SIA you switched
9  from being on the assembly line to this job in
10 Team Relations Specialist?
11        MR. SCOFIELD:  Object to the form.
12   A    The job was posted on our board.
13   Q    Posted.  So you took the job?
14   A    I applied and was accepted.
15   Q    When you applied for that job, did you
16 tell them that you had flunked out of Indiana
17 University and that you failed to ever complete
18 any type of course in anything?
19        MR. SCOFIELD:  Object to the form.
20   A    That wasn't a question asked.  No.
21   Q    And you didn't tell them?
22   A    No, sir.
23   Q    You have never been arrested or charged

18 (Pages 66 to 69)

ROBERT ALLEN CLEVENGER

Page 70

1    with a crime, have you?
2        A    No, sir.
3            MR. SCOFIELD:  Object to the form.
4        Q    Do you abuse alcohol or drugs, such as
5    cocaine?
6        A    No, sir.
7            MR. SCOFIELD:  Object to the form.
8        Q    Do you know Jim Brookshire?
9        A    Yes, sir.
10       Q    Do you know about his drug and alcohol
11   problem?
12           MR. SCOFIELD:  Object to the form.
13       A    I know that situation, yes.
14       Q    How do you know it?
15       A    I was made aware by our medical client.
16       Q    Who is that?
17       A    Industrial Care Management.
18       Q    Industrial Care Management?
19       A    (Witness nods head.)
20       Q    Is that some division or department of
21   Hyundai?
22       A    No, sir.
23       Q    And what does Industrial Care

Page 71

1    Management do?
2        A    They operate our clinic.
3        Q    Medical clinic?
4        A    Yes, sir.
5        Q    And you have an office in the
6    Administration Building doing investigations and
7    assembling corrective action material and
8    writing policy?
9            MR. SCOFIELD:  Object to the form.
10       A    Yes, sir.
11       Q    So what are you doing having
12   communications with Industrial Care Management
13   or the medical clinic about Jim Brookshire?
14       A    They contacted me regarding a possible
15   failure of a drug test.
16       Q    What would you have to do with that?
17       A    Once I receive a confirmation that the
18   drug test was failed, then there would be a
19   corrective action applied.
20       Q    Did you get the confirmation?
21       A    Yes, sir.
22       Q    Since that's pretty personal
23   information, how did you get that?

Page 72

1            MR. SCOFIELD:  Object to the form.
2        A    It comes to me to present the
3    corrective action to that Team Member.
4        Q    Is that some policy in force that
5    whenever Team Members are caught with cocaine in
6    their system or alcohol in their system while on
7    the job or even off the job you're supposed to
8    be notified?
9            MR. SCOFIELD:  Object to the form.
10       A    I'm notified if they fail a drug screen.
11       Q    And that's company policy?
12       A    Yes, sir.
13       Q    How about if they show up drunk or
14   smelling of alcohol on the job?
15           MR. SCOFIELD:  Object to the form.
16       A    Then they would be taken to the clinic
17   and the clinic would determine.
18       Q    Well, most people are taken to the
19   drunk take.  Why are they taken to the clinic?
20           MR. SCOFIELD:  Object to the form.
21       A    The clinic performs a test to determine
22   whether they're under the influence.
23       Q    So they do a urinalysis?

Page 73

1        A    I believe they have an alcohol...
2        Q    Breath test?
3        A    Yes, sir.
4        Q    The street version or the real one?
5            MR. SCOFIELD:  Object to the form.
6        A    I'm not aware of what the machine -- I
7    don't know which machine, sir.
8        Q    Well, did you also find out that
9    Mr. Brookshire had an alcohol abuse problem?
10       A    No, sir.
11           MR. SCOFIELD:  Object to the form.
12       Q    You didn't know he was going to AA,
13   Alcoholics Anonymous, for an alcohol problem?
14       A    No, sir.
15       Q    You didn't know he was going through
16   the AA 12 step program, the first of which is
17   you have to admit that you're an alcoholic?
18           MR. SCOFIELD:  Object to the form.
19       A    No, sir.
20       Q    You didn't know he was going through
21   the 12 step drug abuse program where the first
22   step is you've got to admit you're addicted to
23   drugs?

19 (Pages 70 to 73)

ROBERT ALLEN CLEVENGER

Page 74

1      MR. SCOFIELD:  Object to the form.
2  Asked and answered.
3      Q   You didn't know that either?
4      A   No, sir.
5      Q   Well, would the fact that your chief
6  witness, Jim Brookshire, was caught on company
7  property with cocaine in his system -- would
8  that have anything to do with his credibility in
9  your mind?
10      MR. SCOFIELD:  Object to the form.
11      A   No, sir.
12      Q   You don't use cocaine yourself, I take
13  it?
14      A   No, sir.
15      Q   So you don't know about the
16  debilitating effects it has on the human body,
17  do you?
18      MR. SCOFIELD:  Object to the form.
19      A   No, sir.
20      Q   Was Mr. Brookshire ever asked was he on
21  cocaine the night he was supposed to have
22  seen Dees sleeping?
23      MR. SCOFIELD:  Object to the form.

Page 75

1      A   No, sir.
2      Q   How do you know he wasn't on cocaine
3  that night?
4      A   I don't, sir.
5      Q   Was he ever asked had he been drinking
6  that night?
7      MR. SCOFIELD:  Object to the form.
8      A   No, sir.
9      Q   How do you know he hadn't been
10  drinking?
11      A   I don't, sir.
12      Q   In your experience, does cocaine or
13  alcohol in a person's system affect their
14  ability to see and recognize and process events?
15      MR. SCOFIELD:  Object to the form.
16      A   Can you ask that again, please?
17      Q   I'll put it simpler.  You know people
18  are charged with murder if they kill people when
19  they're drinking and driving, don't you?
20      MR. SCOFIELD:  Object to the form.
21      A   Yes.
22      Q   And you know people are charged with
23  murder if they kill people when they have drugs

Page 76

1  in their system, don't you?
2      A   Yes, sir.
3      Q   You know it's very bad for people to do
4  that, don't you?
5      A   Yes.
6      Q   And you know that people who abuse
7  drugs and alcohol tend to lie about it, don't
8  you?
9      MR. SCOFIELD:  Object to the form.
10      A   I don't know that, sir.
11      Q   Have you ever spoken with
12  Mr. Brookshire about this cocaine and alcohol?
13      A   No, sir, not in depth.  I was only
14  involved in the corrective action.
15      Q   So tell me about that.  What did he
16  admit to?
17      MR. SCOFIELD:  Object to the form.
18      A   There was no request for an admission.
19  I took the information.  Once I was notified, I
20  contacted Wendy Warner.  She's the manager of
21  employment.  At that time, I was instructed to
22  assemble a serious misconduct document and then
23  a meeting took place between Wendy,

Page 77

1  Mr. Brookshire, and myself where Wendy
2  administered the corrective action.
3      Q   Was this the same type of meeting that
4  is described in this Plaintiff's Exhibit 21,
5  this notification regarding Mr. Dees?
6      MR. SCOFIELD:  Object to the form.
7      A   No, sir.  This was a serious misconduct
8  meeting.
9      Q   I thought Dees' was a serious
10  misconduct meeting?
11      A   In this instance, he was put into a
12  corrective action serious misconduct.
13      Q   Well, what was the difference in
14  Brookshire and Dees?  They both had a meeting,
15  but one of them was serious misconduct and one
16  of them was not.  Explain that to me.
17      MR. SCOFIELD:  Object to the form.
18      A   We have a drug and alcohol policy that
19  states that's the step that is taken.
20      Q   So drug and alcohol abuse on company
21  property is considered a lesser offense than
22  sleeping, I take it?
23      MR. SCOFIELD:  Object to the form.

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

ROBERT ALLEN CLEVENGER

Page 78

1    A   No, sir.
2    Q   Well, aren't both serious misconduct?
3    A   Yes, sir.
4    Q   Was sleeping serious misconduct?
5    A   Yes, sir.
6    Q   Was using cocaine serious misconduct?
7    A   Having the substance in his system was
8  a serious misconduct.
9    Q   Okay.  Well, why didn't Brookshire have
10  the same kind of meeting that Dees did?
11       MR. SCOFIELD:  Object to the form.
12    A   I was notified that he failed a drug
13  screen.  That's what triggered the serious
14  misconduct.
15    Q   But I'm asking you why were the two
16  treated differently.
17       MR. SCOFIELD:  Object to the form.
18    A   He was not under the influence when the
19  drug test took place.
20    Q   How do you know that?
21    A   The clinic does a Fit for Duty test.
22    Q   So he got a second test; is that
23  correct?

Page 79

1        MR. SCOFIELD:  Object to the form.
2    A   It's something they perform.
3    Q   Was that performed when he was -- when
4  he was caught with the cocaine in his system?
5    A   To my knowledge.
6    Q   And tell me about the Fit for Duty
7  test.
8    A   I don't have any personal knowledge,
9  sir.
10    Q   But you've read it?
11       MR. SCOFIELD:  Object to the form.
12    A   No, sir.  They perform a -- what they
13  determine a standard Fit for Duty test.
14    Q   Well, tell me what you know about it.
15    A   I only know that if they say -- if they
16  pass somebody fit for duty, then they're not
17  under the influence.
18    Q   So it's not your business to go behind
19  what they say?
20    A   No, sir.
21    Q   Well, what did they do to determine
22  Brookshire was fit for duty?
23       MR. SCOFIELD:  Object to the form.

Page 80

1    A   I don't know, sir.
2    Q   Was it a physical test, a written
3  test --
4        MR. SCOFIELD:  He just said he --
5    Q   -- dexterity test or what?
6        MR. SCOFIELD:  He just said he didn't
7  know, Vince.
8    A   I don't know, sir.
9    Q   As far as you know, it could be a
10  swimming test?
11       MR. SCOFIELD:  Object to the form.
12  Argumentative.
13    Q   Is that correct?
14    A   I don't know what the test consists of.
15       MR. SCOFIELD:  Vince, we've been going
16  about an hour and a half.  When you have an
17  opportunity, we'd like a short break.
18    Q   Well, who told you to do -- who told
19  you to let's have a corrective action meeting on
20  Brookshire after he flunked the drug test?
21    A   When I received the result, I went to
22  Wendy Warner and made her aware and she
23  instructed that I prepare the document.

Page 81

1    Q   But you did interview Brookshire?
2    A   No, sir.
3    Q   You said you talked to Brookshire?
4    A   In the corrective action meeting, we
5  administered the corrective action.
6    Q   And what questions was he asked and
7  what did he say?
8        MR. SCOFIELD:  Object to the form.
9    A   I don't remember him being asked any
10  questions.
11    Q   Well, was he and you just don't
12  remember what they are?
13    A   Ms. Warner read the corrective action
14  to him, and then he was told that he would be
15  taken to our clinic and that they would arrange
16  the treatment program.
17    Q   Now, you said it was 36 months, I
18  think, conditional employment?
19    A   Drug and alcohol is 24.
20    Q   And what's 36?
21    A   A Letter of Conditional Employment.
22    Q   And do you get updates on how he's
23  doing on his conditional employment letter?

21 (Pages 78 to 81)

ROBERT ALLEN CLEVENGER

Page 82

1    A   I do not, sir.
2    Q   Is he still employed?
3    A   Yes, sir.
4    Q   Is he given random drug tests?
5    A   Yes, sir.
6    Q   Do you get those results?
7    A   I do not, sir.
8    Q   If he failed a random drug test, what
9  would happen to him?
10       MR. SCOFIELD:  Object to the form.
11   A   Then I would be notified.
12   Q   What would your recommendation be?
13   A   At that point, I would simply turn the
14  information over to Ms. Warner.
15   Q   And what would her recommendation be?
16       MR. SCOFIELD:  Object to the form.
17   A   I don't know, sir.
18   Q   Well, you know his conditional
19  employment -- what the conditions of that
20  conditional employment are, don't you?
21   A   Yes, sir.
22   Q   And that means if you get caught again,
23  you're terminated, doesn't it?

Page 83

1    A   Yes, sir.
2    Q   So that's what would happen to him;
3  right?
4        MR. SCOFIELD:  Object to the form.
5    A   I would assume that would be her
6  direction.
7    Q   All right.  What do you think getting
8  terminated for drugs in your system would do to
9  his career?
10       MR. SCOFIELD:  Object to the form.
11   A   I don't know, sir.
12   Q   What do you think it would do to your
13  career if you got terminated for that?
14       MR. SCOFIELD:  Object to the form.
15   A   I don't know.
16   Q   Wouldn't be good, would it?
17   A   I would suspect not.
18   Q   What do you think that Mr. Dees getting
19  fired for sleeping did to his career?
20       MR. SCOFIELD:  Object to the form.
21   A   I don't know, sir.
22   Q   Did you ever once talk to Leon Dees
23  about this sleeping?

Page 84

1    A   No, sir.
2    Q   Who do you talk to at the medical
3  clinic about Brookshire?
4        MR. SCOFIELD:  Object to the form.
5    A   There's a clinic manager, and she would
6  call me.
7    Q   What's her name?
8    A   Her first name is Debra.
9    Q   And what's her last name?
10   A   I don't remember at this time.
11   Q   Now, Mr. Brookshire, as a condition of
12  his continued employment letter, he has to agree
13  to release all information about his drug and
14  alcohol usage and treatment to Hyundai, doesn't
15  he?
16   A   Yes, sir.
17   Q   So Hyundai has complete access to that
18  as a condition, do they not?
19       MR. SCOFIELD:  Object to the form.
20   A   That's my understanding.
21   Q   And he goes to, what, an outside clinic
22  called Alabama Psychiatric Services?
23   A   I believe that's the name, sir.

Page 85

1    Q   Dr. Shaw?
2    A   That, I don't know, sir.
3    Q   You don't know who he is?
4    A   No.
5    Q   Does he send reports to Hyundai on
6  what's happening?
7    A   To Debra.
8    Q   To Debra.  She reads them?
9    A   I assume so.
10   Q   And she shares whatever is in there she
11  thinks is relevant to you?
12   A   No, sir.
13       MR. SCOFIELD:  Object to the form.
14   Q   Who does she share that with?
15   A   I would only be contacted if he failed
16  a drug screen.
17   Q   Okay.  Have you ever been to this
18  Alabama Psychiatric Services?
19   A   No, sir.
20   Q   Do you know what they do?
21   A   I don't, sir.
22   Q   Have you got any other involvement with
23  the medical clinic or any disciplinary action

22  (Pages 82 to 85)

ROBERT ALLEN CLEVENGER

Page 86

1  involving them?
2      A   No, sir.
3      Q   Do you know anything about the drug and
4  alcohol abuse program?
5      A   I know what our policy states.
6      Q   Okay.  What does it state?
7      A   It states that if there is a failure
8  due to a random drug screen or due to a drug
9  screen because of an accident, then that Team
10  Member would be put into the treatment program.
11     Q   And what happened to Mr. Brookshire was
12  he got caught because he cut his hand, didn't
13  he?
14         MR. SCOFIELD:  Object to the form.
15     A   I honestly don't know the reason that
16  the screen was done, sir.
17     Q   Well, don't you know that he was using
18  cocaine and he cut his hand and he didn't think
19  anybody at Hyundai would know about it, but he
20  cut his hand and y'all did a test and they said,
21  got you, you got cocaine?
22         MR. SCOFIELD:  Object to the form.
23     Q   Isn't that what happened?

Page 87

1      A   I was made aware that he had failed a
2  screen.
3      Q   Did anybody at this meeting -- this
4  corrective action meeting -- ask him are you
5  addicted to drugs or do you use cocaine or do
6  you use alcohol?  Anybody ask him that?
7         MR. SCOFIELD:  Object to the form.
8      A   No, sir.
9      Q   Why wouldn't that be relevant?
10     A   At the meeting that I attended with
11  Wendy Warner, the corrective action was being
12  administered.
13     Q   So it had already been decided?
14     A   Yes, sir.
15     Q   What evidence did you gather as part of
16  your investigation to take that corrective
17  action against Brookshire?
18         MR. SCOFIELD:  Object to the form.
19     Q   Other than the drug screen he failed?
20     A   The failure of the drug screen.
21     Q   Okay.  Were any questions asked about
22  prior usage of alcohol or drugs?
23         MR. SCOFIELD:  Object to the form.

Page 88

1      A   No, sir.
2      Q   Do you know if the medical clinic or
3  Debra evaluated Mr. Brookshire's fitness for
4  duty based in part at least on any of those drug
5  screens or random reports from Alabama
6  Psychiatric Services?
7         MR. SCOFIELD:  Object to the form.
8      A   I don't have any knowledge, sir.
9      Q   His treatment for drug and alcohol
10  abuse is that relevant to his fitness for duty?
11         MR. SCOFIELD:  Object to the form.
12     A   I don't have anything to do with that
13  process.
14     Q   So you don't know if it's relevant?
15     A   No, sir.
16     Q   Would it be relevant to you?
17         MR. SCOFIELD:  Object to the form.
18     A   If I'm notified that he's failed a
19  screen, then I would have to take that
20  information to Ms. Warner.
21     Q   Look at those two statements that we've
22  got there, 2-15-07 and 2-19-07, as Plaintiff's
23  Exhibit 13.  Do you know of any information that

Page 89

1  these two statements are not credible?
2      A   No, sir.
3      Q   In your February 23, 2007 report to
4  Mr. Greg Kimble -- that's the one with the
5  conclusion the Department is asking for
6  termination -- in the second paragraph it
7  says -- third line down -- two doors of the
8  panel were open, which served as a blind, and
9  hide Leon from most views.  See that?
10     A   Yes, sir.
11     Q   Did you write that?
12     A   Yes, sir.
13     Q   What information did you base your
14  statement that the two doors of the panel served
15  as a blind and hide Leon from most views?  What
16  did you base that on?
17     A   That was communicated to me.
18     Q   By who?
19     A   Mr. Applegate.
20     Q   Verbally?
21     A   Verbally.
22     Q   There's nothing in Mr. Brookshire's
23  statements to that effect?

23 (Pages 86 to 89)

ROBERT ALLEN CLEVENGER

Page 90

1    A   (Witness reviews documents.) No, sir.
2    Q   Well, what did Mr. Brookshire's two
3  statements dated February 15th and 19th of '07,
4  Plaintiff's Exhibit 13 -- what in there
5  indicates that the two panels were used as a
6  blind to hide Mr. Dees from view?
7        MR. SCOFIELD:  Object to the form.
8    A   Can you repeat the question?
9    Q   What in these two statements say that?
10   A   It does not.
11   Q   Well, where in the statements does it
12 say that -- well, where does it even refer to
13 panels?
14       MR. SCOFIELD:  Object to the form.
15   A   In the second paragraph, it mentions
16 cabinet.
17   Q   Yeah, it mentions cabinet, but it says
18 Leon Dees sitting at operating station, Leon was
19 positioned with his head down and his back was
20 toward the cabinet.  I see that.  Where does
21 that talk about panels being positioned as a
22 blind to hide Mr. Dees?
23   A   It does not.

Page 91

1    Q   Well, Mr. Brookshire was the only one
2  who saw it, wasn't he?
3    A   Yes.
4    Q   But he didn't say in either statement
5  that there was panels positioned to make a blind
6  to hide Dees, does he?
7    A   No.
8    Q   And, in fact, in the document two days
9  previous to that that Mr. William Ware wrote to
10 you, February 21, 2007 -- if you'll look at
11 that, Defendant's Exhibit 1.  It's also
12 Plaintiff's Exhibit 16.  Where in there do you
13 see anything about panels being positioned to
14 create a blind to hide Mr. Dees?
15   A   I don't see anything there, sir.
16   Q   There's not even a mention of a blind
17 or hiding or a panel even, is there?
18   A   No, sir.
19   Q   As a matter of fact in this, there's
20 not even a mention of the cabinet, is it?
21   A   No, sir.
22   Q   In this document, the February 21, 2007
23 Team Relations Memo from Ware to yourself, it

Page 92

1  says his location was at the RO1 station.  What
2  does that mean?
3    A   It's my understanding that's the --
4  that's the cabinet referred to in this
5  station -- or in this statement.
6    Q   Well, who told you that?
7    A   That's the -- that's the physical name
8  of the station.  Mr. Applegate told me.
9    Q   Mr. Applegate told you that?
10   A   Yes.
11   Q   What does RO stand for?
12   A   I don't know, sir.
13   Q   And you never knew?
14   A   No, sir.
15   Q   Don't have a clue?
16   A   No, sir.
17   Q   What does the 1 stand for?
18   A   I don't know, sir.
19   Q   So Mr. Applegate told you that
20 Mr. Brookshire said the panels -- the two doors
21 of the panel were opened which served as a blind
22 hide Leon from most views.  That's something
23 Mr. Applegate told you?

Page 93

1    A   There seems to be more than one piece
2  there, sir.
3    Q   Well, I'm reading from the February 23,
4  2007 memo from Clevenger to Kimble, Bates number
5  33 at the bottom.  It says two doors of panel
6  were open which served as a blind and hide Leon
7  from most views.  Is your testimony that
8  Applegate told you that?
9    A   Yes, sir.
10   Q   Brookshire didn't tell you that, did
11 he?
12   A   No, sir.
13   Q   And nobody else told you that, did
14 they?
15   A   Mr. Applegate.
16   Q   Except Mr. Applegate?
17   A   Except Mr. Applegate.
18   Q   And he wasn't there, was he?
19   A   No, sir.
20   Q   So where did he get the information?
21   A   I don't know, sir.
22   Q   He'd have to get it from somewhere,
23 wouldn't he?

24 (Pages 90 to 93)

ROBERT ALLEN CLEVENGER

Page 94

1        MR. SCOFIELD:  Object to the form.
2        A   I would assume so, sir.
3        Q   And where could he have gotten that
4   information from?
5        MR. SCOFIELD:  Object to the form.
6        A   I don't know, sir.
7        Q   Well, that was key information in this
8   memo, wasn't it?
9        A   No, sir.
10       MR. SCOFIELD:  Same objection.
11       Q   It wasn't?  Why wasn't it key?
12       A   The sleeping was the -- is the incident
13   that we're discussing.
14       Q   Well, you spend -- you spend a whole
15   paragraph about -- about this discussion of the
16   sitting in front of the panel, he's asleep, the
17   two doors of the panel were open that served as
18   a blind to hide him.  Why did you think all that
19   would be relevant?
20       A   It was information that I was told.
21       Q   By Applegate?
22       A   Yes, sir.
23       Q   Now, where is Mr. Applegate's statement

Page 95

1   in the packet?
2        A   There isn't one, sir.
3        Q   Why isn't there one by Mr. Applegate?
4        A   There wasn't one taken, sir.
5        Q   Why not?
6        A   He wasn't there that evening.
7        Q   But if he wasn't there that evening,
8   then why would what he said happened be believed
9   by anybody including you?
10       MR. SCOFIELD:  Object to the form.
11       A   That particular piece is only
12   information that I was given.  It's not key.
13   It's not the reason that this report was
14   generated.
15       Q   Well, why did you, Rob Clevenger, see
16   fit to put it in your report?
17       A   Because I was told that.
18       Q   You were told to put it in, or you were
19   just told it?
20       A   Or I was told the information.
21       Q   Well, why did you put it in the report
22   rather than leaving it out if it wasn't
23   important?

Page 96

1        MR. SCOFIELD:  Object to the form.
2        A   Because I'm just responsible to put the
3   information that I'm told in the report.
4        Q   All right.
5        MR. SCOFIELD:  There's --
6        Q   There's nothing in this report that you
7   left out?
8        MR. SCOFIELD:  I'm going to let him
9   answer this question and then we're going to
10   take a five-minute break.
11       Q   Did you leave anything out of this
12   report?
13       A   Not that I'm aware.
14       Q   Well, didn't you --
15       MR. SCOFIELD:  Let's take a break.
16       Q   -- leave out the name of another
17   witness?
18       MR. SCOFIELD:  We're going to take a
19   five-minute break.  We can come back to that
20   question.
21
22       (Whereupon, a brief recess was had in
23   the proceeding.)

Page 97

1
2   BY MR. KILBORN:
3        Q   Mr. Clevenger, if you'd take a look at
4   that February 21, 2007 memo from William Ware to
5   yourself, which is within Exhibit 1.  It was
6   also in the packet given to the meeting.  And
7   it's also Plaintiff's Exhibit 16.  Is this a
8   report from William Ware to yourself on his
9   interviews with Dees, Ware, and Prater?
10       A   Yes.
11       Q   It states that Dees denies he was
12   sleeping, does it not?
13       A   Yes.
14       Q   It states that he asked that Brookshire
15   be called in to confront him at that time, does
16   it not?
17       MR. SCOFIELD:  Object to the form.  He
18   being Dees?
19       MR. KILBORN:  Dees.  Correct.
20       A   Yes.
21       Q   It states that Dees says he was sitting
22   in a chair text messaging his daughter due to
23   bad weather outside, does it not?

25 (Pages 94 to 97)

ROBERT ALLEN CLEVENGER

Page 98

1    A   Yes.
2    Q   It states that the location was the RO1
3  station?
4    A   Yes.
5    Q   It doesn't mention the panel, nor does
6  it mention the panel doors, nor does it mention
7  anything about the cabinet at all, does it?
8        MR. SCOFIELD: Object to the form.
9    A   I'm not familiar with the location of
10  RO Station 1. I believe that that's the cabinet
11  referred to in the statement.
12    Q   Does it mention the panel doors?
13    A   No, sir.
14    Q   Does it mention the hiding?
15    A   No, sir.
16    Q   Isn't it true that the Ontario King
17  matter was brought up at the -- what did you
18  call this meeting?
19    A   It's a Term Discussion.
20    Q   Term Discussion?
21    A   Termination Discussion.
22    Q   Termination Discussion referred to in
23  Plaintiff's Exhibit 21.

Page 99

1        MR. KILBORN: Read me back the
2  question.
3
4        (Whereupon, the last question was
5  read by the Reporter.)
6
7        MR. KILBORN: Strike that.
8    Q   Isn't it true that the Ontario King
9  termination was brought up at this termination
10  meeting because that was a case where Mr. King
11  had made a bed and that was one of the factors
12  in his termination, that it was -- he had
13  basically made a bed and it was a fairly
14  egregious type of sleeping?
15    A   He was outside normal view, yes.
16    Q   And so to make the comparison to Dees,
17  the relevance of the blind and the hiding by the
18  panel doors was because it would be outside of
19  normal view with that in place, wouldn't it?
20        MR. SCOFIELD: Object to the form.
21    A   Yes.
22    Q   So the importance of Ontario King and
23  the importance of making of the blind with the

Page 100

1  panel doors was because it made it a more
2  egregious type of a sleeping; isn't that true?
3    A   The location itself is outside normal
4  view. That's the similarity.
5    Q   Similarity also both of them were
6  intentionally trying to hide outside of the
7  normal view; isn't that true?
8    A   They were both outside of normal view,
9  yes.
10    Q   They were both doing that
11  intentionally? In other words, they were both
12  hiding according to your understanding?
13    A   That is my understanding.
14    Q   Right. And so the fact that you -- the
15  reason why you put in the statement about two
16  doors of the panel were open which served as a
17  blind and hide Leon from most views was because
18  that showed the similarity with Ontario King;
19  isn't that true?
20        MR. SCOFIELD: Object to the form.
21    A   No, sir.
22    Q   Does it, in fact, show a similarity to
23  Ontario King?

Page 101

1    A   They were both outside normal view.
2  That's the similarity.
3    Q   I think you said you went to some kind
4  of investigative class at Hyundai?
5        MR. SCOFIELD: Object to the form.
6    A   I was employed at Hyundai when I went
7  to the seminar, yes.
8    Q   What was the name of the seminar?
9    A   I believe it was just Investigations.
10    Q   Did it tell you how to do
11  investigations?
12    A   It went through the process, yes, sir.
13    Q   Okay. Tell me what it did -- what it
14  said.
15        MR. SCOFIELD: Object to the form.
16    A   It discussed taking -- taking
17  information from a complainant and any
18  witnesses.
19    Q   Did it discuss how to do that?
20    A   Yes, sir.
21    Q   Did it discuss how to take a statement
22  from a witness?
23    A   Yes, sir.

26 (Pages 98 to 101)

ROBERT ALLEN CLEVENGER

Page 102

1     Q    And did it discuss how to take
2  statements like Mr. Brookshire's two statements?
3     A    Yes, sir.
4     Q    And did it instruct you to take
5  statements from all witnesses?
6     A    Yes, sir.
7     Q    What is the reason why an investigator
8  such as yourself would take statements from all
9  witnesses?
10       MR. SCOFIELD:  Object to the form.
11    A    To gather information.
12    Q    Well, it's to find the truth, isn't it?
13       MR. SCOFIELD:  Object to the form.
14    A    To gather the information that the
15  witnesses have.
16    Q    To ultimately determine the truth?
17       MR. SCOFIELD:  Object to the form.
18    A    Or a course of action.
19    Q    Well, doesn't that course of action
20  have to be based on the truth?
21    A    That wouldn't be my decision, sir.
22    Q    They didn't teach you that in
23  investigatory school?

Page 103

1     A    That would rest with the decision
2  makers, sir.  I simply collected the
3  information.
4     Q    Well, as an information collector, are
5  you interested in arriving at the truth?
6     A    That's not part of my function.  I just
7  collect the information from the witnesses.
8     Q    Isn't it part of your function to get
9  truthful information?
10    A    It's part of my -- it's part of my
11  responsibility to ask for the information.
12    Q    All right.  And are you taught at all
13  how to separate truth from fiction?
14       MR. SCOFIELD:  Object to the form.
15    A    I don't recall that being part of the
16  information, sir.
17    Q    Well, do you believe Dees was asleep?
18    A    I wasn't a decision maker, sir.
19    Q    Did you understand my question?
20    A    I do.
21    Q    What's the answer?
22    A    I just collected the information.  I
23  believe that the statement taken says he was

Page 104

1  asleep.  So, therefore, I believe he was asleep.
2     Q    Well, what about Dees' denial that he
3  was asleep?
4     A    (No response.)
5     Q    Where is the statement from Dees that
6  denies he was asleep?
7     A    The information taken from the meeting
8  and Mr. Ware's report.
9     Q    Well, where is the statement like
10  Brookshire's signed by Dees?
11    A    I don't have that, sir.
12    Q    Well, Dees would certainly be a witness
13  to what happened, wouldn't he?
14    A    This information collected in this memo
15  is the information that I received.
16    Q    Well, wouldn't it be important to get a
17  statement from Dees?
18    A    This is the information that was
19  collected when they met with him.
20    Q    Well, what about a statement like
21  Mr. Ware took from Mr. Brookshire?  Where is
22  that type of statement, a written statement?
23       MR. SCOFIELD:  Object to the form.

Page 105

1     A    This is the information that Mr. Dees
2  stated in that meeting.
3     Q    I know.  But that's not my question.
4  Where is the written statement like Brookshire
5  gave to that?
6     A    I don't have that, sir.  This is the
7  information that Mr. Ware recorded in that
8  meeting.
9     Q    Well, I know what this is.  You've
10  repeated it three times.  I want to know where
11  is Dees' written statement.
12       MR. SCOFIELD:  Object to the form.  I
13  think he's trying to answer your question.
14    A    I don't have -- I don't have something
15  written by Mr. Dees, sir.
16    Q    Well, if you took a class on
17  investigating and there are two people in the
18  sleeping incident, Brookshire and Dees, why
19  wouldn't you take a statement from Dees just
20  like you did from Brookshire?
21       MR. SCOFIELD:  Object to the form.
22    A    The information contained in this memo
23  is what Mr. Dees stated.

27 (Pages 102 to 105)

ROBERT ALLEN CLEVENGER

Page 106

1    Q    But it's not in the same form, is it?
2    A    No, sir.
3    Q    It's not signed, is it?
4    A    No, sir.
5    Q    It's not dated, is it?
6    A    The memo is dated.
7    Q    Well, the memo is dated, but there's no
8    Dees statement dated, is there?
9    A    No, sir.
10   Q    And Mr. Ware interviewed both Mr. Dees
11   and Mr. Brookshire, didn't he?
12   A    Yes, sir.
13   Q    But he failed to take a statement from
14   Dees like he did from Brookshire, didn't he?
15   A    Mr. Prater was asking the questions.
16   Mr. Ware was simply in the room recording what
17   was being said.
18   Q    So Mr. Ware did not take a statement
19   from Mr. Dees?
20   A    He was recording what Mr. Dees said.
21   Q    How was he recording it?
22   A    He was writing it down.
23   Q    Well, was there a tape-recorder?

Page 107

1    A    No, sir.
2    Q    Why not?
3    A    We have a policy that says no
4    tape-recorders on site.
5    Q    Was there a tape-recorder in the
6    termination meeting?
7    A    No, sir.
8    Q    Was there a video?
9    A    No, sir.
10   Q    Look at the February 21, 2007 e-mail
11   from John Applegate to yourself, which is in
12   that Exhibit 1. And it's also Defendant's
13   Exhibit 6. That's dated two days before your
14   Team Relations Memo, isn't it?
15   A    Yes, sir.
16   Q    Did you know that this e-mail existed
17   when you put together the packet to present to
18   the termination meeting?
19   A    Yes, sir.
20   Q    Does it discuss Dees and the sleeping
21   incident?
22   A    Yes.
23   Q    Does it discuss a conversation that

Page 108

1    Mr. Prater had with Mr. Dees about the sleeping
2    incident?
3    A    Yes.
4    Q    Did Mr. John Applegate get it?
5    A    Yes.
6    Q    Was Mr. John Applegate at the
7    termination meeting?
8    A    For a period of time, yes.
9    Q    Did you rely upon statements Mr. John
10   Applegate gave you about the sleeping incident
11   verbally?
12   A    Yes.
13   Q    Why didn't you take a statement from
14   Mr. John Applegate?
15   A    He wasn't there that evening.
16   Q    But you considered what he told you
17   relevant to the termination?
18   A    I just supplied it as information that
19   I was told.
20   Q    Well, you included it in your
21   memorandum of February 23rd, did you not?
22   A    I did.
23   Q    Well, since you included what Applegate

Page 109

1    told you in your memorandum to this important
2    committee that had this termination meeting and
3    you relied upon that because you put it in this
4    memorandum, why didn't you take a statement as a
5    trained investigator from John Applegate who
6    told you the information?
7         MR. SCOFIELD: Object to the form.
8    A    He wasn't there that evening, sir.
9    Q    That's true. But you did rely upon
10   what he told you, didn't you?
11   A    No, sir. I simply put it in the memo
12   as information that I was told.
13   Q    Well, why did you not -- I know he
14   wasn't at the sleeping incident, but Mr. Ware
15   wasn't either. You weren't either. But you
16   included Mr. Applegate's opinions in your
17   memorandum. Why wasn't it reduced to a format
18   that was used with Mr. Brookshire?
19        MR. SCOFIELD: Object to the form.
20   A    Because it was information I was told
21   verbally and Mr. Applegate wasn't there.
22   Q    Okay. Well, Mr. Brookshire's
23   information was told verbally, too, wasn't it?

28 (Pages 106 to 109)

ROBERT ALLEN CLEVENGER

Page 110

1    A   Mr. Brookshire was there, though.
2    Q   I know, but it was told verbally and
3   then put down in statement form, wasn't it?
4    A   Yes, sir.
5    Q   Now, in discussing the Defendant's
6   Exhibit 6 -- that's this February 21, 2007
7   memorandum -- it discusses sleeping, it
8   discusses Dees, it discusses the incident. It
9   discusses the recommendation, doesn't it?
10       MR. SCOFIELD: Vince, I'm not sure
11   which document you're referring to.
12   Q   The e-mail that is Defendant's Exhibit
13   6, which is also within Plaintiff's Exhibit 1,
14   which was not in the packet that you gave to the
15   termination meeting.
16       MR. SCOFIELD: Can you give us the
17   Bates number on the bottom of that?
18       MR. KILBORN: Yeah. It's 35.
19       MR. SCOFIELD: And it's the e-mail
20   dated Wednesday, February 21? I just wanted to
21   be sure we were looking at the same thing.
22   Q   At 5:20 a.m.
23   A   Yes.

Page 111

1    Q   And you see Dees is misspelled D-E-E-Z?
2    A   Yes, he did.
3    Q   And when you made up the packet to give
4   to the termination meeting, you knew about this
5   e-mail?
6    A   Yes, sir.
7    Q   You knew it discusses subject matter
8   that was going to be discussed at this meeting?
9    A   Yes, sir.
10   Q   You knew it had statements by people
11   who claimed to have information about it?
12       MR. SCOFIELD: Object to the form.
13   A   This is an account by Mr. Prater, sir.
14   Q   Okay. Well, what was wrong with
15   Mr. Prater's account?
16       MR. SCOFIELD: Object to the form.
17   A   He wasn't there.
18   Q   Well, Mr. Applegate wasn't there either
19   but he was considered, wasn't he?
20       MR. SCOFIELD: Object to the form.
21   A   I simply put the information that
22   Mr. Applegate told me in that memo. Mr. Prater
23   was present for the information from -- with

Page 112

1   William Ware when it was collected from
2   Mr. Dees.
3    Q   So Mr. Applegate told you what to put
4   in the packet?
5       MR. SCOFIELD: Object to the form.
6    A   No, sir.
7    Q   Who told you to exclude this e-mail?
8    A   This information was similar to the
9   information that was collected with Mr. Ware
10   present, so I included this information.
11   Q   But this also has additional
12   information, doesn't it?
13   A   (No response.)
14   Q   Well, I'll give you a hint. It's got a
15   recommendation, doesn't it?
16       MR. SCOFIELD: Object to the form.
17   A   Yes.
18   Q   And that's a recommendation from Greg
19   Prater?
20   A   Yes.
21   Q   And why was he making a recommendation
22   on Dees' termination?
23   A   I couldn't say, sir.

Page 113

1    Q   But he, in fact, made one?
2    A   Yes, he did.
3    Q   And he also says based on this
4   conversation I feel that even if he were not
5   sleeping, that he doesn't care enough about his
6   job to prevent anyone from thinking he was
7   sleeping; John, my recommendation, as hard as it
8   is for me to say, termination, Greg. He says
9   that, doesn't he?
10   A   Yes, sir.
11   Q   So his recommendation was termination
12   whether Dees was sleeping or not, wasn't it?
13       MR. SCOFIELD: Object to the form.
14   A   Yes, sir.
15   Q   Well, if Dees wasn't sleeping, then
16   what did he base his recommendation on?
17       MR. SCOFIELD: Object to the form.
18   A   Who is he in your question?
19       MR. KILBORN: Prater.
20   A   I couldn't say, sir.
21   Q   So you don't understand this
22   memorandum?
23       MR. SCOFIELD: Object to the form.

29 (Pages 110 to 113)

ROBERT ALLEN CLEVENGER

Page 114

1    A  I didn't include it in the packet as
2  information for the committee.  Just Mr. Ware's
3  information.
4    Q   But did you specifically exclude it?
5       MR. SCOFIELD:  Object to the form.
6    Q   You looked at it and you decided not to
7  include it?
8    A   Because Mr. Prater wasn't there.
9    Q   But you included what Mr. Applegate
10  said even though he wasn't there either?
11    A   Because that was information told to me
12  by the senior manager.  I included the
13  information.  I didn't draw any conclusion from
14  it.
15    Q   Senior manager being who?
16    A   Mr. Applegate.
17    Q   What is it about the senior management
18  that seems to be more credible than, say, a
19  decorated National Guard Reservist --
20       MR. SCOFIELD:  Object to the form.
21    Q   -- with a spotless employment record at
22  Hyundai?
23       MR. SCOFIELD:  Same objection.

Page 115

1    A   I don't have any information on the
2  National Guard, sir.
3    Q   What is Hyundai's policy on whether or
4  not orders are required for an employee to be
5  allowed to go to weekend drill?
6    A   Verbal notification is accepted.  Of
7  course, written orders are better.  But verbal
8  notification is accepted.
9    Q   And how long has that been in effect?
10    A   I believe -- since day one, I believe
11  that is the requirement under USERRA.
12    Q   What's USERRA?
13    A   Uniform Serviceman's Act.
14    Q   And when did you learn that there was a
15  law called USERRA?
16    A   During my time at SIA.
17    Q   Okay.  And under USERRA is it permitted
18  to require orders for an employee to go to
19  weekend drill?
20    A   It's my understanding it's permitted to
21  ask.
22    Q   Do orders exist?
23       MR. SCOFIELD:  Object to the form.

Page 116

1    A   I don't know if I understand your
2  question.
3    Q   Do orders exist regarding weekend
4  drill?
5       MR. SCOFIELD:  Same objection.
6    A   It's my understanding they can.
7    Q   Well, do they?
8    A   I believe they are generated in some
9  cases.
10    Q   Both Mr. Brookshire and Wendy Warner
11  told me about some confusion within Hyundai
12  whether or not orders would be required from the
13  National Guard regarding that subject.  In fact,
14  Brookshire told me he recalled an e-mail on that
15  subject that came out.
16       MR. SCOFIELD:  Object to the form.
17    A   I don't have any information as to --
18    Q   You don't know anything about that?
19    A   No, sir.
20    Q   So there's never been any confusion
21  from day one at Hyundai about the requirement
22  that an employee has to follow to be allowed to
23  go to weekend National Guard drill?

Page 117

1       MR. SCOFIELD:  Object to the form.
2    A   Not on my part, sir.
3    Q   How about anybody's part that you know
4  of?
5       MR. SCOFIELD:  Object to the form.
6    A   I am not aware.  I couldn't speak for
7  everyone.
8    Q   To your knowledge, it's clear?
9    A   Yes, sir.
10    Q   Is that set forth in writing?
11    A   That is not in the policy.
12    Q   All right.  Has there been any
13  discussion about putting it in the policy?
14       MR. SCOFIELD:  Object to the form.
15    A   Not that I'm aware.
16    Q   Did you ever discuss with Mr. Prater
17  his discussion with Mr. Dees about requiring
18  orders?
19    A   Not that I recall.
20    Q   What does Prater mean he doesn't care
21  enough about his job to prevent anyone from
22  thinking he was sleeping in this February 21,
23  2007 e-mail from Prater to Applegate?

30  (Pages 114 to 117)

ROBERT ALLEN CLEVENGER

Page 118

1       MR. SCOFIELD:  Object to the form.
2    A   I don't know, sir.
3    Q   This February 21, 2007 memo -- Team
4  Relations Memo from William Ware to yourself --
5  it's Plaintiff's Exhibit 16, Bates number 36.
6  It's within your packet.  Look at the reverse
7  side.  There appears to be a drawing.  Tell me
8  what you know about that.
9    A   It appears to be the area where
10 Mr. Brookshire said Mr. Dees was sleeping.
11   Q   Was that in the packet?
12   A   No, sir.
13   Q   I thought you said that document was in
14 the packet?
15   A   It looks to me as though someone drew
16 this.
17   Q   Well, sure it does.  But you said that
18 this document was in the packet.  Now we're
19 looking at the reverse side.  Was the reverse
20 side given to the Termination Committee?
21   A   No, sir, I did not generate that.
22   Q   I know you didn't generate it, but was
23 the document with the sketch on the back given

Page 119

1  to the termination meeting?
2    A   No, sir.
3    Q   Why wasn't the drawing given to the
4  meeting?
5    A   I don't know who generated that
6  drawing.
7    Q   How do you know it wasn't given to them
8  in the packet?
9    A   I put the packet together.
10   Q   Well, the original had this sketch on
11 the reverse side, didn't it?
12       MR. SCOFIELD:  Object to the form.
13   A   No, sir.
14   Q   It didn't?
15   A   No, sir.
16   Q   So somebody put this sketch on it after
17 the meeting?
18       MR. SCOFIELD:  Object to the form.
19   A   I really don't know, sir.
20   Q   Well, it wasn't on there when you gave
21 it to them; right?
22   A   Right.
23   Q   So it must have been put on later if

Page 120

1  it's on there; correct?
2    A   Yes.
3    Q   It wasn't you that did it?
4    A   No, sir.
5    Q   Well, who has access to this document
6  to be drawing the sketch on the back of it?
7    A   Only those that would have been in the
8  discussion meeting.
9    Q   And that would have been the people on
10 Exhibit 21?
11   A   (Indicating.)
12   Q   So you've never seen that sketch before
13 today?
14   A   I don't recall.
15   Q   Do you know what it's a sketch of?
16   A   I believe it's the area where Mr. Dees
17 was seen by Mr. Brookshire.
18   Q   What makes you think that?
19   A   From -- I see the chair and it appears
20 to be a cabinet area.
21   Q   What is this right here (indicating) --
22       MR. SCOFIELD:  Object to the form.
23   Q   -- in front of the chair?

Page 121

1    A   I believe that's a -- I'm only
2  speculating.  I believe it's a spool that wire
3  is coiled on.
4    Q   I don't see any reference to a spool in
5  any of the documents in the packet.  Do you know
6  where the spool came from?
7    A   I don't, sir.  I didn't generate that
8  drawing.
9    Q   I don't see a reference to a spool on
10 Mr. Brookshire's two statements.  Can you
11 explain why that's not on his two statements?
12   A   No, sir.
13   Q   Does it look to you on the sketch that
14 two panels are put in the shape of a blind to
15 hide Mr. Dees if he was sitting in the chair?
16       MR. SCOFIELD:  Object to the form.
17   A   It appears that one door is closed and
18 two doors are opened.
19   Q   So the door that's closed is in the
20 middle and the two doors that are open are on
21 the side?
22   A   Yes, sir.
23   Q   As in the shape of a blind?

31 (Pages 118 to 121)

ROBERT ALLEN CLEVENGER

Page 122

1      MR. SCOFIELD:  Object to the form.
2      A    As the doors are open.
3      Q    Right.  Well, that looks like somebody
4   is trying to make it appear like there was a
5   blind, doesn't it?
6      MR. SCOFIELD:  Object to the form.
7      A    The chair is placed in between the two
8   doors, yes.
9      Q    And the doors are open instead of
10  closed?
11     A    Yes.
12     Q    Well, you wrote the word blind.  What
13  did you mean?
14     MR. SCOFIELD:  Object to the form.
15     A    That was information I was given by
16  Mr. Applegate.  I didn't draw any conclusion.
17     Q    So when you wrote the word blind, you
18  didn't know whether it meant blind man or any
19  other kind of blind.  He said the word blind and
20  you wrote it down not knowing what he meant?
21     MR. SCOFIELD:  Object to the form.
22     A    I included it in the context of the
23  information that he gave me.

Page 123

1      Q    Well, what did you mean by it?
2      A    I didn't mean anything by it, sir.  I
3   took the information that he stated.
4      Q    You meant nothing by it; is that
5   correct?
6      A    I took the information down.  I put it
7   in the report as he stated it to me.
8      Q    Is it your testimony to this federal
9   jury that you wrote the word blind and you do
10  not know what that meant, you did not know what
11  you meant by it?
12     MR. SCOFIELD:  Object to the form.
13     A    It wasn't my word, sir.
14     Q    I know that.  But you wrote it.  Now,
15  is it your testimony that you did not know what
16  that meant when you wrote it?
17     MR. SCOFIELD:  Object to the form.
18     A    In the context of what Mr. Applegate
19  said, the chair was placed between the two open
20  doors, the area is several feet off the floor --
21  I'm sorry.  I read the wrong paragraph.  Two
22  doors of the panel to serve as a blind to hide
23  Leon from most views.

Page 124

1      Q    Now, my question is, is it your
2   testimony under oath that you did not know what
3   you meant by the word blind?
4      A    It wasn't my word.  I understand what
5   Mr. Applegate meant.
6      Q    What did he mean?
7      A    That the doors were open so as not to
8   be able to see.
9      Q    And did he say the word hide or is that
10  your word?
11     A    That is what Mr. Applegate stated to
12  me, that sentence.
13     Q    Do you know what hide means?
14     A    Yes, sir.
15     MR. SCOFIELD:  Object to the form.
16     Q    What does it mean?
17     A    To be unable to see.
18     Q    Now, my question is, on the reverse of
19  this Exhibit 16 where this sketch is, is it not
20  true that that sketch is meant to position the
21  panel doors so that it creates a blind to hide
22  Mr. Dees?
23     MR. SCOFIELD:  Object to the form.

Page 125

1      A    It appears that the doors are open,
2   yes, sir.
3      Q    Does it appear to you --
4      A    And would conceal the chair in the
5   middle.
6      Q    It would hide it, wouldn't it?
7      A    Yes, sir.
8
9      (Whereupon, Plaintiff's Exhibit
10  Number 23 was marked for identification
11  and copy of same is attached hereto.)
12
13     Q    I'm going to show you, Mr. Clevenger, a
14  series of photographs Bates numbered 344 through
15  350.  And the Bates numbers are at the bottom
16  lower right, so we may refer to those numbers.
17  Do you know what these pictures are?
18     A    Yes, sir.
19     MR. SCOFIELD:  Go ahead and flip
20  through all of them.
21     Q    Have you flipped through it?
22     A    Yes, sir.
23     Q    What are they?

32 (Pages 122 to 125)

ROBERT ALLEN CLEVENGER

Page 126

1    A    This is the area that Mr. Applegate
2  said that the incident took place.
3    Q    And Hyundai has told us that these were
4  taken on March 5, 2007.  Does that jibe with
5  your recollection?
6    A    Yes, sir.
7    Q    Did you take the pictures?
8    A    Yes.
9    Q    And what was the purpose?
10   A    Mr. Dees had requested that his
11  termination be reviewed by a Team Member Review
12  Board.  So in preparation for him starting that
13  process, I took these photos.
14   Q    And how did you know where to go take
15  the photos?
16   A    Mr. Applegate had shown me where the
17  incident had taken place.
18   Q    Previously?
19   A    During this situation.
20   Q    So he was there when you took the
21  pictures?
22   A    As I recall.
23   Q    Anybody else?

Page 127

1    A    I don't recall.
2    Q    Did you take any more pictures other
3  than the ones here?
4    A    I don't recall if there were more than
5  this or not.
6    Q    Was that a company camera that you
7  used?
8    A    Yes.
9    Q    You still have the negatives?
10   A    It's a digital camera, sir.
11   Q    Do you still have those on your
12  computer?
13   A    I believe so.
14   Q    Is that in Dees' file?
15   A    No, sir.
16   Q    What file is that in?
17   A    Team Member Review Request file.
18   Q    Is that a computer folder that you
19  have?
20   A    A folder, yes, sir.
21   Q    And it's still on your computer?
22   A    Yes, sir.
23   Q    So Team Member Review Request?

Page 128

1    A    Yes, sir.
2    Q    Does it have the request in it?
3    A    Mr. Dees made that by phone.
4    Q    Okay.  Does it have a memo of the phone
5  call?
6    A    I don't believe so.
7    Q    Did you speak to him?
8    A    No, sir.
9    Q    Who spoke to him?
10   A    He left a message.
11   Q    Did you hear it?
12   A    I did, sir.
13   Q    Do you still have it?
14       MR. SCOFIELD:  Object to the form.
15   A    I don't recall.  I don't know if it's
16  in my -- I don't know if it's saved or not.
17   Q    Do you routinely save it?
18   A    No, sir.
19   Q    And what was the date of the request?
20   A    I'd have to see the documents, sir.  I
21  don't remember.
22       MR. KILBORN:  I don't recall seeing
23  that, Trent.  Could you find that?

Page 129

1        MR. SCOFIELD:  I know, Vince, there's a
2  Post-it note that Rob has on the face of Wendy
3  Warner's letter regarding the Team Member Review
4  Board.  It's going to be in 1 through 5 of
5  Wendy's deposition.
6        MR. KILBORN:  Is this a Post-it note?
7        MR. SCOFIELD:  I mean, that's what I'm
8  recalling.  It's going to be in the Team Member
9  Review -- the skinny folder -- and should be
10  just about the first page in the folder, if it's
11  what I'm thinking of.
12       MR. SPORT:  There's a memo to the file.
13       MR. SCOFIELD:  I'm thinking of
14  something different.
15   Q    Well, let me show you this document.
16  It's within Plaintiff's Exhibit 2, which is a
17  file we were given.  It's dated March 2, 2007.
18  And why don't I just put an exhibit number on
19  it.  For clarity, I'll just mark it as Exhibit
20  24 within Exhibit 27 and ask you if this is what
21  you're referring to.
22
23       (Whereupon, Plaintiff's Exhibit

33 (Pages 126 to 129)

ROBERT ALLEN CLEVENGER

Page 130

1  Number 24 was marked for identification
2  and copy of same is attached hereto.)
3
4      A   No, sir.  He left a phone message on my
5  phone.
6      Q   Well, that refers to a phone message.
7      A   This was communicated to Nancy Powers.
8  I believe he left me a phone mail message on my
9  phone as well requesting Team Member Review.
10     Q   So this is -- you were trying to get
11 ready for this review?
12     A   Yes, sir.
13         MR. SCOFIELD:  Vince, if I might just
14 clarify.  I'm not trying to slow things down at
15 all, but I believe that's the Post-it note that
16 I had recalled that's copied on this document
17 dated March 7, 2007.
18     Q   Why don't we put a Plaintiff's Exhibit
19 25 on that?
20
21     (Whereupon, Plaintiff's Exhibit
22 Number 25 was marked for identification
23 and copy of same is attached hereto.)

Page 131

1
2      Q   And look at Plaintiff's Exhibit 25,
3  which is a letter to Dees dated March 7, 2007
4  from Warner stating that Dees must meet with you
5  on Monday, March 12th, with a Post-it note on
6  it.  Is that what you're referring to?
7      A   Can you ask that question again,
8  please?
9      Q   Is that what you're referring to when
10 you say you have seen a message or something
11 relating to a message from Dees that he wanted a
12 review, or is there something else?
13     A   He left a phone mail message on my
14 machine specifically requesting Team Member
15 Review.
16     Q   And you took these photographs to get
17 ready for that?
18     A   Yes, sir.
19     Q   Exhibit 23?
20     A   Yes, sir.
21     Q   And you believe Mr. Applegate was
22 there?
23     A   Yes, sir.

Page 132

1      Q   And you don't think anybody else was
2  there?
3      A   I don't recall.
4      Q   And the purpose of the photographs was
5  what?
6      A   Team Member Review panel wouldn't
7  likely have been able to go to this area, so the
8  pictures were to allow them to view the area if
9  they asked.
10     Q   So the Team Member Review committee
11 would not be allowed to go to the area?
12     A   There's five -- it might be difficult
13 to get them all up there, or if they were afraid
14 of heights, it might not be possible.
15     Q   So these photographs were to reproduce
16 the scene?
17         MR. SCOFIELD:  Object to the form.
18     A   All I did was take photos of the area
19 at the time.  I didn't reproduce anything.  I
20 just took photos of the area.
21     Q   So these photographs are exactly how
22 you saw the area when you went up to take the
23 photographs?

Page 133

1      A   On that day.
2      Q   On March the 5th?
3      A   Yes, sir.
4      Q   2007?
5      A   Yes, sir.
6      Q   So you walked up the stairs to the
7  third floor mezzanine where the control panel
8  was and this is what you saw?
9      A   Yes, during that day.
10     Q   Do you know what time of day or night
11 it was?
12     A   It was during the day, sir, but I don't
13 remember what time.
14     Q   And that would include Bates number
15 345, the second photograph?
16     A   Yes, sir.
17     Q   So when you first saw this, the chair
18 and the spool and the door panels were exactly
19 like they appear in the photograph?
20     A   Yes, sir.
21     Q   Nothing was moved an inch; correct?
22     A   I didn't -- I just took the photos of
23 that area, sir.  I didn't touch anything.

34  (Pages 130 to 133)

ROBERT ALLEN CLEVENGER

Page 134

1    Q   You didn't touch a thing?
2    A   No, sir.
3    Q   So your fingerprints wouldn't be on
4  anything; right?
5        MR. SCOFIELD:  Object to the form.
6    A   No, sir.
7        MR. SPORT:  Can we go off the Record a
8  second?
9
10   (Whereupon, a discussion was held off
11 the Record.)
12
13 BY MR. KILBORN:
14   Q   Mr. Clevenger, when you walked up the
15 stairs to the third floor mezzanine and stood in
16 front of the panel, you're telling me that you
17 saw what appears on Bates number 0345 exactly as
18 it appears?
19   A   Yes, sir.
20   Q   Nobody touched a thing as far as you
21 know?
22   A   I don't know if they did or not.  When
23 I walked up, I just took a picture of the area

Page 135

1  so that the area could be viewed.
2    Q   And did Mr. Applegate say there it is
3  and then you took the shot?
4    A   Yes.
5    Q   So the chair was there, the spool was
6  there, the panel was there, and the panels were
7  in the same position they appear on Bates number
8  345 when you took the picture and when you
9  walked up the stairs and viewed it for the first
10 time?
11   A   Yes.
12   Q   And is it your understanding that this
13 is RO1?
14   A   That's my understanding.
15   Q   Do you know what this panel does?
16   A   I believe it controls the panel
17 carriers that are in that mezzanine area.
18   Q   The trolleys?
19   A   Yes, sir.
20   Q   The trolleys hold the door panels to
21 the automobiles and they go around.  And you've
22 got pictures, I think, of the panels on the
23 trolleys in 350, don't you?

Page 136

1    A   They're body side panels, yes.
2    Q   You've got pictures of the panels in
3  Bates numbers -- they appear clearly in 348,
4  349, and 350, don't they?
5    A   Yes, sir.
6    Q   And they're in 47 but it's a bad
7  photograph, you can't hardly see them?
8    A   Yes, sir.
9    Q   And as far as you know, the control
10 panel controls these trolleys?
11   A   As far as I know, sir.
12   Q   And does it control the stopping and
13 starting of the trolleys?
14   A   As far as I know, sir.
15   Q   Had you ever been in this location
16 before you took the photograph?
17   A   No, sir.
18   Q   Do you know why the chair was there?
19   A   I don't, sir.
20   Q   Do you know where the chair went after
21 the photograph was taken?
22   A   I don't, sir.
23   Q   Do you know why the spool was there?

Page 137

1    A   I don't, sir.
2    Q   Do you know where the spool went after
3  the photograph?
4    A   I don't, sir.
5    Q   And if you look at the sketch on the
6  reverse side of Plaintiff's Exhibit 16, that
7  appears to be very similar to the photograph,
8  doesn't it, 345?
9    A   Yes, sir.
10   Q   You've got a chair, a spool, and door
11 panels that were open; correct?
12   A   Yes, sir.
13   Q   And you've got the middle door panel is
14 closed and the two on the outside are open?
15   A   Yes, sir.
16   Q   And it looks like one could say that
17 this photograph would be a picture of a blind if
18 someone were sitting in that chair to hide that
19 person, wouldn't it?
20       MR. SCOFIELD:  Object to the form.
21   A   It could be, sir.
22   Q   Now, then, 346, the next photograph, it
23 appears to me that the panels are closed and the

35 (Pages 134 to 137)

ROBERT ALLEN CLEVENGER

Page 138

1  spool and the chair have been moved. Who moved
2  it?
3      A   I don't know, sir.
4      Q   Did you take this photograph?
5      A   I did, sir.
6      Q   Well, what happened between frame
7  number 345 and 346?
8      A   I don't know, sir. That was during a
9  working day and I was up there for a period of
10 time. When I snapped this photo, that's how it
11 was represented.
12     Q   By who?
13     A   I don't know, sir.
14     Q   So you took both photographs and you
15 don't know who moved the chair, the spool, or
16 the door panels?
17     A   No, sir.
18     Q   Do you know why they were moved?
19     A   I don't, sir.
20     Q   Do you know why you took a picture of
21 them in their moved position and the panels
22 being shut?
23     A   I don't, sir. I just took several

Page 139

1  photos that day.
2      Q   Well, why did you even take a
3  photograph of 346?
4      A   I don't know, sir. I just was taking
5  several photos to try to show the area.
6      Q   So you, Rob Clevenger, who has been to
7  Hyundai investigatory class who was handling an
8  important matter like termination took a
9  photograph, 345 and 346, of the scene of the
10 sleeping and you don't know why the two
11 photographs are different?
12         MR. SCOFIELD: Object to the form.
13     A   These photos were taken after the
14 situation, sir. These were for a different
15 purpose.
16     Q   I know. But they were taken at the
17 same time, weren't they?
18     A   All the photos were taken at the same
19 time, yes.
20     Q   Well, who changed the scene between the
21 two frames?
22     A   I don't know, sir.
23         MR. SCOFIELD: Object to the form.

Page 140

1      A   This is a working area.
2      Q   Well, I understand. But you were there
3  with the camera, weren't you?
4      A   Yes, sir.
5      Q   Well, explain to me how you can take a
6  photograph, 345, with two big door panels open
7  and a chair and a spool sitting and your next
8  frame, 346, is completely different and you
9  don't have an explanation and you're the one
10 that took the photographs?
11         MR. SCOFIELD: Object to the form.
12     A   This is a very large area. And these
13 side panel areas are quite -- several feet away
14 from the other picture, and it's a working
15 area. I don't know who was up there working or
16 who would have changed the -- or moved the
17 chairs.
18     Q   Well, did you leave?
19     A   No, sir. I was on the other side of
20 the mezzanine taking these other photos.
21     Q   Well, let me get this straight. You're
22 standing there with a camera and you take 345
23 and then all of a sudden everything is changed

Page 141

1  and you take 346, and you can't tell me who did
2  the change?
3          MR. SCOFIELD: Object to the form.
4      A   I don't know, sir.
5      Q   You can't tell me who did the change?
6      A   No, sir.
7      Q   And you didn't do it?
8      A   No, sir.
9      Q   And the only one there was Applegate?
10     A   Mr. Applegate was with me. I don't
11 know if there was anyone else up there. I don't
12 recall.
13     Q   So somebody must have -- some ninja
14 must have slipped in and made this change right
15 in front of your eyes and Applegate's and you
16 didn't see it?
17         MR. SCOFIELD: Object to the form.
18     Q   Is that what happened?
19         MR. SCOFIELD: Vince, I don't think
20 he's ever testified that these are the
21 sequential order he took the pictures in.
22 That's how they were produced.
23         MR. KILBORN: Well, I'm trying to get

36 (Pages 138 to 141)

ROBERT ALLEN CLEVENGER

Page 142

1  to the truth.
2      Q   Is that what happened?
3          MR. SCOFIELD:  Object to the form.
4      A   Sir, I didn't see anyone change the
5  area.
6      Q   But the pictures were taken at the same
7  time?
8      A   During the same time frame.
9      Q   Well, within how many minutes of each
10  other?
11     A   I would say approximately 30.
12     Q   So you were up there for 30 minutes?
13     A   Approximately.
14     Q   With Applegate?
15     A   Yes, sir.
16     Q   And in 30 minutes, you took 1, 2, 3, 4,
17  5, 6, 7 pictures?
18     A   Yes, sir.
19     Q   What were you doing the rest of the
20  time?
21     A   I was walking through that area, sir.
22  It's very high off the ground.  I wasn't moving
23  very fast.

Page 143

1      Q   Well, what's the significance of 345 as
2  opposed to 346?
3      A   I just took the pictures to show the
4  Team Member Review Board.  I didn't hold one in
5  more significance than another.
6      Q   Well, you were planning on showing the
7  Team Member Review Board both 345 and 346?
8      A   If they asked to see the area.
9      Q   What were you going to tell them about
10  the difference in the two pictures?
11     A   I wasn't going to tell them anything,
12  sir.  It's not my role in that meeting to tell
13  them anything other than if they asked to see it
14  then I would be able to show it to them.
15     Q   You will agree with me that some live
16  person actually moved the spool and the chair
17  and closed the panels?
18     A   Yes, sir.
19     Q   It wasn't a spook or anything --
20     A   No, sir.
21     Q   -- or some magic that occurred, was it?
22     A   No, sir.
23     Q   And who told you to take pictures of

Page 144

1  trolleys, 348, 349, 350?
2      A   No one, sir.  I was just trying to
3  capture the area so that if the Team Member
4  Review Board asked to see the area that I would
5  be able to represent it to them.
6      Q   Why didn't you take a picture from the
7  ground floor looking up at the chair in front of
8  the panel so that one could clearly see that
9  somebody standing on the floor could clearly see
10  somebody in the chair?
11         MR. SCOFIELD:  Object to the form.
12     A   It didn't occur to me, sir.  I was
13  trying to show the area up there.
14     Q   So you didn't have any particular
15  agenda in these photographs?
16     A   No, sir.
17     Q   You were just seeking the truth?
18         MR. SCOFIELD:  Object to the form.
19     A   I had no agenda, sir.  I was just
20  trying to represent the area.
21     Q   And did you direct any of these shots,
22  or was it Applegate?
23     A   No one directed the shots, sir.  I took

Page 145

1  those photos of the area to try to show the
2  whole area.
3      Q   But you knew that there had been a memo
4  written by yourself where Applegate told you two
5  doors of the panel were open which served as a
6  blind and hide Leon from most views.  You knew
7  that, didn't you?
8      A   That is what Mr. Applegate had told me.
9      Q   And you were trying to depict that in
10  photograph number 345, weren't you?
11         MR. SCOFIELD:  Object to the form.
12     A   No, sir.  That was as it was when I
13  took that picture.  That was not staged.
14     Q   Well, I wouldn't insinuate that.  Where
15  did you get that idea?
16         MR. SCOFIELD:  Object to the form.
17     Q   Where did you get the idea of staged?
18     A   You had mentioned it earlier.
19     Q   Staging?
20     A   You had mentioned did I recreate that
21  area.
22     Q   All right.  Well, you and Applegate
23  didn't that, didn't you?

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

ROBERT ALLEN CLEVENGER

Page 146

1    MR. SCOFIELD:  Object to the form.
2    A   No, sir.
3    Q   That's exactly what you and Applegate
4  did; isn't that true?
5    A   No, sir.
6    Q   You and Applegate staged these
7  photographs; isn't that true, Mr. Clevenger?
8    A   No, sir.
9    Q   You tried to stage the area to create a
10  blind so you could back up what Applegate had
11  told you; isn't that true?
12    MR. SCOFIELD:  Object to the form.
13    A   No, sir.
14    Q   Was this area like what's shown in 345
15  or 346 since Mr. Dees has been terminated?
16    A   Ask me that one more time, please.
17    Q   Was this area just like it was when
18  Dees was terminated, 345, 346?
19    MR. SCOFIELD:  Object to the form.
20    A   That area is as it was that day.
21    Q   Okay.  And I noticed, for instance,
22  there's another chair, and it's shown in 348.
23  How did that chair get over there?

Page 147

1    A   That was there as well.
2    Q   What are chairs doing up there?
3    A   I don't know, sir.
4    Q   I thought people weren't supposed to be
5  up there?
6    MR. SCOFIELD:  Object to the form.
7    Q   Didn't you tell me earlier that this
8  was in a place where people are not supposed to
9  be and in particular Dees wasn't supposed to be
10  there?
11    A   No.  I said it's not a normal working
12  area.
13    Q   Well, what's a chair doing there?
14    A   I don't know, sir.
15    Q   The purpose of a chair is for a human
16  being to sit in, isn't it?
17    A   Yes, sir.
18    Q   So you had a chair when you came up to
19  take the photographs on March the 5th sitting in
20  front of the control panel, didn't you?
21    A   No, sir.
22    Q   The chair was sitting there when you
23  walked up, wasn't it?

Page 148

1    A   Yes, sir.
2    Q   And the purpose of a chair is for
3  somebody to sit in, isn't it?
4    A   Yes, sir.
5    Q   So obviously somebody was sitting in
6  that chair, wasn't it?
7    A   I don't know, sir.
8    Q   So you have no explanation for the
9  chair in front of the control panel on March the
10  5th or the chair in picture photograph number
11  348?
12    A   I don't, sir.  All I know is when
13  there's a fault, Maintenance goes up there.
14  It's not a normal working area.  I don't know
15  why the chair was there.
16    Q   What is a fault?
17    A   Regarding the trolley or carriers.
18    Q   I don't understand.  Tell me.
19    A   When they stop working.
20    Q   They stop working.
21    A   (Witness nods head.)
22    Q   So what does this control panel have to
23  do with that?

Page 149

1    A   The control panel, to my knowledge,
2  controls those trolleys.
3    Q   So if -- you say if there's a fault,
4  you have to go up there to look at the control
5  panel?
6    A   A Maintenance person would, yes.
7    Q   Like Dees?
8    A   Yes.
9    Q   Does this control panel need periodic
10  inspection and examination to see if it's
11  working right?
12    MR. SCOFIELD:  Object to the form.
13    A   Not to my knowledge, sir.
14    Q   It's like a big computer, isn't it?
15    A   I'm not -- I don't know, sir.
16    Q   You don't know.  So you don't know
17  anything about what's inside the control panel?
18    A   No, sir.
19    Q   It just looks like a lot of wires?
20    A   To me, sir.
21    Q   Were the trolleys operational when you
22  took these photographs?
23    A   Yes, the area was running.

38  (Pages 146 to 149)

ROBERT ALLEN CLEVENGER

Page 150

1    Q   Okay.  And this is on up in the top of
2  the building?
3    A   Yes, sir.
4    Q   What was the temperature?
5    A   I don't recall.
6    Q   Hot?  Cold?
7        MR. SCOFIELD:  Object to the form.
8    A   I don't remember it being either one.
9    Q   Standing at the -- standing on the main
10  floor and looking up at the chair, can you see
11  the chair?
12    A   I don't know, sir.
13    Q   Did you ever look to see if you could
14  see the chair?
15    A   I don't recall looking.
16    Q   So let me get this straight.  You took
17  picture photograph number 345 when you first
18  walked up.  That's how the scene looked.  And
19  you were up there about 30 minutes, and sometime
20  in that 30 minutes, some person who you don't
21  know -- it wasn't you or Applegate -- closed the
22  door panels and moved the chair and the spool
23  and then you took photo 346.  Is that a good

Page 151

1  summation of what you've said?
2        MR. SCOFIELD:  Object to the form.
3    A   Yes, sir.
4    Q   You say in your February 23, 2007 Team
5  Relations Memo to Greg Kimble that was given to
6  the termination meeting in your conclusion, I
7  believe we must give weight to the manager's
8  account and assume that the event took place at
9  one a.m. on Wednesday morning.  Did you see
10  that?
11        MR. SCOFIELD:  No, Vince.  We're trying
12  to get to that document.
13        MR. KILBORN:  It's in your Exhibit 1.
14        MR. SCOFIELD:  There are only about 500
15  pages in here.  So we're working our way there.
16        MR. SPORT:  No.  That one was out.
17        MR. KILBORN:  There you go.
18    Q   Have you got that memo that you wrote?
19    A   Yes, sir.
20    Q   You see your conclusion?
21    A   I see the sentence that you read, yes,
22  sir.
23    Q   You say, I believe we must give weight

Page 152

1  to the manager's account.  Is the I you?
2        MR. SCOFIELD:  Object to the form.
3    A   Yes.
4    Q   And the we is who?
5    A   HMMA.
6    Q   That's not just the team -- the people
7  who were going to be in the team meeting.
8  That's the entire company?
9    A   Well, I mean the collective we.
10    Q   And you say weight.  What do you mean
11  weight to the manager's account?  Do you mean
12  that he would be more believable than Dees?
13    A   I believe that we must give -- that we
14  needed to give that statement more weight.
15    Q   And do you base that on anything other
16  than the fact that Brookshire was a manager?
17    A   No, sir.
18    Q   You also state underneath there, I have
19  a signed statement by the Stamping Manager that
20  he was 15 feet from Leon and observed him for
21  two minutes.  There was a chair placed in
22  between the two open doors.  The area is several
23  feet off the floor and isn't an area that a

Page 153

1  maintenance man would enter to fix a carrier and
2  then leave.  Now, is that your statement?
3    A   That is information that was shared
4  with me by Mr. Applegate.
5    Q   So you don't attribute the chair being
6  placed between the two open doors to anybody in
7  here, but it was Applegate that said that?
8    A   That's who told me that, yes.
9    Q   Then you say the area is several feet
10  off the floor.  Well, it's about 75 feet off the
11  floor, isn't it?
12    A   Yes, sir.
13    Q   That's not several feet, is it?
14    A   Approximately.  I don't know the exact
15  height.
16    Q   What do you mean by several feet?
17    A   It's very far up there.
18    Q   That means several?
19        MR. SCOFIELD:  Object to the form.
20    A   To me, sir.
21    Q   And then you say there is not a need or
22  a practice where a person would need a chair.
23  You see that?

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652   (251)694-0950   (888)557-2969

ROBERT ALLEN CLEVENGER

Page 154

1    A   Yes, sir.
2    Q   Well, why is the chair in the picture
3  on March the 5th if there's no need for a chair
4  in that area?
5    A   I don't know, sir.
6    Q   Well, obviously, there was a need,
7  wasn't there?
8       MR. SCOFIELD:  Object to the form.
9    A   I don't know, sir.  I don't know what
10  the need would have been.  This information was
11  shared by Mr. Applegate.
12    Q   Well, we now know that there was a
13  chair there, and that contradicts your statement
14  that there is not a need or practice where a
15  person would need a chair, doesn't it?
16       MR. SCOFIELD:  Object to the form.
17    A   To perform work.
18    Q   Well, isn't it reasonable to conclude
19  that since the chair was there two weeks later
20  that there must have been some need?
21       MR. SCOFIELD:  Object to the form.
22    A   I wouldn't be able make that
23  conclusion, sir.  I don't know.

Page 155

1    Q   Well, who says there's not a need or
2  practice where a person would need a chair,
3  then?
4    A   Mr. Applegate.
5    Q   That's not your conclusion?
6    A   No, sir.
7    Q   Well, when Applegate and you went up
8  there to take the picture on March the 5th, did
9  Applegate say, well, gee, there must be a need
10  for a chair because low and behold there one
11  sits?
12       MR. SCOFIELD:  Object to the form.
13    A   I don't recall him saying that, sir.
14    Q   Well, did you get a statement from
15  Applegate after he saw the chair there that said
16  there, in fact, is a chair there?
17    A   No, sir.
18    Q   I get the impression that that plant is
19  kept spotless.  Would you agree with that?
20       MR. SCOFIELD:  Object to the form.
21    A   It's very clean.
22    Q   Chairs just don't accidentally remain
23  in front of that panel without somebody knowing

Page 156

1  about it, do they?
2       MR. SCOFIELD:  Object to the form.
3    A   I don't know, sir.
4    Q   And, of course, you don't know where
5  the chair has gone?
6    A   No, sir.
7    Q   Now, you include a statement in this
8  same memorandum, in the fourth paragraph you
9  say, Leon states Jim never got closer than 50
10  feet from him.  Leon became agitated and stated
11  he didn't give a damn and was tired of this
12  shit.  Now, where did you get that from?
13    A   That's from the information in that
14  e-mail.
15    Q   That's the e-mail that we looked at
16  earlier dated February 21, 2007, which is also
17  in this Exhibit 1?
18       MR. KILBORN:  Trent, that's Bates
19  number 35.
20       MR. SCOFIELD:  Okay.
21    Q   Did that come from this e-mail?
22    A   Yes, sir.
23    Q   That's the e-mail you did not give to

Page 157

1  the termination meeting?
2    A   Yes, sir.
3    Q   So you extracted information from this
4  e-mail but you did not give them the e-mail?
5    A   No, sir.
6    Q   Why didn't you give them e-mail if you
7  were using information you extracted from the
8  e-mail --
9       MR. SCOFIELD:  Object to the form.
10    Q   -- to give them the complete truth as
11  to what was in that e-mail?
12       MR. SCOFIELD:  Object to the form.
13    A   I put in there that particular
14  statement because Mr. Dees was described as
15  being agitated.
16       MR. SPORT:  For the Record, that
17  document was described -- has already been
18  marked as Defendant's Exhibit 6.
19    Q   Well, why didn't you put what we read
20  before in that e-mail that Prater felt that even
21  if Dees was not sleeping, he doesn't care enough
22  about his job to prevent anyone from thinking he
23  was sleeping?

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652   (251)694-0950   (888)557-2969

ROBERT ALLEN CLEVENGER

Page 158

1    A  I felt that was opinion.
2    Q    So you extracted what you thought was
3  fact and put it in your memo to the termination
4  meeting and then you left out what you thought
5  was opinion?
6        MR. SCOFIELD:  Object to the form.
7    A  I think in the e-mail when you read you
8  can draw the last statement by Mr. Prater was
9  his opinion.
10    Q    Well, when did you become, you know,
11  qualified to extract opinion and fact?
12        MR. SCOFIELD:  Object to the form.
13    A  I took the information above because
14  that was stated as a direct statement.  The
15  bottom is Mr. Prater talking to Mr. Applegate.
16    Q    So you actually looked at the February
17  21, 2007 e-mail, Applegate to yourself,
18  Defendant's Exhibit 6, and you extracted some
19  parts of it and put it in your memo of two days
20  later, February 23, 2007, and left other things
21  out, didn't you?
22    A  Only that statement, sir.
23    Q    But that's true.  You picked and

Page 159

1  choosed what you were going to take out of that
2  e-mail and give to the termination meeting,
3  didn't you?
4    A  I took that information out and put it
5  in the summary.
6    Q    All right.  Well, you took a lot of
7  other information out, didn't you?
8        MR. SCOFIELD:  Object to the form.
9    Q    For instance, it says, per John and --
10  John per Leon and I and Willis conversation I
11  stated that it was reported by management he was
12  sleeping in the SOPS.  He said, I know who it
13  is; it was Jim.  I didn't confirm or deny.  I
14  just said, I was just following up.  Leon said
15  he was not sleeping there in the SOPS; he
16  watched Jim walk around the mezzanine area and
17  he was text messaging his daughter due to bad
18  weather.  And none of that's in there, is it?
19    A  I believe that information is contained
20  in the information Mr. Ware recorded.
21    Q    Well, I see your lawyer pointed
22  something out.  Did you notice that he pointed
23  out something out in this deposition?

Page 160

1        MR. SCOFIELD:  Vince, I was showing him
2  where you were reading.
3    Q    Did you notice that?
4    A  No, sir.  He pointed to this page.
5    Q    Well, where is this -- where did you --
6  why did you leave out this statement, you guys
7  just do whatever you want; I'm fed up with this
8  shit; I explained that what you do if you were a
9  forward observer on lookout and guard duty and
10  you had some officer come by, would you have
11  done the same?  His reply was, that's totally
12  different; you can't compare that with this.
13  And he goes on about his war stories.  Then back
14  to the point.  Why did you take that out?
15        MR. SCOFIELD:  Object to the form.
16    A  It wasn't relevant to the situation.  I
17  didn't understand the reference.
18    Q    Well, it was two days before the
19  meeting, wasn't it?
20        MR. SCOFIELD:  Object to the form.
21    A  (No response.)
22    Q    And it was subject of Leon Dees, wasn't
23  it?  Why wouldn't that be relevant?

Page 161

1    A    The issue was him sleeping.
2    Q    The issue -- well, the issue was
3  credibility, wasn't it?
4        MR. SCOFIELD:  Object to the form.
5    A    The issue was him sleeping in the
6  overhead.
7    Q    But the issue was who was telling the
8  truth about that, wasn't it?
9    A    A member of management witnessed him
10  sleeping in the overhead.
11    Q    I understand that.  But the issue was
12  who was telling the truth, wasn't it?
13        MR. SCOFIELD:  Object to the form.
14    A    The issue was management stated he was
15  sleeping in the overhead.
16    Q    So the issue wasn't that Dees stated he
17  wasn't?  That wasn't the issue?
18        MR. SCOFIELD:  Object to the form.
19    A    No, sir.  The member of management's
20  statement saying he saw Leon sleeping in the
21  overhead.
22    Q    Well, then, what does a blind and the
23  hiding got to do with that, then?  If the

41 (Pages 158 to 161)

ROBERT ALLEN CLEVENGER

Page 162

1  manager said it and it's true, why go any
2  further?
3      A    That was information that Mr. Applegate
4  had told me.
5      Q    Why did you put the chair was placed in
6  between the two open doors?  If management said
7  it, why would you need to repeat that?
8      A    That was the information Mr. Applegate
9  had told me.
10     Q    I understand.  But why is it relevant?
11     A    It's not my job to determine whether
12  it's relevant or not.
13     Q    Well, you did determine --
14     A    In that situation he's told it to me,
15  so I put it in there.
16     Q    Well, you determined that the
17  discussion about the Guard duty is irrelevant.
18  You did make that determination?
19     A    I didn't understand that reference.
20         MR. SCOFIELD:  Object to the form.
21     A    Mr. Prater wasn't there up top in this
22  situation.
23     Q    Well, neither was Mr. Applegate?

Page 163

1      A    Mr. Applegate is the senior manager of
2  the department.  He would have been the one to
3  make the recommendation for termination.
4      Q    But you did make determinations as to
5  what from this e-mail to put in your memo and
6  what to leave out, didn't you?
7      A    Only with regard to this e-mail from --
8  forwarded to me by Mr. Applegate.
9      Q    Well, why didn't you just give them the
10  whole e-mail and let them make their own
11  determination as to what was relevant?  I mean,
12  you had the company lawyer sitting there.  He
13  knows what's relevant, doesn't he?
14         MR. SCOFIELD:  Object to the form.
15  And, again, to the extent he's asking for --
16     Q    You're telling me that --
17         MR. SCOFIELD:  -- any --
18         THE REPORTER:  I'm sorry.
19         MR. SCOFIELD:  I know we can only talk
20  at once.
21         THE REPORTER:  Can you repeat it?
22         MR. SCOFIELD:  To the extent that
23  Mr. Kilborn is asking you about anything that

Page 164

1  Mr. Neal said, I'm going to instruct you not
2  answer.
3      Q    The company lawyer was a member of the
4  termination meeting, but you, Mr. Clevenger,
5  decided what was relevant.  Is that what
6  happened?
7         MR. SCOFIELD:  Object to the form.
8      A    I just didn't include this information
9  from Mr. Prater except for that one statement.
10     Q    Because you thought it was not
11  relevant?
12     A    I didn't understand the reference.
13     Q    Well, if you didn't understand it, did
14  you go back and ask what the reference meant to
15  anybody?
16     A    No, sir.
17     Q    Why not?
18     A    Mr. Prater wasn't there that evening.
19     Q    Well, you had a telephone, didn't you?
20     A    I mean Mr. Prater wasn't there that
21  evening in the sense that he wasn't there when
22  Mr. Dees was sleeping in the overhead.
23     Q    Well, then, why did you include

Page 165

1  anything from this e-mail?
2      A    I only included that Mr. Dees was
3  agitated and he made that statement.
4      Q    I know.  But that was what Prater said,
5  wasn't it?
6      A    The items below are Mr. Prater's
7  speculation.
8      Q    Oh, so tell me what speculation is.
9         MR. SCOFIELD:  Object to the form.
10     A    This is an e-mail that wasn't intended
11  to go to me.  It went to Mr. Applegate.  He
12  forwarded it to me.  I pulled that one line out
13  regarding what Mr. Dees had said.
14     Q    What do you mean by speculation?
15     A    The last line that you repeated to me
16  earlier.
17     Q    I know.  But what does that word mean
18  to you?
19     A    Mr. Prater was offering his opinion
20  there at the end.
21     Q    So who determined that Mr. Prater was
22  speculating?
23         MR. SCOFIELD:  Object to the form.

42 (Pages 162 to 165)

ROBERT ALLEN CLEVENGER

Page 166

1    A   I determined that Mr. Prater was
2  offering his opinion at the end, and it's
3  Mr. Applegate who recommends termination, not
4  Mr. Prater.
5    Q   Do you remember my question?
6    A   Please repeat it.
7    Q   You determined it was speculation,
8  didn't you?
9       MR. SCOFIELD:  Object to the form.
10   A   I believed Mr. Prater was speculating
11 at the end as to his opinion.
12   Q   Did you believe that -- well, do you
13 believe this conversation took place between
14 Prater and Dees about this forward observer
15 reference?
16   A   I don't know, sir.
17   Q   Who on that committee do you think
18 could not have determined for themselves how
19 much of the e-mail of February 21, 2007 to
20 consider and how much to not consider?
21      MR. SCOFIELD:  Object to the form.
22   A   Ask that again, please.
23   Q   Yeah.  Isn't it true that everybody on

Page 167

1  that committee could have made their own
2  judgment about what to consider and not to
3  consider --
4       MR. SCOFIELD:  Object to the form.
5    Q   -- out of this e-mail without you
6  selectively choosing what you wanted them to
7  see?
8       MR. SCOFIELD:  Same objection.
9    A   I think there's two questions there.
10 Yes, they could have looked at this.  I don't
11 know what they would have determined.
12   Q   What would have been the harm of giving
13 it to them?
14   A   This was an e-mail communication to
15 Mr. Applegate.  It wasn't in conjunction with
16 the normal proceeding.  Mr. Ware's memo was in
17 conjunction with the information I was
18 collecting.
19   Q   So you didn't give them the e-mail
20 because it wasn't in the normal proceeding?
21   A   And the only reason I put the statement
22 in there was because it was attributed to
23 Mr. Dees.

Page 168

1    Q   But it wasn't in the normal proceeding,
2  was it?
3    A   This e-mail, no, sir.
4    Q   In your February 23, 2007 Team
5  Relations Memo to Mr. Kimble you state --
6  regarding the chirping sound of the radio you
7  say, at this sound, Leon lifted his head, then
8  got up and picked up a tool used to clear
9  carriers when they become inoperable.  Is that
10 what Brookshire told you?
11      MR. SCOFIELD:  Object to the form.
12      THE WITNESS:  It is okay if I --
13      MR. SCOFIELD:  Sure.
14   A   That's contained in Mr. Brookshire's
15 written information.
16   Q   That's not Mr. Applegate?
17   A   No, sir.  That was from
18 Mr. Brookshire's information.
19   Q   Let me show you...
20      MR. SCOFIELD:  While y'all are looking,
21 I'm going to run to the restroom.
22
23      (Whereupon, a brief recess was had in

Page 169

1  the proceeding.)
2
3       MR. KILBORN:  Trent, we have requested
4  that e-mail regarding that policy that
5  Brookshire referred to and Wendy referred to.
6  Is there such a thing?
7       MR. SCOFIELD:  Not that -- I mean,
8  we're looking.  I think Mr. Clevenger testified
9  under oath that he doesn't have it.  I'm not --
10 I'll tell you, Vince, we're looking for it but
11 have not found any e-mail that Brookshire
12 referenced.
13      MR. KILBORN:  Wendy referred to
14 something.  She used the word confusion, I
15 think.  Some document come out, the
16 clarification.  You just can't find it?
17      MR. SCOFIELD:  Again, not to my
18 knowledge.
19
20   (Whereupon, Plaintiff's Exhibit
21 Number 26 was marked for identification
22 and copy of same is attached hereto.)
23

43 (Pages 166 to 169)

ROBERT ALLEN CLEVENGER

Page 170

1    Q    Take a look at what's been marked
2  Plaintiff's Exhibit 26.  Have you ever seen this
3  e-mail before?
4    A    (Witness reviews document.)  Yes.
5    Q    Did you get a copy of the February 7,
6  2007 e-mail sent from William Ware to yourself?
7    A    Ask me that one more time, please.
8    Q    Did you get a copy of this e-mail dated
9  February 7, 2007 from William Ware to yourself?
10   A    I don't understand.  You said did I get
11 a copy?
12   Q    Yeah.  Did you get that e-mail?
13   A    Yes, I received the e-mail.
14   Q    Did you read it?
15   A    Yes, sir.
16   Q    Was that included in the packet given
17 to the termination meeting?
18   A    No, sir.  This was a different
19 situation.
20   Q    How many days before this termination
21 meeting was this e-mail sent to you?
22   A    Is it okay if I --
23      MR. SCOFIELD:  Sure.

Page 171

1    Q    Sure.
2    A    The meeting notice was set for February
3  26th and this e-mail was sent by William Ware on
4  February 7th.
5    Q    19 days?
6    A    Yes, sir.
7    Q    So you had actual knowledge of the
8  information in this e-mail but you did not share
9  this with the termination meeting?
10      MR. SCOFIELD:  Object to the form.
11   A    This was an unrelated incident.
12   Q    That's not my question.  You did not
13 share this with the termination meeting?
14   A    No, sir.
15   Q    And you made a deliberate decision not
16 to do that?
17      MR. SCOFIELD:  Object to the form.
18   A    I made the decision this wasn't part of
19 the discussion that the term committee would be
20 discussing.
21   Q    How did you know what they would be
22 discussing?
23   A    They would be discussing the sleeping

Page 172

1  incident.
2    Q    How did you know that?
3    A    When I put the packet together, they
4  would be discussing the sleeping incident.
5  That's what the Term Discussion was in regards
6  to.
7    Q    Isn't it reasonable for -- when
8  discussing a termination to consider the
9  employee's history with the company at all?
10      MR. SCOFIELD:  Object to the form.
11   A    They were there to make a determination
12 on this incident.
13   Q    I know.  But isn't it reasonable to
14 consider the employee's history with the
15 company?
16   A    In this situation, this was an
17 unrelated incident.  This was something that had
18 happened prior.
19   Q    I know.  You've repeated that.  But
20 isn't it reasonable to consider the employee's
21 history with the company?
22   A    I would say it depends on the
23 situation.  This situation was regarding his

Page 173

1  sleeping, not his -- a performance issue earlier
2  in the month.
3    Q    You obviously decided this didn't have
4  anything to do with his termination at all?
5    A    It didn't have anything to do with his
6  sleeping, yes.
7    Q    Well, let's see.  It had something to
8  do with Mr. Applegate's opinion, didn't it?
9      MR. SCOFIELD:  Object to the form.
10   A    I see instruction from Mr. Applegate.
11   Q    And it certainly had something to do
12 with Mr. Prater's opinion about Mr. Dees, didn't
13 it?
14   A    Ask me that question again, please.
15   Q    It had something to do with
16 Mr. Applegate and Mr. Prater's opinion of
17 Mr. Dees, didn't it?
18      MR. SCOFIELD:  Object to the form.
19   A    No.  I would say it had to do with
20 their -- their assessment of the situation that
21 this is relating to.
22   Q    Well, it certainly had something to do
23 with Mr. William Ware's opinion of Mr. Dees,

44 (Pages 170 to 173)

ROBERT ALLEN CLEVENGER

Page 174

1  didn't it?
2      MR. SCOFIELD:  Object to the form.
3      Q    The investigator who took Brookshire's
4  statement?
5      MR. SCOFIELD:  Same objection.
6      A    I don't see his opinion reflected in
7  there of Mr. Dees.
8      Q    Well, you see where it says the TM and
9  Leon are not on speaking terms.  Who is the TM?
10     A    Team Member.
11     MR. SCOFIELD:  I think it's TL.
12     Q    TL.  Who is the TL?  Prater?
13     A    No.  Team Leader.
14     Q    Who is that?
15     A    I believe that would be Kevin Hughes.
16     Q    So this is talking about Kevin Hughes
17  and Mr. Dees are not on speaking terms?
18     A    That's what Mr. Ware is saying, yes.
19     Q    And he's saying it appears that he --
20  meaning Hughes -- blew the incident out of
21  proportion and he only singled out Leon but for
22  no apparent reason.  That's referring to Kevin
23  Hughes?

Page 175

1      MR. SCOFIELD:  Object to the form.
2      A    I believe so, sir.
3      Q    And this says to you in the beginning
4  of the e-mail, Rob, Greg P. and I met with all
5  the TMs in question about Leon leaving for lunch
6  while the lift was down.  Now, why are they
7  telling you that?
8      A    He's explaining that the Department is
9  going to proceed with a Discussion Planner based
10 on that information.
11     Q    Why would Leon Dees be singled out for
12 no apparent reason?
13     MR. SCOFIELD:  Object to the form.
14     A    I don't know.
15     Q    Was there a Discussion Planner had as a
16 result of this?
17     A    I'd have to review the documents, sir.
18     Q    You don't remember?
19     A    Not right off hand, no.
20     Q    Are you familiar with the laws that
21 protect military personnel from being
22 disciplined or having any employment action
23 taken against them because of their military

Page 176

1  obligation?
2      A    Yes, sir.
3      Q    And explain to me why USERRA is not
4  mentioned in any of the company policy on
5  military duty.
6      MR. SCOFIELD:  Object to the form.
7      A    It's a federal act.  It's not an HMMA
8  policy.
9      Q    Why isn't a federal act part of HMMA
10 policy?
11     MR. SCOFIELD:  Object to the form.
12     A    We comply with that as it's written,
13 sir.
14     Q    As what's written?
15     A    As the USERRA guidelines.  We comply
16 with those.  It's not our policy.  We follow
17 what the USERRA guidelines are.
18     Q    But my question is, why doesn't the
19 Hyundai policy mention that law?
20     MR. SCOFIELD:  Object to the form.
21     A    I don't know, sir.
22     Q    Did you write it?
23     A    No, sir.

Page 177

1      Q    Let's see.  Take a look at Plaintiff's
2  Exhibit 9.  I just want to refer to Bates number
3  26.  This is an application of Mr. Dees.  Take a
4  look at that.
5      A    (Witness reviews document.)
6      Q    Have you ever seen one of those before?
7      A    I've seen an application before, yes.
8      Q    Did you sign one like that?
9      A    I'm sure I did.
10     Q    Look at the statement at the asterisk
11 on the bottom of that.  It says, HMMA fully
12 complies with the spirit and intent of laws
13 regarding nondiscrimination for employment
14 because of sex, race, creed, color, national
15 origin, age, disability, or Vietnam veteran
16 status.  You see that?
17     A    Yes, sir.
18     Q    Where is USERRA mentioned?
19     MR. SCOFIELD:  Object to the form.
20     A    I don't see it mentioned specifically
21 there, sir.
22     Q    I thought you said Hyundai complied
23 with all the laws?

45 (Pages 174 to 177)

ROBERT ALLEN CLEVENGER

Page 178

1    A    We are required to, yes.
2    Q    Why don't they mention it?
3        MR. SCOFIELD:  Object to the form.
4    A    I don't know, sir.
5    Q    Do you know what this Vietnam veteran
6    status is?
7    A    Not specifically, no.
8    Q    Well, since you are an expert, how
9    would Dees know if you don't know?
10       MR. SCOFIELD:  Object to the form.
11   A    I don't understand your question, sir.
12   Q    Well, explain to me -- is this Hyundai
13   policy that's stated here?
14       MR. SCOFIELD:  Object to the form.
15   A    This is the employment application,
16   sir.
17   Q    Is that Hyundai policy?
18   A    It's a Hyundai form.
19   Q    I know.  But is it Hyundai policy?
20       MR. SCOFIELD:  Object to the form.
21   A    I would say it's a Hyundai form.  I
22   didn't author it.
23   Q    You can't tell me if it's policy or

Page 179

1    not?
2    A    I could tell that you it's a Hyundai
3    form.
4    Q    Are you familiar with the Hyundai
5    policy on military duty?
6    A    Yes, sir.
7    Q    Okay.  Tell me what it says.
8    A    I can paraphrase.
9    Q    Sure.
10   A    It states that HMMA will allow a Team
11   Member difference in pay for a period up to 30
12   days for military service.
13   Q    Is that it?
14   A    That policy -- that policy deals
15   specifically with making up the difference in
16   pay for military service while employed.
17   Q    Take a look at that document in front
18   of you and turn to Bates number 87.  It says
19   Military Leave Policy.  Is that the Military
20   Leave Policy?
21   A    Yes, sir.
22   Q    Where does it talk about whether or not
23   orders are required?

Page 180

1    A    It doesn't.
2    Q    I thought you said the policy was that
3    it's better to obtain orders but it's not
4    required?
5    A    I believe what I said is that's what
6    the USERRA guideline is.
7    Q    But why isn't that in the official
8    Military Leave Policy?
9    A    I don't know, sir.
10   Q    Well, where is the military guidelines
11   stated?
12       MR. SCOFIELD:  Object to the form.
13   Q    You said it was in the military
14   guideline.  Where is that?
15   A    The USERRA Act.
16   Q    So you've seen the USERRA Act and you
17   know that?
18       MR. SCOFIELD:  Object to the form.
19   A    I've read that clause in there, yes.
20   Q    And that's what that says?
21   A    Paraphrased, yes.
22   Q    Explain to me why that isn't in the
23   Hyundai Military Leave Policy.

Page 181

1        MR. SCOFIELD:  Object to the form.
2    A    I don't know, sir.  I didn't write this
3    policy.
4    Q    You do write policies, though, don't
5    you?
6    A    It can be part of my function, yes.
7    Q    Okay.  Who wrote this policy?
8    A    Mr. Swegman.
9    Q    Have you discussed this with him?
10       MR. SCOFIELD:  Object to the form.
11   A    This policy or that question
12   specifically?
13   Q    Have you discussed this policy with
14   him?
15   A    I would say I've probably talked about
16   this policy with Mr. Swegman before, yes.
17   Q    Have you discussed with him improving
18   or amending this policy to address military
19   orders and whether or not they're required?
20   A    No, sir.
21   Q    Have you discussed with him or anybody
22   else amending this policy to make it clear that
23   military orders are not required for weekend

46 (Pages 178 to 181)

ROBERT ALLEN CLEVENGER

Page 182

1  leave?
2      A  No, sir.
3      Q  This policy was not given to the
4  termination meeting?
5      A  No, sir.
6      Q  Do you know Mr. Prater personally?
7      A  Yes.  I know who he is, yes.
8      Q  Does he still work for the company?
9      A  No, sir.
10     Q  What happened to him?
11         MR. SCOFIELD:  Object to the form.
12     A  It's my understanding he obtained
13  employment at a company north -- in Tennessee, I
14  believe.
15     Q  You don't have any knowledge of that,
16  do you, him leaving?  Personal knowledge of him
17  leaving?
18     A  I know he went to another company.
19     Q  Do you know why?
20     A  I don't, sir.
21     Q  Does Hyundai evaluate employees?
22     A  There's information on salaried Team
23  Members.

Page 183

1      Q  Have you ever seen a Hyundai evaluation
2  of Mr. Dees' employment?
3      A  No, sir.
4      Q  And, to your knowledge, did anybody at
5  Hyundai evaluate Mr. Dees' employment prior to
6  his termination?
7      A  He would have gone through the 90-day
8  probationary period.
9      Q  That's not my question.  Did anybody
10  evaluate his employment?
11         MR. SCOFIELD:  Object to the form.
12     A  I would have to assume -- I would have
13  to assume he was evaluated in that 90-day
14  period, sir.
15     Q  How about after that?
16     A  Not that I'm aware.
17     Q  Have you ever seen military orders for
18  drill duty on the weekend?
19         MR. SCOFIELD:  Object to the form.
20     A  I believe I have.
21     Q  Have you ever seen orders on Mr. Dees?
22     A  No, sir.
23     Q  Who have you seen orders on?

Page 184

1      A  I don't remember a name specifically.
2      Q  What would be the occasion?
3      A  I believe they were attached to a Leave
4  of Absence form requesting military leave.
5      Q  Have you ever been involved in any way,
6  shape, or form in any type of claim against
7  Hyundai involving violation of any federal law?
8         MR. SCOFIELD:  Object to the form.
9      A  Not that I'm aware.
10     Q  Did you sign a Code of Ethics when you
11  went to work for Hyundai?
12     A  I'd have to review the documents that I
13  signed when I was employed, sir.
14     Q  Have you ever signed a Code of Ethics?
15         MR. SCOFIELD:  Object to the form.
16     A  I don't recall.
17     Q  Does Hyundai have a Code of Ethics?
18     A  I don't recall if there's such a
19  document, sir.
20     Q  Do you know a Mr. Mun, M-U-N?
21     A  I don't know him.  I know of him.  I
22  know who he is.
23     Q  Did you ever talk to Mr. Mun about

Page 185

1  Mr. Dees?
2      A  No, sir.
3      Q  Do you have any knowledge of Mr. Mun
4  making his own inquiry about Mr. Dees'
5  termination?
6      A  Not specifically, no.
7      Q  How about generally?
8      A  I believe I heard Mr. Applegate say
9  that Mr. Mun had some questions.
10     Q  When did Mr. Applegate tell you that?
11     A  I don't remember.
12     Q  Before or after the termination?
13     A  I don't remember.
14     Q  Have you got any idea why Mr. Mun would
15  be making some inquiry?
16     A  I don't, sir.
17     Q  Do you have a name for the Koreans who
18  work at the plant?
19         MR. SCOFIELD:  Object to the form.
20     A  I normally refer as my Korean
21  counterparts.
22     Q  And I think you told me you don't have
23  one?

47 (Pages 182 to 185)

ROBERT ALLEN CLEVENGER

Page 186

1    A   I don't, sir.
2    Q   Does Mr. Swegman have a Korean
3  counterpart?
4    A   Yes, sir.
5    Q   Who is that?
6    A   S.D. Park.
7    Q   What's the S.D. stand for?
8    A   Soon-du.  I believe S-O-O-N dash D-U.
9  I believe that's correct.
10    Q   And do you know what his job title is?
11    A   He is the Coordinator for Team
12  Relations.
13    Q   Do you know what that means,
14  coordinator?
15    A   Generally, he would be Mr. Swegman's
16  counterpart.
17    Q   Is it fair to say that Hyundai does not
18  permit any type of job action against an
19  employee because of his National Guard
20  obligation?
21    A   Yes.
22    Q   All right.  If an employer takes action
23  against an employee because of his military

Page 187

1  obligation, whether it's National Guard or
2  active military or whatever, how would you
3  characterize that?
4        MR. SCOFIELD:  Object to the form.
5    A   I don't know if I understand what
6  you --
7    Q   Yeah.  Let's -- if an employer were to
8  take some type of job action against someone
9  because of his military obligation, would you
10  consider that a serious offense?
11        MR. SCOFIELD:  Object to the form.
12    A   I guess I would say that wouldn't be
13  permitted.
14    Q   Right.  Would you agree that it would
15  violate federal law?
16        MR. SCOFIELD:  Object to the form.
17    A   To my understanding, I would agree,
18  yes, sir.
19    Q   All right.  And would you consider
20  violation of federal law a serious matter?
21        MR. SCOFIELD:  Object to the form.
22    A   Yes, sir.
23    Q   Do you know anybody named Shane Archer?

Page 188

1    A   I don't, sir.
2    Q   Do you know of anybody who interviewed
3  Shane Archer about the sleeping incident?
4    A   I don't, sir.
5    Q   You didn't interview him?
6    A   No, sir.
7    Q   Do you know who HMA is?
8        MR. SCOFIELD:  Object to the form.
9    A   HMA?
10    Q   Right.
11    A   Yes, sir.
12    Q   Who is that?
13    A   Hyundai Motor America.
14    Q   Do you know who HMC is?
15    A   Yes, sir.
16    Q   Does HMA do business on the same
17  property that HMMA does business here in
18  Montgomery?
19        MR. SCOFIELD:  Object to the form.
20    A   I don't know, sir.
21    Q   Do you know what HMA does?
22    A   Yes, sir.
23    Q   What do they do?

Page 189

1    A   It's my understanding that's our sales
2  arm.
3    Q   And who is our?
4    A   HMC.
5    Q   HMC.  And who is HMC?
6    A   Hyundai Motor Company.
7    Q   And who are they?
8    A   That would be the company based in
9  Korea.
10    Q   All right.  What's their relationship,
11  if you know, to HMA or HMMA?
12        MR. SCOFIELD:  Object to the form.
13    A   It's my understanding we're two
14  separate companies under HMC.
15    Q   All right.  I noticed when I was at the
16  plant the other day there was a picture of
17  Chairman Chung right there in the lobby.  What's
18  that all about?  Who is he?
19        MR. SCOFIELD:  Object to the form.
20    A   He is the head of HMC.
21    Q   Okay.  Do you know what his picture is
22  doing in the HMMA lobby?
23    A   Because we are a company under HMC, and

48  (Pages 186 to 189)

ROBERT ALLEN CLEVENGER

Page 190

1  he is the leader of the HMC company.
2      Q   Do you know if he's ever been in
3  Montgomery?
4      A   Yes, sir.
5      Q   Have you seen him?
6      A   I believe I saw him at the grand
7  opening.
8      Q   Of the plant?
9      A   Yes, sir.
10     Q   Do you know his relationship to HMC?
11     A   He is the head of that company.
12     Q   Other than your attorney here -- your
13 two attorneys here, have you discussed your
14 deposition with anybody else?
15     A   No, sir.
16     Q   Have you discussed this case with
17 anybody else?
18     A   No, sir.
19     Q   You haven't discussed it with
20 Applegate, Prater, Hughes, Kimble, Warner, or
21 Ware?
22         MR. SCOFIELD:  Object to the form.
23     A   No, sir.

Page 191

1      Q   Neal?
2          MR. SCOFIELD:  Same objection.
3      A   No, sir.
4      Q   Does Mr. Neal sit in on all termination
5  meetings?
6      A   Yes, he is in the room.
7      Q   Okay.  Does he participate?
8          MR. SCOFIELD:  I'm going to instruct
9  you not to answer.
10     Q   Does he sit in on all disciplinary
11 meetings?
12     A   No.
13     Q   Just termination meetings?
14         MR. SCOFIELD:  If you know.
15     A   There could be other things that I'm
16 not aware of.
17     Q   Well, to your personal knowledge, does
18 he sit in on any meeting besides termination
19 meetings?
20     A   Yes.
21         MR. SCOFIELD:  Object to the form.
22     Q   What type?
23     A   I believe also workplace violence.

Page 192

1      Q   What kind of violence?
2      A   Workplace violence.
3      Q   Workplace violence?
4      A   Yes, sir.
5      Q   Do you know who the CFO of HMMA is?
6      A   The CFO of HMMA?
7      Q   Right.
8      A   Jason Lee.
9      Q   Okay.  Do you know who H.I. Kim is?
10     A   Yes, sir.
11     Q   Who is he?
12     A   I believe his title is COO.
13     Q   All right.  Do you know who Mr. Ahn is?
14     A   Yes, sir.
15     Q   Who is he?
16     A   He is the president.
17     Q   Of what company?
18     A   HMMA.
19     Q   Have you ever been to Seoul, South
20 Korea for cultural training?
21     A   I've been to Seoul, South Korea, but it
22 was not the cultural training, no, sir.
23     Q   What was it for?

Page 193

1      A   In 2004, Team Members were sent to do
2  line training, and I was one of those trips.
3      Q   And what is line training?
4      A   Where they went to the factory and they
5  actually learned jobs on the line.
6      Q   Okay.  Did you participate in the
7  termination of Mr. Dees?
8          MR. SCOFIELD:  Object to the form.
9      A   I don't understand.
10     Q   Well, he was terminated on a room in a
11 security building.  Were you there?
12     A   No, sir.
13     Q   All right.  Do you know anything about
14 that?
15         MR. SCOFIELD:  Object to the form.
16     A   At that point of the process, I'm no
17 longer involved.
18     Q   So you don't know who was there?
19     A   Only generally.
20     Q   Okay.  Who did you find that out from?
21         MR. SCOFIELD:  Object to the form.
22     A   I would only know that a Team Rep was
23 present at the request of the Employment

49 (Pages 190 to 193)

ROBERT ALLEN CLEVENGER

Page 194

1   Department.
2      Q   The Team Rep purpose would be what?
3      A   They sit on the same side of the table
4   with the Team Member so that they're not sitting
5   by themselves and to answer any questions that
6   may come up that the Team Member may have.
7      Q   Represent the Team Member?
8         MR. SCOFIELD:  Object to the form.
9      A   No, sir, not in that format.
10     Q   Advocate for the Team Member?
11        MR. SCOFIELD:  Object to the form.
12     A   Not in that format, sir.
13     Q   Have you ever been a Team Rep?
14     A   Yes, sir.
15     Q   What were your duties?
16     A   You were out on the floor to answer
17  questions regarding policy, procedure,
18  facilitate communications between the Team
19  Member and their direct supervisors.
20     Q   What is the purpose of the Team Rep
21  sitting on the same side of the table as the
22  employee?
23     A   In case they would have any questions

Page 195

1   and also to -- so that they're not sitting on
2   that side by themselves.
3      Q   What's the matter with sitting by
4   themselves?
5      A   Simply to provide some comfort.
6      Q   All right.  Why do you want to provide
7   comfort?
8      A   To make the situation easier for the
9   Team Member to go through.
10     Q   Is the Team Rep there to speak on
11  behalf of the employee?
12     A   No, sir.
13     Q   Give him advice?
14     A   No, sir.
15     Q   So how do you give comfort to an
16  employee, since you did it?
17        MR. SCOFIELD:  Object to the form.
18     A   Simply by sitting on that side of the
19  table.
20     Q   Well, what do you say them to?
21     A   There's really no speaking role, sir.
22     Q   So what happens is you just sit there
23  silent by the employee?

Page 196

1         MR. SCOFIELD:  Object to the form.
2      A   Unless they have a question.
3      Q   And then he's read his termination
4   letter?
5      A   Yes, sir.
6      Q   And are you instructed what to do and
7   not what to do?
8      A   No, sir.
9      Q   Well, are you instructed why you're
10  there?
11     A   To provide any information that the
12  Team Member might ask.
13     Q   Have you ever had a Team Member ask
14  anything or provide any comfort?
15        MR. SCOFIELD:  Object to the form.
16     A   I don't recall specifically.
17     Q   Have you witnessed an employee being
18  terminated before?
19     A   Yes, sir.
20     Q   In the security building, in the
21  termination room?
22        MR. SCOFIELD:  At HMMA?
23     Q   At HMMA.

Page 197

1      A   I don't recall if I've been in the room
2   or not.
3      Q   You would agree with me that it's a
4   very stressful situation, isn't it?
5      A   Yes, sir.
6      Q   It's very stressful emotionally, isn't
7   it?
8         MR. SCOFIELD:  Object to the form.
9      A   I would imagine so.
10     Q   It's stressful financially, isn't it?
11        MR. SCOFIELD:  Object to the form.
12     A   I suppose it could be.
13     Q   And you wouldn't know because you've
14  never gotten fired; that's correct, isn't it?
15     A   Yes, sir.
16     Q   It also leaves -- termination leaves a
17  black mark on somebody's record, doesn't it?
18        MR. SCOFIELD:  Object to the form.
19     A   I don't -- I wouldn't know, sir.
20     Q   What's your opinion?
21     A   My opinion is that's not information
22  that's shared between employers.
23     Q   Well, whether it's shared or not, would

50 (Pages 194 to 197)

ROBERT ALLEN CLEVENGER

Page 198

1    you agree that most employers ask on
2    questionnaires -- on applications have you ever
3    been terminated, don't they?
4        MR. SCOFIELD: Object to the form.
5        A   I don't know.
6        Q   You don't know. Well, Hyundai asks
7    that, don't they?
8        MR. SCOFIELD: Object.
9        A   I've have to review the documents, sir.
10       Q   Well, assuming that an employee tells
11   on an application he's been terminated, wouldn't
12   you agree that would be a black mark on his
13   record?
14       A   That's not part of the process -- a
15   process that I'm involved in, sir, so I don't
16   know.
17       Q   So you don't have any idea whether
18   termination would be a black mark?
19       A   I don't know, sir.
20       Q   Does your wife work?
21       A   Yes, sir.
22       Q   Where does she work?
23       A   Acutech.

Page 199

1        Q   Acutech. What do they do?
2        A   It's a copier sales and service.
3        Q   Has she ever been terminated?
4        MR. SCOFIELD: Object to the form.
5        A   Not that I'm aware.
6        Q   Anybody in your family ever been
7    terminated?
8        MR. SCOFIELD: Object to the form.
9        A   I believe one of my daughters when she
10   was younger in high school.
11       Q   From a job?
12       A   Yes, sir.
13       Q   Did that affect her emotionally?
14       MR. SCOFIELD: Object to the form.
15       A   I would say in her situation, no.
16       Q   So your life experience does not
17   include the devastating effect of termination on
18   somebody's record, does it?
19       MR. SCOFIELD: Object to the form.
20       A   No, sir.
21       Q   Do you consider it a serious matter?
22       A   Yes, sir.
23       Q   Do you consider it a life-altering

Page 200

1    matter?
2        MR. SCOFIELD: Object to the form.
3        A   I think it could be.
4        Q   And it could be in what circumstances?
5        A   I don't know, sir.
6        Q   The time where you served as a Team Rep
7    was Wendy Warner there?
8        A   No, sir. It was at a different -- it
9    was at SIA.
10       Q   Different employer?
11       A   Yes, sir.
12       MR. KILBORN: Let's take five minutes
13   and let me talk to Jeff.
14       MR. SCOFIELD: Okay.
15
16       (Whereupon, a brief recess was had in
17   the proceeding.)
18
19   BY MR. KILBORN:
20       Q   I want to put together by Bates number
21   what was in the packet. And looking at
22   Plaintiff's Exhibit 9, these do have Bates
23   numbers on them. And if we can just look at

Page 201

1    these Bates numbers and confirm for me that what
2    was in the packet was Bates number 33, 34, 35
3    and the sketch was not -- excuse me -- 36, but
4    the sketch on the reverse side was not in there;
5    correct?
6        A   Correct.
7        Q   And then Bates number 37, 38. Have I
8    correctly identified the Bates numbers of what
9    was in the packet?
10       A   Yes, sir.
11       Q   And I've correctly stated that the
12   sketch was not on the back of Bates number 36?
13       A   Yes, sir.
14       Q   And these -- you mentioned this
15   Industrial Care Management?
16       A   Yes, sir.
17       Q   Is that some company owned by Hyundai
18   or controlled by Hyundai or some division or
19   department of HMMA?
20       MR. SCOFIELD: Object to the form.
21       A   No, sir.
22       Q   What is it?
23       A   It's my understanding -- it's my

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

ROBERT ALLEN CLEVENGER

Page 202

1  understanding it's an outside medical company.
2      Q   Does it have offices on the Hyundai
3  property?
4      A   They occupy our medical clinic, sir.
5      Q   So you've got a building called a
6  medical clinic.  Do they have a lease on it?
7          MR. SCOFIELD:  Object to the form.
8      A   Yes, we have an area called the medical
9  clinic.  It's within the Admin Building.  I
10 don't know any -- I don't know any information
11 regarding lease or anything like that.
12     Q   But your understanding is that's a
13 separate company from HMMA?
14     A   Yes, sir.
15     Q   Is Debra -- the lady named Debra, does
16 she run it?
17     A   It's my understanding she's the clinic
18 manager, yes.
19     Q   And do you have access so that if you
20 needed something from Industrial Care Management
21 you can go ask for it and it would be given to
22 you --
23         MR. SCOFIELD:  Object to the form.

Page 203

1      Q   -- if it was pertinent to your job?
2      A   I wouldn't be -- I would not be allowed
3  access to medical records, no, sir.
4      Q   You saw the drug test?
5      A   No, sir.  I was communicated the
6  results.
7      Q   The results.  You didn't see it but you
8  were told what was in there?
9      A   Yes.
10     Q   And you were told -- what else were you
11 told about what was in Brookshire's file over
12 there?
13         MR. SCOFIELD:  Object to the form.
14     A   The only thing that's communicated is
15 that there was a confirmed positive and what the
16 substance -- or I believe now it's classed as
17 family of substance that was found.
18     Q   And that family was what?
19     A   Cocaine.
20     Q   And who at HMMA has -- keeps track of
21 the treatment that Industrial Care Management
22 gives to Brookshire?
23     A   Industrial Care Management would keep

Page 204

1  that information.
2      Q   I know.  But how does -- obviously
3  there was a release signed by Brookshire so that
4  HMMA could get it.  Who has access to this
5  information --
6          MR. SCOFIELD:  Object to the form.
7      Q   -- that's the subject of this release?
8      A   I don't know the answer to that
9  question, sir.
10     Q   What is the purpose of getting
11 Brookshire to give a release?
12         MR. SCOFIELD:  Object to the form.
13     A   It's my understanding that if he did
14 not comply with whatever treatment was suggested
15 or required that his medical provider would
16 contact ICM.
17     Q   That his who would contact ICM?
18     A   Whoever the medical provider was for
19 the treatment.
20     Q   Why does Hyundai get Brookshire to sign
21 a release releasing information to Hyundai?
22         MR. SCOFIELD:  Object to the form.
23     A   It's my understanding that that release

Page 205

1  releases the information to ICM, but as far as
2  HMMA would be concerned, so that we could
3  receive information regarding if he was
4  noncompliant.
5      Q   Has Hyundai received that information?
6          MR. SCOFIELD:  Object to the form.
7      A   I have not, sir.
8      Q   Has Hyundai?
9      A   I don't know, sir.
10     Q   Take a look at Bates number 282.  This
11 is a document which was in the file of
12 Mr. Brookshire's given to me.  And that is
13 within his file, which was marked to his
14 deposition as Plaintiff's Exhibit 14.  You can
15 just read over my shoulder.  This is signed by
16 Brookshire, and it says you must agree to allow
17 the HMMA medical clinic to monitor your
18 progress.  That's the HMMA medical clinic?
19     A   Yes.  That would -- and the provider
20 down there would be ICM at the current time.
21     Q   Well, it says HMMA medical clinic.
22     A   That's really the location.  It's a
23 clinic that is on our site but it's manned by

52 (Pages 202 to 205)

ROBERT ALLEN CLEVENGER

Page 206

1    ICM.
2        Q    To monitor your progress and to
3    communicate with the assessment and
4    rehabilitation provider.  Who is that?
5        A    It would be whomever ICM makes the
6    arrangements with.
7        Q    And it says this requires you to sign
8    the necessary forms authorizing the release of
9    your medical information; is that correct?
10       A    Yes, sir.
11       Q    And are you familiar with this form?
12       A    I know of it.  I don't know what it
13   looks like specifically, but I know of it.
14       Q    And how does ICM communicate to the
15   employer, which is HMMA?
16       A    I could only tell you what I believe
17   takes place is once that form is signed it
18   allows ICM to communicate with whomever is
19   administering treatment and discuss the progress
20   of that individual.
21       Q    Well, how does the employer -- you know
22   what an employer is?
23       A    Yes, sir.

Page 207

1        Q    That's HMMA?
2        A    Yes, sir.
3        Q    That's Brookshire's employer?
4        A    Yes.
5        Q    And this is a condition of employment?
6        A    Yes, sir.
7        Q    And one of the conditions is that he
8    complies with all aspects of any prescribed
9    rehabilitation program; that's correct, isn't
10   it?
11       A    Yes, sir.
12       Q    All right.  Well, how does ICM or the
13   medical clinic communicate to HMMA?
14           MR. SCOFIELD:  Object to the form.
15       A    If there were -- if there were some
16   noncompliance on a Team Member's part, that
17   would be communicated by the provider to ICM and
18   then ICM would in turn make myself aware.
19       Q    So ICM is not a medical provider?
20           MR. SCOFIELD:  Object to the form.
21       Q    The medical provider is whatever
22   medical provider, like Alabama Psychiatric
23   Services, that they contract to or with?

Page 208

1        A    I don't know if I know their system
2    well enough to answer that question, sir,
3    because I do know that they employ nurses and
4    doctors.
5        Q    Well, are they a medical provider?
6           MR. SCOFIELD:  Object to the form.
7        A    I honestly don't know.
8        Q    You've never been over there?
9        A    I have.  I just don't know -- I don't
10   know if they would be termed as a medical -- or
11   as a medical provider or not.  I know there's
12   nurses and doctors.
13       Q    So this says HMMA medical clinic, but
14   that really means ICM?
15           MR. SCOFIELD:  Object to the form.
16       A    I think -- I believe that the reason it
17   says HMMA medical clinic is because that
18   provider is down there now.  I suppose it really
19   could be whomever HMMA contracts to operate that
20   clinic.
21       Q    Has there been more than one company?
22       A    Not that I'm aware.
23       Q    And does the building have a sign on

Page 209

1    it?
2        A    It's actually an area within the
3    Administration Building, sir.
4        Q    HMMA's Administration Building?
5        A    Yes, sir.
6        Q    Does it have identification on the
7    door?
8        A    I honestly don't remember.
9        Q    It also says you're required to attend
10   the substance abuse session that will be
11   scheduled through HMMA's medical clinic.
12       A    Yes, sir.
13       Q    You say what that is is ICM?
14       A    I can tell you what my understanding
15   is, is that ICM sets up an appointment with that
16   medical -- or that substance abuse provider and
17   then that information is shared back with ICM
18   after that assessment.
19       Q    When an employee is discovered with
20   cocaine in his system, why aren't the legal
21   authorities called?
22           MR. SCOFIELD:  Object to the form.
23       Q    Obviously he's broken the law.

53 (Pages 206 to 209)

ROBERT ALLEN CLEVENGER

Page 210

1      MR. SCOFIELD:  Same objection.
2      A    The way our policy is written if you're
3  under the influence, you're removed from the
4  site.  We don't call legal authorities.  But if
5  you are -- you have a screen and it comes back
6  non-negative, then that's sent out for
7  confirmation.  And then until there's a positive
8  that comes back, then at that point nothing's
9  done except for a Fit for Duty.
10     Q    Is there any policy that Hyundai has to
11  your knowledge that if you're a felon with
12  regard to drugs that you can't work there?
13     MR. SCOFIELD:  Object to the form.
14     A    The only thing that I'm aware of is on
15  the employment application.  I believe it asks
16  that question.  But I don't think that -- I
17  don't believe it's targeted specifically towards
18  drugs.  I believe it just asks whether you have
19  ever been convicted of a felony.
20     Q    Okay.  Do you schedule all team
21  discussions -- term discussions?
22     A    No.
23     Q    Who else does that?

Page 211

1      A    There's another assistant manager in
2  the area.  It just would depend on which shift
3  something occurred.  But at that time the
4  position had not been filled, so it was just me
5  at that time.
6      Q    Are the attendees always the same?
7      MR. SCOFIELD:  Object to the form.
8      A    Usually the Director of HR would be in
9  there as well.
10     Q    Which would be who?
11     A    Which would be Mr. Kimble.
12     Q    Do you know why Mr. Kimble was absent
13  from the Dees hearing?
14     A    I only know that he's on medical leave.
15     Q    Was he ill when he -- when this -- when
16  this matter was taking place?
17     MR. SCOFIELD:  Object to the form.
18     A    I don't know the circumstances
19  surrounding Mr. Kimble's medical leave, sir.  I
20  don't know.
21     Q    Have you ever seen any Power Point
22  presentations by the Legal Department?
23     MR. SCOFIELD:  Object to the form.

Page 212

1      A    Yes, sir.
2      Q    And what was the subject?
3      A    I believe the one that I've seen is
4  Sexual Harassment.
5      MR. KILBORN:  That's all I have.  Thank
6  you, Mr. Clevenger.

23     FURTHER DEPONENT SAITH NOT

Page 213

1      C E R T I F I C A T E
2
3  STATE OF ALABAMA    )
4
5  COUNTY OF AUTAUGA   )
6
7
8      I hereby certify that the above and
9  foregoing deposition was taken down by me in
10  stenotype, and the questions and answers thereto
11  were transcribed by means of computer-aided
12  transcription, and that the foregoing represents
13  a true and accurate transcript of the testimony
14  given by said witness upon said hearing.
15      I further certify that I am neither of
16  counsel, nor kin to the parties to the action,
17  nor am I in anywise interested in the result of
18  said cause.
19
19
20
20
21      -------------------------------
21      STACEY L. JOHNSON, Commissioner
22      Certified Court Reporter,
22      ACCR#: 386 - Expires 09-30-2008
23      Commission Expires 06-22-2011
23

54 (Pages 210 to 213)

ROBERT ALLEN CLEVENGER

Page 214

```
 1        SIGNATURE OF WITNESS
 2
 3
 4        I, ROBERT ALLEN CLEVENGER, do hereby
 5    certify that on this, the     day of
 6    2007, I have read the foregoing transcript and,
 7    to the best of my knowledge, it constitutes a
 8    true and accurate transcript of my testimony
 9    taken on oral deposition the 13th day of
10    December, 2007.
11
12
13
14        _____
15        Robert Allen Clevenger
16
16
17
17
18
18
19
19
20
20
21
21
22
22
23
23
```

Page 215

```
 1        ERRATA SHEET
 2        As you read your deposition, if you have
 2    any corrections to make, please itemize them
 3    below.  Upon completion, please sign your name
 3    to the signature line of this errata sheet so
 4    that we may attach it to your deposition to be
 4    returned to the respective Court.
 5        However, if you do not have any corrections
 5    to make, please sign your name on the signature
 6    line of the last page of your deposition.
 6        Thank you.
 7
 7    Page  Line    Explanation
 8
 9    ___  ___  _____
 9
10    ___  ___  _____
10
11    ___  ___  _____
11
12    ___  ___  _____
12
13    ___  ___  _____
13
14    ___  ___  _____
14
15    ___  ___  _____
15
16    ___  ___  _____
16
17    ___  ___  _____
17
18    ___  ___  _____
18
19    ___  ___  _____
19
20    ___  ___  _____
20
21
21
22
22
23        _____
23
```

55 (Pages 214 to 215)

Statement with Jim Brookshire

On Feb 14 at approx. 1:00 AM. Jim went upstairs to check on some quality issues in the SOP. (Side outer)

Jim went up to the 3rd floor where he noticed Leon Deas sitting at operating station. Leon was positioned with his head down and his back was towards the cabinet.

Jim observed Leon sitting in this position for approx. 2 minutes.

At this time Jim turned up his radio and let it chirp about 4 times before Leon responded.

Whenever Leon woke up he grabbed a pole and began to act like he was pulling trolleys.

Jim went around to check some panels and when he approached the area again he noticed Leon sitting in the same chair; however, this time he was alert. Not long after this Jim witnessed Leon walking down the stairs.

About 30 minutes passed by before Jim talked to TL Kevin Hughes. During this time Kevin did not know where Leon was.

EXHIBIT
C

DEES V HMMA 00037   DOCS PRODUCED

Jim was approximately 25 feet away from Leon when he noticed that he was asleep.

Jim walked towards Leon and began chirping his radio at a distance approx. 15 feet.

Due to Leon's hat being on his head Jim did not see his eyes closed; however he (Jim) stated that his head was facing towards the floor, with his chin tucked to his chest)

J.A.B.
2-19-07

DEES V HMMA 00038  DOCS PRODUCED

| **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | Harassment Policy | HR-AL-HR-TR-S-00014 |
| --- | --- | --- |
| Revision Date: 4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

### Harassment

HMMA is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age (40+), religion, or any other legally protected characteristic will not be tolerated. Discrimination and unlawful harassment (both overt and subtle) are forms of misconduct that demean another person and undermine the integrity of the employment relationship. This type of behavior is strictly prohibited. Any Team Member engaging in unlawful discrimination or harassment may be subject to disciplinary action, up to and including termination of employment.

### What is Harassment?

Harassment can take many forms. It may be, but is not limited to, words, signs, jokes, pranks, intimidation, physical contact, or violence. Harassment is not necessarily sexual in nature.

One form of illegal discrimination and harassment is sexual harassment. We may generally categorize "sexual harassment" as unwanted and unwelcome verbal, physical, or visual behavior or conduct that is either (1) sexual in nature or (2) directed at a person's gender where:

- Submission to the behavior may be perceived to be a term or condition of employment;

- Submission to or rejection of the behavior is used as the basis for making employment decisions such as promotions, transfers, annual evaluations, etc.; or

- Such conduct creates an intimidating, hostile, or offensive working environment or interferes with an individual's work performance.

Examples of sexual harassment include, but are not limited to, the following:

- Innuendoes, jokes, comments, slurs, invitations, or graphic commentary about an individual's body which are either sexual in nature or directed at a person's gender;

*NOTICE: Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure*



EXHIBIT
D

DEES V HMMA 00083  DOCS PRODUCED

- Sexually suggestive or obscene objects, pictures, cartoons, posters, calendars, clothing, notes, letters, emails, or electronic media;

- Sexual gestures, leering, touching, assaulting, or impeding or blocking movements.

1.    Responsibility

As an HMMA Team Member, you are responsible for keeping our work environment free of harassment. Any Team Member who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, must report it to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable. When HMMA becomes aware that harassment might exist, it will take prompt and appropriate action.

2.    Reporting Harassment

If you feel that you have experienced harassment, you should take action immediately. If you are able, clearly explain to the person causing the harassment that you are uncomfortable with his or her behavior and request that the conduct cease immediately. If you are uncomfortable with that direct approach, report the incident immediately to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable. HMMA will not retaliate against any Team Member who makes a good faith report of alleged harassment, even if the Team Member was in error.

3.    Investigation of Complaints of Harassment/Confidentiality

All reports will be promptly investigated with due regard for the privacy of everyone involved. Due to the sensitive nature of complaints of sexual and other unlawful harassment, the Team Relations Department will investigate the complaints with particular care, and, to the extent possible, keep them confidential. Please be advised that anonymous claims usually cannot be investigated.

4.    Immediate and Appropriate Corrective Action

Any Team Member found to have harassed a fellow Team Member or subordinate will be subject to severe disciplinary action or possible discharge. HMMA will also take any additional action necessary to correct the situation immediately.

DEES V HMMA 00084  DOCS PRODUCED

5.    Consensual, Romantic or Sexual Relationships

5.1    HMMA strongly discourages romantic or sexual relationships between Team Members.

5.2    HMMA prohibits romantic or sexual relationships between any HMMA member of management and any subordinate Team Member. Such a relationship may give rise to the perception by others that there is favoritism or bias in employment decisions affecting the Team Member. Moreover, given the uneven balance of power within such relationships, consent by the Team Member is suspect and may be viewed by others or, at a later date, by the Team Member himself or herself as having been given as a result of coercion or intimidation. The atmosphere created by such appearances of bias, favoritism, intimidation, coercion or exploitation undermines the spirit of trust and mutual respect which is essential to a healthy work environment.

DEES V HMMA 00085  DOCS PRODUCED

I ACKNOWLEDGE RECEIPT OF THE HMMA ANTI-HARASSMENT POLICY AND COMPLAINT POLICY.

THIS POLICY IS PART OF THE COMPANY'S COMPLIANCE WITH FEDERAL AND STATE LAW PROHIBITING HARASSMENT. THE HARASSMENT POLICY CREATES NO CONTRACTUAL OBLIGATIONS ON THE PART OF HMMA OR ITS TEAM MEMBERS AND DOES NOT ALTER THE AT-WILL RELATIONSHIP BETWEEN HMMA AND ITS TEAM MEMBERS. YOU ARE FREE TO RESIGN AT ANY TIME, AND HMMA HAS THE SAME ABILITY TO TERMINATE THE EMPLOYMENT RELATIONSHIP. THE COMPANY RESERVES THE RIGHT TO REVISE THIS POLICY, WITHOUT NOTICE, TO RESPOND TO BUSINESS CONDITIONS AS THEY ARISE.

_____          _____
[Team Member's Signature]                         [Date]

ENT'D NOV 2 8 2006

| HYUNDAI Hyundai Motor Manufacturing Alabama | DISCUSSION PLANNER | HR-AL-HR-TR-F-00028 |
|---|---|---|
| Rev Date: 06/24/06 | Owner: Team Relations | Revision Level: 02 |

| DATE | 15-Nov-06 |
|---|---|
| SUPERVISOR NAME (originator of this document) | John W Applegate |
| DISCUSSION WITH Include T/M# & Department | Greg Prater, 100332, Plant Engineering, Press Maintenance Assistant Manager |
| SITUATION To be discussed | On 11/15/06, Leon from the Press Shop complained that Greg was not treating him fairly concerning his military duty. He accused Greg of requiring written orders when not required and assigning him hard work as a form of punishment. I discussed the situation with Greg and Leon. This is another example of a communication problem in Press Maintenance. |
| DESCRIBE PERSON INVOLVED * Performance/Work Habits Record * General Behavior * Specifics for KP-1 | Greg Prater is the Assistant Manager for the Press Maintenance area Over the past months he has experienced several problems managing his Team Leaders, Team Members and Specialists |
| OBJECTIVE(S) * What do you hope to accomplish in this discussion | Greg needs to improve his relationship with his subordinates. |
| CRITICAL STEPS TO BE USED * Which key principles will you use? When? | Explanation that it is primarily his responsibility to improve this situation. |
| BACKGROUND INFORMATION * Facts Known * Information Needed * Concerns * Possible cause(s)/reason(s) for the situation * Consequences to T/M if the situation continues * Other | Leon serves in the Guard and fulfills his duty on weekends and in the summers. Greg feels that Leon is taking advantage of his duty to get out of weekend work and that he is a disruption in the team. Greg has assigned Leon and others to unpopular jobs within the shop and Leon believes this is a form of punishment. The main problem is that Greg has a poor relationship with his Team Members which leads to this kind of miscommunication. |
| ALTERNATIVES | |



EXHIBIT
E

CONFIDENTIAL

DEES V HMMA 00173  DOCS PRODUCED

* Possible actions/solutions
* Resources available
* Constraints

**DISCUSSION SUMMARY**

Met with Greg for a brief discussiopn of the problem.  He blamed the situation on Leon.  I informed him that regardless it was his responsibility to provide good communication and treat his Team Members fairly.

| SPECIFIC ACTIONS: | PERSON RESPONSIBLE | BY WHEN |
|---|---|---|
| Improve communication with his subordinates | Greg Prater | Immediately |

**FOLLOW-UP**
* Date, Time, Place
* Other

**REVIEW**

To what extent did you meet your objectives?

What Critical Steps/Key Principles did you handle most effectively?

What Critical Steps/Key Principles could you have used more effectively?

What will you do differently in your next discussion?

DEES V HMMA 00174  DOCS PRODUCED

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4    CASE NO.: 2:07-cv-00306-MHT-CSC
5
6    JERRY LEON DEES, JR.,
7         Plaintiff,
8         V.
9    HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC and
10   HYUNDAI MOTOR AMERICA, INC.,
11        Defendants.
12
13
14
15
16        S T I P U L A T I O N S
17
18        IT IS STIPULATED AND AGREED by and
19   between the parties, through their respective
20   counsel, that the deposition of GWANG MUN may be
21   taken before STACEY L. JOHNSON, Commissioner, at
22   the Hampton Inn, 60 Wasden Road, Hope Hull,
23   Alabama, on the 8th day of January, 2008.

Exhibit
F

Page 2

1         IT IS FURTHER STIPULATED AND AGREED
2    that the signature to and the reading of the
3    deposition by the witness is hereby waived, the
4    deposition to have the same force and effect as
5    if full compliance had been had with all laws
6    and rules of Court relating to the taking of
7    depositions.
8         IT IS FURTHER STIPULATED AND AGREED
9    that it shall not be necessary for any
10   objections to be made by counsel to any
11   questions except as to form or leading
12   questions, and that counsel for the parties may
13   make objections and assign grounds at the time
14   of trial, or at the time said deposition is
15   offered in evidence, or prior thereto.
16        IT IS FURTHER STIPULATED AND AGREED
17   that the notice of filing of the deposition by
18   the Commissioner is waived.
19
20
21
22
23

Page 3

1              INDEX
2    EXAMINATION BY:              PAGE NUMBER:
3    Mr. Sport..................................5-71
4    Mr. Johnson............................72-75
5    Mr. Sport...............................76-77
6
7    EXHIBITS:
8    Plaintiff's Exhibit 27......................44
9       (organizational charts)
10   Plaintiff's Exhibit 28......................60
11      (photograph)
12   Plaintiff's Exhibit 29......................61
13      (photograph)
14
15
16
17
18
19
20
21
22
23

Page 4

1         A P P E A R A N C E S
2    FOR THE PLAINTIFF, JERRY LEON DEES, JR.:
3       KILBORN, ROEBUCK & McDONALD
        Jeffrey R. Sport
4       (SPORJ5390)
        jeff.sport@sportlaw.us
5       1810 Old Government Street
        Mobile, Alabama  36606
6       (251) 479-9010
7
     FOR THE DEFENDANTS, HYUNDAI MOTOR MANUFACTURING
8    ALABAMA, LLC and HYUNDAI MOTOR AMERICA, INC:
9       OGLETREE, DEAKINS, NASH, SMOAK
           & STEWART, P.C.
10      Matthew K. Johnson
        P. O. Box 2757
11      Greenville, South Carolina  29602
12      HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC
        Christopher N. Smith
13      chrissmith@hmmausa.com
        700 Hyundai Boulevard
14      Montgomery, Alabama  36105
        (334) 387-8057
15
16   ALSO PRESENT:
17   MR. JERRY LEON DEES, JR.
18   MRS. KATHERINE DEES
19   MR. ROBERT CHU
20   MR. RAYMOND K. KIM (Interpreter)
21
22
23

GWANG MUN

Page 5

1     I, STACEY L. JOHNSON, a CCR of Deatsville,
2   Alabama, and Notary Public for the State of
3   Alabama at Large, acting as Commissioner,
4   certify that on this date, as provided by the
5   Federal Rules of Civil Procedure and the
6   foregoing stipulation of counsel, there came
7   before me at 60 Wasden Road, Hope Hull, Alabama,
8   beginning at 10:26 a.m., GWANG MUN, witness in
9   the above cause, for oral examination, whereupon
10  the following proceedings were had:
11
12            (Interpreter sworn.)
13
14            GWANG MUN,
15  the witness, after having been first duly sworn
16  to speak the truth, the whole truth, and nothing
17  but the truth, testified as follows:
18            EXAMINATION
19  BY MR. SPORT:
20    Q    Mr. Mun, good morning.
21    A    (In English.)  Good morning.
22    Q    State your full name for the Record,
23  please.

Page 6

1     THE INTERPRETER: Excuse me.  Would you
2   like me to --
3     MR. SPORT:  Please.
4     THE INTERPRETER: -- interpret
5   everything that -- that is transpiring here
6   or --
7     MR. SPORT:  I think that would probably
8   be best.
9     A    Okay.  Could you repeat that question
10  again?
11    Q    State your full name for the Record,
12  please.
13    A    Mun Gwang Soeb.
14    Q    And, Mr. Mun, how old are you?
15    A    I was -- I was born in 1962.  In Korea,
16  the ages are counted differently than we do
17  in -- in the United States.  By Korean custom,
18  I'm 47 years old, but by American standards, I'm
19  45.
20    Q    Well, I was also born in 1962, and I'm
21  going to claim to be 45.
22         Are you a citizen of the Nation of
23  Korea?

Page 7

1     A    Yes.
2     Q    And what is your residence status here
3   in the United States?
4     THE INTERPRETER:  I don't know --
5     MR. CHU:  In-patriate.  HMMA
6   in-patriate or, slash, coordinator.
7     Q    Okay.  My -- my question really is, are
8   you here under a visa or a green card or -- what
9   is your immigration status?
10    A    L1.  I -- I hold an L1 Visa.
11    Q    How long have you been in the United
12  States?
13    A    A year and six months.
14    Q    And prior to that time, did you reside
15  in Korea?
16    A    Yes.
17    Q    Have you ever given a deposition
18  before?
19    A    No.  This is my first experience.
20    Q    What we're going to do today is, I'm
21  going to ask you questions; you'll give me
22  answers.  If you don't know the answer to a
23  question, tell me that you don't know the

Page 8

1   answer.  If you think of an answer later or
2   think of a better answer or a more complete
3   answer and you need to change a previous answer,
4   just tell me that.
5     A    I -- I understand.
6     Q    Very good.  What did you do to prepare
7   for your deposition today?
8     A    I -- I have done two things.  The first
9   is I watched a videotaped program that explains
10  how the deposition process works.  I watched --
11  I watched -- I -- I discussed with the
12  attorney -- general -- general process that he
13  should expect today.
14    Q    Was this discussion with Mr. Johnson?
15    A    Yes.
16    Q    And was Mr. Smith also there?
17    A    Yes.
18    Q    And was Mr. Kim who left already, was
19  he present, also?
20    A    No, he wasn't there.
21    Q    Was anyone else present at these
22  discussions?
23    A    No.

2 (Pages 5 to 8)

GWANG MUN

Page 9

1    Q    Did you review any documents prior to
2  your deposition?
3    A    I -- I had a chance to read --
4        THE INTERPRETER:  By the way, what's
5  his name?  Leon?
6        MR. SPORT:  Leon Dees.
7        THE INTERPRETER:  How do you spell
8  that?
9        MR. SPORT:  L-E-O-N.
10        THE INTERPRETER:  L-E-O-N.  D --
11        MR. SPORT:  Dees, D-E-E-S.
12        THE INTERPRETER:  D-E-E-S.
13    A    I had a chance to review the document
14  prepared by Mr. Leon Dees.
15    Q    And what document was that?
16    A    As I understand it, it was a record of
17  a deposition.
18    Q    Okay.  Very good.  Is that the only
19  document that you reviewed?
20    A    Yes.
21    Q    Mr. Mun, what is your position at HMMA?
22    A    I am a Coordinator.
23    Q    In what department?

Page 10

1    A    (In English.)  Plant Engineering.
2        (By the interpreter.)  Plant
3  Engineering.  I am Coordinator in Plant
4  Engineering Department.
5    Q    As a Coordinator in Plant Engineering,
6  what are your responsibilities?
7    A    I'm responsible for improving the
8  productivity of the plant, and I'm also
9  responsible for training of the workers.
10    Q    Do those responsibilities include both
11  Production as well as Maintenance?
12    A    Just the Maintenance side.
13    Q    Do you have an American counterpart?
14    A    (In English.)  I'm not understand.
15        THE INTERPRETER:  Could you explain?
16  Could you elaborate?
17        MR. SPORT:  Yes.
18    Q    Ms. Warner in Human Resources has
19  explained that within the plant there is what at
20  least the Americans refer to as an American side
21  and a Korean side.  So as I understand the
22  hierarchy of management on the American side, we
23  had Mr. Dees who reported to Greg Prater who was

Page 11

1  a supervisor who reported to John Applegate.
2  And so my question is, are you of equal level of
3  management with Mr. Applegate or Mr. Prater or
4  someone else?
5    A    No.
6        THE INTERPRETER:  The answer is no, but
7  I -- would you like to...
8    Q    Does Mr. Applegate report to you?
9    A    No.
10    Q    Would Mr. Prater have been your
11  American counterpart?
12    A    He was not at the same level, but he
13  was a manager who was responsible for Press side
14  of the operation.
15    Q    So Mr. Prater was not at the same level
16  as Mr. Mun?
17    A    Coordinator is separate from
18  Mr. Prater's organization.
19    Q    Who do you report to?
20    A    Director Kim Jun Ha.
21    Q    Are you an employee of HMMA, or are you
22  an employee of Hyundai Motor Company?
23        THE INTERPRETER:  HMMA or Hyundai Motor

Page 12

1  Company.
2    A    I belong to HMMA.
3    Q    Does HMMA pay your salary?
4    A    Yes.  True.
5    Q    Ms. Warner indicated that there were 78
6  or so ex-patriate Koreans that ran the HMMA
7  plant and that they were employees of Hyundai
8  Motor Company; is that correct?
9    A    That's not so.  I receive my pay from
10  HMMA.  Five years later that organization may
11  change to HMC.
12    Q    Okay.  I don't understand that.
13    A    I am receiving my pay from HMMA.
14    Q    And what could happen in five years?
15    A    I will be returning to Korea in five
16  years.
17    Q    Okay.
18        THE INTERPRETER:  May I add something?
19  May I add a remark?  I think he meant although
20  he's being paid by HMMA now, his contract with
21  the company is for him to work here for five
22  years and then return to Korea.  In that event,
23  he will again will be belonging to HMC.

3 (Pages 9 to 12)

Page 13

1    MR. SPORT: Okay. Well, let me ask it
2 that way so that we can confirm that with the
3 witness.
4    Q   Do you have a five-year contract with
5 HMMA?
6    A   That's true. As a Coordinator.
7    Q   And did you work with HMC prior to
8 coming to the United States?
9    A   Yes.
10    Q   And when your five-year contract is
11 complete, will you be returning to work for HMC
12 in Korea?
13    A   Yes.
14    Q   While you're here in the United States,
15 does HMC have any control over you?
16    A   No. While I'm here, I belong to HMMA.
17    Q   You indicated that you report to
18 Director Kim?
19    A   Yes, I did.
20    Q   Who does Mr. Kim report to?
21    A   He's now president, and his name is Kim
22 Hwae Il.
23    Q   What was that name?

Page 14

1    THE INTERPRETER: Let me spell it for
2 you.
3    MR. SPORT: Okay.
4    THE INTERPRETER: K-I-M H-W-A-E and the
5 last is I-L.
6    Q   Is Mr. Ahn no longer the president?
7    A   He was transferred to Russia.
8    Q   When was that?
9    A   As of January 1st of this year.
10    Q   Was his contract complete?
11    A   Yes.
12    Q   Do you agree that there is an American
13 side and a Korean side within the plant?
14    A   Yes. What you call Korean side are
15 Coordinators. On the other side are the
16 American side, the managers.
17    Q   What is the difference between a
18 manager and a Coordinator?
19    A   Coordinators are responsible for
20 technical assistance. And the management side
21 manages the business, plant.
22    Q   So -- so do the Coordinators have any
23 oversight responsibility with respect to

Page 15

1 management of Team Members?
2    A   No.
3    Q   Do you know whether or not -- I'm
4 sorry. Strike that. Do you know whether
5 American law or Korean law applies inside the
6 plant?
7    MR. JOHNSON: Object to the form.
8    A   I don't know.
9    Q   To your knowledge, has there ever been
10 a member of the Korean side that has been
11 terminated?
12    A   I don't know if there was any.
13    Q   Are you familiar with the policies and
14 procedures that HMMA has put into place to
15 administer the operation of the plant?
16    A   I -- I was given a general overview of
17 that procedure and the rules when I first came
18 here, but I do not know them in detail.
19    Q   Fair enough. Do you know whether those
20 policies and procedures govern the
21 administration and behavior of the Team Members
22 as well as the Koreans?
23    A   I -- I don't know.

Page 16

1    Q   Do the Coordinators participate in any
2 of the various management meetings, such as the
3 Termination Committee?
4    A   I do not know for sure, but I don't
5 think they participate in such meetings. That
6 is, Coordinators participate in such meetings.
7    Q   Does that mean that you have never
8 participated in any of those meetings?
9    A   That's true.
10    Q   When I visited the Administration
11 Building at HMMA, I noticed that there were
12 exhibits on the walls showing the different
13 components of the Hyundai business, such as the
14 research and design center in California,
15 manufacturing plant in -- here in Alabama, and
16 the HMC in -- in Korea. What is your
17 understanding of the relationship between those
18 three companies?
19    MR. JOHNSON: Object to the form just
20 for the Record.
21    A   I don't know much about those things.
22    Q   Do you know that there's a company in
23 California called HMA?

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652 (251)694-0950 (888)557-2969

GWANG MUN

Page 17

1    A    Yeah, I am aware of that.  In LA.
2    Q    Correct.  Correct.  So you have no
3  understanding of the relationship between HMA
4  and HMMA?
5    A    I don't know if there's any
6  relationship.
7    Q    Would it be fair to say that all of the
8  Hyundai companies operate as one for the success
9  of the whole?
10      MR. JOHNSON:  Object to the form.
11    A    Most likely.
12    Q    Okay.  Do you know how often personnel
13  from HMA in California visit the plant here in
14  Alabama?
15      MR. JOHNSON:  Object to the form.
16    A    No, I don't know.
17    Q    Has anyone from HMA ever visited your
18  department here in Alabama?
19      MR. JOHNSON:  Object to the form.
20    A    I don't know.  I'm not aware.
21    Q    Have you ever visited HMA's offices in
22  California?
23    A    No.

Page 18

1    Q    Are you aware of anyone from HMC in
2  Korea coming to visit the plant here in Alabama?
3    A    I'm not aware of it.
4    Q    Do you know anything about who owns the
5  parts that are used to assemble the vehicles?
6    A    I -- I do not understand the -- the
7  purpose of the question.  I believe HMMA owns
8  the equipment for assembly.
9    Q    Okay.  And do you know who owns the
10  vehicles once their assembly is complete?
11    A    (By the interpreter.)  I guess they
12  belong to HMA.
13      (In English.)  I'm not --
14      (By the interpreter.)  I'm not
15  sure.
16      (In English.)  -- sure.  Maybe my
17  opinion is HMA.
18    Q    Why would you think that?
19    A    I'm just guessing.
20    Q    Are you aware that occasionally
21  production at the plant needs to be either
22  slowed down or halted for some period of days?
23    A    I'm working in the Stamping Department,

Page 19

1  so I'm not aware of things that are going on
2  outside my jurisdiction.
3    Q    Does the Stamping Department never
4  cease operations?
5    A    When the number of pieces -- planned
6  pieces are completed, then we stop for a while.
7    Q    And who makes the decision?
8      MR. JOHNSON:  Object to the form.
9    A    I am -- I'm not sure who that is, but
10  in any case, it isn't something done by us.
11  That is, Coordinators do not.
12    Q    So someone tells you to stop production
13  until you get the next directive to produce more
14  parts?
15    A    No one specifically tells me to stop
16  it, but I -- I am aware when the line stops
17  because I'm always working with the process.
18    Q    Were you not aware that the plant was
19  scheduled to be shut down for seven to ten days
20  in December?
21      MR. JOHNSON:  Object to the form.
22    A    I was aware that production line
23  stopped, but we as Maintenance people

Page 20

1  responsible for maintenance worked during that
2  period.
3    Q    I understand.  So the Maintenance
4  personnel had maintenance activities to perform
5  even though production was stopped?
6    A    That's true.
7    Q    Are you familiar with the Team Member
8  Handbook?
9    A    I -- I don't know what you're talking
10  about.
11    Q    Are you familiar with HMMA's Serious
12  Misconduct Policy?
13    A    It was mentioned during my orientation
14  program shortly after I arrived, but I don't
15  know anything about the details.
16    Q    Do you believe that no matter what the
17  policy provides in its details it should be
18  applied to all Team Members evenly?
19      MR. JOHNSON:  Object to the form.
20    A    I don't know because I'm just a
21  Coordinator.
22    Q    Mr. Mun, do you know Leon Dees?
23    A    Yes.

GWANG MUN

Page 21

1    Q    How long have you known Mr. Dees?
2    A    Since August of last year.
3    Q    Of 2007 or 2006?
4    A    (In English.) 6.  2006.
5        (By the interpreter.)  2006.
6    Q    So, as I understand it, then, Mr. Dees
7    would have been employed at HMMA before you
8    arrived?
9    A    I'm not sure about that, but I guess
10   that is the case -- that was the case.
11   Q    You arrived at HMMA in August of 2006;
12   is that correct?
13   A    It was July 24th of 2006.
14   Q    Do you believe that Mr. Dees is an
15   honest man?
16       MR. JOHNSON:  Object to the form.
17   A    I have never had a -- a chance to
18   develop a deep understanding of him.
19   Q    Do you believe that Mr. Dees is an
20   honorable man?
21       MR. JOHNSON:  Object to the form.
22   A    I usually find it difficult to judge a
23   man just by the face.

Page 22

1    Q    You worked with Mr. Dees for seven
2    months prior to him being terminated, did you
3    not?
4    A    Until January of 2007, I used to work
5    in the Welding Department, and at that time --
6    that is, January of 2007 -- I moved over to
7    Stamping Department and I have worked with
8    Mr. Dees for about a month.  I used to spend
9    about roughly 80 percent of my time for the
10   Welding side.
11   Q    Prior to January of 2007?
12   A    That is true.
13   Q    Did Mr. Dees ever give you any reason
14   to believe that he was not honest?
15       MR. JOHNSON:  Object to the form.
16   A    No.
17   Q    Did Mr. Dees ever give you any reason
18   to believe that he was not an honorable man?
19       MR. JOHNSON:  Object to the form.
20       THE INTERPRETER:  I have a little
21   difficulty in interpreting the word honorable,
22   so let me explain to him because I can't find
23   the exact match -- matching word in Korean.  May

Page 23

1    I ask him a little help?
2        MR. JOHNSON:  It's Mr. Sport's
3    deposition.
4        MR. SPORT:  I don't have a problem with
5    that as long as -- as long as the meaning of my
6    question is ultimately conveyed to Mr. Mun.
7        THE INTERPRETER:  Okay.  I'm assuming
8    that there is a word for it, but I just can't
9    think of it.  And that's what I would like to
10   tell him.
11       MR. SPORT:  A Korean word for --
12       MR. CHU:  I'm actually still trying to
13   find the direct appropriate translation.
14       THE INTERPRETER:  These are cultural
15   differences that sometimes -- the expression is
16   not used in Korea that way, so it's difficult
17   to -- honorable man.
18       MRS. DEES:  It means -- I would take it
19   as wouldn't do anything out of line.
20       MR. SPORT:  Well, let me explain --
21       THE INTERPRETER:  It's -- it's --
22       MR. SPORT:  -- what I mean in English
23   and then maybe you can find an appropriate way

Page 24

1    to phrase it in Korean.  What I mean when I say
2    an honorable man is he has integrity, he is
3    honest, he -- he tells the truth, he behaves
4    appropriately.
5        MR. JOHNSON:  Object to the form.
6    A    I would say that he is an honorable
7    man.
8    Q    Okay.
9    A    It is a rather difficult question for
10   me to answer because as I explained.
11   Q    I understand.  Do you know Katherine
12   Dees?
13   A    This is the first chance that I have to
14   see her in person.
15   Q    Have you ever spoken with Mrs. Dees on
16   the telephone?
17   A    I have talked with her twice on the
18   phone.
19   Q    Do you know Greg Prater?
20   A    I do.
21   Q    How long did you know Mr. Prater?
22   A    About 14 months.  Approximately 14
23   months.

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

GWANG MUN

Page 25

1    Q    During that time, were you able to form
2  any opinion of Mr. Prater?
3        MR. JOHNSON:  Object to the form.
4    A    It is hard for me to judge a person.
5    Q    I know it might be hard to do, but did
6  you form an opinion as to Mr. Prater?
7        MR. JOHNSON:  Object to the form.
8    A    I did not judge the -- his character,
9  but I just worked with him.
10    Q    Did his work performance ever give you
11  any indication that he might have flaws in his
12  character?
13        MR. JOHNSON:  Object to the form.
14    A    No, he has not.
15    Q    To your knowledge, did Mr. Prater's
16  coworkers get along with him?
17    A    I didn't think he was the smoothest
18  operator, smoothest working person with his
19  associates.
20    Q    Does that mean -- when you say
21  associates, are you referring to the Team
22  Members that reported to Mr. Prater?
23    A    His subordinates.

Page 26

1    Q    Did any of Mr. Prater's subordinates
2  ever come to you and complain about Mr. Prater?
3    A    No.
4        THE VIDEOGRAPHER:  I need to change
5  tapes real quick.
6        MR. JOHNSON:  Do you want to take a
7  break?
8        MR. SPORT:  Yeah, let's take five
9  minutes.
10
11        (Whereupon, a brief recess was had in
12  the proceeding.)
13
14        THE VIDEOGRAPHER:  Back on the Record.
15  Tape 2.
16
17  BY MR. SPORT:
18    Q    Mr. Mun, I asked you a question before
19  the break about whether or not Mr. Dees was an
20  honorable man, and we had a bit of a problem
21  translating that phrase into Korean.  And the
22  interpreter has now indicated that there is a
23  rough translation of that English expression,

Page 27

1  honorable man, in the Korean language, and he
2  has equated that to being a good man that would
3  be an honorable man or a bad man meaning a
4  dishonorable man.  Is that your understanding?
5        MR. JOHNSON:  Object to the form.
6    A    I guess it's okay.
7    Q    Okay.  I was -- I was asking the
8  question based on the information that I had.
9    A    I have a tendency to trust everybody
10  until they show otherwise.  I think everybody's
11  a good man.
12    Q    Did Mr. Prater ever show you that he
13  was not a good man?
14        MR. JOHNSON:  Object to the form.
15    A    I did not think there was any problem
16  with Mr. Prater as a person, but I did observe
17  some undesirable activities or behaviors.
18    Q    In the workplace?
19    A    It was interaction between him and
20  myself at the workplace.
21    Q    Could you tell me about that?
22    A    As an example, he did not -- on one
23  occasion did not complete a task that was

Page 28

1  promised to be completed on that day.
2    Q    Did that task have anything to do with
3  why we're here today?
4    A    No, it wasn't related.
5    Q    What are some other examples?
6    A    No, I do not have any other -- other
7  points to bring up.
8    Q    What was the task that Mr. Prater did
9  not complete?
10    A    He was supposed to acquire certain
11  supplies but that action was delayed.
12    Q    Did that behavior result in any
13  disciplinary action?
14    A    It -- it wasn't that significant and it
15  was easily corrected on that same day.
16    Q    So when you indicated that there were
17  some problems with Mr. Prater's behavior, that's
18  the only incident to which you were referring?
19    A    There was a tendency for him -- for
20  Mr. Prater not to live up to the commitment.
21    Q    Generally or some specific commitment?
22    A    I don't remember exactly, but I -- I
23  believe there were more than once.

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

GWANG MUN

Page 29

1    Q    Did I understand you before the break
2  to say that none of Mr. Prater's subordinates
3  ever came to you and complained about
4  Mr. Prater?
5    A    That's -- that's correct.
6    Q    Did Mr. Dees ever come to you and
7  complain about Mr. Prater -- Mr. Prater
8  harassing him about his military obligations?
9        MR. JOHNSON:  Object to the form.
10    A    I don't -- I don't recall.
11    Q    Are you aware that Mr. Prater has left
12  HMMA?
13    A    Yes, I do.
14    Q    Are you aware of why he left HMMA?
15    A    I understand that he moved on to a
16  place closer to his hometown and then also
17  his -- his salary has been increased.
18    Q    So as far as you know, he left for more
19  money and to be closer to home?
20    A    That's how I understand it.
21    Q    Do you know Jim Brookshire?
22    A    Yes, I do.
23    Q    How long have you known Mr. Brookshire?

Page 30

1    A    As soon as I came here, I got to know
2  him.
3    Q    Earlier when I asked you about how long
4  you had known or worked with Mr. Dees, you had
5  indicated that you came to Stamping Maintenance
6  full time in January of 2007, but then you
7  indicated that you worked -- prior to that you
8  had worked 80 percent of the time in Body Weld.
9  Was the other 20 percent of the time in Stamping
10  Maintenance?
11    A    Yes, 20 percent of the time was spent
12  on Stamping side.
13    Q    So from the time that you began working
14  at HMMA, you had responsibility for both Body
15  Weld and Stamping Maintenance?
16        MR. JOHNSON:  Object to the form.
17    A    I -- since I am a technician, I -- I
18  was asked to work on both sides, that is,
19  Stamping side and Body side.
20    Q    Okay.  Do you know whether or not
21  Mr. Brookshire and Mr. Prater knew one another?
22    A    I believe so they knew each other.
23    Q    Do you know whether or not they were

Page 31

1  friends?
2    A    I don't know that part.
3    Q    Did you see them together frequently in
4  the plant?
5    A    Vaguely I must have seen them together,
6  but not specifically.
7    Q    Do you know what Mr. Brookshire's
8  responsibilities were?
9    A    He was on the side of Production
10  Stamping, so I -- I don't know that
11  responsibility very well.
12    Q    Did you ever see Mr. Prater sleeping at
13  his desk in the Stamping Maintenance office?
14        MR. JOHNSON:  Object to the form.
15    A    No.
16    Q    If Mr. Prater had slept sitting at that
17  desk, would that have been acceptable behavior?
18        MR. JOHNSON:  Object to the form.
19    A    I don't know how the rules apply in
20  such cases.
21    Q    Well, let's just assume that there's no
22  rule.  Would you expect to find someone asleep
23  at work while they were being paid?

Page 32

1        MR. JOHNSON:  Object to the form.
2    A    I -- I don't think company will accept
3  that behavior.
4    Q    Did you come to form any opinion about
5  Mr. Brookshire?
6        MR. JOHNSON:  Object to the form.
7    A    I don't know him very well.  I only
8  recognize his face.
9    Q    You've never worked with Mr. Brookshire
10  for any reason?
11    A    There was no contact with him.
12    Q    Are you aware that it was
13  Mr. Brookshire that supposedly caught Mr. Dees
14  asleep?
15    A    Yeah, I heard that.
16    Q    Were you also aware that about that
17  same time or shortly within a couple of weeks
18  one way or the other that Mr. Brookshire hurt
19  himself at the plant and as a result of going to
20  the medical office had to get a drug test and
21  failed his drug test?
22        MR. JOHNSON:  Object to the form.
23    A    No, I have not heard.

8 (Pages 29 to 32)

GWANG MUN

Page 33

1    Q    Do you have any opinion as to whether
2  or not that fact, assuming it occurred, would
3  have any impact on Mr. Brookshire's reliability?
4          MR. JOHNSON:  Object to the form.
5    A    Since I do not decide such methods, I
6  don't have any opinion.
7    Q    It has been suggested by other
8  witnesses in this case that in a situation where
9  there's a dispute as to a fact between a Team
10  Member and a supervisor that the word of the
11  supervisor should always be believed because
12  that person is a supervisor.
13          MR. JOHNSON:  Object to the form.
14    Q    Is that your understanding of how the
15  business is run within the plant?
16          MR. JOHNSON:  Object to the form.
17    A    I've never heard such talks.
18    Q    If there was a factual dispute or
19  disagreement between a subordinate and a
20  supervisor, how do you think that dispute should
21  be resolved?
22          MR. JOHNSON:  Object to the form.
23    A    They should discuss the problem further

Page 34

1  until they come to an agreement.
2    Q    If -- if they cannot agree, what should
3  happen?
4          MR. JOHNSON:  Object to the form.
5    A    Since I am a technician basically, we
6  usually resolved the differences because we can
7  understand technically what's better or worse or
8  which one's correct and incorrect.
9    Q    I understand that from a technical
10  standpoint, but what we have here in this case
11  is we have a Production supervisor alleging that
12  a Stamping Maintenance subordinate was asleep.
13  The Stamping Maintenance subordinate says that
14  he was not asleep.  In that situation, should
15  the word of the Production supervisor be
16  believed simply because he is a Production
17  supervisor?
18          MR. JOHNSON:  Object to the form.
19    A    It is a difficult question, but I don't
20  know how.
21    Q    You indicated that none of the Stamping
22  Maintenance employees ever came to you and
23  complained about Mr. Prater.  Are you aware of

Page 35

1  whether or not any of those Team Members went to
2  Human Resources and complained about Mr. Prater?
3    A    I don't know what it involved -- what
4  was involved, but I've heard once that somebody
5  complained about something in the Human
6  Resources department.
7    Q    Relating to Mr. Prater?
8    A    That part, I don't know whether it was.
9    Q    Are you aware of whether or not any
10  Stamping Maintenance Team Members complained to
11  Human Resources about Mr. Applegate?
12    A    No.
13    Q    Did any of the Stamping Maintenance
14  Team Members come to you and complain about
15  Mr. Applegate?
16    A    No.
17    Q    Do you know John Applegate?
18    A    Yes, I do.
19    Q    What are his responsibilities at HMMA?
20    A    He's a senior manager in the Plant
21  Engineering department.
22    Q    Does he have responsibility for
23  Stamping Maintenance?

Page 36

1    A    That's what I believe.
2    Q    So Mr. Prater would have reported to
3  Mr. Applegate?
4    A    Yes.
5    Q    Do you know whether Mr. Applegate would
6  have any reason to want to get rid of Mr. Dees?
7    A    I don't know that.
8    Q    Do you know Kevin Hughes?
9    A    Yes, I do.
10    Q    And what are his responsibilities at
11  HMMA?
12    A    He is a Team Leader.
13    Q    And what is a Team Leader?
14    A    He's a -- he's a leader of a group of
15  people which is a team.
16    Q    Is that Team Leader below the level of
17  supervisor?
18    A    In HMMA, there are -- they do not use
19  supervisors.  There are Team Leaders.
20    Q    So what was Mr. Prater?
21    A    He was a supervisor and assistant
22  manager.
23    Q    Are you aware of whether or not

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

Page 37

1  Mr. Hughes had any problems with the members of
2  his team?
3       MR. JOHNSON:  Object to the form.
4    A   No, I do not know.
5    Q   Mr. Mun, explain to me exactly what it
6  is that a Coordinator does.
7    A   Main purpose -- main objectives of a
8  Coordinator is to improve productivity and work
9  operations and also to train the workers for
10 that purpose, that is, to improve productivity
11 and improve the processes.
12   Q   So part of your responsibilities would
13 include training or helping to train the Team
14 Members within Stamping Maintenance; is that
15 correct?
16   A   Formal training was a responsibility of
17 the Production side, but as a technician
18 Coordinator, I helped people around me in
19 performing the work.
20   Q   Would that include the Team Members in
21 Stamping Maintenance?
22   A   Yes.
23   Q   So in the performance of your duties at

Page 38

1  HMMA, you had the opportunity on a daily basis
2  to work with the Team Members in Stamping
3  Maintenance?
4       MR. JOHNSON:  Object to the form.
5    A   It's not that I worked daily with the
6  people in the Maintenance, but when there was
7  any problems, then I would come in to help them.
8    Q   And if there were no problems in
9  Stamping Maintenance, what would you be doing?
10   A   There's almost no day without any
11 problems.
12   Q   Okay.  Well, that leads me back to my
13 earlier question which was, so, then, on a daily
14 basis, you interacted with the people in
15 Stamping Maintenance?
16       MR. JOHNSON:  Object to the form.
17   A   Yeah, I could meet any one of those
18 people in Stamping Maintenance and work to solve
19 the problem.
20   Q   Whoever was working on that day?
21   A   Yes, that's true.
22   Q   And so would you have had an
23 opportunity to observe the interactions of the

Page 39

1  Stamping Maintenance Team Members with one
2  another and with their Team Leader and with
3  their supervisor?
4    A   Yes, of course.
5    Q   I'm sorry, Mr. Mun.  I don't remember
6  the answer to this question, but I believe I've
7  already asked you.  Did you observe any problems
8  that Mr. Hughes might have had with his Team
9  Members?
10       MR. JOHNSON:  Object to the form.
11   A   There were no problems.
12   Q   Do you know Wendy Warner?
13   A   No, I don't know.
14   Q   Do you know Rob Clevenger?
15   A   Vaguely.  Vaguely.
16   Q   Do you know Mr. Dees' former coworkers,
17 former Team Members?
18   A   Yes, I do.
19   Q   Do you have any opinion of those Team
20 Members as to whether or not they're good people
21 or bad people?
22       MR. JOHNSON:  Object to the form.
23   A   As I said earlier, I believe most

Page 40

1  people are good.
2    Q   Okay.  Did you come to believe that any
3  of those Team Members were bad?
4       MR. JOHNSON:  Object to the form.
5    A   No.
6    Q   Did any of those Team Members ever give
7  you any reason to believe that they were not
8  honest?
9       MR. JOHNSON:  Object to the form.
10   A   No.
11   Q   Did any of those Team Members ever give
12 you a reason to believe that they were not
13 truthful?
14       MR. JOHNSON:  Object to the form.
15   A   No, there was no such thing.
16   Q   Do you have any knowledge of any other
17 HMMA Team Member being caught sleeping on the
18 job?
19   A   No, I don't.
20   Q   Do you know a Team Member by the name
21 of Orlando King?
22   A   No.
23   Q   Are you familiar with how Mr. Prater

10 (Pages 37 to 40)

Page 41

1  assigned the duties to the Team Members within
2  Stamping Maintenance?
3      MR. JOHNSON:  Object to the form.
4      A   I don't -- I don't understand the
5  question.
6      Q   Each day when a -- when the shift
7  changed a group of Team Members in Stamping
8  Maintenance would come into work.  Those Team
9  Members had to accomplish all the activities
10 that were on the schedule that evening in
11 Stamping Maintenance.  And my question is, do
12 you know how Mr. Prater assigned those various
13 activities to the Team Members.
14     MR. JOHNSON:  Object to the form.
15     A   I don't understand how he did it.
16     Q   Do you recall whether or not Mr. Prater
17 would assign a Team Member to a specific area
18 within Stamping Maintenance and then have that
19 individual or that Team Member remain in that
20 area during their shift?
21     MR. JOHNSON:  Object to the form.
22     A   I don't have such information.
23     Q   Do you only work day shift or during

Page 42

1  the daytime?
2      A   Yeah, I do.
3      Q   So if a Team Member was working the
4  night shift, you would not be there to see that
5  Team Member?
6      A   I usually stay in the plant until about
7  eight p.m., so I get a chance to see some of
8  those people in the evening.
9      Q   At the beginning of the shift?
10     A   Yes.
11     Q   Do you recall what area of Stamping
12 Maintenance you would normally see Mr. Dees?
13     A   He was on the -- on the SOP side.
14     Q   And that's where you normally saw him?
15     A   I didn't visit the SOP very often, so I
16 didn't see him on the floor, but on the floor,
17 occasionally I ran into him.
18     MR. SPORT:  It's coming up on 12:30.
19 Let's take a little break.  And in the meantime,
20 I'm going to get my -- the proper next exhibit
21 number and I ought to be able to wrap it up an
22 hour and a half or so after lunch.
23     MR. JOHNSON:  You think an hour and a

Page 43

1  half?
2      MR. SPORT:  Something like that.
3      MR. JOHNSON:  Are y'all okay with
4  that?  Are you okay with that?  Did you
5  understand?
6      THE WITNESS:  Yeah, it's okay.
7      MR. SPORT:  We're not taking an hour
8  and a half lunch break.  I mean, I'll be
9  finished in an hour and a half after we take a
10 short lunch break.  I'm diabetic and I need to
11 get a little something.
12     THE VIDEOGRAPHER:  Off the Record.
13
14     (Whereupon, a lunch recess was had in
15 the proceeding.)
16
17     THE VIDEOGRAPHER:  Back on the Record.
18 Tape 3.
19
20 BY MR. SPORT:
21     Q   Mr. Mun, during the break, did you have
22 discussions with anyone?
23     A   No.

Page 44

1      Q   You didn't talk to anyone?
2      A   I talked with the interpreter on
3  personal things.
4
5      (Whereupon, Plaintiff's Exhibit
6  Number 27 was marked for identification
7  and copy of same is attached hereto.)
8
9      Q   Mr. Mun, I'm going to show you what
10 I've marked as Plaintiff's Exhibit 27.  These
11 are two organizational charts that I got from
12 your lawyers.  I want you to --
13     MR. SPORT:  They're stamped with my
14 work copy, but that's the only one I've got.
15 Does that look like what you gave me?
16     MR. JOHNSON:  Looks like it.
17     Q   I'm going to show that to you, Mr. Mun,
18 and ask you have you ever seen that before.
19     A   I don't recall exactly whether I saw
20 that before, but looks like I may have seen it.
21     Q   Or some version of it?
22     A   Yes.
23     Q   The first page appears to show an

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

Page 45

1  organizational chart for the Maintenance group;
2  is that correct?
3      A    Yes.
4      Q    And the -- the columns that go across
5  the page from left to right appear to be the
6  various departments within Maintenance.  And I
7  believe the first column on the left is Stamping
8  Maintenance; is that correct?
9      A    That's true.
10     Q    And is that your name at the very top
11 of that column?
12     A    Yes, it is correct.
13     Q    So that organizational chart that has
14 been given to me by your lawyers shows you as
15 being the senior manager of Stamping, not a
16 Coordinator.  Can you explain that to me?
17     A    This -- this organizational chart
18 indicate that -- the functions of the various
19 department.  But I do not have any managerial
20 responsibility, and I am -- I'm working as a
21 Coordinator, a technical Coordinator for the
22 department, not as a manager and I'm not a part
23 of management organization.

Page 46

1      Q    Okay.  And I understood your testimony
2  earlier, and that's why I'm asking you this
3  question.  There appear to be several
4  Coordinators on the chart right here, and
5  there's also two Coordinators on the chart up
6  above in between Mr. Applegate and Mr. -- I
7  think that's Mr. Kim.  So if -- if you are a
8  Coordinator, why is your name not listed over
9  here with the Coordinators?
10     A    This is the first time I see this
11 particular chart, and I don't know who made this
12 chart, for what purpose.
13     Q    Okay.  If you'll notice the date up at
14 the top it appears to be February of 2007.
15 Would you agree with that?
16     A    It looks like it was prepared on that
17 date.
18     Q    So sometime about the same month that
19 Mr. Dees was terminated and during the relevant
20 time that I've been asking these questions about
21 this chart was prepared.  Is that -- is that the
22 way it appears?
23     A    Looks like it was about the same time.

Page 47

1      Q    Would there be any purpose for
2  preparing an organizational chart other than to
3  show the structure of the organization?
4          MR. JOHNSON:  Object to the form.
5      A    There is definitely a substantial
6  difference -- or I should substantive difference
7  between my actual function and what the chart
8  indicates.  I am working as Coordinator, not a
9  manager.
10     Q    Is the chart incorrect?
11         MR. JOHNSON:  Object to the form.
12     A    I am wondering whether this chart was
13 prepared to show the managerial organizations or
14 something else.  I understood this to be a chart
15 to show technical organizations, but...
16     Q    Okay.  I understand your comment.  But
17 you have testified that you are a Coordinator;
18 is that correct?
19     A    Yes, I did.
20     Q    And this chart shows Coordinators such
21 as yourself or such as the position that you say
22 that -- that you hold and yet you are not shown
23 as one of those Coordinators.  So my question

Page 48

1  is, is the chart incorrect.
2      A    It appears that there are two
3  Coordinators on these vertical lines.  But one
4  of them is remaining on this chart but the other
5  one has been taken off from that to be shown
6  here.  And it appears that this was drawn up to
7  show the technical functions.
8      Q    Okay.  So is it your testimony that one
9  of the Coordinators over here is also a
10 Coordinator for Stamping Maintenance?
11     A    There -- there is only one Coordinator
12 in Stamping, but the second Coordinator in
13 Stamping section joined us in October, last
14 October.  Other than that, these are all
15 shown -- these Coordinators are all shown here
16 as a second Coordinator in that department --
17 rather, sections.
18     Q    I don't understand that.  You're going
19 to have to explain that to me because I don't
20 see a second Coordinator.
21     A    He's not listed on this chart.
22         THE INTERPRETER:  You remember, if I
23 may, this was -- this chart was prepared in

12 (Pages 45 to 48)

GWANG MUN

Page 49

1  February of last year and this man joined in
2  October.
3      Q   In October?  Three months ago?
4      A   Yes.
5      Q   So that has nothing to do, then, with
6  this chart or my question.  You are shown on
7  this chart as senior manager of Stamping, but
8  you are not, according to you, senior manager of
9  Stamping.
10      A   When I was with HMC in Korea, my job
11  title was senior manager, and since I came here
12  since there was a mismatch with the actual
13  function and the title, they changed it.
14      Q   They changed what to what?
15      A   To Coordinator.  Senior Coordinator.
16  And this chart doesn't reflect that.
17      Q   So this chart is wrong?
18      A   (In English) Not wrong.  That time --
19          (By the interpreter)  In that time
20  it must have been correct, but it's not what I
21  do now.
22      Q   Okay.  Earlier today I asked you
23  questions about what your responsibilities

Page 50

1  were.  And we talked specifically about the
2  seven or so months between the time you arrived
3  at HMMA at the end of July of 2006 and when
4  Mr. Dees was terminated on February 26th or so
5  of 2007.  And you testified that you became
6  Stamping full-time Coordinator in January of
7  2007 and prior to that you were -- you worked in
8  both Stamping and in --
9          THE INTERPRETER:  Welding.
10      Q   -- Body Weld.  80 percent Body Weld, 20
11  percent Stamping.  Is that a fair summary of
12  what your testimony was?
13          MR. JOHNSON:  Object to the form.
14      A   Yes, it was.
15      Q   Okay.  And between February of 2007 and
16  today, you have remained the Coordinator for
17  Stamping; is that correct?
18      A   Yeah.  Yes, I am.
19      Q   Okay.  So except for the change in
20  January of 2007 from working 80 percent of the
21  time with Body Weld and 20 percent of the time
22  with Stamping, you have performed essentially
23  the same duties since you started with HMMA?

Page 51

1          MR. JOHNSON:  Object to the form.
2      A   That's true.
3      Q   So it's your testimony that at no time
4  during your tenure at HMMA have you been senior
5  manager of Stamping?
6          MR. JOHNSON:  Object to the form.
7      A   Could you explain that, or could you
8  ask me the question again?
9      Q   Yes.  I'm trying to understand his
10  testimony.  And as I understand his testimony,
11  he has -- he has testified that at no time
12  during the time he has been at HMMA has he been
13  senior manager of Stamping Maintenance.
14          MR. JOHNSON:  Object to the form.
15      A   I have never worked as a manager since
16  I arrived in the United States.
17      Q   So at all times since you have been at
18  HMMA, you have been either a Coordinator or a
19  Senior Coordinator or something like that?
20          MR. JOHNSON:  Object to the form.
21      A   That's correct.  Correct.
22      Q   Okay.  If I asked you this question
23  earlier, please forgive me.  But are you aware

Page 52

1  of any other employees caught sleeping on the
2  job besides Mr. Dees?
3          MR. JOHNSON:  Object to the form.
4      A   I do not have any such information.
5      Q   How did you learn that Mr. Dees had
6  been fired?
7      A   I heard it from Mr. Dees when he called
8  me.
9      Q   And do you recall when it was that he
10  called you?
11      A   I don't remember the exact date, but it
12  was in February of 2007.
13      Q   Was it the exact day he was fired?
14      A   It was the same day.
15      Q   What did Mr. Dees tell you when he
16  called you?
17      A   I heard that he said he was fired, but
18  there was some other things said but I do not
19  recall what they were.
20      Q   Did he tell you why he was fired?
21      A   I don't recall exactly what he said,
22  but I -- I found out or I learned when his wife
23  called me.

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

GWANG MUN

Page 53

1    Q    Did she make a separate phone call to
2  you, or did she talk to you on the same phone
3  call?
4    A    The telephone was turned over to her.
5    Q    Okay.  What did Mrs. Dees tell you?
6    A    I remember there were two things.
7  First item was that he did not sleep on his job
8  but he was accused of having done that.  He was
9  fired but without due evaluation of the event.
10    Q    And what do you mean by due evaluation
11  of the event?
12        MR. JOHNSON:  Object to the form.
13    A    The -- the due course was not my words;
14  it was Mrs. Dees'.  And her point was that if
15  one is to be fired, there must be a due process
16  of evaluating the fact of the matter before they
17  actually firing someone.
18    Q    And is that evaluation process your
19  understanding of how HMMA normally conducts its
20  inquiry into events like this?
21        MR. JOHNSON:  Object to the form.
22    A    From my experience from Korea if
23  someone is accused of wrongdoing, there usually

Page 54

1  was some procedure to confirm whether such
2  findings were correct or incorrect.
3    Q    Did that procedure include an
4  investigation of the circumstances of what
5  happened and interviews with potential
6  witnesses?
7        MR. JOHNSON:  Object to the form.
8    A    Exactly what's included in such
9  procedure, I do not know, but there should have
10  been some sort of investigation or procedures
11  before one is fired.
12    Q    So you said that Mrs. Dees told you two
13  things, that Mr. Dees was not asleep but he was
14  accused of sleeping and he was fired without due
15  evaluation of the event.  Is there anything else
16  that Mrs. Dees told you?
17    A    I am guessing that there were other
18  things that we talked about, but I do not
19  remember exactly what they were.
20    Q    Okay.  Well, your lawyer will tell you
21  not to guess, and I don't want you to guess
22  either.
23    A    I don't recall.

Page 55

1    Q    After she told you these things, what
2  did you say to her?
3    A    Since she said that Mr. Dees did not
4  fall sleep on his job, I told her that I would
5  try to find out what actually happened.
6    Q    So it was Mrs. Dees that -- that -- oh,
7  no, you volunteered to -- to check into it?
8    A    I don't remember whether I volunteered
9  or she asked me.
10    Q    Okay.  Prior to Mr. Dees being fired,
11  was Mr. Dees a good Team Member?
12        MR. JOHNSON:  Object to the form.
13    A    I -- I like almost everybody anyway.
14    Q    But did Mr. Dees do his job in your
15  opinion?
16        MR. JOHNSON:  Object to the form.
17    A    I did not have a thorough understanding
18  of all the coworkers at the time.
19    Q    Okay.  I'm not asking about all of the
20  coworkers; I'm asking about Mr. Dees
21  specifically.
22    A    Because -- because he was one of the
23  employees there, I didn't have any particular

Page 56

1  understanding.
2    Q    So when -- when Mr. Dees called you and
3  you subsequently had the conversation with
4  Mrs. Dees, did it seem odd that they would call
5  you?
6    A    I didn't have any strong feelings one
7  way or another, but I was just wondering how he
8  got hold of my telephone number at the time.
9    Q    Do you know how he got your number?
10    A    I -- I might have -- I might have given
11  him my own telephone numbers, but I do not
12  recall exactly whether I did or did not.
13    Q    Is it your testimony that your
14  relationship with Mr. Dees was no different than
15  your relationship with any other Team Member in
16  Stamping Maintenance?
17        MR. JOHNSON:  Object to the form.
18    A    They were the same.
19    Q    Did you discuss with all Team Members
20  the possibility of going fishing at their house?
21    A    I have expressed my desire to go
22  hunting or something else to other members of
23  the team.

14 (Pages 53 to 56)

Page 57

1    Q   Did you think it was unusual for
2  Mr. and Mrs. Dees to call you and tell you what
3  had happened?
4        MR. JOHNSON:  Object to the form.
5    A   A little.
6    Q   Why did you agree to check into the
7  matter?
8    A   I thought I should help clear up the
9  situation if someone is accused of doing
10 something they claim they didn't, whether it was
11 Mr. Dees or someone else.
12   Q   Isn't it true, Mr. Mun, that Mr. Dees
13 was a very good worker and that this accusation
14 that led to his firing was totally out of
15 character for Mr. Dees?
16       MR. JOHNSON:  Object to the form.
17   A   My feeling was not that strong.
18   Q   Was it a feeling along those lines but
19 may be not quite as strong as I expressed it?
20       MR. JOHNSON:  Object to the form.
21   A   I do not understand the point of your
22 question.
23   Q   Well, I'm just trying to -- to

Page 58

1  ascertain why it was that you agreed to help
2  these people if you had absolutely no
3  relationship with them beyond knowing who
4  Mr. Dees was at work.
5    A   I feel I should try to help anybody who
6  is falsely accused of wrongdoing.
7    Q   Did you think he was falsely accused at
8  that point?
9        MR. JOHNSON:  Object to the form.
10   A   Aside from the fact I was just told by
11 Mr. and Mrs. Dees that he was accused of
12 sleeping.
13   Q   Falsely?
14   A   Falsely.
15   Q   Did you actually check into why
16 Mr. Dees had been fired?
17   A   Yes.
18   Q   Who did you make inquiries to?
19   A   I was told that a man by the name of
20 Jim filled out the report, and I did talk to
21 Jim.
22   Q   So you talked to Mr. Brookshire?
23       MR. JOHNSON:  Object to the form.

Page 59

1    A   Probably.
2    Q   And what did Mr. -- well, scratch
3  that.
4        Who told you that Mr. Brookshire had
5  filled out the report?
6    A   Greg Prater.
7    Q   So the first person you talked to was
8  Mr. Prater, and he told you that Mr. Brookshire
9  had filled out the report?
10       MR. JOHNSON:  Object to the form.
11   A   I did ask Mr. Prater what happened, and
12 Jim Brookshire -- and he said Jim Brookshire
13 filled out the report.
14   Q   And when you talked to Mr. Brookshire,
15 what did he tell you?
16   A   He explained what it looked like from
17 the third floor, and I read his report.
18   Q   Do you recall anything about what he
19 told you it looked like?
20   A   Yes, I do remember what he told me.
21   Q   And what was that?
22   A   I went to the place with him.
23   Q   The place where he allegedly saw

Page 60

1  Mr. Dees asleep?
2    A   Yes.
3    Q   And what happened when you went to the
4  place?
5    A   He was sitting in his chair and was
6  sleeping.
7    Q   That's what Mr. Brookshire told you?
8    A   Yes.
9    Q   So when you went up to the third floor
10 mezzanine near the PLC controller, what did you
11 see?
12   A   There was a chair on the side.
13   Q   On the side of what?
14   A   Beside the control panel.
15
16       (Whereupon, Plaintiff's Exhibit
17 Number 28 was marked for identification
18 and copy of same is attached hereto.)
19
20   Q   I'm going to show you what I've marked
21 as Plaintiff's Exhibit Number 28.  Is that what
22 you saw?
23   A   I'm not sure, but when I was there,

15 (Pages 57 to 60)

Page 61

1  this chair was sitting on the left side.
2
3      (Whereupon, Plaintiff's Exhibit
4  Number 29 was marked for identification
5  and copy of same is attached hereto.)
6
7      Q   Okay.  Let me show you what I've marked
8  as Exhibit 29.  Is that closer to what you saw
9  but the chair is on the wrong side?
10     A   I remember the chair was on the left
11  side.
12     Q   So -- and the positioning of the doors,
13  were the doors closed?
14     A   I believe it was closed.
15     Q   And this visit that you made with
16  Mr. Brookshire up to the third floor mezzanine
17  would have been the day after Mr. Dees was
18  fired?
19     A   It was the next day.
20     Q   Did you call Mrs. Dees back?
21     A   Yes, I did.
22     Q   And when was that?
23     A   I don't remember exactly what day.  I

Page 62

1  remember calling her from my house.
2      Q   Would that have been the next night
3  from the original phone call?
4      A   It was right after I met Jim
5  Brookshire, so it's likely that there was --
6  there was a day.
7      Q   What did you -- well, before I get to
8  that, did Mr. Brookshire say anything else about
9  him finding Mr. Dees asleep?
10     A   He didn't talk about anything else.
11     Q   Did he -- did he describe to you what
12  he saw in any more specific terms than just
13  seeing Mr. Dees asleep?
14     A   I don't recall exactly what took place
15  between Mr. Brookshire and myself, but I recall
16  that Mr. Brookshire mentioned that until I got
17  quite close to Mr. Dees he did not -- he was not
18  aware of my approaching.
19     Q   That's what Mr. Brookshire said?
20     A   Yes.
21     Q   Is that all that you remember about
22  your conversation with Mr. Brookshire?
23     A   That's it.  That's about all.

Page 63

1      Q   Did you -- other than Mr. Prater and
2  Mr. Brookshire, did you discuss this situation
3  with anyone else as you made your inquiry?
4          THE INTERPRETER:  Mr. Prater?
5          MR. SPORT:  Prater and Brookshire.
6      A   I have heard that -- other members of
7  the team talk about Mr. Dees being fired.
8      Q   Well, my question was a little more
9  specific than that.  My question related to
10  during the time when you were making your
11  inquiry, because you agreed or you told
12  Mrs. Dees that you would check into it, and the
13  time that you called her back and told her what
14  you had learned, did you discuss your inquiry
15  with anyone other than Mr. Prater and
16  Mr. Brookshire?
17     A   Other members of the team indicated
18  that they have heard about that, so I told them
19  that I was looking into it, also.
20     Q   Did any of the other Team Members
21  express to you whether or not they thought that
22  Mr. Dees had been fired improperly?
23     A   My interest at that time was since I

Page 64

1  was told that he did not -- Mr. Dees did not
2  sleep, but I wanted to find out whether that was
3  a fact or not.  But I wasn't interested in
4  whether he was duly fired or unduly fired.
5      Q   Fair -- fair statement.  Did any one of
6  the other Team Members tell you that Mr. Dees
7  was not asleep?
8      A   I don't recall exactly what was said
9  about that.
10     Q   Did any of them tell you that he was
11  asleep?
12     A   No.
13     Q   Other than Mr. Prater, Mr. Brookshire,
14  and some of the Team Members -- do you recall
15  who the Team Members were?
16     A   No, I do not recall.
17     Q   Before you called Mrs. Dees back that
18  night, did you discuss your inquiry with anyone
19  else?
20     A   No.
21     Q   When you called Mrs. Dees back, what
22  did you tell her?
23     A   I told her that Jim Brookshire saw --

16 (Pages 61 to 64)

Page 65

1  Jim Brookshire stated that he saw Mr. Dees
2  sleeping on the job.
3      Q   Is that all?
4      A   I -- I don't remember anything else.
5      Q   Is it your testimony that you did not
6  tell Mrs. Dees that Mr. Prater was lying about
7  Mr. Dees being asleep?
8      A   I don't recall saying anything like
9  that because I knew that Mr. Prater was not the
10  one who made out the report.
11      Q   Is there anything else that you told
12  Mrs. Dees during that conversation?
13      A   I don't recall anything else
14  specifically.
15      Q   Did you tell Mrs. Dees whether or not
16  anything could be done about Mr. Dees being
17  terminated?
18      A   No, I did not have such discussions.
19      Q   Did you tell Mrs. Dees that there was
20  nothing you could do about the situation?
21      A   I told her that I couldn't do much
22  because I am simply a Coordinator.
23      Q   Did you do any investigation into the

Page 66

1  process that was gone through by whoever it was
2  that ultimately fired Mr. Dees?
3      A   I remember asking someone what kind of
4  process they went through before firing
5  Mr. Dees.  Someone -- someone told me at the
6  time that Mr. Dees was supposed to appear at an
7  investigative hearing, but either he didn't come
8  to the meeting or he went away from the meeting.
9      Q   Well, I --
10      THE VIDEOGRAPHER:  Excuse me.  I need
11  to change tapes.
12      MR. SPORT:  Okay.
13      THE VIDEOGRAPHER:  Off the Record.
14      Back on the Record.  Tape 4.
15
16  BY MR. SPORT:
17      Q   Mr. Mun, I understand that Hyundai
18  has -- has tried to make a big deal about --
19  about this -- about the fact that Mr. Dees
20  didn't show up for his hearing, but that would
21  have occurred after the one-day period that you
22  had to make this initial inquiry on behalf of
23  Mrs. Dees.  My question is, did you do any

Page 67

1  investigation into the process that was gone
2  through to ensure that HMMA was following its
3  own policies and, as you stated, the normal
4  practice of making sure that someone got an
5  evaluation prior to being terminated.
6      MR. JOHNSON:  Object to the form.
7      Q   Did you follow up on that?
8      THE INTERPRETER:  It's too long.
9      MR. SPORT:  Too long.
10      THE INTERPRETER:  I can't -- yeah.
11  Could you cut it short a few pieces?
12      MR. SPORT:  Sure.
13      Q   You said to me a moment ago that
14  someone had told you that Mr. Dees did not show
15  up for his hearing.
16      A   Whether he didn't come or whether he
17  left the meeting, yeah, I don't remember.
18      Q   Okay.  But that would have occurred
19  after your return phone call to Mrs. Dees?
20      MR. JOHNSON:  Object to the form.
21      A   That must have taken place before he
22  was fired.
23      Q   Well, the documents will show whatever

Page 68

1  they show.  But my question is this.  Mrs. Dees
2  told you two things.  One was that Mr. Dees was
3  not asleep but he had been accused of being
4  asleep and that's why he was fired.  And you've
5  told me what you did to check into that.  The
6  second thing that you told me was that he was
7  fired without a due evaluation of the event.
8  And I'm asking what did you do to check into
9  whether or not that was true.
10      MR. JOHNSON:  Object to the form.
11      A   I simply asked someone about that.
12      Q   And who did you ask?
13      A   Greg Prater.
14      Q   And what did Mr. Prater say?
15      A   As I told you a few minutes ago, either
16  Mr. Dees did not come to the meeting or he left
17  the meeting.  And I heard that there was a
18  hearing about that.
19      Q   And that's what Mr. Prater told you?
20      A   Yes.  That's correct.
21      Q   So when you called Mrs. Dees, did you
22  tell her anything about the fact that there had
23  been an investigation and it had been determined

17 (Pages 65 to 68)

GWANG MUN

Page 69

1    that Mr. Dees, in fact, was asleep?
2         MR. JOHNSON:  Object to the form.
3    A    I remember I said something like that.
4    Q    So when you called Mrs. Dees back as
5    you said you would, you were doing what you
6    promised to do; is that correct?
7         MR. JOHNSON:  Object to the form.
8    A    I told her the day before that I would
9    look into the matter, and I was trying to give
10   her what I found out.
11   Q    And you did that?
12   A    Yes.
13   Q    So you were an honorable man; you were
14   a good man?
15        MR. JOHNSON:  Object to the form.
16   A    Thank you for regarding me as a good
17   man.
18   Q    Mr. Mun, is it not true that when you
19   called Mrs. Dees you told her that Mr. Prater
20   was lying but there was nothing you could do
21   about it, that you had been told to stay out of
22   it?
23        MR. JOHNSON:  Object to the form.

Page 70

1    A    I don't -- I don't recall saying that
2    Mr. Prater was lying, but I simply told her that
3    I'm not a member of the management team and it's
4    not anything that I could get involved.
5    Q    So is it your testimony that you did
6    not tell her that you had been warned to stay
7    out of it?
8         MR. JOHNSON:  Object to the form.
9    A    I came here as a Coordinator and I know
10   my responsibilities, and I know I should not get
11   involved with anything else.
12   Q    Mr. Mun, has anybody at Hyundai
13   threatened you with firing you and sending you
14   back to Korea if you didn't show up here today
15   and testify right?
16   A    I came here in response to a court
17   request, I understand.
18   Q    That's correct.  But that's not my
19   question.  My question is, did anyone at Hyundai
20   tell you that you would be sent back to Korea if
21   you didn't stay out of this situation.
22   A    No, there was no such things.  But
23   initially when I was going through orientation,

Page 71

1    we were told to stay within the -- his own
2    responsibilities.
3    Q    Or what?
4    A    As a Coordinator stay within my
5    responsibilities.  Implying that I should not
6    get involved with anything else.
7    Q    And when this situation came up with
8    Mr. Dees being fired, did anyone at Hyundai
9    remind you of that?
10   A    No, there wasn't anyone.
11   Q    And did anyone remind you of that
12   before this deposition?
13   A    No.
14        MR. SPORT:  That's all I've got.  Thank
15   you.
16        MR. JOHNSON:  If we can take a quick
17   break, and we'll be right back.  And I should
18   not be long.
19        MR. SPORT:  Okay.
20        THE VIDEOGRAPHER:  Off the Record.
21
22        (Whereupon, a brief recess was had in
23   the proceeding.)

Page 72

1
2            EXAMINATION
3    BY MR. JOHNSON:
4    Q    Mr. Mun, I'm Matt Johnson, and I'm an
5    attorney with Ogletree, Deakins.  And I want to
6    talk to you a little bit further.  I have a few
7    more questions.  A couple of my questions have
8    to do with some translation issues that I just
9    want to make sure are accurate.
10        First, Mr. Sport has asked questions
11   about what you did to prepare for the
12   deposition, and you mentioned that you had
13   watched a videotape.
14   A    Yes.
15   Q    And did you watch that videotape last
16   Friday?
17   A    Yes.
18   Q    Okay.  And I believe Mr. Sport asked
19   some questions about who was there, and I just
20   wanted to clear up, make sure the translation is
21   complete.
22   A    Yes.
23   Q    Just to make sure we have an accurate

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

GWANG MUN

Page 73

1   list of who was present last Friday, tell us
2   exactly who was there.
3       A   I and the interpreter, Mr. Chu, and
4   Mr. Smith. I not remember his name. There was
5   another person. I can't remember their names
6   exactly.
7       Q   Okay. If I said the name Trent
8   Scofield would that sound familiar?
9       A   Yes. That's correct.
10      Q   And you mentioned yesterday you
11  reviewed the written transcript of Mr. Dees'
12  deposition?
13      A   Yes, I did.
14      Q   And to make sure we have an accurate
15  accounting of who was there, tell us who was
16  there yesterday.
17      A   The four of us who are here today.
18      Q   And that would be Mr. Smith?
19      A   Mr. Smith, Mr. Chu, Matt Johnson.
20      THE WITNESS:  I'm sorry.
21      A   And myself.
22      Q   Okay. You had spoken to Mr. Sport
23  about contracts, and we used the English word

Page 74

1   contracts. And I want to talk to you a little
2   bit about how that word translates into Korean.
3       A   It's not really a contract, but we
4   generally call that a period of stay.
5       Q   So the question I was going to ask is,
6   in English as we use the word contract, it
7   often -- people think of something in writing
8   that you signed. In this case, did he actually
9   sign a written contract like that?
10      A   No, there was no such contract.
11      Q   Okay. And Mr. Sport asked questions
12  about your pay or your salary. Are you paid on
13  a monthly basis?
14      A   Once a month.
15      Q   And do you have any information on how
16  often other employees of HMMA -- such as when
17  Mr. Dees was employed -- how often they would be
18  paid?
19      A   They receive pay every two weeks.
20      Q   There was some discussion about Mr. Mun
21  and Mr. Brookshire. And I want to clarify a bit
22  of that. When you were asked what sort of
23  relationship do you have with Mr. Brookshire,

Page 75

1   the translated response was that you had no
2   contact with Mr. Brookshire. And I just want to
3   follow up with that. Is it that he had no
4   contact with him or he had no direct work
5   relationship with him? Or clarify that
6   relationship.
7       A   There was no working relationship with
8   Mr. Brookshire and myself.
9       Q   Okay. Last question. In your first
10  telephone conversation with Mrs. Dees, did she
11  mention the possibility of filing a lawsuit
12  against HMMA?
13      A   Not the first time I talked to her.
14      Q   Did she the second time?
15      A   During the second conversation, I think
16  she mentioned something like that.
17      Q   Okay.
18      MR. JOHNSON:  I believe that's all we
19  have.
20      Chris?
21      MR. SMITH:  (Counsel shakes head.)
22      MR. JOHNSON:  That's all.
23      MR. SPORT:  Just one or two.

Page 76

1          FURTHER EXAMINATION
2   BY MR. SPORT:
3       Q   Mr. Mun, do you recall sometime shortly
4   after Mr. Dees was terminated Mr. Prater's
5   responsibilities being moved from supervisor or
6   assistant manager of the Stamping Maintenance
7   over to working in the storeroom?
8       THE INTERPRETER:  I didn't get that
9   question. Mr. Prater?
10      MR. SPORT:  My question is, after
11  Mr. Dees was terminated, does he recall being
12  transferred from assistant manager or supervisor
13  of Stamping Maintenance over to the storeroom.
14      A   He was not transferred. He continued
15  to work as assistant manager.
16      Q   But rather than supervising the Team
17  Members was he now in the storeroom?
18      A   No. No, he has not been transferred to
19  the store.
20      Q   So at no time were you ever in charge
21  of the Stamping Maintenance Team Members; is
22  that correct?
23      MR. JOHNSON:  Object to the form.

19 (Pages 73 to 76)

GWANG MUN

Page 77

1          THE INTERPRETER:  I didn't catch that
2    tail end.
3          Q    My question is, were you -- so, as I
4    understand it, at no time were you in charge or
5    did you supervise the Stamping Maintenance Team
6    Members; is that correct?
7          A    No, I have never.
8          Q    Mr. Mun, do you have your employee
9    badge?
10         A    Yes.
11         Q    Can we see that?
12         A    (Witness complied.)
13         Q    G.S., those are your initials?
14         A    Yes.
15         MR. SPORT:  Let the Record reflect that
16    I'm just looking at his badge.  I don't think we
17    need a copy of that.
18         Thank you.
19         MR. JOHNSON:  That's all.
20         Thank you.
21
22
23         FURTHER DEPONENT SAITH NOT

Page 78

1          C E R T I F I C A T E
2
3    STATE OF ALABAMA      )
4
5    COUNTY OF AUTAUGA     )
6
7
8          I hereby certify that the above and
9    foregoing deposition was taken down by me in
10   stenotype, and the questions and answers thereto
11   were transcribed by means of computer-aided
12   transcription, and that the foregoing represents
13   a true and accurate transcript of the testimony
14   given by said witness upon said hearing.
15         I further certify that I am neither of
16   counsel, nor kin to the parties to the action,
17   nor am I in anywise interested in the result of
18   said cause.
19
19
20
20
21   -------------------------------
21         STACEY L. JOHNSON, Commissioner
22         Certified Court Reporter,
22         ACCR#: 386 - Expires 09-30-2008
23         Commission Expires 06-22-2011
23

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

**A**

**able** 25:1 42:21
**absolutely** 58:2
**accept** 32:2
**acceptable** 31:17
**accomplish** 41:9
**accounting** 73:15
**ACCR** 78:22
**accurate** 72:9,23 73:14
  78:13
**accusation** 57:13
**accused** 53:8,23 54:14
  57:9 58:6,7,11 68:3
**acquire** 28:10
**acting** 5:3
**action** 28:11,13 78:16
**activities** 20:4 27:17
  41:9,13
**actual** 47:9 49:12
**add** 12:18,19
**administer** 15:15
**administration** 15:21
  16:10
**ages** 6:16
**ago** 49:3 67:13 68:15
**agree** 14:12 34:2 46:15
  57:6
**agreed** 1:18 2:1,8,16
  58:1 63:11
**agreement** 34:1
**Ahn** 14:6
**Alabama** 1:2,9,23 4:5,8
  4:12,14 5:2,3,7 16:15
  17:14,18 18:2 78:3
**allegedly** 59:23
**alleging** 34:11
**AMERICA** 1:10 4:8
**American** 6:18 10:13
  10:20,22 11:11 14:12
  14:16 15:5
**Americans** 10:20
**answer** 7:22 8:1,1,2,3,3
  11:6 24:10 39:6
**answers** 7:22 78:10
**anybody** 58:5 70:12
**anyway** 55:13
**anywise** 78:17
**appear** 45:5 46:3 66:6
**appears** 44:23 46:14,22
  48:2,6
**Applegate** 11:1,3,8
  35:11,15,17 36:3,5
  46:6
**applied** 20:18
**applies** 15:5
**apply** 31:19

**approaching** 62:18
**appropriate** 23:13,23
**appropriately** 24:4
**Approximately** 24:22
**area** 41:17,20 42:11
**arrived** 20:14 21:8,11
  50:2 51:16
**ascertain** 58:1
**Aside** 58:10
**asked** 26:18 30:3,18
  39:7 49:22 51:22
  55:9 68:11 72:10,18
  74:11,22
**asking** 27:7 46:2,20
  55:19,20 66:3 68:8
**asleep** 31:22 32:14
  34:12,14 54:13 60:1
  62:9,13 64:7,11 65:7
  68:3,4 69:1
**assemble** 18:5
**assembly** 18:8,10
**assign** 2:13 41:17
**assigned** 41:1,12
**assistance** 14:20
**assistant** 36:21 76:6,12
  76:15
**associates** 25:19,21
**assume** 31:21
**assuming** 23:7 33:2
**attached** 44:7 60:18
  61:5
**attorney** 8:12 72:5
**August** 21:2,11
**AUTAUGA** 78:5
**aware** 17:1,20 18:1,3
  18:20 19:1,16,18,22
  29:11,14 32:12,16
  34:23 35:9 36:23
  51:23 62:18
**a.m** 5:8

**B**

**back** 26:14 38:12 43:17
  61:20 63:13 64:17,21
  66:14 69:4 70:14,20
  71:17
**bad** 27:3 39:21 40:3
**badge** 77:9,16
**based** 27:8
**basically** 34:5
**basis** 38:1,14 74:13
**began** 30:13
**beginning** 5:8 42:9
**behalf** 66:22
**behaves** 24:3
**behavior** 15:21 28:12

  28:17 31:17 32:3
**behaviors** 27:17
**believe** 18:7 20:16
  21:14,19 22:14,18
  28:23 30:22 36:1
  39:6,23 40:2,7,12
  45:7 61:14 72:18
  75:18
**believed** 33:11 34:16
**belong** 12:2 13:16
  18:12
**belonging** 12:23
**best** 6:8
**better** 8:2 34:7
**beyond** 58:3
**big** 66:18
**bit** 26:20 72:6 74:2,21
**Body** 30:8,14,19 50:10
  50:10,21
**born** 6:15,20
**Boulevard** 4:14
**Box** 4:11
**break** 26:7,19 29:1
  42:19 43:8,10,21
  71:17
**brief** 26:11 71:22
**bring** 28:7
**Brookshire** 29:21,23
  30:21 32:5,9,13,18
  58:22 59:4,8,12,12
  59:14 60:7 61:16
  62:5,8,15,16,19,22
  63:2,5,16 64:13,23
  65:1 74:21,23 75:2,8
**Brookshire's** 31:7 33:3
**Building** 16:11
**business** 14:21 16:13
  33:15

**C**

**C** 4:1 78:1,1
**California** 16:14,23
  17:13,22
**call** 14:14 53:1,3 56:4
  57:2 61:20 62:3
  67:19 74:4
**called** 16:23 52:7,10,16
  52:23 56:2 63:13
  64:17,21 68:21 69:4
  69:19
**calling** 62:1
**card** 7:8
**Carolina** 4:11
**case** 1:4 19:10 21:10,10
  33:8 34:10 74:8
**cases** 31:20

**catch** 77:1
**caught** 32:13 40:17
  52:1
**cause** 5:9 78:18
**CCR** 5:1
**cease** 19:4
**center** 16:14
**certain** 28:10
**Certified** 78:22
**certify** 5:4 78:8,15
**chair** 60:5,12 61:1,9,10
**chance** 9:3,13 21:17
  24:13 42:7
**change** 8:3 12:11 26:4
  50:19 66:11
**changed** 41:7 49:13,14
**character** 25:8,12
  57:15
**charge** 76:20 77:4
**chart** 45:1,13,17 46:4,5
  46:11,12,21 47:2,7
  47:10,12,14,20 48:1
  48:4,21,23 49:6,7,16
  49:17
**charts** 3:9 44:11
**check** 55:7 57:6 58:15
  63:12 68:5,8
**Chris** 75:20
**chrissmith@hmmaus...**
  4:13
**Christopher** 4:13
**Chu** 4:19 7:5 23:12
  73:3,19
**circumstances** 54:4
**citizen** 6:22
**Civil** 5:5
**claim** 6:21 57:10
**clarify** 74:21 75:5
**clear** 57:8 72:20
**Clevenger** 39:14
**close** 62:17
**closed** 61:13,14
**closer** 29:16,19 61:8
**column** 45:7,11
**columns** 45:4
**come** 26:2 29:6 32:4
  34:1 35:14 38:7 40:2
  41:8 66:7 67:16
  68:16
**coming** 13:8 18:2 42:18
**comment** 47:16
**Commission** 78:23
**Commissioner** 1:21
  2:18 5:3 78:21
**commitment** 28:20,21
**Committee** 16:3

**companies** 16:18 17:8
**company** 11:22 12:1,8
  12:21 16:22 32:2
**complain** 26:2 29:7
  35:14
**complained** 29:3 34:23
  35:2,5,10
**complete** 8:2 13:11
  14:10 18:10 27:23
  28:9 72:21
**completed** 19:6 28:1
**compliance** 2:5
**complied** 77:12
**components** 16:13
**computer-aided** 78:11
**conducts** 53:19
**confirm** 13:2 54:1
**contact** 32:11 75:2,4
**continued** 76:14
**contract** 12:20 13:4,10
  14:10 74:3,6,9,10
**contracts** 73:23 74:1
**control** 13:15 60:14
**controller** 60:10
**conversation** 56:3
  62:22 65:12 75:10,15
**conveyed** 23:6
**coordinator** 7:6 9:22
  10:3,5 11:17 13:6
  14:18 20:21 37:6,8
  37:18 45:16,21,21
  46:8 47:8,17 48:10
  48:11,12,16,20 49:15
  49:15 50:6,16 51:18
  51:19 65:22 70:9
  71:4
**Coordinators** 14:15,19
  14:22 16:1,6 19:11
  46:4,5,9 47:20,23
  48:3,9,15
**copy** 44:7,14 60:18
  61:5 77:17
**correct** 12:8 17:2,2
  21:12 29:5 34:8
  37:15 45:2,8,12
  47:18 49:20 50:17
  51:21,21 54:2 68:20
  69:6 70:18 73:9
  76:22 77:6
**corrected** 28:15
**counsel** 1:20 2:10,12
  5:6 75:21 78:16
**counted** 6:16
**counterpart** 10:13
  11:11
**COUNTY** 78:5

GWANG MUN

couple 32:17 72:7
course 39:4 53:13
court 1:1 2:6 70:16
  78:22
coworkers 25:16 39:16
  55:18,20
cultural 23:14
custom 6:17
cut 67:11

**D**

D 9:10
daily 38:1,5,13
date 5:4 46:13,17 52:11
day 1:23 28:1,15 38:10
  38:20 41:6,23 52:13
  52:14 61:17,19,23
  62:6 69:8
days 18:22 19:19
daytime 42:1
Deakins 4:9 72:5
deal 66:18
Deatsville 5:1
December 19:20
decide 33:5
decision 19:7
deep 21:18
Dees 1:6 4:2,17,18 9:6
  9:11,14 10:23 20:22
  21:1,6,14,19 22:1,8
  22:13,17 23:18 24:12
  24:15 26:19 29:6
  30:4 32:13 36:6
  39:16 42:12 46:19
  50:4 52:2,5,7,15 53:5
  53:14 54:12,13,16
  55:3,6,10,11,14,20
  56:2,4,14 57:2,11,12
  57:15 58:4,11,16
  60:1 61:17,20 62:9
  62:13,17 63:7,12,22
  64:1,6,17,21 65:1,6,7
  65:12,15,16,19 66:2
  66:5,6,19,23 67:14
  67:19 68:1,2,16,21
  69:1,4,19 71:8 73:11
  74:17 75:10 76:4,11
Defendants 1:11 4:7
definitely 47:5
delayed 28:11
department 9:23 10:4
  17:18 18:23 19:3
  22:5,7 35:6,21 45:19
  45:22 48:16
departments 45:6
DEPONENT 77:23

deposition 1:20 2:3,4
  2:14,17 7:17 8:7,10
  9:2,17 23:3 71:12
  72:12 73:12 78:9
depositions 2:7
describe 62:11
design 16:14
desire 56:21
desk 31:13,17
detail 15:18
details 20:15,17
determined 68:23
develop 21:18
diabetic 43:10
difference 14:17 47:6,6
differences 23:14,35
different 16:12 56:14
differently 6:16
difficult 21:22 23:16
  24:9 34:19
difficulty 22:21
direct 23:13 75:4
directive 19:13
Director 11:20 13:18
disagreement 33:19
disciplinary 28:13
discuss 33:23 56:19
  63:2,14 64:18
discussed 8:11
discussion 8:14 74:20
discussions 8:22 43:22
  65:18
dishonorable 27:4
dispute 33:9,18,20
DISTRICT 1:1,2
DIVISION 1:3
document 9:13,15,19
documents 9:1 67:23
doing 38:9 57:9 69:5
doors 61:12,13
drawn 48:6
drug 32:20,21
due 53:9,10,13,15
  54:14 68:7
duly 5:15 64:4
duties 37:23 41:1 50:23
D-E-E-S 9:11,12

**E**

E 4:1,1 78:1,1
earlier 30:3 38:13
  39:23 46:2 49:22
  51:23
easily 28:15
effect 2:4
eight 42:7

either 18:21 51:18
  54:22 66:7 68:15
elaborate 10:16
employed 21:7 74:17
employee 11:21,22
  77:8
employees 12:7 34:22
  52:1 55:23 74:16
Engineering 10:1,3,4,5
  35:21
English 5:21 10:1,14
  18:13,16 21:4 23:22
  26:23 49:18 73:23
  74:6
ensure 67:2
equal 11:2
equated 27:2
equipment 18:8
essentially 50:22
evaluating 53:16
evaluation 53:9,10,18
  54:15 67:5 68:7
evening 41:10 42:8
evenly 20:18
event 12:22 53:9,11
  54:15 68:7
events 53:20
everybody 27:9 55:13
everybody's 27:10
evidence 2:15
exact 22:23 52:11,13
exactly 28:22 37:5
  44:19 52:21 54:8,19
  56:12 61:23 62:14
  64:8 73:2,6
examination 3:2 5:9,18
  72:2 76:1
example 27:22
examples 28:5
Excuse 6:1 66:10
exhibit 3:8,10,12 42:20
  44:5,10 60:16,21
  61:3,8
exhibits 3:7 16:12
expect 8:13 31:22
experience 7:19 53:22
Expires 78:22,23
explain 10:15 22:22
  23:20 37:5 45:16
  48:19 51:7
explained 10:19 24:10
  59:16
explains 8:9
express 63:21
expressed 56:21 57:19
expression 23:15 26:23

ex-patriate 12:6

**F**

F 78:1
face 21:23 32:8
fact 33:2,9 53:16 58:10
  64:3 66:19 68:22
  69:1
factual 33:18
failed 32:21
fair 15:19 17:7 50:11
  64:5,5
fall 55:4
falsely 58:6,7,13,14
familiar 15:13 20:7,11
  40:23 73:8
far 29:18
February 46:14 49:1
  50:4,15 52:12
Federal 5:5
feel 58:5
feeling 57:17,18
feelings 56:6
filing 2:17 75:11
filled 58:20 59:5,9,13
find 21:22 22:22 23:13
  23:23 31:22 55:5
  64:2
finding 62:9
findings 54:2
finished 43:9
fired 52:6,13,17,20
  53:9,15 54:11,14
  55:10 58:16 61:18
  63:7,22 64:4,4 66:2
  67:22 68:4,7 71:8
firing 53:17 57:14 66:4
  70:13
first 5:15 7:19 8:8
  15:17 24:13 44:23
  45:7 46:10 53:7 59:7
  72:10 75:9,13
fishing 56:20
five 12:10,14,15,21
  26:8
five-year 13:4,10
flaws 25:11
floor 42:16 59:17 60:9
  61:16
follow 67:7 75:3
following 5:10 67:2
follows 5:17
force 2:4
foregoing 5:6 78:9,12
forgive 51:23
form 2:11 15:7 16:19

17:10,15,19 19:8,21
  20:19 21:16,21 22:15
  22:19 24:5 25:1,3,6,7
  25:13 27:5,14 29:9
  30:16 31:14,18 32:1
  32:4,6,22 33:4,13,16
  33:22 34:4,18 37:3
  38:4,16 39:10,22
  40:4,9,14 41:3,14,21
  47:4,11 50:13 51:1,6
  51:14,20 52:3 53:12
  53:21 54:7 55:12,16
  56:17 57:4,16,20
  58:9,23 59:10 67:6
  67:20 68:10 69:2,7
  69:15,23 70:8 76:23
Formal 37:16
former 39:16,17
found 52:22 69:10
four 73:17
frequently 31:3
Friday 72:16 73:1
friends 31:1
full 2:5 5:22 6:11 30:6
full-time 50:6
function 47:7 49:13
functions 45:18 48:7
further 2:1,8,16 33:23
  72:6 76:1 77:23
  78:15

**G**

general 8:12,12 15:16
generally 28:21 74:4
give 7:21 22:13,17
  25:10 40:6,11 69:9
given 7:17 15:16 45:14
  56:10 78:14
go 45:4 56:21
going 6:21 7:20,21 19:1
  32:19 42:20 44:9,17
  48:18 56:20 60:20
  70:23 74:5
good 5:20,21 8:6 9:18
  27:2,11,13 39:20
  40:1 55:11 57:13
  69:14,16
govern 15:20
Government 4:5
green 7:8
Greenville 4:11
Greg 10:23 24:19 59:6
  68:13
grounds 2:13
group 36:14 41:7 45:1
guess 18:11 21:9 27:6

54:21,21
guessing 18:19 54:17
Gwang 1:20 5:8,14
    6:13
G.S 77:13

**H**

Ha 11:20
half 42:22 43:1,8,9
halted 18:22
Hampton 1:22
Handbook 20:8
happen 12:14 34:3
happened 54:5 55:5
    57:3 59:11 60:3
harassing 29:8
hard 25:4,5
head 75:21
heard 32:15,23 33:17
    35:4 52:7,17 63:6,18
    68:17
hearing 66:7,20 67:15
    68:18 78:14
help 23:1 38:7 57:8
    58:1,5
helped 37:18
helping 37:13
hereto 44:7 60:18 61:5
hierarchy 10:22
HMA 16:23 17:3,13,17
    18:12,17
HMA's 17:21
HMC 12:11,23 13:7,11
    13:15 16:16 18:1
    49:10
HMMA 7:5 9:21 11:21
    11:23 12:2,3,6,10,13
    12:20 13:5,16 15:14
    16:11 17:4 18:7 21:7
    21:11 29:12,14 30:14
    35:19 36:11,18 38:1
    40:17 50:3,23 51:4
    51:12,18 53:19 67:2
    74:16 75:12
HMMA's 20:11
hold 7:10 47:22 56:8
home 29:19
hometown 29:16
honest 21:15 22:14
    24:3 40:8
honorable 21:20 22:18
    22:21 23:17 24:2,6
    26:20 27:1,3 69:13
Hope 1:22 5:7
hour 42:22,23 43:7,9
house 56:20 62:1

Hughes 36:8 37:1 39:8
Hull 1:22 5:7
Human 10:18 35:2,5
    35:11
hunting 56:22
hurt 32:18
Hwae 13:22
Hyundai 1:9,10 4:7,8
    4:12,14 11:22,23
    12:7 16:13 17:8
    66:17 70:12,19 71:8
H-W-A-E 14:4

**I**

identification 44:6
    60:17 61:4
II 13:22
immigration 7:9
impact 33:3
Implying 71:5
improperly 63:22
improve 37:8,10,11
improving 10:7
incident 28:18
include 10:10 37:13,20
    54:3
included 54:8
incorrect 34:8 47:10
    48:1 54:2
increased 29:17
INDEX 3:1
indicate 45:18
indicated 12:5 13:17
    26:22 28:16 30:5,7
    34:21 63:17
indicates 47:8
indication 25:11
individual 41:19
information 27:8 41:22
    52:4 74:15
initial 66:22
initially 70:23
initials 77:13
Inn 1:22
inquiries 58:18
inquiry 53:20 63:3,11
    63:14 64:18 66:22
inside 15:5
integrity 24:2
interacted 38:14
interaction 27:19
interactions 38:23
interest 64:3 78:17
interested 64:3 78:17
interpret 6:4
interpreter 4:20 5:12

6:1,4 7:4 9:4,7,10,12
    10:2,15 11:6,23
    12:18 14:1,4 18:11
    18:14 21:5 22:20
    23:7,14,21 26:22
    44:2 48:22 49:19
    50:9 63:4 67:8,10
    73:3 76:8 77:1
interpreting 22:21
interviews 54:5
investigation 54:4,10
    65:23 67:1 68:23
investigative 66:7
involved 35:3,4 70:4,11
    71:6
in-patriate 7:5,6
issues 72:8
item 53:7
I-L 14:5

**J**

January 1:23 14:9 22:4
    22:6,11 30:6 50:6,20
Jeffrey 4:3
jeff.sport@sportlaw...
    4:4
JERRY 1:6 4:2,17
Jim 29:21 58:20,21
    59:12,12 62:4 64:23
    65:1
job 40:18 49:10 52:2
    53:7 55:4,14 65:2
John 11:1 35:17
Johnson 1:21 3:4 4:10
    5:1 8:14 15:7 16:19
    17:10,15,19 19:8,21
    20:19 21:16,21 22:15
    22:19 23:2 24:5 25:3
    25:7,13 26:6 27:5,14
    29:9 30:16 31:14,18
    32:1,6,22 33:4,13,16
    33:22 34:4,18 37:3
    38:4,16 39:10,22
    40:4,9,14 41:3,14,21
    42:23 43:3 44:16
    47:4,11 50:13 51:1,6
    51:14,20 52:3 53:12
    53:21 54:7 55:12,16
    56:17 57:4,16,20
    58:9,23 59:10 67:6
    67:20 68:10 69:2,7
    69:15,23 70:8 71:16
    72:3,4 73:19 75:18
    75:22 76:23 77:19
    78:21
joined 48:13 49:1

JR 1:6 4:2,17
judge 21:22 25:4,8
July 21:13 50:3
Jun 11:20
jurisdiction 19:2

**K**

K 4:10,20
Katherine 4:18 24:11
Kevin 36:8
KILBORN 4:3
Kim 4:20 8:18 11:20
    13:18,20,21 46:7
kin 78:16
kind 66:3
King 40:21
knew 30:21,22 65:9
know 7:4,22,23 15:3,4
    15:8,12,18,19,23
    16:4,21,22 17:5,12
    17:16,20 18:4,9 20:9
    20:15,20,22 24:11,19
    24:21 25:5 29:18,21
    30:1,20,23 31:2,7,10
    31:19 32:7 34:20
    35:3,8,17 36:5,7,8
    37:4 39:12,13,14,16
    40:20 41:12 46:11
    54:9 56:9 70:9,10
knowing 58:3
knowledge 15:9 25:15
    40:16
known 21:1 29:23 30:4
Korea 6:15,23 7:15
    12:15,22 13:12 16:16
    18:2 23:16 49:10
    53:22 70:14,20
Korean 6:17 10:21
    14:13,14 15:5,10
    22:23 23:11 24:1
    26:21 27:1 74:2
Koreans 12:6 15:22
K-I-M 14:4

**L**

L 1:16,21 5:1 78:21
LA 17:1
language 27:1
Large 5:3
law 15:5,5
laws 2:5
lawsuit 75:11
lawyer 54:20
lawyers 44:12 45:14
leader 36:12,13,14,16
    39:2

Leaders 36:19
leading 2:11
leads 38:12
learn 52:5
learned 52:22 63:14
led 57:14
left 8:18 29:11,14,18
    45:5,7 61:1,10 67:17
    68:16
Leon 1:6 4:2,17 9:5,6
    9:14 20:22
let's 26:8 31:21 42:19
level 11:2,12,15 36:16
line 19:16,22 23:19
lines 48:3 57:18
list 73:1
listed 46:8 48:21
little 12:20 23:1 42:19
    43:11 57:5 63:8 72:6
    74:1
live 28:20
LLC 1:9 4:8,12
long 7:11 21:1 23:5,5
    24:21 29:23 30:3
    67:8,9 71:18
longer 14:6
look 44:15 69:9
looked 59:16,19
looking 63:19 77:16
looks 44:16,20 46:16
    46:23
lunch 42:22 43:8,10,14
lying 65:6 69:20 70:2
L-E-O-N 9:9,10
L1 7:10,10

**M**

main 37:7,7
maintenance 10:11,12
    19:23 20:1,3 30:5
    30:10,15 31:13 34:12
    34:13,22 35:10,13,23
    37:14,21 38:3,6,9,15
    38:18 39:1 41:2,8,11
    41:18 42:12 45:1,6,8
    48:10 51:13 56:16
    76:6,13,21 77:5
making 63:10 67:4
man 21:15,20,23 22:18
    23:17 24:2,7 26:20
    27:1,2,3,3,4,11,13
    49:1 58:19 69:13,14
    69:17
management 10:22
    11:3 14:20 15:1 16:2
    45:23 70:3

GWANG MUN

manager 11:13 14:18
35:20 36:22 45:15,22
47:9 49:7,8,11 51:5
51:13,15 76:6,12,15
managerial 45:19
47:13
managers 14:16
manages 14:21
manufacturing 1:9 4:7
4:12 16:15
marked 44:6,10 60:17
60:20 61:4,7
match 22:23
matching 22:23
Matt 72:4 73:19
matter 20:16 53:16
57:7 69:9
Matthew 4:10
McDONALD 4:3
mean 16:7 23:22 24:1
25:20 43:8 53:10
meaning 23:5 27:3
meant 12:19
medical 32:20
meet 38:17
meeting 66:8,8 67:17
68:16,17
meetings 16:2,5,6,8
member 15:10 20:7
33:10 40:17,20 41:17
41:19 42:3,5 55:11
56:15 70:3
members 15:1,21 20:18
25:22 35:1,10,14
37:1,14,20 38:2 39:1
39:9,17,20 40:3,6,11
41:1,7,9,13 56:19,22
63:6,17,20 64:6,14
64:15 76:17,21 77:6
mention 75:11
mentioned 20:13 62:16
72:12 73:10 75:16
met 62:4
methods 33:5
mezzanine 60:10 61:16
MIDDLE 1:2
military 29:8
minutes 26:9 68:15
Misconduct 20:12
mismatch 49:12
Mobile 4:5
moment 67:13
money 29:19
Montgomery 4:14
month 22:8 46:18

74:14
monthly 74:13
months 7:13 22:2 24:22
24:23 49:3 50:2
morning 5:20,21
Motor 1:9,10 4:7,8,12
11:22,23 12:8
moved 22:6 29:15 76:5
Mun 1:20 5:8,14,20
6:13,14 9:21 11:16
20:22 23:6 26:18
37:5 39:5 43:21 44:9
44:17 57:12 66:17
69:18 70:12 72:4
74:20 76:3 77:8

N

N 1:16 4:1,13
name 5:22 6:11 9:5
13:21,23 40:20 45:10
46:8 58:19 73:4,7
names 73:5
NASH 4:9
Nation 6:22
near 60:10
necessary 2:9
need 8:3 26:4 43:10
66:10 77:17
needs 18:21
neither 78:15
never 16:7 19:3 21:17
32:9 33:17 51:15
77:7
night 42:4 62:2 64:18
normal 67:3
normally 42:12,14
53:19
NORTHERN 1:3
Notary 5:2
notice 2:17 46:13
noticed 16:11
number 3:2 19:5 42:21
44:6 56:8,9 60:17,21
61:4
numbers 56:11

O

O 1:16 4:11
Object 15:7 16:19
17:10,15,19 19:8,21
20:19 21:16,21 22:15
22:19 24:5 25:3,7,13
27:5,14 29:9 30:16
31:14,18 32:1,6,22
33:4,13,16,22 34:4
34:18 37:3 38:4,16

39:10,22 40:4,9,14
41:3,14,21 47:4,11
50:13 51:1,6,14,20
52:3 53:12,21 54:7
55:12,16 56:17 57:4
57:16,20 58:9,23
59:10 67:6,20 68:10
69:2,7,15,23 70:8
76:23
objections 2:10,13
objectives 37:7
obligations 29:8
observe 27:16 38:23
39:7
occasion 27:23
occasionally 18:20
42:17
occurred 33:2 66:21
67:18
October 48:13,14 49:2
49:3
odd 56:4
offered 2:15
office 31:13 32:20
offices 17:21
Ogletree 4:9 72:5
oh 55:6
okay 6:9 7:7 9:18 12:12
12:17 13:1 14:3
17:12 18:9 23:7 24:8
27:6,7 30:20 38:12
40:2 43:3,4,6 46:1,13
47:16 48:8 49:22
50:15,19 51:22 53:5
54:20 55:10,19 61:7
66:12 67:18 71:19
72:18 73:7,22 74:11
75:9,17
old 4:5 6:14,18
once 18:10 28:23 35:4
74:14
one's 34:8
one-day 66:21
operate 17:8
operation 11:14 15:15
operations 19:4 37:9
operator 25:18
opinion 18:17 25:2,6
32:4 33:1,6 39:19
55:15
opportunity 38:1,23
oral 5:9
organization 11:18
12:10 45:23 47:3
organizational 3:9
44:11 45:1,13,17

47:2
organizations 47:13,15
orientation 20:13
70:23
original 62:3
Orlando 40:21
ought 42:21
outside 19:2
oversight 14:23
overview 15:16
owns 18:4,7,9

P

P 1:16 4:1,1,11
page 3:2 44:23 45:5
paid 12:20 31:23 74:12
74:18
panel 60:14
part 31:2 35:8 37:12
45:22
participate 16:1,5,6
participated 16:8
particular 46:11 55:23
parties 1:19 2:12 78:16
parts 18:5 19:14
pay 12:3,9,13 74:12,19
people 19:23 36:15
37:18 38:6,14,18
39:20,21 40:1 42:8
58:2 74:7
percent 22:9 30:8,9,11
50:10,11,20,21
perform 20:4
performance 25:10
37:23
performed 50:22
performing 37:19
period 18:22 20:2
66:21 74:4
person 24:14 25:4,18
27:16 33:12 59:7
73:5
personal 44:3
personnel 17:12 20:4
phone 24:18 53:1,2
62:3 67:19
photograph 3:11,13
phrase 24:1 26:21
pieces 19:5,6 67:11
place 15:14 29:16
59:22,23 60:4 62:14
67:21
Plaintiff 1:7 4:2
Plaintiff's 3:8,10,12
44:5,10 60:16,21
61:3

planned 19:5
plant 10:1,2,3,5,8,19
12:7 14:13,21 15:6
15:15 16:15 17:13
18:2,21 19:18 31:4
32:19 33:15 35:20
42:6
PLC 60:10
please 5:23 6:3,12
51:23
point 53:14 57:21 58:8
points 28:7
policies 15:13,20 67:3
policy 20:12,17
position 9:21 47:21
positioning 61:12
possibility 56:20 75:11
potential 54:5
practice 67:4
Prater 10:23 11:3,10
11:15 24:19,21 25:2
25:6,22 26:2 27:12
27:16 28:8,20 29:4,7
29:7,11 30:21 31:12
31:16 34:23 35:2,7
36:2,20 40:23 41:12
41:16 59:6,8,11 63:1
63:4,5,15 64:13 65:6
65:9 68:13,14,19
69:19 70:2 76:9
Prater's 11:18 25:15
26:1 28:17 29:2 76:4
prepare 8:6 72:11
prepared 9:14 46:16
46:21 47:13 48:23
preparing 47:2
present 4:16 8:19,21
73:1
president 13:21 14:6
Press 11:13
previous 8:3
prior 2:15 7:14 9:1
13:7 22:2,11 30:7
50:7 55:10 67:5
probably 6:7 59:1
problem 23:4 26:20
27:15 33:23 38:19
problems 28:17 37:1
38:7,8,11 39:7,11
procedure 5:5 15:17
54:1,3,9
procedures 15:14,20
54:10
proceeding 26:12
43:15 71:23
proceedings 5:10

process 8:10,12 19:17
  53:15,18 66:1,4 67:1
processes 37:11
produce 19:13
production 10:11
  18:21 19:12,22 20:5
  31:9 34:11,15,16
  37:17
productivity 10:8 37:8
  37:10
program 8:9 20:14
promised 28:1 69:6
proper 42:20
provided 5:4
provides 20:17
Public 5:2
purpose 18:7 37:7,10
  46:12 47:1
put 15:14
P.C 4:10
p.m 42:7

**Q**

question 6:9 7:7,23
  11:2 18:7 23:6 24:9
  26:18 27:8 34:19
  38:13 39:6 41:5,11
  46:3 47:23 49:6 51:8
  51:22 57:22 63:8,9
  66:23 68:1 70:19,19
  74:5 75:9 76:9,10
  77:3
questions 2:11,12 7:21
  46:20 49:23 72:7,7
  72:10,19 74:11 78:10
quick 26:5 71:16
quite 57:19 62:17

**R**

R 4:1,3 78:1
ran 12:6 42:17
RAYMOND 4:20
read 9:3 59:17
reading 2:2
real 26:5
really 7:7 74:3
reason 22:13,17 32:10
  36:6 40:7,12
recall 29:10 41:16
  42:11 44:19 52:9,19
  52:21 54:23 56:12
  59:18 62:14,15 64:8
  64:14,16 65:8,13
  70:1 76:3,11
receive 12:9 74:19
receiving 12:13

recess 26:11 43:14
  71:22
recognize 32:8
record 5:22 6:11 9:16
  16:20 26:14 43:12,17
  66:13,14 71:20 77:15
refer 10:20
referring 25:21 28:18
reflect 49:16 77:15
regarding 69:16
related 28:4 63:9
relating 2:6 35:7
relationship 16:17 17:3
  17:6 56:14,15 58:3
  74:23 75:5,6,7
relevant 46:19
reliability 33:3
remain 41:19
remained 50:16
remaining 48:4
remark 12:19
remember 28:22 39:5
  48:22 52:11 53:6
  54:19 55:8 59:20
  61:10,23 62:1,21
  65:4 66:3 67:17 69:3
  73:4,5
remind 71:9,11
repeat 6:9
report 11:8,19 13:17
  13:20 58:20 59:5,9
  59:13,17 65:10
reported 10:23 11:1
  25:22 36:2
Reporter 78:22
represents 78:12
request 70:17
research 16:14
reside 7:14
residence 7:2
resolved 33:21 34:6
Resources 10:18 35:2,6
  35:11
respect 14:23
respective 1:19
response 70:16 75:1
responsibilities 10:6,10
  31:8 35:19 36:10
  37:12 49:23 70:10
  71:2,5 76:5
responsibility 14:23
  30:14 31:11 35:22
  37:16 45:20
responsible 10:7,9
  11:13 14:19 20:1
result 28:12 32:19

78:17
return 12:22 67:19
returning 12:15 13:11
review 9:1,13
reviewed 9:19 73:11
rid 36:6
right 45:5 46:4 62:4
  70:15 71:17
Road 1:22 5:7
Rob 39:14
ROBERT 4:19
ROEBUCK 4:3
rough 26:23
roughly 22:9
rule 31:22
rules 2:6 5:5 15:17
  31:19
run 33:15
Russia 14:7

**S**

S 1:16,16 4:1
SAITH 77:23
salary 12:3 29:17 74:12
saw 42:14 44:19 59:23
  60:22 61:8 62:12
  64:23 65:1
saying 65:8 70:1
says 34:13
schedule 41:10
scheduled 19:19
Scofield 73:8
scratch 59:2
second 48:12,16,20
  68:6 75:14,15
section 48:13
sections 48:17
see 24:14 31:3,12 42:4
  42:7,12,16 46:10
  48:20 60:11 77:11
seeing 62:13
seen 31:5 44:18,20
sending 70:13
senior 35:20 45:15 49:7
  49:8,11,15 51:4,13
  51:19
sent 70:20
separate 11:17 53:1
Serious 20:11
seven 19:19 22:1 50:2
shakes 75:21
shift 41:6,20,23 42:4,9
short 43:10 67:11
shortly 20:14 32:17
  76:3
show 27:10,12 44:9,17

44:23 47:3,13,15
  48:7 60:20 61:7
  66:20 67:14,23 68:1
  70:14
showing 16:12
shown 47:22 48:5,15
  48:15 49:6
shows 45:14 47:20
shut 19:19
side 10:12,20,21,22
  11:13 14:13,13,14,15
  14:16,20 15:10 22:10
  30:12,19,19 31:9
  37:17 42:13 60:12,13
  61:1,9,11
sides 30:18
sign 74:9
signature 2:2
signed 74:8
significant 28:14
simply 34:16 65:22
  68:11 70:2
sitting 31:16 60:5 61:1
situation 33:8 34:14
  57:9 63:2 65:20
  70:21 71:7
six 7:13
slash 7:6
sleep 53:7 55:4 64:2
sleeping 31:12 40:17
  52:1 54:14 58:12
  60:6 65:2
slept 31:16
slowed 18:22
Smith 4:13 8:16 73:4
  73:18,19 75:21
SMOAK 4:9
smoothest 25:17,18
Soeb 6:13
solve 38:18
somebody 35:4
soon 30:1
SOP 42:13,15
sorry 15:4 39:5 73:20
sort 54:10 74:22
sound 73:8
South 4:11
speak 5:16
specific 28:21 41:17
  62:12 63:9
specifically 19:15 31:6
  50:1 55:21 65:14
spell 9:7 14:1
spend 22:8
spent 30:11
spoken 24:15 73:22

SPORJ5390 4:4
Sport 3:3,5 4:3 5:19
  6:3,7 9:6,9,11 10:17
  13:1 14:3 23:4,11,20
  23:22 26:8,17 42:18
  43:2,7,20 44:13 63:5
  66:12,16 67:9,12
  71:14,19 72:10,18
  73:22 74:11 75:23
  76:2,10 77:15
Sport's 23:2
STACEY 1:21 5:1
  78:21
stamped 44:13
Stamping 18:23 19:3
  22:7 30:5,9,12,15,19
  31:10,13 34:12,13,21
  35:10,13,23 37:14,21
  38:2,9,15,18 39:1
  41:2,7,11,18 42:11
  45:7,15 48:10,12,13
  49:7,9 50:6,8,11,17
  50:22 51:5,13 56:16
  76:6,13,21 77:5
standards 6:18
standpoint 34:10
started 50:23
State 5:2,22 6:11 78:3
stated 65:1 67:3
statement 64:5
States 1:1 6:17 7:3,12
  13:8,14 51:16
status 7:2,9
stay 42:6 69:21 70:6,21
  71:1,4 74:4
stenotype 78:10
STEWART 4:10
STIPULATED 1:18
  2:1,8,16
stipulation 5:6
stop 19:6,12,15
stopped 19:23 20:5
stops 19:16
store 76:19
storeroom 76:7,13,17
Street 4:5
Strike 15:4
strong 56:6 57:17,19
structure 47:3
subordinate 33:19
  34:12,13
subordinates 25:23
  26:1 29:2
subsequently 56:3
substantial 47:5
substantive 47:6

**success** 17:8
**suggested** 33:7
**summary** 50:11
**supervise** 77:5
**supervising** 76:16
**supervisor** 11:1 33:10
  33:11,12,20 34:11,15
  34:17 36:17,21 39:3
  76:5,12
**supervisors** 36:19
**supplies** 28:11
**supposed** 28:10 66:6
**supposedly** 32:13
**sure** 16:4 18:15,16 19:9
  21:9 60:23 67:4,12
  72:9,20,23 73:14
**sworn** 5:12,15

---
**T**

**T** 1:16,16 78:1,1
**tail** 77:2
**take** 23:18 26:6,8 42:19
  43:9 71:16
**taken** 1:21 48:5 67:21
  78:9
**talk** 44:1 53:2 58:20
  62:10 63:7 72:6 74:1
**talked** 24:17 44:2 50:1
  54:18 58:22 59:7,14
  75:13
**talking** 20:9
**talks** 33:17
**Tape** 26:15 43:18
  66:14
**tapes** 26:5 66:11
**task** 27:23 28:2,8
**team** 15:1,21 20:7,18
  25:21 33:9 35:1,10
  35:14 36:12,13,15,16
  36:19 37:2,13,20
  38:2 39:1,2,8,17,19
  40:3,6,11,17,20 41:1
  41:7,8,13,17,19 42:3
  42:5 55:11 56:15,19
  56:23 63:7,17,20
  64:6,14,15 70:3
  76:16,21 77:5
**technical** 14:20 34:9
  45:21 47:15 48:7
**technically** 34:7
**technician** 30:17 34:5
  37:17
**telephone** 24:16 53:4
  56:8,11 75:10
**tell** 7:23 8:4 23:10
  27:21 52:15,20 53:5

54:20 57:2 59:15
  64:6,10,22 65:6,15
  65:19 68:22 70:6,20
  73:1,15
**tells** 19:12,15 24:3
**ten** 19:19
**tendency** 27:9 28:19
**tenure** 51:4
**terminated** 15:11 22:2
  46:19 50:4 65:17
  67:5 76:4,11
**Termination** 16:3
**terms** 62:12
**test** 32:20,21
**testified** 5:17 47:17
  50:5 51:11
**testify** 70:15
**testimony** 46:1 48:8
  50:12 51:3,10,10
  56:13 65:5 70:5
  78:13
**Thank** 69:16 71:14
  77:18,20
**thereto** 2:15 78:10
**thing** 40:15 68:6
**things** 8:8 16:21 19:1
  44:3 52:18 53:6
  54:13,18 55:1 68:2
  70:22
**think** 6:7 8:1,2 12:19
  16:5 18:18 23:9
  25:17 27:10,15 32:2
  33:20 42:23 46:7
  57:1 58:7 74:7 75:15
  77:16
**third** 59:17 60:9 61:16
**thorough** 55:17
**thought** 57:8 63:21
**threatened** 70:13
**three** 16:18 49:3
**time** 2:13,14 7:14 22:5
  22:9 25:1 30:6,8,9,11
  30:13 32:17 46:10,20
  46:23 49:18,19 50:2
  50:21,21 51:3,11,12
  55:18 56:8 63:10,13
  63:23 66:6 75:13,14
  76:20 77:4
**times** 51:17
**title** 49:11,13
**today** 7:20 8:7,13 28:3
  49:22 50:16 70:14
  73:17
**told** 54:12,16 55:1,4
  58:10,19 59:4,8,19
  59:20 60:7 63:11,13

63:18 64:1,23 65:11
  65:21 66:5 67:14
  68:2,5,6,15,19 69:8
  69:19,21 70:2 71:1
**top** 45:10 46:14
**totally** 57:14
**train** 37:9,13
**training** 10:9 37:13,16
**transcribed** 78:11
**transcript** 73:11 78:13
**transcription** 78:12
**transferred** 14:7 76:12
  76:14,18
**translated** 75:1
**translates** 74:2
**translating** 26:21
**translation** 23:13 26:23
  72:8,20
**transpiring** 6:5
**Trent** 73:7
**trial** 2:14
**tried** 66:18
**true** 12:4 13:6 16:9
  20:6 22:12 38:21
  45:9 51:2 57:12 68:9
  69:18 78:13
**trust** 27:9
**truth** 5:16,16,17 24:3
**truthful** 40:13
**try** 55:5 58:5
**trying** 23:12 51:9 57:23
  69:9
**turned** 53:4
**twice** 24:17
**two** 8:8 44:11 46:5 48:2
  53:6 54:12 68:2
  74:19 75:23

---
**U**

**U** 1:16
**ultimately** 23:6 66:2
**understand** 8:5 9:16
  10:14,21 12:12 18:6
  20:3 21:6 24:11 29:1
  29:15,20 34:7,9 41:4
  41:15 43:5 47:16
  48:18 51:9,10 57:21
  66:17 70:17 77:4
**understanding** 16:17
  17:3 21:18 27:4
  33:14 53:19 55:17
  56:1
**understood** 46:1 47:14
**undesirable** 27:17
**unduly** 64:4
**United** 1:1 6:17 7:3,11

13:8,14 51:16
**unusual** 57:1
**use** 36:18 74:6
**usually** 21:22 34:6 42:6
  53:23

---
**V**

**V** 1:8
**Vaguely** 31:5 39:15,15
**various** 16:2 41:12
  45:6,18
**vehicles** 18:5,10
**version** 44:21
**vertical** 48:3
**VIDEOGRAPHER**
  26:4,14 43:12,17
  66:10,13 71:20
**videotape** 72:13,15
**videotaped** 8:9
**visa** 7:8,10
**visit** 17:13 18:2 42:15
  61:15
**visited** 16:10 17:17,21
**volunteered** 55:7,8

---
**W**

**waived** 2:3,18
**walls** 16:12
**want** 26:6 36:6 44:12
  54:21 72:5,9 74:1,21
  75:2
**wanted** 64:2 72:20
**warned** 70:6
**Warner** 10:18 12:5
  39:12
**Wasden** 1:22 5:7
**wasn't** 8:20 28:4,14
  64:3 71:10
**watch** 72:15
**watched** 8:9,10,11
  72:13
**way** 9:4 13:2 23:16,23
  32:18 46:22 56:7
**weeks** 32:17 74:19
**Weld** 30:8,15 50:10,10
  50:21
**Welding** 22:5,10 50:9
**Wendy** 39:12
**went** 35:1 59:22 60:3,9
  66:4,8
**we'll** 71:17
**we're** 7:20 28:3 43:7
**wife** 52:22
**witness** 2:3 5:8,15 13:3
  43:6 73:20 77:12
  78:14

**witnesses** 33:8 54:6
**wondering** 47:12 56:7
**word** 22:21,23 23:8,11
  33:10 34:15 73:23
  74:2,6
**words** 53:13
**work** 12:21 13:7,11
  22:4 25:10 30:18
  31:23 37:8,19 38:2
  38:18 41:8,23 44:14
  58:4 75:4 76:15
**worked** 20:1 22:1,7
  25:9 30:4,7,8 32:9
  38:5 50:7 51:15
**worker** 57:13
**workers** 10:9 37:9
**working** 18:23 19:17
  25:18 30:13 38:20
  42:3 45:20 47:8
  50:20 75:7 76:7
**workplace** 27:18,20
**works** 8:10
**worse** 34:7
**wouldn't** 23:19
**wrap** 42:21
**writing** 74:7
**written** 73:11 74:9
**wrong** 49:17,18 61:9
**wrongdoing** 53:23 58:6

---
**Y**

**yeah** 17:1 26:8 32:15
  38:17 42:2 43:6
  50:18 67:10,17
**year** 7:13 14:9 21:2
  49:1
**years** 6:18 12:10,14,16
  12:22
**yesterday** 73:10,16
**y'all** 43:3

---
**0**

**06-22-2011** 78:23
**09-30-2008** 78:22

---
**1**

**1st** 14:9
**10:26** 5:18
**12:30** 42:18
**14** 24:22,22
**1810** 4:5
**1962** 6:15,20

---
**2**

**2** 26:15
**2:07-cv-00306-MHT...**

GWANG MUN

1:4
**20** 30:9,11 50:10,21
**2006** 21:3,4,5,11,13
50:3
**2007** 21:3 22:4,6,11
30:6 46:14 50:5,7,15
50:20 52:12
**2008** 1:23
**24th** 21:13
**251** 4:6
**26th** 50:4
**27** 3:8 44:6,10
**2757** 4:11
**28** 3:10 60:17,21
**29** 3:12 61:4,8
**29602** 4:11

_____
**3**
**3** 43:18
**334** 4:15
**36105** 4:14
**36606** 4:5
**386** 78:22
**387-8057** 4:15

_____
**4**
**4** 66:14
**44** 3:8
**45** 6:19,21
**47** 6:18
**479-9010** 4:6

_____
**5**
**5-71** 3:3

_____
**6**
**6** 21:4
**60** 1:22 3:10 5:7
**61** 3:12

_____
**7**
**700** 4:14
**72-75** 3:4
**76-77** 3:5
**78** 12:5

_____
**8**
**8th** 1:23
**80** 22:9 30:8 50:10,20